# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

-ooOoo-

STEPHANIE WADSWORTH, :
Individually and as
Parent and Legal :
Guardian of W.W., K.W.,
G.W. and L.W., minor : Case No.
children, and MATTHEW   2:23-cv-00118-NDF JURY
WADSWORTH, :

        Plaintiff, :

v. :

WALMART, INC. and JETSON :
ELECTRIC BIKES, LLC,
       :
        Defendants.
       :
_____

DEPOSITION OF MATTHEW WADSWORTH
TAKEN THROUGH
VERITEXT

Taken on Monday, February 26, 2024
9:57 a.m. to 2:47 p.m.

At HAMPTON INN
1055 Wild Horse Canyon Road
Green River, Wyoming 82935

Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC
Job No.:      CS6457156

```
1        A.    I don't remember it.
2        Q.    Okay.
3        A.    I remember talking to a sheriff.  At the
4    time, I -- later that day.  I can't remember, male,
5    female.  There was too much information, too much going
6    on.
7        Q.    Okay.  Before you talked to Detective
8    Sheaman the day after the fire, you had had a chance,
9    obviously, to talk to your kids; correct?
10       A.    I don't remember if I did or not.
11       Q.    Okay.  I'm going to start it at 7:45.
12             [Audio played.]
13   BY MR. LAFLAMME:
14       Q.    So when you're saying the fire -- that the
15   kids first saw the fire on the window and on the wall,
16   you're talking about the window and wall by their bed;
17   correct?
18             MR. AYALA:  Form.
19             THE WITNESS:  The window is next to the
20   bed.
21   BY MR. LAFLAMME:
22       Q.    Okay.
23       A.    Correct.
24       Q.    And that's the only window in that bedroom?
25       A.    Correct.
```

Page 92

1   Q.   Okay.  So if the boys had said they saw a
2   fire by the window and on that -- on a wall, it would
3   be that window by their bed and the wall by their bed;
4   correct?
5           MR. AYALA:  Form.
6           THE WITNESS:  I don't know what they would
7   mean by "wall," because there were -- they have to run
8   past the wall going out.
9   Q.   Okay.
10  A.   I don't know what they would mean.  I
11  mean --
12  Q.   You agree that you told Detective Sheaman
13  the day after the fire that the boys had relayed to you
14  that they saw fire at the window --
15  A.   And the wall.
16  Q.   -- and at least at a wall?
17  A.   Yes.
18  Q.   Okay.  And the only window in that bedroom
19  is the window by the bed?
20  A.   Correct.
21  Q.   Okay.
22  A.   And that bed took up most of that wall.
23  Q.   Okay.  When the kids told you that they saw
24  flames at the window and at the wall, did you
25  understand it to be the wall by their bed?

Page 93

1      A.    Correct.
2      Q.    Okay.  There's also a reference to
3  [reading] it was hot on their backs and it woke them
4  up.
5            Do you know what that means as far as where
6  they were -- where their backs were positioned?
7      A.    I'm assuming it was next to their bed.
8      Q.    Okay.  Did the boys have anything in their
9  beds with them, like stuffed animals or anything else?
10     A.    I don't know, but probably.  There are
11 pillows and there are blankets.
12     Q.    Okay.
13     A.    I don't know what kind of stuffed animals
14 they had.  I also do not recall which kid felt the
15 fire -- or the heat first.
16     Q.    Okay.
17     A.    Did one scream and wake up the other?  Did
18 the one on the top wake up the one on the bottom?  I
19 don't know.
20     Q.    Okay.  And they -- the kids did not wake up
21 from the smoke alarm; correct?  They woke up from heat?
22           MR. AYALA:  Form.
23           THE WITNESS:  I don't know the answer.
24 BY MR. LAFLAMME:
25     Q.    Okay.

```
1         A.    Correct.
2         Q.    And some of those investigators are no
3    longer involved in this case.  Are you aware of that?
4         A.    I don't know who was hired and was still
5    on.  I don't know or recall all of their names.
6         Q.    Okay.
7         A.    I'm terrible with names.
8         Q.    Okay.  You and Stephanie did smoke in the
9    smoking shed the night before the fire; correct?
10              MR. AYALA:  Form.
11              THE WITNESS:  The day before?  Yes.
12   BY MR. LAFLAMME:
13        Q.    The night before also; correct?
14        A.    I was not there.
15        Q.    Okay.  Stephanie smoked the night before --
16        A.    I do not know.
17        Q.    -- the fire?
18              Okay.  Do you recall coming to the site
19   inspection when it was a number of experts that were
20   out there investigating the scene?
21        A.    Yes.
22        Q.    Okay.  And do you remember giving
23   statements at the site inspection?
24              MR. AYALA:  Form.
25              THE WITNESS:  I remember asking direct
```

```
 1         A.    I do not remember using it.
 2         Q.    It's possible you did?
 3         A.    It's possible.
 4         Q.    Okay.
 5         A.    We turned it on and off as needed, mostly
 6    off because of the expense.
 7         Q.    Okay.  The smoking shed, as I understand
 8    it, was -- it was yellow; correct?
 9         A.    Correct.
10         Q.    Okay.  And it would have been directly
11    below the boys' window; correct?
12               MR. AYALA:  Form.
13               THE WITNESS:  The exact placement, I don't
14    know if it was directly below it or if it was offset.
15    I do not recall.
16         Q.    Okay.
17         A.    It would be in the diagram of the
18    investigation of the exact placement.
19         Q.    Of which investigation?
20         A.    There was three of them.
21               (Exhibit No. 29 was marked
22                  for identification.)
23    BY MR. LAFLAMME:
24         Q.    I'm going to show you what has been marked
25    as Exhibit 29.  That is a photo of the melted shed.  Is
```

Page 102

```
 1     that -- are you able to tell that?
 2          A.     Yes.
 3          Q.     Okay.  And you can see how it's flipped up?
 4          A.     I do see that.
 5          Q.     Okay.  So you can see where there is the
 6     bare area around the fire debris?
 7          A.     So it was offset from the window.
 8          Q.     Okay.  Where the shed was initially;
 9     correct?
10          A.     Correct.
11          Q.     Okay.  And then, the shed would have been
12     flipped up here from its current location, correct, or
13     from it's like location pre-fire?
14          A.     Close to it, yes.
15          Q.     Okay.  And from here, you can see the
16     window -- the boys' window; correct?
17          A.     Correct.
18          Q.     Okay.  And it looks like about three
19     quarters of the shed or so traverses across that
20     window?
21          A.     Two-thirds -- two-thirds.
22          Q.     Okay.  There is at least a good portion of
23     the shed that traverses across that window; correct?
24          A.     Correct.
25          Q.     And that's where it was located, from your
```

1    recollection, prior to the fire as well?
2           A.    Yes.
3           Q.    Okay.  And the shed, I think you had
4    described it as a 55-gallon drum type of storage shed;
5    is that accurate?
6           A.    Yes.
7           Q.    Okay.  What was that -- I think you said
8    you had taken it from another -- or from a prior job?
9           A.    Correct.
10          Q.    And what was that -- how did you first get
11   the shed?
12          A.    When I was at Baker Hughes, it may have
13   still been BJ's at the time of acquiring this shed.
14   They ordered them in for the drum containment.
15          Q.    Okay.
16          A.    It was impractical for our use.  So it was
17   cheaper for them to give them away than to send them
18   back.
19          Q.    Okay.
20          A.    So there were multiple of us that worked in
21   the bulk plant that was able to --
22                (Clarification by the reporter.)
23                THE WITNESS:  That was able to take one
24   home.
25   ///

1   the prior smoking shed had been located for the whole
2   time?
3       A.   Out -- the master bed, the one that blew
4   away, correct.
5       Q.   Okay.  So when you were -- would access
6   the -- the prior smoking shed, would you use the side
7   doorway between the master and Weston's room?
8       A.   No.
9       Q.   Okay.  You would still go out the kitchen
10  doorway?
11      A.   Correct.
12      Q.   All right.  And the current -- or the
13  smoking shed that was in place at the time of the fire,
14  was that always located outside Gunner and Layne's
15  room?
16      A.   Yes.
17      Q.   Okay.
18      A.   And if I'm correct, that shed would have
19  been there for all but the first winter that we lived
20  there because it blew away in the first winter.
21      Q.   Okay.  You're talking about the prior
22  shed --
23      A.   Correct.
24      Q.   -- that blew away in the first winter?
25           And then once that prior shed blew away,

Page 193

1       REPORTER'S CERTIFICATE
2    STATE OF UTAH         )
                           )
3    COUNTY OF SALT LAKE   )
4              I, ABIGAIL D.W. JOHNSON, a Certified
5    Shorthand Reporter and Registered Professional
6    Reporter, hereby certify:
7              THAT the foregoing proceedings were
8    taken before me at the time and place therein set
9    forth, at which time the witness was placed under oath
10   to tell the truth, the whole truth, and nothing but the
11   truth; that the proceedings were taken down by me in
12   shorthand and thereafter my notes were transcribed
13   through computer-aided transcription; and the foregoing
14   transcript constitutes a full, true, and accurate
15   record of such testimony adduced and oral proceedings
16   had, and of the whole thereof.
17             I FURTHER CERTIFY that I am not a
18   relative or employee of any attorney of the parties,
19   nor do I have a financial interest in the action.
20         (X) Review and signature was requested.
21         ( ) Review and signature was waived.
22         ( ) Review and signature was not requested.
23             I have subscribed my name on this
24   11th day of March, 2024.   *Abigail D.W. Johnson*
25
                      ABIGAIL D.W. JOHNSON, RPR, CRR, CRC