Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF WYOMING

 3     STEPHANIE WADSWORTH, individually )
                                         )
       and as Parent and Legal Guardian  )
                                         )
 4     of W.W., K.W., G.W. and L.W.      )
                                         )
       minor children, and MATTHEW       )
                                         )
 5     WADSWORTH,                        )    Case No.:
                                         )
               Plaintiffs,               )    2:23-cv-00118-NDF
                                         )
 6             vs.                       )
                                         )
       WALMART, INC. and JETSON          )
                                         )
 7     ELECTRIC BIKES, LLC,              )
                                         )
               Defendants.               )
13
                          - - -
14
                 Wednesday, August 14, 2024
15
                          - - -
16           Videoconference deposition of

17    RONALD E. SYNDER, M.D. was taken via Zoom,

18    before Elizabeth M. Kondor, Certified Court

19    Reporter and Notary Public, on the above date,

20    commencing at 11:00 a.m.

21

22            LEXITAS LEGAL PHILADELPHIA

23          1600 MARKET STREET, SUITE 1700

24         PHILADELPHIA, PENNSYLVANIA 19103

25                 (215) 504-4622
```

Page 38

1  Dr. LeChapelle?
2       A.   I have not.
3       Q.   Has anyone from your office spoken
4  with Dr. LeChapelle?
5       A.   We have not.  Yesterday I reached out
6  saying, Hey, where is this?  And I think one
7  person spoke to one of his secretaries or
8  whatever.  They did some research.  And I was
9  asked to -- or they were asked to take this
10 report and fax it to them, which was faxed
11 yesterday to them.
12      Q.   And at least, as you sit here today,
13 I think you previously testified, you don't have
14 a completed copy of the questionnaire that you
15 sent to Dr. LeChapelle?
16      A.   I do not have a returned copy, that's
17 correct.
18      Q.   Okay.
19           And when you say "returned," just so
20 we're speaking the same language, you don't have
21 a returned or a completed copy of this
22 questionnaire, correct?
23      A.   Correct, yes.  I have what I sent
24 them and I expect for them to sign it, complete
25 it and return it back to me.  And I do not have

Page 39

1  anything of that nature, that's correct.
2       Q.   Are there any of Stephanie
3  Wadsworth's treating physicians that you --
4  strike that.
5            Have you spoken with any of Stephanie
6  Wadsworth's treating physicians?
7       A.   I have not.  After I saw the patient,
8  I had some discussions with plaintiffs' counsel,
9  as far as needing to get some additional
10 clarification, because I'm not a plastic
11 surgeon.  And in order for me to put particular
12 procedures in, it would be inappropriate for me
13 to add those procedures.
14           And you'll see in my life care plan,
15 I have a list of procedures that I presume the
16 patient is going to be needing, but I could not
17 put in because that's outside of my wheelhouse.
18 So I presume in the future, there will be some
19 additional experts or counsel will set up an
20 appointment for me to speak with those treating
21 physicians.  But at this point, none of that has
22 been arranged at this point.
23      Q.   And it sounds like Dr. LeChapelle is
24 the only one that you've actually reached out to
25 as part of your work in this case?

Page 40

1       A.   Correct.
2            What I did was, when I see the
3  patient, I'll say, Look, you have a host of
4  doctors, who would know you the best and who
5  would best be able to tell us in their agreement
6  or disagreement particularly with equipment and
7  so forth.  And she said very quickly, This would
8  be the guy, so that's who we reached out to.
9       Q.   Is it your understanding that
10 Dr. LeChapelle is the primary doctor that is
11 organizing her care, so to speak?
12      A.   That's what I understand.  There have
13 been some different people coming and going.
14 She tried to get some care locally, and that did
15 not work very well.  And so that's the real
16 problem is, they live so far away and are
17 financially limited with travel.  So they tried
18 locally, and it did not work.
19           An example, a physical therapist,
20 they tried to get physical therapy locally and
21 the physical therapist had never done burn
22 therapy, so she's limited where she lives.
23      Q.   And who puts together this
24 questionnaire, Doctor, that we have up as
25 Exhibit 62?

Page 41

1       A.   Well, I, obviously, wrote the letter.
2            This, basically -- my office staff,
3  they basically take the life care plan and they
4  remove certain things.  Everything was generated
5  by me, but they remove some pieces.  I don't
6  send the full life care plan to the physician,
7  but we, basically, clean things up and put on
8  the right-hand side, Agree, Disagree Unknown, so
9  we do put that in.  My team does that.
10      Q.   And that starts at -- actually, let
11 me take a step back here.  I guess it goes a
12 number of pages, but starts first at page 3.
13      A.   Right.
14           And if you would then look at page 61
15 -- I'm sorry -- page 60 of my report, you see
16 they basically mimic exactly those boxes, except
17 they were slightly changed to be forwarded as a
18 questionnaire.
19      Q.   And then it looks like your
20 expectation for the treating physician is that
21 they would go through on this right-hand column
22 for each line, indicate whether they agree,
23 disagree or just don't know?
24      A.   Correct.
25           And the problem is none of them have

Page 90
1  wheelhouse. But it's obviously a real
2  disability and really prevents her from
3  functioning in life.
4      Q.   So with respect to the calluses on
5  her feet, it looks like they're bilaterally to a
6  certain extent?
7      A.   Yes.
8      Q.   Is one foot worse than the other, do
9  you know?
10     A.   No. They're both bad. The right
11 have one, two, three, four, five, six. And the
12 left had two or three as well. So it was
13 unique. I've never seen it in my life like
14 that. It literally looked like she had grown
15 toenails to the bottom of her foot.
16 Fascinating.
17     Q.   And as far as the treatment going
18 forward to address the calluses; is that the
19 correct term for it?
20     A.   I think that's what one of the
21 doctors called it. It's hyperkeratosis. I
22 mean, it's unique.
23     Q.   I'll use the term calluses just
24 because it's easier to say.
25     A.   Sure.

Page 91
1      Q.   With respect to the calluses that she
2  has on her left and right foot, as you sit here
3  today, you don't know what type of treatment she
4  will require going forward, correct?
5      A.   Correct. I mean, my experience has
6  been, they've done radiation to some of my
7  patients that have done this. I've seen where
8  they do cold laser treatments, two treatments.
9  I just don't know. I think, certainly, just
10 shaving off the calluses, which is what she has
11 had so far, is not appropriate, and she's going
12 to need more than that, but I don't know. I
13 have to refer to a plastic surgeon.
14     Q.   And you don't know what type of
15 duration of treatment she may need to address
16 the calluses on her feet, correct?
17     A.   Correct. And that may be open-ended.
18 They may need to do that for a lifetime. I
19 don't know.
20     Q.   The inverse of that is, it may not
21 need to be done for her lifetime, correct, you
22 just don't know?
23     A.   Correct.
24     Q.   Okay.
25          And the cost associated with any

Page 92
1  treatment for the calluses on her feet, as you
2  sit here today, you also don't know that,
3  correct?
4      A.   Correct. I would have to defer to a
5  plastic surgeon, who needs to see the patient
6  and help me to provide any further response.
7      Q.   And going to page 14 of your report,
8  this is where you have a picture of the four
9  children as well. And you indicated that they
10 were present during the home visit, correct?
11     A.   They were. They were watching TV. I
12 was sitting where I'm sitting, there's a dining
13 room table and we were sitting at the dining
14 room table, and the children were watching
15 cartoons.
16     Q.   Okay.
17          Did you, aside from any pleasantries,
18 interact substantive with the Wadsworth
19 children?
20     A.   I did.
21          The one child, Weston, when I found
22 out that he was having problems and had burns
23 and was reduced to wear shorts and so forth, I
24 did see him, I did examine him, I did photograph
25 some of the burns, but did not issue any reports

Page 93
1  or anything. But I thought if I'm flying all
2  the way out there, I may need to document
3  something, so in case I was asked to do a future
4  life care plan on him.
5      Q.   Did you actually talk to Weston or
6  did you just do your cursory exam --
7      A.   I mean, I talked with him. I didn't
8  do an indepth question-and-answer, like I would,
9  but I do have some opinions, that he's very shy,
10 he's very anxious. And, basically, the focus
11 would be around whatever a plastic surgery would
12 need to do to those burns. So I, basically,
13 documented what he looked like, put it in my
14 file, and if I'm asked to do a life care plan,
15 we can move forward.
16     Q.   And that's not anything you've been
17 asked to do thus far, correct?
18     A.   That's correct.
19     Q.   There is a Pain Diagram on page 14.
20     A.   Yes.
21     Q.   And I know both her feet are circled
22 on the pain diagram.
23     A.   Correct. And that corresponds to
24 page 2 of the medical questionnaire.
25     Q.   It also looks like there's something

Page 130
1  that.
2      Q.   And you agree that her smoking and
3  alcohol use predated the fire accident, correct?
4      A.   Yes, that's correct.
5      Q.   Doctor, why don't we just take a
6  quick five minutes, and then we will get into
7  the actual life care plan part, and then I think
8  we'll be able to let you go after that.
9           (Recess.)
10 BY MR. LaFLAMME:
11     Q.   Dr. Synder, before we took the break,
12 we were just getting into the actual
13 spreadsheet-type life care plan that you put
14 together here, and that starts at page 59 of
15 your report, correct?
16     A.   Correct.
17     Q.   Okay.
18          Starting on page 60, and I'm
19 certainly not going to go through everything
20 line by line, but I wanted to talk about some of
21 them.
22          With respect to the "Burn Surgery at
23 Burn Center" and "Plastic Surgery" line items, I
24 know you later on in the report have some
25 specific burn-related line items that are not

Page 131
1  given a cost or duration estimate.
2           Are these to encompass those, meaning
3  is the "Burn Surgery at Burn Center" to
4  encompass the line item of Scar, Excision and
5  Reconstruction Surgery, that type of stuff, or
6  are those separate?
7      A.   These would be basically the
8  monitoring evaluation by physicians.  It does
9  not include procedures.
10     Q.   Okay.
11          And you have not talked to
12 Dr. LeChapelle as to whether he specifically
13 agrees with the "Burn Surgery at Burn Center,"
14 "Plastic Surgery," "Hair Transplantation," that
15 type of stuff, correct?
16     A.   Correct.  When I was with the
17 patient, she, basically, ended up telling me she
18 needed to go every two months.  And she,
19 basically, pretty much put out what she's
20 supposed to be able to be doing, and, basically,
21 said, I can't do because I can't afford it.  So
22 I heard her tell me what apparently she had been
23 told she needed, but it should be confirmed by
24 the surgeon.
25     Q.   And then going on to page 61, with

Page 132
1  respect to "Vocational Rehabilitation," and,
2  again, you probably didn't understand until I
3  told you, but there is no vocational loss being
4  claimed in this case, that you're aware of,
5  correct?
6      A.   Correct, but I often will still end
7  up doing something like that that they can look
8  at some areas where she can donate time when the
9  kids are grown.  Because she's going to live
10 another 44 years, she may want to ultimately go
11 back to work.  And it would be appropriate to
12 have somebody help her kind of find something
13 that she might be able to do.  So just because
14 we're not claiming that, it doesn't mean she
15 shouldn't think about it as she gets older.
16     Q.   Okay.
17          Looking at page 64, this is where you
18 have some comments about "Unable to Determine
19 Cost of Procedure" for three of the line items,
20 correct?
21     A.   Correct.
22     Q.   For the "FREQUENCY" under the
23 "Removal/Excision of Benign Feet Lesions," where
24 did you get that frequency?
25     A.   That's kind of what's been happening

Page 133
1  to her now and needed to come, and they grow
2  back very quickly.
3      Q.   And you don't know if there's any way
4  to permanently remove those lesions at this
5  point, correct?
6      A.   And, again, and if I could have a
7  plastic surgeon opine, I would certainly defer
8  to the plastic surgeon on that.
9      Q.   Okay.
10          So with these three line items, is it
11 your anticipation that you will be doing
12 additional work on these line items?
13     A.   I would certainly hope so, or it's
14 just not brought to the table, and there's no
15 money put aside for that.  I certainly can't
16 apply -- I have to stay within my wheelhouse of
17 background and training.
18     Q.   Okay.
19          And, certainly, understanding your
20 background and training, you agree, as you've
21 noted in your report, that, at this point, you
22 are unable to determine the cost of these three
23 line items, correct?
24     A.   And the frequency, that's correct.
25 And I would end up asking them to help me with

Page 134
1  the CPT codes.  One of the problems is, when
2  they've done the CO2 burns, if you read the
3  records, it includes the anesthesia and it
4  included several large areas.  And so I presume
5  there are different CPT codes, given the amount
6  of space or the amount of surface area, as well
7  as the duration under anesthesia.  So there's
8  just a lot of stuff that I would not be able to
9  add.
10      Q.   And you are not able to add that
11 without further guidance from her treating
12 physicians, true?
13      A.   Absolutely.
14      Q.   Okay.
15      A.   Or an expert.
16           Often, I find my university treating
17 doctors are not even permitted to offer legal
18 opinions, and so sometimes we have to go and
19 hire an expert.  So we just need to have a
20 plastic surgical expert to be able to offer
21 those opinions.
22      Q.   Okay.
23           With respect to the "Semi-Permanent
24 Tattoo for Her Right Eyelid," is that something
25 that Mrs. Wadsworth has expressed an interest in

Page 135
1  getting?
2       A.   We talked about it.  She's
3  embarrassed.  And so I did do the pricing and
4  found that it doesn't last forever, and so we've
5  got that as a potential charge.
6            And, again, I would probably ask a
7  plastic surgeon their opinion.  Maybe do a
8  permanent one.  I don't know what's out there.
9  I'm not a cosmetic person, and so I would
10 probably defer, again, for a plastic surgeon for
11 his or her opinion on that.
12      Q.   Okay.
13           And that was going to be my next
14 question, is there a permanent option in that
15 regard, understanding that tattoos can certainly
16 be permanent in nature?
17      A.   Yes.
18      Q.   But you just don't know?
19      A.   Correct.
20           In looking at the literature for
21 eyebrows, they strongly suggested not doing
22 permanent, but, again, I don't know why.  I
23 would defer really to an plastic surgeon.
24 That's something I would have an expert help me
25 with.

Page 136
1       Q.   So with respect to the $34,000
2  lifetime cost, it sounds like that you may need
3  a little more guidance from a plastic surgeon to
4  really finalize that line item?
5       A.   I agree.  And when I was preparing
6  for the deposition and doing the report, it's
7  like these whole plastic surgical procedures, if
8  you ask me for an artificial arm or a leg or
9  therapy after stroke, that's my wheelhouse.  At
10 this point, I have to rely on an expert.  I can
11 do the pricing, identify the pricing, but the
12 frequency and type of procedure, I would really
13 need to have an expert.
14      Q.   And then you have ER visits of one
15 time every five years.
16           What's the basis for that?
17      A.   The basis is, basically, cellulitis.
18 Her skin breaks down.  She gets infected.  She
19 bleeds all day long when she puts her hands into
20 stuff.  So there's the potential for cellulitis.
21 She has had cellulitis of the earlobe.  So to be
22 able to say every five years to identify a
23 probability is pretty low.  And it's just for an
24 ER visit rather than a hospitalization.
25      Q.   Has she had any other cellulitis

Page 137
1  episodes other than that one time on her
2  earlobe?
3       A.   No, but we're under five years for
4  that, and we're talking about the next 44 years.
5       Q.   Did her cellulitis on her earlobe
6  necessitate an ER visit?
7       A.   I don't remember, but, again,
8  patients will show up to an urgent care center
9  rather than a family doctor.
10      Q.   So the ER visits that you are
11 presuming here relates primarily to her
12 cellulitis potential?
13      A.   Yes, because she's got skin
14 breakdown, and she bleeds easily in multiple
15 areas.
16      Q.   And cellulitis, in and of itself, is
17 not any emergency medical condition, correct?
18      A.   Correct.
19      Q.   It can be treated at a typical
20 doctor's office?
21      A.   They can, but often, patients go to
22 urgent care centers when there's bleeding and
23 infection.
24      Q.   Has Mrs. Wadsworth gone to urgent
25 care --

Page 158

1  using the state of Wyoming?
2      A.   Yes.  That's the only way to get
3  that, yes.  There is no breakdown for the state.
4      Q.   Okay.
5           And then for the state of Wyoming, it
6  sounds like it's, basically, 99 percent of the
7  national cost, so a 1 percent difference or so?
8      A.   Correct.  It's a little bit less than
9  national numbers, that's correct.
10     Q.   Okay.
11          And then on page 78, when you
12 reference the Green River, Wyoming local average
13 costs, those are obtained from calling local
14 physicians?
15     A.   Calling or utilizing the website.
16 And so in this particular case, we have a
17 website the University of Health, which ends up
18 indicating what they charge.  Sometimes it's
19 phone calls, like, the neurologists.  It depends
20 on where we can get the numbers.
21     Q.   And when you ask for those numbers,
22 are those the health insurance discounted rated
23 numbers or are the wrap rate numbers?
24     A.   No.  Those are usual customary
25 numbers.  That's the methodology required of our

Page 159

1  methodology doing life care planning.  We're not
2  to use any discounted numbers, because you don't
3  know if the discounts are going to remain or
4  what those percentages would be.
5      Q.   So the figures that you use would be
6  the figures if someone that did not have health
7  insurance would be charged, correct?
8      A.   Correct, correct, usual customary
9  charges.
10     Q.   And any discounts that may be applied
11 through health insurance, that's not a
12 consideration in your life care plan at all,
13 correct?
14     A.   Right.  Because you never know when a
15 discount is going to be available or not.  For
16 example, you can get medications and get a
17 prescription and get a coupon for GoodRx, and
18 you can get it half price, but you don't know
19 what's going to exist for the next 44 years.
20 So, statistically, we're looking at 44 years
21 worth of costing.  And it's been identified to
22 use usual customary charges.  So you don't know
23 if discounts are going to be available.  You
24 don't know what Medicare rates are going to be,
25 simply because they change from year to year.

Page 160

1  But in utilizing usual customary charges, they
2  are the most statistically reliable.
3      Q.   And you're using those same charges
4  for the duration of the care needed, so for the
5  44 years.  So even once there is Medicare
6  available, potentially available to
7  Mrs. Wadsworth, that's not a consideration,
8  correct?
9      A.   Correct, potentially available.  And
10 understand, we just are coming off of a period
11 of time when it used to be, if there was any
12 kind of legal settlement, that was considered
13 prehistory, and they would not cover anything
14 like that.  So we don't know if we're going to
15 go back to that system where any preexisting
16 condition is not going to be covered by the new
17 insurance.  So we deal with what the patient
18 needs from a specific injury and what the usual
19 customary costs are.
20     Q.   And it looks like for your travel
21 expenses, you are, basically, assuming a
22 two-night stay every time she goes to Salt Lake?
23     A.   Yeah, but when she goes there, the
24 problem there, by the time she takes off, drives
25 there and then she has an office visit, and she

Page 161

1  has to wait, and then multiple experts will see
2  her, and then it's too late to go home.  So
3  we're giving her two nights because she's
4  exhausted when she goes.
5           So when I talked about that, I
6  suggested that we ought to talk about two days.
7  Oh, that would be so wonderful.  Because they
8  try to do it one time and get back at midnight,
9  so I try and give decent coverage.
10     Q.   So, presently, when they go, do they
11 do it in one day with no hotels?
12     A.   Yes.
13     Q.   Doctor, with respect to your
14 deposition here today, what did you do to
15 prepare?
16     A.   I spent a couple of hours three or
17 four days ago, in preparation.  And then last
18 night, I spent about two hours looking at my
19 report, about four hours in preparation time.
20     Q.   Did you have any meetings with
21 Mr. Ayala?
22     A.   I had a meeting about a half hour,
23 hour before the deposition.
24     Q.   What did you guys discuss?
25     A.   We, basically, discussed the case and

Page 162

1  was I comfortable with what I was relating. And
2  I, basically, discussed with him the need for
3  getting additional consultations, as we
4  discussed earlier today, the need for additional
5  experts.
6      Q.   And what additional experts did you
7  request?
8      A.   The plastic surgery discussion in the
9  future; perhaps ophthalmology for the corneal
10 abrasions, and ear, nose and throat for the
11 tracheal burns.
12     Q.   So ENT, ophthalmology and plastic
13 surgery?
14     A.   Plastic surgery/burn therapies.
15     Q.   And did you discuss any specific
16 doctors that you would recommend using in that
17 regard?
18     A.   I did not, but I did indicate that we
19 were waiting to perhaps hear from
20 Dr. LeChapelle.
21     Q.   Okay.
22          And in your mind, there is additional
23 work on your end to be done on those three items
24 where you don't have any duration, frequency or
25 costs associated?

Page 163

1      A.   Correct.
2      Q.   Were you told about the expert
3  disclosure deadline on July 15th?
4      A.   No.
5      Q.   Were you aware that whatever the
6  expert disclosure deadline was, that you were to
7  have your opinions to be completed by then?
8           MR. AYALA:  Form.
9      A.   I can't control any of that.  I gave
10 a report.  That's what it is.
11     Q.   Okay.
12          And the report that you gave is the
13 one that obviously we have marked as Exhibit 64,
14 and that's your understanding as to what was
15 disclosed as your expert opinion by the expert
16 disclosure deadline, correct?
17     A.   Correct.  And it's a very anemic and
18 will have to stand by itself, if that's what
19 happens.  It would not cover what she may need
20 in the future.  So be it, that's the way
21 discovery occurs.  It's not in my control.
22     Q.   Aside from potentially getting the
23 questionnaire back from Dr. LeChapelle and the
24 additional medical expert consultations with an
25 ENT, ophthalmology and plastic burn therapist,

Page 164

1  any other work that you anticipate doing on this
2  case?
3      A.   I wouldn't anticipate anything
4  additional, but it would be a quite of bit of
5  research at that point, focusing on whatever
6  they say.
7      Q.   Okay.  All right, sir.  I appreciate
8  your time.  I think that's all the questions I
9  have for you.
10     A.   Thank you, sir.
11          MR. AYALA:  I have a few questions,
12     but if we can take a couple of minutes so I
13     can use the restroom and then come back.
14          (Recess.)
15 EXAMINATION BY MR. AYALA:
16     Q.   I'd like to pick up sort of where
17 opposing counsel left off.  He was asking you
18 some questions about additional work to be
19 performed and potentially additional experts and
20 research needed and necessary.
21          Do you remember some of those
22 questions?
23     A.   Yes, sir.
24     Q.   Am I to understand that your
25 testimony and certainly your position is that

Page 165

1  you've been attempting to reach out, communicate
2  and learn more information from some of
3  Stephanie's treaters for purposes of assisting
4  you with the compilation of your life care plan?
5      A.   Yes, one, Dr. LeChapelle, because
6  that's who Stephanie felt would be the most
7  appropriate person who would understand all of
8  her future needs and some of the questions that
9  I was raising.
10     Q.   And so in what you do in putting
11 together your recommendations for purposes of a
12 life care plan, you speak with, to the extent
13 they are available, to the extent it's
14 necessary, or with regards to any special
15 limitations you might have, but do you speak
16 with treaters, specialists to try to gain an
17 understanding, in addition to all of the other
18 work, review and research you perform; is that
19 fair?
20     A.   Yes.  The majority of the time I find
21 speaking is very difficult, so that's why we
22 send the questionnaires.  They can do it at
23 their timeframe and get it off to me.  But at
24 times, they'll call and say, Can I speak to the
25 doctor, and then I will fill out the form for

Page 166
1  them.  If they don't want to fill the form out,
2  then I'll ask them the questions.  So, yes, we
3  do both.  The majority tend to fill out the
4  questions for me.
5       Q.    And that's certainly what you were
6  communicating to opposing counsel that you did
7  in this case, as it relates to Dr. LeChapelle,
8  but he has not returned the questionnaire as of
9  yet, despite being in contact as early or as
10 late as yesterday?
11      A.    Correct.
12      Q.    But to date, you haven't spoken with
13 him, so you haven't gotten specific details or
14 information relating to his care of Stephanie
15 and potential future needs?
16      A.    That's correct.
17      Q.    In your career as a life care
18 planner, you also review depositions of medical
19 providers or treaters if they're available?
20      A.    I do.
21      Q.    Okay.
22            And I haven't provided you any of
23 those, have I?
24      A.    That's correct.
25      Q.    Did you know that the reason I

Page 167
1  haven't provided you any of those is because
2  treaters' depositions are still being taken?
3       A.    I know nothing about the mechanics of
4  what you guys are doing and so forth.
5       Q.    But by way of example, there was a
6  physical therapist whose deposition was taken
7  earlier this week; a member of the burn team at
8  the University of Utah a little over a week ago
9  was taken.
10            Were you aware of any of that?
11      A.    No.
12      Q.    Is it fair to say that, when those
13 depositions are taken and when the deposition
14 transcripts come in, that's something that you
15 would want to review and look at to assist you
16 with any additions, changes or modifications to
17 your plan?
18      A.    Yes.
19      Q.    And, specifically, with regards to
20 these plastic surgeons, to the therapists, even
21 to the podiatrists, those are depositions that
22 you would like to review, in addition to speak
23 with those treaters, if they allow it?
24      A.    That's correct.
25      Q.    And if you're unable to get the

Page 168
1  information that you need for purposes of
2  completing your life care plan in those specific
3  areas, either because you can't speak with those
4  treaters or because the deposition becomes
5  unavailable, is that what you're suggesting that
6  then that would require an expert witness to be
7  brought into the case for purposes of testifying
8  and opining in those specific areas?
9       A.    That's correct, yes.
10      Q.    You were asked a lot of questions
11 about the deadlines for expert disclosure and
12 all of that stuff.  I think it's obvious, but
13 you're not a lawyer, you don't represent the
14 Wadsworth family from a legal representation
15 standpoint in this case, fair?
16      A.    That's correct, yes.
17      Q.    What you know is that you were
18 provided records, you were provided certain
19 information, you conducted your own evaluation
20 and examination of Mrs. Wadsworth, and you were
21 asked to prepare a life care plan, based upon
22 the information available to you; is that
23 accurate?
24      A.    That's very accurate, yes.
25      Q.    And so why don't we talk about, if

Page 169
1  you could, Doc, give us the benefit of your
2  educational background.  I know you talked about
3  your experience in life care planning, but give
4  us the benefit of your educational background,
5  please.
6       A.    I graduated from Indiana University
7  Medical School.  I then went to Yale and did a
8  residency program in pediatrics.  I became board
9  certified as a pediatrician.  I practiced
10 pediatrics for ten years.  I then went to
11 Pittsburgh and did a residency in physical
12 medicine and rehabilitation.
13            From that point, I moved to Rhode
14 Island, where I became director of a 60-bed
15 inpatient rehab unit.  I was medical director
16 for the State of Rhode Island Department of
17 Vocational Rehabilitation, and developed an
18 outpatient traumatic brain injury program.
19            I then moved to Maine, where I was a
20 director of an inpatient traumatic brain injury
21 program.  I was director of New England's Good
22 Will Industry Brain Injury Programs, and
23 practiced pain medicine -- pain management
24 medicine as well.
25            I've been in Florida for almost 20

Page 170
1  years now.  And I have worked in several
2  hospitals, including AdventHealth, which is the
3  new name for the Florida hospital.  I have
4  directed inpatient/outpatient programs.
5           Beginning about six years ago, I
6  began the process of weaning from acute care,
7  where one day a week, I see patients.  The
8  remainder I have now been doing life care
9  planning.
10      Q.   Thank you for that.
11           Is it fair to say that, over the
12 course of your career, not just in practice, but
13 also as a life care planner, that you've
14 occasion to see, evaluate, assess patients that
15 have suffered significant injuries, including
16 burns like Mrs. Wadsworth?
17      A.   Yes.
18      Q.   And you've been called upon and asked
19 to assist in litigation matters relating to
20 injuries, such as burns like the ones
21 Mrs. Wadsworth has suffered?
22      A.   I have.
23      Q.   And even though you may not have the
24 majority of your patients that you see and treat
25 in practice with significant or severe burns

Page 171
1  like Mrs. Wadsworth, there have been the
2  occasional patients that you've treated even in
3  your private practice with burns, fair?
4       A.   Absolutely fair.
5       Q.   And in what you do as a life care
6  planner, even if you don't have an abundance of
7  patients in private practice with burns that
8  you're treating, as a life care planner, do you
9  speak with and learn from some of those
10 specialists that are treating the particular
11 patient whom you're asked to make
12 recommendations for future care?
13      A.   That's correct.
14      Q.   You were asked earlier on in the
15 deposition about the scope of your work in this
16 case.  And you have not prepared a life care
17 plan for Weston, correct?
18      A.   That's correct.
19      Q.   And, in fact, I instructed you to
20 focus your efforts on preparing your
21 recommendations and any opinions you had as to
22 Mrs. Wadsworth's future medical care needs,
23 fair?
24      A.   That's correct.
25      Q.   If, after receipt of depositions of

Page 172
1  these treaters that are being taken, there is
2  information in those depositions that you deem
3  important and needed and necessary for
4  consideration as to Weston's future care needs,
5  is that something that you'll let me know?
6           MR. LaFLAMME:  Object to form.
7       A.   I would, yes.
8       Q.   If there's information in these
9  depositions of treaters that, after your review,
10 obviously, after they're taken and they're typed
11 up and I can provide them to you, but after your
12 review, if you deem it necessary for purposes
13 of, at the very least, gaining an understanding
14 as to what Weston's future care needs,
15 prognosis, et cetera, may be, is that something
16 that you would be willing to prepare
17 recommendations for by way of a life care plan?
18      A.   Yes.
19      Q.   And I have not provided you any
20 depositions of treaters relating to Weston as of
21 yet, correct?
22      A.   That's correct.
23      Q.   And whether you know or don't know,
24 that they have not been taken yet, that's
25 outside of your scope, but if I provide you with

Page 173
1  those depositions, you'll review those?
2       A.   I would.  And then I may ask to do a
3  Zoom with the mother and see the child again
4  before I would issue any kind of report.
5       Q.   And although your focus back in I
6  believe you said it was April, your focus back
7  in April when you met with Mrs. Wadsworth was
8  relating to her future care needs, did you have
9  occasion to, at the very least, meet and see
10 Weston?
11      A.   I did.  And that resulted in me
12 looking at the wounds and placing a phone call
13 to you to let you know that you need to at least
14 consider that I think the child is going to have
15 some long-term needs as well.  But I did it,
16 basically, informally.
17      Q.   All right.
18           And then with regards to, again, what
19 those future care needs may or may not be,
20 that's not something that you've taken into
21 account, considered as of yet, given the
22 inability to speak with his treaters and review
23 any deposition transcripts of his treaters; is
24 that correct?
25           MR. LaFLAMME:  Object to form.