

September 5, 2024

Eugene LaFlamme, Attorney at Law
N19 W24200 Riverwood Dr, Ste 125
Waukesha, WI 53188

Re:     Stephanie Wadsworth
DOB:   3/16/1987
DOI:   2/1/2022

Dear Mr. LaFlamme:

Thank you for referring Ms. Stephanie Wadsworth for an Assessment and recommendations, including review and rebuttal of the Life Care Plan presented by Ronald Snyder, MD. In performing my work, I have reviewed the Complaint, the Interrogatories, the Plaintiff's Response to Request to Produce, the February 27, 2024 deposition of Ms. Wadsworth, August 5, 2024 deposition of Giavonni Lewis, MD, August 12, 2024, August 14, 2024 deposition of Ronald Snyder, MD, deposition of Michael Nelson, PT, August 27, 2024 deposition of Scott Sulentich, MD, and August 28, 2024 deposition of Malinda Tollefson; as well as records from Aspen Mountain Medical Center, Steamboat Orthopedic & Spine Institute, including records from Darin McCann PAC and Clint Devin MD, Castle Rock Hospital District, Memorial Hospital of Sweetwater County, University of Utah Health, Rock Springs Plastic Surgery Center, including records from Scott Sulentich, MD, Desert View Eye Care, including records from Jeffrey Wilson OD, and Ronald Snyder, MD.

These records have formed the basis of my understanding of the nature and extent of Ms. Wadsworth's injury and resulting impairment. It is not my intent to restate these records or consultations in their entirety for purposes of this report.

☐ Main Office (Bothell) • 10132 NE 185th St
Bothell, WA 98011 • (425) 486-4040
Fax: (425) 486-8701
☐ Mount Vernon Office • 205 Stewart Rd Ste 108-7
Mount Vernon, WA 98273 • (360) 424-6239
Fax: (360) 738-9524
☐ Olympia Office • 2101 4th Ave Suite 101
Olympia, WA 98506 • (360) 352-5078
Fax: (360) 352-5417
☐ Wenatchee Office • 200 Palouse St Ste 201-4
Wenatchee, WA 98801 • (509) 665-8382
Fax: (509) 325-7666

☐ Edmonds Office • 7500 212th St SW Suite 216
Edmonds, WA 98026 • (425) 672-9600
Fax: (425) 776-5375
☐ Burien Office • 601 SW 152nd St
Burien, WA 98166 • (206) 243-1300
Fax: (206) 243-0366
☐ Kingston Office • 26127 Calvary Lane Suite 300
Kingston, WA 98346 • (360) 633-4252
Fax: (360) 352-5417
☐ Moses Lake Office • 2130 Basin St SW Suite A
Ephrata, WA 98823 • (509) 766-0379
Fax: (509) 325-7666

☐ Bellingham Office • 119 N Commercial Suite 350
Bellingham, WA 98225 • (360) 734-9163
Fax: (360) 738-9524
☐ Tacoma Office • 2607 Bridgeport Way W #2H2
Tacoma, WA 98466 • (253) 779-5485
Fax: (253) 779-5486
☐ Spokane Office • 1814 N Normandie St
Spokane, WA 99205 • (509) 325-7766
Fax: (509) 325-7666
☐ Aberdeen Office • 403 W State Street, Suite 101
Aberdeen, WA 98520 • (360) 637-4024
Fax: (360) 352-5417

EXHIBIT M

Stephanie Wadsworth
September 5, 2024
Page 2

In performing this work I have followed accepted methodologies and standards of practice. As a Vocational Rehabilitation Counselor, Case Manager and Life Care Planner, I have looked to the medical community to define the nature and extent of impairment. I have then translated those limitations and recommendations to the world of work, independent living, coordination of future medical and rehabilitation services and the costs associated to promote quality of life in the least restrictive environment with respect for independence and human dignity where appropriate. I have received input for those items prescribed or deemed medically necessary and appropriate from the requisite professional(s); and then provided case management and vocational rehabilitation foundation and expertise for the identification of additional items, as well as costs and replacement rate for the various items identified when appropriate. All opinions expressed by me herein are to a reasonable degree of professional probability and certainty. In reaching any opinion expressed herein, I relied on my specialized knowledge, training, education, experience, and clinical. My opinions are based upon my knowledge, training and experience combined with my professional and clinical judgments.

By way of brief summary, Ms. Wadsworth sustained 30-39% TBSA burn injuries on February 1, 2022 when she was caught in a house fire. Ms. Wadsworth was 34 years of age at the time of injury.

## MEDICAL:

Medical records provide foundation for the nature and extent of medical impairment. Diagnoses, treatment recommendations and limitations provide insight into injuries and impairments. Medical records were reviewed and information specific to the nature and extent of injury are noted below.

Upon injury, Ms. Wadsworth was attended to at the scene of the fire by emergency responders. Ms. Wadsworth was observed to be conscious, breathing with obvious stridor, and had obvious burns throughout her body. They noted a severely burned face, neck, arms, lower legs, and feet. Emergency responders documented that Ms. Wadsworth did not recall exact events up to this point. At this time, Ms. Wadsworth was assessed to have second and third degree burns throughout 60% of her body including the back, face, head, neck, upper and lower arms, hands, lower legs and feet as well as black soot in her mouth and nose. Ms. Wadsworth was emergently transported to Memorial Hospital of Sweetwater. A GCS of 15 was noted.

Later on February 1, 2022, Ms. Wadsworth was evaluated at Memorial Hospital of Sweetwater County Emergency Department. Burns were noted to the head, face, and upper back, mid-back and lower back. Severe pain was reported along with smoke inhalation. Ms. Wadsworth was reported to have been coughing up soot. 25% total body surface area burns were assessed. Ms. Wadsworth was intubated for airway precautions. Some airway edema was noted. Significant second-degree burns to the entire face were assessed, as well as the

Stephanie Wadsworth
September 5, 2024
Page 3

interior back ranging from the neck to the buttocks as well as some involvement of the bilateral upper and lower extremities. Ms. Wadsworth was provided with fluids and transferred to the University of Utah Health trauma center by airlift on February 1, 2022.

Ms. Wadsworth was initially seen in the emergency department at University of Utah Health on February 1, 2022. Scott McIntosh, MD documented a trauma one activation due to partial and full thickness burns in a house fire involving Ms. Wadsworth's face, shoulder, back, bilateral hand and bilateral lower extremities. Dr. McIntosh noted that Ms. Wadsworth had been started on a cyanokit due to concern for chemical inhalation injury. Ms. Wadsworth was noted to be presently intubated. Stridor and soot in the airway were noted, with a Lactate level of 13. Ms. Wadsworth was promptly admitted to the burn service for further treatment and management of her injuries.

On the burn unit, Irma Fleming, MD evaluated Ms. Wadsworth. TBSA 35% partial/full thickness burns were assessed. Surgical planning was discussed. Recommendations were provided for medication management and consultations as well as continued diagnostics. Dr. Fleming documented, "per husband, patient has high EtOh use and usually drinks about 1 pint of whiskey per day." Ongoing nutritional support was recommended.

Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.

Ophthalmology consultation occurred on February 2, 2022 with Theresa Long, MD. Dr. Long assessed bilateral corneal abrasions and thermal corneal injury of the left eye. She further assessed periocular and facial burns with severe eyelid edema. Moxifloxacin and erythromycin was recommended QID to the bilateral eyes.

Dr. Fleming took Ms. Wadsworth into the operating room on February 3, 2022 for Excision of burn wounds from back and posterior bilateral lower legs down through skin, dermis to subcutaneous tissue; Preparation of wound bed for grafting (Total Area Prepared: $3339cm^2$: Back, Right lower leg $636cm^2$, Left lower leg ($273cm^2$); Placement of allograft over all debrided areas and wound care.

On February 4, 2022, Callie Thompson, MD performed Tangential excision of burn wound eschar and preparation of wound bed to left upper arm $483cm^2$, left forearm $207cm^2$, left hand $135cm^2$, right upper arm $225cm^2$, right forearm $120cm^2$, right hand $117cm^2$, left thigh $168cm^2$, right thigh $330cm^2$, right lower leg $24cm^2$, right foot $108cm^2$; Placement of cadaveric allograft to left upper arm $483cm^2$, left forearm $207cm^2$, left hand $135cm^2$, right upper arm $225cm^2$, right forearm $120cm^2$, right hand $117cm^2$, left thigh $168cm^2$, right thigh $330cm^2$, right lower leg $24cm^2$, right foot $108cm^2$.

Stephanie Wadsworth
September 5, 2024
Page 4

Additionally on February 4, 2022, Dr. Long reevaluated Ms. Wadsworth for an ophthalmology consultation. No ophthalmic concerns were reported by nursing staff. On examination, Dr. Long documented severe periorbital edema, right eye greater than left and severe upper and lower eyelid edema right greater than left. A dilated fundus exam was completed. Dr. Long assessed corneal abrasions of both eyes, which were improving, and thermal corneal injury to the left eye, which was also improving. Continued moxifloxacin and erythromycin ointment were recommended four times daily in both eyes. No sign of orbital compartment syndrome was seen.

Dr. Long re-evaluated Ms. Wadsworth on February 8, 2022. She noted that Ms. Wadsworth remained intubated and sedated. Dr. Long again assessed that corneal abrasions of the bilateral eyes were improving. She opined that the thermal corneal injury to the left eye had resolved. Continued erythromycin ointment was recommended. Dr. Long discussed that periocular and facial burns with severe eyelid edema to the bilateral eyes was also improving.

Additionally on February 8, 2022, Ms. Wadsworth returned to the operating room with Dr. Thompson. Dr. Thompson performed Removal of allograft; Tangential excision of burn wound eschar and preparation of wound bed to posterior torso 1000cm2; Versajet debridement of wound bed posterior torso 3600cm$^2$, left leg 353 cm$^2$, right leg 588 cm$^2$; Placement of split thickness skin graft (meshed) to posterior torso 3600 cm$^2$, left leg 353 cm$^2$, right leg 588 cm$^2$; Placement of Recell epidermal autologous skin graft overlay to posterior torso 3600 cm$^2$, left leg 353 cm$^2$, right leg 588 cm$^2$ and Placement of Recell epidermal autologous skin graft to donors on right buttock 375 cm$^2$, right thigh 780 cm$^2$, left thigh 986 cm$^2$.

Social Work Assessment occurred on February 8, 2022. Gretchen James, LCSW documented that Ms. Wadsworth had been a stay-at-home mother for the past 8 years. She noted that Ms. Wadsworth's husband worked at a baking soda factory. A history of post-partum depression and depression was noted. Additionally, substance use was documented. Ms. James recorded, "increased ETOH use in the past month; [her husband] reported Stephanie drinks 1 pint/Jagermeister and whiskey a day. Psychosocial support was provided.

During an interdisciplinary meeting on February 9, 2022, Noah Brown, MD documented that Ms. Wadsworth's, "drinking really escalated in the last month. Husband sees correlation between depression and drinking. Plan to consult psychiatry after she is extubated."

Ms. Wadsworth returned to the operating room with Giavonni Lewis, MD on February 11, 2022 for Excision of burn wounds from bilateral hands down through epidermis and dermis, through subcutaneous tissue, fascia and up to, but not through, tendon (total area excised: 300 sq cm per hand); Removal of allograft to bilateral hands, bilateral upper extremities, bilateral thighs, right foot; Versajet debridement of bilateral hands, bilateral upper extremities, bilateral thighs, right foot down through epidermis and dermis, through subcutaneous tissue and up to, but not through, fascia; Preparation of wound bed for grafting; Harvest of split thickness skin graft from

Stephanie Wadsworth
September 5, 2024
Page 5

donor site along the left flank (520 sq. cm), left thigh (850 sq. cm) and right thigh (440 sq. cm) at 10,000th of an inch thickness (total area: 1810 sq. cm); Split thickness autologous grafting of the bilateral hands, bilateral upper extremities, bilateral thighs (meshed at 3:1). (Areas grafted: Rhand-300 cm$^2$; Lhand-300 cm$^2$; RUE-400 cm$^2$; LUE-600 cm$^2$; RLE-400 cm$^2$; LLE-200 cm$^2$); Application of Recell epidermal autologous cell suspension skin graft overlay to bilateral hands, bilateral upper extremities, bilateral thighs and to donors on bilateral thighs and left flank (24 cm$^2$ allocated to ReCell application); Allograft application to right foot (200 cm$^2$) and Norson debridement to face and right foot. Dr. Lewis noted purulent eschar on the face, and purulence on the bilateral posterior shoulders over the previously autografted area.

On February 14, 2022, Dr. Lewis returned Ms. Wadsworth to the operating room. At this time, she performed Norson debridement of bilateral face and forehead; Excision of burn wounds from forehead and left face down through epidermis and dermis, through subcutaneous tissue (total area excised: 200 sq. cm); Versajet debridement of forehead and left face down through epidermis and dermis, through subcutaneous tissue and Split thickness Allografting of the forehead and left face (total area grafted: 200 sq. cm, meshed at 2:1). Dressing care was performed to the anterior and posterior torso. Purulent eschar was noted along the forehead from ear to ear. Purulent material was seen overlying the bilateral shoulders, extending further on to the back. Cultures were taken.

Ophthalmology reevaluation occurred with Dr. Long on February 15, 2022. At this time, Dr. Long assessed that corneal abrasions to the bilateral eyes had resolved. Chemosis of both eyes was assessed as minimal. Additionally, punctuate epithelial erosions of the bilateral eyes were assessed as minimal. Dr. Long opined that the periocular and facial burns with severe eyelid edema to the bilateral eyes was improving. Continued erythromycin ointment was recommended four times daily to the bilateral eyes.

An interdisciplinary meeting of February 16, 2022 documented that there was concern for some level of infection of grafts, with Ms. Wadsworth currently on meropenem. Physical therapy was noted to have splinted Ms. Wadsworth, and was working with her at bedside. Ms. Wadsworth was reported to be agitated during wound care. Range of motion exercises were recommended initiated. A plan to consult psychiatry following extubation related to depression and drinking was reiterated. Ms. Wadsworth's tube feeds were changed by nutrition on this date. Dr. Fleming documented, "patient has a long surgical course of the head."

Speech language evaluation then occurred with Hadley Regal, CCC-SLP on February 21, 2022. Ms. Regal performed an oral mechanical evaluation and assessed that structures appeared symmetrical with functional range of motion for speech and swallow. She opined that due to her inhalation injury, Ms. Wadsworth was at a 16 times greater risk of dysphagia then a patient without inhalation injury. She noted that prolonged intubation increased this risk (52%). Limited trials were provided to determine ability to swallow safely. Further assessment

Stephanie Wadsworth
September 5, 2024
Page 6

with ENT was recommended for any possible VF pathology. Instrumental examination was also recommended. Ms. Regal assessed that Ms. Wadsworth was not yet safe for functional by mouth nutrition. Close follow-up with speech language services were recommended.

Otolaryngology consultation then occurred on February 21, 2022 with Katherine Keefe, MD. Dysphonia and dysphagia were evaluated. Dr. Keefe discussed that Ms. Wadsworth was found to have a Grade IV inhalation injury with visible tissue sloughing, necrosis, and copious cabonaceous deposits. She reviewed that Ms. Wadsworth had been extubated without respiratory distress. Currently, Ms. Wadsworth was taking nothing by mouth due to concern for coughing with ice chips and sips of water. No premorbid voice concerns were noted. Flexible laryngoscopy was performed at this time. Dr. Keefe reviewed that on exam, Ms. Wadsworth's upper airway was widely patent and grossly normal, mucosa was healthy without erosion, necrosis, or sloughing. Some pooling of thick secretions was seen in the pyriforms. The bilateral vocal folds were noted to be healthy and mobile. Dr. Keefe suspected that dysphagia and dysphonia were secondary to deconditioning from prolonged intubation and acute illness. Full recovery was expected. No interventions were recommended from an ENT standpoint. Continued work with speech language was recommended to assess the safety of swallowing diet and vocal strengthening exercises.

A burn interdisciplinary meeting of February 23, 2022 documented a plan for return to the operating room on the following day for bilateral feet and face excision with placement of allograft. Noah Brown, MD documented that delirium and alcohol withdrawal were resolving.

On February 24, 2022, Dr. Fleming performed Excision of burn wounds from bilateral face, right neck and bilateral ears, bilateral plantar feet down through epidermis and dermis, through subcutaneous tissue and up to, but not through, fascia (total area excised: Face and Bilateral Ears (464 sq cm) and Bilateral Feet 1:1 (196 cm sq); Preparation of wound bed for grafting (total area prepared: Face and Bilateral Ears (464 sq cm) and Bilateral Feet 1:1 (196 cm sq); Split thickness Allografting of the Face, bilateral ears, and bilateral plantar feet, right dorsal foot (total area grafted: Face and Bilateral Ears (464 sq cm) and Bilateral Feet meshed 1:1 (196 cm sq) and Wound care to all extremities, anterior and posterior trunk, and face.

A modified barium study was performed on February 25, 2022 by speech therapy. Mild-moderate oropharyngeal dysphagia was assessed, characterized by delayed onset of swallow trigger, decreased superior laryngeal elevation and impaired airway closure. Impairments were assessed as resulting in consistent airway compromise within liquid media. Mildly thick and solid textures were noted to have been tolerated without any airway compromise. Ms. Wadsworth's diet was recommended advanced to mildly thick liquids, and soft and bite - sized solids.

Stephanie Wadsworth
September 5, 2024
Page 7

On March 1, 2022, Ms. Wadsworth was returned to the operating room with Dr. Lewis for removal of allograft; versa jet debridement; harvest skin graft from donor site on right anterior thigh, right flank and abdomen of 1065 cm²; placement of autographed face sheet (wound size 325 cm²); bilateral ears (sheet graft) and right foot (wound is size 600 cm²), left foot (wound size 400 cm²) and right thigh. Dr. Lewis furthermore placed recell to all sites.

Ophthalmology consultation follow-up occurred on March 2, 2022 with Rachel Patel, MD. She documented that Ms. Wadsworth reported, "eyes are fine, she has no concerns or vision changes." Dr. Patel documented that Ms. Wadsworth was now able to participate in a subjective exam. She assessed that the history of corneal abrasions in the bilateral eyes and the history of thermal corneal injury to the left eye were all resolved. Ointment was recommended stopped. Artificial tears were recommended initiated. Outpatient follow-up was recommended within one month of discharge. Dr. Patel documented, "ophthalmology signing off."

An interdisciplinary burn meeting of March 2, 2022 documented that delirium had largely resolved. Physical and occupational therapy noted that Ms. Wadsworth's arms had great mobility. Social work assessed that Ms. Wadsworth was future oriented and had good coping skills. Nutrition noted advance to level 7 diet. Continued tube feeds were recommended to compensate for loss of calories. Continued therapies were planned.

An updated modified barium study was conducted on March 4, 2022. Mild oropharyngeal dysphagia was again assessed. However, improvements were noted as compared with the initial study. Ms. Wadsworth was recommended to advance to a regular diet with thin liquids. Medications were recommended taken whole with liquid. Adherence to standard aspiration precautions was recommended to minimize the risk of airway compromise.

An interdisciplinary burning meeting occurred on March 16, 2022. Ms. Wadsworth was noted to have been recovering well postoperatively. It was noted that she was cleared for discharge from a physical therapy perspective and was demonstrating good range of motion. Social work also recommended that Ms. Wadsworth was ready for discharge from their perspective. No concerns were noted by nutrition. No concerns were noted by speech therapy. Ms. Wadsworth was recommended to wean from MSIR. Discharge was anticipated to occur by March 21, 2022.

On March 21, 2022, Ms. Wadsworth was evaluated by Heidi Stirling, CSW of social work services. Ms. Stirling documented discussion of resources for potential substance abuse concerns. She reported that Ms. Wadsworth denied that she had an alcohol abuse problem. Local resources for substance abuse counseling and services were provided. Ms. Stirling also provided a temporary disability placard application form.

Stephanie Wadsworth
September 5, 2024
Page 8

A case management discharge plan of March 21, 2022 documented that Ms. Wadsworth and her family would be discharging to a paternal grandparent's home, which was next door to their home. A total loss of the family home was noted. Ms. Wadsworth's youngest son was still in the hospital, but their other 3 children had been staying with grandparents. It was noted that Ms. Wadsworth's husband's employer was very supportive and was paying him full wages for several months.

A burn therapy discharge note of March 21, 2022 by Ronda Hopkins, PT discussed that Ms. Wadsworth had met all inpatient goals and was ready to discharge home. Good wound healing was assessed at all sites, except with some small open spots on the upper left arm. Scar tightness was documented as present in the bilateral hand, limiting a combined flexion of the digits bilaterally. Right toe scars were noted to begin to form with potential to interfere with gait and balance. Balance training, patient education, splinting, range of motion and stretching, therapeutic exercises, caregiver training, strength training, scar management, fine motor activities, and gait training were noted to have been provided. Follow-up with outpatient burn therapy was recommended in one week, and as needed for scar management with splinting and custom compression garments. Referral was provided to High Plains Physical Therapy for local outpatient physical therapy after discharge. No equipment was recommended outside of custom compression garments.

On March 21, 2022, Ms. Wadsworth was discharged from University of Utah Health. The following discharge diagnoses were documented:

- 35% TBSA partial and full thickness burns to face, back, bilateral lower extremities, and bilateral hands.
- Acute pain
- Pruritis
- Delirium
- History of ETOH use
- Corneal abrasions
- Persistent dysphonia/dysphasia
- Burn hypermetabolism
- Nutrition in the setting of burn injury
- Prevention of opioid induced constipation
- Electrolyte abnormalities
- DVT prophylaxis
- Positive wound cultures (MSSA, Enterobacter cloacae)

Stephanie Wadsworth
September 5, 2024
Page 9

- Sepsis
- Acute blood loss anemia

Callie Thompson, MD documented that when Ms. Wadsworth was initially taken to Memorial Hospital of Sweetwater County, her GCS was 15. She reviewed that Ms. Wadsworth had stridorous respirations and was intubated. Dr. Thompson discussed that Ms. Wadsworth had been transferred via air med to the University of Utah as a Trauma one activation due to unknown cause of the house fire. Dr. Thompson discussed that 98% of Ms. Wadsworth's original burns were closed at time of discharge. 100% of the donor site was assessed as closed at the time of discharge. ICU related delirium was assessed as appearing to have been resolved by the time of discharge. Dr. Thompson discussed that Ms. Wadsworth was provided with thiamine replacement during her hospitalization for her alcohol use. She noted that the LCSW at the University of Utah was planning to reach out to Ms. Wadsworth after discharge for ongoing management and to provide local resources to assist with her sobriety.

Dr. Thompson reviewed that Ms. Wadsworth had been evaluated by ophthalmology while an inpatient. She further discussed that ENT had been consulted and had opined that dystonia and dysphagia were due to acute illness in prolonged intubation. Ms. Wadsworth was encouraged to follow up with the voice disorders clinic upon discharge. Referral was placed. Ms. Wadsworth's vital signs were noted to be stable at the time of discharge. No acute pulmonary concerns were noted. Ms. Wadsworth was on a regular diet at the time of discharge. She received omeprazole for stress ulcer prophylaxis. Dr. Thompson noted that Ms. Wadsworth received Lovenox for DVT prophylaxis until independent ambulation was sufficient. Various wound infections were treated with topical and systemic antibiotic therapies. Sepsis was noted to have resolved. Ms. Wadsworth was documented to have no range of motion restrictions for burn therapy. Follow-up was recommended with the outpatient burn clinic. Ms. Wadsworth was also recommended to be in contact with the outpatient clinic LCSW for concerns regarding ongoing alcohol sobriety.

On March 24, 2022, physical therapy was initiated with High Plains Physical Therapy. Michael Nelson, PT assessed signs and symptoms consistent with stiffness, etc. from burns of approximately 35% of body with an underlying herniated disc. Limitations in range of motion, strength, balance, and flexibility were assessed which impacted Ms. Wadsworth's ability to reach, lift, walk, climb stairs, participate in recreational activities, home maintenance, and sleeping. Mr. Nelson documented that Ms. Wadsworth was utilizing compression sleeves and gloves over much of her extremities. No signs of infection were noted to burn sites. Complaints of itching were noted. Skilled physical therapy was recommended on a basis of three times per week for 12 weeks. Approximately 55 visits are reviewed in the records through September 28, 2022. The most recent therapy note documented that Ms. Wadsworth reported, "has been hunting which gave her a pretty good workout overall." At that time, improvements were noted with exercise tolerance. On February 2, 2023, Ms. Wadsworth was discharged from physical therapy as she had canceled her last few appointments and could not continue due to back problems. At the time

Stephanie Wadsworth
September 5, 2024
Page 10

of discharge, Mr. Nelson documented good improvements overall. He discussed that Ms. Wadsworth had tolerated treatment activities well with good response and good progress toward goals.

A burn therapy evaluation occurred with Callie Hayes, OT on March 28, 2022. Ms. Hayes documented that Ms. Wadsworth had difficulty, "finding the time and motivation to perform her therapy home exercise program." The importance of stretching was reviewed. Difficulty was noted with transitioning home (Ms. Wadsworth and her family were currently staying with her in-laws). Ms. Haley documented that Ms. Wadsworth was scheduled to begin outpatient therapy locally. Custom compression had not yet arrived. Range of motion, stretching, and scar management training was provided. Follow-up was recommended in 1-2 weeks.

Ms. Wadsworth was also seen by social worker, Heidi Stirling, on March 28, 2022. She documented that Ms. Stirling was not sleeping well, but reported that in regard to her emotional well-being, "I'm doing fine." She noted that Ms. Wadsworth reported that her needs were being met.

Evaluation occurred with Irma Fleming, MD on March 28, 2022. She noted that since being discharged, Ms. Wadsworth had been applying bacitracin/Restore/Mep AG dressings, and some of the dressings had been caught "slipping." Intense itching was reported, especially on the back. Difficulty was reported was sleeping. Melatonin 3 mg was reported to have been unhelpful. Approximately 5% TBSA wounds were assessed as still open at this time. Dressing changes and wound care instructions were provided. Dr. Fleming documented, "patient reports she has had trouble sleeping since she was started on SSRI when her 4-year-old was born." Dr. Fleming discussed this case with PharmD. She noted that SSRI plus trazodone could cause serotonin syndrome. She encouraged Ms. Wadsworth to reach out to primary care to determine what the next best steps would be. Sleep hygiene was discussed. Melatonin was recommended increased. Continued work with social work services was recommended to find resources available to assist with sobriety. Referral was placed to the Voice Disorders Center. Additional medication management was provided. Ms. Wadsworth was also instructed to come in person at the next visit for a fitting for custom compression garments. Outpatient physical therapy was planned. Follow-up was recommended with primary care for ongoing management of other health issues and health maintenance. Ms. Wadsworth was recommended to remain off of work at this time.

Wesley Hunsaker, PAC evaluated Ms. Wadsworth on April 6, 2022 in follow-up for her burn injuries. Ms. Wadsworth was documented overall pleased with progress. Severe itching was reported. Sleep was noted to have been impacted. Continued outpatient physical therapy was noted on a 3 times weekly basis. PAC Hunsaker discussed that Ms. Wadsworth was seeing a progression with strength, but felt that her scars returned to being tight every day. He noted that she had a splint, but reported she was not wearing it consistently. Continued wound care and dressing instructions were provided. Wounds were assessed as healing well overall with areas of scattered friction

Stephanie Wadsworth
September 5, 2024
Page 11

blistering. Wounds were assessed as overall smaller than previous encounters. The importance of daily compression and therapy was discussed to help manage scarring. Further scar management strategies were discussed if current therapies did not provide adequate benefits. Ongoing outpatient physical therapy was advised. Sleep hygiene was discussed. Atarax was also provided. Continued work with social work was advised to find resources to assist with sobriety. Medication management was discussed.

Dr. Lewis reevaluated Ms. Wadsworth on April 19, 2022. Wound care was reported to be without issue. Intermittent issues with friction blisters were reported. Significant itching was also noted. Sleep was reported to have been impacted since the time of injury. Difficulty was reported with falling asleep, though Ms. Wadsworth was noted to frequently drink caffeine in the afternoon. Current use of compression was discussed. Current outpatient physical therapy was reported on a basis of 3 times per week. Dressing changes were discussed and continued wound care recommendations were provided. Wounds were assessed as well healing with areas of scattered friction blistering. Wounds were assessed as smaller overall than in previous encounters. Ms. Wadsworth was advised that she was having early signs of hyper vascular scar formation due to thickened, texture change, robbery appearing and raised scars. The importance of daily compression and therapy was discussed to help manage his scarring at this time. Continued scar management techniques were recommended as guided by burn therapy. Ongoing attendance to outpatient physical therapy was encouraged. Good sleep hygiene was discussed. Continued work with social work services was recommended. Follow-up was recommended with the voice disorders clinic for evaluation and treatment of dysphonia. Ms. Wadsworth was recommended to remain off of work at this time due to ongoing therapy needs and ongoing narcotic pain medication use.

Burn therapy evaluation occurred on April 19, 2022 with Cynthia Lundy, PT. 35% TBSA full and partial burns were assessed to the bilateral upper extremities, bilateral hand, bilateral lower extremities, and face and torso. Skin grafts were noted to the face, torso, bilateral hand and upper extremities and bilateral extremities. Immature hypertrophic scarring was seen in all grafted areas with decreased strength and endurance, decreased activities of daily living, decreased grip and decreased range of motion. Cognitive status was assessed as within functional limits. Custom compression garments were fit and minor changes were made. A splint was constructed for the left upper extremity. Ms. Wadsworth was recommended to wear the splint for one hour 2 times per day. Ms. Wadsworth was assessed to show good rehab potential. Skilled burn therapy was recommended to address impairments. Decreased activities of daily living, decreased upper extremity range of motion, decreased upper extremity strength, decreased lower extremity strength, decreased lower extremity range of motion, decreased endurance, decreased high-level ADLs, high risk for hypertrophic scar formation, and immature hypertrophic scar requiring treatment were assessed. Training and education were provided along with recommendations for stretching and scar management. Physical therapy was recommended every 3 to 4 weeks virtually and every 2 to 3 months in person.

Stephanie Wadsworth
September 5, 2024
Page 12

A social work visit occurred with Heidi Stirling CSW on April 19, 2022. No social work needs were expressed by Ms. Wadsworth or her family at this time. Social work was discussed to be available for Ms. Wadsworth as needed going forward.

Evaluation occurred with Breanne Schiffer MD on May 3, 2022 in the Voice Disorders Center for consultation regarding dysphonia. Dr. Schiffer recorded that since the injury, Ms. Wadsworth's voice had been variable. She reported that, "at its worst her voice is barely at 0% normal." Increased/random throat clearing was endorsed. Dr. Schiffer discussed that Ms. Wadsworth was back to eating a normal diet. Breathing was reported to be improving. A sensation of a stuffy nose was endorsed since hospitalization. Dr. Schiffer documented that Ms. Wadsworth reported drinking 12 cans of Diet Pepsi per day. Posterior glottic stenosis was assessed following prolonged intubation for burn injury along with bilateral vocal fold edema and stiffness, suspected secondary to prolonged intubation coupled with active current smoking/tobacco use. Treatment options were discussed. Dr. Schiffer discussed concern that if the scar tissue matured, it would restrict Ms. Wadsworth's breathing further. Microdirected laryngoscopy was recommended with Kenalog injection and balloon dilation to improve breathing and limit restrictions as scar tissue matured. She opined that this would not markedly improve Ms. Wadsworth's voice. Consideration for decadron versus saline instillation at the time of the procedure was discussed to treat vocal fold edema. Smoking cessation was encouraged. Future voice therapy was also discussed if needed.

Videolaryngeal endoscopy with stroboscopy was also performed on May 3, 2022. Laryngeal function studies were also performed at this time along with stimulability testing. Dysphonia was assessed. Voice therapy exercises were provided.

Ms. Wadsworth was reevaluated by The University of Utah Burn Therapy by telehealth on May 11, 2022. Custom compression garments were noted to have been sent, but had not yet arrived to Ms. Wadsworth. Silicone foam was recommended between the fingers. Therapeutic exercises were discussed. Hypersensitivity in the feet was discussed as well as in other burn scar areas. Desensitization exercises were discussed. Ms. Wadsworth was recommended not to use a body lotion for her face as she was having some acne problems, and body lotion was too thick for facial pores. It was noted that Ms. Wadsworth was unable to walk barefoot at this time. An in person appointment was discussed to occur in approximately 3 weeks. Continued outpatient burn and physical therapies were recommended.

A telehealth visit also occurred with PAC Hunsaker on May 11, 2022. Ms. Wadsworth was noted to report that her burns were doing, "good." Severe itching was reported. Sleeping was reported to be getting worse. Wounds were assessed. Neuropathic pain and primary insomnia were diagnosed in addition to burn injuries. Wound care treatment was discussed. PAC Hunsaker noted that less than 1% of burns were open wound at this time. Medication management was provided. Continued attendance with outpatient physical therapy was encouraged. Ms. Wadsworth was recommended to remain off of work at this time due to ongoing therapy needs.

Stephanie Wadsworth
September 5, 2024
Page 13

A burn therapy progress note of June 2, 2022 by Walter Anyan PT assessed decreased high level ADLs, high risk for hypertropic scar formation, immature hypertrophic scar requiring treatment. Mr. Anyan noted that Ms. Wadsworth's UEFI (Upper Extremity Functional Index) score had increased from 45 to 56, with grip strength improved. Continued outpatient therapy was recommended. Ms. Wadsworth was noted to be making gains. Her gait was assessed as normal, and she was within functional limits for dorsiflexion over the bilateral ankles. Physical therapy follow-up was recommended in 4-6 months.

Ms. Wadsworth was also seen by social work on June 2, 2022. At this time, Heidi Stirling CSW documented that no social work needs were expressed.

Additionally on June 2, 2022 a burn scar consultation occurred with Dr. Fleming. Dr. Fleming discussed that Ms. Wadsworth reported her burns were doing "good." Wound care was reported to be going without issue. However significant and severe itching were reported to bother Ms. Wadsworth daily. The majority of the pain was reported in the bilateral feet, described as constantly dull and achy. Sleep was reported to be becoming worse. Dr. Fleming assessed that less than 1% total body surface area wounds were open. Bacitracin and Mepilex AG dressings were recommended applied to these open wounds. Additional topical care was discussed. $CO_2$ laser treatments were recommended initiated for treatment to the face, back, bilateral upper extremities and hands, and bilateral lower extremities in six months from discharge (September/October 2022). Dr. Fleming also noted a concern for "acne." She discussed that this was common and expected in burn wound scar tissue due to impaired sweat and oil gland function. Facial moisturizers and acne body wash were recommended. Importance of daily compression in therapy was discussed to help manage scarring. Ongoing attendance to outpatient physical therapy was recommended. Melatonin was recommended for insomnia. Dr. Fleming also recommended continued work with social work services for history of alcohol use. Continued follow-up with ENT was recommended. Additional medication management was provided. Dr. Fleming recommended that Ms. Wadsworth remain off work at this time due to ongoing therapy needs.

On June 8, 2022, Breanne Schiffer MD took Ms. Wadsworth into the operating room for microlaryngoscopy with balloon dilation and injection of kenalog as well as bronchoscopy with $CO_2$ laser. Ms. Wadsworth was discharged later on this date with follow-up planned in 3-4 weeks to determine any improvement in breathing or voice quality.

Jeffrey Wilson, OD evaluated Ms. Wadsworth on June 22, 2022 for an adult eye health and vision examination. Blurred vision was reported at distance. Dr. Wilson assessed physiologic cupping with good IOP as well as myopia and astigmatism of the left eye. An adjustment was made to Ms. Wadsworth lens prescription. Follow-up was recommended 12 months.

Stephanie Wadsworth
September 5, 2024
Page 14

Follow-up occurred with Dr. Schiffer on June 24, 2022. She documented that Ms. Wadsworth reported the procedure had "helped a lot. She is not quite back to 100%, but is close." Breathing was reported to have improved. No swallowing issues were noted. Follow-up was recommended 6 weeks postop to evaluate symptoms and discuss any further procedures. Smoking cessation was encouraged.

Ms. Wadsworth was seen by telehealth on July 18, 2022 by Dr. Lewis. Concern was noted for infection on this date. Pain was reported at a 1/10, with no need for pain control. At this time, Ms. Wadsworth reported that the wound was no longer open. The wound to the right hand fifth digit was seen to appear 100% closed at this time. Continue moisturizer was recommended. Wound care and activity instructions were discussed. Activities were recommended as tolerated.

A virtual burn therapy physical therapy progress note of July 18, 2022 by PT Hopkins documented decreased high level ADLs, high risk for hypertrophic scar formation, immature hypertrophic scar requiring treatment. A good prognosis was opined. Caregiver training and patient education was discussed along with range of motion and stretching, as well as scar management. Follow-up with burn therapy was recommended in 4-6 months. Continued burn therapy was recommended until scars matured. Outpatient physical therapy was also recommended. Adjustments were made to orthotics (compression garments) at this time.

A social work follow-up appointment occurred with Heidi Stirling CSW on July 18, 2022. No social work needs were expressed at this time by Ms. Wadsworth or her family. Ms. Stirling discussed that social work would remain available as needed or as requested to assess for psychosocial support and interventions going forward.

A telehealth visit occurred with Dr. Schiffer on August 2, 2022 for consultation regarding breathing concerns. She noted that Ms. Wadsworth had developed mild PGS post-intubation for burn injuries. Ms. Wadsworth's voice was reported to have improved. Some shortness of breath was reported. Voice was rated as 90% normal. Posterior glottic stenosis was assessed following prolonged intubation for burn injury, stable following dilation June 8, 2022. Follow-up was recommended as needed.

Ms. Wadsworth was evaluated for COVID symptoms by Lynn Eskelson, MD on August 24, 2022. Paxlovid was prescribed.

A telehealth visit occurred with Rylee Whitehouse PAC on August 31, 2022 for a six month follow-up appointment. She discussed that overall, Ms. Wadsworth was doing well, and reported no open spots. Itching was reported to be improved, though intermittently woke her up. PAC Whitehouse documented that Ms. Wadsworth had gained 30 pounds since her injury, and her primary care physician was no longer filling her citalopram. A recent COVID diagnosis was documented. All grafts were assessed as 100% well epithelialialized and healed and hypopigmented in color. Immature hypertrophic scarring was seen at graft sites especially on the hand. Continued use of

Stephanie Wadsworth
September 5, 2024
Page 15

Aquaphor and Resta moisturizer was recommended throughout the day. Continued compression therapy and daily sunscreen was recommended. Medication management was provided. Weight gain was noted as possibly due to contributing factors including medications, physical activity, and injury recovery. Dietary changes were discussed. Celexa was prescribed. PAC Whitehouse discussed that this medication could also contribute to weight gain. She noted that Ms. Wadsworth was also being followed by social work in the clinic. No acute pain was endorsed at this time. Over-the-counter pain medications were recommended if needed. Activities were recommended as tolerated.

Follow-up occurred with Dr. Thompson on September 6, 2022. She discussed that Ms. Wadsworth was undergoing her first laser treatment on this date. Significant areas of concern for hypertrophic burn scars were noted to include the face, back, bilateral upper extremities and hand and bilateral lower extremities. Significant itching was reported associated with the scar and loss of range of motion. Dr. Thompson documented that otherwise, Ms. Wadsworth was doing well overall. Wounds were assessed as mostly fully epithelialized at this time. Daily moisturizer and sunscreen was recommended to all healed areas. Daily compression was recommended along with scar therapy. Ongoing outpatient physical therapy was encouraged. Desensitization training was also discussed. Dr. Thompson recommended that Ms. Wadsworth remain off of work at this time due to ongoing therapy needs.

On September 6, 2022, CO2 laser treatment was performed by Dr. Thompson to a total body area of 4474 cm². Dr. Thompson discussed that four sequential laser treatments were planned, after which Ms. Wadsworth would be reassessed. Laser treatments were discussed to be expected every 4 to 6 weeks, with a total of 8 to 10 treatments unless no improvement was noted.

I have reviewed a burn therapy progress note from the University of Utah of September 15, 2022. Ms. Wadsworth was measured for custom compression garments. Gloves, anklets, pants, and a sleeved vest were ordered.

On October 26, 2022, PAC McCann reevaluated Ms. Wadsworth for her low back. He reviewed that an epidural steroid injection to the lumbar spine had worked extremely well for about a year. At this time, similar symptoms were documented regarding recurrent right leg pain. PAC McCann discussed that there was certainly risk for repeat surgery, but hoped that the issue could be solved with conservative measures. Lumbar radiculopathy was assessed. A repeat injection at L4 and L5 on the right side was recommended.

Laser treatment was performed by Dr. Lewis on November 15, 2022 to the anterior neck and face, abdomen, right upper arm, right elbow, right forearm, left upper arm, left elbow, left forearm, right and left hand, right knee, left foot, right foot, and upper back and lower back.

Stephanie Wadsworth
September 5, 2024
Page 16

A progress note by APRN Orr on November 30, 2022 discussed a virtual visit for follow-up from laser treatment. APRN Orr documented that Ms. Wadsworth, "really enjoyed the benefits of laser treatment and notices she is less itchy and her feet don't hurt nearly as much." Itching was reported to be substantially improved since the initial laser treatment. All wounds were reported to be closed at this time, and Ms. Wadsworth was noted to quickly heal after laser treatment. All grafts were assessed at 100% well epithelialized and healed and hypo pigmented in color. Mature hypertrophic scarring at graph sites was seen, especially on the hands. 2 additional laser treatments were recommended at this time. Continued compression therapy, daily sunscreen, and lotion/Aquaphor were recommended to all healed areas. Medications were noted to include Zyrtec 10 milligrams BID, Lyrica 150 mg TID, Atarax 25-50 mg PRN. APRN Orr also noted that Ms. Wadsworth was requesting refill of her Celexa 40 mg at this time. She documented that LCSW was following Ms. Wadsworth in the clinic and had no concerns at this time. Increased sleep, guilt, energy, concentration difficulties or decreased interest in activities were denied. No acute pain was endorsed. Continued ibuprofen and Tylenol were recommended PRN for pain. In regard to work/activity restrictions, Ms. Wadsworth was recommended to perform activities as tolerated.

A burn physical therapy progress note of February 6, 2023 by Daphne Perry, PT discussed that Ms. Wadsworth had completed four visits to date. Immature hypertrophic scarring was assessed in all grafted areas and decreased strength and endurance, decreased activities of daily living, decreased grip and decreased range of motion were assessed at this time. Compression gloves were reordered at this time. Prognosis was assessed as, "good." Education and scar management was discussed. Follow-up with physical therapy was recommended in 4-6 months. Continued follow-up was recommended until scars matured. Outpatient burn therapy was recommended.

Ms. Wadsworth was seen for a rash on her earlobe on March 15, 2023 by Brenna Kirsch, ARNP. Cellulitis was assessed. Cephalexin was prescribed.

Wound assessment was performed by Carlin Barney PAC on June 6, 2023. PAC Barney documented:

*Right upper extremity:* Autograft to the dorsal right hand appears approximately 100% epithelialized at this time. Healed skin reveals red scars that is red appearing, rubbery, raised and hypervascula. Texture changes appreciated throughout. Patient able to demonstrate fair to good active range of motion in their hand.

*Left upper extremity:* Autograft placement to the dorsum of the left hand appears to be 100% epithelialized at this time. Healed skin is pink to dark pink in color, appears slightly raised with mild texture changes. Patient able to demonstrate fair active range of motion in the left hand, left hand appears to have less range of motion compared to right hand.

Stephanie Wadsworth
September 5, 2024
Page 17

*Right lower extremity:* Previous wounds and autograft areas to the right lower extremity appear to be approximately 100% epithelialized at this time. healed skin reveals early signs of scar formation as wounds appear red, rubbery, raised with texture change. Some areas of scar tissue appear to be hypopigmented. Scars appear to be hypervascular. Donor sites are fully epithelialized at this time.

*Left lower extremity:* Autograft areas as well as other wounds on the left lower extremity appear to be 100% epithelialized at this time. Healed skin is pink to dark pink in color, appears soft with some texture changes thickened scarring, particularly on the bottom of the foot. Blanching noticed on the plantar aspect of the left great toe upon extension. Very dry, flaky skin present on the plantar aspect of the foot.

*Posterior torso:* Wounds and autograft areas to the posterior torso appear much improved, overall, from previous photos. Wounds appear to be fully epithelialized at this time. Healed areas reveal signs of scar formation with tissue being red, rubbery, raised, obvious texture changes noted and very hypervascular. Wounds to the head, face and scalp appear to be fully epithelialized at this time with texture change and raised scarring appreciated on the face as well as anterior to bilateral ears. Various areas of thickened scar bands present on the face and neck.

PAC Barney discussed that Ms. Wadsworth was able to demonstrate fair active range of motion to the affected joints. He assessed that wounds appeared to be mostly fully epithelialized at this time. Obvious scarring was noted with hypervascular scar tissue.

On June 6, 2023, Dr. LaChapelle performed laser treatment to Ms. Wadsworth's abdomen, right hand, left hand, left forearm, left elbow, and left upper arm as well as her right upper arm and right elbow and right forearm, upper and lower back, head and face. Total body surface area lasered was noted as 27%. Ms. Wadsworth was instructed to return for the next laser treatment in 4-6 weeks.

Follow-up occurred with PAC Sherwin on August 9, 2023. Hard lumps were reported on the bottom of the feet, which Ms. Wadsworth reported having noticed a year prior. PAC Sherwin documented that these were painful, and Ms. Wadsworth felt like she was walking on rocks. Skin grafts were assessed as well healed. Callus of the foot was assessed. Papules were cleansed with alcohol pads and shaved. Wound care was provided. Am-Lactin was recommended twice daily to the areas of lumps shaved until they had healed. Follow-up was recommended in 3 weeks.

Stephanie Wadsworth
September 5, 2024
Page 18

An office visit occurred with PAC Sherwin on September 6, 2023 in follow-up for burn injuries. PAC Sherwin reviewed that Ms. Wadsworth reported her feet had felt better for one and a half weeks after the paring procedure, but then pain had returned. Painful callous type growth was noted to the soles. PAC Sherwin assessed callus of the foot. Consultation was recommended with Dr. Sulentich.

On September 13, 2023, Scott Sulentich, MD evaluated Ms. Wadsworth for "corns" on the feet. He recommended scheduling an excision of one "corn" only in order to assess Ms. Wadsworth's ability to heal. Excision was then performed to one location on the left foot on October 24, 2023.

Ms. Wadsworth returned to Dr. Wilson on September 27, 2023 for optometry follow-up. He recorded that Ms. Wadsworth was utilizing glasses with driving. Blurred vision at distance was again reported. Diagnoses of myopia and astigmatism of the bilateral eyes were documented. An updated optical prescription was provided. Follow-up was recommended in 12 months.

On November 7, 2023, David Souza, PA-C performed laser treatment number 4. Some ongoing thickness and fixed scars were reported. PAC Souza discussed that Ms. Wadsworth was applying lotion daily to her healed wounds and endorsed significant itching for which she applied moisturizer. He documented that decreased range of motion was reported, though Ms. Wadsworth admitted that she was not performing daily range of motion exercises and stretches as instructed. Continued growth was noted to the bottoms of the feet which resembled corn/callous. PAC Souza discussed that these were being treated locally, and had been excised. Sutures in the feet were pending removal by plastic surgery on the following day.

Follow-up occurred with Dr. Sulentich on November 8, 2023. He documented that her foot, "looks great" and no infection was noted. Sutures were then removed on November 15, 2023. No signs or symptoms of complications were reported. Follow-up was recommended in 2 weeks.

Additional excision was performed on the left foot by Dr. Sulentich on January 16, 2024. Keflex was then prescribed on January 26, 2024 as Ms. Wadsworth was concerned regarding the way her left foot looked after excision.

A telehealth visit occurred on January 17, 2024 with Dr. LaChapelle. Current pain was reported at 0/10 on the pain intensity scale. Overall itching on lasered areas was reported to be improved, though there had been return of itching over the past months. Tightness was reported in the upper back, and across the shoulders which, "pulls" when she is reaching for items. Tightness was also reported to the left hand and occasionally to the right hand. Full range of motion was noted in all joints at this time. Dr. LaChapelle recorded, "no limitations in functional activity, just more challenging related to tightness." No current open wounds were reported. Scar thickness was noted to have

Stephanie Wadsworth
September 5, 2024
Page 19

improved in some areas of the back with laser treatments. Scars on the dorsal hands were reported to break down easily with minimal trauma when reaching into boxes, etc. Four additional laser treatments were recommended. Dr. LaChapelle recommended laser treatments every 4 to 6 weeks for a total of 8 to 10 treatments unless there was no improvement noted. Specifically, he discussed that four additional laser treatments would be performed to the upper back, bilateral upper arms and anterior neck/jaw. Dr. LaChapelle discussed that other areas had not made significant notable progress, so those would not be treated. He further discussed that as Ms. Wadsworth's skin was thin on her hands, and prone to wounds with minimal trauma, so no hand laser treatment would be performed. Dr. LaChapelle recorded that Ms. Wadsworth had completed medication treatments and was not on any prescribed medications at this time.

Occupational therapy evaluation occurred on January 29, 2024 with Jose Lucio, OT. Mr. Lucio assessed Ms. Wadsworth's overall cognitive status as within functional limits. He documented that Ms. Wadsworth was independent with basic and instrumental activities of daily living and independent with functional mobility. Range of motion of the hand, thumb, and fingers were assessed as within normal limits bilaterally. Mr. Lucio assessed that Ms. Wadsworth showed good rehab potential and would benefit from skilled burn therapy. He noted that laser treatments were planned. Good range of motion was assessed with no deficits. Mr. Lucio noted tightness when protracted the arms forward. Therapy was recommended initiated after the last laser treatment.

On January 30, 2024, Dr. Thompson performed laser treatment number 5 to the face, back, and bilateral upper extremities.

Follow-up occurred with Dr. Thompson on March 19, 2024 for laser treatment number 6. Dr. Thompson documented that Ms. Wadsworth continued to endorse thickened scarring to both arms, as well as her face and back. She discussed that previous laser procedures had been tolerated well. On examination, Dr. Thompson noted significant hypertrophic scar formation on the face/neck, back, bilateral upper extremities (although becoming smoother to palpation), bilateral hands (smooth to palpation) and bilateral feet. C02 Laser treatment was performed at this time to the face, back, and bilateral upper extremities. Dressings were applied, and recommended to remain in place for one day. Aquaphor was recommended applied if no drainage. Follow-up was recommended with photos in one week.

**Medical Records Reviewed Prior to February 1, 2022:**

PAC Robertson reevaluated Ms. Wadsworth on January 2, 2020 for numbness and tingling in the back. He documented that both Ms. Wadsworth's mother and grandmother had multiple sclerosis. PAC Robertson documented that numbness was reported across the entire back at the level of Ms. Wadsworth's bra, and she could not recall when this had started, "it has been there for a long time." No vision loss was reported. PAC Robertson assessed sensation disturbance of skin. He opined that MS was not likely, but laboratory work was ordered and an MRI of the brain was also requested.

Stephanie Wadsworth
September 5, 2024
Page 20

MRI of the brain was taken on January 6, 2020 due to a family history of multiple sclerosis and reported sensations of tingling/skin sensation disturbance. Very mild nonspecific supratentorial white matter disease was seen. Lesions were assessed as possibly related to a remote white matter injury. It was noted that foci such as this had been described with migraine headaches. No specific imaging features of multiple sclerosis were noted, but demyelinating disease was included in the differential diagnosis.

A chart note by PAC Robertson of June 26, 2020 documented that Ms. Wadsworth reported some depression issues as well as sleep issues. MRI of the brain was reviewed, and PAC Robertson discussed that Ms. Wadsworth reported no symptoms of migraines. He discussed that she was interested in seeing a neurologist. Abnormal thyroid function test and elevated liver enzymes were also diagnosed at this time. Additional laboratory work was ordered.

On November 17, 2020, Dr. Eskelson treated Ms. Wadsworth for a rash on her leg. This was assessed as herpes zoster.

On January 18, 2021, Joel Robertson, PAC evaluated Ms. Wadsworth for a runny nose as well as back and leg pain. He documented difficulty with sitting for prolonged periods of time, bending, lifting, changing positions, and "hurts to sleep at night." Lumbago with sciatica and other chronic pain were assessed. Lumbar spine x-rays were ordered. Hydrocodone-acetaminophen tablets and cyclobenzaprine were prescribed.

MRI of the lumbar spine was taken on January 27, 2021. Severe degenerative changes at L4-5 with a very large paracentral caudally directed disc extrusion were seen. The extruded disc was assessed as contributing to severe spinal canal stenosis with left lateral displacement of all spinal nerve roots. Additionally, severe narrowing of the right lateral recess with significant impingement on both the transiting right L5 and S1 nerve roots was seen. Mild degenerative changes were noted at L5-S1 without significant neurologic impingement.

On February 25, 2021, Alexis Tracy, DO evaluated Ms. Wadsworth for right leg pain. She documented that 3 months prior, Ms. Wadsworth had developed severe low back pain with radiation of pain into the right leg in the right L5 versus S1 distribution. Chronic intermittent low back pain was reported for more than 15 years, but Ms. Wadsworth reported she had never experienced pain this severe. Pain was rated as 9/10 on bad days, with the need to lie down in order to improve symptoms. Associated weakness was reported. Chiropractic care was noted to have been of no benefit. MRI of the lumbar spine was reviewed to demonstrate a very large disc herniation at L4-5, causing severe canal and lateral recess stenosis, right greater than left. Severe nerve root compression was seen, causing persistent right low back and leg pain with associated weakness. A right L5 transforaminal epidural steroid injection was offered, and surgical

Stephanie Wadsworth
September 5, 2024
Page 21

evaluation was also discussed. Gabapentin 300 to 600 mg nightly was prescribed for neuropathic pain. An addendum by Clint Devin MD of February 26, 2021 documented that Ms. Wadsworth was in severe pain and wished to have surgery.

On March 3, 2021, Dr. Eskelson treated Ms. Wadsworth for a urinary tract infection. Acute cystitis without hematuria and dysuria were assessed.

On April 8, 2021, Ms. Wadsworth was taken into the operating room with Clint Devin, MD for right L4-5 microdiscectomy. Dr. Devin discussed that surgery was being performed to treat debilitating back and right leg pain which had failed to improve with conservative measures.

Follow-up occurred with Dr. Devin on May 26, 2021. He reported that Ms. Wadsworth was doing well postoperatively. Some right calf weakness was noted to have remained, though radicular symptoms had dissipated. Strength was assessed as 5/5 for the lower extremity with the exception of the right calf, which was 5 minus/5, with weakness noted on toe walking. Referral was provided for physical therapy on a basis of 2 to 3 times per week for 4 to 6 weeks. No follow-up was recommended unless complications or concerns arose.

Follow-up occurred with Dr. Devin on August 12, 2021. He reviewed that Ms. Wadsworth had done well for approximately 3 months after lumbar decompression. However, an insidious onset of debilitating right leg pain and even some weakness had occurred for approximately 2 to 3 weeks. Numbness was also reported. Dr. Devin documented that this was affecting Ms. Wadsworth's ability to sleep and work. Physical examination was noted to be positive for straight leg raise on the right, 3-4/5 strength in the right tibialis anterior, extensor hallucis longus, and right gastrocsoleus complex. Blunted reflexes were noted at the right ankle. Updated x-rays were recommended. MRI was also ordered given Ms. Wadsworth's strength related issues to assess for a recurrent disc herniation or other area of stenosis. A Medrol Dosepak was dispensed. X-ray of the lumbar spine was then taken on August 12, 2021. Moderate to severe L4-L5 and L5-S1 disk space narrowing was seen. Following review of the updated x-ray, Dr. Devin recommended a right L5 transforaminal epidural steroid injection to help with pain and scarring, along with physical therapy.

MRI of the lumbar spine was then taken on August 25, 2021. Interval right-sided L4 laminotomy with microdiscectomy at L4-L5 with resection of the previously seen large right paracentral and subarticular focal disc extrusion was noted. Residual rim enhancing disc material was seen in the right subarticular space measuring 1 x 1.1 x 1.6 cm compared with 1.7 x 1.6 x 1.7 cm on the previous exam. Significant overall interval decrease in spinal canal stenosis was seen, but there was residual moderate right lateral recess narrowing with mass effect on the transiting right L5 nerve root. Additionally, unchanged degenerative changes were seen at the L5-S1 level.

Stephanie Wadsworth
September 5, 2024
Page 22

On August 31, 2021, Ms. Wadsworth was treated by APRN Kirsch for cough and congestion.

Ms. Wadsworth was seen on September 1, 2021 for cough and congestion by Charles Amy, PAC. Current medications were recorded as gabapentin 300 mg TID and citalopram 40 mg daily.

On September 30, 2021, Tracy Alexis, DO administered a right L5 transforaminal epidural steroid injection under fluoroscopic guidance for treatment of symptoms of radiculopathy.

**BACKGROUND:**

Ms. Wadsworth is married, and has 4 children, aged 6 to 14. She and her family live in Green River, WY, which is approximately two and a half hours east/northeast of Salt Lake City. Ms. Wadsworth testified that they are renting a home owned by her husband's grandmother, which they intend to purchase one day. Per Dr. Snyder's report, she lives in a one-story home with 5 steps to enter. I understand that Ms. Wadsworth's husband is a Production Mechanic for Arm and Hammer and works night shift.

Ms. Wadsworth testified that one of her children suffered burn injuries to her feet in the incident event, but these are now resolved. Ms. Wadsworth is right-hand dominant. Ms. Wadsworth testified that her oldest daughter treated with mental health services after the fire, and was now being seen as needed. Ms. Wadsworth testified that her daughter was engaging in cutting behaviors. Her second oldest son was also treating with mental health services both before and after the fire. Ms. Wadsworth reported that prior to the fire, her son was treating for anger issues and impulsivity problems. At the time of her deposition, he was no longer participating in mental health counseling. Ms. Wadsworth's youngest son also sustained burns to his hand, leg, back, and foot, and these are now healed. She testified that he was hospitalized for approximately three weeks. Her youngest son is undergoing laser treatments for his scarring. Her youngest son also participated in mental health counseling, but was no longer attending counseling at the time of her deposition.

Ms. Wadsworth testified that she was currently participating in laser treatment for her burns at the University of Utah.

> *Q. When you first started the laser treatment, where was that done?*
> *A. Everywhere.*
> *Q. So, basically, on all the areas that you had burn areas?*
> *A. Head, arms, hands, back, legs, not my calves, and feet.*

Stephanie Wadsworth
September 5, 2024
Page 23

Q. Okay. And what's your future outlook for laser treatment?
A. I have three more scheduled.
Q. So that would get you to the eight total that you had referenced before?
A. Yes.

Q. Okay. Any other current treatment that you're undergoing for your burn injuries?
A. Yes.
Q. Sorry, go ahead, what is that?
A. I am seeing a plastic surgeon for calluses on the bottom of my feet.
Q. Is this through the University of Utah as well?
A. No.
Q. Where is this surgeon from?
A. Plastic surgery of Rock Springs.

Q. Have the two plastic surgery events, have they helped?
A. Yes.
Q. Okay. When was your last one?
A. January.
Q. And do you have any future planned?
A. Not right now.

Q. So is it a situation where over time they build up and then it gets to a point where it becomes painful enough that you need to address it?
A. Correct.
Q. Any other ongoing treatment that you have for your burn injuries?
A. No.

Q. Okay. And were you still on antidepressants at the time of the fire?
A. Yes.
Q. Are you still taking antidepressants?
A. No.

Stephanie Wadsworth
September 5, 2024
Page 24

    *Q. Okay. When did you stop taking antidepressants?*
    *A. Last winter-ish.*
    *Q. Okay. Are you currently on any medication?*
    *A. No.*

    *Q. Is there any daily routine for burn or wound care that you still need to do?*
    *A. Lotion.*
    *Q. Okay. Is that a daily process?*
    *A. As often as I possibly can.*
    *Q. Okay. Is it just an over-the-counter lotion or is there a specialized prescription lotion?*
    *A. Just over-the-counter.*

    *Q. Okay. And summer, I assume, is sunscreen and covering up?*
    *A. Lots and lots of sunscreen, yes.*

Ms. Wadsworth was not presently utilizing an elevated adjustable bed, a shower chair, an assistive reacher, a walker, a scooter, scooter backpack, an all-terrain scooter, or portable ramps.

    *Q. Do you have any trouble breathing or any lung issues presently?*
    *A. Presently, no.*
    *Q. How about mental health. Are you undergoing any treatment for that presently?*
    *A. No.*
    *Q. Have you had any mental health treatment after the fire?*
    *A. No.*
    *Q. Do you plan to have any in the future?*
    *A. No.*

    *Q. Okay. How is -- as far as your current physical limitations, what are some of those limitations compared to how you were pre-fire?*
    *A. Mostly it's just the amount of things that I can do for a duration of time.*
    *Q. So basically, you don't have as much endurance as you used to before the fire?*

Stephanie Wadsworth
September 5, 2024
Page 25

A. Yes.

Q. Any specific limitations in what you can physically do as far as activities?

A. Can you ask again, please?

Q. Sure. Are there any activities that you did before the fire that you can no longer do now?

A. No.

Q. Do you have any specific limitations that your doctors have placed on you as far as lifting restrictions or any other type of activity restrictions?

A. No

Q. The issues going on with your feet, do they -- do they give you difficulty in walking?

A. It hurts, yes.

Q. Okay. Do you limit your walking because of that?

A. Absolutely.

Q. Okay. So the -- the burn injury areas are more of an issue for you than the donor site areas?

A. Yes.

Q. Okay. As far as the various locations of your burn injuries, what is the most bothersome to you?

A. My back and my hands.

Q. Back and both hands, bilateral?

A. Yes.

Q. All right. Aside from the University of Utah and Plastic Surgery of Rock Springs, anyone else that you're currently treating with?

A. No.

Q. Anyone else that you have plans to treat with in the future?

A. No

Q. Okay. Do you feel that you need to?

A. Probably.

Q. At some point in the future, are you open to seeking that type of [mental health] treatment?

Stephanie Wadsworth
September 5, 2024
Page 26

> *A. Yes.*

> *Q. Is that something that you feel that you still are reliving every day?*
> *A. Every day.*

Past surgical history included a lumbar spine surgery in April 2021, tubal ligation and wisdom tooth extraction. Medications prior to injury were reported as Celexa 40 mg daily. Ms. Wadsworth also testified that prior to injury, she was smoking approximately one pack per day, and is still smoking at approximately this frequency. She also testified to alcohol use on "most days", and typically drinks liquor.

> *Q. Roughly, how many drinks per day?*
> *A. I don't know.*
> *Q. Okay. More than five?*
> *A. Yes.*
> *Q. More than ten?*
> *A. Maybe.*
> *Q. Okay. And was that consistent with before the fire as well?*
> *A. It's worse now.*
> *Q. Okay. How was it before the fire?*
> *A. It was --*
> *Q. As far as, what was your average daily alcohol intake?*
> *A. Not a lot less than now.*
> *Q. Okay. So somewhere around ten or so?*
> *A. Sure.*
> *Q. Have you ever had any alcohol-related treatment?*
> *A. No.*

Ms. Wadsworth testified that prior to the injury, she was sleeping on a make shift bed set up in the living room due to her back condition.

> *Q. A life-care plan is, basically, a plan or an estimate as to what future medical care or accommodations someone can expect moving forward. You're not aware of any of that having been done for you, at least at this point?*
> *A. No.*

Stephanie Wadsworth
September 5, 2024
Page 27


Pre-injury hobbies included hiking, fishing, camping, and riding horses. Ms. Wadsworth testified that she does not go hunting with her husband like she used to.

> Q. Okay. At the time of this fire, you owned four horses?
> A. Three, I think.
> Q. Okay. How many do you own now?
> A. Five.
>
> Q. And how about with your injuries, are you able to go outside in the sun?
> A. Not for long periods of time.
> Q. Okay. What is that general duration, typically?
> A. Depends on how hot it is.
>
> Q. Okay. I assume the sunnier and the hotter, the worse it would be for you?
> A. Yes, it's painful.
> Q. Yep. So is there also heat sensitivity?
> A. Yes.
> Q. Okay. Do you have cold sensitivity as well?
> A. Not as bad, but yes.
>
> Q. Okay. You also mentioned doing household chores outside. Like, what kinds of things would you assist Matt with outside?
> A. Getting hay, getting firewood, feeding the animals, cleaning. We used to do everything together, everything.
> Q. Okay. I take it that those activities outside are limited for all the same reasons that you just described?
> A. Yes.

**<u>EDUCATION:</u>**

Ms. Wadsworth graduated from Jackson Hole High School in 2005. She completed CNA studies while in high school.

Stephanie Wadsworth
September 5, 2024
Page 28

Ms. Wadsworth testified that she completed her CNA license at the end of her senior year in high school.

She went on to complete approximately one and a half years at Western Wyoming Community College, but did not complete any degree. Ms. Wadsworth studied nursing, social work, and general education.

## OCCUPATIONAL BACKGROUND:

Ms. Wadsworth was not employed outside of the home at the time of injury. I understand that she stopped working after her second child was born.

> *Q. Okay. When were you last employed?*
> *A. Eleven years ago.*
> *Q. Okay. Was that the Albertsons job?*
> *A. Yes.*
> *Q. What did you do for Albertsons?*
> *A. I started as a cashier. And then I went to a front-end supervisor. And then I was their bookkeeper.*
> *Q. And I understand that as -- at least in this case, you're not making any damage claims for lost wages or future lost wages?*
> *A. That would be correct.*

## REPORT OF RONALD SNYDER, MD:

I have reviewed the June 4, 2024 report of Ronald Snyder, MD. He provided a Physiatry home evaluation on April 13, 2023. His diagnoses, discussion, opinions, and recommendations are reviewed below. Additionally, Dr. Snyder provided a life care plan, which I have analyzed in the below Life Care Plan section of my report.

Dr. Snyder diagnosed severe burns involving 30-39% TBSA as well as a grade 3/4 inhalation injury, burns to the oropharynx, airway edema (status-post intubation and mechanical ventilation), thrombocytopenia and anemia (status-post blood transfusions), burn hypermetabolism, bilateral corneal abrasions, thermal corneal injury to the left eye, dysphonia with vocal fold edema, dysphagia and posterior glottic stenosis.

Stephanie Wadsworth
September 5, 2024
Page 29

Dr. Snyder reported that Ms. Wadsworth now had hypertrophic scarring, burn scarring: alopecia, neuropathic pain, pruritus, fragile skin of the hand, foot callous, feet pain, posterior glottic stenosis, suspected PTSD (though PTSD is not documented in any of the medical records I have reviewed), suspected depression aggravation (also not documented in any of the medical records I have reviewed), suspected cognitive sequelae (not documented in any of the medical records by Ms. Wadsworth's treaters after delirium resolved during her hospital stay), and impaired mobility and ADLs due to physical losses.

Dr. Snyder reported that Ms. Wadsworth continued to follow-up with a burn specialist, and had received several laser treatments. He documented that she did not feel laser treatments have been beneficial for her hands or feet so far. Dr. Snyder reported that Ms. Wadsworth had developed several painful calluses on her feet, and reported severe pain when putting weight in her feet. He reported that she did not tolerate the sun and had significant skin itching. Dr. Snyder further reported that Ms. Wadsworth easily scraped her skin, and the skin on her hand was very thin and bled easily. Fingers and hands were described as, "shaky/wonky" with activities such as laundry and cleaning and trying to reach behind the back. He stated that cosmesis regarding the face ears, and her hair had not been addressed or discussed. Continued aches and loss of range of motion were reported. Dr. Snyder documented that Ms. Wadsworth had initiated physical therapy, but stopped this treatment as her therapist did not have much experience with burn victims. Memory was reported to be worse after the injury. Hypervigilance and difficulty sleeping was reported. Dr. Snyder documented that Ms. Wadsworth's children and husband were emotionally affected.

**The August 14, 2024 Deposition of Ronald E. Snyder, MD:**

Dr. Snyder testified that he took life care planning classes through the Institute of Rehab Education and Training, and obtained no certification associated with Life Care Planning.

He confirmed that he reached out to Dr. LaChapelle, however has not received a received a response, nor has he consulted with any other treating physicians.

> *Q.   And is that the -- I saw a questionnaire that went to a Dr. LeChapelle….*
> *A: We did send a check and a letter out to him.  We did not get anything back.  He did not cash the check. Our office did reach out to him yesterday or his staff.  And they said, Oh, yes, that's sitting on his desk.  So I may get that report sent to me somewhere along the line, but I do not have it in my files.  It's not been  sent to me as of today.*

Stephanie Wadsworth
September 5, 2024
Page 30

>    Q.    And this would have been sent on June 6, 2024, as you noted, via certified mail and  through the certified mail process....
>    A.    Correct.
>
>    Q. Have you spoken with any of Stephanie Wadsworth's treating physicians?
>    A.    I have not.  After I saw the patient, I had some discussions with plaintiffs' counsel, as far as needing to get some additional  clarification, because I'm not a plastic surgeon.  And in order for me to put particular procedures in, it would be inappropriate for me to add those procedures. And you'll see in my life care plan, I have a list of procedures that I presume the patient is going to be needing, but I could not  put in because that's outside of my wheelhouse.
>
>    Q.    Is it your understanding that Dr. LeChapelle is the primary doctor that is organizing her care, so to speak?
>    A.    That's what I understand.

Dr. Snyder testified, "they tried to get physical therapy locally and the physical therapist had never done burn therapy, so she's limited where she lives."

He further testified he had a non-professional present the life time costs.

>    Dr. Snyder testified, "I have a young high school graduate who is very good at Excel reports, who I try to protect, because I don't  want her having to testify.  So I put in red, "This spreadsheet of Lifetime Costs is provided  as a Professional Courtesy."
>
>    Q.    When you say you can't testify to the veracity of the numbers, what do you mean by that?
>    A.    That's what I mean.  This is work product.  A young high school girl does it for me.  I don't know how to do the equations and so forth.  So this is, basically, to provide to the  attorneys on the side.
>
>    Q.    So as far as the numbers that are listed here, understanding you have a high school grad employee or 1099 consultant help you out with this, you don't do anything to verify that these numbers are indeed correct?
>    A.    That is correct.  It's, basically, to give them a general idea of the value of the  case.

Stephanie Wadsworth
September 5, 2024
Page 31

Q.    And then I presume the lifetime total of $3.698 million and some change, have you  verified whether that total is correct?
A. No.  Basically, this is something I give to the attorneys, so that they can end up getting an idea of what they ultimately send to an economist.

Q.    Okay. So you would ultimately rely on an economist to provide the final life care plan figures that would be claimed as damages in this case?
A.    That's correct.

Q.    Are you aware of any economist that has done the calculations relative to your life care plan in this case?
A.    I am not.

He testified, "And the vision, she knew she had problems with corneal burns and that she was having some blurred visions, so she ended up seeking medical treatment.  It sounds like they just found regular vision problems, a stigma and so forth,"

Q.    So you think that the vision  treatment with Desert View Eye Care is related to the burn injuries?
A.    No, but she sought evaluation because of the potential.  But what the diagnosis was was the usual optometric problems of growing older.

He testified, "I told her she needs to move to Utah. And she's not been able to get a lot of treatments.  From what my understanding is, it's basically because of the travel and the time off from work and so forth.  So she's missing a lot  of the treatments.

Q.    Right. So as you sit here today, you, number one, don't know the frequency of laser therapy treatment that she'll need going forward,  correct?
A.    Correct.
Q.    And you don't know the duration, meaning how many years into the future or how often she'll need the laser therapy treatment, correct?
A.    Correct.
Q.    And you don't have the cost of the laser therapy treatment, correct?
A.    Correct.

Stephanie Wadsworth
September 5, 2024
Page 32

*Q.   And as far as the injections that she is getting or has received, do you know what those injections are and where they are located?*

*A.   I don't.  It sounded like they may have been PRP.  It sounded like it may have been the stem cell stuff.  It also sounded like maybe some steroids which are often injected, but I  don't know what their plans are.*

*Q.    Okay. So similar questions with respect to  the injections, as you sit here today, you do not know the frequency in which she may need those going forward, correct?*

*A.   That's correct.*

*Q.   And you don't know the duration in which she may need those going forward, correct?*

*A.   Correct.  That's outside of my wheelhouse of experience and training and background.*

With regard to pre-existing conditions, Dr. Snyder testified:

*Q.   And do you know if Mrs. Wadsworth had  sleep issues prior to the fire?*

*A.    I believe I asked her question, but I'm trying to remember herself.  She did have some problems with depression minimally at one time in her life.  But she described, I believe, the sleep is definitely a new thing, from what I recollect.*

*Q.    Do you know whether she was sleeping on a small foam mattress in the living room prior to the fire due to sleep issues that she was having?  Are you aware of that at all?*

*A.   No.*

*Q.   And what is your understanding of her alcohol use?*

*A.   She drinks two to three drinks of hard liquor at night, and it's what helps her  sleep.*

*Q.    Where did you get the number of two to three alcoholic drinks per night?*

*A.   That's what I'm trying to remember. It's two to three a night.  It was more than is healthy.*

*Q.   The number two to three alcoholic drinks is not anywhere in your report.  So where is it?*

*A.   I'm trying to remember.*

*Q.   And are you aware that she testified that she had upwards of 10 or more drinks at night?*

*A.   Wow.  No.  That's a lot.*

Stephanie Wadsworth
September 5, 2024
Page 33

Q. *Are you aware that she was a heavy drinker even prior to the fire?*
A. *I was.*

Q. *So you don't recall seeing in her medical records that she was given some specific medication to address alcohol withdraw?*
A. *I don't remember that at this point*

Q. *Okay. Do you know where the pigmentation issue affected her prior to the fire?*
A. *I do not.*

Q. *Do you know when she would have started taking Celexa?*
A. *No, I don't.*

Q. *And it looks like the only current medication she is on is the Resta Lite lotion; is that correct?*
A. *Yes. She'll either use that. Or if she doesn't have the money to buy that, she'll just use lots of regular Vaseline.*

Q. *At this point is she taking any other medications currently?*
A. *She's not. She is, basically, self-medicating to sleep with alcohol, rather than using prescriptive meds.*

Q. *And the cigarette use obviously with it being 20 years at about a pack a day certainly predated the fire, correct?*
A. *Correct.*
Q. *And it's still ongoing today?*
A. *Correct*

With regard to Activities of Daily Living, Dr. Snyder testified:

Q. *Going to page 18, and on this page, you get into the Activities of Daily Living Checklist. And it looks like this is likely taken basically from her ADL questionnaire?*
A. *Correct. This is a lady who says Don't tell me I can't do it, I can show you I can. And so she does everything. And she leaves a trail of blood behind. She talks about when she does the laundry, her hands bleed. When she cooks, her hands*

Stephanie Wadsworth
September 5, 2024
Page 34

*bleed. So she, basically, does everything, but then has skin breakdown when she does some of the things.  But she, basically, is pretty activity and really tries not to let this  discourage her from being a day-to-day functioning person.*

*Q.    Does she wear any protective gloves when she does her ADLs?*
*A.    No.*

*Q.    So at least by Mrs. Wadsworth's self-reporting, she says that she does not need help with her ADLs, correct?*
*A.    She doesn't say she doesn't need help.  She says, I'm doing it myself…she had never thought about getting  help.*

*Q.    And just so it's clear on the Activities of Daily Living Questionnaire, which is Questionnaire 2 of 3, when you ask questions*
*such as, "Do you need help grocery shopping?" "Do you need help with home maintenance?"  On all of those she checked no, correct?*
*A.    Correct, correct.*

*Q.    If you could go to page 27, there's a reference to a neurologic examination that was provided. Who provided that examination?*
*A.    I did.*

Dr. Snyder testified regarding the neurological examination:

*Q.    Now, with respect to the neurological examination, you are performing this from the view of a physiatrist, as opposed to a neurologist, correct?*
*A.    Correct, correct.*
*Q.    And I think you certainly agree that you're not a neurologist, correct?*
*A.    Correct, but we do neurologic examinations as often as neurologists does on a daily basis in our offices and in a hospital.*
*Q.    Are you offering any specific neurological opinions in this case?*
*A.    No.  The only thing I found was some sensory abnormalities.  And she had decreased sensation in the foot which corresponded to a prior lumbar surgery, so we did find that… there's altered sensation, which we would anticipate because the burns are in the area where sensation organs are for the skin.*

Stephanie Wadsworth
September 5, 2024
Page 35

> Q.  Okay. And it sounds like, for the most part, there's a decreased sensation in most if not all of those areas?
> A.  Correct.  It made sense because those are 3rd degrees.

With regard to the costing resource, Dr. Snyder testified:

> Q.  And it looks like, in your life care plan, you utilized the 75th percentile?
> A.  Correct, and that's part of the standard methodology.
>
> Q.   And you indicated that there's some studies or literature that supports using the 75th percentile over the 50th percentile. What are those?
> A.  Yeah.  That came out probably five, seven years ago in some arguments.  And then there's still some -- there's certainly - defense like to use 50 percent.  They like using 25th percentile. From understanding all the training and education and background, the methodology nationally for care life planners is the 75th percentile.
>
> Q.  As far as the specific studies or literature that supports the 75th percentile, as you sit here today, are you able to name any of them?
> A.  No.  But it's the standard, that, if you take a course in life care planning, it's  the 75th percentile.
>
> Q.  Okay. For the "Work Expectation" section, are you aware that there is no vocational loss claim in this case?
> A.  I'm aware of it.
>
> Q.  All right. And you are not offering any opinions on any future loss of earning capacity issues, right?
> A.  No.  I don't do loss of earning capacity.  I may be asked physical capacity to  work, but I have not been asked to do that.
>
> Q.   And then looking at the future needs section, which is on the bottom of page 41, you have three items listed that you basically are using to support your life care plan, and that's the review of medical records, the history obtained and the physical examination, correct?
>  A.   Correct, correct.

Stephanie Wadsworth
September 5, 2024
Page 36

Q.    And those are the only three items that you're using to support your life care plan, outside of the pricing indexes and stuff like that that you've used?
A.    Correct.  It's, basically, my background, training and experience.

Q.    But at least with respect to her smoking and alcohol use, that is not something that is healthy, correct?
A.    That's correct, absolutely.  And that's why I had a long time talking with her. From my understanding, she has not had any programming for alcoholism.  She has not had any programs to formally stop smoking.  So I did  encourage her to do that.

Q.    And you agree that her smoking and alcohol use predated the fire accident, correct?
A.    Yes, that's correct

Q.    Okay. And you have not talked to Dr. LeChapelle as to whether he specifically agrees with the "Burn Surgery at Burn Center," "Plastic Surgery," "Hair Transplantation," that type of stuff, correct?
A.    Correct.

Q.    For the "FREQUENCY" under the "Removal/Excision of Benign Feet Lesions," where did you get that frequency?
A.    That's kind of what's been happening  to her now and needed to come, and they grow back very quickly.
Q.    And you don't know if there's any way to permanently remove those lesions at this point, correct?
A.    And, again, and if I could have a plastic surgeon opine, I would certainly defer  to the plastic surgeon on that.

Q.    Okay. With respect to the "Semi-Permanent Tattoo for Her Right Eyelid," is that something that Mrs. Wadsworth has expressed an interest in getting?
 A.    We talked about it.  She's embarrassed.  And so I did do the pricing and found that it doesn't last forever, and so we've got that as a potential charge.  And, again, I would probably ask a plastic surgeon their opinion.  Maybe do a permanent one.  I don't know what's out there. I'm not a cosmetic person, and so I would probably defer, again, for a plastic surgeon for his or her opinion on that.
Q.    Okay. And that was going to be my next question, is there a permanent option in that regard, understanding that tattoos can certainly be permanent in nature?
A.    Yes

Stephanie Wadsworth
September 5, 2024
Page 37

Q.    So with respect to the $34,000 lifetime cost, it sounds like that you may need a little more guidance from a plastic surgeon to really finalize that line item?
A.   I agree.

Q.   And then you have ER visits of one time every five years. What's the basis for that?
A.   The basis is, basically, cellulitis. Her skin breaks down.  She gets infected

Q.   Has she had any other cellulitis  episodes other than that one time on her earlobe?
A.   No, but we're under five years for that, and we're talking about the next 44 years.
Q.   Did her cellulitis on her earlobe necessitate an ER visit?
A.   I don't remember,

Q.   And cellulitis, in and of itself, is not any emergency medical condition, correct?
A.   Correct.
Q.   It can be treated at a typical doctor's office?
A.   They can, but often, patients go to  urgent care centers when there's bleeding and  infection.

Q.   Has Mrs. Wadsworth gone to urgent care –
A.   I don't know --
Q.    -- for her cellulitis?

A: I did relate to her some of the medications I thought would be appropriate that she should be on.  And I felt that if she was on appropriate medications, she would not be utilizing alcohol.
Q.   And do you know if she has made any efforts to discuss these medications with her treating physicians?
A.   I do not.

Q.   Are there any other locations besides Walmart where she uses a scooter, that you're aware of presently?
A.   I don't know…She's okay walking at the house short distances and then she sits down.  But any length of distance, you can just imagine walking on those feet, she hurts.

Stephanie Wadsworth
September 5, 2024
Page 38

He testified, *"It's fascinating, it's the biggest limitation that I see is basically the feet with standing and walking, and the bleeding hands. Those are the two basic things that pretty much changed and have changed her quality of life."*

> *Q.   So if her lesions are able to be addressed medically, then she likely would not need a scooter, correct?*
> *A.    That's probably -- if they could probably stop growing those horns on the and she had a normal life, yeah...And I would be happy to remove them, if it's not necessary.*

> *Q.   And you have not seen anywhere in her medical records where there was a suggestion that she obtain a scooter?*
> *A.   No.  Nobody has addressed that.*

> *Q.   If you could go to page 69, we're still under the same section here, so the "Adjustable Bed with Elevating Head." What is the purpose of that?*
> *A.   She has a hard time getting out of bed.  I don't know whether it's the burns on the back with scooting or whatever, but I remember*
> *saying to her, well, how about, do you need an elevated headrest?  She said yes...It was not related to sleeping. It was more care of her legs and feet and so forth.*

Dr. Snyder testified, *"I felt at age 50, we need to give her something that's a little bit more supportive than walking on her own to offload the feet."*

> *Q.   In her medical records, you haven't seen any discussion or suggestion about a walker, correct?*
> *A.   Correct.*

> *Q.   What type of vehicle does she drive presently?*
> *A.   I think she's got a truck.*
> *Q.   Does she have any complaints about using the truck?*
> *A.    No, but we're talking about what do we do so she can go places, to put her scooter, and, particularly, an all terrain scooter when she went places...Does it normally come out of what normal people buy; I don't know.  But from a practical perspective, she's going to need a van to be able to use that  scooter to go places.*

> *Q.   And with respect to the van items, is that only required in your mind due to the all  terrain scooter?*

Stephanie Wadsworth
September 5, 2024
Page 39

A.   Yes.  And, actually, taking the other scooters, too, to, perhaps, church or other places, but the all terrain, the basic reason is so she can go out and about for either of the two scooters.

Q.   And do you know how often the Wadsworths typically replace their vehicles?
A.   I don't. The normal replacement, most people replace it in seven years.  The problem is the mechanics, the hydraulics don't last more than about five years.  So standard, we replace anything that requires hydraulics in five years because of the possibility of being stranded with a ramp left out and you can't get it in or being able to shut the doors and so forth.  So the standard is we replace it every five years for vans, if there are hydraulics involved.

Q.   Wouldn't you only need to replace the actual hydraulics, then, not the van?
A.   You could do that, but then the cost of doing that is equal to the value of the van, so, no, they're just traded out.

Q.   For the - and this is, obviously, a small ticket number - AAA membership, what's the purpose of that?
A.   If you have somebody who can't walk distances or can't stand, particularly, on the hot pavement out in Wyoming, they don't do well if you're not dealing with the right people to come in and help them.  So any time we have a van and potential mobility issues, we always put in AAA.
Q.   Do you know if they're AAA members already?
A.   I do not

Q.   But you tie the home modifications to the use of the walker?
A.   Around 50 years of age, the aging  process and pain and so forth

Q.   Okay. And then there's a home security monitoring that's provided as a line item here as well. Is that like an ADT type thing that you're thinking of?
A.   Yes.  Any of my patients that have mobility issues, there's always a concern of home intruders.

Q.   Do you know if they have home security presently?
A.   I don't.

Q.   All of the items that the personal care attendant would help with, she is presently doing, correct?
A.   Correct.

Stephanie Wadsworth
September 5, 2024
Page 40

*Q.    And she's presently doing them to the extent that, on your questionnaire, she said she does not need help with them, correct?*
*A.    Correct.*

*Q.    Do you know what home maintenance she was doing prior to the fire?*
*A.    No.*

*Q.    So in order for the "Home Maintenance" line item to be valid, there's an assumption that she's going to get a divorce from Matthew?*
*A.    Well, when we work around more probable than not.  So if we talk about a disabled person, there's a very high probability, it's more than 50 percent, that  they're going to be single in their life*

*Q.    So if Mr. or Mrs. Wadsworth stay married, you would agree the home maintenance aspect of your life care plan would not be  necessary?*
*A.    That's correct.*

*Q.    Okay. With respect to page 74, you have two line items, "Phoenix World Burn Congress Registration" and then the "Burn Support Group at Salt Lake City Burn Center." Do you see that?*
*A.    Yes.*
*Q.    Has Mrs. Wadsworth expressed an interest in attending any of those?*
*A.    She did not know anything about them.*

*Q.    Is there any reference in any of Mrs. Wadsworth's medical records from any of her treaters recommending or suggesting either burn support groups or going to the World Burn Congress?*
*A.    I don't see that they have.*

*Q.    And it looks like for your travel expenses, you are, basically, assuming a two-night stay every time she goes to Salt Lake?*
*A.    Yeah, but when she goes there, the problem there, by the time she takes off, drives there and then she has an office visit, and she has to wait, and then multiple experts will see her, and then it's too late to go home.  So we're giving her two nights*

*because she's exhausted when she goes. So when I talked about that, I suggested that we ought to talk about two days. Oh, that would be so wonderful.*

*Q.   So, presently, when they go, do they do it in one day with no hotels?*
*A.   Yes*

*Q.   And what additional experts did you request?*
*A.   The plastic surgery discussion in the future; perhaps ophthalmology for the corneal abrasions, and ear, nose and throat for the tracheal burns.*
*Q.   So ENT, ophthalmology and plastic surgery?*
*A.   Plastic surgery/burn therapies.*

*Q.   Okay. And in your mind, there is additional work on your end to be done on those three items where you don't have any duration, frequency or costs associated?*
*A.   Correct.*

In regard to his life care plan, Dr. Snyder testified, *"it's a very anemic and will have to stand by itself, if that's what happens. It would not cover what she may need in the future."* in regard to the scenario in which no other physicians opine on Ms. Wadsworth's future care needs.

*Q.   And so in what you do in putting together your recommendations for purposes of a life care plan, you speak with, to the extent they are available, to the extent it's necessary, or with regards to any special limitations you might have, but do you speak with treaters, specialists to try to gain an understanding, in addition to all of the other work, review and research you perform; is that fair?*
*A.   Yes. The majority of the time I find speaking is very difficult, so that's why we send the questionnaires.*

*Q.   Is it fair to say that, when those depositions are taken and when the deposition transcripts come in, that's something that you would want to review and look at to assist you with any additions, changes or modifications to your plan?*
*A.   Yes.*

Stephanie Wadsworth
September 5, 2024
Page 42

> Q.    And, specifically, with regards to these plastic surgeons, to the therapists, even to the podiatrists, those are depositions that you would like to review, in addition to speak with those treaters, if they allow it?
> A.    That's correct.

Dr. Snyder testified, "*I mean, this case demonstrates why I just need to reach out to certain other treaters and certainly not handle the decisions on my own.*"

> Q.    And so do you feel that you have a need to review her deposition transcript in order for your life care plan to be complete?
> A.    No, I don't need her deposition. I need treating physician depositions, but I don't need hers for my perspective.

> Q.    There's been a suggestion that the number that's set forth in the life care plan of the three -- let me just make sure I get it completely -- the 3.698 million and change that in some way, shape or form, it's inaccurate, it's speculative, it's unreliable. Can you describe for the jury that might read this deposition transcript as to what that number reflects, as best as you can recount?
> A.    Well, that number reflects, I have a young lady who takes my life care plan, which I stand by, and simply now converts it into a number that an attorney who hires me wants to understand what the potential value is.. I do not do the numbers myself. I do not do it line by line…in the far right-hand corner, it's either the yearly or lifetime costs.  That I can stand by.

Dr Snyder testified, "*It was my impression, my feeling she was going to need to see those physicians for routine monitoring for the rest of her life, but I do not know the specific types of treatment, procedures and the costs that they would recommend.*"

> Q.    And is it fair to say that one of the additional areas that you would consider looking into in speaking with a treater is in either psychiatry, psychology or mental health?
> A.    I think that's appropriate, yes.
> Q.    And so by way of example, there's a deposition to take place in a couple of weeks of a mental health therapist that Mrs. Wadsworth has been seeing and treating with. Is that a deposition transcript that you would like to review?
> A.    Yes, sir.

> Q.    And even though Mr. Wadsworth and Mrs. Wadsworth love each other, as you probably were told when you met with her, you still look at and rely upon your experience as to the numbers and the statistics?

Stephanie Wadsworth
September 5, 2024
Page 43

    *A.   The more probable than not is appropriate to use.*

    *Q.   So by that statistic, every single life care plan that you author presumes that they're going to get divorced; isn't that correct?*
    *A.   I have to, yes.  That's life.  That's life.*

### August 5, 2024 deposition of Giavonni Lewis, MD:

On August 5, 2024 Giavonni Lewis, MD was deposed. As a past care provider of Ms. Wadsworth he confirmed as such, however was unable to provide prognosis, treatment recommendations and permanent limitations associated with the injuries sustained. There were no recommendations for current and future care and services to be included in the life care plan below.

### August 12, 2024 deposition of Michael Nelson, PT:

On August 12, 2024 Michael Nelson, PT was deposed. As a past care provider of Ms. Wadsworth he confirmed as such, however was unable to provide prognosis, treatment recommendations and permanent limitations associated with the injuries sustained. There were no recommendations for current and future care and services to be included in the life care plan below.

### August 27, 2024 deposition of Scott  Sulentich, MD:

On August 27, 2024 Scott  Sulentich, MD was deposed. As a past care provider of Ms. Wadsworth he confirmed as such, however was unable to provide prognosis, treatment recommendations and permanent limitations associated with the injuries sustained. Dr.  Sulentich was to evaluate Ms. Wadsworth this same day, however at the time of his deposition, current and future care and services were unknown.

### August 28, 2024 deposition of Malinda Tollefson:

On August 28, 2024 Malinda Tollefson was deposed. As a past care provider of Ms. Wadsworth's children, she confirmed as such, and confirmed she has not treated Ms. Wadsworth. There were no recommendations for current and future care and services for Ms. Wadsworth to be included in the life care plan below.

Stephanie Wadsworth
September 5, 2024
Page 44

## LIFE CARE PLAN:

Life Care Planning is a longstanding tool of Case Management used to coordinate current and future medical and rehabilitation needs for people who experience a serious injury or illness. A Life Care Plan is a dynamic document based upon published standards of practice, comprehensive assessment, data analysis, and research which provides an organized, concise plan for current and future needs with associated costs, for individuals who have experienced catastrophic injury or have chronic health care needs.

Per the Life Care Planning Standards of Practice [1] and the Majority and Consensus statements derived from Life Care Planning Summits since 2000 [2], the associated costs noted in the Life Care Plan can be derived from a combination of costs gathered from day-to-day clinical practice, including but not limited to: Costs obtained from actual provider bills; and/or a survey of costs from geographically appropriate providers; and/or conservative estimations obtained from resources routinely relied upon within the sub-specialty practice of Life Care Planning. The cost for each item represents a base cost for geographically appropriate resources that are routinely and reliably available, now and in the future. Sales taxes, shipping, handling, and installation fees are not included, unless otherwise specified. All costs should reflect the usual and ordinary charge for each item (the average cost) within a specific geographic area.

## General Analysis of Dr. Snyder's Life Care Plan:

Dr. Snyder reports that he used the following sources for information regarding the costs provided in his life care plan: American Hospital Directory; PMIC Medical Fees (2024); Context4 Healthcare Database (2024); VA Reasonable Data Charges and Real Estate Values. I am unclear how this last source would be utilized to have identified any cost laid out in Dr. Snyder's life care plan. Specifically, Dr. Snyder reported utilizing PMIC Medical Fees for physician office costs nationally and regionally, and combined these with actual charges from providers Ms. Wadsworth had either already been receiving services from, or from local providers in her geographic region. In most cases, this resulted in a higher cost estimate than what was obtained by Dr. Snyder through local/actual providers, or as is evidenced by medical

---

[1] 4th Edition published by the Life Care Planning Section of the International Association of Rehabilitation Professionals, (2022), Journal of Life Care Planning, Vol. 20, No. 3, pp 7-23.

[2] Johnson, C., Pomeranz, J. and Stetten, N., 2019 Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010, 2012, 2015 and 2017 and updated via Delphi study in 2018, , Journal of Life Care Planning, 16(4), pp. 15- 19, Athens, GA: Elliott & Fitzpatrick, Inc.; Johnson, C. (2015) Consensus and Majority Statements Derived from Life Care Planning Summits Held in 2000, 2002, 2004, 2006, 2008, 2010, 2012 and 2015, Journal of Life Care Planning, Vol. 13, No. 4, 35-38. Athens, GA: Elliott & Fitzpatrick, Inc.; Johnson, C. & Preston, K., Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010 and 2012, Journal of Life Care Planning, Vol. 11, No.2, 9-14. Athens, GA: Elliott & Fitzpatrick, Inc.

Stephanie Wadsworth
September 5, 2024
Page 45

billing received from Ms. Wadsworth's actual providers. This does not comport with Standards of Practice or Majority and Consensus Statements derived from Life Care Planning Summits since 2000.

With regard to the other sources Dr. Snyder utilized to obtain costs for the life care plan, it should be noted that such resources do not provide verifiable data from appropriately referenced sources, and do not reflect the charges of Ms. Wadsworth's actual providers. It is not clear why Dr. Snyder arbitrarily chose to rely upon the 75th percentile for data reported from PMIC Medical Fees. Contrary to his deposition, this is not generally accepted, peer reviewed or published in the subspecialty practice of Life Care Planning.

It is noted that Dr. Snyder opines that Ms. Wadsworth is having memory problems. He recommends significant additional evaluations and services related to his assessment of this, including neuropsychological testing and follow-up, speech language and occupational therapy for cognitive therapy, brain injury education and group therapy. There is no evidence in the medical records that Ms. Wadsworth has, or complains of, cognitive deficits. There is no evidence that a mild traumatic brain injury has ever been diagnosed by any of Ms. Wadsworth's medical providers. Medical records do indicate that Ms. Wadsworth experienced delirium while in the hospital, but reported that this resolved when she was supplemented with thiamine, which was provided related to her alcohol abuse.

Dr. Snyder does not appear to address Ms. Wadsworth's pre-existing and continued alcohol abuse, for which she has not participated in any treatment, despite recommendations of University of Utah providers. He does not appear to acknowledge the impact of Ms. Wadsworth's history of depression and substance use, or her lumbar spine condition, or the pre-existing sequelae of these conditions. While he listed the pre-existing conditions in his report, it is clear that he did not take these conditions into account when making recommendations in her Life Care Plan. Further, he confirmed the same in his deposition.

Further, medical records indicate additional impairments pre-injury:

On January 18, 2021, PAC Robertson documented that Ms. Wadsworth was having difficulty with sitting for prolonged periods of time, bending, lifting, changing positions, and "hurts to sleep at night" with respect to her low back condition. Records relate that Ms. Wadsworth underwent surgical intervention for this condition, but had recurrence of symptoms post-surgery, and was being continuing in treatment for her low back at the time of her burn injuries. As of August 12, 2021, Dr. Devin documented that Ms. Wadsworth had had an insidious onset of debilitating right leg pain and even some weakness with numbness reporting. Dr. Devin noted that Ms. Wadsworth's ability to sleep and work was affected.

Given Ms. Wadsworth's testimony, these low back issues, sleep issues, and substance use issues had not abated before February 1, 2022:

Stephanie Wadsworth
September 5, 2024
Page 46

> *Q. Okay. What time did you go to bed the night before the fire?*
> *A. About 2:00 a.m.*
> *Q. And you were -- I understand you were sleeping in the living room?*
> *A. That night I was, yes.*
> *Q. Okay. And was that because of your back issues?*
> *A. My back and I had an easier time waking up with Kamille...*
>
> *Q. Okay. And at that time -- so Kamille would have been in middle school in 2022?*
> *A. Yes.*
> *Q. What time would she have gotten on the bus?*
> *A. 6:15...*
>
> *Q. All right. And is your bedtime typically around 2:00 a.m.?*
> *A. Yes.*
> *Q. And do you typically have a cigarette before you go to bed?*
> *A. Yes...*
> *Q. Okay. And did you have any alcohol the night of January 31st?*
> *A. Yes.*
> *Q. Okay. Do you know how much you had that evening?*
> *A. No.*
> *Q. Would it have been a typical day for alcohol consumption for you?*
> *A. Yes.*
> *Q. As far as when you would consume alcohol, is it more at night or is it throughout the day?*
> *A. More at night.*

Furthermore, while Dr. Snyder provides further explanation of what many of the items in his life care plan refer to, he does not specifically explain how each provider/item relates to Ms. Wadsworth's needs, and what the purpose of the item is related to Ms. Wadsworth's unique, individual, and specific conditions is. For example, Dr. Snyder states, "Podiatrists are medical specialists who help with problems that affect feet and lower legs. They can treat injuries as well as complications from ongoing health issues." He does not explain why podiatry is medically necessary for Ms. Wadsworth when she has neither seen a podiatrist in the past, or is stated by her medical providers to

Stephanie Wadsworth
September 5, 2024
Page 47

require podiatry in the future. In other words, stating the role and function of a podiatrist does not provide medical foundation for inclusion of this item in Ms. Wadsworth's life care plan.

I note that as of the most recently reviewed chart note from Dr. LaChapelle of January 17, 2024, pain was reported as 0/10, and Dr. LaChapelle documented "no limitations in functional activity, just more challenging related to tightness."

Both Ms. Wadsworth and her providers report no significant limitations in regard to her functional activities. In their depositions, none of Ms. Wadsworth past treatment providers provide definitive information regarding prognosis, treatment recommendations and permanent limitations associated with the injuries sustained. There were no recommendations for current and future care and services to be included in the life care plan below. However, Dr. Snyder recommends a level of need that would be appropriate for a person with significant physical disabilities and ambulation challenges.

The Life Care Plan presented by Dr. Snyder has been reviewed and analyzed in the context of Ms. Wadsworth's medical records, pre and post injury, her deposition and the other available records for review. Additional comments regarding the accuracy of costs provided by Dr. Snyder are discussed in respect to the individual items below:

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Burn Surgery | Six times annually for 5 years, then annually | Current Age to Life Expectancy | $747.54 per visit | Dr. Snyder includes the cost of mileage and a 2 night hotel stay for these visits, despite not being utilized by Ms. Wadsworth. Medical records demonstrate that Ms. Wadsworth participates in telehealth appointments. Snyder cost is excessive[3] and he deferred in his deposition to the specialists frequency and duration. | Burn Surgery follow-up annually is reasonable[4] $242.61 per established patient office visit. |

[3] University of Utah Charges are $242.61 per established patient office visit.
[4] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

Stephanie Wadsworth
September 5, 2024
Page 48

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Plastic Surgeon | Four times annually | Current Age to Life Expectancy | $202.12 per visit | Cost is excessive[5]. *On 2/27/24 she testified that she had no plans to return to plastic surgery.* Dr. Snyder deferred to Ms. Wadsworth's treating provider as to the appropriate duration and frequency of this treatment. Dr. Sulentich could not estimate whether she would have needed any specific number of treatments in the future, and would be dependent on her pain level and desire to continue future treatments. | Plastic Surgery follow-up annually is reasonable[6] $202.12 per established patient office visit. |
| Hair Transplantation | Six times annually | Next 2 Years | $698.54 per visit | Dr. Snyder includes the cost of mileage and a 2 night hotel stay for these visits. Cost is excessive. I have reviewed no records planning for this procedure, or stating that it is appropriate for Ms. Wadsworth. No justification is provided for recommended frequency of visits. No medical foundation for this procedure. No records demonstrate that Ms. Wadsworth will benefit from such a procedure on a more probable than not basis. | Remove from life care plan. |
| Physiatry | Annually | Current Age to Life Expectancy | $252.12 per visit | Dr. Snyder reports that "physiatrists modulate and organize any rehabilitation programs", including PT/OT, and pain management. Medical records demonstrate that the burn team at the University of Utah are performing these roles. Overlaps role of Burn Specialist. Not medically justified over and above follow-up in the burn clinic. | Physiatry follow-up annually is reasonable[7] $252.12 per established patient office visit. |

[5] Per Dr. Sulentich's billing, an established patient office visit (99213) is charged at $150.00.
[6] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.
[7] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

Stephanie Wadsworth
September 5, 2024
Page 49

Stephanie Wadsworth
September 5, 2024
Page 50

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| ENT | Annually | Current Age to Life Expectancy | $220.87 per visit | No evidence for the need of ongoing ENT services. *Ms. Wadsworth was last seen by Dr. Schiffer on 8/2/2022, at which time Dr. Schiffer rated Ms. Wadsworth as stable, with her voice at 90% normal. Follow-up was recommended PRN at that time.* Not medically justified ongoing annually through LE. PRN only per Dr. Schiffer 8/2/2022. Dr. Snyder deferred to Ms. Wadsworth's treating provider as to the appropriate duration and frequency of this treatment. University of Utah Charges are $242.61 average per established patient office visit. | ENT follow-up annually is reasonable[8] $220.87 per established patient office visit. |
| Ophthalmology | Annually | Current Age to Life Expectancy | $252.12 per visit | No evidence of the need for ongoing Ophthalmology services. *On 3/2/22 Dr. Patel documented "eyes are fine, she has no concerns or vision changes." Ophthalmological diagnoses were all assessed as resolved by Dr. Patel at that time.* Records indicate that Ms. Wadsworth has since been seen by optometry for myopia and astigmatism, but these conditions are unrelated to burn injuries. No medical foundation for this recommendation. Ophthalmology diagnoses were resolved prior to U of U discharge. | Remove from life care plan. |

---

[8] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

Stephanie Wadsworth
September 5, 2024
Page 51

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Internal Medicine | Annually | Current Age to Life Expectancy | $239.62 per visit | Not clear why this would be needed above and beyond pre-injury needs. *On 3/28/2022, Dr. Fleming recommended follow-up with primary care for ongoing management of other health issues and health maintenance.* No medical foundation for this recommendation above and beyond pre-injury needs. | Remove from life care plan. |
| Psychiatry | 60 times over lifetime | Current Age to Life Expectancy | $202.45 per visit | Ms. Wadsworth clearly had pre-existing psychological needs related to depression and substance use[9]. *During an interdisciplinary meeting on February 9, 2022, Noah Brown, MD documented that Ms. Wadsworth's, "drinking really escalated in the last month. Husband sees correlation between depression and drinking. Plan to consult psychiatry after she is extubated."* Dr. Snyder does not appear to have taken pre-injury needs into account. No medical justification for this item in relation to burn injuries. It is also confusing that Dr. Snyder includes family counseling in his costs for this service, as family counseling is typically provided by a mental health therapist, not a psychiatrist.[10] Dr. Snyder's costs reflect only the initial visit and are excessive. | Remove from life care plan. |

[9] Ms. Wadsworth was prescribed Celexa 40 mg by her primary care provider prior to her burn injuries, and had been taking this "for years." Psychiatry needs reported in the medical records are related to pre-existing depression and alcohol use.

[10] High Country Behavioral Health in Evanston only has mental health counselors on their staff. Dr. Amy Parry is located in Murray, UT and only offers telehealth. Follow-up visits, per Dr. Parry's website, are $180.00.

Stephanie Wadsworth
September 5, 2024
Page 52

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Psychology | 180 times over lifetime | Current Age to Life Expectancy | $200.94 per visit | Ms. Wadsworth had pre-injury depression and substance use issues which do not appear to have been taken into account by Dr. Snyder. Dr. Snyder is not transparent about how he arrived at this number of recommended visits. Ms. Wadsworth testified that she did not have plans to see a counselor. Cost is excessive[11]. Psychology needs reported in the medical records are related to pre-existing depression and alcohol use. No medical justification for 180 sessions related to burn injuries. | Psychological follow-up of 2 – 3 blocks of 8-12 sessions is reasonable[12] $200.94 per established patient office visit. |
| Physical Therapy | 12 times annually | Current Age to Life Expectancy | $326.36 per visit | Dr. Snyder does not provide costs from Ms. Wadsworth's actual, local provider, but only relies on PMIC Medical Fees data for this estimate. Frequency and duration are not medically justified. On 2/2/2023, Ms. Wadsworth's therapist at High Plains PT discharged her noting "good improvements overall" with good response and good progress toward goals. He recorded that she had stopped attending due to [unrelated and pre-existing] back problems. On 1/29/2024 by Jose Lucio OT recommends that Ms. Wadsworth resume therapy after her last laser treatment.[13] | Evaluation every 4 years with treatment pending the outcome of the evaluation is reasonable[14] $326.36 per established patient office visit. |

[11] Local providers surveyed by Dr. Snyder reported an average of $175.00 per session.

[12] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

[13] However, there is no medical recommendation for physical or occupational therapy for the remainder of Ms. Wadsworth's lifetime. Continued burn therapy has been recommended by University of Utah therapists "until scars mature." She will eventually be medically stable and discharged to a home exercise program on a more probable than not basis.

[14] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

Stephanie Wadsworth
September 5, 2024
Page 53

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Occupational Therapy | 12 times annually | Current Age to Life Expectancy | $366.16 per visit | Frequency and duration are not medically justified. See above opinion regarding physical therapy, same comments | Evaluation every 4 years with treatment pending the outcome of the evaluation is reasonable[15] $366.16 per established patient office visit. |
| Podiatry | 8 times annually | Current Age to Life Expectancy | $235.37 per visit | No medical evidence in records reviewed to justify this item. Ms. Wadsworth has not seen, nor has she been recommended to see, a podiatrist. Foot care for burn injuries is being provided by plastic surgery, reflected above. | Podiatry follow-up annually is reasonable[16] $235.37 per established patient office visit. |
| Nutrition Consultation | Twice annually | Current Age to Life Expectancy | $133.33 per visit | No medical evidence in records reviewed to justify this item. *Ms. Wadsworth was discharged home with recommendations for a normal diet on 3/21/22. On 5/3/2022, Dr. Schiffer also documented that Ms. Wadsworth was back to eating a normal diet.* | Remove from life care plan. |

---

[15] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.
[16] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

Stephanie Wadsworth
September 5, 2024
Page 54

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Vocational Rehab Evaluation | Two times total | Current Age to Life Expectancy | $1,880.55 each time | Ms. Wadsworth electively left the workforce when her second child was born, 12 years ago. She is not claiming lost earnings damages. No vocational losses are identified. | Remove from life care plan. |
| Vocational Rehab Counseling | Sixteen times total | Current Age to Life Expectancy | $165.00 per hour | Ms. Wadsworth electively left the workforce when her second child was born, 12 years ago. She is not claiming lost earnings damages. No vocational losses are identified. | Remove from life care plan. |
| Ergonomic Evaluation | Two times total | Current Age to Life Expectancy | $2,507.40 | Ms. Wadsworth electively left the workforce when her second child was born, 12 years ago. She is not claiming lost earnings damages. | Remove from life care plan. |
| Neuro-psychology Testing | One time | Current Age to Life Expectancy | $2,761.28 | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequeale as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Neuro-psychology Follow-Up | Twenty four times total | Current Age to Life Expectancy | $219.44 per visit | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequeale as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 55

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Neuro-psychology Cognitive Rehabilitation | Twenty four times total | Current Age to Life Expectancy | $229.85 per visit | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequeale as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Speech and Language Cognitive Rehabilitation | One time | Current Age to Life Expectancy | $402.98 each time | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequeale as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Speech and Language Cognitive Therapy | Twenty four times total | Current Age to Life Expectancy | $229.85 per visit | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequelae as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Occupational Therapy Cognitive Evaluation | One time | Current Age to Life Expectancy | $255.72 each time | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequelae as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 56

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Occupational Therapy Cognitive Therapy | Twenty four times total | Current Age to Life Expectancy | $229.85 per visit | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequelae as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Brain Injury Education | Twenty four times total | Current Age to Life Expectancy | $79.60 each time | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequelae as a result of her injuries. No diagnosis of a brain injury is reviewed anywhere in the records. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Group Therapy | 72 times total | Current Age to Life Expectancy | $55.72 each time | There is no evidence in the medical records that Ms. Wadsworth has sustained any cognitive sequelae as a result of her injuries. *On 1/29/24, Jose Lucio, OT assessed Ms. Wadsworth's cognitive status as within functional limits. He documented that she was independent with BADLs and IADLs.* | Remove from life care plan. |
| Removal/ Excision of Benign Feet Lesions | "N/A" | "N/A" | "N/A" | It is unknown if she will require these procedures in the future based upon the records and testimony to date. However, if needed would cost in a range of $1,200.00 to $1,500.00 per procedure[17] . | Remove from life care plan. |

---

[17] Per Dr. Sulentich's records.

Stephanie Wadsworth
September 5, 2024
Page 57

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Scar Excision and Re-construction Surgery | "N/A" | "N/A" | "N/A" | It is unknown if she will require these procedures in the future based upon the records and testimony to date. However, if needed would cost in a range of $1,200.00 to $1,500.00 per procedure. | Remove from life care plan. |
| Follicular Unit Hair Transplant Surgery | "N/A" | "N/A" | "N/A" | It is unknown if she will require these procedures in the future based upon the records to date. | Remove from life care plan. |
| Semi-Permanent Tattoo for Right Eyelid | Average annually | Current Age to Life Expectancy | $774.78 each time | This recommendation is confusing. Dr. Snyder recommends a tattoo for the right eyelid. Does he mean eyebrow? The CPT code he cites is not for semi-permanent, but permanent work. No medical foundation for this procedure, no records demonstrate that Ms. Wadsworth will benefit from such a procedure on a more probable than not basis, if she requires scar revision it is noted above. | Remove from life care plan. |
| ER Visits | Once every 5 years | Current Age to Life Expectancy | $1,599.11 each time | I have reviewed no medical records indicating that Ms. Wadsworth has been seen in an emergency department relative to her burn injuries since her discharge from University of Utah in 2022. Additionally, Dr. Snyder's source for this cost estimate is not clear. He provides no justification for this item other than stating, *"Given Mrs. Wadsworth history and physical examination, there is a strong probability for recurrent ER visits"* Lacks medical foundation and transparency regarding cost estimate. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 58

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Bilateral Shoulder X-Ray | Once every 5 years | Current Age to Life Expectancy | $282.58 each time | *Dr. Snyder states:* "Given the significant musculoskeletal injuries and surgeries, future needs for monitoring these problems, as well as a more than probable need for future surgical procedures, imaging studies will be mandated as follows" *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Shoulder MRI | Two times total | Current Age to Life Expectancy | $5,940.16 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Shoulder MRI reading fee | Two times total | Current Age to Life Expectancy | $839.06 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Hand X-Ray | Once every 5 years | Current Age to Life Expectancy | $288.56 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Hand MRI | Two times total | Current Age to Life Expectancy | $3,860.60 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Hand MRI reading fee | Two times total | Current Age to Life Expectancy | $632.82 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Bilateral Foot X-Ray | Once every 5 years | Current Age to Life Expectancy | $165.18 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Foot MRI | Two times total | Current Age to Life Expectancy | $4,107.36 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Bilateral Foot reading fee | Two times total | Current Age to Life Expectancy | $632.82 each time | *Orthopedic surgery consultation occurred with Ian Clapp, MD on February 1, 2022. No orthopedic injuries were noted on assessment.* There is no medical foundation to justify further imaging. | Remove from life care plan. |
| Neurontin[18] 600 mg TID | Daily | Current Age to Life Expectancy | $5.61 per day | Dr. Snyder notes that this is not presently prescribed, but recommends. Ms. Wadsworth testified that she is not taking any medications. There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. Additionally, Ms. Wadsworth was prescribed Gabapentin prior to injury for her back condition.[19] | Remove from life care plan. |
| Baclofen 10 mg TID | Daily | Current Age to Life Expectancy | $1.74 per day | Dr. Snyder notes that this is not presently prescribed, but recommends. Ms. Wadsworth testified that she is not taking any medications. It is noteworthy that there are also published risks in regard to combining alcohol and Baclofen. There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |

[18] On January 17, 2024, Dr. Lachapelle reported that Ms. Wadsworth had completed medication treatments and was not on any prescribed medications at this time.
[19] Per Drugs.com, It is noteworthy that there are also published risks in regard to combining alcohol and Gabapentin

Stephanie Wadsworth
September 5, 2024
Page 60

Stephanie Wadsworth
September 5, 2024
Page 61

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Duloxetine 30 mg TID | Daily | Current Age to Life Expectancy | $6.50 per day | Dr. Snyder notes that this is not presently prescribed, but recommends. Per Dr. Snyder's report, Ms. Wadsworth was taking Celexa 40 mg daily prior to the injury. Ms. Wadsworth testified that she is not presently taking any medications. Overlaps pre-injury need. It is noteworthy that there are also published risks in regard to combining alcohol and Duloxetine. There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Lansoprazole 15 mg daily | Daily | Current Age to Life Expectancy | $6.45 per day | Dr. Snyder notes that this is not presently prescribed. No issues with acid reflux are documented in the records. Ms. Wadsworth testified that she is not taking any medications. It is noteworthy that there are also published risks in regard to combining alcohol and Lansoprazole. There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Zolpidem Tartrate 10 mg nightly | Daily | Current Age to Life Expectancy | $2.13 per day | Dr. Snyder notes that this is not presently prescribed. Ms. Wadsworth testified that she is not taking any medications. It is noteworthy that there are also published risks in regard to combining alcohol and Ambien. Ms. Wadsworth also had pre-injury sleep difficulties. There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 62

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| CBC | Annually | Current Age to Life Expectancy | $43.78 each time | Not clear why this would be needed above and beyond pre-injury needs. *On 3/28/2022, Dr. Fleming recommended follow-up with primary care for ongoing management of other health issues and health maintenance.* There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Liver Profile | Annually | Current Age to Life Expectancy | $50.75 each time | Not clear why this would be needed above and beyond pre-injury needs. Ms. Wadsworth had elevated liver enzymes noted pre-injury on 6/26/2020. *On 3/28/2022, Dr. Fleming recommended follow-up with primary care for ongoing management of other health issues and health maintenance.* There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Renal Profile | Annually | Current Age to Life Expectancy | $89.55 each time | Not clear why this would be needed above and beyond pre-injury needs. *On 3/28/2022, Dr. Fleming recommended follow-up with primary care for ongoing management of other health issues and health maintenance.* There is no medical foundation in the records for this recommendation related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Draw Fee | Annually | Current Age to Life Expectancy | $21.89 each time | Not clear why this would be needed above and beyond pre-injury needs. *On 3/28/2022, Dr. Fleming recommended follow-up with primary care for ongoing management of other health issues and health maintenance.* | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 63

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Shower Chair | Every 5 Years | Current Age to Life Expectancy | $70.59 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." | Remove from life care plan. |
| Long-Handled Lotion Application | Annually | Current Age to Life Expectancy | $10.49 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." | Remove from life care plan. |
| Long-Handled Shower Sponge | Annually | Current Age to Life Expectancy | $12.98 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." | Remove from life care plan. |
| Reacher | Every 3 Years | Current Age to Life Expectancy | $18.00 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." | Remove from life care plan. |
| Motorized Scooter | Every 5 Years | Current Age to Life Expectancy | $2,189.00 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." A normal gait was assessed by Walter Anyan PT as early as 6/2/2022. | Remove from life care plan. |
| Motorized Scooter Maintenance (Excluding year of purchase) | Annually | Current Age to Life Expectancy | $218.90 each time | See above analysis for Motorized Scooter. Furthermore, Dr. Snyder assesses this cost based on 10% of the purchase price. This is not commensurate with the actual cost of maintenance. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 64

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| All Terrain Scooter | Every 5 Years | Current Age to Life Expectancy | $5,349.00 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." A normal gait was assessed by Walter Anyan PT as early as 6/2/2022. | Remove from life care plan. |
| All Terrain Scooter Maintenance | Annually (Excluding year of purchase) | Current Age to Life Expectancy | $534.90 each time | See above analysis for All Terrain Scooter. Dr. Snyder assesses this cost based on 10% of the purchase price. This is not commensurate with the actual cost of maintenance | Remove from life care plan. |
| Scooter Backpack | Every 2 Years | Current Age to Life Expectancy | $62.00 each time | See above analysis for All Terrain Scooter. | Remove from life care plan. |
| Portable Ramps: 3' and 5' | Every 10 Years | Current Age to Life Expectancy | $497.32 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." A normal gait was assessed by Walter Anyan PT as early as 6/2/2022. There is no mention in the records or in Dr. Snyder's reports of the need for a wheelchair. | Remove from life care plan. |
| Adjustable, Elevating Head of Bed | Every 8.5 Years | Current Age to Life Expectancy | $4,048.00 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." A normal gait was assessed by Walter Anyan PT as early as 6/2/2022. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 65

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Walker (Start Age 50) | Every 5 Years | Age 50 to Life Expectancy | $71.52 each time | No DME has been recommended by Ms. Wadsworth's providers. On 1/17/2024, Dr. LaChapelle documented full range of motion in all joints, with "no limitations in functional activity." A normal gait was assessed by Walter Anyan PT as early as 6/2/2022. | Remove from life care plan. |
| Resta Lite | 12 times annually | Current Age to Life Expectancy | $17.69 each time | Concur with ongoing need for burn moisturizer. Cost is reasonable | Concur, reasonable. |
| Vaseline | 12 times annually | Current Age to Life Expectancy | $6.29 each time | Concur with ongoing need for burn moisturizer. Cost is reasonable | Concur, reasonable. |
| Cut Protective Gloves | 4 times annually (12 pair each time) | Current Age to Life Expectancy | $143.04 each time | Concur with ongoing need for protection of bilateral hand burns, replacement rate is excessive. Dr. Snyder is not transparent with his costs for this item. Cost is excessive[20]. | Concur with item need. Recommend need of average 12 pair annually, $66.00 per year. |
| Sun/UV Protective Clothing | 4 times annually | Current Age to Life Expectancy | $243.00 each time | Ms. Wadsworth would have required clothing regardless of her burn injuries. Duplicates pre-injury need. Specialized clothing is not required. Per the American Academy of Dermatology: "When selecting clothing, avoid fabrics with a loose or open weave, such as lace. In addition, dark colors offer more protection than light colors." Not medically justified above and beyond pre-injury needs. | Remove from life care plan. |

---

[20] According to uline.com, the hyflex gloves he appears to have included actually cost $66.00 per 12 pair ($5.50 per pair).

Stephanie Wadsworth
September 5, 2024
Page 66

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Sunscreen | 12 times annually | Current Age to Life Expectancy | $38.99 | Concur with ongoing need skin protection. However, cost is excessive and not transparent. Dr. Snyder does not provide specific information regarding how much sunscreen is recommended per month. However, he appears to have included a higher-cost sunscreen (LaRoche Posay 5.1 oz). Banana Boat also has a 100 SPF option, at a cost of $10.97 for 4 oz. | $10.97 - $21.94 per month |
| Standard Van: Initial Purchase | 1 time | Current Age to Life Expectancy | $47,035.00 each time | Ms. Wadsworth would have had to purchase vehicles over the course of her life regardless of her injury. Overlaps with pre-injury needs. Remove. | Remove from life care plan. |
| Standard Van: Replacement Purchase (To begin 5 years after Initial Purchase) | Every 5 years | Current Age to Life Expectancy | $15,250.00 each time | He is subtracting out the resale value of the original vehicle for purchase of a new van. Ms. Wadsworth would have had to purchase vehicles regardless of her injury. Overlaps with pre-injury needs. Remove. Additionally, replacement rate is excessive. | Remove from life care plan. |
| Van Modifications | Every 5 Years | Current Age to Life Expectancy | $35,625.00 each time | Cost is excessive Replacement rate is excessive. Dr. Snyder's costs are based on modifications needed for a paraplegic and include power doors & ramp/lift, tie-downs, lowered floor, raised roof, remote side-door, lift, and hand controls. There is no evidence that this is medically necessary for Ms. Wadsworth, either now or in the future. She does not require, nor as any medical provider recommended, a full time wheelchair. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 67

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Van Modification Maintenance (Excluding year of purchase) | Annually | Current Age to Life Expectancy | $362.50 | Cost is excessive. See above comments. As there is no medical foundation for van modifications, maintenance is not necessary either. | Remove from life care plan. |
| Automobile Association Membership | Annually | Current Age to Life Expectancy | $99.99 per year | Such an item is not necessary for or related to Ms. Wadsworth's injury. There is no medical foundation for how such an item would be related to Ms. Wadsworth's burn injuries. | Remove from life care plan. |
| Handicapped Home Modifications | One time | Current Age to Life Expectancy | $32,956.52 each time | Dr. Snyder's costs are clearly based on modifications needed a full time wheelchair user. There is no evidence that this is medically necessary for Ms. Wadsworth, either now or in the future. She does not require, nor as any medical provider recommended, a full time wheelchair. *Per 1/29/24 note by Jose Lucio OT: Ms. Wadsworth was independent with basic and instrumental activities of daily living and independent with functional mobility. Ms. Wadsworth further testified that there are no activities she did before the fire that she can no longer do now and that doctors have not placed restrictions as far as lifting or any other type of activity.* | Remove from life care plan. |
| Home Security Monitoring | 12 times annually | Current Age to Life Expectancy | $49.32 each time | Such an item is not medically necessary for or medically related to Ms. Wadsworth's injury. | Remove from life care plan. |

Stephanie Wadsworth
September 5, 2024
Page 68

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Housekeeper | 12 times annually (8 hours twice monthly) | Current Age to Life Expectancy | $520.00 each time | *Per 1/29/24 note by Jose Lucio OT: Ms. Wadsworth was independent with basic and instrumental activities of daily living and independent with functional mobility. Ms. Wadsworth further testified that there are no activities she did before the fire that she can no longer do now and that doctors have not placed restrictions as far as lifting or any other type of activity.* | Remove from life care plan see Household Services[21] below. |
| Personal Care Attendant | 52.18 times annually (4 hours five times weekly) | Current Age to Life Expectancy | $599.00 each time | *Per 1/29/24 note by Jose Lucio OT: Ms. Wadsworth was independent with basic and instrumental activities of daily living and independent with functional mobility. Ms. Wadsworth further testified that there are no activities she did before the fire that she can no longer do now and that doctors have not placed restrictions as far as lifting or any other type of activity.* | Remove from life care plan see Household Services below. |
| Home Maintenance | 12 times annually (4-6 hours per month) | Current Age to Life Expectancy | $321.85 each time | *Per 1/29/24 note by Jose Lucio OT: Ms. Wadsworth was independent with basic and instrumental activities of daily living and independent with functional mobility. Ms. Wadsworth further testified that there are no activities she did before the fire that she can no longer do now and that doctors have not placed restrictions as far as lifting or any other type of activity.* | Remove from life care plan. |

---

[21] Household services are those activities which are normally performed to maintain oneself and one's family, and typically consist of such task groups as housecleaning, meal preparation and clean up, laundry, minor maintenance, lawn and garden care, transportation, shopping, and record keeping. Assessment of Ms. Wadsworth's impairments indicates some assistance would be beneficial, however not to the extent asserted by Dr. Snyder as evidenced by Ms. Wadsworth and the medical records.

Stephanie Wadsworth
September 5, 2024
Page 69

| ITEM, Per Dr. Snyder | FREQUENCY, Per Dr. Snyder | DURATION, Per Dr. Snyder | BASE COST, Per Dr. Snyder | ANALYSIS, Cloie Johnson | OPINION, Cloie Johnson |
|---|---|---|---|---|---|
| Phoenix World Burn Congress | 10 times | Current Age to Life Expectancy | $4,000.00 each time | Dr. Snyder's cost includes airfare and a 5 night hotel stay allowance, however is not supported by Ms. Wadsworth, or her medical records. | 1 time minimum is reasonable[22] $4,000.00. |
| Burn Support Group Salt Lake City Burn Center | 5 times | Current Age to Life Expectancy | $700.00 each time | Dr. Snyder's cost includes a 2-night hotel stay and gas allowance. Ms. Wadsworth has access to this support, free of charge and travel, as the University of Utah provides a Zoom attendance option to those who live far from the Burn Clinic. This would be a more appropriate option for a mother of 4 who lives two and a half hours one way from the University of Utah. | Remove from life care plan. |

According to the National Vital Statistics Reports, Vol. 72, No. 12, November 7, 2023[23] the life expectancy remaining is an additional 43.9 years. Dr. Snyder used an older life expectancy table for the same resource. Life expectancy has decreased somewhat since that time.

Ms. Wadsworth has sustained injuries that require future medical care, however not to the extent as described above. Based upon the records reviewed, including medical records and Ms. Wadsworth deposition, Ms. Wadsworth's condition and sequelae will require ongoing medical, rehabilitation, and durable medical equipment needs over her lifetime to enable her to maintain her life roles and responsibilities as an adult woman. Based on the recommendations for current and future medical and rehabilitation needs, I have researched and identified providers, costs and frequencies of replacement for the identified equipment and items. As there were no specific treatment recommendations within the medical records reviewed, I have utilized my knowledge, training, experience, clinical judgment and past work with similarly situated individuals for current and future care needs.

I have completed a thorough and comprehensive coordination and facilitation of resources and costs to address medical and rehabilitation needs. The Preliminary Life Care Plan below is reflective of information obtained from the available medical records, and my specialized knowledge, training, experience and clinical judgment.

---

[22] Based upon my knowledge, training, experience, clinical judgment and past work with similarly situated individuals.

[23] https://www.cdc.gov/nchs/data/nvsr/nvsr72/nvsr72-12.pdf

Stephanie Wadsworth
September 5, 2024
Page 70

| ITEM | FREQUENCY | DURATION | BASE COST, | TOTAL |
|---|---|---|---|---|
| Burn Surgery Evaluation, Monitoring and Treatment | Average annually Pending additional medical foundation | Current Age to Life Expectancy | $242.61 per visit | $10,650.58 |
| Plastic Surgeon Evaluation, Monitoring and Treatment | Average annually Pending additional medical foundation | Current Age to Life Expectancy | $202.12 per visit | $6,600.00 |
| ENT Evaluation, Monitoring and Treatment | Average annually Pending additional medical foundation | Current Age to Life Expectancy | $220.87 per visit | $9,696.19 |
| Psychology Evaluation, Monitoring and Treatment | 2 to 3 blocks of 8 – 12 sessions, although not consecutive. | Current Age to Life Expectancy | $175.00 per visit | $2,800.00 - $6,300.00 |
| Physical Therapy Evaluation, Monitoring and Treatment | Evaluation every 4 years, with additional needs pending outcome of evaluation | Current Age to Life Expectancy | $326.36 per visit | $3,581.80 |
| Occupational Therapy Evaluation, Monitoring and Treatment | Evaluation every 4 years, with additional needs pending outcome of evaluation | Current Age to Life Expectancy | $366.16 per visit | $4,018.61 |
| Podiatry Evaluation, Monitoring and Treatment | Average annually Pending additional medical foundation | Current Age to Life Expectancy | $235.37 per visit | $10,332.74 |

Stephanie Wadsworth
September 5, 2024
Page 71

| ITEM | FREQUENCY | DURATION | BASE COST, | TOTAL |
|---|---|---|---|---|
| Resta Lite | 12 times annually | Current Age to Life Expectancy | $17.69 each time<br><br>$212.28 per year | $9,319.09 |
| Vaseline | 12 times annually | Current Age to Life Expectancy | $6.29 each time<br><br>$75.48 per year | $3,313.57 |
| Cut Protective Gloves | 12 pair annually | Current Age to Life Expectancy | $66.00 per year | $2,897.40 |
| Sunscreen | 12 times annually | Current Age to Life Expectancy | $10.97 - $21.94 per month<br><br>$131.64 - $263.28 per year | $5,779.00 - $11,557.99 |
| Household Services | Average 8 hours per month | Current Age to Life Expectancy | $40.00 per hour | $169,960.00 |
| Phoenix World Burn Congress | 1 time, additional pending outcome | Current Age to Life Expectancy | $4,000.00 each time | $4,000.00 |

**The total cost of the life care plan ranges from $194,077.06 to $199,856.06, however does not include future laser treatments which would cost in the range of $1,200.00 to $1,500.00.**

Please contact me should you have any comments or questions concerning this information. I reserve the right to revise or amend this report if new or additional information becomes available.

Sincerely,

Cloie B. Johnson, M.Ed., ABVE, CCM
Vocational Rehabilitation Counselor/Case Manager