EXHIBIT C

1

1                    ROUGH-DRAFT DISCLAIMER

2    DEPOSITION OF:  BRIAN N. STRANDJORD, PE, CFI, CFEI

3    DATE:  NOVEMBER 27, 2024

4         DISCLAIMER:  This rough draft text is roughly
     edited, uncertified, and may contain untranslated
5    words, a note made by the reporter, a misspelled
     proper name, and/or word combinations that do not make
6    sense.  All such entries will be corrected on the
     final certified transcript which we will deliver to
7    you in accordance with our customary/your requested
     delivery arrangements.

8
          Due to the need to correct entries prior to
9    certification, this rough draft is to be used only for
     the purposes of augmenting counsel's notes and cannot
10   be used or cited in any court proceedings or to
     distribute to other parties to the case who have not
11   purchased a transcript copy.

12        THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL
     TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF
13   VERBATIM CITATION OF TESTIMONY.

14        CONSENT:  By opting for this rough draft
     service, you have agreed:  (1) To purchase the
15   transcript at the customary/agreed-upon rate, (2) Not
     to furnish the transcript, either in whole or in part,
16   on disk or hard copy, via modem or computer, or by any
     other means, to any party or counsel to the case.

17

18

19

20

21

22

23

24

25

2

1               P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.  We are

3     going on the record at 9:02 a.m.  Today is November

4     27, 2024.

5          Please note that audio and video recording

6     will continue to until all parties agree to go off the

7     record.

8          Your microphones are sensitive and may pick

9     up whispering and private conversations.  I would ask

10    that why please mute your phones at this time.

11         This is media unit No. 1 in the

12    video-recorded deposition of Brian Strandjord, PC, CFI

13    taken by counsel for the plaintiff, in the matter of

14    Stephanie Wadsworth, et al., versus Walmart, Inc., and

15    Jetson Electric Bikes, LLC, filed in the United States

16    District Court, in and for the District of Wyoming;

17    Case No. 223 CV 00118 N D F.

18         The location of this deposition is 1660

19    Lincoln Street, Suite 2250 in Denver, Colorado.

20         My name is Julie Butcher.  I'm representing

21    Veritext, and I'm the videographer.  Our court

22    reporter is Kim Smith from the firm Veritext.

23          Counsel, will you please introduce yourself

24    for the record, beginning with the noticing attorney.

25          MR. MORGAN:  Mike Morgan for the

♠   3


1    plaintiffs.

2          MR. LaFLAMME:  Eugene LaFlamme for

3    defendants Walmart and Jetson.

4          THE VIDEOGRAPHER:  Will the court reporter

5    please swear in the witness.

6          BRIAN N. STRANDJORD, PE, CFI, CFEI

7    having been first duly sworn, was examined and

8    testified as follows:

9                    EXAMINATION

10   BY MR. MORGAN:

11       Q    Good morning.  Could you please state your

12   name for the record.

13       A    Good morning.  My name is Brian Strandjord.

14       Q    Strandjord is the pronunciation?

15       A    Correct.

16       Q    Okay.  And, Mr. Strandjord, you're here in

17   relation to some work you did at the Wadsworth house

18   in Green River, Wyoming; is that correct?

19       A    Yes.

20       Q    And specifically looking at your report,

21    which I would like to attach as plaintiff's Exhibit A,

22    when I -- when I go to the purpose of your inspection,

23    it was -- is it a fair characterization that your

24    purpose was to evaluate the impact of the fire on the

25    electrical system on the Wadsworth home?

⬆    4


1         A    My purpose was to evaluate the electrical

2     system for what is it might tell us about the fire

3     that occurred.

4         Q    Okay.  Specifically, what do you mean when

5     you say tell us about the fire?  Because when I look

6     at the -- when I look at the introduction, which is on

7     page 4 of 26 of your report, it says, AEI Corporation

8     was retained by McCoy Leavitt Laskey, LLC, to examine

9     the electrical system at the residence as it related

10    to the fire.

11             Will you explain how that statement tells

12    us according to what you just told me.

13        A    Sure.  So when we have a fire in a

14    structure and we have an electrical system in the

15    structure, branch circuit wiring throughout the

16    structure, the fire -- when the fire attacks that

17    electrical system, we will see evidence of arcing in

18    locations where the conductors your energized when the

19    fire attacked them.

20        Q    Okay.  Is it fair to say that the primary

21   focus of your responsibilities in the Wadsworth matter

22   was to evaluate the arcing patterns within the

23   Wadsworth home?

24        A    That is correct.

25        Q    And in those findings, to the best of your

5

1    understanding, were then passed on to Mr. Filas?

2         A    Yes.  They were passed on to Mr. Filas.

3         Q    Filas.

4              But you all don't work in the same company;

5    do you?

6         A    We do not.

7         Q    But so when you talk about it how it

8    relates to the fire, you're finding specifically about

9    arch mapping, right?

10        A    Correct.

11        Q    Is it fair to say that your finding in your

12   report are confined to the arch mapping?

13        A    Yes.

14        Q    And so today, we can focus our

15   conversations on that.  Is that okay?

16        A    That's okay with me.

17        Q    All right.  If we could put as plaintiff's

18   Exhibit B on the screen, which will be the CV for

19   Mr. Strandjord?

20         MR. CURRAN:  Yes, sir.  One moment.

21         It's coming up now.

22         MR. MORGAN:  Okay.

23   Q    (By Mr. Morgan)  Okay.  Mr. Strandjord, I'm

24   now showing you what has been marked as Plaintiffs'

25   Exhibit B, which was produced in relation to this

6

1    deposition as your current CV.

2          Can you verify that this is up-to-date and

3    current as of today?

4    A    Are there multiple pages to this CV.

5    Q    Yes, sir.  We'll just scroll down.  I just

6    want to make sure you have a chance to see it.

7    A    No, that's not a current CV of mine.  My

8    current CV is attached to my report that was produced

9    in this matter.

10   Q    Okay.  Going back to the report.  Going to

11   page 27 of the report but on the PDF.  Pull that up.

12         MR. CURRAN:  Yes, sir.  27?

13         MR. MORGAN:  The PDF, yes.

14         MR. CURRAN:  Yes, sir.

15         MR. MORGAN:  There's 26 pages on the report

16   and then page 27 of the CV.

17          MR. CURRAN:  Yes, sir.  Okay.  One moment.

18     Q    (By Mr. Morgan)  Okay.  Page 1 --

19          MR. LaFLAMME:  Is this part of Exhibit A

20     already?

21          MR. MORGAN:  Yes, sir.

22          MR. CURRAN:  Okay.  Thanks.

23          MR. MORGAN:  Yes, this is what we received

24     as Exhibit A.

25     Q    (By Mr. Morgan)  So -- and is the testimony

       7


1      record included as part of your CV, Mr. Strandjord?

2          A    The testimony record is -- I would not

3      consider part of my CV.  It's a separate document,

4      being my testimony record.

5          Q    Okay.  So your CV has been reduced to one

6      page at this point; is that correct?

7          A    That's correct.

8          Q    Will you give us the -- on this page, will

9      you point to the specific training that you believe is

10     relevant or education that you believe is relevant to

11     your training to perform arc mapping.

12         A    Certainly.  In addition to my bachelor of

13     science degree in mechanical engineering, my licensing

14     is both a mechanical engineer and an electrical

15    engineer in multiple states.

16          And my work history, which over the last

17    approximately ten years, has almost exclusively

18    involved the investigation of fires and explosions and

19    the examination of electrical systems.

20    Q    Where there are electrical systems present,

21    obviously, correct?

22    A    Correct.

23    Q    I see that you look at other explosion

24    types, such as lithium ion batteries or things of that

25    nature.

8

1          Would there still be arcing in those type

2    of issues?

3    A    There certainly could be.

4    Q    I guess depending on the location of where

5    the fire takes place?

6    A    Yes.

7    Q    Okay.  When -- tell me about how your

8    training as a mechanical engineer prepared you for arc

9    mapping.  What is the relevant educational background

10    there?

11    A    Certainly.  In the field of mechanical

12    engineering, and specifically in my education, there

13    was a great deal of heat transfer, thermodynamics and

14    materials science that all play into how a fire would

15    affect materials, specifically electrical conductors.

16         Q    Where was that training at?

17         A    That was at the University of Colorado.

18         Q    They have special classes at the University

19    of Colorado that teach about how fire will interact

20    with specific electrical conductors?

21         A    They have -- they have classes which I --

22    when I took at part of my education involving heat

23    transfer and thermodynamics and material science,

24    which are all applicable to that.

25         Q    But no specific training on how fire

9

1    interacts with electrical conductors at the University

2    of Colorado; is that fair?

3         A    Not at the university.

4         Q    Okay.  Where did you obtain that specific

5    training?

6         A    That specific training was through my

7    employment over approximately the last ten years, in

8    forensics.

9         Q    When you say forensics, can you explain

10    what that means?

11         A    Sure.  That would be investigating

12    different failures, fire, explosions, accidents, and

13    explaining that using science and engineering to help

14    explain what happened to my clients.

15         Q    Okay.  And when we say the last ten years,

16    are we starting that forensic work and this training

17    in 2014?

18         A    Correct.

19         Q    And again, I don't mean to say that there's

20    not --

21              MR. MORGAN:  We can take this down.

22         Q    (By Mr. Morgan)  I'm not meaning to say

23    that there's not applicable science and that

24    translates between what you're doing here and

25    otherwise.

10

1              But specifically for arc mapping and the

2    forensic, that would have started when you worked at

3    Rimkus?

4         A    Correct.

5         Q    And when you worked at Rimkus, did you work

6    with Mr. Filas?

7         A    I did work with Mr. Filas.

8         Q    I apologize for saying his name wrong.  How

9    long did you work with Mr. Filas?

10        A    Approximately five years.

11          Q     Is Mr. Filas the one who specifically

12     trained you in arc mapping?

13          A     I certainly received some training from Mr.

14     Filas.  I also worked with other engineers at Rimkus.

15     I learned -- I also -- I also learned aspects of arc

16     mapping from both International Association of Arson

17     Investigators Training and National Association of

18     Fire Investigators training class.

19          Q     Okay.  How many of those training classes

20     did you go to with the IAAI or NAFI?

21          A     I've been to several week-long classes and

22     seminars with -- with both organizations.  And then a

23     great number of hours of online training.

24          Q     Okay.  Is your online training represented

25     in this CV?

11

1          A     I don't believe it is specifically

2     represented there.

3          Q     Okay.  Do you know approximately how many

4     hours you spent online learning about arc mapping?

5          A     Specifically about arc map, I couldn't say.

6          Q     Okay.  Is there any specific classes that

7     you took that you would have obtained a certificate

8     regarding arc mapping?

9        A    Yes.  I obtained certificates for all of

10   the online courses.

11       Q    Okay.  And do you have those in your

12   possession somewhere?

13       A    I do not have them with me today.

14       Q    No.  I understand.  But those are things

15   that you could retrieve if we asked you for online

16   certifications regarding arc mapping, that's something

17   you would be able to find?

18       A    Yes.

19       Q    Okay.  As far as the IAAI arc mapping work,

20   did you receive a certificate for that class?

21       A    Yes.  I have certificates for all of the

22   fire investigative training courses, both in person

23   and online, that I've attended.

24       Q    So when you went to these fire

25   investigative courses, did you -- were they in total

12

1    fire investigation or were they specific to arc

2    mapping?

3        A    Most of them would be total fire

4    investigation.

5        Q    Could you give us the history of arc

6    mapping, please.  When was it created and how it's

7    advanced from its creation to today.

8         A    I couldn't tell you the history of the

9    subject.

10        Q    Okay.  And looking at Plaintiffs' Exhibit

11   A, I don't see any references to any peer reviewed

12   studies regarding arc mapping.

13             Are there some that you have not provided

14   to us?

15        A    No.  I do not have any publications.

16        Q    I'm not asking about your publications.

17   I'm saying, do you have any publications that support

18   the tool of arc mapping and fire investigation?

19        A    Included in my report, under reviewed

20   items, there is both NFPA 921 and there is technical

21   bulletin No. 1 from the ATF fire research laboratory.

22        Q    Okay.  Would that conclude what you

23   considered to be peer reviewed publications regarding

24   arc mapping?

25        A    Yes, it would.

13


1         Q    Is there a reason that you used NFPA 221

2    version in the references that you cited?

3         A    Yes.  While there's a more recent

4    publications, 2024, which has some minor additions,

5    explanatory material, the science has not changed.

6            And I certainly could not state that I

7    followed the 2024 edition when I conducted the site

8    inspection because that edition had not been published

9    yet.

10       Q    But you did write your report when that

11   edition had been published, correct?

12       A    I did.

13       Q    And you realized that specifically in

14   relation to arc mapping, there has been some changes

15   within the NFPA's 921 guidance on arc mapping; true?

16       A    There was some guidance that changed in the

17   2021 edition compared to previous editions.  In the

18   2024 edition, the guidance retained the same, the

19   science remains the same.

20            They have simply added more explanatory

21   material, example photographs to help explain that to

22   people.

23       Q    So your position is that if the NFPA says

24   otherwise, you do not believe that their guidance has

25   changed on the use of arc mapping and fire

14


1    investigation?

2        A    Not related to how I've -- not related to

3    how I have used arc mapping in this instance.

4        Q    Okay.  Can you tell me about the lit air

5    review that you did in preparation for validating that

6    arc mapping is a valid tool or method of determining

7    fire origin?

8         A    I'm sorry.  I don't quite understand the

9    question.

10        Q    Okay.  Did you do -- did you search any

11   publication today find out the scientific

12   acceptability of arc mapping in preparation for your

13   deposition or performing your report?

14        A    I did not do any searches specific for this

15   deposition.

16        Q    Okay.  Tell me about the searches that you

17   did in preparation of performing the investigation of

18   arc mapping.  In this case, what type of literary

19   review, if any, did you do?

20        A    I did not do any literary review

21   specifically for this case.  As I have been doing this

22   as a profession for many years, I was already familiar

23   with the subject.

24        Q    Okay.  And as doing this for many years,

25   you understand the requirements in federal court as

15


1    far as what you're report must include, correct?

2         A    Correct.

```
 3       Q    And you understand that any -- that in

 4  order to be accepted, one of the categories, not the

 5  only one, but one the thing we look at is peer

 6  reviewed literature on the subject that you plan to

 7  testify; is that fair?

 8            MR. LaFLAMME:  Object to the form, to the

 9  extent is it calls for a legal conclusion.

10            Go ahead.

11       Q    (By Mr. Morgan)  Sure.

12       A    Could you restate the question, please.

13       Q    Sure.  You work in a science-based

14  industry, where you testify as an expert for a living,

15  correct?

16       A    Correct.

17       Q    And you understand in science and

18  specifically in the court evaluating science, one of

19  the things that is looked to is peer reviewed

20  literature supporting methodology or a finding of

21  scientific fact; is that fair?

22       A    Yes.

23       Q    Okay.  Are you familiar with the recent

24  peer reviewed publications dating back to 2016 through

25  2024 that take a negative view of arc mapping?
16
```

❖

```
 1       A    I'm aware that there's some articles out
```

2    there.

3         Q     Was there some reason that those articles

4    were not included in your report?

5         A     I did not find those articles to be

6    applicable to my report.

7         Q     Okay.  And we're going to go through those

8    no detail.

9              Would you walk me through the hypothesis

10   that you made regarding the Wadsworth case before

11   starting your investigation.

12        A     Prior to starting my investigation, I did

13   not have a hypothesis.

14        Q     Okay.  Did you develop one at any time?

15        A     Yes, I did.

16        Q     All right.  Then walk me through your

17   methodology that was utilized in this case from

18   receiving the report to receiving the assignment to

19   creating your report.

20        A     Certainly.  After receiving the assignment,

21   doing some background research, what was available

22   from public entities, social media, newspaper reports,

23   things of that nature, participated in several site

24   investigations, where we collected data, then analyzed

25   that data and developed several hypotheses, one of

17

1     which was that the fire had started inside of the

2     residence, specifically inside of Bedroom 4; and the

3     other hypothesis was that the fire had started outside

4     of the residence.

5               And then using -- using the data that we

6     had collected, analyzed and evaluated those hypotheses

7     to determine if any of them could be eliminated.

8          Q     Okay.  Let's go back to -- at which phase

9     of this process did the arc mapping take place?

10         A     The arc mapping was conducted both at the

11    scene, during the site inspection, and at the

12    laboratory examination that followed.

13         Q     Take me through the entirety of your

14    process of arc mapping in this case.

15         A     Certainly.  The first thing -- the first

16    thing that we did was we surveyed and evaluated the

17    entire electrical system, we documented what was

18    present, which circuits were involved, what exception

19    cord wither plugged in other thing, then we collected

20    those items, documenting where they were.

21              And then at the laboratory, we went through

22    in more detail and examined those conductors for any

23    evidence ever electrical arcing.

24         Q     Take me through the process of surveying

25    and evaluating the electrical initial units present at

♠ 18

1    the seen?

2        A    Sure.  So that involved looking through the

3    scene, tracing circuits, determining what circuits

4    were present, which locations, and documenting that.

5        Q    What does it mean to trace a circuit?

6        A    That can be done either electrically or in

7    this case, physically, following the conductors back

8    to where they're connected to determine where the

9    conductors run and what is powering them.

10       Q    Okay.  You did that manually in this case?

11       A    Yes.  I did that in conjunction with other

12   investigators at the site, all working together.

13       Q    But you personally did the arc mapping in

14   this case correct?

15       A    I personally did arc mapping, yes.

16       Q    Okay.  Tell me about how you manually

17   traced the currents in this house.

18       A    I'm sorry.  We did not trace any currents

19   in the house.

20       Q    Okay.  How did -- how did you trace the

21   circuits?  I apologize.

22       A    The circuities in this case were traced

23   physically.  We simply followed the extension cords

24    outside to where they were plugged in.  We followed

25    the conductors in the walls, back to where they

19

1    connected to the main circuit panel.

2        Q    Was there any touching of these wires

3    during that process?

4        A    Yes.

5        Q    I want to be very clear:  I'm asking for

6    everything that you did to manually trace the entire

7    process; because, as you know, there's a very specific

8    process, right, for arc mapping --

9        A    Right.

10        Q    -- that's accepted?

11            I understand the basic premise, and I want

12    to be clear on my question.  I understand the basic

13    premise that you traced it back.

14            What I'm asking is:  What did you actually

15    do step by step in this process to arc map this home,

16    each -- each circuit you are phrased, each material

17    you used, how you decided where there was an arc,

18    every single thing.

19            So my question is:  Would you please walk

20    me through in detail every element of arc mapping that

21    you performed at this home.

22      A     Sure.  As I stated, we physically -- we

23    physically traced out the conductors to determine

24    exactly where everything was.  We documented that,

25    then collected those conductors.

20


1              We collected -- in this case, we were able

2    to collect them -- the entire circuit, branch circuit

3    that went to Bedroom 4 in its entirety without cutting

4    or severing any of the conductors by cutting out

5    sections of the wall that still remained; then

6    collected the extension cords and other conductors

7    that were outside of the residence that were plugged

8    into a receptacle on the residence, collected all of

9    those.  Those were preserved.

10             And at the laboratory, we went through

11    every inch of the fire damaged conductors, both

12    visually and tactically, with fingers, myself and

13    other investigators that were participating, to look

14    and feel for evidence of electrical arcing.

15      Q     Okay.  I wanted to break that down.  So

16    when you say that you physically traced, you went to

17    the circuit breaker, correct?

18      A     Correct.

19      Q     And where was the circuit breaker in this

20    home?

21          A    The main circuit panel was located in the

22    basement, below Bedroom 4.

23          Q    Okay.  As far as the extension cords and

24    the entire branch circuit for Bedroom 4, were those

25    all connected to that breaker panel in the basement?

21

1          A    Yes.  Every -- the two circuits that were

2    collected, the circuit that served Bedroom 4 and the

3    circuit that served the outside receptacle, both of

4    those circuit breakers were located in that main

5    electrical panel.

6          Q    Okay.  And on the scene, in relation to the

7    branch circuit for Bedroom 4, you were able to remove

8    those, but you did not inspect them at the scene for

9    evidence of arcing, correct?

10          A    Are you speaking about the breakers

11    themselves?

12          Q    I mean the branch circuit, that you

13    removed.

14          A    That is correct.

15          Q    Also, is it fair to say that based off the

16    pictures that you took, that the -- there was minimal,

17    if any, fire damage within the basement area of the

18    Wadsworth home?

19      A    That's correct.

20      Q    You also recovered the extension cords that

21 were running to the shed outside of Bedroom 4,

22 correct?

23      A    Yes, we did.

24      Q    Did you retrieve any of the branch

25 circuitry into which those extension cords were

⬆
22


1 plugged into?

2      A    We retrieved some of that.  We traced out

3 those lines.  We retrieved some of it.  Some of it was

4 non-fire damage and very well encased in the wall.

5      Q    Okay.  Being encased in walls is important

6 in arcing, correct, arcing evaluations; is that fair?

7      A    It can be.

8      Q    Well, walls and insulation generally

9 provide some protection versus a stranded line,

10 correct?

11      A    They can.  In this case, the conductors I'm

12 referring to that fed the outdoor receptacle were in

13 an area just outside of where we had direct fire

14 damage.

15      Q    Okay.  As far as collection of other branch

16 circuits, other than the ones for Bedroom 4, was that

17 done?

18        A    No.  There were no other branch circuits

19    collected within the house.

20        Q    Was Bedroom 4 the only room that had fire

21    damage within the home?

22        A    It was not.

23        Q    Is there a reason that the other branch

24    circuits were not collected?

25        A    Yes:  It was determined by the fire

23

1    investigators at the scene that those other rooms were

2    outside of the area of origin as they determined it

3    for the fire and, therefore, we did not collect those

4    circuits.

5        Q    Fair to say that that based off the fact

6    that those circuits were not collected for the

7    physical lab inspection, that you were unable to tell

8    us whether or not those circuits outside of Bedroom 4

9    were energized at the time the fire reached the room?

10        A    You're speaking about the other individual

11    rooms in the house?

12        Q    Correct.  Yes, sir.

13        A    I cannot speak to -- I cannot speak to what

14    condition those conductors are in.  However, based on

15    the information that we did -- we did find during the

16    arc mapping, I believe to those circuits were all

17    de-energized by the time the fire got to them.

18        Q    Okay.  But you did not inspect those to be

19    able to give us an opinion here today that you believe

20    they were de-energized because of lack of arcing,

21    correct.

22        A    Correct.  I did not physically inspect

23    those other conductors.

24        Q    And the same vein, you did not trace each

25    physical conductor back to the circuit breaker; is

24

1     that fair?

2         A    From the other parts of the house, that is

3     correct.

4         Q    Okay.  So when we talk about tracing the

5     circuit breaker, we are limiting that to Bedroom 4 and

6     the extension cords that were in the shed outside of

7     Bedroom 4; is that fair?

8         A    Correct.  We are limiting it to the area --

9     the potential areas of the origin identified by the

10    fire investigators.

11        Q    Okay.  When we go back to your training and

12    experience, education or work-wise, will you tell me

13    your background in metallurgy and where that has come

14    from.

15        A    Those were -- that is from some basic

16   material science classes during my undergraduate

17   education.

18        Q    Okay.  And beyond that, there's no master's

19   or Ph.D. that has been left off or is in process right

20   now; is there?

21        A    No.

22        Q    Okay.  Take me through the process of once

23   we get to the lab, how it was that you were able to --

24   let me strike that.

25             Take me through the process of when you got
25

1    to the lab of what you did to look for the presence of

2    arcing.

3         A    Sure.  As I previously stated, we went --

4    went through every inch of the fire damage conductors,

5    both visually and tactically, by hand, to look for

6    evidence of arcing.

7         Q    When we talk about the fire damage

8    conductors, is it fair to assume that every conductor

9    within Room 4 is included in that?

10        A    When I speak about the fire damage

11   portions, I'm referring to the portions of the

12   circuits that have the insulation burned on them.

13    There were portions buried in the walls that had

14    intact installation.

15        Q    So when we're talking about the entire

16    circuit, you did not take the entire branch circuit

17    from Bedroom 4; you only took the portions that you

18    deemed potentially worthy of further investigation; is

19    that fair?

20        A    No, that is not correct.  The entire branch

21    circuit was collected.  However, the portions of the

22    conductors that still had intact wiring insulation

23    were not cut open and examined.

24        Q    Why not?

25        A    Because there was no evidence that there

26

1    was a fire there.

2        Q    In Bedroom 4, there was no evidence ever

3    fire in some of those walls?

4        A    There was no evidence that there was fire

5    at the unburned electrical insulation on the

6    conductors.

7        Q    Okay.  Will you explain that to the Court,

8    please.

9        A    Sure.  The -- when we -- when we find

10    portions of the wire that have unburned insulation,

11    that is consistent with those portions of the wire not

12    being directly attacked by the fire.

13         Q    Okay.  And how is that determination made?

14         A    The determination as to whether the wires

15    are burned or not?

16         Q    Yeah.  Whether they're burned to the level

17    that would be impacted by the fire.

18         A    In many cases here -- or in some cases, I

19    should I say, when I say intact insulation, I mean

20    that the wire has not -- has not been burned.  It

21    might be partially discolored, but it is intact.

22         Q    Meaning it has its outside insulation cover

23    on it?

24         A    Correct.

25         Q    And when you talk about the loss of

27


1     insulation, you're talking about seeing an actual

2     metal wire; is that fair?

3          A    That's fair.

4          Q    And so do you trace the -- did you trace

5     the wire in the point where you found intact

6     insulation on these -- in Bedroom 4, when you were

7     collecting the samples?

8          A    We traced out the entire circuit, including

9     those portions.

10          Q    But I'm saying were you -- but you

11     eventually decided to gather some, correct?

12          A    We gathered the entire branch circuit for

13     Bedroom 4.

14          Q    Okay.  Did you have to cut wires that

15     were -- when it's still connected within the wall that

16     you didn't take, you had to cut it at some point,

17     right?

18          A    No.  We did not cut any of the wires.  We

19     cut the wall around it to take the wires.

20          Q    Okay.  And so some -- every portion that --

21     every portion of the wire that you saw had damage to

22     its insulation was taken all the way back to -- to the

23     circuit breaker; is that right?

24          A    The entire branch circuit that was within

25     Bedroom 4, whether the insulation was damaged or not,

28

1     was taken intact.  That was traced down to a junction

2     box in the basement, adjacent to the main electrical

3     panel.

4               That was an area where we had no fire

5     damage.  And the decision was made to cut the

6     conductors there and collect them.

7          Q    Okay.  So that's where -- that's where it

8     ended, at least for our evaluation here, of what you

9    were able to examine?

10         A    Yes.

11         Q    Okay.  So when you say we determined, who

12   is we?

13         A    At the fire scene, there's always a -- when

14   there are multiple investigators from multiple parties

15   involved, we try to do everything to the extent we can

16   by consensus.  So we would all agree on a location

17   where it would be good to cut the wires.

18         Q    Do you agree that there are certain types

19   of fires that involve electrical conductors that are

20   not appropriate for arc mapping?

21         A    Yes, there certainly can be.

22         Q    What would those be?

23         A    Well, one common example would be a vehicle

24   that is powered about a battery.  That battery will

25   be -- until that battery is consumed by the fire,

29

1    there will be electrical energy present.

2              And we can see arcing in many, many places

3    that have really nothing to do with the fire.

4         Q    What about aluminum conductors?

5         A    In the case -- in the case of aluminum

6    conductors, because aluminum has such a lower melting

7    point, it is often not possible to find arc sites on

8    an aluminum conductor.

9         Q    Okay.  What is the melting temperature of

10   copper?

11        A    The melting temperature of copper,

12   reasonably pure copper, which is typically used for

13   electrical wiring, is approximately, if I recall

14   correctly, about 1,983 degrees Fahrenheit.

15        Q    And what did -- the fire temperature in

16   Bedroom 4, what did that temperature reach?

17        A    I do not any the answer that that.

18        Q    Is that important to your analysis?

19        A    I'll clarify that:  I saw no evidence that

20   the fire reached the temperature equal or greater to

21   the melting temperature of copper.  We did not see

22   evidence that the copper melted in Bedroom 4 from fire

23   attack.

24        Q    Okay.  Are you basing that evidence solely

25   on the fact that you do not believe the copper melted?

30

1         A    That is correct.

2         Q    Because you agree that if copper melts, it

3    can produce a false arcing result; true?

4         A    If copper melts as the result of fire

5    attack, it -- it melts as it would during an

6    electrical arcing event; but it melts in a different

7    fashion, which is often visually apparent.

8       Q    Is -- do you have any literature to support

9    that proposition?

10      A    Yes, I do.  Going back to my report, the

11   Department of Alcohol, Tobacco, and Firearms Fire

12   Research Laboratory Technical Bulletin No. 1.

13      Q    Okay.  And do you also agree that arcing is

14   not appropriate in fires with extensive and widespread

15   fire damage?

16      A    That's a very -- that's a very --

17           MR. LaFLAMME:  Object to form.

18           Go ahead.  Sorry.

19      A    I think that's a very vague question, that

20   I'm not sure I can answer.

21      Q    (By Mr. Morgan)  Okay.  Could we please

22   pull up and mark as Exhibit -- well, hold on one

23   second.  Yes, but I'm going to ask one more question

24   first.

25           Are you familiar with the National Academy

31

1    of Forensic Engineers?

2       A    Yes, I am.

3       Q    Are you a member of the National Academy of

4      Forensic Engineers?

5          A    I am not.

6          Q    Do you receive or subscribe to the journal

7      of the national Academy of forensic engineers?

8          A    I do not.

9          Q    Are you familiar with David J Icove, Ph.D.?

10         A    I don't believe so.

11         Q    How about Elizabeth Buc, Ph.D.?

12         A    Yes, I have worked on cases where Elizabeth

13     Buc has been involved.

14         Q    Okay.  Mark Goodson?

15         A    Yes, I know Mark Goodson.

16         Q    Or Thomas May?

17         A    I don't know whether I know Thomas May or

18     not.

19         Q    Okay.  If we could pull up as Plaintiffs'

20     Exhibit C, the Journal of National Academy of Forensic

21     Engineers.

22              MR. CURRAN:  Bear with me.  What's the

23     document name?  I don't see that title.

24              MR. MORGAN:  Oh, let me just give you it,

25     actually.  It will be under -- it would say 127,
32

1      Article Text --

2              MR. CURRAN:  I got it.

3                MR. MORGAN:  -- 2584.

4                MR. CURRAN:  Yes, sir.  Coming up.

5         Q    (By Mr. Morgan)  Okay.  What is the

6    National Academy of Forensic Engineers?

7         A    My understanding is it's a -- it's an

8    organization of forensic engineers.

9         Q    Okay.  Are any of your colleagues members

10   that you know of?

11        A    Yes, I believe they are.

12        Q    And the journal of national Academy for

13   forensic engineers, you understand is peer reviewed,

14   correct?

15        A    That is my understanding.

16        Q    But what does into mean to be peer

17   reviewed?

18        A    It means that the -- when an article is

19   written by an engineer or scientist, and that article

20   is then reviewed by other -- his peers in the -- in

21   the industry to -- for their input, to ensure that the

22   methodology, the results from studies are

23   scientifically acceptable.

24                MR. MORGAN:  Okay.  If we could scroll down

25   to page 6 -- it's going to say 64 at the top.  It's

33

1    page 3.  If we keep going further down.  If we do go

2    to the one further down and go to the bottom where we

3    see Figure 1, if can he could zoom in on figure 1,

4    please.

5        Q    (By Mr. Morgan)  This article is titled

6    state of the arc and then in quotes, mapping by David

7    Icove, Ph.D., listed by Ph.D., Mark Goodson, PE, and

8    Thomas May, JD.

9            I want to read to you the abstract of this.

10   And it was published in June of 2021.  The abstract is

11   in NFPA 921, guide for fire and explosion

12   investigations considers the technique arc mapping to

13   be one of the methodologies used in isolating a fire's

14   origin and spread.  Provided the technique is used

15   properly and understanding its limitation, it is a

16   tool for investigators.  Synthesized here is the

17   latest peer reviewed research and discussions on the

18   implementations of increased use the ground and arc

19   fault circuit interrupters on arc mapping analysis.

20   Incorporated are case studies and evaluations of

21   recent legal decisions.  The goal is to arm

22   investigators with what's needed to maximize the arc

23   mapping's efficacy and the best -- and best presented

24   use in results.

25           You have never read this article; have you?

34

1      A    I don't believe so.

2      Q    Okay.  So Figure 1 lists what's been peer

3  reviewed as when arc mapping is useful and when arc

4  mapping is not useful.

5           In reviewing Figure 1, are there any

6  instances that you disagree personally what that?

7      A    I could not offer an opinion on this, as I

8  don't have context for it.  I haven't read the entire

9  paper.

10      Q    Okay.  But when we go through on that

11  usefulness, do you agree that arc mapping is useful in

12  incipient stage fires?

13      A    It can be.

14      Q    Okay.  Do you agree that it's useful where

15  there's limited damage?

16      A    That term would have to be defined further.

17      Q    Okay.  Can you think of other than the

18  house burning down in the Wadsworth case, what would

19  be more extensive internal damage?

20           MR. LaFLAMME:  Object to form.

21      A    There was -- there was certainly fire

22  damage throughout most of the structure.  But as I --

23  as I stated here, when we say limited damage and

24  extensive damage, I would need further context on

25    that.  I can't -- I can't offer an opinion based just

35

1    on this.

2         Q    (By Mr. Morgan)  Okay.  All right.  We'll

3    come back to this.  We can take this down for now.

4              Do you agree that the investigators should

5    examine the electrical wiring and devices in rooms

6    adjacent to the area of suspected origin until they're

7    satisfied their analysis is sufficient to support

8    their finding?

9         A    I think investigators should always

10   investigate whenever they believe is necessary to

11   satisfy themselves that their investigation is sea

12   periphery.

13        Q    Well, satisfy themselves, but

14   scientifically be satisfactory as well, where you're

15   offering your opinions to the court or for a peer

16   reviewed study; is that fair?

17        A    Absolutely.

18             MR. MORGAN:  So when we go to -- if we

19   could pull up your report and go to the Conclusions

20   section, which was marked as Plaintiffs' Exhibit A.

21        Q    (By Mr. Morgan)  Okay.  I wanted to

22   specifically look at Conclusion 2.  Conclusion 2, you

23    said, There was no evidence of electrical arcing on

24    conductors located within the residence.

25               Would you like to amend that conclusion

36

1     based off the investigation that you told us that you

2     have done?

3          A    I would say that --

4               MR. LaFLAMME:  Object to form.

5               Go ahead.

6          A    -- there as no evidence of electrical

7     arcing on the conductors within the residence that

8     were part of the study for this matter.

9          Q    (By Mr. Morgan)  Would a fair statement be:

10    There was no evidence of electrical arcing on the

11    conductors located within the residence in Bedroom 4?

12         A    I would agree with that statement.

13         Q    Okay.

14              MR. MORGAN:  Okay.  We can take that down.

15         Q    (By Mr. Morgan)  Now, going back to the lab

16    and the way that you inspected for arcing:  Who all

17    was inspecting the branch circuit for arcing?

18         A    There were a number of -- there were a

19    number of people present at the lab.  I don't recall

20    everyone's name at this moment.  I was focused on --

21    on tracing -- on evaluating those conductors myself.

22          I know that others were involved.  But I

23    was focused on evaluating the conductors.

24        Q    Okay.  Was anyone else involved in the

25    evaluation of the conductors, like you were?

37

1         A    I believe.

2         Q    That you remember?

3         A    I believe there was.

4         Q    Would it have been I guess from the

5    Plaintiffs' side, or do you not know?

6         A    I believe so, yes.

7         Q    Okay.  Anybody else -- Filas, is that

8    right?

9         A    I'm sorry.

10        Q    Is it Mr. Filas or Dr. Filas?

11        A    Oh, yeah, yeah.  Mr. Filas, yes.

12        Q    Filas.  The pronunciation just gets me

13    because it looks like Filas?

14        A    No worries.

15        Q    Is it Dr. Filas or Mr. Filas?  I don't

16    remember.

17        A    Mr.

18        Q    Okay.  Mr. Filas, was he also involved in

19    the actual touching examination, looking for the

20   arcing?

21        A    He may have been.  I don't recall.

22        Q    Okay.  So take me through -- let's just

23   focus on what you did there.  Take me through your

24   process to evaluate the branch circuits that you had,

25   the extension cords that you had, everything that you

38

1    took with you, take me through the process of how you

2    evaluated for arcing.

3         A    Certainly.  So as I stated before, all of

4    the -- anytime we have bare conductors, we look -- we

5    visually examine those, look for any evidence of --

6    anyplace the copper could be melted or anyplace

7    there's any type of anomaly that's not what we would

8    normally find on a copper wire.

9              Also, while we're doing that, feeling along

10   the wires, along every inch of the wire, to feel for

11   any small nicks or bumps or craters in the wire that

12   would require further investigation.

13             Every time that you identify a location

14   where there's something going on with the wire, I take

15   a closer look at that.  It could be -- it could be

16   visually.  It could be micro- -- you know, with a

17   microscope.

18             In this case, I don't believe we had a

19    microscope at the scene.  I simply used a macro

20    setting on my -- one of my cameras.

21             And then using the visual characteristics

22    of known -- known visual characteristics of electrical

23    arcing instances, determine whether each anomaly we

24    find on the wire is or is not consistent with

25    electrical arcing.

39

1             Q    Okay.  That last part again.  I apologize.

2             A    Then --

3             Q    How you again whether it is or not

4    consistent.  Sorry.

5             A    Sure.  Comparing -- comparing the visual

6    characteristics of the anomaly found on the wire to

7    known visual characteristics of electrical arcing.

8             Q    What are the known visual characteristics

9    of electrical arcing?

10            A    Well, there are a number of them.  Some of

11   them are that we have a clear demarcation between

12   melted and unmelted portions of the conductor.

13            Another is that we have -- we can have

14   undamaged -- completely undamaged wire -- portions of

15   the wire outside of the arc, such as drawing lines or

16   tool -- tool marks from manufacturing of the wire.

17          We'll have a -- an arc bead, as it's

18   called, would have a round, smooth appearance to it.

19   Those are just -- those are just some of the

20   characteristics.

21      Q    Okay.  And what are the other causes in a

22   fire that can cause a bead type shape on a wire?

23      A    Well, as far as -- you as far as a bead

24   type shape for -- when we're talking about electrical

25   arcing, or arc mapping, a bead would be evidence of an
40

1    electrical arcing instance.

2           We could have a melt globule, as they are

3    known, for conductors that are melted say by fire

4    attack.

5       Q    And what is the difference between a

6    globule and a bead in visual presentation?

7       A    Sure.  When we look -- when we look at at

8    globule, it will have quite the opposite visual

9    characteristics that we could typically see with a

10   bead from electrical arcing.

11          We would see less localized damage and more

12   spread-out damage.  We will not see a clear line of

13   demarcation between melted and unmelted conductor.

14          And there could be other effects.

15      Q    Do you have any peer reviewed literature

16   that supports that?

17        A    Yes.  Both NFPA 921 and again, the ATF Fire

18   Research Laboratory Technical Bulletin No. 1.

19        Q    When we talk about the NFPA 921, would that

20   be in both the '21 and '24 editions?

21        A    Yes.

22        Q    Do you know what chapter they moved the

23   discussions on arc mapping to in the '24 edition, or

24   are they the same?

25        A    I couldn't say for certain, but I believe

41


1    they're in 6.3 or thereabouts.  I believe they're in

2    Chapter 6.

3         Q    Okay.  So walk me back through the tools

4    and methodology you used to physically touch the wire

5    in search of arcing.

6         A    Well, the tool I used were my fingers to go

7    along and feel every inch of that exposed conductor

8    and feel for any type of -- any type of anomaly on the

9    wire, anything that's not smooth, that doesn't feel

10   like normal -- normal new copper wire would.

11        Q    Did you use any objective tool that would

12   be able to be replicated by another party?

13        A    So feeling along the wire is simply -- is

14    simply a way to find areas that would warrant further

15    investigation.  Simply feeling something on a wire by

16    itself is not an indication that there's there was an

17    electrical arc.

18        Q    Isn't it true, though, that your method of

19    feeling and determining where you should look based

20    off your personal feel, is completely subjective to

21    you?

22        A    Certainly what I feel with my fingers is

23    subjective to me.  However, that is -- that is common

24    practice in the industry amongst -- amongst experts.

25    Other -- often we will -- we will all feel the same

42

1    wire to verify.

2        Q    Isn't it true that common practice is

3    actually to use a -- to drag a cotton ball and trace

4    the wire so that it would leave fibers that we can see

5    objectively the places of imperfections?

6        A    In the last ten years that I've been in

7    this industry, I've actually never seen anybody do

8    that.

9        Q    Have you ever read personally any

10    instruction on methodology of how to trace wire for

11    arcing?

12        A    I'm sure that I have at some point.

13          Q     But you can't point the Court or us to any

14     of that specific documentation?

15          A     Not at this time.

16          Q     Other than what you believe is NFPA --

17     that's in NFPA 921 and ATF Bulletin 1, any other place

18     that can he could -- any other literature that you can

19     point to that would support that using your fingers is

20     the proper methodology for that trace?

21          A     I don't know of a specific piece of

22     literature for that.

23          Q     What causes circuit breakers to trip?

24          A     Well, when we're talking about a circuit --

25     a typical circuit breaker in the residence, there

43

1      could be -- there can be many things that cause a

2      circuit breaker to trip.

3                 Typical circuit breaker in a residence is

4      what is known as a thermal magnetic circuit breaker.

5      So there are two modes that it is meant to trip in:

6      One is thermal, which is for detecting overloads over

7      a period of time; the other is magnetic, which is for

8      detecting short circuits, much higher current events

9      over a shorter period of time.

10                The circuit breakers, in addition to

11    tripping on thermal or magnetic from electrical

12    activity or just electrical current flowing through

13    them, they can also trip if they are -- the thermal

14    element will trip if the circuit breaker is exposed to

15    sufficiently high temperatures, such as in a fire.

16            If the fire is to reach near the circuit

17    breaker panel, it can cause the circuit breakers to

18    trip; and because they're a mechanical device, the

19    circuit breaker can also trip due to physical impact

20    or shock.

21    Q    In the Wadsworth case specifically, would

22    you agree that the -- based off the lack of fire

23    damage in the basement, that it was unlikely that the

24    temperatures reached a level in the basement that

25    would cause the breakers to trip?

44

1    A    I can say for certain that --

2            MR. LaFLAMME:  Object to form.  Go ahead.

3    A    I can say for certain in the case of the

4    Wadsworth residence that the temperatures did not

5    reach -- the temperatures at the circuit breaker panel

6    did not reach adequate temperature to trip those

7    circuit breakers, because none of the circuit breakers

8    were tripped.

9    Q    (By Mr. Morgan)  Okay.  However, the

10    failure of a circuit breaker to trip during a fire

11    does not conclusively mean that the house was not

12    energized during the time of the fire; is that fair?

13        A    That is correct.

14            MR. LaFLAMME:  Mike, are you at an okay

15    point to take a quick break?

16            MR. MORGAN:  Sure.

17            THE VIDEOGRAPHER:  The time is 10:05.  We

18    are off the record.

19            (Recess taken.)

20            THE VIDEOGRAPHER:  The time is 10:14.  We

21    are back on the record.

22        Q    (By Mr. Morgan)  Okay.  Let's turn back to

23    the arc mapping process that is laid out in NFPA 921.

24            That's what you followed, correct?

25        A    That is correct.

45

1         Q    And specifically, we've gone over the fact

2    that the arc mapping that was done for this case

3    was -- within the residence, was just Bedroom 4,

4    right?

5         A    Correct.

6         Q    The NFPA 921 on electricity and fire, the

7    process where this is described, talks about that you

8    need to systematically examine the circuits and wires

9    remains for localized damage to conductors or plug

10   blades.

11              Did you do that for Bedroom 4?

12       A    Yes, we did.

13       Q    It then says, That colored tape or a flag

14   is used to mark arc site locations.

15              Did you use any colored tape or flags to

16   mark the locations in the site?

17       A    Very few of the actual locations of arcing

18   were identified at the site.  But those were -- those

19   were marked and collected separately.

20       Q    Did you attempt to search for arcing

21   locations at the site where the removing of the branch

22   circuit?

23       A    No.  It was determined that that would be

24   better conducted in the laboratory setting.

25       Q    So there would be no pictures dictating or
46


1    detailing rather where you thought potential for arc

2    site that's would need further investigation were at

3    the scene; fair?

4        A    As I just stated, we determined that it

5    would be better to collect the circuits whole and look

6    for evidence of arcing in a more controlled setting.

7      Q     You do realize that that departs from the

8    recommendations of NFPA 921 that you had cited in your

9    report in this deposition; true?

10      A     I do not believe it does.

11      Q     Okay.  If it says that is specifically what

12    you should do, you do not agree that that is what NFPA

13    921 states, correct?

14      A     I'm not disagreeing with what NFPA 921

15    states.  I'm saying, it was determined by the

16    investigators, myself included, in this instance, that

17    it would be better to do that in a controlled

18    environment.

19      Q     Well, there's no reason you cannot do both,

20    right?

21      A     We believe this it would not be productive

22    to do it at the site.  We documented where the

23    conductors ran through the site, and we collected them

24    so we could, again, investigate -- examine them in a

25    more controlled environment.

47

1      Q     I understand that in a laboratory, it is

2    more controlled.  And NFPA actually provides for that,

3    right?

4      A     Yes.

5      Q    Ninety-two -- well, did I freeze or you

6    froze?

7      A    I'm sorry.  It froze up in the middle of

8    what were you saying.

9      Q    Sorry.  I think it was me.

10          I said, NFPA 921 actually provides for the

11   process after you do a site determination to collect

12   and review in the lab, if necessary, correct?

13     A    Yes.

14     Q    But you chose -- whoever "we" is chose to

15   not do the on-site documentation; fair?

16     A    It was agreed upon by all of the

17   investigators at the site, representing all of the

18   parties involved, that it would not be productive to

19   attempt to do that at the site and that we could risk

20   damaging or destroying evidence if we -- if we did so.

21     Q    Is it your position in this deposition that

22   there's a greater risk of destroying evidence by

23   visually inspecting for areas of arc and labeling it

24   with a flag or tape versus removing it from the scene?

25          MR. LaFLAMME:  Object to form.

48

1           Go ahead.

2      A    I'm stating that it was not feasible to --

3    or productive to search along the length of the

4    conductors at the scene in the condition that the

5    building was in and it was more -- it was more

6    productive and we believed safer from the -- from the

7    perspective of preserving evidence to collect those

8    items whole rather than feel along them, clean them

9    up, visually examine them at the scene.

10        Q    (By Mr. Morgan)  Okay.  Well, let's be very

11   clear:  It was feasible, correct?

12        A    I don't believe it would have been

13   productive.

14        Q    But that's not my question.  It was

15   feasible, correct?

16        A    Could it have occurred?

17             MR. LaFLAMME:  Object to form.  Asked and

18   answered.

19             Go ahead.

20        Q    (By Mr. Morgan)  I asked -- he said before

21   it wasn't feasible.  I'm asking specifically about

22   feasibility:

23             MR. LaFLAMME:  Same objection.

24        Q    (By Mr. Morgan)  So -- okay.  Was it

25   feasible?

49

1        A    Could it have been done, yes.

2        Q    Okay.  When you say we decided it would not

3    be productive, who is "we"?

4        A    That would be myself and all of the other

5    investigators that were present at the site that were

6    participating -- participating in the investigation.

7        Q    But fair to say you were the one on the

8    defendant's side responsible for determination of

9    whether or not arcing was present in Bedroom 4,

10   correct?

11       A    That is correct.

12       Q    And was it your recommendation to -- that

13   it would not be productive to mark potential sites of

14   arcing with tape or flags on the scene?

15       A    It was any position that it was -- it was

16   better for the investigation as a whole to collect all

17   of the artifacts and look at them in a more controlled

18   environment.

19       Q    Okay.  Did you at least take pictures with

20   some level of magnification within Bedroom 4 of the

21   potential arc sites?

22       A    As I stated, we didn't -- we didn't locate

23   potential arc sites in Bedroom 4.  What I did document

24   with photography and in my notes was the location

25   where the branch circuit conductors ran in the

50

1    bedroom.

2        Q    Okay.  If we can pull up the report again,

3    Exhibit A, and go do the conclusions, please.

4            MR. CURRAN:  Yes, sir.  One moment.

5            It's up, sir.

6            MR. MORGAN:  Okay.

7        Q    (By Mr. Morgan)  When we look at Conclusion

8    No. 4, the conclusion reads, The physical evidence

9    presented by the electrical system at the residence

10   was not consistent with a fire originating within the

11   residence.

12           When we talk about the physical evidence

13   presented by the electrical system, are you referring

14   to arcing?

15       A    Yes, I'm referring to electrical arcing or

16   the lack therefore.

17       Q    Okay.  And is it a fair interpretation of

18   this statement that it is not saying conclusively the

19   fire did not originate in the residence.  It is simply

20   saying there was no evidence of electrical arcing in

21   Bedroom 4?

22       A    Part of what -- part of what Conclusion 4

23   is saying is that there's no evidence of electrical

24   arcing in Bedroom 4, but it goes further than that.

25           The arc mapping, as a whole, provides in

1    this case an indication of the fire spread or how the

2    fire progressed through the course of the fire.

3        Q    Okay.  Explain.

4        A    Sure.  So with we look at the -- the

5    area -- potential areas of origin defined by the fire

6    investigators involved in thinks matter, so we looked

7    at the Bedroom 4 and we looked at area just outside of

8    Bedroom 4, where a polymer smoking shed was located.

9            If we look at the -- all of the conductors

10   that we looked at, we found no evidence of electrical

11   arcing in the branch circuit conductors in Bedroom 4,

12   we found evidence of electrical arcing on small

13   fragment wells of wires located in what was the

14   polymer shed, whether that was the ends of extension

15   cords or appliance cords plugs into that, we don't

16   know.  They were simply fragments.  But we have

17   evidence of electrical arcing in the shed.

18           And then we have the severed service

19   triplex provided electrical service to the residence

20   from the -- from the utility company.

21           And so we have -- we have arc -- once --

22   I'll start with the service triplex.  The service

23   triplex was composed of aluminum, and it ran

24    approximately right over the polymer shed.

25        The service triplex was melted and severed
52

1    during the fire, which is not uncommon.  Again,

2    aluminum has a low enough melting temperature that it

3    is common for eliminate to melt if a fire.

4        Once that service triplex melted and was

5    severed, there would no longer be any electrical

6    service to the residence; there could no longer be any

7    electrical energy in any of the branch circuits in the

8    residence.

9        So having evidence of electrical arcing on

10    cords in the shed, we know that fire was present in

11    the shed or at the shed prior to the time that the

12    service triplex was severed; because again, after the

13    service triplex was severed, we would have no

14    electricity to produce arcing.

15        Then the --

16    Q    Okay.

17    A    -- the -- once that service triplex was

18    severed, there is no longer -- again, no longer any

19    electrical energy present in any of the branch

20    circuits, so there would be no -- there would be no

21    electrical arcing, there would be no evidence of

22    electrical arcing on any of the circuits after that.

23          Q    Okay.  We've already discussed that you are

24    not able to give us an opinion as to whether or not

25    there was electrical arcing on any conductors or

53

1    circuits other than in Bedroom 4 within the residence;

2    true?

3          A    Correct.

4          Q    If that is true, then whether or not the

5    fire originated inside or outside of the house, that

6    can't be told simply by the electrical arcing on a

7    power cord or an appliance cord, correct?

8          A    While I -- while I -- my scope was not to

9    look for or determine a specific area of origin.

10    Again, I used the arc mapping as a tool to show

11    evidence of fire spread.

12          So this can provide a timeline.  I can --

13    from the physical evidence, we know that there was

14    fire at the shed before there was fire in the bedroom,

15    Bedroom 4.

16          Q    Let's stop right there.  How do we know

17    that?

18          A    Sure.  I'll go through it again.

19          Q    No.  I mean, here's where I'm having

20    trouble, right:  We know that you did not arc map the

21    entire home, correct?

22        A    That is correct.

23        Q    So when you say that you believe that

24    because the triplex was melted and you didn't see

25    arcing in Bedroom 4, that means there was no

54

1    electricity to the home, right?  Is that right?

2        A    I want to make sure I understand exactly

3    what you're stating there.

4            Yes, once the service triplex melted and

5    severed, there was no more electrical power to the

6    home.

7        Q    Right.  But what I'm saying is:  Because

8    you only arc mapped two places, Bedroom 4 and the

9    shed, you cannot tell anyone that there was not

10    electricity in the home at the time that the service

11    triplex melted, because I don't have any evidence

12    yourself, right?

13            MR. LaFLAMME:  Object to form.

14        A    So if I understand what you just asked me,

15    you're saying -- you're saying that I cannot determine

16    that there was no electrical power in the home when

17    the service triplex melted.  And that is incorrect.

18        Q    (By Mr. Morgan)  Correct.

19        A    When the service triplex melted, there was

20    no longer any electrical energy in the home.

21         Q    Okay.  That part is true.  But whether or

22    not Bedroom 4 was on fire before that, cannot be

23    stated, right?

24         A    No, I don't believe -- I don't believe

25    that's true.

55

1         Q    Okay.  Well, let's walk through it,

2    because -- was there electrical arcing in the kitchen?

3         A    We do -- we do not have -- we do not have

4    evidence, as we just went through.  We looked at

5    Bedroom 4 and we looked at the area outside of Bedroom

6    4, in the area -- in the area where the fire

7    investigators involved in this matter determined their

8    potential areas of origin to be.

9         Q    I'm going to go through it, because you're

10    making big assumptions.  And I want to go through

11    piece by piece for the Court to be able to determine

12    the validity of this methodology.  So please just bear

13    with me on the piece-by-piece analysis.

14              At the time that the fire got to the

15    kitchen, is there any evidence that you have as to

16    whether or not there's electrical arcing on any of

17    those outlets?

18      A    In the kitchen?

19      Q    Yes.

20      A    No.

21      Q    Do you have any evidence as to whether

22  there is or is not arcing within the master bedroom of

23  the Wadsworth home at the time of the fire?

24      A    I do not.

25      Q    Do you have any evidence as to whether or

56

1   not there is electrical arcing in the living room on

2   the Wadsworth home?

3       A    I do not.

4       Q    When we talk about electrical and power

5   cords and appliance cords, those are what are referred

6   to as stranded, correct, stranded cords?

7       A    I'm sorry.  You broke up a little there.

8   Did you say stranded cords?

9       Q    Correct.  Yes, sir.

10      A    Yes.

11      Q    Okay.  And how are stranded cords different

12  from the branch circuits in Bedroom 4?

13      A    The branch circuits in Bedroom 4, as with

14  typical construction, are conducted -- are constructed

15  with solid conductors, where it is -- each conductor

16  is one solid piece of copper.

17          The stranded conductors, each conductor is

18   composed of many smaller copper wires.

19     Q    Okay.  And what about the insulation

20   generally on stranded cords versus branch circuits

21   used in home construction?

22     A    It depends entirely on the cord.  The

23   insulation can be the same or it can be composed of a

24   different material.

25     Q    Isn't it true that most power cords on

57

1   stranded wires are made up of a single layer of

2   insulation?

3     A    Well, if we're talking about a power

4   cord -- well, it depends.  There are some power cords

5   that contain a single layer of insulation.

6          There are other cords, such as extension

7   cords, specifically the extension cords in this

8   matter, where there is individual insulation around

9   each conductor and then there's an outer jacket that

10   is also insulation.

11     Q    Where you found evidence of arcing within

12   the shed, which conductors did you find arcing on?

13     A    We found arcing on fragments of conductors

14   that were located in the shed.

15    Q    Okay.  Explain.

16    A    So these were short sections of wire that

17  were in the shed that were severed from whatever cord

18  that they were originally part of prior to the fire.

19    Q    And what were they made of.  What type of

20  metal were these fragments?

21    A    They were copper.

22    Q    So you're unable to tell us specifically

23  what they're from.  Did you find often remnants that

24  could be connected to them or no?

25    A    We did not -- we did not find section

58

1  that's we believed we could connect together with any

2  certainty.

3         MR. MORGAN:  If we can pull up what is --

4  the document is called 2018 Fire Tech Arc Mapping.

5         MR. CURRAN:  Yes, sir.

6    Q    (By Mr. Morgan)  Okay.  This is an article

7  that was published in Fire Technology.

8         Are you familiar with Fire Technology?

9    A    I am.

10   Q    Is Fire Technology also a peer reviewed

11  journal?

12   A    I believe that it is.

13   Q    Do you subscribe to Fire Technology?

14          A    I do not.

15          Q    What publications do you subscribe to to

16    stay up-to-date on the latest in fire investigation?

17          A    I do not currently subscribe to any

18    printed -- printed publications aside from Fire and

19    Arson Investigator Magazine.  Most of -- most of the

20    information I get these days is now published online.

21          Q    As are these.  I mean, are you a member of

22    Fire Technology online?

23          A    I am not.

24          Q    What about the National Academy of Forensic

25    Investigators?

59

1           A    Do you mean the National -- I'm sorry.

2     Could you restate that.

3           Q    Yeah.  From the -- well, let me ask you

4     this:  You get it most online.  Which journals do you

5     subscribe to online dealing with fire investigation

6     and technology?

7           A    I subscribe to fire an Arson Investigator

8     through the International Association of Arson

9     Investigators.

10          Q    Any other ones?

11          A    No specific subscriptions.

12          Q    Oh.  I thought there were more, because you

13     said you got that one on paper, but you got most of it

14     online.  But there's no other online ones you get.

15          A    I certainly get information online.  I

16     don't have subscriptions per se.

17          Q    For the peer reviewed -- most of the peer

18     reviewed articles have subscriptions, right?

19          A    I don't know that I could answer whether

20     most peer reviewed articles have subscriptions or not.

21          Q    Okay.  Are there any that you're -- that

22     you don't need a subscription to that you regularly

23     receive and review?

24          A    I don't know that I do offhand, no.

25          Q    Okay.  This is the title of this is arc
60

1     mapping and critical review.  You've never read this

2     before, correct?

3          A    I couldn't say if I've read this article or

4     not.  I don't recall.

5          Q    Okay.  Well, this isn't one that you said

6     that you considered and discounted when talking about

7     the critiques of fire -- of arc mapping, right?

8          A    I did not cite this article.

9          Q    Okay.  Are you familiar with Vytenis

10     Babrauskas?

11          A    Yes, I am.

12          Q    How are you familiar with him?

13          A    He has authored a number of publications,

14   most -- most notably one entitled the ignition

15   handbook.

16          Q    Okay.  Do you consider him to be an

17   authority within the fire investigation world?

18          A    I consider him to be a knowledgeable

19   individual.

20          Q    Sure.  If we can go -- well, first, let me

21   ask you this:  If we go down to -- it's page 29 of 33.

22   It's 776 in the journal.

23               If we go -- if we look at these hypotheses,

24   he says, The following hypotheses are not supported by

25   science or reliable experimental data, that is, they

61

1    are myths.

2                And what I want to ask you is -- I'm going

3    to go through each one and ask if you have any peer

4    reviewed literature or based off your training,

5    knowledge, or experience or otherwise, believe that he

6    is wrong.

7                One:  An abundance of arc beads at a given

8    locale means that fire originated in that area, while

9    I postie of arc beads indicates that it did not.

10         Do you believe that to be false?

11    A    I do not.

12    Q    Do you think that is true?

13    A    I believe that is a true statement.

14    Q    So even know Mr. Babrauskas says that is a

15    myth, you actually believe that is true?

16    A    I think -- I think we're getting crossed up

17    here.

18    Q    Okay.  Let me be very clear.

19    A    Yes.

20    Q    What he's saying is these next three things

21    are not true, that it is -- people have assumed it

22    within science, but he does not believe these to be

23    true.

24         And one of the things that he does not

25    believe to be true is that an abundance of arc beads

62


1    at a given locale means that fire originated in that

2    area, while a postie of arc beads indicates that it

3    did not.

4         He does not believe that is true.  Do you

5    agree with him?

6    A    I'll state my answer more clearly:  I agree

7    with the author that that statement is not true.

8        Q    Okay.  Thank you.  That was a weirdly

9    worded question.  So I apologize.

10          Do you also agree that the following

11    statement is not true:  When multiple arcs are present

12    on a circuit, the direction of arcing will necessarily

13    proceed upstream towards the power source?

14        A    I also agree that that statement is not

15    true.

16        Q    Okay.  He goes on -- I don't think 3 is

17    applicable to us.

18          But he goes on, and he says, In fire

19    investigation reports, it is not acceptable for an

20    investor to report that a conclusion was based simply

21    on arc mapping.

22          Do you agree with that?

23        A    If we're talking -- if we're talking about

24    the origin and cause of a fire as a whole, when we're

25    talking about in fire investigation reports, then,

63

1    yes, I would agree that it is -- it would not be -- it

2    would not be ideal for an investigator to report

3    solely based on arc mapping.

4        Q    Okay.  He also says -- he goes on to say,

5    There are few circumstances where arc mapping may be

6    utilized in a scientifically reliable manner.

7         Do you agree with that?

8    A    I certainly agree that there are

9    circumstances where arc mapping may be utilized in a

10   scientifically reliable manner.

11   Q    And he says that in order to do that, a

12   fire investigator wishing to rely on arc mapping in a

13   fire investigation report must explicitly set forth a

14   valid governing hypothesis and demonstrate how the

15   analysis comports with that analysis.

16        Do you agree with that statement?

17   A    I do.

18   Q    Okay.

19        MR. MORGAN:  We can take that down.

20        All right.  If we can pull up what is

21   labeled -- the title of the document is arc mapping --

22   did I mark that last one as an exhibit, I'm sorry.

23        MR. CURRAN:  Yes, sir.

24        MR. MORGAN:  Okay.  The next exhibit will

25   be the one entitled Arc Mapping Methodology of module
64

1    globulus.

2         MR. CURRAN:  Yes, sir.  This will be

3    Exhibit E.

4    Q    (By Mr. Morgan)  Okay.  I'm showing you

5    what has been marked as Exhibit E.  And this is

6    article from liquor Lincoln memorial university law

7    review.

8              Have you read this before?

9       A    I have not.

10      Q    And again, this is one by David Icove,

11   Ph.D., as well as Thomas May, Esquire.

12             It was published in fall of 2020, which is

13   before you performed or before you wrote your report,

14   correct?

15      A    Yes, that is before I wrote my report.

16             MR. MORGAN:  If we can go down -- let's

17   see.  We're going to go down to page 18 of the PDF,

18   page 54 of the journal.

19      Q    (By Mr. Morgan)  When we look at the last

20   paragraph, in sentence two, it says, At present,

21   field-based arc mapping is besieged by limited

22   non-peer reviewed scientific literary support, two,

23   substantial research, and three, idiosyncratic visual

24   and tactile testing techniques.  The addition of

25   ill-equipped non-metallurgic practitioners into the

65

1    mix assured a resulting consequence of tacked tenuous

2    inferences, along with unsupported and unreliable

3    speculation.

4            Do you agree with that statement?

5        A    I would need more context on that

6    statement.  I would need to read this article.

7        Q    Okay.  I'm not sure if I asked:  But you

8    have not read this article today -- before today?

9        A    I have not.

10       Q    And this is not one of the articles that

11   you dismissed when you talked about the limited

12   criticisms of arc mapping before you created your

13   report; fair?

14       A    I don't believe I dismissed any articles

15   specifically.

16       Q    In the beginning of the deposition -- and

17   I'm paraphrasing.  But we can always go back and find

18   it -- I asked if you had read or reviewed in a

19   literary review any articles relating to criticisms of

20   arc mapping.

21           And you had said there was not a specific

22   criticism that you can remember and that you did

23   not -- hold on one second.  I'll start over.

24           In the beginning of the deposition, we

25   spoke about the fact that you did not do a specific

66

1    literary review for this case.

2            But you did mention that you were aware of

3    certain reviews and studies which spoke about

4    criticisms regarding arc mapping, but you did not find

5    those studies to be credible.

6            Do you remember that line of thought?

7    A    I remember something along that line, yes.

8    Q    Okay.  The ones that you did not think to

9    be credible -- I'm not saying that you find this

10   credible at this point.

11           But this isn't one that you would have seen

12   before?

13   A    Fair enough.  I understand your question.

14   I do not believe I have seen this paper before.

15   Q    Okay.

16           MR. MORGAN:  If we can go down to --

17   Q    (By Mr. Morgan)  Let me ask that you:  Can

18   you explain the difference between causal arcs and

19   victim arcs?

20   A    Can I explain the difference between them?

21   Q    Yes.

22   A    The -- well, a victim arc would be an arc

23   that results from fire attacking an energized circuit;

24   whether -- whereas a causal arc would be an arcing

25   event that ignites a fire.

67

1              If you're asking specifically about what

2    the differences are physically if we look at those two

3    arcs, there -- the arcs themselves would be no

4    different.  We would have to look at a larger context.

5    We would have to look at all of other circumstances

6    surrounding that to determine if an arch may have may

7    be the result of fire attack or if it may be causal.

8              MR. MORGAN:  Okay.  If we go down to page

9    36 of 41.

10        Q    (By Mr. Morgan)  We're talking about this

11    paragraph.  You can review it.  But it's talking about

12    experimentation that's been done to validate arcing.

13              One of the things said in the second

14    sentence is:  The experiments conducted to date are

15    not statistically based, involve dissimilar facts and

16    are subjective.

17              My question to you is:  First off, what is

18    a statistically significant experiment?  What does

19    that mean?

20        A    A statistically specific experiment --

21              MR. LaFLAMME:  Object to form.

22              Go ahead.

23        A    A statistically significant study would

24    involve a sufficiently large sample size to show that

25   there actually is a correlation between two or more
68

1    variables.

2        Q    (By Mr. Morgan)  Okay.  Are you aware of

3    any studies that have been done that do support --

4    that are statistically significant relating to arc

5    mapping?

6        A    I don't -- I don't know that I have a

7    specific example for you.

8        Q    Okay.

9            MR. MORGAN:  All right.  We can take that

10   down.

11       Q    (By Mr. Morgan)  Let's go back to your

12   conclusions.  And we've talked about 2 and we talked

13   about 4.  I want to talk about the No. 3.

14           MR. MORGAN:  If we can pull that back up.

15       Q    (By Mr. Morgan)  Okay.  No. 3 says -- we'll

16   take it in two parts -- The physical evidence

17   presented by the electrical system at the residence

18   was consistent with, A, fire being present at or

19   within the polymer smoking shed prior to the time that

20   the fire severed the overhead service triplex to the

21   residence.

22           So let's start just with that.  The

23   evidence that that is based off is the arcing found on

24    the metal fragments within the shed, correct?

25    A    Yes, on the conductor fragments in the

69

1    shed.

2    Q    As well as the lack of arcing in Bedroom 4,

3    correct?

4    A    Well, when we're speaking specifically

5    about Conclusion 3A, when I say fire being present at

6    or within the polymer showing shed prior to the time

7    that the fire severed the overhead service triplex to

8    the residence, I'm not -- I'm not making that

9    statement based on anything that was or was not found

10    in Bedroom 4.

11    I'm making that statement simply based on

12    the fact that the service triplex was severed and

13    after the fact that that service triplex was severed,

14    there was no longer any electrical energy supplied to

15    the residence.

16    Therefore, any electrical arcing that

17    occurred to those conductors in the shed, which was

18    plugged into extension cords, powered by the

19    residence, for there to be evidence of electrical

20    arcing in the shed, that had to have happened prior to

21    the time that the service triplex was severed.

22        Q    Okay.  I do -- I believe I understand.  But

23   let me ask you a hypothetical:  Hypothetically, if we

24   had a fire in Bedroom 4 coming out of the window, did

25   that also cause the aluminum to melt and disconnect

70

 1   power from the home?

 2        A    Any fire present at the service triplex

 3   could cause the aluminum to melt and severe the

 4   service to the residence.

 5        Q    Okay.  And so going specifically to A:

 6   What we are basing the fact that the fire must have

 7   come from the shed that we have the presence of arcing

 8   on the wire fragments and we do not have the inference

 9   of arcing in Bedroom 4?

10        A    No.  That's not what I'm stating in 3a.

11   What I'm stating --

12        Q    Okay.  I'm still lost.

13        A    I'm sorry.  Go ahead.

14        Q    Go ahead.  No, I'm just having trouble

15   figuring out who other elements are considered there,

16   so I want to -- I'm trying to understand it.

17        A    Sure.  Sure.  Conclusion 3A is very simple:

18   There was evidence of arcing, electrical arcing, on

19   conductor fragments in the shed.  That could only

20   occur if there was electrical energy present, if the

21    electrical service to the residence was still intact.

22                The service triplex to the residence, which

23    supplies all of the electrical power to the residence,

24    was severed during the fire.  It was melted and

25    severed.

71

1                After the time that that service triplex

2     was severed, there was no longer any electrical energy

3     in the building and there was no possibility of

4     electrical arcing on conductors powers by the

5     building.

6                So all I'm saying in Conclusion 3A is that

7     the arcing occurred on the conductors within the shed

8     prior to the time that the overhead service triplex

9     was severed.

10        Q    How do you determine that there was not

11    fire inside the residence and fire in the shed at the

12    same time?

13        A    Well, I'm not -- not talking about in --

14    are we still speaking specifically about conclusion

15    3A?

16        Q    Yes.  Because conclusion 3A specifically

17    says that at the time there was fire in the home,

18    there was no -- there was did he energize the home was

19   did he energize at this time, correct?

20        A   So you're talking about 3B now?

21        Q   No.  I'm still talking about 3A.

22        A   Okay.

23        Q   Hold on.  Let me read it again.  Maybe --

24   oh, I see.  You're just saying 3A is simply saying

25   that there was fire in the shed before it lost it,

72

1    before the energy was cut off, regardless, right?

2         A   Correct.

3         Q   That's -- that's the totality of 3A:  is

4    that there must have been energy in the shed when

5    there was fire in the shed; is that right?

6         A   Correct.

7         Q   Got with.  It got it.  Sorry.  I was just

8    reading it together.

9             Okay.  So then 3B says, The overhead

10   service triplex being severed by the fire prior to the

11   time that the fire attacked the branch circuit wiring

12   within Bedroom 4 of the residence.

13            And is that saying that because there was

14   no arcing within Bedroom 4, that you believe the power

15   must have been cut by that time?

16        A   That is correct.

17        Q   Got it.  Now, are you aware of hypothesis

18    or research relating to arcing on non-energized lines?

19         A    I'm not aware -- I'm not aware of any

20    arcing occurring on non-energized lines, because

21    electrical arcing requires that the lines be

22    energized.

23         Q    Okay.  And then let's go to Conclusion 1.

24    And I'm going to leave out a word just for future

25    motion in limine, but you can talk about whether you

73

1    should come back in later.

2              No. 1:  Evidence of electrical arcing was

3    present on conductors located within the polymer shed

4    adjacent to the residence.

5              That conclusion is simply talking about the

6    arcing on the metal fragments that we've seen,

7    correct, or that we've spoken about?

8         A    Yes.  That is -- that is speaking about

9    evidence of electrical arcing on the conductor

10    fragments that were found within the shed.

11             MR. MORGAN:  Okay.  We can take that down.

12         Q    (By Mr. Morgan)  We have spoken a lot about

13    peer reviewed articles that have been published by

14    other people.

15             Have you yourself ever published or

16    attempted to publish any literature on arc mapping?

17        A    I have not published any literature.

18        Q    And if we can attach what should be labeled

19    as invoices as the next exhibit?

20            MR. CURRAN:  Yes, sir.

21            MR. LaFLAMME:  Sorry, Mike.  What was the

22    next exhibit?

23            MR. MORGAN:  We've put a consolidated group

24    of invoices together versus going through all of them.

25            MR. CURRAN:  It's coming up.

74

1        Q    (By Mr. Morgan)  Just in general, do you

2    know how much that you charge for the hour for

3    investigative work?

4        A    My current rate for investigative work is

5    $350 per hour.

6        Q    And do you have different rates for

7    different jobs that you do within AEI?

8        A    I do not.

9        Q    So for deposition, for writing report,

10    scene investigation, travel, everything that would be

11    build at that 350 rate?

12        A    Sorry.  I misunderstood your previous

13    question.  My standard rate is $350 per hour

14    currently.  And my testimony rate is $525 per hour.

15        Q    Okay.  Are there any other hourly rate

16   changes for any other activities?

17        A    No.

18        Q    And on this -- when -- are you based in

19   Denver?

20        A    I am.

21        Q    So when you come to Wyoming, do you charge

22   from the time you leave your house to the time you get

23   home to your house?

24        A    I charge -- I charge from the location of

25   my office or when I pass my office and back to my

♠

75

1    office, not to my home.

2        Q    So if you have to sleep in Wyoming, do you

3    charge while you're sleeping?

4        A    Do I charge hourly while I'm sleeping?

5        Q    Yes.

6        A    No, I do not.  When I -- when I -- when I

7    travel to a job out of town, I stop billing when I

8    reach my hotel.

9        Q    Got it.  Do you know approximately -- and

10   we can scroll through what would have been provided as

11   a list of hours that we have.

12             Each one looks to be separate.  Do you know

13    if there's a master invoice with all of your hours on

14    it?

15         A    I do not believe there would be.

16         Q    This is your typical billing practice:  is

17    as work comes due, you have that invoice, but you

18    don't keep a master?

19         A    I couldn't -- I couldn't speak to what is

20    kept in our accounting system.  That's not something

21    that I have involvement in normally.

22         Q    Okay.  Who is the head of the accounting at

23    AEI?

24         A    I believe -- I believe Carol Chavez would

25    be what we call the head of accounting.  She wears

76

1    many hats.

2         Q    Okay.  And do you know approximately how

3    many hours you've billed in this case to date?

4         A    Not offhand.  I would have to refer back to

5    these same invoices.

6         Q    Okay.  And on the quantities of hours, that

7    would be where we're able to find specifically how

8    much was done?

9         A    Yes.

10        Q    Okay.  And do you have work still to be

11    completed in this case, other than testifying at

12  trial?

13       A    I currently have no work planned on this

14  case other than testimony.

15       Q    Okay.  Did anyone else assist you on

16  this -- in this work?

17       A    That's a very vague question, but on its

18  face, no.

19       Q    You're right.  That is a vague question.  I

20  just meant technically, did you have any technical

21  assistance from a junior engineer or something of that

22  matter?

23       A    No.

24       Q    The Defendant Walmart, have you prior --

25  have you worked for Walmart previously?

77

1        A    I don't believe I ever have.

2        Q    Do you believe that you ever worked for

3   Jetson, the hoverboard manufacturer?

4        A    I may have had one other case with them.  I

5   don't recall if it was prior to or following this one,

6   as this was several years ago.

7        Q    Did it involve a fire?

8        A    I believe it did.  And again, I believe

9   I've had one other case for them.  I couldn't say that

10    for certain.

11         Q    I understand.  Do you remember the -- the

12    location that the case would have been pending?

13         A    Not offhand.

14         Q    Was Mr. LaFlamme the attorney on that case?

15         A    I don't believe so.

16         Q    Have you worked with Mr. LaFlamme or his

17    firm before?

18         A    I have.

19         Q    How many times?

20         A    I would have to estimate I would say ten to

21    20 times perhaps.

22         Q    Did all of those cases involve fires?

23         A    I would say that -- I would say it is

24    likely that -- most of them involve fires or

25    explosions.  There was at least one that did not.

78

1         Q    Okay.  Other ones that involve fire or

2    explosions, approximately how many of those involved a

3    product?

4              Let me strike that.  That's a bad question.

5              MR. LaFLAMME:  I was going to object to

6    form.  Go ahead, Mike.

7         Q    (By Mr. Morgan)  In the cases that involve

8    fire or explosion, approximately how many of those

9  alleged that a product was the cause of the fire or

10  explosion?

11         MR. LaFLAMME:  Mike, are you just talking

12  about just if they were put on notice or if it went to

13  a case and there was an actual allegation?  There's

14  two differences there.

15         MR. MORGAN:  Good point.

16     Q    (By Mr. Morgan)  I'm talking about where

17  you were retained as an expert in a lawsuit, where a

18  lawsuit had been filed, and that lawsuit alleged that

19  a product caused an explosion or a fire.

20     A    Are you asking specifically about matters

21  that I was retained by Mr. LaFlamme's firm or all

22  matters?

23     Q    Mr. LaFlamme's firm.

24     A    I would -- again, I'm estimating here.  I

25  would say that likely most of them involved a product

79

1  of some sort.  Though, some would have involved a

2  service.

3     Q    Okay.  Of the ones that involved the an

4  allegation that the product caused the fire or

5  explosion, do you have any recollection of any case

6  where you agreed that the product was the cause of the

7    fire or explosion?

8         A    Again, if you're asking specifically to

9    Mr. LaFlamme's firm, I couldn't say for sure.  I'd

10   have to go back and look at my files.

11              However, I will say that it is a regular

12   occurrence for me to go back to a client and have to

13   tell them bad news.  It all depends -- it all depends

14   on where the evidence leads.

15        Q    In the other case involving the Jetson

16   hoverboard, did you give the client bad news in that

17   case?

18        A    Again, I think there may have been one

19   other case, and I don't recall.  I would have -- I

20   have would have to look that up to see if there even

21   was another case.

22              I know that I have worked on other cases

23   with other hoverboards before that were not Jetson.

24   So again -- I'm sorry -- I'd have to look that up.

25        Q    And are you generally familiar with the

80

1    allegations that hover- -- some hoverboards have of

2    lithium ion batteries that become unstable and have

3    thermal runaway events, causing fires?

4         A    I am aware of those allegations.

5         Q    Have you ever been involved in a case where

6    you were retained by a defendant by agreed that the

7    source of the fire was a lithium ion battery from a

8    hoverboard?

9         A    A hoverbored specifically, I do not believe

10   that I ever have.

11        Q    Okay.  Approximately what percentage of

12   your work, your personal work, is done on behalf of

13   defendants?

14        A    I would estimate that it's approximately

15   90 percent.

16        Q    Have you ever worked for my firm:  Morgan &

17   Morgan?

18        A    I don't believe I ever have.

19        Q    Within your report, when we look at it in

20   total -- we can take down the invoices -- what

21   percentage of the actual first 26 pages were created

22   specifically for this case versus language that you

23   use in multiple cases or repeated?

24        A    Aside from the -- the basic template

25   outlining different sections of the report, this was

81

1    entirely authored by me specifically for this matter.

2         Q    Okay.  Other than yourself, do you know --

3    well, first off, let me ask you:  Are you an owner or

4    a shareholder in AEI?

5         A    I am not.

6         Q    You don't participate in equity of the firm

7    in any way?

8         A    I do not.

9         Q    Do you know if the firm AEI does work for

10   Walmart?

11        A    I do not know offhand if they have ever

12   done work for Walmart.

13        Q    Do you know offhand if any other people

14   within your firm or within AEI have done work for

15   Mr. LaFlamme's firm?

16        A    Yes.

17        Q    Do you know approximately how much income

18   Mr. LaFlamme's firm has paid AEI over the last five

19   years?

20        A    I have no idea.

21        Q    Have you and Mr. LaFlamme ever gone on

22   vacation together?

23        A    We have not.

24        Q    All right.  Any outside work dealings with

25   Mr. LaFlamme or my members of his firm?

82

1         A    Aside from -- aside from perhaps getting

2    dinner after an inspection that we all traveled to,

3    no.

4        Q    Sure.  And that is not meant to be

5    critical.  I'm just asking about your personal

6    relationships.

7        A    Sure.

8            MR. MORGAN:  I'll send it to Mr. LaFlamme

9            MR. LaFLAMME:  Why don't we take a quick

10   break.  And I don't know if I'm going to have any.  I

11   just want to go through my notes quick and then we can

12   wrap it up.

13           MR. MORGAN:  Sure.

14           THE VIDEOGRAPHER:  The time is 11:17.  We

15   are off the record.

16           (Recess taken.)

17           THE VIDEOGRAPHER:  The time is 11:22.  We

18   are back on the record.

19                    EXAMINATION

20   BY MR. LaFLAMME:

21       Q    Mr. Strandjord, just a couple of very quick

22   questions.  You were shown by Mr. Morgan some small

23   portions of various articles that you referred to as

24   peer reviewed articles.

25           Do you recall that?

83

1      A    I do.

2      Q    Okay.  Are you familiar with an -- you're

3   familiar with NFPA 921, correct?

4      A    Yes, I am.

5      Q    And I think you mentioned that there's a

6   2021 version and a 2024 version of NFPA 921?

7      A    Yes.  Those are the two most recent

8   editions.

9      Q    Okay.  How often generally does NFPA 921

10  update their editions?

11     A    There's generally a new edition of NFPA 921

12  every three years.

13     Q    Okay.  And in that process of updating the

14  edition, do you know if NFPA 921 considers various

15  peer reviewed articles that are out there in the

16  marketplace concerning issues of fire investigation?

17          MR. MORGAN:  Object to predicated

18  foundation.

19     A    Yes.  Certainly -- certainly, it does.

20  NFPA 921 is a consensus document that is authored

21  jointly by many individuals in the fire investigation

22  community.

23     Q    (By Mr. LaFlamme)  And when you say,

24  "consensus document," what do you mean by that?

25     A    I mean the NFPA 921 is a guide, and it is

84

1    published by -- it is published by a committee within

2    NFPA.  That -- that committee consists of a number of

3    individuals.  I don't know how many offhand.  But many

4    individuals who all must agree to one degree or

5    another on what is going to be published in that

6    guide.

7        Q    And in NFPA 921, is that generally titled

8    The Guide for Fire and Explosion Investigation?

9        A    Yes, I believe that's the title.  It's

10   considered the standard in the industry as a guide.

11       Q    Do you know if NFPA 921 is generally

12   accepted nationally as the guide for fire origin and

13   cause investigation?

14       A    Yes, it most certainly is.

15       Q    Does NFPA 921, both the 2021 version and

16   the 2024 version, do they allow for the use of

17   identifying electrical arcs, whether we call it arc

18   mapping or arc surveying, in the fire investigation

19   process?

20       A    Yes, yes.  They both include that as part

21   of the fire investigation process.

22       Q    And do they allow the use of arc mapping

23   and arc surveying for the process of identifying or

24   assisting in the identification of fire spread?

25        A    Yes.  Arc -- arc mapping is considered a

♠  85

1    fire pattern in NFPA 921.  And just like any other

2    fire pattern, it can be used as an aid in determining

3    spread or origin.

4         Q    And can the identification of electrical

5    arcing also aid in the identification of or assist in

6    the identification of an area of origin under NFPA

7    921?

8         A    I'm sorry.  Your voice cut out there at the

9    end.  I didn't hear the end of your question.

10        Q    Sure.  Can the identification of electrical

11   arc in through arc mapping and arc surveying under

12   NFPA 921 can that also aid in accessing an area of

13   origin for a fire?

14        A    Yes.  Just like any other fire pattern, it

15   can be used -- it can be used for origin

16   determination.

17        Q    You discussed quickly before the lab

18   inspection, where there was electrical arcing that was

19   identified in some of the wiring found in the polymer

20   shed that was outside the house.  And had indicated

21   that some other experts were there with you.

22             Was one of them a Scott Cramer from EDT?

23    Does that name ring a bell?

24         A    That does ring a bell.  Mr. Cramer may have

25    been present there, yes.

86

1         Q    Okay.  Did you understand that Mr. Cramer

2    had -- was retained by Plaintiffs in this case at that

3    time?

4         A    Yeah.  If --

5              MR. MORGAN:  Object to predicate.

6         A    If indeed it was Mr. Cramer there, my

7    understanding was he was there on behalf of the

8    plaintiff.

9         Q    (By Mr. LaFlamme)  Okay.  Do you recall at

10    least there being some expert consultants at the lab

11    inspection for the plaintiffs -- or on behalf of the

12    plaintiffs.

13              Is that accurate?

14         A    Yes, I recall there being two individuals

15    there for the -- that identified themselves as being

16    there for the plaintiffs.

17         Q    Okay.  And do you know whether one of them

18    was Scott Cramer or not off the top of your head?

19         A    I believe it may have been Scott Cramer.

20         Q    Okay.  And was the other expert an

21    individual named Smoky Dyer, D-y-e-r?

22      A    Smoky Dyer, yes.  That's a very unique

23  name.  I believe that was smoky there.

24      Q    Okay.  And were those -- were the two

25  individuals that were there on behalf of the

87

1  plaintiffs, were they also involved in identifying

2  potential areas of arcing on the electrical wiring

3  that were then investigated further?

4      A    I believe they were.  As I stated earlier,

5  my primary focus was on examining the wires for arcing

6  myself; but I believe the other individuals there were

7  involved in that as well.

8      Q    But those individuals that were there for

9  the plaintiffs were also involved in that process.

10         Is that accurate?

11      A    I believe that.

12         MR. MORGAN:  Object to speculation.

13      Q    (By Mr. LaFlamme)  Was it your

14  understanding that the other individuals that were

15  there for or on behalf of the plaintiffs were also

16  involved in the process of identifying potential arc

17  locations?

18      A    I believe they were certainly interested in

19  identifying any potential arcing.

20          MR. LaFLAMME:  Okay.  Sir, that's all the

21    questions I have for you.  I don't know if Mr. Morgan

22    has some quick follow-up or not.

23          MR. MORGAN:  Super quick.

24          One thing, just for the record, we've

25    agreed that the file produced in connection with Mr.

88

1    Strandjord's deposition, his expert file of what

2    defendants have found relevant to collection from the

3    plaintiff, is authentic for purposes of use at trial

4    or otherwise.

5          Is that fair, Mr. LaFlamme?

6          MR. LaFLAMME:  Yeah.  And the only caveat,

7    Mike, with that is there are photographs in there from

8    other people.

9          So to the extent he may not be able to

10    authenticate that, but he can authenticate it that

11    it's part of his file.

12          MR. MORGAN:  Yeah, that's fair.  And I

13    understand.  We all maintain our relevance objections

14    to all of that stuff.

15                    EXAMINATION

16    BY MR. MORGAN:

17      Q    But the only other thing that I forgot to

18    ask is:  I saw your testifying list.  There was about

19    five cases; is that right?

20        A    I believe -- I believe the -- what was

21    supposed to be a four-year testimony history, I

22    believe it went back a little further than that on

23    that document.  But there were more than five, I

24    believe.

25        Q    Okay.  How many times do you think you've

89

1    testified in the last four years, for deposition or

2    trial, approximately?

3        A    My -- my best answer to that would be that

4    that testimony record.

5        Q    Okay.  Okay.  And I'll double-check it.

6    But I thought it was rather small.

7             How many cases do you think you worked on

8    in the last four years?

9        A    How many total cases?  I would -- I could

10    estimate it would be several hundred.

11        Q    Okay.  And have you -- has your testimony

12    ever been stricken under a prior or Daubert standard

13    for any reason or any portion?

14        A    No, it has not.

15             MR. MORGAN:  All right.  That's all I have.

16    Thank you very much.

17          MR. LaFLAMME:  And then we will read and

18     sign.  Otherwise, I think we should be good.

19          THE VIDEOGRAPHER:  Very good.  This will

20     conclude the deposition of Brian Strandjord.  The time

21     is 11:31.

22          (The following colloquy is not on the video

23     record.)

24          THE STENOGRAPHER:  I just need to get

25     transcript orders on the record as well.

90


1          MR. MORGAN:  What I was going to say, we

2     need an expedited copy.  I understand it's

3     Thanksgiving, but we've got to file this on Monday.

4          My request would be if we could use an

5     uncertified copy in the motion, that way we don't have

6     to expedite it, like, tomorrow.  Otherwise, we would

7     need it tomorrow.

8          MR. LaFLAMME:  Yeah.  Mike, I think just

9     use a rough draft, and then supplement it when you get

10     it.

11          MR. MORGAN:  Okay.  Okay.  Cool.  As long

12     as we're in agreement, that's good.

13          THE STENOGRAPHER:  E-tran and exhibits for

14     both counsel?

15          MR. MORGAN:  Yes, please.

16              MR. LaFLAMME:  Yes, please.

17

18

19

20

21

22

23

24

25