Timothy M. Stubson, Wyo. Bar No. 6-3144     Eugene M. LaFlamme (Admitted pro hac vice)
Brandon E. Pryde, Wyo. Bar No. 8-6883     Jared B. Giroux (Admitted pro hac vice)
Holly L. Tysse, Wyo. Bar No. 7-5553     Jillian L. Lukens (Admitted pro hac vice)
Crowley Fleck, PLLP     McCoy Leavitt Laskey, LLC
111 West 2nd Street, Suite 220     N19 W24200 Riverwood Drive, Suite 125
Casper, WY 82601     Waukesha, WI 53188
(P) 307-232-6901     (P) 262-522-7000
tstubson@crowleyfleck.com     elaflamme@MLLlaw.com
bpryde@crowleyfleck.com     jgiroux@MLLlaw.com
htysse@crowleyfleck.com     jlukens@MLLlaw.com

*Attorneys for Defendants,*
*Walmart Inc. and Jetson Electric Bikes, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STEPHANIE WADSWORTH ) | |
| Individually and as Parent and Legal Guardian ) | |
| of W.W., K.W., G.W., and L.W., minor children ) | |
| and MATTHEW WADSWORTH, ) | Case No. 2:23-cv-00118-NDF |
| ) | |
| Plaintiffs, ) | DEFENDANTS JETSON |
| ) | ELECTRIC BIKES, LLC AND |
| v. ) | WALMART INC.'S MOTION |
| ) | FOR SUMMARY JUDGMENT; |
| WALMART INC. and ) | **MEMORANDUM IN SUPPORT** |
| JETSON ELECTRIC BIKES, LLC, ) | **OF MOTION** |
| ) | |
| Defendants. ) | |

Defendants, Jetson Electric Bikes, LLC and Walmart Inc., respectfully request that this Court grant its Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56 as there is no genuine issue of material fact because Plaintiffs cannot meet their burden to show that the Jetson Plasma hoverboard caused the subject fire.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  This case involves a February 1, 2022 residential fire at the Wadsworth residence in Sweetwater County, Wyoming. (LaFlamme Dec. ¶3, Ex. 1: Plts' Compl., Doc. 1, ¶¶3-8, 33).

2.  Plaintiffs contend that the fire started at a Jetson Plasma hoverboard that was located near the bedroom door for G.W. and L.W.'s bedroom. (LaFlamme Dec. ¶3, Ex. 1: Plts' Compl. Doc. 1, ¶¶33-34; ¶4, Ex. 2: G.W. Dep. 10:10-12). Below is a diagram of the bedroom:



(LaFlamme Dec. ¶5, Ex. 3: Schulz Report, pg. 77).

3.  G.W. and L.W. were in their bunk bed sleeping when the fire occurred. (LaFlamme Dec. ¶4, Ex. 2: G.W. Dep. 17:3-10).

4.  When G.W. and L.W. woke up, there was already fire at their bedroom window (which is directly adjacent to their bunk bed), and the window had broken. (LaFlamme Dec. ¶4, Ex. 2: G.W. Dep. 17:3-19; ¶6, Ex. 4: L.W. Dep. 11:22-12:18).

5.  There was a smoking shed located just outside G.W. and L.W.'s bedroom window where Mr. and Mrs. Wadsworth would smoke during the winter months to provide protection from the cold and wind while they smoked cigarettes. (LaFlamme Dec. ¶7, Ex. 5: S. Wadsworth Dep. 68:20-22, 71:7-9; ¶8, Ex. 6: M. Wadsworth Dep. 114:11-17).

6.  Mrs. Wadsworth smoked in the smoking shed a couple of hours before the fire was identified.  (LaFlamme Dec. ¶7, Ex. 5: S. Wadsworth Dep. 89:17-90:8).

7.  Mrs. Wadsworth also consumed about ten alcoholic drinks the evening/morning before the fire. (LaFlamme Dec. ¶7, Ex. 5: S. Wadsworth Dep. 62:24-64:7, 90:9-91:24).

8.  Defense experts concluded that the fire originated at the smoking shed and then spread to the house. (LaFlamme Dec. ¶9, Ex. 7: Filas Report, pg. 3; ¶10, Ex 8: Strandjord Report, pg. 25).

9.  Plaintiffs have alleged negligence, strict liability and breach of warranty claims against Defendants. (LaFlamme Dec. ¶3, Ex. 1: Plts' Compl., Doc 1, pgs. 11-65)**.**

10. Plaintiffs generally allege that the hoverboard was "unreasonably dangerous" and that Defendants breached their "duty to properly and adequately inspect, test, label, provide adequate warnings for, package, distribute and/or sell the subject hoverboard." (LaFlamme Dec. ¶3, Ex. 1: Plts' Compl., Doc 1, ¶¶52-54, 82-84).

11. Defendants deny the hoverboard was dangerous or that Defendants breached any alleged duty. (LaFlamme Dec. ¶11, Ex. 9: Jetson's Answer & Aff. Def., Doc 18, ¶¶52-54, 82-84; *see* generally, Doc 18, pgs. 8-72).

12. Plaintiffs further contend that Defendants are strictly liable because the hoverboard "was not properly and adequately designed, manufactured, inspected, tested, labeled, packaged, distributed, sold or had adequate warnings." (LaFlamme Dec. ¶3, Ex. 1: Plts' Compl., Doc 1, ¶¶62, 93, 123, 154, 184, 215, 245, 376, 306, 337).

13. Defendants deny they are strictly liable for the injuries alleged by Plaintiffs. (LaFlamme Dec. ¶11, Ex. 9: Jetson's Answer & Aff. Def., Doc 18, ¶¶62, 93, 123, 154, 184, 215, 245, 376, 306, 337).

14. Derek King is Plaintiffs' only fire cause expert. His opinion is that the fire was caused by the alleged failure of two of the ten total lithium-ion battery cells in the subject hoverboard. (LaFlamme Dec. ¶12, Ex. 10: King Report, pg. 10; ¶13, Ex. 11: King Dep. 190:20-191:9).

15. King contends that the specific failures in the two battery cells occurred at substantially the same time due to an internal short circuit, which then resulted in the fire. (LaFlamme Dec. ¶12, Ex. 10: King Report, pg. 13; ¶13, Ex. 11: King Dep. 190:20-191:9).

16. To have an internal short circuit, the anode (negative side) and cathode (positive side) need to communicate with each other. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 75:18-22).

17. Each lithium-ion battery cell, however, is manufactured with a polymer-based separator that prevents the anode and cathode from communicating. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 87:25-88:14).

18. Therefore, to have a short circuit, the separator must fail in each of the two cells. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 87:25-88:14).

19. The appearance of a lithium-ion battery cell failure from an external fire attack (meaning a fire that started somewhere else) is similar to cells that have allegedly failed from internal rupture. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 192:9-19).

20. King only reviewed two deposition transcripts prior to issuing his opinion: Coryn Kremers (Walmart's corporate representative) and Sam Husain (Jetson's corporate representative). (LaFlamme Dec. ¶13, Ex. 11: King Dep. 33:8-13).

21. King did not review any of the other 18 fact witness depositions that were taken in this case prior to Plaintiffs' expert disclosures before issuing his report. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 33:8-16).

22. After issuing his report and just a few days before his deposition, King "skimmed" Sweetwater County Sheriff Detective Sergeant Sheaman's deposition, but acknowledged he did not read much of it. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 33:12-34:6).

23. King did not review any of the body camera footage and was not aware of statements made on that footage by the Wadsworth children or Mr. Pasborg. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 49:1-24).

24. King only received his Professional Engineer license one year ago. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 21:4-10).

25. King did not know that UL 2580 was the standard that applied to lithium-ion battery cells and therefore did not consult UL 2580 at all in his analysis. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 50:23-51:1; 69:5-16).

26. King only attended the hoverboard inspection on February 29, 2023, reviewed CT scans of the hoverboard and visually inspected an exemplar Jetson Plasma hoverboard. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 9:22-25, 65:4-16, 37:6-7).

27. King did not participate in the May 18, 2022 site inspection, the August 2 and 3, 2022 site inspection or the October 30, 2023 evidence inspection. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 31:22-24; ¶14, Ex. 12: October 30, 2023 Lab Exam Sign-In Sheet).

28. King did not review any of Jetson's or Walmart's discovery documents, which included certifications and test records for the Jetson Plasma hoverboard and its components – including the lithium-ion batteries. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 65:25-66:5).

29. King did not review any photographs from the lab inspection where the electrical arcing in the smoking shed was identified. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 197:6-9).

30. King's focus was only on the hoverboard and whether it had a failure. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 145:3-6; 183:4-12).

31. King did not do anything to assess whether the fire could have started at the smoking shed. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 189:25-190:3).

32. King acknowledged that there was arcing on wires in the smoking shed, and no arcing in G.W. and L.W.'s bedroom or in the hoverboard. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 90:23-92:3; 195:24-196:2).

33. The identification of electrical arcing (*i.e.* arc mapping) can be used to help determine a fire's origin and spread. *See* NFPA 921 (2021 ed.) § 3.3.9. (LaFlamme Dec. ¶15, Ex. 13: NFPA 921 (2021 ed.), pg. 14).

34. King did not know where the electrical service came into the house (it came in directly above the smoking shed). (LaFlamme Dec. ¶13, Ex. 11: King Dep. 92:15-17).

35. King was not aware that Mrs. Wadsworth was smoking in the shed about two hours before the fire or that she had about ten alcoholic drinks the evening before the fire prior to going to bed around 2:00 a.m. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 197:10-25).

36. King acknowledged that, as an expert conducting an investigation, it is important to have all the information about the fire loss to render an opinion. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 196:7-20).

37. King has never had another case where two individual cells short-circuited and failed at the same time. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 191:10-12).

38. King has not done any research to determine the percentage of chance of two cells failing at the same time, noting that the circumstances of his dual failure theory was "unusual" and "a coincidence". (LaFlamme Dec. ¶13, Ex. 11: King Dep. 191:10-192:6).

39. Sweetwater County Sheriff's Office Detective Sergeant Jeff Sheaman and Green River Fire Department Assistant Chief Bill Robinson also investigated the fire. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 36:5-10; ¶17 Ex. 15: Robinson Dep. 60:25-61:20).

40. Sheaman's investigation closed on March 4, 2022. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 203:8-12, 254:10-13).

41. Robinson's investigation was even more short lived and was closed on February 9 2022. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 51:18-52:3).

42. Both Sheaman and Robinson initially concluded that the fire started in G.W. and L.W.'s bedroom and originated at the hoverboard, but they both acknowledged that their conclusions were only based on the information they had at the time (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 117:17-21, 255:6-16; ¶17, Ex. 15: Robinson Dep. 156:7-157:4, 184:12-23).

43. Sheaman agreed that his opinions are only "based on the information [he] learned up through March 4th of 2022." (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 254:10-13).

44. Sheaman has not been provided with any additional information related to this fire since March 4, 2022. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 164:24-165:2).

45. Sheaman agreed that to complete a "full and thorough origin and cause investigation under NFPA 921 – Guide for Fire and Explosion Investigations, [he] would need to consider all evidence that's been uncovered." (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 203:8-22).

46. Sheaman agreed that if "additional information comes to light, he would need to consider that evidence under NFPA 921." (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 252:11-14).

47. Green River Fire Department Assistant Chief Bill Robinson assisted Detective Sergeant Sheaman with his fire investigation. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 62:15– 63:11).

48. Robinson's total investigation was limited to an approximate two-hour site visit on the day of the fire. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 130:10-16).

49. Robinson agreed that an origin and cause investigator should continue to evaluate additional fire evidence as it is discovered and that an investigator needs to "consider all evidence". (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 129:24-130:9).

50. Robinson was not aware of the evidence that had been identified since he ceased his investigation when he issued his report. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 181:22-182:4).

51. Robinson did not interview any witnesses. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 122:15-16).

52. Robinson did not review any of the body camera footage. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 122:20-22).

53. Robinson was not aware of the Wadsworth children's statements after the fire that indicated that the fire started outside. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 133:14-18, 180:1-4).

54. Robinson acknowledged he would have to classify the fire origin as "undetermined" based on additional information identified pursuant to NFPA 921 until the investigation is complete. (LaFlamme Dec. ¶17, Ex. 15: Robinson Dep. 156:7-157:4, 179:3-15).

55. Neither Sheaman nor Robinson attended or participated in the May 18, 2022 site inspection, the August 2 and 3, 2022 site inspection, the October 30, 2023 evidence inspection, or the February 29, 2024 hoverboard inspection. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 164:24-16:25, 203:8-22; ¶17, Ex. 15: Robinson Dep. 144:14-24, 181:22-182:4).

56. Sheaman and Robinson were not privy to any of the information identified during the four additional inspections or any of the discovery conducted in this case. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 203:13-22; ¶17, Ex. 15: Robinson Dep. 144:14-20).

57. Sheaman and Robinson are not engineers, electrical engineers or battery experts. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 7:7-9:6, 18:21-19:7; ¶17, Ex. 15: Robinson Dep. 6:9-12, 8:20-23).

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn" in the non-movant's favor. *Anderson,* 477 U.S. at 255.

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(l)(A)–(B).

Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing the moving party's cited materials do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine dispute of material fact for trial. *See Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

The moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *See Celotex,* 477 U.S. 317 at 325. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* at 322. The non-moving party must make an affirmative showing on all matters in issue by the motion as to which it has the burden of proof at trial. *Id.* at 325. Summary judgment is appropriate here and should be granted where Plaintiffs cannot establish by admissible factual or scientific evidence that the Jetson Plasma hoverboard caused the subject fire. *Id.* at 322.

## **LEGAL STANDARDS**

To establish a prima facie claim for strict product liability, plaintiffs must prove (1) that the sellers were engaged in the business of selling the product that caused the harm; (2) that the product was defective when sold; (3) that the product was unreasonably dangerous to the user or consumer; (4) that the product was intended to and did reach the consumer without substantial change in the condition in which it was sold; and (5) that the product caused physical harm to the plaintiff /consumer. *Loredo v. Solvay American, Inc.*, 2009 WY 93, ¶12, 212 P.3d 614, 633; *Rohde*

*v. Smiths Medical,* 2007 WY 134, ¶18, 165 P.3d 433, 437 (Wyo. 2007). Proof of defect and causation must be provided by expert testimony where the question is beyond the experience of the average layperson. *Truck Ins. Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1214, 63 Fed. R. Evid. Serv. 948, Prod.Liab.Rep. (CCH) P 16, 918.

To prevail on a negligence claim, a plaintiff is required to prove all four of the following elements: (1) duty; (2) breach of the duty; (3) causation; and (4) damages. *Loredo v. Solvay American, Inc.*, 2009 WY 93, ¶12, 212 P.3d 614, 622 (*citing Franks v. Indep. Prod. Co., Inc.,* 2004 WY 97, ¶9, 96 P.3d 484, 489 (Wyo. 2004)).

For a breach of warranty claim, a plaintiff is required to prove all four of the necessary elements: (1) the existence of a warranty, (2) breach of a warranty, (3) the breach proximately caused the losses claimed, and (4) defendant received timely notice of the breach. *"See Platt v. Winnebago Industries, Inc.,* 960 F.3d 1264, 1271, 101 UCC Rep.Serv.2d 1603 (10th Cir. 2020).

Finally, punitive damages are only available when a plaintiff proves, by preponderance of the evidence that the particular defendant acted with intentional, willful and wanton misconduct. *See* Wyo. Civ. Pattern Jury Instructions 4.06.

## **ARGUMENT**

Plaintiffs' claims against Defendants fall into three basic categories that largely overlap: 1) strict liability[1], 2) negligent product liability, and 3) breach of warranty. (LaFlamme Dec. ¶3, Ex. 1, *See generally Plts' Compl., Doc 1).* Each of these claims have causation as a common element.

---

[1] Breach of warranty claims made in the context of product liability are akin to a claim for strict liability. *See e.g. Schneider Nat., Inc. v. Holland Hitch Co.,* 843 P.2d 561, 583 (Wyo. 1992) ("The product liability action for breach of warranty … is a misunderstood form of strict liability whose inclusion in product liability cases is often a matter of form."). Thus, the analysis provided below regarding Plaintiffs' inability to prove their strict liability claim due to a failure to prove the existence of a defect resulting in cause applies equally to any breach of warranty claim asserted by Plaintiffs. *See e.g. McLaughlin v. Michelin Tire Corp.,* 778 P.2d 59, 65 (Wyo. 1989) (summary judgment on claim for implied warranty of merchantability properly granted where record showed no proof of defect in tire).

Plaintiffs' claims against Defendants primarily relate to the design, manufacture, warnings, distribution, and sale of the subject hoverboard. (LaFlamme Dec. ¶3, Ex. 1, *See generally Plts' Compl., Doc 1).* Plaintiffs, however, cannot meet their burden as they do not have any expert witness that can offer an opinion that the hoverboard caused the fire within the requirements of Fed. R. Evid. 702. As a result, summary judgment under Fed. R. of Civ. P. 56 is appropriate.

## I.    CAUSATION IS A COMMON ELEMENT TO ALL OF PLAINTIFFS' CLAIMS AND PLAINTIFFS CANNOT MEET THEIR BURDEN ON CAUSATION.

### A. King's causation opinion fails to satisfy the reliability standard for admissibility.

The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The expert requirement to establish the cause of a fire was discussed extensively in *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206 (10th Cir. 2004). In that case, a fire destroyed a restaurant in Lakewood, Colorado. *Id.* at 1207. The plaintiff claimed that the light ballast manufactured by defendant MagneTek caused the fire. *Id.* Wood normally will not catch fire until exposed to a heat source of about 400°. *Id.* at 1215. The evidence was that the maximum temperature the ballast could have reached was 340°. *Id.* The plaintiff's expert, Dr. Romig, however, opined that heat from the ballast was sufficient to cause wood materials in the ceiling to catch fire – despite the fact that it was below the 400° combustible threshold. *Id.* at 1211. Romig posited the theory of pyrolysis, which hypothesizes that wood can catch fire at temperatures below 400° if it is exposed to such temperatures over a long enough period of time. *Id.* at 1209. The district court found that Romig's theory was unreliable and it had not been reliably applied to the

14

facts of the case. *Id.* at 1211. Specifically, the Tenth Circuit Court of Appeals found that Romig's opinion lacked a showing of evidence of peer viewed testing, applicable rate of error, and that the scientific community questioned Romig's theory. *Id.* at 1212-13.

The district court ultimately excluded Romig's expert testimony. *Id.* Without expert testimony showing that the ballast could have reached temperatures approaching 400° or that wood can catch fire below that temperature, the district court concluded that without such evidence, plaintiff could not establish causation, an essential element of all its claims, and granted summary judgment. *Id.*at 1209. Similar to the *Truck Ins. Exch.* case, here, Plaintiffs only named one expert to address causation: Derek King. (LaFlamme Dec. ¶19, Ex. 17: Plts' Initial Expert Witness Discl. Doc 73-3).

As an initial matter, King is not qualified to offer any opinions on whether the lithium-ion battery cells in the subject hoverboard caused the fire because he does not have the necessary knowledge, skill, experience, training, or education. King has never been an identified expert under Rule 26 or any equivalent state civil procedure rules for an alleged lithium-ion battery fire case. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 16:14-18). King has never worked for a company that designed or manufactured lithium-ion battery products nor has he ever personally designed or manufactured, or been involved in the design or manufacture, a lithium-ion battery product. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 20:15-25). King also only received his Professional Engineer license one year ago. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 21:4-10). He did not even know that UL 2580 was the standard that applied to lithium-ion battery cells and therefore did not consult UL 2580 at all in his analysis. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 50:23-51:1, 69:5-16).

Further, other courts have excluded or limited King's opinions on multiple occasions. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 27:9-13; see *Ibarra v. Further Motion, Inc.*, No. 22-cv-14067, 2023 LEXIS 79285, at *24-25 (S.D. Fla. May 1, 2023) (excluding King's opinions "that design alternatives *could* include software modifications, as well as the opinion that there is the likelihood of a defect in the source code based upon the number of lines of code . . . [because the opinions were] speculative, and therefore, unreliable"); Ex. 5: *Bettencourt v. Sharkninja Operating LLC.*, No. 22-cv-09091, 2024 LEXIS 111877 at *19-21 (N.D. Cal. June 25, 2024) (excluding three of King's five opinions because they were "unsupported speculation," "not based on a body of known facts or . . . ideas inferred from such facts or accepted as true" and therefore unreliable); *see generally, Moore v. National Presto Industries, Inc.*, 603 F. Supp. 3d 676 (W.D. Wisc. 2022) (granting summary judgment in favor of defendants because King's opinions were not based on sufficient facts and data and he failed to use reliable methods)).

Despite this, Plaintiffs have identified King as their sole causation expert. (LaFlamme Dec. ¶18, Ex. 16: Plts' Initial Expert Witness Discl. Doc. 73). King is not an origin and cause expert, is not a certified fire investigator, and is not a certified fire and explosion investigator. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 30:15-20). Further, King is not offering any opinion as to the origin of the fire and does not intend to testify at trial as to any issues related to the origin of the fire at the Plaintiffs' residence. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 30:15–32:6).

King's *alleged* causation opinion is that two individual – and separately manufactured – battery cells in the Jetson Plasma hoverboard ruptured separately, but nearly simultaneous, due to an internal short and caused the subject fire. (LaFlamme Dec. ¶12, Ex. 10: King Report, pgs. 10, 13; Ex. 11: King Dep. 190:15-191:9). Therefore, even if King may have a sufficient background to discuss the alleged dual lithium-ion battery cell failure theory, his analysis, nonetheless, fails to

16

meet the reliability standard pertaining to "scientific knowledge." *See Goebel*, 346 F.3d at 991-92. "To be reliable, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not mere 'subjective belief or unsupported speculation.'" *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)).

Here, King's opinions are pure litigation constructs and unreliable as he uses no peer reviewed or scientific methodology to reach his conclusions. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 192:4-6, 198:1-199:24).  He did no testing to support his opinions. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 106:12-14). As a result, no objective examination of his opinions can be conducted, and they are incapable of scientific scrutiny. In fact, even King acknowledged that his opinion lacks reliable scientific testing to determine when a lithium-ion battery cell is the cause of a fire as opposed to a victim of a fire because battery cells can fail when they are subject to an external attack. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 190:7-10). More to the point, the appearance of a lithium-ion battery cell failure from an external fire attack is similar to cells that have allegedly failed from internal rupture. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 192:9-19). (*See e.g.,* Nagourney, T., Jordan J. Marsh, L. et al, *The Implications of Post-Fire Physical Features of Cylindrical 18650 Lithium-Ion Battery Cells*, Fire Technol 57, 1707-1722 (2021) (https://doi.org/10.1007/s10694-020-01077-8)).

Remarkably, King's opinion also is not limited to a single cell failure in the Jetson Plasma hoverboard. Rather, King opined that <u>two</u> individual cells, which were individually manufactured, short-circuited and failed nearly simultaneously. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 190: 20-191:9). To understand how unusual this opinion is, it is important to understand how a short circuit occurs. To have a short circuit, the anode (negative side) and cathode (positive side) need to

communicate with each other. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 75:18-22). Each lithium-ion battery cell, however, is manufactured with a polymer-based separator that prevents the anode and cathode from communicating. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 87:25-88:14). Therefore, to have a short circuit, the separator must fail. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 88:11-14). For King's theory to be correct, there would need to be two separately manufactured cells (cells 4 and 10) that had an identical failure with the separator at virtually the same time. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 88:25-90:6).

King has _never_ had another case where two individual cells short-circuited and failed at the same time. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 191:10-12). King has not done any research to determine the percentage of chance of two cells failing at the same time, noting that the circumstances of his dual failure theory were "*unusual*" and "*a coincidence*". (LaFlamme Dec. ¶13, Ex. 11: King Dep. 191:10-192:6 (*emphasis added*)). King also did not review critical evidence prior to arriving at this opinion. King did not review the majority of the depositions taken in this case. Incredulously, the only depositions King reviewed prior to drafting his report were those of the corporate representatives of Walmart and Jetson. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 33:8-13).

Additionally, King also failed to review a number of relevant documents in this case, including Jetson's and Walmart's respective document productions, which included the applicable Underwriters Laboratories' test reports and/or certification records for the hoverboard and its components. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 65:25-66:5). King acknowledged he normally would have requested to see the Defendants' document productions; however, his focus was only on the hoverboard and whether it had a failure. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 68:12-15). King also did not review any photographs from the lab inspection where the arcing in

the smoking shed was identified. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 197:6-9). Simply put, King was not provided the full discovery record – or even a majority of the discovery record – to consider in formulating his opinions.

Because King did not conduct a proper investigation, ignored facts, used no scientific peer reviewed methodology and has done no testing, his opinions fall outside the realm of science and lack any indicia of reliability. *Becerra v. Schultz*, 499 F. Supp. 3d 1142, 1147 (D. Wyo. 2020) (unsupported conjecture is inadmissible). As such, King's opinions are unreliable under Fed. R. Evid. 702, as his opinion that the fire started at the hoverboard due to the near simultaneous internal short-circuits of two separately and independently manufactured battery cells does not "reliably flow from . . . the facts at issue" and must be excluded. *Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo. 1999) (quoting *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3rd Cr. 1999)); *see also Becerra v. Schultz*, 499 F. Supp. 3d 1142, 1147 (D. Wyo. 2020) (unsupported conjecture is inadmissible).

Defendants have concurrently filed a Fed. R. Evid. 702 *Daubert* motion on King's expert opinions and incorporate the arguments made therein by reference. Without expert testimony as to causation (*i.e.,* whether or not two separately and independently manufactured battery cells simultaneously failed at the same time resulting in the fire), Plaintiffs are unable to prove the causation element, which is a common element for all of their claims against Defendants. As a result, summary judgment is appropriate. *Truck Ins. Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1214, (10th Cir. 2004) (when the question is beyond the experience of the average layperson, expert testimony is required to prove causation).

**B. Plaintiffs Cannot Circumvent King's Inadmissible Opinion Testimony Through Non-Expert Designated Witnesses Jeff Sheaman and Bill Robinson.**

19

Moreover, even if Plaintiffs contend that they can prove causation through Sweetwater County Sheriff's Office Detective Sergeant Jeff Sheaman and/or Green River Fire Department Assistant Chief Bill Robinson, Plaintiffs still cannot meet their burden on causation as neither Sheaman nor Robinson should be permitted to offer any fire origin and cause opinions because: (1) their opinions are unreliable due to their limited investigations; and (2) they were not designated as experts by Plaintiffs.

### i.    Sheaman and Robinson's causation opinions are unreliable.

Courts readily accept NFPA 921 as a barometer for determining the reliability of methods used by fire investigation experts. *Philmar Dairy, LLC v. Armstrong Farms*, No. 18-CV-0530 SMV/KRS, 2019 WL 3070588, at *9 (D.N.M. July 12, 2019) (collecting cases). When expert testimony fails to comply with NFPA 921 where the expert explicitly relies on NFPA 921 in reaching their conclusions, courts frequently exclude that testimony. *See Schlesinger v. United States*, 898 F.Supp.2d 489, 504 (E.D.N.Y. 2012). When NFPA 921 principles and methods are not applied, their opinions may be excluded as unreliable. *See Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005); *see also Presley v. Lakewood Engineering and Mfg. Co.,* 553 F.3d 638 (8th Cir. 2009).

Sheaman and Robinson both agree that in order to complete a full and thorough origin and cause investigation under NFPA 921, they would need to consider all evidence that's been uncovered. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 203:17-22; ¶17, Ex. 15: Robinson Dep. 106:15-20). Further, they both agreed that if additional information came to light, they would need to consider it. (LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 252:11-14; ¶17, Ex. 15: Robinson Dep. 129:24-130:9). Neither Sheaman nor Robinson, however, participated in any of the four follow up inspections on May 18, 2022, August 2-3, 2022, October 30, 2023, and February 29, 2024.

(LaFlamme Dec. ¶16, Ex. 14: Sheaman Dep. 164:23-165:2, 203:8-22; ¶17, Ex. 15: Robinson Dep. 144:14-24, 181:22-182:4). Neither Sheaman nor Robinson reviewed or were provided any additional information after they closed their respective files on March 4, 2022 and February 9, 2022. (LaFlamme Dec. ¶16,  Ex. 14: Sheaman Dep. 164:24-165:2, 203:8-22; ¶17, Ex. 15: Robinson Dep. 51:18-52:3). Further, both Sheaman and Robinson are not electrical engineers nor are they lithium-ion battery experts. (LaFlamme Dec¶16,  Ex. 14: Sheaman Dep. 7:7-9:2, 18:21-19:7; ¶17, Ex. 15: Robinson Dep. 6:9-12, 8:20-23).

Defendants have also filed Fed. R. Evid. 702 *Daubert* motions to bar any origin and cause opinion testimony from Sheaman and Robinson, and the argument presented in those motions are incorporated further herein. Based on the above, as well as the contemporaneously filed Fed. R. Evid. 702 *Daubert* motions, Sheaman and Robinson's origin and cause opinions are unreliable and should be barred by this Court.

### ii. Plaintiffs have not designated Sheaman or Robinson as retained or non-retained origin and cause experts.

Moreover, Plaintiffs have not designated Sheaman or Robinson as retained or non-retained experts and they, therefore, cannot elicit expert opinion testimony from them to revive their claim.

The Court's Order on Initial Pretrial which specifically states:

> In accordance with U.S.D.C.L.R. 26.1(g), the plaintiff shall designate expert witnesses and provide the defendant with a complete summary of the testimony of each expert by June 14, 2024... These summaries **shall** include a comprehensive statement of the expert's opinions and the basis for the opinions. *See Smith v. Ford Motor Company*, 626 F.2d 784 (10th Cir. 1980) … .

(Doc. 48). The Court entered a "text only" Order on May 13, 2024, extending the Plaintiffs' and Defendants' designation deadlines by 30 days to July 15, 2024 and September 13, 2024,

respectively. (Doc 70). Plaintiffs filed their expert disclosures consistent with the text only order

on July 15, 2024. (Doc 73). Plaintiffs did not identify Sheaman or Robinson as experts.[2]

Parties are required to provide "a complete summary of the testimony expected from each

expert," even for non-retained experts, including investigators, (Doc 48 at 3); *see also Wapiti Corp.*

*v. Thorcon Shotcrete & Shoring, LLC*, No. 22-CV-175-F, 2023 WL 4893544, at *3 (D. Wyo. Apr.

11, 2023) ("Each expert, even a non-retained expert, must provide the subject matter and a

summary of the facts and opinions to which the expert will testify").

Because Plaintiffs have not designated Sheaman or Robinson as retained or non-retained

experts, they cannot use their causation opinions to revive their claim even if they are admissible

– which they are not as described above.

## II.    IRRESPECTIVE OF THE ABOVE CAUSTION ARGUMENTS, DEFENDANTS ARE STILL ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STRICT LIABILITY DESIGN DEFECT CLAIM.

### A. Plaintiffs have not retained any expert to offer any design defect opinions in this case.

Plaintiffs have only identified Michael Schulz (fire origin) and Derek King (fire cause) as

their liability experts. *See Plts' Initial Expert Witness Disc. (Doc 73).* Neither have issued any

opinions that the hoverboard was defectively designed. (LaFlamme Dec. ¶5, Ex. 3: Schulz Report;

¶12, Ex. 10: King Report). In fact, Schulz' opinion is limited to fire origin, and he does not have

any opinions related to the cause of the fire. (LaFlamme Dec. ¶20, Ex. 18: Schulz Dep. 145:8-10).

King's opinion is that two separate and independently manufactured lithium-ion battery

cells had separators that failed which allowed the anode and cathode to communicate and cause an

internal short circuit – which supposedly lead to the fire. (LaFlamme Dec. ¶12, Ex. 10: King

---

[2] In a November 18, 2024 Order, this Court denied Plaintiffs' Motion to Amend Expert Disclosures (to add previously undisclosed experts). This Court held that Plaintiffs have not shown good cause to name additional experts nor would permitting Plaintiffs to name additional non-retained experts be justified or harmless. (LaFlamme Dec. ¶21, Ex. 19: Order Denying Plts' Motion to Amend Expert Discl. Doc 93, pgs. 14-15).

Report; ¶13, Ex. 11: King Dep. 190:20-191:9). This is a manufacturing defect opinion. King does not offer any opinions that the battery cells were improperly designed. (LaFlamme Dec. ¶12, Ex. 10: King Report). In fact, King did not even know what UL standard applied to the individual battery cells, let alone that the battery cells in the hoverboard were subjected to testing in order to receive UL 2580 listing. (LaFlamme Dec. ¶13, Ex. 11: King Dep. 50:23-51:1, 69:5-16, 140:19-25).

Plaintiffs have not identified any expert to support a strict liability design defect claim. Undoubtedly, the design of lithium-ion battery cells and/or a hoverboard is an area that requires expert testimony. Without such testimony, Plaintiffs cannot meet their burden of proof and Plaintiffs' design defect claim should be dismissed.

### i. Plaintiffs have not retained any expert to offer testimony to support their failure to warn claims.

Plaintiffs must provide expert testimony to support a negligent or strict liability failure to warn claim. *Smith v. Sears Roebuck and Co.,* 232 Fed.Appx. 780, FN 1, 2007 WL 1252487 (that without the testimony of an expert witness, plaintiff could not prove her claims [] for products liability or negligence based on failure to warn). When the standard of care is outside the common knowledge and experience of ordinary persons, both the standard of care and the defendant's failure to adhere to that standard must be established by the expert opinion testimony of a qualified expert witness. *Raup v. Vail Summit Resorts, Inc.,* 233 F.Supp.3d 934, 94.

Here, UL sets forth the standard for labels and warnings on hoverboards to comply with UL 2272 – the UL listing applicable to hoverboards. (LaFlamme Dep. ¶22, Ex. 20: Husain Dep. 31:19-32:23). Again, Plaintiffs only named fire origin (Michael Schulz) and fire cause (Derek King) as liability experts. Neither of these experts discuss warnings, nor do they have the proper

background to address a failure to warn claim. Failure to warn claims are commonly supported by human factors experts. Plaintiffs have not named _any_ human factors expert to support their failure to warn claims. Moreover, Plaintiffs have not even identified what warnings they believe are insufficient. In fact, neither of their liability experts discuss the issue of warnings at all.

Without the necessary expert testimony, Plaintiffs cannot meet their burden of proof on the failure to warn claims and, as such, the failure to warn claims should be dismissed.

## III.   PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.

Punitive damages are only proper in cases where "wanton and willful misconduct is alleged." *Verschoor v. Mountain West Farm Bureau Mut. Ins. Co.,* 907 P.2d 1293, 1301 (Wyo. 1995) (citing *Danculovich v. Brown,* 593 P.2d 187, 191 (Wyo. 1979)). "Wanton and willful conduct 'must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention.'" *Verschoor*, 907 P.2d at 1301. Punitive damages are to be awarded at the discretion of the trial court because a plaintiff has no right to punitive damages. *Sheridan Commercial Park, Inc. v Briggs,* 848 P.2d 811, 818 (Wyo. 1993).

As the *Danculovich* Court states, "[t]he intent in willful and wanton misconduct is not an intent to cause the injury, but it is an intent to do an act, or an intent to not do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another." 593. P.2d 187, 193 (citing *Mitchell v. Walters,* 55 Wyo. 317, 100 P.2d 102 (1940); 57 Am.Jur.2d, Negligence, s 101, p. 707).

### A.  Plaintiffs Cannot Prove any Willful or Wanton Conduct Against Jetson.

Here, Plaintiffs have not only failed to provide any admissible expert testimony to support its claim that the Jetson Plasma caused the subject fire, but Plaintiffs have also failed to show that Jetson's conduct in distributing and selling the hoverboard was "willful and wanton" such that it would be highly unreasonable or an extreme departure from ordinary care. *Danculovich,* 593 P.2d 187, 191 (Wyo. 1979). In fact, Plaintiffs make no allegation that Jetson's conduct was willful or wanton in their Complaint. *See* generally Complaint. Rather, Plaintiffs only make a general plea for an award of punitive damages in its Prayer for Relief. *Id.* Plaintiffs can point to no action or inaction on the part of Jetson that rises to the level of conduct necessary to impose the penalty of punitive damages.

Jetson purchases its hoverboard in a sealed box from the product manufacturer. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 141:7-13). When the hoverboards arrive at Jetson's warehouse in California from the Chinese product manufacturer, they are already packaged in a sealed and taped box, ready to be distributed for sale. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 142:3-13). Jetson does not box or package the hoverboards for distribution to its retail partners. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 141:7-13). Each hoverboard arrives at the California warehouse ready for distribution. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 142:3-7). Further, each hoverboard model is tested by UL to ensure it is certified consistent with UL 2272, the standard for hoverboards. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 74:1-75:4, 143:19-23).

Jetson also hired a third-party independent testing firm, TestCoo, to perform spot inspections on the subject model hoverboard. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 78:16-24). Testcoo's "spot inspections" occur in China at the manufacturing plant. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 78:16-79:3). Testcoo physically plugs the product in, checks all the details, and ensures that the product is consistent with the UL 2272 certification. (LaFlamme Dec. ¶22,

Ex. 20: Husain Dep. 150:18-151:7). Jetson further conducts inquiries with UL on potential product manufacturers to determine if they have experienced any violations and what products have been produced and certified. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 79:21-80:8). Jetson also performs a factory visit and audit to check on the manufacturing plant and component suppliers prior to engaging with them to purchase products. (LaFlamme Dec. ¶22, Ex. 20: Husain Dep. 79:21-80:8).

Therefore, Plaintiffs have failed to show that Jetson's conduct in distributing and selling the hoverboard rose to a level deemed "willful and wanton" such that it would be highly unreasonable or an extreme departure from ordinary care. *Danculovich,* 593 P.2d 187, 191 (Wyo. 1979). As such, Plaintiffs punitive damage claim against Jetson should be dismissed.

**B.  Plaintiffs Cannot Prove any Willful or Wanton Conduct Against Walmart.**

Similarly, Plaintiffs cannot show willful or wanton conduct against Walmart. Specifically, Plaintiffs have failed to show that Walmart's conduct in purchasing hoverboards from the distributor, Jetson, and subsequently selling them to consumers rose to a level deemed "willful and wanton" such that it would be highly unreasonable or an extreme departure from ordinary care. *Danculovich,* 593 P.2d 187, 191 (Wyo. 1979).

Walmart partners with its suppliers to provide different products, including the Jetson Plasma hoverboard, to consumers through its retail stores. (LaFlamme Dec. ¶23, Ex. 21: *See generally* Kremers Dep. 95:24-96:3, 97:23-98:2). To be a supplier partner, Walmart requires all general merchandise products, including the Jetson Plasma model hoverboard, to be tested prior to initial sale and annually through one of Walmart's five approved third-party lab organizations. (LaFlamme Dec. ¶23, Ex. 21: Kremers Dep. 11:9-16). Walmart further requires that all micro-

mobility products, including the Plasma model hoverboard, meet and be listed to UL 2272 standards. (LaFlamme Dec. ¶23, Ex. 21: Kremers Dep. 26:15-27:4).

Further, Walmart monitors all Consumer Product Safety Commission ("CPSC") recalls and safety warnings so they are able to respond appropriately to any concerns with a product sold through Walmart. (LaFlamme Dec. ¶23, Ex. 21: Kremers Dep. 61:4-14). Additionally, Walmart relies on the UL 2272 listing, the product manufacturer, distributor, and laboratories to advise Walmart regarding any safety concerns with a consumer product. (LaFlamme Dec. ¶23, Ex. 21: Kremers Dep. 77:5-14).

Given the above, Plaintiffs cannot show that Walmart's conduct in selling the hoverboard to consumers rose to a level deemed "willful and wanton" such that it would be highly unreasonable or an extreme departure from ordinary care. *Danculovich,* 593 P.2d 187, 191 (Wyo. 1979). As such, Plaintiffs punitive damage claim against Walmart should also be dismissed.

## <u>CONCLUSION</u>

This Court should grant Defendants' instant motion for summary judgment and dismiss all claims against Defendants as a matter of law because Plaintiffs cannot meet their burden of proof to establish the essential causation element of liability as alleged. Moreover, Plaintiffs have not put forth any expert testimony to support their alleged design defect and failure to warn claims. Finally, Plaintiffs also cannot meet their burden that either Defendant acted with willful or wanton conduct that would warrant a punitive damages consideration.

 Attorneys for Defendants Walmart Inc. and Jetson Date: November 26, 2024

**McCOY LEAVITT LASKEY LLC**

Attorneys for Defendants, Jetson Electric Bikes,
LLC and Walmart Inc.

Dated: December 2, 2024          By:_____

Eugene M. LaFlamme *(pro hac vice)*
Jared B. Giroux *(pro hac vice)*
Jillian L. Lukens *(pro hac vice)*
McCoy Leavitt Laskey, LLC
N19 W24200 Riverwood Drive, Suite 125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

and

Timothy M. Stubson, Wyo. Bar No. 6-3144
Brandon E. Pryde, Wyo. Bar No. 8-6883
Holly L. Tysse, Wyo. Bar No. 7-5553
Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
htysse@crowleyfleck.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 2, 2024, a true and correct copy of the foregoing was electronically served to all counsel of record.

_____
**EUGENE M. LaFLAMME, Esq.**