EXHIBIT 15

Page 1

```
 1              UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF WYOMING
 2

 3        STEPHANIE WADSWORTH,          )
          individually and as Parent   )
 4        and legal guardian of ww, KW)
          GW and LW, minor children of)
 5        MATTHEW WADSWORTH,           )

 6

 7                  Plaintiffs,        )
                                       ) Case No.
 8        vs.                          ) 2:23-cv-00118-NDF
                                       )
 9        WALMART, INC., and JETSON    )
          ELECTRIC BIKES, LLC          )
10                                     )
                    Defendants,        )
11        _____)

12            DEPOSITION OF BILL ROBINSON

13        Wednesday, November 15, 2023, 1:00 P.M.

14              Via Zoom video conference

15

16

17                  BE IT REMEMBERED that the
     deposition of BILL ROBINSON was taken by the attorney for
18   the Plaintiffs, GRAYSON GOODY, ESQ., 58 Malaga Cove Plaza,
     Palos Verdes Estates, California 90274 before Christine J.
19   Roybal, Court Reporter for the State of Idaho, in the
     above-entitled matter.

20

21

22

23

24

25
```

1      Q.   If at any point in time you don't understand my

2  question, sometimes I might ask a poor question, just let me

3  know that, I will make sure you restate or rephrase it,

4  okay?

5      A.   Okay.

6      Q.   And you refused my water earlier, but if at any

7  time you need a break, you need some water, just let me know

8  and we'll get that.  Okay?  All right.

9       Sir, where are you currently employed?

10      A.   City of Green River fire department.

11      Q.   And what is your role with the fire department?

12      A.   Fire Chief.

13      Q.   How long have you been employed by the fire

14  department?

15      A.   I originally got on the fire department in 1999.

16      Q.   When you came on in 1999, did you come on as chief

17  or did you have another role?

18      A.   I came on a firefighter, volunteer firefighter.

19      Q.   When did you transition to chief?

20      A.   2018, 2019, somewhere in that, February, I

21  believe.

22      Q.   Could you describe for the jury that might either

23  see this video or read the transcripts what some of your

24  duties and responsibilities as fire chief?

25      A.   To put it shortly, it's to oversee all operations,

1        A.    I'm aware.

2        Q.    You would have been involved at the very least in

3   response and investigation of that fire?

4        A.    Correct.

5        Q.    As part of your role as Fire Chief, can you talk

6   to me a little bit about the process by which you

7   investigate a fire?

8        A.    Well, it starts, we have to get all the fire out

9   first and then when everything is done, then we move all

10  firefighters from the building and we start from the outside

11  in, we go inside, and we do it as a whole, we don't try to

12  focus on one area, we try to do it as a whole and work down

13  to one area.

14       Q.    Were you employed by any other fire department

15  prior to 1999?

16       A.    No.

17       Q.    Would that have been your first job or employment

18  as a firefighter?

19       A.    Correct.

20       Q.    Can you walk us through your educational

21  background, please?

22       A.    Graduated high school, did some college, and then

23  everything else I have is in fire education.

24       Q.    Okay.  Where did you graduate high school?

25       A.    Here in town, Green River.

1      Q.   Okay.  Exposure ID, what's that refer to, if you

2    know?

3      A.   It's automatic, I don't know exactly what that one

4    is.

5      Q.   Okay.  Same thing for exposure number?

6      A.   That's correct.

7      Q.   Incident date is listed as February 1, 2022,

8    that's consistent with your recollection of when this

9    occurred?

10      A.   Yes.

11      Q.   And dispatch run number, is that also auto

12    populated?

13      A.   It's.

14      Q.   This first page identifies that the report was

15    completed by you, it was reviewed by you, and is printed by

16    you, correct?

17      A.   Correct.

18      Q.   You would have completed this report February 9,

19    2022?

20      A.   I don't recall.  Yeah, probably pretty close.

21      Q.   Okay.  And again, I'm just referring to that first

22    line where it says "report completed by," it has your name,

23    ID is left blank, but then it says date February 9, 2022, do

24    you see that?

25      A.   Yes, that is correct.

1      Q.   That would reflect at the very least when you

2   would have completed this report.

3      A.   Correct.

4      Q.   The next line lists the date of March 2, 2022,

5   would that have been when you reviewed this report?

6      A.   Correct.

7      Q.   And could you describe for the jury what that

8   means?  Is that after completion of the report you go back

9   in and you review the report?

10      A.   Sometimes.  Sometimes it can be as simple a, I had

11   to go back in there and type who we gave the investigation

12   over to, or if something else came up that we had to put in,

13   and it will log that later on in the pages, it will say who

14   did what or added what to it and for what purpose.

15      Q.   Okay.  So we'll go certainly the entirety of this

16   report.

17       You have identified of course that it was an enclosed

18   building, it was a family dwelling, correct?

19      A.   Correct.

20      Q.   You've marked that the detectors were present, is

21   that referring to smoke detectors?

22      A.   It is.

23      Q.   By the way, when you arrived on scene, were you

24   able to hear the smoke detectors going off?

25      A.   You could hear them audibly, yes.

1   have been my first time talking with Detective Sheman.

2        Q.    Okay.  So tell me about that initial conversation

3   with Detective Sheman.

4        A.    I told him what we had, told him it was out in the

5   county and asked if he would like to come take a look.

6        Q.    And he agreed?

7        A.    Absolutely.

8        Q.    When he came out to the home did you have a

9   conversation with him upon his presentation to the scene?

10       A.    I did.

11       Q.    What do you recall about that conversation?

12       A.    It was more of a friendly greeting, how are things

13  going type things.  We don't get too many of these we get to

14  work on together so it's nice to be able to have that to

15  help us out for down the road stuff, experience wise.

16        And then I told him the structure was safe, you could

17  enter it, and I will remain outside and tell him if he has

18  any questions, needs help moving anything he can just give

19  us a holler we'll pop on in there, and I wasn't going to

20  tell him what I found at that time.  He respected that as

21  well.

22       Q.    Did he come alone or with company?

23       A.    He came alone at first.  He called in

24  Detective Michelle Hall afterwards to assist him.

25       Q.    So other than telling him the structure was safe,

1    telling him that you had just concluded your inspection and

2    investigation, did you provide him with any detail

3    whatsoever of the results of your investigation?

4         A.    No.

5         Q.    And so after that, he conducted his own inspection

6    and investigation?

7         A.    That's correct.

8         Q.    Do you know how long it took for him to conduct

9    his inspection and investigation?

10        A.    They're more thorough than we are, as expected,

11   they are more diving in for origin and cause than we are,

12   which is typical.  Very normal.  And I want to say his took

13   pretty much the remainder of the day, maybe even some into

14   the evening, if I recall.

15        Q.    Okay.  Do you know approximately how many hours

16   that would have been?

17        A.    I don't.

18        Q.    Do you know how long your inspection and

19   investigation took?

20        A.    Mine took just under two hours, roughly.

21        Q.    Did you remain on the scene until he concluded his

22   inspection and investigation?

23        A.    I don't recall if I remained the entire time he

24   was there, but I remained the majority of the time at least.

25        Q.    After you greeted Detective Sheman and

1    communicated what you just testified to him, what else did

2    you do on the scene that day?

3        A.    While he's in there doing his investigation, I sit

4    outside.

5        Q.    Do you recall having any conversations with other

6    firefighters, other personnel during that time while you

7    were waiting for him to complete his investigation?

8        A.    I know at that time Larry was with me, but I don't

9    remember what we had talked about.  And even though Larry

10   was on -- the same in the same capacity as I am as a job

11   goes, I still wouldn't tell him what I found.

12       Q.    Okay.  At some point in time did Larry conduct his

13   own inspection and investigation?

14       A.    He never tried to conduct an investigation here.

15       Q.    So as you're sitting outside waiting for it

16   Detective Sheman to conclude his own inspection and

17   investigation, I take it at some point time passes and you

18   leave?

19       A.    I don't recall if I left before I helped him out,

20   went in to -- and he had some questions inside, and needed

21   some help moving some things, I believe.  I don't recall if

22   I left before that or after.

23       Q.    Okay.  Do you recall anything about questions he

24   had or what you might have assisted him with inside the

25   home?

1      A.   I do.  I remember going in there, and Larry and I

2  both went in there.  I don't remember, we had -- I want to

3  say it was a bookcase or something that had fallen during

4  the fire or something that we helped try to peel all that

5  back, because we wanted to look at more of the room to

6  perform his style of investigation that he does.  And so and

7  that's pretty common, pretty typical as well.  We help out,

8  we don't touch anything they don't want us to touch, but we

9  help them out again under their capacity, whatever they want

10 to do.  He was -- during that time he was focused on that

11 same room.

12      Q.   Still without your input?

13      A.   100 percent without my input, yep.

14      Q.   Do you recall him saying anything to you as you're

15 in there answering questions or helping him out about what

16 he was thinking of the cause?

17      A.   I don't recall.

18      Q.   Did he ever tell you that he believed the fire

19 started outside the home?

20      A.   No.

21      Q.   Did anybody ever tell you that they believed the

22 fire started outside the home?

23      A.   No, that was never ever an issue.

24      Q.   Aside from helping him with potentially a bookcase

25 or some other things that needed to be moved, do you recall

1      Q.    Okay.  Did he arrive before or after you?

2      A.    After.

3      Q.    Do you know how long after you?

4      A.    I don't.

5       If he was there before me, I don't recall if he was or

6   not.

7      Q.    And he would have come in a private vehicle?

8      A.    He would have been in a personal vehicle.

9      Q.    Looking at what we see as the fire at about

10  10 minutes 30 seconds into this video, is that consistent of

11  what you would have seen when you arrived?

12     A.    I don't recall.

13     Q.    In your investigations do you realize --

14        (Court reporter clarification.)

15     Q        (By MR. LAFLAMME) In your fire investigation do

16  you utilize NFPA921?

17     A.    You'd have to refresh me what NFPA291 is.

18     Q.    NFPA29 is the guide for fire and explosion

19  investigations.

20     A.    We try to.

21     Q.    And are you familiar with that guide?

22     A.    Not without looking at it.

23     Q.    I believe you had -- I want to take a little step

24  back and just go over some of the background items again.

25  You had indicated that you started with City of Green River

Page 122

```
 1    origin investigator?
 2         A.   Or the PD unit, or the PD department or wherever
 3    we go, yes.
 4         Q.   I'm going to jump around, you've been asked a
 5    bunch of questions already.
 6          Did you have any contact with the Wadsworth family
 7    during your investigation?
 8         A.   Not the people that lived in the house, no, no, I
 9    did not.
10         Q.   Was the only contact with the grandparents that
11    lived next door?
12         A.   If that's his grandparents, yeah.
13         Q.   And was that while you were on site?
14         A.   I was on site.
15         Q.   Did you ever interview any witnesses in this case?
16         A.   No.
17         Q.   Have you ever reviewed -- do you review interviews
18    that Detective Sheman did?
19         A.   No.
20         Q.   Have you reviewed any body camera footage of the
21    responding sheriff's department?
22         A.   No, that's the first ones I saw.
23         Q.   I think you had indicated that Larry Erdman was
24    not involved in this investigation for origin and cause; is
25    that correct?
```

Page 129

1          You can answer.

2      A.   Say that again.

3          MR. LAFLAMME:  He's just objecting for the

4    record for the judge later on.

5      A.   Yeah, I got it.  Go ahead again with the question.

6      Q.     (BY MR. LAFLAMME) If the Hoverboard was not

7    plugged in at the time of the fire that would affect your

8    opinion, correct?

9          MR. AYALA:  Same objection.

10     A.   It would make me look at it a little bit.

11     Q      (By MR. LAFLAMME) Okay.  And that's because

12   there wouldn't be any power to the Hoverboard, correct?

13     A.   I wouldn't agree with that 100 percent.  There

14   could still be the battery located into it because you can

15   remove them batteries.  I don't know in that one could be

16   removed or not.

17     Q.   But if the Hoverboard wasn't plugged in, that

18   would cause you to at least do -- take a second look at

19   everything, correct?

20          MR. AYALA:  Form.

21     A.   I still can't answer that 100 percent.  I would

22   say with investigation efforts I would look into that a

23   little bit different.

24     Q      (BY MR. LAFLAMME) And under fire origin and

25   cause investigation, you always want to continue to evaluate

1    evidence as it becomes available, correct?

2          A.    That's correct.

3          Q.    And if evidence becomes available, that may affect

4    your opinion, that opinion should be reassessed, correct?

5          A.    Depending how the evidence became available,

6    correct.

7          Q.    As new evidence comes to light you need to

8    consider that evidence, true?

9          A.    Consider all evidence, correct.

10         Q.    And as I understand it, you were on scene for

11   about two hours for your origin and cause -- or for your --

12   you didn't work just an origin investigation, correct?

13         A.    Correct.

14         Q.    Okay.  You were on scene for about two hours for

15   your origin investigation, correct?

16         A.    Roughly, correct.

17         Q.    If the fire had started in the bedroom where you

18   believe it started, you would expect to see some arcing on

19   electrical wiring in that room, correct?

20               MR. AYALA:  Form.

21         A.    That's actually not 100 percent correct.

22         Q.    (BY MR. LAFLAMME) You would not expect to see

23   any electrical arcing in that room?

24         A.    Well, it depends on where the -- the fire, if it

25   started in the electrical box you could see some arcing.

1        MR. AYALA:  Form.

2     A.   I would have look at everything as an origin.  As

3  a matter of fact I looked at whatever that building was when

4  I got there, and afterwards I looked.  And I still stick

5  with my determination that that fire started inside that

6  room.

7     Q.   (BY MR. LAFLAMME) Did you do anything to process

8  the items, the fire debris that was outside of that window?

9     A.   Other than look for, during had -- the during the

10  battling the blaze, when they got that out we looked for hot

11  spots when it's over.  We rake through it a little bit to

12  make sure there's no hot spots, and then that's it.  We try

13  to practice preservation anytime we can.

14     Q.   Were you aware of any of the kids' statements that

15  the fire started outside of the house on the date of the

16  fire?

17        MR. AYALA:  Form.

18     A.   I wasn't aware of any kids' statements, no.

19        MR. LAFLAMME:  Okay.  I'm going to pull up a video

20  here but I want to use sound, how do I do that?

21        CONCIERGE:  So when you go to the screen share

22  menu, on the bottom of the screen share page there's going

23  to be a check box that says "share computer audio."

24        MR. LAFLAMME:  Screen share.  Okay, so share sound

25  on the lower left?

1    to go through their bed area, correct?

2        A.   Not correct.

3            MR. AYALA:  Form.

4        A.   It would have gone up, in this case I believe I

5    looked at it, it went up through ceiling, hit the ceiling

6    which is common in fire behavior, it goes up to the ceiling

7    and rolls down.

8        Q      (By MR. LAFLAMME) Okay.  Is there any other

9    pattern that you are relying on besides what we see in

10   Exhibit 14 on the top photograph, for the origin of this

11   fire?

12       A.   No.  Again, from my investigation, that's what led

13   me to that area being the origin.

14       Q.   Are you aware of the results of joint fire

15   inspection from the private side that occurred after the

16   fire?

17       A.   No, I wasn't even aware there was one.

18       Q.   Are you aware of the lab inspection results that

19   was done after the fire?

20       A.   No.

21       Q.   Okay.  So as to the information that was

22   identified during the private sector investigation, you

23   don't have any information?

24       A.   That's correct.

25       Q.   Are you aware of what the scientific method is

1      Q.   Okay.  All right.  You had indicated during in

2   your prior testimony that you were 100 percent that it

3   came -- the fire originated in the area of that outlet that

4   we see here in Exhibit 15, correct?

5      A.   To my -- to the best of my knowledge I'm 100

6   percent that the fire originated in that room.

7      Q.   Based on the information you've been given here

8   today you would agree that there would be more investigation

9   that you would want to conduct?

10     A.   I would conduct more investigation to this.

11     Q.   Okay.  And that's based on the additional

12  information that you've been provided here today, correct?

13     A.   Right.

14     Q.   So at this point if you were to assess the origin

15  of the fire it's because there's official investigation that

16  you would want to do to fully assess that you would have to

17  classify it as undetermined under NFPA921, correct?

18          MR. AYALA:  Form.

19     A.   I would determine it currently still under

20  investigation, undetermined until investigation is complete.

21     Q.   (BY MR. LAFLAMME) Okay.  And you can't, you

22  can't get off the undetermined designation until the

23  investigation is complete, correct?

24     A.   That's correct.

25     Q.   So as you sit here today, if you had to classify

Page 157

1  the origin on your NFPA912, it would be undetermined

2  investigation not complete, correct?

3              MR. AYALA:   Form.

4       A.   Correct.

5       Q.       (By MR. LAFLAMME) The Sweetwater Fire District

6  No. 1, What is their role?

7       A.   They're just a mutual aid department.  They

8  control their own district on the east side of the county.

9       Q.   Okay.  So is Green River Fire Department on the

10  west side of the county and then Sweetwater Fire District is

11  the one on the east side the county?

12      A.   That's correct.

13      Q.   Any other fire districts involved in Sweetwater

14  County?

15      A.   There's Rock Springs Fire, but they control their

16  city.

17      Q.   So they are just in the city?

18      A.   Correct.

19      Q.   Rock Springs as a city is pulled out from

20  jurisdiction of the county split?

21      A.   Yes, it is.

22      Q.   The Sweetwater Fire District No. 1, where are they

23  held at?  What is that their headquarters?

24      A.   They got two stations over there on the east side

25  of Rock Springs.

1                    EXAMINATION

2      BY MR. LAFLAMME:

3        Q.    Chief Robinson, before you testified that as we

4    sit here today, based on the additional information you

5    heard today, that you would classify this origin as

6    undetermined under NFPA921 and that the investigation would

7    be ongoing, correct?

8              MR. AYALA:   Form.

9        A.    If the evidence that you presented to me was

10   there, you would have no choice but to determine that.

11       Q     (By MR. LAFLAMME) Okay.   And is that the

12   determination of the origin under NFPA921 as we sit here

13   today would be in undetermined and that the investigation

14   would be ongoing on the area of origin, true?

15       A.    True.

16       Q.    And prior to today, you're not aware that there

17   was a shed outside that window, correct?

18       A.    Correct.

19       Q.    You were not aware that shed was used for smoking,

20   correct?

21       A.    That's correct.

22             MR. AYALA:   Form.

23       Q.    (BY MR. LAFLAMME) You are also not aware that

24   there was a space heater in that shed, correct?

25       A.    That is correct.

1    Q.    You were not aware of the kids' statements about

2    the fire starting outside in the shed area, correct?

3            MR. AYALA:  Form.

4        A.    That's correct.

5        Q.    (By MR. LAFLAMME) And you don't know what was --

6    so if you didn't know there was a shed you don't know what

7    was in that shed, correct?

8        A.    That's correct.

9        Q.    And furniture within a shed would be an additional

10    fuel load that could burn, correct?

11        A.    Correct.

12            MR. AYALA:  Object to form.

13            MR. LAFLAMME:  And you were not aware prior to

14    today that there was arcing found on the wiring in that

15    shed.

16        A.    That's correct.

17        Q.    And you were not aware prior to today that there

18    was no arcing found on the inside of had a house, correct?

19        A.    That's correct.

20        Q.    And you're aware that smoking material can cause a

21    fire, correct.

22        A.    Correct.

23        Q.    And smoking material doesn't necessarily always

24    cause a fire at the time of smoking, correct?

25        A.    Correct.

1          MR. AYALA:  Form.

2     Q.    (BY MR. LAFLAMME) Meaning you can have someone

3  smoke in a area and hours later a fire starts, correct?

4          MR. AYALA:  Form.

5     A.    Absolutely.

6     Q.    (BY MR. LAFLAMME) And you've run into that in

7  your career, correct?

8     A.    That is correct.

9     Q.    And you are aware that space heaters can cause

10 fires as well, correct?

11    A.    Correct.

12    Q.    And aren't space heaters one of the most common

13 causes of fires for heating appliances?

14         MR. AYALA:  Object to form.

15    A.    I don't know if that's accurate.  I know they are

16 definitely a factor.

17    Q.    (BY MR. LAFLAMME) Are you aware of the NFPA fire

18 statistics that are put out every year?

19    A.    I'm aware of them, I don't remember them.

20    Q.    It's not something you look at in your position?

21    A.    No.

22    Q.    And understanding that when you were there on the

23 date of the fire, you were operating just with the evidence

24 and facts that you had on that day, correct?

25    A.    That's correct.

1      Q.   And additional evidence and facts that has been --

2  have been revealed and discovered since that day, you have

3  not been privy of, correct?

4      A.   That's correct.

5      Q.   There was some questioning about whether you've

6  investigated a Hoverboard or lithium ion battery fire

7  before, do you recall that?

8      A.   I do.

9      Q.   And counsel I don't think liked the way I phrased

10  my question so I will rephrase for you.  Have you ever

11  investigated a fire that you determined originated at or

12  near a Hoverboard other than this fire?

13      A.   No.

14      Q.   Okay.  Have you ever investigated a fire that you

15  believe originated at or near a lithium ion battery product

16  other than in the Wadsworth fire?

17      A.   Not prior to this.

18      Q.   Okay.  Subsequent to?

19      A.   Yes.

20      Q.   What was that product?

21      A.   It was an electric bike motor, an electric bike

22  and they have the same, essentially same thing, it's not the

23  same battery but it's exactly, I mean, it's essentially the

24  same thing.

25      Q.   There's lot of products that have lithium ion

Page 184

1      Q.    I gotcha.  So it would be a detective from Green

2   River Police Department --

3      A.    That's correct.

4      Q.    -- finish the investigation on the electric bike

5   issue?

6      A.    Correct.

7      Q.    Okay.  You're not aware that Mr. Pasborg stated on

8   the date of the fire shortly after you responded that it

9   looked like the fire started on the outside or the exterior

10  wall?

11     A.    No.

12     Q.    And all of this additional facts and evidence, if

13  you were to do a full and complete origin analysis you would

14  want to walk through all of those additional facts and

15  evidence, correct?

16     A.    You would have to.

17           MR. AYALA:  Object to form.

18     Q.    (BY MR. LAFLAMME) And when you say "you would

19  have to," you're saying you would have to consider all of

20  those facts and evidence in order to give it a final origin

21  determination, correct?

22           MR. AYALA:  Object to the form.

23     A.    Correct.

24     Q.    (BY MR. LAFLAMME) And so based on -- based on

25  the information that you've learned here today -- strike