Timothy M. Stubson, Wyo. Bar. No. 6-3144
Holly Tysse Wyo. Bar. No. 7-5553
Brandon E. Pryde Wyo. Bar. No. 8-6883
Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-265-2279
tstubson@crowleyfleck.com
htysse@crowleyfleck.com
bpryde@crowleyfleck.com

and

Eugene M. LaFlamme *(admitted pro hac vice)*
Jared B. Giroux *(admitted pro hac vice)*
Jillian L. Lukens *(admitted pro hac vice)*
McCoy Leavitt Laskey LLC
N19 W24200 Riverwood Drive, #125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

*Attorneys for Defendants,*
*Walmart Inc. and Jetson Electric Bikes, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| STEPHANIE WADSWORTH Individually and as Parent and Legal Guardian of W.W., K.W., G.W., and L.W., minor children and MATTHEW WADSWORTH<br><br>Plaintiff,<br><br>v.<br><br>WALMART, INC. and JETSON ELECTRIC BIKES, LLC<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:23-cv-00118-NDF<br><br>DEFENDANTS JETSON ELECTRIC BIKES, LLC AND WALMART INC.'S MOTION TO EXCLUDE TESTIMONY OF JEFF SHEAMAN; **MEMORANDUM IN SUPPORT OF MOTION** |

Defendants, Walmart Inc. and Jetson Electric Bikes, LLC, respectfully request that this Court exclude any opinion testimony from Detective Sergeant Jeff Sheaman pursuant to Federal

4

Rules of Civil Procedure 702, as his origin and cause opinions are unreliable and speculative. Defendants further incorporate into this memorandum the arguments and authorities presented in the accompanying summary judgment motion.

## BACKGROUND

This case involves a February 1, 2022 residential fire at the Wadsworth residence in Green River, Wyoming. The first report of fire was between 4:00 a.m. – 4:30 a.m. (LaFlamme Dec. ¶7, Ex. 1: Pasborg Dep. 24:22-25:3). The primary liability dispute is whether the fire originated in G.W. and L.W.'s bedroom at a Jetson Plasma hoverboard by the bedroom door (as Plaintiffs contend) or whether the fire originated at a smoking shed that was located outside the residence by G.W. and L.W.'s bedroom window (as Defendants contend). (LaFlamme Dec. ¶4).

G.W. and L.W. were asleep in bed when the fire started. They both woke up when flames reached and broke their bedroom window (which is directly adjacent to their bunk bed). (LaFlamme Dec. ¶¶8-9, Ex. 2: Sheaman Dep. 322:12-323:6, 328:20-329:16; Ex. 3: Schulz Dep. 13:4-14:22).



If the fire started at the hoverboard as Plaintiffs allege, then the fire would have had to travel from the hoverboard to the bedroom window. Between the hoverboard and the window,

5

however, was the bunk bed where G.W. and L.W. were sleeping. G.W. and L.W. were not injured in the fire and exited their bedroom through their bedroom door – right next to the hoverboard.

The smoking shed was used by Mr. and Mrs. Wadsworth during the winter months to provide cold and wind protection while they smoked cigarettes. Mrs. Wadsworth smoked in the smoking shed just prior to 2:00 a.m. on February 1, 2022, before she went to bed. (LaFlamme Dec. ¶10, Ex. 4: S. Wadsworth Dep. 89:17-90:8). Mrs. Wadsworth smoked about a pack of cigarettes per day around the time of the fire. (Id. at 61:19-62:1). Mr. Wadsworth was also a cigarette smoker. (LaFlamme Dec. ¶11, Ex. 5: M. Wadsworth Dep. 47:1-7). Mrs. Wadsworth further consumed about ten alcoholic drinks the evening/morning before the fire. (LaFlamme Dec. ¶10, Ex. 4: S. Wadsworth Dep. 62:24-64:7, 90:9-91:24).

Jeff Sheaman was the origin and cause investigator for the Sweetwater County Sheriff's Office that investigated the fire. Although Plaintiffs have not formally designated Sheaman as an expert, it is anticipated that Plaintiffs may attempt to elicit expert testimony from him regarding his origin and cause opinions. While Sheaman concluded that the fire originated in G.W. and L.W.'s bedroom at the Jetson Plasma hoverboard, Sheaman's investigation was very limited, did not consider the extensive evidence identified since he ceased his investigation, and did not comply with NFPA 921 – Guide for Fire and Explosion Investigations.

Sheaman agreed that NFPA 921 was the guide he should follow for his origin and cause investigation. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 202:17-203:4). Sheaman also agreed that to complete a "full and thorough origin and cause investigation under NFPA 921, [he] would need to consider all evidence that's been uncovered." (Id. at 203:17-22). Further, if "additional information comes to light," Sheaman agreed that he would need to consider that evidence under NFPA 921. (Id. at 252:11-14). Despite acknowledging that NFPA 921 requires him to consider all

6

available evidence, Sheaman nonetheless stated that "I don't think any evidence would – would lead me to believe something else started that fire" and there is no "information that anybody could give [him] to change [his] mind." (Id. at 167:12-168:7).

Regardless, Sheaman also conceded that his opinions are only "based on the information [he] learned up through March 4th of 2022." (Id. at 254:10-13). Sheaman has not been provided with any additional information related to this fire since March 4, 2022. (Id. at 164:24-165:2). In total, Sheaman's investigation only included a short site visit on the date of the fire and interviews of Ryan Pasborg on February 1, 2022, Mr. Wadsworth on February 2, 2022, and K.W., G.W. and L.W. on March 4, 2022. (LaFlamme Dec. ¶12, Ex. 6: Sheaman Report). Sheaman also agreed that as an origin and cause investigator he would want to be present when the fire scene is processed. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 325:20-326:20).

Sheaman did not participate in the May 18, 2022 site inspection, the August 2 and 3, 2022 site inspection, the October 30, 2023 evidence inspection, or the February 29, 2024 hoverboard inspection (Id. at 164:24-165:2, 203:8-22). All of these inspections were critical steps to identify facts related to the fire's origin and cause. Sheaman, however, was not privy to any of the information identified during the four additional inspections or any of the discovery conducted in this case.

The fire scene was not processed until the August 2-3, 2022 site inspection. This included marking search grids for the areas of interest, which included all of G.W. and L.W.'s bedroom and the outside smoking shed area. (LaFlamme Dec. ¶9, Ex. 3: Schulz Dep. 34:9-35:17; ¶13: Ex. 7: Structure Diagram). The fire debris from each of these search grids, along with other items of interest, were put into plastic bins to be sifted and evaluated at the evidence inspection. (LaFlamme

7

Dec. ¶14, Ex. 8: Evidence Logs). In total, *71 different items or individual fire debris bins* were retained for further investigation. (Id).

At the October 30, 2023 evidence inspection,[1] all of the fire debris bins were sifted and items of interest were processed and inspected. The parties also took CT scans and x-ray scans of certain evidence and reviewed electrical items of interest under a microscope. It was confirmed at the evidence inspection that there was no electrical arcing in G.W. and L.W.'s bedroom, and the only electrical arcing found at the residence was on electrical wires that were in the smoking shed. (LaFlamme Dec. ¶17, Ex. 11: Strandjord Report *generally* and at pg. 25). The identification of electrical arcing (*i.e.,* arc mapping) can be used to help determine a fire's origin and spread. See NFPA 921 (2021 ed.) § 3.3.9. (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) p. 14).

As to Sheaman's conclusions, he does not believe that the plastic smoking shed would burn and contends that it would merely melt. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 150:23-151:9). Sheaman, however, did not do any testing to confirm this belief. Defendants did test an exemplar smoking shed and the plastic smoking shed is certainly flammable.

---

[1] Plaintiffs had consultants Scott Cramer (electrical engineer) and Smokey Dyer (origin and cause) attend the evidence inspection. (LaFlamme Dec. ¶15, Ex. 9: Sign In Sheets). Interestingly, Plaintiffs did not name either of these consultants as experts in this case. The two liability experts that Plaintiffs have identified did not attend either the August 2-3, 2022 site inspection when the scene was processed or the October 30, 2023 evidence inspection.

8



**Figure 9:** Fire Test Results (note: the fire was extinguished ~9.5 minutes [570s] due to fire spreading to surrounding structures; pool fire continued to burn with flame heights ~4-5ft)

(LaFlamme Dec. ¶16, Ex: 10: Gorbett Report). Although Mr. Wadsworth told Sheaman during his February 2, 2022 interview that there was a concern the shed outside G.W. and L.W.'s bedroom was a potential area of origin, Sheaman did not do anything to follow up on this information. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 221:25-222:10, 237:21-238:8, 254:14-20, 330:1-15).

> Q. Did you ever follow up on that issue with the shed --
> A. With the shed --
> Q. -- being the potential area of origin?
> A. No.

(Id. at 222:5-10).

A number of additional facts have been identified since Sheaman concluded his investigation on March 4, 2022 that are pertinent to an origin and cause investigation. Specifically, Sheaman was not aware of the following facts when he issued his report or was deposed:

- Sheaman was not aware of the body camera statements from the Wadsworth children that indicated the fire started outside (Id. at 329:21-25);
- Sheaman was not aware that the circuit breaker for G.W. and L.W.'s bedroom did not trip (LaFlamme Dec ¶8, Ex. 2: Sheaman Dep. 316:19-317:19, 330:20-24; ¶9, Ex. 3: Schulz Dep. 98:2-4);
- Sheaman was not aware that no electrical arcing was found in G.W. and L.W.'s bedroom. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 331:1-14; ¶9, Ex. 3: Schulz Dep. 15:2-4, 97:24-98:1; ¶17, Ex. 11: Strandjord Report *generally* and at pg. 25); and
- Sheaman was not aware that the only electrical arcing at the scene was found in the smoking shed. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 331:1-14; ¶9,

9

>Ex. 3: Schulz Dep. 15:5-16:10; ¶17, Ex. 11: Strandjord Report *generally* and at pg. 25).

Sheaman agreed that he would have expected the circuit breaker that controlled G.W. and L.W.'s bedroom to trip if the fire originated in that area. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 316:19-317:19). Sheaman, however, did not assess whether any circuit breakers tripped during his limited investigation. (Id. at 317:15-19). Sheaman also conceded that with the type of additional information noted in the above bullet points, he would have classified "the origin [sic] as underdetermined and his investigation as ongoing." (Id. at 255:6-16).

>Further, Sheaman believed that the hoverboard was charging at the time of the fire:

>Q. Okay. Based on your investigation, is it your belief that the hoverboard was -- the hoverboard at the Wadsworth property was charging at the time?
>A. Yes.

(Id. at 280:7-11). Sheaman even identified an outlet where he believed the hoverboard *may* have been plugged into. (Id. at 112:9-113:22). The outlet Sheaman identified, however, was not an outlet in G.W. and L.W.'s bedroom, but rather it was a kitchen outlet located on the other side of the wall. (LaFlamme Dec. ¶9, Ex. 3: Schulz Dep. 82:13-84:11, 108:7-12). As even Plaintiffs' area of origin expert conceded, there is no evidence that the hoverboard was plugged in and charging at the time of the fire. (Id. at 11:19-13:3). Sheaman also conceded that if the hoverboard was not charging that could cause him to reevaluate his opinion. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 280:7-280:21).

Further, neither G.W. nor L.W. ever told Sheaman that they saw fire at the hoverboard. (Id. at 329:9-20). Sheaman also conceded that "it's hard to believe" that G.W. and L.W. escaped the fire uninjured if the fire started at the hoverboard and had spread to the bedroom window area before G.W. and L.W. woke up. (Id. at 322:12-323:6). Unfortunately, Sheaman made up his mind about the origin and cause of the fire well before he even concluded his limited investigation on

10

March 4, 2022. The day after the fire – February 2, 2022 – Sheaman told Mr. Wadsworth that he would be willing to bet his paycheck that it was the hoverboard that caused this fire. (LaFlamme Dec. ¶9, Ex. 3: Schulz Dep. 56:14-57:23).

## **LEGAL STANDARD**

Rule 702 calls upon courts to act as gatekeepers to ensure that expert testimony is both reliable and relevant. *Rutstein v. Cindy's Trucking of Ill., Inc.*, 2012 WL 8813611, at *3 (D. Wyo. Case 2:21-cv-00095-NDF Aug. 8, 2012). The proponent of the testimony bears the burden of "proving the foundational requirements of Rule 702 by a preponderance of the evidence." *Davenport v. Menard, Inc.*, 2016 WL 1298636, at *2 (D. Wyo. Jan. 28, 2016) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

Fulfilling the gatekeeper duty requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts. *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* (quoting *Kumho*, 526 U.S. at 149).

"To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not mere 'subjective belief or unsupported speculation.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). Any "inference or assertion must be derived by the scientific method ... [and] must

11

be supported by appropriate validation—i.e. 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590).

> To assist in the assessment of reliability, the Supreme Court in Daubert listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* at 991-92 (citing *Daubert*, 509 U.S. at 593–94).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Id.* at 992 (citing *Daubert,* 509 U.S. at 595). "However, an expert's conclusions are not immune from scrutiny: 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Regardless of the specific factors at issue, the purpose of the Daubert inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 152).

**ARGUMENT**

I.   **Detective Sergeant Sheaman's Origin and Cause Opinions are Unreliable as he Failed to Complete his Investigation Consistent with NFPA 921.**

"Courts readily accept NFPA 921 as a barometer for determining the reliability of methods used by fire investigation experts." *Philmar Dairy, LLC v. Armstrong Farms*, No. 18-CV-0530 SMV/KRS, 2019 WL 3070588, at *9 (D.N.M. July 12, 2019) (collecting cases). "Courts frequently exclude expert testimony for failure to comply with NFPA 921 in circumstances where the expert explicitly relies on NFPA 921 in reaching his or her conclusion." *See Schlesinger v. United States*,

12

898 F.Supp.2d 489, 504 (E.D.N.Y. 2012). When an origin and cause expert does not apply the principles and methods of NFPA 921, then their opinions may be excluded as unreliable. *See Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005); *see also Presley v. Lakewood Engineering and Mfg. Co.,* 553 F.3d 638 (8th Cir. 2009).

Here, Sheaman agreed that he should follow NFPA 921 for his origin and cause investigation. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 202:17-203:4). NFPA 921 requires that origin and cause investigators follow a systematic approach which is based on the scientific method. *See* NFPA 921 (2021 ed.) § 4.2. (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) p. 20). The scientific method instructs origin and cause investigators to collect data, analyze the data, develop hypotheses, test the hypotheses and then select a hypothesis. *See* NFPA 921 (2021 ed.) §§ 4.3 to 4.3.7. (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) pp. 20-21). *See* NFPA 921 also discusses the problems with expectation bias at § 4.3.9. (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) p. 21).

> Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the premature determination to dictate investigative processes, analyses, and, ultimately, conclusions, in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.

In addition, to conduct a proper origin and cause investigation under the scientific method, "**all collected and available data should be analyzed using principles of the scientific method**." *See* NFPA 921 (2021 ed.) § 4.4.5; *see also* § 18.4 and § 19.4 (**emphasis added**). (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) pp. 22, 226, 233).

13

Sheaman, however, did not consider all collected and available data. He failed to investigate whether the fire originated at the smoking shed. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 221:25-222:10, 237:21-238:8). Also, Sheaman was not provided with any additional information related to this fire after he closed his investigation on March 4, 2022. (Id. at 164:24-165:2, 203:8-22). As a result, Sheaman was not aware of the information identified during the four additional inspections or any of the discovery conducted in this case. (Id). In short, Sheaman's investigation is incomplete and, therefore, his opinions are not reliable.

Specifically, Sheaman was not aware that:

- The Wadsworth children body camera statements support an area of origin at the smoking shed;
- The location of any electrical arcing identified from the scene; or
- The condition of the residence's circuit breakers post fire.

Sheaman acknowledged, however, that NFPA 921 requires him to consider all evidence. He also acknowledged that he would need to classify the fire origin as undetermined with these additional factors identified after he completed his investigation (*i.e.* Wadsworth children statements, arcing and circuit breaker evidence). (Id. at 255:6-16).

Despite such an acknowledgement, Sheaman then also stated that "I don't think any evidence would – would lead me to believe something else started that fire" and there is no "information that anybody could give [him] to change [his] mind." (Id. at 167:12-168:7). These statements directly violate NFPA 921's requirement that fire investigators consider all the evidence. *See* NFPA 921 (2021 ed.) § 4.4.5; *see also* § 18.4 and § 19.4. (LaFlamme Dec. ¶18, Ex. 12: NFPA 921 (2021 ed) pp. 22, 226, 233).

Moreover, certain assumptions that Sheaman made in reaching his conclusion are not true. For example, Sheaman assumed that the hoverboard was charging at the time of the fire when it was not. (LaFlamme Dec. ¶8, Ex. 2: Sheaman Dep. 280:7-280:21). Sheaman also believed that the

14

smoking shed would not burn, but Defendants' test shows that it will burn and is combustible. (Id. at 150:23-151:9). Also, Sheaman could not explain how G.W. and L.W. were not injured if the fire started at the hoverboard in the bedroom while they were sleeping. (Id. at 322:12-323:6). Finally, Sheaman did not even investigate whether the smoking shed could have been the area of origin. (Id. at 221:25-222:10, 237:21-238:8, 254:14-20, 330:1-15).

Based on the above, Sheaman's origin and cause opinions are unreliable and should be barred under the Court's gatekeeper duty per Rule 702.

## II. Plaintiffs Have Not Designated Detective Sergeant Sheaman as an Expert.

In addition to the above arguments, Plaintiffs did not designate Sheaman as an expert. As a result, Sheaman should not be permitted to offer any expert opinion testimony in this case. F.R.C.P. 26(a)(2)(A).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant the Motion and bar Detective Sergeant Sheaman from offering any fire origin and cause opinion testimony. Detective Sergeant Sheaman, however, may still testify as a fact witness about his observations and investigation.

**McCOY LEAVITT LASKEY LLC**

Attorneys for Defendants, Jetson Electric Bikes, LLC and Walmart Inc.

Dated: December 2, 2024       By: _[signature]_

Eugene M. LaFlamme *(pro hac vice)*
Jared B. Giroux *(pro hac vice)*
Jillian L. Lukens *(pro hac vice)*
McCoy Leavitt Laskey, LLC
N19 W24200 Riverwood Drive, Suite 125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com

15

jgiroux@MLLlaw.com
jlukens@MLLlaw.com

and

Timothy M. Stubson, Wyo. Bar No. 6-3144
Brandon E. Pryde, Wyo. Bar No. 8-6883
Holly L. Tysse, Wyo. Bar No. 7-5553
Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
htysse@crowleyfleck.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2024, a true and correct copy of the foregoing was electronically served to all counsel of record.

**EUGENE M. LaFLAMME, Esq.**