EXHIBIT 2

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF WYOMING
 3     ---------------------------------------
 4     STEPHANIE WADSWORTH, Individually and
       as Parent and Legal Guardian of W.W.,
 5     K.W., G.W., and L.W., minor children,
       and MATTHEW WADSWORTH,
 6
 7                          Plaintiffs,
 8          -against-                    Case No.:
                                    23-cv-00118-NDF
 9     WALMART, INC. and JETSON ELECTRIC
       BIKES, LLC,
10
11                          Defendants.
       ---------------------------------------
12
13                    Thursday, November 16, 2023
14                    9:46 a.m.
15
16          Deposition of JEFF SHEAMAN, taken by
17     Plaintiff, pursuant to Notice, held at The Hampton
18     Inn, 1055 Wild Horse Canyon Road, Green River,
19     Wyoming, before Denise Nowak, a Shorthand Reporter
20     and Notary Public within and for the State of Idaho,
21     appearing remotely.
22
23
24
25
```

Page 112

1          Q.     -- to determine that this was the

2     cause?

3          A.     Yes.

4          Q.     Okay.  There was nothing suspicious

5     that you found within the home as having been

6     either criminal activity or malicious activity or

7     anything of that nature that started the fire?

8          A.     No.

9          Q.     You noticed that there was an outlet

10    that showed that something had been inserted into

11    the lower plug?

12         A.     Yes.

13         Q.     There was melted plastic covering the

14    lower plug holes, and wires were coming out of the

15    melted plastic.  Do you see that in your report?

16         A.     Yes.  I remember writing that too.  I

17    remember reading that too.

18         Q.     And then in parenthesis, you put,

19    "This showed that something may have been plugged

20    into the outlet, maybe a charger."  Do you see

21    that?

22         A.     Yes.

23         Q.     Okay.  And let me see if I understand

24    that.

25              So are you saying that upon observing

Page 113

1  this damage you identified an electrical plug?

2          A.     Yes.

3          Q.     That was plugged into an outlet?

4          A.     There was an outlet, yes.   And

5  then -- yes, something was plugged into the lower

6  portion of the outlet.

7          Q.     Because what you saw was melted wire

8  and plastic coming from that outlet?

9          A.     Yes.

10         Q.     Obviously, because of the extent of

11 the fire damage, that wire would have been

12 severed --

13         A.     Yes.

14         Q.     -- at some point?

15         A.     Yes.

16         Q.     And you were not able to definitively

17 identify what it was that was actually plugged into

18 that outlet?

19         A.     Correct.   It was completely

20 destroyed.

21         Q.     And that outlet was near the doorway?

22         A.     Yes, it was.

23         Q.     You stated -- and you continue that

24 you focused your attention near the floor close to

25 the entryway into the bedroom.  This was just below

Page 150

1          A.    Yes.

2          Q.    Even taking into consideration all of

3     the statements that you did from Mr. Pasborg, Mr.

4     Wadsworth, and the kids, correct?

5          A.    Yes.

6          Q.    And also taking into consideration

7     the lack of evidence that you -- that existed

8     outside of the home, right?

9          A.    Correct.

10         Q.    By the way, have you ever

11    investigated fires that have originated in a

12    plastic shed?

13         A.    No, I have not.

14         Q.    Did you ever learn from either Chief

15    Robinson, Chief Urgman or any other first responder

16    that when they arrived on the scene there was

17    something burning outside that window?

18         A.    No, I don't remember anybody saying

19    anything about that.  Again, I haven't watched the

20    body cameras or anything like that, but I don't

21    remember anybody telling me anything about a shed

22    outside.

23         Q.    Okay.  Do you have any knowledge or

24    understanding, from your education and your

25    training and your background, as to the

1    flammability of plastic?

2                MR. LaFLAMME:  Object to form.

3          A.    It will melt, not necessarily burn.

4    If it burns more likely it just -- it -- it melts,

5    plastic melts.  So it's -- if a fire is set to

6    plastic, it will melt.  It doesn't necessarily go

7    up in flames like a hollow core door or a piece of

8    wood or something like that.  That's -- that's just

9    my take on that, my opinion on that.

10   BY MR. AYALA:

11         Q.    All right.  Do you have any

12   understanding or experience as to the rate at which

13   plastic melts?

14               MR. LaFLAMME:  Object to form.

15         A.    I'm --

16               MR. LaFLAMME:  Go ahead.

17         A.    -- not sure.

18   BY MR. AYALA:

19         Q.    And the next portion, and this is at

20   the bottom of page 12 of your report, it's titled

21   Officers Actions and Observations.  It describes

22   that on February 3rd you went to Walmart in Rock

23   Springs to research a little bit about the

24   hoverboard sold there?

25         A.    Yes.

Page 164

1    describe the locations of the window, the bed, the

2    closet, the outlet, the door.

3              Was your description of the locations

4    of those items in the bedroom consistent with the

5    information provided to you by Mr. Wadsworth?

6         A.    Yes, it was.

7         Q.    So you concluded those interviews.

8    You showed Matt some of the photographs, those were

9    the photographs that you had taken?

10        A.    Yes.

11        Q.    And that assisted you in

12   understanding where those items that he described

13   were located in the house before the fire?

14        A.    Yes.

15        Q.    And then Matthew and the children

16   left the building.  That concluded your interview

17   of all of that, correct?

18        A.    Right.

19        Q.    Again, the audio and video recordings

20   from the interviews were download into the

21   electronic evidence by you, and the case was closed

22   pending further information, correct?

23        A.    Right.

24        Q.    Following March 4th, 2022, have you

25   receive or been provided with any additional

1    information relating to this fire incident?

2             A.    No.

3             Q.    Aside from -- putting this aside for

4    now, but aside from those hypotheticals that I

5    asked you about, a shed and smoking and a space

6    heater and arcing; and in all of those things,

7    you've not been provided with any additional

8    information relating to potential origin or cause

9    of this fire.

10            A.    No, I have not.

11            Q.    And even with all of those

12   hypotheticals and the information provided in those

13   hypotheticals, none of that changes your ultimate

14   conclusions that you've reached and pronounced

15   today.

16            A.    No.

17            MR. LaFLAMME:   Object to the form.

18   BY MR. AYALA:

19            Q.    By the way, and we've referred to it

20   and you've described it a little bit earlier today,

21   did you find any arcing at all?

22            A.    No, I don't believe there was any,

23   not that I noticed.

24            Q.    Okay.  But even still, as you

25   described earlier, any evidence of arcing, whether

Page 167

1    of in passing, so.

2           Q.    Okay.  Would it be fair to say that

3    that conversation with Stephanie was more to see

4    how she was doing as opposed to investigating

5    further?

6           A.    Yes.  Yeah, if there was anything

7    that came out of that conversation that I thought

8    was relevant to the report, obviously I would have

9    probably brought her in at a later date, but she

10   was still healing, still in a lot of pain and

11   obviously it wasn't the time or the place, so.

12          Q.    Okay.  What -- what type of either

13   information or evidence would need to see to change

14   your ultimate conclusions as to the cause of this

15   fire?

16               MR. LaFLAMME:  Object to form.

17          A.    I don't think any evidence would --

18   would lead me to believe something else started

19   that fire.  And it wasn't just based off what I

20   found.  You know, if I go in on an investigation by

21   myself and I make an assumption or I have an idea

22   of what started this fire or who caused or

23   committed this crime or whatever, I'm open for

24   someone to come in and say, hey I found this or I

25   found that, or, you know, compare evidence so to

Page 168

1    speak.  But with three different investigators,

2    firefighters, law enforcement going in at separate

3    times and coming up with the same conclusion,

4    there's -- there's nothing that I don't think

5    anybody could show or give to me or any -- any

6    information that anybody could give to me to change

7    my mind.

8                    MR. AYALA:  Okay.  Give me one quick

9    moment to look over some notes I had here and I

10   might be just about done.

11                    THE WITNESS:  Okay.

12                    (Pause in proceedings.)

13   BY MR. AYALA:

14          Q.    Did you ever review Chief Robinson's

15   report?

16          A.    I did not; I sure didn't.

17          Q.    Aside from the photographs that you

18   took, and you did review them earlier today, did

19   you review any other photographs taken by others?

20          A.    No.  I will say that there are other

21   photographs that -- and I cycled through the

22   photographs you guys provided me here.  I know

23   there's more photographs because there are

24   photographs of the hoverboard --

25          Q.    Right.

1    somebody needs a copy of a report or evidence or

2    that kind of stuff, so.

3         Q.    And the first time that we've

4    discussed -- that you discussed news today,

5    correct?

6         A.    Correct.

7         Q.    Does the Sweetwater Sheriff's

8    Department have any specific written policies or

9    procedures as to the process to conduct an origin

10   and cause investigation?

11        A.    Not necessarily, no.  It's -- it's

12   just based off -- it's just basically how to handle

13   investigations and, you know, when to call a

14   detective, when not to, you know, that kind of

15   thing.  So nothing specific though for origin and

16   cause investigation.

17        Q.    Okay.  And do you follow NFPA 921 for

18   your origin and cause investigations?

19        A.    Yes.

20        Q.    And that's what you would consider to

21   be the -- the guide that you would follow for your

22   process?

23        A.    Yes.

24        Q.    And is that what you try to follow

25   with respect to the law enforcement investigation?

1            A.    Yes.

2            Q.    And you understand your NFPA 921

3    describes the scientific method?

4            A.    Yes.

5            Q.    And the scientific method requires

6    you to assess all items, correct?

7            A.    Correct.

8            Q.    Okay.  And I know that you did your

9    report, which has been marked as Exhibit 16, and

10   this report was completed.  The last supplemental

11   was, I believe, March, March 4th of 2022, correct?

12           A.    Correct.

13           Q.    And any additional evidence that was

14   discovered on the private side, you're not aware of

15   that, right?

16           A.    Correct.

17           Q.    And you would agree that in order to

18   complete a full and thorough origin and cause

19   investigation under an NFPA 921, you would need to

20   consider all the evidence that's been uncovered,

21   correct?

22           A.    Yes.

23                 MR. AYALA:  Object to the form.

24   BY MR. LaFLAMME:

25           Q.    Did you take any video during your

Page 221

1    on that.  I don't want to go to the scene and

2    think, okay, it started in the shed because that's

3    what they thought.  I want to get there, form my

4    own opinions about that, and then obviously go back

5    and compare that to the witness statements.

6            Q.    This is from the same.

7                  (Playing video recording.)

8            Q.    And did you hear Kamille at about 10

9    minutes 42, 43 that the fire started outside on the

10   porch?

11           A.    Yes.

12           Q.    Okay.  Going back 12 minutes 30

13   seconds.

14                 (Playing video recording.)

15           Q.    Stopped it at 13 minutes 18 seconds.

16   There do hear Mr. Pasborg indicate that it looked

17   like the fire started outside of the exterior wall,

18   correct?

19           A.    Right.

20           Q.    And then you also hear Detective

21   Merrill indicate that the kids felt that they it

22   started around the shed and that the parents smoked

23   in there, correct?

24           A.    Yes.

25           Q.    And Mr. Wadsworth had raised the

1   prospect of the shed being the potential cause, or

2   something in the shed being the potential cause

3   during your interview with him, correct?

4            A.    Yes.

5            Q.    Did you ever followup on that issue

6   with the shed --

7            A.    With the shed --

8            Q.    -- being the potential area of

9   origin?

10           A.    No.

11           Q.    One of the reasons you that you have

12  indicated that you found -- the area of the

13  hoverboard was located to be the area of origin was

14  related to V patterns, correct?

15           A.    Correct.

16           Q.    Okay.  Was there anything else,

17  besides V patterns, that led you to the believe

18  that that was the area of origin?

19           A.    Just the amount of damage, the amount

20  of charring, the amount of damage with the burned

21  away studs, that was the most damaged area of the

22  residence.

23           Q.    Okay.  Did -- you're aware that there

24  are times when a fire can start on the exterior of

25  a building and move to the interior.

Page 237

1    injuries, correct?

2            A.    Correct.

3            Q.    Okay.  So if the fire had started at

4    this hoverboard, and traveled to the window enough

5    to break the window before the kids -- before the

6    boys before woke up, that bed would have likely

7    caught fire, correct?

8            A.    You would think so, yes.

9            Q.    Okay.

10           MR. LaFLAMME:  If you'd share this as

11   18A?

12           MR. CURRAN:  Yes, sir.

13           MR. LaFLAMME:  Thank you.

14           MR. CURRAN:  I have it saved.  I'll

15   get it uploaded here in a moment.

16           Do you still need the image shared?

17           MR. LaFLAMME:  No, you can take it

18   down.  Thank you.

19           MR. CURRAN:  Thank you.

20   BY MR. LaFLAMME:

21           Q.    When Mr. Wadsworth said that he was

22   concerned about the shed outside of the bedroom as

23   a potential area of origin, that isn't in your

24   report at all, is it?

25           A.    No.

Page 238

1      Q.    Why wouldn't you have included that
2   in your report?
3      A.    I think for the -- to be a hundred
4   percent honest, when I showed up on scene, there
5   wasn't anything that led me to believe initially
6   that the fire started on the outside, and I focused
7   my attention on the inside to where I believe the
8   fire started.
9      Q.    And you're aware that when Mr.
10  Pasborg had arrived there was fire outside of the
11  house, correct?
12     A.    I believe that's what he said, he saw
13  fire outside of the home.
14     Q.    Okay.  And if there was a shed there
15  that was used for smoking and that shed is the area
16  of origin, the fire could have traveled into the
17  boys bedroom through that window, correct?
18          MR. AYALA:  Object to the form.
19     A.    Potentially it depends on what -- I
20  would imagine whatever's inside that shed, whatever
21  the shed's built from, I mean obviously if it's
22  plastic, if it's, you know, wood, whatever is in
23  that shed, whatever the flammability of the
24  whatever the contents of that shed were to travel
25  up for that enough to break out that window and

1          A.    That's something I would -- I would

2     definitely be all ears to talk to someone if

3     someone came to me.  Again, I'm always bouncing

4     ideas off someone.  If someone came to me and said,

5     hey, this is what we think, I would definitely look

6     into that; I would definitely consider, you know,

7     hey, let's -- let's take a second look at it.  I've

8     done that with criminal investigations; I have no

9     problem with that.  But again, it doesn't change my

10    opinion on where I believe the fire started.

11         Q.    But you understand under NFPA 921,

12    that if additional evidence comes to light, you

13    need to consider that evidence, correct?

14         A.    Correct.

15         Q.    Okay.

16         A.    And I wasn't -- I didn't hear of any

17    other, you know, any other calls, any other

18    evidence, or anything like that.

19         Q.    Okay.  I understood that you weren't

20    part of the private investigation --

21         A.    Sure.

22         Q.    -- and you haven't been privy of what

23    those results were, but if there was arcing that

24    was found in that shed, you would agree with me

25    that under 921 you would want to reevaluate your

1    house, this is what we found; something that might

2    spark an interest to look back into that, I would

3    be all over that, I would be very much for that.

4                    But again, I still hold that opinion

5    of -- based off what I found, the firefighters

6    found, in discussing with them what they determined

7    what was the origin of cause, and it matched mine,

8    which is what I had said earlier.

9    BY MR. LaFLAMME:

10         Q.    And your opinion is based on the

11   information you learned up through March 4th of

12   2022.

13         A.    Yes.

14         Q.    Okay.  And even before then, you were

15   told about the smoking shed by Mr. Wadsworth,

16   correct?

17         A.    Yes, yes.

18         Q.    And that just wasn't anything that

19   you've followed up on at that time.

20         A.    Correct.

21         Q.    The fact that there -- there were

22   statements by the children about the fire starting

23   outside in the body camera footage cam, if there

24   was arcing that was found at the shed, that would

25   certainly cause you to look at that area as a

1    potential area of origin.  True?

2              MR. AYALA:  Form.

3         A.    I would -- in that case, obviously

4    any additional information I got on something like

5    that I would look into it for sure.

6         Q.    Okay.  And with that type of

7    additional information, if that is the result of

8    the private investigation, Chief Robison indicated

9    yesterday that he would have -- as he was sitting

10   there yesterday, based, if that information was

11   true, he would have to put under NFPA 921 the

12   original as undetermined and his investigation as

13   ongoing.

14             Would that be the same qualification

15   you would use?

16        A.    Yes.

17        Q.    An as part of your investigation, you

18   went out to Walmart to look at the type of

19   hoverboard, correct?

20        A.    Yes.

21        Q.    Did you ever purchase an exempt -- an

22   exemplar?

23        A.    No, I did not.

24        Q.    Okay.  I wasn't sure if you had.

25        A.    Nope, I didn't.

1          A.    Yeah.

2          Q.    -- you don't know the background of

3    that --

4          A.    No.

5          Q.    -- correct?

6          A.    No.

7          Q.    Okay.  Based on your investigation,

8    is it your belief that the hoverboard was -- the

9    hoverboard at the Wadsworth property was charging

10   at the time?

11         A.    Yes.

12         Q.    If it wasn't charging at the time,

13   would that have -- that would have caused you to

14   reevaluate your opinion, correct?

15         A.    Again, again, potentially.  You know,

16   I don't know enough about them to know if, you

17   know, if you -- maybe if unplug them, maybe if they

18   continue to be hot, if there's some kind of

19   malfunction or something inside of them, if they

20   could still catch fire, blow up, anything like

21   that, I honestly don't know, but.

22         Q.    But your presumption was in your

23   investigation that it was plugged in --

24         A.    Plugged in --

25         Q.    -- correct?

1   questions.

2                     There was nothing about this fire

3   that rendered you incapable of conducting a

4   thorough origin and cause investigation?

5            A.    No.

6            Q.    The body cam footage that you saw,

7   nothing from that body cam footage, that you were

8   shown today for the first time, affected and

9   impacted your opinion to the point of changing your

10  conclusions?

11           A.    No.

12           Q.    In fact it reinforced it.

13           A.    It did, yes.

14                 MR. AYALA:  Sir, thank you.

15                 THE WITNESS:  You're welcome.

16                 MR. LaFLAMME:  Thank you.

17                       EXAMINATION

18  BY MR. LaFLAMME:

19           Q.    Detective sergeant, with respect to a

20  fire originating in Gunner and Layne's bedroom, you

21  would expect that circuit breaker to trip, correct?

22                 MR. AYALA:  Form.

23           A.    In -- it's tied to the same circuit

24  breaker?

25  BY MR. LaFLAMME:

Page 317

```
 1          Q.    Correct.

 2          A.    You -- probably more than likely,

 3    yes.

 4          Q.    Okay.  Generally, if a fire, wherever

 5    the fire starts in the room of origin, that circuit

 6    breaker for that room is going to trip --

 7          A.    Going to trip --

 8          Q.    -- correct?

 9          A.    -- yes.

10                (Inaudible, simultaneous talking.)

11          Q.    You at least --

12          A.    -- a lot of times I've, yes.

13          Q.    -- you agree with that, correct?

14          A.    I do.

15          Q.    Did you look at the breaker box in

16    the basement?

17          A.    I don't believe I did.  If I did, I

18    probably would have photographed that.  I don't

19    believe I did.

20                MR. LaFLAMME:  Let me show you what

21    we'll mark as Exhibit 21.

22                (Whereupon, Exhibit 21 was marked for

23    identification.)

24    BY MR. LaFLAMME:

25          Q.    Exhibit 21 is a photo of the breaker
```

1          Q.     Okay.  And do you recall that --

2          A.     I do.

3          Q.     -- kind of thing?

4          A.     Yeah.

5          Q.     And I think you agreed that it would

6     make sense for the fire to start at the hoverboard,

7     go up to the ceiling, come down the wall, and then

8     below out the window --

9          A.     Yes.

10         Q.     -- correct?

11         A.     Yes.

12         Q.     Okay.  How would the boys get out of

13    the bedroom uninjured if that happened?

14         A.     The that's a good question.  And

15    that's one I can't answer.

16                I know that based off their testimony

17    saying they felt heat, they saw flames.  I don't

18    know how intense -- if it did start there at that

19    hoverboard.  I don't know how intense that flame

20    was at that point, and that's what make me question

21    if that window was actually broke out or open at

22    that point, because it sure wouldn't be open in

23    February.  If that fire had already reached to the

24    point where it broke the window, it's hard to

25    believe that they would escape without injury.

Page 323

1    Q.    And Gunner said, in your interview
2    with him on March 4 2022, by the time I woke up
3    there was no window, correct?
4            A.    Yes, I remember him saying that.
5            Q.    Do you recall him saying that?
6            A.    I do.
7            Q.    All right.  The kids never
8    indicated -- Gunner and Layne never indicated that
9    they heard any popping noises, correct?
10           A.    Right.
11           Q.    Have you ever seen a -- or heard a
12   lithium ion battery pack fail?
13           A.    I have not.
14           Q.    All right.  You don't know what noise
15   it makes?
16           A.    I mean if you watch like a YouTube
17   video like the YouTube video I watched, but really
18   I don't remember if it's like a popping noise or
19   anything like that, so.
20           Q.    Okay.  You are aware it at least
21   makes a noise?
22           A.    Oh yeah.
23           Q.    And popping is probably the best type
24   of description for it --
25           A.    Yes.

1          A.    I would imagine, let's put it that

2    way.

3          Q.    And a there's no indication that the

4    boys heard a pop, pop type noise?

5          A.    No.

6          Q.    You were asked a question as to

7    whether it is possible have to have arcing outside

8    if the fire traveled from the inside of the

9    building to the outside of the shed.  Do you recall

10   that?

11         A.    Yes, I do.

12         Q.    Okay.  If that happened, you would

13   have a tripped circuit breaker for that bedroom,

14   correct?

15                MR. AYALA:  Form.

16         A.    That I -- I don't know about that;

17   I'm not sure.  I -- I think -- I know with fires

18   anything can happen anything, anything is possible,

19   but I don't know if I can answer that real well.

20         Q.    Okay, fair enough.  You would agree

21   that as an origin and cause investigator it's

22   important to be at the site to -- to process the

23   site, correct?

24         A.    Yes.

25         Q.    And as an origin and cause

1   investigator, you would want to be part of the

2   processing of the scene, correct?

3            A.    Yes, for sure.

4            Q.    And in order to come to a final

5   opinion, you would want to be involved in the final

6   processing of the scene, correct?

7                  MR. AYALA:   Form.

8            A.    Umm, by final you mean -- I mean I

9   was there with -- when, when both chiefs and I were

10  there during that day.  I was confident, by the

11  time we left, we had an idea of what had happened

12  there.

13                 I'm not sure how to answer your

14  question.

15  BY MR. LaFLAMME:

16           Q.    Okay.  In order to come to a final

17  conclusion as to what you're going to state was the

18  cause of the fire, you would want to be involved in

19  all of the scene processing activities, correct?

20           A.    Yes.

21           Q.    If you were an origin and cause

22  expert and you were just brought in after the scene

23  was already gone, you would agree that that creates

24  some difficulty, correct?

25           A.    Yes, it would.

1    much more, but I would probably go over if you are

2    right on the edge.

3                    THE VIDEOGRAPHER:  Yeah, I'm like

4    three minutes.

5                    MR. LaFLAMME:  Okay, yeah.  I -- I

6    probably don't have any more than five to eight

7    minutes, but why don't we change it.

8                    THE VIDEOGRAPHER:  Thank you.

9                    This is the end of Media Unit number

10   5.  We are off the record at 5:25 p.m.

11                   (Recess taken.)

12                   THE VIDEOGRAPHER:  This is the

13   beginning of Media Unit number 6.  We are on the

14   record at 5:28 p.m.

15   BY MR. LaFLAMME:

16           Q.    Detective sergeant, thanks for --

17           A.    Sure --

18           Q.    -- the interruption.

19           A.    -- that's okay.

20           Q.    You're aware that, in the interviews

21   that you had with Gunner and Layne, that -- that

22   Gunner described that the fire was behind him,

23   correct?

24           A.    Yes.

25           Q.    That he said it moved up the wall and

Page 329

1   melted through the window, correct?

2           A.      Yes.

3           Q.      Okay.  And that Layne said there was

4   a giant shed in that area, correct?

5           A.      I believe so, yes.  That's on my

6   report.

7           Q.      Okay.

8           A.      I believe so, yes.

9           Q.      And then you asked Gunner where was

10  the fire in the room, and Gunner said it was by the

11  window, correct?

12          A.      I remember that, yes.

13          Q.      Okay.  Gunner and Layne never said

14  that they saw fire at the hoverboard, correct?

15          A.      I don't -- I don't remember if they

16  did or not; I don't believe so though.

17          Q.      One of them said that they saw it --

18  ash by the hoverboard, but they never said they saw

19  fire at the hoverboard, correct?

20          A.      I believe that's correct.

21          Q.      At the conclusion of your

22  investigation on -- in March of 2022, at the point

23  in time you didn't know about the body cam

24  statements immediately after the fire, correct?

25          A.      Correct.

1      Q.    And you didn't know much about the

2  shed, other than Matthew Wadsworth's kind of

3  passing statement at the end of his interview,

4  correct?

5      A.    Correct.

6      Q.    And you didn't know what was in the

7  shed, correct?

8      A.    Right.

9      Q.    You didn't know that the Wadsworths

10 smoked in the shed, correct?

11     A.    He had told me that, but I -- I

12 didn't recall.

13     Q.    And you didn't follow up on that,

14 correct?

15     A.    No.

16     Q.    And you didn't know that there was a

17 space heater in the shed?

18     A.    No.  Again, I -- he told me that and

19 I -- I guess I figured it out.

20     Q.    Okay.  You didn't know that there was

21 no tripped breaker for the bedroom where you put

22 the area of origin, correct?

23          MR. AYALA:    Form.

24     A.    Right.

25 BY MR. LaFLAMME:

1    Q.    You didn't know that there was no

2    arcing found in that bedroom, correct?

3          A.    Correct -- umm, in the bedroom?

4          Q.    Correct.

5          A.    Correct.

6          Q.    And there was -- you didn't know that

7    there was no arcing found anywhere in the house,

8    correct?

9          A.    Correct.

10         Q.    And you didn't know, in March of

11   2022, that there was arcing found in the shed

12   outside, correct?

13               MR. AYALA:   Form.

14         A.    Correct.

15   BY MR. LaFLAMME:

16         Q.    All of that information, if that

17   bears out in evidence, that was all information

18   that you did not have when you wrote your report in

19   March of 2022, correct?

20         A.    Right.

21               MR. LaFLAMME:  All right.

22               That's all the questions I have.

23   Thank you.

24               THE WITNESS:  Thank you.

25               MR. AYALA:  Okay.