# EXHIBIT 3

Michael Schulz
09/10/2024

Page 1

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

STEPHANIE WADSWORTH,             )
Individually and as Parent       )
and Legal Guardian of W.W,       )
K.W., G.W., and L.W., minor      )
children, and MATTHEW            )
WADSWORTH                        )
                                 )
         Plaintiffs,             )
                                 )
    vs.                          )  No. 2:23-cv-00118-NDF
                                 )
WALMART, INC., and JETSON        )
ELECTRIC BIKES, LLC,             )
                                 )
         Defendants.             )
_____)

DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California

REPORTED BY:  Joy E. Shure, CSR No. 3659

Michael Schulz
09/10/2024

Page 11

```
 1   you're deferring to BEAR on.  At some point, you did an
 2   analysis on fire spread, though; correct?
 3        A.   Correct.
 4        Q.   Okay.  So where do you pick up from where they
 5   drop off?
 6        A.   So they really pick up from where I drop off.
 7   I identified the origin of the fire, and within that
 8   origin I identified two potential sources of ignition --
 9   well, three potential sources of ignition, and then they
10   picked up from there.
11        Q.   Okay.  What are the three potential sources of
12   ignition?
13        A.   The hoverboard and any -- at the time, any
14   associated charging components, the electrical outlet
15   for Bedroom No. 4 on the wall behind the refrigerator,
16   and then thirdly, initially, I included the refrigerator
17   as a potential source because of its location on the
18   other side of that bedroom wall.
19        Q.   Was the hoverboard charging at the time of the
20   accident -- of the fire?
21        A.   There's testimony that it had been charging at
22   the end of the day's use and prior to the fire, but I
23   concur -- and I did not see and I concur that in the
24   photographs of the joint inspection of the evidence,
25   there were no electrical plugs in that outlet.
```

Michael Schulz
09/10/2024

Page 12

```
 1      Q.   Okay.  So based on your investigation, you've
 2   concluded that the hoverboard was not charging at the
 3   time of the fire; correct?
 4           MR. AYALA:  Form.
 5           THE WITNESS:  I don't see any evidence that
 6   says that it was, but I can only speak to how I found
 7   the electrical outlet post incident, and not having any
 8   of the blade plates in there, that would seem to be
 9   indicative that the charger was not plugged in at the
10   time of the fire, yes.
11   BY MR. LaFLAMME:
12      Q.   Okay.  So there were no blade plugs in the
13   outlet directly behind the hoverboard; correct?
14      A.   Correct.
15      Q.   There was no wiring from any charging device
16   found by the hoverboard; correct?
17      A.   Correct.
18      Q.   And there was no indication on the female end
19   of the receptacle on the hoverboard that anything had
20   been plugged in at the time of the fire; correct?
21      A.   So that's something I didn't -- I looked at
22   briefly in the field, but I didn't do a detailed
23   analysis of that, but I'm not aware of any evidence of
24   that.
25      Q.   Okay.  So based on the physical evidence,
```

Michael Schulz
09/10/2024

Page 13

```
 1   you're not aware of any evidence that would suggest this
 2   hoverboard was plugged in at the time of the fire; true?
 3       A.   True.  That's correct.
 4       Q.   And this fire was first identified by Gunner
 5   and Layne Wadsworth; correct?
 6       A.   Correct.
 7       Q.   And Gunner and Layne, we've referred to it as
 8   Bedroom 4, that was their bedroom; correct?
 9       A.   Correct.
10       Q.   All right.  And they were in a bunk bed that
11   abutted the wall and window for their bedroom?
12       A.   Correct.
13       Q.   And when they first woke up, that window had
14   already been breached or broken; correct?
15            MR. AYALA:  Form.
16            THE WITNESS:  I haven't read any testimony that
17   that's their testimony.  There is testimony that Gunner
18   in particular recalls that there were shards of glass in
19   the bed.
20   BY MR. LaFLAMME:
21       Q.   Okay.  And that's when he woke up; correct?
22       A.   Yes.
23       Q.   And you've seen the interview with -- that
24   Detective Sheaman did with the Wadsworth boys; correct?
25       A.   Correct.
```

Michael Schulz
09/10/2024

Page 14

```
 1      Q.   And in that interview Gunner describes how when
 2   he woke up, the window had already broken; correct?
 3      A.   I don't recall.  It's been a while since I've
 4   watched it, but I'm not doubting your representation.
 5      Q.   Well, we can pull it up if you'd like to.
 6      A.   No, I'm fine.
 7      Q.   Okay.  You agree that that's what Gunner said
 8   to Detective Sheaman; correct?
 9      A.   That's my recollection, yes.
10      Q.   All right.  So when the boys woke up, based on
11   the evidence that's in the record, you'd agree that the
12   fire was already at the window; correct?
13           MR. AYALA:  Form.
14           THE WITNESS:  Correct.  And I think that's
15   consistent with Gunner's other testimony.
16   BY MR. LaFLAMME:
17      Q.   Okay.  And that's the window of -- just so I'm
18   clear as to what window -- the window of Bedroom No. 4?
19      A.   Correct.
20      Q.   And there's only one window in that bedroom;
21   correct?
22      A.   That's correct.
23           I'll stop you if I think we need to identify
24   something --
25      Q.   Okay.
```

Michael Schulz
09/10/2024

Page 15

1       A.    -- more precisely.
2       Q.    Was there any arcing found in the house?
3       A.    Not that I'm aware of; however, I did not
4    undertake to study that or not.
5       Q.    Was there any arcing found anywhere on the
6    site?
7       A.    There are reports and there are photographs of
8    what appear to be electrical anomalies on electrical
9    wiring in the shed located in front of the house
10   outdoors.
11      Q.    Okay.
12      A.    But I wasn't present for that evidence
13   inspection and I've never had a close-up look at those
14   artifacts, and I would defer to the electrical engineers
15   that were present.
16      Q.    Do you know if the electrical engineers that
17   were present for the Wadsworth family have been named as
18   experts in this case?
19      A.    I'm not aware that they are, but I don't know
20   who all of the experts are in this case.
21      Q.    So based on your involvement in the case, you
22   just don't have an opinion one way or the other as to
23   whether the anomalies, as I think you termed it, on the
24   wiring at the shed outside was indeed arcing; correct?
25      A.    Correct.

Michael Schulz
09/10/2024

Page 16

1    Q.    You agree that there are electrical anomalies
2    that were identified out at the shed?
3    A.    Correct.
4    Q.    Okay.  And those anomalies do have an
5    appearance of arc damage; correct?
6    A.    They do.  Those anomalies that were marked with
7    the colored wire ties would be things that I would want
8    an electrical engineer to look at under a microscope,
9    and if I was present, I would have looked under the
10   microscope, too, and formed more of an opinion.
11   Q.    Okay.  Have you seen the microscopic images of
12   the arc damage?
13   A.    I have not.
14   Q.    Were you aware any were taken?
15   A.    I saw a reference to marking things for the
16   microscope in something that I read, but I don't think
17   that I've ever seen the images.
18   Q.    Did any circuit breakers trip in the house?
19   A.    Not that I'm aware of, no.
20         When I was there on Day 1, which was in May of
21   2022, there were no circuit breakers that were
22   identifiable in the tripped position.
23         There was a single circuit breaker in the
24   subpanel that was off, and I think it was marked for a
25   washing machine.

Michael Schulz
09/10/2024

Page 34

```
 1   indicating -- or the diagrams that you're indicating
 2   that he did?
 3       A.   Correct, independent of the Matterport diagrams
 4   that he generated.
 5       Q.   Correct.
 6       A.   And the only difference is there's a few more
 7   of these in my case file, but he provided some without
 8   the graph paper lines.
 9       Q.   Okay.  So the other diagrams that are in your
10   case file, they're similar to what we see here in
11   Exhibit 98; correct?
12       A.   That's where I printed these from.
13       Q.   Okay.
14       A.   And then under Matterport scan, under his
15   Matterport data, you'll see some other diagrams of the
16   incident scene that are generated automatically by
17   Matterport.
18       Q.   And the Matterport process involves setting up
19   the scanner, letting it run its 360 in each area where
20   you want a data point and then that is then developed
21   into a 3D scan; correct?
22       A.   Correct.  And then from that they generate
23   floor plans for you.
24       Q.   Okay.  Do you know if Mr. Birdsong assisted in
25   processing the fire scene in August of 2022?
```

Page 35

1     A.   I know that he did.
2     Q.   Okay.  What was his involvement in that regard?
3     A.   He's the one that I had him define the search
4   grids and then I have him over -- supervise the
5   searching of the different search grids, another thing
6   that he routinely does at fire and explosion scenes for
7   as long as I've known him some 20 years.
8     Q.   So the search grids would be shown on Page 4 of
9   Exhibit 98?
10    A.   Correct, and he originally defined those.
11    Q.   Okay.  Do you know if he was -- was he actually
12   involved in the processing of the scene or did he just
13   oversee it?
14    A.   I wasn't there, so I don't think -- I don't
15   know that I can answer that question, but he was there
16   to supervise it and make sure that the evidence got
17   marked properly out of those search grids.
18    Q.   Okay.  Do you know if he was involved in
19   actually shoveling out the fire debris and sifting
20   through it?
21    A.   I don't know the extent of his involvement.  I
22   don't know that I've ever discussed that with him.
23    Q.   In looking at the search grids that he put
24   together, so there's a Search Grid A-1 and then B-1 that
25   seem to indicate the areas of where the hoverboard was

Page 56

```
 1   BY MR. LaFLAMME:
 2       Q.   Okay.  You are a municipal fire investigator;
 3   correct?
 4       A.   Correct.
 5       Q.   When you did your municipal investigations,
 6   would you tell witnesses what your preliminary thoughts
 7   were of the investigation before it was completed?
 8       A.   I never did that, no.
 9       Q.   And you wouldn't do that because you wouldn't
10   want to taint the witness's statements to you
11   subsequently?
12       A.   That's one reason not to do it.
13            MR. AYALA:  Form.
14            MR. LaFLAMME:  Okay.  I'm going to start
15   Sheaman's interview with Matthew Wadsworth at 11:30.
16                (Video played.)
17   BY MR. LaFLAMME:
18       Q.   Those aren't any types of statements that you
19   would make to a homeowner the day after the fire when
20   your investigation is still ongoing; correct?
21            MR. AYALA:  Form.
22            THE WITNESS:  I would not by my personal choice
23   of how I do business.
24   BY MR. LaFLAMME:
25       Q.   You would not indicate that a certain product
```

Michael Schulz
09/10/2024

Page 57

```
 1   is notorious for causing fires when you have not
 2   completed your fire investigation to the homeowner;
 3   correct?
 4           MR. AYALA:  Form.
 5           THE WITNESS:  I wouldn't do that, no.
 6           MR. LaFLAMME:  Then moving up to 23 minutes,
 7   33 seconds.
 8              (Video played.)
 9   BY MR. LaFLAMME:
10      Q.   Would you make that type of statement that
11   you'd be willing to bet your next paycheck as to the
12   cause of the fire the day after the fire?
13           MR. AYALA:  Form.
14           THE WITNESS:  I would not do that, no.
15   BY MR. LaFLAMME:
16      Q.   Okay.  And just so I get my full statement out
17   here, you heard Detective Sheaman state to Mr. Wadsworth
18   the day after the fire that he would be willing to bet
19   his paycheck that it was the hoverboard.
20           That is not a statement you would ever make as
21   a municipal fire investigator to the homeowner; correct?
22           MR. AYALA:  Form.
23           THE WITNESS:  I would not, no.
24           MR. LaFLAMME:  And then continuing on at 24
25   minutes.
```

Michael Schulz
09/10/2024

Page 82

1  on with the wire coming out.  That's not -- that wasn't
2  on the bedroom side of the wall.  That's on the kitchen
3  side of the wall.
4      Q.  Okay.
5      A.  And I have a separate set of two pages of notes
6  where I showed those two photographs because I was
7  trying to decide, figure out what he was talking about,
8  and I figured it out.
9      Q.  I was as well at one point.
10     A.  Okay, yeah.  And then the oval at the bottom of
11 this represents that the hoverboard is also located
12 there.
13     Q.  So you would agree that the outlet that was on
14 the bedroom side, there is no wiring coming from that
15 outlet; correct?
16     A.  No wire protruding from that.
17     Q.  Okay.  The wiring that is protruding from an
18 outlet in that area is the upper outlet that serviced
19 the refrigerator?
20     A.  Correct.
21     Q.  So Detective Sheaman in his analysis when he
22 indicated that there was wiring from that outlet into
23 Bedroom No. 4 was incorrect?
24     A.  That's incorrect.
25         And I think I called that set of notes

Michael Schulz
09/10/2024

Page 83

```
 1   something like Sheaman's observations of the outlets,
 2   but yes, it's in the case notes folder and it's entitled
 3   "Sheriffs Detective Sheaman Outlet Observations."
 4        Q.   Since I have it here, why don't we mark it and
 5   we'll knock that one out.
 6        A.   Okay.
 7        Q.   I'll hand you what's been marked as Exhibit 99,
 8   and this is from your expert file; correct?
 9        A.   Correct.
10             (The aforementioned document was
11             marked as Exhibit 99 for identification
12             and is attached hereto.)
13   BY MR. LaFLAMME:
14        Q.   Okay.  And there was an indication from
15   Detective Sheaman's report that there was wiring coming
16   out of an outlet in Bedroom 4; correct?
17        A.   Both his report and as well in his discovery
18   deposition.
19        Q.   And he had attributed that potentially to the
20   hoverboard being plugged in; correct?
21        A.   Correct.
22        Q.   Okay.  Based on your analysis, it sounds like
23   you disagree with that; correct?
24        A.   I totally disagree with that.
25        Q.   All right.  That the wiring that was in the
```

Page 84

1   receptacle that Detective Sheaman identified was wiring
2   that went to the refrigerator?
3        A.   Correct.
4        Q.   Okay.  And that wiring was in the receptacle
5   that would have been facing the kitchen?
6        A.   Correct, so it started on the opposite side of
7   this wall.
8        Q.   And the receptacle that was in Bedroom
9   No. 4 doesn't have any wiring protruding from it?
10       A.   Correct.  And that's depicted on Page 2 of
11  Exhibit 99 and represented by my Photograph 160.
12       Q.   All right.  Back to your annotations here.
13       A.   Okay.
14       Q.   So we're on Photo 159 of Exhibit 97.
15       A.   Correct.  So I'm indicating the circles and the
16  ovals are indicating the potential sources of ignition
17  that are located within the area of origin.
18            And then in the top third quadrant there's
19  damage to -- there's burning of this little section of
20  horizontal 2 x 4 which indicates that the burning is
21  moving from left to right on that little short section.
22  It's about four, six inches long.
23       Q.   Okay.  So you have three circles here.  One is
24  the area of the hoverboard?
25       A.   The lower oval at the bottom is the hoverboard.

Michael Schulz
09/10/2024

Page 97

1    inside the wall.

2    BY MR. LaFLAMME:

3        Q.   Well, this is wood panelling covering; correct?

4        A.   Correct.

5        Q.   Combustible covering?

6        A.   It is.

7        Q.   There is no fire rating to wood panelling

8    covering; correct?

9        A.   There is not.

10       Q.   So unlike drywall where it would have some

11   protection, it does not have protection from the wood

12   panelling covering; correct?

13       A.   Correct.  Well, it has far less protection.

14       Q.   The fire is going to breach that wood panelling

15   fairly quickly?

16       A.   Compared to drywall, yes.

17       Q.   How quickly does the fire breach the wood

18   panelling immediately above the hoverboard?

19       A.   I don't have an estimation of that.

20       Q.   The fire would breach the wood panelling before

21   the fire breaches the window; correct?

22       A.   I don't know that I can say that with any

23   certainty.

24       Q.   Okay.  You agree that there is no arcing

25   anywhere in Bedroom 4; correct?

Michael Schulz
09/10/2024

Page 98

1    A.   I'm not aware of any arcing.
2    Q.   And the circuit breaker for Bedroom 4 also did
3  not trip at all?
4    A.   Correct.
5    Q.   So for the entire time in which the fire, under
6  your theory, is moving through Bedroom 4, the house
7  wiring is energized -- or let me take a step back.
8  That's a poor question.
9         For the early stages of the fire when it is
10 moving through Bedroom 4, under your theory, until the
11 window is breached and it is venting out the window, the
12 house wiring is energized?
13   A.   Correct.  It will remain energized until the
14 service entrance conductor is damaged.
15   Q.   Okay.  And under your theory, the only way the
16 service -- electrical service would be damaged is once
17 that fire breaches the window?
18   A.   Correct.
19   Q.   Okay.  And then it is either damaged through
20 the fire venting through the window or through an
21 ignition of the shed outside?
22   A.   It could be heat energy from either one of
23 those or a combination thereof, yes.
24   Q.   Okay.  And how long does it take the fire to
25 move from the hoverboard to venting out the window?

Michael Schulz
09/10/2024

Page 108

1  healthcare that they were dealing with to find out
2  whether or not it's okay to interview them, and you also
3  want the parents to feel okay with that.
4           So you don't want to put anybody in a position
5  that they're resentful for the interview, but I always
6  tried to do it as soon as possible.
7      Q.   And you also identified in your report that
8  Detective Sheaman had incorrectly identified one of the
9  outlets as belonging to Bedroom 4 with wiring in it when
10 that outlet actually was in the kitchen?
11           MR. AYALA:  Form.
12           THE WITNESS:  Correct.
13 BY MR. LaFLAMME:
14     Q.   Anything else with Detective Sheaman's
15 investigation that either you would have handled
16 differently or that you thought was incorrect?
17     A.   Not that I can think of as I sit here, no.
18     Q.   I'm going to show you what's been marked as
19 Exhibit 100 which are some diagrams that came from your
20 file, and these were put together by Mr. Birdsong;
21 correct?
22     A.   Correct.
23           (The aforementioned document was
24           marked as Exhibit 100 for identification
25           and is attached hereto.)