EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF WYOMING
 2
 3         STEPHANIE WADSWORTH,           )
           individually and as Parent  )
 4         and legal guardian of ww, KW)
           GW and LW, minor children of)
 5         MATTHEW WADSWORTH,            )
 6
 7                  Plaintiffs,          )
                                         ) Case No.
 8         vs.                           ) 2:23-cv-00118-NDF
                                         )
 9         WALMART, INC., and JETSON     )
           ELECTRIC BIKES, LLC           )
10                                       )
                    Defendants,          )
11         _____)
12              DEPOSITION OF BILL ROBINSON
13         Wednesday, November 15, 2023, 1:00 P.M.
14              Via Zoom video conference
15
16
17                      BE IT REMEMBERED that the
     deposition of BILL ROBINSON was taken by the attorney for
18   the Plaintiffs, GRAYSON GOODY, ESQ., 58 Malaga Cove Plaza,
     Palos Verdes Estates, California 90274 before Christine J.
19   Roybal, Court Reporter for the State of Idaho, in the
     above-entitled matter.
20
21
22
23
24
25
```

Page 46

1    absolutely.

2        Q.   Based upon your education, training, and

3    experience, did you conclude based upon the charring, based

4    upon the V pattern, that the likely cause was related to the

5    electrical outlet located within the room pictured in

6    Exhibit 4?

7        A.   Like, you're asking me if I knew it came from that

8    electrical outlet?

9        Q.   Yes, sir.

10       A.   I did not determine that it came from that

11   electrical outlet.  I could determine 100 percent fact that

12   it came from that area of that outlet.

13       Q.   Did you ever gain an understanding as to what was

14   plugged into that outlet?

15       A.   I did.

16       Q.   And what did you understand that to be?

17       A.   A Hoverboard.

18       Q.   How did you ever learn of that information?

19       A.   Well, during my investigation I saw something that

20   was melted plastic and I didn't get into it, it's just a

21   blob, looked like maybe a wheel or something on it.  At that

22   point I called off my investigation.  I had enough to

23   determine where I felt it came from and got the sheriff's

24   office to come over and they usually take over after that.

25       Q.   So if I could summarize, at the very least your

Page 51

1        Q.   Okay.  Exposure ID, what's that refer to, if you

2    know?

3        A.   It's automatic, I don't know exactly what that one

4    is.

5        Q.   Okay.  Same thing for exposure number?

6        A.   That's correct.

7        Q.   Incident date is listed as February 1, 2022,

8    that's consistent with your recollection of when this

9    occurred?

10       A.   Yes.

11       Q.   And dispatch run number, is that also auto

12   populated?

13       A.   It's.

14       Q.   This first page identifies that the report was

15   completed by you, it was reviewed by you, and is printed by

16   you, correct?

17       A.   Correct.

18       Q.   You would have completed this report February 9,

19   2022?

20       A.   I don't recall.  Yeah, probably pretty close.

21       Q.   Okay.  And again, I'm just referring to that first

22   line where it says "report completed by," it has your name,

23   ID is left blank, but then it says date February 9, 2022, do

24   you see that?

25       A.   Yes, that is correct.

1      Q.    That would reflect at the very least when you

2    would have completed this report.

3           A.    Correct.

4      Q.    The next line lists the date of March 2, 2022,

5    would that have been when you reviewed this report?

6           A.    Correct.

7      Q.    And could you describe for the jury what that

8    means?  Is that after completion of the report you go back

9    in and you review the report?

10          A.    Sometimes.  Sometimes it can be as simple a, I had

11   to go back in there and type who we gave the investigation

12   over to, or if something else came up that we had to put in,

13   and it will log that later on in the pages, it will say who

14   did what or added what to it and for what purpose.

15          Q.    Okay.  So we'll go certainly the entirety of this

16   report.

17           You have identified of course that it was an enclosed

18   building, it was a family dwelling, correct?

19          A.    Correct.

20          Q.    You've marked that the detectors were present, is

21   that referring to smoke detectors?

22          A.    It is.

23          Q.    By the way, when you arrived on scene, were you

24   able to hear the smoke detectors going off?

25          A.    You could hear them audibly, yes.

1  telling him that you had just concluded your inspection and

2  investigation, did you provide him with any detail

3  whatsoever of the results of your investigation?

4      A.   No.

5      Q.   And so after that, he conducted his own inspection

6  and investigation?

7      A.   That's correct.

8      Q.   Do you know how long it took for him to conduct

9  his inspection and investigation?

10     A.   They're more thorough than we are, as expected,

11 they are more diving in for origin and cause than we are,

12 which is typical.  Very normal.  And I want to say his took

13 pretty much the remainder of the day, maybe even some into

14 the evening, if I recall.

15     Q.   Okay.  Do you know approximately how many hours

16 that would have been?

17     A.   I don't.

18     Q.   Do you know how long your inspection and

19 investigation took?

20     A.   Mine took just under two hours, roughly.

21     Q.   Did you remain on the scene until he concluded his

22 inspection and investigation?

23     A.   I don't recall if I remained the entire time he

24 was there, but I remained the majority of the time at least.

25     Q.   After you greeted Detective Sheman and

Page 106

```
 1        Q.    Okay.  Did he arrive before or after you?
 2        A.    After.
 3        Q.    Do you know how long after you?
 4        A.    I don't.
 5         If he was there before me, I don't recall if he was or
 6   not.
 7        Q.    And he would have come in a private vehicle?
 8        A.    He would have been in a personal vehicle.
 9        Q.    Looking at what we see as the fire at about
10   10 minutes 30 seconds into this video, is that consistent of
11   what you would have seen when you arrived?
12        A.    I don't recall.
13        Q.    In your investigations do you realize --
14         (Court reporter clarification.)
15        Q      (By MR. LAFLAMME) In your fire investigation do
16   you utilize NFPA921?
17        A.    You'd have to refresh me what NFPA291 is.
18        Q.    NFPA29 is the guide for fire and explosion
19   investigations.
20        A.    We try to.
21        Q.    And are you familiar with that guide?
22        A.    Not without looking at it.
23        Q.    I believe you had -- I want to take a little step
24   back and just go over some of the background items again.
25   You had indicated that you started with City of Green River
```

1    origin investigator?

2         A.   Or the PD unit, or the PD department or wherever

3    we go, yes.

4         Q.   I'm going to jump around, you've been asked a

5    bunch of questions already.

6          Did you have any contact with the Wadsworth family

7    during your investigation?

8         A.   Not the people that lived in the house, no, no, I

9    did not.

10        Q.   Was the only contact with the grandparents that

11   lived next door?

12        A.   If that's his grandparents, yeah.

13        Q.   And was that while you were on site?

14        A.   I was on site.

15        Q.   Did you ever interview any witnesses in this case?

16        A.   No.

17        Q.   Have you ever reviewed -- do you review interviews

18   that Detective Sheman did?

19        A.   No.

20        Q.   Have you reviewed any body camera footage of the

21   responding sheriff's department?

22        A.   No, that's the first ones I saw.

23        Q.   I think you had indicated that Larry Erdman was

24   not involved in this investigation for origin and cause; is

25   that correct?

Page 126

1   entities.

2       Q.    So looking at Exhibit 9, it shows your report was

3   completed February 9, 2022.   After you left the scene on

4   February 1 of 2022, did you have any further investigative

5   activities after the day of the fire?

6       A.    I don't recall if I popped back out there for a

7   thing or two or not.   I think after I turned it over, it was

8   a while back, I don't remember, but once I -- common

9   practice, once we turn it over to the PD unit, this case

10  being the sheriff's unit, we don't touch the scene.   We

11  don't try to go on there unless we're called again.

12      Q.    Do you recall being called back to the scene in

13  this instance?

14      A.    No.

15      Q.    It looks like you did take some evidence from the

16  scene, correct?

17      A.    I didn't personally take any of it from the scene.

18      Q.    Looking at Exhibit 9, from the narrative 2, when

19  it says, "The evidence found on scene during the

20  investigation and any other findings were turned over to the

21  Sweetwater County Sheriff's Department."

22       Does that mean they took possession of it right away?

23      A.    So when they show up, if we're going to turn -- in

24  this case, exactly.   They showed up, I talked to them.   When

25  he's going in to do his I turn it over to him.   I'm already

Page 128

1        A.   No, I turned it over that day to them.

2        Q.   All right.  Thank you.

3         Looking through with the narrative on No. 1, you

4    stated, "After a thorough investigation, including GRFD and

5    Sweetwater County Sheriff's Department, it was determined

6    that the fire started to come from a Hoverboard that was

7    plugged in."

8         Do you see that?

9        A.   I do see it.

10       Q.   When was it determined that the Hoverboard was

11   plugged in?

12       A.   That was from Detective Sheman when he found

13   his -- he determined that plug was running towards the

14   Hoverboard area.

15       Q.   Was there ever a determination that the plug into

16   the Hoverboard port was plugged in?

17       A.   At that time, not that I'm aware of.

18       Q.   How did you come to the determination that the

19   Hoverboard was plugged in per your narrative report?

20       A.   Just based off of what -- where our origin and

21   cause was based off what he found, everything led right to

22   that Hoverboard.  I -- yeah.

23       Q.   And if the Hoverboard wasn't plugged in, that

24   would affect your opinion, correct?

25            MR. AYALA:  Form.

1          You can answer.

2          A.    Say that again.

3                MR. LAFLAMME:  He's just objecting for the

4     record for the judge later on.

5          A.    Yeah, I got it.  Go ahead again with the question.

6          Q.    (BY MR. LAFLAMME) If the Hoverboard was not

7     plugged in at the time of the fire that would affect your

8     opinion, correct?

9                MR. AYALA:  Same objection.

10         A.    It would make me look at it a little bit.

11         Q     (By MR. LAFLAMME) Okay.  And that's because

12    there wouldn't be any power to the Hoverboard, correct?

13         A.    I wouldn't agree with that 100 percent.  There

14    could still be the battery located into it because you can

15    remove them batteries.  I don't know in that one could be

16    removed or not.

17         Q.    But if the Hoverboard wasn't plugged in, that

18    would cause you to at least do -- take a second look at

19    everything, correct?

20                MR. AYALA:  Form.

21         A.    I still can't answer that 100 percent.  I would

22    say with investigation efforts I would look into that a

23    little bit different.

24         Q     (BY MR. LAFLAMME) And under fire origin and

25    cause investigation, you always want to continue to evaluate

Page 130

1   evidence as it becomes available, correct?
2        A.   That's correct.
3        Q.   And if evidence becomes available, that may affect
4   your opinion, that opinion should be reassessed, correct?
5        A.   Depending how the evidence became available,
6   correct.
7        Q.   As new evidence comes to light you need to
8   consider that evidence, true?
9        A.   Consider all evidence, correct.
10       Q.   And as I understand it, you were on scene for
11  about two hours for your origin and cause -- or for your --
12  you didn't work just an origin investigation, correct?
13       A.   Correct.
14       Q.   Okay.  You were on scene for about two hours for
15  your origin investigation, correct?
16       A.   Roughly, correct.
17       Q.   If the fire had started in the bedroom where you
18  believe it started, you would expect to see some arcing on
19  electrical wiring in that room, correct?
20            MR. AYALA:  Form.
21       A.   That's actually not 100 percent correct.
22       Q.   (BY MR. LAFLAMME) You would not expect to see
23  any electrical arcing in that room?
24       A.   Well, it depends on where the -- the fire, if it
25  started in the electrical box you could see some arcing.

1   but if it started as electrical you'd see some arcings.

2        Q.    (BY MR. LAFLAMME) If there was no arcing

3   anywhere in the boys' bedroom, that would cause you to take

4   a further look at the origin you determined in this case,

5   correct?

6        A.    Correct.

7            MR. AYALA:  Form.

8        Q.    (BY MR. LAFLAMME) And if the only arcing that

9   was found was outside at the shed, that would cause you to

10  at least look at the shed as a potential origin, correct?

11           MR. AYALA:  Form.

12       A.    Not necessarily.  There was arcing where that

13  line, the power line I was previously talking about had

14  bounced, and it had -- you could see arc marks where it had

15  bounced and was continuously doing it when I was there, but

16  I know for a fact it didn't start each time it arced when it

17  hit.

18       Q.    (BY MR. LAFLAMME) Do you know what that shed was

19  used for outside the boys' room?

20       A.    I have no idea.

21       Q.    Did you know it was a smoking shed?

22       A.    I did not.

23           MR. AYALA:  Form.

24       Q.    (BY MR. LAFLAMME) If it was a smoking shed,

25  would you potentially look at as an area of origin?

Page 133

1          MR. AYALA:  Form.

2      A.   I would have look at everything as an origin.  As

3  a matter of fact I looked at whatever that building was when

4  I got there, and afterwards I looked.  And I still stick

5  with my determination that that fire started inside that

6  room.

7      Q.   (BY MR. LAFLAMME) Did you do anything to process

8  the items, the fire debris that was outside of that window?

9      A.   Other than look for, during had -- the during the

10  battling the blaze, when they got that out we looked for hot

11  spots when it's over.  We rake through it a little bit to

12  make sure there's no hot spots, and then that's it.  We try

13  to practice preservation anytime we can.

14      Q.   Were you aware of any of the kids' statements that

15  the fire started outside of the house on the date of the

16  fire?

17          MR. AYALA:  Form.

18      A.   I wasn't aware of any kids' statements, no.

19          MR. LAFLAMME:  Okay.  I'm going to pull up a video

20  here but I want to use sound, how do I do that?

21          CONCIERGE:  So when you go to the screen share

22  menu, on the bottom of the screen share page there's going

23  to be a check box that says "share computer audio."

24          MR. LAFLAMME:  Screen share.  Okay, so share sound

25  on the lower left?

1    shed catching on fire and melting, correct?

2            MR. AYALA:  Object to the form.

3        A.   Ask that question again.

4        Q       (By MR. LAFLAMME) You can't discount the

5    possibility that this V pattern that we see here is the

6    result of the smoking shed catching on fire and melting.

7            MR. AYALA:  Same objection.

8        A.   I would have to know placement of shed.  I guess

9    you can't discount it either way, without all the

10   information given to you, you can't do it.

11       Q       (By MR. LAFLAMME) It's certainly something you

12   would want to investigate if further --

13       A.   I would need to investigate it further.

14       Q.   And you would want to investigate further given

15   children's statements, correct?

16       A.   Absolutely.

17       Q.   And directly above where this shed would have been

18   outside the window would have been the electrical service

19   line?

20       A.   I have no idea where the electrical service line

21   was.

22       Q.   Okay.  Did they come in where the weather head is

23   here?

24       A.   I did.

25       Q.   And I think you had indicated before that you

Page 144

1    to go through their bed area, correct?

2         A.    Not correct.

3              MR. AYALA:  Form.

4         A.    It would have gone up, in this case I believe I

5    looked at it, it went up through ceiling, hit the ceiling

6    which is common in fire behavior, it goes up to the ceiling

7    and rolls down.

8         Q       (By MR. LAFLAMME) Okay.  Is there any other

9    pattern that you are relying on besides what we see in

10   Exhibit 14 on the top photograph, for the origin of this

11   fire?

12        A.    No.  Again, from my investigation, that's what led

13   me to that area being the origin.

14        Q.    Are you aware of the results of joint fire

15   inspection from the private side that occurred after the

16   fire?

17        A.    No, I wasn't even aware there was one.

18        Q.    Are you aware of the lab inspection results that

19   was done after the fire?

20        A.    No.

21        Q.    Okay.  So as to the information that was

22   identified during the private sector investigation, you

23   don't have any information?

24        A.    That's correct.

25        Q.    Are you aware of what the scientific method is

1      A.   I don't think that's true, we process everything.

2  When I went through my investigation I started from the

3  outside working all the way in, almost try to copy the same

4  pattern I do when I get there.

5      Q.   (BY MR. LAFLAMME) What testing did you do for

6  the hypothesis that it was -- that originated in the smoking

7  shed?

8      A.   All visual.

9      Q.   And your visual testing of the -- of it

10 potentially starting outside, that was just done in the

11 two hours that you were on scene, correct?

12     A.   Well, even when I originally got there, I tried to

13 see because there was some fire that had started that was

14 burning when I got there below that window on that ground

15 and I wanted to know what that was.

16     Q.   Okay.  And what did you determine it was?

17     A.   I determined it was materials that came off the

18 house.

19     Q.   Okay.  And that's because you didn't know there

20 was a smoking shed there, correct?

21     A.   At that time I didn't know there was a smoking

22 shed out front.

23     Q.   Was the first time you heard there was a smoking

24 shed today?

25     A.   Today in this room.  I knew there was a shed, I

Page 147

1    didn't know what it was for.

2          Q.   Did you know the parents had smoked in that shed

3    that night?

4          A.   No.

5               MR. AYALA:  Form.

6          Q.   (BY MR. LAFLAMME) Did you know they also

7    utilized a space heater in that shed?

8          A.   No.

9          Q.   It was cold February 1, 2022, in Green River,

10   correct?

11         A.   Correct.

12         Q.   And you were not aware that they had utilized a

13   space heater in that smoking shed that evening, true?

14         A.   That's true.

15         Q.   I think he said you had not spoken with Matthew

16   Wadsworth; is that correct?

17         A.   That's correct.

18         Q.   You have not spoken to either of the children,

19   correct?

20         A.   That's correct.

21         Q.   Did Larry Erdman, did he do anything with respect

22   to an origin investigation?

23         A.   He wasn't there.  The only part that he even went

24   inside for was when Detective Sheman was there.  He went in

25   with me to help us move a few items, kind of peel back those

1      Q.   Okay.  All right.  You had indicated during in

2   your prior testimony that you were 100 percent that it

3   came -- the fire originated in the area of that outlet that

4   we see here in Exhibit 15, correct?

5      A.   To my -- to the best of my knowledge I'm 100

6   percent that the fire originated in that room.

7      Q.   Based on the information you've been given here

8   today you would agree that there would be more investigation

9   that you would want to conduct?

10     A.   I would conduct more investigation to this.

11     Q.   Okay.  And that's based on the additional

12   information that you've been provided here today, correct?

13     A.   Right.

14     Q.   So at this point if you were to assess the origin

15   of the fire it's because there's official investigation that

16   you would want to do to fully assess that you would have to

17   classify it as undetermined under NFPA921, correct?

18          MR. AYALA:  Form.

19     A.   I would determine it currently still under

20   investigation, undetermined until investigation is complete.

21     Q.   (BY MR. LAFLAMME) Okay.  And you can't, you

22   can't get off the undetermined designation until the

23   investigation is complete, correct?

24     A.   That's correct.

25     Q.   So as you sit here today, if you had to classify

Page 157

1    the origin on your NFPA912, it would be undetermined

2    investigation not complete, correct?

3              MR. AYALA:   Form.

4         A.   Correct.

5         Q.      (By MR. LAFLAMME) The Sweetwater Fire District

6    No. 1, What is their role?

7         A.   They're just a mutual aid department.  They

8    control their own district on the east side of the county.

9         Q.   Okay.  So is Green River Fire Department on the

10   west side of the county and then Sweetwater Fire District is

11   the one on the east side the county?

12        A.   That's correct.

13        Q.   Any other fire districts involved in Sweetwater

14   County?

15        A.   There's Rock Springs Fire, but they control their

16   city.

17        Q.   So they are just in the city?

18        A.   Correct.

19        Q.   Rock Springs as a city is pulled out from

20   jurisdiction of the county split?

21        A.   Yes, it is.

22        Q.   The Sweetwater Fire District No. 1, where are they

23   held at?  What is that their headquarters?

24        A.   They got two stations over there on the east side

25   of Rock Springs.

```
1                         EXAMINATION
2           BY MR. LAFLAMME:
3              Q.   Chief Robinson, before you testified that as we
4       sit here today, based on the additional information you
5       heard today, that you would classify this origin as
6       undetermined under NFPA921 and that the investigation would
7       be ongoing, correct?
8                  MR. AYALA:   Form.
9              A.   If the evidence that you presented to me was
10      there, you would have no choice but to determine that.
11             Q     (By MR. LAFLAMME) Okay.  And is that the
12      determination of the origin under NFPA921 as we sit here
13      today would be in undetermined and that the investigation
14      would be ongoing on the area of origin, true?
15             A.   True.
16             Q.   And prior to today, you're not aware that there
17      was a shed outside that window, correct?
18             A.   Correct.
19             Q.   You were not aware that shed was used for smoking,
20      correct?
21             A.   That's correct.
22                  MR. AYALA:  Form.
23             Q.     (BY MR. LAFLAMME) You are also not aware that
24      there was a space heater in that shed, correct?
25             A.   That is correct.
```

Page 180

1     Q.   You were not aware of the kids' statements about

2     the fire starting outside in the shed area, correct?

3              MR. AYALA:   Form.

4     A.   That's correct.

5     Q     (By MR. LAFLAMME) And you don't know what was --

6     so if you didn't know there was a shed you don't know what

7     was in that shed, correct?

8     A.   That's correct.

9     Q.   And furniture within a shed would be an additional

10    fuel load that could burn, correct?

11    A.   Correct.

12             MR. AYALA:  Object to form.

13             MR. LAFLAMME:  And you were not aware prior to

14    today that there was arcing found on the wiring in that

15    shed.

16    A.   That's correct.

17    Q.   And you were not aware prior to today that there

18    was no arcing found on the inside of had a house, correct?

19    A.   That's correct.

20    Q.   And you're aware that smoking material can cause a

21    fire, correct.

22    A.   Correct.

23    Q.   And smoking material doesn't necessarily always

24    cause a fire at the time of smoking, correct?

25    A.   Correct.

1              MR. AYALA:  Form.

2         Q.    (BY MR. LAFLAMME) Meaning you can have someone

3    smoke in a area and hours later a fire starts, correct?

4              MR. AYALA:  Form.

5         A.    Absolutely.

6         Q.    (BY MR. LAFLAMME) And you've run into that in

7    your career, correct?

8         A.    That is correct.

9         Q.    And you are aware that space heaters can cause

10   fires as well, correct?

11        A.    Correct.

12        Q.    And aren't space heaters one of the most common

13   causes of fires for heating appliances?

14             MR. AYALA:  Object to form.

15        A.    I don't know if that's accurate.  I know they are

16   definitely a factor.

17        Q.    (BY MR. LAFLAMME) Are you aware of the NFPA fire

18   statistics that are put out every year?

19        A.    I'm aware of them, I don't remember them.

20        Q.    It's not something you look at in your position?

21        A.    No.

22        Q.    And understanding that when you were there on the

23   date of the fire, you were operating just with the evidence

24   and facts that you had on that day, correct?

25        A.    That's correct.

1       Q.   And additional evidence and facts that has been --
2   have been revealed and discovered since that day, you have
3   not been privy of, correct?
4       A.   That's correct.
5       Q.   There was some questioning about whether you've
6   investigated a Hoverboard or lithium ion battery fire
7   before, do you recall that?
8       A.   I do.
9       Q.   And counsel I don't think liked the way I phrased
10  my question so I will rephrase for you.  Have you ever
11  investigated a fire that you determined originated at or
12  near a Hoverboard other than this fire?
13      A.   No.
14      Q.   Okay.  Have you ever investigated a fire that you
15  believe originated at or near a lithium ion battery product
16  other than in the Wadsworth fire?
17      A.   Not prior to this.
18      Q.   Okay.  Subsequent to?
19      A.   Yes.
20      Q.   What was that product?
21      A.   It was an electric bike motor, an electric bike
22  and they have the same, essentially same thing, it's not the
23  same battery but it's exactly, I mean, it's essentially the
24  same thing.
25      Q.   There's lot of products that have lithium ion

Page 184

```
 1        Q.   I gotcha.  So it would be a detective from Green
 2   River Police Department --
 3        A.   That's correct.
 4        Q.   -- finish the investigation on the electric bike
 5   issue?
 6        A.   Correct.
 7        Q.   Okay.  You're not aware that Mr. Pasborg stated on
 8   the date of the fire shortly after you responded that it
 9   looked like the fire started on the outside or the exterior
10   wall?
11        A.   No.
12        Q.   And all of this additional facts and evidence, if
13   you were to do a full and complete origin analysis you would
14   want to walk through all of those additional facts and
15   evidence, correct?
16        A.   You would have to.
17             MR. AYALA:  Object to form.
18        Q.   (BY MR. LAFLAMME) And when you say "you would
19   have to," you're saying you would have to consider all of
20   those facts and evidence in order to give it a final origin
21   determination, correct?
22             MR. AYALA:  Object to the form.
23        A.   Correct.
24        Q.   (BY MR. LAFLAMME) And so based on -- based on
25   the information that you've learned here today -- strike
```