# EXHIBIT 4

Michael Schulz
09/10/2024

Page 1

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

```
STEPHANIE WADSWORTH,            )
Individually and as Parent      )
and Legal Guardian of W.W,      )
K.W., G.W., and L.W., minor     )
children, and MATTHEW           )
WADSWORTH                       )
                                )
          Plaintiffs,           )
                                )
     vs.                        )  No. 2:23-cv-00118-NDF
                                )
WALMART, INC., and JETSON       )
ELECTRIC BIKES, LLC,            )
                                )
          Defendants.           )
_____)
```

DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California

REPORTED BY:  Joy E. Shure, CSR No. 3659

Michael Schulz
09/10/2024

Page 11

1  you're deferring to BEAR on.  At some point, you did an
2  analysis on fire spread, though; correct?
3      A.   Correct.
4      Q.   Okay.  So where do you pick up from where they
5  drop off?
6      A.   So they really pick up from where I drop off.
7  I identified the origin of the fire, and within that
8  origin I identified two potential sources of ignition --
9  well, three potential sources of ignition, and then they
10 picked up from there.
11     Q.   Okay.  What are the three potential sources of
12 ignition?
13     A.   The hoverboard and any -- at the time, any
14 associated charging components, the electrical outlet
15 for Bedroom No. 4 on the wall behind the refrigerator,
16 and then thirdly, initially, I included the refrigerator
17 as a potential source because of its location on the
18 other side of that bedroom wall.
19     Q.   Was the hoverboard charging at the time of the
20 accident -- of the fire?
21     A.   There's testimony that it had been charging at
22 the end of the day's use and prior to the fire, but I
23 concur -- and I did not see and I concur that in the
24 photographs of the joint inspection of the evidence,
25 there were no electrical plugs in that outlet.

Michael Schulz
09/10/2024

Page 12

```
 1      Q.   Okay.  So based on your investigation, you've
 2   concluded that the hoverboard was not charging at the
 3   time of the fire; correct?
 4            MR. AYALA:  Form.
 5            THE WITNESS:  I don't see any evidence that
 6   says that it was, but I can only speak to how I found
 7   the electrical outlet post incident, and not having any
 8   of the blade plates in there, that would seem to be
 9   indicative that the charger was not plugged in at the
10   time of the fire, yes.
11   BY MR. LaFLAMME:
12      Q.   Okay.  So there were no blade plugs in the
13   outlet directly behind the hoverboard; correct?
14      A.   Correct.
15      Q.   There was no wiring from any charging device
16   found by the hoverboard; correct?
17      A.   Correct.
18      Q.   And there was no indication on the female end
19   of the receptacle on the hoverboard that anything had
20   been plugged in at the time of the fire; correct?
21      A.   So that's something I didn't -- I looked at
22   briefly in the field, but I didn't do a detailed
23   analysis of that, but I'm not aware of any evidence of
24   that.
25      Q.   Okay.  So based on the physical evidence,
```

Michael Schulz
09/10/2024

Page 13

```
 1   you're not aware of any evidence that would suggest this
 2   hoverboard was plugged in at the time of the fire; true?
 3       A.   True.  That's correct.
 4       Q.   And this fire was first identified by Gunner
 5   and Layne Wadsworth; correct?
 6       A.   Correct.
 7       Q.   And Gunner and Layne, we've referred to it as
 8   Bedroom 4, that was their bedroom; correct?
 9       A.   Correct.
10       Q.   All right.  And they were in a bunk bed that
11   abutted the wall and window for their bedroom?
12       A.   Correct.
13       Q.   And when they first woke up, that window had
14   already been breached or broken; correct?
15            MR. AYALA:  Form.
16            THE WITNESS:  I haven't read any testimony that
17   that's their testimony.  There is testimony that Gunner
18   in particular recalls that there were shards of glass in
19   the bed.
20   BY MR. LaFLAMME:
21       Q.   Okay.  And that's when he woke up; correct?
22       A.   Yes.
23       Q.   And you've seen the interview with -- that
24   Detective Sheaman did with the Wadsworth boys; correct?
25       A.   Correct.
```

Michael Schulz
09/10/2024

Page 15

1   A.   -- more precisely.
2   Q.   Was there any arcing found in the house?
3   A.   Not that I'm aware of; however, I did not
4   undertake to study that or not.
5   Q.   Was there any arcing found anywhere on the
6   site?
7   A.   There are reports and there are photographs of
8   what appear to be electrical anomalies on electrical
9   wiring in the shed located in front of the house
10  outdoors.
11  Q.   Okay.
12  A.   But I wasn't present for that evidence
13  inspection and I've never had a close-up look at those
14  artifacts, and I would defer to the electrical engineers
15  that were present.
16  Q.   Do you know if the electrical engineers that
17  were present for the Wadsworth family have been named as
18  experts in this case?
19  A.   I'm not aware that they are, but I don't know
20  who all of the experts are in this case.
21  Q.   So based on your involvement in the case, you
22  just don't have an opinion one way or the other as to
23  whether the anomalies, as I think you termed it, on the
24  wiring at the shed outside was indeed arcing; correct?
25  A.   Correct.

Michael Schulz
09/10/2024

Page 82

```
 1   on with the wire coming out.  That's not -- that wasn't
 2   on the bedroom side of the wall.  That's on the kitchen
 3   side of the wall.
 4        Q.   Okay.
 5        A.   And I have a separate set of two pages of notes
 6   where I showed those two photographs because I was
 7   trying to decide, figure out what he was talking about,
 8   and I figured it out.
 9        Q.   I was as well at one point.
10        A.   Okay, yeah.  And then the oval at the bottom of
11   this represents that the hoverboard is also located
12   there.
13        Q.   So you would agree that the outlet that was on
14   the bedroom side, there is no wiring coming from that
15   outlet; correct?
16        A.   No wire protruding from that.
17        Q.   Okay.  The wiring that is protruding from an
18   outlet in that area is the upper outlet that serviced
19   the refrigerator?
20        A.   Correct.
21        Q.   So Detective Sheaman in his analysis when he
22   indicated that there was wiring from that outlet into
23   Bedroom No. 4 was incorrect?
24        A.   That's incorrect.
25             And I think I called that set of notes
```

Michael Schulz
09/10/2024

Page 83

```
 1    something like Sheaman's observations of the outlets,
 2    but yes, it's in the case notes folder and it's entitled
 3    "Sheriffs Detective Sheaman Outlet Observations."
 4        Q.    Since I have it here, why don't we mark it and
 5    we'll knock that one out.
 6        A.    Okay.
 7        Q.    I'll hand you what's been marked as Exhibit 99,
 8    and this is from your expert file; correct?
 9        A.    Correct.
10              (The aforementioned document was
11              marked as Exhibit 99 for identification
12              and is attached hereto.)
13    BY MR. LaFLAMME:
14        Q.    Okay.  And there was an indication from
15    Detective Sheaman's report that there was wiring coming
16    out of an outlet in Bedroom 4; correct?
17        A.    Both his report and as well in his discovery
18    deposition.
19        Q.    And he had attributed that potentially to the
20    hoverboard being plugged in; correct?
21        A.    Correct.
22        Q.    Okay.  Based on your analysis, it sounds like
23    you disagree with that; correct?
24        A.    I totally disagree with that.
25        Q.    All right.  That the wiring that was in the
```

Michael Schulz
09/10/2024

Page 84

1   receptacle that Detective Sheaman identified was wiring
2   that went to the refrigerator?
3       A.   Correct.
4       Q.   Okay.  And that wiring was in the receptacle
5   that would have been facing the kitchen?
6       A.   Correct, so it started on the opposite side of
7   this wall.
8       Q.   And the receptacle that was in Bedroom
9   No. 4 doesn't have any wiring protruding from it?
10      A.   Correct.  And that's depicted on Page 2 of
11  Exhibit 99 and represented by my Photograph 160.
12      Q.   All right.  Back to your annotations here.
13      A.   Okay.
14      Q.   So we're on Photo 159 of Exhibit 97.
15      A.   Correct.  So I'm indicating the circles and the
16  ovals are indicating the potential sources of ignition
17  that are located within the area of origin.
18           And then in the top third quadrant there's
19  damage to -- there's burning of this little section of
20  horizontal 2 x 4 which indicates that the burning is
21  moving from left to right on that little short section.
22  It's about four, six inches long.
23      Q.   Okay.  So you have three circles here.  One is
24  the area of the hoverboard?
25      A.   The lower oval at the bottom is the hoverboard.

Michael Schulz
09/10/2024

Page 108

1  healthcare that they were dealing with to find out
2  whether or not it's okay to interview them, and you also
3  want the parents to feel okay with that.
4         So you don't want to put anybody in a position
5  that they're resentful for the interview, but I always
6  tried to do it as soon as possible.
7      Q.   And you also identified in your report that
8  Detective Sheaman had incorrectly identified one of the
9  outlets as belonging to Bedroom 4 with wiring in it when
10  that outlet actually was in the kitchen?
11          MR. AYALA:  Form.
12          THE WITNESS:  Correct.
13  BY MR. LaFLAMME:
14      Q.   Anything else with Detective Sheaman's
15  investigation that either you would have handled
16  differently or that you thought was incorrect?
17      A.   Not that I can think of as I sit here, no.
18      Q.   I'm going to show you what's been marked as
19  Exhibit 100 which are some diagrams that came from your
20  file, and these were put together by Mr. Birdsong;
21  correct?
22      A.   Correct.
23          (The aforementioned document was
24          marked as Exhibit 100 for identification
25          and is attached hereto.)