# EXHIBIT 5

2024 WL 3325600 (N.D.Cal.) (Trial Motion, Memorandum and Affidavit)
United States District Court, N.D. California.

Jessica Ann BETTENCOURT, Plaintiff,

v.

SHARKNINJA OPERATING LLC, Defendant.

No. 3:22-cv-09091-CRB.
April 5, 2024.

(Filed concurrently with Memorandum of Points and Authorities, Declaration of Scott Kaiser, and Proposed Order)
Date: May 17, 2024
Time: 10:00 a.m.
Ctrm.: 6

### Notice of Motion and Motion Under Federal Rule of Evidence 702 to Exclude Opinions and Testimony of Derek King

Scott D. Kaiser (SBN: 332399), skaiser@shb.com, Shook, Hardy & Bacon L.L.P., 2555 Grand Blvd., Kansas City, MO 64108, Tel: 816-474-6550 | Fax: 816-421-5547, Eva M. Weiler (SBN: 233942), eweiler@shb.com, Shook, Hardy & Bacon L.L.P., Jamboree Center, 5 Park Plaza, Suite 1600, Irvine, California 92614-2546, Tel: 949-475-1500 | Fax: 949-475-0016, for defendant, Sharkninja Operating LLC.

Judge: Hon. Charles R. Breyer, Ctrm.: 6.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 17, 2024, at 10:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 6 of the U.S. District Court for the Northern District of California, on the 17th floor at 450 Golden Gate Avenue, San Francisco, California 94102, defendant SharkNinja Operating LLC will and hereby does move the Court for an order excluding the opinions and report of Derek King, engineer with Berkeley Engineering and Research, Inc. ("BEAR").

King's opinions in the BEAR report are inadmissible under Rule 702 because they are unreliable, speculative, apply an erroneous understanding of the dynamics of the incident, and do not reliably apply the referenced testing methodology. King provides insufficient support that the Ninja BL610's stacked blade assembly contained a design defect--the design is common in the industry, complied with applicable standards, and presented no risk of laceration if used as intended. King's comparison product was dissimilar and he offered no testing or evidence to show his suggested alternatives would be safer. Further, he failed to show or reference any evidence as to how SharkNinja's Design Failure Mode and Effects Analysis ("DFMEA") process was deficient or that it failed to consider his suggested alternatives. And his understanding and recitation of how the actual incident happened was contrary to the plaintiff's own testimony, thereby rendering his entire analysis unreliable.

SharkNinja seeks an order excluding and/or limiting King's expert testimony. This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Scott Kaiser and all exhibits, the pleadings and other records on file in this action, and any further argument and evidence properly before the Court.

Date: April 5, 2024

SHOOK, HARDY & BACON L.L.P.

By: */s/ Eva M. Weiler*

Eva M. Weiler

Attorneys for Defendant SHARKNINJA OPERATING LLC

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY OF ARGUMENT | 1 |
| MEMORANDUM OF POINTS AND AUTHORITIES | 1 |
| INTRODUCTION | 1 |
| FACTUAL BACKGROUND | 2 |
| THE INCIDENT | 3 |
| LEGAL STANDARD | 5 |
| ARGUMENT | 5 |
| I. Opinion No. 1 that the blade assembly is defectively designed because it can "unintentionally separate" is inadmissible. | 5 |
| II. Opinion No. 1 regarding purported safer alternative designs is inadmissible. | 8 |
| III. Opinion No. 2 regarding the existence of warnings of loose blades is inadmissible as existence of a design defect. | 12 |
| IV. .. Opinion Nos. 3 and 4 regarding SharkNinja's purported failure to conduct an adequate risk assessment are inadmissible. | 12 |
| V. BEAR Opinion No. 5 regarding causation and alternative designs is inadmissible | 14 |
| CONCLUSION | 15 |

## TABLE OF AUTHORITIES

**Federal Cases**

| | |
|---|---|
| *Andrews v. Brethren Mut. Ins. Co.*, No. 4:19-CV-02107, 2023 WL 6690710 (M.D. Pa. Oct. 12, 2023) | 9 |
| *Banga v. Kanios*, No. 16-cv-04270-RS, 2023 WL 1934484 (N.D. Cal. Jan. 24, 2023) | 14 |
| *Brooks v. Outboard Marine Corp.*, 234 F.3d 89 (2nd Cir. 2000) | 7 |
| *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) | 10 |
| G*en. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) | 10, 14 |
| *Hardeman v. Monsanto Co.*, 216 F.Supp.3d 1037 (N.D. Cal.) | 12 |
| *Hilaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223 (E.D.N.Y. 2014) | 10 |
| *Kaseberg v. Conaco, LLC*, No. 15-CV-1637, 2019 WL 1641161 (S.D. Cal. 2019) | 7 |
| *MH v. Cnty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 894758 (N.D. Cal. Jan 2, 2015).. | 14 |
| *Ramos v. Home Depot Inc.*, No. 3:20-CV-01768, 2022 WL 615023 (N.D. Tex. Mar. 1, 2022) | 7 |
| *Tang v. Toyota Motor Corp.*, No. SA-19-CV-01005, 2022 WL 2555749 (W.D. Tex. Jan. 20, 2022) | 8 |
| *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-cv-764, 2023 WL 384016 (N.D. Tex. Jan. 20, 2023) | 7 |
| *Welch v. SharkNinja*, Case No. 3:21-CV-00123 (S.D. Tex.) | 4 |
| *Willet v. Johnson & Johnson*, 465 F.Supp.3d 895 (S.D. Iowa 2020) | 10 |

**Other Authorities**

| | |
|---|---|
| Report to Standing Committee, Advisory Committee on Evidence Rules, May 15, 2022 | 5 |
| Rule 702 | passim |

## SUMMARY OF ARGUMENT

**Jessica Ann BETTENCOURT, Plaintiff, v. SHARKNINJA..., 2024 WL 3325600...**

In this product-liability action, Plaintiff Bettencourt claims she was using a Ninja BL610 blender for the first time to make a smoothie; as she inverted the pitcher to pour the smoothie into a cup (as illustrated below), the pitcher lid fell off because she had just unlocked it, and the blade assembly slid out, cutting her left hand.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The BL610 is designed with a *removable* sharp blade assembly that extends the length of the pitcher. This enables the BL610 to quickly and evenly process whole fruits, vegetables, and ice in seconds. The blade assembly is secured within the pitcher by the locking lid; the motor of the BL610 will not function unless the lid is properly on the pitcher and the lid handle is in the "locked" / down position.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Based on her incident, Plaintiff claims the BL610 is defectively designed. The sole defect theory offered by her engineering expert, Derek King, is that the BL610 is defectively designed because the blade assembly is removable and secured within the pitcher only by the locking lid. His report does not claim the locking lid malfunctioned or otherwise failed to function as designed in Ms. Bettencourt's case; rather, his report simply makes the undisputed observation that "if the product is inverted or tilted with the lid removed, the blade assembly will slide off the spline shaft and out of the pitcher" - which poses a risk of laceration. With that background in mind, the Court should exclude the following of King's opinions under Rule 702:

First, King's opinion that the blade assembly is defectively designed because it can "unintentionally separate" is inadmissible. He did not identify or analyze any scenario or circumstance where the assembly can "unintentionally separate" or where the locking lid was inadequate to retain the blade assembly. His opinion is simply that the blade assembly can slide out "if the product is inverted or tilted with the lid removed," which is exactly how the BL610 blade assembly and lid were designed. What's worse, he copied and relied upon the facts of an incident from *another case* that were *materially different* from Plaintiff's incident, rendering unreliable and irrelevant his opinions concerning the role of any purported design defect in causing Plaintiff's incident. *See Ramos v. Home Depot Inc.*, No. 3:20-CV-01768, 2022 WL 615023 (N.D. Tex. Mar. 1, 2022) (citing *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996)); *Kaseberg v. Conaco, LLC*, No. 15-CV-1637, 2019 WL 1641161 (S.D. Cal. 2019); *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-cv-764, 2023 WL 384016 (N.D. Tex. Jan. 20, 2023) (citing *Jacked Up, LLC v. Sara Lee Corp.*, 291 F.Supp.3d 795 (N.D. Tex. 2018); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89 (2nd Cir. 2000).

Second, his opinions on purportedly safer alternative designs ("snap and magnetic holding mechanisms") are inadmissible because they lack a reliable foundation. King relies on the blade design for a small "food chopper," a product with materially different characteristics. Critically, his report identifies no testing or other details necessary to evaluate the efficacy and safety of his proposed alternative designs, including the forces necessary to retain a blade assembly during normal use or the consumer's strength necessary to remove it by overcoming the proposed "locking mechanism." Lacking these details or any testing, his report failed to address new potential hazards and unintended consequences associated with his recommended "safer alternatives." *See Tang v. Toyota Motor Corp.*, No. SA-19-CV-01005, 2022 WL 2555749 (W.D. Tex. Jan. 20, 2022) (*citing Guy v. Crown Equip. Corp.*, 394 F.3d 320 (5th Cir. 2004).

Third, King offers the unhelpful observation that the existence of warnings, such as "contains loose, SHARP blades," is an admission that the blade assembly poses a risk of laceration.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

But simply admitting that a risk exists (particularly in a warning) does not establish a design defect or render a product unreasonably dangerous. See *Hardeman v. Monsanto Co.*, 216 F.Supp.3d 1037 (N.D. Cal.) (citing Restatement (Second) of Torts § 402A cmt. j (1965)). King's observation regarding product warnings is just that--a reiteration of warnings that jurors can read themselves. This observation does not rise to the level of an opinion, and would not help a jury understand the evidence or determine a fact at issue.

Fourth, King opines that SharkNinja failed to address the known hazard of laceration from the blade assembly; and that if it had, it would have considered and implemented "a locking mechanism" to secure the blade assembly to the bottom of the pitcher. These opinions lack a reliable foundation. King ignores SharkNinja's multiple warnings regarding the blades and ignores SharkNinja data and documentation about the testing and analysis performed on the BL610 product. King fails to provide any evidence that SharkNinja did *not* consider alternatives or that it rejected those alternatives based on other negative consequences. He also fails to consider the possible negative consequences of his own proposed alternative design. See *Banga v. Kanios*, No. 16-cv-04270-RS, 2023 WL 1934484 (N.D. Cal. Jan. 24, 2023); *MH v. Cnty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 894758 (N.D. Cal. Jan 2, 2015); G*en. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

Fifth, King opines that if a "locking mechanism" (his proposed alternative) had been used to secure the blade assembly, it is likely Plaintiff would not have been injured. This lacks a reliable foundation. His causation opinion relies on an inaccurate description of how Plaintiff's incident actually occurred. His report states that "Ms. Bettencourt was lacerated attempting to catch the pitcher," and that "the stacked blade assembly dislodged when she reached for it, resulting in a severe laceration on her dominant hand" - details that are simply not found anywhere in Ms. Bettencourt's deposition or written discovery responses. Those incident details came from *Welch*, a case in Texas in which BEAR submitted an expert report in 2022.

In sum, the above opinions are inadmissible under Rule 702 and should be excluded.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In this product-liability action, Plaintiff Bettencourt claims she was using a Ninja BL610 blender for the first time to make a smoothie; as she inverted the pitcher to pour the smoothie into a cup, the pitcher lid fell off because she had just unlocked it, and the blade assembly slid out, cutting her left hand. With those incident details in mind, Plaintiff's retained expert, Derek King, opines that the BL610 is defectively designed because the blade assembly can slide out "if the product is inverted or tilted with the lid removed." He proposes "snap and magnetic holding mechanisms" to secure the blade assembly to the pitcher even if the lid is removed. He goes on to claim SharkNinja would have discovered and implemented his proposed "holding mechanism" if only it had conducted an adequate risk assessment, and these alternative designs would have prevented Ms. Bettencourt's incident. None of those opinions are admissible under Rule 702. To appreciate why, it helps to have some additional factual background.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

### FACTUAL BACKGROUND

**Jessica Ann BETTENCOURT, Plaintiff, v. SHARKNINJA..., 2024 WL 3325600...**

The Ninja BL610 is a blender intended to quickly and evenly process whole fruits, vegetables, and ice in seconds. This processing is accomplished by the design of the stacked blade assembly, which has sharp blades and extends vertically throughout the entire length of the pitcher, as shown on the BL610 retail box. *See* Kaiser Declaration (all exhibits cited herein are attached thereto), **Ex. A** (Retail Box). To pour out the blended contents, a user may open the pour spout in the lid, or press a "release" button on the top of the lid, pull back the handle by 90 degrees and remove the lid. *See* **Ex. B** (Rimkus Report) at 8-9.

The stacked blade assembly has sharp blades that pose a risk of laceration if not handled carefully. For this reason, the BL610 is accompanied by multiple layers of warnings in different locations that inform consumers that the blade assembly is loose, removable, and sharp, and that it must be handled with care. A consumer must unbox the BL610 before first use, and will encounter and remove packaging around the pitcher, which states: "WARNING: Open with care. Contains loose, SHARP blades" and "WARNING: Contains loose, SHARP blades. Open band from top end." *See* **Ex. C** (Photos of wrap and insert); Ex. B at 13 and photos 26-29.

The Owner's Guide similarly warns that the BL610 is "provided with a stacked blade assembly" that is "sharp," "not locked in place," and "designed to be removable." The Owner's Guide warns "ALWAYS exercise care when handling blade assembly" and states "[u]pon completion of processing, ensure the blade assembly is removed BEFORE emptying container's contents....Failure to remove the blade assembly before emptying the container results." *See* **Ex. D** (Owner's Guide), at 4 [Warning 6], 7 [Warning 40].

The Owner's Guide describes the "Lid with Locking Handle" that locks the lid in place during blending. It describes how the lid must be pressed down until it clicks and the triangles must be aligned for the blender to function; that when using the pour spout, consumers should hold the cover in place or ensure the lid lock is engaged. *Id.*, Ex. D (Owner's Guide), 7 [Warning 41]. The lid is removable only by pressing the "release" button and pulling the handle up to a 90-degree angle. *Id.*, 10-11 [Instructions 8 and 13b], 7 [Warning 41]. The Inspiration Guide also references a stacked blade assembly that is "sharp and not locked in place," and to "make sure the lid is locked onto pitcher before pouring." *See* **Ex. E** (Inspiration Guide). Finally, the actual blender itself has the following warning: "WARNING - Loose sharp blades. Do not open until blades stop. Keep lid locked when pouring or carefully remove Stacked Blade Assembly before pouring without lid." *See* **Ex. F** (Lid Warning).

### The Incident

Per Plaintiff's testimony, she received a new Ninja BL610, opened it, washed it, and put it together. *See* **Ex. G** (Pltf. Dep., V. I), 16:19-23, 18:3-5; **Ex. H** (Pltf. Dep., V. II), 30:7-18, 33:2-5, 33:16-34:2. Despite being exposed to all of the warnings described above, Plaintiff does not recall reading the warnings.

On the day of the incident, Plaintiff placed smoothie ingredients into the blender, put on the lid, and blended. *See* Ex. H (Pltf. Dep., V. II), 24:10-23, 27:6-21. After blending, Plaintiff poured the smoothie into a cup with the lid "on," but did not remove the blade assembly from the pitcher. *See* Ex. H (Pltf. Dep., V. II), 23:20-25, 27:20-21, 28:1-6, 28:10-15, 31:2-9. Plaintiff used her left hand to hold the cup and her right hand to hold the pitcher handle, and, as she was pouring, the "lid fell off" and the blade slid out, cutting her left hand. *Id.*, Ex. H, 29:2-9; 31:25-32:8; 36:7-14; 43:23-25.

Oddly, the incident description in Mr. King's report is materially different than Ms. Bettencourt's account. Mr. King's report states:
• "Ms. Bettencourt was using the subject Ninja BL610 Professional Blender ... that was on her kitchen counter and the stacked blade assembly dislodged when she **reached for** it, resulting in a severe laceration on her dominant hand." *See* **Ex. K** (*Bettencourt* Report by Derek King), at 4, ¶ 3.0.

• "When the pitcher was knocked over, the blade assembly slid off the spline shaft and out of the pitcher, and Ms. Bettencourt was **lacerated attempting to catch** the pitcher." *Id.* at 5, ¶ 3.1.

The above incident description was copied from an earlier BEAR report submitted in *Welch v. SharkNinja*, Case No. 3:21-CV-00123 (S.D. Tex.) by Glen Stevick, one of Mr. King's colleagues at BEAR. Notably, the incident description in *Bettencourt* (above) is substantially identical to *Welch* (below):

• "Mr. Welch was at home moving boxes and accidently tipped over the subject Ninja BL68530 Kitchen System that was on his kitchen counter and the stacked blade assembly dislodged when he **reached for** the it [sic], resulting in a severe thumb laceration on his dominant hand." *See***Ex. I** (*Welch* Report by Glen Stevick) at 5 (emphasis added).

• "When the product was knocked over, the blade assembly slid off the spline shaft, out of the bowl and Mr. Welsh [sic] was **lacerated attempting to catch** the bowl." *Id.* at 6.

Further, looking at plaintiff's deposition in *Welch*, the incident involved a "food processor" (not a blender) and a plaintiff who was on his "second" beer and moving boxes in his kitchen when the food processor somehow fell off the counter; he could not recall whether the lid was attached at the time of the incident. *See***Ex. J** (Welch Dep.), at 24:13-15, 25:6-15, 28:11-17.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should enter an order excluding or limiting Derek King's opinions regarding the Ninja BL610 under Federal Rule of Evidence 702.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, a qualified expert witness may testify as such only if the proponent of the testimony shows the court that it is more likely than not that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (amended Dec. 1, 2023).

A meaningful amendment to Rule 702 went into effect on December 1, 2023, and emphasizes that "judicial gatekeeping [under Rule 702] is essential[.]" Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendment rejects case law that "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* The Committee also emphasized that "the [C]ourt must ... find that the opinion actually proceeds from a reliable application of the methodology." Report to Standing Committee, Advisory Committee on Evidence Rules, p. 6, May 15, 2022.

## ARGUMENT

**I. Opinion No. 1 that the blade assembly is defectively designed
because it can "unintentionally separate" is inadmissible.**

In his report, King opines that the BL610 was defectively designed because the blade assembly can "unintentionally separate" from the pitcher (Ex. K, p. 15, ¶ 1):

> 1. The design of the Ninja BL610 Professional Kitchen System is defective in that it creates an unnecessary risk of laceration by allowing the blade assembly to unintentionally separate from the pitcher, which directly led to the subject incident. A comparison of other products and common industry technology reveals that designs exist where the risk is minimized, if not eliminated.

This opinion is inadmissible for several reasons. First, King's report does not identify any scenario where the blade assembly can "unintentionally separate" if the user has properly locked the lid. His report acknowledges that the locking-lid design is adequate to secure the blade assembly inside the pitcher. Ex. K, pp. 5-8. King does not offer the opinion that this lid-locking design is inadequate to secure the blade inside the pitcher, or that the lid can "unintentionally" become unlocked and allow the blade become unsecured. Absent such opinions or analysis, he lacks the facts for this "opinion" and does not reliably apply a methodology to the facts of this case to demonstrate there is any fault or defect in the lid-locking design.

With the lid-locking design in mind, King's report makes the unremarkable observation that "[i]f the product is inverted or tilted *with the lid removed*, the blade assembly will slide off the spline shaft and out of the pitcher." *See* Ex. K, at 5 (emphases added). That observation does not describe "unintentional separation" of the blade assembly - it describes exactly how the product was designed and what a consumer would expect who had just unlocked and removed the lid and who had read the multiple warnings regarding the loose, removable, and sharp blade assembly.

King identifies no basis for characterizing the above scenario as "unintentional separation," or otherwise suggesting that a food-preparation appliance like the BL610 is defectively designed because the blade can slide out if the pitcher is inverted or tilted *with the lid removed*. Such a lid-locking design with a loose blade assembly has been used for decades on such appliances, as King himself conceded. *See* Ex. H at 11 ("the food processor has become a common household item since its invention in France in 1963, and subsequent introduction to American households in 1973"); *see* Ex. B at 24 ("the general design of utilizing a removable blade assembly without a retention mechanism in food preparation appliances is common practice"). And the BEAR report does not address the applicable UL 982 standard for blenders or food processors, including the fact that the UL 982 standard acknowledges the use of removable blade assemblies in blenders and food processors. [1]

Finally, the BEAR report does not accurately identify the details of the incident, which renders the opinion both unreliable and irrelevant. As noted in the Factual Background section above, King's description of the facts were copied from another BEAR report (*see* Ex. I), which involved a materially different incident, product, and circumstances. There, the consumer somehow knocked a food processor off the kitchen counter and tried to catch it. Ex. I, at 3, 5, 7. He had been unpacking the device and did not know if he had latched the lid. *Id.*, Ex. J, at 25:14-15, 28:11-17. He was not, like Ms. Bettencourt, intentionally using it to make a smoothie and then pouring the contents into a cup.

A Court "does not need to admit testimony based on indisputably wrong facts." *Ramos v. Home Depot Inc.*, No. 3:20-CV-01768, 2022 WL 615023, *1 (N.D. Tex. Mar. 1, 2022) (citing *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)). "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Kaseberg v. Conaco, LLC*, No. 15-CV-1637, 2019 WL 1641161, *5 (S.D. Cal. 2019) (citing *Guillory*, *supra,* at 1331). "[T]he *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion,' " and 'an opinion based on insufficient, erroneous information, fails the reliability standard.' " *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-cv-764, 2023

WL 384016, *7 (N.D. Tex. Jan. 20, 2023) (citing *Jacked Up, LLC v. Sara Lee Corp.*, 291 F.Supp.3d 795, 802 (N.D. Tex. 2018). An expert's testimony can be excluded if he fails to test his theory of causation by obtaining and relying on the actual facts underlying that theory. *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, at 92 (2nd Cir. 2000) (safer alternative design opinion regarding boat motor deemed unreliable because he had never seen the motor or boat, did not know the placement of the components or users nor what happened during the incident, and had never attempted to reconstruct the incident or test his theory). If an expert opines that a defect had a role in causing a particular incident and injury, he cannot rely on a completely different incident and its circumstances to prove a different causal relationship. The other incident's facts are irrelevant.

King also did not consider the fact that the only way the lid could come off in Ms. Bettencourt's case is if she first UNLOCKED it. *See* Ex. D (Warning 41)(the lid must be pressed down until it clicks and the triangles must be aligned for the blender to function). If she unlocked it, she knew or should have known the lid was loose when pouring the pitcher. Because King did not consider the details of the incident in Plaintiff's case, his opinions and the BEAR report lack any relevance or connection to Plaintiff's incident and the role of any purported "design defect."

### II. Opinion No. 1 regarding purported safer alternative designs is inadmissible.

In Opinion No. 1 (quoted above), Mr. King also references alternative designs (such as "snap and magnetic holding mechanisms") that he claims would have minimized or eliminated the "risk of laceration" from the blade assembly "unintentionally separating" from the pitcher. Mr. King's opinions regarding alternative designs are inadmissible for several reasons:

First, King has no reliable foundation for his opinion that his alternative designs would actually be safer. "The proper methodology for proposing alternative designs includes more than just conceptualizing possibilities." *Tang v. Toyota Motor Corp.*, No. SA-19-CV-01005, 2022 WL 2555749 at *5 (W.D. Tex. Jan. 20, 2022) (expert opinions insufficient because expert showed no work in arriving at opinions, did no testing, calculations, or drawings about how the design would function) (*citing Guy v. Crown Equip. Corp.*, 394 F.3d 320, 327 (5th Cir. 2004).

Mr. King's report does not address any of the basic considerations necessary to determine whether his proposed "snap and magnetic holding mechanisms" would make the BL610 safer or actually make it more dangerous. For example, his report fails to address:
• The extent to which "snap and magnetic holding mechanisms" (*see* Ex. K, at 15) like those proposed by King "are dependent on the user properly installing them for proper operation." *See* Ex. B, p. 35.

• The extent to which "the retention force required to ensure the blade assembly never detached [from King's proposed locking mechanism] during use could result in the user actively manipulating a sharp blade assembly during installation and removal that suddenly released from its retention mechanism, causing an unpredictable jerking motion that would potentially allow the user to lose control of the blade assembly." *See id.*, p. 35.

• The extent to which "excessive force to remove the blade assembly [from King's proposed locking mechanism] may also encourage the user to place his/her off hand on the rim of the pitcher for support, placing that hand at risk of laceration in the event of a sudden release of the blade assembly." *Id.*

• Whether there are other negative consequences of implementing BEAR's proposed "locking mechanism" to hold the assembly in place. *Id.*, at 35-36.

Second, these "safer alternatives" are not relevant because they seek to solve a problem that King failed to identify. As noted above, King and the BEAR report fail to identify any scenario where the blade assembly "unintentionally separates," other than a scenario where the user inverts the pitcher with the lid removed.

Third, King's comparison of the BL610 to a KitchenAid 3.5 Cup Food Chopper is unreliable because it is based only on Mr. King's assertion that the KitchenAid is "visually similar to the subject product." "Rule 702's reliability threshold requires expert testimony to be based on methods and procedures of science, not on subjective belief and unsupported speculation." *Andrews v. Brethren Mut. Ins. Co.*, No. 4:19-CV-02107, 2023 WL 6690710, at *6 (M.D. Pa. Oct. 12, 2023) (applying Rule 702 as amended) (internal quotation marks and citation omitted). When comparing products to demonstrate the sufficiency of an alternative, feasible design, the party must provide "sufficient evidence to identify a comparable product or design concept." *Willet v. Johnson & Johnson*, 465 F.Supp.3d 895, 907-908 (S.D. Iowa 2020). Just being used for a similar purpose does not mean a product is a "comparable product" or "comparable design concept." *See id.* at 908-910 (plaintiff's expert's opinions about natural graft as safer alternative not relevant or reliable because they did not relate to an alternative product or design concept; and opinions that an alternative synthetic was safer also excluded because it was "substantially and significantly different product").

Likewise, a plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used. *Hilaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223, 248-249 (E.D.N.Y. 2014) (expert's opinions that entirely different device was feasible alternative design did not satisfy *Daubert* standards because he did not show the device could work the same way as the device at issue, make the same cuts, be used in the same locations, or weighed the same). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Here, King's mere reference to the existence of snap fit joint mechanism does not demonstrate this would be appropriate for the BL610 in terms of durability, functionality, or any other purpose. The mere existence of another technology does not mean it can or should be utilized in other products. Here, an actual comparison (which King did not perform) of King's referenced product--the KitchenAid 3.5 Cup Food Chopper--to the BL610 demonstrates multiple characteristics that are vastly different and demonstrate the KitchenAid is not a representative product for accurate comparison. The BL610 and the KitchenAid Chopper have materially different specifications: (a) capacity (3.5 cups v. 9 cups), (b) size (1.8*oz* v. 6.0 oz), and (c) rated motor power (240 watts vs. 1000 watts). *Id.*, Ex. B, at 30 and Figure 13.

There is no indication from KitchenAid product materials or from King's report that the KitchenAid product was intended for smoothies or for chopping /crushing ice. *Id.* And Mr. King did not test the KitchenAid product to determine what force was required to dislodge the blade from that device to demonstrate that it was less likely to occur. *Compare with id.*, at 31 (Rimkus demonstrated that "shaking the [KitchenAid] bowl to remove additional contents could cause the blade assembly to suddenly detail and fall out of the bowl").

Without testing and actual comparison of product characteristics, mentioning the snapfit mechanism of a different product with different functionality does not help a jury nor does it constitute any type of reliable methodology. In addition, Mr. King's design defect opinion cannot refute that the removable blade assembly design employed on the Ninja BL610 is common in the food preparation appliance industry and requires similar conscientious operation on the part of the user as other appliances using this design. *Id.*, B, at 2, Figures 9-12 (referencing Vitamix 12-Cup Food Processor VM0215, and blenders or food processors by Hamilton Beach, Oster, and Cuisinart). He also cannot refute that the Ninja BL610 design with a removable blade assembly complied with applicable standards, as listed by two national testing facilities in Intertek and UL, which meant that the BL610 was found to be in compliance with UL 982 - "Standard for Safety: Motor-Operated Household Food Preparing Machines."[2] *Id.* at 27-28. King's design defect opinion is unreliable and irrelevant, lacks foundation, and should be excluded.

**Jessica Ann BETTENCOURT, Plaintiff, v. SHARKNINJA..., 2024 WL 3325600...**

### III. Opinion No. 2 regarding the existence of warnings of loose blades is inadmissible as existence of a design defect.

King makes the unremarkable observation that SharkNinja was aware of the risks identified in the warnings that it provided with the BL610, including the risk of laceration from the blade assembly:

> 2. Warnings provided by SharkNinja, as well as the BL660 recall, show that the laceration hazard from loose blades falling out of the pitcher had been identified.

This opinion is not relevant. As noted above, the BL610 is accompanied by multiple, conspicuous warnings on its packing materials, on the outside box, in the manual, and even on the product itself with respect to sharp, loose blades. *See,* Factual Background, *supra*, p. 7. This product was designed to crush ice and whole fruits and vegetables (Ex. A and Figure 1), so it must include mechanisms and parts that are sufficiently sharp to do so. The mere existence of "a product bearing such a warning," that the blade assembly is loose and not locked in place and should be handled with care, is not a "defective condition nor is it unreasonably dangerous," nor has King even made that statement. *Hardeman v. Monsanto Co.*, 216 F.Supp.3d 1037, 1040 (N.D. Cal. 2016) (citing Restatement (Second) of Torts § 402A cmt. j (1965)). King's statement about warnings does not even rise to the level of an opinion, as it merely confirms that there are warnings about the fact the blade assembly is loose and not locked in place and should be handled with care--something about which SharkNinja sought to inform its customers. Notice of the risk is not in dispute. This "opinion" is irrelevant and unhelpful and should be excluded.

### IV. Opinion Nos. 3 and 4 regarding SharkNinja's purported failure to conduct an adequate risk assessment are inadmissible.

King opines that Shark Ninja did not consider or address the "known hazard of loss blades falling out of the pitcher" and that if it had, it would have considered and implemented a "locking mechanism to hold the blade assembly in place:"
3. Although an DFMEA was performed, it did not address the known hazard of loose blades falling out of the pitcher

4. Systematically determining and addressing all failure modes due to foreseeable uses and misuses through proper risk assessment would have led to the consideration (and implementation) of a locking mechanism to hold the blade assembly in place regardless of orientation and allowing separation only when deliberately removed. Snap and magnetic holding mechanisms have been available for decades.

These opinions are inadmissible. For starters, Opinion No. 3 lacks a reliable foundation. It ignores that SharkNinja provided multiple warnings regarding the risk of loose, sharp blade assembly - so there is no foundation for BEAR to claim that SharkNinja "did not address the known hazard of loose blades falling out of the pitcher." This opinion also ignores other facts and data, including documents and information produced to Plaintiff about the testing and analysis of the BL610 product.

Documents made available to Plaintiff and her expert establish that approximately 100 failure modes were considered and evaluated for the BL610 blender. Kaiser Decl., Ex. B, at 34. In addition, approximately 100 component and system-level tests were performed as part of the Design Qualification Test plan for the BL610. *Id.* Documentation of Ongoing Reliability Testing was also produced by SharkNinja, and the device was tested and listed by both Intertek and UL. *Id.* On the contrary, King and the BEAR Report provide no evidence that SharkNinja did *not* consider alternative designs or blade retention mechanisms

for the BL610 in the design process, but concluded those designs should be dismissed based on other negative consequences. Without consideration of actual facts, King's opinions are unreliable.

In addition to failing to analyze whether SharkNinja considered potential negative consequences to its designs and others, King himself failed to consider the potential negative consequences of implementing his proposed locking mechanism to hold the blade assembly in place. For example, if the blades were permanently affixed to the pitcher, cleaning would be severely inhibited and laceration risk increased if a consumer were to try and clean the blades inside the pitcher's tight space. Kaiser Decl., Ex. I, pp. 34-35. Likewise, if the blades were affixed in a non-permanent design, the functionality of the blender would depend on the user properly installing them, which would involve using retention force and/or manipulating a sharp blade assembly under force, which could result in even greater laceration risk. *See id*. In addition, if the retention mechanism failed, the consumer would again be at risk of laceration, but this time without expectation of the failure. *See id.* As a result, alternative designs could still pose the same risks as the current design.

Opinion No. 4 is speculative and without foundation. Without having analyzed the actual risk analysis performed by SharkNinja, King's opinion that a "systematic[] determining and addressing all failure modes" "would have led to the consideration (and implementation) of a locking mechanism to hold the blade assembly in place" is fatally speculative and does not reflect a "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d); *see also, e.g., Banga v. Kanios*, No. 16-cv-04270-RS, 2023 WL 1934484, at *2 (N.D. Cal. Jan. 24, 2023) (excluding expert testimony as speculative because "there is simply no way to know whether this hypothetical sequence of events would have played out"); *MH v. Cnty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 894758, *2 (N.D. Cal. Jan. 2, 2015) (excluding as "speculative" expert's prediction about what might have happened). Because there is "too great an analytical gap between the data and the opinion proffered," King's BL610, speculative and unreliable opinions Nos. 3 and 4 must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### V. Opinion No. 5 regarding causation and alternative designs is inadmissible.

King opines that if a locking mechanism had been used to secure the blade assembly against "unintentional separation," then Plaintiff would not have been injured from the "pitcher being tipped over without the lid:"

> 5. The subject injury was due to an anticipated action: the pitcher being tipped over without the lid. Had a locking mechanism been used to retain the blade assembly against unintentional separation, it is likely that the subject injuries would have been prevented.

This opinion is unreliable. It is based on grossly inaccurate facts. *See*, *supra*, Factual Background at 9-10, and Argument, § I, at 7-8. King did not understand or rely on the very basic elements of the incident in question. He cannot, therefore, reliably opine about the likelihood of an injury occurring and the factors affecting how and when that injury would have occurred if he did not have even the most basic facts correct. *Id.* King's understanding of the dynamics of Plaintiff's incident were inaccurate, not based on sufficient facts or data, and, therefore, his opinions do not reflect a reliable application of the principles and methods to the facts of the case. *See* Fed. R. Evid. 702 (amended Dec. 1, 2023). King's failure to rely on the actual facts in this case render irrelevant his opinion about whether Plaintiff's injuries could have been prevented.

### CONCLUSION

**Jessica Ann BETTENCOURT, Plaintiff, v. SHARKNINJA..., 2024 WL 3325600...**

For the foregoing reasons, the five opinions in Mr. King's report are inadmissible under Rule 702. The Court should therefore grant the instant motion.

Date: April 5, 2024

SHOOK, HARDY & BACON L.L.P.

By: /s/ Eva M. Weiler

Eva M. Weiler

Attorneys for Defendant SHARKNINJA OPERATING LLC

## Footnotes

1   *See* Ex. B, at 29 ("UL 982 acknowledges the use of removable blade assemblies in blenders and food processors. Similarly, no requirement in other sections of UL 982 specific to the performance or construction of blenders/food processors require a retention mechanism for a removable blade assembly.")

2   UL 982, Standard for Safety for Motor-Operated Household Food Preparing Machines (intertek.com) available at: https://www.intertek.com/standards-updates/ul-982-household-food-preparing-machines/

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.