Timothy M. Stubson, Wyo. Bar. No. 6-3144
Holly Tysse Wyo. Bar. No. 7-5553
Brandon E. Pryde Wyo. Bar. No. 8-6883
Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-265-2279
tstubson@crowleyfleck.com
htysse@crowleyfleck.com
bpryde@crowleyfleck.com

and

Eugene M. LaFlamme *(admitted pro hac vice)*
Jared B. Giroux *(admitted pro hac vice)*
Jillian L. Lukens *(admitted pro hac vice)*
McCoy Leavitt Laskey LLC
N19 W24200 Riverwood Drive, #125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

*Attorneys for Defendants,*
*Walmart Inc. and Jetson Electric Bikes, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| STEPHANIE WADSWORTH Individually and as Parent and Legal Guardian of W.W., K.W., G.W., and L.W., minor children and MATTHEW WADSWORTH,<br><br>    Plaintiffs,<br><br>v.<br><br>WALMART INC. and JETSON ELECTRIC BIKES, LLC,<br><br>    Defendants. | Case No. 2:23-cv-00118-NDF<br><br>DEFENDANTS JETSON ELECTRIC BIKES, LLC AND WALMART INC.'S MOTION TO EXCLUDE TESTIMONY OF DR. RONALD SNYDER; **MEMORANDUM IN SUPPORT OF MOTION** |

Defendants, Jetson Electric Bikes, LLC and Walmart Inc., collectively "Defendants", respectfully request that this Court exclude any testimony from Plaintiffs' expert Dr. Ronald Snyder pursuant to Federal Rules of Civil Procedure 702. As explained further below, Dr. Snyder bases his opinions on speculation and they are therefore unreliable. Furthermore, Dr. Snyder is unqualified to offer testimony regarding the costs of Mrs. Wadsworth's future care needs. As a result, this Court should preclude him from testifying.

## BACKGROUND

Plaintiffs have designated Dr. Ronald Snyder as a retained expert to offer opinions regarding Mrs. Wadsworth's future care needs as a result of the injuries she allegedly suffered in the fire. (Plts' Initial Expert Witness Discl. Doc 73, p. 2). Dr. Snyder issued his report on June 4, 2024. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures Exhibit A filed on July 15, 2024, Doc. 73-1, p. 12). The Plaintiffs expert designation indicated, in relevant part, that Dr. Snyder relied upon his "conversations with [Mrs. Wadsworth's] treating providers" as a basis for his opinions. (Plts' Initial Expert Witness Discl. Doc 73, p. 2). With respect to the need for future medical treatment, Dr. Snyder testified that "this case demonstrates why I just need to reach out to certain other treaters and certainly not handle these decisions on my own." (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 174:22-175:8). However, at the time that Dr. Snyder issued his report and when he gave his deposition testimony, he had not consulted with or spoken to any of Mrs. Wadsworth's treating physicians. (Id. at 39:2-22).

Dr. Snyder testified that he wanted to speak with a plastic surgery expert for her burn treatments, an ophthalmology expert for the corneal abrasions, and an ear, nose and throat (ENT) expert for the tracheal burns. (Id. at 162:6-14). Dr. Snyder testified that he would defer to a plastic surgeon in support of the cosmetic treatments identified in his report (hair transplant surgery, semi-

2

permanent tattoo for her right eyelid) and explained that with respect to the frequency and types of procedures for her burn injuries, "I would really need to have an expert." (Id. at 134:22-135:11, 136:1-13). However, the Plaintiffs have not disclosed a plastic surgeon as an expert and the Court recently ruled that they cannot amend their expert disclosures to identify one. (ECF No. 93, p. 10-14). Similarly, the Plaintiffs have not identified either an ENT or ophthalmology experts. (See generally Plts' Initial Expert Witness Discl., Doc. 73).

Dr. Snyder identified a number of treatments for Mrs. Wadsworth's burns in his life care plan. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures Exhibit A filed on July 15, 2024, Doc. 73-1 at p. 184-185). With respect to the laser therapies, Dr. Snyder stated, "we really need to have a plastic surgeon to give me the optimal number of what needs to be done so I can provide an appropriate life care plan." (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 85:18-86:14). He did not know of the frequency of the laser treatments she will need going forward. (Id. at 87:1-6). Dr. Snyder did not know how many years into the future Mrs. Wadsworth would need laser treatments. (Id. at 87:7-11). He did not know the cost of the laser treatment therapy. (Id. at 87:12-15).

The Burn Center Team at the University of Utah treated Mrs. Wadsworth for her burn injuries and administered the laser therapy. (Giroux Dec. ¶7, Ex. 3: Thompson Dep 11:2-20). The team included Dr. Thompson, Dr. Lewis, Dr. Fleming and Dr. LaChapelle. (Id. at 11:21-12:6). Dr. Thompson opined that with respect to her burn injuries, Mrs. Wadsworth will have a "full return to her preinjury level of function." (Id. at 43:7-14). Mrs. Wadsworth has undergone eight laser treatments, which is the maximum amount of treatments Dr. Thompson and her group typically provide. (Id. at 16:7-9, 17:4-14). Dr. Thompson testified that Mrs. Wadsworth is not a candidate for scar revision surgery related to the scars on her face, forehead, or hands. (Id. at 24:8-21). She

would need to see Stephanie for a reassessment to determine whether she is a candidate for scar revision surgery to any of the other affected areas on her body. (Id. at 24:22-25:2).

Similarly, with respect to the calluses that Mrs. Wadsworth has on her feet, Dr. Snyder did not know what type of treatment or the duration of treatment she will require going forward stated that he would defer to a plastic surgeon. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 91:1-19). Dr. Scott Sulentich is the plastic surgeon who treated Mrs. Wadsworth for the calluses on her feet. (Giroux Dec. ¶8, Ex. 4: Sulentich Dep. 8:24-9:4, 16:19-17:1). Dr. Sulentich only treated Mrs. Wadsworth for the burns to her feet and he did not evaluate or treat any of her other burns. (Id. at 20:22-21:4). Dr. Sulentich does not know what Stephanie's outlook is with respect to her feet. (Id. at 39:15-41:18). He testified there is no way to tell how many lesions[1] Mrs. Wadsworth will develop or how many she will need removed. (Id. at 41:19-42:11).

With respect to the injections Mrs. Wadsworth received for her burns, Dr. Snyder did not know what those injections were or where they were located. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 87:16-23). Dr. Snyder did not know how often Mrs. Wadsworth may need those injections going forward. (Id. at 87:24-88:4). He did not know how long into the future she would need those injections and acknowledged "that's outside of [my] experience and training and background." (Id. at 88:5-9).

Mrs. Wadsworth had significant pre-existing conditions. She had pre-existing back pain, lumber stenosis and underwent a lumbar spine surgery and microdiscectomy in 2021. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 27). Prior to the fire, she was sleeping on a makeshift bed setup in the living room due to her back condition. (Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 146:21-147:6). Dr.

---

[1] Dr. Sulentich referred to them as lesions in his depositions with Dr. Snyder referred to them as calluses.

Snyder acknowledged her prior back injuries and treatment but was unaware that she slept on a foam mattress in the living room prior to the fire because of the sleep issues she was having. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 96:14-18, 101:11-15).

Mrs. Wadsworth testified she did not have any physical limitations caused by the incident. (Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 47:18-23). She also noted that in the Activities of Daily Living Checklist that she completed for Dr. Snyder. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 105:11-106:1). None of Mrs. Wadsworth's medical records from her treating physicians suggested she get a personal care attendant to help with her activities of daily living. (Id. at 154:8-16). Dr. Snyder testified that Mrs. Wadsworth was doing all of the items a personal care attendant would help with. (Id. at 152:3-6). He stated that she indicated she does not need any help with those items, yet he allocated $1,375,256.08 for the cost of a personal care attendant and $274,560.00 for a housekeeper. (Id. at 152:7-10) (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187).

Dr. Snyder acknowledged there is no suggestion that Mrs. Wadsworth will need a scooter or walker anywhere in her medical records. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 142:17-25, 145:9-14). However, Dr. Snyder allocated costs for scooters and related accessories (totaling $94,232.16) in his report. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 186).

Dr. Snyder identified a number of home modifications and transportation costs (i.e. purchase of a handicap van every five years and maintenance) despite the fact that Mrs. Wadsworth testified she has no physical limitations. (See Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187; Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 47:18-23). Dr. Snyder tied the home modifications (totaling

$58,997.48) to Mrs. Wadsworth's use of a walker, for which there is no support in the medical records. (Giroux Dec. ¶¶5-6, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187; Ex. 2: Snyder Dep. 145:9-14, 149:1-14).

Dr. Snyder acknowledged that Mrs. Wadsworth has a truck and does not have any complaints about using it. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 145:20-146:3). The only need for a handicap van is to transport the scooters that have not been deemed necessary by Mrs. Wadsworth or any of her medical providers. (Id. at 142:17-25, 146:23-147:5). Dr. Snyder speculated that Mrs. Wadsworth would need to replace the handicap van every five years because the hydraulics do not last longer than that. (Id. at 147:9-21). He acknowledged that they could simply replace the hydraulics rather than the entire van. (147:22-148:1). He also admitted that Mrs. Wadsworth would have incurred the expense of a personal vehicle if the accident had not happened. (Id. at 146:15-22). Nonetheless, he allocated $496,644.60 to Mrs. Wadsworth in future transportation costs. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187).

Perhaps the most speculative portion of Dr. Snyder's report and testimony is that he bases the $169,936.80 in "Home Maintenance" costs on the unfounded premise that Stephanie and Matthew Wadsworth will get divorced. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 152:14-153:5). He did not have any information about how the Wadsworth's relationship is. (Id at. 153:20-23). Dr. Snyder acknowledged that if the two remained married, the home maintenance aspect of the life care plan would not be necessary. (Id. at 154:3-7).

In his report, Dr. Snyder allocated costs for the following medications for Mrs. Wadsworth: Neurontin ($90,158.20); Baclofen ($27,963.76), Duloxetine ($104,461.72); Lansoprazole ($3,405.60) and Zolpidem Tartrate ($34,231.12). (See ECF No. 73-1, p. 185-86). Mrs. Wadsworth

testified she was not taking any medications. (Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 59:12-13). Dr. Snyder acknowledged this as well and noted that she was "self-medicating" with alcohol. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 104:14-18, 138:8-16). He did not know whether Mrs. Wadsworth had made any effort to discuss these medications with her treating physicians. (Id. at 138:17-21). Other than Duloxetine that she was on at one time, Mrs. Wadsworth treating physicians never prescribed any of these medications. (Id. at 138:22-139:7).

Dr. Snyder acknowledged that the vision issues Mrs. Wadsworth experienced after the incident "were the usual optometric problems of growing older." (Id. at 84:17-85:6). Therefore, the vision treatment with Desert View Eye Care was not related to her burn injuries. (Id. at 84:25-85:6). However, he still allocated $11,093.28 for future ophthalmology services. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 184).

Dr. Snyder's report indicated that Mrs. Wadsworth would incur $3,698,895.16 in future care costs. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187). However, Dr. Snyder testified that he "could not testify to the veracity of the numbers" because a young high school student who is more proficient in Excel prepared them. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 63:16-65:2). He did not verify that the 3,698,895.16 in future care costs was accurate, but rather had this prepared in shorthand to give the attorneys a general idea of the value of the case. (Id. at 65:3-66:6). Dr. Snyder does not provide the final figures that would be attributable to a damage claim but rather relies on an economist to do those calculations. (Id. at 66:16-67:2). The Plaintiffs failed to disclose an economist as an expert and the Court recently ruled that they cannot supplement their expert disclosures to identify one. (ECF No. 93, p. 9-10).

## **LEGAL STANDARD**

Rule 702 calls upon courts to act as gatekeepers to ensure that expert testimony is both reliable and relevant. *Rutstein v. Cindy's Trucking of Ill., Inc.*, 2012 WL 8813611, at *3 (D. Wyo. Aug. 8, 2012). The proponent of the testimony bears the burden of "proving the foundational requirements of Rule 702 by a preponderance of the evidence." *Davenport v. Menard, Inc.*, 2016 WL 1298636, at *2 (D. Wyo. Jan. 28, 2016) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

Fulfilling the gatekeeper duty requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts. *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' " *Id.* (quoting *Kumho*, 526 U.S. at 149).

"To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not mere 'subjective belief or unsupported speculation.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). Any "inference or assertion must be derived by the scientific method ... [and] must be supported by appropriate validation—i.e. 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590).

> To assist in the assessment of reliability, the Supreme Court in Daubert listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential

rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* at 991-92 (citing *Daubert*, 509 U.S. at 593–94).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Id.* at 992 (citing *Daubert,* 509 U.S. at 595). "However, an expert's conclusions are not immune from scrutiny: 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Regardless of the specific factors at issue, the purpose of the Daubert inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 152). A court should not allow an expert to offer an opinion that does not rely on proper methodologies and is therefore speculative. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003).

## ARGUMENT

I. Dr. Snyder's opinions on Mrs. Wadsworth's future care are speculative because they are not supported by the medical records or testimony.

A life care planner is an assimilation expert in that he or she reviews the records and opinions of medical experts and assimilates that information into a summary of future medical and rehabilitation care and its related expenses for the jury. *Feliciano v. Cate St. Cap., Inc.*, 2014 WL 7642091, at *2 (D. Wyo. Sept. 17, 2014). A life care planner does not formulate medical opinions, "but rather ***relies upon the opinions and findings of medical specialist.***" *Id.* (emphasis added). A life care planner's testimony must be excluded when there is no reliable medical foundation to support it. *See In re Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, 2014 WL

9

186872, at *13 (S.D. W. Va. 2014) (excluding life care planner testimony to extent where there was not a reliable medical foundation).

Dr. Snyder has never consulted with or spoke to any of Mrs. Wadsworth's treating physicians. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 39:2-22). Dr. Snyder repeatedly opined that Mrs. Wadsworth will need future care and services that have no basis in the medical records and at times are even contradicted by the medical records, the testimony of treating physicians, or Mrs. Wadsworth's own testimony.

Mrs. Wadsworth maintains she does not have any physical limitations caused by the incident. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 105:11-106:1; Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 47:18-23). However, Dr. Snyder allocated $1,375,256.08 for the cost of a personal care attendant and $274,560.00 for a housekeeper even though Mrs. Wadsworth performs all of those tasks herself and none of her treating physicians suggested she hire a personal attendant. (Giroux Dec. ¶¶5-6, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187; Ex. 2: Snyder Dep. 152:3-10, 154:8-16). Dr. Snyder does not know anything about Stephanie and Matthew Wadsworth's relationship, but speculates the two will get divorced and she will incur $169,936.80 in "Home Maintenance" costs. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 152:14-153:5, 153:20-23, ECF No. 73-1, p. 187).

Dr. Snyder allocated $58,997.48 for modifications to Mrs. Wadsworth's home that were tied to Mrs. Wadsworth's use of a walker. (Giroux Dec. ¶¶5-6, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187; Ex. 2: Snyder Dep. 149:1-14). However, Snyder acknowledged there is no indication in the medical records that Mrs. Wadsworth will need a walker. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 145:9-14). Similarly, Dr. Snyder allocated $94,232.16 for scooters and related accessories even though none of Mrs.

10

Wadsworth's treating provides have suggested she needs one. (Giroux Dec. ¶¶5-6, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 186; Ex. 2: Snyder Dep. 142:17-25).

Dr. Snyder opined that Mrs. Wadsworth would incur $496,644.60 in future transportation costs for the purchase, modifications and maintenance of a handicap van. (See Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187). Dr. Snyder acknowledged the only need for a handicap van is to transport the scooters that have not been deemed necessary by Mrs. Wadsworth or any of her medical providers. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 142:17-25, 146:23-147:5). Furthermore, Mrs. Wadsworth would have incurred the expense of a personal vehicle if the accident happened. (Id. at 146:15-22). The evidence does not support the need for these transportation costs.

In his report, Dr. Snyder allocated costs for the following medications for Mrs. Wadsworth: Neurontin ($90,158.20); Baclofen ($27,963.76), Duloxetine ($104,461.72); Lansoprazole ($3,405.60) and Zolpidem Tartrate ($34,231.12). (See Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 185-86). Mrs. Wadsworth testified she was not taking any medications. (Giroux Dec. ¶9, Ex. 5: S. Wadsworth Dep. 59:12-13). Other than Duloxetine that she was on at one time, Mrs. Wadsworth has not been prescribed any of these medications. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. at 138:22-139:7). There simply is no medical foundation for any of the aforementioned costs and Dr. Snyder should not be permitted to testify about them. *See In re Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, 2014 WL 186872, at *13 (S.D. W. Va. 2014).

Dr. Snyder repeatedly stated throughout his deposition that certain evaluations regarding the necessary treatment for Mrs. Wadsworth's burn injuries were beyond his education, training

11

and experience and he would confer with a plastic surgeon. (See generally id. at 39:5-22, 62:3-62:17, 85:18-86:25, 91:1-92:6, 101:19-102:12, 133:3-133:8, 134:22-136:13). However, the Plaintiffs have not disclosed a plastic surgeon as an expert and they cannot amend their expert disclosures to identify one. (ECF No. 93, p. 10-14).

Dr. Snyder's opinions must be excluded because they are not based on medical records or the testimony of Mrs. Wadsworth's treating physicians and therefore amount to nothing more than unsupported conjecture. *Becerra v. Schultz*, 499 F. Supp. 3d 1142, 1147 (D. Wyo. 2020) (unsupported conjecture is inadmissible); *see Dodge v. Cotter Corp.*, 328 F.3d at 1221-22 (holding that a court should not allow an expert to offer an opinion that does not rely on proper methodologies and is therefore speculative); *see also Abraham v. Graebel Van Lines, Inc.*, 2016 WL 1304853, at *3 (D. Wyo. Feb. 3, 2016) (ruling that expert opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion).

II. Dr. Snyder is unqualified to offer opinions regarding the costs associated with Mrs. Wadsworth's future care because he did not verify the figures were accurate and he needs an economist to perform those calculations.

In order for opinions to be admissible, the witness must be qualified as an expert by knowledge, skill, experience, training or education. *Sinclair Wyoming Ref. Co. v. A&B Builders, Ltd.,* 2018 WL 4698781, at *2 (D. Wyo. Sept. 11, 2018). By his own admission, Dr. Snyder is not qualified to calculate the future life care plan costs. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 66:7-21). Rather, he relies on an economist to perform these calculations. (Id.). Dr. Snyder's report indicated that Mrs. Wadsworth would incur $3,698,895.16 in future care costs. (Giroux Dec. ¶5, Ex. 1: Plaintiffs' Initial Expert Witness Disclosures – Dr. Snyder's Report filed on July 15, 2024, Doc. 73-1, p. 187). However, Dr. Snyder testified that he "could not testify to the veracity of the

numbers" because they were prepared by a young high school student who is more proficient in Excel. (Giroux Dec. ¶6, Ex. 2: Snyder Dep. 63:16-65:2).

The Plaintiffs failed to disclose an economist as an expert and the Court recently ruled that they will not be permitted to supplement their expert disclosures to identify one. (ECF No. 93, p. 9-10). Dr. Snyder must be precluded from testifying because the Plaintiffs do not have an economist, Dr. Snyder is unqualified to calculate the life care plan costs and any testimony he would offer on those costs would be unreliable and speculative. *See Dodge*, 328 F.3d at 1221-22 (10th Cir. 2003) (a court should not allow an expert to offer an opinion that does not rely on proper methodologies and is therefore speculative).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant the Motion and preclude Dr. Ronald Synder from testifying at trial.

**McCOY LEAVITT LASKEY LLC**

Attorneys for Defendants, Jetson Electric Bikes, LLC and Walmart Inc.

Dated: December 2, 2024     By: _____

Eugene M. LaFlamme *(pro hac vice)*
Jared B. Giroux *(pro hac vice)*
Jillian L. Lukens *(pro hac vice)*
McCoy Leavitt Laskey, LLC
N19 W24200 Riverwood Drive, Suite 125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

and

Timothy M. Stubson, Wyo. Bar No. 6-3144
Brandon E. Pryde, Wyo. Bar No. 8-6883
Holly L. Tysse, Wyo. Bar No. 7-5553

Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
htysse@crowleyfleck.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2024, a true and correct copy of the foregoing was electronically served to all counsel of record.

_____
**EUGENE M. LaFLAMME, Esq.**