EXHIBIT 2

Ronald E. Synder, M.D.
08/14/2024

Page 1

1                    UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF WYOMING

3      STEPHANIE WADSWORTH, individually )
                                          )
       and as Parent and Legal Guardian  )
                                          )
4      of W.W., K.W., G.W. and L.W.       )
                                          )
       minor children, and MATTHEW       )
                                          )
5      WADSWORTH,                         )      Case No.:
                                          )
              Plaintiffs,                 ) 2:23-cv-00118-NDF
                                          )
6                    vs.                  )
                                          )
       WALMART, INC. and JETSON           )
                                          )
7      ELECTRIC BIKES, LLC,               )
                                          )
              Defendants.                 )
13
                            -  -  -
14
                    Wednesday, August 14, 2024
15
                            -  -  -
16                  Videoconference deposition of

17     RONALD E. SYNDER, M.D. was taken via Zoom,

18     before Elizabeth M. Kondor, Certified Court

19     Reporter and Notary Public, on the above date,

20     commencing at 11:00 a.m.

21

22              LEXITAS LEGAL PHILADELPHIA

23           1600 MARKET STREET, SUITE 1700

24           PHILADELPHIA, PENNSYLVANIA 19103

25                  (215) 504-4622

Ronald E. Synder, M.D.
08/14/2024

Page 39

1    anything of that nature, that's correct.

2         Q.    Are there any of Stephanie

3    Wadsworth's treating physicians that you --

4    strike that.

5              Have you spoken with any of Stephanie

6    Wadsworth's treating physicians?

7         A.    I have not.  After I saw the patient,

8    I had some discussions with plaintiffs' counsel,

9    as far as needing to get some additional

10   clarification, because I'm not a plastic

11   surgeon.  And in order for me to put particular

12   procedures in, it would be inappropriate for me

13   to add those procedures.

14              And you'll see in my life care plan,

15   I have a list of procedures that I presume the

16   patient is going to be needing, but I could not

17   put in because that's outside of my wheelhouse.

18   So I presume in the future, there will be some

19   additional experts or counsel will set up an

20   appointment for me to speak with those treating

21   physicians.  But at this point, none of that has

22   been arranged at this point.

23        Q.   And it sounds like Dr. LeChapelle is

24   the only one that you've actually reached out to

25   as part of your work in this case?

Ronald E. Synder, M.D.
08/14/2024

Page 62

1    origin and cause investigation, correct?

2         A.    That's correct.

3         Q.    Are there any documents that you

4    asked for as part of your evaluation in this

5    case that you are waiting to receive or just

6    have not been given?

7         A.    After I saw the patient, I did speak

8    with counsel, indicating that I could not put in

9    the specific types of plastic surgical

10   procedures, the types of pulmonary procedures

11   and so forth; that if he did do that, then I

12   would have to -- I would then do the research

13   and the costs.  So I did have listed the

14   procedures that I could not do pricing for that

15   I suggested would ultimately come if I got

16   further documentation.  And that would be found

17   on page 64.

18        Q.    Okay.

19        A.    That I could not do life care

20   planning as a physiatrist, and, therefore,

21   suggested that we were going to need some

22   additional consultations, if I were to put those

23   values into the life care plan.

24        Q.    Since we've been referring to your

25   report, Doctor, why don't we just go ahead and

Ronald E. Synder, M.D.
08/14/2024

Page 63

1    mark it.

2              I'm going to show you a copy of your

3    report.  And we can mark your report as Exhibit

4    64.

5              (Exhibit 64, Life Care Plan Report

6         prepared by Ronald Snyder, M.D., is

7         received and marked for identification.)

8         Q.    And just so we can confirm that we're

9    on the same page here, obviously, I won't page

10   through all 172 pages to have you authenticate

11   them, but here is the first page, and it's 172

12   pages long.

13             Is that consistent with the report

14   that you authored in this case?

15        A.    That is correct.

16        Q.    And then I'll also mark as Exhibit

17   65, I've call it the Life Care Plan Summary, I

18   don't know if you have a different name for it,

19   but it is a five-page document that, kind of,

20   basically, boils down the 172 pages into a

21   little more readable format.

22             (Exhibit 65, Lifetime Cost Summary,

23        is received and marked for identification.)

24        A.    What it is is, the life care plan is

25   what we just spoke about, the Word document.

Lexitas Legal Philadelphia
215-504-4622

Ronald E. Synder, M.D.
08/14/2024

Page 64

1   I sent that the attorneys, and then they could

2   call me and say What's the value of this?  So I

3   put this into an Excel report.  I have a young

4   high school graduate who is very good at Excel

5   reports, who I try to protect, because I don't

6   want her having to testify.  So I put in red,

7   "This spreadsheet of Lifetime Costs is provided

8   as a Professional Courtesy.  As it is a Work

9   Product, it is NOT to be released or published.

10  Additionally, this document does not replace the

11  findings and work of an Economist."

12              So this is the shorthand version to

13  give the attorney as to what the ultimate value

14  would be, but I can't testify as to the veracity

15  of the numbers.  But it is a shorthand idea of

16  what the life care plan really is.

17      Q.    When you say you can't testify to the

18  veracity of the numbers, what do you mean by

19  that?

20      A.    That's what I mean.  This is work

21  product.  A young high school girl does it for

22  me.  I don't know how to do the equations and so

23  forth.  So this is, basically, to provide to the

24  attorneys on the side.  This is not the life

25  care plan.  This is, basically, a summary, so

Ronald E. Synder, M.D.
08/14/2024

Page 65

1    they can get an idea of what the costs would be,

2    but it's not the life care plan.

3         Q.     So in going through and looking at

4    the average costs per lifetime figures, do you

5    verify that these figures are consistent with

6    what's in your expert report?

7         A.     No.  That's why I'm saying, I send

8    this to the attorneys for a shorthand term and

9    say very, very specifically that this

10   spreadsheet of lifetime costs is provided as a

11   professional courtesy.  This gives them a

12   shorthand understanding of the value of the

13   case.

14        Q.     So as far as the numbers that are

15   listed here, understanding you have a high

16   school grad employee or 1099 consultant help you

17   out with this, you don't do anything to verify

18   that these numbers are indeed correct?

19        A.     That is correct.  It's, basically, to

20   give them a general idea of the value of the

21   case.  That's why it's in full red.  I try to

22   protect her at all costs.

23        Q.     And then I presume the lifetime total

24   of $3.698 million and some change, have you

25   verified whether that total is correct?

Ronald E. Synder, M.D.
08/14/2024

Page 66

1        A.    No.  Basically, this is something I

2   give to the attorneys, so that they can end up

3   getting an idea of what they ultimately send to

4   an economist.  And the economists do not use

5   this.  They use the actual 172-page report for

6   them to do their own reports.

7        Q.    And in your report, you do not

8   provide any final figures, correct, as far as

9   what the overall life care plan would cost?

10       A.    Correct.  I, basically, do a weekly,

11  yearly, monthly of the values.  And then I have

12  that report ultimately go to the economists,

13  because they do lots of other manipulations with

14  those numbers for an ultimate amount of money

15  that should be involved.

16       Q.    Okay.

17             So you would ultimately rely on an

18  economist to provide the final life care plan

19  figures that would be claimed as damages in this

20  case?

21       A.    That's correct.

22       Q.    Okay.

23             So as you sit here today, you, as a

24  life care planner, you do not provide the final

25  figures that would be attributable to the damage

Ronald E. Synder, M.D.
08/14/2024

Page 67

1    claim, correct?

2          A.     Correct.

3          Q.     Are you aware of any economist that

4    has done the calculations relative to your life

5    care plan in this case?

6          A.     I am not.

7          Q.     Okay.

8                 Is it a typical situation where -- or

9    let me take a step back.

10                Generally, when you do your life care

11   plans, are you in contact with the economist to

12   provide them your life care plan?

13         A.     No.  Most of the time, my reports are

14   simply sent to the economists.  Occasionally,

15   I'll get a phone call wanting me to define

16   biweekly or some kind of a question as far as

17   verbiage.  But the majority of the time I am not

18   contacted by the economists.

19         Q.     Okay.

20                And then there were three

21   questionnaires that you had Mrs. Wadsworth

22   complete?

23         A.     Yes.

24         Q.     And they were completed prior to your

25   home visit; is that accurate?

Ronald E. Synder, M.D.
08/14/2024

Page 84

```
 1    was for vision.  And one was for an episode of

 2    cellulitis.

 3              Do you see that?

 4        A.    Correct, of the ear, yes.

 5        Q.    Those three visits are unrelated to

 6    her burn injuries, correct?

 7        A.    Well, the rash on the ear, I believe

 8    that was an infection of the burn.  And the

 9    callus of the foot was also from the burns.

10        Q.    Where is there a callus from the

11    foot?  Oh, you're talking about the one below

12    that.  I wasn't talking about that one.

13        A.    Yeah.

14              All of those are related, from my

15    understanding, as secondary complications from

16    the burns.

17        Q.    Okay.

18        A.    And the vision, she knew she had

19    problems with corneal burns and that she was

20    having some blurred visions, so she ended up

21    seeking medical treatment.  It sounds like they

22    just found regular vision problems, a stigma and

23    so forth, but she sought that because she

24    thought she had a burn of the cornea.

25        Q.    So you think that the vision
```

Lexitas Legal Philadelphia
215-504-4622

Ronald E. Synder, M.D.
08/14/2024

Page 85

1    treatment with Desert View Eye Care is related

2    to the burn injuries?

3         A.    No, but she sought evaluation because

4    of the potential.  But what the diagnosis was

5    was the usual optometric problems of growing

6    older.

7         Q.    Okay.

8               And then the COVID issue, obviously,

9    unrelated to her burn injuries, correct?

10        A.    Correct.

11        Q.    Okay.

12              On page 13, you discuss the current

13   treatment that she is going through.

14              And at No. 3a on that page, you

15   reference some laser therapy and injections,

16   correct?

17        A.    Correct.

18        Q.    Do you know what frequency she is

19   getting laser therapy?

20        A.    Not much at all.  So she can't get it

21   locally.  It's a three-hour drive.  And by the

22   time she drives and waits for the appointment,

23   gets the treatment and so forth, she's,

24   basically, indicating that she can't afford it.

25   Also, she has to have her husband take off to do

Ronald E. Synder, M.D.
08/14/2024

Page 86

```
 1   it.
 2              So, I mean, I had a long discussion
 3   with her.  I told her she needs to move to Utah.
 4   And she's not been able to get a lot of
 5   treatments.  From what my understanding is, it's
 6   basically because of the travel and the time off
 7   from work and so forth.  So she's missing a lot
 8   of the treatments.
 9              And the treatments she told me she
10   needed to be every two weeks, every six weeks.
11   And that's why I thought, when I got that story,
12   we really need to have a plastic surgeon to give
13   me the optimal number of what needs to be done
14   so I can provide an appropriate life care plan.
15       Q.    So as far as laser therapy treatments
16   going forward, you don't have an opinion as to
17   what those may be, correct?
18       A.    Well, she's had a lot.  And she
19   actually had to have anesthesia for it.  They're
20   large areas.  But, again, I don't have a plan.
21   And I don't have, actually, the area.  And I
22   would kind of like need to have a plastic
23   surgeon let me know what the CPT code would be
24   for that and so forth to really accurately
25   provide a life care plan.
```

Ronald E. Synder, M.D.
08/14/2024

Page 87

```
 1        Q.    Right.

 2              So as you sit here today, you, number

 3    one, don't know the frequency of laser therapy

 4    treatment that she'll need going forward,

 5    correct?

 6        A.    Correct.

 7        Q.    And you don't know the duration,

 8    meaning how many years into the future or how

 9    often she'll need the laser therapy treatment,

10    correct?

11        A.    Correct.

12        Q.    And you don't have the cost of the

13    laser therapy treatment, correct?

14        A.    Correct.  So I only put in office

15    visits.  And I don't have any procedures.

16        Q.    And as far as the injections that she

17    is getting or has received, do you know what

18    those injections are and where they are located?

19        A.    I don't.  It sounded like they may

20    have been PRP.  It sounded like it may have been

21    the stem cell stuff.  It also sounded like maybe

22    some steroids which are often injected, but I

23    don't know what their plans are.

24        Q.    Okay.

25              So similar questions with respect to
```

Ronald E. Synder, M.D.
08/14/2024

Page 88

1      the injections, as you sit here today, you do

2      not know the frequency in which she may need

3      those going forward, correct?

4          A.    That's correct.

5          Q.    And you don't know the duration in

6      which she may need those going forward, correct?

7          A.    Correct.  That's outside of my

8      wheelhouse of experience and training and

9      background.

10         Q.    And you don't know the cost of the

11     injections going forward, correct?

12         A.    I would be able to do the cost if I

13     knew the procedures, but I do not at this time,

14     that's correct.

15         Q.    And then with respect to her feet, it

16     looks like she has had treatment on her left

17     foot a couple of times, and there's some pending

18     treatment on her right foot.

19         A.    Yes.

20         Q.    Okay.

21               Do you know what the treatment on her

22     left foot has been and what the pending

23     treatment for her right foot is to be?

24         A.    I kind of do.  And I would end up

25     respectfully asking you to turn to look at what

Ronald E. Synder, M.D.
08/14/2024

Page 91

1          Q.     With respect to the calluses that she

2     has on her left and right foot, as you sit here

3     today, you don't know what type of treatment she

4     will require going forward, correct?

5          A.     Correct.  I mean, my experience has

6     been, they've done radiation to some of my

7     patients that have done this.  I've seen where

8     they do cold laser treatments, two treatments.

9     I just don't know.  I think, certainly, just

10    shaving off the calluses, which is what she has

11    had so far, is not appropriate, and she's going

12    to need more than that, but I don't know.  I

13    have to refer to a plastic surgeon.

14         Q.     And you don't know what type of

15    duration of treatment she may need to address

16    the calluses on her feet, correct?

17         A.     Correct.  And that may be open-ended.

18    They may need to do that for a lifetime.  I

19    don't know.

20         Q.     The inverse of that is, it may not

21    need to be done for her lifetime, correct, you

22    just don't know?

23         A.     Correct.

24         Q.     Okay.

25               And the cost associated with any

Ronald E. Synder, M.D.
08/14/2024

Page 92

1    treatment for the calluses on her feet, as you

2    sit here today, you also don't know that,

3    correct?

4         A.    Correct.  I would have to defer to a

5    plastic surgeon, who needs to see the patient

6    and help me to provide any further response.

7         Q.    And going to page 14 of your report,

8    this is where you have a picture of the four

9    children as well.  And you indicated that they

10   were present during the home visit, correct?

11        A.    They were.  They were watching TV.  I

12   was sitting where I'm sitting, there's a dining

13   room table and we were sitting at the dining

14   room table, and the children were watching

15   cartoons.

16        Q.    Okay.

17              Did you, aside from any pleasantries,

18   interact substantive with the Wadsworth

19   children?

20        A.    I did.

21              The one child, Weston, when I found

22   out that he was having problems and had burns

23   and was reduced to wear shorts and so forth, I

24   did see him, I did examine him, I did photograph

25   some of the burns, but did not issue any reports

Ronald E. Synder, M.D.
08/14/2024

Page 96

1    sleep issues prior to the fire?

2         A.    I believe I asked her question, but

3    I'm trying to remember herself.  She did have

4    some problems with depression minimally at one

5    time in her life.  But she described, I believe,

6    the sleep is definitely a new thing, from what I

7    recollect.  I don't have it listed, but I'm

8    trying to remember.  And I remember kind of

9    going into that.  It's definitely worse at this

10   point.  But I don't know whether or not she had

11   some mild sleep problems.  But, to my knowledge,

12   it's definitely worse.  That's the best I can

13   answer.

14        Q.    Do you know whether she was sleeping

15   on a small foam mattress in the living room

16   prior to the fire due to sleep issues that she

17   was having?  Are you aware of that at all?

18        A.    No.

19        Q.    Were her prior pre-fire sleep issues

20   discussed at all with you during your interview,

21   or did you focus on the post-fire or both?

22        A.    I think I did ask, so did you have

23   sleep problems in the past.  And I just -- I

24   thought maybe she had some mild sleep problems,

25   and that they were worse, to my best

Ronald E. Synder, M.D.
08/14/2024

Page 101

```
 1    intubated for multiple weeks, she would have

 2    been on medication that would have prevented

 3    withdraw.  So by the time she became more awake

 4    and conscious, she would have been past the time

 5    for withdraw symptomatology, in my background

 6    and training.

 7         Q.    On to page 16, these just discuss

 8    some of the pre-fire medical issues that she

 9    had, correct?

10         A.    Correct.

11         Q.    And one is the postpartum depression,

12    which you already mentioned.  She also had back

13    pain and back surgery as a result of that.

14               You're aware of that, correct?

15         A.    I am.

16         Q.    And I'm going to butcher this, but

17    vitiligo --

18         A.    Vitiligo.

19         Q.    Vitiligo - V-I-T-I-L-I-G-O, Betsy - I

20    had to Google it, but it's, basically, a

21    pigmentation issue with the skin, correct?

22         A.    Yes.  You know, in preparation for

23    the depo, I realized that I did not know how to

24    address that and plastic surgery is going to

25    need to address that.  So you end up having a
```

Ronald E. Synder, M.D.
08/14/2024

Page 102

1    pigmentation problem, but then if you have a

2    burn that goes into the pigment layer, I don't

3    know whether or not additional services are

4    going to be required because of the preexisting

5    condition.

6              We did talk about tattooing eyebrows

7    and so forth.  There are ways -- and she has

8    some changes in the pigmentation in the forehead

9    and so forth.  I think plastic surgery may treat

10   her slightly differently because of that

11   diagnosis.  She may be at more of a risk of a

12   more intense treatment.

13        Q.    Okay.

14              Do you know where the pigmentation

15   issue affected her prior to the fire?

16        A.    I do not.

17        Q.    Is there a typical location that the

18   pigmentation issue generally affects someone or

19   is it really just --

20        A.    I haven't read the literature.  In my

21   experience, I've seen it everywhere, so I don't

22   know.

23        Q.    So it really depends on the patient,

24   it could be various parts of the body?

25        A.    Correct.

Ronald E. Synder, M.D.
08/14/2024

Page 104

1      A.    I don't.

2      Q.    And it looks like the only current

3  medication she is on is the Resta Lite lotion;

4  is that correct?

5      A.    Yes.  She'll either use that.  Or if

6  she doesn't have the money to buy that, she'll

7  just use lots of regular Vaseline.

8      Q.    And the Resta Lite lotion I presume

9  is used for all of her burn injuries?

10     A.    Yes.

11     Q.    And is that an over-the-counter or is

12 that a prescription?

13     A.    I believe it's over-the-counter.

14     Q.    At this point is she taking any other

15 medications currently?

16     A.    She's not.  She is, basically,

17 self-medicating to sleep with alcohol, rather

18 than using prescriptive meds.

19     Q.    Okay.

20           And have you discussed her smoking

21 habits with her?

22     A.    Well, we did.  And, again, I'm a

23 midwesterner and I'm used to being out in the

24 mid-west, and I saw a lot of people smoking and

25 a lot of people using alcohol.  And I talked to

Ronald E. Synder, M.D.
08/14/2024

Page 105

```
 1    her.  She smoked a pack a day and has done so

 2    for 20 years.  And I've spent some time talking

 3    to her about needing to stop the cigarettes as

 4    well.

 5         Q.    And the cigarette use obviously with

 6    it being 20 years at about a pack a day

 7    certainly predated the fire, correct?

 8         A.    Correct.

 9         Q.    And it's still ongoing today?

10         A.    Correct.

11         Q.    Going to page 18, and on this page,

12    you get into the Activities of Daily Living

13    Checklist.  And it looks like this is likely

14    taken basically from her ADL questionnaire?

15         A.    Correct.  This is a lady who says

16    Don't tell me I can't do it, I can show you I

17    can.  And so she does everything.  And she

18    leaves a trail of blood behind.  She talks about

19    when she does the laundry, her hands bleed.

20    When she cooks, her hands bleed.

21               So she, basically, does everything,

22    but then has skin breakdown when she does some

23    of the things.  But she, basically, is pretty

24    activity and really tries not to let this

25    discourage her from being a day-to-day
```

Ronald E. Synder, M.D.
08/14/2024

Page 106

1    functioning person.

2         Q.    Does she wear any protective gloves

3    when she does her ADLs?

4         A.    No.  We talked about wearing some

5    gloves when she's out and about.  But you can't

6    use gloves when you're cooking.  You can't use

7    gloves, like, when you're reaching into the

8    washer and dryer, she'll scrape her hand and

9    she'll bleed.  So they don't wear gloves

10   normally throughout life.  But you'll do it if

11   you think you're doing something active like

12   gardening and so forth.

13        Q.    Does she use gloves at all for any

14   ADLs?

15        A.    I don't know.  I know we talked about

16   gloves, but I don't remember whether she uses

17   them or not.  I didn't see any or I would have

18   photographed them.

19        Q.    So at least by Mrs. Wadsworth's

20   self-reporting, she says that she does not need

21   help with her ADLs, correct?

22        A.    She doesn't say she doesn't need

23   help.  She says, I'm doing it myself.  She never

24   asks for help.  When I talked about what we

25   would put in the life care plan, she was open to

Ronald E. Synder, M.D.
08/14/2024

Page 133

1    to her now and needed to come, and they grow

2    back very quickly.

3         Q.    And you don't know if there's any way

4    to permanently remove those lesions at this

5    point, correct?

6         A.    And, again, and if I could have a

7    plastic surgeon opine, I would certainly defer

8    to the plastic surgeon on that.

9         Q.    Okay.

10        So with these three line items, is it

11   your anticipation that you will be doing

12   additional work on these line items?

13        A.    I would certainly hope so, or it's

14   just not brought to the table, and there's no

15   money put aside for that.  I certainly can't

16   apply -- I have to stay within my wheelhouse of

17   background and training.

18        Q.    Okay.

19        And, certainly, understanding your

20   background and training, you agree, as you've

21   noted in your report, that, at this point, you

22   are unable to determine the cost of these three

23   line items, correct?

24        A.    And the frequency, that's correct.

25   And I would end up asking them to help me with

Ronald E. Synder, M.D.
08/14/2024

Page 134

1    the CPT codes.  One of the problems is, when

2    they've done the CO2 burns, if you read the

3    records, it includes the anesthesia and it

4    included several large areas.  And so I presume

5    there are different CPT codes, given the amount

6    of space or the amount of surface area, as well

7    as the duration under anesthesia.  So there's

8    just a lot of stuff that I would not be able to

9    add.

10        Q.    And you are not able to add that

11   without further guidance from her treating

12   physicians, true?

13        A.    Absolutely.

14        Q.    Okay.

15        A.    Or an expert.

16              Often, I find my university treating

17   doctors are not even permitted to offer legal

18   opinions, and so sometimes we have to go and

19   hire an expert.  So we just need to have a

20   plastic surgical expert to be able to offer

21   those opinions.

22        Q.    Okay.

23              With respect to the "Semi-Permanent

24   Tattoo for Her Right Eyelid," is that something

25   that Mrs. Wadsworth has expressed an interest in

Ronald E. Synder, M.D.
08/14/2024

Page 135

1    getting?

2        A.    We talked about it.  She's

3    embarrassed.  And so I did do the pricing and

4    found that it doesn't last forever, and so we've

5    got that as a potential charge.

6              And, again, I would probably ask a

7    plastic surgeon their opinion.  Maybe do a

8    permanent one.  I don't know what's out there.

9    I'm not a cosmetic person, and so I would

10   probably defer, again, for a plastic surgeon for

11   his or her opinion on that.

12       Q.    Okay.

13             And that was going to be my next

14   question, is there a permanent option in that

15   regard, understanding that tattoos can certainly

16   be permanent in nature?

17       A.    Yes.

18       Q.    But you just don't know?

19       A.    Correct.

20             In looking at the literature for

21   eyebrows, they strongly suggested not doing

22   permanent, but, again, I don't know why.  I

23   would defer really to an plastic surgeon.

24   That's something I would have an expert help me

25   with.

Ronald E. Synder, M.D.
08/14/2024

Page 136

1        Q.       So with respect to the $34,000

2    lifetime cost, it sounds like that you may need

3    a little more guidance from a plastic surgeon to

4    really finalize that line item?

5        A.       I agree.  And when I was preparing

6    for the deposition and doing the report, it's

7    like these whole plastic surgical procedures, if

8    you ask me for an artificial arm or a leg or

9    therapy after stroke, that's my wheelhouse.  At

10   this point, I have to rely on an expert.  I can

11   do the pricing, identify the pricing, but the

12   frequency and type of procedure, I would really

13   need to have an expert.

14       Q.       And then you have ER visits of one

15   time every five years.

16                What's the basis for that?

17       A.       The basis is, basically, cellulitis.

18   Her skin breaks down.  She gets infected.  She

19   bleeds all day long when she puts her hands into

20   stuff.  So there's the potential for cellulitis.

21   She has had cellulitis of the earlobe.  So to be

22   able to say every five years to identify a

23   probability is pretty low.  And it's just for an

24   ER visit rather than a hospitalization.

25       Q.       Has she had any other cellulitis

Ronald E. Synder, M.D.
08/14/2024

Page 138

```
 1        A.      I don't know --

 2        Q.      -- for her cellulitis?

 3        A.      -- but just because somebody has not

 4   done it does not preclude them from wanting to

 5   utilize it.

 6              MR. LaFLAMME:   Off the record.

 7              (Discussion off the record.)

 8        Q.      Doctor, going on to page 66, which is

 9   "MEDICATIONS," for all of the medications that

10   you have listed here, she is not presently using

11   any of them, correct?

12        A.      Correct.  I did relate to her some of

13   the medications I thought would be appropriate

14   that she should be on.  And I felt that if she

15   was on appropriate medications, she would not be

16   utilizing alcohol.

17        Q.      And do you know if she has made any

18   efforts to discuss these medications with her

19   treating physicians?

20        A.      I do not.  I have not seen her since

21   the home visit.

22        Q.      And you have not seen anything in her

23   records where she was prescribed any of these

24   specific medications, correct?

25        A.      She was on Duloxetine at one time,
```

Ronald E. Synder, M.D.
08/14/2024

Page 139

1    but the rest of these medications are to protect

2    her stomach preventively and so forth, no, I

3    don't see that she's been on any of them.

4        Q.    And not only that she has not been on

5    any of them, she hasn't been prescribed any of

6    them, correct?

7        A.    Correct.

8        Q.    And, Doctor, if you can go to page

9    68, which is the "SPECIAL EQUIPMENT" section,

10   and then this is where you get into some

11   discussion about at least one of the items is a

12   scooter or a couple of scooters?

13       A.    Correct.

14       Q.    One is a more traditional motorized

15   scooter, and one is an all terrain scooter,

16   correct?

17       A.    Correct.

18       Q.    She doesn't use either of these

19   presently, correct?

20       A.    Correct, but she will use -- when she

21   goes to Walmart, she will use their scooter.

22   But she was a very active lady, hunting and

23   fishing and very active going out into the -- I

24   mean, there are no repertory theaters where she

25   is.  They go out and do outdoor activities.  And

Ronald E. Synder, M.D.
08/14/2024

Page 142

1    Those are not issues -- you know, counselor,

2    when a doctor sees a patient, they figure out

3    what they need to do.  They don't think about

4    life care planning and hobbies and so forth, so

5    those have not been addressed, that's correct.

6        Q.    And you have seen medical records

7    from her podiatrist, correct?

8        A.    That they did procedures, that's

9    correct.

10       Q.    And within those medical records,

11   there's no reference or even suggestions that

12   she obtain a scooter, correct?

13       A.    Correct.  You're talking about a

14   podiatrist.  You're not talking about a

15   long-term prescription by a physiatrist or a

16   life care planner.  They're podiatrists.

17       Q.    But with respect to - and I'll just

18   ask it even more broadly - with respect to all

19   of her medical treaters and all of the medical

20   records that you've reviewed, there has not been

21   a mention or suggestion of the use of a scooter,

22   correct?

23       A.    Correct.  None of them have been

24   asked to provide long-term planning for home

25   capabilities.

Ronald E. Synder, M.D.
08/14/2024

Page 145

1    or inside the house at a later age?

2          A.    No.  I think at 50 would be the time

3    that she's going to need to offload, whether

4    it's in the home or outside the home.  But,

5    basically, she's using no assistive devices now,

6    and I really think by about 50, she's going to

7    need it in the home and definitely outside the

8    home as well.

9          Q.    In her medical records, you haven't

10   seen any discussion or suggestion about a

11   walker, correct?

12         A.    Correct.  I don't see that anybody

13   asked that question or talked about it, that's

14   correct.

15         Q.    And if you could go to page 71, and

16   this relates to a van purchase and subsequent

17   purchases.

18               Do you see that?

19         A.    Correct.

20         Q.    What type of vehicle does she drive

21   presently?

22         A.    I think she's got a truck.

23         Q.    Does she have any complaints about

24   using the truck?

25         A.    No, but we're talking about what do

Ronald E. Synder, M.D.
08/14/2024

Page 146

1   we do so she can go places, to put her scooter,

2   and, particularly, an all terrain scooter when

3   she went places.

4            So, counselor, I don't know what

5   bucket of money pays for this, but in order to

6   go places, she needs a van that can take the

7   scooter, and so that's what's needed.  I don't

8   know who is going to pay for it.  Does it

9   normally come out of what normal people buy; I

10  don't know.  But from a practical perspective,

11  she's going to need a van to be able to use that

12  scooter to go places.  So if you need this, you

13  need that.  It is what it is.  That's all I can

14  say.

15       Q.    Okay.

16            You would agree that she would have

17  -- let's assume this fire never happened, if she

18  wanted to purchase vehicles for her own personal

19  use moving forward, she would have that cost

20  anyway, correct?

21       A.    Absolutely, but not the

22  modifications.

23       Q.    And with respect to the van items, is

24  that only required in your mind due to the all

25  terrain scooter?

Ronald E. Synder, M.D.
08/14/2024

Page 147

1       A.      Yes.  And, actually, taking the other

2    scooters, too, to, perhaps, church or other

3    places, but the all terrain, the basic reason is

4    so she can go out and about for either of the

5    two scooters.

6       Q.      It relates to both the scooters, not

7    just the all terrain scooter?

8       A.      Correct.

9       Q.      And do you know how often the

10   Wadsworths typically replace their vehicles?

11      A.      I don't.

12              The normal replacement, most people

13   replace it in seven years.  The problem is the

14   mechanics, the hydraulics don't last more than

15   about five years.  So standard, we replace

16   anything that requires hydraulics in five years

17   because of the possibility of being stranded

18   with a ramp left out and you can't get it in or

19   being able to shut the doors and so forth.  So

20   the standard is we replace it every five years

21   for vans, if there are hydraulics involved.

22      Q.      Wouldn't you only need to replace the

23   actual hydraulics, then, not the van?

24      A.      You could do that, but then the cost

25   of doing that is equal to the value of the van,

Ronald E. Synder, M.D.
08/14/2024

Page 148

1    so, no, they're just traded out.

2        Q.    And then I assume, and you do list a

3    resale value after the five years, so you would

4    deduct that from any future purchases, correct?

5        A.    Correct.

6        Q.    So, basically, just to use your

7    numbers, you're purchasing a van at 47, but

8    you're turning in a van that has a 31K value,

9    then at least for your price that you list for

10   the subsequent purchases, it's a 15K, the

11   difference between those two?

12       A.    Correct, correct.

13       Q.    For the - and this is, obviously, a

14   small ticket number - AAA membership, what's the

15   purpose of that?

16       A.    If you have somebody who can't walk

17   distances or can't stand, particularly, on the

18   hot pavement out in Wyoming, they don't do well

19   if you're not dealing with the right people to

20   come in and help them.  So any time we have a

21   van and potential mobility issues, we always put

22   in AAA.

23       Q.    Do you know if they're AAA members

24   already?

25       A.    I do not.

Ronald E. Synder, M.D.
08/14/2024

Page 149

```
 1        Q.    Going to page 72, where we get into
 2   home modifications.
 3              When do you anticipate home
 4   modifications needing to be done?
 5        A.    I indicated one time in a lifetime.
 6   And I would presume probably at 40 to 50 years
 7   of age is when I'm talking about needing that
 8   walker.  And that's when I would presume that
 9   she would use that mobile device in the home
10   more than just out and about.
11        Q.    But you tie the home modifications to
12   the use of the walker?
13        A.    Around 50 years of age, the aging
14   process and pain and so forth.
15        Q.    And when you have the average cost
16   per year for lifetime here, is this cost being
17   obtained as a result of bids received from
18   contractors, or is this being obtained through
19   various web searches?
20        A.    So the Veterans Administration
21   indicates about $120,000 for somebody who is
22   wheelchair dependent.  And a lot of that -- hold
23   on one second -- basically, that research is in
24   the back here.  We basically indicated what the
25   patient was going to need.
```

Ronald E. Synder, M.D.
08/14/2024

Page 152

1    services?

2        A.    Correct.

3        Q.    All of the items that the personal

4    care attendant would help with, she is presently

5    doing, correct?

6        A.    Correct.

7        Q.    And she's presently doing them to the

8    extent that, on your questionnaire, she said she

9    does not need help with them, correct?

10       A.    Correct.

11       Q.    With the "Home Maintenance," she is

12   married, correct?

13       A.    Correct.

14       Q.    Do you know what home maintenance she

15   was doing prior to the fire?

16       A.    No.  But, counselor, right now, we

17   have a 52 percent divorce rate among Americans.

18   If you have a patient who has pain and

19   disabilities, it's about a 73 percent divorce

20   rate.  So if we, in the legal system, talk about

21   the more probable than not, the idea is to at

22   least provide some kind of security for her home

23   that we're going to give her that there's going

24   to be some maintenance to take care of that and

25   not know that there's going to be a husband

Ronald E. Synder, M.D.
08/14/2024

Page 153

1    that's going to be there.

2              So if I deal with the percentages,

3    the more probable than not, I've got to think

4    that, and I agree it's very minimal, but it's

5    five hours a month to do that.

6         Q.    So in order for the "Home

7    Maintenance" line item to be valid, there's an

8    assumption that she's going to get a divorce

9    from Matthew?

10        A.    Well, when we work around more

11   probable than not.  So if we talk about a

12   disabled person, there's a very high

13   probability, it's more than 50 percent, that

14   they're going to be single in their life.

15        Q.    You haven't read Matthew's or

16   Stephanie's depositions where I asked them about

17   how their relationship was?

18        A.    No.  I presume it's good at this

19   point.

20        Q.    And you don't have any information as

21   to how their relationship is, correct?

22        A.    Correct.  I'm just dealing with

23   understanding statistics.

24        Q.    Did you have a discussion with

25   Mrs. Wadsworth during your home visit about the

Ronald E. Synder, M.D.
08/14/2024

Page 154

```
 1    strength of her marriage?

 2        A.    No.

 3        Q.    So if Mr. or Mrs. Wadsworth stay

 4    married, you would agree the home maintenance

 5    aspect of your life care plan would not be

 6    necessary?

 7        A.    That's correct.

 8        Q.    With respect to the "Personal Care

 9    Attendant," are you aware of any medical records

10    from any of her treaters that discuss or suggest

11    that she get a personal care attendant to help

12    with some ADLs?

13        A.    No, I don't think they've ever been

14    asked that question.  That's why I need to reach

15    out to the treating doctors to ask that

16    question.

17        Q.    And you're aware that there was a

18    date for expert disclosures in this case, and

19    for yours, it was July 15th, correct?

20        A.    I don't know.  That's not part of my

21    purview.  I see a patient and write a report.

22    That's your stuff.

23        Q.    Okay.

24             With respect to page 74, you have two

25    line items, "Phoenix World Burn Congress
```

Ronald E. Synder, M.D.
08/14/2024

Page 162

1    was I comfortable with what I was relating.  And

2    I, basically, discussed with him the need for

3    getting additional consultations, as we

4    discussed earlier today, the need for additional

5    experts.

6         Q.    And what additional experts did you

7    request?

8         A.    The plastic surgery discussion in the

9    future; perhaps ophthalmology for the corneal

10   abrasions, and ear, nose and throat for the

11   tracheal burns.

12        Q.    So ENT, ophthalmology and plastic

13   surgery?

14        A.    Plastic surgery/burn therapies.

15        Q.    And did you discuss any specific

16   doctors that you would recommend using in that

17   regard?

18        A.    I did not, but I did indicate that we

19   were waiting to perhaps hear from

20   Dr. LeChapelle.

21        Q.    Okay.

22              And in your mind, there is additional

23   work on your end to be done on those three items

24   where you don't have any duration, frequency or

25   costs associated?

Ronald E. Synder, M.D.
08/14/2024

Page 174

1       A.      That's correct.

2       Q.      You were asked questions about your

3   experience as an expert witness in these types

4   of litigation matters, and whether you've ever

5   had any of your opinions stricken by a court.

6               Do you remember some of those

7   questions early on?

8       A.      Yes, yes, I do.

9       Q.      And if I wrote correctly in my notes,

10  there was reference to a Collett case that was

11  discussed with you, and whether you were aware

12  of your either opinions being stricken or you

13  even being stricken as an expert.

14              Do you remember some of those

15  questions?

16      A.      Yes.

17      Q.      Did I understand your testimony that

18  you have no personal knowledge of any findings

19  of that board or what may have happened, what

20  may have been argued or otherwise, correct?

21      A.      Correct.

22      Q.      Certainly, can I at least safely

23  assume that, at no point in time, do you

24  intentionally endeavor to go beyond the scope of

25  your background, your training, your experience

Ronald E. Synder, M.D.
08/14/2024

Page 175

1    when you're rendering opinions relating to

2    either the life care planning for a patient or

3    for a plaintiff, or the treatment as a

4    physiatrist of a patient?

5          A.     Absolutely.  I mean, this case

6    demonstrates why I just need to reach out to

7    certain other treaters and certainly not handle

8    the decisions on my own.

9          Q.     And despite, I think, it's, what, the

10   170-odd pages of the complete report that you

11   tendered over, despite as extensive as it is, as

12   detailed as it is, there are portions that we've

13   gone through, there are portions where you did

14   not render opinions as to the exact type of

15   treatment needed, the frequency, or even the

16   costs associated with that treatment, because,

17   frankly, it just goes beyond your scope of

18   expertise.

19              Is that fair?

20         A.     That's fair.

21         Q.     And that's what we talked about with

22   the plastics, with the ophthalmology and even

23   with the ENT?

24         A.     Correct.  I don't know what

25   procedures they're going to suggest.  I think