# EXHIBIT 3

Page 1

```
 1                UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF WYOMING
 2

 3

      STEPHANIE WADSWORTH,
 4    Individually and as
      Parent and Legal Guardian   CASE NO.:
 5    of W.W., K.W., G.W., and     2:23-cv-00118-NDF
      L.W., minor children, and
 6    MATTHEW WADSWORTH,
 7       Plaintiffs,
 8    vs.
 9    WALMART, INC. AND JETSON
      ELECTRIC BIKES, LLC,

10

         Defendants.
11    _____/
12

13

14

                   VIDEOTAPED REMOTE DEPOSITION OF
15                 CALLIE M. THOMPSON, M.D., FACS
                        Pages 1 to 56
16

17                     October 15, 2024
                  12:34 p.m. ET to 1:51 p.m. ET
18                10:34 a.m. MT to 11:51 a.m. MT
                     Via Zoom Videoconference
19

20

                   Stenographically Reported By:
21          HEATHER M. ANDREWS, Certified Court Reporter,
                        Notary Public
22

23

24                      Videotaped By:
25                 COREY MCMILLAN, Videographer
```

1    that.

2        Q.    That's okay.  We'll go through it in a minute.

3    I'll ask you some questions as we go through this

4    process, and certainly if there's ever a moment where

5    you feel you need to go to the record, that's fine.

6    Just let me know what you're looking at so we're looking

7    at the same thing.  Okay?

8        A.    Yep.

9        Q.    Certainly after she was discharged from her

10   initial admission you continued to follow up with

11   Stephanie and to provide her care and treatment

12   primarily through the laser therapy you described is

13   that right?

14       A.    That's correct.

15       Q.    And just so I understand and the jury, if they

16   get to read your deposition transcript, understands at

17   the university and specifically within the burn unit,

18   would it be fair to say all of the health care providers

19   operate as a team?

20       A.    That's correct.

21       Q.    And so by way of example as Stephanie is

22   admitted under your service, certainly there would have

23   been other surgeons as well that would have cared for

24   her and treated her over the course of her admission?

25       A.    Yes, that's correct.  In 2022 when she was

Page 12

1    admitted there were three burn surgeons here.

2        Q.    Would that have included Dr. Lewis?

3        A.    Dr. Lewis and Dr. Fleming.

4        Q.    At some point in time did Dr. LaChapelle come

5    on board for purposes of treating burn survivors?

6        A.    Yes.   He joined us in October of 2022.

7        Q.    So even though you would have been the

8    admitting and attending for Stephanie back in February

9    and March of 2022, Dr. Lewis and Dr. Fleming would have

10   also been involved in her care and treatment?

11       A.    That's correct.   We take calls Friday morning

12   at 6:00 a.m. to the following Friday morning.   So we

13   switch off Friday mornings and we hand over the entire

14   service so all of the care to the patients is completely

15   handed off to the next person who is on call.

16       Q.    We can flip to whatever note you would like to

17   but let me just ask you generally, are you familiar with

18   the extent of Stephanie's burn injuries, at least as of

19   her admission from February of 2022?

20       A.    Yes.

21       Q.    Okay.   Describe for the jury what your

22   knowledge and recollection is of Stephanie's injuries

23   were back in February of 2022?

24       A.    So I'm going to look at the H&P from February

25   1st, 2022 that was co-signed by my partner, Dr. Irma

1  patient reports less itching, more pliability, improved

2  function.  If they're working we do -- so we do four and

3  then we reassess and we do an additional four.  Those

4  laser treatments should be four to eight weeks apart

5  ideally, but they don't have to be that distance apart

6  for efficacy.  That's just ideal.

7      Q.   If they are working is the maximum amount of

8  treatments eight?

9      A.   Typically, yes.

10     Q.   What happens if laser treatment fails?

11     A.   So if it isn't working for a patient then we

12 utilize our alternative scar management, which is

13 compression, silicone, scar massage and time.  We didn't

14 have laser before really like 2016.  We weren't doing it

15 regularly and it was just people waited for their scars

16 to improve with time.

17     Q.   As it pertains to Stephanie Wadsworth do you

18 know how many laser treatments she has undergone to

19 date?

20     A.   I can look for you.  I feel like she's almost

21 towards her end but let me double check.

22     Q.   Sure.

23     A.   She completed her eight treatment on -- there's

24 an H&P that's co-signed by Dr. Lewis on 8/5/2024 that

25 was for her eighth treatment.  So she should, based on

1  our typical practice, be having a visit with one of the

2  burn surgeons here to discuss next steps for scar

3  management after the eighth treatment.

4      Q.   And that's a record that I don't have yet since

5  it's only been, I guess, a couple of months since then.

6           But did Dr. Lewis discuss in any of her entries

7  the expected plan or prognosis for Stephanie as it

8  relates to caring for those scars?

9      A.   The only statement I have, I can read it for

10  you, is that "Patient has completed the recommended

11  eight treatments per our burn center practice guideline.

12  We in assessment will include a provider and therapy

13  assessment using the VBSS measurement tool in four to

14  six weeks.

15      Q.   All right.  Sitting here today do you know if

16  that follow-up and reassessment has been scheduled?

17      A.   It has not been scheduled.  It appears that

18  Stephanie was working on rescheduling and has not

19  messaged back in our patient message portal.

20      Q.   You have an understanding that Stephanie and

21  her family live in Wyoming?

22      A.   Yes.  They live in Green River I believe.

23      Q.   When Stephanie would come for these laser

24  treatments, would it be -- if you know, would it be

25  typical for her to stay overnight given the distance?

Page 24

1    surgeons that get together every other month and we

2    review cases.  And we review what the patients are

3    unhappy about, what they would like potentially to have

4    intervened upon.  Then we discuss as a group whether or

5    not we actually have the ability to do that because

6    there's things people want changed that medicine just

7    can't provide that.

8        Q.    And by way of example one of the areas which

9    she has at least voiced to you having concerns about,

10   and if I can use that term for a moment, would be her

11   face or her forehead.

12             Is she a candidate for any type of scar

13   revision surgeries relating to those issues?

14       A.    Probably not because it's her forehead and not

15   her haired part of her head so things like tissue

16   expanders aren't really going to fix the problems she

17   wants us to fix.

18       Q.    Okay.  How about relating to the scars that she

19   has on her hands, are there scar revision surgeries that

20   are available to her to address those issues?

21       A.    Not if she has full functional capacity.

22       Q.    Are there any areas of her body that based on

23   at least your recollection and last visit with her, you

24   believe she would be a candidate for scar revision

25   surgery?

Page 25

1       A.    Not at this time but we haven't seen her post
2    her eighth laser.
3       Q.    Okay.  Would the reassessment or that follow-up
4    visit following her eighth laser on August 5th, I think
5    you said it was, would that reassessment take into
6    account any potential future care needs, procedures or
7    treatments for Stephanie?
8       A.    Yes, it would.
9       Q.    Is there an individual within the burn unit who
10   would be responsible for that reassessment or would it
11   be any one of the three or four folks that you
12   mentioned?
13      A.    It would be any one of us except for
14   Dr. Fleming who doesn't do reconstruction on hands.
15      Q.    Okay.  Sitting here today do you know who would
16   be tasked with that responsibility for the reassessment
17   for Stephanie?
18      A.    No, because it hasn't been scheduled.
19      Q.    One moment.  Let me just see if I can pull
20   something up here.
21           I'm just pulling up an H&P note from September
22   6th, 2022, and it lists you as the attending here.
23           Have you, probably not in anticipation of the
24   deposition, but I would assume at some point you would
25   have been involved in creation of this note or at the

Page 43

1      Q.    And outside of counsel did you speak to anybody

2    in preparation for today's deposition?

3      A.    I did not.

4      Q.    And you didn't review any of the records;

5    correct?

6      A.    Not before just looking in the chart, no.

7      Q.    In your professional opinion what is

8    Stephanie's future outlook with regards to her burn

9    injuries?

10          MR. AYALA:   Form.

11     A.    I would expect that she will have a full return

12   to her preinjury level of function and that she will

13   have a very personal response to her lifelong scars that

14   I cannot speak to.

15     Q.    (By Mr. Giroux)  And that personal response,

16   the reason you can't speak to that I think you talked

17   about earlier is because each survivor responds to burns

18   and deals with them differently; correct?

19     A.    Yeah.  And I think you can see that just

20   within, between Stephanie and Weston.  Weston lives

21   every day like he doesn't have a burn.

22     Q.    And how would you characterize Stephanie as

23   being different than Weston in that regard?

24     A.    Stephanie has always expressed to me a lot more

25   concern about the physical appearance of her scars.