# EXHIBIT 4

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STEPHANIE WADSWORTH, Individually and as Parent and Legal Guardian of W.W., K.W., G.W., and L.W., minor children, and MATTHEW WADSWORTH | : : : : : : |
| vs. | : CASE NO. : 2:23-cv-00118-NDF |
| WALMART, INC. and JETSON ELECTRIC BIKES, LLC | : : : |

- - -
Rock Springs, Wyoming
Tuesday, August 27, 2024
- - -

ORAL DEPOSITION of SCOTT SULENTICH, MD, taken pursuant to notice, held virtually, commencing at 2:30 CST, before Angela M. King, RPR, Court Reporter - Notary Public there being present.

- - -

LEXITAS LEGAL PHILADELPHIA
FULL SERVICE COURT REPORTING AGENCY
1600 MARKET STREET, SUITE 1700
PHILADELPHIA, PENNSYLVANIA 19103
(215) 504-4622
SERVING NJ, PA, NY & DE

Scott Sulentich
08/27/2024

Page 8

1  I am.
2  Q.  Sure.  We can -- we are here today as a result
3  of a lawsuit that was filed by Stephanie Wadsworth
4  as well as her husband for injuries that she
5  sustained in a fire in her home on February 1,
6  2022.
7      Does that refresh your recollection at all?
8  A.  I'm -- I'm familiar with the patient and why
9  I'm seeing her.  I'm just not sure what Wal-Mart
10 and the Wadsworths are fighting about.  I don't
11 know why I am involved.
12     I'm being honest and telling you that I have
13 taken care of her on more than one occasion.  But
14 I have no idea what's going on between you and
15 Rudy.  And I was asked, I believe by your firm, to
16 give a deposition.  And I agreed to do it.
17 Q.  I appreciate that.  I do not think you will be
18 here for very long today, so.
19 A.  Okay.
20 Q.  I will probably show you a few documents to
21 help move this along a little quicker.
22     Okay?
23 A.  Okay.  Yup.  Yes.
24 Q.  Can you just let me know, what is your

Scott Sulentich
08/27/2024

Page 9

```
 1   current -- you're a board-certified physician,
 2   correct?
 3   A.  I'm a board-certified plastic surgeon,
 4   correct.
 5   Q.  Okay.  And how long have you been a
 6   board-certified plastic surgeon?
 7   A.  Twenty years.  Twenty years.
 8   Q.  Prior to becoming a board-certified plastic
 9   surgeon, did you hold any other positions in the
10   field of medicine?
11   A.  I did not.
12   Q.  When did you graduate medical school?
13   A.  I graduated medical school in 1990.
14   Q.  Have you ever had your medical license revoked
15   or suspended?
16   A.  No.
17   Q.  Do you have any additional training or
18   certifications outside of what you received in
19   medical school?
20   A.  Well, after medical school, I did a general
21   surgery residency in Denver at St. Joseph's
22   Hospital from 1990 to 1993.  And then from 1993 to
23   1995, I did a plastic surgery fellowship at the
24   University of Tennessee in Memphis, which was a
```

Scott Sulentich
08/27/2024

Page 16

1                  (Document shared on screen.)
2    BY MR. GIROUX:
3    Q.   Do you see the document I pulled up, Scott,
4    that we will mark as Exhibit 86?
5    A.   Yup.  Yes.
6    Q.   Does this appear to be -- I will tell you what
7    I have is -- does this appear to be the entire
8    file?  Just gonna scroll through quickly.  It's
9    twelve pages in length.
10                 (Scrolls through exhibit.)
11              THE WITNESS:  That looks to be
12         about right.  Because I notice that in here
13         is, I believe, something disclosed protect
14         healthcare information from your firm.
15              So if I exclude that, it looks like
16         about twelve pages in my chart.  That would
17         be correct.
18   BY MR. GIROUX:
19   Q.   Okay.  So, why don't we just sort of go
20   through the file.
21        Can you tell me just generally, when do you --
22   why was Mrs. Wadsworth referred to you?
23   A.   She was referred to me for scarring on her
24   feet that was painful in shoes when she walked,

Scott Sulentich
08/27/2024

Page 17

1   and for treatment for those -- for those issues.
2   Q.   And who referred Mrs. Wadsworth to you?  If
3   you need me to scroll through to -- I'm not asking
4   you to guess.  If you need me to scroll through
5   the records or you need to look through your
6   records, please, feel free to do so.
7   A.   Yeah.  I am looking through my records.  But,
8   Jared, there are days where, you know, we will see
9   60, 80 people.  And so, I don't always get a
10  referral.  But there is work like -- I will just
11  tell you, like, that do not reach clinic.  And we
12  were laughing about it the other day.  It's up in
13  Lander, Wyoming.
14       And we had a morning where I looked out into
15  the waiting room when I got there, and there are
16  20 people there.  And I said, are all these people
17  scheduled?  And my staff said, no, they are not,
18  but they knew you were going to be here, so they
19  brought family.
20       So I -- I don't know how Stephanie was
21  referred.  I don't -- if -- if -- if there is a
22  referral letter that I think is appropriate, I
23  will write it down.  And when I write status post
24  extensive burns, that means -- I mean, that's why

Scott Sulentich
08/27/2024

Page 20

1   long time to measure, Jared, because it wasn't
2   part of -- I wasn't doing a burn resuscitation.
3   So, there was no reason for me to calculate the
4   percentage of her body area that was burned.  But
5   I would guess it was 50 to 70 percent.  It was a
6   lot.
7        So I feel like, you know, Kris is a
8   physician's assistant.  And just felt like she was
9   in over her head.  And so, she referred her to me.
10  Q.  Okay.  And when you say you didn't calculate
11  the percentage of the body that was burned, are
12  you talking about her entire body I presume?
13  A.  Correct.  I'm just saying when I -- like when
14  I write in my initial note "status post extensive
15  burns," she wasn't here for me to treat the
16  entirety of her burns.  She had a specific
17  complaint on the day that I saw her.
18       I did not take the time to get out, you know,
19  a measuring device or ruler and try to calculate
20  the percentage of body surface area that was
21  initially burned because it was irrelevant.
22  Q.  That's totally understandable.
23       So in other words, you were, essentially,
24  treating her for the burns on her feet and you

Scott Sulentich
08/27/2024

Page 21

1  were not evaluating the percentage of burns on her
2  entire body.
3      Is that fair?
4  A.  That's correct.  That's fair.
5  Q.  Okay.  And so, my understanding is that
6  Stephanie's complaints was that the scar and the
7  lesions on her feet were painful.
8      Is that fair to say?
9  A.  Correct.  She had -- she had lesions -- she
10 had hyperkeratosis and acanthosis.  And that is a
11 common sequella of burn patients and skin-graft
12 patients.  And so, those lesions on the soles of
13 her feet were like, you know, stepping on a pebble
14 in your shoe.
15 Q.  So, when did you first treat Stephanie?  And
16 feel free to refer to your records.
17 A.  Yeah, no I got it.
18     The first one we did was on October 24 of last
19 year.  And I did one area because I hadn't seen
20 her before.  Skin grafts are fragile.  And I
21 didn't want to treat several different areas and
22 have them all fail.  I want to sort of assess like
23 I wrote.
24     I wanted to assess her ability to heal, not

Page 39

1    Rudy as far as where did the bill go.  And I can
2    bill a million dollars, right, I'm not going to
3    get paid.  I have contractual -- you know, I have
4    contracts that say I'll accept whatever it is.
5         And I am sure we can provide that information
6    for both of you.  I just don't know.  But that
7    sounds right.  That sounds in the ballpark of what
8    we have billed.  I just have no idea what I got
9    reimbursed for it.  But --
10   Q.   Got you.
11   A.   -- I'm sure there is an EOB we can provide
12   through whatever legal process you guys -- you
13   know, whatever you send a request, and we'll send
14   it to you.
15   Q.   Okay.  In your professional opinion as a
16   board-certified plastic surgeon, what is
17   Stephanie's future outlook with regards to her
18   feet?
19   A.   I think it's more of the same.  But like I
20   said, I'm not -- I don't -- I don't feel like this
21   is going to create a -- I think it's going to
22   be -- I think it is potential -- let me back up a
23   half a step.
24        My first answer is, I don't know.

Page 40

```
 1        My second answer is, it will not surprise me
 2   if she requires ongoing care for these issues for
 3   the rest of her life because she's, hopefully,
 4   never going to stop walking.
 5        And so, she can continue to develop these
 6   lesions.  They can continue to treat.  As far as
 7   how many or how often, I can't predict that.
 8   That's why I wrote in one of my notes, follow up
 9   PRN.  Which I am sure you are both familiar, you
10   do this stuff.  It means "as needed" in Latin,
11   whatever it stands for.  And I told her, I'm happy
12   to see her and happy to help.  I just can't
13   predict how many, how often or how long.
14        From what I have seen of her, the lesions that
15   I treated, obviously, they're legitimate.
16   Obviously, they are bothersome.  As I mentioned to
17   you earlier, I'm not sure how many she has today,
18   but I will make note of that after, you know,
19   going through this process.
20        But -- and -- and to the best of my
21   recollection, she hasn't come in asking me to
22   remove all of them.  She has more than three, but
23   not all of them bother her.
24        And so, I explained to her that no surgical
```

Page 41

 1   procedure is without risk.  And it's one of the
 2   reasons -- I, usually, don't underline things,
 3   Jared.  And I said, you know, skin grafts are
 4   tenuous at best.
 5        And so, I was concerned enough about the fact
 6   that the entire plantar surface of her foot is
 7   skin grafted that I said, I am just not going to
 8   remove five or six of these things because they
 9   are there and I can.  I want to see how you heal.
10   Skin grafts are notorious for breaking down easily
11   if you disrupt them.  And so, I wanted to make
12   sure that her foot was stable enough to withstand
13   the procedure, right, to accomplish something good
14   for her.
15        And as I -- as I said earlier, not make a bad
16   decision worse by doing three, four, five at once
17   and then having five wounds break down that are
18   now a new problem for her.
19   Q.  It'd be fair to say, you don't know how many
20   lesions she may need to remove.  It's really up to
21   her and her pain tolerance level of what she can
22   deal with?
23   A.  That's fair.  That's fair.
24        But I would also add, it depends on how many

Scott Sulentich
08/27/2024

Page 42

1   develop, right?  Depends on whether or not she
2   develops more in the future.  And because it's
3   obviously -- I'm not trying to state the obvious
4   here and be flip.  I'm just trying to take this
5   thing whole thing seriously for everybody
6   involved.
7       Because it's the plantar surface of her foot,
8   she's going to be walking on it for the rest of
9   time.  There is just no way to tell how many or
10  how often she will develop these lesions.  That's
11  my best answer.
12  Q.  Understood.  I appreciate it, Doctor.  That's
13  very candid.  Thank you.
14      I am going to know the answer to some of these
15  questions, and I apologize.  I've got to ask them
16  on the record.
17  A.  Fair enough.
18  Q.  Have you ever reviewed a report from a
19  Dr. Ronald Snyder?
20  A.  For Stephanie?
21  Q.  Regarding Stephanie, yes.  I apologize.
22  A.  To the best of my knowledge, no, I have not.
23  I don't know that person.
24              (Document shared on screen.)