**EXHIBIT 3**

1              UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF WYOMING

3             CASE NO.: 2:23-CV-00118-NDF

4

5     STEPHANIE WADSWORTH, INDIVIDUALLY AND AS PARENT AND

6     LEGAL GUARDIAN OF W.W., K.W., G.W., AND L.W., MINOR

7             CHILDREN, AND MATTHEW WADSWORTH,

8                     Plaintiffs

9

10                        V.

11

12       WALMART, INC. AND JETSON ELECTRIC BIKES, LLC,

13                    Defendants

14

15

16

17

18

19

20

21

22

23   DEPONENT:  GREGORY E. GORBETT, PH.D.

24   DATE:      OCTOBER 24, 2024

25   REPORTER:  OLIVIA M. DOSKER

1    it did not actually transition to flaming.

2        Q.    Fire Test Number 2 did, correct?

3        A.    Yes.

4        Q.    Who was present when you performed the Fire

5    Tests Number 1 and Number 2?

6        A.    So I had an intern this summer, and he was

7    present.  And William Hicks, a colleague of mine, was

8    also present.

9        Q.    What's the intern's name?

10        A.    Cody Radzik.

11        Q.    I saw with these fire tests that there was a

12    -- there was at least some assistance -- unless that was

13    William Hicks, but there was some assistance there from

14    the fire department?

15        A.    No.

16        Q.    Okay.  Who was the individual who was going

17    into the shed for ignition?

18        A.    Oh, that's a good question.  I think that's me

19    in turnout gear.

20        Q.    Okay.  All right.  Describe how -- describe

21    the process of performing the fire test.

22        A.    So we started with obtaining an exemplar shed,

23    the same make and model as that -- that was reported at

24    the Wadsworth house on the exterior of the structure. We

25    reviewed the transcripts of Stephanie and Matthew

1  Wadsworth.  Through their depositions, they provided
2  descriptions of what contents were in there.  And so --
3  so did the kids.  So in reviewing those, the testimony,
4  we tried to fill the shed similar to what they reported
5  was in the shed.
6      Q.   Were the contents of the shed important
7  variables for your test?
8      A.   Not really.
9      Q.   Would the contents and the makeup or materials
10  of those contents influence the tests in any fashion?
11      A.   Not really.  Not significantly.  We were
12  focused on -- you -- the combustibility and how this
13  shed burned.  So really all we needed to do was get
14  something to allow enough heat transfer to ignite the
15  shed.  And we tried to, as similar as possible, match
16  the description that was -- of the contents that were in
17  there.
18      Q.   What is your understanding, if you recall, of
19  what actually was inside of the shed on the night of
20  incident?
21      A.   So in reviewing their transcripts, they
22  indicate that there's -- there were two chairs, a
23  nightstand end table, a heater, a comforter or a quilt.
24  And then you know, there were some other miscellaneous
25  stuff, but we were focused more on the fuel side of

1    things.

2         Q.   Okay.  Do you recall reviewing the materials

3    or the material of that blanket or quilt?

4         A.   I didn't understand your question.

5         Q.   Let me rephrase it.  Do you recall seeing in

6    Stephanie -- Stephanie's deposition where she described

7    the material of the quilt?

8         A.   Vaguely.  If I remember, she described it as a

9    quilt, possibly.  If I remember right.  Like denim

10   material of some sort.

11        Q.   Did you endeavor to find a denim quilt or

12   blanket for the purposes of your fire tests?

13        A.   So we did look for a similar-described quilt,

14   but that was more difficult than you think, to find

15   something like that.  So we found as close as we could

16   and purchased it, you know, locally and added that into

17   the -- into the fuel load.

18        Q.   Okay.  But what kind of quilt did you purchase

19   and add to the shed?

20        A.   It was like a comforter-type material,

21   essentially with a very similar type denim-esq material

22   to as closely resemble what she had described.

23        Q.   Was it cotton?

24        A.   No.  No.  It would have been synthetic.

25        Q.   Okay.  Did you -- as part of your fire tests,

Page 34

1    did you analyze the effect, if any, or the impact, if

2    any, of the blanket material in contributing to the

3    fire?

4        A.    No.   There would not have been any significant

5    issue from that.

6        Q.    How did you start the fire or ignite it?

7        A.    We just used a torch to ignite the chair.

8        Q.    Okay.  Why did you decide to torch the chair?

9        A.    We used a torch as just a flaming ignition

10   source to the chair.  It was not our intent of that test

11   to replicate or duplicate the scenario.  The intent of

12   this test was to see the ignitability, combustibility,

13   and ultimately the heat release rate of the shed.  And

14   what kind of fire would exist from that and what impact

15   that would have on the height of the window in

16   relationship to the smoker shed and -- and, you know,

17   various other things.  But it was focused more on, how

18   does the shed burn?  So the interior contents, you know,

19   as long as they were similar, it doesn't really add to

20   the -- to what we were looking for or looking to at in

21   this case.

22       Q.    And what did you consider for purposes of

23   determining whether the contents were similar?

24       A.    We read their testimony and as best -- based

25   on their, you know, generalized descriptions of what

1    were present, we -- we matched as closely as possible.

2        Q.    So you were really focused on determining the

3    combustibility of the shed, not necessarily the -- any

4    type of influence that the contents of the shed may

5    cause or affect?

6        A.    That -- that's correct.    We -- we know from

7    looking at the photos that the contents in the shed

8    completely -- were completely, essentially, consumed. So

9    going off of the testimony description by the only folks

10   that actually had been in the shed, we tried to resemble

11   that as closely as possible.    But at the end of the day,

12   we know they were combustible except for the metal

13   chair.    So they would just add a little bit to the

14   ultimate heat release rate of this fuel.

15       Q.    Did you make any determinations in this case

16   as to the cause?

17       A.    No, I did not.    That was not my role.

18       Q.    You certainly discussed within your report, as

19   part of your hypothesis, the potential cause of this

20   fire, correct?

21       A.    I don't believe I did.

22       Q.    You discussed a smoldering from a cigarette?

23       A.    I -- I do talk about the timeframe related to

24   a smoldering cigarette as it relates to the overall heat

25   release rate curve associated with the smoker shed.

1    Q.    Okay.  Did you factor in as part of your fire

2   tests of -- the effect and impact of the weather on the

3   heat release rate?

4    A.    Yeah.  I mean, you always consider the weather

5   as part of, you know, fire aspects.  So yes.  We

6   considered it.

7    Q.    Okay.  Did you detail in any of your reports,

8   notes, or materials the effect or impact of the weather

9   on the date of the fire test upon the heat release rate?

10    A.    Oh, that -- weather wouldn't have an -- an

11   overall effect on the heat release rate curve.  So no. I

12   did not detail that in my report.

13    Q.    Did you consider the effect and impact of any

14   of the wind patterns on the flame height?

15    A.    Yes.

16    Q.    Okay.  Did you consider that with regards to

17   the date of incident, the fire on the incident -- the

18   date of incident?

19    A.    Yes.

20    Q.    Okay.  Did you compare the fire test wind

21   patterns to the date of incident?

22    A.    Yes.

23    Q.    Okay.  Did that influence in any way your

24   opinions gathered from the fire test performed?

25    A.    Yes.

1        Q.    In what way?

2        A.    We had significant wind the day we did our

3    fire test, blowing the wind -- or blowing the flames, as

4    you're looking at the shed, to the left, and it was

5    still able to reach above the top of the window with

6    significant heat and temperatures to create a condition

7    that would have failed the window.  So regardless of

8    what the wind and temperatures and conditions were the

9    night of the fire, we had pretty significant weather

10   when we did our test that were as adverse to -- to

11   simulating the weather that would have been that night,

12   and we still had enough energy to create a condition to

13   fail the window.  So at the end of the day, this fuel is

14   more than capable of failing the window.

15       Q.    Okay.  Did temperature factor into your

16   analysis as to -- in comparison to the night of incident

17   and what effect it would have had on the failure of the

18   window?

19       A.    Of course.  It's something we always consider.

20       Q.    Okay.  What was the temperature on the date of

21   your fire tests?

22       A.    I don't remember exactly, but I can -- I can

23   look it up for you because that's historical weather.

24   You know, we can -- we can always look that up, but the

25   -- it's probably on the order of 50, 60 degrees.  It was

Page 39

1    a relatively pleasant, you know -- temperature-wise,

2    versus the night of the fire was -11 degrees.  So what

3    that tells me is that it is definitely going to fail the

4    window from that fuel, because it's more of an issue

5    when you have that big of a temperature difference.

6        Q.    Whether the fire started on the inside of that

7    Bedroom number 4 or at the shed outside, given the

8    temperature difference from -11 to the inside of the

9    home, that window was going to fail in either scenario.

10        Do you agree?

11        A.    I agree that had a fire originated on the

12    outside or the inside, the window in that Bedroom number

13    4 would have failed eventually.  Yes.

14        Q.    Okay.  How long did it take for the shed

15    during your fire test to completely burn to the ground?

16        A.    I can look up -- because we have a -- we have

17    a curve.  But it's -- I think from ignition to when we

18    actually put the fire out would have been on the order

19    of 15 minutes.

20

21

22        Q.    Okay.  Did you do any similar fire tests where

23    you tested the window failure?

24        A.    No.  There's adequate research already

25    available to help us understand when a window fails.  I

1  to make sure that we're checking the physics and not

2  just relying upon, you know, years of experience.  So

3  that's -- it is kind of a combination.

4      Q.    The fire modeling software that you used,

5  what's the name of it?

6      A.    So I used empirical correlations, which are

7  just basic hand calculations that come from experimental

8  data, as well as the computational fluid dynamics model.

9  That's the one that I used, was Fire Dynamics Simulator,

10  or otherwise known as FDS.  And that was produced by

11  NIST, the National Institute of Standards and

12  Technology.

13      Q.    Okay.  Are there certain assumptions or

14  defaults that are set forth in the software that you

15  use?

16      A.    There aren't any defaults.  You -- you have to

17  input all of the data.  There are values from material

18  databases that we use to assign to specific known

19  materials.  So those are -- those are added, yes.

20      Q.    And the material databases that certain

21  information is pulled from, is that within the software,

22  meaning the software already has that built in, and you

23  just have to apply it?

24      A.    No.

25      Q.    Okay.

Page 104

1    question today.

2         Q.   Okay.  Well, do you have those with you?

3    Because I know you have your computer with you.  Do you

4    have everything that you've prepared in this case?

5         A.   Yes.

6         Q.   Why don't you go ahead and get that out.

7    Because I want to make sure that if there's stuff that

8    you've included in your analysis, that you have access

9    to that readily.

10        A.   Okay.

11             MR. AYALA:  So why don't we take a couple

12        minutes and set up whatever you need to set up.

13             THE VIDEOGRAPHER:  Do you want to go off the

14        record?

15             MR. AYALA:  Yep.

16             THE VIDEOGRAPHER:  Okay.  We're off the record.

17        The time is 12:34 p.m.

18               (OFF THE RECORD)

19             THE VIDEOGRAPHER:  We are back on the record

20        for the deposition of Dr. Gorbett.  My name is

21        Madison Haven.  Today is October 24, 2024.  The time

22        is 12:43 p.m.

23    BY MR. AYALA:

24        Q.   Think before we took a break, we were

25    discussing to what extent your analysis took into

1    account the timing for smoke to have entered the room

2    from the outside shed area and caused the smoke alarms

3    to go off.  And you wanted to look at some of the

4    studies that you performed.  And if you can just kind of

5    walk me through what you're looking at and what's

6    reflected.

7         A.   So we can go into, you know, individual

8    simulations if you'd like, but I -- what I try to do is

9    provide you a computer fire modeling notes into an Excel

10   spreadsheet.

11        Q.   Yep.

12        A.   That kind of summarizes a lot of that, so

13   that's what I'm looking at currently.

14        Q.   Okay.  And so based upon that spreadsheet and

15   those -- the modeling results, how much time -- under

16   this hypothesis and theory of the fire originating

17   outside, how much time after the window failure would it

18   have taken for the smoke alarms to go off?

19        A.   It would've been less than ten seconds.

20        Q.   Okay.  And how much smoke would have entered

21   within those ten seconds?

22        A.   Yeah.  Without -- I can get that answer for

23   you.  I don't have that in the summary notes.  So that

24   would have required to go in the individual simulations.

25   And there's a couple different ways to do that.  You can

1    visualize it by, you know, looking at the -- the actual

2    animation, or you can pull the actual data from the

3    spreadsheet and do that.  But I -- I don't have that

4    readily available.  That's not something I looked at.

5         Q.   Okay.  Well, what work is it going to take you

6    to look at, spreadsheet or anything else, to determine

7    the amount of smoke that would have been in the room at

8    the time the fire alarms go off?

9         A.   So I can -- I mean, I can pull up a couple of

10   simulations, and we can look at it from a visual

11   standpoint.  But to sit down and actually pull the data,

12   tell you the specific amount, that -- that takes a

13   little bit of time.  Not something I could do sitting

14   here right now.

15        Q.   Okay.

16        A.   It's -- it's here.  It's just you have to pull

17   all the data out.

18        Q.   And again, is that -- to make that

19   determination of the amount of smoke that would have

20   filled that bedroom within any amount of time, whether

21   it's five seconds, ten seconds, or beyond that, that's a

22   computation that's performed by the software based upon

23   some of the research numbers and figures that you've

24   outlined in your report?

25        A.   Yes.

1    Q.    Obviously, there's variations in the results,

2    correct?

3    A.    Yes.   So I always try to provide -- since it's

4    a range of input variables, you have to also put a range

5    of what the -- the answers or the conclusions can be. So

6    you'll see everything will have, like, a minimum and a

7    maximum timing, at least what I summarized in the

8    spreadsheet.   But that's why I do 50 simulations is, you

9    know, we're accounting for those differences in the

10   variables and then ultimately the differences in the

11   output.

12   Q.    Okay.   And is it your testimony that the

13   results of all of those simulations, wherever they might

14   fall, but the results of the totality of those

15   simulations are the conclusion of what occurred with

16   certainty?

17   A.    So I'll -- I'll phrase it the way that makes

18   most sense to me and I think it's answering your

19   question.   But the purpose of the simulations are to

20   test the hypotheses, in this case of origin, as it

21   relates to what we know about the fuels there.   And what

22   that tells us from these simulations in this scenario is

23   I can tell you the governing physics that apply to both

24   of those hypotheses.   And so that's kind of what the

25   totality of all of this will do.   It will show us like,

1  you know, generally, a fire originating in the room will

2  do this.  Generally, a fire on the exterior will do

3  this.  So kind of the governing equations or governing

4  physics from those.

5      Q.   And because you used the term "generally,"

6  obviously that infers that there are exceptions to the

7  generalities, fair?

8      A.   I mean, in this scenario, not really.  The --

9  the interior does the same thing regardless if I change

10  the heat release rate by 20 percent plus or minus,

11  regardless if I change the opening of the window or the

12  failure of the window from 250 degrees to 300 to 350

13  degrees.  That doesn't change.  Same thing with the

14  exterior fires.  The governing physics there are -- are

15  essentially going to show the exact same thing.

16      Q.   What's the margin of error in use of the

17  modeling -- computer modeling?

18      A.   So you got to get into, like, specifics on the

19  margin of error for something like that.  Like what

20  specific variable are you questioning the rate of -- or

21  the -- the error is.  So it's -- it's a deeper question

22  than -- you -- you can't just characterize the model has

23  a, you know, plus or minus five percent error.  It --

24  it's not -- it doesn't work that way.  You have to look

25  at the very specific physics.

1    Q.   Okay.  Well, there -- there's been articles

2    out there that talk about the margin of error with fire

3    modeling softwares, and it describes it as anywhere from

4    15 to 20 percent.  Have you seen that?

5    A.   It depends on what they're talking about.  I

6    don't know what article you're -- you're describing, but

7    a 15 to 20 percent error for modeling is not unheard of.

8    Q.   Okay.

9    A.   That's why we do the range, to account for

10   that potential error.

11   Q.   There was actually a case out of New York that

12   discussed fire modeling.  And, in fact, it was a case in

13   which an expert's fire modeling analysis was excluded at

14   the time of trial.  And in it, they noted that fire

15   modeling carries with it a 15 to 20 percent margin of

16   error assuming all conditions are correct but could be

17   as high as 80 percent depending upon the real

18   conditions.  Have you ever heard of that?

19   A.   I'm somewhat familiar with that case.

20   Q.   Okay.  Dr. Urbas was -- it was his testimony.

21   He was the expert.  And Dr. Urbas acknowledged that

22   there'd be -- there could be a difference between the

23   material represented in a table and the actual material

24   at the fire scene.  Do you agree with that?

25        MR. LAFLAMME:  Object to form.

1       inside.  That I am sure of.

2   BY MR. AYALA:

3       Q.  So when I exclude the term 100 percent

4   certainty, would it be fair to say you are excluding the

5   possibility of this fire originating in bedroom 4?

6       A.  Yes.

7       Q.  Okay.  You state here, under the approach

8   section, that you conducted more than 45 simulations,

9   correct?

10      A.  Yes.  I -- I actually think the number is 50.

11  I just said over, but yes, it -- it's more like 50.

12      Q.  And I know I saw it somewhere in the report,

13  but was it -- was it 50 or over 50 for each hypothesis?

14      A.  No.  It would've been somewhere in, you know,

15  50 -- 50 on the hypothesis testing.

16      Q.  Okay.  Were there any simulations that were

17  consistent with the possibility of the fire originating

18  in bedroom 4?

19      A.  No.

20      Q.  Have you analyzed any of the remnants of the

21  hover board?

22      A.  No.  I -- you know, I -- I believe I remember

23  seeing some X-rays that were provided, but -- and photos

24  from a lab exam.  But other than that, no.  And

25  Mr. King's report.

1    believe that it is consistent with the principles of

2    physics for the fire to originate out of the shed,

3    window failure or breakage to occur, ignition of the

4    bunk bed between six seconds and 30 seconds, and the

5    room transitioning through flashover within a minute and

6    a half to three minutes with the understanding that

7    before G. ever gets out of bed, L. is up, is out, trying

8    to wake up mom, comes back in.

9            You think that's all consistent?

10       A.    I believe the governing physics are much more

11    consistent with that series of events than a fire

12    originating in the room.

13       Q.    Okay.  You would agree with me that given the

14    events as laid out by L. of getting up, going out to

15    check on mom, knowing that there was a fire already,

16    knowing that the wall -- the window had failed, by the

17    time he comes back in and G. is still in bed, you'd

18    agree with me that that bunk bed would have been on

19    fire?

20       A.    So we -- we talked about this earlier, right?

21    My model is -- just has the bunk bed, right, igniting or

22    not igniting.  I didn't have bedding and then eventually

23    the bid -- bedding spreading to the bed and igniting

24    that.  So I -- I do believe the ignition of the bedding

25    material is relatively quick.  Whether or not it

Page 162

1    actually gets into and starts the entire bunk bed on

2    fire, that's -- there's some time element to that.  But

3    I think it's much more consistent that we have some time

4    for all of those activities that you're describing to

5    happen with an exterior fire and not with an interior

6    fire.

7        Q.   Within six to 30 seconds, whether it's the bed

8    material, the bunk bed material, the mattress, you would

9    expect that the child on that top bunk, G., would have

10   realized that it was on fire?

11       A.   Yeah.  And I -- I believe that's -- you know,

12   he gets injured on his back because of the heat coming

13   through the window.  So I believe his injuries are also

14   consistent with that happening.

15       Q.   But you do not believe that -- well, let me

16   ask you.  Do you -- do you believe that by the time G.

17            gets up and starts his -- to make his way out

18   of his bed and out of the room, that his sheets and his

19   mattress were on fire?

20       A.   I believe part of it was, yes.  And when we

21   see K. -- or when she walks down the hallway, she also

22   describes that.  She says the -- the bedding and that

23   back wall are ignited and burning.  So that's

24   consistent.

25       Q.   Don't you think that's a memory that he would

1    have and be able to recount without prompting that his

2    actual bed was on fire?

3         A.    Well, again, I -- when I'm talking about

4    bedding, it's going to be the side closest to the

5    window.  It's not going to be the top of the -- the

6    mattress that's burning right away.  So it's his

7    perspective, what can he see versus what he can't see

8    when he's laying on the bed.

9         Q.    Well, how do you know that?  How do you know

10   it wouldn't have spread to his sheet that's on top of

11   him?

12        A.    Because he says it wasn't up there.

13        Q.    Okay.  So if the entire bunk bed is ignited --

14   at least according to your report, "Bunk bed ignites

15   relatively quickly.  You say, that's within six to 36

16   seconds.  The room transitions to flashover between a

17   minute and a half and three minutes."

18             And given the testimony that you've accepted,

19   that L. gets up, goes out to check on mom, comes back,

20   G. is still in bed, you don't think by that point the

21   bed, the mattress around G. is on fire?

22        A.    Again, I -- I believe the bedding that's

23   closest to the window side has probably already ignited.

24   He may not see it because of his perspective.  But that

25   -- those physics are much closer to the governing

Page 164

1    physics of this fire than a fire originating in the

2    bedroom, because the tenable conditions inside that

3    bedroom would not have exist very long.  And neither of

4    those boys would have been able to say -- safely egress

5    through that doorway.

6         Q.   But that theory as laid out does not defy

7    physics?

8         A.   No.  Actually, that is what the physics is

9    showing.  I'm not -- I'm not sitting here guessing off

10   of years of experience.  That's why I did 50 simulations

11   to test these hypotheses.

12        Q.   Uh-huh.  It's important to know how long that

13   window had broken or failed before L. gets out of bed,

14   correct?

15        A.   I don't think so.  You know, would it -- would

16   it have been nice to know?  Yes.  But we're never going

17   to have that kind of clock on those events.  So that's

18   why we do the simulations.  That's why we run ranges.

19   That's why we bound the answers based on what the

20   physics is showing.

21        Q.   Under the theory that the fire began at the

22   shed, if that window had failed a minute before L. gets

23   out of bed to check on his mom, that only gives him 30

24   seconds to get back into the room and wake up G. based

25   upon the minimum assimilation numbers of transitioning

Page 165

1  through flashover, right?

2      A.   Yes.   Based on the simulation, yes, and the

3  physics.

4      Q.   Okay.   If that window had failed two minutes

5  before L. gets out of bed and goes to check on his

6  mother, under this theory of the shed being the origin

7  of the fire, more likely than not, G. is in that room

8  when it transitions to -- when it transitions through

9  the flashover?

10     A.   You're correct.   These -- these kids would not

11  have survived.   Right.   The tenable conditions would've

12  been reached in that space, and they would have been

13  injured significantly, if not dead from this fire.

14     Q.   Do you know if L. closed the door behind him

15  when he went to check on his mom?

16     A.   I don't remember that in the testimony.

17     Q.   Does it matter one way or another for your

18  analysis?

19     A.   It's -- I mean, it's not consistent with the

20  position of a door after the fire.   So somehow if it

21  closed, it had to been reopened.   And that -- that could

22  have influenced the development inside that compartment,

23  but that's also not consistent with, you know, K.

24          walking by an open door.   It's not consistent

25  with the smoke and heat and gases that get out into the

1  would have had on tripped circuits in the home?

2      A.   No.

3           MR. AYALA:   Okay.   I think those are all my

4      questions.   Thanks for your time.

5           THE WITNESS:   Yeah.   Thank you.

6                CROSS EXAMINATION

7  BY MR. LAFLAMME:

8      Q.   Mr. Gorbett, I have a couple quick follow-ups.

9  Apologies.   I'll probably bounce around here a little

10 bit.   What is the name of the computer model simulation

11 that -- program that you used for your simulations in

12 this case?

13     A.   Fire Dynamics Simulator, or FDS.

14     Q.   Okay.   And what is FDS as far as -- I --

15 strike that.

16          Is FDS a generally accepted computer model in

17 the fire science industry?

18     A.   Yeah, absolutely.   Internationally, it's the

19 most widely used.

20     Q.   And who uses it?

21     A.   Researchers, academics, forensic specialists,

22 design engineers.   Those are usually the -- the big, you

23 know, categories that use it.

24     Q.   How long has the software been around?

25     A.   So I think the first version was 2000.

1      Q.    And I assume since 2000, the computer modeling

2   industry has continued to develop?

3      A.    Yeah.   So I think we're on Version 6 or almost

4   close to 7 of the -- of the software.   And they have --

5   you know, it's like 6.9.   So they always have additions

6   that are coming out regularly.   It's updated on a

7   regular basis when there's new research that helps

8   better understand the physics.

9      Q.    Based on your education and experience in the

10  fire science field, is the computer model software that

11  you used, I think you alluded it's the most accepted and

12  -- or most used in the industry, is -- correct?

13     A.    Yes.

14     Q.    Okay.   You've indicated that -- early on in

15  your testimony you've done some work for both Plaintiff

16  and the defendants.   Have you ever worked for Morgan &

17  Morgan?

18     A.    Yes.

19     Q.    On how many occasions, if you can recall?

20     A.    About a -- maybe 10.   Around 10.

21     Q.    With respect to the computer modeling that you

22  did, we talked about tenability.   Could you describe

23  what tenability means?

24     A.    So tenability is dealing with the conditions

25  within the compartment or, you know, just the conditions

1      Q.    Okay.  And based on your work in this case and

2   the computer models that you did, were there any

3   computer models that would have allowed for a -- the

4   area of origin to be within bedroom four?

5      A.    No.

6      Q.    So in all of the computer models and

7   simulations that you ran, it was -- they were all

8   consistent with only a fire starting outside at the

9   smoker shed?

10      A.    That's correct.  That's -- that's why I

11   testified about the governing physics.  The governing

12   physics for an interior fire does not fit.  The

13   governing physics for an exterior fire fits pretty much

14   everything we see and hear from the -- the testimony.

15           MR. LAFLAMME:  All right.  Thank you.  That's

16      all the questions I have.

17           THE VIDEOGRAPHER:  All right.

18           THE WITNESS:  Oh.

19           THE VIDEOGRAPHER:  This concludes the video

20      deposition of Dr. Gorbett.  The time is 3:09 p.m.

21           THE REPORTER:  Okay.  We're still on the

22      written record.  Mr. Ayala, how would you like your

23      copy of the transcript?

24           MR. AYALA:  I'll answer that in a minute, but

25      let me, before I do, if you have an objection, I