1                                                              **EXHIBIT 1**


 1              ROUGH-DRAFT DISCLAIMER

 2   DEPOSITION OF:  BRIAN N. STRANDJORD, PE, CFI, CFEI

 3   DATE:  NOVEMBER 27, 2024

 4        DISCLAIMER:  This rough draft text is roughly
     edited, uncertified, and may contain untranslated
 5   words, a note made by the reporter, a misspelled
     proper name, and/or word combinations that do not make
 6   sense.  All such entries will be corrected on the
     final certified transcript which we will deliver to
 7   you in accordance with our customary/your requested
     delivery arrangements.
 8
         Due to the need to correct entries prior to
 9   certification, this rough draft is to be used only for
     the purposes of augmenting counsel's notes and cannot
10   be used or cited in any court proceedings or to
     distribute to other parties to the case who have not
11   purchased a transcript copy.

12        THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL
     TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF
13   VERBATIM CITATION OF TESTIMONY.

14        CONSENT:  By opting for this rough draft
     service, you have agreed:  (1) To purchase the
15   transcript at the customary/agreed-upon rate, (2) Not
     to furnish the transcript, either in whole or in part,
16   on disk or hard copy, via modem or computer, or by any
     other means, to any party or counsel to the case.
17

18

19

20

21

22

23

24

25

2     A    The testimony record is -- I would not

3  consider part of my CV.  It's a separate document,

4  being my testimony record.

5     Q    Okay.  So your CV has been reduced to one

6  page at this point; is that correct?

7     A    That's correct.

8     Q    Will you give us the -- on this page, will

9  you point to the specific training that you believe is

10  relevant or education that you believe is relevant to

11  your training to perform arc mapping.

12     A    Certainly.  In addition to my bachelor of

13  science degree in mechanical engineering, my licensing

14  is both a mechanical engineer and an electrical

15  engineer in multiple states.

16          And my work history, which over the last

17  approximately ten years, has almost exclusively

18  involved the investigation of fires and explosions and

19  the examination of electrical systems.

20     Q    Where there are electrical systems present,

21  obviously, correct?

22     A    Correct.

23     Q    I see that you look at other explosion

24  types, such as lithium ion batteries or things of that

25  nature.

8

1          Would there still be arcing in those type

2  of issues?

3     A   There certainly could be.

4     Q   I guess depending on the location of where

5  the fire takes place?

6     A   Yes.

7     Q   Okay.  When -- tell me about how your

8  training as a mechanical engineer prepared you for arc

9  mapping.  What is the relevant educational background

10  there?

11     A   Certainly.  In the field of mechanical

12  engineering, and specifically in my education, there

13  was a great deal of heat transfer, thermodynamics and

14  materials science that all play into how a fire would

15  affect materials, specifically electrical conductors.

16     Q   Where was that training at?

17     A   That was at the University of Colorado.

18     Q   They have special classes at the University

19  of Colorado that teach about how fire will interact

20  with specific electrical conductors?

21     A   They have -- they have classes which I --

22  when I took at part of my education involving heat

23  transfer and thermodynamics and material science,

24  which are all applicable to that.

25     Q   But no specific training on how fire

9

1  interacts with electrical conductors at the University

2  of Colorado; is that fair?

3    A    Not at the university.

4    Q    Okay.  Where did you obtain that specific

5    training?

6    A    That specific training was through my

7    employment over approximately the last ten years, in

8    forensics.

9    Q    When you say forensics, can you explain

10   what that means?

11   A    Sure.  That would be investigating

12   different failures, fire, explosions, accidents, and

13   explaining that using science and engineering to help

14   explain what happened to my clients.

15   Q    Okay.  And when we say the last ten years,

16   are we starting that forensic work and this training

17   in 2014?

18   A    Correct.

19   Q    And again, I don't mean to say that there's

20   not --

21        MR. MORGAN:  We can take this down.

22   Q    (By Mr. Morgan)  I'm not meaning to say

23   that there's not applicable science and that

24   translates between what you're doing here and

25   otherwise.

10

1        But specifically for arc mapping and the

2    forensic, that would have started when you worked at

3   Rimkus?

4   A   Correct.

5   Q   And when you worked at Rimkus, did you work

6   with Mr. Filas?

7   A   I did work with Mr. Filas.

8   Q   I apologize for saying his name wrong. How

9   long did you work with Mr. Filas?

10   A   Approximately five years.

11   Q   Is Mr. Filas the one who specifically

12   trained you in arc mapping?

13   A   I certainly received some training from Mr.

14   Filas. I also worked with other engineers at Rimkus.

15   I learned -- I also -- I also learned aspects of arc

16   mapping from both International Association of Arson

17   Investigators Training and National Association of

18   Fire Investigators training class.

19   Q   Okay. How many of those training classes

20   did you go to with the IAAI or NAFI?

21   A   I've been to several week-long classes and

22   seminars with -- with both organizations. And then a

23   great number of hours of online training.

24   Q   Okay. Is your online training represented

25   in this CV?

11

1   A   I don't believe it is specifically

2   represented there.

3   Q   Okay. Do you know approximately how many

4  hours you spent online learning about arc mapping?

5      A   Specifically about arc map, I couldn't say.

6      Q   Okay.  Is there any specific classes that

7  you took that you would have obtained a certificate

8  regarding arc mapping?

9      A   Yes.  I obtained certificates for all of

10  the online courses.

11     Q   Okay.  And do you have those in your

12  possession somewhere?

13     A   I do not have them with me today.

14     Q   No.  I understand.  But those are things

15  that you could retrieve if we asked you for online

16  certifications regarding arc mapping, that's something

17  you would be able to find?

18     A   Yes.

19     Q   Okay.  As far as the IAAI arc mapping work,

20  did you receive a certificate for that class?

21     A   Yes.  I have certificates for all of the

22  fire investigative training courses, both in person

23  and online, that I've attended.

24     Q   So when you went to these fire

25  investigative courses, did you -- were they in total

12


1  fire investigation or were they specific to arc

2  mapping?

3      A   Most of them would be total fire

23   potential arc sites in Bedroom 4.  What I did document

24   with photography and in my notes was the location

25   where the branch circuit conductors ran in the

50

1   bedroom.

2     Q   Okay.  If we can pull up the report again,

3   Exhibit A, and go do the conclusions, please.

4         MR. CURRAN:  Yes, sir.  One moment.

5         It's up, sir.

6         MR. MORGAN:  Okay.

7     Q   (By Mr. Morgan)  When we look at Conclusion

8   No. 4, the conclusion reads, The physical evidence

9   presented by the electrical system at the residence

10   was not consistent with a fire originating within the

11   residence.

12        When we talk about the physical evidence

13   presented by the electrical system, are you referring

14   to arcing?

15     A   Yes, I'm referring to electrical arcing or

16   the lack therefore.

17     Q   Okay.  And is it a fair interpretation of

18   this statement that it is not saying conclusively the

19   fire did not originate in the residence.  It is simply

20   saying there was no evidence of electrical arcing in

21   Bedroom 4?

22     A   Part of what -- part of what Conclusion 4

23  is saying is that there's no evidence of electrical

24  arcing in Bedroom 4, but it goes further than that.

25           The arc mapping, as a whole, provides in

51

 1  this case an indication of the fire spread or how the

 2  fire progressed through the course of the fire.

 3      Q   Okay.  Explain.

 4      A   Sure.  So with we look at the -- the

 5  area -- potential areas of origin defined by the fire

 6  investigators involved in thinks matter, so we looked

 7  at the Bedroom 4 and we looked at area just outside of

 8  Bedroom 4, where a polymer smoking shed was located.

 9           If we look at the -- all of the conductors

10  that we looked at, we found no evidence of electrical

11  arcing in the branch circuit conductors in Bedroom 4,

12  we found evidence of electrical arcing on small

13  fragment wells of wires located in what was the

14  polymer shed, whether that was the ends of extension

15  cords or appliance cords plugs into that, we don't

16  know.  They were simply fragments.  But we have

17  evidence of electrical arcing in the shed.

18           And then we have the severed service

19  triplex provided electrical service to the residence

20  from the -- from the utility company.

21           And so we have -- we have arc -- once --

22  I'll start with the service triplex.  The service

23  triplex was composed of aluminum, and it ran

24    approximately right over the polymer shed.

25            The service triplex was melted and severed

52

 1    during the fire, which is not uncommon.  Again,

 2    aluminum has a low enough melting temperature that it

 3    is common for eliminate to melt if a fire.

 4            Once that service triplex melted and was

 5    severed, there would no longer be any electrical

 6    service to the residence; there could no longer be any

 7    electrical energy in any of the branch circuits in the

 8    residence.

 9            So having evidence of electrical arcing on

10    cords in the shed, we know that fire was present in

11    the shed or at the shed prior to the time that the

12    service triplex was severed; because again, after the

13    service triplex was severed, we would have no

14    electricity to produce arcing.

15            Then the --

16        Q   Okay.

17        A   -- the -- once that service triplex was

18    severed, there is no longer -- again, no longer any

19    electrical energy present in any of the branch

20    circuits, so there would be no -- there would be no

21    electrical arcing, there would be no evidence of

22    electrical arcing on any of the circuits after that.

23        Q   Okay.  We've already discussed that you are

Page 53

25  arcing in Bedroom 4, that means there was no

54

1   electricity to the home, right?  Is that right?

2      A   I want to make sure I understand exactly

3   what you're stating there.

4          Yes, once the service triplex melted and

5   severed, there was no more electrical power to the

6   home.

7      Q   Right.  But what I'm saying is:  Because

8   you only arc mapped two places, Bedroom 4 and the

9   shed, you cannot tell anyone that there was not

10   electricity in the home at the time that the service

11   triplex melted, because I don't have any evidence

12   yourself, right?

13         MR. LaFLAMME:  Object to form.

14     A   So if I understand what you just asked me,

15   you're saying -- you're saying that I cannot determine

16   that there was no electrical power in the home when

17   the service triplex melted.  And that is incorrect.

18     Q   (By Mr. Morgan)  Correct.

19     A   When the service triplex melted, there was

20   no longer any electrical energy in the home.

21     Q   Okay.  That part is true.  But whether or

22   not Bedroom 4 was on fire before that, cannot be

23   stated, right?

24     A   No, I don't believe -- I don't believe

Page 55

5   mapping?

6   A   I don't -- I don't know that I have a

7   specific example for you.

8   Q   Okay.

9       MR. MORGAN:  All right.  We can take that

10  down.

11  Q   (By Mr. Morgan)  Let's go back to your

12  conclusions.  And we've talked about 2 and we talked

13  about 4.  I want to talk about the No. 3.

14      MR. MORGAN:  If we can pull that back up.

15  Q   (By Mr. Morgan)  Okay.  No. 3 says -- we'll

16  take it in two parts -- The physical evidence

17  presented by the electrical system at the residence

18  was consistent with, A, fire being present at or

19  within the polymer smoking shed prior to the time that

20  the fire severed the overhead service triplex to the

21  residence.

22      So let's start just with that.  The

23  evidence that that is based off is the arcing found on

24  the metal fragments within the shed, correct?

25  A   Yes, on the conductor fragments in the

69

1   shed.

2   Q   As well as the lack of arcing in Bedroom 4,

3   correct?

4   A   Well, when we're speaking specifically

5   about Conclusion 3A, when I say fire being present at

6   or within the polymer showing shed prior to the time

7   that the fire severed the overhead service triplex to

8   the residence, I'm not -- I'm not making that

9   statement based on anything that was or was not found

10  in Bedroom 4.

11          I'm making that statement simply based on

12  the fact that the service triplex was severed and

13  after the fact that that service triplex was severed,

14  there was no longer any electrical energy supplied to

15  the residence.

16          Therefore, any electrical arcing that

17  occurred to those conductors in the shed, which was

18  plugged into extension cords, powered by the

19  residence, for there to be evidence of electrical

20  arcing in the shed, that had to have happened prior to

21  the time that the service triplex was severed.

22      Q   Okay.  I do -- I believe I understand.  But

23  let me ask you a hypothetical:  Hypothetically, if we

24  had a fire in Bedroom 4 coming out of the window, did

25  that also cause the aluminum to melt and disconnect

70

1   power from the home?

2       A   Any fire present at the service triplex

3   could cause the aluminum to melt and sever the

4   service to the residence.

5       Q   Okay.  And so going specifically to A:

```
 6   What we are basing the fact that the fire must have
 7   come from the shed that we have the presence of arcing
 8   on the wire fragments and we do not have the inference
 9   of arcing in Bedroom 4?
10        A    No.  That's not what I'm stating in 3a.
11   What I'm stating --
12        Q    Okay.  I'm still lost.
13        A    I'm sorry.  Go ahead.
14        Q    Go ahead.  No, I'm just having trouble
15   figuring out who other elements are considered there,
16   so I want to -- I'm trying to understand it.
17        A    Sure.  Sure.  Conclusion 3A is very simple:
18   There was evidence of arcing, electrical arcing, on
19   conductor fragments in the shed.  That could only
20   occur if there was electrical energy present, if the
21   electrical service to the residence was still intact.
22             The service triplex to the residence, which
23   supplies all of the electrical power to the residence,
24   was severed during the fire.  It was melted and
25   severed.
 71


 1             After the time that that service triplex
 2   was severed, there was no longer any electrical energy
 3   in the building and there was no possibility of
 4   electrical arcing on conductors powers by the
 5   building.
 6             So all I'm saying in Conclusion 3A is that
```

Page 72

7    Q    Got with.  It got it.  Sorry.  I was just

8    reading it together.

9         Okay.  So then 3B says, The overhead

10   service triplex being severed by the fire prior to the

11   time that the fire attacked the branch circuit wiring

12   within Bedroom 4 of the residence.

13        And is that saying that because there was

14   no arcing within Bedroom 4, that you believe the power

15   must have been cut by that time?

16   A    That is correct.

17   Q    Got it.  Now, are you aware of hypothesis

18   or research relating to arcing on non-energized lines?

19   A    I'm not aware -- I'm not aware of any

20   arcing occurring on non-energized lines, because

21   electrical arcing requires that the lines be

22   energized.

23   Q    Okay.  And then let's go to Conclusion 1.

24   And I'm going to leave out a word just for future

25   motion in limine, but you can talk about whether you

73

1    should come back in later.

2         No. 1:  Evidence of electrical arcing was

3    present on conductors located within the polymer shed

4    adjacent to the residence.

5         That conclusion is simply talking about the

6    arcing on the metal fragments that we've seen,

7    correct, or that we've spoken about?

13    Q   Okay.  And in that process of updating the

14   edition, do you know if NFPA 921 considers various

15   peer reviewed articles that are out there in the

16   marketplace concerning issues of fire investigation?

17         MR. MORGAN:  Object to predicated

18   foundation.

19    A   Yes.  Certainly -- certainly, it does.

20   NFPA 921 is a consensus document that is authored

21   jointly by many individuals in the fire investigation

22   community.

23    Q   (By Mr. LaFlamme)  And when you say,

24   "consensus document," what do you mean by that?

25    A   I mean the NFPA 921 is a guide, and it is

84

1   published by -- it is published by a committee within

2   NFPA.  That -- that committee consists of a number of

3   individuals.  I don't know how many offhand.  But many

4   individuals who all must agree to one degree or

5   another on what is going to be published in that

6   guide.

7    Q   And in NFPA 921, is that generally titled

8   The Guide for Fire and Explosion Investigation?

9    A   Yes, I believe that's the title.  It's

10   considered the standard in the industry as a guide.

11    Q   Do you know if NFPA 921 is generally

12   accepted nationally as the guide for fire origin and