Exhibit 1

Ronald E. Synder, M.D.
08/14/2024

1           UNITED STATES DISTRICT COURT

2         IN AND FOR THE DISTRICT OF WYOMING

3     STEPHANIE WADSWORTH, individually )
                                        )
      and as Parent and Legal Guardian  )
                                        )
4      of W.W., K.W., G.W. and L.W.     )
                                        )
      minor children, and MATTHEW       )
                                        )
5     WADSWORTH,                    )      Case No.:
                                    )
         Plaintiffs,            ) 2:23-cv-00118-NDF
                                    )
6             vs.                )
                                    )
      WALMART, INC. and JETSON        )
                                    )
7     ELECTRIC BIKES, LLC,              )
                                    )
         Defendants.            )

13                    - - -

14            Wednesday, August 14, 2024

15                    - - -

16            Videoconference deposition of

17    RONALD E. SYNDER, M.D. was taken via Zoom,

18    before Elizabeth M. Kondor, Certified Court

19    Reporter and Notary Public, on the above date,

20    commencing at 11:00 a.m.

21

22            LEXITAS LEGAL PHILADELPHIA

23         1600 MARKET STREET, SUITE 1700

24         PHILADELPHIA, PENNSYLVANIA 19103

25                (215) 504-4622

Ronald E. Synder, M.D.
08/14/2024

Page 2

1  A P P E A R A N C E S :

2

3       MORGAN & MORGAN, P.A.

4       BY: RUDWIN AYALA, ESQ.

5         1700 Palm Beach Lakes Boulevard

6         Suite 500

7         West Palm Beach, Florida 33401

8         rayala@forthepeople.com

9         (561) 764-2220

10      Representing the Plaintiffs

11      (Via Zoom.)

12

13      McCOY LEAVITT LASKEY, LLC

14      BY: EUGENE M. LaFLAMME, ESQ.

15        N19 W24200 Riverwood Drive

16        Suite 125

17        Waukesha, Wisconsin 53188

18        elaflamme@MLLlaw.com

19        (262) 522-7026

20      Representing the Defendants

21      (Via Zoom.)

22

23

24

25

Page 3

1             I N D E X

2

3  WITNESS                        PAGE

4  RONALD E. SYNDER, M.D.

5     EXAMINATION BY MR. LaFLAMME        4

6     EXAMINATION BY MR. AYALA        164

7

8

9          E X H I B I T S

10

11  NO.       DESCRIPTION          PAGE

12  Exhibit 60  CV of Ronald E. Snyder...... 10

13  Exhibit 61  7/30/2024 Billing invoice... 24

14  Exhibit 62  6/6/24 letter to C.

15           LeChapelle from R. Snyder... 37

16  Exhibit 63  Dr. Snyder's Elkins List.... 42

17  Exhibit 64  Life Care Plan Report

18           prepared by Ronald Snyder,

19           M.D....................... 63

20  Exhibit 65  Lifetime Cost Summary....... 63

21  Exhibit 66  Questionnaire No. 1......... 81

22  Exhibit 67  Questionnaire No. 2......... 82

23  Exhibit 68  Questionnaire No. 3......... 82

24         (EXHIBITS ATTACHED)

25

Page 4

1        (Bridgitt Myers, Notary Public, swore

2    in Ronald Snyder, M.D..)

3        NOTARY PUBLIC:  Doctor, do you swear

4    or affirm the testimony you're about to

5    give is the truth, the whole truth and

6    nothing but the truth.

7        DR. SNYDER:  Yes, I do.

8  R O N A L D   E.   S N Y D E R,   M. D.,

9  appearing remotely at his office address of 668

10  North Orlando Avenue, Suite 1018, Maitland,

11  Florida, was first duly sworn, testified as

12  follows;

13  EXAMINATION BY MR. LaFLAMME:

14     Q.   Dr. Synder, good morning.  We met

15  briefly off the record.  Obviously, we are

16  conducting this deposition here by Zoom.  I

17  presume you have gone through the Zoom process

18  for depositions a number of times; is that

19  accurate?

20     A.   That's accurate.

21     Q.   All right.

22        Just to start, could you please state

23  your full name for the record, sir.

24     A.   Sure.  My name is Ronald Synder,

25  S-N-Y-D-E-R.

Page 5

1     Q.   Okay.

2        My name is Eugene LaFlamme,

3  representing the two defendants in this case.

4  Obviously, you have been named as an expert in

5  this matter by the plaintiffs and have issued a

6  life care plan relative to Stephanie Wadsworth,

7  is that correct?

8     A.   That is correct.

9     Q.   And you understand that you are here

10  today to give testimony about the life care plan

11  that you put together for Stephanie Wadsworth,

12  correct?

13     A.   That is correct.

14     Q.   I know you've had your deposition

15  taken a number of times before, it looks like

16  multiple times per year.

17        I assume you are familiar with the

18  deposition process and so I won't belabor all of

19  the traditional instructions that we give a

20  witness that may not be so familiar with this

21  process.

22        The only one I will get out is, if

23  you don't understand a question, or if we have a

24  break in transmission, understanding that we're

25  on Zoom here, let me know.  I'll either rephrase

Ronald E. Synder, M.D.
08/14/2024

Page 6

1  it or have it reread, whatever is appropriate so
2  that we're communicating.
3       Okay?
4    A.  Yes.  Thank you.
5    Q.  If you answer my question as worded,
6  we're going to presume that you understood the
7  question and that you're giving your honest and
8  truthful answer to those questions.
9       Fair enough?
10   A.  Fair enough, yes.
11   Q.  The only life care plan that you've
12 done in this case is for Stephanie Wadsworth,
13 correct?
14   A.  I've only done one for her, that's
15 correct.
16   Q.  You are not offering any opinions in
17 this case on any life care plan issues related
18 to any of the other Wadsworth family members,
19 true?
20   A.  That is correct.
21      I would say I did see the boy, and
22 when I completed my evaluation, I did call
23 counsel and let him know that there were some
24 significant problems, but I have not been hired
25 to do a life care plan.

Page 7

1    Q.  You have not done a life care plan
2  for Weston Wadsworth, correct?
3    A.  That is correct.
4    Q.  And you're not offering any opinions
5  in this case as to a potential life care plan
6  for Weston Wadsworth?
7    A.  Correct, not at this point, but I may
8  be asked in the future, but at this point, I
9  have not.
10   Q.  Okay.
11      And just so we're perfectly clear as
12 to what I am questioning you on here today, the
13 only opinions that you are offering in this case
14 presently is the life care plan opinions for
15 Stephanie Wadsworth, true?
16   A.  That is true.  That is correct.
17   Q.  And although you met the Wadsworth
18 children on your home visit, you have not done a
19 life care plan for any of them, including
20 Weston, and are not offering any opinions here
21 today on any life care plan issues related to
22 any other members of the Wadsworth family,
23 correct?
24   A.  That is correct.
25   Q.  And I understand that you are based

Page 8

1  out of Florida; is that correct?
2    A.  Correct.
3    Q.  How long have you -- I'll pull out
4  your CV here, your company's name is Physiatry
5  Life Care Planning Associates?
6    A.  Correct.
7    Q.  And it looks like that company was
8  opened in 2020; is that accurate?
9    A.  Correct.  I was doing life care
10 planning under Ronald E. Synder, M.D., P.A. for
11 many years, and then I elected to start bringing
12 additional physicians on board toward my
13 retirement and rechanged so there would be
14 multiple physiatrists, and so we renamed it at
15 that point.
16   Q.  Okay.
17      How long have you been doing life
18 care plans, regardless as to what umbrella or
19 institution you were working for?
20   A.  If you have a copy of my Elkins list,
21 it, basically, has all my life care plans.  I
22 was doing it back in 2010.
23   Q.  And, Doctor, we were talking about
24 how long you've been doing life care plans, and
25 you referenced your Elkins list, which was part

Page 9

1  of your expert file.  And your Elkins list is a
2  Florida term, but it, basically, provides a list
3  of your prior engagements, correct?
4    A.  Correct.  I thought it was a federal
5  name, but, yeah.
6    Q.  Maybe it is federal.
7    A.  Yeah, it's federal.
8    Q.  One or the other, it provides a list
9  of your prior engagements, correct?
10   A.  It's a list of any case that I've
11 done depositions or did trial.  It is not all
12 the cases I've done, but only the cases in which
13 testimony was offered.
14   Q.  And your Elkins list goes back to
15 2010 being your first engagements, so is that
16 when you would have started doing life care
17 plans for litigation or claims contexts?
18   A.  Yes.  I mean, I was doing a lot of
19 treating physician work-up many years prior.
20 And I was a pediatrician.  I was a child abuse
21 doctor many years ago.  But life care planning
22 in earnest began in 2010.  I may have had some
23 earlier, but very sporadic.
24   Q.  With respect to the cases that are on
25 your Elkins list, there's obviously a number of

Ronald E. Synder, M.D.
08/14/2024

Page 10

1  them here, are these all life care plan-related,
2  or is it a combo of life care plan and more
3  traditional medical?
4      A.   I believe all of them are life care
5  plans.  2010 may have been a combination of
6  treating doctor and life care plan, but
7  definitely beginning 2011, purely life care
8  planning.
9      Q.   Doctor, I'm going to share my screen
10  with you, which is just going to be a copy of
11  your CV.
12      MR. LaFLAMME:  And, Betsy, what I'll
13  probably do is just e-mail these to you
14  after.  I'll keep track of the exhibit
15  numbers and then e-mail them to you.
16  BY MR. LaFLAMME:
17      Q.   Doctor, I think I have this up
18  accurately.
19      A.   You do.
20      MR. LaFLAMME:  We will mark this as
21  Exhibit 60, which is our next exhibit in
22  line on this case.
23      (Exhibit 60, CV of Ronald E. Snyder,
24  is received and marked for identification.)
25      Q.   Now, Doctor, this was a copy of your

Page 11

1  CV that has been provided in this case.  And
2  I'll page through it quickly.  You may even have
3  a hard copy with you.
4      A.   I do.
5      Q.   I did not see a specific date on here
6  as far as when it was updated, but is this your
7  most up-to-date CV, the one that was provided in
8  this case?
9      A.   Let me look at one page and I'll know
10  specifically the issue date.
11      It is, but I believe I did close my
12  Puerto Rican license just recently on page 2,
13  but this is an up-to-date copy.
14      Q.   This is at least the most up-to-date
15  copy that you have in your file, correct?
16      A.   Correct.
17      Q.   And the one change that you mentioned
18  was, there's a "LICENSE" section on page 2 of
19  Exhibit 60 which shows a Florida license and a
20  Puerto Rico license.  And it sounds like your
21  Puerto Rico license has either lapsed or you
22  haven't renewed it, whatever the case may be.
23      A.   Correct.
24      Q.   So, presently, is your only medical
25  license in Florida?

Page 12

1      A.   Correct.
2      Q.   Have you ever been licensed in
3  Wyoming?
4      A.   I have not.
5      Q.   In your CV, there is an area titled
6  "CERTIFICATIONS/ACADEMIC MEMBERSHIP," which
7  starts on the first page and goes to the second
8  page.
9      Do you see that?
10      A.   Yes.
11      Q.   It looks like for the life care
12  planning specific certification or academic
13  membership, those are on the start of the second
14  page; is that accurate?
15      A.   Correct, correct.
16      Q.   And these would have been put on by
17  the Institute of Rehabilitation Education and
18  Training?
19      A.   Correct.  I've been doing life care
20  planning for many years, and they started doing
21  some ongoing training, and so I elected to go
22  ahead and take those courses as well.
23      Q.   Where is the Institute of Rehab
24  Education and Training?
25      A.   It's online.  The last course is done

Page 13

1  in Gainesville University of Florida where you
2  do it live.  The rest of it is online.
3      Q.   And then it looks like there's six
4  bullet points under the Institute's reference
5  which lists the specific coursework that you
6  would have taken?
7      A.   Yes.  Those are the required
8  coursework, that's correct.
9      Q.   And so, for example, the first bullet
10  point "Life Care Planning: Professional
11  Orientation," dated 12/29/2018, that's a
12  singular course?
13      A.   Correct.  They're a singular course.
14  They're about 20 hours apiece, and you have to
15  take a test at the end.  So the date is the date
16  that I was issued the certification for that
17  course.
18      Q.   So for each of these courses, for
19  each of the six bullet points, is there a
20  roughly 20-hour course associated with it or
21  some --
22      A.   Yeah, it's 10 to 20 hours.  I think
23  it's 10 hours of direct video, but then it's
24  followed by, you have to kind of do a lot of
25  book work, several chapters to get into it and

Ronald E. Synder, M.D.
08/14/2024

Page 14

1  so forth, but it's about 20 hours per chapter.
2      Q.   Okay.
3          But each coursework has approximately
4  10 hours of video that you would start with?
5      A.   Correct.
6      Q.   If you're getting a phone call, we
7  can take a break.
8      A.   No.  For some reason, I had it muted
9  and it rang one ring.
10     Q.   No problem.
11     A.   Nothing is more important than a
12 deposition.
13     Q.   That's what we think, but there's
14 certainly more.
15         At any rate, each course has roughly
16 10 hours of direct video, then; is that correct?
17     A.   That's correct.
18     Q.   All right.
19         And then on top of the direct video,
20 then there's some it sounds like reading of some
21 sort of textbook or other manuals provided for
22 you?
23     A.   Correct.  Examples:  The videos did
24 not cover long-term care of AIDS; it did not
25 cover long-term management of heart and kidney

Page 15

1  transplants.  And yet the tests had questions on
2  it, so you had to fill in the blanks with
3  reading before taking the test.
4      Q.   And is there a test for each of these
5  six courses or is there just one overall test?
6      A.   Yes, for each segment, there's a
7  test.
8      Q.   Is there a specific section in any of
9  these six courses that deal with burn injuries?
10     A.   There was.  One of them, maybe --
11     Q.   Which one?
12     A.   Oh, I don't remember.  I would
13 presume -- I would presume probably the multiple
14 disabilities.
15     Q.   So burn injuries would have been a
16 section or a component of that coursework?
17     A.   Correct.
18         Obviously, the texts can go over
19 every specific injury, but they, basically, fly
20 over 60,000 feet, as far as what information
21 you need.  And then they give you a lot of
22 additional resources that you have to reach out
23 to when you ultimately get to specific cases.
24     Q.   Are you still in private practice as
25 far as treating patients?

Page 16

1      A.   I do.  One day a week, I have an
2  office in West Palm Beach, I work in an
3  orthopedic office, Palm Beach Sports Medicine,
4  these days, so I see patients on a weekly basis
5  there.
6      Q.   I assume based on the name of the
7  business that you do it with, that those are
8  mostly orthopedic injuries?
9      A.   Correct.  Neck, back, carpal tunnels.
10 And then we are the doctors for the Astros, the
11 farm team in West Palm, so I do a lot of
12 complicated shoulder rehab and so forth.
13     Q.   During your career in which you were
14 a treater, including even the orthopedic
15 treatment that you currently do, how many burn
16 patients have you treated?
17     A.   The majority of my burn treatment was
18 in my pediatric residency, where we had a
19 pediatric burn unit.  But per se, I do not do a
20 lot of burns.  I tend to do mostly neck, back
21 and shoulders, and a lot of pediatric burn
22 trauma.
23     Q.   When was your residency where you
24 would have had exposure to the pediatric burn
25 unit?

Page 17

1      A.   That would have been from 1972 to
2  1975.
3      Q.   I see that, now.
4          That's on the first page of your CV,
5  correct?
6      A.   Correct.
7      Q.   And so that would have been up in
8  Connecticut?
9      A.   Yes.
10         Again, I did a residency at Yale that
11 had a very large burn unit, both for adults and
12 pediatrics.
13     Q.   So when you got most of your exposure
14 to burn patients in your residency, was it just
15 pediatric or were there adult burn patients as
16 well?
17     A.   I was doing my residency in
18 pediatrics, so I would see burn children in the
19 adult burn unit, so it was pediatrics.
20     Q.   So although they had adults in the
21 burn unit, your experience through the residency
22 program was with the pediatric side?
23     A.   Correct.
24     Q.   And then in your professional career
25 as a physiatrist, it sounds like most of your

Ronald E. Synder, M.D.
08/14/2024

Page 18

1  treatment is more orthopedic-related; is that
2  accurate?
3      A.  No, no.  Mostly, a lot of brain, a
4  lot of amputations.  We do it all.  But we did
5  not have a burn unit in Pittsburgh where I was,
6  so, you know, I've treated burn cases for the
7  last 15, 20 years intermittently, but very
8  sporadically, and not like the number of necks,
9  backs, strokes and brain injuries that I do now.
10     Q.  And as a physiatrist, I understand
11  that is, basically, physical medicine and rehab.
12  Is that an accurate description of what a
13  physiatrist does?
14     A.  Correct.
15     Q.  You have not ever been involved as a
16  surgeon, correct?
17     A.  That's correct.
18     Q.  You have not been involved as a
19  psychiatrist or psychologist, correct?
20     A.  That's correct, although long-term
21  injuries result in long-term psychiatric
22  problems and just like family practitioners who
23  can prescribe antidepressants and antianxiety
24  medications, physiatrists can do so as well.
25     Q.  As far as any psychological or

Page 19

1  psychiatric diagnoses or diagnosis, you would
2  refer that to the mental health professional,
3  correct?
4      A.  In a legal situation, yes, but as a
5  treating doctor, no.  That comes all the time.
6  But I did do testing for her when I saw her and
7  the testing was significant for depression and
8  PTSD.
9      Q.  And just so the record is clear, when
10  you say "her," you're talking about Stephanie
11  Wadsworth, correct?
12     A.  Correct.  She completed testing that
13  did the BECK Inventory Depression scale, the
14  PTSD questionnaires and those were all abnormal
15  for depression and PTSD.  But, again, in this
16  kind of forum as a physiatrist, you should only
17  request psychiatrists to provide such
18  documentation.
19     Q.  And although you've had some
20  experience with burn injuries in your residency,
21  you are not a burn specialist, correct?
22     A.  That is correct.
23     Q.  And you are not giving any testimony
24  in this case as a surgeon, correct?
25     A.  That's correct.

Page 20

1      Q.  You're not giving any testimony in
2  this case as a psychiatrist, correct?
3      A.  That's correct.
4      Q.  And you are not giving any testimony
5  in this case as a psychologist, true?
6      A.  That's correct, that's correct.
7      Q.  And you're not giving any testimony
8  in this case as a radiologist, true?
9      A.  That's correct.
10     Q.  Of the certifications that you have
11  for life care planning, is the only
12  certification from the Institute of Rehab
13  Education and Training?
14     A.  Correct.  There are now six, I think,
15  certification companies that certify from
16  vocational rehab doctors to nurses to I think
17  there's even one specifically for insurance
18  actuarial.  There are multiple agencies that do
19  some of the certifications.  This company
20  provides a lot of the educational courses for
21  all the certifications.
22     Q.  And what is the certification called
23  that the Institute of Rehab Education and
24  Training provides?
25     A.  Well, they give individual -- I can

Page 21

1  forward it to you.  I think I've got this
2  scanned someplace, the certifications that they
3  gave me when I passed the course.
4      Q.  So is it a certification on a
5  per-course basis, as opposed to an overall
6  certification in which you complete a battery of
7  courses?
8      A.  For this company, yes.  There are,
9  like I say, some -- there's a physician life
10  care planning association, there is a life care
11  planning that is for nurses that kind of do this
12  same thing and give you a certificate.
13         Since I've been, basically,
14  grandfathered in doing it way before
15  certifications started, I've taken all the
16  coursework just to kind of make me look like,
17  you know, I know what I'm doing, but I've been
18  doing it longer than certifications came out.
19     Q.  So if we're looking at the six or so
20  courses that you took, do each individual ones
21  of those have their own independent
22  certification?
23     A.  No, no.  It's, basically, the course
24  that I took.
25         If you'll notice, beginning on page -

Ronald E. Synder, M.D.
08/14/2024

Page 22

1 hold on - 30 of my report, I very specifically
2 list all of the methodologies and foundations
3 that are utilized in the report, utilizing
4 several different life care planning tenets and
5 methodologies that are nationally accepted, so I
6 list all the methodologies specifically utilized
7 in the report.
8    Q.   And that's, basically, on page 30 to
9 35, correct, of your report?
10   A.   Correct. I try to indicate all of
11 the -- actually, it goes beyond that. This is,
12 basically, from 30 to 55, basically, is a
13 documentation of and descriptions of what I'm
14 going to be ultimately utilizing in the actual
15 life care plan, as far as what we levelly call
16 in my office boxes, which begin on page 60.
17   Q.   Okay.
18   A.   But those first 20 pages lays the
19 foundation of how I'm utilizing, what resources
20 I'm utilizing and the basis of my opinions.
21   Q.   And are those -- we'll get to
22 your report, but since you jumped there a little
23 bit, I'll jump there too. Those citations that
24 you have in your report, are those pretty
25 standard citations that you put in most of your

Page 23

1 life care planning reports?
2    A.   Correct. If I have a pediatric case,
3 I'll utilize some pediatric documentation. If I
4 have a brain injury, I want to have something
5 very specific for brain injury. These are
6 specific particularly for a mother, and the
7 types of services that she's going to need would
8 be put into, basically, what's a podiatrist or
9 what's a surgeon, we identify it and quote their
10 training.
11   Q.   Do you do any life care plans
12 presently outside of the litigation or claim
13 context?
14   A.   No. Otherwise, they would called a
15 case management tool. A life care plan is
16 specifically for litigation.
17   Q.   How about, then, case management
18 tools, do you do those in your private practice
19 currently?
20   A.   No. I mean, the way I'm testifying,
21 when I discharge a patient, I almost do some of
22 this. But we don't need the pricing and we
23 don't need to do it in a formal way that we do
24 with life care planning. But, obviously,
25 someone with a brain injury or amputation,

Page 24

1 there's a litany of services that they are going
2 to require, and we do go over them with the
3 patient at the time of discharge, but nothing
4 formal like we do in the life care plan reports.
5    Q.   I understand your rate currently is
6 $500 per hour for your life care forensic work;
7 is that accurate?
8    A.   Correct, correct.
9    Q.   Is there a -- at least I saw in your
10 billing invoice, that it was an initial $6,000
11 charge. Is that just your typical retainer
12 charge?
13   A.   That's my retainer charge.
14   Q.   Doctor, I'll share the screen again
15 here. If whenever I say I'm going to share the
16 screen and it doesn't show up on your end, just
17 let me know. It probably means I screwed it up
18 somewhere on my side.
19   A.   You've got it there now.
20       (Exhibit 61, 7/30/2024 Billing
21 invoice, is received and marked for
22 identification.)
23   Q.   Doctor, we will mark as Exhibit 61.
24 It's a copy of your billing invoice. And I know
25 you issued another invoice to our firm related

Page 25

1 to this deposition, but is this the only invoice
2 dated July 30, 2024 that would have gone to
3 Morgan & Morgan?
4    A.   That's correct.
5    Q.   In looking at the invoice, obviously,
6 we have the $6,000 retainer that we talked
7 about. Then there's this statement underneath
8 the retainer portion of it, and I'll blow it up
9 here. It says, "'Due to changes in Life Care
10 Planning for Physiatrists acting as both Expert
11 Life Care Witnesses and Expert Physicians, this
12 notice serves to ensure that you, as Attorney,
13 have adjusted your disclosures to address that
14 Doctors from PLCPA serve as both Expert
15 Witnesses as Physicians and Life Care Planners,
16 and thus, will make all medical opinions (within
17 their scope of medical present) and testimony
18 admissible.'"
19       Did I read that correctly?
20   A.   That is correct.
21   Q.   What does that mean?
22   A.   We had several recent cases here in
23 Florida where physicians were hired to do life
24 care planning, and, for some reason, at the time
25 of disclosure, they did not indicate that they

Ronald E. Synder, M.D.
08/14/2024

Page 26

1  were a physician, as well as life care planner.
2  And then those physicians were disqualified and
3  Daubert'd out.
4         And SO I'm very protective of my
5  status, and so we put that in so that the
6  attorneys understand – or I understand why I'm
7  being hired.  I'm being hired as a physician to
8  do an evaluation, to see the patient, understand
9  the diagnosis, and be able to provide not only
10 life care planning by talking to other doctors,
11 but be able to provide my own information,
12 background and training into the preparation of
13 what I do.  So I want to make sure the attorneys
14 so indicate that to all sides, that that's what
15 I was hired to do.
16 Q.    Basically, it's an effort – it
17 sounds like to protect yourself to make sure
18 that you're not improperly disclosed and face a
19 Daubert challenge due to a lack of disclosure of
20 full information on your background?
21 A.    Correct.  I do not have a retainer
22 contract or whatever.  This is as close to what
23 I get, basically, to let everybody know what I
24 understand and what I'm hired for.
25 Q.    In this case with Stephanie

Page 27

1  Wadsworth, did you conduct a full medical
2  examination on her?
3  A.    Well, it depends what you call
4  "full."  I, obviously, listened to her lungs and
5  felt her belly and looked at her skin.  We did
6  range of motion.  So we did a medical
7  evaluation, both a medical, as well as
8  orthopedic and neurologic, all the things that
9  would be required in looking at a burn patient
10 who had been intubated.
11 Q.    And the only time that you saw
12 Mrs. Wadsworth, was that at – you have an
13 evaluation of patient for four hours, was that
14 when you saw Mrs. Wadsworth?
15 A.    Correct.  I spent four hours on April
16 13, 2023.
17 Q.    It looks like you would have flown up
18 there on April 12th.  And I presume you're
19 coming from Florida?
20 A.    Correct.
21 Q.    And then you did the evaluation on
22 the 13th?
23 A.    Correct.
24 Q.    And then you would have flown back to
25 Florida after that?

Page 28

1  A.    Correct, that evening.
2  Q.    Was the evaluation at her house?
3  A.    Yes.
4  Q.    When you did the evaluation, I know
5  you mentioned her four children were around.
6         Was her husband Matthew around?
7  A.    He was, but had just gone to sleep.
8  He works night and he was sleeping, and,
9  apparently, had a rough night so I did not need
10 him at the time of my visit.
11 Q.    He was at the house, but you didn't
12 get to meet him because he was sleeping?
13 A.    That's correct.
14 Q.    Prior to your evaluation of
15 Mrs. Wadsworth, in-patient evaluation, did you
16 have any prior contact with her in the lead-up
17 to your home visit?
18 A.    I did not.  My staff may have called
19 and talked with her, because we did have
20 questionnaires forwarded to her to fill out in
21 preparation for my arrival.  So my staff did,
22 but I did not.  And it was all, basically,
23 perfunctory as far as scheduling and where her
24 address was.  She lives – it's not like turning
25 your GPS on and going six blocks and finding her

Page 29

1  house.  She's out in the middle of nowhere.  And
2  so it took us a little while to make sure we had
3  all the ideas on how to find her and so forth.
4         I did talk to her then on the phone
5  probably 15 minutes prior to my arrival, just
6  making sure I knew where – what was her house
7  and where her house was.
8  Q.    It sounds like the first substantive
9  discussion you had with her would have been when
10 you arrived at her house; is that accurate?
11 A.    That's accurate.
12 Q.    And I believe in some of the
13 photographs that I saw, there was a female that
14 was with you assisting, correct?
15 A.    Correct.  Dr. Maria Ocasio.  She's
16 been with me now for three years.  She is board
17 certified as a life care planner.  I bring two
18 with me.  I just turned 78, and I'm going to try
19 to retire somewhere along the line, and so I
20 have another doctor with me.  We've been
21 traveling together, two doctors, for a while.
22 This report is mine, but I do end up teaching so
23 that she knows my techniques and plans on how to
24 do things so I can retire.
25 Q.    How do you spell Dr. Maria's last

Ronald E. Synder, M.D.
08/14/2024

Page 30

1  name?
2      A.   Her name is on the letterhead.  It's
3  Ocasio-Silva, O-C-A-S-I-O - S-I-L-V-A.  She was
4  born in Puerto Rico and trained here in the
5  United States.
6      Q.   How many total doctors do you have on
7  staff at your location?
8      A.   I don't have them on staff.  They all
9  work.
10          Dr. Ocasio is director of outpatient
11  rehab services at Nemours Children's Hospital.
12          I have Dr. Nicholas Bagnoli.  He is
13  director of inpatient rehabilitation services at
14  AdventHealth in Orlando.
15          I have Dr. Rafael Santiago.  He is
16  director of the traumatic brain injury program
17  in Veterans Administration in Tampa.
18          Those are my physicians who I am
19  presently training to do life care planning.
20      Q.   Are those three other physicians,
21  Drs. Ocasio-Silva, Bagnoli and Santiago, are
22  they employees of your company or independent
23  contractors?
24      A.   Independent contractors.
25      Q.   So you, basically, 1099 them at the

Page 31

1  end of the year?
2      A.   Correct.
3      Q.   Did anyone else besides Dr.
4  Ocasio-Silva join you for the home visit?
5      A.   And the children, that's it.  No, no
6  professional people came along, other than we
7  call her Dr. Ocasio or Maria.
8      Q.   Did anyone besides you and Maria do
9  any work from your office on this life care
10  plan?
11      A.   Oh, definitely.  I have an entire
12  team that helps with the pricing.  I have Leslie
13  Watson.  Leslie is nationally known.  She's
14  written all the chapters on pricing in
15  Dr. Weed's textbook of life care planning.  So
16  she helps me with making the phone calls and
17  helping to do the screenshots that are included
18  in the report that goes from page 75 to page
19  172.  That is my documentation of resources.
20          So I have her particularly help make
21  phone calls and call different doctors in the
22  community and ask them what their usual
23  customary charges are.  And she's the one that
24  does all the research.  Every research that she
25  has done, she screenshots it and then puts it

Page 32

1  into that thing with the report.  So I'm totally
2  transparent of the work that she had done.
3      Q.   And what was her name again?
4      A.   Leslie Watson, W-A-T-S-O-N.
5      Q.   Leslie is just L-E-S-L-I-E?
6      A.   L-E-S, yes, I-E.
7      Q.   And is she a doctor or more staff?
8      A.   She's a master's level.  She's a
9  certified rehabilitation counselor.  She has a
10  master's in there.  She also has a degree in
11  durable medical equipment.
12      Q.   How long has Ms. Watson been with
13  you?
14      A.   Probably, eight or nine years now.
15      Q.   And is she an employee of your
16  company?
17      A.   A 1099.
18      Q.   Are you the only employee of
19  Physiatry Life Care Planning Associates?
20      A.   No.  I have two secretaries.  I have
21  one secretary who worked as a paralegal in an
22  attorney's office.  She's my major go-to.  I
23  also just recently hired a gentleman who will
24  now reach out to treating doctors, asking the
25  treating doctors for their opinion on our life

Page 33

1  care plan.  And that's a new department about
2  three months ago.
3      Q.   So three total employees at your
4  location?
5      A.   Yes, yes, yes.
6      Q.   And then everyone else that assists
7  in one form or another are 1099s?
8      A.   Correct.
9          I have two other 1099 employees.  I
10  have Rachel Richardson, who is a board certified
11  life care planner.  She's got a master's in
12  education, and she helps with proofreading.  And
13  I have a young high school graduate young lady
14  who worked in an accounting office that will
15  sometimes provide an Excel sheet to give to the
16  attorneys so they might have an idea of the
17  general value of the case.
18      Q.   In looking at your invoice in this
19  case which we have marked as Exhibit 61 -- let
20  me know if you need me to pull it up again or if
21  you have it in front of you.
22      A.   Okay.
23      Q.   There's eight hours review of
24  records.  Is that a task that you did or would
25  someone else in your office do that?

Ronald E. Synder, M.D.
08/14/2024

Page 34

1    A.    I do the review of records.
2    Q.    And do you take any notes during that
3    process?
4    A.    No.  I have what's called – I call
5    it a living document.  I start putting stuff
6    right into the report as I review records.  And
7    that ultimately is incorporated into the final
8    report.  I have no three different levels of a
9    report.  We always work on the same document.
10    Q.    Would Dr. Maria help you with the
11    review of records, or is that done totally on
12    your own?
13    A.    She may have helped somewhere along
14    the line.  I mean, what we do is, when you're on
15    a plane for two or three hours or we're in a car
16    for two or three hours, we talk about the
17    report.  We talk about what we found.  And so we
18    bounce things off as a training.  It's kind of
19    like a residency program or a fellowship
20    program.  So you do share back and forth kind of
21    opinions and so forth, but I reviewed the
22    records.
23    Q.    And as far as the "Research: Cost of
24    Services/Equipment research" at eight hours, was
25    that done by Leslie Watson?

Page 35

1    A.    That would have been done by Leslie.
2    Q.    Any of those hours attributed to you
3    or is that all Leslie's hours?
4    A.    That's Leslie's hours.
5    Q.    And then "Life Care Report
6    Generation" at 10 hours, is that all you?
7    A.    Correct.
8    Q.    Is there anyone else in your office,
9    whether it be Dr. Maria or Leslie, would they
10    have helped in the report generation aspect?
11    A.    Not at all.
12    And understand, what Leslie does is
13    totally under my direction.  I review what she
14    does on about an every two-to-three-month
15    period, making sure we're doing everything the
16    way I want it to be done because it's all under
17    my signature.
18    Q.    And then the last line item on your
19    invoice relates to "Treating Drs. Questionnaire
20    Fee."
21    A.    Yes.
22    Q.    And is that the – I saw a
23    questionnaire that went to a Dr. LeChapelle.
24    Is that what that relates to?
25    A.    Correct.  So here in Florida,

Page 36

1    particularly, we had a case where a physician
2    did a life care plan, but they still want – one
3    of the judges still wanted us to touch bases
4    with the treating physicians.  So beginning a
5    couple of months ago, we started doing that.
6    So I did mail that out to that
7    physician – he's an interesting gentleman.
8    He's a burn surgeon, as well as he has a
9    doctorate in physical therapy as well.  We did
10    send a check and a letter out to him.  We did
11    not get anything back.  He did not cash the
12    check.
13    Our office did reach out to him
14    yesterday or his staff.  And they said, Oh, yes,
15    that's sitting on his desk.  So I may get that
16    report sent to me somewhere along the line, but
17    I do not have it in my files.  It's not been
18    sent to me as of today.
19    Q.    And that was certainly going to be
20    one of my questions, as to whether you received
21    any contact back from Dr. LeChapelle.  And it
22    sounds like, at this point, the answer is, no,
23    you have not?
24    A.    That is correct.
25    Q.    And since we're talking about it now,

Page 37

1    just as a matter of housekeeping, why don't we
2    mark this as the next exhibit in line.  And I'll
3    pull it up.
4    (Exhibit 62, 6/6/24 letter to C.
5    LeChapelle from R. Snyder, is received and
6    marked for identification.)
7    Q.    Dr. Synder, if you could confirm - so
8    this would be Exhibit 62 - this is the letter to
9    Dr. LeChapelle with the accompanying
10    questionnaire, you probably can't see it, but it
11    is 19 pages long.  Is that the questionnaire
12    that you would have sent to Dr. LeChapelle?
13    A.    That is correct.  And we did get
14    notification they had received it by certified
15    mail so they did receive it.
16    Q.    And this would have been sent on June
17    6, 2024, as you noted, via certified mail and
18    through the certified mail process, as well as
19    it sounds like your recent conversation with his
20    office, he did receive this, correct?
21    A.    Correct.
22    Q.    Hold on one second.  I apparently
23    didn't shut my office phone off.
24    Sorry about that.
25    Have you ever spoken with

Page 38

1 Dr. LeChapelle?
2    A.   I have not.
3    Q.   Has anyone from your office spoken
4 with Dr. LeChapelle?
5    A.   We have not.  Yesterday I reached out
6 saying, Hey, where is this?  And I think one
7 person spoke to one of his secretaries or
8 whatever.  They did some research.  And I was
9 asked to -- or they were asked to take this
10 report and fax it to them, which was faxed
11 yesterday to them.
12    Q.   And at least, as you sit here today,
13 I think you previously testified, you don't have
14 a completed copy of the questionnaire that you
15 sent to Dr. LeChapelle?
16    A.   I do not have a returned copy, that's
17 correct.
18    Q.   Okay.
19       And when you say "returned," just so
20 we're speaking the same language, you don't have
21 a returned or a completed copy of this
22 questionnaire, correct?
23    A.   Correct, yes.  I have what I sent
24 them and I expect for them to sign it, complete
25 it and return it back to me.  And I do not have

Page 39

1 anything of that nature, that's correct.
2    Q.   Are there any of Stephanie
3 Wadsworth's treating physicians that you --
4 strike that.
5       Have you spoken with any of Stephanie
6 Wadsworth's treating physicians?
7    A.   I have not.  After I saw the patient,
8 I had some discussions with plaintiffs' counsel,
9 as far as needing to get some additional
10 clarification, because I'm not a plastic
11 surgeon.  And in order for me to put particular
12 procedures in, it would be inappropriate for me
13 to add those procedures.
14       And you'll see in my life care plan,
15 I have a list of procedures that I presume the
16 patient is going to be needing, but I could not
17 put in because that's outside of my wheelhouse.
18 So I presume in the future, there will be some
19 additional experts or counsel will set up an
20 appointment for me to speak with those treating
21 physicians.  But at this point, none of that has
22 been arranged at this point.
23    Q.   And it sounds like Dr. LeChapelle is
24 the only one that you've actually reached out to
25 as part of your work in this case?

Page 40

1    A.   Correct.
2       What I did was, when I see the
3 patient, I'll say, Look, you have a host of
4 doctors, who would know you the best and who
5 would best be able to tell us in their agreement
6 or disagreement particularly with equipment and
7 so forth.  And she said very quickly, This would
8 be the guy, so that's who we reached out to.
9    Q.   Is it your understanding that
10 Dr. LeChapelle is the primary doctor that is
11 organizing her care, so to speak?
12    A.   That's what I understand.  There have
13 been some different people coming and going.
14 She tried to get some care locally, and that did
15 not work very well.  And so that's the real
16 problem is, they live so far away and are
17 financially limited with travel.  So they tried
18 locally, and it did not work.
19       An example, a physical therapist,
20 they tried to get physical therapy locally and
21 the physical therapist had never done burn
22 therapy, so she's limited where she lives.
23    Q.   And who puts together this
24 questionnaire, Doctor, that we have up as
25 Exhibit 62?

Page 41

1    A.   Well, I, obviously, wrote the letter.
2       This, basically -- my office staff,
3 they basically take the life care plan and they
4 remove certain things.  Everything was generated
5 by me, but they remove some pieces.  I don't
6 send the full life care plan to the physician,
7 but we, basically, clean things up and put on
8 the right-hand side, Agree, Disagree Unknown, so
9 we do put that in.  My team does that.
10    Q.   And that starts at -- actually, let
11 me take a step back here.  I guess it goes a
12 number of pages, but starts first at page 3.
13    A.   Right.
14       And if you would then look at page 61
15 -- I'm sorry -- page 60 of my report, you see
16 they basically mimic exactly those boxes, except
17 they were slightly changed to be forwarded as a
18 questionnaire.
19    Q.   And then it looks like your
20 expectation for the treating physician is that
21 they would go through on this right-hand column
22 for each line, indicate whether they agree,
23 disagree or just don't know?
24    A.   Correct.
25       And the problem is none of them have

Ronald E. Synder, M.D.
08/14/2024

Page 42

1  had training in life care planning, as usual.
2  So they often do not know or understand
3  frequency.  They obviously don't understand all
4  the pieces.  But we had begun doing it because
5  of some recent judgments here in Florida.  So I
6  carry it out nationally wherever I go as well.
7        Q.    Doctor, I'm going to pull up what we
8  will mark as Exhibit 63.
9            (Exhibit 63, Dr. Snyder's Elkins
10      List, is received and marked for
11      identification.)
12       Q.    And this is your Elkins list which we
13  referred to previously a little bit, correct?
14      A.    That's correct.
15      Q.    And in looking at your Elkins list,
16  this is your first case that you've had in
17  Wyoming; is that accurate?
18      A.    Correct.
19      Q.    And in looking at the list, which
20  isn't surprise given where you're based, it
21  looks like about 95 percent plus or so are
22  Florida cases, correct?
23      A.    Correct.
24      Q.    And then over the past five years, it
25  looks like that you've worked with Morgan &

Page 43

1  Morgan on more than 30 cases.
2            Does that sound accurate?
3      A.    I have no idea.  I haven't counted.
4  You know, they're all over the country, and
5  different attorneys ask us to see cases.  So I
6  started, basically, just keeping the names of
7  the attorneys that hired me, because I've had
8  all sorts from all over and I just don't know
9  even where they're from anymore.
10      Q.    You agree you've worked with Morgan &
11  Morgan on a number of cases?
12      A.    If you added up 30, then that's it.
13  But I have not sat down and looked at it.
14  That's a possibility.
15      Q.    Does 30 sound about accurate for the
16  past five years for Morgan & Morgan?
17      A.    I think that's accurate, five years
18  or so, yes.
19      Q.    And, obviously, for some of them, you
20  just list them by attorney, so who knows if that
21  attorney was with Morgan & Morgan at the time or
22  if they have moved on?
23      A.    Correct.  Sometimes they started it
24  and they moved into Morgan & Morgan, and so
25  forth, yes.

Page 44

1        Q.    Or vice-versa, they could have been
2  with Morgan & Morgan when they hired you and now
3  they're somewhere else?
4      A.    That's correct.
5      Q.    At least, based on what we could
6  glean from the names of cases, it looked like it
7  was roughly 30 or so in the past five years, and
8  you wouldn't dispute that, correct?
9      A.    I wouldn't dispute that.  That sounds
10  accurate.
11      Q.    And in going through your case list,
12  it looked like there were only two other cases
13  that you've done life care plans for burn
14  injuries.
15            Does that sound accurate?
16      A.    I don't know.  I see the first page
17  here, the Brennen case was a major burn with
18  amputation.  I've done some pediatric burns.
19  I've done some scaldings.  But I don't remember
20  exactly when and where we saw them.  You see
21  Brennen right there is listed for Ted Leopold,
22  that was back in 2012.
23      Q.    Is it Brennen or Brennen?
24      A.    I don't remember.
25      Q.    However you pronounce it, it's

Page 45

1  B-R-E-N-N-E-N, that was certainly one of the
2  cases that involved a motor vehicle accident,
3  apparently, with some burns and amputation?
4      A.    Correct.  The truck that she was
5  riding burst into flames.  The driver burned to
6  death.  And she, basically, lost arms and legs.
7      Q.    And Leopold, is that the attorney's
8  name or is that the law firm's name?
9      A.    Ted Leopold is the attorney.
10      Q.    Who is Ted Leopold with?
11      A.    He had his own firm at the time.
12      Q.    And then the other one that I saw was
13  the Shappard case from 2021, so more recently.
14  It involved some electrical burns.
15      A.    Yes.  He lost his arms and legs,
16  yes – he lost his arms, anyways.
17      Q.    And that was with an attorney Marc
18  Warner.  Does that name ring a bell?
19      A.    It sounds familiar.
20      Q.    Do you know what firm Marc Warner was
21  with?
22      A.    No, no.
23      Q.    And the electrical burns, I presume
24  that was – or let me ask you, was it from a
25  high voltage line or what were the circumstances

Ronald E. Synder, M.D.
08/14/2024

Page 46

1  in that regard?
2      A.   Yes, that was a high voltage line.
3           I've done some others.  I had a
4  pediatric case, where a pressure cooker exploded
5  and a little girl lost arms and legs.  I've got
6  four or five burns that I've done.  I don't know
7  if they're lifted.  It may be.  I've done quite
8  a few cases where I did not have to do a
9  deposition or go to court as well.
10     Q.   Okay.
11          I could tell you that I searched
12 Exhibit 63 for the term "burn," "burns," "fire,"
13 or anything that could be related, and those are
14 the only two that came up.
15     Q.   Okay.
16     Q.   So at least those would be the only
17 two that you would have provided any deposition
18 for, correct?
19     A.   Correct, correct.
20     Q.   And it sounds like you may have done
21 some others, but either you were in the
22 background, or it never got to a deposition
23 phase?
24     A.   That's correct.  I've had three or
25 four electrical burns, a product liability

Page 47

1  pressure cooker exploded for a four-year-old.
2  I've had quite a few, yes.
3      Q.   Okay.
4           And electrical burns are typically
5  different from fire impingement burns by way of
6  treatment, correct?
7      A.   I don't know about treatment.  I'm
8  not a treatment person.  But as far as the
9  long-term outcomes, it depends on how severe it
10 is.
11     Q.   As far as their life care plan goes,
12 they would have different needs from an
13 electrocution perspective than a burn injury
14 from a fire or flame impingement, correct?
15     A.   Well, the life care plan would be
16 dependent on what their long-term needs are.
17 Certainly, there's more cardiac events with an
18 electrical burn.  There's often more cognitive
19 issues with an electrical burn.  But that does
20 not preclude, just because of the diagnosis, you
21 do a life care for what the patient is presently
22 needing.  Each individual is specific.
23     Q.   And, generally, electrical burns have
24 less TBSA on the exterior of the body, meaning
25 on the skin - TBSA meaning total body surface

Page 48

1  area - than someone that's involved in a fire,
2  correct?
3      A.   That's correct, but they often have
4  more muscle trauma.  And they can also have an
5  explosive what almost looks like exiting bullet
6  hole where you can have large holes where it
7  leaves.
8      Q.   So at least as far as burns caused
9  from electric shock, compared to burns caused
10 from fire or flame impingement, they are
11 different injuries, correct?
12     A.   Yes.  Again, but I'm not your
13 treating doctor, so I'm looking at long-term
14 what they need from what their treating doctors
15 are now providing.
16     Q.   Doctor, have you ever been
17 successfully Daubert'd or Rule 702 challenged?
18     A.   They always ask me that.  And I have
19 to answer in one particular question, I about 15
20 years ago was on the stand testifying on a brain
21 injury case and plaintiff's attorney turned
22 around and asked me if I had an opinion whether
23 the patient needed neck surgery.  And it was,
24 like, what?  And so explosions went off and so
25 forth.  And, obviously, I would not – that's

Page 49

1  not appropriate for me to offer that opinion.
2  So I was kind of, quote/unquote, Daubert'd
3  extemporaneously immediately, and I did not
4  offer an opinion.  But short of that, no, I've
5  never been Daubert'd.
6      Q.   Do you know what the name of that
7  case was?
8      A.   No.  It was about 15 years ago and --
9  Thomas.  It was the Thomas case, T-H-O-M-A-S, in
10 Orlando.
11     Q.   Is that the Thomas versus Government
12 Employees Insurance Company case?
13     A.   I don't know.  Attorney Salzman was
14 the attorney.
15     Q.   Was that sometime around 2017?
16     A.   I'm going to say, like, ten years
17 ago.  It seemed like forever.
18     Q.   How about the Collett, C-O-L-L-E-T-T,
19 versus Fisher case, are you aware of that case?
20     A.   That was a case where an attorney did
21 not appropriately list me as a physician doing a
22 life care plan.  But I've never been aware of
23 any Daubert cases.
24     Q.   Are you aware that, under the Collett
25 case, that the Daubert challenge was successful

Ronald E. Synder, M.D.
08/14/2024

Page 50

1 upon you?
2    A.    No, I do not.
3    Q.    And the Collett case was with
4 Attorney Donny Owens with Morgan & Morgan.
5        Do you know him?
6    A.    No.  I mean, I remember some kind of
7 case where they did not present me appropriately
8 as almost very similar to what I got in this
9 contract, as the treating physician doing a life
10 care plan, but I did not think that was
11 successful.  But it was not my opinions that
12 were challenged, that I'm aware of.
13    Q.    You don't think in the Collett case
14 that they changed the methodology or opinions
15 that you utilized?
16    A.    I think that's what they were going
17 after, but they didn't understand my background
18 and training.  I don't know, counselor.  But,
19 certainly, it's not germane to what I do in my
20 practice in life.
21    Q.    Have you read the Collett case?
22    A.    No.
23    Q.    It was issued in 2022 from the Middle
24 District Florida Jacksonville Division.
25        You're not aware of what the specific

Page 51

1 decision is in that case, are you?
2    A.    No, not at all.  I knew they were
3 fighting, and I said something to the attorneys
4 and they never got back to me.  So this is news
5 to me.
6    Q.    Okay.
7        Just to show you the decision here,
8 to the extent you want to look into it further,
9 you can see that defendants' motion to strike or
10 limit testimony of Dr. Ronald Synder was
11 granted.
12    A.    And it looks like multiple were
13 granted.  It looked more like a problem with
14 lawyering to me.
15        MR. AYALA:  Let me just object to the
16 form of the question, and I'll leave it at
17 that.  I'll object to the form of the
18 question.
19 BY MR. LaFLAMME:
20    Q.    Doctor, so it sounds like,
21 ultimately, you don't know what the end result
22 was of the Collett case, and that this was the
23 first time that you've heard that your testimony
24 was successfully challenged in that case?
25    A.    Yes, I remember them discussing it,

Page 52

1 and I wrote a letter or something, but no.  I
2 would like to get a copy of that so I can end up
3 having it in my file that almost all of the
4 doctors were challenged and granted, so it
5 sounds like it was a problem with the case.
6    Q.    Doctor, when were you first hired in
7 Mrs. Wadsworth's case?
8    A.    I don't know, since I don't have a
9 contract.  I get a phone call.  My staff – I do
10 talk to an attorney.  And then we get records
11 sent to us, and then we schedule the patient.
12 And so I presume I was contacted about two
13 months prior to my seeing her.
14    Q.    At least, in looking at your invoice,
15 it looks like the retainer was sent or received
16 2/23/24.
17        Would that coincide with roughly when
18 you were retained on this case?
19    A.    Well, I would have received – that
20 would be when they wrote the check.  So I
21 presume, two or three weeks prior to that, I
22 would have been retained.  And we call and tell
23 them to set up an appointment and so forth.
24        My staff just walked in.  The intake
25 was February 14, 2024, I got a call.

Page 53

1        THE WITNESS:  Thank you.
2    Q.    And who was that from your staff that
3 just walked in?
4    A.    My secretary.
5    Q.    So February 14, 2024 was when you
6 first received the call to see if you could or
7 would work on this case?
8    A.    That would have been the date that I
9 spoke with an attorney, yes.
10    Q.    And do you know which attorney you
11 spoke with?  Was it Mr. Ayala or someone else?
12    A.    I do not.  I presume it's Dr. Ayala.
13        MR. LaFLAMME:  You've been elevated
14 to doctor.
15    A.    Oh, counselor, sorry.
16        MR. AYALA:  We receive an juris
17 doctorate for a reason.
18        MR. LaFLAMME:  Yes, that is true.
19        THE WITNESS:  You're a JD,
20 absolutely.
21        MR. AYALA:  I'll just note he had a
22 Puerto Rico license, but in Puerto Rico,
23 you're referred to as doctor.
24        THE WITNESS:  Exactly.
25 BY MR. LaFLAMME:

Ronald E. Synder, M.D.
08/14/2024

Page 54

1    Q.   All right.
2         Well, as far as -- so it sounds like
3    Mr. Ayala would have been the first attorney
4    that you spoke with when you opened this case;
5    is that correct?
6    A.   It's just, basically, we run over
7    60,000 feet the story of what I'm going to be
8    seeing.  And they, basically, get the records to
9    me.  And most of the time, my questioning is the
10   timeline, because I'll get a referral and they
11   want to get a life care plan in six weeks, and
12   it can't be done.  So I, basically, try to
13   understand what I can do and what I can't do for
14   the system, and then we ask for the records and
15   we fly.
16   Q.   Now, have you worked with Mr. Ayala
17   previously?
18   A.   I don't know.
19        THE WITNESS:  I mean, counselor, your
20        face looks familiar, maybe, but I don't
21        remember.
22   A.   Again, you know, my exposure to the
23   attorneys is a phone call, and then about only
24   20 percent end up with depositions, so I don't
25   see the attorneys.  The name doesn't even cross

Page 55

1    my mind at all on the case at all.  So I
2    unfortunately am not that oriented, from a
3    public relations point, to know all the
4    attorneys that reach out to me.
5    Q.   Are there any other attorneys for
6    Mrs. Wadsworth that you have worked with on this
7    case besides Mr. Ayala?
8    A.   I have no idea who she has, as far as
9    attorneys.  I only know this particular
10   situation.
11   Q.   A Greyson Goody, does that name sound
12   familiar?
13   A.   Not that I'm aware of.
14   Q.   And I believe an Eitan Goldrosen is
15   another attorney from Morgan & Morgan that has
16   done some work on this case.
17   A.   I don't know.  That's certainly not
18   familiar.  He could have put something in the
19   file that went to my staff.  But I certainly
20   don't know the name or focused on any of that.
21   Q.   How about any of the paralegals at
22   Morgan & Morgan, have you worked with them on
23   this matter?
24   A.   My staff would have talked to the
25   paralegals as far as setting up appointments and

Page 56

1    so forth, but that's all.  But not for opinions.
2    That would be, basically, organizing the visit.
3    Q.   And then with Mr. Ayala, it sounds
4    like you would have received an initial
5    reach-out from him in February 2024.  And I
6    think you described it as a 60,000 foot view of
7    the case that you would have been provided at
8    that point, correct?
9    A.   Correct.  What the story?  What's the
10   events?  Timelines.  And get the records to me.
11   And then the retainer.  And I just want to make
12   sure my schedules would fall within their
13   schedules being able to do the case.
14   Q.   Do you have any sort of intake form
15   where you take notes related to that initial
16   call?
17   A.   I don't take notes.  But it's just
18   part of -- sometimes I will open up the report
19   and type a couple of the lines in.  And now I've
20   opened up a document that I'm going to be adding
21   to over the next four months.  But I don't
22   remember on this case.  My staff, she just
23   looked it up in the calendar.
24   Q.   And the report that you have
25   described as a working document, is that a

Page 57

1    template that you basically have and then you
2    fill it in on a per-case basis?
3    A.   Yeah.  So I, basically, have the
4    classic history that you fill in.  And then I
5    take the records, the past medical records.  If
6    the patient has been identified as having
7    allergies, while I'm doing a review of records,
8    I'll put it in the classic medical history.  So
9    I, basically, have a pretty normal medical,
10   orthopedic, neurology template that I use.  And
11   then I have five or six different types of,
12   like, for an amputation or whatever, to help me
13   make sure I fill in my boxes and do what's
14   necessary.
15   Q.   Have you reviewed any deposition
16   testimony in this case?
17   A.   Not that I remember.  I certainly did
18   not review any in preparation for today.  I
19   don't believe I saw any.  I don't know.
20   Certainly, not in preparation for the
21   deposition.  I can see if I've got records.  I
22   don't remember.
23   Q.   In your report at page 3, you do have
24   a list of documents reviewed.
25   A.   Right.

Ronald E. Synder, M.D.
08/14/2024

Page 58

1    Q.   Are those all the documents that you
2    would have reviewed as part of your work in this
3    case?
4    A.   Correct.
5    Q.   Are there any additional documents
6    that you have reviewed since you authored this
7    report that are not listed in this report?
8    A.   No.  The only thing I've gotten back
9    is that they had not received my questionnaire,
10   so, no, I got nothing back.  I have nothing new
11   that I'm aware of.
12   Q.   And there are not any -- there is not
13   any deposition testimony listed as part of your
14   "Documents Reviewed," so does that tell you that
15   you have not reviewed any deposition testimony?
16   A.   That is correct.
17   Q.   And since it's not listed under
18   "Documents Reviewed," I presume you have not
19   reviewed any of the videos or body camera
20   footage from the evening of the accident -- or
21   the morning of the accident?
22   A.   I did get -- they did send me some
23   photos acutely, and I think I did see -- I'm
24   trying to remember if I had my staff download
25   it, or something from the news, something of an

Page 59

1    video, an interview of the gentleman who got her
2    out of the house.  I did review some of that.
3    Q.   Was that a news clip, as opposed to
4    body camera footage from the responding
5    officers?
6    A.   Counselor, I don't remember.  I would
7    have seen it just before I saw the patient.  And
8    that just kind of -- as a physician, I'm just
9    trying to get an idea of what I'm going to be
10   seeing before I see the patient.  It does not
11   ultimately add anything to my long-term
12   planning.  It just gets me ready and prepared to
13   see the patient.
14   Q.   Okay.
15        As part of your interview process
16   with Mrs. Wadsworth, did you have any discussion
17   about what may have caused the fire?
18   A.   Certainly -- it was certainly the
19   background, I understand that there was a
20   hoverboard that caught on fire.  I don't -- I
21   knew that as, generally, the question that was
22   being at hand.  I am not a factfinder, so I
23   don't remember questioning her specifically what
24   she saw or did, but I just knew that was the
25   premise of the report.

Page 60

1    Q.   When you say "the premise of the
2    report," what do you mean by that?
3    A.   My evaluation that the hoverboard
4    caught on fire and that's what lead to this.  I
5    certainly was not a factfinder of asking her
6    what she saw or what she didn't see and so
7    forth.  It was my understanding that she
8    understood that a hoverboard caught on fire.
9    Q.   And did you ask her any
10   questions about -- understanding you said you
11   weren't a factfinder, but did you ask any
12   questions about what occurred that night, what
13   she witnessed, those types of things?
14   A.   Well, she woke up, the house was on
15   fire.  She ran out of her bedroom.  She helped
16   one of the children out of the house.  She
17   realized she had to come back in to get another
18   child.  And then she didn't remember much more
19   than that.  She remembered a moment being
20   outside.  She remembered a moment in the
21   helicopter or ambulance, and then nothing else.
22   So those are the scattered little pieces of her
23   memory that she told me.
24   Q.   Okay.
25        Any discussion with Mrs. Wadsworth

Page 61

1    about the fire potentially starting at a smoking
2    shed that was outside the boys' bedroom?
3    A.   No.
4    Q.   Have you ever heard that before?
5    A.   I have not.
6    Q.   Understanding you're here as a life
7    care expert, just to get this on the record, I
8    presume you are not offering any opinions or
9    testimony about where the fire, number one, may
10   have originated, correct?
11   A.   That is correct.
12   Q.   And you're not offering any opinions
13   or testimony about what the potential cause or
14   causes of the fire may have been, correct?
15   A.   Correct.  I'm, basically, dealing
16   with a burned patient and her long-term needs.
17   Q.   And although you're aware that the
18   claim in this case is that it started at the
19   hoverboard, you're just aware of that as being
20   one of the issues in the case?
21   A.   It was the only issue that I was
22   aware of until just now.
23   Q.   And I assume, as the life care
24   planning expert, you haven't talked to any of
25   the investigators that were involved in the

Ronald E. Synder, M.D.
08/14/2024

Page 62

1  origin and cause investigation, correct?
2      A.   That's correct.
3      Q.   Are there any documents that you
4  asked for as part of your evaluation in this
5  case that you are waiting to receive or just
6  have not been given?
7      A.   After I saw the patient, I did speak
8  with counsel, indicating that I could not put in
9  the specific types of plastic surgical
10  procedures, the types of pulmonary procedures
11  and so forth; that if he did do that, then I
12  would have to -- I would then do the research
13  and the costs.  So I did have listed the
14  procedures that I could not do pricing for that
15  I suggested would ultimately come if I got
16  further documentation.  And that would be found
17  on page 64.
18      Q.   Okay.
19      A.   That I could not do life care
20  planning as a physiatrist, and, therefore,
21  suggested that we were going to need some
22  additional consultations, if I were to put those
23  values into the life care plan.
24      Q.   Since we've been referring to your
25  report, Doctor, why don't we just go ahead and

Page 63

1  mark it.
2          I'm going to show you a copy of your
3  report.  And we can mark your report as Exhibit
4  64.
5          (Exhibit 64, Life Care Plan Report
6      prepared by Ronald Snyder, M.D., is
7      received and marked for identification.)
8      Q.   And just so we can confirm that we're
9  on the same page here, obviously, I won't page
10  through all 172 pages to have you authenticate
11  them, but here is the first page, and it's 172
12  pages long.
13          Is that consistent with the report
14  that you authored in this case?
15      A.   That is correct.
16      Q.   And then I'll also mark as Exhibit
17  65, I've call it the Life Care Plan Summary, I
18  don't know if you have a different name for it,
19  but it is a five-page document that, kind of,
20  basically, boils down the 172 pages into a
21  little more readable format.
22          (Exhibit 65, Lifetime Cost Summary,
23      is received and marked for identification.)
24      A.   What it is is, the life care plan is
25  what we just spoke about, the Word document.

Page 64

1  I sent that the attorneys, and then they could
2  call me and say What's the value of this?  So I
3  put this into an Excel report.  I have a young
4  high school graduate who is very good at Excel
5  reports, who I try to protect, because I don't
6  want her having to testify.  So I put in red,
7  "This spreadsheet of Lifetime Costs is provided
8  as a Professional Courtesy.  As it is a Work
9  Product, it is NOT to be released or published.
10  Additionally, this document does not replace the
11  findings and work of an Economist."
12          So this is the shorthand version to
13  give the attorney as to what the ultimate value
14  would be, but I can't testify as to the veracity
15  of the numbers.  But it is a shorthand idea of
16  what the life care plan really is.
17      Q.   When you say you can't testify to the
18  veracity of the numbers, what do you mean by
19  that?
20      A.   That's what I mean.  This is work
21  product.  A young high school girl does it for
22  me.  I don't know how to do the equations and so
23  forth.  So this is, basically, to provide to the
24  attorneys on the side.  This is not the life
25  care plan.  This is, basically, a summary, so

Page 65

1  they can get an idea of what the costs would be,
2  but it's not the life care plan.
3      Q.   So in going through and looking at
4  the average costs per lifetime figures, do you
5  verify that these figures are consistent with
6  what's in your expert report?
7      A.   No.  That's why I'm saying, I send
8  this to the attorneys for a shorthand term and
9  say very, very specifically that this
10  spreadsheet of lifetime costs is provided as a
11  professional courtesy.  This gives them a
12  shorthand understanding of the value of the
13  case.
14      Q.   So as far as the numbers that are
15  listed here, understanding you have a high
16  school grad employee or 1099 consultant help you
17  out with this, you don't do anything to verify
18  that these numbers are indeed correct?
19      A.   That is correct.  It's, basically, to
20  give them a general idea of the value of the
21  case.  That's why it's in full red.  I try to
22  protect her at all costs.
23      Q.   And then I presume the lifetime total
24  of $3.698 million and some change, have you
25  verified whether that total is correct?

Page 66

1    A.   No.  Basically, this is something I
2  give to the attorneys, so that they can end up
3  getting an idea of what they ultimately send to
4  an economist.  And the economists do not use
5  this.  They use the actual 172-page report for
6  them to do their own reports.
7    Q.   And in your report, you do not
8  provide any final figures, correct, as far as
9  what the overall life care plan would cost?
10   A.   Correct.  I, basically, do a weekly,
11  yearly, monthly of the values.  And then I have
12  that report ultimately go to the economists,
13  because they do lots of other manipulations with
14  those numbers for an ultimate amount of money
15  that should be involved.
16   Q.   Okay.
17       So you would ultimately rely on an
18  economist to provide the final life care plan
19  figures that would be claimed as damages in this
20  case?
21   A.   That's correct.
22   Q.   Okay.
23       So as you sit here today, you, as a
24  life care planner, you do not provide the final
25  figures that would be attributable to the damage

Page 67

1  claim, correct?
2    A.   Correct.
3    Q.   Are you aware of any economist that
4  has done the calculations relative to your life
5  care plan in this case?
6    A.   I am not.
7    Q.   Okay.
8        Is it a typical situation where – or
9  let me take a step back.
10       Generally, when you do your life care
11  plans, are you in contact with the economist to
12  provide them your life care plan?
13   A.   No.  Most of the time, my reports are
14  simply sent to the economists.  Occasionally,
15  I'll get a phone call wanting me to define
16  biweekly or some kind of a question as far as
17  verbiage.  But the majority of the time I am not
18  contacted by the economists.
19   Q.   Okay.
20       And then there were three
21  questionnaires that you had Mrs. Wadsworth
22  complete?
23   A.   Yes.
24   Q.   And they were completed prior to your
25  home visit; is that accurate?

Page 68

1    A.   Correct, correct.  She had them for
2  me when we arrived.  They were completed and,
3  again, she handed them to us at that time.
4    Q.   And the questionnaires that we have
5  for the Medical Questionnaire 1 of 3, Medical
6  Questionnaire 2 of 3, I presume that these were
7  two-sided documents or two-sided pages because
8  we only –
9    A.   Correct.  They came to me – what I
10  have here are two-sided, so I think she printed
11  them out two-sided and then completed them.  I
12  have them.  So I think when she printed them out
13  – I don't know.  I have the originals here and
14  one page is upside down and so forth.  And this
15  is what she handed to me.  When she printed them
16  out, that's the way they printed.  She filled
17  them out and then gave them to us.
18   Q.   Do you have – and I ask you this,
19  Doctor, because for Questionnaires 1 and 2, we
20  only have the odd-numbered pages.
21       (Phone interruption.)
22   A.   Well, when they scanned it – I do
23  have both sides.  I apologize.  I presume –
24  it's very rare to have something on both sides.
25  So I guess my secretary may have just

Page 69

1  perfunctorily scanned them in.  I can do that
2  now, if you'd like, and get them sent to you.
3    Q.   If you could do that and have them
4  rescanned just so that we have all the pages.
5        And let me just walk through to tell
6  you what I have to make sure that whatever we're
7  going to get from you is all encompassing.
8        So for Medical Questionnaire No. 1, I
9  have the odd pages up to a page 7.  I'm not sure
10  how many pages in totally is.
11   A.   And it actually is 8.
12   Q.   Okay.
13       And then for the Medical
14  Questionnaire 2 of 3, I have the odd-numbered
15  pages up to a page 33.  And then there is that
16  same BECK Inventory Questionnaire attached that
17  has page 7, so I'm not sure if that was just
18  accidentally attached to the end of that one.
19   A.   The BECK Inventory would have been
20  part of the first.  I don't know why.
21   Q.   Okay.
22   A.   And the second report goes to page
23  34.
24   Q.   Okay.
25       And then for Medical Questionnaire 3

Ronald E. Synder, M.D.
08/14/2024

Page 70

1  of 3, I have pages 1 through 5 all in
2  consecutive order, so I do have the
3  even-numbered pages there.
4       Is that the full report or the full
5  questionnaire?
6  A.  That is the full report.
7       MR. LaFLAMME:  Then why don't we take
8  a quick break.  We've been going around an
9  hour and a half anyway, so it's probably
10  about that time.  Could you have the full
11  copies of Questionnaires 1 and 2 forwarded.
12  And I can put my e-mail in the chat.
13       THE WITNESS:  I will have my staff
14  send it to plaintiff's counsel and they can
15  forward it to you.
16       Okay?
17  Q.  Okay.
18  A.  Because she's got that on her system.
19       MR. LaFLAMME:  Why don't we take a
20  quick five minutes here.
21       (Recess.)
22  BY MR. LaFLAMME:
23  Q.  Doctor, we talked quickly off the
24  record.  You're going to get me copies through
25  Attorney Ayala for the two questionnaires, No. 1

Page 71

1  and No. 2, that were missing some pages, so
2  we'll hold off going through those in any
3  detail.
4       But just generally discussing the
5  questionnaires, those three questionnaires would
6  have been sent to Mrs. Wadsworth in advance of
7  your home meeting?
8  A.  Correct.
9  Q.  And would you have received the
10  responses prior to your home evening or are
11  those given to you at that meeting?
12  A.  I believe she gave them to me at the
13  meeting.
14  Q.  Were they already completed at that
15  point or did she complete them while you were
16  there for your home meeting?
17  A.  They were completed before.  She
18  handed them to us and we go through the
19  questionnaire with her.
20  Q.  Okay.
21       And as far as you understand, it is
22  Stephanie that completed each of the three
23  questionnaires herself, correct?
24  A.  Correct.  That's an interesting
25  question.  I've been asked that so many times I

Page 72

1  now have a place where I have them sign who
2  completed it, so I have a document.  But,
3  certainly, it was my understanding she completed
4  it.
5  Q.  And I'm asking this because I don't
6  have the final signature page for two of them,
7  is there a signature page for each of the three
8  questionnaires?
9  A.  No.  I indicated, I am now starting
10  to put signatures on.  I did not have it for
11  this particular case.  But I've been asked so
12  many times, I said, All right, I've got to add a
13  signature so I've reconfigured the report.
14  Q.  Well, at least our defense attorneys
15  are staying consistent.
16  A.  You are.
17  Q.  So your form is updated now that it
18  does have a signature page for the patient?
19  A.  And a date, yes.
20  Q.  Okay.
21       And these questionnaires, are these
22  template questionnaires or are they fashioned
23  for each case?
24  A.  They're templates.  One is a classic
25  medical history, including a list of the

Page 73

1  doctors, their medications, their allergies,
2  prior surgeries and so forth.  The other is a
3  34-page document that asks all sorts of just
4  activities of daily living questions; are you
5  able to do this, are you able to do that, from
6  personal care to community.
7  Q.  With respect to your home visit, I
8  know you indicated that you had to do somewhat
9  of a physical exam on Mrs. Wadsworth, correct?
10  A.  Yes, I did.
11  Q.  What else is done during that
12  four-hour visit?
13  A.  I normally start off with reviewing
14  with the patient the records that I received, so
15  that if she remembers some of the
16  hospitalizations and so forth, I review those
17  with the patient.
18       Since I had treating doctors, present
19  medications, allergies and prior surgeries, I
20  review all of those with the patient to make
21  sure I understand, so that my report is going to
22  be up to date and that the patient agrees to it.
23       We then ask about, particularly, in
24  the questionnaires that are going to be redone,
25  what you are able to do, what are you not able

Ronald E. Synder, M.D.
08/14/2024

Page 74

1  to do.  So I review the questionnaires with the
2  patient as well, as well as what my
3  understanding of the past medical records
4  entailed.  That normally takes about an hour.
5          I then basically do a physical exam.
6  And so we do a medical exam.  And then depending
7  upon the problems, we would end up doing a
8  neurological evaluation, an orthopaedic
9  evaluation.  And then in this particular case,
10  we looked at the skin and looked at all of the
11  burned areas and photographed those.
12          I did not see her back live.  She was
13  very embarrassed so those pictures of the back
14  were taken with my female doctor when she went
15  in the bedroom and took those pictures.  I did
16  look at them on my way driving back to the
17  hotel, but I did not physically take those
18  photographs, but I wanted to see what her back
19  looked like.
20          Then, normally, what we do, I review
21  with the patient kind of like what I think needs
22  to be in the life care plan.  Are they in
23  agreement?  Are they in disagreement?  Who
24  should I reach out for treatment to get better
25  understandings and so forth.

Page 75

1          So the next part in her case was
2  tying it all together.  Often, that period of
3  time is spent with me walking around the house,
4  looking at pieces of equipment, activities of
5  daily living, braces, canes, wheelchairs, home
6  modifications and so forth, which were not
7  required in this particular case.
8          And then we, basically, review with
9  the patient what I think I'm going to be putting
10  in the life care plan, and then we head out.  It
11  takes about two to four hours, depending upon
12  what we're going to be doing in reviewing and so
13  forth.
14      Q.   The medical records that you go with
15  her, do you physically have hard copy medical
16  records with you at the appointment?
17      A.   No.  Basically, what is the first two
18  or three pages of my report, that's what I go
19  through with my understanding.
20      Q.   So when you go for the home visit,
21  have you already started filling in your report
22  template?
23      A.   Yes.  So, basically, the report has
24  the review of records.  And if the review of
25  records says she is allergic to bee stings, I

Page 76

1  would put that in the report.  All the surgeries
2  that have been done, I have that in the list as
3  well.  And then I sit down and, basically,
4  review that with the patient.  I find sometimes
5  there's an error in prior surgeries, so I get a
6  date of when prior surgeries were performed and
7  so forth.  We try to make sure it's completed
8  and the patient kind of feels with what her past
9  medical history has been.
10      Q.   Doctor, do you have a hard copy of
11  your report in front of you?
12      A.   I do.
13      Q.   Is it all 172 pages?
14      A.   I do.
15      Q.   All right.
16          I presume it's probably easier for
17  you to work off your hard copy than it is to
18  look off my computer screen.
19      A.   It is.
20      Q.   All right.
21          Why don't we proceed that way, then.
22  I won't pull it up on the computer.  I have a
23  hard copy in front of me as well, so we should
24  be able to communicate.  We'll just need to make
25  sure we reference page numbers and everything to

Page 77

1  each other.
2          Fair enough?
3      A.   Sure.
4      Q.   All right.
5          And, Doctor, what else do you have in
6  front of you for this deposition?
7      A.   Well, I have my computer.  I have the
8  fax that I sent yesterday to Dr. LeChapelle's
9  office asking again -- I do have a copy of the
10  check that I sent to him.
11          And then in this notebook, I have the
12  life care plan, I have my Elkins, I have my CV,
13  my usual and customary fees, my deposition
14  notice, my billing, my billing for the depo, and
15  the questionnaires that were forwarded to the
16  treating doctor.
17      Q.   Okay.
18          And your deposition notice was a
19  duces tecum notice, correct; meaning we asked
20  you to produce some documents as part of this
21  process?
22      A.   Correct.
23      Q.   And the documents we asked you to
24  produce was more or less your expert file.  And
25  I know you provided Attorney Ayala some

Ronald E. Synder, M.D.
08/14/2024

Page 78

1 documents, I don't know whether it was last week
2 or not, but we got them last week.
3        Is it your understanding that you
4 provided your full discoverable expert file to
5 Attorney Ayala?
6    A.  I do.  But I don't send the medical
7 records that I have.  I request defense or
8 plaintiff to go ahead and send that.  Because
9 every once in a while, I have some records that
10 were reported to you while I'm on the road
11 someplace, and I'll look at it on my laptop and
12 I fail to file it, so I do ask for plaintiffs to
13 forward a complete set of records to you.
14    Q.  Okay.
15        And just so we're clear, I think I've
16 asked this before, though, but the documents
17 that you did review, the medical records you
18 reviewed are all itemized on pages 3, 4 and 5 of
19 Exhibit 64, and it lists 47 different groups of
20 medical records that you've reviewed?
21    A.  That's correct.
22    Q.  And you have not received any
23 additional medical records beyond those that are
24 listed in your report, correct?
25    A.  That's correct.  I have not worked on

Page 79

1 this case since I saw the patient and generated
2 this report.
3    Q.  All right.
4        In looking at the report, the date of
5 the report is 6/4/2024 on page 1.
6        Do you see that?
7    A.  Yes.
8    Q.  And is that the last time you would
9 have done any substantive work on your opinion
10 for this case?
11    A.  Correct.  That's when I would have
12 received the research -- looked at the research
13 and put the whole thing together and signed it
14 and got it off to plaintiff.  So that's normally
15 the date that I send it to plaintiff's
16 attorneys.
17    Q.  When you're talking about the
18 research, is that the research that Leslie does
19 on pricing?
20    A.  Correct.  And I have somebody who is
21 doing proofreading and so forth, so it's a team
22 effort.
23    Q.  Since you've issued the report on
24 June 4, 2024, have you been asked to do any
25 additional work?

Page 80

1    A.  No.  I had asked plaintiff's counsel
2 several things that I thought needed to be
3 accomplished in order for this to be a more
4 valuable document in the course, such as needing
5 to perhaps talk to this Dr. LeChapelle, I needed
6 that report.  I did ask counsel whether or not
7 they wanted me to do a life care plan for the
8 young boy, because he obviously had scars, and I
9 have not.  I also indicated that I thought I
10 should talk with pulmonary because she has had
11 some problems with that.
12        So I indicated that the life care
13 plan is put together as best I could for now,
14 but I thought that there are some pieces missing
15 that could more appropriately meet her
16 challenges if I had some additional
17 documentation.
18    Q.  Doctor, it looks like Mr. Ayala has
19 now sent me a copy of the questionnaires.
20    A.  And let me get mine back.  My
21 secretary has it.
22    Q.  Okay.
23        MR. AYALA:  And, Eugene, she just
24 sent another one right now, and I think she
25 was able to flip the pages, so let me send

Page 81

1 that one to you.
2        MR. LaFLAMME:  Okay.
3        Betsy, we can go off the record.
4        (Off the record.)
5 BY MR. LaFLAMME:
6    Q.  For these, Doctor, I will share them,
7 just to make sure I have the full copies.
8        So looking at Medical Questionnaire
9 No. 1 of 3, this a questionnaire that's
10 completed by Mrs. Wadsworth that has ten pages.
11 And I'll just page through it quickly.  Page 7
12 is blank.  Then it jumps to 9.  But I think it's
13 just out of order, because you have pages 7 and
14 8 at the back end of that, which is the BECK
15 Inventory Questionnaire.
16    A.  Correct.  That is the complete form.
17        MR. LaFLAMME:  So we will mark
18 Questionnaire No. 1 as Exhibit 66.
19        (Exhibit 66, Questionnaire No. 1, is
20 received and marked for identification.)
21    Q.  And then Questionnaire No. 2 is the
22 Activities of Daily Listing Checklist.  And
23 that's a 34-page document, and although there
24 were a couple of pages that were out of order,
25 but they all appear to be there, so it's 34

Page 82

1  pages on your end?
2      A.   That's correct, yes.
3          MR. LaFLAMME:  So we will mark that
4  as Exhibit 67.
5          (Exhibit 67, Questionnaire No. 2, is
6      received and marked for identification.)
7      Q.   And then the third one is Medical
8  Questionnaire 3 of 3, which has six pages, but
9  it looks like really it's a five-page document
10  with the sixth being a blank page.
11      A.   That's correct.
12          MR. LaFLAMME:  So we will mark that
13  as Exhibit 68, Questionnaire No. 3.
14          (Exhibit 68, Questionnaire No. 3, is
15      received and marked for identification.)
16      Q.   And those are all the three
17  questionnaires that Mrs. Wadsworth has completed
18  in this case, correct?
19      A.   That's correct.
20      Q.   Or at least with respect to your
21  work?
22      A.   That's correct.
23      Q.   Now, getting back to your report, on
24  page 2 at the bottom, there's a reference to
25  some outpatient physical therapy that

Page 83

1  Mrs. Wadsworth did through High Plains Physical
2  Therapy.
3          Do you see that?
4      A.   Correct.
5      Q.   Okay.
6          Is that the physical therapy outfit
7  that she stopped going to?
8      A.   Correct.  From my understanding, yes.
9          And she indicated that they did not
10  know how -- they, basically, were orthopedic
11  physical therapists, not burn therapists.
12      Q.   Okay.
13          Has she undergone any physical
14  therapy since being released from the hospital,
15  other than with High Plains Physical Therapy?
16      A.   Not that I'm aware of.  I mean, she
17  does the classic kind of stretching of the
18  scars.  When she puts her Vaseline on, she does
19  break up some scar tissue and so forth.  But I
20  do not know if she's had any actual physical
21  therapy from that point on -- or from that point
22  on, I should say.
23      Q.   On page 3, you reference a couple of
24  hospitalizations or medical appointments that
25  she had.  It looks like one was for COVID.  One

Page 84

1  was for vision.  And one was for an episode of
2  cellulitis.
3          Do you see that?
4      A.   Correct, of the ear, yes.
5      Q.   Those three visits are unrelated to
6  her burn injuries, correct?
7      A.   Well, the rash on the ear, I believe
8  that was an infection of the burn.  And the
9  callus of the foot was also from the burns.
10      Q.   Where is there a callus from the
11  foot?  Oh, you're talking about the one below
12  that.  I wasn't talking about that one.
13      A.   Yeah.
14          All of those are related, from my
15  understanding, as secondary complications from
16  the burns.
17      Q.   Okay.
18      A.   And the vision, she knew she had
19  problems with corneal burns and that she was
20  having some blurred visions, so she ended up
21  seeking medical treatment.  It sounds like they
22  just found regular vision problems, a stigma and
23  so forth, but she sought that because she
24  thought she had a burn of the cornea.
25      Q.   So you think that the vision

Page 85

1  treatment with Desert View Eye Care is related
2  to the burn injuries?
3      A.   No, but she sought evaluation because
4  of the potential.  But what the diagnosis was
5  was the usual optometric problems of growing
6  older.
7      Q.   Okay.
8          And then the COVID issue, obviously,
9  unrelated to her burn injuries, correct?
10      A.   Correct.
11      Q.   Okay.
12          On page 13, you discuss the current
13  treatment that she is going through.
14          And at No. 3a on that page, you
15  reference some laser therapy and injections,
16  correct?
17      A.   Correct.
18      Q.   Do you know what frequency she is
19  getting laser therapy?
20      A.   Not much at all.  So she can't get it
21  locally.  It's a three-hour drive.  And by the
22  time she drives and waits for the appointment,
23  gets the treatment and so forth, when's,
24  basically, indicating that she can't afford it.
25  Also, she has to have her husband take off to do

Ronald E. Synder, M.D.
08/14/2024

1  it.
2      So, I mean, I had a long discussion
3  with her.  I told her she needs to move to Utah.
4  And she's not been able to get a lot of
5  treatments.  From what my understanding is, it's
6  basically because of the travel and the time off
7  from work and so forth.  So she's missing a lot
8  of the treatments.
9      And the treatments she told me she
10  needed to be every two weeks, every six weeks.
11  And that's why I thought, when I got that story,
12  we really need to have a plastic surgeon to give
13  me the optimal number of what needs to be done
14  so I can provide an appropriate life care plan.
15      Q.  So as far as laser therapy treatments
16  going forward, you don't have an opinion as to
17  what those may be, correct?
18      A.  Well, she's had a lot.  And she
19  actually had to have anesthesia for it.  They're
20  large areas.  But, again, I don't have a plan.
21  And I don't have, actually, the area.  And I
22  would kind of like need to have a plastic
23  surgeon let me know what the CPT code would be
24  for that and so forth to really accurately
25  provide a life care plan.

1      Q.  Right.
2      So as you sit here today, you, number
3  one, don't know the frequency of laser therapy
4  treatment that she'll need going forward,
5  correct?
6      A.  Correct.
7      Q.  And you don't know the duration,
8  meaning how many years into the future or how
9  often she'll need the laser therapy treatment,
10  correct?
11      A.  Correct.
12      Q.  And you don't have the cost of the
13  laser therapy treatment, correct?
14      A.  Correct.  So I only put in office
15  visits.  And I don't have any procedures.
16      Q.  And as far as the injections that she
17  is getting or has received, do you know what
18  those injections are and where they are located?
19      A.  I don't.  It sounded like they may
20  have been PRP.  It sounded like it may have been
21  the stem cell stuff.  It also sounded like maybe
22  some steroids which are often injected, but I
23  don't know what their plans are.
24      Q.  Okay.
25      So similar questions with respect to

1  the injections, as you sit here today, you do
2  not know the frequency in which she may need
3  those going forward, correct?
4      A.  That's correct.
5      Q.  And you don't know the duration in
6  which she may need those going forward, correct?
7      A.  Correct.  That's outside of my
8  wheelhouse of experience and training and
9  background.
10      Q.  And you don't know the cost of the
11  injections going forward, correct?
12      A.  I would be able to do the cost if I
13  knew the procedures, but I do not at this time,
14  that's correct.
15      Q.  And then with respect to her feet, it
16  looks like she has had treatment on her left
17  foot a couple of times, and there's some pending
18  treatment on her right foot.
19      A.  Yes.
20      Q.  Okay.
21      Do you know what the treatment on her
22  left foot has been and what the pending
23  treatment for her right foot is to be?
24      A.  I kind of do.  And I would end up
25  respectfully asking you to turn to look at what

1  her feet looked like.  I've never seen anything
2  like it in all my life.  It looks like she had
3  grown a toenail on the bottom of her foot.  It's
4  on page 27.  And she has these it looks like
5  horns.  It literally looks like toenails, which
6  are the calluses that she's never had before,
7  which is a product of the burn.  And so it
8  sounds like they kind of slice it down, like you
9  do for a corn.  But at the same time, I would
10  think they would do some kind of additional
11  treatments to maybe prevent them from coming
12  back.
13      And then the whole bottom of the foot
14  looks like her shoulder.  I mean, they're
15  burned.  And so the major concern I have for
16  this lady in the long-term treatment, from a
17  life care planning perspective, almost focuses
18  around the feet and the bleeding hands.  She
19  cannot stand for very long on these feet.  And
20  that's the major concern.
21      So, yeah, she needs to follow up with
22  plastic surgery.  I'm concerned, you need to
23  stop growing these horns, versus just shaving
24  them down, I don't think is going to be the
25  answer.  So I don't know.  It's outside of my

Page 90

1  wheelhouse.  But it's obviously a real
2  disability and really prevents her from
3  functioning in life.
4      Q.   So with respect to the calluses on
5  her feet, it looks like they're bilaterally to a
6  certain extent?
7      A.   Yes.
8      Q.   Is one foot worse than the other, do
9  you know?
10     A.   No.  They're both bad.  The right
11 have one, two, three, four, five, six.  And the
12 left had two or three as well.  So it was
13 unique.  I've never seen it in my life like
14 that.  It literally looked like she had grown
15 toenails to the bottom of her foot.
16 Fascinating.
17     Q.   And as far as the treatment going
18 forward to address the calluses; is that the
19 correct term for it?
20     A.   I think that's what one of the
21 doctors called it.  It's hyperkeratosis.  I
22 mean, it's unique.
23     Q.   I'll use the term calluses just
24 because it's easier to say.
25     A.   Sure.

Page 91

1      Q.   With respect to the calluses that she
2  has on her left and right foot, as you sit here
3  today, you don't know what type of treatment she
4  will require going forward, correct?
5      A.   Correct.  I mean, my experience has
6  been, they've done radiation to some of my
7  patients that have done this.  I've seen where
8  they do cold laser treatments, two treatments.
9  I just don't know.  I think, certainly, just
10 shaving off the calluses, which is what she has
11 had so far, is not appropriate, and she's going
12 to need more than that, but I don't know.  I
13 have to refer to a plastic surgeon.
14     Q.   And you don't know what type of
15 duration of treatment she may need to address
16 the calluses on her feet, correct?
17     A.   Correct.  And that may be open-ended.
18 They may need to do that for a lifetime.  I
19 don't know.
20     Q.   The inverse of that is, it may not
21 need to be done for her lifetime, correct, you
22 just don't know?
23     A.   Correct.
24     Q.   Okay.
25          And the cost associated with any

Page 92

1  treatment for the calluses on her feet, as you
2  sit here today, you also don't know that,
3  correct?
4      A.   Correct.  I would have to defer to a
5  plastic surgeon, who needs to see the patient
6  and help me to provide any further response.
7      Q.   And going to page 14 of your report,
8  this is where you have a picture of the four
9  children as well.  And you indicated that they
10 were present during the home visit, correct?
11     A.   They were.  They were watching TV.  I
12 was sitting where I'm sitting, there's a dining
13 room table and we were sitting at the dining
14 room table, and the children were watching
15 cartoons.
16     Q.   Okay.
17          Did you, aside from any pleasantries,
18 interact substantive with the Wadsworth
19 children?
20     A.   I did.
21          The one child, Weston, when I found
22 out that he was having problems and had burns
23 and was reduced to wear shorts and so forth, I
24 did see him, I did examine him, I did photograph
25 some of the burns, but did not issue any reports

Page 93

1  or anything.  But I thought if I'm flying all
2  the way out there, I may need to document
3  something, so in case I was asked to do a future
4  life care plan on him.
5      Q.   Did you actually talk to Weston or
6  did you just do your cursory exam --
7      A.   I mean, I talked with him.  I didn't
8  do an indepth question-and-answer, like I would,
9  but I do have some opinions, that he's very shy,
10 he's very anxious.  And, basically, the focus
11 would be around whatever a plastic surgery would
12 need to do to those burns.  So I, basically,
13 documented what it looked like, put it in my
14 file, and if I'm asked to do a life care plan,
15 we can move forward.
16     Q.   And that's not anything you've been
17 asked to do thus far, correct?
18     A.   That's correct.
19     Q.   There is a Pain Diagram on page 14.
20     A.   Yes.
21     Q.   And I know both her feet are circled
22 on the pain diagram.
23     A.   Correct.  And that corresponds to
24 page 2 of the medical questionnaire.
25     Q.   It also looks like there's something

Ronald E. Synder, M.D.
08/14/2024

Page 94

1 written inside the circles.  I couldn't make
2 that out, though.
3      A.  Right.  There's an A, a T and a D.
4 And the A is for aching.  The T is for tingling.
5 And the D is for dull.
6          So they fill out the questionnaire.
7 And on page 1 of the questionnaire, it ends up
8 asking them to put documentation as far as what
9 the pain or discomfort feels like.
10     Q.  So is this diagram taken from the
11 Medical Questionnaire No. 1?
12     A.  Correct.
13     Q.  Okay.
14         And did you, as part of that
15 questionnaire, ask her to circle all areas that
16 she has pain?
17     A.  That was the understanding of the
18 questionnaire.  And, basically, the feet are the
19 real problem right now.  I mean, I go into
20 detail where she can't be outdoors.  She has
21 pain when the sun strikes.  And she stretches
22 and she has pain in the hands.  She leave blood
23 everywhere if she uses her hands.  And that's
24 somewhat discussed or described elsewhere in the
25 report.  But this, basically, is her pain when

Page 95

1 she filled it out in preparation for our coming
2 to see her.
3      Q.  Okay.
4          And then on the next page of page 14,
5 and here you talk about the pain actually.  Now
6 I see the achy, throbbing and dull that is
7 referenced there, which you just described from
8 the photograph.  That's on the top of page 15.
9      A.  Yes.
10     Q.  And then for the pain intensity, it
11 looks like it ranges from a 1 to an 8 out of 10,
12 with a general average of 5 out of 10?
13     A.  Correct.
14     Q.  And when we're talking about this
15 pain report, we're talking about the two areas
16 where she circled on page 14, so, basically, her
17 bilateral feet?
18     A.  Correct.  And those numbers were
19 obtained from the questionnaire, on page 3 of
20 the questionnaire.
21     Q.  And then looking further down on page
22 15, "Daily Biological Functions," there's a
23 discussion about sleep issues.
24     A.  Correct.
25     Q.  And do you know if Mrs. Wadsworth had

Page 96

1 sleep issues prior to the fire?
2      A.  I believe I asked her question, but
3 I'm trying to remember herself.  She did have
4 some problems with depression minimally at one
5 time in her life.  But she described, I believe,
6 the sleep is definitely a new thing, from what I
7 recollect.  I don't have it listed, but I'm
8 trying to remember.  And I remember kind of
9 going into that.  It's definitely worse at this
10 point.  But I don't know whether or not she had
11 some mild sleep problems.  But, to my knowledge,
12 it's definitely worse.  That's the best I can
13 answer.
14     Q.  Do you know whether she was sleeping
15 on a small foam mattress in the living room
16 prior to the fire due to sleep issues that she
17 was having?  Are you aware of that at all?
18     A.  No.
19     Q.  Were her prior pre-fire sleep issues
20 discussed at all with you during your interview,
21 or did you focus on the post-fire or both?
22     A.  I think I did ask, so did you have
23 sleep problems in the past.  And I just -- I
24 thought maybe she had some mild sleep problems,
25 and that they were worse, to my best

Page 97

1 recollection of my interview with her.
2      Q.  And when you are doing your home
3 visit and your interview of Mrs. Wadsworth, is
4 this recorded?
5      A.  No.
6      Q.  And when I say "recorded," I mean
7 either audio or video?
8      A.  No, that's correct, neither.
9      Q.  And are there any notes that you are
10 taking contemporaneously with your visit with
11 Mrs. Wadsworth?
12     A.  They sometimes are.  But they're in
13 the computer, and we add them right into the
14 report.
15     Q.  How about after your visit, do you
16 take any notes, summary notes of the visit
17 outside of what you put into your working report
18 document?
19     A.  If I'm working on it, why write it
20 down twice?  I try to put it in the report at
21 the same time.  And, again, if we're in the car
22 or flying, we put them into the report.
23     Q.  All right.
24         There's a reference under "Daily
25 Biological Functions," that she reports drinking

Ronald E. Synder, M.D.
08/14/2024

Page 98

1  alcohol at night as it helps her go to sleep.
2          Did you discuss her alcohol use?
3      A.  I did.
4      Q.  And what is your understanding of her
5  alcohol use?
6      A.  She drinks two to three drinks of
7  hard liquor at night, and it's what helps her
8  sleep.  So we had a discussion about that, and I
9  indicated that it's time to talk to a doctor to
10 get appropriate medication rather than
11 self-medicating.
12     Q.  Where did you get the number of two
13 to three alcoholic drinks per night?
14     A.  That's what I'm trying to remember.
15 It's two to three a night.  It was more than is
16 healthy.
17     Q.  The number two to three alcoholic
18 drinks is not anywhere in your report.  So where
19 is it?
20     A.  I'm trying to remember.  It was
21 something that was not healthy.  So, certainly,
22 more than one or two is not healthy.  So I
23 remember that's not healthy, so I remember two
24 to three.
25     Q.  And are you aware that she testified

Page 99

1  that she had upwards of 10 or more drinks at
2  night?
3      A.  Wow.  No.  That's a lot.
4      Q.  Are you aware that she was a heavy
5  drinker even prior to the fire?
6      A.  I was.
7          From what I understand, she had
8  postpartum depression.  And then she couldn't
9  get any medication, and she used alcohol for the
10 depression.  And she ultimately had been on
11 alcohol.  And I strongly discouraged that, and I
12 spent some time talking with her about the need
13 to stop it and to get into some alcohol
14 treatment program.
15     Q.  Are you aware that she was drinking
16 about 10 drinks per night even prior to the
17 fire?
18     A.  Like I said, I don't remember that
19 number.
20     Q.  Okay.
21          In looking at her medical records,
22 you're aware that she was given some medication
23 for alcohol withdraw, correct?
24     A.  I don't remember that.  You say that.
25 I don't remember seeing any hospitalizations for

Page 100

1  withdraw, but that's possible, given that
2  history.  Again, I'm not -- it's not germane per
3  se.  I'm not going to be treating her for
4  alcoholism in the life care plan.
5      Q.  And it wasn't a specific treatment in
6  the hospital or she didn't go to the hospital
7  due to withdraw.  When she went to the
8  University of Michigan Burn Center, which is in
9  records that you reviewed, you're aware that she
10 was given medication to address her alcohol
11 withdraw while there, correct?
12     A.  Well, I don't know why that would be
13 necessary.  She's on Fentanyl as soon as she
14 goes in, and that's going to prevent any
15 withdraws, so they may have discussed it.  But
16 certainly by the time she became aware and
17 alert, she would have gone way past the withdraw
18 pattern of when you see withdraw.
19     Q.  So you don't recall seeing in her
20 medical records that she was given some specific
21 medication to address alcohol withdraw?
22     A.  I don't remember that at this point.
23 And I would question why, because if she was on
24 Fentanyl for such a long time while she was
25 intubated, within two weeks, as I think she was

Page 101

1  intubated for multiple weeks, she would have
2  been on medication that would have prevented
3  withdraw.  So by the time she became more awake
4  and conscious, she would have been past the time
5  for withdraw symptomatology, in my background
6  and training.
7      Q.  On to page 16, these just discuss
8  some of the pre-fire medical issues that she
9  had, correct?
10     A.  Correct.
11     Q.  And one is the postpartum depression,
12 which you already mentioned.  She also had back
13 pain and back surgery as a result of that.
14          You're aware of that, correct?
15     A.  I am.
16     Q.  And I'm going to butcher this, but
17 vitiligo --
18     A.  Vitiligo.
19     Q.  Vitiligo - V-I-T-I-L-I-G-O, Betsy - I
20 had to Google it, but it's, basically, a
21 pigmentation issue with the skin, correct?
22     A.  Yes.  You know, in preparation for
23 the depo, I realized that I did not know how to
24 address that and plastic surgery is going to
25 need to address that.  So you end up having a

Ronald E. Synder, M.D.
08/14/2024

Page 102

1 pigmentation problem, but then if you have a
2 burn that goes into the pigment layer, I don't
3 know whether or not additional services are
4 going to be required because of the preexisting
5 condition.
6        We did talk about tattooing eyebrows
7 and so forth.  There are ways – and she has
8 some changes in the pigmentation in the forehead
9 and so forth.  I think plastic surgery may treat
10 her slightly differently because of that
11 diagnosis.  She may be at more of a risk of a
12 more intense treatment.
13    Q.    Okay.
14        Do you know where the pigmentation
15 issue affected her prior to the fire?
16    A.    I do not.
17    Q.    Is there a typical location that the
18 pigmentation issue generally affects someone or
19 is it really just –
20    A.    I haven't read the literature.  In my
21 experience, I've seen it everywhere, so I don't
22 know.
23    Q.    So it really depends on the patient,
24 it could be various parts of the body?
25    A.    Correct.

Page 103

1        And often it won't show up on the
2 body because you haven't tanned.  So if you have
3 it in your face and you tan, the area would not
4 tan and would show up.  But I don't know if it
5 affects other areas or not.  It often shows up
6 on the face of someone who tans, and it doesn't
7 tan.  It's more of a cosmetic issue, if it's on
8 the face.
9    Q.    Going to page 17, looking at her
10 prior medications, she was on Celexa, correct?
11    A.    Correct.
12    Q.    And that was to address her
13 postpartum depression?
14    A.    Correct.
15    Q.    Do you know when she stopped that?
16    A.    I do not.  She indicated nobody
17 wanted to give it to her, so she didn't ask for
18 it anymore.  I think she went to a nurse
19 practitioner or somebody, and they didn't want
20 to prescribe it for her.
21    Q.    Do you know when she would have
22 started taking Celexa?
23    A.    No, I don't.
24    Q.    Do you know which child it was
25 related to for the postpartum?

Page 104

1    A.    I don't.
2    Q.    And it looks like the only current
3 medication she is on is the Resta Lite lotion;
4 is that correct?
5    A.    Yes.  She'll either use that.  Or if
6 she doesn't have the money to buy that, she'll
7 just use lots of regular Vaseline.
8    Q.    And the Resta Lite lotion I presume
9 is used for all of her burn injuries?
10    A.    Yes.
11    Q.    And is that an over-the-counter or is
12 that a prescription?
13    A.    I believe it's over-the-counter.
14    Q.    At this point is she taking any other
15 medications currently?
16    A.    She's not.  She is, basically,
17 self-medicating to sleep with alcohol, rather
18 than using prescriptive meds.
19    Q.    Okay.
20        And have you discussed her smoking
21 habits with her?
22    A.    Well, we did.  And, again, I'm a
23 midwesterner and I'm used to being out in the
24 mid-west, and I saw a lot of people smoking and
25 a lot of people using alcohol.  And I talked to

Page 105

1 her.  She smoked a pack a day and has done so
2 for 20 years.  And I've spent some time talking
3 to her about needing to stop the cigarettes as
4 well.
5    Q.    And the cigarette use obviously with
6 it being 20 years at about a pack a day
7 certainly predated the fire, correct?
8    A.    Correct.
9    Q.    And it's still ongoing today?
10    A.    Correct.
11    Q.    Going to page 18, and on this page,
12 you get into the Activities of Daily Living
13 Checklist.  And it looks like this is likely
14 taken basically from her ADL questionnaire?
15    A.    Correct.  This is a lady who says
16 Don't tell me I can't do it, I can show you I
17 can.  And so she does everything.  And she
18 leaves a trail of blood behind.  She talks about
19 when she does the laundry, her hands bleed.
20 When she cooks, her hands bleed.
21        So she, basically, does everything,
22 but then has skin breakdown when she does some
23 of the things.  But she, basically, is pretty
24 active and really tries not to let this
25 discourage her from being a day-to-day

Ronald E. Synder, M.D.
08/14/2024

Page 106

1 functioning person.
2    Q.   Does she wear any protective gloves
3 when she does her ADLs?
4    A.   No.  We talked about wearing some
5 gloves when she's out and about.  But you can't
6 use gloves when you're cooking.  You can't use
7 gloves, like, when you're reaching into the
8 washer and dryer, she'll scrape her hand and
9 she'll bleed.  So they don't wear gloves
10 normally throughout life.  But you'll do it if
11 you think you're doing something active like
12 gardening and so forth.
13    Q.   Does she use gloves at all for any
14 ADLs?
15    A.   I don't know.  I know we talked about
16 gloves, but I don't remember whether she uses
17 them or not.  I didn't see any or I would have
18 photographed them.
19    Q.   So at least by Mrs. Wadsworth's
20 self-reporting, she says that she does not need
21 help with her ADLs, correct?
22    A.   She doesn't say she doesn't need
23 help.  She says, I'm doing it myself.  She never
24 asks for help.  When I talked about what we
25 would put in the life care plan, she was open to

Page 107

1 it, but she had never thought about getting
2 help.
3    Q.   Well, I'm looking at your summary on
4 page 18, you use the term "does not need help,"
5 correct?
6    A.   That's what she's saying, I don't
7 need help, correct.
8    Q.   Okay.
9    A.   But understanding these patients
10 don't know that they could ask for help, and
11 they can't afford it.  She's a very
12 strong-willed lady who really pushes through.
13 It's one of the kind of cases of patients we
14 love in rehab, you know, they try to push
15 forward as much as they can.
16    Q.   And just so it's clear on the
17 Activities of Daily Living Questionnaire, which
18 is Questionnaire 2 of 3, when you ask questions
19 such as, "Do you need help grocery shopping?"
20 "Do you need help with home maintenance?"  On
21 all of those she checked no, correct?
22    A.   Correct, correct.
23    Q.   And that's what you're summarizing
24 here on page 18, correct?
25    A.   Correct, correct.

Page 108

1    Q.   Looking at her Family History, her
2 mother and father are 71 and 72 years old
3 respectively and still alive, right?
4    A.   Correct, correct.
5    Q.   Do you know if her mother is a
6 smoker?
7    A.   I don't know.
8    Q.   Do you know if her mother is a heavy
9 alcohol user?
10    A.   I don't know.
11    Q.   The same questions for her father, do
12 you know if he's a smoker or heavy alcohol user?
13    A.   I do not know.
14    Q.   Going to page 19 of your report –
15 actually, let me take a quick step back.
16       If you could go back to page 15 of
17 your report under "Review of Symptoms" under No.
18 5, it says, "Other symptoms reviewed and
19 negative," what were those other systems that
20 were reviewed?
21    A.   Well, the questionnaire has a whole
22 bunch of things that you check.  And she,
23 basically, checked weight, night sweats, memory,
24 weakness, sinus, dry skin and itching, all the
25 other potentials were not circled.  That would

Page 109

1 be on page 3 and 4 of the Medical Questionnaire
2 No. 1.
3    Q.   So on page 3 and 4 of Exhibit 66,
4 which is the first questionnaire, is where that
5 information is being pulled from?
6    A.   Correct.  And she circled what I had
7 indicated, she was positive.
8    Q.   Okay.
9       All right.
10       Then going back to 19, page 19 of
11 your report, you have a "Substance Abuse" area,
12 and we've talked about the tobacco use, we've
13 talked about the alcohol use.
14       Then the caffeine use, drinks coffee
15 1-2x per day," where did you obtain that
16 information?
17    A.   I asked that question.  It may also
18 be on the questionnaire, on page 3.
19    Q.   I saw that as well.  It looks like
20 she's saying she drinks 12 cups of coffee per
21 day –
22    A.   That's one to two.
23    Q.   That's one to two, okay.
24    A.   Yeah.
25    Q.   When she drinks alcohol, do you know

Ronald E. Synder, M.D.
08/14/2024

Page 110

1  what type of alcohol she drinks?  Was that a
2  discussion at all?
3      A.    I know it's a hard liquor.  It's not
4  beer, I know it's not wine, but I don't know
5  exactly what she's drinking.
6      Q.    Okay.
7          With respect to, moving to page 20,
8  it looks like this is where we get to the BECK
9  Inventory Depression testing.  And the BECK
10  Inventory Depression testing is part of
11  Questionnaire No. 1.
12      A.    Correct, pages 7 and 8.
13      Q.    And so pages 7 and 8 under the BECK
14  Inventory Questionnaire, that would have been
15  completed before you arrived as well, or is that
16  administered while you're there?
17      A.    It would have been completed before
18  my arrival.
19      Q.    So this is all part of the
20  Questionnaire No. 1?
21      A.    Correct.
22      Q.    And it's, basically, a multiple
23  choice questionnaire that has 21 questions.  And
24  then it's, basically, ranked by the number of
25  points associated per question.

Page 111

1          Is that how it's done?
2      A.    From not a symptom to severe
3  symptoms, with a score in between, 1 to 3 – 0
4  to 3.
5      Q.    So just by way of example, under BECK
6  Inventory Questionnaire No. 1, where the options
7  are "I do not feel sad," "I feel sad sometimes,"
8  "I am sad all of the time," "I am so sad/unhappy
9  that I can't stand it," she circled, No. 1,
10  which is "I feel sad sometimes."
11          So would that be 1 point under that
12  questionnaire?
13      A.    That's correct.
14      Q.    And then just by of example, jumping
15  down to 13, where there's talking of
16  disappointment or disgust with yourself, she
17  circled No. 2, "I am disgusted with myself,"
18  which would correlate to two points, correct?
19      A.    Correct.
20      Q.    And then you just add up all of those
21  numbers, and whatever the total comes out to,
22  which in her case looks to be 24 points, which
23  falls under the moderate depression range?
24      A.    Correct.
25      Q.    Do you know if she has received any

Page 112

1  other mental health screening or testing?
2      A.    Not that I'm aware of.  This is the
3  questionnaire we do with chronic pain.
4  Physiatrists use it all the time.  Sometimes
5  family practitioners use it.  But I don't know
6  if she's had any other testing or screening.
7      Q.    How long has the BECK Inventory
8  Questionnaire been around?
9      A.    Yeah, that's a good question.  I
10  would say I've seen it probably at least 20
11  years.
12      Q.    Does B-E-C-K stand for anything since
13  it's all capitalized?
14      A.    I don't know.  It's called a BECK.  I
15  had it back in my training when I was a
16  physiatrist, so it's been around for a long
17  time.
18      Q.    Have the 21 questions remained the
19  same for the times that you've used the BECK
20  questionnaire?
21      A.    Yeah, I presume so, yes.  I don't
22  remember seeing a modified test coming out in
23  the last 20 years.
24      Q.    Okay.
25          And does this questionnaire – I'm

Page 113

1  probably going to show some of my ignorance of
2  the mental health training here, but does it
3  relate to the DSM at all?
4      A.    No.  This is a questionnaire that was
5  designed for mostly chronic pain doctors, to be
6  able to look at patients and get a handle on
7  depression often with pain situations.
8          As a physiatrist, it's been used in
9  my training.  I've used it with multiple
10  sclerosis patients and stroke patients.
11  Patients often never tell you they're depressed,
12  but they will tell you the symptoms of
13  depression.  And so I've used it in my office,
14  and after they fill it out, I say, Are you
15  depressed?  And they say, Oh no, I'm not
16  depressed.  And I say, Well, guess what, if
17  you're sad sometimes and this and this and that,
18  that equals depression.  And it allows me to
19  open up the discussion of the treatment with
20  patients.
21      Q.    Do you know if psychiatrists or
22  psychologists use the BECK Inventory
23  Questionnaire or is it more by pain management
24  doctors?
25      A.    It's mostly by pain management.

Ronald E. Synder, M.D.
08/14/2024

Page 114

1  Certainly, they might use it as a screening when
2  a patient first comes in.  But they generally
3  use much more sophisticated questioning.
4      Q.    And the BECK Inventory Questionnaire,
5  do you know if that's used by neuropsychs?
6      A.    I have seen it in some neuropsychs,
7  but, again, they have more sophisticated
8  testing.
9      Q.    From your perspective, it sounds like
10 the BECK Inventory Questionnaire is kind of a
11 quick way to give a broad overview as to how
12 someone is feeling?
13     A.    Correct.
14     Q.    And it's not an indepth analysis, but
15 it's more, I guess, a broad scope quick
16 questionnaire that can be evaluated?
17     A.    Correct.
18     Q.    If you could go to page 27, there's a
19 reference to a neurologic examination that was
20 provided.
21         Who provided that examination?
22     A.    I did.
23     Q.    And was that in conjunction with
24 Dr. Maria, or is that done on your own?
25     A.    Well, she's in the room.  We do it

Page 115

1  together.
2      Q.    Now, with respect to the neurological
3  examination, you are performing this from the
4  view of a physiatrist, as opposed to a
5  neurologist, correct?
6      A.    Correct, correct.
7      Q.    And I think you certainly agree that
8  you're not a neurologist, correct?
9      A.    Correct, but we do neurologic
10 examinations as often as neurologists does on a
11 daily basis in our offices and in a hospital.
12     Q.    Are you offering any specific
13 neurological opinions in this case?
14     A.    No.  The only thing I found was some
15 sensory abnormalities.  And she had decreased
16 sensation in the foot which corresponded to a
17 prior lumbar surgery, so we did find that.
18         And, then, basically, the entire area
19 of the scars, we have a pinwheel, and we kind of
20 go up and down and we touch, and she did not
21 have the ability to differentiate in the scarred
22 areas between sharp, dull and light touch.  So
23 there's altered sensation, which we would
24 anticipate because the burns are in the area
25 where sensation organs are for the skin.  So,

Page 116

1  basically, she falls within the normal
2  neurologic of a severe burn, a third degree
3  burn, as well as some findings in that foot
4  which would go along with the reason why she had
5  previous lumbar surgery.
6      Q.    Doctor, we were discussing the little
7  pinwheel tool that you used, and I think I saw
8  some photographs of that in your expert file.
9         Are there multiple pinwheels that you
10 use or are there -- let me take a step back.
11         You indicated there's a sharp,
12 there's a dull pressure put on, is that done all
13 by the pinwheel or how is that performed?
14     A.    Normally, we run the pinwheel, and
15 either we'll run our pinky, can you tell the
16 difference, sharp or dull.  And sometimes I'll
17 flip that around and I'll use the pinwheel or
18 the handle.  But anybody could pick up the
19 difference between the sharpness or the touch of
20 the finger or the back of the handle.
21     Q.    And I presume the pinwheel part is
22 the sharp part?
23     A.    Absolutely.
24         It's, actually, now you buy them at
25 Joann Fabrics.  It's what they use to transfer

Page 117

1  patterns for making dresses and so forth.  And
2  it's about one-third the price versus buying as
3  a neurologic tool on Amazon.
4      Q.    And so the dull side would be the
5  handle or your finger or pinky, correct?
6      A.    Finger, yes.
7      Q.    And was the decreased sensory that
8  Mrs. Wadsworth had, was that bilaterally on her
9  feet?
10     A.    It was on the right distal foot,
11 which is the area where she needed the surgery,
12 and then all the burns, essentially, all the
13 burns she could not differentiate.
14     Q.    Were there any burn injuries where
15 she was able to differentiate between--
16     A.    I mean, she's burned all over.  We
17 would just kind of go here, here, do you feel
18 this, is it sharp or dull; it's dull.  So there
19 may have been some skipped areas, but I
20 certainly -- it was basically all of these
21 areas she had decreased sharp, dull.
22     Q.    She had about 35 percent TBSA burn
23 injuries, correct?
24     A.    Correct.  But it was, basically, in
25 the back, the arms, the hands, yes.

Ronald E. Synder, M.D.
08/14/2024

Page 118

1    Q.   Okay.
2        And it sounds like, for the most
3    part, there's a decreased sensation in most if
4    not all of those areas?
5    A.   Correct.  It made sense because those
6    are 3rd degrees.  And basically all the areas of
7    third degree had loss of sharp to dull
8    circulation.
9    Q.   And then if you could go to page 29,
10   Doctor, "Potential Medical Complications to
11   Family Members," those are just some general
12   statements that you've made, but, again, aren't
13   offering any specific opinions in that regard,
14   correct?
15   A.   Correct.  Those are what we call
16   anticipatory guidance when you have somebody who
17   comes to you with a problem of concern that you
18   need to be thinking about when you see a
19   patient.
20   Q.   And we talked about page 30 to 35,
21   which is where you get into some of the
22   citations related to various goals or
23   definitions within the life care planning
24   industry, correct?
25   A.   Basically, the methodology.

Page 119

1    Q.   And I think that you had said that
2    these are common snippets that you put in your
3    life care plans, depending on the nature of the
4    person that you are doing the life care plan
5    with?
6    A.   Yeah.  So, basically, all the way
7    through up to 37 are classically used in all of
8    my life care plans, because the methodology
9    really does not change.
10        Then beginning at page 37, we start
11   talking about the discussion of burns, which
12   would be unique for this report.
13   Q.   And then you got exactly where I was
14   going next, so on page 37, with the discussion
15   of burns, I know you have a citation to where
16   this is pulled from.
17        Is this a summary of the materials
18   included in the citation?
19   A.   Yes.
20   Q.   And these are general discussions on
21   burn injuries, as opposed to specific
22   discussions as to Mrs. Wadsworth?
23   A.   Correct.  This is literature
24   discussion, in general, long-term concerns and
25   so forth.

Page 120

1    Q.   And then on page -- just to go back
2    one page, the PMIC that you reference on page
3    36, which I think is one of the pricing outlets
4    that you used for a good amount of the medical
5    side of your life care plan, correct?
6    A.   Correct.
7    Q.   And they provide customary rates of
8    the 50th, 75th and 90th percentiles?
9    A.   Correct.
10   Q.   And it looks like, in your life care
11   plan, you utilized the 75th percentile?
12   A.   Correct, and that's part of the
13   standard methodology.  There had been some
14   studies for a while, and they did try using the
15   50, and that ended up preventing a patient from
16   going to a university medical center for good
17   treatment.  When you do the 50th percentile, you
18   cut off the 25th most expensive and the 25th
19   cheapest, and you stay in there.  And studies
20   indicated that that basically prevents you from
21   going to any university, any top quality place.
22   So we now use the 75th percentile.  And we,
23   basically, cut off the 13-and-a-half percent,
24   13-and-a-half percent and then take those
25   averages.

Page 121

1        The numbers are not that different,
2    because you simply add more expensive and
3    cheaper, and when you average, the numbers are
4    very close.
5    Q.   So when you say the 75th percentile
6    and you're talking about knocking off the
7    13-and-a-half on each side, I guess I'm trying
8    to figure out what you're saying there.  They
9    just provide a 75th percentile across the board,
10   though, the PMIC?
11   A.   They basically knock off -- the 75th
12   percentile is the center.
13   Q.   So the 75th percentile is the center
14   when you take off the top 13-and-a-half and the
15   bottom 13-and-a half?
16   A.   Correct, correct.
17   Q.   And you indicated that there's some
18   studies or literature that supports using the
19   75th percentile over the 50th percentile.
20        What are those?
21   A.   Yeah.  That came out probably five,
22   seven years ago in some arguments.  And then
23   there's still some -- there's certainly --
24   defense like to use 50 percent.  They like using
25   25th percentile.

Ronald E. Synder, M.D.
08/14/2024

Page 122

1    From understanding all the training
2  and education and background, the methodology
3  nationally for care life planners is the 75th
4  percentile.
5    Q.   Okay.
6       Are you aware of any life care
7  planners that use the 50th percentile?
8    A.   Absolutely.  And they tend to be
9  mostly defense, who do mostly defense work-ups.
10  And I've often asked them to please show the
11  methodology and look at what is required for us
12  life care planners.
13    Q.   As far as the specific studies or
14  literature that supports the 75th percentile, as
15  you sit here today, are you able to name any of
16  them?
17    A.   No.  But it's the standard, that, if
18  you take a course in life care planning, it's
19  the 75th percentile.
20    Q.   So is it your testimony that, if you
21  take any course on life care planning, you're
22  instructed to use the 75th percentile for the
23  PMIC?
24    A.   Yes.  That's part of my training and
25  background and absolutely part of my textbook

Page 123

1  that sits right behind me, that's correct.
2    Q.   What is the textbook that's behind
3  you?
4    A.   Weeds Textbook of Life Care Planning.
5    Q.   How do you spell that?
6    A.   W-E-E-D.  I think there's five
7  editions, maybe four editions.
8    Q.   Moving to page 41, there's a
9  discussion about "Work Expectations."
10      Are you there?
11    A.   I'm there.
12    Q.   Okay.
13      For the "Work Expectation" section,
14  are you aware that there is no vocational loss
15  claim in this case?
16    A.   I'm aware of it.  She was a
17  stay-at-home mom, but sometimes people will want
18  to work later on, and understand that she could
19  have a difficult time trying to find a vocation
20  because of sleep and pain and so forth, with
21  standing and so forth.
22      This is a common paragraph that I
23  keep in almost all of my reports that have
24  significant limitations of physical
25  capabilities.

Page 124

1    Q.   So is this "Work Expectation" section
2  part of your template that is your standard
3  template for reports?
4    A.   Yes.  But if the patient doesn't have
5  significant problems, I would not put it in.  So
6  if somebody who had significant complications, I
7  would use it as part of the template.
8    Q.   But you're aware in this case that
9  there is no past wage lost claim and there is no
10  future loss of earning capacity claim, correct?
11    A.   I'm not privy to that information,
12  but that's fine.  I may not have asked that
13  question, so I don't know that.  We just don't
14  ask that.
15    Q.   All right.
16      And you are not offering any opinions
17  on any future loss of earning capacity issues,
18  right?
19    A.   No.  I don't do loss of earning
20  capacity.  I may be asked physical capacity to
21  work, but I have not been asked to do that.
22    Q.   And then looking at the future needs
23  section, which is on the bottom of page 41, you
24  have three items listed that you basically are
25  using to support your life care plan, and that's

Page 125

1  the review of medical records, the history
2  obtained and the physical examination, correct?
3    A.   Correct, correct.
4    Q.   And those are the only three items
5  that you're using to support your life care
6  plan, outside of the pricing indexes and stuff
7  like that that you've used?
8    A.   Correct.  It's, basically, my
9  background, training and experience.
10    Q.   As far as the case specific items
11  that have been produced in this case relative to
12  this specific claim, it's just those three
13  items, the medical records, the history and the
14  physical examination that you rely on, correct?
15    A.   Yes.  And then at the very top, No.
16  4, the pricing research.
17    Q.   Sure.  And that's why I had mentioned
18  the case specific.  Because the pricing
19  research, that's out there, but it's not
20  necessarily specific to this case.
21    A.   No, the pricing is very specific to
22  the case.  I do the pricing specifically for
23  what the patient needs.  I do the research
24  locally and so forth, so that's very specific.
25    Q.   Meaning, it's not discovery that's

Ronald E. Synder, M.D.
08/14/2024

Page 126

1  been produced in this case is what I'm getting
2  at?
3      A.   I don't know exactly what you mean by
4  that.
5      Q.   Okay.
6          So with respect to the pricing
7  research that you have done, that's related to
8  the various life care plan items that you are
9  saying Mrs. Wadsworth needs, correct?
10     A.   That's correct.
11     Q.   To get to the life care plan items
12 that you think Mrs. Wadsworth needs, for that,
13 you are relying on the review of medical
14 records, the history obtained and the physical
15 examination?
16     A.   Yes.  Thank you.
17     Q.   And the history obtained, I presume
18 that's the history directly from Mrs. Wadsworth,
19 or is there other history that you are
20 referencing there?
21     A.   When I do a history in my report,
22 it's, basically, a combination of the review of
23 records, what the patient has said, what the
24 patient has agreed to, what was in the report, I
25 kind of put that all together like a physician

Page 127

1  does.  You talk to the patient and then you
2  write the report as far as the history told to
3  them.  It's a combination of all the above.
4      Q.   And then starting on page 52 is where
5  you get to a discussion of life expectancy,
6  correct?
7      A.   Yes.
8      Q.   All right.
9          And for Mrs. Wadsworth, you used the
10 life expectancy of 81 years old?
11     A.   I don't add it up, but it would say
12 44 additional years when I saw her at 37 years.
13     Q.   Right.  So I just did the arithmetic.
14 That gets you to 81, correct?
15     A.   Okay.  That's not a number we
16 normally think of.  We talk about the number of
17 years needed to do the math.
18     Q.   When you saw her she was 37 years
19 old, and then you determined that, as a
20 non-Hispanic white female, she would have an
21 additional life expectancy of 44 years, correct?
22     A.   Correct, correct.
23     Q.   Any other parameters that you put on
24 the life expectancy beyond the fact that she is
25 a non-Hispanic white female?

Page 128

1      A.   No.
2          I mean, I understand where you're
3  kind of going.  This includes smokers.  It
4  includes patients with AIDS.  It includes Down's
5  Syndrome cases.  It includes alcoholics.  It
6  includes drug abusers.  It includes all takers.
7  So it includes all the people that would
8  circumscribe her past medical history.
9      Q.   But this takes into account all
10 populations?
11     A.   Correct.
12     Q.   It's just all populations that fall
13 within the non-Hispanic white female category,
14 correct?
15     A.   Correct.
16     Q.   And with Mrs. Wadsworth, having been
17 a smoker in which she smokes a pack of day for
18 20-plus years and is continuing to do that, you
19 agree that smokers generally have a lower life
20 expectancy than the average, correct?
21     A.   They do.  They do.
22     Q.   And individuals that are heavy
23 drinkers, upwards of 10 alcoholic drinks per
24 day, generally, have a lower life expectancy
25 than the average, correct?

Page 129

1      A.   That's correct.
2      Q.   And then if you combine those two, a
3  daily smoker and a heavy drinker, that would
4  further reduce the life expectancy, correct?
5      A.   Yes.  But once you start subtracting,
6  then you need to go on the plus side.  Is she a
7  safe driver?  Has she had car accidents?  Is she
8  promiscuous?  Is she married versus not married?
9  Because married people live longer than
10 non-married.
11         So once you start wanting to
12 subtract, then you have to start adding, and
13 that's the problem when you start doing that.
14 So that's why, as life care planners, we use the
15 national life expectancy, which includes all
16 comers.
17     Q.   But at least with respect to her
18 smoking and alcohol use, that is not something
19 that is healthy, correct?
20     A.   That's correct, absolutely.  And
21 that's why I had a long time talking with her.
22 From my understanding, she has not had any
23 programming for alcoholism.  She has not had any
24 programs to formally stop smoking.  So I did
25 encourage her to do that.  And she should do

Ronald E. Synder, M.D.
08/14/2024

Page 130

1  that.
2     Q.   And you agree that her smoking and
3  alcohol use predated the fire accident, correct?
4     A.   Yes, that's correct.
5     Q.   Doctor, why don't we just take a
6  quick five minutes, and then we will get into
7  the actual life care plan part, and then I think
8  we'll be able to let you go after that.
9        (Recess.)
10 BY MR. LaFLAMME:
11    Q.   Dr. Synder, before we took the break,
12 we were just getting into the actual
13 spreadsheet-type life care plan that you put
14 together here, and that starts at page 59 of
15 your report, correct?
16    A.   Correct.
17    Q.   Okay.
18       Starting on page 60, and I'm
19 certainly not going to go through everything
20 line by line, but I wanted to talk about some of
21 them.
22       With respect to the "Burn Surgery at
23 Burn Center" and "Plastic Surgery" line items, I
24 know you later on in the report have some
25 specific burn-related line items that are not

Page 131

1  given a cost or duration estimate.
2        Are these to encompass those, meaning
3  is the "Burn Surgery at Burn Center" to
4  encompass the line item of Scar, Excision and
5  Reconstruction Surgery, that type of stuff, or
6  are those separate?
7     A.   These would be basically the
8  monitoring evaluation by physicians.  It does
9  not include procedures.
10    Q.   Okay.
11       And you have not talked to
12 Dr. LeChapelle as to whether he specifically
13 agrees with the "Burn Surgery at Burn Center,"
14 "Plastic Surgery," "Hair Transplantation," that
15 type of stuff, correct?
16    A.   Correct.  When I was with the
17 patient, she, basically, ended up telling me she
18 needed to go every two months.  And she,
19 basically, pretty much put out what she's
20 supposed to be able to be doing, and, basically,
21 said, I can't do because I can't afford it.  So
22 I heard her tell me what apparently she had been
23 told she needed, but it should be confirmed by
24 the surgeon.
25    Q.   And then going on to page 61, with

Page 132

1  respect to "Vocational Rehabilitation," and,
2  again, you probably didn't understand until I
3  told you, but there is no vocational loss being
4  claimed in this case, that you're aware of,
5  correct?
6     A.   Correct, but I often will still end
7  up doing something like that that they can look
8  at some areas where she can donate time when the
9  kids are grown.  Because she's going to live
10 another 44 years, she may want to ultimately go
11 back to work.  And it would be appropriate to
12 have somebody help her kind of find something
13 that she might be able to do.  So just because
14 we're not claiming that, it doesn't mean she
15 shouldn't look at it as she gets older.
16    Q.   Okay.
17       Looking at page 64, this is where you
18 have some comments about "Unable to Determine
19 Cost of Procedure" for three of the line items,
20 correct?
21    A.   Correct.
22    Q.   For the "FREQUENCY" under the
23 "Removal/Excision of Benign Feet Lesions," where
24 did you get that frequency?
25    A.   That's kind of what's been happening

Page 133

1  to her now and needed to come, and they grow
2  back very quickly.
3     Q.   And you don't know if there's any way
4  to permanently remove those lesions at this
5  point, correct?
6     A.   And, again, and if I could have a
7  plastic surgeon opine, I would certainly defer
8  to the plastic surgeon on that.
9     Q.   Okay.
10       So with these three line items, is it
11 your anticipation that you will be doing
12 additional work on these line items?
13    A.   I would certainly hope so, or it's
14 just not brought to the table, and there's no
15 money put aside for that.  I certainly can't
16 apply -- I have to stay within my wheelhouse of
17 background and training.
18    Q.   Okay.
19       And, certainly, understanding your
20 background and training, you agree, as you've
21 noted in your report, that, at this point, you
22 are unable to determine the cost of these three
23 line items, correct?
24    A.   And the frequency, that's correct.
25 And I would end up asking them to help me with

Ronald E. Synder, M.D.
08/14/2024

Page 134

1  the CPT codes.  One of the problems is, when
2  they've done the CO2 burns, if you read the
3  records, it includes the anesthesia and it
4  included several large areas.  And so I presume
5  there are different CPT codes, given the amount
6  of space or the amount of surface area, as well
7  as the duration under anesthesia.  So there's
8  just a lot of stuff that I would not be able to
9  add.
10      Q.    And you are not able to add that
11  without further guidance from her treating
12  physicians, true?
13      A.    Absolutely.
14      Q.    Okay.
15      A.    Or an expert.
16          Often, I find my university treating
17  doctors are not even permitted to offer legal
18  opinions, and so sometimes we have to go and
19  hire an expert.  So we just need to have a
20  plastic surgical expert to be able to offer
21  those opinions.
22      Q.    Okay.
23          With respect to the "Semi-Permanent
24  Tattoo for Her Right Eyelid," is that something
25  that Mrs. Wadsworth has expressed an interest in

Page 135

1  getting?
2      A.    We talked about it.  She's
3  embarrassed.  And so I did do the pricing and
4  found that it doesn't last forever, and so we've
5  got that as a potential charge.
6          And, again, I would probably ask a
7  plastic surgeon their opinion.  Maybe do a
8  permanent one.  I don't know what's out there.
9  I'm not a cosmetic person, and so I would
10  probably defer, again, for a plastic surgeon for
11  his or her opinion on that.
12      Q.    Okay.
13          And that was going to be my next
14  question, is there a permanent option in that
15  regard, understanding that tattoos can certainly
16  be permanent in nature?
17      A.    Yes.
18      Q.    But you just don't know?
19      A.    Correct.
20          In looking at the literature for
21  eyebrows, they strongly suggested not doing
22  permanent, but, again, I don't know why.  I
23  would defer really to an plastic surgeon.
24  That's something I would have an expert help me
25  with.

Page 136

1      Q.    So with respect to the $34,000
2  lifetime cost, it sounds like that you may need
3  a little more guidance from a plastic surgeon to
4  really finalize that line item?
5      A.    I agree.  And when I was preparing
6  for the deposition and doing the report, it's
7  like these whole plastic surgical procedures, if
8  you ask me for an artificial arm or a leg or
9  therapy after stroke, that's my wheelhouse.  At
10  this point, I have to rely on an expert.  I can
11  do the pricing, identify the pricing, but the
12  frequency and type of procedure, I would really
13  need to have an expert.
14      Q.    And then you have ER visits of one
15  time every five years.
16          What's the basis for that?
17      A.    The basis is, basically, cellulitis.
18  Her skin breaks down.  She gets infected.  She
19  bleeds all day long when she puts her hands into
20  stuff.  So there's the potential for cellulitis.
21  She has had cellulitis of the earlobe.  So to be
22  able to say every five years to identify a
23  probability is pretty low.  And it's just for an
24  ER visit rather than a hospitalization.
25      Q.    Has she had any other cellulitis

Page 137

1  episodes other than that one time on her
2  earlobe?
3      A.    No, but we're under five years for
4  that, and we're talking about the next 44 years.
5      Q.    Did her cellulitis on her earlobe
6  necessitate an ER visit?
7      A.    I don't remember, but, again,
8  patients will show up to an urgent care center
9  rather than a family doctor.
10      Q.    So the ER visits that you are
11  presuming here relates primarily to her
12  cellulitis potential?
13      A.    Yes, because she's got skin
14  breakdown, and she bleeds easily in multiple
15  areas.
16      Q.    And cellulitis, in and of itself, is
17  not any emergency medical condition, correct?
18      A.    Correct.
19      Q.    It can be treated at a typical
20  doctor's office?
21      A.    They can, but often, patients go to
22  urgent care centers when there's bleeding and
23  infection.
24      Q.    Has Mrs. Wadsworth gone to urgent
25  care --

Ronald E. Synder, M.D.
08/14/2024

Page 138

1    A.   I don't know –
2    Q.   – for her cellulitis?
3    A.   – but just because somebody has not
4  done it does not preclude them from wanting to
5  utilize it.
6        MR. LaFLAMME:  Off the record.
7        (Discussion off the record.)
8    Q.   Doctor, going on to page 66, which is
9  "MEDICATIONS," for all of the medications that
10  you have listed here, she is not presently using
11  any of them, correct?
12    A.   Correct.  I did relate to her some of
13  the medications I thought would be appropriate
14  that she should be on.  And I felt that if she
15  was on appropriate medications, she would not be
16  utilizing alcohol.
17    Q.   And do you know if she has made any
18  efforts to discuss these medications with her
19  treating physicians?
20    A.   I do not.  I have not seen her since
21  the home visit.
22    Q.   And you have not seen anything in her
23  records where she was prescribed any of these
24  specific medications, correct?
25    A.   She was on Duloxetine at one time,

Page 139

1  but the rest of these medications are to protect
2  her stomach preventively and so forth, no, I
3  don't see that she's been on any of them.
4    Q.   And not only that she has not been on
5  any of them, she hasn't been prescribed any of
6  them, correct?
7    A.   Correct.
8    Q.   And, Doctor, if you can go to page
9  68, which is the "SPECIAL EQUIPMENT" section,
10  and then this is where you get into some
11  discussion about at least one of the items is a
12  scooter or a couple of scooters?
13    A.   Correct.
14    Q.   One is a more traditional motorized
15  scooter, and one is an all terrain scooter,
16  correct?
17    A.   Correct.
18    Q.   She doesn't use either of these
19  presently, correct?
20    A.   Correct, but she will use – when she
21  goes to Walmart, she will use their scooter.
22  But she was a very active lady, hunting and
23  fishing and very active going out into the – I
24  mean, there are no repertory theaters where she
25  is.  They go out and do outdoor activities.  And

Page 140

1  she has not been able to do any of those.
2        And so when I began talking to her
3  about what she wants to do and physical
4  activities to get her life back to normal, she
5  can't go hiking, she can't do anything with her
6  kids, and when I ended up talking about an all
7  terrain, her eyes lit up.  That would be
8  wonderful.  I can go out and be with my kids.  I
9  can do what Wyoming is all about.  And so I felt
10  very comfortable putting her on it.
11        Then at the same time, it's not
12  something you can use at the house.  So it looks
13  excessive, but I really think it appropriately
14  meets what she did in Wyoming, what she did
15  proactively, what would make her happy to be
16  with her children and family, so I felt it was
17  very appropriate.
18    Q.   Are there any other locations besides
19  Walmart where she uses a scooter, that you're
20  aware of presently?
21    A.   I don't know.  I asked, where do you
22  go?  Because there's no big box stores and
23  there's no – there's just little tiny
24  mom-and-pop stores there.  And I said, Well, how
25  about is there a Walmart here?

Page 141

1        Yes.  I do need it at the Walmart.
2        She's okay walking at the house short
3  distances and then she sits down.  But any
4  length of distance, you can just imagine walking
5  on those feet, she hurts.  And she cannot do
6  long distance.
7        It's fascinating, it's the biggest
8  limitation that I see is basically the feet with
9  standing and walking, and the bleeding hands.
10  Those are the two basic things that pretty much
11  changed and have changed her quality of life.
12    Q.   So if her lesions are able to be
13  addressed medically, then she likely would not
14  need a scooter, correct?
15    A.   That's probably – if they could
16  probably stop growing those horns on the and she
17  had a normal life, yeah.  I think that would be
18  a good question.  And that would be a question
19  to put to a surgeon during deposition or a
20  plastic surgeon.  And I would be happy to remove
21  them, if it's not necessary.
22    Q.   And you have not seen anywhere in her
23  medical records where there was a suggestion
24  that she obtain a scooter?
25    A.   No.  Nobody has addressed that.

Ronald E. Synder, M.D.
08/14/2024

Page 142

1 Those are not issues – you know, counselor,
2 when a doctor sees a patient, they figure out
3 what they need to do. They don't think about
4 life care planning and hobbies and so forth, so
5 those have not been addressed, that's correct.
6    Q.    And you have seen medical records
7 from her podiatrist, correct?
8    A.    That they did procedures, that's
9 correct.
10    Q.    And within those medical records,
11 there's no reference or even suggestions that
12 she obtain a scooter, correct?
13    A.    Correct. You're talking about a
14 podiatrist. You're not talking about a
15 long-term prescription by a physiatrist or a
16 life care planner. They're podiatrists.
17    Q.    But with respect to - and I'll just
18 ask it even more broadly - with respect to all
19 of her medical treaters and all of the medical
20 records that you've reviewed, there has not been
21 a mention or suggestion of the use of a scooter,
22 correct?
23    A.    Correct. None of them have been
24 asked to provide long-term planning for home
25 capabilities.

Page 143

1    Q.    If you could go to page 69, we're
2 still under the same section here, so the
3 "Adjustable Bed with Elevating Head."
4         What is the purpose of that?
5    A.    She has a hard time getting out of
6 bed. I don't know whether it's the burns on the
7 back with scooting or whatever, but I remember
8 saying to her, well, how about, do you need an
9 elevated headrest? She said yes. And it may be
10 able to help take care of some of her skin, by
11 being able to put lotion on her legs and so
12 forth by bending over. But we did talk about
13 it, and I don't remember the specifics. But we
14 did review that with her, and she said that
15 would be very helpful, because she said she does
16 have a problem in her own bed.
17    Q.    Does it relate to the ability to put
18 lotion on while she's in bed, or does it relate
19 to her sleeping at all?
20    A.    No. It was not related to sleeping.
21 It was more care of her legs and feet and so
22 forth.
23    Q.    All right.
24         And then with respect to the walker
25 you have this one starting at age 50.

Page 144

1    A.    Right. As she gets older, she's
2 going have more and more problems. I cannot
3 believe that those burned feet, the skin is
4 going to age, is going to crack, she's going to
5 have more and more problems with distance. So I
6 felt at age 50, we need to give her something
7 that's a little bit more supportive than walking
8 on her own to offload the feet.
9    Q.    Why was it age 50 that you picked?
10    A.    My background and training. Sixty
11 was too long, I felt, because she's having
12 problems now, so I felt at age 50 it was
13 appropriate. At age 50, we start feeling our
14 bones and our aches and pains more frequently.
15 That's where chronic disorders start to show up.
16    Q.    As someone that's approaching 50, I
17 can appreciate that.
18    A.    And I'm way past it.
19    Q.    With respect to the walker, is it
20 your expectation or thought that she would be
21 using that just outside of the house or in the
22 house as well?
23    A.    Probably, in the house as well at
24 that point.
25    Q.    And is it inside the house at age 50

Page 145

1 or inside the house at a later age?
2    A.    No. I think at 50 would be the time
3 that she's going to need to offload, whether
4 it's in the home or outside the home. But,
5 basically, she's using no assistive devices now,
6 and I really think by about 50, she's going to
7 need it in the home and definitely outside the
8 home as well.
9    Q.    In her medical records, you haven't
10 seen any discussion or suggestion about a
11 walker, correct?
12    A.    Correct. I don't see that anybody
13 asked that question or talked about it, that's
14 correct.
15    Q.    And if you could go to page 71, and
16 this relates to a van purchase and subsequent
17 purchases.
18         Do you see that?
19    A.    Correct.
20    Q.    What type of vehicle does she drive
21 presently?
22    A.    I think she's got a truck.
23    Q.    Does she have any complaints about
24 using the truck?
25    A.    No, but we're talking about what do

Ronald E. Synder, M.D.
08/14/2024

Page 146

1  we do so she can go places, to put her scooter,
2  and, particularly, an all terrain scooter when
3  she went places.
4        So, counselor, I don't know what
5  bucket of money pays for this, but in order to
6  go places, she needs a van that can take the
7  scooter, and so that's what's needed. I don't
8  know who is going to pay for it. Does it
9  normally come out of what normal people buy; I
10  don't know. But from a practical perspective,
11  she's going to need a van to be able to use that
12  scooter to go places. So if you need this, you
13  need that. It is what it is. That's all I can
14  say.
15     Q.   Okay.
16        You would agree that she would have
17  -- let's assume this fire never happened, if she
18  wanted to purchase vehicles for her own personal
19  use moving forward, she would have that cost
20  anyway, correct?
21     A.   Absolutely, but not the
22  modifications.
23     Q.   And with respect to the van items, is
24  that only required in your mind due to the all
25  terrain scooter?

Page 147

1     A.   Yes. And, actually, taking the other
2  scooters, too, to, perhaps, church or other
3  places, but the all terrain, the basic reason is
4  so she can go out and about for either of the
5  two scooters.
6     Q.   It relates to both the scooters, not
7  just the all terrain scooter?
8     A.   Correct.
9     Q.   And do you know how often the
10  Wadsworths typically replace their vehicles?
11     A.   I don't.
12        The normal replacement, most people
13  replace it in seven years. The problem is the
14  mechanics, the hydraulics don't last more than
15  about five years. So standard, we replace
16  anything that requires hydraulics in five years
17  because of the possibility of being stranded
18  with a ramp left out and you can't get it in or
19  being able to shut the doors and so forth. So
20  the standard is we replace it every five years
21  for vans, if there are hydraulics involved.
22     Q.   Wouldn't you only need to replace the
23  actual hydraulics, then, not the van?
24     A.   You could do that, but then the cost
25  of doing that is equal to the value of the van,

Page 148

1  so, no, they're just traded out.
2     Q.   And then I assume, and you do list a
3  resale value after the five years, so you would
4  deduct that from any future purchases, correct?
5     A.   Correct.
6     Q.   So, basically, just to use your
7  numbers, you're purchasing a van at 47, but
8  you're turning in a van that has a 31K value,
9  then at least for your price that you list for
10  the subsequent purchases, it's a 15K, the
11  difference between those two?
12     A.   Correct, correct.
13     Q.   For the - and this is, obviously, a
14  small ticket number - AAA membership, what's the
15  purpose of that?
16     A.   If you have somebody who can't walk
17  distances or can't stand, particularly, on the
18  hot pavement out in Wyoming, they don't do well
19  if you're not dealing with the right people to
20  come in and help them. So any time we have a
21  van and potential mobility issues, we always put
22  in AAA.
23     Q.   Do you know if they're AAA members
24  already?
25     A.   I do not.

Page 149

1     Q.   Going to page 72, where we get into
2  home modifications.
3        When do you anticipate home
4  modifications needing to be done?
5     A.   I indicated one time in a lifetime.
6  And I would presume probably at 40 to 50 years
7  of age is when I'm talking about needing that
8  walker. And that's when I would presume that
9  she would use that mobile device in the home
10  more than just out and about.
11     Q.   But you tie the home modifications to
12  the use of the walker?
13     A.   Around 50 years of age, the aging
14  process and pain and so forth.
15     Q.   And when you have the average cost
16  per year for lifetime here, is this cost being
17  obtained as a result of bids received from
18  contractors, or is this being obtained through
19  various web searches?
20     A.   So the Veterans Administration
21  indicates about $120,000 for somebody who is
22  wheelchair dependent. And a lot of that -- hold
23  on one second -- basically, that research is in
24  the back here. We basically indicated what the
25  patient was going to need.

Ronald E. Synder, M.D.
08/14/2024

Page 150

1    Hold on.
2        If you look on page 160, 161, 162,
3    basically, we, basically, kind of took a look at
4    all of those items, and felt that 32,000 would
5    be what she was going to need, which is about
6    one-third the price if we were to do an
7    all-handicapped accessible,
8    wheelchair-accessible home.
9    Q.    So it looks like these cost prices
10   that you're pulling for the handicapped home
11   modifications are from online sources, as
12   opposed to local contractors, correct?
13   A.    Correct.  We did not have a local
14   contractor.
15   Q.    Okay.
16       And then there's a home security
17   monitoring that's provided as a line item here
18   as well.
19       Is that like an ADT type thing that
20   you're thinking of?
21   A.    Yes.  Any of my patients that have
22   mobility issues, there's always a concern of
23   home intruders.  And then if we've got somebody
24   who has sustained a fire, certainly, the idea is
25   that they will want some kind of a modification

Page 151

1    for the home for monitoring.
2    Q.    Do you know if they have home
3    security presently?
4    A.    I don't.  I was afraid you were going
5    to ask that question.  I'm going through my
6    mind, did I see a home monitor or not.  I don't
7    remember.
8    Q.    Okay.
9        And you're not aware of any specific
10   notes or suggestions in her medical records from
11   her treaters that she had home security,
12   correct?
13   A.    That's correct.  And that would not
14   be the purview of a treating doctor when they
15   see a patient in their offices.
16   Q.    Going to page 73, which is "HOMEMAKER
17   CARE," is the subcategory.
18   A.    Yes.
19   Q.    And here you have "Housekeeper,"
20   "Personal Care Attendant" and "Home Maintenance"
21   as a line item cost.
22   A.    Correct.
23   Q.    So with the "Personal Care Attendant"
24   for four hours, five times per week, you're
25   suggesting that she has 20 hours of PCA

Page 152

1    services?
2    A.    Correct.
3    Q.    All of the items that the personal
4    care attendant would help with, she is presently
5    doing, correct?
6    A.    Correct.
7    Q.    And she's presently doing them to the
8    extent that, on your questionnaire, she said she
9    does not need help with them, correct?
10   A.    Correct.
11   Q.    With the "Home Maintenance," she is
12   married, correct?
13   A.    Correct.
14   Q.    Do you know what home maintenance she
15   was doing prior to the fire?
16   A.    No.  But, counselor, right now, we
17   have a 52 percent divorce rate among Americans.
18   If you have a patient who has pain and
19   disabilities, it's about a 73 percent divorce
20   rate.  So if we, in the legal system, talk about
21   the more probable than not, the idea is to at
22   least provide some kind of security for her home
23   that we're going to give her that there's going
24   to be some maintenance to take care of that and
25   not know that there's going to be a husband

Page 153

1    that's going to be there.
2        So if I deal with the percentages,
3    the more probable than not, I've got to think
4    that, and I agree it's very minimal, but it's
5    five hours a month to do that.
6    Q.    So in order for the "Home
7    Maintenance" line item to be valid, there's an
8    assumption that she's going to get a divorce
9    from Matthew?
10   A.    Well, when we work around more
11   probable than not.  So if we talk about a
12   disabled person, there's a very high
13   probability, it's more than 50 percent, that
14   they're going to be single in their life.
15   Q.    You haven't read Matthew's or
16   Stephanie's depositions where I asked them about
17   how their relationship was?
18   A.    No.  I presume it's good at this
19   point.
20   Q.    And you don't have any information as
21   to how their relationship is, correct?
22   A.    Correct.  I'm just dealing with
23   understanding statistics.
24   Q.    Did you have a discussion with
25   Mrs. Wadsworth during your home visit about the

Ronald E. Synder, M.D.
08/14/2024

Page 154

1  strength of her marriage?
2      A.   No.
3      Q.   So if Mr. or Mrs. Wadsworth stay
4  married, you would agree the home maintenance
5  aspect of your life care plan would not be
6  necessary?
7      A.   That's correct.
8      Q.   With respect to the "Personal Care
9  Attendant," are you aware of any medical records
10 from any of her treaters that discuss or suggest
11 that she get a personal care attendant to help
12 with some ADLs?
13     A.   No, I don't think they've ever been
14 asked that question.  That's why I need to reach
15 out to the treating doctors to ask that
16 question.
17     Q.   And you're aware that there was a
18 date for expert disclosures in this case, and
19 for yours, it was July 15th, correct?
20     A.   I don't know.  That's not part of my
21 purview.  I see a patient and write a report.
22 That's your stuff.
23     Q.   Okay.
24         With respect to page 74, you have two
25 line items, "Phoenix World Burn Congress

Page 155

1  Registration" and then the "Burn Support Group
2  at Salt Lake City Burn Center."
3         Do you see that?
4      A.   Yes.
5      Q.   Has Mrs. Wadsworth expressed an
6  interest in attending any of those?
7      A.   She did not know anything about them.
8      Q.   Okay.
9         Has she expressed – once she was
10 made aware of them, did she express an interest
11 in attending?
12     A.   Yes, she was.  I described with her
13 the ability to meet with other people with
14 similar burns.  And the Phoenix is totally
15 survival driven.  It's put on by survivors, and
16 it's nationally one of the better conferences.
17 They go all over the country, sometimes they're
18 in Dallas, sometimes they're in Phoenix,
19 sometimes they're in Chicago.  And any patient
20 that I've known who have gone to them strongly
21 advise that I continue to have patients attend
22 them.  It makes them empowered as far as knowing
23 what to order, what to ask for, how to ask
24 doctors what they need and so forth.
25     Q.   Have you ever attended the World Burn

Page 156

1  Congress?
2      A.   I have not.  I've looked at their
3  agendas frequently, but I have not attended.
4      Q.   For the Burn Support Group at Salt
5  Lake City, is that through the University of
6  Utah Burn Center?
7      A.   Yes.  And they encourage patients to
8  attend, but, again, she's so far away.  I kept
9  telling her she needed to move to Salt Lake
10 City.
11     Q.   And has she ever attended that Burn
12 Support Group in the past?
13     A.   No, no.  She did not know it existed
14 at the time.
15     Q.   Is there any reference in any of
16 Mrs. Wadsworth's medical records from any of her
17 treaters recommending or suggesting either burn
18 support groups or going to the World Burn
19 Congress?
20     A.   I don't see that they have.  And
21 that's another reason why I want to talk with
22 the treating doctors, would they be in agreement
23 that such an approach would be needed.
24     Q.   Going to page 75, this is where you
25 get to your price reference sources.  And in

Page 157

1  there you use, depending on what line item we're
2  talking about, you've used national costs,
3  regional costs, local costs.
4      A.   We average them all of them together.
5  So we end up looking at the national.  We then
6  use as a modifier for the local.  And then we
7  make phone calls to local physicians.  And we
8  average those together.
9      Q.   Where do you get the regional costs
10 from?
11     A.   The regional cost is a modifier.  And
12 so if you look on page 77, you'll see three
13 horizontal gray boxes.  And the skinny one going
14 all the way across should be a 0.990.  That is
15 the modifier for Wyoming.  So anybody living in
16 Wyoming, we use the national number, multiply
17 that, that gives you the modifier for the
18 community.  Then phone calls were placed at the
19 burn center, and we asked – hold on.  We
20 contacted – you'll see on page 78, actually,
21 what they charge is online, and we average those
22 together.
23     Q.   So when you say you average those
24 together, you take the national costs as one
25 figure, and then for the regional costs, you're

Ronald E. Synder, M.D.
08/14/2024

Page 158

1  using the state of Wyoming?
2      A.   Yes.  That's the only way to get
3  that, yes.  There is no breakdown for the state.
4      Q.   Okay.
5          And then for the state of Wyoming, it
6  sounds like it's, basically, 99 percent of the
7  national cost, so a 1 percent difference or so?
8      A.   Correct.  It's a little bit less than
9  national numbers, that's correct.
10     Q.   Okay.
11         And then on page 78, when you
12  reference the Green River, Wyoming local average
13  costs, those are obtained from calling local
14  physicians?
15     A.   Calling or utilizing the website.
16  And so in this particular case, we have a
17  website the University of Health, which ends up
18  indicating what they charge.  Sometimes it's
19  phone calls, like, the neurologists.  It depends
20  on where we can get the numbers.
21     Q.   And when you ask for those numbers,
22  are those the health insurance discounted rated
23  numbers or are the wrap rate numbers?
24     A.   No.  Those are usual customary
25  numbers.  That's the methodology required of our

Page 159

1  methodology doing life care planning.  We're not
2  to use any discounted numbers, because you don't
3  know if the discounts are going to remain or
4  what those percentages would be.
5      Q.   So the figures that you use would be
6  the figures if someone that did not have health
7  insurance would be charged, correct?
8      A.   Correct, correct, usual customary
9  charges.
10     Q.   And any discounts that may be applied
11  through health insurance, that's not a
12  consideration in your life care plan at all,
13  correct?
14     A.   Right.  Because you never know when a
15  discount is going to be available or not.  For
16  example, you can get medications and get a
17  prescription and get a coupon for GoodRx, and
18  you can get it half price, but you don't know
19  what's going to exist for the next 44 years.
20  So, statistically, we're looking at 44 years
21  worth of costing.  And it's been identified to
22  use usual customary charges.  So you don't know
23  if discounts are going to be available.  You
24  don't know what Medicare rates are going to be,
25  simply because they change from year to year.

Page 160

1  But in utilizing usual customary charges, they
2  are the most statistically reliable.
3      Q.   And you're using those same charges
4  for the duration of the care needed, so for the
5  44 years.  So even once there is Medicare
6  available, potentially available to
7  Mrs. Wadsworth, that's not a consideration,
8  correct?
9      A.   Correct, potentially available.  And
10  understand, we just are coming off of a period
11  of time when it used to be, if there was any
12  kind of legal settlement, that was considered
13  prehistory, and they would not cover anything
14  like that.  So we don't know if we're going to
15  go back to that system where any preexisting
16  condition is not going to be covered by the new
17  insurance.  So we deal with what the patient
18  needs from a specific injury and what the usual
19  customary costs are.
20     Q.   And it looks like for your travel
21  expenses, you are, basically, assuming a
22  two-night stay every time she goes to Salt Lake?
23     A.   Yeah, but when she goes there, the
24  problem there, by the time she takes off, drives
25  there and then she has an office visit, and she

Page 161

1  has to wait, and then multiple experts will see
2  her, and then it's too late to go home.  So
3  we're giving her two nights because she's
4  exhausted when she goes.
5          So when I talked about that, I
6  suggested that we ought to talk about two days.
7  Oh, that would be so wonderful.  Because they
8  try to do it one time and get back at midnight,
9  so I try and give decent coverage.
10     Q.   So, presently, when they go, do they
11  do it in one day with no hotels?
12     A.   Yes.
13     Q.   Doctor, with respect to your
14  deposition here today, what did you do to
15  prepare?
16     A.   I spent a couple of hours three or
17  four days ago, in preparation.  And then last
18  night, I spent about two hours looking at my
19  report, about four hours in preparation time.
20     Q.   Did you have any meetings with
21  Mr. Ayala?
22     A.   I had a meeting about a half hour,
23  hour before the deposition.
24     Q.   What did you guys discuss?
25     A.   We, basically, discussed the case and

Ronald E. Synder, M.D.
08/14/2024

Page 162

1  was I comfortable with what I was relating. And
2  I, basically, discussed with him the need for
3  getting additional consultations, as we
4  discussed earlier today, the need for additional
5  experts.
6      Q.    And what additional experts did you
7  request?
8      A.    The plastic surgery discussion in the
9  future; perhaps ophthalmology for the corneal
10  abrasions, and ear, nose and throat for the
11  tracheal burns.
12      Q.    So ENT, ophthalmology and plastic
13  surgery?
14      A.    Plastic surgery/burn therapies.
15      Q.    And did you discuss any specific
16  doctors that you would recommend using in that
17  regard?
18      A.    I did not, but I did indicate that we
19  were waiting to perhaps hear from
20  Dr. LeChapelle.
21      Q.    Okay.
22          And in your mind, there is additional
23  work on your end to be done on those three items
24  where you don't have any duration, frequency or
25  costs associated?

Page 163

1      A.    Correct.
2      Q.    Were you told about the expert
3  disclosure deadline on July 15th?
4      A.    No.
5      Q.    Were you aware that whatever the
6  expert disclosure deadline was, that you were to
7  have your opinions to be completed by then?
8      MR. AYALA:  Form.
9      A.    I can't control any of that. I gave
10  a report. That's what it is.
11      Q.    Okay.
12          And the report that you gave is the
13  one that obviously we have marked as Exhibit 64,
14  and that's your understanding as to what was
15  disclosed as your expert opinion by the expert
16  disclosure deadline, correct?
17      A.    Correct. And it's a very anemic and
18  will have to stand by itself, if that's what
19  happens. It would not cover what she may need
20  in the future. So be it, that's the way
21  discovery occurs. It's not in my control.
22      Q.    Aside from potentially getting the
23  questionnaire back from Dr. LeChapelle and the
24  additional medical expert consultations with an
25  ENT, ophthalmology and plastic burn therapist,

Page 164

1  any other work that you anticipate doing on this
2  case?
3      A.    I wouldn't anticipate anything
4  additional, but it would be a quite of bit of
5  research at that point, focusing on whatever
6  they say.
7      Q.    Okay. All right, sir. I appreciate
8  your time. I think that's all the questions I
9  have for you.
10      A.    Thank you, sir.
11      MR. AYALA:  I have a few questions,
12      but if we can take a couple of minutes so I
13      can use the restroom and then come back.
14      (Recess.)
15  EXAMINATION BY MR. AYALA:
16      Q.    I'd like to pick up sort of where
17  opposing counsel left off. He was asking you
18  some questions about additional work to be
19  performed and potentially additional experts and
20  research needed and necessary.
21          Do you remember some of those
22  questions?
23      A.    Yes, sir.
24      Q.    Am I to understand that your
25  testimony and certainly your position is that

Page 165

1  you've been attempting to reach out, communicate
2  and learn more information from some of
3  Stephanie's treaters for purposes of assisting
4  you with the compilation of your life care plan?
5      A.    Yes, one, Dr. LeChapelle, because
6  that's who Stephanie felt would be the most
7  appropriate person who would understand all of
8  her future needs and some of the questions that
9  I was raising.
10      Q.    And so in what you do in putting
11  together your recommendations for purposes of a
12  life care plan, you speak with, to the extent
13  they are available, to the extent it's
14  necessary, or with regards to any special
15  limitations you might have, but do you speak
16  with treaters, specialists to try to gain an
17  understanding, in addition to all of the other
18  work, review and research you perform; is that
19  fair?
20      A.    Yes. The majority of the time I find
21  speaking is very difficult, so that's why we
22  send the questionnaires. They can do it at
23  their timeframe and get it off to me. But at
24  times, they'll call and say, Can I speak to the
25  doctor, and then I will fill out the form for

Ronald E. Synder, M.D.
08/14/2024

Page 166

1  them.  If they don't want to fill the form out,
2  then I'll ask them the questions.  So, yes, we
3  do both.  The majority tend to fill out the
4  questions for me.
5      Q.   And that's certainly what you were
6  communicating to opposing counsel that you did
7  in this case, as it relates to Dr. LeChapelle,
8  but he has not returned the questionnaire as of
9  yet, despite being in contact as early or as
10  late as yesterday?
11     A.   Correct.
12     Q.   But to date, you haven't spoken with
13  him, so you haven't gotten specific details or
14  information relating to his care of Stephanie
15  and potential future needs?
16     A.   That's correct.
17     Q.   In your career as a life care
18  planner, you also review depositions of medical
19  providers or treaters if they're available?
20     A.   I do.
21     Q.   Okay.
22          And I haven't provided you any of
23  those, have I?
24     A.   That's correct.
25     Q.   Did you know that the reason I

Page 167

1  haven't provided you any of those is because
2  treaters' depositions are still being taken?
3      A.   I know nothing about the mechanics of
4  what you guys are doing and so forth.
5      Q.   But by way of example, there was a
6  physical therapist whose deposition was taken
7  earlier this week; a member of the burn team at
8  the University of Utah a little over a week ago
9  was taken.
10          Were you aware of any of that?
11     A.   No.
12     Q.   Is it fair to say that, when those
13  depositions are taken and when the deposition
14  transcripts come in, that's something that you
15  would want to review and look at to assist you
16  with any additions, changes or modifications to
17  your plan?
18     A.   Yes.
19     Q.   And, specifically, with regards to
20  these plastic surgeons, to the therapists, even
21  to the podiatrists, those are depositions that
22  you would like to review, in addition to speak
23  with those treaters, if they allow it?
24     A.   That's correct.
25     Q.   And if you're unable to get the

Page 168

1  information that you need for purposes of
2  completing your life care plan in those specific
3  areas, either because you can't speak with those
4  treaters or because the deposition becomes
5  unavailable, is that what you're suggesting that
6  then that would require an expert witness to be
7  brought into the case for purposes of testifying
8  and opining in those specific areas?
9      A.   That's correct, yes.
10     Q.   You were asked a lot of questions
11  about the deadlines for expert disclosure and
12  all of that stuff.  I think it's obvious, but
13  you're not a lawyer, you don't represent the
14  Wadsworth family from a legal representation
15  standpoint in this case, fair?
16     A.   That's correct, yes.
17     Q.   What you know is that you were
18  provided records, you were provided certain
19  information, you conducted your own evaluation
20  and examination of Mrs. Wadsworth, and you were
21  asked to prepare a life care plan, based upon
22  the information available to you; is that
23  accurate?
24     A.   That's very accurate, yes.
25     Q.   And so why don't we talk about, if

Page 169

1  you could, Doc, give us the benefit of your
2  educational background.  I know you talked about
3  your experience in life care planning, but give
4  us the benefit of your educational background,
5  please.
6      A.   I graduated from Indiana University
7  Medical School.  I then went to Yale and did a
8  residency program in pediatrics.  I became board
9  certified as a pediatrician.  I practiced
10  pediatrics for ten years.  I then went to
11  Pittsburgh and did a residency in physical
12  medicine and rehabilitation.
13          From that point, I moved to Rhode
14  Island, where I became director of a 60-bed
15  inpatient rehab unit.  I was medical director
16  for the State of Rhode Island Department of
17  Vocational Rehabilitation, and developed an
18  outpatient traumatic brain injury program.
19          I then moved to Maine, where I was a
20  director of an inpatient traumatic brain injury
21  program.  I was director of New England's Good
22  Will Industry Brain Injury Programs, and
23  practiced pain medicine -- pain management
24  medicine as well.
25          I've been in Florida for almost 20

Ronald E. Synder, M.D.
08/14/2024

Page 170

1  years now.  And I have worked in several
2  hospitals, including AdventHealth, which is the
3  new name for the Florida hospital.  I have
4  directed inpatient/outpatient programs.
5          Beginning about six years ago, I
6  began the process of weaning from acute care,
7  where one day a week, I see patients.  The
8  remainder I have now been doing life care
9  planning.
10     Q.   Thank you for that.
11          Is it fair to say that, over the
12  course of your career, not just in practice, but
13  also as a life care planner, that you've
14  occasion to see, evaluate, assess patients that
15  have suffered significant injuries, including
16  burns like Mrs. Wadsworth?
17     A.   Yes.
18     Q.   And you've been called upon and asked
19  to assist in litigation matters relating to
20  injuries, such as burns like the ones
21  Mrs. Wadsworth has suffered?
22     A.   I have.
23     Q.   And even though you may not have the
24  majority of your patients that you see and treat
25  in practice with significant or severe burns

Page 171

1  like Mrs. Wadsworth, there have been the
2  occasional patients that you've treated even in
3  your private practice with burns, fair?
4     A.   Absolutely fair.
5     Q.   And in what you do as a life care
6  planner, even if you don't have an abundance of
7  patients in private practice with burns that
8  you're treating, as a life care planner, do you
9  speak with and learn from some of those
10  specialists that are treating the particular
11  patient whom you're asked to make
12  recommendations for future care?
13     A.   That's correct.
14     Q.   You were asked earlier on in the
15  deposition about the scope of your work in this
16  case.  And you have not prepared a life care
17  plan for Weston, correct?
18     A.   That's correct.
19     Q.   And, in fact, I instructed you to
20  focus your efforts on preparing your
21  recommendations and any opinions you had as to
22  Mrs. Wadsworth's future medical care needs,
23  fair?
24     A.   That's correct.
25     Q.   If, after receipt of depositions of

Page 172

1  these treaters that are being taken, there is
2  information in those depositions that you deem
3  important and needed and necessary for
4  consideration as to Weston's future care needs,
5  is that something that you'll let me know?
6          MR. LaFLAMME:  Object to form.
7     A.   I would, yes.
8     Q.   If there's information in these
9  depositions of treaters that, after your review,
10  obviously, after they're taken and they're typed
11  up and I can provide them to you, but after your
12  review, if you deem it necessary for purposes
13  of, at the very least, gaining an understanding
14  as to what Weston's future care needs,
15  prognosis, et cetera, may be, is that something
16  that you would be willing to prepare
17  recommendations for by way of a life care plan?
18     A.   Yes.
19     Q.   And I have not provided you any
20  depositions of treaters relating to Weston as of
21  yet, correct?
22     A.   That's correct.
23     Q.   And whether you know or don't know,
24  that they have not been taken yet, that's
25  outside of your scope, but if I provide you with

Page 173

1  those depositions, you'll review those?
2     A.   I would.  And then I may ask to do a
3  Zoom with the mother and see the child again
4  before I would issue any kind of report.
5     Q.   And although your focus back in I
6  believe you said it was April, your focus back
7  in April when you met with Mrs. Wadsworth was
8  relating to her future care needs, did you have
9  occasion to, at the very least, meet and see
10  Weston?
11     A.   I did.  And that resulted in me
12  looking at the wounds and placing a phone call
13  to you to let you know that you need to at least
14  consider that I think the child is going to have
15  some long-term needs as well.  But I did it,
16  basically, informally.
17     Q.   All right.
18          And then with regards to, again, what
19  those future care needs may or may not be,
20  that's not something that you've taken into
21  account, considered as of yet, given the
22  inability to speak with his treaters and review
23  any deposition transcripts of his treaters; is
24  that correct?
25          MR. LaFLAMME:  Object to form.

Ronald E. Synder, M.D.
08/14/2024

Page 174

1    A.  That's correct.
2    Q.  You were asked questions about your
3    experience as an expert witness in these types
4    of litigation matters, and whether you've ever
5    had any of your opinions stricken by a court.
6         Do you remember some of those
7    questions early on?
8    A.  Yes, yes, I do.
9    Q.  And if I wrote correctly in my notes,
10   there was reference to a Collett case that was
11   discussed with you, and whether you were aware
12   of your either opinions being stricken or you
13   even being stricken as an expert.
14        Do you remember some of those
15   questions?
16   A.  Yes.
17   Q.  Did I understand your testimony that
18   you have no personal knowledge of any findings
19   of that board or what may have happened, what
20   may have been argued or otherwise, correct?
21   A.  Correct.
22   Q.  Certainly, can I at least safely
23   assume that, at no point in time, do you
24   intentionally endeavor to go beyond the scope of
25   your background, your training, your experience

Page 175

1    when you're rendering opinions relating to
2    either the life care planning for a patient or
3    for a plaintiff, or the treatment as a
4    physiatrist of a patient?
5    A.  Absolutely.  I mean, this case
6    demonstrates why I just need to reach out to
7    certain other treaters and certainly not handle
8    the decisions on my own.
9    Q.  And despite, I think, it's, what, the
10   170-odd pages of the complete report that you
11   tendered over, despite as extensive as it is, as
12   detailed as it is, there are portions that we've
13   gone through, there are portions where you did
14   not render opinions as to the exact type of
15   treatment needed, the frequency, or even the
16   costs associated with that treatment, because,
17   frankly, it just goes beyond your scope of
18   expertise.
19        Is that fair?
20   A.  That's fair.
21   Q.  And that's what we talked about with
22   the plastics, with the ophthalmology and even
23   with the ENT?
24   A.  Correct.  I don't know what
25   procedures they're going to suggest.  I think

Page 176

1    they need to follow these conditions for
2    monitoring, but I have no idea what type of
3    procedures that she's going to need or the
4    costs.
5    Q.  You were asked whether you reviewed
6    the deposition of the plaintiff.
7         Do you remember that?
8    A.  Yes.
9    Q.  In some of the cases, is it fair to
10   assume that you read the deposition transcripts
11   of the plaintiffs?
12   A.  I will do that from time to time.  I
13   don't remember reading any in this particular
14   case, as I sit here today.
15   Q.  Based upon just your typical
16   practice, Doctor, when you went to see and
17   evaluate Mrs. Wadsworth in April, did you obtain
18   information from her that you felt was needed
19   and necessary for your purposes in putting
20   together and compiling this life care plan?
21   A.  Yes.
22   Q.  And, in fact, as you've described
23   throughout your deposition testimony, you asked
24   her specific questions on various issues and
25   matters, including her daily activities,

Page 177

1    including activities for entertainment and
2    outdoors, and pains, and issues and limitations
3    she has.  You asked her those types of
4    questions?
5    A.  I did.
6    Q.  And so do you feel that you have a
7    need to review her deposition transcript in
8    order for your life care plan to be complete?
9    A.  No, I don't need her deposition.  I
10   need treating physician depositions, but I don't
11   need hers for my perspective.
12   Q.  Understood.
13        You were asked questions about the
14   pricing that's set forth within the proof and
15   life care plan.
16        Do you remember some of those
17   questions earlier?
18   A.  Yes.
19   Q.  And if I understood your testimony,
20   you have someone that you associate with there
21   in your practice that puts together or compiles
22   these numbers, these prices.  But you would rely
23   upon an economist expert that would price it out
24   accurately and fully, fair?
25   A.  Well, I have someone who specifically

Ronald E. Synder, M.D.
08/14/2024

Page 178

1  knows the specific price. An accountant or an
2  economist now takes it and averages what the
3  cost is going to be over the next 44 years.
4     Q.  There's been a suggestion that the
5  number that's set forth in the life care plan of
6  the three -- let me just make sure I get it
7  completely -- the 3.698 million and change that
8  in some way, shape or form, it's inaccurate,
9  it's speculative, it's unreliable.
10    Can you describe for the jury that
11 might read this deposition transcript as to what
12 that number reflects, as best as you can
13 recount?
14    A.  Well, that number reflects, I have a
15 young lady who takes my life care plan, which I
16 stand by, and simply now converts it into a
17 number that an attorney who hires me wants to
18 understand what the potential value is. So I do
19 it as a process to allow the attorney to know,
20 is this a case that we're going to go to trial
21 over or what the value is, to understand the
22 value of the case.
23    But I do not do the numbers myself.
24 I do not do it line by line. And so it is a
25 handy way for the attorney to know the value of

Page 179

1  the case, but it should not be considered the
2  life care plan.
3     Q.  And then when it comes to an accurate
4  depiction or reflection that at least you would
5  rely on, is there a number, is there a method by
6  which you compiled the costs, the expenses and
7  what that life care plan is actually priced out
8  to be?
9     A.  I'm sorry. I don't understand the
10 question.
11    I have the life care plan in a Word
12 document. And in the far right-hand corner,
13 it's either the yearly or lifetime costs. That
14 I can stand by. The remainder over the next 44
15 years projecting out, I rely on a economist to
16 do that.
17    Q.  Perfect. That's what I was asking.
18    But, obviously, the numbers provided
19 and associated with your life care plan, Doc,
20 those are incomplete at this point, fair?
21    A.  Correct, because I need additional
22 resources to really give a complete picture of
23 what her long-term needs are going to be.
24    Q.  So even with the numbers that are
25 attached to that life care plan, for all of the

Page 180

1  various line items that you have detailed and
2  talked about today, there are potentially
3  additional costs associated with the future care
4  needs for Mrs. Wadsworth, fair?
5     A.  That's correct.
6     MR. LaFLAMME:  Object to form.
7     Q.  Although you do not know the specific
8  procedures, the duration of any types of
9  procedures or modalities or the costs associated
10 with them, from a plastic surgery or from a
11 plastics perspective, based upon your evaluation
12 of Mrs. Wadsworth, you were certainly able to
13 identify continued issues with her feet, fair?
14    A.  Yes.
15    MR. LaFLAMME:  Object to form.
16    Q.  She was able to communicate with you
17 complaints and issues she continued to have with
18 her feet, fair?
19    A.  Yes.
20    MR. LaFLAMME:  Object to form.
21    Q.  And she continued to communicate with
22 you complaints and issues she was even having
23 with her skin generally; is that fair?
24    A.  Yes.
25    MR. LaFLAMME:  Object to form.

Page 181

1     Q.  So you may not know yet, because you
2  haven't had the opportunity to speak with those
3  treaters or read their deposition transcripts,
4  what and how frequent and the costs of future
5  care needs, from a plastic surgery perspective,
6  you certainly do know that there is the need
7  there, and you're just awaiting those
8  conversations to detail what those needs
9  specifically are?
10    MR. LaFLAMME:  Object to form.
11    A.  Correct.
12    It was my impression, my feeling she
13 was going to need to see those physicians for
14 routine monitoring for the rest of her life, but
15 I do not know the specific types of treatment,
16 procedures and the costs that they would
17 recommend.
18    Q.  You were not asked in this case to
19 render any opinions relating to the liability
20 issues in the case, correct?
21    A.  That's correct.
22    Q.  I did not send you any depositions
23 relating to first responders or anyone that
24 might be related to the liability aspects of the
25 case, correct?

Ronald E. Synder, M.D.
08/14/2024

Page 182

1   A.   Correct.
2   Q.   That's nothing that you need to see
3 for purposes of the scope of your work in this
4 case; is that fair?
5   A.   Correct. Those records help me
6 prepare when I'm going to see the patient, when
7 I see the patient, and what they're going to
8 need long term.
9   Q.   Okay.
10      You were asked questions about
11 Mrs. Wadsworth's life expectancy.
12      Do you remember some of those
13 questions and answers?
14   A.   Yes.
15   Q.   And you were asked - and I'm
16 paraphrasing - to what extent you analyzed a
17 reduction in life expectancy due to her smoking
18 and alcohol?
19      Do you remember that?
20   A.   Yes.
21   Q.   And I want to make sure I understood
22 your testimony.
23      Did you say that, when you begin to
24 make reductions in life expectancy due to
25 whether it's smoking or alcohol or any other

Page 183

1 factors, then you also have to begin an analysis
2 as to what are those positive behaviors,
3 actions, attributes that now add to the life
4 expectancy.
5      Did I paraphrase that correctly?
6   A.   That's correct. And that's why we
7 have a tendency to use the National Vital
8 Statistics that includes all comers. Otherwise,
9 if you start doing this, then you have to do an
10 analysis on all things that extend life. And
11 now you start getting I'll call it into a
12 pissing war between the pros and the cons, and
13 so forth. And the National Vital Statistics
14 answers that question.
15   Q.   Okay.
16      And the suggestion was made certainly
17 that smoking and alcohol is generally not
18 healthy for an individual.
19      We could agree on that?
20   A.   Totally agree.
21   Q.   But are there any metrics, Doctor, is
22 there any research or literature that suggests,
23 because a person either smokes or drinks alcohol
24 that there is no chance they would ever make it
25 to the expected life expectancy?

Page 184

1      MR. LaFLAMME:  Object to form.
2   A.   I've never seen that research.
3   Q.   In fact, based on all of the work
4 you've done, your background, your training,
5 your experience, have you treated patients, have
6 you consulted as a life care planner on cases
7 where individuals smoke, individuals drink
8 alcohol, and they end up exceeding the life
9 expectancy?
10   A.   Not in the life care plan world, but
11 in my treating world, I will see patients -- the
12 classic one I remember is George Burns who swore
13 that five cigars a day allowed him to live to 90
14 years of age, so we all see that. It's
15 difficult. So we try and only use scientific
16 research to utilize in my report.
17   Q.   That's why you relied upon, as you
18 said, the standards that you've referenced and
19 you've talked about today, fair?
20   A.   Correct, yes.
21   Q.   And there were questions asked of you
22 relating to some of the questionnaires on the
23 ADLs and occasions where Mrs. Wadsworth said, I
24 don't need help, I don't need help, I don't need
25 help.

Page 185

1      Do you remember some of those
2 questions?
3   A.   Yes.
4   Q.   Based upon your conversations with
5 her, your having met her and gotten to know her
6 a little bit, is she the type of person who is a
7 go-getter?
8   A.   Yes. She is the kind of lady who
9 says, Don't tell me I can't, I'm going to show
10 you I can; very strong-willed lady.
11   Q.   She's, as I put it, a tough cookie.
12   A.   Absolutely.
13   Q.   And so in reading the questionnaire
14 where she said, I don't need help, I don't need
15 help, does that, in your mind, based on your
16 background, training and experience, translate
17 to she doesn't need help?
18   A.   No, it does not mean she doesn't need
19 help. In fact, I told her, I'm just saying, you
20 can cook a meal for me, but if I see blood from
21 your hand on my dish, I'm not going to -- no.
22 So she doesn't understand really what she does
23 do, how it can be a turn-off to other people and
24 deleterious in the long term.
25   Q.   You were asked questions about

Ronald E. Synder, M.D.
08/14/2024

Page 186

1  whether or not you have the requisite background
2  or training in the field of psychology or
3  psychiatry.
4       Do you remember some of that?
5  A.  Yes.
6  Q.  And is it fair to say that one of the
7  additional areas that you would consider looking
8  into in speaking with a treater is in either
9  psychiatry, psychology or mental health?
10  A.  I think that's appropriate, yes.
11  Q.  And so by way of example, there's a
12  deposition to take place in a couple of weeks of
13  a mental health therapist that Mrs. Wadsworth
14  has been seeing and treating with.
15       Is that a deposition transcript that
16  you would like to review?
17  A.  Yes, sir.
18  Q.  There were sections of your life care
19  plan that provide a description or detail that
20  is typical or commonplace for the life care
21  plans that you prepare dealing with significant
22  or catastrophic injury cases; is that fair?
23  A.  Yes.
24  Q.  And then there are other sections of
25  your life care plan that are specific to the

Page 187

1  facts, the circumstances and your evaluation of
2  this case, true?
3  A.  Correct.
4  Q.  The pricing that you have listed in
5  your life care plan for what your
6  recommendations are for Mrs. Wadsworth, those
7  are prices certainly based on research and
8  standards and metrics, but they're specific to
9  Mrs. Wadsworth; is that true?
10  A.  Absolutely correct, absolutely.
11  Q.  In other words, you didn't take
12  pricing from another life care plan or some
13  website and just slap it on this life care plan
14  and say that it applies?
15  A.  No.  In evaluating the patient,
16  identifying what she needed, I specifically
17  looked at the costs specifically in her region
18  and actually reached out to treating doctors in
19  her area to find out the specific costs.
20  Q.  We've talked about deposition
21  transcripts, but to the extent there are
22  additional medical records that are received
23  relating to Mrs. Wadsworth, and even Weston, are
24  those records that you would like to, at the
25  very least, receive and review?

Page 188

1  A.  I would, if I'm requested to update
2  my life care plan.
3  Q.  Let me just check my notes.  I'm
4  almost done here, Doc.
5       You were asked questions in the
6  section of your life care plan that discusses
7  medications that you are recommending for
8  various reasons.
9       Do you remember some of those
10  questions?
11  A.  Yes.
12  Q.  And you were asked a question of,
13  well, is Mrs. Wadsworth currently taking any of
14  those medications?
15       Do you remember that?
16  A.  Yes.
17  Q.  Is your job as a life care planner to
18  only include therapies, medications, procedures
19  that a patient is currently going through, or do
20  you look at, what are the future care needs,
21  irrespective of what that individual is
22  currently receiving?
23       MR. LaFLAMME:  Object to form.
24  A.  That is the difference between a
25  nonphysician and a physician life care planner.

Page 189

1  As a physician life care planner, if the patient
2  needs certain things that he or she is not
3  receiving, it is in my purview as a treating
4  physician of multiple years of practice, I can
5  add specifically what this patient should
6  require.  And I did describe some of these
7  medications to her at the time of the visit.
8  Q.  So it's not surprising to you,
9  because you were asked about this, but it's not
10  surprising to you that Mrs. Wadsworth's past and
11  current treaters haven't discussed some of her
12  future care needs within their records?
13  A.  Correct, because they're not asked to
14  do that.  They're asked to treat the patient
15  spontaneously at the time when they're in their
16  office, what are their needs right now.  They do
17  not do life care planning.
18  Q.  So as you review some of the records
19  that you have, there's no discussion of mobility
20  scooters, there's no discussion of some of the
21  medications that you're recommending; again, not
22  surprising, given the difference in scope of
23  what current treating physicians are doing
24  versus what your role is?
25  A.  Correct.

Ronald E. Synder, M.D.
08/14/2024

Page 190

1    MR. LaFLAMME:  Object to form.
2    A.   They are not considering the next 44
3  years of life.
4    Q.   And I guess the last area that I'll
5  cover with you, Doctor, you were asked questions
6  about the home maintenance portion of your life
7  care plan.
8      Do you remember that?
9    A.   Yes.
10    Q.   And there was a discussion as to,
11  really, the "why" behind it, why there would be
12  a section for home maintenance if Mrs. Wadsworth
13  is married to Mr. Wadsworth.
14      Do you remember that?
15    A.   Yes, yes.
16    Q.   And did I understand your testimony
17  correctly that, one of the considerations that
18  you take into account as a life care planner,
19  looking into the future for a severely or
20  catastrophically injured individual, is to what
21  extent is there a likelihood, more likely than
22  not, occasion where that individual might find
23  themselves in a need for a particular modality,
24  assistance, et cetera.
25      Is that part of your role?

Page 191

1    A.   Yes.
2    Q.   And so when you look at specifically
3  home maintenance, part of what you did, if I
4  understood your testimony, is, you looked at
5  statistics in our country specifically as to the
6  divorce rates, but, more particularly, divorce
7  rates amongst those individuals who are
8  catastrophically injured, physically injury and
9  what that means for marriages either staying
10  together or breaking up?
11    A.   That's correct.
12    Q.   And what your research, and based on
13  your background, training and your experience
14  doing this type of work, has demonstrated is
15  that there is a strong, meaning more likely than
16  not, chance that Mrs. Wadsworth may find herself
17  in the future in need of home maintenance as a
18  result of what the statistics, what the numbers
19  say is a strong likelihood of a divorce?
20    MR. LaFLAMME:  Object to form.
21    A.   Yes.
22    Q.   And so that's what the numbers
23  provide, that's what the research and the
24  statistics show; is that fair?
25    A.   Correct.

Page 192

1    Q.   And so, as a life care planner, are
2  you to rely upon those statistics and those
3  numbers and that research for purposes of your
4  recommendations and your opinions, or do you
5  speculate that Mrs. Wadsworth is going to stay
6  with Mr. Wadsworth?
7    A.   I utilize the research available.
8    Q.   And even though Mr. Wadsworth and
9  Mrs. Wadsworth love each other, as you probably
10  were told when you met with her, you still look
11  at and rely upon your experience as to the
12  numbers and the statistics?
13    A.   The more probable than not is
14  appropriate to use.
15    Q.   And, in fact, with regard to the
16  entirety of your life care plan, those are your
17  opinions as of this date, understanding that
18  there's information you haven't received yet,
19  understanding that there is conversations you
20  want to have and haven't had yet, but those are
21  your opinions and your recommendations, more
22  likely than not, as to what Stephanie is going
23  to need in the future, fair?
24    A.   Yes, that's correct.
25    Q.   Doc, those are all my questions.

Page 193

1  Mr. LaFlamme might have some follow-ups.
2  FURTHER EXAMINATION BY MR. LaFLAMME:
3    Q.   Doctor, just some quick follow-ups.
4      With respect to the discussion that
5  centered around home maintenance, but just the
6  general concept that you believe it's more
7  likely than not that Mr. and Mrs. Wadsworth may
8  get divorced, based on the statistics, you are
9  just relying on statistics in that regard, as
10  opposed to any information you received from
11  Mr. and Mrs. Wadsworth, correct?
12    A.   That's correct.
13    Q.   I think you referenced that 52
14  percent of all marriages in the US unfortunately
15  ended up in divorce, correct?
16    A.   That's correct.
17    Q.   So by that statistic, every single
18  life care plan that you author presumes that
19  they're going to get divorced; isn't that
20  correct?
21    A.   I have to, yes.  That's life.  That's
22  life.
23    Q.   Okay.
24      And, Doctor, with respect to the
25  medication that Mrs. Wadsworth was provided at

Ronald E. Synder, M.D.
08/14/2024

Page 194

1  the University of Utah to deal with her alcohol
2  use, do you recall seeing that she had thiamine
3  replacement therapy during her hospitalization,
4  for her alcohol use?
5      A.  Well, that's routinely given to
6  anyone with alcoholism, because they may be
7  thiamine deficient.  That's routine.
8      Q.  Okay.
9          And you're aware that that relates to
10 heavy alcohol use, correct?
11     A.  It's normally used because of the
12 fact that they forget to eat, and they don't eat
13 certain foods that have thiamine, so anybody
14 with an alcohol problem will be put on thiamine.
15     Q.  And the thiamin replacement that she
16 was given was specific due to her alcohol use;
17 is that correct.
18     A.  Yes, that's correct.
19     Q.  That's all the questions, I have,
20 sir.
21        MR. AYALA:  All right.  Doc, read or
22 waive?
23        THE WITNESS:  Counselor said this was
24 audiotaped, so I don't need to read.  I'm
25 waiving.

Page 196

1              C E R T I F I C A T E
2         I, ELIZABETH M. KONDOR, a Certified
3  Court Reporter, License ##30XI00117200, and
4  Notary Public of the State of New Jersey, do
5  hereby certify that prior to the commencement of
6  the examination, RONALD E. SNYDER, M.D. was duly
7  sworn by Bridgett Myers, Notary Public, to
8  testify the truth, the whole truth and nothing
9  but the truth.
10        I DO FURTHER CERTIFY that the
11 foregoing is a true and accurate transcript of
12 the testimony as taken stenographically by and
13 before me at the time, place and on the date
14 hereinbefore set forth.
15        I DO FURTHER CERTIFY that I am
16 neither a relative nor employee nor attorney nor
17 counsel of any of the parties to this action,
18 and that I am neither a relative nor employee of
19 such attorney or counsel, and that I am not
20 financially interested in the action.
21
22        _____
                        *Betsy Kondor*
23        Certified Court Reporter
24
25 Dated:  Monday, August 19, 2024

Page 195

1      (Transcript orders.)
2        MR. LaFLAMME:  I'll just take
3  everything electronic.
4        MR. AYALA:  The same.
5      (Deposition adjourned at 3:25 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**$**

$120,000
149:21

$3.698
65:24

$34,000
136:1

$500
24:6

$6,000
24:10 25:6

**0**

0
111:3

0.990
157:14

**1**

1
68:5,19
69:8 70:1,
11,25 79:5
81:9,18,19
94:7,11
95:11
109:2
110:11,20
111:3,6,9,
11 158:7

1-2x
109:15

10
13:22,23
14:4,16
35:6
95:11,12
99:1,16
128:23

1018
4:10

1099
30:25
32:17 33:9
65:16

1099s
33:7

12
109:20

12/29/2018
13:11

12th
27:18

13
27:16
85:12
111:15

13-and-a
121:15

13-and-a-
half
120:23,24
121:7,14

13th
27:22

14
52:25 53:5
92:7 93:19
95:4,16

15
18:7 29:5
48:19 49:8
95:8,22
108:16

15K
148:10

15th
154:19
163:3

16
101:7

160
150:2

161
150:2

162
150:2

17
103:9

170-odd
175:10

172
31:19
63:10,11,
20 76:13

172-page
66:5

18
105:11
107:4,24

19
37:11
108:14
109:10

1972
17:1

1975
17:2

**2**

2
11:12,18
68:6,19
69:14
70:11 71:1
81:21
82:5,24
93:24
107:18
111:17

2/23/24
52:16

20
13:14,22
14:1 18:7
22:18
54:24
105:2,6
110:7
112:10,23
151:25
169:25

20-hour
13:20

20-plus
128:18

2010
8:22 9:15,
22 10:5

2011
10:7

2012
44:22

2017
49:15

2020
8:8

2021
45:13

2022
50:23

2023
27:16

2024
25:2 37:17
52:25 53:5
56:5 79:24

21
110:23
112:18

24
111:22

25th
120:18
121:25

27
89:4
114:18

29
118:9

**3**

3
41:12
57:23
68:5,6
69:14,25
70:1 78:18
81:9 82:8,
13,14
83:23
95:19
107:18
109:1,3,18
111:3,4

3.698
178:7

30
22:1,8,12
25:2 43:1,
12,15 44:7
118:20

31K
148:8

32,000
150:4

33
69:15

34
69:23
81:25

34-page
  73:3 81:23
35
  22:9
  117:22
  118:20
36
  120:3
37
  119:7,10,
  14 127:12,
  18
3:25
  195:5
3a
  85:14
3rd
  118:6

_____
    4

4
  78:18
  79:24
  109:1,3
  125:16
40
  149:6
41
  123:8
  124:23
44
  127:12,21
  132:10
  137:4
  159:19,20
  160:5
  178:3
  179:14
  190:2
47
  78:19

148:7

_____
    5

5
  70:1 78:18
  95:12
  108:18
50
  120:15
  121:24
  143:25
  144:6,9,
  12,13,16,
  25 145:2,6
  149:6,13
  153:13
50th
  120:8,17
  121:19
  122:7
52
  127:4
  152:17
  193:13
55
  22:12
59
  130:14

_____
    6

6
  37:17
6/4/2024
  79:5
6/6/24
  37:4
60
  10:21,23
  11:19
  22:16
  41:15

130:18
60,000
  15:20 54:7
  56:6
60-bed
  169:14
61
  24:20,23
  33:19
  41:14
  131:25
62
  37:4,8
  40:25
63
  42:8,9
  46:12
64
  62:17
  63:4,5
  78:19
  132:17
  163:13
65
  63:17,22
66
  81:18,19
  109:3
  138:8
668
  4:9
67
  82:4,5
68
  82:13,14
  139:9
69
  143:1

_____
    7

7
  69:9,17
  81:11,13
  110:12,13
7/30/2024
  24:20
702
  48:17
71
  108:2
  145:15
72
  108:2
  149:1
73
  151:16
  152:19
74
  154:24
75
  31:18
  156:24
75th
  120:8,11,
  22 121:5,
  9,11,13,19
  122:3,14,
  19,22
77
  157:12
78
  29:18
  157:20
  158:11

_____
    8

8
  69:11
  81:14

95:11
  110:12,13
81
  127:10,14

_____
    9

9
  81:12
90
  184:13
90th
  120:8
95
  42:21
99
  158:6

_____
    A

AAA
  148:14,22,
  23
ability
  115:21
  143:17
  155:13
abnormal
  19:14
abnormalitie
  s
  115:15
abrasions
  162:10
absolutely
  53:20
  116:23
  122:8,25
  129:20
  134:13
  146:21
  171:4

175:5
185:12
187:10

abundance
171:6

abuse
9:20
109:11

abusers
128:6

academic
12:12

accepted
22:5

accessible
150:7

accident
45:2
58:20,21
130:3

accidentally
69:18

accidents
129:7

accompanying
37:9

accomplished
80:3

account
128:9
173:21
190:18

accountant
178:1

accounting
33:14

accurate
4:19,20
8:8 12:14
18:2,12

24:7
29:10,11
42:17
43:2,15,17
44:10,15
67:25
168:23,24
179:3

accurately
10:18
86:24
177:24

aches
144:14

aching
94:4

achy
95:6

acting
25:10

actions
183:3

active
106:11
139:22,23

activities
73:4 75:4
81:22
105:12
107:17
139:25
140:4
176:25
177:1

activity
105:24

actual
22:14 66:5
83:20
130:7,12
147:23

actuarial
20:18

acute
170:6

acutely
58:23

add
39:13
59:11
72:12
97:13
111:20
121:2
127:11
134:9,10
183:3
189:5

added
43:12

adding
56:20
129:12

addition
165:17
167:22

additional
8:12 15:22
39:9,19
58:5 62:22
78:23
79:25
80:16
89:10
102:3
127:12,21
133:12
162:3,4,6,
22 163:24
164:4,18,
19 179:21
180:3
186:7

187:22

Additionally
64:10

additions
167:16

address
4:9 25:13
28:24
90:18
91:15
100:10,21
101:24,25
103:12

addressed
141:13,25
142:5

adjourned
195:5

Adjustable
143:3

adjusted
25:13

ADL
105:14

ADLS
106:3,14,
21 154:12
184:23

administered
110:16

Administrati
on
30:17
149:20

admissible.'
25:18

ADT
150:19

adult
17:15,19

adults
17:11,20

advance
71:6

Adventhealth
30:14
170:2

advise
155:21

affected
102:15

affects
102:18
103:5

affirm
4:4

afford
85:24
107:11
131:21

afraid
151:4

age
143:25
144:4,6,9,
12,13,25
145:1
149:7,13
184:14

agencies
20:18

agendas
156:3

aging
149:13

agree
41:8,22
43:10
115:7
128:19
130:2

133:20
136:5
146:16
153:4
154:4
183:19,20

agreed
126:24

agreement
40:5 74:23
156:22

agrees
73:22
131:13

ahead
12:22
62:25 78:8

AIDS
14:24
128:4

alcohol
98:1,2,5
99:9,11,
13,23
100:10,21
104:17,25
108:9,12
109:13,25
110:1
129:18
130:3
138:16
182:18,25
183:17,23
184:8
194:1,4,
10,14,16

alcoholic
98:13,17
128:23

alcoholics
128:5

alcoholism
100:4
129:23
194:6

alert
100:17

alive
108:3

all-
handicapped
150:7

allergic
75:25

allergies
57:7 73:1,
19

allowed
184:13

altered
115:23

Amazon
117:3

ambulance
60:21

Americans
152:17

amount
66:14
120:4
134:5,6

amputation
23:25
44:18 45:3
57:12

amputations
18:4

analysis
114:14
183:1,10

analyzed

182:16

anemic
163:17

anesthesia
86:19
134:3,7

answers
182:13
183:14

antianxiety
18:23

anticipate
115:24
149:3
164:1,3

anticipation
133:11

anticipatory
118:16

antidepressa
nts
18:23

anxious
93:10

anymore
43:9
103:18

apiece
13:14

apologize
68:23

apparently
28:9 37:22
45:3
131:22

appearing
4:9

applied
159:10

applies
187:14

apply
133:16

appointment
39:20
52:23
75:16
85:22

appointments
55:25
83:24

approach
156:23

approaching
144:16

appropriatel
y
49:21 50:7
80:15
140:13

approximatel
y
14:3

April
27:15,18
173:6,7
176:17

area
12:5 48:1
86:21
103:3
109:11
115:18,24
117:11
134:6
187:19
190:4

areas
74:11
86:20

94:15
95:15
103:5
115:22
117:19,21
118:4,6
132:8
134:4
137:15
168:3,8
186:7

argued
174:20

arguments
121:22

arithmetic
127:13

arm
136:8

arms
45:6,15,16
46:5
117:25

arranged
39:22

arrival
28:21 29:5
110:18

arrived
29:10 68:2
110:15

artificial
136:8

asks
73:3
106:24

aspect
35:10
154:5

aspects
181:24

assess
170:14

assist
167:15
170:19

assistance
190:24

assisting
29:14
165:3

assistive
145:5

assists
33:6

associate
177:20

Associates
8:5 32:19

association
21:10

assume
5:17 16:6
61:23
146:17
148:2
174:23
176:10

assuming
160:21

assumption
153:8

Astros
16:10

attached
69:16,18
179:25

attempting
165:1

attend
155:21

156:8

attendant
151:20,23
152:4
154:9,11

attended
155:25
156:3,11

attending
155:6,11

attorney
25:12
43:20,21
45:9,17
48:21
49:13,14,
20 50:4
52:10
53:9,10
54:3 55:15
64:13
70:25
77:25 78:5
178:17,19,
25

attorney's
32:22 45:7

attorneys
26:6,13
33:16
43:5,7
51:3
54:23,25
55:4,5,9
64:1,24
65:8 66:2
72:14
79:16

attributable
66:25

attributed
35:2

attributes
183:3

audio
97:7

audiotaped
194:24

authenticate
63:10

author
193:18

authored
58:6 63:14

Avenue
4:10

average
65:4 95:12
121:3
128:20,25
149:15
157:4,8,
21,23
158:12

averages
120:25
178:2

awaiting
181:7

awake
101:3

aware
49:19,22,
24 50:12,
25 55:13
58:11
61:17,19,
22 67:3
83:16
96:17
98:25
99:4,15,22
100:9,16

101:14
112:2
122:6
123:14,16
124:8
132:4
140:20
151:9
154:9,17
155:10
163:5
167:10
174:11
194:9

Ayala
51:15
53:11,12,
16,21
54:3,16
55:7 56:3
70:25
77:25 78:5
80:18,23
161:21
163:8
164:11,15
194:21
195:4

_____

B

B-E-C-K
112:12

B-R-E-N-N-E-
N
45:1

back
8:22 9:14
16:9,20
27:24
34:20
36:11,21
38:25

41:11
44:22 51:4
58:8,10
60:17 67:9
74:12,13,
16,18
80:20
81:14
82:23
89:12
101:12,13
108:15,16
109:10
112:15
116:10,20
117:25
120:1
132:11
133:2
140:4
143:7
149:24
160:15
161:8
163:23
164:13
173:5,6

background
26:12,20
46:22
50:17
59:19 88:9
101:5
122:2,25
125:9
133:17,20
144:10
169:2,4
174:25
184:4
185:16
186:1
191:13

backs
  18:9
bad
  90:10
Bagnoli
  30:12,21
based
  7:25 16:6
  42:20 44:5
  168:21
  176:15
  180:11
  184:3
  185:4,15
  187:7
  191:12
  193:8
bases
  36:3
basic
  141:10
  147:3
basically
  8:21 9:2
  15:19
  18:11
  21:13,23
  22:8,12
  23:8
  26:16,23
  28:22
  30:25
  41:2,3,7,
  16 43:6
  45:6 54:6,
  8,12 56:2
  57:1,3,9
  61:15
  63:20
  64:23,25
  65:19
  66:1,10

74:5 75:8,
17,23 76:3
83:10
85:24 86:6
93:10,12
94:18,25
95:16
101:20
104:16
105:14,21,
23 108:23
110:22,24
115:18
116:1
117:20,24
118:6,25
119:6
120:20,23
121:11
124:24
125:8
126:22
131:7,17,
19,20
136:17
141:8
145:5
148:6
149:23,24
150:3
158:6
160:21
161:25
162:2
173:16
basis
  16:4 21:5
  22:20 57:2
  115:11
  136:16,17
battery
  21:6

Beach
  16:2,3
BECK
  19:13
  69:16,19
  81:14
  110:8,9,13
  111:5
  112:7,14,
  19 113:22
  114:4,10
bed
  143:3,6,
  16,18
bedroom
  60:15 61:2
  74:15
bee
  75:25
beer
  110:4
began
  9:22 140:2
  170:6
begin
  22:16
  182:23
  183:1
beginning
  10:7 21:25
  36:4
  119:10
  170:5
begun
  42:4
behaviors
  183:2
belabor
  5:18
bell
  45:18

belly
  27:5
bending
  143:12
benefit
  169:1,4
Benign
  132:23
Betsy
  10:12 81:3
  101:19
between--
  117:15
bids
  149:17
big
  140:22
biggest
  141:7
bilateral
  95:17
bilaterally
  90:5 117:8
billing
  24:10,20,
  24 77:14
Biological
  95:22
  97:25
bit
  22:23
  42:13
  144:7
  158:8
  164:4
  185:6
biweekly
  67:16
blank
  81:12

82:10
blanks
  15:2
bleed
  105:19,20
  106:9
bleeding
  89:18
  137:22
  141:9
bleeds
  136:19
  137:14
blocks
  28:25
blood
  94:22
  105:18
  185:20
blow
  25:8
blurred
  84:20
board
  8:12 29:16
  33:10
  121:9
  169:8
  174:19
body
  47:24,25
  58:19 59:4
  102:24
  103:2
boils
  63:20
bones
  144:14
book
  13:25

born
30:4

bottom
82:24
89:3,13
90:15
121:15
124:23

bounce
34:18

box
140:22

boxes
22:16
41:16
57:13
157:13

boy
6:21 80:8

boys'
61:2

braces
75:5

brain
18:3,9
23:4,5,25
30:16
48:20
169:18,20,
22

break
5:24 14:7
70:8 83:19
130:11

breakdown
105:22
137:14
158:3

breaking
191:10

breaks
136:18

Brennen
44:17,21,
23

bridgitt
4:1

briefly
4:15

bring
29:17

bringing
8:11

broad
114:11,15

broadly
142:18

brought
133:14
168:7

bucket
146:5

bullet
13:4,9,19
48:5

bunch
108:22

burn
15:9,15
16:15,17,
19,21,24
17:11,14,
15,18,19,
21 18:5,6
19:20,21
27:9 36:8
40:21
44:13,17
46:12
47:13,18,
19 83:11

84:6,8,24
85:2,9
89:7 100:8
102:2
104:9
116:2,3
117:14,22
119:21
130:22,23
131:3,13
154:25
155:1,2,25
156:4,6,
11,17,18
157:19
163:25
167:7

burn-related
130:25

burned
45:5 61:16
74:11
89:15
117:16
144:3

burns
16:20
44:18
45:3,14,23
46:6,12,25
47:4,5,23
48:8,9
84:9,16,19
92:22,25
93:12
115:24
117:12,13
119:11,15
134:2
143:6
155:14
162:11
170:16,20,

25 171:3,7
184:12

burst
45:5

business
16:7

butcher
101:16

buy
104:6
116:24
146:9

buying
117:2

_____

C
C-O-L-L-E-T-
T
49:18

caffeine
109:14

calculations
67:4

calendar
56:23

call
6:22 14:6
22:15 27:3
31:7,21
34:4 52:9,
22,25 53:6
54:23
56:16
63:17 64:2
67:15
118:15
165:24
173:12
183:11

called
20:22

23:14
28:18 34:4
90:21
112:14
170:18

calling
158:13,15

calls
31:16,21
157:7,18
158:19

callus
84:9,10

calluses
89:6 90:4,
18,23
91:1,10,16
92:1

camera
58:19 59:4

canes
75:5

capabilities
123:25
142:25

capacity
124:10,17,
20

capitalized
112:13

car
34:15
97:21
129:7

cardiac
47:17

care
5:6,10
6:11,17,25
7:1,5,14,
19,21 8:5,

9,18,21,24
9:16,21
10:1,2,4,
6,7 12:11,
19 13:10
14:24
20:11
21:10
22:4,15
23:1,11,
15,24
24:4,6
25:9,11,
15,24
26:1,10
29:17
30:19
31:9,15
32:19
33:1,11
35:5 36:2
39:14
40:11,14
41:3,6
42:1 44:13
47:11,15,
21 49:22
50:10
54:11
61:7,23
62:19,23
63:5,17,24
64:16,25
65:2 66:9,
18,24
67:5,10,12
73:6 74:22
75:10
77:12
80:7,12
85:1
86:14,25
89:17
93:4,14

100:4
106:25
118:23
119:3,4,8
120:5,10
122:3,6,
12,18,21
123:4
124:25
125:5
126:8,11
129:14
130:7,13
137:8,22,
25 142:4,
16 143:10,
21 151:17,
20,23
152:4,24
154:5,8,11
159:1,12
160:4
165:4,12
166:14,17
168:2,21
169:3
170:6,8,13
171:5,8,
12,16,22
172:4,14,
17 173:8,
19 175:2
176:20
177:8,15
178:5,15
179:2,7,
11,19,25
180:3
181:5
184:6,10
186:18,20,
25 187:5,
12,13
188:2,6,

17,20,25
189:1,12,
17 190:7,
18 192:1,
16 193:18
career
  16:13
  17:24
  166:17
  170:12
carpal
  16:9
carry
  42:6
cartoons
  92:15
case
  5:3 6:12,
  17 7:5,13
  9:10 10:22
  11:1,8,22
  19:24
  20:2,5,8
  23:2,15,17
  26:25
  33:17,19
  36:1 39:25
  42:16
  44:11,17
  45:13 46:4
  48:21
  49:7,9,12,
  19,20,25
  50:3,7,13,
  21 51:1,
  22,24
  52:5,7,18
  53:7 54:4
  55:1,7,16
  56:7,13,22
  57:16 58:3
  61:18,20

62:5 63:14
65:13,21
66:20 67:5
72:11,23
74:9 75:1,
7 79:1,10
82:18 93:3
111:22
115:13
123:15
124:8
125:10,11,
18,20,22
126:1
132:4
154:18
158:16
161:25
164:2
166:7
168:7,15
171:16
174:10
175:5
176:14
178:20,22
179:1
181:18,20,
25 182:4
187:2
cases
  9:12,24
  15:23 18:6
  25:22
  42:22
  43:1,5,11
  44:6,12
  45:2 46:8
  49:23
  107:13
  128:5
  176:9
  184:6

186:22
cash
  36:11
catastrophic
  186:22
catastrophic
ally
  190:20
  191:8
category
  128:13
caught
  59:20
  60:4,8
caused
  48:8,9
  59:17
Celexa
  103:10,22
cell
  87:21
cellulitis
  84:2
  136:17,20,
  21,25
  137:5,12,
  16 138:2
center
  100:8
  120:16
  121:12,13
  130:23
  131:3,13
  137:8
  155:2
  156:6
  157:19
centered
  193:5
centers
  137:22

certificate
  21:12
certification
  12:12
  13:16
  20:12,15,
  22 21:4,6,
  22
certifications
  20:10,19,
  21 21:2,
  15,18
CERTIFICATIO
NS/ACADEMIC
  12:6
certified
  29:17 32:9
  33:10
  37:14,17,
  18 169:9
certify
  20:15
cetera
  172:15
  190:24
challenge
  26:19
  49:25
challenged
  48:17
  50:12
  51:24 52:4
challenges
  80:16
chance
  183:24
  191:16
change
  11:17

65:24
119:9
159:25
178:7
changed
  41:17
  50:14
  141:11
chapter
  14:1
chapters
  13:25
  31:14
charge
  24:11,12,
  13 135:5
  157:21
  158:18
charged
  159:7
charges
  31:23
  159:9,22
  160:1,3
chat
  70:12
cheaper
  121:3
cheapest
  120:19
check
  36:10,12
  52:20
  77:10
  108:22
  188:3
checked
  107:21
  108:23
Checklist
  81:22

105:13
Chicago
  155:19
child
  9:20 60:18
  92:21
  103:24
  173:3,14
children
  7:18 17:18
  28:5 31:5
  60:16
  92:9,14,19
  140:16
Children's
  30:11
choice
  110:23
chronic
  112:3
  113:5
  144:15
church
  147:2
cigarette
  105:5
cigarettes
  105:3
cigars
  184:13
circle
  94:15
circled
  93:21
  95:16
  108:25
  109:6
  111:9,17
circles
  94:1

circulation
  118:8
circumscribe
  128:8
circumstance
s
  45:25
  187:1
citation
  119:15,18
citations
  22:23,25
  118:22
City
  155:2
  156:5,10
claim
  23:12
  61:18 67:1
  123:15
  124:9,10
  125:12
claimed
  66:19
  132:4
claiming
  132:14
claims
  9:17
clarificatio
n
  39:10
classic
  57:4,8
  72:24
  83:17
  184:12
classically
  119:7
clean
  41:7

clear
  7:11 19:9
  78:15
  107:16
clip
  59:3
close
  11:11
  26:22
  121:4
$CO_2$
  134:2
code
  86:23
codes
  134:1,5
coffee
  109:14,20
cognitive
  47:18
coincide
  52:17
cold
  91:8
Collett
  49:18,24
  50:3,13,21
  51:22
  174:10
column
  41:21
combination
  10:5
  126:22
  127:3
combine
  129:2
combo
  10:2
comers

129:16
183:8

comfortable
140:10
162:1

comments
132:18

common
119:2
123:22

commonplace
186:20

communicate
76:24
165:1
180:16,21

communicating
6:2 166:6

community
31:22 73:6
157:18

companies
20:15

company
8:7 20:19
21:8 30:22
32:16
49:12

company's
8:4

compared
48:9

compilation
165:4

compiled
179:6

compiles
177:21

compiling

176:20

complaints
145:23
180:17,22

complete
21:6 38:24
67:22
71:15
78:13
81:16
175:10
177:8
179:22

completed
6:22 19:12
38:14,21
67:24
68:2,11
71:14,17,
22 72:2,3
76:7 81:10
82:17
110:15,17
163:7

completely
178:7

completing
168:2

complicated
16:12

complications
84:15
118:10
124:6

component
15:16

computer
76:18,22
77:7 97:13

concept

193:6

concern
89:15,20
118:17
150:22

concerned
89:22

concerns
119:24

condition
102:5
137:17
160:16

conditions
176:1

conduct
27:1

conducted
168:19

conducting
4:16

conferences
155:16

confirm
37:7 63:8

confirmed
131:23

Congress
154:25
156:1,19

conjunction
114:23

Connecticut
17:8

cons
183:12

conscious
101:4

consecutive
70:2

consideration
159:12
160:7
172:4

considerations
190:17

considered
160:12
173:21
179:1

consistent
63:13 65:5
72:15

consultant
65:16

consultations
62:22
162:3
163:24

consulted
184:6

contact
28:16
36:21
67:11
166:9

contacted
52:12
67:18
157:20

contemporaneously
97:10

context
23:13

contexts
9:17

continue
155:21

continued
180:13,17,
21

continuing
128:18

contract
26:22 50:9
52:9

contractor
150:14

contractors
30:23,24
149:18
150:12

control
163:9,21

conversation
37:19

conversations
181:8
185:4
192:19

converts
178:16

cook
185:20

cooker
46:4 47:1

cookie
185:11

cooking
106:6

cooks
105:20

copies
70:11,24
81:7

copy
8:20
10:10,25
11:3,13,15
24:24
38:14,16,
21 52:2
63:2 75:15
76:10,17,
23 77:9
80:19

corn
89:9

cornea
84:24

corneal
84:19
162:9

corner
179:12

correct
5:7,8,12,
13 6:13,
15,20 7:2,
3,7,16,23,
24 8:1,2,
6,9 9:3,4,
9 11:15,
16,23
12:1,15,19
13:8,13
14:5,16,
17,23
15:17 16:9
17:5,6,23
18:14,16,
17,19,20
19:3,11,
12,21,22,
24,25
20:2,3,6,
9,14 22:9,

10 23:2
24:8 25:4,
20 26:21
27:15,20,
23 28:1,13
29:14,15
31:2 33:8
35:7,25
36:24
37:13,20,
21 38:17,
22,23 39:1
40:1 41:24
42:13,14,
18,22,23
43:23
44:4,8
45:4
46:18,19,
24 47:6,14
48:2,3,11
54:5 56:8,
9 58:4,16
61:10,11,
14,15
62:1,2
63:15
65:18,19,
25 66:8,
10,21
67:1,2
68:1,9
71:8,23,24
73:9
77:19,22
78:21,24,
25 79:11,
20 81:16
82:2,11,
18,19,22
83:4,8
84:4,6
85:9,10,
16,17

86:17
87:5,6,10,
11,13,14
88:3,4,6,
7,11,14
90:19
91:4,5,16,
17,21,23
92:3,4,10
93:17,18,
23 94:12
95:13,18,
24 97:8
99:23
100:11
101:9,10,
14,21
102:25
103:10,11,
14 104:4
105:7,8,
10,15
106:21
107:5,7,
21,22,24,
25 108:4
109:6
110:12,21
111:13,18,
19,24
114:13,17
115:5,6,8,
9 117:5,
23,24
118:5,14,
15,24
119:23
120:5,6,9,
12 121:16
123:1
124:10
125:2,3,8,
14 126:9,
10 127:6,

14,21,22
128:11,14,
15,20,25
129:1,4,
19,20
130:3,4,
15,16
131:15,16
132:5,6,
20,21
133:5,23,
24 135:19
137:17,18
138:11,12,
24 139:6,
7,13,16,
17,19,20
141:14
142:5,7,9,
12,13,22,
23 145:11,
12,14,19
146:20
147:8
148:4,5,12
150:12,13
151:12,13,
22 152:2,
5,6,9,10,
12,13
153:21,22
154:7,19
158:8,9
159:7,8,13
160:8,9
163:1,16,
17 166:11,
16,24
167:24
168:9,16
171:13,17,
18,24
172:21,22
173:24

174:1,20,
21 175:24
179:21
180:5
181:11,20,
21,25
182:1,5
183:6
184:20
187:3,10
189:13,25
191:11,25
192:24
193:11,12,
15,16,20
194:10,17,
18

correctly
25:19
174:9
183:5
190:17

correlate
111:18

corresponded
115:16

corresponds
93:23

cosmetic
103:7
135:9

cost
34:23
63:22 66:9
87:12
88:10,12
91:25
131:1
132:19
133:22
136:2
146:19

147:24
149:15,16
150:9
151:21
157:11
158:7
178:3

costing
159:21

costs
62:13 64:7
65:1,4,10,
22 157:2,
3,9,24,25
158:13
160:19
162:25
175:16
176:4
179:6,13
180:3,9
181:4,16
187:17,19

counsel
6:23 39:8,
19 62:8
70:14
80:1,6
164:17
166:6

counselor
32:9 50:18
53:15
54:19 59:6
142:1
146:4
152:16
194:23

counted
43:3

country
43:4

155:17
191:5

couple
36:5 56:19
81:24
83:23
88:17
139:12
161:16
164:12
186:12

coupon
159:17

courses
12:22
13:18
15:5,9
20:20
21:7,20

coursework
13:5,8
14:3 15:16
21:16

court
46:9 174:5

courtesy
64:8 65:11

cover
14:24,25
160:13
163:19
190:5

coverage
161:9

covered
160:16

COVID
83:25 85:8

CPT
86:23
134:1,5

crack
144:4

cross
54:25

cups
109:20

current
85:12
104:2
189:11,23

cursory
93:6

customary
31:23
77:13
120:7
158:24
159:8,22
160:1,19

cut
120:18,23

CV
8:4 10:11,
23 11:1,7
12:5 17:4
77:12

_____

D

daily
73:4 75:5
81:22
95:22
97:24
105:12
107:17
115:11
129:3
176:25

Dallas
155:18

damage

66:25

damages
66:19

date
11:5,10
13:15 53:8
72:19
73:22 76:6
79:4,15
154:18
166:12
192:17

dated
13:11 25:2

Daubert
26:19
49:23,25

Daubert'd
26:3 48:17
49:2,5

day
16:1
105:1,6
109:15,21
128:17,24
136:19
161:11
170:7
184:13

day-to-day
105:25

days
16:4
161:6,17

deadline
163:3,6,16

deadlines
168:11

deal
15:9 153:2
160:17

194:1

dealing
61:15
148:19
153:22
186:21

death
45:6

decent
161:9

decision
51:1,7

decisions
175:8

decreased
115:15
117:7,21
118:3

deduct
148:4

deem
172:2,12

defendants
5:3

defendants'
51:9

defense
72:14 78:7
121:24
122:9

defer
92:4 133:7
135:10,23

deficient
194:7

define
67:15

definitions
118:23

degree
32:10
116:2
118:7

degrees
118:6

deleterious
185:24

demonstrated
191:14

demonstrates
175:6

department
33:1
169:16

dependent
47:16
149:22

depending
74:6 75:11
119:3
157:1

depends
27:3 47:9
102:23
158:19

depiction
179:4

depo
77:14
101:23

deposition
4:16 5:14,
18 14:12
25:1 46:9,
17,22
57:15,21
58:13,15
77:6,13,18
136:6
141:19

161:14,23
167:6,13
168:4
171:15
173:23
176:6,10,
23 177:7,9
178:11
181:3
186:12,15
187:20
195:5

depositions
4:18 9:11
54:24
153:16
166:18
167:2,13,
21 171:25
172:2,9,20
173:1
177:10
181:22

depressed
113:11,15,
16

depression
19:7,13,15
96:4 99:8,
10 101:11
103:13
110:9,10
111:23
113:7,13,
18

describe
178:10
189:6

description
18:12
186:19

descriptions

22:13

Desert
85:1

designed
113:5

desk
36:15

detail
71:3 94:20
181:8
186:19

detailed
175:12
180:1

details
166:13

determine
132:18
133:22

determined
127:19

developed
169:17

device
149:9

devices
145:5

diagnoses
19:1

diagnosis
19:1 26:9
47:20 85:4
102:11

diagram
93:19,22
94:10

difference
116:16,19
148:11
158:7

188:24
189:22

differentiate
115:21
117:13,15

differently
102:10

difficult
123:19
165:21
184:15

dining
92:12,13

direct
13:23
14:16,19

directed
170:4

direction
35:13

directly
126:18

director
30:10,13,
16 169:14,
15,20,21

disabilities
15:14
152:19

disability
90:2

disabled
153:12

disagree
41:8,23

disagreement
40:6 74:23

disappointment

111:16

discharge
23:21 24:3

disclosed
26:18
163:15

disclosure
25:25
26:19
163:3,6,16
168:11

disclosures
25:13
154:18

discomfort
94:9

discount
159:15

discounted
158:22
159:2

discounts
159:3,10,
23

discourage
105:25

discouraged
99:11

discoverable
78:4

discovery
125:25
163:21

discuss
85:12 98:2
101:7
138:18
154:10
161:24
162:15

discussed
94:24
96:20
100:15
104:20
161:25
162:2,4
174:11
189:11

discusses
188:6

discussing
51:25 71:4
116:6

discussion
29:9 59:16
60:25 86:2
95:23 98:8
110:2
113:19
119:11,14,
24 123:9
127:5
138:7
139:11
145:10
153:24
162:8
189:19,20
190:10
193:4

discussions
39:8
119:20,22

disgust
111:16

disgusted
111:17

dish
185:21

disorders
144:15

dispute
44:8,9

disqualified
26:2

distal
117:10

distance
141:4,6
144:5

distances
141:3
148:17

District
50:24

Division
50:24

divorce
152:17,19
153:8
191:6,19
193:15

divorced
193:8,19

Doc
169:1
179:19
188:4
192:25
194:21

doctor
4:3 8:23
9:21 10:6,
9,17,25
19:5
24:14,23
29:20 32:7
40:10,24
42:7
48:13,16
51:20 52:6
53:14,23

62:25
68:19
70:23
74:14
76:10
77:5,16
80:18 81:6
98:9 116:6
118:10
130:5
137:9
138:8
139:8
142:2
151:14
161:13
165:25
176:16
183:21
190:5
193:3,24

doctor's
137:20

doctorate
36:9 53:17

doctors
16:10
20:16
25:14
26:10
29:21 30:6
31:21
32:24,25
40:4 48:14
52:4 73:1,
18 90:21
113:5,24
134:17
154:15
155:24
156:22
162:16
187:18

document
34:5,9
56:20,25
63:19,25
64:10 72:2
73:3 80:4
81:23 82:9
93:2 97:18
179:12

documentatio
n
19:18
22:13 23:3
31:19
62:16
80:17 94:8

documented
93:13

documents
57:24
58:1,5,14,
18 62:3
68:7
77:20,23
78:1,16

donate
132:8

Donny
50:4

doors
147:19

Down's
128:4

download
58:24

dresses
117:1

drink
184:7

drinker
99:5 129:3

drinkers
128:23

drinking
97:25
99:15
110:5

drinks
98:6,13,18
99:1,16
109:14,20,
25 110:1
128:23
183:23

drive
85:21
145:20

driven
155:15

driver
45:5 129:7

drives
85:22
160:24

driving
74:16

Drs
30:21
35:19

drug
128:6

dry
108:24

dryer
106:8

DSM
113:3

duces
77:19

due
25:9 26:19

96:16
100:7
146:24
182:17,24
194:16

dull
94:5 95:6
115:22
116:12,16
117:4,18,
21 118:7

Duloxetine
138:25

duly
4:11

durable
32:11

duration
87:7 88:5
91:15
131:1
134:7
160:4
162:24
180:8

E

e-mail
10:13,15
70:12

ear
84:4,7
162:10

earlier
9:23 162:4
167:7
171:14
177:17

earlobe
136:21
137:2,5

early
166:9
174:7

earnest
9:22

earning
124:10,17,
19

easier
76:16
90:24

easily
137:14

eat
194:12

economist
64:11
66:4,18
67:3,11
177:23
178:2
179:15

economists
66:4,12
67:14,18

editions
123:7

education
12:17,24
20:13,23
33:12
122:2

educational
20:20
169:2,4

effort
26:16
79:22

efforts
138:18
171:20

Eitan
55:14

elected
8:11 12:21

electric
48:9

electrical
45:14,23
46:25
47:4,18,
19,23

electrocutio
n
47:13

electronic
195:3

elevated
53:13
143:9

Elevating
143:3

Elkins
8:20,25
9:1,14,25
42:9,12,15
77:12

embarrassed
74:13
135:3

emergency
137:17

employee
32:15,18
65:16

employees
30:22
33:3,9
49:12

empowered
155:22

encompass
131:2,4

encompassing
69:7

encourage
129:25
156:7

end
13:15
24:16
29:22 31:1
51:21 52:2
54:24 66:2
69:18 74:7
81:14 82:1
88:24
101:25
132:6
133:25
157:5
162:23
184:8

endeavor
174:24

ended
84:20
120:15
131:17
140:6
193:15

ends
94:7
158:17

engagements
9:3,9,15

England's
169:21

ensure
25:12

ENT
162:12

163:25
175:23

entailed
74:4

entertainmen
t
177:1

entire
31:11
115:18

entirety
192:16

episode
84:1

episodes
137:1

equal
147:25

equals
113:18

equations
64:22

equipment
32:11 40:6
75:4 139:9

ER
136:14,24
137:6,10

error
76:5

essentially
117:12

estimate
131:1

Eugene
5:2 80:23

evaluate
170:14
176:17

evaluated
114:16
evaluating
187:15
evaluation
6:22 26:8
27:7,13,21
28:2,4,14,
15 60:3
62:4 74:8,
9 85:3
131:8
168:19
180:11
187:1
even-
numbered
70:3
evening
28:1 58:20
71:10
events
47:17
56:10
exact
175:14
exam
73:9 74:5,
6 93:6
examination
4:13 27:2
114:19,21
115:3
125:2,14
126:15
164:15
168:20
193:2
examinations
115:10
examine

92:24
Examples
14:23
exceeding
184:8
Excel
33:15
64:3,4
excessive
140:13
Excision
131:4
exhausted
161:4
exhibit
10:14,21,
23 11:19
24:20,23
33:19
37:2,4,8
40:25
42:8,9
46:12
63:3,5,16,
22 78:19
81:18,19
82:4,5,13,
14 109:3
163:13
exist
159:19
existed
156:13
exiting
48:5
expect
38:24
expectancy
127:5,10,
21,24
128:20,24

129:4,15
182:11,17,
24 183:4,
25 184:9
expectation
41:20
123:13
124:1
144:20
Expectations
123:9
expected
183:25
expenses
160:21
179:6
expensive
120:18
121:2
experience
17:21
19:20 88:8
91:5
102:21
125:9
169:3
174:3,25
184:5
185:16
191:13
192:11
expert
5:4 9:1
25:10,11,
14 61:7,24
65:6 77:24
78:4 116:8
134:15,19,
20 135:24
136:10,13
154:18
163:2,6,

15,24
168:6,11
174:3,13
177:23
expertise
175:18
experts
39:19
161:1
162:5,6
164:19
exploded
46:4 47:1
explosions
48:24
explosive
48:5
exposure
16:24
17:13
54:22
express
155:10
expressed
134:25
155:5,9
extemporaneo
usly
49:3
extend
183:10
extensive
175:11
extent
51:8 90:6
152:8
165:12,13
182:16
187:21
190:21

exterior
47:24
Eye
85:1
eyebrows
102:6
135:21
Eyelid
134:24
eyes
140:7

F

Fabrics
116:25
face
26:18
54:20
103:3,6,8
fact
127:24
171:19
176:22
184:3
185:19
192:15
194:12
factfinder
59:22
60:5,11
factors
183:1
facts
187:1
fail
78:12
fair
6:9,10
77:2
165:19
167:12

168:15
170:11
171:3,4,23
175:19,20
176:9
177:24
179:20
180:4,13,
18,23
182:4
184:19
186:6,22
191:24
192:23

fall
56:12
128:12

falls
111:23
116:1

familiar
5:17,20
45:19
54:20
55:12,18

family
6:18 7:22
18:22
108:1
112:5
118:11
137:9
140:16
168:14

farm
16:11

fascinating
90:16
141:7

fashioned
72:22

father
108:2,11

fax
38:10 77:8

faxed
38:10

February
52:25 53:5
56:5

federal
9:4,6,7

Fee
35:20

feel
111:7,10
117:17
177:6

feeling
114:12
144:13
181:12

feels
76:8 94:9

fees
77:13

feet
15:20 54:7
88:15
89:1,18,19
90:5 91:16
92:1 93:21
94:18
95:17
117:9
132:23
141:5,8
143:21
144:3,8
180:13,18

fellowship
34:19

felt
27:5
138:14
140:9,16
144:6,11,
12 150:4
165:6
176:18

female
29:13
74:14
127:20,25
128:13

Fentanyl
100:13,24

field
186:2

fighting
51:3

figure
121:8
142:2
157:25

figures
65:4,5
66:8,19,25
159:5,6

file
9:1 11:15
52:3 55:19
77:24
78:4,12
93:14
116:8

files
36:17

fill
15:2 28:20
57:2,4,13
94:6
113:14
165:25

166:1,3

filled
68:16 95:1

filling
75:21

final
34:7 66:8,
18,24 72:6

finalize
136:4

financially
40:17

find
29:3 76:4
115:17
123:19
132:12
134:16
165:20
187:19
190:22
191:16

finding
28:25

findings
64:11
116:3
174:18

fine
124:12

finger
116:20
117:5,6

fire
46:12
47:5,14
48:1,10
59:17,20
60:4,8,15
61:1,9,14
96:1,16

99:5,17
102:15
105:7
130:3
146:17
150:24
152:15

firm
24:25
45:11,20

firm's
45:8

Fisher
49:19

fishing
139:23

five-page
63:19 82:9

flame
47:14
48:10

flames
45:5

flip
80:25
116:17

Florida
4:11 8:1
9:2 11:19,
25 13:1
25:23
27:19,25
35:25
42:5,22
50:24
169:25
170:3

flown
27:17,24

fly
15:19

54:15

flying
93:1 97:22

foam
96:15

focus
93:10
96:21
171:20
173:5,6

focused
55:20

focuses
89:17

focusing
164:5

follow
89:21
176:1

follow-ups
193:1,3

foods
194:13

foot
56:6 84:9,
11 88:17,
18,22,23
89:3,13
90:8,15
91:2
115:16
116:3
117:10

footage
58:20 59:4

forehead
102:8

forensic
24:6

forever

49:17
135:4

forget
194:12

form
33:7
51:16,17
56:14
72:17
81:16
163:8
165:25
166:1
172:6
173:25
178:8
180:6,15,
20,25
181:10
184:1
188:23
190:1
191:20

formal
23:23 24:4

formally
129:24

format
63:21

forum
19:16

forward
21:1 70:15
78:13
86:16 87:4
88:3,6,11
90:18 91:4
93:15
107:15
146:19

forwarded
28:20

41:17
70:11
77:15

found
34:17
62:16
84:22
92:21
115:14
135:4

foundation
22:19

foundations
22:2

four-hour
73:12

four-year-
old
47:1

frankly
175:17

frequency
42:3 85:18
87:3 88:2
132:22,24
133:24
136:12
162:24
175:15

frequent
181:4

frequently
144:14
156:3

front
33:21
76:11,23
77:6

full
4:23 26:20
27:1,4

41:6 65:21
70:4,6,10
78:4 81:7

fully
177:24

functioning
90:3 106:1

Functions
95:22
97:25

future
7:8 39:18
87:8 93:3
124:10,17,
22 148:4
162:9
163:20
165:8
166:15
171:12,22
172:4,14
173:8,19
180:3
181:4
188:20
189:12
190:19
191:17
192:23

---

**G**

gain
165:16

Gainesville
13:1

gaining
172:13

gardening
106:12

gave
21:3 68:17

71:12
163:9,12

general
33:17
65:20
95:12
118:11
119:20,24
193:6

generally
47:23
59:21
67:10 71:4
102:18
114:2
128:19,24
180:23
183:17

generated
41:4 79:1

generation
35:6,10

gentleman
32:23 36:7
59:1

George
184:12

germane
50:19
100:2

girl
46:5 64:21

give
4:5 5:10,
19 15:21
20:25
21:12
33:15
64:13
65:20 66:2
86:12
103:17

114:11
144:6
152:23
161:9
169:1,3
179:22

giving
6:7 19:23
20:1,4,7
161:3

glean
44:6

gloves
106:2,5,6,
7,9,13,16

go-getter
185:7

go-to
32:22

goals
118:22

Goldrosen
55:14

good
4:14 64:4
112:9
120:4,16
141:18
153:18
169:21

Goodrx
159:17

Goody
55:11

Google
101:20

Government
49:11

GPS
28:25

grad
65:16

graduate
33:13 64:4

graduated
169:6

grandfathere
d
21:14

granted
51:11,13
52:4

gray
157:13

Green
158:12

Greyson
55:11

grocery
107:19

Group
155:1
156:4,12

groups
78:19
156:18

grow
133:1

growing
85:5 89:23
141:16

grown
89:3 90:14
132:9

guess
41:11
68:25
113:16
114:15
121:7

190:4

guidance
118:16
134:11
136:3

guy
40:8

guys
161:24
167:4

_____

H

habits
104:21

Hair
131:14

half
70:9
121:15
159:18
161:22

hand
59:22
106:8
185:21

handed
68:3,15
71:18

handicapped
150:10

handle
113:6
116:18,20
117:5
175:7

hands
89:18
94:22,23
105:19,20
117:25
136:19

141:9

handy
178:25

happened
146:17
174:19

happening
132:25

happy
140:15
141:20

hard
11:3 75:15
76:10,17,
23 98:7
110:3
143:5

head
75:10
143:3

headrest
143:9

health
19:2 112:1
113:2
158:17,22
159:6,11
186:9,13

healthy
98:16,21,
22,23
129:19
183:18

hear
162:19

heard
51:23 61:4
131:22

heart
14:25

heavy
99:4
108:8,12
128:22
129:3
194:10

helicopter
60:21

helped
34:13
35:10
60:15

helpful
143:15

helping
31:17

helps
31:12,16
33:12
98:1,7

Hey
38:6

high
33:13
45:25 46:2
64:4,21
65:15
83:1,15
153:12

hiking
140:5

hire
134:19

hired
6:24 25:23
26:7,15,24
32:23 43:7
44:2 52:6

hires
178:17

history
57:4,8
72:25 76:9
100:2
108:1
125:1,13
126:14,17,
18,19,21
127:2
128:8
hobbies
142:4
hold
22:1 37:22
71:2
149:22
150:1
157:19
hole
48:6
holes
48:6
home
7:18 28:17
31:4 67:25
71:7,10,16
73:7 75:5,
20 92:10
97:2
107:20
138:21
142:24
145:4,7,8
149:2,3,9,
11 150:8,
10,16,23
151:1,2,6,
11,20
152:11,14,
22 153:6,
25 154:4
161:2

190:6,12
191:3,17
193:5
HOMEMAKER
151:16
honest
6:7
hope
133:13
horizontal
157:13
horns
89:5,23
141:16
hospital
30:11
83:14
100:6
115:11
170:3
hospitalizat
ion
136:24
194:3
hospitalizat
ions
73:16
83:24
99:25
hospitals
170:2
host
40:3
hot
148:18
hotel
74:17
hotels
161:11
hour

24:6 70:9
74:4
161:22,23
hours
13:14,22,
23 14:1,4,
16 27:13,
15 33:23
34:15,16,
24 35:2,3,
4,6 75:11
151:24,25
153:5
161:16,18,
19
house
28:2,11
29:1,6,7,
10 59:2
60:14,16
75:3
140:12
141:2
144:21,22,
23,25
145:1
Housekeeper
151:19
housekeeping
37:1
hoverboard
59:20
60:3,8
61:19
hunting
139:22
hurts
141:5
husband
28:6 85:25
152:25

hydraulics
147:14,16,
21,23
hyperkeratos
is
90:21

_____

I

I-E
32:6
idea
33:16 43:3
55:8 59:9
64:15
65:1,20
66:3
150:24
152:21
176:2
ideas
29:3
identificati
on
10:24
24:22 37:6
42:11
63:7,23
81:20
82:6,15
identified
57:6
159:21
identify
23:9
136:11,22
180:13
identifying
187:16
ignorance
113:1
imagine

141:4
immediately
49:3
impingement
47:5,14
48:10
important
14:11
172:3
impression
181:12
improperly
26:18
in-patient
28:15
inability
173:22
inaccurate
178:8
inappropriat
e
39:12
include
131:9
188:18
included
31:17
119:18
134:4
includes
128:3,4,5,
6,7 129:15
134:3
183:8
including
7:19 16:14
72:25
170:2,15
176:25
177:1

incomplete
179:20

incorporated
34:7

independent
21:21
30:22,24

indepth
93:8
114:14

indexes
125:6

Indiana
169:6

indicating
62:8 85:24
158:18

individual
20:25
21:20
47:22
183:18
188:21
190:20,22

individuals
128:22
184:7
191:7

industry
118:24
169:22

infected
136:18

infection
84:8
137:23

informally
173:16

information
15:20
26:11,20

109:5,16
124:11
153:20
165:2
166:14
168:1,19,
22 172:2,8
176:18
192:18
193:10

initial
24:10
56:4,15

injected
87:22

injections
85:15
87:16,18
88:1,11

injured
190:20
191:8

injuries
15:9,15
16:8 18:9,
21 19:20
44:14
48:11 84:6
85:2,9
104:9
117:14,23
119:21
170:15,20

injury
15:19
23:4,5,25
30:16
47:13
48:21
160:18
169:18,20,
22 186:22

191:8

inpatient
30:13
169:15,20

inpatient/
outpatient
170:4

inside
94:1
144:25
145:1

Institute
12:17,23
20:12,23

Institute's
13:4

institution
8:19

instructed
122:22
171:19

instructions
5:19

insurance
20:17
49:12
158:22
159:7,11
160:17

intake
52:24
56:14

intense
102:12

intensity
95:10

intentionall
y
174:24

interact

92:18

interest
134:25
155:6,10

interesting
36:7 71:24

intermittent
ly
18:7

interruption
68:21

interview
59:1,15
96:20
97:1,3

intruders
150:23

intubated
27:10
100:25
101:1

Inventory
19:13
69:16,19
81:15
110:9,10,
14 111:6
112:7
113:22
114:4,10

inverse
91:20

investigatio
n
62:1

investigator
s
61:25

invoice
24:10,21,
24,25

25:1,5
33:18
35:19
52:14

involved
18:15,18
45:2,14
48:1 61:25
66:15
147:21

irrespective
188:21

Island
169:14,16

issue
11:10
61:21 85:8
92:25
101:21
102:15,18
103:7
173:4

issued
5:5 13:16
24:25
50:23
79:23

issues
6:17 7:21
47:19
61:20
95:23
96:1,16,19
101:8
124:17
142:1
148:21
150:22
176:24
177:2
180:13,17,
22 181:20

itching
108:24

item
35:18
131:4
136:4
150:17
151:21
153:7
157:1

itemized
78:18

items
124:24
125:4,10,
13 126:8,
11 130:23,
25 132:19
133:10,12,
23 139:11
146:23
150:4
152:3
154:25
162:23
180:1

J

Jacksonville
50:24

JD
53:19

Joann
116:25

job
188:17

join
31:4

judges
36:3

judgments

42:5

July
25:2
154:19
163:3

jump
22:23

jumped
22:22

jumping
111:14

jumps
81:12

June
37:16
79:24

juris
53:16

jury
178:10

K

keeping
43:6

kidney
14:25

kids
132:9
140:6,8

kind
13:24
19:16
21:11,16
34:18,20
49:2 50:6
59:8 63:19
67:16
74:21 76:8
83:17
86:22
88:24

89:8,10
96:8
107:13
114:10
115:19
117:17
126:25
128:3
132:12,25
150:3,25
152:22
160:12
173:4
185:8

knew
29:6 51:2
59:21,24
84:18
88:13

knock
121:11

knocking
121:6

knowing
155:22

knowledge
96:11
174:18

L

L-E-S
32:6

L-E-S-L-I-E
32:5

lack
26:19

lady
33:13
89:16
105:15
107:12

139:22
178:15
185:8,10

Laflamme
4:13 5:2
10:12,16,
20 51:19
53:13,18,
25 70:7,
19,22
81:2,5,17
82:3,12
130:10
138:6
172:6
173:25
180:6,15,
20,25
181:10
184:1
188:23
190:1
191:20
193:1,2
195:2

Lake
155:2
156:5,9
160:22

language
38:20

lapsed
11:21

laptop
78:11

large
17:11 48:6
86:20
134:4

laser
85:15,19
86:15

87:3,9,13
91:8

late
161:2
166:10

laundry
105:19

law
45:8

lawyer
168:13

lawyering
51:14

layer
102:2

lays
22:18

lead
60:4

lead-up
28:16

learn
165:2
171:9

leave
51:16
94:22

leaves
48:7
105:18

Lechapelle
35:23
36:21
37:5,9,12
38:1,4,15
39:23
40:10 80:5
131:12
162:20
163:23
165:5

166:7

Lechapelle's
77:8

left
88:16,22
90:12 91:2
147:18
164:17

leg
136:8

legal
19:4
134:17
152:20
160:12
168:14

legs
45:6,15
46:5
143:11,21

length
141:4

Leopold
44:21
45:7,9,10

lesions
132:23
133:4
141:12

Leslie
31:12,13
32:4,5
34:25
35:1,9,12
79:18

Leslie's
35:3,4

letter
36:10
37:4,8
41:1 52:1

letterhead
30:2

level
32:8

levelly
22:15

levels
34:8

liability
46:25
181:19,24

license
11:12,18,
19,20,21,
25 53:22

licensed
12:2

life
5:6,10
6:11,17,25
7:1,5,14,
19,21 8:5,
9,17,21,24
9:16,21
10:1,2,4,
6,7 12:11,
19 13:10
20:11
21:9,10
22:4,15
23:1,11,
15,24
24:4,6
25:9,11,
15,23
26:1,10
29:17
30:19
31:9,15
32:19,25
33:11 35:5
36:2 39:14

41:3,6
42:1 44:13
47:11,15,
21 49:22
50:9,20
54:11
61:6,23
62:19,23
63:5,17,24
64:16,24
65:2 66:9,
18,24
67:4,10,12
74:22
75:10
77:12
80:7,12
86:14,25
89:2,17
90:3,13
93:4,14
96:5 100:4
106:10,25
118:23
119:3,4,8
120:5,10
122:3,6,
12,18,21
123:4
124:25
125:5
126:8,11
127:5,10,
21,24
128:19,24
129:4,14,
15 130:7,
13 140:4
141:11,17
142:4,16
153:14
154:5
159:1,12
165:4,12

166:17
168:2,21
169:3
170:8,13
171:5,8,16
172:17
175:2
176:20
177:8,15
178:5,15
179:2,7,
11,19,25
181:14
182:11,17,
24 183:3,
10,25
184:6,8,10
186:18,20,
25 187:5,
12,13
188:2,6,
17,25
189:1,17
190:3,6,18
192:1,16
193:18,21,
22

lifetime
63:22 64:7
65:4,10,23
91:18,21
136:2
149:5,16
179:13

lifted
46:7

light
115:22

likelihood
190:21
191:19

limit

51:10

limitation
141:8

limitations
123:24
165:15
177:2

limited
40:17,22

lines
56:19

liquor
98:7 110:3

list
8:20,25
9:1,2,8,
10,14,25
22:2,6
39:15
42:10,12,
15,19
43:20
44:11
49:21
57:24
72:25 76:2
148:2,9

listed
44:21
58:7,13,17
62:13
65:15
78:24 96:7
124:24
138:10
187:4

listened
27:4

Listing
81:22

lists

13:5 78:19

lit
140:7

litany
24:1

Lite
104:3,8

literally
89:5 90:14

literature
102:20
119:23
121:18
122:14
135:20
183:22

litigation
9:17
23:12,16
170:19
174:4

live
13:2 40:16
74:12
129:9
132:9
184:13

lives
28:24
40:22

living
34:5 73:4
75:5 96:15
105:12
107:17
157:15

local
150:12,13
157:3,6,7
158:12,13

locally

40:14,18,
20 85:21
125:24

located
87:18

location
30:7 33:4
102:17

locations
140:18

long
8:3,17,24
32:12
37:11
63:12 86:2
89:19
100:24
112:7,16
129:21
136:19
141:6
144:11
182:8
185:24

long-term
14:24,25
18:20,21
47:9,16
48:13
59:11
61:16
89:16
119:24
142:15,24
173:15
179:23

longer
21:18
129:9

looked
27:5 43:13
44:6,12

51:13
56:23
74:10,19
79:12 89:1
90:14
93:13
156:2
187:17
191:4

loss
118:7
123:14
124:10,17,
19 132:3

lost
45:6,15,16
46:5 124:9

lot
9:18 13:24
15:21
16:11,20,
21 18:3,4
20:20
86:4,7,18
99:3
104:24,25
134:8
149:22
168:10

lotion
104:3,8
143:11,18

lots
66:13
104:7

love
107:14
192:9

low
136:23

lower
128:19,24

lumbar
115:17
116:5

lungs
27:4

_____

M

M.d
4:2

M.D.
8:10 63:6

made
118:5,12
138:17
155:10
183:16

mail
36:6
37:15,17,
18

Maine
169:19

maintenance
107:20
151:20
152:11,14,
24 153:7
154:4
190:6,12
191:3,17
193:5

Maitland
4:10

major
32:22
44:17
89:15,20

majority
16:17
67:17
165:20

166:3
170:24

make
21:16
25:16
26:13,17
29:2 31:20
56:11
57:13 69:6
73:20
76:7,24
81:7 94:1
140:15
157:7
171:11
178:6
182:21,24
183:24

makes
155:22

making
29:6 31:16
35:15
117:1

management
14:25
23:15,17
113:23,25
169:23

manipulation
s
66:13

manuals
14:21

Marc
45:17,20

Maria
29:15
31:7,8
34:10 35:9
114:24

Ronald E. Synder, M.D.
08/14/2024
25

Maria's
29:25
mark
10:20
24:23 37:2
42:8 63:1,
3,16 81:17
82:3,12
marked
10:24
24:21
33:19 37:6
42:10
63:7,23
81:20
82:6,15
163:13
marriage
154:1
marriages
191:9
193:14
married
129:8,9
152:12
154:4
190:13
master's
32:8,10
33:11
materials
119:17
math
127:17
matter
5:5 37:1
55:23
matters
170:19
174:4
176:25

Matthew
28:6 153:9
Matthew's
153:15
mattress
96:15
meal
185:20
meaning
47:24,25
77:19 87:8
125:25
131:2
191:15
means
24:17
191:9
mechanics
147:14
167:3
medical
10:3 11:24
25:16,17
27:1,6,7
32:11
57:5,8,9
68:5 69:8,
13,25
72:25
74:3,6
75:14,15
76:9 78:6,
17,20,23
81:8 82:7
83:24
84:21
93:24
94:11
99:21
100:20
101:8
109:1

118:10
120:4,16
125:1,13
126:13
128:8
137:17
141:23
142:6,10,
19 145:9
151:10
154:9
156:16
163:24
166:18
169:7,15
171:22
187:22
medically
141:13
Medicare
159:24
160:5
medication
98:10
99:9,22
100:10,21
101:2
104:3
193:25
medications
18:24
73:1,19
103:10
104:15
138:9,13,
15,18,24
139:1
159:16
188:7,14,
18 189:7,
21
medicine

16:3 18:11
169:12,23,
24
meds
104:18
meet
28:12
80:15
155:13
173:9
meeting
71:7,11,
13,16
161:22
meetings
161:20
meets
140:14
member
167:7
members
6:18 7:22
118:11
148:23
membership
12:6,13
148:14
memory
60:23
108:23
mental
19:2 112:1
113:2
186:9,13
mention
142:21
mentioned
11:17 28:5
101:12
125:17

met
4:14 7:17
173:7
185:5
192:10
method
179:5
methodologie
s
22:2,5,6
methodology
50:14
118:25
119:8
120:13
122:2,11
158:25
159:1
metrics
183:21
187:8
Michigan
100:8
mid-west
104:24
middle
29:1 50:23
midnight
161:8
midwesterner
104:23
mild
96:11,24
million
65:24
178:7
mimic
41:16
mind
55:1
146:24

151:6
162:22
185:15

mine
29:22
80:20

minimal
153:4

minimally
96:4

minutes
29:5 70:20
130:6
164:12

missing
71:1 80:14
86:7

mobile
149:9

mobility
148:21
150:22
189:19

modalities
180:9

modality
190:23

moderate
111:23

modification
150:25

modifications
75:6
146:22
149:2,4,11
150:11
167:16

modified
112:22

modifier
157:6,11,
15,17

mom
123:17

mom-and-pop
140:24

moment
60:19,20

money
66:14
104:6
133:15
146:5

monitor
151:6

monitoring
131:8
150:17
151:1
176:2
181:14

month
153:5

monthly
66:11

months
33:2 36:5
52:13
56:21
131:18

Morgan
25:3 42:25
43:1,10,
11,16,21,
24 44:2
50:4
55:15,22

morning
4:14 58:21

mother
23:6
108:2,5,8
173:3

motion
27:6 51:9

motor
45:2

motorized
139:14

move
86:3 93:15
156:9

moved
43:22,24
169:13,19

moving
110:7
123:8
146:19

multiple
5:16 8:14
15:13
20:18
51:12
101:1
110:22
113:9
116:9
137:14
161:1
189:4

multiply
157:16

muscle
48:4

muted
14:8

Myers
4:1

———————
N

named
5:4

names
43:6 44:6

national
129:15
157:2,5,
16,24
158:7,9
183:7,13

nationally
22:5 31:13
42:6 122:3
155:16

nature
39:1 119:3
135:16

necessarily
125:20

necessitate
137:6

neck
16:9,20
48:23

necks
18:8

needed
48:23
80:2,5
86:10
117:11
127:17
131:18,23
133:1
146:7
156:9,23
160:4
164:20
172:3

175:15
176:18
187:16

needing
39:9,16
47:22 80:4
105:3
149:4,7

negative
108:19

Nemours
30:11

neurologic
27:8
114:19
115:9
116:2
117:3

neurological
74:8
115:2,13

neurologist
115:5,8

neurologists
115:10
158:19

neurology
57:10

neuropsychs
114:5,6

news
51:4 58:25
59:3

Nicholas
30:12

night
28:8,9
60:12
98:1,7,13,
15 99:2,16
108:23

161:18

nights
161:3

non-hispanic
127:20,25
128:13

non-married
129:10

nonphysician
188:25

normal
57:9 116:1
140:4
141:17
146:9
147:12

North
4:10

nose
162:10

Notary
4:1,3

note
53:21

notebook
77:11

noted
37:17
133:21

notes
34:2
56:15,17
97:9,16
151:10
174:9
188:3

notice
21:25
25:12
77:14,18,
19

notification
37:14

number
4:18 5:15
9:25 18:8
41:12
43:11 61:9
86:13 87:2
98:12,17
99:19
110:24
127:15,16
148:14
157:16
178:5,12,
14,17
179:5

numbers
10:15
64:15,18
65:14,18
66:14
76:25
95:18
111:21
121:1,3
148:7
158:9,20,
21,23,25
159:2
177:22
178:23
179:18,24
191:18,22
192:3,12

nurse
103:18

nurses
20:16
21:11

— O —

O-C-A-S-I-O
30:3

object
51:15,17
172:6
173:25
180:6,15,
20,25
181:10
184:1
188:23
190:1
191:20

obtain
109:15
141:24
142:12
176:17

obtained
95:19
125:2
126:14,17
149:17,18
158:13

obvious
168:12

Ocasio
29:15
30:10 31:7

Ocasio-silva
30:3,21
31:4

occasion
170:14
173:9
190:22

occasional
171:2

Occasionally

67:14

occasions
184:23

occurred
60:12

occurs
163:21

odd
69:9

odd-numbered
68:20
69:14

offer
49:1,4
134:17,20

offered
9:13

offering
6:16 7:4,
13,20
61:8,12
115:12
118:13
124:16

office
4:9 16:2,3
22:16 31:9
32:22
33:14,25
35:8 36:13
37:20,23
38:3 41:2
77:9 87:14
113:13
137:20
160:25
189:16

officers
59:5

offices
115:11

151:15

offload
144:8
145:3

older
85:6
132:15
144:1

one-third
117:2
150:6

ongoing
12:21
105:9

online
12:25 13:2
150:11
157:21

open
56:18
106:25
113:19

open-ended
91:17

opened
8:8 54:4
56:20

ophthalmology
162:9,12
163:25
175:22

opine
133:7

opining
168:8

opinion
32:25
48:22
49:1,4
79:9 86:16

Ronald E. Synder, M.D.
08/14/2024
28

135:7,11
163:15

opinions
6:16 7:4,
13,14,20
22:20
25:16
34:21
50:11,14
56:1 61:8,
12 93:9
115:13
118:13
124:16
134:18,21
163:7
171:21
174:5,12
175:1,14
181:19
192:4,17,
21

opportunity
181:2

opposed
21:5 59:3
115:4
119:21
150:12
193:10

opposing
164:17
166:6

optimal
86:13

option
135:14

options
111:6

optometric
85:5

order
39:11 70:2
80:3
81:13,24
146:5
153:6
155:23
177:8

orders
195:1

organizing
40:11 56:2

organs
115:25

Orientation
13:11

oriented
55:2

origin
62:1

originals
68:13

originated
61:10

Orlando
4:10 30:14
49:10

orthopaedic
74:8

orthopedic
16:3,8,14
27:8 57:10
83:10

orthopedic-
related
18:1

outcomes
47:9

outdoor
139:25

outdoors
94:20
177:2

outfit
83:6

outlets
120:3

outpatient
30:10
82:25
169:18

over-the-
counter
104:11,13

overview
114:11

Owens
50:4

—————

P

P.A.
8:10

p.m.
195:5

pack
105:1,6
128:17

pages
22:18
37:11
41:12
63:10,12,
20 68:7,20
69:4,9,10,
15 70:1,3
71:1 75:18
76:13
78:18
80:25
81:10,13,
24 82:1,8

110:12,13
175:10

pain
93:19,22
94:9,16,
21,22,25
95:5,10,15
101:13
112:3
113:5,7,
23,25
123:20
149:14
152:18
169:23

pains
144:14
177:2

Palm
16:2,3,11

paragraph
123:22

paralegal
32:21

paralegals
55:21,25

parameters
127:23

paraphrase
183:5

paraphrasing
182:16

part
8:25 39:25
56:18
58:2,13
59:15 62:4
69:20 75:1
77:20
94:14
110:10,19

116:21,22
118:3
120:12
122:24,25
124:2,7
130:7
154:20
190:25
191:3

parts
102:24

passed
21:3

past
42:24
43:16 44:7
57:5 74:3
76:8 96:23
100:17
101:4
124:9
128:8
144:18
156:12
189:10

patient
23:21 24:3
26:8 27:9,
13 39:7,16
40:3 47:21
48:23
52:11 57:6
59:7,10,13
61:16 62:7
72:18
73:14,17,
20,22
74:2,21
75:9 76:4,
8 79:1
92:5
102:23
114:2

118:19
120:15
124:4
125:23
126:23,24
127:1
131:17
142:2
149:25
151:15
152:18
154:21
155:19
160:17
171:11
175:2,4
182:6,7
187:15
188:19
189:1,5,14

patients
15:25
16:4,16
17:14,15
91:7
107:9,13
113:6,10,
11,20
128:4
137:8,21
150:21
155:21
156:7
170:7,14,
24 171:2,7
184:5,11

pattern
100:18

patterns
117:1

pavement
148:18

pay
146:8

pays
146:5

PCA
151:25

pediatric
16:18,19,
21,24
17:15,22
23:2,3
44:18 46:4

pediatrician
9:20 169:9

pediatrics
17:12,18,
19 169:8,
10

pending
88:17,22

people
31:6 40:13
104:24,25
123:17
128:7
129:9
146:9
147:12
148:19
155:13
185:23

per-case
57:2

per-course
21:5

percent
42:21
54:24
117:22
120:23,24
121:24

152:17,19
153:13
158:6,7
193:14

percentages
153:2
159:4

percentile
120:11,17,
22 121:5,
9,12,13,
19,25
122:4,7,
14,19,22

percentiles
120:8

Perfect
179:17

perfectly
7:11

perform
165:18

performed
76:6
116:13
164:19

performing
115:3

perfunctoril
y
69:1

perfunctory
28:23

period
35:15 75:2
160:10

permanent
135:8,14,
16,22

permanently
133:4

permitted
134:17

person
38:7 47:8
106:1
119:4
135:9
153:12
165:7
183:23
185:6

personal
73:6
146:18
151:20,23
152:3
154:8,11
174:18

perspective
47:13
89:17
114:9
146:10
177:11
180:11
181:5

phase
46:23

Phoenix
154:25
155:14,18

phone
14:6 29:4
31:16,21
37:23 52:9
54:23
67:15
68:21
157:7,18
158:19
173:12

photograph
92:24 95:8

photographed
74:11
106:18

photographs
29:13
74:18
116:8

photos
58:23

physiatrist
17:25
18:10,13
19:16
62:20
112:16
113:8
115:4
142:15
175:4

physiatrists
8:14 18:24
25:10
112:4

Physiatry
8:4 32:19

physical
18:11 36:9
40:19,20,
21 73:9
74:5 82:25
83:1,6,11,
13,15,20
123:24
124:20
125:2,14
126:14
140:3
167:6
169:11

physically
74:17
75:15
191:8
physician
9:19 21:9
26:1,7
36:1,7
41:6,20
49:21 50:9
59:8
126:25
177:10
188:25
189:1,4
physicians
8:12
25:11,15,
23 26:2
30:18,20
36:4 39:3,
6,21 131:8
134:12
138:19
157:7
158:14
181:13
189:23
pick
116:18
164:16
picked
144:9
picture
92:8
179:22
pictures
74:13,15
pieces
41:5 42:4
60:22 75:4
80:14

pigment
102:2
pigmentation
101:21
102:1,8,
14,18
pinky
116:15
117:5
pinwheel
115:19
116:7,13,
14,17,21
pinwheels
116:9
pissing
183:12
Pittsburgh
18:5
169:11
place
72:1
120:21
186:12
places
146:1,3,6,
12 147:3
placing
173:12
Plains
83:1,15
plaintiff
78:8 79:14
175:3
176:6
plaintiff's
48:21
70:14
79:15 80:1
plaintiffs
5:5 78:12

176:11
plaintiffs'
39:8
plan
5:6,10
6:11,17,25
7:1,5,14,
19,21
10:2,6
22:15
23:15 24:4
31:10 33:1
36:2 39:14
41:3,6
47:11,15
49:22
50:10
54:11
62:23
63:5,17,24
64:16,25
65:2 66:9,
18 67:5,12
74:22
75:10
77:12
80:7,13
86:14,20,
25 93:4,14
100:4
106:25
119:4
120:5,11
124:25
125:6
126:8,11
130:7,13
154:5
159:12
165:4,12
167:17
168:2,21
171:17

172:17
176:20
177:8,15
178:5,15
179:2,7,
11,19,25
184:10
186:19,25
187:5,12,
13 188:2,6
190:7
192:16
193:18
plan-related
10:1
plane
34:15
planner
26:1 29:17
33:11
66:24
142:16
166:18
170:13
171:6,8
184:6
188:17,25
189:1
190:18
192:1
planners
25:15
122:3,7,12
129:14
planning
8:5,10
9:21 10:8
12:12,20
13:10
20:11
21:10,11
22:4 23:1,

24 25:10,
24 26:10
30:19
31:15
32:19 42:1
59:12
61:24
62:20
89:17
118:23
122:18,21
123:4
142:4,24
159:1
169:3
170:9
175:2
189:17
plans
8:18,21,24
9:17 10:5
23:11
29:23
44:13
67:11
87:23
119:3,8
186:21
plastic
39:10 62:9
86:12,22
89:22
91:13 92:5
93:11
101:24
102:9
130:23
131:14
133:7,8
134:20
135:7,10,
23 136:3,7
141:20

162:8,12,
14 163:25
167:20
180:10
181:5
plastics
175:22
180:11
PLCPA
25:14
pleasantries
92:17
PMIC
120:2
121:10
122:23
podiatrist
23:8
142:7,14
podiatrists
142:16
167:21
point
7:7,8 8:15
13:10
36:22
39:21,22
55:3 56:8
71:15
83:21
96:10
100:22
104:14
111:11
133:5,21
136:10
144:24
153:19
164:5
169:13
174:23
179:20

points
13:4,19
110:25
111:18,22
populations
128:10,12
portion
25:8 190:6
portions
175:12,13
position
164:25
positive
109:7
183:2
possibility
43:14
147:17
post-fire
96:21
postpartum
99:8
101:11
103:13,25
potential
7:5 61:13
85:4
118:10
135:5
136:20
137:12
148:21
166:15
178:18
potentially
61:1
160:6,9
163:22
164:19
180:2
potentials

108:25
practical
146:10
practice
15:24
23:18
50:20
170:12,25
171:3,7
176:16
177:21
189:4
practiced
169:9,23
practitioner
103:19
practitioner
s
18:22
112:5
pre-fire
96:19
101:8
preclude
47:20
138:4
predated
105:7
130:3
preexisting
102:4
160:15
prehistory
160:13
premise
59:25 60:1
preparation
26:12
28:21
57:18,20
95:1

101:22
161:17,19
prepare
161:15
168:21
172:16
182:6
186:21
prepared
59:12 63:6
171:16
preparing
136:5
171:20
prescribe
18:23
103:20
prescribed
138:23
139:5
prescription
104:12
142:15
159:17
prescriptive
104:18
present
25:17 50:7
73:18
92:10
presently
7:14 11:24
23:12
30:19
47:21
138:10
139:19
140:20
145:21
151:3
152:4,7
161:10

pressure
46:4 47:1
116:12
presume
4:17 6:6
15:13
27:18
39:15,18
45:23
52:12,21
53:12
58:18 61:8
65:23
68:6,23
76:16
104:8
112:21
116:21
126:17
134:4
149:6,8
153:18
presumes
193:18
presuming
137:11
pretty
22:24 57:9
105:23
131:19
136:23
141:10
prevent
89:11
100:14
prevented
101:2
preventing
120:15
preventively
139:2

prevents
90:2
120:20
previous
116:5
previously
38:13
42:13
54:17
price
117:2
148:9
150:6
156:25
159:18
177:23
178:1
priced
179:7
prices
150:9
177:22
187:7
pricing
23:22
31:12,14
62:14
79:19
120:3
125:6,16,
18,21,22
126:6
135:3
136:11
177:14
187:4,12
primarily
137:11
primary
40:10
printed
68:10,12,

15,16
prior
9:3,9,19
28:14,16
29:5
52:13,21
67:24
71:10
73:2,19
76:5,6
96:1,16,19
99:5,16
102:15
103:10
115:17
152:15
private
15:24
23:18
171:3,7
privy
124:11
proactively
140:15
probability
136:23
153:13
probable
152:21
153:3,11
192:13
problem
14:10
40:16
41:25
51:13 52:5
94:19
102:1
118:17
129:13
143:16
147:13

160:24
194:14
problems
6:24 18:22
74:7 80:11
84:19,22
85:5 92:22
96:4,11,
23,24
124:5
134:1
144:2,5,12
procedure
132:19
136:12
procedures
39:12,13,
15 62:10,
14 87:15
88:13
131:9
136:7
142:8
175:25
176:3
180:8,9
181:16
188:18
proceed
76:21
process
4:17 5:18,
21 34:3
37:18
59:15
77:21
149:14
170:6
178:19
produce
77:20,24

produced
125:11
126:1
product
46:25
64:9,21
89:7
professional
13:10
17:24 19:2
31:6 64:8
65:11
prognosis
172:15
program
17:22
30:16
34:19,20
99:14
169:8,18,
21
programming
129:23
programs
129:24
169:22
170:4
projecting
179:15
promiscuous
129:8
pronounce
44:25
proof
177:14
proofreading
33:12
79:21
pros
183:12

protect
26:17 64:5
65:22
139:1
protective
26:4 106:2
provide
19:17
26:9,11
33:15
64:23
66:8,18,24
67:12
86:14,25
92:6 120:7
121:9
142:24
152:22
172:11,25
186:19
191:23
provided
11:1,7
14:21
46:17 56:7
64:7 65:10
77:25 78:4
114:20,21
150:17
166:22
167:1
168:18
172:19
179:18
193:25
providers
166:19
providing
48:15
PRP
87:20

psychiatric
 18:21 19:1
psychiatrist
 18:19 20:2
psychiatrists
 19:17
 113:21
psychiatry
 186:3,9
psychological
 18:25
psychologist
 18:19 20:5
psychologists
 113:22
psychology
 186:2,9
PTSD
 19:8,14,15
public
 4:1,3 55:3
published
 64:9
Puerto
 11:12,20,
 21 30:4
 53:22
pull
 8:3 33:20
 37:3 42:7
 76:22
pulled
 109:5
 119:16
pulling
 150:10
pulmonary

62:10
80:10
purchase
 145:16
 146:18
purchases
 145:17
 148:4,10
purchasing
 148:7
purely
 10:7
purpose
 143:4
 148:15
purposes
 165:3,11
 168:1,7
 172:12
 176:19
 182:3
 192:3
purview
 151:14
 154:21
 189:3
push
 107:14
pushes
 107:12
put
 5:11 12:16
 22:25 23:8
 26:5
 39:11,17
 41:7,9
 55:18 57:8
 62:8,22
 64:3,6
 70:12
 72:10 76:1

79:13
80:13
87:14
93:13 94:8
97:17,20,
22 106:25
116:12
119:2
124:5
126:25
127:23
130:13
131:19
133:15
141:19
143:11,17
146:1
148:21
155:15
185:11
194:14
puts
 31:25
 40:23
 83:18
 136:19
 177:21
putting
 34:5 75:9
 140:10
 165:10
 176:19

———————
Q
———————

quality
 120:21
 141:11
question
 5:23 6:5,7
 48:19
 51:16,18
 59:21

67:16
71:25 96:2
100:23
109:17
110:25
112:9
124:13
135:14
141:18
145:13
151:5
154:14,16
179:10
183:14
188:12
question-
and-answer
 93:8
questioning
 7:12 54:9
 59:23
 114:3
questionnaire
 35:19,23
 37:10,11
 38:14,22
 40:24
 41:18 58:9
 68:5,6
 69:8,14,
 16,25 70:5
 71:19
 81:8,9,15,
 18,19,21
 82:5,8,13,
 14 93:24
 94:6,7,11,
 15,18
 95:19,20
 105:14
 107:17,18
 108:21

109:1,4,18
110:11,14,
20,23
111:6,12
112:3,8,
20,25
113:4,23
114:4,10,
16 152:8
163:23
166:8
185:13
questionnaires
 19:14
 28:20
 67:21
 68:4,19
 70:11,25
 71:5,23
 72:8,21,22
 73:24 74:1
 77:15
 80:19
 82:17
 165:22
 184:22
questions
 6:8 15:1
 36:20
 60:10,12
 73:4 87:25
 107:18
 108:11
 110:23
 112:18
 164:8,11,
 18,22
 165:8
 166:2,4
 168:10
 174:2,7,15
 176:24

Ronald E. Synder, M.D.
08/14/2024

177:4,13,
17 182:10,
13 184:21
185:2,25
188:5,10
190:5
192:25
194:19

quick
70:8,20
108:15
114:11,15
130:6
193:3

quickly
11:2 40:7
70:23
81:11
133:2

quote
23:9

quote/
unquote
49:2

———

R

Rachel
33:10

radiation
91:6

radiologist
20:8

Rafael
30:15

raising
165:9

ramp
147:18

ran
60:15

rang
14:9

range
27:6
111:23

ranges
95:11

ranked
110:24

rare
68:24

rash
84:7

rate
14:15 24:5
152:17,20
158:23

rated
158:22

rates
120:7
159:24
191:6,7

reach
15:22
32:24
36:13 55:4
74:24
154:14
165:1
175:6

reach-out
56:5

reached
38:5 39:24
40:8
187:18

reaching
106:7

read
25:19

50:21
102:20
134:2
153:15
176:10
178:11
181:3
194:21,24

readable
63:21

reading
14:20 15:3
176:13
185:13

ready
59:12

real
40:15 90:1
94:19

realized
60:17
101:23

reason
14:8 25:24
53:17
116:4
147:3
156:21
166:25

reasons
188:8

recall
100:19
194:2

receipt
171:25

receive
37:15,20
53:16 62:5
187:25

received

10:24
24:21
36:20
37:5,14
42:10
52:15,19
53:6 56:4
58:9 63:7,
23 71:9
73:14
78:22
79:12
81:20
82:6,15
87:17
111:25
149:17
187:22
192:18
193:10

receiving
188:22
189:3

recent
25:22
37:19 42:5

recently
11:12
32:23
45:13

Recess
70:21
130:9
164:14

rechanged
8:13

recollect
96:7

recollection
97:1

recommend
162:16

181:17

recommendati
ons
165:11
171:12,21
172:17
187:6
192:4,21

recommending
156:17
188:7
189:21

reconfigured
72:13

Reconstructi
on
131:5

record
4:15,23
19:9 61:7
70:24
81:3,4
138:6,7

recorded
97:4,6

records
33:24
34:1,6,11,
22 52:10
54:8,14
56:10
57:5,7,21
73:14 74:3
75:14,16,
24,25
78:7,9,13,
17,20,23
99:21
100:9,20
125:1,13
126:14,23
134:3

138:23
141:23
142:6,10,
20 145:9
151:10
154:9
156:16
168:18
182:5
187:22,24
189:12,18
recount
178:13
red
64:6 65:21
redone
73:24
reduce
129:4
reduced
92:23
reduction
182:17
reductions
182:24
refer
19:2 91:13
reference
13:4 76:25
82:24
83:23
85:15
97:24
114:19
120:2
142:11
156:15,25
158:12
174:10
referenced
8:25 95:7

184:18
193:13
referencing
126:20
referral
54:10
referred
42:13
53:23
referring
62:24
reflection
179:4
reflects
178:12,14
regard
46:1
118:13
135:15
162:17
192:15
193:9
region
187:17
regional
157:3,9,
11,25
Registration
155:1
regular
84:22
104:7
rehab
12:23
16:12
18:11
20:12,16,
23 30:11
107:14
169:15

rehabilitati
on
12:17
30:13 32:9
132:1
169:12,17
relate
113:3
138:12
143:17,18
related
6:17 7:21
24:25
46:13
56:15
84:14 85:1
103:25
118:22
126:7
143:20
181:24
relates
35:19,24
137:11
145:16
147:6
166:7
194:9
relating
162:1
166:14
170:19
172:20
173:8
175:1
181:19,23
184:22
187:23
relations
55:3
relationship
153:17,21

relative
5:6 67:4
125:11
released
64:9 83:14
reliable
160:2
relied
184:17
rely
66:17
125:14
136:10
177:22
179:5,15
192:2,11
relying
126:13
193:9
remain
159:3
remainder
170:8
179:14
remained
112:18
remember
15:12
44:19,24
50:6 51:25
54:21
56:22
57:17,22
58:24
59:6,23
60:18
96:3,8
98:14,20,
23 99:18,
24,25
100:22
106:16

112:22
137:7
143:7,13
151:7
164:21
174:6,14
176:7,13
177:16
182:12,19
184:12
185:1
186:4
188:9,15
190:8,14
remembered
60:19,20
remembers
73:15
remotely
4:9
Removal/
excision
132:23
remove
41:4,5
133:4
141:20
renamed
8:14
render
175:14
181:19
rendering
175:1
renewed
11:22
repertory
139:24
rephrase
5:25

replace
64:10
147:10,13,
15,20,22

replacement
147:12
194:3,15

report
22:1,3,7,
9,22,24
29:22
31:18 32:1
34:6,8,9,
17 35:5,10
36:16
38:10
41:15
56:18,24
57:23 58:7
59:25 60:2
62:25
63:3,5,13
64:3 65:6
66:5,7,12
69:22
70:4,6
72:13
73:21
75:18,21,
23 76:1,11
78:24
79:2,4,5,
23 80:6
82:23 92:7
94:25
95:15
97:14,17,
20,22
98:18
108:14,17
109:11
119:12
126:21,24

127:2
130:15,24
133:21
136:6
154:21
161:19
163:10,12
173:4
175:10
184:16

reported
78:10

reports
23:1 24:4
64:5 66:6
67:13
92:25
97:25
123:23
124:3

represent
168:13

representati
on
168:14

representing
5:3

request
19:17 78:7
162:7

requested
188:1

require
24:2 91:4
168:6
189:6

required
13:7 27:9
75:7 102:4
122:11
146:24
158:25

requires
147:16

requisite
186:1

reread
6:1

resale
148:3

rescanned
69:4

research
31:24
34:23,24
38:8 62:12
79:12,18
125:16,19,
23 126:7
149:23
164:5,20
165:18
183:22
184:2,16
187:7
191:12,23
192:3,7

residency
16:18,23
17:10,14,
17,21
19:20
34:19
169:8,11

resources
15:22
22:19
31:19
179:22

respect
9:24 73:7
82:20
87:25
88:15 90:4

91:1 110:7
115:2
126:6
129:17
130:22
132:1
134:23
136:1
142:17,18
143:24
144:19
146:23
154:8,24
161:13
193:4,24

respectfully
88:25

responders
181:23

responding
59:4

response
92:6

responses
71:10

rest
13:2 139:1
181:14

Resta
104:3,8

restroom
164:13

result
18:21
51:21
101:13
149:17
191:18

resulted
173:11

retained

52:18,22

retainer
24:11,13
25:6,8
26:21
52:15
56:11

retire
29:19,24

retirement
8:13

return
38:25

returned
38:16,19,
21 166:8

review
33:23
34:1,6,11
35:13
57:7,18
59:2
73:16,20
74:1,20
75:8,24
76:4 78:17
108:17
125:1
126:13,22
143:14
165:18
166:18
167:15,22
172:9,12
173:1,22
177:7
186:16
187:25
189:18

reviewed
34:21
57:15,24

58:2,6,14,
15,18,19
78:18,20
100:9
108:18,20
142:20
176:5
reviewing
73:13
75:12
Rhode
169:13,16
Rican
11:12
Richardson
33:10
Rico
11:20,21
30:4 53:22
riding
45:5
right-hand
41:8,21
179:12
ring
14:9 45:18
risk
102:11
River
158:12
road
78:10
role
189:24
190:25
Ronald
4:2,24
8:10 10:23
51:10 63:6
room

92:13,14
96:15
114:25
rough
28:9
roughly
13:20
14:15 44:7
52:17
routine
181:14
194:7
routinely
194:5
Rule
48:17
run
54:6
116:14,15

S
S-I-L-V-A
30:3
S-N-Y-D-E-R
4:25
sad
111:7,8,10
113:17
sad/unhappy
111:8
safe
129:7
safely
174:22
Salt
155:2
156:4,9
160:22
Salzman
49:13

Santiago
30:15,21
sat
43:13
scaldings
44:19
scale
19:13
scanned
21:2 68:22
69:1
scar
83:19
131:4
scarred
115:21
scars
80:8 83:18
115:19
scattered
60:22
schedule
52:11
schedules
56:12,13
scheduling
28:23
school
33:13
64:4,21
65:16
169:7
scientific
184:15
sclerosis
113:10
scooter
139:12,15,
21 140:19
141:14,24

142:12,21
146:1,2,7,
12,25
147:7
scooters
139:12
147:2,5,6
189:20
scooting
143:7
scope
25:17
114:15
171:15
172:25
174:24
175:17
182:3
189:22
score
111:3
scrape
106:8
screen
10:9
24:14,16
76:18
screening
112:1,6
114:1
screenshots
31:17,25
screwed
24:17
searched
46:11
searches
149:19
secondary
84:15

secretaries
32:20 38:7
secretary
32:21 53:4
68:25
80:21
section
11:18
15:8,16
123:13
124:1,23
139:9
143:2
188:6
190:12
sections
186:18,24
security
150:16
151:3,11
152:22
seeking
84:21
sees
142:2
segment
15:6
self-
medicating
98:11
104:17
self-
reporting
106:20
Semi-
permanent
134:23
send
36:10 41:6
58:22 65:7
66:3 70:14

78:6,8
79:15
80:25
165:22
181:22
sensation
115:16,23,
25 118:3
sense
118:5
sensory
115:15
117:7
separate
131:6
serve
25:14
serves
25:12
services
23:7 24:1
30:11,13
102:3
152:1
Services/
equipment
34:24
set
39:19
52:23
78:13
177:14
178:5
setting
55:25
settlement
160:12
severe
47:9 111:2
116:2
170:25

severely
190:19
shape
178:8
Shappard
45:13
share
10:9
24:14,15
34:20 81:6
sharp
115:22
116:11,16,
22 117:18,
21 118:7
sharpness
116:19
shaving
89:23
91:10
she'll
87:4,9
104:5,6
106:8,9
shed
61:2
sheet
33:15
shock
48:9
shopping
107:19
short
49:4 141:2
shorthand
64:12,15
65:8,12
shorts
92:23
shoulder

16:12
89:14
shoulders
16:21
show
24:16 51:7
63:2
103:1,4
105:16
113:1
122:10
137:8
144:15
185:9
191:24
shows
11:19
103:5
shut
37:23
147:19
shy
93:9
side
17:22
24:18 41:8
64:24
117:4
120:5
121:7
129:6
sides
26:14
68:23,24
sign
38:24 72:1
signature
35:17
72:6,7,13,
18
signatures

72:10
signed
79:13
significant
6:24 19:7
123:24
124:5,6
170:15,25
186:21
similar
50:8 87:25
155:14
simply
67:14
121:2
159:25
178:16
single
153:14
193:17
singular
13:12,13
sinus
108:24
sir
4:23
164:7,10,
23 186:17
194:20
sit
38:12
66:23 76:3
87:2 88:1
91:2 92:2
122:15
176:14
sits
123:1
141:3
sitting
36:15

92:12,13
situation
19:4 55:10
67:8
situations
113:7
sixth
82:10
Sixty
144:10
skin
27:5 47:25
74:10
101:21
105:22
108:24
115:25
136:18
137:13
143:10
144:3
180:23
skinny
157:13
skipped
117:19
slap
187:13
sleep
28:7 95:23
96:1,6,11,
16,19,23,
24 98:1,8
104:17
123:20
sleeping
28:8,12
96:14
143:19,20
slice
89:8

slightly
41:17
102:10

small
96:15
148:14

smoke
184:7

smoked
105:1

smoker
108:6,12
128:17
129:3

smokers
128:3,19

smokes
128:17
183:23

smoking
61:1
104:20,24
129:18,24
130:2
182:17,25
183:17

snippets
119:2

Snyder
4:2,7
10:23 37:5
63:6

Snyder's
42:9

someplace
21:2 78:11

sophisticate
d
114:3,7

sort
14:21

56:14
164:16

sorts
43:8 73:3

sought
84:23 85:3

sound
43:2,15
44:15
55:11

sounded
87:19,20,
21

sounds
11:20
14:20
17:25
26:17 29:8
36:22
37:19
39:23 44:9
45:19
46:20
51:20 52:5
54:2 56:3
84:21 89:8
114:9
118:2
136:2
158:6

sources
150:11
156:25

space
134:6

speak
39:20
40:11 62:7
165:12,15,
24 167:22
168:3
171:9

173:22
181:2

speaking
38:20
165:21
186:8

special
139:9
165:14

specialist
19:21

specialists
165:16
171:10

specific
11:5 12:12
13:5 15:8,
19,23
23:5,6
47:22
50:25 62:9
100:5,20
115:12
118:13
119:21
122:13
125:10,12,
18,20,21,
24 130:25
138:24
151:9
160:18
162:15
166:13
168:2,8
176:24
178:1
180:7
181:15
186:25
187:8,19
194:16

specifically
11:10
20:17
22:1,6
23:16
59:23 65:9
125:22
131:12
167:19
177:25
181:9
187:16,17
189:5
191:2,5

specifics
143:13

speculate
192:5

speculative
178:9

spell
29:25
123:5

spent
27:15 75:3
99:12
105:2
161:16,18

spoke
38:7 53:9,
11 54:4
63:25

spoken
37:25 38:3
39:5
166:12

spontaneousl
y
189:15

sporadic
9:23

sporadically
18:8

Sports
16:3

spreadsheet
64:7 65:10

spreadsheet-
type
130:13

staff
28:18,21
30:7,8
32:7 36:14
41:2 52:9,
24 53:2
55:19,24
56:22
58:24
70:13

stand
48:20
89:19
111:9
112:12
148:17
163:18
178:16
179:14

standard
22:25
120:13
122:17
124:2
147:15,20

standards
184:18
187:8

standing
123:21
141:9

standpoint
168:15

start
4:22 8:11
12:13 14:4
34:5 73:13
119:10
129:5,11,
12,13
144:13,15
183:9,11
started
9:16 12:20
21:15 36:5
43:6,23
61:18
75:21
103:22
starting
61:1 72:9
127:4
130:18
143:25
starts
12:7
41:10,12
130:14
state
4:22
158:1,3,5
169:16
statement
25:7
statements
118:12
States
30:5
statistic
193:17
statistically
159:20
160:2

statistics
153:23
183:8,13
191:5,18,
24 192:2,
12 193:8,9
status
26:5
stay
120:19
133:16
154:3
160:22
192:5
stay-at-home
123:17
staying
72:15
191:9
stem
87:21
step
41:11 67:9
108:15
116:10
Stephanie
5:6,11
6:12 7:15
19:10
26:25
39:2,5
71:22
165:6
166:14
192:22
Stephanie's
153:16
165:3
steroids
87:22
stigma

84:22
stings
75:25
stomach
139:2
stop
89:23
99:13
105:3
129:24
141:16
stopped
83:7
103:15
stores
140:22,24
story
54:7 56:9
86:11
stranded
147:17
strength
154:1
stretches
94:21
stretching
83:17
stricken
174:5,12,
13
strike
39:4 51:9
strikes
94:21
stroke
113:10
136:9
strokes
18:9

strong
191:15,19
strong-
willed
107:12
185:10
strongly
99:11
135:21
155:20
studies
120:14,19
121:18
122:13
stuff
34:5 87:21
125:6
131:5,15
134:8
136:20
154:22
168:12
subcategory
151:17
subsequent
145:16
148:10
Substance
109:11
substantive
29:8 79:9
92:18
subtract
129:12
subtracting
129:5
successful
49:25
50:11
successfully
48:17

51:24
suffered
170:15,21
suggest
154:10
175:25
suggested
62:15,21
135:21
161:6
suggesting
151:25
156:17
168:5
suggestion
141:23
142:21
145:10
178:4
183:16
suggestions
142:11
151:10
suggests
183:22
Suite
4:10
summarizing
107:23
summary
63:17,22
64:25
97:16
107:3
119:17
sun
94:21
support
124:25
125:5
155:1

156:4,12,
18
supportive
144:7
supports
121:18
122:14
supposed
131:20
surface
47:25
134:6
surgeon
18:16
19:24 23:9
36:8 39:11
86:12,23
91:13 92:5
131:24
133:7,8
135:7,10,
23 136:3
141:19,20
surgeons
167:20
surgeries
73:2,19
76:1,5,6
surgery
48:23
89:22
93:11
101:13,24
102:9
115:17
116:5
117:11
130:22,23
131:3,5,
13,14
162:8,13
180:10

181:5
surgery/burn
162:14
surgical
62:9
134:20
136:7
surprise
42:20
surprising
189:8,10,
22
survival
155:15
survivors
155:15
sustained
150:24
swear
4:3
sweats
108:23
swore
4:1 184:12
sworn
4:11
symptom
111:2
symptomatolo
gy
101:5
symptoms
108:17,18
111:3
113:12
Synder
4:14,24
8:10 37:7
51:10
130:11

Syndrome
128:5
system
54:14
70:18
152:20
160:15
systems
108:19

T

T-H-O-M-A-S
49:9
table
92:13,14
133:14
takers
128:6
takes
74:4 75:11
128:9
160:24
178:2,15
taking
15:3 97:10
103:22
104:14
147:1
188:13
talk
29:4
34:16,17
52:10
80:5,10
93:5 95:5
98:9 102:6
127:1,16
130:20
143:12
152:20
153:11
156:21

161:6
168:25
talked
25:6 28:19
55:24
61:24
70:23 93:7
104:25
106:4,15,
24 109:12,
13 118:20
131:11
135:2
145:13
161:5
169:2
175:21
180:2
184:19
187:20
talking
8:23 19:10
26:10
36:25
79:17
84:11,12
95:14,15
99:12
105:2
111:15
119:11
121:6
129:21
137:4
140:2,6
142:13,14
145:25
149:7
157:2
talks
105:18
Tampa
30:17

tan
103:3,4,7
tanned
103:2
tans
103:6
task
33:24
Tattoo
134:24
tattooing
102:6
tattoos
135:15
TBSA
47:24,25
117:22
teaching
29:22
team
16:11
31:12 41:9
79:21
167:7
techniques
29:23
tecum
77:19
Ted
44:21
45:9,10
telling
131:17
156:9
template
57:1,10
72:22
75:22
124:2,3,7
templates

72:24

ten
49:16
81:10
169:10

tend
16:20
122:8
166:3

tendency
183:7

tendered
175:11

tenets
22:4

term
9:2 46:12
65:8
90:19,23
107:4
182:8
185:24

terrain
139:15
140:7
146:2,25
147:3,7

test
13:15
15:3,4,5,7
112:22

testified
4:11 38:13
98:25

testify
64:6,14,17

testifying
23:20
48:20
168:7

testimony
4:4 5:10
9:13 19:23
20:1,4,7
25:17
51:10,23
57:16
58:13,15
61:9,13
122:20
164:25
174:17
176:23
177:19
182:22
190:16
191:4

testing
19:6,7,12
110:9,10
112:1,6
114:8

tests
15:1

textbook
14:21
31:15
122:25
123:2,4

texts
15:18

theaters
139:24

therapies
162:14
188:18

therapist
40:19,21
163:25
167:6
186:13

therapists
83:11
167:20

therapy
36:9
40:20,22
82:25
83:2,6,14,
15,21
85:15,19
86:15
87:3,9,13
136:9
194:3

thiamin
194:15

thiamine
194:2,7,
13,14

thing
21:12 32:1
58:8 79:13
96:6
115:14
150:19

things
27:8 29:24
34:18
41:4,7
60:13 80:2
105:23
108:22
141:10
183:10
189:2

thinking
118:18
150:20

Thomas
49:9,11

thought
9:4 80:2,

9,14 84:24
86:11 93:1
96:24
107:1
138:13
144:20

three-hour
85:21

throat
162:10

throbbing
95:6

ticket
148:14

tie
149:11

time
19:5 24:3
25:24
27:11
28:10
43:21
45:11
51:23 54:9
67:13,17
68:3 70:10
75:3 79:8
85:22 86:6
88:13 89:9
96:5 97:21
98:9 99:12
100:16,24
101:3,4
105:2
111:8
112:4,17
123:19
129:21
132:8
136:15
137:1
138:25

140:11
143:5
145:2
148:20
149:5
156:14
160:11,22,
24 161:8,
19 164:8
165:20
174:23
176:12
189:7,15

timeframe
165:23

timeline
54:10

Timelines
56:10

times
4:18 5:15,
16 71:25
72:12
88:17
112:19
151:24
165:24

tingling
94:4

tiny
140:23

tissue
83:19

titled
12:5

tobacco
109:12

today
5:10 7:12,
21 36:18
38:12

Ronald E. Synder, M.D.
08/14/2024
43

57:18
66:23 87:2
88:1 91:3
92:2 105:9
122:15
161:14
162:4
176:14
180:2
184:19

toenail
89:3

toenails
89:5 90:15

told
60:23
86:3,9
127:2
131:23
132:3
163:2
185:19
192:10

tool
23:15
116:7
117:3

tools
23:18

top
14:19 95:8
120:21
121:14
125:15

total
30:6 33:3
47:25
65:23,25
111:21

totally
32:1 34:11
35:13

69:10
155:14
183:20

touch
36:3
115:20,22
116:19

tough
185:11

tracheal
162:11

track
10:14

traded
148:1

traditional
5:19 10:3
139:14

trail
105:18

trained
30:4

training
12:18,21,
24 20:13,
24 23:10
26:12
30:19
34:18 42:1
50:18 88:8
101:6
112:15
113:2,9
122:1,24
125:9
133:17,20
144:10
174:25
184:4
185:16
186:2
191:13

transcript
177:7
178:11
186:15
195:1

transcripts
167:14
173:23
176:10
181:3
187:21

transfer
116:25

translate
185:16

transmission
5:24

transparent
32:2

Transplantat
ion
131:14

transplants
15:1

trauma
16:22 48:4

traumatic
30:16
169:18,20

travel
40:17 86:6
160:20

traveling
29:21

treat
102:9
170:24
189:14

treated
16:16 18:6
137:19

171:2
184:5

treater
16:14
186:8

treaters
142:19
151:11
154:10
156:17
165:3,16
166:19
167:23
168:4
172:1,9,20
173:22,23
175:7
181:3
189:11

treaters'
167:2

treating
9:19 10:6
15:25 19:5
32:24,25
35:19 36:4
39:3,6,20
41:20
48:13,14
50:9 73:18
77:16
100:3
134:11,16
138:19
151:14
154:15
156:22
171:8,10
177:10
184:11
186:14
187:18
189:3,23

treatment
16:15,17
18:1 47:6,
7,8 74:24
84:21
85:1,13,23
87:4,9,13
88:16,18,
21,23
89:16
90:17
91:3,15
92:1 99:14
100:5
102:12
113:19
120:17
175:3,15,
16 181:15

treatments
86:5,8,9,
15 89:11
91:8

trial
9:11
178:20

truck
45:4
145:22,24

true
6:19 7:15,
16 20:5,8
53:18
134:12
187:2,9

truth
4:5,6

truthful
6:8

tunnels
16:9

turn
88:25

turn-off
185:23

turned
29:18
48:21

turning
28:24
148:8

TV
92:11

two-night
160:22

two-sided
68:7,10,11

two-to-
three-month
35:14

tying
75:2

type
56:19
91:3,14
110:1
131:5,15
136:12
145:20
150:19
175:14
176:2
185:6
191:14

typed
172:10

types
23:7 57:11
60:13
62:9,10
174:3
177:3

180:8
181:15

typical
24:11 67:8
102:17
137:19
176:15
186:20

typically
47:4
147:10

---

U

ultimate
64:13
66:14

ultimately
15:23
22:14 34:7
51:21
59:11
62:15
66:3,12,17
99:10
132:10

umbrella
8:18

unable
132:18
133:22
167:25

unavailable
168:5

undergone
83:13

underneath
25:7

understand
5:9,23
7:25 18:10
24:5 26:6,

8,24 35:12
40:12
42:2,3
50:17
54:13
59:19
71:21
73:21 99:7
123:18
128:2
132:2
160:10
164:24
165:7
174:17
178:18,21
179:9
185:22
190:16

understandin
g
5:24 40:9
60:7,10
61:6
65:12,15
72:3 74:3
75:19 78:3
83:8 84:15
86:5 94:17
98:4 107:9
122:1
129:22
133:19
135:15
153:23
163:14
165:17
172:13
192:17,19

understandin
gs
74:25

understood
6:6 60:8
177:12,19
182:21
191:4

unique
90:13,22
119:12

unit
16:19,25
17:11,19,
21 18:5
169:15

United
30:5

university
13:1 100:8
120:16,21
134:16
156:5
158:17
167:8
169:6
194:1

Unknown
41:8

unrelated
84:5 85:9

unreliable
178:9

up-to-date
11:7,13,14

update
188:1

updated
11:6 72:17

upside
68:14

upwards
99:1
128:23

urgent
137:8,22,
24

user
108:9,12

usual
31:22 42:1
77:13 85:5
158:24
159:8,22
160:1,18

Utah
86:3 156:6
167:8
194:1

utilize
23:3 138:5
184:16
192:7

utilized
22:3,6
50:15
120:11

utilizing
22:3,14,
19,20
138:16
158:15
160:1

---

V

V-I-T-I-L-I-
G-O
101:19

valid
153:7

valuable
80:4

values
62:23
66:11

van
  145:16
  146:6,11,
  23 147:23,
  25 148:7,
  8,21
vans
  147:21
Vaseline
  83:18
  104:7
vehicle
  45:2
  145:20
vehicles
  146:18
  147:10
veracity
  64:14,18
verbiage
  67:17
verified
  65:25
verify
  65:5,17
version
  64:12
versus
  49:11,19
  89:23
  117:2
  129:8
  189:24
Veterans
  30:17
  149:20
vice-versa
  44:1
video
  13:23
  14:4,16,19

59:1 97:7
videos
  14:23
  58:19
view
  56:6 85:1
  115:4
vision
  84:1,18,
  22,25
visions
  84:20
visit
  7:18
  28:10,17
  31:4 56:2
  67:25
  73:7,12
  75:20
  92:10
  97:3,10,
  15,16
  136:24
  137:6
  138:21
  153:25
  160:25
  189:7
visits
  84:5 87:15
  136:14
  137:10
Vital
  183:7,13
vitiligo
  101:17,18,
  19
vocation
  123:19
vocational
  20:16

123:14
132:1,3
169:17
voltage
  45:25 46:2

---

### W

W-A-T-S-O-N
  32:4
W-E-E-D
  123:6
Wadsworth
  5:6,11
  6:12,18
  7:2,6,15,
  17,22
  19:11
  27:1,12,14
  28:15 55:6
  59:16
  60:25
  67:21 71:6
  73:9 81:10
  82:17 83:1
  92:18
  95:25
  97:3,11
  117:8
  119:22
  126:9,12,
  18 127:9
  128:16
  134:25
  137:24
  153:25
  154:3
  155:5
  160:7
  168:14,20
  170:16,21
  171:1
  173:7

176:17
180:4,12
184:23
186:13
187:6,9,23
188:13
190:12,13
191:16
192:5,6,8,
9 193:7,
11,25
Wadsworth's
  39:3,6
  52:7
  106:19
  156:16
  171:22
  182:11
  189:10
Wadsworths
  147:10
wage
  124:9
wait
  161:1
waiting
  62:5
  162:19
waits
  85:22
waive
  194:22
waiving
  194:25
walk
  69:5
  148:16
walked
  52:24 53:3
walker
  143:24

144:19
145:11
149:8,12
walking
  75:3
  141:2,4,9
  144:7
Walmart
  139:21
  140:19,25
  141:1
wanted
  36:3 74:18
  80:7
  103:17
  130:20
  146:18
wanting
  67:15
  129:11
  138:4
war
  183:12
Warner
  45:18,20
washer
  106:8
watching
  92:11,14
Watson
  31:13
  32:4,12
  34:25
ways
  102:7
weakness
  108:24
weaning
  170:6
wear
  92:23

Ronald E. Synder, M.D.
08/14/2024                                                46

106:2,9

wearing
106:4

web
149:19

website
158:15,17
187:13

Weed's
31:15

Weeds
123:4

week
16:1 78:1,
2 151:24
167:7,8
170:7

weekly
16:4 66:10

weeks
52:21
54:11
86:10
100:25
101:1
186:12

weight
108:23

West
16:2,11

Weston
7:2,6,20
92:21 93:5
171:17
172:20
173:10
187:23

Weston's
172:4,14

wheelchair
149:22

wheelchair-
accessible
150:8

wheelchairs
75:5

wheelhouse
39:17 88:8
90:1
133:16
136:9

white
127:20,25
128:13

wine
110:4

withdraw
99:23
100:1,7,
11,17,18,
21 101:3,5

withdraws
100:15

witnessed
60:13

Witnesses
25:11,15

woke
60:14

wonderful
140:8
161:7

Word
63:25
179:11

worded
6:5

words
187:11

work
13:25 16:2

24:6 30:9
31:9 32:2
34:9 39:25
40:15,18
53:7 55:16
58:2 64:8,
11,20
76:17
79:9,25
82:21 86:7
123:9,13,
18 124:1,
21 132:11
133:12
153:10
162:23
164:1,18
165:18
171:15
182:3
184:3
191:14

work-up
9:19

work-ups
122:9

worked
32:21
33:14
42:25
43:10
54:16
55:6,22
78:25
170:1

working
8:19 56:25
97:17,19

works
28:8

world
154:25

155:25
156:18
184:10,11

worse
90:8 96:9,
12,25

worth
159:21

wounds
173:12

Wow
99:3

wrap
158:23

write
97:19
127:2
154:21

written
31:14 94:1

wrote
41:1 52:1,
20 174:9

Wyoming
12:3 42:17
140:9,14
148:18
157:15,16
158:1,5,12

———————

Y

Yale
17:10
169:7

year
5:16 31:1
149:16
159:25

yearly
66:11
179:13

years
8:11 9:19,
21 12:20
18:7 29:16
32:14
42:24
43:16,17
44:7 48:20
49:8,16
87:8
105:2,6
108:2
112:11,23
121:22
127:10,12,
17,18,21
128:18
132:10
136:15,22
137:3,4
147:13,15,
16,20
148:3
149:6,13
159:19,20
160:5
169:10
170:1,5
178:3
179:15
184:14
189:4
190:3

yesterday
36:14
38:5,11
77:8
166:10

young
33:13
64:3,21
80:8
178:15

Z

Zoom
  4:16,17
  5:25 173:3