Exhibit 2

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2        IN AND FOR THE DISTRICT OF WYOMING
 3   ---------------------------------------
 4   STEPHANIE WADSWORTH, Individually and
     as Parent and Legal Guardian of W.W.,
 5   K.W., G.W., and L.W., minor children,
     and MATTHEW WADSWORTH,
 6
                          Plaintiffs,
 7
              -against-                  Case No.:
 8                                       23-cv-00118-NDF
 9   WALMART, INC. and JETSON ELECTRIC
     BIKES, LLC,
10
                          Defendants.
11
     ---------------------------------------
12
13                 Thursday, November 16, 2023
14                 9:46 a.m.
15
16           Deposition of JEFF SHEAMAN, taken by
17   Plaintiff, pursuant to Notice, held at The Hampton
18   Inn, 1055 Wild Horse Canyon Road, Green River,
19   Wyoming, before Denise Nowak, a Shorthand Reporter
20   and Notary Public within and for the State of Idaho,
21   appearing remotely.
22
23
24
25
```

1    2011, and then I moved into detectives at that

2    point.  So I've been in investigation since 2011.

3         Q.    Talk to me, if you could, the duties

4    and responsibilities -- really, your role in these

5    varying capacities from patrol corporal to

6    detective sergeant.

7         A.    So I run a crew of anywhere from five

8    to six.  So basically I supervise five or six

9    deputies.

10              Currently in investigations, I

11   supervise four.  And we conduct followup

12   investigations from initial reports.  We handle

13   conflicts, investigations, death investigations,

14   you know, anything of that magnitude.

15        Q.    As you, I'm sure, know, you are here

16   today to talk about your involvement in an

17   investigation that took place back in February of

18   2022 relating to a fire at the Wadsworth residence.

19              You know that, right?

20        A.    Yes.

21        Q.    Okay.  Part of your job duties and

22   the role for the Sheriff's Office include not just

23   investigation deaths and crimes but also

24   investigating fires?

25        A.    Yes.

1          Q.    Does that include origin and cause?

2          A.    Yes.

3                And that's not all investigators -- I

4    myself and, I believe, one other deputy with the

5    Sheriff's Office are certified in origin and cause

6    investigations.

7          Q.    Okay.  Before getting into some of

8    the more specifics of your certifications, your

9    education, your training, did you have -- did you

10   bring anything with you today, any types of

11   documents, photographs, anything?

12         A.    I didn't.  Just my report.

13         Q.    Okay.  Did you -- other than your

14   counsel who's here with you today, did you speak

15   with any of the attorneys involved in this case?

16         A.    No.  Just with Mr. DeLeon -- that was

17   it -- just before this deposition.

18         Q.    All right.  Have you spoken with any

19   other persons involved with this incident in

20   preparation of this deposition; that could include

21   deputies, firefighters, et cetera?

22         A.    I talked to Bill Robinson who's the

23   chief of Green River Fire.  He actually called me,

24   I believe, a week, week and a half ago just asking

25   me about this depo.  He had questions on how these

```
 1    work and what was being expected of him.  So we

 2    talked just for a couple minutes about that.

 3          Q.    Okay.  Did that conversation

 4    basically just cover the logistics of a deposition?

 5          A.    Yes, that's it.

 6          Q.    You didn't discuss any of the facts,

 7    circumstances or even allegations of the lawsuit?

 8          A.    No.

 9          Q.    Did you speak with anyone else in

10    preparation of the deposition?

11          A.    I did not.

12          Q.    So you told me about your current

13    role as detective sergeant; your role since 2011 as

14    patrol corporal?

15          A.    Correct.

16          Q.    Any other roles that you've held for

17    the Sheriff's Office?

18          A.    Just deputy when I first started here

19    in 2008.

20          Q.    Right.

21          A.    And I was just on patrol.  I was a

22    patrol deputy.

23          Q.    So that was from '08 to 2011?

24          A.    Correct.

25          Q.    And prior to joining the Sheriff's
```

1    Office, you said you had been in law enforcement

2    for 19 years, so, what, approximately three years

3    elsewhere?

4           A.    Yes.

5           Q.    Where was that?

6           A.    That was in Rawlins, the City of

7    Rawlins, Wyoming.  I was a police officer there.

8           Q.    That's where you began your career in

9    law enforcement?

10           A.    Correct.

11           Q.    You were a deputy?

12           A.    I was a patrol officer with the

13    Rawlins PD.

14           Q.    Talk to me a little bit about your

15    educational background.

16           A.    Okay.  So after high school I

17    enrolled in Aims Community College, which is down

18    in Greeley, Colorado.  And I studied fire science

19    and suppression.  And I got two associates degrees

20    from that college.  And I believe I graduated in

21    2002.

22           Q.    Fire science and suppression.

23                 Did you obtain -- well, what kind of

24    degree did you obtain?

25           A.    It's two associates degrees.  So it's

1    actually -- it's, like, a four-year degree, but

2    it's broken down into associates, two associates,

3    two two-year degrees basically.

4             Q.    Okay.  And were those degrees both in

5    fire science and suppression?

6             A.    Yes.  One side was fire suppression;

7    one side was fire prevention, if that makes sense.

8             Q.    What's the difference?

9             A.    Just basically fighting fires versus

10   fire prevention of building codes, doing

11   inspections, that kind of thing, just a huge part

12   of that, that field, which I was in for several

13   years before law enforcement.

14            Q.    And let's talk about that.

15            Before getting into law enforcement,

16   you held other employment?

17            A.    I did.

18            Q.    In what fields?

19            A.    So I was a firefighter.  I started as

20   a volunteer at the age of 18 with a small agency

21   northwest of Fort Collins, Colorado, which was the

22   Livermore Fire Department.  And then I was also a

23   volunteer down in Fort Collins with the Poudre Fire

24   Authority.

25            Q.    And in totality, how many years were

1    you a firefighter?

2          A.    About six or seven.  And I did

3    structural firefighting.  And I also moved into

4    wildland firefighting.

5          Q.    When did you make that move?

6          A.    That was in 2001, I believe.  And I

7    did that basically until I began my career in law

8    enforcement.

9          Q.    Okay.  And when you describe

10   structural firefighting, that includes residences,

11   that includes office buildings?

12         A.    Correct.  Yes.

13         Q.    Is it fair to say that some of the

14   education, the background -- or certainly

15   experience that you gained with fire suppression

16   and fire prevention came from your past career as a

17   firefighter?

18         A.    Yes.

19         Q.    And certainly you reinforced that

20   with your education at Aims Community College?

21         A.    Correct.

22         Q.    And you continued down that line with

23   additional training and education and experience

24   with law enforcement?

25         A.    Correct.  Yes.

Page 14

1          Q.    When did you become certified in

2    origin and cause?

3          A.    2010.  I think January and February

4    of 2010.

5          Q.    And what did that certification

6    entail?

7          A.    It's a two-week course.  And it was

8    held locally here in Rock Springs or in Rock

9    Springs.  And it was just -- yeah, just a long,

10   intense two-week program.  I don't remember how

11   many hours it was.  But that was just investigating

12   fires and investigating specifically origin and

13   cause, determining where a fire started and

14   potentially how a fire started.

15         Q.    Was that in a classroom setting, like

16   a lecture?

17         A.    It was, yes.  The whole thing was.

18         Q.    Were there -- if you know -- certain

19   prerequisites for you to enroll in that

20   certification course?

21         A.    Not necessarily, no.  There were

22   people in there that had no experience in

23   firefighting or anything like that.  But it was --

24   it was -- they wanted to get investigators in

25   there, people with some kind of experience, whether

Page 15

```
1    it be law enforcement or fire or anything like
2    that.  But there were several people in that class
3    with zero experience.
4            Q.    That two-week course, was that put on
5    by the State of Wyoming?
6            A.    It was, yes.
7            Q.    Is there a requirement for
8    recertification?
9            A.    There is.
10           Q.    And what is that requirement?
11           A.    I believe it's 40 hours every 3 year.
12   And it can any kind of training, online training,
13   you know, if you attend an actual training in
14   person, that kind of thing.
15           Q.    Okay.  Have you recertified every
16   three years since 2010?
17           A.    Yes, I have.
18           Q.    And for purposes of the jury that
19   might read your deposition transcript or see the
20   video, when we talk about origin and cause, it's
21   almost exactly what that name infers, isn't it,
22   determining the origin of a fire where it starts as
23   well as what caused the fire?
24           A.    Correct, yes.
25           Q.    Do you agree with me that in
```

1    determining the origin and cause of a fire, that

2    you must analyze various types of evidence?

3           A.    Yes, correct.

4           Q.    You must analyze all available

5    evidence, meaning not excluding certain evidence?

6           A.    Yes.

7           Q.    Every fire is different.

8           A.    Very true.

9           Q.    It requires you to use not just your

10   education, your background, your training, your

11   experience, but also intuition?

12          A.    Yes.

13          Q.    Where available, speak with either

14   witnesses or victims of a fire?

15          A.    Yes.

16          Q.    At the appropriate times, even speak

17   with other first responders?

18          A.    Yes.

19          Q.    Are there times where you investigate

20   fires for purposes of determining origin and cause

21   and you involve the city marshal, fire marshal?

22          A.    I have in the past.  Yes, I have.

23   Complex fires or anything, that's kind of above my

24   head.  I've done that several times.

25          Q.    Okay.  What do you consider to be a

1    complex fire?

2            A.    Major industrial buildings, you know.

3    For example, we had a fire years ago that was at an

4    Arco building that was a massive, massive building.

5    And I had to bring in outside resources, because it

6    was so big and so complex that I requested their

7    assistance.

8            Q.    Can we agree that in your experience,

9    at least since 2010 you are not shy asking for help

10   you need it?

11           A.    Nope, not at all.

12           Q.    That you understand the magnitude and

13   the import of bringing in others who are

14   experienced and certified in assisting you where

15   necessary?

16           A.    Yes.

17           Q.    Do you also train others within the

18   Sheriff's Office or even the fire department in

19   origin and cause?

20           A.    I -- not like it's a certification or

21   anything like that.  I do require my -- all of my

22   detectives -- the detective that worked for me to

23   carry fire gear, you know, protective gear, that

24   kind of thing just in case we have a fire to

25   investigate in case I need assistance.  And each

Page 18

```
 1    time I've brought them into a fire sitting, whether
 2    it's residential or commercial, I try to help them
 3    kind of understand what my job is as an origin and
 4    cause investigator; that kind of thing.
 5            Q.    And when you're explaining -- the
 6    reason I ask that is because you come across as
 7    this person to me -- maybe I'm totally off.  But.
 8            Are you the type of person with those
 9    that are working alongside you -- you were talking
10    to them, talking them through your processes and
11    trying to help them understand the process?
12            A.    Yes, very much so.
13            Q.    And so that includes if there's
14    others -- is there's deputies and other Sheriff's
15    Office personnel that are assisting you on
16    investigation, you are talking them through your
17    processes so that they can gain an understanding of
18    what you're doing, how you are doing it and why you
19    are doing it?
20            A.    Correct.
21            Q.    Do you hold any other state
22    certifications that relate to either fire
23    suppression or fire prevention?
24            A.    No.  That's it.  Just origin and
25    cause.
```

1          Q.    Do you hold any state certifications

2     relating to law enforcement?

3          A.    Yes.

4          Q.    Okay.  And what certifications do you

5     hold currently?

6          A.    Just my peace officer certification.

7     I've had that since 2005.

8          Q.    You say peace officer?

9          A.    Yes.

10          Q.    And what is that?

11          A.    That's from the law enforcement

12     academy.  So every law enforcement officer in the

13     state of Wyoming has to go through that academy.

14     And it's in Douglas, Wyoming.  And it's about a

15     three to four-month class.

16          Q.    Is that also a certification that

17     also requires recertifying?

18          A.    Yes.

19          Q.    And how often?

20          A.    You have to have a certain amount of

21     hours.  And it changes constantly.  So they require

22     a certain amount of hours per year to maintain a

23     certification, whether it be training or on-the-job

24     experience; that kind of thing.

25          Q.    What kind of training do they offer

1   you that encompasses this certification?

2          A.   We do yearly -- well, quarterly

3   firearms training, yearly Taser training, anything

4   we carry as far as equipment, you know.  We're

5   trained on that.  We continue that education and

6   that training to keep up on certifications.

7          Q.   In addition to the two certifications

8   you've mentioned, am I safe to assume that you

9   undergo additional education and training on a

10  yearly basis, whether through your Sheriff's Office

11  or on your own?

12         A.   Yes.

13         Q.   Is that for purposes of ensuring that

14  you are offering the absolute best service that you

15  can to the residents of this county?

16         A.   Yes.

17         Q.   Do you ever engage in any type of

18  joint training or education with local fire

19  departments?

20         A.   Not as often as like the other police

21  departments in this jurisdiction, but sometimes we

22  do.  We have, you know, mass casualty trainings,

23  that kind of thing, where we work with the fire

24  department; that kind of thing, so...

25         Q.   This fire on February 1st, 2022, am I

Page 21

1    safe to assume that that's not the first fire

2    you've ever responded to?

3          A.    No.

4          Q.    Is there any way -- and I know it's

5    been, what, 19 years in law enforcement and many,

6    many more as a firefighter.

7                Is there any way that you can

8    quantify how many fires you've ever -- structural

9    fires you've ever responded to?

10         A.    50 to 100.  Maybe more.

11         Q.    How about since at least 2010, is

12   there any way you can quantity how many fires

13   you've responded to for purposes of conducting

14   origin of cause investigation?

15         A.    So we hadn't had an origin and cause

16   investigator here for a long time.  So when I got

17   that certification, a lot of the agencies,

18   including the fire department, weren't aware that

19   someone was certified in that.

20                For a Wyoming State statute, if a

21   small jurisdiction, say, Farson Wyoming Fire

22   Department responds to an incident or a fire in

23   their jurisdiction, it's -- first they -- they are

24   the ones that are actually supposed to investigate

25   that.  Now they can request me for assistance or an

1    origin and cause investigator for assistance.  But

2    it took a while for people to understand that I had

3    that certification.  So for a couple of years I

4    didn't stay too busy.  And then I started getting

5    calls more often.

6              So, I mean, since 2010, maybe 25, 30

7    fires or something like that that I've been called

8    to assist.

9         Q.    Okay.  Are you a member of any type

10   of professional organizations or associations

11   relating to either law enforcement or firefighter?

12        A.    Yes.

13        Q.    Okay.  Which ones?

14        A.    So I was part of the International

15   Homicide Investigation and Investigation

16   Association.

17        Q.    And any others?

18        A.    And Wyoming Peace Officers

19   Association.

20              MR. LaFlamme:  Can you say the first

21   one again?

22              THE WITNESS:  It's International

23   Homicide Investigators Association.

24              MR. LaFlamme:  Yes.

25              THE WITNESS:  It's a mouthful.

Page 23

1    BY MR. AYALA:

2         Q.    Since you began your origin and cause

3    investigations following your certification, have

4    you received or reviewed any types of standards or

5    guidelines that assist you in conducting your

6    origin and cause investigations?

7         A.    I think, as far as continuing

8    education or anything like that, I keep up on some

9    of the online trainings that I do to keep my

10   certification.  Every time I go through there, it

11   seems likes things change, just like they always do

12   with fire codes or statutes, anything like that.

13   So I try to keep up on those when I go through

14   those trainings.

15        Q.    Okay.

16        A.    I'm trying to think of the online

17   training course that I use and I can't think of it

18   off the top of my head.

19        Q.    Okay.

20        A.    But other than that, I have got a lot

21   of books and stuff I try to keep up on, just

22   keeping sharp, as far as my investigations and that

23   kind of thing.  So every time I go to a fire, I ask

24   a lot of questions, bounce a lot of ideas off

25   people, and then try to research.  If I don't know

Page 24

```
 1    something, I try to research so I know later on --
 2    or how to handle something later on.
 3           Q.    I take it there are no, either
 4    guidelines or standards in the field of origin and
 5    cause investigation that you find to be
 6    authoritative; is that fair?
 7           A.    Yeah, it's fair.  Yes.
 8           Q.    And part of the reason for that, sir,
 9    is because, as you mentioned earlier, every fire is
10    different, right; and so you have to employ
11    different skills, different experiences, different
12    training for purposes of concluding that
13    investigation?
14           A.    Yes.
15           Q.    Talk to me a little bit about -- and
16    even understanding that fires differ from one to
17    the other, talk to me a little bit about your
18    processes.
19                 When you are called to assist on an
20    origin and cause investigation, and you arrive on
21    scene, talk to me about the process that you go
22    through that is typical or customary?
23           A.    So working with the fire department,
24    the times we have, I think most of the fire
25    departments now know to call me.  And if they are
```

1          A.     In my experience in the fires I've

2     been on, every time I found a "V" pattern, it's --

3     I can't think of the time where it has -- where I

4     found that a fire started somewhere else in the

5     vicinity.

6               I remember investigating a fire that

7     was in a trailer house; that was a long time ago.

8     And it was actually -- it was an arcs and fire.  So

9     there was actually two start points.  So the "V"

10    pattern led us to one origin.  But there was also

11    another one that we actually missed in the back

12    bedroom that started a second fire.

13         Q.     What can you tell me about the term

14    "arcing" and its import or significance as it

15    relates to an origin and cause investigation?

16         A.     You know, a lot of times if you find

17    that "V" pattern that leads to, say, an outlet or

18    an electrical switch, a lot of times you can take

19    apart that switch or take apart that outlet, and

20    you can find evidence of arcing.

21               So you can find metal that's melted;

22    wires that are melted.  That can lead to determine

23    that potentially the fire started from electrical

24    issues.

25         Q.     Does arcing always indicate the

1    origination point of a fire?

2            A.    Not always.  I wouldn't say always,

3    no.

4            Q.    Are there times that you've seen, in

5    your experience of conducting these investigations,

6    where arcing is identified, but it has not marked

7    the origination point of a fire?

8            A.    Yes.

9            Q.    We discussed "protected areas" as it

10   relates to a place of origin of a fire.

11               Are you familiar with that term?

12           A.    I don't think so.

13           Q.    But the way in which it was brought

14   up in questioning was where there is -- where

15   you've identified a place of origination of that

16   fire and underneath the -- whether it's a

17   structure, whether it's -- whatever it is, there's

18   a place that is protected from the severity of the

19   burning and the fire --

20           A.    Okay.

21           Q.    -- that is more intact than the

22   remainder of the structure.

23           A.    I understand.

24           Q.    Are you familiar with that?

25           A.    I understand that, yes.

1           Q.    Is there a better term that you use
2      in your experience than just "protected area"?
3           A.    No.  I think that's probably a good
4      way to explain it.
5           Q.    In your experience, when you are
6      investigating fires, have you found protected areas
7      near a place of origination?
8           A.    If I'm understanding you correctly,
9      yes.
10          Q.    By way of example, where you've
11     identified a "V" pattern --
12          A.    Um-hum.
13          Q.    -- and made the determination that
14     the fire originated at or near that "V" pattern,
15     have there been times where in removing debris
16     where you've seen a protected area that is not as
17     burned or destroyed as the surrounding areas?
18          A.    Yes, I have.
19          Q.    Is that -- the identification of a
20     protected area -- I'll use that term -- does that
21     provide further evidence for you, an investigator,
22     of a place of origination?
23          A.    It can, yes.  I wouldn't say always,
24     but in some circumstances, yes.
25          Q.    Certainly it's one piece of evidence

Page 33

```
 1    that you can utilize in coming to your ultimate
 2    conclusions?
 3              A.    Yes.
 4              Q.    We've been provided, certainly, and
 5    we have copies of your report, and you have a copy
 6    there with you.  I would certainly like to go
 7    through that in a minute.
 8                    But first let me ask you:  In your
 9    experience investigating fires, have you -- prior
10    to 2022, have you ever investigated a fire that you
11    concluded was caused by a hoverboard?
12              A.    No.
13              Q.    Prior to 2022, have you ever
14    investigated a fire that you concluded was caused
15    by a lithium battery?
16              A.    Yes.
17              Q.    Do you know on how many occasions?
18              A.    I can think of one on the top of my
19    head.  It was probably right after I gained my
20    origin and cause certification.  And it was
21    actually a lithium battery that was plugged in
22    outside of a residence that actually caught fire
23    and burned that residence.
24              Q.    In that experience with the lithium
25    battery, if you recall, were you able to identify a
```

1        A.    Yes.

2        Q.    When you were walking around the

3   home, including and especially in this front part

4   of the home, did you walk up to this area of the

5   window and look at this "V" pattern?

6        A.    I did.  There was -- I mean there was

7   a lot of debris.  And I remember something about a

8   shed.  I -- I didn't remember that until we

9   discussed it, but there was a lot of debris and

10  stuff around there, so I didn't walk right up to

11  it, but I just kind of focused my efforts almost

12  basically where the -- this picture was taken about

13  this or is as close as I walked up to that.

14        Q.    And I just want to be clear for the

15  record that you presented to this residence the day

16  of the fire?

17        A.    Yes.  Yeah, I think it was 1 o'clock,

18  probably -- I mean, eight, nine hours after the

19  fire was -- after the fire had occurred, so...

20        Q.    In walking up to this portion of the

21  home, even with the debris that existed there, did

22  you find any evidence to support the hypothesis and

23  ultimately the conclusion that the fire began

24  outside of the home?

25        A.    No.

1          Q.    None?

2          A.    Nothing.

3          Q.    Other than Bill Robinson and Chief

4    Urgman, at some point in time you spoke with other

5    witnesses?

6          A.    Yes, I did.

7          Q.    Including Ryan Pasborg?

8          A.    Yes.

9          Q.    If I refer to him as the hero, you'll

10   know who I'm talking about?

11         A.    Yes.

12         Q.    You spoke with Matthew Wadsworth?

13         A.    Yes.

14         Q.    Did you speak with anyone else?

15         A.    I did.

16         Q.    Who did you speak with?

17         A.    I spoke with the children that were

18   in the home.  I interviewed -- I remember there

19   were the two boys.  And then I believe their

20   sister.  That was in the first part of March 2022.

21   So about a month afterwards.  I did speak to

22   Matthew over the phone just to get updates on his

23   wife and his child.

24         Q.    Do you take into account all of those

25   conversations, all of the information that the

1    family members, that the hero provide you in

2    ultimately coming to the conclusions that you do?

3              A.    Every time, yes.

4              Q.    You consider all of them?

5              A.    I do.

6              Q.    Together with the physical evidence?

7              A.    Yes.

8              Q.    Together with certainly your

9    experience and your background and your training?

10             A.    Yes.  Every investigation, I follow

11   the evidence, whether that be physical evidence or

12   statements given by witnesses; anything like that.

13             Q.    Sir, you've gone be doing this for

14   many years?

15             A.    Yes.

16             Q.    In the many years that you've been

17   not just conducting your origin and cause

18   investigation of fires but also conducting your

19   investigations relating to criminal activity,

20   relating to tragedies that occur, you've spoken

21   with and taken statements of victims?

22             A.    I have, yes.

23             Q.    Have you found in your experience

24   that, there are times when individuals who suffer

25   through a trauma either have difficulty

Page 55

```
 1    do you take everything that somebody tells you as
 2    fact?
 3            A.    No.
 4            Q.    In fact, what you are called to do as
 5    a detective, as an investigator is you're called to
 6    take everything into account and decipher fact from
 7    nonfact?
 8            A.    That is correct.
 9            Q.    Okay.  And there are times where you
10    are siphoning through all of the evidence and you
11    realize and determine that some information given
12    to you by victims, by witnesses is not 100 percent
13    accurate?
14            A.    That is correct as well.
15            Q.    And the physical evidence sometimes
16    provide you the best evidence for purposes of
17    determining the cause or origin of a fire?
18            A.    Yes.
19            Q.    And in the same way, the lack of
20    physical evidence can also provide you with the
21    cause or origin of the fire?
22            A.    Yes, it can.  Yep.
23            MR. AYALA:  We've been going for a
24    little over an hour, about an hour and 15.
25            Are you okay to continue?
```

```
 1                    THE WITNESS:  Yes.
 2                    MR. AYALA:  Folks, on the other side,
 3      I know there are sometimes media changes.
 4                    Are we okay to continue?
 5                    THE VIDEOGRAPHER:  I have about
 6      another 15 minutes or so.
 7                    MR. AYALA:  Let's stop now then, cuz
 8      I'm gonna get into his report a little bit more.
 9      And we'll change that video.
10                    THE VIDEOGRAPHER:  Fair enough.
11                    This is the end of Media Unit 1.
12                    We are off the record at 10:46 am.
13                    (Recess taken.)
14                    THE VIDEOGRAPHER:  This is the
15      beginning of Media Unit number 2.
16                    We are on the record at 10:53 a.m.
17      BY MR. AYALA:
18          Q.    Sir, based on your investigation of
19      the Wadsworth residence fire, assume with me that
20      the children made a statement about the fire
21      starting outside, assume that the children also
22      made a statement that they were woken up by the
23      fire, do those statements, with the totality of all
24      of the evidence that you were able to identify and
25      gather, do those statements change your opinions at
```

Page 57

1   to the origin and cause of the fire?

2           A.    No, not at all.

3           Q.    Assume with me that there will be

4   testimony at some point about a plastic shed, about

5   a space heater inside, about it being used, you

6   know, to smoke at, would that in any way change

7   your opinions as to the origin and cause of this

8   fire?

9           A.    No.

10          Q.    Assume with me that private

11  inspectors and investigators were retained for

12  purposes of conducting an inspection of this home

13  and the result of that inspection found arcing

14  outside of this shed was -- would that in any way

15  change your conclusions and your opinions with the

16  totality of the evidence as to the origin and cause

17  of this fire?

18          A.    No.

19          Q.    You're fairly certain as to where

20  this fire originated?

21          A.    Yes.

22          Q.    And you're fairly certain as to what

23  caused this fire?

24          A.    Yes.

25          Q.    What would you need to either see or

1    hear for purposes of changing that opinion, if

2    anything?

3           A.    I'm open -- I'm open-minded.  If

4    someone walked into one of my complex

5    investigations, for lack of a better term, if

6    somebody has an idea that something else happened

7    besides what I thought, I'm open-minded about that.

8    But, again, I also follow the evidence.  I don't

9    form an opinion initially.  I follow the evidence,

10   whether that be an interview or physical evidence

11   or anything like that.  And I do that on every

12   single investigation -- I always have -- since I

13   became a law enforcement officer.

14                So I'm open-minded if somebody has an

15   idea.  And we'll bounce ideas off each another.

16                But in this case, I -- based off

17   my -- what I found, the physical evidence, based on

18   my training and experience, I was fairly certain

19   where this fire started.

20           Q.    And even with the ideas that I just

21   gave you through those hypotheticals, the fire

22   starting outside, a plastic shed, potentially a

23   space heater causing on fire, or potentially a

24   cigarette, or some spark in the shed causing of the

25   fire, the potential of arcing being found after the

Page 59

```
 1    fact, none of that is sufficient to change your
 2    opinions based on the evidence that you found and
 3    based on your background, training and your
 4    experience?
 5                 MR. LaFLAMME:  Object to form.
 6                 Go ahead.
 7         A.     Okay.  No.
 8    MR. AYALA:
 9         Q.     Meaning what I said is correct.
10         A.     Yeah, correct.  Yes.  Yep.
11         Q.     Okay.  So let's take a look at your
12    report, if you could.
13         A.     Okay.
14         Q.     At least from the copy I have and I
15    believe the one that was presented to you there --
16         A.     Yes.
17         Q.     -- there appears to be 15 total
18    pages?
19         A.     16, I believe.
20         Q.     Oh, okay.
21         A.     And this is a report from not only my
22    followup report, but also one of the officials
23    from --
24         Q.     Let me --
25         A.     -- that one as well.
```

1    line was disconnected?

2         A.    I don't remember.

3         Q.    Do you ever learn when power went out

4    to the house?

5         A.    No.

6         Q.    Does that -- knowing when power went

7    out to the house, would that in any way, shape or

8    form affect your opinions as to the origin or cause

9    of the fire?

10        A.    No.

11        Q.    And, again, that's because of the

12   physical evidence that you've reviewed, the

13   totality of the evidence, including statements and

14   all of that information provided to you?

15        A.    Yes.

16        Q.    And your background, your training

17   and your experience?

18        A.    Yes.

19        Q.    The log jumps from 4:49 to 5:21:25

20   for an entry by A. Hook of information provided by

21   Officer McFee.  States, "Mom and 4 year old were

22   taken to hospital.  Other kids were checked by EMS

23   and had no burns.  They were taken to grandma's

24   house."  Do you see that?

25        A.    Yes.

Page 112

1          Q.    -- to determine that this was the
2     cause?
3          A.    Yes.
4          Q.    Okay.  There was nothing suspicious
5     that you found within the home as having been
6     either criminal activity or malicious activity or
7     anything of that nature that started the fire?
8          A.    No.
9          Q.    You noticed that there was an outlet
10    that showed that something had been inserted into
11    the lower plug?
12         A.    Yes.
13         Q.    There was melted plastic covering the
14    lower plug holes, and wires were coming out of the
15    melted plastic.  Do you see that in your report?
16         A.    Yes.  I remember writing that too.  I
17    remember reading that too.
18         Q.    And then in parenthesis, you put,
19    "This showed that something may have been plugged
20    into the outlet, maybe a charger."  Do you see
21    that?
22         A.    Yes.
23         Q.    Okay.  And let me see if I understand
24    that.
25                So are you saying that upon observing

1    this damage you identified an electrical plug?

2            A.    Yes.

3            Q.    That was plugged into an outlet?

4            A.    There was an outlet, yes.  And

5    then -- yes, something was plugged into the lower

6    portion of the outlet.

7            Q.    Because what you saw was melted wire

8    and plastic coming from that outlet?

9            A.    Yes.

10           Q.    Obviously, because of the extent of

11   the fire damage, that wire would have been

12   severed --

13           A.    Yes.

14           Q.    -- at some point?

15           A.    Yes.

16           Q.    And you were not able to definitively

17   identify what it was that was actually plugged into

18   that outlet?

19           A.    Correct.  It was completely

20   destroyed.

21           Q.    And that outlet was near the doorway?

22           A.    Yes, it was.

23           Q.    You stated -- and you continue that

24   you focused your attention near the floor close to

25   the entryway into the bedroom.  This was just below

1   where the back of the refrigerator was exposed.

2   And you noticed a heavily burned item lying on the

3   floor, but it was difficult to determine what it

4   was initially.  Do you see that?

5           A.    That is correct, yes.

6           Q.    Was that close in proximity to that

7   outlet that you were describing?

8           A.    Yes, it was.

9           Q.    You could see what was believed to be

10  a tire or a wheel and batteries?

11          A.    Yes.

12          Q.    Could you describe -- as you're

13  looking through this severely damaged home, and you

14  find this, what appeared to at the very least be a

15  tire or a wheel, can you describe how it looked?

16          A.    It was almost completely covered with

17  debris.  Obviously, any fire you sift through,

18  sometimes 6, 7, 8 inches of debris.  That can be

19  insulation, roofing materials, building materials,

20  studs, you know, burned away wood, anything like

21  that.

22              So this object was almost completely

23  covered.  The reason why we focused our attention

24  on that area and start digging through or sifting

25  through that area, it's because we knew it was

1    somewhere around that -- for one, the plug and for

2    two, the area we believed was the origin of the

3    fire.

4                    And in sifting through, again, I came

5    to a -- it looks like a -- I can only describe it

6    as it looks like a wheel or a plastic wheel or

7    something off a toy truck or something like that.

8    And then, obviously, batteries that stuck out.  And

9    all the tires, the batteries, everything were

10   attached to the same item, if that makes sense.

11        Q.    All right.  And the "V" pattern that

12   you've been talking about, would it have been in

13   that same area?

14        A.    In that area, yes.

15        Q.    Okay.

16        A.    In that vicinity.

17        Q.    You go on to say, "In observing the

18   item closer, you determined the item was a

19   hoverboard riding toy, commonly used by children."

20                    Let me ask you about that.

21                    Were you able to come to that

22   determination based on your inspection of that

23   item?

24        A.    Yes.  And I'm familiar with them.  My

25   kids had one almost identical to it.

Page 116

1          Q.    And we'll talk to that about that in
2     a little bit, because you make reference to the one
3     your kids had in your interview with Matthew
4     Wadsworth.
5               Do you remember that?
6          A.    I do.  I believe so, yes.
7          Q.    In fact, you had an experience with
8     the hoverboard that your kids had with it getting
9     hot.
10              Do you remember that?
11         A.    Yes.  Yes, I do.
12         Q.    And you talked to Matthew Wadsworth
13    about that?
14         A.    Yes.
15         Q.    To the point that as it was plugged
16    in, it was so hot that it was almost difficult to
17    touch?
18         A.    Yes.
19         Q.    So you came to the determination that
20    it was a hoverboard.  And you go on to state, "As
21    an origin and cause investigator, you are aware
22    that certain hoverboards with lithium iron
23    batteries are known to get hot and possibly catch
24    fire or explode if plugged in for a long period of
25    time and left unattended."

1            Did I read that correctly?

2       A.    Yes.

3       Q.    And we talked earlier about whether

4  you ever concluded that a hoverboard was the cause

5  of the fire or lithium batteries were a cause of

6  the fire.

7            Irrespective of that, you've become

8  aware over the years just by the very nature and

9  virtue of what you do, that hoverboards, in fact,

10 can cause fires?

11      A.    Yes.

12      Q.    And you've heard of those stories --

13 even if you haven't investigated one specifically,

14 you've heard of those stories of hoverboards

15 catching fire?

16      A.    Yes.

17      Q.    You spoke with Chief Robinson and

18 Chief Urgman.  And you documented, you both agree

19 that the fire started in the bedroom near where the

20 hoverboard was found.

21      A.    Yes.

22      Q.    In that conversation with Chief

23 Robinson and Chief Urgman, did you gain an

24 understanding from them that they concluded the

25 hoverboard contributed or caused the fire?

Page 118

1          A.    It was believed.  I mean, we couldn't

2    say it 100 percent.  But more than likely it

3    started from that unit, that item.  We all agreed

4    that the fire started in that origin.  We all came

5    to the same conclusion there.  And in sifting

6    through or searching that area, is where this

7    hoverboard was found.  So it was our believe that

8    it did.

9          Q.    Are you familiar with what, if any,

10   investigation Chief Urgman performed?

11         A.    I know he had gone in and entered the

12   fire as well.  I don't know -- I don't remember

13   what his -- I talked to Chief Robinson more than

14   Chief Urgman.

15         Q.    Okay.

16         A.    But I don't remember.  I don't think

17   he had any differences or any different opinions.

18         Q.    This conversation with Chief Robinson

19   and Chief Urgman was after you concluded your

20   inspection and investigation of the inside of the

21   property?

22         A.    Um-hum.  Yes.

23         Q.    That was the first time that they

24   communicated to you the origin --

25         A.    Yes.

Page 251

```
 1    I saw in the exterior is what made me focus my --
 2    my investigation 1 interior, because I didn't
 3    believe at that point from what I saw -- and then
 4    in talking with the firefighters later on it was
 5    determined that the fire -- we believed the fire
 6    started inside based off nothing on the outside
 7    showed us anything that would make us believe that
 8    it started on the outside.
 9         Q.   Okay.  Arcing within the shed would
10    cause you to take a look at the shed as a potential
11    area of origin, correct?
12              MR. AYALA:  Form.
13         A.   Potentially, yes.
14    BY MR. LaFLAMME:
15         Q.   Okay.  And understanding that you
16    didn't have the opportunity to process the shed
17    area, correct?
18         A.   Right.
19         Q.   And obviously that's done -- been
20    done now by the private sector, if there was arcing
21    that was found in that shed area, as you sit here
22    today, you would still want to investigate that to
23    determine if your opinion is still accurate,
24    correct?
25              MR. AYALA:  Form.
```

1          A.    That's something I would -- I would

2    definitely be all ears to talk to someone if

3    someone came to me.  Again, I'm always bouncing

4    ideas off someone.  If someone came to me and said,

5    hey, this is what we think, I would definitely look

6    into that; I would definitely consider, you know,

7    hey, let's -- let's take a second look at it.  I've

8    done that with criminal investigations; I have no

9    problem with that.  But again, it doesn't change my

10   opinion on where I believe the fire started.

11         Q.    But you understand under NFPA 921,

12   that if additional evidence comes to light, you

13   need to consider that evidence, correct?

14         A.    Correct.

15         Q.    Okay.

16         A.    And I wasn't -- I didn't hear of any

17   other, you know, any other calls, any other

18   evidence, or anything like that.

19         Q.    Okay.  I understood that you weren't

20   part of the private investigation --

21         A.    Sure.

22         Q.    -- and you haven't been privy of what

23   those results were, but if there was arcing that

24   was found in that shed, you would agree with me

25   that under 921 you would want to reevaluate your

Page 280

1           A.    Yeah.

2           Q.    -- you don't know the background of

3     that --

4           A.    No.

5           Q.    -- correct?

6           A.    No.

7           Q.    Okay.  Based on your investigation,

8     is it your belief that the hoverboard was -- the

9     hoverboard at the Wadsworth property was charging

10    at the time?

11          A.    Yes.

12          Q.    If it wasn't charging at the time,

13    would that have -- that would have caused you to

14    reevaluate your opinion, correct?

15          A.    Again, again, potentially.  You know,

16    I don't know enough about them to know if, you

17    know, if you -- maybe if unplug them, maybe if they

18    continue to be hot, if there's some kind of

19    malfunction or something inside of them, if they

20    could still catch fire, blow up, anything like

21    that, I honestly don't know, but.

22          Q.    But your presumption was in your

23    investigation that it was plugged in --

24          A.    Plugged in --

25          Q.    -- correct?

Page 281

```
 1          A.    -- yes.  It was based off statements
 2     and everything, and then what we found at the scene
 3     with the -- with the plug, and yeah, that's what we
 4     found out.
 5          Q.    The plug that you found at the scene
 6     was plugged into the outlet wall, correct?
 7          A.    Yes.
 8          Q.    You weren't able to trace that cord
 9     to the hoverboard itself, correct?
10          A.    No, it burned away.
11          Q.    Okay.  So as to whether it was
12     actually plugged in based on the physical evidence
13     that you saw, you can't make that determination.
14          A.    No, I could not.
15          MR. LaFLAMME:  I think that's all the
16     questions I have for you.  I'm sure they'll have
17     a -- be some followup --
18                THE WITNESS:  Okay.
19          MR. LaFLAMME:  -- and then I may have
20     some followup.
21                THE WITNESS:  Sounds good.
22          MR. AYALA:  Yeah.
23                (Inaudible, simultaneous talking.)
24          MR. AYALA:  Are you okay to continue?
25                THE WITNESS:  Sure, yeah.
```

Page 282

1          MR. AYALA:  Let me -- I also will

2     jump around a little bit, but let me see if I can

3     start where opposing counsel left off.

4          THE WITNESS:  Sure.

5          (Court reporter interruption for

6     clarification.)

7                    EXAMINATION

8     BY MR. AYALA:

9          Q.    The -- during your investigation,

10     when you found the cord that was attached to that

11     outlet, you weren't able to determine whether or

12     not it was connected to the hoverboard because it

13     burned away.

14          A.    Yes.

15          Q.    From the evidence that you collected,

16     including the statements from -- from family, did

17     anybody say that anything else was plugged into

18     that outlet?

19          A.    No.

20          Q.    Did anybody say that anything else

21     was ever plugged into that outlet?

22          A.    No.

23          Q.    In fact what they said and what they

24     communicated was that the one thing that they

25     plugged into that outlet in the boys' room was the

Page 283

1    hoverboard.

2              A.    Yes.

3              Q.    And by the way, that plug, that

4    outlet, was in the vicinity of where the hoverboard

5    was?

6              A.    Yes, it was.

7              Q.    Okay.  You mentioned that you did

8    some, some research online after this to learn a

9    little bit more about hoverboards.  Is that -- did

10   I hear you correctly?

11             A.    Yes.

12             Q.    And you learned about some other

13   fires related to hoverboards and related to lithium

14   batteries?

15             A.    Yes.

16             Q.    Did you -- in your research, did you

17   find or uncover any recalls by Jetson relating to

18   their hoverboards?

19             A.    I don't remember -- I don't recall if

20   I did or not specifically with Jetson hoverboards.

21             Q.    Did you ever learn in your research

22   that there was a hoverboard fire in Pennsylvania in

23   April of 2022 related to a Jetson hoverboard?

24             MR. LaFLAMME:  Objection to form.

25             A.    That I don't remember if I just came

```
 1    across it.  I looked at quite a few of them online,
 2    so I don't remember that one specifically, but.
 3    BY MR. AYALA:
 4         Q.    Okay.  Did you ever learn that Jetson
 5    recalled a brand of their hoverboards as a result
 6    of that April 2020 fire that killed two?
 7         A.    That I --
 8               MR. LaFLAMME:  Object to form.
 9         A.    -- don't recall.
10    BY MR. AYALA:
11         Q.    And that the -- the conclusion of the
12    origin and causation investigation in that
13    Pennsylvania case related to the Jetson hoverboard
14    concluded that it was the hoverboard that caused
15    the fire --
16               MR. LaFLAMME:  Object to form.
17    BY MR. AYALA:
18         Q.    -- did you know that?
19         A.    I did.  No, I did not.
20         Q.    When opposing counsel showed you one
21    of the body cam videos, and I believe it was -- I
22    believe it was Deputy Hansen, you -- your eyebrow
23    raised, and then later you made a comment that that
24    further solidifies your conclusions.
25               What did you mean by that?
```

1          A.    So just -- what I saw in that video,

2     the immense amount of fire and smoke that was

3     coming -- I shouldn't say smoke because it was

4     dark.  The fire that was coming out that window,

5     and I understand there's debris or there's a fire

6     underneath that window.

7               That is common for when you get a

8     fire that extends from the interior to the exterior

9     of a fire.  When it burns up, it burns that soffit,

10     it burns that material.  That soffit will

11     clearly -- it will ignite and it will drop down

12     off -- off of the structure onto the ground; so

13     that is common.  If it did drop down onto that

14     shed, whether it was plastic or whatever it was, it

15     could get -- it clearly started the shed on fire.

16          Q.    And that was going to be the next

17     question that I asked you, and then you kind of

18     covered that.  But you were given a lot of

19     hypotheticals during today's deposition.  You were

20     given a lot of hypotheticals and even assumptions

21     in some of the questioning from opposing counsel as

22     to the origination of this fire from the shed

23     versus inside.  Do you remember some of those

24     questions?

25          A.    Yes.

1          Q.    Okay.  One possibility that wasn't

2     covered by opposing counsel is if this fire in fact

3     began inside of that bedroom, as you concluded, is

4     it possible that as it spread and raced out of that

5     window to that soffit, I believe you called it --

6          A.    Yes.

7          Q.    -- to the roof, is it possible that

8     debris could fall on that shed and ignite the shed?

9          A.    Yes.

10              MR. LaFLAMME:  Object to form.

11     BY MR. AYALA:

12         Q.    In fact, in all of the years that

13     you've been investigating fires, have you seen

14     occasions where fires begin inside, make their way

15     to the exterior of that home, and debris falls and

16     it ignites other things?

17         A.    Yes.

18         Q.    By the way, opposing counsel brought

19     up the vent in the bedroom, remember some of those

20     questions?

21         A.    Yes.

22         Q.    About whether or not -- I believe the

23     term was whether it fuel load, whether it was an

24     igniter.  Do you remember some of that?

25         A.    I do.

1           Q.    Okay.  How about the plastic shed.

2      Is that is fuel or an igniter?

3           A.    I wouldn't say it's an igniter.  I

4      mean if it's plastic, like I said earlier during my

5      testimony, it would still melt.

6           Q.    Okay.

7           A.    So I mean -- and it depends on what

8      is inside, and I understand that, it depends on

9      what may be inside that shed, if there's flammable

10     liquids, flammable contents inside that shed --

11          Q.    Mm-hmm.

12          A.    -- but still that -- that shed

13     would -- I would believe would melt.

14          Q.    Is it combustible?  As that a term

15     that is used and understood?

16          A.    I wouldn't say so.

17          Q.    Opposing counsel was asking you

18     questions about the siding, and showed you a

19     picture of the outside of the home.  Do you

20     remember that?

21          A.    Yes.

22          Q.    Okay.  And -- and it was referred

23     through questioning that that siding was metal.  Do

24     you remember some --

25          A.    Yes --

1          Q.    -- of those questions?

2          A.    -- I do.

3          Q.    Metal siding, isn't that typically

4     non combustible?

5          A.    Yes.

6          Q.    If the fire began in the shed and

7     spread to the home from the outside in, and that

8     was metal siding -- I'm sorry, and it was not metal

9     siding, wood or some other material that was

10    combustible, would it consume the out -- the

11    exterior of the home?

12         A.    It could potentially.

13         Q.    But when you have a metal siding that

14    is one combustible and a fire begins outside in a

15    shed, would you expect it to consume the interior

16    of the home?

17              MR. LaFLAMME:  Object --

18         A.    No --

19              MR. LaFLAMME:  -- to form.

20         A.    -- I honestly wouldn't.

21    BY MR. AYALA:

22         Q.    Opposing counsel established a few

23    things for us today.  Opposing counsel established

24    that the boys in that bedroom were uninjured.  Do

25    you remember some of that questioning?

1              A.    I do.

2              Q.    If a fire began in the interior of

3    the home in that boys' bedroom, would you expect

4    that window to blow out, meaning to blow its debris

5    out of the home, or inside of the home?

6              A.    This is if a fire started inside?

7              Q.    Correct.

8              A.    Once it would -- once it would get

9    hot enough, it would blow to the exterior.

10             Q.    If the fire began in the shed from

11   the exterior of the home, and heated the window to

12   such a degree that it would cause it to, to blow,

13   would you expect debris inside of the home?

14             A.    I believe so, yes.  That -- that's a

15   good question.

16             Q.    Thank you.

17                   Would you expect to have debris on

18   the inside of the home on the bed, where the bed

19   was located according to your understanding?

20             A.    Potentially, yes.  If it was pushed

21   right up against that wall, yes.

22             Q.    And given the fact that the window

23   was glass, would you expect a child who is on that

24   top bunk to at the very least have some scrapes,

25   some marks from glass that exploded on them?

Page 290

1          A.    Yes, I believe so.

2          Q.    Did they have any of that?

3          A.    Not that I saw, no.  And they didn't

4     report -- the dad didn't report any injuries, the

5     kids said weren't injured; that kind of thing.

6          Q.    And they certainly weren't treated

7     for any injuries, were they?

8          A.    Correct.

9          Q.    Opposing counsel asked you about the

10    bed and discussed it being a fuel load or igniter.

11    If the fire began in that bedroom, and the cause of

12    the fire was the hoverboard, as you've concluded,

13    would the fire necessarily go directly to the bed?

14         A.    No.

15         Q.    Okay.  Fires aren't always linear,

16    are they?

17         A.    Right, correct.

18         Q.    In fact, isn't the more reasonable

19    conclusion, given the V pattern and given the

20    physical evidence that you saw in your inspection,

21    wouldn't the more reasonable conclusion be that

22    that fire would actually go up those wood panels

23    towards the ceiling of that home?

24         A.    Yes.

25               MR. LaFLAMME:  Object to form.

1    BY MR. AYALA:

2          Q.    And then the fire, the flames would

3    run across the ceiling of that home?

4          A.    Yes.

5          Q.    And then would find its way down the

6    wall of that home eventually?

7          A.    Eventually, yes.

8          Q.    All right.  And so it wouldn't go

9    directly to that bed, would it?

10               MR. LaFLAMME:  Object to form.

11         A.    Not necessarily, unless you had an

12   accelerant cord on the ground or something that

13   would that have led it to that.

14   BY MR. AYALA:

15         Q.    Okay.  Was there any accelerant that

16   you discovered or that you learned through any of

17   the statements, that there was some accelerant on

18   that -- on that floor of that bedroom that would

19   have caused the fire to run directly to the bed?

20         A.    No.

21         Q.    And so this -- this assumption, this

22   inference that if the fire began inside that

23   bedroom, it had to run directly to that bed, and it

24   would have consumed the bed and thereby injure the

25   children.  Well that's not exactly true, is it?

```
 1              MR. LaFLAMME:  Object --
 2         A.   I don't think so.
 3              MR. LaFLAMME:  -- to form.
 4    BY MR. AYALA:
 5         Q.   That's just not the way in which a
 6    fire of this nature, given the facts and
 7    circumstances that you know, occurs.
 8              MR. LaFLAMME:  Object to form.
 9         A.   Correct.
10    BY MR. AYALA:
11         Q.   Okay.  And in fact, isn't the more
12    likely conclusion, having that fire, again,
13    originate in that bedroom, go up the walls, across
14    the ceiling, start to make its way down the walls,
15    and then that window blows out?  Doesn't that make
16    more sense?
17         A.   It does to me, yes.
18         Q.   Okay.  And that's based on all of
19    your years of not just investigating from a origin
20    and causation standpoint, but education.
21         A.   Yes.
22         Q.   Background, training, and of course
23    experience.
24         A.   Yes.
25         Q.   Any glass debris found inside the
```

Page 294

1            (Playing video recording.)
2       Q.    You were -- you were asked, and it
3  was just around here where the still frame where
4  the video was paused for you, and you were asked a
5  question whether the fire was bigger on the ground
6  than on the home, or something along those lines.
7            Do you remember that question?
8       A.    Yes, I do.
9       Q.    Okay.  There's a lot of smoke there,
10  isn't there?
11       A.    Yes, there is.
12       Q.    Let's keep playing.
13            (Playing video recording.)
14       Q.    By the way, as I'm playing, do you
15  see debris falling to the ground?
16       A.    Yes.
17       Q.    Does that go along the lines of what
18  you were explaining is typical and expected when
19  you have a soffit, when you have a fire that
20  originates in the home and blows out?
21       A.    Yes.
22       Q.    Okay.  Let me keep playing.
23            (Playing video recording.)
24       Q.    Can you see right there, the fire now
25  is exposing itself as a larger fire in the home?

Page 295

1      A.    I do.

2            (Playing video recording.)

3      Q.    Okay.  And did you see that the fire

4   grew and looks larger than it did originally in

5   that still frame?

6      A.    Yes.

7      Q.    And right there as well?

8      A.    Yes.

9            (Playing video recording.)

10     Q.    Right there, do you see the magnitude

11  of the fire coming from the inside of the home?

12     A.    I do.

13     Q.    Do you see the shape of the fire from

14  the inside of the home?

15     A.    The shape, yes.

16     Q.    Is that consistent with the V pattern

17  that you saw on the wall in Exhibit 4 that we

18  showed you?

19     A.    Yes, it is.

20     Q.    Is that -- is that consistent, again,

21  consistent with the organization being inside the

22  bedroom as opposed to outside?

23     A.    I believe so, yes.

24     Q.    And, in fact, if this fire originated

25  in the shed outside, you would expect to see a V

Page 296

```
 1    pattern going down towards the ground, wouldn't
 2    you?
 3                MR. LaFLAMME:  Object to --
 4         A.    I believe so --
 5                MR. LaFLAMME:  -- form.
 6         A.    -- yes.
 7                (Playing video recording.)
 8    BY MR. AYALA:
 9         Q.    Can we at least agree, because here's
10    another still shot.  Can we at least agree that as
11    we watch this video, and there's a different angle
12    where now the smoke is not impeding your viewed,
13    that the -- the greater fire is coming from the
14    interior of that home of that bedroom?
15         A.    Yes.
16                (Playing video recording.)
17         Q.    You were asked questions about the
18    affected impact of ventilation in relation to
19    whether that bedroom door was opened or closed.  Do
20    you remember some of those questions?
21         A.    I do.
22         Q.    Okay.  And whether or not ventilation
23    can play a role when it comes to some of the
24    evidence that you find, whether it's a V pattern or
25    inverted cone, so on and so forth.  Do you remember
```

Page 299

1   of that hoverboard.

2                Do you remember the nature of that

3   question?

4          A.    Yes.

5          Q.    Okay.  Unless someone was there and

6   observed, and knowledgeable, and competent, can

7   anyone say with a hundred percent certainty how it

8   started and where it started?

9          A.    No.

10         Q.    What you do as a investigator, with

11  the years of experience, training and education

12  that you have, is that you gather all of facts

13  available, you gather the evidence that you are

14  able to see, to observe, and using that knowledge

15  and that experience, you put together a likely

16  cause and a likely origin.  Is that fair?

17         A.    That is correct.

18         Q.    And so what you are able to do when

19  you concluded your investigation, is you conclude

20  more likely than not what caused that fire and

21  where it started.  Is that fair?

22         A.    That is fair, yes.

23         Q.    In fact, even -- even the after the

24  fact inspectors and investigators I believe the

25  term was, private investigators, even they could

Page 300

```
 1    never, with a hundred percent certainty, say how
 2    and where this fire started.
 3                 MR. LaFLAMME:  Object to form.
 4          A.     True.  I believe that would be true,
 5    yes.
 6    BY MR. AYALA:
 7          Q.     Okay.  You were asked about arcing a
 8    few times, including there was inferences that
 9    there was arcing found out there in the shed area.
10                 Do you remember some of those
11    questions?
12          A.     I do, yes.
13          Q.     Okay.  Could arcing be found if the
14    fire started inside, made its way outside, burned
15    that soffit, debris falls on the shed, burns down
16    that shed; could you still find arcing in that
17    area?
18          A.     Potentially, yes --
19                 MR. LaFLAMME:  Object to --
20          A.     -- I believe so.
21                 MR. LaFLAMME:  -- form.
22    BY MR. AYALA:
23          Q.     And that -- that exists as a
24    possibility, doesn't it?
25          A.     I think so, yes.
```

1    they told me or not.  I honestly don't remember.

2          Q.    Okay, all right.  If the window was

3    already -- let me just use the word open.

4          A.    Okay.

5          Q.    If the window was already broken and

6    open at the time that they were awoken from the

7    fire, if the fire originated outside, you would

8    expect that they would have known, at the time that

9    that window broke and opened, they would have known

10   what was going on?

11         A.    Yes.  I would assume so, yes.

12         Q.    The fact that when they woke up the

13   window was already open, already broken, doesn't

14   that support the fact that the window blew out as a

15   result of the fire inside the home?

16               MR. LaFLAMME:  Object to form.

17         A.    I believe so, yes.

18   BY MR. AYALA:

19         Q.    Because if it blew in, they would be

20   covered in glass, wouldn't they?

21         A.    Yes.  And I had a hard time

22   believing, too, that -- and I would have to go back

23   and read some of my interview, but I have a hard

24   time, too, believing that the window was open when

25   they did wake up and feel fire, because at that

1    point, if they felt fire and the window was already

2    broken, I had have a hard time believing that

3    window was -- was already broken, because that

4    would have been -- because that would have meant

5    there was more fire exposure, especially around

6    that bed and where that bed was by that window, so

7    I have a hard time believing that the window was

8    actually broken out.  It's common for children to

9    make little mistakes like that, that kind of think

10   like we were talking --

11          Q.    Um-hum.

12          A.    -- but even if that window was

13   broken, I mean if that's -- they felt fire if the

14   window was already broken, obviously it was cold

15   out that night, too.  The top bunk was about level

16   with that window as well, if that makes sense.

17          Q.    It does make sense.

18                Again, another piece of evidence that

19   you can consider.

20          A.    Yes.

21          Q.    When a window blows out from a fire

22   like that, does it make a noise?

23          A.    It does.

24          Q.    Did any of them testify as to a noise

25   like that -- other than the noise of the fire

Page 308

1    alarms --

2           A.    Right.

3           Q.    -- that they heard, did any of them

4    tell you about a loud noise or a banging noise that

5    they heard while they were in their room?

6           A.    No.

7           Q.    Again, another clue or piece of the

8    puzzle that you take into account?

9           A.    Yes, very much so.

10          Q.    If that fire was blown out prior to

11   them waking up from the fire -- they told you that

12   they felt the heat, right?

13          A.    Yes.

14          Q.    And they told you that it was hot and

15   they saw some flames, right?

16          A.    Yes.

17          Q.    Okay.  And I think one of them

18   described it as a glow?

19          A.    Yes.

20          Q.    Okay.  If that fire originated

21   outside and that window was already blown out, and

22   these kids were still asleep, but they could feel

23   the intensity of that fire, would you expect that

24   bed to at least be on fire or catching on fire?

25               MR. LaFLAMME:  Object to form.

1    exclude the most likely scenario, which is that the

2    fire began inside, blew out that window, made its

3    way out of the house, burnt that soffit, and debris

4    burned that shed.

5                    MR. LaFLAMME:  Object to form.

6    BY MR. AYALA:

7            Q.    Go ahead.

8            A.    Correct.

9            Q.    You were asked questions about NFPA

10   statistics as to cause of fires and all that stuff;

11   when you're investigating a fire like this one at

12   the Wadsworth residence, are you concerned about

13   statistics?

14           A.    No.

15           Q.    Are you concerned about, well, I saw

16   once on the statistics that more fires occur as a

17   result of space heaters than hoverboards, are you

18   concerned about statistics?

19           A.    No.

20           Q.    Okay.  You're investigating based

21   upon the evidence, correct?

22           A.    Correct.

23           Q.    And in fact, if you're more concerned

24   about statistics than you are the evidence, doesn't

25   that influence your conclusion?

1              MR. LaFLAMME:  Object to form.

2         A.    It can, yes.  I would imagine it

3    would.

4         Q.    You were asked a lot of questions

5    about -- about standards, about hypotheses, about

6    guidelines.  We -- we've agreed every fire is

7    different, correct?

8         A.    Yes.

9         Q.    How you approach your origin and

10   cause investigation, however, is based upon a

11   certain -- typical practice that you employ, which

12   includes, first and foremost, collecting evidence

13   from outside the home, then making the way inside

14   of the home.  Fair?

15        A.    Yes.

16        Q.    And then you add on to that, speaking

17   with other first responding, the family, victims,

18   witnesses.  Fair?

19        A.    Correct, yes.

20        Q.    Does the mere existence of a space

21   heater inside of a shed lead you to concludes that

22   that's where a fire originates?

23        A.    No.

24        Q.    Has anybody shared any actual

25   evidence to suggest that the space heater was on

Page 314

1              A.    In my opinion inside --

2                    MR. LaFLAMME:  Object to form.

3              A.    -- and -- and shooting outside.

4              Q.    So Detective Sergeant, if you're

5     provided with information relating to arcing in

6     that shed area, if you're provided -- provided

7     information, which you already had, about the

8     existence of a shed where they used to smoke, the

9     existence of a space heater in that shed, if you're

10    provided with all of that evidence, does that

11    change your opinion?

12             A.    It --

13                   MR. LaFLAMME:  Object to form.

14             A.    -- no, it does not.

15    BY MR. AYALA:

16             Q.    You'll look at it, right?  You look

17    at additional evidence?

18             A.    Absolutely, yes.

19             Q.    And -- and that evidence that's been

20    subjected to you, you'll look at it, you'll analyze

21    it, but ultimately are you fairly confident, based

22    on the time that you spent on the scene on the day

23    of this incident, not after the fact, on the day of

24    this incident, are you fairly confident with your

25    conclusions and the efforts that you employed, and

Page 315

1    the other investigators on the scene employed, to

2    investigate this fire?

3         A.    Am I confident --

4         Q.    Yes, sir.

5         A.    -- in my decision --

6         Q.    Yes, sir.

7         A.    -- of what started it?  Yes.

8         Q.    Okay.  And you were asked questions

9    about whether or not, you know, the situations in

10   which you bring in the fire marshal, the state

11   marshals and all of that.  And you describe that,

12   it was a complex fire, industrial, things like that

13   you would consider.

14             Was there anything complex about this

15   fire that would lead you to reach out to the

16   marshal?

17        A.    Not necessarily, or else I would

18   have.  I didn't feel -- I felt with having Larry,

19   Bill and myself there, I was confident that we --

20   we formed a good idea of what happened.

21        Q.    Okay.  And I guess the intention of

22   my question is you're not above asking for help if

23   you feel you needed it?

24        A.    No, not at all.

25        Q.    Okay.  I think those are all of my

1    questions.

2              There was nothing about this fire

3    that rendered you incapable of conducting a

4    thorough origin and cause investigation?

5         A.    No.

6         Q.    The body cam footage that you saw,

7    nothing from that body cam footage, that you were

8    shown today for the first time, affected and

9    impacted your opinion to the point of changing your

10   conclusions?

11        A.    No.

12        Q.    In fact it reinforced it.

13        A.    It did, yes.

14             MR. AYALA:  Sir, thank you.

15             THE WITNESS:  You're welcome.

16             MR. LaFLAMME:  Thank you.

17                  EXAMINATION

18   BY MR. LaFLAMME:

19        Q.    Detective sergeant, with respect to a

20   fire originating in Gunner and Layne's bedroom, you

21   would expect that circuit breaker to trip, correct?

22             MR. AYALA:  Form.

23        A.    In -- it's tied to the same circuit

24   breaker?

25   BY MR. LaFLAMME: