EXHIBIT 11

Page 1

1           UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF WYOMING
2

3   STEPHANIE WADSWORTH,          )
    individually and as           )
4   Parent and Legal              )   CASE NO.
    Guardian of W.W., K.W.,       )   2:23-cv-00118-NDF
5   G.W., and L.W., minor         )
    children, and MATTHEW         )
6   WADSWORTH,                     )
                                   )
7        Plaintiffs,              )
                                   )
8   v.                            )
                                   )
9   WALMART, INC. and JETSON      )
    ELECTRIC BIKES, LLC,          )
10                                )
         Defendants.             )
11

12

13                ORAL DEPOSITION OF

14            DEREK A. KING, M.S., P.E.

15            MONDAY, AUGUST 19, 2024

16

17

18

19

20

21

22  REPORTED BY:

23  DEBRA A. DIBBLE, FAPR, RDR, CRR, CRC, Notary Public

24  California CSR 14345

25  JOB NO. 44990

Derek A. King, M.S., P.E.
08/19/2024

1       all capitalized, B-E-A-R.

2 BY MR. LAFLAMME:

3       Q.    What is your position at BEAR currently?

4       A.    Engineer.

5       Q.    And any particular designation for

6 engineer?

7       A.    No.

8       Q.    Or is engineer the title?

9       A.    That's it.

10       Q.    All right.  How many engineers total are

11 at BEAR?

12       A.    Six, I believe.

13       Q.    And how many employees total are at BEAR?

14       A.    I'd say nine, maybe ten.

15       Q.    So fair to state that the additional

16 three to four employees, are they on the admin side?

17       A.    Yes.

18       Q.    When were you first hired on this case?

19       A.    For this case?  I actually don't

20 remember.  Yeah, I don't recall when we were

21 retained.

22       Q.    Do you recall that we had a lab

23 inspection at your location, I think it was in --

24 was it in February of this year?

25       A.    Yes.

Derek A. King, M.S., P.E.
08/19/2024

Page 16

1            Another was -- I believe it was -- it was

2 in a dry cleaner.  We actually didn't get very far

3 in that investigation, so...

4      Q.    So for the other fire claims in which you

5 have been the identified expert, or the primary

6 engineer from BEAR, we have two refrigerator cases,

7 one battery -- or marine battery case, and then a

8 case at a dry cleaner facility?

9      A.    Yes.  There was another one.  It was an

10 appliance -- appliance and wiring at a house.

11      Q.    What type of appliance?

12      A.    That wasn't -- we -- that wasn't clear.

13 We didn't get very far in that investigation.

14      Q.    Fair to state that you have never been

15 the primary expert or an identified expert by a

16 party that is claiming that there was a lithium-ion

17 battery failure that caused a fire?

18      A.    Correct.

19      Q.    We'll mark your CV as 70.

20            (King Deposition Exhibit 70 marked.)

21 BY MR. LAFLAMME:

22      Q.    There you go, Mr. King.

23            Mr. King, I've handed you what's been

24 marked as Exhibit 70, which is a copy of the CV that

25 was produced in this case.  And it looks like you

Derek A. King, M.S., P.E.
08/19/2024

Page 20

1 job during -- was it your last year of school?

2      A.    Yeah.

3      Q.    And then once you graduated from

4 UC Berkeley, that's when you went to work for BEAR?

5      A.    Yes.

6      Q.    Was that job at BEAR, was -- did you have

7 any jobs in between BEAR and the time you graduated

8 UC Berkeley?

9      A.    No.

10      Q.    So it sounds like, for all intents and

11 purposes, for your professional career, it has

12 always been at BEAR?

13      A.    Yes.

14      Q.    Have you ever -- or strike that.

15            You haven't ever worked for a company

16 that designs or manufactures lithium-ion battery

17 products, correct?

18      A.    Correct.

19      Q.    And you have never personally designed or

20 manufactured a lithium-ion battery product, correct?

21      A.    Correct.

22      Q.    And you have never been involved in the

23 design or manufacture of a lithium-ion battery pack,

24 correct?

25      A.    Correct.

Derek A. King, M.S., P.E.
08/19/2024

Page 21

```
 1      Q.     Are you a member of any professional

 2 organizations?

 3      A.     No.

 4      Q.     And I know you -- on your CV you have the

 5 PE designation.  When did you get that?

 6      A.     I believe that was in -- I think that was

 7 in the fall of 2023.

 8      Q.     So approximately a year ago is when you

 9 got your PE designation?

10      A.     Yeah.

11      Q.     And where are you licensed as a PE?

12      A.     California.

13      Q.     Any other states?

14      A.     No.

15      Q.     And I take it you have never been on a --

16 any of the UL technical committees?

17      A.     Correct.

18      Q.     You haven't been on any of the NFPA

19 technical committees?

20      A.     Correct.

21      Q.     No ANSI technical committees?

22      A.     Correct.

23      Q.     And really, no technical committees of

24 any standard-issuing organization, correct?

25      A.     Correct.
```

Derek A. King, M.S., P.E.
08/19/2024

Page 27

1      A.    Yes.

2      Q.    And was that the -- was that the only

3 role that you played with respect to that other

4 hoverboard case with Rong?

5      A.    Yes.

6      Q.    And I assume you weren't named as an

7 expert in that case, correct?

8      A.    Correct.

9      Q.    Do you know if any of your opinions have

10 ever been limited or stricken in any manner by a

11 judge?

12      A.    There -- I believe so.  I'm not aware of

13 the details.

14      Q.    Okay.  Do you know the name of the case

15 or cases in which that occurred?

16      A.    Possibly Ibarra, I-B-A-R-R-A.

17      Q.    And what happened with that case?

18      A.    I don't really know the details.

19      Q.    Was that Jason Ibarra versus Future

20 Motion case?

21      A.    Yes.

22      Q.    Okay.  And that was the -- a case out of

23 the Southern District of Florida?

24      A.    That sounds correct.

25      Q.    And as far as what the decision was in

Derek A. King, M.S., P.E.
08/19/2024

Page 30

1  Bettencourt v. SharkNinja Operating, are you aware

2  of that case?

3      A.    Yes.

4      Q.    Are you aware that your -- three of your

5  five opinions were excluded in that case?

6      A.    That sounds familiar.  I don't recall the

7  count.

8      Q.    Are you aware that in the Bettencourt

9  case, one of the opinions that was excluded was your

10 FMEA opinions?

11     A.    Yes.

12     Q.    And you have issued some FMEA-related

13 opinions in this case as well, correct?

14     A.    I believe so, yes.

15     Q.    You are -- you would agree that you are

16 not an origin and cause expert, correct?

17     A.    Correct.

18     Q.    And I understand you do not have your CFI

19 or CFEI designation?

20     A.    Correct.

21     Q.    Do you know what those designations are?

22     A.    Only that they relate to investigating

23 cause and origin of fires.

24     Q.    And you are not offering any origin

25 opinions in this case, correct?

Derek A. King, M.S., P.E.
08/19/2024

Page 31

```
 1      A.      No.

 2      Q.      And you are relying on Mr. Schulz in this

 3 case for his origin opinion as to where the fire may

 4 have started, correct?

 5      A.      Schulz, or any other -- any other

 6 investigators.  I don't recall the different

 7 investigators and roles specifically.

 8      Q.      Needless to say, you do not have any

 9 opinions in this case as to the origin of the fire,

10 correct?

11      A.      Right.

12      Q.      And you do not intend to testify at trial

13 as to any issues related to the origin of the fire,

14 true?

15      A.      Correct.

16              MR. AYALA:  Just object to the form

17     of that question.

18 BY MR. LAFLAMME:

19      Q.      You did not do an origin investigation,

20 correct?

21      A.      Correct.

22      Q.      You were not at any of the site

23 inspections, correct?

24      A.      Correct.

25      Q.      Do you know what NFPA code applies to
```

Derek A. King, M.S., P.E.
08/19/2024

Page 32

1 origin investigations?

2      A.      No.

3      Q.      And just to clear up any objections, you

4 are not offering an origin opinion in this case at

5 all, correct?

6      A.      Correct.

7              (King Deposition Exhibit 71 marked.)

8 BY MR. LAFLAMME:

9      Q.      Sir, I'm going to show you what's been

10 marked as Exhibit 71.

11             And could you describe what 71 is?

12      A.      71 is a document summary.

13      Q.      And what does that mean?  This was one of

14 the documents within your expert files.

15      A.      This is a -- I'll call it a high-level

16 summary of what the documents contain, what

17 information is in the documents that we were

18 provided at the time.

19      Q.      So what is the date that this summary is

20 put together?

21      A.      I don't know the date that this was

22 started or the last time I edited this.

23      Q.      Is this something that you start when you

24 receive an assignment?

25      A.      It would be when we received materials,

Derek A. King, M.S., P.E.
08/19/2024

Page 33

1 so there's probably a date for when we received --

2 started receiving documents.

3        Q.     And does this document summary, does this

4 cover all of the documents that you have received in

5 this case?

6        A.     This summary does not have any

7 information on depositions.

8        Q.     Okay.  What depositions have you reviewed

9 in this case?

10       A.     There were -- there was a -- I believe a

11 Walmart representative.  I believe there was a

12 Jetson representative.  And I briefly reviewed the

13 Sheaman deposition.

14              I have just received some depositions of

15 the family, but I haven't had the -- really had a

16 chance to review those.

17       Q.     Okay.  When did you obtain the Sheaman

18 dep transcript?

19       A.     I believe that was Friday.

20       Q.     So after you issued your report?

21       A.     Yes.

22       Q.     Have you reviewed the whole Sheaman dep

23 transcript?

24       A.     I would say no.

25       Q.     It was a pretty lengthy one.

Page 34

1    A.    It was.

2    Q.    All right.  So you looked at part of it
3 over this weekend?

4    A.    Skimmed it, yeah.

5    Q.    How much of it did you read?

6    A.    Not much.

7    Q.    And then did you say the Wadsworth family
8 or the Wadsworth father?

9    A.    Family.

10    Q.    So Mr. and Mrs., and the four children?

11    A.    Yes, I believe that's what's in there.

12    Q.    Did you receive that on Friday as well?

13    A.    Yes.

14    Q.    And it sounds like you have not reviewed
15 those dep transcripts yet?

16    A.    No.

17    Q.    Any other dep transcripts that you have
18 received in this case?

19    A.    No.

20    Q.    Did you review the Walmart and Jetson
21 corporate rep depositions?

22    A.    Yes.

23    Q.    When you do that, do you take notes on
24 the transcript?

25    A.    Yes.

Derek A. King, M.S., P.E.
08/19/2024

1 BY MR. LAFLAMME:

2     Q.   Okay.  You do not know if the hoverboard

3 was plugged in or not at the time of the fire?

4     A.   I don't know.  No, I don't know for sure

5 either way.

6     Q.   Did you review the CT scans in this case?

7     A.   Yes.

8     Q.   And you are aware that on the CT scans,

9 you can zoom in to the three-pin plug, the

10 receptacle that the charger would plug into on the

11 hoverboard, correct?

12     A.   Yes.

13     Q.   There's no evidence or physical

14 indication that the hoverboard was plugged in based

15 on what you see on the CT scans for that three-pin

16 receptacle, correct?

17           MR. AYALA:  Form.

18     A.   I wouldn't expect there to be either way.

19 I mean, we received the evidence with no -- with

20 nothing plugged in, so nothing would be there on the

21 CT.

22 BY MR. LAFLAMME:

23     Q.   You agree that when the hoverboard was

24 found on-site, it was not plugged in, correct?

25           MR. AYALA:  Form.

Derek A. King, M.S., P.E.
08/19/2024

Page 49

1      Q.    You have not reviewed any of the body

2  camera footage from this case, have you?

3      A.    I have not.

4      Q.    Did you even know there was body camera

5  footage from immediate -- immediately after the

6  accident?

7                MR. AYALA:  Form.

8      A.    I don't know.  I didn't recall, unless it

9  was -- maybe it was mentioned in the sheriff report,

10 but...

11 BY MR. LAFLAMME:

12     Q.    Regardless, you haven't reviewed any of

13 the body camera footage from the responding police

14 officers that responded the morning of the fire,

15 correct?

16     A.    Correct.

17     Q.    And you're not aware of any statements

18 that would have been made on that body camera

19 footage by any of the Wadsworth children, correct?

20     A.    Correct.

21     Q.    And you're not aware of any of the

22 statements that would have been made on that body

23 camera footage from Mr. Ryan Pasborg, correct?

24     A.    Correct.

25     Q.    Do you know who Ryan Pasborg is?

Derek A. King, M.S., P.E.
08/19/2024

Page 50

1      A.    I think he was the first one on scene, if

2 I remember correctly.

3      Q.    He was the good samaritan that assisted

4 in getting the Wadsworth family out of the house.

5            You're not aware of any statements he

6 would have said on that body camera footage about

7 where he first saw fire, correct?

8      A.    Correct.

9      Q.    Do you know what UL codes are applicable

10 to the design and manufacture of this hoverboard?

11      A.    I believe there's the UL -- I want to say

12 2722, if I remember the number correctly.

13      Q.    You were close.  It's UL 2272.

14      A.    2272.  Okay.

15      Q.    Any other UL codes that you are aware of

16 that would apply to the design or manufacture of

17 this hoverboard?

18      A.    I know there's another one that deals

19 with lithium-ion batteries.  I don't recall the

20 number offhand.

21      Q.    Okay.

22      A.    Yeah.

23      Q.    Do you know what the -- so you don't know

24 what the UL code is that applies to the specific

25 lithium-ion battery cells, correct?

Derek A. King, M.S., P.E.
08/19/2024

Page 51

1        A.      Correct.  Not offhand.

2        Q.      And in this case, it's your opinion that

3   two of the -- two of the ten battery cells that were

4   in this battery pack experienced an internal short

5   circuit with thermal runaway.  Correct?

6        A.      Yes.

7        Q.      And you've identified those in your

8   report as cells 4 and 10?

9        A.      Yes.

10       Q.      So you believe that it is a -- an issue

11  with the lithium-ion battery cells, for cell 4 and

12  10, that caused this fire?  At least that's your

13  opinion in this case, correct?

14       A.      Yes.

15       Q.      But you don't know what UL code applies

16  to these specific lithium-ion battery cells?

17       A.      I don't recall the number.

18       Q.      Do you know if the lithium-ion battery

19  cells in this hoverboard were UL listed?

20       A.      I did not check that, so I don't know.

21                       (King Deposition Exhibit 72 marked.)

22  BY MR. LAFLAMME:

23       Q.      We'll mark as Exhibit 72, this is a copy

24  of a PowerPoint presentation that you went

25  through -- or at least put together, correct?

Derek A. King, M.S., P.E.
08/19/2024

Page 65

1 here it shows the battery cell from an exemplar

2 Plasma unit, correct?

3      A.    Yes.

4      Q.    And how is it that you obtained the

5 exemplar Plasma unit?

6      A.    I purchased.

7      Q.    From where?

8      A.    eBay.

9      Q.    When did you purchase the exemplar

10 Plasma?

11      A.    Should be a few months ago.  I don't

12 remember exactly.

13      Q.    Had you purchased the exemplar Plasma

14 before the lab inspection that we were at at your

15 place in February?

16      A.    No.

17      Q.    Did you do anything to determine who the

18 manufacturer was of the battery cell for the Plasma

19 unit?

20      A.    No.  My understanding is JDDL is the name

21 of a manufacturer, but beyond that...

22      Q.    Do you know which manufacturer name that

23 is?

24      A.    No.

25      Q.    Have you seen any of the document

Derek A. King, M.S., P.E.
08/19/2024

Page 66

 1 productions that Jetson has made in this case?

 2      A.     I don't believe so.

 3      Q.     You haven't seen any of the UL test

 4 reports or certification records in this case?

 5      A.     I have not.

 6      Q.     We'll mark this as 74.

 7             (King Deposition Exhibit 74 marked.)

 8 BY MR. LAFLAMME:

 9      Q.     Handing you what's been marked as

10 Exhibit 74, which is a Bates document that starts

11 with JETSON 311.

12             Do you see that in the lower right-hand

13 corner?

14      A.     Yes.

15      Q.     And you have not seen this before,

16 correct?

17      A.     Correct.

18      Q.     If you go to the second page of this

19 document, there's a description of this battery.

20 And you can see the model number is INR, all

21 capitalized, 18650P.

22             Do you see that?

23      A.     Yes.

24      Q.     And that's the same model number on this

25 battery cell, correct?

Derek A. King, M.S., P.E.
08/19/2024

Page 68

1 Exhibit 74, you agree with me that this is a UL

2 certification report for this model battery cell?

3     A.    Yes.

4     Q.    So with respect to the battery cell that

5 was utilized in the Plasma model hoverboards, you

6 agree that they were UL-certified battery cells,

7 correct?

8                 MR. AYALA:    Form.

9     A.    It certainly appears they were, based on

10 this report.

11 BY MR. LAFLAMME:

12     Q.    Did you ever ask to see Jetson's document

13 production in this case?

14     A.    I don't recall if I did or didn't.

15 Normally I would, yeah.

16     Q.    The UL test records and certifications is

17 something that would directly relate to your

18 analysis in this case, correct?

19     A.    Somewhat.  They could help if we wanted

20 to dig into why these specific cells might have an

21 internal short.

22     Q.    Do you have an understanding as to what

23 testing was required of these cells in order to

24 obtain the UL certification?

25     A.    Not in -- not really, as I sit here.

Derek A. King, M.S., P.E.
08/19/2024

Page 69

1    Q.    Do you know if a short-circuit test was

2  done as part of the UL certification and test

3  process?

4    A.    I believe so, yes.

5    Q.    And now in looking at this document, you

6  are aware that UL 2580 is the standard that applies

7  to battery cells, lithium-ion battery cells,

8  correct?

9    A.    Yes.

10    Q.    You did not know that prior to looking at

11  this document, correct?

12    A.    I did not recall the document number, the

13  UL number.

14    Q.    Did you consult with UL 2580 at all in

15  your analysis in this case?

16    A.    No.

17    Q.    And you don't reference UL 2580 at all in

18  your report, correct?

19    A.    Correct.

20    Q.    Are you aware of a recall that Jetson had

21  on a different hoverboard model?

22    A.    Yes.

23    Q.    What is your awareness of that?

24    A.    I believe it was the Rogue model, model

25  name.  I -- if I recall correctly, it was related to

Derek A. King, M.S., P.E.
08/19/2024

Page 75

1      A.      Yes.

2      Q.      The negative side does not have a cap,

3 correct?

4      A.      Correct.

5      Q.      And then you have:  Internal materials

6 are mostly ejected, meaning they would have left the

7 cell itself, correct?

8      A.      Yes.

9      Q.      And they would have left the cell through

10 the end cap?

11     A.      Yes.  Or along with the end cap.

12     Q.      And then you have that that is consistent

13 with an internal short, correct?

14     A.      Yes.

15     Q.      And when you say internal short, you mean

16 a short circuit?

17     A.      Yes.

18     Q.      And in order to get a short circuit, you

19 have to have -- does that require communication with

20 the positive and negative side, meaning the anode

21 and cathode?

22     A.      Yes.  Yep.

23     Q.      And then, so it's your opinion that

24 cells 4 and 10, they both had an internal short

25 circuit, correct?

Derek A. King, M.S., P.E.
08/19/2024

Page 87

1 BY MR. LAFLAMME:

2      Q.    And with respect to Exhibit 76, that

3 doesn't show really any damage to this tab, correct?

4                    MR. AYALA:  Form.

5      A.    That's correct.  Just a little

6 deformation.

7                    (King Deposition Exhibit 77 marked.)

8 BY MR. LAFLAMME:

9      Q.    In looking at Exhibit 77, which is from

10 the CT scan in a cross section of cell 4, here we

11 still see the tab intact, correct?

12      A.    Yes.

13      Q.    And there's no melting on this tab?

14      A.    Not that's apparent.

15      Q.    And there was no melting on the tab in

16 Exhibit 76 either, correct?

17      A.    That's correct.

18      Q.    And as with cell 10 in Exhibit 76, you

19 would expect to see some damage or melting to this

20 tab had there been an internal short circuit,

21 correct?

22      A.    Possibly.

23                    MR. AYALA:  Form.

24 BY MR. LAFLAMME:

25      Q.    And in order to get an internal short

Derek A. King, M.S., P.E.
08/19/2024

Page 88

 1 circuit, we talked about how the anode and cathode

 2 need to communicate, correct?

 3      A.    Yes.

 4      Q.    And the -- in between the anode and

 5 cathode within an 18650 cell is a separator,

 6 correct?

 7      A.    Yes.

 8      Q.    And what is the separator made out of?

 9      A.    It's typically a polymer, a porous

10 polymer.

11      Q.    So in order for the short circuit to

12 occur in cells 4 and 10, you need to have a failure

13 of the separator, correct?

14      A.    Yes.

15      Q.    If the separator doesn't fail, then there

16 is no way for a short circuit to occur, correct?

17      A.    That's right.

18      Q.    And the separator is -- it's independent

19 to each cell, correct?

20      A.    Each cell has its own separator.

21      Q.    Right.  So -- I guess what I'm getting at

22 is, so each of the ten cells has its own separator

23 between the anode and cathode, correct?

24      A.    Yes.

25      Q.    So in order to get a short at cells 4 and

Derek A. King, M.S., P.E.
08/19/2024

Page 89

1  10, both of those separators, so the separator in

2  cell 4 and the separator in cell 10 would need to

3  fail in order to get the communication from the

4  anode and cathode.

5       A.   Yes.

6       Q.   And both of those separators would have

7  to fail at the same time in order to get a short in

8  cells 4 and 10, correct?

9       A.   I don't see a timing requirement for

10 those to be synchronized.

11      Q.   Well, in order to get -- because we just

12 talked about how you have cells 4 and 10, those are

13 the two cells that had a short circuit, correct?

14      A.   Yes.

15      Q.   And both of those cells, when they had

16 their short circuit, you talked about how your --

17 the progression of the failure was that the end caps

18 would have come off on cells 4 and 10, then you'd

19 get the internal contents and some flame on the

20 internal portions of the hoverboard, which would

21 then ignite combustibles by cells 4 and 10, correct?

22      A.   Yes.

23      Q.   And cells 4 and 10 would have failed at

24 the same time, correct?

25                 MR. AYALA:  Form.

Derek A. King, M.S., P.E.
08/19/2024

Page 90

1      A.      Approximately, yeah.

2 BY MR. LAFLAMME:

3      Q.      So in order to get the cells 4 and 10 to

4 short circuit, both of their separators would have

5 had to fail at approximately the same time, correct?

6      A.      Yes.

7      Q.      Have you ever had any other hoverboard

8 cases where you believe there was a short circuit in

9 two different cells at approximately the same time?

10      A.      I have not personally had any other

11 hoverboard cases.

12      Q.      Okay.  How about any other lithium-ion

13 battery cases, any others that you can identify

14 where you believe the -- two of -- at least two of

15 the battery cells within the battery pack failed at

16 approximately the same time due to a short circuit?

17      A.      Not -- nothing comes to mind.

18      Q.      Okay.  If you could pull out your

19 PowerPoint again, and go to the page of the CT scan.

20          Were you able to -- was there any arcing

21 that was found on any wires within the hoverboard?

22      A.      Not that I observed.

23      Q.      Was there any arcing -- or are you aware

24 of any arcing that was found on any wires related to

25 the Wadsworth house at the site?

Derek A. King, M.S., P.E.
08/19/2024

Page 91

```
 1      A.    I thought someone mentioned a possible
 2 arc outside.  I'm not certain that --
 3      Q.    So you are aware that there has at least
 4 been some discussions about some arcing that may
 5 have been found on some wires outside of the
 6 residence?
 7      A.    Yes, at least some discussion of that
 8 possibility.
 9      Q.    Do you know where that arcing was
10 located?
11      A.    Somewhere related to the shed, the
12 smoking shed.
13      Q.    So you are aware at least of at least
14 some discussion about some arcing that was
15 identified at the smoking shed outside of the
16 residence, correct?
17      A.    Yes.
18      Q.    Are you aware of any arcing that was
19 identified inside the residence, the internal house
20 wiring?
21      A.    No, I'm not.
22      Q.    And this hoverboard was located just in
23 front of an electrical outlet, correct?
24      A.    I believe so, yes.
25      Q.    And you're not aware of any arcing that
```

Page 92

 1   was located on that electrical outlet or the

 2   associated wires, correct?

 3          A.    I'm not aware of any.

 4      Q.    And arcing within a fire occurs when an

 5   electrical line is hit by flames or high heat and it

 6   is energized, correct?

 7          A.    Yeah.  If the insulation between the

 8   electrified lines goes away and they contact each

 9   other, then you can get an arc.

10      Q.    And one of the tenets -- or one of the

11   necessities in order to have an arc to occur on an

12   electrical wire is that it needs to be energized,

13   correct?

14          A.    Yes.

15      Q.    Do you know where the electrical service

16   came into the house at the Wadsworth residence?

17          A.    No.

18      Q.    And do you know where the electrical

19   service came into the house in relation to where the

20   smoking shed was located?

21          A.    No.

22      Q.    Have you seen any photographs of the

23   arcing that was identified at the smoking shed?

24          A.    No.

25      Q.    Looking at the CT scan that you have in

Derek A. King, M.S., P.E.
08/19/2024

Page 106

1 worked on, did you ever see the board that was being

2 investigated to determine if it had failed?

3            Or did you just see the exemplar?

4      A.   I just saw the exemplar, to my memory.

5      Q.   And your involvement with that exemplar

6 was coming up with a process to extract data from

7 it, correct?

8      A.   Yes.

9            MR. LAFLAMME:  I'm just going to save

10      this now, before I forget.

11 BY MR. LAFLAMME:

12      Q.   Did you do any testing in this case

13 relative to the hoverboard?

14      A.   No.

15            (King Deposition Exhibit 80 marked.)

16 BY MR. LAFLAMME:

17      Q.   I'll hand you what's been marked as

18 Exhibit 80.

19            And in Exhibit 80, this is from the CT

20 scan.  Can you see the plug receptacle?

21      A.   Yes.

22      Q.   And that's the barrel with three pins in

23 it?

24      A.   Yes.

25      Q.   And looking at the plug receptacle, there

Derek A. King, M.S., P.E.
08/19/2024

Page 140

1  you know, consumer complaints, incidents, anything

2  that could drive a re-evaluation of what's already

3  been laid out.

4       Q.    Well, in your report here at page 13, you

5  reference FMEA or other risk assessment to eliminate

6  unnecessary risks as part of their design process.

7             Do you see that?

8       A.    Yes.  Mm-hmm, I do.

9       Q.    When you say "their" design process,

10  whose design are you talking about?

11      A.    Well, when I wrote this, I mean, the

12  only -- the only name I was really familiar with was

13  Jetson, so, you know, at the time in my mind, it

14  would -- it was Jetson who would do it.

15      Q.    Do you have any information as to what

16  FMEA or other risk assessment process may have been

17  adopted by the manufacturer for this hoverboard?

18      A.    I don't have that information.

19      Q.    But you are aware that the battery cells

20  that were utilized in this hoverboard were UL

21  certified, correct?

22      A.    Yes.

23      Q.    And would have gone through the UL test

24  process to get that UL 2580 certification.

25      A.    Yes.

Derek A. King, M.S., P.E.
08/19/2024

Page 145

 1  fire analysis in that regard?

 2      A.    Correct.

 3      Q.    And with respect to your work in this

 4  case, you were really just focused on the hoverboard

 5  and that's it, correct?

 6      A.    Yes.

 7      Q.    Have you ever spoken with anyone from the

 8  Wadsworth family?

 9      A.    No.

10      Q.    Have you ever spoken with any witnesses

11  in this case?

12      A.    No.

13      Q.    Has your only contact in this case been

14  with individuals with Morgan & Morgan?

15      A.    Yes.  And, of course, at the inspection.

16      Q.    Sure.  When we were there at the joint

17  inspection?

18      A.    Yes.

19      Q.    Do you know what temperature carpeting

20  starts to melt at?

21      A.    No.

22      Q.    Is there any additional work that you

23  plan to do in this case?

24      A.    Not -- not that I plan at this time.  Not

25  unless I'm asked to.

Derek A. King, M.S., P.E.
08/19/2024

Page 183

1 in this case.

2          You didn't review any of that, right?

3     A.    Correct.

4     Q.    Did you -- as far as your involvement and

5 the scope of your involvement goes, is that a piece

6 of evidence that you feel you need to review for any

7 reason?

8               MR. LAFLAMME:  Object to form.

9     A.    Well, my understanding of my scope was

10 looking at the hoverboard evidence, you know,

11 personally, directly, to determine if -- if it was

12 consistent with a -- being an origin of fire.

13 BY MR. AYALA:

14    Q.    And based upon your understanding of your

15 scope, do you believe that it -- it is -- all the

16 evidence you reviewed is consistent with the battery

17 cells of this hoverboard being, at the very least,

18 the cause of this fire?

19               MR. LAFLAMME:  Object to form.

20    A.    More likely.

21 BY MR. AYALA:

22    Q.    More likely than not?

23    A.    Than not, yes.

24    Q.    Okay.  As far as the questions asked of

25 you regarding V patterns and inverted cone patterns

Derek A. King, M.S., P.E.
08/19/2024

Page 189

1 lithium-ion battery case is this one?

2      A.    Yes.

3      Q.    And the only one in which you've ever sat

4 for a deposition related to a lithium-ion -- an

5 alleged lithium-ion battery fire is this case,

6 correct?

7      A.    Yes.

8      Q.    And the only case in which you've been

9 named as an expert, disclosed as an expert for a

10 lithium-ion battery case, involving an alleged fire

11 is this one?

12      A.    Yes.

13      Q.    You indicated that you considered the

14 possibility of the fire not starting at the

15 hoverboard as part of your investigation in this to

16 Attorney Ayala.

17           Do you recall that?

18      A.    Yes.

19      Q.    But then later, you said the scope of

20 your work was to only look at the hoverboard

21 evidence, correct?

22      A.    Was to look at the hoverboard evidence to

23 see if it is consistent or not with internal -- with

24 being a fire origin.

25      Q.    You have not done anything to assess

Derek A. King, M.S., P.E.
08/19/2024

Page 190

1 whether the fire could have started at the smoking

2 shed, correct?

3        A.    Correct.

4        Q.    And the only physical evidence that you

5 have looked at is the hoverboard, correct?

6        A.    Yes.

7        Q.    And you'll agree that lithium-ion battery

8 cells can fail when they are subject to an external

9 fire attack?

10       A.    Yes.

11       Q.    And you don't -- you haven't done any

12 assessment to determine how this fire may have moved

13 through the Wadsworth structure, correct?

14       A.    Correct.

15       Q.    One of the things that you said is that

16 an internal short within a lithium-ion battery

17 should only affect that singular cell.

18             Do you recall that?

19       A.    Yes.

20       Q.    And in this case, you're saying that two

21 singular cells had a short circuit, correct?

22       A.    Yes.

23       Q.    So at substantially the same time, two

24 different cells in two different parts of this

25 battery pack had a failure of the separators within

Derek A. King, M.S., P.E.
08/19/2024

Page 191

1  those individual cells, correct?

2      A.    Yes.

3      Q.    And they had a failure of the separator

4  at substantially the same time to the extent that

5  they both short-circuited at substantially the same

6  time.

7            That's your theory, correct?

8      A.    That's what it -- that's what it appears

9  to be.

10     Q.    Have you ever had another case where two

11 individual cells short-circuited at the same time?

12     A.    No.

13     Q.    That would be pretty unusual, wouldn't

14 it?

15            MR. AYALA:  Form.

16     A.    It's unusual, so far.

17 BY MR. LAFLAMME:

18     Q.    Meaning you have to have an individual

19 failure within cell 4, at substantially the same

20 time as you have an individual but completely

21 separate failure at cell 10, correct?

22     A.    Yes.

23     Q.    That's what you're saying in this case.

24            MR. AYALA:  Form.

25            He's said what he's saying.

Derek A. King, M.S., P.E.
08/19/2024

Page 192

```
 1      A.    Yes.  Yes.  I believe it's a coincidence,

 2 but that's what appears to have occurred.

 3 BY MR. LAFLAMME:

 4      Q.    Have you done any research to determine

 5 the percentage chance of that coincidence?

 6      A.    No.

 7                MR. AYALA:  Form.

 8 BY MR. LAFLAMME:

 9      Q.    The individual cell itself, the

10 conditions that we see cells 4 and 10 in after the

11 fire, those conditions would have the same

12 appearance if it was an external fire attack as

13 well, correct?

14      A.    Yes.  For those individual cells, yes.

15      Q.    Meaning when lithium-ion battery cells

16 fail in a fire due to a fire attack, the appearance

17 is similar to what we see the two cells that have

18 failed in this case.

19      A.    Yes.

20      Q.    You were asked if it's possible to have a

21 short -- an internal short with the cell -- or,

22 sorry, with the hoverboard not plugged in.

23           Do you recall that?

24      A.    Yes.

25      Q.    You'd agree with me that it's very
```

Derek A. King, M.S., P.E.
08/19/2024

Page 195

1                    MR. AYALA:  Form.

2       A.    Yes, I believe there would be.

3 BY MR. LAFLAMME:

4       Q.    Meaning if the hoverboard is plugged in,

5 while some of the wires may not be energized, there

6 would certainly be some internal wires that are

7 energized when it's plugged in?

8       A.    Yes, the -- let's see.  There would be,

9 at least from the charger port into probably the

10 DMS.  And that's probably at a fairly low

11 energization, if the battery -- if it's fully

12 charged.

13      Q.    That section of wiring, though, would

14 have power to it, correct, meaning it would be

15 energized?

16      A.    Yes.

17      Q.    And it would be energized to the extent

18 that had it been attacked by fire while plugged in,

19 you could see an arc in that area?

20                    MR. AYALA:  Form.

21      A.    That -- that, I don't -- I don't know if

22 that's true offhand.

23 BY MR. LAFLAMME:

24      Q.    Okay.  Regardless, I think we agree,

25 there wasn't any arcing that was found on any of the

Derek A. King, M.S., P.E.
08/19/2024

Page 196

 1 internal wiring in the hoverboard, correct?

 2      A.    That's true.

 3      Q.    And there wasn't any arcing found on the

 4 house wiring immediately adjacent to where the

 5 hoverboard was located, correct?

 6      A.    Not that I read about.

 7      Q.    As an expert doing an investigation, you

 8 agree that it's important to have as much

 9 information as you can about the fire loss, correct?

10      A.    Yes.

11                MR. AYALA:  Form.

12      A.    In general, yes.

13 BY MR. LAFLAMME:

14      Q.    I mean, as an engineer, you want all the

15 information that's available, right?

16      A.    Yes.

17      Q.    And you want to have the opportunity to

18 review all the information that's available during

19 your investigation.

20      A.    Yes.

21      Q.    You don't want parts of the

22 investigation -- or parts of whatever information is

23 available to be hidden from you, correct?

24                MR. AYALA:  Form.

25      A.    True.

Derek A. King, M.S., P.E.
08/19/2024

Page 197

1 BY MR. LAFLAMME:

2      Q.    And you agree with me that there were a

3 number of documents that you've seen here today that

4 you had not seen prior to today, correct?

5      A.    True.  Yes.

6      Q.    And you indicated that you have not seen

7 any photographs from the lab inspection at Palmer's

8 lab, correct?

9      A.    Correct.

10      Q.    Are you aware at all of what

11 Mrs. Wadsworth's activities were the evening before

12 and in the early morning hours before the fire?

13      A.    No.

14      Q.    Do you know that she had smoked in that

15 smoking shed a couple of hours before this fire was

16 reported?

17      A.    No.

18                MR. AYALA:  Form.

19 BY MR. LAFLAMME:

20      Q.    Are you first learning that right now?

21      A.    Yes.

22      Q.    Did you know that she had upwards of ten

23 alcoholic drinks that evening?

24                MR. AYALA:  Form.

25      A.    No.

Derek A. King, M.S., P.E.
08/19/2024

Page 198

 1 BY MR. LAFLAMME:

 2      Q.    You are first learning about that now?

 3      A.    Yes.

 4      Q.    Were there any outside studies or

 5 standards that you relied on that were not

 6 referenced in your report?

 7      A.    I mean, there's literature that I have

 8 read that's part of my general kind of background

 9 knowledge at this point, but --

10      Q.    So what is that --

11      A.    -- the --

12      Q.    Sorry.  Go ahead.

13      A.    Just that wasn't specific to this case.

14      Q.    Okay.

15      A.    Yeah.

16      Q.    As far as the literature that you have

17 read over your career as general background

18 knowledge, any of it that you would reference or

19 cite as specific to this case?

20      A.    Not -- I think it's applicable.  It's

21 applicable information, but I'm not really more

22 specific than that.

23      Q.    Applicable in what way?

24      A.    Well, there are some 20 -- I want to say

25 around 20 -- I want to say 2015 articles on thermal

Derek A. King, M.S., P.E.
08/19/2024

Page 199

1  runaway within battery packs.  So those were, you

2  know, it was done in the lab, and people wrote

3  papers about it.

4        Q.    When you say 2015, you're talking about

5  the year?

6        A.    Yes.  Yeah.

7        Q.    And that's kind of when lithium-ion

8  battery products were being introduced to the

9  market, correct?

10        A.    Yes.

11        Q.    So back in 2015 when a lot of these

12  products were first being introduced to the market,

13  there were some articles about how there were some

14  issues with the products from a potential fire

15  perspective?

16        A.    Yes.

17        Q.    Okay.  Are those the articles that you're

18  talking about?

19        A.    Yes.

20        Q.    And as a result of those issues back in

21  2014-15 and those articles, you understand that UL

22  then got involved and created some standards for

23  products that utilize lithium-ion batteries,

24  correct?

25        A.    That sounds reasonable.  I'm not really