# EXHIBIT 14

```
                                                              Page 1
 1         UNITED STATES DISTRICT COURT
 2       IN AND FOR THE DISTRICT OF WYOMING
 3    ----------------------------------------
 4    STEPHANIE WADSWORTH, Individually and
      as Parent and Legal Guardian of W.W.,
 5    K.W., G.W., and L.W., minor children,
      and MATTHEW WADSWORTH,
 6
                        Plaintiffs,
 7
                -against-                        Case No.:
 8                                               23-cv-00118-NDF
 9    WALMART, INC. and JETSON ELECTRIC
      BIKES, LLC,
10
                        Defendants.
11
      ----------------------------------------
12
13               Thursday, November 16, 2023
14                      9:46 a.m.
15
16          Deposition of JEFF SHEAMAN, taken by
17    Plaintiff, pursuant to Notice, held at The Hampton
18    Inn, 1055 Wild Horse Canyon Road, Green River,
19    Wyoming, before Denise Nowak, a Shorthand Reporter
20    and Notary Public within and for the State of Idaho,
21    appearing remotely.
22
23
24
25
```

1 the record -- and I just wanted to put on the
2 record -- my name is John DeLeon, and I'm with the
3 Sweetwater County Attorney's Office representing
4 Detective Sheaman.
5                MR. AYALA:  Thank you.
6      BY MR. AYALA:
7           Q.    Sir, who are you currently employed
8      by?
9           A.    Sweetwater County Sheriff's Office.
10          Q.    And how long have you been employed
11     by the Sheriff's Office?
12          A.    I've been with the Sheriff's Office
13     just shy of 16 years.  And I've been in law
14     enforcement just shy of 19.
15          Q.    Okay.  In what capacity are you
16     employed by the Sheriff's Office?
17          A.    At this point I'm the detective
18     sergeant.
19          Q.    And how long have you had that role?
20          A.    Since April of this year.
21          Q.    Congratulations.
22          A.    Thank you.
23          Q.    Prior to that role, what other role
24     or title did you hold for Sheriff's Office?
25          A.    I was a patrol corporal starting in

1  2011, and then I moved into detectives at that
2  point. So I've been in investigation since 2011.
3      Q.   Talk to me, if you could, the duties
4  and responsibilities -- really, your role in these
5  varying capacities from patrol corporal to
6  detective sergeant.
7      A.   So I run a crew of anywhere from five
8  to six. So basically I supervise five or six
9  deputies.
10           Currently in investigations, I
11 supervise four. And we conduct followup
12 investigations from initial reports. We handle
13 conflicts, investigations, death investigations,
14 you know, anything of that magnitude.
15     Q.   As you, I'm sure, know, you are here
16 today to talk about your involvement in an
17 investigation that took place back in February of
18 2022 relating to a fire at the Wadsworth residence.
19           You know that, right?
20     A.   Yes.
21     Q.   Okay. Part of your job duties and
22 the role for the Sheriff's Office include not just
23 investigation deaths and crimes but also
24 investigating fires?
25     A.   Yes.

1      Q.    Does that include origin and cause?
2      A.    Yes.
3            And that's not all investigators -- I
4   myself and, I believe, one other deputy with the
5   Sheriff's Office are certified in origin and cause
6   investigations.
7      Q.    Okay.  Before getting into some of
8   the more specifics of your certifications, your
9   education, your training, did you have -- did you
10  bring anything with you today, any types of
11  documents, photographs, anything?
12     A.    I didn't.  Just my report.
13     Q.    Okay.  Did you -- other than your
14  counsel who's here with you today, did you speak
15  with any of the attorneys involved in this case?
16     A.    No.  Just with Mr. DeLeon -- that was
17  it -- just before this deposition.
18     Q.    All right.  Have you spoken with any
19  other persons involved with this incident in
20  preparation of this deposition; that could include
21  deputies, firefighters, et cetera?
22     A.    I talked to Bill Robinson who's the
23  chief of Green River Fire.  He actually called me,
24  I believe, a week, week and a half ago just asking
25  me about this depo.  He had questions on how these

1   time I've brought them into a fire sitting, whether
2   it's residential or commercial, I try to help them
3   kind of understand what my job is as an origin and
4   cause investigator; that kind of thing.
5       Q.   And when you're explaining -- the
6   reason I ask that is because you come across as
7   this person to me -- maybe I'm totally off.  But.
8           Are you the type of person with those
9   that are working alongside you -- you were talking
10  to them, talking them through your processes and
11  trying to help them understand the process?
12      A.   Yes, very much so.
13      Q.   And so that includes if there's
14  others -- is there's deputies and other Sheriff's
15  Office personnel that are assisting you on
16  investigation, you are talking them through your
17  processes so that they can gain an understanding of
18  what you're doing, how you are doing it and why you
19  are doing it?
20      A.   Correct.
21      Q.   Do you hold any other state
22  certifications that relate to either fire
23  suppression or fire prevention?
24      A.   No.  That's it.  Just origin and
25  cause.

Page 19

1  Q. Do you hold any state certifications
2  relating to law enforcement?
3  A. Yes.
4  Q. Okay. And what certifications do you
5  hold currently?
6  A. Just my peace officer certification.
7  I've had that since 2005.
8  Q. You say peace officer?
9  A. Yes.
10 Q. And what is that?
11 A. That's from the law enforcement
12 academy. So every law enforcement officer in the
13 state of Wyoming has to go through that academy.
14 And it's in Douglas, Wyoming. And it's about a
15 three to four-month class.
16 Q. Is that also a certification that
17 also requires recertifying?
18 A. Yes.
19 Q. And how often?
20 A. You have to have a certain amount of
21 hours. And it changes constantly. So they require
22 a certain amount of hours per year to maintain a
23 certification, whether it be training or on-the-job
24 experience; that kind of thing.
25 Q. What kind of training do they offer

1       A.   Okay.
2       Q.   But I recall on there -- it looks
3  like you arrived at the residence at approximately
4  1300, so 1 p.m.
5            Does that jibe with your
6  recollection?
7       A.   Yes.  I believe I had lunch before.
8  I think I got that call at 11:00 something or just
9  shy of noon.  I remember grabbing lunch and
10 responded to it after that.
11           MR. LaFLAMME:  Mark it as 16.
12           Was that the report?
13           MR. AYALA:  Yeah.  Let's go ahead and
14 do that.
15           We'll mark and identify as Exhibit 16
16 Detective Sheaman's report.
17           (Whereupon, Exhibit 16 was marked for
18 identification.)
19           MR. LaFLAMME:  Would that be the
20 document listed as Public Investigative Report
21 from --
22           MR. AYALA:  That's right.
23           MR. LaFLAMME:  -- County Sheriff?
24           MR. AYALA:  Yes.
25           MR. LaFLAMME:  Okay.  One moment.

1              Did I read that correctly?
2         A.   Yes.
3         Q.   And we talked earlier about whether
4    you ever concluded that a hoverboard was the cause
5    of the fire or lithium batteries were a cause of
6    the fire.
7              Irrespective of that, you've become
8    aware over the years just by the very nature and
9    virtue of what you do, that hoverboards, in fact,
10   can cause fires?
11        A.   Yes.
12        Q.   And you've heard of those stories --
13   even if you haven't investigated one specifically,
14   you've heard of those stories of hoverboards
15   catching fire?
16        A.   Yes.
17        Q.   You spoke with Chief Robinson and
18   Chief Urgman.  And you documented, you both agree
19   that the fire started in the bedroom near where the
20   hoverboard was found.
21        A.   Yes.
22        Q.   In that conversation with Chief
23   Robinson and Chief Urgman, did you gain an
24   understanding from them that they concluded the
25   hoverboard contributed or caused the fire?

Page 164

1  describe the locations of the window, the bed, the
2  closet, the outlet, the door.
3          Was your description of the locations
4  of those items in the bedroom consistent with the
5  information provided to you by Mr. Wadsworth?
6     A.  Yes, it was.
7     Q.  So you concluded those interviews.
8  You showed Matt some of the photographs, those were
9  the photographs that you had taken?
10    A.  Yes.
11    Q.  And that assisted you in
12 understanding where those items that he described
13 were located in the house before the fire?
14    A.  Yes.
15    Q.  And then Matthew and the children
16 left the building.  That concluded your interview
17 of all of that, correct?
18    A.  Right.
19    Q.  Again, the audio and video recordings
20 from the interviews were download into the
21 electronic evidence by you, and the case was closed
22 pending further information, correct?
23    A.  Right.
24    Q.  Following March 4th, 2022, have you
25 receive or been provided with any additional

1  information relating to this fire incident?
2       A.   No.
3       Q.   Aside from -- putting this aside for
4  now, but aside from those hypotheticals that I
5  asked you about, a shed and smoking and a space
6  heater and arcing; and in all of those things,
7  you've not been provided with any additional
8  information relating to potential origin or cause
9  of this fire.
10      A.   No, I have not.
11      Q.   And even with all of those
12 hypotheticals and the information provided in those
13 hypotheticals, none of that changes your ultimate
14 conclusions that you've reached and pronounced
15 today.
16      A.   No.
17           MR. LaFLAMME:  Object to the form.
18 BY MR. AYALA:
19      Q.   By the way, and we've referred to it
20 and you've described it a little bit earlier today,
21 did you find any arcing at all?
22      A.   No, I don't believe there was any,
23 not that I noticed.
24      Q.   Okay.  But even still, as you
25 described earlier, any evidence of arcing, whether

1      A.    Yes.
2      Q.    And you understand your NFPA 921
3  describes the scientific method?
4      A.    Yes.
5      Q.    And the scientific method requires
6  you to assess all items, correct?
7      A.    Correct.
8      Q.    Okay.  And I know that you did your
9  report, which has been marked as Exhibit 16, and
10 this report was completed.  The last supplemental
11 was, I believe, March, March 4th of 2022, correct?
12     A.    Correct.
13     Q.    And any additional evidence that was
14 discovered on the private side, you're not aware of
15 that, right?
16     A.    Correct.
17     Q.    And you would agree that in order to
18 complete a full and thorough origin and cause
19 investigation under an NFPA 921, you would need to
20 consider all the evidence that's been uncovered,
21 correct?
22     A.    Yes.
23           MR. AYALA:  Object to the form.
24 BY MR. LaFLAMME:
25     Q.    Did you take any video during your

Page 252

1     A.     That's something I would -- I would
2  definitely be all ears to talk to someone if
3  someone came to me.  Again, I'm always bouncing
4  ideas off someone.  If someone came to me and said,
5  hey, this is what we think, I would definitely look
6  into that; I would definitely consider, you know,
7  hey, let's -- let's take a second look at it.  I've
8  done that with criminal investigations; I have no
9  problem with that.  But again, it doesn't change my
10  opinion on where I believe the fire started.
11     Q.     But you understand under NFPA 921,
12  that if additional evidence comes to light, you
13  need to consider that evidence, correct?
14     A.     Correct.
15     Q.     Okay.
16     A.     And I wasn't -- I didn't hear of any
17  other, you know, any other calls, any other
18  evidence, or anything like that.
19     Q.     Okay.  I understood that you weren't
20  part of the private investigation --
21     A.     Sure.
22     Q.     -- and you haven't been privy of what
23  those results were, but if there was arcing that
24  was found in that shed, you would agree with me
25  that under 921 you would want to reevaluate your

Page 254

1  house, this is what we found; something that might
2  spark an interest to look back into that, I would
3  be all over that, I would be very much for that.
4           But again, I still hold that opinion
5  of -- based off what I found, the firefighters
6  found, in discussing with them what they determined
7  what was the origin of cause, and it matched mine,
8  which is what I had said earlier.
9  BY MR. LaFLAMME:
10          Q.   And your opinion is based on the
11  information you learned up through March 4th of
12  2022.
13          A.   Yes.
14          Q.   Okay.  And even before then, you were
15  told about the smoking shed by Mr. Wadsworth,
16  correct?
17          A.   Yes, yes.
18          Q.   And that just wasn't anything that
19  you've followed up on at that time.
20          A.   Correct.
21          Q.   The fact that there -- there were
22  statements by the children about the fire starting
23  outside in the body camera footage cam, if there
24  was arcing that was found at the shed, that would
25  certainly cause you to look at that area as a

Page 255

```
 1    potential area of origin.  True?
 2               MR. AYALA:  Form.
 3         A.    I would -- in that case, obviously
 4    any additional information I got on something like
 5    that I would look into it for sure.
 6         Q.    Okay.  And with that type of
 7    additional information, if that is the result of
 8    the private investigation, Chief Robison indicated
 9    yesterday that he would have -- as he was sitting
10    there yesterday, based, if that information was
11    true, he would have to put under NFPA 921 the
12    original as undetermined and his investigation as
13    ongoing.
14               Would that be the same qualification
15    you would use?
16         A.    Yes.
17         Q.    An as part of your investigation, you
18    went out to Walmart to look at the type of
19    hoverboard, correct?
20         A.    Yes.
21         Q.    Did you ever purchase an exempt -- an
22    exemplar?
23         A.    No, I did not.
24         Q.    Okay.  I wasn't sure if you had.
25         A.    Nope, I didn't.
```