EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2           IN AND FOR THE DISTRICT OF WYOMING

 3      STEPHANIE WADSWORTH, individually )
                                          )
        and as Parent and Legal Guardian )
                                          )
 4      of W.W., K.W., G.W. and L.W.      )
                                          )
        minor children, and MATTHEW      )
                                          )
 5      WADSWORTH,                        )       Case No.:
                                          )
             Plaintiffs,                  ) 2:23-cv-00118-NDF
                                          )
 6                 vs.                    )
                                          )
        WALMART, INC. and JETSON         )
                                          )
 7      ELECTRIC BIKES, LLC,              )
                                          )
             Defendants.                  )
13                          - - -

14                  Wednesday, August 14, 2024
15                          - - -
16                  Videoconference deposition of

17      RONALD E. SYNDER, M.D. was taken via Zoom,

18      before Elizabeth M. Kondor, Certified Court

19      Reporter and Notary Public, on the above date,

20      commencing at 11:00 a.m.

21

22              LEXITAS LEGAL PHILADELPHIA

23           1600 MARKET STREET, SUITE 1700

24           PHILADELPHIA, PENNSYLVANIA 19103

25                  (215) 504-4622
```

Page 27

 1   Wadsworth, did you conduct a full medical

 2   examination on her?

 3        A.    Well, it depends what you call

 4   "full."  I, obviously, listened to her lungs and

 5   felt her belly and looked at her skin.  We did

 6   range of motion.  So we did a medical

 7   evaluation, both a medical, as well as

 8   orthopedic and neurologic, all the things that

 9   would be required in looking at a burn patient

10   who had been intubated.

11        Q.    And the only time that you saw

12   Mrs. Wadsworth, was that at -- you have an

13   evaluation of patient for four hours, was that

14   when you saw Mrs. Wadsworth?

15        A.    Correct.  I spent four hours on April

16   13, 2023.

17        Q.    It looks like you would have flown up

18   there on April 12th.  And I presume you're

19   coming from Florida?

20        A.    Correct.

21        Q.    And then you did the evaluation on

22   the 13th?

23        A.    Correct.

24        Q.    And then you would have flown back to

25   Florida after that?

Page 39

1    anything of that nature, that's correct.

2         Q.    Are there any of Stephanie

3    Wadsworth's treating physicians that you --

4    strike that.

5              Have you spoken with any of Stephanie

6    Wadsworth's treating physicians?

7         A.    I have not.  After I saw the patient,

8    I had some discussions with plaintiffs' counsel,

9    as far as needing to get some additional

10   clarification, because I'm not a plastic

11   surgeon.  And in order for me to put particular

12   procedures in, it would be inappropriate for me

13   to add those procedures.

14             And you'll see in my life care plan,

15   I have a list of procedures that I presume the

16   patient is going to be needing, but I could not

17   put in because that's outside of my wheelhouse.

18   So I presume in the future, there will be some

19   additional experts or counsel will set up an

20   appointment for me to speak with those treating

21   physicians.  But at this point, none of that has

22   been arranged at this point.

23        Q.    And it sounds like Dr. LeChapelle is

24   the only one that you've actually reached out to

25   as part of your work in this case?

Page 62

1   origin and cause investigation, correct?

2           A.      That's correct.

3           Q.      Are there any documents that you

4    asked for as part of your evaluation in this

5    case that you are waiting to receive or just

6    have not been given?

7           A.      After I saw the patient, I did speak

8    with counsel, indicating that I could not put in

9    the specific types of plastic surgical

10   procedures, the types of pulmonary procedures

11   and so forth; that if he did do that, then I

12   would have to -- I would then do the research

13   and the costs.  So I did have listed the

14   procedures that I could not do pricing for that

15   I suggested would ultimately come if I got

16   further documentation.  And that would be found

17   on page 64.

18          Q.      Okay.

19          A.      That I could not do life care

20   planning as a physiatrist, and, therefore,

21   suggested that we were going to need some

22   additional consultations, if I were to put those

23   values into the life care plan.

24          Q.      Since we've been referring to your

25   report, Doctor, why don't we just go ahead and

Page 85

1    treatment with Desert View Eye Care is related

2    to the burn injuries?

3        A.    No, but she sought evaluation because

4    of the potential.  But what the diagnosis was

5    was the usual optometric problems of growing

6    older.

7        Q.    Okay.

8              And then the COVID issue, obviously,

9    unrelated to her burn injuries, correct?

10       A.    Correct.

11       Q.    Okay.

12             On page 13, you discuss the current

13   treatment that she is going through.

14             And at No. 3a on that page, you

15   reference some laser therapy and injections,

16   correct?

17       A.    Correct.

18       Q.    Do you know what frequency she is

19   getting laser therapy?

20       A.    Not much at all.  So she can't get it

21   locally.  It's a three-hour drive.  And by the

22   time she drives and waits for the appointment,

23   gets the treatment and so forth, she's,

24   basically, indicating that she can't afford it.

25   Also, she has to have her husband take off to do

1    it.

2                So, I mean, I had a long discussion

3    with her.  I told her she needs to move to Utah.

4    And she's not been able to get a lot of

5    treatments.  From what my understanding is, it's

6    basically because of the travel and the time off

7    from work and so forth.  So she's missing a lot

8    of the treatments.

9                And the treatments she told me she

10   needed to be every two weeks, every six weeks.

11   And that's why I thought, when I got that story,

12   we really need to have a plastic surgeon to give

13   me the optimal number of what needs to be done

14   so I can provide an appropriate life care plan.

15        Q.    So as far as laser therapy treatments

16   going forward, you don't have an opinion as to

17   what those may be, correct?

18        A.    Well, she's had a lot.  And she

19   actually had to have anesthesia for it.  They're

20   large areas.  But, again, I don't have a plan.

21   And I don't have, actually, the area.  And I

22   would kind of like need to have a plastic

23   surgeon let me know what the CPT code would be

24   for that and so forth to really accurately

25   provide a life care plan.

1        Q.    With respect to the calluses that she

2    has on her left and right foot, as you sit here

3    today, you don't know what type of treatment she

4    will require going forward, correct?

5        A.    Correct.  I mean, my experience has

6    been, they've done radiation to some of my

7    patients that have done this.  I've seen where

8    they do cold laser treatments, two treatments.

9    I just don't know.  I think, certainly, just

10   shaving off the calluses, which is what she has

11   had so far, is not appropriate, and she's going

12   to need more than that, but I don't know.  I

13   have to refer to a plastic surgeon.

14       Q.    And you don't know what type of

15   duration of treatment she may need to address

16   the calluses on her feet, correct?

17       A.    Correct.  And that may be open-ended.

18   They may need to do that for a lifetime.  I

19   don't know.

20       Q.    The inverse of that is, it may not

21   need to be done for her lifetime, correct, you

22   just don't know?

23       A.    Correct.

24       Q.    Okay.

25             And the cost associated with any

Page 92

1   treatment for the calluses on her feet, as you

2   sit here today, you also don't know that,

3   correct?

4        A.    Correct.  I would have to defer to a

5   plastic surgeon, who needs to see the patient

6   and help me to provide any further response.

7        Q.    And going to page 14 of your report,

8   this is where you have a picture of the four

9   children as well.  And you indicated that they

10  were present during the home visit, correct?

11       A.    They were.  They were watching TV.  I

12  was sitting where I'm sitting, there's a dining

13  room table and we were sitting at the dining

14  room table, and the children were watching

15  cartoons.

16       Q.    Okay.

17             Did you, aside from any pleasantries,

18  interact substantive with the Wadsworth

19  children?

20       A.    I did.

21             The one child, Weston, when I found

22  out that he was having problems and had burns

23  and was reduced to wear shorts and so forth, I

24  did see him, I did examine him, I did photograph

25  some of the burns, but did not issue any reports

1    intubated for multiple weeks, she would have

2    been on medication that would have prevented

3    withdraw.  So by the time she became more awake

4    and conscious, she would have been past the time

5    for withdraw symptomatology, in my background

6    and training.

7          Q.    On to page 16, these just discuss

8    some of the pre-fire medical issues that she

9    had, correct?

10         A.    Correct.

11         Q.    And one is the postpartum depression,

12   which you already mentioned.  She also had back

13   pain and back surgery as a result of that.

14               You're aware of that, correct?

15         A.    I am.

16         Q.    And I'm going to butcher this, but

17   vitiligo --

18         A.    Vitiligo.

19         Q.    Vitiligo - V-I-T-I-L-I-G-O, Betsy - I

20   had to Google it, but it's, basically, a

21   pigmentation issue with the skin, correct?

22         A.    Yes.  You know, in preparation for

23   the depo, I realized that I did not know how to

24   address that and plastic surgery is going to

25   need to address that.  So you end up having a

1   pigmentation problem, but then if you have a

2   burn that goes into the pigment layer, I don't

3   know whether or not additional services are

4   going to be required because of the preexisting

5   condition.

6           We did talk about tattooing eyebrows

7   and so forth.  There are ways -- and she has

8   some changes in the pigmentation in the forehead

9   and so forth.  I think plastic surgery may treat

10   her slightly differently because of that

11   diagnosis.  She may be at more of a risk of a

12   more intense treatment.

13       Q.    Okay.

14            Do you know where the pigmentation

15   issue affected her prior to the fire?

16       A.    I do not.

17       Q.    Is there a typical location that the

18   pigmentation issue generally affects someone or

19   is it really just --

20       A.    I haven't read the literature.  In my

21   experience, I've seen it everywhere, so I don't

22   know.

23       Q.    So it really depends on the patient,

24   it could be various parts of the body?

25       A.    Correct.

1  her.  She smoked a pack a day and has done so

2  for 20 years.  And I've spent some time talking

3  to her about needing to stop the cigarettes as

4  well.

5      Q.    And the cigarette use obviously with

6  it being 20 years at about a pack a day

7  certainly predated the fire, correct?

8      A.    Correct.

9      Q.    And it's still ongoing today?

10      A.    Correct.

11      Q.    Going to page 18, and on this page,

12  you get into the Activities of Daily Living

13  Checklist.  And it looks like this is likely

14  taken basically from her ADL questionnaire?

15      A.    Correct.  This is a lady who says

16  Don't tell me I can't do it, I can show you I

17  can.  And so she does everything.  And she

18  leaves a trail of blood behind.  She talks about

19  when she does the laundry, her hands bleed.

20  When she cooks, her hands bleed.

21              So she, basically, does everything,

22  but then has skin breakdown when she does some

23  of the things.  But she, basically, is pretty

24  activity and really tries not to let this

25  discourage her from being a day-to-day

1    functioning person.

2         Q.    Does she wear any protective gloves

3    when she does her ADLs?

4         A.    No.  We talked about wearing some

5    gloves when she's out and about.  But you can't

6    use gloves when you're cooking.  You can't use

7    gloves, like, when you're reaching into the

8    washer and dryer, she'll scrape her hand and

9    she'll bleed.  So they don't wear gloves

10   normally throughout life.  But you'll do it if

11   you think you're doing something active like

12   gardening and so forth.

13        Q.    Does she use gloves at all for any

14   ADLs?

15        A.    I don't know.  I know we talked about

16   gloves, but I don't remember whether she uses

17   them or not.  I didn't see any or I would have

18   photographed them.

19        Q.    So at least by Mrs. Wadsworth's

20   self-reporting, she says that she does not need

21   help with her ADLs, correct?

22        A.    She doesn't say she doesn't need

23   help.  She says, I'm doing it myself.  She never

24   asks for help.  When I talked about what we

25   would put in the life care plan, she was open to

1    to her now and needed to come, and they grow

2    back very quickly.

3         Q.    And you don't know if there's any way

4    to permanently remove those lesions at this

5    point, correct?

6         A.    And, again, and if I could have a

7    plastic surgeon opine, I would certainly defer

8    to the plastic surgeon on that.

9         Q.    Okay.

10         So with these three line items, is it

11   your anticipation that you will be doing

12   additional work on these line items?

13        A.    I would certainly hope so, or it's

14   just not brought to the table, and there's no

15   money put aside for that.  I certainly can't

16   apply -- I have to stay within my wheelhouse of

17   background and training.

18        Q.    Okay.

19         And, certainly, understanding your

20   background and training, you agree, as you've

21   noted in your report, that, at this point, you

22   are unable to determine the cost of these three

23   line items, correct?

24        A.    And the frequency, that's correct.

25   And I would end up asking them to help me with

1    the CPT codes.  One of the problems is, when

2    they've done the CO2 burns, if you read the

3    records, it includes the anesthesia and it

4    included several large areas.  And so I presume

5    there are different CPT codes, given the amount

6    of space or the amount of surface area, as well

7    as the duration under anesthesia.  So there's

8    just a lot of stuff that I would not be able to

9    add.

10        Q.    And you are not able to add that

11   without further guidance from her treating

12   physicians, true?

13        A.    Absolutely.

14        Q.    Okay.

15        A.    Or an expert.

16              Often, I find my university treating

17   doctors are not even permitted to offer legal

18   opinions, and so sometimes we have to go and

19   hire an expert.  So we just need to have a

20   plastic surgical expert to be able to offer

21   those opinions.

22        Q.    Okay.

23              With respect to the "Semi-Permanent

24   Tattoo for Her Right Eyelid," is that something

25   that Mrs. Wadsworth has expressed an interest in

Page 135

1    getting?

2        A.    We talked about it.  She's

3    embarrassed.  And so I did do the pricing and

4    found that it doesn't last forever, and so we've

5    got that as a potential charge.

6              And, again, I would probably ask a

7    plastic surgeon their opinion.  Maybe do a

8    permanent one.  I don't know what's out there.

9    I'm not a cosmetic person, and so I would

10   probably defer, again, for a plastic surgeon for

11   his or her opinion on that.

12       Q.    Okay.

13             And that was going to be my next

14   question, is there a permanent option in that

15   regard, understanding that tattoos can certainly

16   be permanent in nature?

17       A.    Yes.

18       Q.    But you just don't know?

19       A.    Correct.

20             In looking at the literature for

21   eyebrows, they strongly suggested not doing

22   permanent, but, again, I don't know why.  I

23   would defer really to an plastic surgeon.

24   That's something I would have an expert help me

25   with.

1        Q.    So with respect to the $34,000

2    lifetime cost, it sounds like that you may need

3    a little more guidance from a plastic surgeon to

4    really finalize that line item?

5        A.    I agree.  And when I was preparing

6    for the deposition and doing the report, it's

7    like these whole plastic surgical procedures, if

8    you ask me for an artificial arm or a leg or

9    therapy after stroke, that's my wheelhouse.  At

10    this point, I have to rely on an expert.  I can

11    do the pricing, identify the pricing, but the

12    frequency and type of procedure, I would really

13    need to have an expert.

14        Q.    And then you have ER visits of one

15    time every five years.

16            What's the basis for that?

17        A.    The basis is, basically, cellulitis.

18    Her skin breaks down.  She gets infected.  She

19    bleeds all day long when she puts her hands into

20    stuff.  So there's the potential for cellulitis.

21    She has had cellulitis of the earlobe.  So to be

22    able to say every five years to identify a

23    probability is pretty low.  And it's just for an

24    ER visit rather than a hospitalization.

25        Q.    Has she had any other cellulitis

Page 138

1       A.      I don't know --

2       Q.      -- for her cellulitis?

3       A.      -- but just because somebody has not

4   done it does not preclude them from wanting to

5   utilize it.

6               MR. LaFLAMME:  Off the record.

7               (Discussion off the record.)

8       Q.      Doctor, going on to page 66, which is

9   "MEDICATIONS," for all of the medications that

10  you have listed here, she is not presently using

11  any of them, correct?

12      A.      Correct.  I did relate to her some of

13  the medications I thought would be appropriate

14  that she should be on.  And I felt that if she

15  was on appropriate medications, she would not be

16  utilizing alcohol.

17      Q.      And do you know if she has made any

18  efforts to discuss these medications with her

19  treating physicians?

20      A.      I do not.  I have not seen her since

21  the home visit.

22      Q.      And you have not seen anything in her

23  records where she was prescribed any of these

24  specific medications, correct?

25      A.      She was on Duloxetine at one time,

1   but the rest of these medications are to protect

2   her stomach preventively and so forth, no, I

3   don't see that she's been on any of them.

4        Q.    And not only that she has not been on

5   any of them, she hasn't been prescribed any of

6   them, correct?

7        A.    Correct.

8        Q.    And, Doctor, if you can go to page

9   68, which is the "SPECIAL EQUIPMENT" section,

10  and then this is where you get into some

11  discussion about at least one of the items is a

12  scooter or a couple of scooters?

13       A.    Correct.

14       Q.    One is a more traditional motorized

15  scooter, and one is an all terrain scooter,

16  correct?

17       A.    Correct.

18       Q.    She doesn't use either of these

19  presently, correct?

20       A.    Correct, but she will use -- when she

21  goes to Walmart, she will use their scooter.

22  But she was a very active lady, hunting and

23  fishing and very active going out into the -- I

24  mean, there are no repertory theaters where she

25  is.  They go out and do outdoor activities.  And

1    Those are not issues -- you know, counselor,

2    when a doctor sees a patient, they figure out

3    what they need to do.  They don't think about

4    life care planning and hobbies and so forth, so

5    those have not been addressed, that's correct.

6         Q.    And you have seen medical records

7    from her podiatrist, correct?

8         A.    That they did procedures, that's

9    correct.

10        Q.    And within those medical records,

11   there's no reference or even suggestions that

12   she obtain a scooter, correct?

13        A.    Correct.  You're talking about a

14   podiatrist.  You're not talking about a

15   long-term prescription by a physiatrist or a

16   life care planner.  They're podiatrists.

17        Q.    But with respect to - and I'll just

18   ask it even more broadly - with respect to all

19   of her medical treaters and all of the medical

20   records that you've reviewed, there has not been

21   a mention or suggestion of the use of a scooter,

22   correct?

23        A.    Correct.  None of them have been

24   asked to provide long-term planning for home

25   capabilities.

Page 145

1   or inside the house at a later age?

2         A.    No.   I think at 50 would be the time

3   that she's going to need to offload, whether

4   it's in the home or outside the home.   But,

5   basically, she's using no assistive devices now,

6   and I really think by about 50, she's going to

7   need it in the home and definitely outside the

8   home as well.

9         Q.    In her medical records, you haven't

10   seen any discussion or suggestion about a

11   walker, correct?

12         A.    Correct.   I don't see that anybody

13   asked that question or talked about it, that's

14   correct.

15         Q.    And if you could go to page 71, and

16   this relates to a van purchase and subsequent

17   purchases.

18               Do you see that?

19         A.    Correct.

20         Q.    What type of vehicle does she drive

21   presently?

22         A.    I think she's got a truck.

23         Q.    Does she have any complaints about

24   using the truck?

25         A.    No, but we're talking about what do

1   we do so she can go places, to put her scooter,

2   and, particularly, an all terrain scooter when

3   she went places.

4              So, counselor, I don't know what

5   bucket of money pays for this, but in order to

6   go places, she needs a van that can take the

7   scooter, and so that's what's needed.  I don't

8   know who is going to pay for it.  Does it

9   normally come out of what normal people buy; I

10  don't know.  But from a practical perspective,

11  she's going to need a van to be able to use that

12  scooter to go places.  So if you need this, you

13  need that.  It is what it is.  That's all I can

14  say.

15       Q.    Okay.

16              You would agree that she would have

17  -- let's assume this fire never happened, if she

18  wanted to purchase vehicles for her own personal

19  use moving forward, she would have that cost

20  anyway, correct?

21       A.    Absolutely, but not the

22  modifications.

23       Q.    And with respect to the van items, is

24  that only required in your mind due to the all

25  terrain scooter?

1      A.    Yes.  And, actually, taking the other

2   scooters, too, to, perhaps, church or other

3   places, but the all terrain, the basic reason is

4   so she can go out and about for either of the

5   two scooters.

6      Q.    It relates to both the scooters, not

7   just the all terrain scooter?

8      A.    Correct.

9      Q.    And do you know how often the

10  Wadsworths typically replace their vehicles?

11     A.    I don't.

12           The normal replacement, most people

13  replace it in seven years.  The problem is the

14  mechanics, the hydraulics don't last more than

15  about five years.  So standard, we replace

16  anything that requires hydraulics in five years

17  because of the possibility of being stranded

18  with a ramp left out and you can't get it in or

19  being able to shut the doors and so forth.  So

20  the standard is we replace it every five years

21  for vans, if there are hydraulics involved.

22     Q.    Wouldn't you only need to replace the

23  actual hydraulics, then, not the van?

24     A.    You could do that, but then the cost

25  of doing that is equal to the value of the van,

1      Q.    Going to page 72, where we get into

2    home modifications.

3              When do you anticipate home

4    modifications needing to be done?

5      A.    I indicated one time in a lifetime.

6    And I would presume probably at 40 to 50 years

7    of age is when I'm talking about needing that

8    walker.  And that's when I would presume that

9    she would use that mobile device in the home

10   more than just out and about.

11     Q.    But you tie the home modifications to

12   the use of the walker?

13     A.    Around 50 years of age, the aging

14   process and pain and so forth.

15     Q.    And when you have the average cost

16   per year for lifetime here, is this cost being

17   obtained as a result of bids received from

18   contractors, or is this being obtained through

19   various web searches?

20     A.    So the Veterans Administration

21   indicates about $120,000 for somebody who is

22   wheelchair dependent.  And a lot of that -- hold

23   on one second -- basically, that research is in

24   the back here.  We basically indicated what the

25   patient was going to need.

 1   services?

 2        A.    Correct.

 3        Q.    All of the items that the personal

 4   care attendant would help with, she is presently

 5   doing, correct?

 6        A.    Correct.

 7        Q.    And she's presently doing them to the

 8   extent that, on your questionnaire, she said she

 9   does not need help with them, correct?

10        A.    Correct.

11        Q.    With the "Home Maintenance," she is

12   married, correct?

13        A.    Correct.

14        Q.    Do you know what home maintenance she

15   was doing prior to the fire?

16        A.    No.  But, counselor, right now, we

17   have a 52 percent divorce rate among Americans.

18   If you have a patient who has pain and

19   disabilities, it's about a 73 percent divorce

20   rate.  So if we, in the legal system, talk about

21   the more probable than not, the idea is to at

22   least provide some kind of security for her home

23   that we're going to give her that there's going

24   to be some maintenance to take care of that and

25   not know that there's going to be a husband

Page 153

1    that's going to be there.

2              So if I deal with the percentages,

3    the more probable than not, I've got to think

4    that, and I agree it's very minimal, but it's

5    five hours a month to do that.

6        Q.    So in order for the "Home

7    Maintenance" line item to be valid, there's an

8    assumption that she's going to get a divorce

9    from Matthew?

10       A.    Well, when we work around more

11   probable than not.  So if we talk about a

12   disabled person, there's a very high

13   probability, it's more than 50 percent, that

14   they're going to be single in their life.

15       Q.    You haven't read Matthew's or

16   Stephanie's depositions where I asked them about

17   how their relationship was?

18       A.    No.  I presume it's good at this

19   point.

20       Q.    And you don't have any information as

21   to how their relationship is, correct?

22       A.    Correct.  I'm just dealing with

23   understanding statistics.

24       Q.    Did you have a discussion with

25   Mrs. Wadsworth during your home visit about the