# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

```
STEPHANIE WADSWORTH,            )
Individually and as Parent      )
and Legal Guardian of W.W,      )
K.W., G.W., and L.W., minor     )
children, and MATTHEW           )
WADSWORTH                       )
                                )
          Plaintiffs,           )
                                )
     vs.                        )  No. 2:23-cv-00118-NDF
                                )
WALMART, INC., and JETSON       )
ELECTRIC BIKES, LLC,            )
                                )
          Defendants.           )
_____)
```

DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California

REPORTED BY:  Joy E. Shure, CSR No. 3659

Page 11

```
 1   you're deferring to BEAR on.  At some point, you did an
 2   analysis on fire spread, though; correct?
 3        A.   Correct.
 4        Q.   Okay.  So where do you pick up from where they
 5   drop off?
 6        A.   So they really pick up from where I drop off.
 7   I identified the origin of the fire, and within that
 8   origin I identified two potential sources of ignition --
 9   well, three potential sources of ignition, and then they
10   picked up from there.
11        Q.   Okay.  What are the three potential sources of
12   ignition?
13        A.   The hoverboard and any -- at the time, any
14   associated charging components, the electrical outlet
15   for Bedroom No. 4 on the wall behind the refrigerator,
16   and then thirdly, initially, I included the refrigerator
17   as a potential source because of its location on the
18   other side of that bedroom wall.
19        Q.   Was the hoverboard charging at the time of the
20   accident -- of the fire?
21        A.   There's testimony that it had been charging at
22   the end of the day's use and prior to the fire, but I
23   concur -- and I did not see and I concur that in the
24   photographs of the joint inspection of the evidence,
25   there were no electrical plugs in that outlet.
```

Page 12

1    Q.   Okay.  So based on your investigation, you've
2    concluded that the hoverboard was not charging at the
3    time of the fire; correct?
4         MR. AYALA:  Form.
5         THE WITNESS:  I don't see any evidence that
6    says that it was, but I can only speak to how I found
7    the electrical outlet post incident, and not having any
8    of the blade plates in there, that would seem to be
9    indicative that the charger was not plugged in at the
10   time of the fire, yes.
11   BY MR. LaFLAMME:
12   Q.   Okay.  So there were no blade plugs in the
13   outlet directly behind the hoverboard; correct?
14   A.   Correct.
15   Q.   There was no wiring from any charging device
16   found by the hoverboard; correct?
17   A.   Correct.
18   Q.   And there was no indication on the female end
19   of the receptacle on the hoverboard that anything had
20   been plugged in at the time of the fire; correct?
21   A.   So that's something I didn't -- I looked at
22   briefly in the field, but I didn't do a detailed
23   analysis of that, but I'm not aware of any evidence of
24   that.
25   Q.   Okay.  So based on the physical evidence,

Page 13

```
 1   you're not aware of any evidence that would suggest this
 2   hoverboard was plugged in at the time of the fire; true?
 3       A.   True.  That's correct.
 4       Q.   And this fire was first identified by Gunner
 5   and Layne Wadsworth; correct?
 6       A.   Correct.
 7       Q.   And Gunner and Layne, we've referred to it as
 8   Bedroom 4, that was their bedroom; correct?
 9       A.   Correct.
10       Q.   All right.  And they were in a bunk bed that
11   abutted the wall and window for their bedroom?
12       A.   Correct.
13       Q.   And when they first woke up, that window had
14   already been breached or broken; correct?
15            MR. AYALA:  Form.
16            THE WITNESS:  I haven't read any testimony that
17   that's their testimony.  There is testimony that Gunner
18   in particular recalls that there were shards of glass in
19   the bed.
20   BY MR. LaFLAMME:
21       Q.   Okay.  And that's when he woke up; correct?
22       A.   Yes.
23       Q.   And you've seen the interview with -- that
24   Detective Sheaman did with the Wadsworth boys; correct?
25       A.   Correct.
```

Page 27

1  showing the progression and development of the fire
2  plume out of that window.  The location of those arrows
3  identify the base of that fire plume as having been at
4  the window level.
5          And then the two yellow lines are, I've marked
6  those two lines of demarcation to show that the damage
7  to the brickwork on the front of the house is straight
8  up, kind of a columnar shape which would represent the
9  second phase of the development of a fire plume.
10         So when I compare the fire plume denoted by the
11 red arrows compared to the one denoted by the -- in
12 between the yellow lines, the fire plume coming out of
13 the window occurred first because it's fully developed
14 in a conical shape.
15      Q.   Okay.  And above that window area is the
16 electrical service that comes into the house; correct?
17      A.   On the righthand side there, yes.
18      Q.   And that comes diagonally across the window?
19      A.   Correct.
20      Q.   Meaning --
21      A.   Yeah, I think we need to define which way we're
22 seeing the diagonals.
23      Q.   Yeah, so --
24      A.   From upper right at the post, it comes across
25 towards the lower left --

Page 28

1  Q. Okay.
2  A. -- in that direction, the diagonal.
3     Well, let's just make it -- it crosses over
4  the -- it crosses over the area in front of that bedroom
5  window.
6  Q. Okay. And crosses over the area where the
7  smoking shed was?
8  A. Correct.
9  Q. When in your analysis did that electrical
10 service line get breached?
11 A. I don't -- I don't know any way to determine
12 that because we have venting out of this front window
13 that was pretty intense based on the witnesses and even
14 some of the police body cam videos, and then and/or it
15 could be from the -- once the smoke -- plastic smoking
16 shed is ignited and is contributing to the overall fire.
17 Q. If the fire started inside at the hoverboard,
18 when that fire initiated, this electrical service line
19 would have still been intact; correct?
20 A. It should have been, yes.
21 Q. This electrical service line, if the fire
22 started inside the bedroom, would not have been impacted
23 until there is flame coming out of that window?
24 A. Correct.
25 Q. So if the fire started at the hoverboard, then