# EXHIBIT 7

Page 1

1             UNITED STATES DISTRICT COURT
          IN AND FOR THE DISTRICT OF WYOMING
2
3         STEPHANIE WADSWORTH,          )
          individually and as Parent   )
4         and legal guardian of ww, KW)
          GW and LW, minor children of)
5         MATTHEW WADSWORTH,            )
6
7                   Plaintiffs,         )
                                        ) Case No.
8         vs.                           ) 2:23-cv-00118-NDF
                                        )
9         WALMART, INC., and JETSON    )
          ELECTRIC BIKES, LLC           )
10                                      )
                    Defendants,         )
11        _____)
12             DEPOSITION OF BILL ROBINSON
13        Wednesday, November 15, 2023, 1:00 P.M.
14              Via Zoom video conference
15
16
17                       BE IT REMEMBERED that the
    deposition of BILL ROBINSON was taken by the attorney for
18  the Plaintiffs, GRAYSON GOODY, ESQ., 58 Malaga Cove Plaza,
    Palos Verdes Estates, California 90274 before Christine J.
19  Roybal, Court Reporter for the State of Idaho, in the
    above-entitled matter.
20
21
22
23
24
25

1  telling him that you had just concluded your inspection and
2  investigation, did you provide him with any detail
3  whatsoever of the results of your investigation?
4      A.   No.
5      Q.   And so after that, he conducted his own inspection
6  and investigation?
7      A.   That's correct.
8      Q.   Do you know how long it took for him to conduct
9  his inspection and investigation?
10     A.   They're more thorough than we are, as expected,
11 they are more diving in for origin and cause than we are,
12 which is typical.  Very normal.  And I want to say his took
13 pretty much the remainder of the day, maybe even some into
14 the evening, if I recall.
15     Q.   Okay.  Do you know approximately how many hours
16 that would have been?
17     A.   I don't.
18     Q.   Do you know how long your inspection and
19 investigation took?
20     A.   Mine took just under two hours, roughly.
21     Q.   Did you remain on the scene until he concluded his
22 inspection and investigation?
23     A.   I don't recall if I remained the entire time he
24 was there, but I remained the majority of the time at least.
25     Q.   After you greeted Detective Sheman and

```
 1      Q.   Okay.  Did he arrive before or after you?
 2      A.   After.
 3      Q.   Do you know how long after you?
 4      A.   I don't.
 5           If he was there before me, I don't recall if he was or
 6   not.
 7      Q.   And he would have come in a private vehicle?
 8      A.   He would have been in a personal vehicle.
 9      Q.   Looking at what we see as the fire at about
10   10 minutes 30 seconds into this video, is that consistent of
11   what you would have seen when you arrived?
12      A.   I don't recall.
13      Q.   In your investigations do you realize --
14           (Court reporter clarification.)
15      Q    (By MR. LAFLAMME) In your fire investigation do
16   you utilize NFPA921?
17      A.   You'd have to refresh me what NFPA291 is.
18      Q.   NFPA29 is the guide for fire and explosion
19   investigations.
20      A.   We try to.
21      Q.   And are you familiar with that guide?
22      A.   Not without looking at it.
23      Q.   I believe you had -- I want to take a little step
24   back and just go over some of the background items again.
25   You had indicated that you started with City of Green River
```

1  entities.
2  Q. So looking at Exhibit 9, it shows your report was
3  completed February 9, 2022. After you left the scene on
4  February 1 of 2022, did you have any further investigative
5  activities after the day of the fire?
6  A. I don't recall if I popped back out there for a
7  thing or two or not. I think after I turned it over, it was
8  a while back, I don't remember, but once I -- common
9  practice, once we turn it over to the PD unit, this case
10 being the sheriff's unit, we don't touch the scene. We
11 don't try to go on there unless we're called again.
12 Q. Do you recall being called back to the scene in
13 this instance?
14 A. No.
15 Q. It looks like you did take some evidence from the
16 scene, correct?
17 A. I didn't personally take any of it from the scene.
18 Q. Looking at Exhibit 9, from the narrative 2, when
19 it says, "The evidence found on scene during the
20 investigation and any other findings were turned over to the
21 Sweetwater County Sheriff's Department."
22  Does that mean they took possession of it right away?
23 A. So when they show up, if we're going to turn -- in
24 this case, exactly. They showed up, I talked to them. When
25 he's going in to do his I turn it over to him. I'm already

Page 130

1  evidence as it becomes available, correct?
2      A.  That's correct.
3      Q.  And if evidence becomes available, that may affect
4  your opinion, that opinion should be reassessed, correct?
5      A.  Depending how the evidence became available,
6  correct.
7      Q.  As new evidence comes to light you need to
8  consider that evidence, true?
9      A.  Consider all evidence, correct.
10     Q.  And as I understand it, you were on scene for
11 about two hours for your origin and cause -- or for your --
12 you didn't work just an origin investigation, correct?
13     A.  Correct.
14     Q.  Okay.  You were on scene for about two hours for
15 your origin investigation, correct?
16     A.  Roughly, correct.
17     Q.  If the fire had started in the bedroom where you
18 believe it started, you would expect to see some arcing on
19 electrical wiring in that room, correct?
20         MR. AYALA:  Form.
21     A.  That's actually not 100 percent correct.
22     Q.  (BY MR. LAFLAMME) You would not expect to see
23 any electrical arcing in that room?
24     A.  Well, it depends on where the -- the fire, if it
25 started in the electrical box you could see some arcing.

Page 144

1   to go through their bed area, correct?

2      A.   Not correct.

3      MR. AYALA:  Form.

4      A.   It would have gone up, in this case I believe I
5   looked at it, it went up through ceiling, hit the ceiling
6   which is common in fire behavior, it goes up to the ceiling
7   and rolls down.

8      Q   (By MR. LAFLAMME) Okay.  Is there any other
9   pattern that you are relying on besides what we see in
10  Exhibit 14 on the top photograph, for the origin of this
11  fire?

12     A.   No.  Again, from my investigation, that's what led
13  me to that area being the origin.

14     Q.   Are you aware of the results of joint fire
15  inspection from the private side that occurred after the
16  fire?

17     A.   No, I wasn't even aware there was one.

18     Q.   Are you aware of the lab inspection results that
19  was done after the fire?

20     A.   No.

21     Q.   Okay.  So as to the information that was
22  identified during the private sector investigation, you
23  don't have any information?

24     A.   That's correct.

25     Q.   Are you aware of what the scientific method is

```
 1            MR. AYALA:  Form.
 2       Q.    (BY MR. LAFLAMME) Meaning you can have someone
 3   smoke in a area and hours later a fire starts, correct?
 4            MR. AYALA:  Form.
 5       A.   Absolutely.
 6       Q.    (BY MR. LAFLAMME) And you've run into that in
 7   your career, correct?
 8       A.   That is correct.
 9       Q.   And you are aware that space heaters can cause
10   fires as well, correct?
11       A.   Correct.
12       Q.   And aren't space heaters one of the most common
13   causes of fires for heating appliances?
14            MR. AYALA:  Object to form.
15       A.   I don't know if that's accurate.  I know they are
16   definitely a factor.
17       Q.    (BY MR. LAFLAMME) Are you aware of the NFPA fire
18   statistics that are put out every year?
19       A.   I'm aware of them, I don't remember them.
20       Q.   It's not something you look at in your position?
21       A.   No.
22       Q.   And understanding that when you were there on the
23   date of the fire, you were operating just with the evidence
24   and facts that you had on that day, correct?
25       A.   That's correct.
```

Page 182

1  Q. And additional evidence and facts that has been --
2  have been revealed and discovered since that day, you have
3  not been privy of, correct?
4  A. That's correct.
5  Q. There was some questioning about whether you've
6  investigated a Hoverboard or lithium ion battery fire
7  before, do you recall that?
8  A. I do.
9  Q. And counsel I don't think liked the way I phrased
10 my question so I will rephrase for you. Have you ever
11 investigated a fire that you determined originated at or
12 near a Hoverboard other than this fire?
13 A. No.
14 Q. Okay. Have you ever investigated a fire that you
15 believe originated at or near a lithium ion battery product
16 other than in the Wadsworth fire?
17 A. Not prior to this.
18 Q. Okay. Subsequent to?
19 A. Yes.
20 Q. What was that product?
21 A. It was an electric bike motor, an electric bike
22 and they have the same, essentially same thing, it's not the
23 same battery but it's exactly, I mean, it's essentially the
24 same thing.
25 Q. There's lot of products that have lithium ion