# Exhibit 1

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF WYOMING
 2
     Case No. 2:23-cv-00118-NDF
 3
     STEPHANIE WADSWORTH, Individually and as
 4   Parent and Legal Guardian of W.W., K.W, G.W,
     and L.W., minor children, and MATTHEW WADSWORTH,
 5
          Plaintiffs,
 6
     vs.
 7
     WALMART, INC. and JETSON ELECTRIC BIKES, LLC,
 8
          Defendants.
 9
     ---------------------------------------------------------
10   VIDEO DEPOSITION OF BRIAN N. STRANDJORD, PE, CFI, CFEI
                       November 27, 2024
11   ---------------------------------------------------------
12   APPEARANCES:
13   ON BEHALF OF THE PLAINTIFFS:
                     T. MICHAEL MORGAN, ESQ.
14                   Morgan & Morgan, P.A.
                     20 North Orange Avenue, Suite 1600
15                   Orlando, Florida 32801
                     Phone: 407-420-1414
16                   Email: mmorgan@forthepeople.com
                     (Via Zoom)
17
     ON BEHALF OF THE DEFENDANTS:
18                   EUGENE M. LaFLAMME, ESQ.
                     McCoy Leavitt Laskey LLC
19                   N19 W24200 Riverwood Drive, Suite 125
                     Waukesha, Wisconsin 53188
20                   Phone: 262-522-7026
                     Email: elaflamme@mlllaw.com
21
     Also Present:   Julie Butcher, Videographer
22                   Peter Curran, Concierge-Tech (Via Zoom)
                     Angela Kelsey-Flowers (Via Zoom)
23
24
25
```

Page 10

1  A   That was at the University of Colorado.
2  Q   They have special classes at the University
3  of Colorado that teach about how fire will interact
4  with specific electrical conductors?
5  A   They have -- they have classes which I --
6  which I took as part of my education involving heat
7  transfer and thermodynamics and materials science,
8  which are all applicable to that.
9  Q   But no specific training on how fire
10 interacts with electrical conductors at the University
11 of Colorado; is that fair?
12 A   Not at the university.
13 Q   Okay. Where did you obtain that specific
14 training?
15 A   That specific training was through my
16 employment over approximately the last ten years, in
17 forensics.
18 Q   When you say, "forensics," can you explain
19 what that means.
20 A   Sure. That would be investigating
21 different failures -- fires, explosions, accidents --
22 and explaining that -- using science and engineering
23 to help explain what happened to my clients.
24 Q   Okay. And when we say, "the last ten
25 years," are we starting that forensic work and this

Page 11

1  training in 2014?
2  A   Correct.
3  Q   And again, I don't mean to say that there's
4  not --
5      MR. MORGAN: We can take this down.
6  Q   (By Mr. Morgan) I'm not meaning to say
7  that there's not applicable science and that
8  translates between what you're doing here and
9  otherwise.
10     But specifically for arc mapping and the
11 forensics, that would have started when you worked at
12 Rimkus?
13 A   Correct.
14 Q   And when you worked at Rimkus, did you work
15 with Mr. Filas?
16 A   I did work with Mr. Filas (pronouncing).
17 Q   How long did you -- and I apologize for
18 saying his name wrong.
19     How long did you work with Mr. Filas?
20 A   Approximately five years.
21 Q   Is Mr. Filas the one who specifically
22 trained you in arc mapping?
23 A   I certainly received some training from Mr.
24 Filas. I also worked with other engineers at Rimkus.
25 I learned -- I also -- I also learned aspects of arc

Page 12

1  mapping from both International Association of Arson
2  Investigators training and National Association of
3  Fire Investigators training classes.
4  Q   Okay. How many of those training classes
5  did you go to with the IAAI or NAFI?
6  A   I've been to several week-long classes and
7  seminars with -- with both organizations and then a
8  great number of hours of online training.
9  Q   Okay. Is your online training represented
10 in this CV?
11 A   I don't believe it is specifically
12 represented there.
13 Q   Okay. Do you know approximately how many
14 hours you spent online learning about arc mapping?
15 A   Specifically about arc mapping, I couldn't
16 say.
17 Q   Okay. Is there any specific classes that
18 you took that you would have obtained a certificate
19 regarding arc mapping?
20 A   Yes. I obtained certificates for all of
21 the online courses.
22 Q   Okay. And do you have those in your
23 possession somewhere?
24 A   I do not have them with me today.
25 Q   No, I understand. But those are things

Page 13

1  that you could retrieve -- if we asked you for online
2  certifications regarding arc mapping, that's something
3  that you would be able to find?
4  A   Yes.
5  Q   Okay. As far as the IAAI arc mapping work,
6  did you receive a certificate for that class?
7  A   Yes. I have certificates -- I have
8  certificates for all of the fire investigative
9  training courses, both in person and online, that I've
10 attended.
11 Q   So when you went to these fire
12 investigative courses, did you -- were they in total
13 fire investigation or were they specific to arc
14 mapping?
15 A   Most of them would be total fire
16 investigation.
17 Q   Could you give us the history of arc
18 mapping, please: when was it created and how it's
19 advanced from its creation to today.
20 A   I couldn't tell you the history of the
21 subject.
22 Q   Okay. And looking at Plaintiffs' Exhibit
23 A, I don't see any references to any peer-reviewed
24 studies regarding arc mapping.
25     Are there some that you have not provided

Page 22

1  every inch of the fire-damaged conductors, both
2  visually and tactically with fingers, myself and other
3  investigators that were participating, to look and
4  feel for evidence of electrical arcing.
5      Q   Okay.  I want to break that down.  So when
6  you say that you physically traced, you went to the
7  circuit breaker, correct?
8      A   Correct.
9      Q   And where was the circuit breaker in this
10 home?
11     A   The main circuit panel was located in the
12 basement below Bedroom 4.
13     Q   Okay.  As far as the extension cords and
14 the entire branch circuit for Bedroom 4, were those
15 all connected to that breaker panel in the basement?
16     A   Yes.  Every -- the two circuits that were
17 collected, the circuit that served Bedroom 4 and the
18 circuit that served the outside receptacle, both of
19 those circuit breakers were located in that main
20 electrical panel.
21     Q   Okay.  And on the scene, in relation to the
22 branch circuit for Bedroom 4, you were able to remove
23 those; but you did not inspect them at the scene for
24 evidence of arcing, correct?
25     A   Are you speaking about the breakers

Page 23

1  themselves?
2      Q   I mean the branch circuit that you removed.
3      A   That is correct.
4      Q   Also, is it fair to say that based off the
5  pictures that you took, that the -- there was minimal,
6  if any, fire damage within the basement area of the
7  Wadsworth home?
8      A   That is correct.
9      Q   You also recovered the extension cords that
10 were running to the shed outside of Bedroom 4,
11 correct?
12     A   Yes, we did.
13     Q   Did you retrieve any of the branch
14 circuitry into which those extension cords were
15 plugged into?
16     A   We retrieved some of that.  We traced out
17 those lines.  We retrieved some of it.  Some of it was
18 non-fire damaged and very well encased in the wall.
19     Q   Okay.  Being encased in walls is important
20 in arcing, correct, arcing evaluations?  Is that fair?
21     A   It can be.
22     Q   Well, walls and insulation generally
23 provide some protection versus a stranded line,
24 correct?
25     A   They can.  In this case, the conductors I'm

Page 24

1  referring to that fed the outdoor receptacle were in
2  an area just outside of where we had direct fire
3  damage.
4      Q   Okay.  As far as collection of other branch
5  circuits, other than the ones for Bedroom 4, was that
6  done?
7      A   No.  There were no other branch circuits
8  collected within the house.
9      Q   Was Bedroom 4 the only room that had fire
10 damage within the home?
11     A   It was not.
12     Q   Is there a reason that the other branch
13 circuits were not collected?
14     A   Yes:  It was determined by the fire
15 investigators at the scene that those other rooms were
16 outside of the area of origin as they determined it
17 for the fire; and, therefore, we did not collect those
18 circuits.
19     Q   Fair to say, then, that based off the fact
20 that those circuits were not collected for the
21 physical lab inspection, that you are unable to tell
22 us whether or not those circuits outside of Bedroom 4
23 were energized at the time the fire reached the room?
24     A   You're speaking about the individ- -- other
25 individual rooms in the house?

Page 25

1      Q   Correct.  Yes, sir.
2      A   I cannot speak to -- I cannot speak to what
3  condition those conductors are in.  However, based on
4  the information that we did -- we did find during the
5  arc mapping, I believe that those circuits were all
6  de-energized by the time the fire got to them.
7      Q   Okay.  But you did not inspect those to be
8  able to give us an opinion here today that you believe
9  they were de-energized because of lack of arcing,
10 correct?
11     A   Correct.  I did not physically inspect
12 those other conductors.
13     Q   And in the same vein, you did not trace
14 each physical conductor back to the circuit breaker;
15 is that fair?
16     A   The other -- from the other parts of the
17 house, that is correct.
18     Q   Okay.  So when we talk about tracing the
19 circuit breaker, we are limiting that to Bedroom 4 and
20 the extension cords that were in the shed outside of
21 Bedroom 4; is that fair?
22     A   Correct.  We are limiting it -- we are
23 limiting it to the area -- the potential areas of
24 origin identified by the fire investigators.
25     Q   Okay.  When we go back to your training and

Page 26
1  experience, education or work-wise, will you tell me
2  your background in metallurgy and where that has come
3  from.
4      A   Those were -- that is from some basic
5  materials science classes during my undergraduate
6  education.
7      Q   Okay. And beyond that, there's no master's
8  or Ph.D. that has been left off or is in process right
9  now; is there?
10     A   No.
11     Q   Okay. Take me through the process of once
12 we get to the lab, how it was that you were able to --
13 let me strike that.
14         Take me through the process of when you got
15 to the lab of what you did to look for the presence of
16 arcing.
17     A   Sure. As I previously stated, we went --
18 went through every inch of the fire-damaged
19 conductors, both visually and tactically, by hand, to
20 look for evidence of arcing.
21     Q   When we talk about the fire damage
22 conductors, is it fair to assume that every conductor
23 within Room 4 is included in that?
24     A   When I speak about the fire-damaged
25 portions, I'm referring to the portions of the

Page 27
1  circuits that have the insulation burned on them.
2  There were portions buried in the walls that had
3  intact insulation.
4      Q   So when we're talking about the entire
5  circuit, you did not take the entire branch circuit
6  from Bedroom 4; you only took the portions that you
7  deemed potentially worthy of further investigation.
8          Is that fair?
9      A   No, that is not correct. The entire branch
10 circuit was collected. However, the portions of the
11 conductors that still had intact wiring insulation
12 were not cut open and examined.
13     Q   Why not?
14     A   Because there was no evidence that there
15 was a fire there.
16     Q   In Bedroom 4, there was no evidence of fire
17 in some of those walls?
18     A   There was no evidence that there was fire
19 at the unburned electrical insulation on the
20 conductors.
21     Q   Okay. Will you explain that to the Court,
22 please.
23     A   Sure. The -- when we -- when we find
24 portions of the wire that have unburned insulation,
25 that is consistent with those portions of the wire not

Page 28
1  being directly attacked by the fire.
2      Q   Okay. And how is that determination made?
3      A   The determination as to whether the wires
4  are burned or not?
5      Q   Yeah. Whether they're burned to the level
6  that would be impacted by the fire.
7      A   In many cases here -- or in some cases, I
8  should say, when I say, "intact insulation," I mean
9  that the wire has not -- has not been burned. It
10 might be partially discolored, but it is intact.
11     Q   Meaning it has its outside insulation cover
12 on it?
13     A   Correct.
14     Q   And when you talk about the loss of
15 insulation, you're talking about seeing an actual
16 metal wire; is that fair?
17     A   That is fair.
18     Q   And so do you trace the -- did you trace
19 the wire into the point where you found intact
20 insulation on these -- in Bedroom 4, when you were
21 collecting the samples?
22     A   We traced out the entire circuit, including
23 those portions.
24     Q   Okay. But I'm saying, Were you -- but you
25 eventually decided to gather some, correct?

Page 29
1      A   We gathered the entire branch circuit for
2  Bedroom 4.
3      Q   Okay. Did you have to cut wires that
4  were -- when it's still connected within the wall that
5  you didn't take, you had to cut it at some point,
6  right?
7      A   No. We did not cut any of the wires. We
8  cut the wall around it to take the wires.
9      Q   Okay. And so some of the -- every portion
10 that -- every portion of the wire that you saw had
11 damage to its insulation was taken all the way back
12 to -- from the circuit breaker; is that right?
13     A   The entire -- the entire branch circuit
14 that was within Bedroom 4, whether the insulation was
15 damaged or not, was taken intact. That was traced
16 down to a junction box in the basement, adjacent to
17 the main electrical panel.
18         That was an area where we had no fire
19 damage. And the decision was made to cut the
20 conductors there and collect them.
21     Q   Okay. So that's where -- that's where it
22 ends, at least for our evaluation here, of what you
23 were able to examine?
24     A   Yes.
25     Q   Okay. So when you say "we" determined, who

Page 46

1  did not reach adequate temperature to trip those
2  circuit breakers, because none of the circuit breakers
3  were tripped.
4      Q   (By Mr. Morgan) Okay.  However, the
5  failure of a circuit breaker to trip during a fire
6  does not conclusively mean that the house was not
7  energized during the time of the fire.
8          Is that fair?
9      A   That is correct.
10         MR. LaFLAMME:  Mike, are you at an okay
11 point to take a quick break?
12         MR. MORGAN:  Sure.  That's great.
13         THE VIDEOGRAPHER:  The time is 10:05.  We
14 are off the record.
15         (Recess taken.)
16         THE VIDEOGRAPHER:  The time is 10:14.  We
17 are back on the record.
18     Q   (By Mr. Morgan) Okay.  Let's turn back to
19 the arc mapping process that's laid out in NFPA 921.
20         Are you -- that's what you followed,
21 correct?
22     A   That is correct.
23     Q   And specifically, we've gone over the fact
24 that the arc mapping that was done for this case
25 was -- within the residence, was just Bedroom 4,

Page 47

1  right?
2      A   Correct.
3      Q   The NFPA 921 on electricity and fire, the
4  process where this is described, talks about that you
5  need to systematically examine the circuits' and
6  wires' remains for localized damage to conductors or
7  plug blades.
8          Did you do that for Bedroom 4?
9      A   Yes, we did.
10     Q   It then says that colored tape or a flag is
11 used to mark arc site locations.
12         Did you use any colored tape or flags to
13 mark the locations in the site?
14     A   Very few of the actual locations of arcing
15 were identified at the site.  But those were -- those
16 were marked and collected separately.
17     Q   Did you attempt to search for arcing
18 locations at the site before the removal of the branch
19 circuit?
20     A   No.  It was determined that that would be
21 better conducted in the laboratory setting.
22     Q   So there would be no pictures dictating --
23 or detailing, rather, where you thought potential for
24 arc sites that would need further investigation were
25 at the scene; fair?

Page 48

1      A   As I just stated, we determined that it
2  would be better to collect the circuits whole and look
3  for evidence of arcing in a more controlled setting.
4      Q   Okay.  You do realize that that departs
5  from the recommendations of NFPA 921 that you have
6  cited in your report and this deposition; true?
7      A   I do not believe it does.
8      Q   Okay.  If it specifically says that is what
9  you should do, you do not agree that that is what NFPA
10 921 states, correct?
11     A   I'm not disagreeing with what NFPA 921
12 states.  I'm saying it was determined by the
13 investigators, myself included, in this instance, that
14 it would be better to do that in a controlled
15 environment.
16     Q   Well, there's no reason you cannot do both,
17 right?
18     A   We believed that it would not be productive
19 to do it at the site.  We documented where the
20 conductors ran through the site; and we collected them
21 so we could, again, investigate -- examine them in a
22 more controlled environment.
23     Q   I understand that in a laboratory, it is
24 more controlled.  And NFPA actually provides for that,
25 right?

Page 49

1      A   Yes.
2      Q   Ninety-two -- well -- did I freeze or you
3  froze?
4      A   I'm sorry.  It froze up in the middle of
5  what you were saying.
6      Q   Sorry.  I think it was me.
7          I said, NFPA 921 actually provides for the
8  process after you do a site determination to collect
9  and review in the lab, if necessary, correct?
10     A   Yes.
11     Q   But you chose -- whoever "we" is chose to
12 not do the on-site documentation; fair?
13     A   It was agreed upon by all of the
14 investigators at the site, representing all of the
15 parties involved, that it would not be productive to
16 attempt to do that at the site and that we could risk
17 damaging or destroying evidence if we -- if we did so.
18     Q   Is it your position in this deposition that
19 there's a greater risk of destroying evidence by
20 visually inspecting for areas of arcing and labeling
21 it with a flag or tape versus removing it from the
22 scene?
23         MR. LaFLAMME:  Object to form.
24         Go ahead.
25     A   I'm stating that it was not feasible to --

Page 54
1  approximately right over the polymer shed.
2       The service triplex was melted and severed
3  during the fire, which is not uncommon.  Again,
4  aluminum has a low enough melting temperature that it
5  is common for aluminum to melt in a fire.
6       Once that service triplex melted and was
7  severed, there would no longer be any electrical
8  service to the residence; there would no longer be any
9  electrical energy in any of the branch circuits in the
10 residence.
11      So having evidence of electrical arcing on
12 cords in the shed, we know that fire was present in
13 the shed or at the shed prior to the time that the
14 service triplex was severed; because again, after the
15 service triplex was severed, we would have no
16 electricity to produce arcing.
17      Then the --
18   Q   Okay.
19   A   -- the -- once that service triplex was
20 severed, there is no longer -- again, no longer any
21 electrical energy present in any of the branch
22 circuits; so there would be no -- there would be no
23 electrical arcing, there would be no evidence of
24 electrical arcing on any of the other circuits after
25 that.

Page 55
1    Q   Okay.  We've already discussed that you are
2  not able to give us an opinion as to whether or not
3  there was electrical arcing on any conductors or
4  circuits other than in Bedroom 4 within the residence;
5  true?
6    A   Correct.
7    Q   If that is true, then whether or not the
8  fire originated inside or outside of the house, that
9  can't be told simply by the electrical arcing on a
10 power cord or an appliance cord, correct?
11   A   While I -- while I -- my scope was not to
12 look for or determine a specific area of origin.
13 Again, I used the arc mapping as a tool to show
14 evidence of fire spread.
15      So this can provide a timeline.  I can --
16 from the physical evidence, we know that there was
17 fire at the shed before there was fire in the bedroom,
18 Bedroom 4.
19   Q   Let's stop right there.  How do we know
20 that?
21   A   Sure.  I'll go through it again.
22   Q   No.  I mean, here's where I'm having
23 trouble, right:  We know that you did not arc map the
24 entire home, correct?
25   A   That is correct.

Page 56
1    Q   So when you say that you believe that
2  because the triplex was melted and you didn't see
3  arcing in Bedroom 4, that means there was no
4  electricity to the home, right?
5    A   (No response.)
6    Q   Is that right?
7    A   I want to make sure I understand exactly
8  what you're stating there.
9       Yes, once the service triplex was melted
10 and severed, there was no more electrical power to the
11 home.
12   Q   Right.  But what I'm saying is:  Because
13 you only arc mapped two places, Bedroom 4 and the
14 shed, you cannot tell anyone that there was not
15 electricity in the home at the time that the service
16 triplex melted, because you don't have any evidence
17 yourself, right?
18      MR. LaFLAMME:  Object to form.
19   A   So if I understand what you just asked me,
20 you're saying -- you're saying that I cannot determine
21 that there was no electrical power in the home when
22 the service triplex melted.  And that is incorrect.
23   Q   (By Mr. Morgan)  Correct.
24   A   When the service triplex melted, there was
25 no longer any electrical energy in the home.

Page 57
1    Q   Okay.  That part is true.  But whether or
2  not Bedroom 4 was on fire before that cannot be
3  stated, right?
4    A   No, I don't believe -- I don't believe
5  that's true.
6    Q   Okay.  Well, let's walk through it,
7  because -- was there electrical arcing in the kitchen?
8    A   We do -- we do not have -- we do not have
9  evidence, as we just went through.  We looked at
10 Bedroom 4 and we looked at the area outside of Bedroom
11 4, in the area -- in the area where the fire
12 investigators involved in this matter determined their
13 potential areas of origin to be.
14   Q   I'm just -- I'm going to go through it,
15 because you're making big assumptions.  And I want to
16 go through piece by piece for the Court to be able to
17 determine the validity of this methodology.  So please
18 just bear with me on the piece-by-piece analysis.
19      At the time that the fire got to the
20 kitchen, is there any evidence that you have as to
21 whether or not there's electrical arcing on any of
22 those outlets?
23   A   In the kitchen?
24   Q   Yes.
25   A   No.

Page 58

1  Q   Do you have any evidence as to whether
2  there is or is not arcing within the master bedroom of
3  the Wadsworth home at the time of the fire?
4  A   I do not.
5  Q   Do you have any evidence as to whether or
6  not there is electrical arcing in the living room --
7  A   I do not.
8  Q   -- in the Wadsworth home?
9      When we talk about electrical and power
10 cords and appliance cords, those are what are referred
11 to as stranded, correct, stranded cords?
12 A   I'm sorry.  You broke up a little there.
13 Did you say, "stranded cords"?
14 Q   Correct.  Yes, sir.
15 A   Yes.
16 Q   Okay.  And how are stranded cords different
17 from the branch circuits in Bedroom 4?
18 A   The branch circuits in Bedroom 4, as with
19 typical construction, are conducted -- are constructed
20 with solid conductors, where it is -- each conductor
21 is one solid piece of copper.
22     The stranded conductors, each conductor is
23 composed of many smaller copper wires.
24 Q   Okay.  And what about the insulation
25 generally on stranded cords versus branch circuits

Page 59

1  used in home construction?
2  A   It depends entirely on the cord.  The
3  insulation can be the same or it can be composed of a
4  different material.
5  Q   Isn't it true that most power cords on
6  stranded wires are made up of a single layer of
7  insulation?
8  A   Well, if we're talking about a power
9  cord -- well, it depends.  There are some power cords
10 that contain a single layer of insulation.
11     There are other cords, such as extension
12 cords, specifically the extension cords in this
13 matter, where there is individual insulation around
14 each conductor and then there's an outer jacket that
15 is also insulation.
16 Q   Where you found evidence of arcing within
17 the shed, which conductors did you find arcing on?
18 A   We found arcing on fragments of conductors
19 that were located in the shed.
20 Q   Okay.  Explain.
21 A   So these were short sections of wire that
22 were in the shed, that were severed from whatever cord
23 that they were originally part of prior to the fire.
24 Q   And what were they made of?  What type of
25 metal were these fragments?

Page 60

1  A   They were copper.
2  Q   But you're unable to tell us specifically
3  what they're from?  Did you find other remnants that
4  could be connected to them, or no?
5  A   We did not -- we did not find sections that
6  we believed we could connect together with any
7  certainty.
8      MR. MORGAN:  If we can pull up what is --
9  the document is called 2018 Fire Tech Arc Mapping.
10     MR. CURRAN:  Yes, sir.
11 Q   (By Mr. Morgan)  Okay.  This is an article
12 that was published in Fire Technology.
13     Are you familiar with Fire Technology?
14 A   I am.
15 Q   Is Fire Technology also a peer-reviewed
16 journal?
17 A   I believe that it is.
18 Q   Do you subscribe to Fire Technology?
19 A   I do not.
20 Q   What publications do you subscribe to to
21 stay up to date on the latest in fire investigation?
22 A   I do not currently subscribe to any
23 printed publica- -- printed publications aside from
24 Fire and Arson Investigator Magazine.  Most of -- most
25 of the information I get these days is now published

Page 61

1  online.
2  Q   As are these.  I mean, are you a member of
3  Fire Technology online?
4  A   I am not.
5  Q   What about the National Academy of Forensic
6  Investigators?
7  A   Do you mean the National -- I'm sorry.
8  Could you restate that.
9  Q   Yeah.  From the -- well, let me ask you
10 this:  You get it mostly online.  Which journals do
11 you subscribe to online dealing with fire
12 investigation and technology?
13 A   I subscribe to Fire and Arson Investigator
14 through the International Association of Arson
15 Investigators.
16 Q   Any other ones?
17 A   No specific subscriptions.
18 Q   Oh.  I thought there were more; because you
19 said you got that one on paper, but you got most of it
20 online.
21     But there's no other online ones that you
22 have?
23 A   I certainly -- I certainly get other
24 information online.  I don't have subscriptions
25 per se.

16 (Pages 58 - 61)

```
                                                   Page 62                                                     Page 64
 1      Q   For the peer-reviewed -- most of the             1      A   I think -- I think we're getting crossed up
 2   peer-reviewed articles have subscriptions, right?       2   here.
 3      A   I don't know that I could answer whether         3      Q   Okay.  Let me be very clear.
 4   most peer-reviewed articles have subscriptions or not.  4      A   Yes.
 5      Q   Okay.  Are there any that you're -- that         5      Q   What he's saying is that these next three
 6   you don't need a subscription to that you regularly     6   things are not true, that it is -- people have assumed
 7   receive and review?                                     7   it within science, but he does not believe these to be
 8      A   I don't know that I do offhand, no.              8   true.
 9      Q   Okay.  This is -- the title of this is Arc       9          And one of the things that he does not
10   Mapping and Critical Review.                          10   believe to be true is that an abundance of arc beads
11          You've never read this before, correct?        11   at a given locale means that fire originated in that
12      A   I -- I couldn't say if I've read this          12   area, while a paucity of arc beads indicates that it
13   article or not.  I don't recall.                      13   did not.
14      Q   Okay.  Well, this isn't one that you said      14          He does not believe that is true.  Do you
15   that you considered and discounted when talking about 15   agree with him?
16   the critiques of fire -- of arc mapping, right?       16      A   I'll state my answer more clearly:  I agree
17      A   I did not cite this article.                   17   with the author that that statement is not true.
18      Q   Okay.  Are you familiar with Vytenis           18      Q   Okay.  Thank you.  That was a weirdly
19   Babrauskas?                                           19   worded question.  So I apologize.
20      A   Yes, I am.                                     20          Do you also agree that the following
21      Q   How are you familiar with him?                 21   statement is not true:  When multiple arcs are present
22      A   He has authored a number of publications,      22   on a circuit, the direction of arcing will necessarily
23   most -- most notably one entitled the Ignition        23   proceed upstream towards the power source?
24   Handbook.                                             24      A   I also agree that that statement is not
25      Q   Okay.  Do you consider him to be an            25   true.

                                                   Page 63                                                     Page 65
 1   authority within the fire investigation world?         1      Q   Okay.  He goes on -- I don't think 3 is
 2      A   I consider him to be a knowledgeable            2   applicable to us.
 3   individual.                                            3          But he goes on, and he says, In fire
 4      Q   Sure.                                           4   investigation reports, it is not acceptable for an
 5          MR. MORGAN:  If we can go -- well, first,       5   investigator to report that a conclusion was based
 6   let me ask you this:  If we go down to -- it's page 29 6   simply on arc mapping.
 7   of 33.  It's 776 in the journal.                       7          Do you agree with that?
 8      Q   (By Mr. Morgan)  If we go -- if we look at      8      A   If we're talking -- if we're talking about
 9   these hypotheses, he says, The following hypotheses    9   the origin and cause of a fire as a whole, when we're
10   are not supported by science or reliable experimental 10   talking about in fire investigation reports, then,
11   data; that is, they are myths.                        11   yes, I would agree that it is -- it would not be -- it
12          And what I want to ask you is -- I'm going    12   would not be ideal for an investigator to report
13   to go through each one and ask if you have any        13   solely based on arc mapping.
14   peer-reviewed literature or based off your knowledge, 14      Q   Okay.  He also says -- goes on to say,
15   training, experience, or otherwise believe that he is 15   There are few circumstances where arc mapping may be
16   wrong.                                                16   utilized in a scientifically reliable manner.
17          One:  An abundance of arc beads at a given    17          Do you agree with that?
18   locale means that fire originated in that area, while 18      A   I certainly agree that there are
19   a paucity of arc beads indicates that it did not.     19   circumstances where arc mapping may be utilized in a
20          Do you believe that to be false?              20   scientifically reliable manner.
21      A   I do not.                                      21      Q   And he says that in order to do that, a
22      Q   Do you think that is true?                     22   fire investigator wishing to rely on arc mapping in a
23      A   I believe that is a true statement.            23   fire investigation report must explicitly set forth a
24      Q   So even though Mr. Babrauskas says that        24   valid governing hypothesis and demonstrate how the
25   that is a myth, you actually believe that is true?    25   analysis comports with that hypothesis.
```

```
                                                            Page 70                                                         Page 72
 1   not statistically based, involve dissimilar facts, and    1   the residence.
 2   are subjective.                                           2         Therefore, any electrical arcing that
 3         My question to you is:  First off, what is          3   occurred to those conductors in the shed, which was
 4   a statistically significant experiment?  What does        4   plugged into extension cords, powered by the
 5   that mean?                                                5   residence, for there to be evidence of electrical
 6      A   A statistically significant experiment --          6   arcing in the shed, that had to have happened prior to
 7         MR. LaFLAMME:  Object to form.                      7   the time that the service triplex was severed.
 8         Go ahead.                                           8      Q   Okay.  I do -- I believe I understand.  But
 9      A   A statistically significant study would            9   let me ask you a hypothetical:  Hypothetically, if we
10   involve a sufficiently large sample size to show that    10   had a fire in Bedroom 4, coming out of the window,
11   there actually is a correlation between two or more      11   could that also cause the aluminum to melt and
12   variables.                                               12   disconnect power from the home?
13      Q   (By Mr. Morgan)  Okay.  Are you aware of          13      A   Any fire present at the service triplex
14   any studies that have been done that do support --       14   could cause the aluminum to melt and severe the
15   that are statistically significant relating to arc       15   service to the residence.
16   mapping?                                                 16      Q   Okay.  And so going specifically to A:
17      A   I don't -- I don't know that I have a             17   What we are basing the fact that the fire must have
18   specific example for you.                                18   come from the shed is that we have the presence of
19      Q   Okay.                                             19   arcing on the wire fragments and we do not have the
20         MR. MORGAN:  All right.  We can take that          20   presence of arcing in Bedroom 4?
21   down.                                                    21      A   No.  That's not what I'm stating in 3a.
22      Q   (By Mr. Morgan)  Let's go back to your            22   What I'm stating -- what I'm stat- --
23   conclusions.  And we've talked about 2 and we've         23      Q   Okay.  I'm still lost.
24   talked about 4.  I want to talk about the -- No. 3.      24      A   I'm sorry.  Go ahead.
25         MR. MORGAN:  If we can pull that back up.          25      Q   Go ahead.

                                                            Page 71                                                         Page 73
 1      Q   (By Mr. Morgan)  Okay.  No. 3 says -- we'll        1         No, I'm still -- I'm just having trouble
 2   take it in two parts -- The physical evidence             2   figuring out what other elements are considered there,
 3   presented by the electrical system at the Residence       3   so I want to -- I'm trying to understand it.  I'm
 4   was consistent with:  A, Fire being present at or         4   sorry.
 5   within the polymer Smoking Shed prior to the time that    5      A   Sure.  Sure.  Conclusion 3a is very simple:
 6   the fire severed the overhead service triplex to the     6   There was evidence of arcing, electrical arcing, on
 7   Residence.                                                7   conductor fragments in the shed.  That could only
 8         So let's start just with that.  The                 8   occur if there was electrical energy present, if the
 9   evidence that that is based off is the arcing found on    9   electrical service to the residence was still intact.
10   the metal fragments within the shed, correct?            10         The service triplex to the residence, which
11      A   Yes, on the conductor fragments in the            11   supplies all of the electrical power to the residence,
12   shed.                                                    12   was severed during the fire.  It was melted and
13      Q   As well as the lack of arcing in Bedroom 4,       13   severed.
14   correct?                                                 14         After the time that that service triplex
15      A   Well, when we're -- when we're speaking           15   was severed, there was no longer any electrical energy
16   specifically about Conclusion 3a, when I say fire        16   in the building and there was no possibility of
17   being present at or within the polymer smoking shed      17   electrical arcing on conductors powered by the
18   prior to the time that the fire severed the overhead     18   building.
19   service triplex to the residence, I'm not -- I'm not     19         So all I'm saying in Conclusion 3a is that
20   making that statement based on anything that was or      20   the arcing occurred on the conductors within the shed
21   was not found in Bedroom 4.                              21   prior to the time that the overhead service triplex
22         I'm making that statement simply based on          22   was severed.
23   the fact that the service triplex was severed; and       23      Q   How do you determine that there was not
24   after the time that that service triplex was severed,    24   fire inside the residence and fire in the shed at the
25   there was no longer any electrical energy supplied to    25   same time?
```