Exhibit 1

1                    ROUGH DRAFT DISCLAIMER

2    DEPOSITION OF:  JOSEPH RAYMOND FILAS, CFI, CFEI, CFI(V)

3    DATE:  DECEMBER 17, 2024

4

5                    DISCLAIMER:  This rough draft text is

6    roughly edited, uncertified, and may contain untranslated

7    words, a note made by the reporter, a misspelled proper

8    name, and/or word combinations that do not make sense.

9    All such entries will be corrected on the final certified

10   transcript which we will deliver to you in accordance

11   with our customary/your requested delivery arrangements.

12                    Due to the need to correct entries prior

13   to certification, this rough draft is to be used only for

14   the purposes of augmenting counsel's notes and cannot be

15   used for citation in any court proceedings, or to

16   distribute to other parties to the case who have not

17   purchased a transcript copy.

18                    CONSENT:  By opting for this rough draft

19   service, you have agreed: (1) To purchase the transcript

20   at the customary/agreed-upon rate; (2) Not to furnish

21   this transcript, either in whole or in part, on disk or

22   hard copy, via modem or computer, or by any other means,

12          Q.   Of the 22 courses that you took in

13   electricity and electrical systems, what -- can you

14   quantity in any way, shape, or form the amount of time or

15   material that was taught relating specifically to

16   lithium-ion batteries?

17          A.   I don't keep a record of that.

18          Q.   Do you keep record whether it's materials,

19   PDF handout, or otherwise of the 22 courses involving

20   electrical systems you've taken?

21          A.   I don't recall that.  I didn't prepare

22   that for my deposition today.  I mean, I'm certain that I

23   save a lot of file materials that I have into a job

24   folder that I have at work that includes articles that

25   I've reviewed, codes, treatises that I use.  All of

                                                        10

1   that's in there that I've reviewed over the course of

2   24 years.

3          Q.   Okay.  When was the last course that you

4   took relating to electrical systems on this 1033 matrix?

5          A.   So it would have been the fire

6   investigation master class.  We certainly discussed it at

7   that time.  And that was in 2024, this year.  I think it

8    was March of 2024.

9              Q.   And are those online courses, sir?

10             A.   No, this particular one was in person.

11             Q.   Where was that?

12             A.   At IRIS Fire Investigations.

13             Q.   Who puts on those courses in electrical

14   systems?

15             A.   I believe it was Bob Toth had spoke.  And

16   then I may butcher his name.  Dave Icove, I believe.

17             Q.   Just judging by your CV, you are not a

18   mechanical engineer, correct?

19             A.   No.

20             Q.   You're not an electrical engineer, correct?

21             A.   No.

22             Q.   Aside from the continuing education

23   or courses relating to electrical systems, you don't have

24   any other specialized training in lithium-ion battery

25   failures?

                                                            11

↥

1                   MR. GIROUX:  Form.

2                   THE DEPONENT:  I certainly have training

3    in lithium-ion battery fires.  I've also had many

 4    discussions about this with other experts, electrical

 5    experts, and certainly we've -- I've been involved in

 6    cases where a battery-operated appliance, whatever you

 7    want to call it, appliance item, toy, a piece of

 8    equipment, that have all had lithium-ion batteries.  So a

 9    hover board to me is -- is electrical components that are

10    powered by battery that are consistent with other, again,

11    appliances or equipment that are battery operated.

12          Q.   Aside from investigating those types of

13    fires and incidents, do you have any specialized education

14    in the cause of lithium-ion battery failures?

15          A.   I would say that there's some education in

16    those, continuing education courses, but that also

17    exceeds my expertise, and I would basically ask for an

18    additional consultant to review the hover board and

19    whether it was the cause of the fire.

20          Q.   Understood.  And that's what I was getting

21    at.  At least with regards to this case, you understand

22    that counsel that has retained you on behalf of the

23    defendants, Jetson and Walmart, they have retained other

24    experts in various fields, one of which includes a battery

25    expert to analyze potential failures in the lithium-ion

18          Q.   You mentioned in your CV that your

19   consulting experience includes evaluation of commercial

20   kitchen cooking equipment, fire suppression system,

21   exhaust, duct and fan, and code-required inspections and

22   cleaning services.  You also mentioned automobile, heavy

23   equipment, oil and gas, industry inspections or

24   investigations.  Quantify for me the work that you do

25   relating to fire investigations involving e-mobility

21

1    devices.

2           A.   Again, I don't keep record of that.  I

3    couldn't tell you a percentage of how many fires I've

4    done that involve mobility devices that are battery

5    operate the.

6           Q.   How many hover board fires have you

7    investigated?

8           A.   Hover boards.  I would say two.

9           Q.   Including this one?

10          A.   Correct.

11          Q.   Okay.  When was the last one prior to this

12   one?

13          A.   It was in Colorado.  I would say maybe

13    opinion.

14            Q.    When you say "we examined the circuit," "we

15    identified," "we looked visually at the interior for

16    evidence of arcing," "we" -- are you walking through and

17    doing all of that side by side with Mr. Strandjord?

18            A.    No, there's times where we're separated.

19    And in this particular case it was decided upon all the

20    participants and the experts in order to process the

21    scene a little bit more efficiently, we separated in two

22    groups initially.  So initially there was a group that

23    was working at the exterior of the structure.  That

24    included myself on our side.  And then Mr. Strandjord was

25    working inside the bedroom.  And then once kind of the

                                                              41

1    debris removal was completed and we're just kind of in

2    the documentation phase of our work, we certainly would

3    have been together and we were looking for additional

4    evidence of arcing.  If there was anything that I would

5    have seen that was either what I thought was arcing or

6    could be arcing or anything like that, I would have

7    addressed that with Mr. Strandjord.

8            Q.    And so if I understood your testimony, when

9   you and Mr. Strandjord would come together that would have

10  been during the documentation phase?

11          A.   Yeah, I would say -- it was after we

12  finished the -- or the debris removal and reconstruction

13  of the shed.  They were working inside.  And then -- and

14  eventually it kind of became -- you know, we were kind of

15  walking together through the house, examining circuits,

16  examining the circuit breaker.  I mean, I remember being

17  at the circuit panel with Mr. Strandjord.  So, yeah,

18  there's a point in time during that inspection where

19  we're together and walking through and talking about this

20  and discussing it.

21          Q.   Do you hold yourself out as an expert in

22  arc mapping?

23          A.   Not arc mapping.

24          Q.   Do you defer to Mr. Strandjord with regards

25  to any opinions in the field of arc mapping, correct?

                                                        42

⌃

1               MR. GIROUX:  Form.

2               THE DEPONENT:  Correct.  I think he's a

3   little bit more knowledgeable than I am.  Certainly I've

4   conducted arc mapping analysis myself and arc mapping on

5    simple sites.  But in this particular case,

6    Mr. Strandjord was involved, so I relied upon

7    Mr. Strandjord for parts of that.

8         Q.   (By Mr. Ayala)  You say parts of it.  What

9    parts did you not rely on him for as it relates to the arc

10   mapping?

11        A.   I would say -- well, I'm talking about arc

12   mapping analysis.  That's what I did not rely upon.

13   Mr. Strandjord totally -- we did discuss.  He provided

14   feedback and I provided feedback.

15        Q.   Okay.  Did you make any changes to his

16   ultimate conclusion as expressed to you which he compiled

17   and rendered for arc mapping?

18        A.   Can you repeat the question?

19        Q.   Yes, sir.

20             Did you make any changes to his ultimate

21   conclusions as it relates to arc mapping?

22        A.   No, I did not.

23        Q.   Given the fact that you and Mr. Strandjord

24   were separated for at least portions of this scene

25   investigation or inspection, are you familiar with every

43

18    you conducted to verify the reliability or accuracy of the

19    arc mapping and you've given me at least a portion of your

20    opinions and analysis as to the application of the

21    mark -- of the arc mapping.  But what I'm really asking

22    you is what testing -- other than thought, what testing

23    did you do to verify the arc mappings for reliability or

24    accuracy?

25            A.    Yeah, I don't know that that's accurate.

46

And maybe we should get the court reporter to read that

1    And maybe we should get the court reporter to read that

2    back, because I think the original question was State

3    everything that I did to -- or what testing I did to

4    determine that.  And that's what I'm -- that's what I

5    discussed in the beginning was those are the thought

6    experience -- thought experiments that I use to apply the

7    arc mapping analysis to the fire dynamics and the fire

8    patterns and render an opinion as to how and when that

9    arcing occurred.

10            Q.    So clearly we're having a little bit of a

11    miscommunication, and that's my fault.  I'll take

12    ownership of that.  I'm not asking you how you applied the

13    arc mapping to ultimately analyze and render the opinions

14    you did as to origin of the fire.  What I'm asking you is

15    what did you do by way of testing to verify the arc

16    mapping's accuracy and reliability.  That's what I'm

17    asking you.

18              MR. GIROUX:  Objection.  Asked and

19    answered.

20              A.    Absolutely.  I think I've discussed this

21    in this case and other questions as well.  Everything

22    that I've done to complete my arc mapping analysis in

23    this case.  And that included everything that I've

24    discussed to this point.

25              Q.    (By Mr. Ayala)  Well, the fire patterns and

                                                          47

✦

1    fire dynamic analysis conducted by Dr. Gorbett, did you

2    rely on him for those?

3              A.    I relied on Mr. Gorbett for the fire

4    testing and fire modeling.

5              Q.    That included the burn of the exemplar

6    shed?

7              A.    Correct.

8              Q.    That included any and all calculations

9    relating to its fire modeling?

10          A.   I'm not going to repeat his calculations.

11          Q.   I didn't ask you to, sir.  Just asking as

12    to your reliance.  You relied on all of his calculations

13    that included and encompassed his fire modeling opinions?

14          A.   I relied on his summary of his fire models

15    that he produced.  I had conversations with Dr. Gorbett.

16    I've read his report.  I've reviewed his methodology

17    within his report.  I've reviewed the data in his report,

18    and nothing suggests to me, nor have I ever been offered

19    any evidence as to why that model was unreliable.

20    Everything to me was are suggestive that that fire model

21    that Mr. Gorbett produced was reliable in this case.

22          Q.   Did you review any of the data that -- that

23    he used and annualized and calculated for purposes of

24    ultimately rendering his fire modeling opinions?

25          A.   Again, what was in his report and what we

                                                              48

1    discussed, again, there was nothing that I saw that was

2    incorrect.

3          Q.   I appreciate that, sir.  But what's the

4    answer to my question?

5          A.   Okay.  Could you repeat the question?

6          Q.    Yeah.

7                Did you review any of the data that he

8     used, the calculations that he made to ultimately render

9     his fire modeling opinions that were summarized in his

10    report?

11         A.    I reviewed -- well, we reviewed on -- on a

12    conference call -- a Zoom conference call several of the

13    videos of burn testing, and we ran a couple of fire --

14    several of the models as well.  I did not review the

15    actual calculations.

16         Q.    Again, that's just something you're relying

17    on Dr. Gorbett in terms of its accuracy, correct?

18         A.    Correct.

19         Q.    So you relied on him for those two

20    components, the fire testing and fire modeling.  You

21    relied on Mr. Strandjord for the arc mapping.  Did you

22    rely on Mr. Sudler for anything related to your ultimate

23    opinions?

24         A.    No, because I don't have an opinion that

25    the fire originated at the hover board.

                                                      49

1          Q.    Okay.  Did you do any -- any examination of

2  the hover board components related to your -- the scope of

3  your work in this case?

4         A.   I reviewed and inspected the hover board

5  from an aspect of fire patterns.

6         Q.   As we discussed earlier, obviously when it

7  comes to potential failure of the lithium-ion battery of

8  the subject hover board, that's something you defer to

9  Mr. Sudler and any other expert qualified?

10        A.   Correct.

11        Q.   As you go about your forensic investigation

12  specifically relating to this case, do you follow

13  NFPA 921?

14        A.   Yes, I do.

15        Q.   Do you believe that NFPA 921 is

16  authoritative and required for purposes of fire

17  investigations?

18        A.   Yes, I do.

19        Q.   Given your reliance on NFPA 921, you

20  understand that it requires analysis -- complete analysis

21  of all available evidence?

22        A.   Yes.

23        Q.   Do you believe that occurred at least with

24  regards to your involvement in this case, correct?

25        A.   Absolutely, yes.

1          Q.    And you agree -- or believe that it

2     occurred with regards to Mr. Strandjord and Dr. Gorbett's

3     analysis and opinions in this case which you relied on?

4          A.    Those are two components that I relied

5     upon -- or excuse me -- three components that I relied

6     upon.

7          Q.    Okay.  And so given your reliance on that,

8     you believe that they would have complied with NFPA 921 as

9     to complete analysis of all available evidence as well?

10          A.    Correct.

11          Q.    If they did not comply with NFPA 921 by

12     failing to review or analyze all available evidence, does

13     that render their opinions unreliable?

14               MR. GIROUX:  Form.

15               THE DEPONENT:  If at any point in time I

16     thought Mr. Strandjord's or Mr. Gorbett's opinions in

17     this case were unreliable, I would have not used them in

18     this case to conclude the origin and cause of my fire.

19          Q.    (By Mr. Ayala)  I appreciate that, sir, but

20     that wasn't exactly my question.

21               Do you agree that failing to conduct a

22     complete analysis of all available evidence in this fire

23    investigation is a failure to comply with NFPA 921?

24         A.   Yes.

25         Q.   And if either Dr. Gorbett or Mr. Strandjord

                                                          51

1    failed to conduct a complete analysis of all available

2    evidence within their field of specialty, if you will,

3    then that would amount to a failure to comply with

4    NFPA 291?

5              MR. GIROUX:  Form.

6              THE DEPONENT:  Correct.

7         Q.   (By Mr. Ayala)  And if that occurred in

8    this hypothetical, then their failure to conduct a

9    complete analysis of all available evidence would render

10   their ultimate opinion unreliable at least pursuant to

11   NFPA 291?

12             MR. GIROUX:  Form.

13             THE DEPONENT:  Correct.

14        Q.   (By Mr. Ayala)  You have expressed in your

15   report, sir, some criticism of Detective Sheaman related

16   to his origin and cause investigation, correct?

17        A.   Correct.

18        Q.   What are your criticisms of his fire

19    investigation related to this Wadsworth case?

20         A.   Certainly I can refer to my report to go

21    over everything, but if you don't want me to waste that

22    time, I can certainly just come up with a few particular

23    topics that I disagree with.

24         Q.   Yeah, it's up to you, sir.  Whatever mode

25    is complete for you.  But I would assume that you've lived

52

1    with this case for a while so you're probably aware of

2    what your criticism are of those individuals, including

3    Sheaman.

4         A.   Correct.

5              I think some of the biggest topic -- I

6    think to start with would be interpretation of fire

7    patterns.  I completely disagree with Mr. Sheaman that a

8    V pattern -- or the visual characteristics of a V pattern

9    are displayed on the west interior wall and continue on

10    the south interior wall of bedroom number 4.  I certainly

11    disagree with his assessment that the V pattern is

12    somehow related to this fire.  I certainly think also

13    that his opinion in his deposition that this V pattern

14    connected to a protected pattern is somehow the origin of

14    for -- could you repeat the question?

15          Q.   (By Mr. Ayala)  Sure.  And let me -- let me

16    make it a little bit easier.

17          A.   Sure.

18          Q.   In conclusion number 2, you rely upon an

19    assumption that Mrs. Wadsworth improperly discarded a

20    cigarette which ignited the combustible materials and

21    thereby the shed, correct?

22          A.   Again, I think I disagree with the word

23    "assumption."  There were no assumptions made.  And I'd

24    certainly -- I think you had previously used the word

25    "leap."  So what I did in this case was I determined the

                                                              72

1     origin of this fire, then I identified the potential

2     ignition sources within this fire.  I identified the

3     materials that were located in the shed that would have

4     been adjacent to any of these potential ignition sources.

5     I evaluated those ignition sources.  I evaluated the

6     materials that were in that room.  I evaluated the

7     potential ignition sequence of that fire.  And my final

8     selection of hypothesis was that the probable cause of

9     this fire was from ignition of the smoldering coal that

10    ignited adjacent combustible materials.

11         Q.   Where specifically was Mrs. Wadsworth

12    smoking that cigarette approximately two hours before the

13    fire within that shed?

14         A.   I was told it was within that shed, and I

15    believe that they had reported that the -- there was a

16    chair on the -- that would be the north side of the shed.

17    There was a table.  That's where the ashtrays were.  Then

18    there was an additional chair I believe at the -- that

19    would be the south end.  I don't recall exactly where she

20    was sitting when she smoked the cigarette.

21         Q.   Okay.  You would agree with me there's

22    no -- there's no evidence in the case as to where she was

23    specifically sitting?

24         A.   Not specifically sitting, no.

25         Q.   Or if she was standing?

                                                              73

1         A.   No.

2         Q.   You would agree with me that there's no

3    evidence in this case for how long she was smoking this

4    cigarette approximately two hours before the fire?

5         A.   I don't think that was discussed of how

6    long she was puffing on the cigarette inside the shed,

7    the time she was last at the shed.

8            Q.    You would agree with me there's no evidence

9    as to how much was left of anything of the cigarette that

10   he was smoking approximately two hours before the fire?

11           MR. GIROUX:  Form.

12           THE DEPONENT:  Correct.  I think that

13   would have been consumed by this fire.

14           Q.    (By Mr. Ayala)  You would agree with me

15   there's no evidence as to which ashtray, if any, she

16   placed the cigarette prior to exiting the shed?

17           MR. GIROUX:  Form.

18           THE DEPONENT:  Correct.  I think there was

19   testimony that there was an ashtray that we found that

20   was consistent with Mr. Wadsworth and Stephanie's

21   description of the ashtray.  And there was this -- I

22   don't know if you would call it like a small

23   skillet -- kind of like a cast iron skillet.  But it

24   didn't have very, like, high sides or anything

25   [indicating].  They were using that.  And then there was

74

1    also some discussion of a bucket of cigarettes or a

2    cigarette -- or excuse me -- a bucket that contained

3    cigarettes.

4            Q.    Regardless, there's no evidence as to which

5    of those three Mrs. Wadsworth used to put out her

6    cigarette before exiting the shed, correct?

7                 MR. GIROUX:  Form.

8                 THE DEPONENT:  Correct.  Correct.

9            Q.    (By Mr. Ayala)  There's no evidence to

10   suggest that she didn't attempt to put out her cigarette

11   before exiting the shed, correct?

12                MR. GIROUX:  Form.

13                THE DEPONENT:  There would be no physical

14   evidence left after that fire.

15           Q.    (By Mr. Ayala)  And by way of even

16   testimony, there's no evidence to suggest that she never

17   attempted to put out that cigarette, correct?

18           A.    I would have to go back and review the

19   deposition, but I don't -- I don't think I can review

20   today that she said specifically whether I extinguished

21   the cigarette or exactly how she extinguished the

22   cigarette.  I think there was testimony that she just,

23   you know, discarded the cigarette in the ashtray -- one

24   of the ashtrays.

25           Q.    Have you done -- related to this case, have

                                                          75

1    you done any type of testing as to this smoldering

2    analysis of the cigarette?

3            A.    I conducted thought experiments in

4    compliance with an NFPA 921.  And I'm sorry.  Can you

5    repeat the question again?

6            Q.    Yeah.  Have you done any testing to verify

7    the smoldering analysis of a cigarette?

8            A.    I have not conducted any physical tests on

9    testing whether a cigarette can ignite adjacent

10    combustible materials.

11            Q.    Ever, correct?

12            A.    In this case or other cases?

13            Q.    In any other case.  I understand your

14    testimony as to this case.  But I'm asking now have you

15    ever done such an analysis through testing.

16            A.    I can recall a few cases where either I

17    did that testing or I reviewed that testing.  And

18    certainly I would review -- have reviewed numerous

19    articles and textbooks about cigarette ignition.

20            Q.    Okay.  And I'm specifically talking about

21    you.  Have you conducted any such testing?

22            A.    No.

23          Q.   Have you reviewed any testing performed by

24   Dr. Gorbett, Mr. Sudler, Mr. Stranjord relating to the

25   smoldering analysis of a cigarette in this case?

⬆

1           A.   I don't recall, no.

2           Q.   In fact, you're aware that none of them

3    conducted such a -- such testing, correct?

4           A.   Correct.

5           Q.   Did you do any testing relating to the

6    combustible materials within the shed on the date of

7    incident?

8           A.   No testing.

9           Q.   And by the way, when you -- you've

10   mentioned it a couple of times.  Thought experiments.  Are

11   you basically telling this jury you're thinking and

12   analyzing the data or the evidence?

13          A.   Yes, that's what I think a fire

14   investigator does throughout his entire investigation.

15          Q.   I'm just trying to understand your

16   terminology of thought experiments.  You're thinking about

17   it?

18          A.   Yeah, the thought experiments are located

19    within that NFPA 921.  And it discusses using thought

20    experiments to test our hypothesis, and that's what I was

21    doing in this case.  And that's what I did throughout

22    this entire case on every hypothesis that I had.

23        Q.    Okay.  Do you -- is one of your opinions

24    that Mr. Schulz did not conduct thought experiments?

25        A.    No, I think Mr. Sheaman conducted you

77

thought experiments.  I think his analysis at -- the

2    interpretation of fire patterns, among everything, is

3    incorrect.

4        Q.    Okay.  And I'm sorry.  I said Schulz.  You

5    said Sheaman.  Let me just clarify my question.  It's

6    okay.

7        A.    Sorry.

8        Q.    Just hearing your -- your testimony, you

9    you believe Detective Sheaman conducted you thought

10    experiments, but you certainly disagree with the

11    conclusions of those thought experiments; is that fair?

12        A.    Correct.

13        Q.    Okay.  Same question as to Mr. Schulz.  You

14    believe that he conducted thought experiments, but you

12    that occurred on the power cord for the space heater and

13    the extension cord that were in the shed.  Certainly

14    those are possible ignition sources that I evaluated in

15    determining the -- or the cause of this fire.

16              Q.   Did you ultimately rule out those two

17    possibilities, the power cord and the space heater?

18              A.   Certainly not completely.  They are

19    possibilities.  And in 921 we have basically two levels

20    of probability, possible and probable.  Probable being

21    greater than 50 percent; possible being less than

22    50 percent.  So the way I reported it in my case was the

23    probable cause of the fire was the ignition from a

24    cigarette.  And that I evaluated those two other

25    potential ignition sources and didn't think that they

                                                                85

♠

1    were viable ignition sources in this case and with the

2    materials present.

3              Q.   Okay.  And so the only -- to use your term,

4    the only viable ignition source in this case, based on

5    your review and analysis, is the smoldering cigarette?

6              A.   Not the viable, but the probable.

7              Q.   Okay.  Did you ever reach an opinion as to

8    whether or not Mrs. Wadsworth attempted to put out the

9    cigarette?

10         A.   No.  I have statements that she smoked

11   outside, and that's the evidence that I was using to

12   indicate that there was smoking in the shed that occurred

13   two hours prior.

14         Q.   Would it be relevant to your analysis to

15   know that she attempted to put out the cigarette?

16         MR. GIROUX:  Form.

17         THE DEPONENT:  I think in the 24 years

18   that I've been doing this everyone has said that they put

19   out the -- the cigarette properly, and that it was

20   100 percent extinguished.  And I would say that the

21   majority of people that I interview don't typically admit

22   to not putting out the cigarette correctly before, you

23   know, placing it into combustibles or adjacent

24   combustibles and so forth.  So what I do is I take that

25   statement and apply it to the potential ignition sources

86

1    in this room.  I know that she was smoking in that shed.

2    And that's what I applied to my -- to my opinions.

3         Q.   (By Mr. Ayala)  I appreciate that, sir.

4    But my only question was, would it be relevant for you to

5    know whether or not she attempted to put it out?

6                     MR. GIROUX:  Form.

7                     THE DEPONENT:  Not necessarily.

8            Q.    (By Mr. Ayala)  Would it be relevant for

9    you to know for purposes of your analysis how much of the

10   cigarette was left?

11           A.    No.  As long as there's a coal still left

12   on it, then it's a potential ignition source.

13           Q.    Would it be relevant for you to know the

14   rate at which the cigarette was burning after she left the

15   shed?

16                     MR. GIROUX:  Form.

17                     THE DEPONENT:  I don't think that's

18   required to come to the conclusion that the probable

19   cause of this fire was from cigarette ignition.

20           Q.    (By Mr. Ayala)  How many cases prior to

21   this one have you concluded that -- along the lines of

22   this smoldering cigarette analysis that an improperly

23   discarded cigarette was the cause of a fire?

24           A.    I couldn't even begin to count.  There's

25   been a lot.