Malinda Tollefson
08/28/2024

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STEPHANIE WADSWORTH, | : | CASE NO.: |
| Individually and as | : | 2:23-CV-00118-NDF |
| Parent and Legal | : | |
| Guardian of W.W., | : | JURY TRIAL DEMANDED |
| K.W., G.W., and L.W., | : | |
| minor children, and | : | |
| MATTHEW WADSWORTH, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| WALMART, INC. and | : | |
| JETSON ELECTRIC BIKES, | : | |
| LLC, | : | |
| | : | |
| Defendants | : | |

- - -

VIDEOCONFERENCE DEPOSITION OF MALINDA TOLLEFSON

- - -

Taken remotely via Zoom Video Communications at 50 Shoshone Avenue, Suite B, Green River, Wyoming 82935, on Wednesday, August 28, 2024, commencing at 9:01 a.m. MST, before Sara J. Vanchure, Notary Public.

- - -

LEXITAS PHILADELPHIA
1600 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103

- - -

Malinda Tollefson
08/28/2024

Page 18

```
 1  A.            Well, it sounds like she was experiencing
 2  a relapse back into depressive symptoms.  So she has
 3  experienced depression.  Is that answering your
 4  question?
 5  Q.            Yeah.  I guess I'll ask a broader
 6  question.  Was she experiencing depression prior to
 7  the February 2022 fire?
 8  A.            Not to my knowledge.
 9  Q.            Had you -- and again you had not treated
10  her prior to February 1st, 2022, the fire that we're
11  here for; correct?
12  A.            Correct.
13  Q.            Do you know whether or not K.W. was
14  receiving counseling from anybody else prior to the
15  fire?
16  A.            No.
17  Q.            In connection with your treatment of
18  K.W., have you reviewed any of her prior medical
19  records?
20  A.            No.
21  Q.            In connection with your treatment of
22  K.W., have you spoken to any of her prior treating
23  physicians and/or counselors?
24  A.            No.
25  Q.            So when you first saw K.W. back in March
```

Malinda Tollefson
08/28/2024

Page 23

1   Do you see that record?

2   A.           Yes.

3   Q.           And is -- I'm having trouble reading.  I

4   apologize.  This is the best copy I have.  Does that

5   appear that this is from August 23rd, 2024?  Is that

6   accurate?

7   A.           Yes.

8   Q.           And in this record, there's a note under

9   the Presenting Problem that indicates that she is

10  seeking treatment due to a recent relapse in

11  depressive symptoms.  Do you see that?

12  A.           Yes.

13  Q.           And then if you go down to the second to

14  last sentence in the Presenting Problem paragraph, it

15  says that it is unclear at this time if her current

16  symptoms are connected -- and then I'll refer you

17  back -- to the fire from February of 2022.  Do you see

18  that?

19  A.           Yes, um-hum.

20  Q.           So is it fair to say that at this point,

21  based on your treatment of K.W., it's not clear

22  whether her current symptoms are related to that

23  February 2022 fire?

24               MR. AYALA:  Form.

25               MS. BOYD:  You can answer, Mindy.

Malinda Tollefson
08/28/2024

Page 24

```
 1                THE WITNESS:  Oh, thank you.  Well, I
 2   remember thinking to myself that I need to look at
 3   this closer because it probably is connected.  I was
 4   trying to debate if I wanted to diagnose PTSD or not
 5   because I know that depression is also sometimes --
 6   you know, happens.  So I think that was my nod to
 7   myself that I needed to look further, if that -- is
 8   that clear?
 9   BY MR. GIROUX:
10   Q.           Sure.  You know, you wrote this five days
11   ago where you had indicated that it is unclear whether
12   her current symptoms were connected to that fire.
13   Have you done any further work since then to change
14   the conclusion you wrote in that Presenting Problem
15   section?
16   A.           No.
17                MR. AYALA:  Form.
18   BY MR. GIROUX:
19   Q.           So is that still a fair statement and an
20   accurate statement based on your treatment of K.W.?
21                MR. AYALA:  Form.
22                THE WITNESS:  Yes.
23   BY MR. GIROUX:
24   Q.           And moving on to Bates stamp KW_068, we
25   talk about -- you mention family history and you
```

Malinda Tollefson
08/28/2024

Page 33

```
 1                THE WITNESS:  No.
 2                MR. GIROUX:  Okay.  I'm going to move on
 3     to L.W.
 4                MS. BOYD:  Counsel, we've been going for
 5     almost an hour right now.  Do you think it's a good
 6     stopping point for a small break?
 7                MR. GIROUX:  That's fine with me.  I have
 8     no problem with that.
 9                MS. BOYD:  Okay.  How about five minutes?
10                MR. GIROUX:  Sure.  Sounds good.
11                MS. BOYD:  Okay.
12                THE WITNESS:  Thank you.
13                MS. BOYD:  Thank you.
14                (A brief recess was taken.)
15     BY MR. GIROUX:
16     Q.         Ms. Tollefson, I just have one more
17     question about K.W.  Would it be fair to say that you
18     cannot evaluate what K.W.'s mental and emotional state
19     was prior to the February 2022 fire because you did
20     not treat her before the fire?
21                MR. AYALA:  Form.
22                THE WITNESS:  Yes.
23     BY MR. GIROUX:
24     Q.         When did you first see L.W. after the
25     fire?
```

Malinda Tollefson
08/28/2024

Page 37

```
 1  A.              Yes.
 2  Q.              Did L.W. have any difficulty sleeping
 3  before the accident -- before the fire?
 4  A.              I don't recall.  Do you want me to look
 5  through my notes?
 6  Q.              No.  That's okay.  And then how long did
 7  you treat L.W. for after the fire?
 8  A.              I treated him for four sessions and then
 9  there was a break in treatment.
10  Q.              And what was the reason that the
11  treatment stopped after those initial four sessions?
12  A.              I don't know.
13  Q.              Was it because you had made a
14  determination that L.W. did not need any additional
15  treatment?
16                  MR. AYALA:  Form.
17                  THE WITNESS:  I wish I remembered because
18  that is one thing with this process that I've been
19  like I don't remember why we -- I don't know if it's
20  because I had offered a set number of sessions.  I
21  don't know if it was because medical things got in the
22  way.  I don't know if it was because of schedules.  I
23  don't know.  Sorry.
24  BY MR. GIROUX:
25  Q.              Did you know the Wadsworth family -- you
```

Malinda Tollefson
08/28/2024

Page 39

1  prognosis of L.W. with respect to his mental and
2  emotional state?
3  A.             I'm looking at my notes.  They got a
4  little out of order.  Sorry.
5  Q.             That's okay.  Here, let me -- let's see.
6  Because I think I have the last date of treatment
7  as -- unless mine are out of order as well, I think I
8  have it as September 13th, 2022.  So let me pull up
9  that note and see if this is the last date that you
10 have as well.
11 A.             No.
12                MR. AYALA:  Jared, did you say September
13 of '22?
14                MR. GIROUX:  I have September 13th, 2022.
15                THE WITNESS:  No.  I have -- I have
16 February 7th, 2023.
17 BY MR. GIROUX:
18 Q.             Okay.
19 A.             January --
20 Q.             Oh, okay.  They're just ending in a
21 different order this time.  That makes sense.
22 A.             Sorry.
23 Q.             Nope, not a problem.  I see some
24 additional dates.  Okay.  So when was the last date
25 based on your review of your notes, Ms. Tollefson,

Malinda Tollefson
08/28/2024

Page 40

 1   that you saw L.W.?

 2   A.           February 7th, 2023.

 3   Q.           And what was your prognosis at that

 4   point?

 5   A.           I do not state a prognosis.  It says he

 6   has made good progress.  I'm going to say fair,

 7   reading this.

 8   Q.           So you wrote good in the record, but your

 9   opinion is instead that he's made fair progress?

10                MR. AYALA:  Form.

11                THE WITNESS:  I say good progress.  I say

12   fair on his prognosis.

13   BY MR. GIROUX:

14   Q.           Okay.  Do you have any upcoming

15   appointments scheduled with L.W.?

16   A.           No.

17   Q.           What was the reason that you stopped

18   seeing him after February 7th, 2023?

19   A.           It looks like he was involved in

20   counseling support at school and it says that I

21   discharged him and he's welcome to return.

22   Q.           Have you spoken at all with the

23   counselors at his school?

24   A.           No.

25   Q.           How was L.W.'s mental and emotional state

Malinda Tollefson
08/28/2024

Page 41

```
 1   as you observed it in your last date of treatment as
 2   compared to how it was prior to the fire?
 3   A.              In that last date of treatment, it says
 4   that topics focused on feelings of the anniversary of
 5   the fire and he chose feelings -- or objects to relay
 6   his feelings of sadness and grief as well as
 7   representing fear that it could happen again.
 8   Q.              Do you have an opinion as to whether or
 9   not L.W.'s mental and emotional state has returned to
10   the baseline it was at prior to the fire?
11   A.              Can you repeat that, please?
12                   MR. GIROUX:  Yeah.  Sara, could you read
13   that back for me, please?
14                   (Reporter reads back the last question.)
15                   THE WITNESS:  I don't believe it has
16   returned to that baseline, no.
17   BY MR. GIROUX:
18   Q.              Do you have an opinion one way or another
19   as to whether or not L.W. will ever be able to return
20   to that baseline?
21   A.              I don't know.
22   Q.              Is there anything about your treatment of
23   L.W. that we have not discussed that you would like to
24   tell me?
25   A.              No.
```

Malinda Tollefson
08/28/2024

Page 42

```
 1  Q.           All right.  We will mark as Exhibit 91
 2  a -- Ms. Tollefson, your medical records and notes for
 3  the treatment of G.W., which are Bates stamped GW_001
 4  through GW_004.
 5               (Deposition Exhibit 91 was
 6                marked for identification.)
 7  BY MR. GIROUX:
 8  Q.           And it looks like you first saw G.W. on
 9  March 29th, 2022; is that correct?
10  A.           Yes.
11  Q.           And what were his complaints during that
12  initial consultation?
13  A.           He was not sleeping.  He was avoiding
14  talking about the fire and he was avoiding his mom.
15  Q.           And again we talked a little bit about
16  the avoidance of Steph previously.  Was that because
17  of burns that she had experienced?
18  A.           Yes, um-hum.
19  Q.           Can you sort of describe for me your
20  treatment of G.W.?
21  A.           Yes.  So I'm going to review my notes.
22  Q.           Sure.
23  A.           It looks like G.W. and I used mostly sand
24  tray therapy to support his processing.
25  Q.           And you saw G.W. on March 29th,
```

Malinda Tollefson
08/28/2024

Page 43

1  April 5th, April 12th, and April 19th, 2022; correct?
2  Excuse me.  Yeah, 2022; correct?
3  A.          Yes.
4  Q.          Okay.  Was there any reason why you
5  discontinued treatment after April 19th, 2022?
6  A.          No.  I don't remember.
7  Q.          Had you ever treated G.W. prior to
8  February of 2022?
9  A.          No.
10 Q.          What was your prognosis for G.W. in that
11 last meeting on March -- excuse me, April 19th, 2022?
12 A.          It looks -- it looks fair, um-hum.  I --
13 um-hum.
14 Q.          Do you have any pending or upcoming
15 appointments scheduled for G.W.?
16 A.          No.
17 Q.          Did G.W.'s mental and emotional state get
18 better during your course of treatment with him?
19 A.          Yes.  The last note states he is sleeping
20 through the night and he is talking about the fire
21 more.
22 Q.          And you have not met with him since that
23 date of April 19th, 2022.  So you have no reason to
24 believe that he has not continued to make progress;
25 correct?

Malinda Tollefson
08/28/2024

Page 44

```
 1   A.            Correct.
 2   Q.            In your professional opinion as a
 3   clinical social worker, what was G.W.'s future outlook
 4   with regards to his mental and emotional state?
 5   A.            That's a difficult question to answer if
 6   you understand trauma and how it affects the body
 7   because, remember, trauma is not an event.  Like it
 8   could -- it could affect him in the future if
 9   something comes up from his memory, right, and so
10   that's a difficult question to answer.  I don't know
11   how to answer that.
12   Q.            Sure.  You're unaware of any setbacks
13   that G.W. has experienced since his last date of
14   treatment with you; correct?
15   A.            Correct.
16   Q.            Is there anything else about your
17   treatment of G.W. that you have not told me that you
18   would like to tell me now?
19   A.            No.
20   Q.            Let's move on to W.W.  When did you first
21   meet W.W.?
22   A.            March 29th, 2022.
23   Q.            I'll mark this as Exhibit 92, which are
24   your notes and medical records for the treatment of
25   W.W. Bates stamped WW_001 through WW_015.
```

Malinda Tollefson
08/28/2024

Page 53

1  individual history, medical history of the children?

2  By way of example, did you discuss with them -- did

3  K.W. have any prior history of depression?

4  A.          Not that I recall.

5              MR. GIROUX:  Form.

6              THE WITNESS:  Do you want me to check my

7  notes?

8  BY MR. AYALA:

9  Q.          Okay.  All right.  When you have a child

10  client and you meet with the parents at least at the

11  outset, do you typically discuss with them any

12  relevant medical history that might affect and impact

13  your care?

14  A.          Yes.

15  Q.          Okay.  Do you have any reasons to believe

16  that in this case with the Wadsworth family that you

17  would have strayed from your typical practice of

18  having those talks and discussions with the parents?

19              MR. GIROUX:  Form.

20              THE WITNESS:  Can you say that again?

21  BY MR. AYALA:

22  Q.          Yes, ma'am.  Do you have any reason to

23  believe that you would have strayed or gone away from

24  your typical practice of discussing any relevant prior

25  histories of clients with the Wadsworth family?

Malinda Tollefson
08/28/2024

Page 54

1                MR. GIROUX:  Form.

2                THE WITNESS:  I did not do a full

3     assessment.

4     BY MR. AYALA:

5     Q.         Okay.  And is that typically the only

6     time when you -- when you ask parents about relevant

7     medical history?

8     A.         No.  I will ask during treatment as well

9     if it comes up and I did ask, yes, um-hum.

10    Q.         So am I to understand that you would have

11    asked -- at least relating to these children, the

12    Wadsworth children, you would have asked about any

13    relevant medical history relating to depression or

14    self-harm?

15               MR. GIROUX:  Form.

16               THE WITNESS:  I did not ask about

17    depression and self-harm.

18    BY MR. AYALA:

19    Q.         Okay.  All right.  And in your

20    discussions, your sessions with K.W., at any point in

21    time did either she or the parents bring up a prior

22    history of depression and self-harm?

23    A.         Not that I recall.  Do you want me to

24    check my notes?

25    Q.         You can if you'd like to.  If you recall

Malinda Tollefson
08/28/2024

Page 73

1   them again and speaking with them and helping them
2   out?
3   A.          Yes.
4   Q.          Given the fact that K.W. has future
5   appointments with you, certainly she's going to
6   require future treatment. You just don't know how
7   long or how many; is that fair?
8   A.          Yes.
9   Q.          And sitting here today, you don't know
10  whether or not L.W., G.W., or W.W. will require future
11  therapy sessions with you to go over some of the
12  traumatic events or symptomatology that you were
13  assisting them with prior; correct?
14  A.          Yes, I do not know.
15  Q.          Are you aware of how the Wadsworth family
16  paid for the additional sessions that K.W. and L.W.
17  received?
18  A.          Insurance.
19  Q.          I know we've talked about the progression
20  or evolution of acute stress disorder and how that can
21  manifest itself into the future, but have you
22  diagnosed any of the children with whether it's PTSD
23  or any other condition aside from acute stress
24  disorder?
25  A.          What did I diagnose L.W. with? Didn't I

Malinda Tollefson
08/28/2024

Page 75

1  counseled Stephanie for the trauma that she's
2  experienced?
3  A.            No.
4  Q.            Have you counseled Matthew for any trauma
5  he may have experienced?
6  A.            No.
7  Q.            Based upon your background, training, and
8  experience treating clients similar to these children,
9  there are times when a traumatic experience, like this
10 fire, can continue to have an effect and impact well
11 into adulthood?
12             MR. GIROUX:  Form.
13             THE WITNESS:  Yes.
14 BY MR. AYALA:
15 Q.            Meaning that just based on your
16 experience treating children who have suffered a
17 similar type of trauma, you've seen through your
18 experience that some have continued to deal with those
19 traumatic issues and problems into adulthood; is that
20 fair?
21             MR. GIROUX:  Form.
22             THE WITNESS:  Yes.
23 BY MR. AYALA:
24 Q.            And that's even with counseling and
25 therapies and coping mechanisms in place?

Malinda Tollefson
08/28/2024

Page 78

1                FURTHER EXAMINATION
2    BY MR. GIROUX:
3    Q.            Ms. Tollefson, I only have a couple more
4    questions for you, and I apologize if I'm jumping
5    around a little bit as well.  We talked a little bit
6    about the fact that you did not do a full assessment
7    of the children; correct?
8    A.            Yes.
9    Q.            And that you did not ask about any prior
10   issues with depression or self-harm; correct?
11   A.            Correct.
12   Q.            And you testified that you were not told,
13   particularly with respect to K.W., by either her or
14   her mother Stephanie about prior incidents of
15   depression or self-harm; correct?
16   A.            I don't recall.
17   Q.            Okay.  But just because you weren't told
18   about them didn't -- doesn't mean that K.W. didn't
19   have incidents of self-harm or depression prior to the
20   fire; correct?
21   A.            Correct.
22   Q.            You just don't know one way or the other?
23   A.            Yeah, so true.  Don't know.  Thank you.
24   Q.            Okay.  And outside of K.W. at this point,
25   you are not actively treating any of the Wadsworth

Malinda Tollefson
08/28/2024

Page 80

```
 1   Q.            Okay.  And you were asked a lot of
 2   questions by opposing counsel about whether it's more
 3   likely than not that these children would continue to
 4   manifest symptoms of ASD or the trauma itself in the
 5   future; correct?
 6   A.            Yes.
 7   Q.            Do you recall being asked those
 8   questions?
 9   A.            Yes.
10   Q.            You don't really know one way or another
11   whether they continued to experience flashbacks or any
12   sort of traumatic events moving forward because you
13   haven't seen them in a few years or even a few months
14   at some point; correct?
15   A.            Yes.
16                 MR. AYALA:  Form.
17   BY MR. GIROUX:
18   Q.            So it's really speculative to say that
19   they're going to continue on in the future to have,
20   you know, traumatic flashbacks; correct?
21                 MR. AYALA:  Form.
22                 THE WITNESS:  Yes.
23   BY MR. GIROUX:
24   Q.            We just don't know one way or the other
25   how this is going to impact them moving forward;
```

Page 81

```
 1   correct?
 2   A.           Yes.
 3   Q.           And it's possible that they could make a
 4   full recovery; correct?
 5                MR. AYALA:  Form.
 6                THE WITNESS:  I'm a little bit more
 7   hesitant with that one, but yes.  I don't know.
 8   BY MR. GIROUX:
 9   Q.           Okay.  So you don't know whether they
10   could make a full recovery; correct?
11   A.           Nope, I don't know.
12                MR. GIROUX:  I don't have anything else.
13   Thank you very much.
14                          - - -
15                     FURTHER EXAMINATION
16   BY MR. AYALA:
17   Q.           The questions -- ma'am, when I asked you
18   questions about the children experiencing the
19   emotional trauma and effects of this traumatic event
20   into adulthood, I never used the term traumatic
21   flashbacks.  So let me ask in my question to make sure
22   that you and I were talking about the same thing.
23   A.           Okay.
24   Q.           Based upon your background, your
25   education, your training, and of course your
```

Malinda Tollefson
08/28/2024

Page 85

1       C E R T I F I C A T I O N

2

3           I hereby certify that the proceedings and

4   evidence noted are contained fully and accurately in

5   the stenographic notes taken by me upon the foregoing

6   matter, and that this is a correct transcript of the

7   same.

8

9

10              _____

11                  Court Reporter-Notary Public

12

13

14          (The foregoing certification of this

15   transcript does not apply to any reproduction of the

16   same by any means, unless under the direct control

17   and/or supervision of the certifying reporter.)

18

19

20

21

22

23

24

25