# EXHIBIT "B"

Page 1

1                UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF WYOMING

3                CASE NO.: 2:23-CV-00118-NDF

4

5     STEPHANIE WADSWORTH, INDIVIDUALLY AND AS PARENT AND

6     LEGAL GUARDIAN OF W.W., K.W., G.W., AND L.W., MINOR

7             CHILDREN, AND MATTHEW WADSWORTH,

8                        Plaintiffs

9

10                          V.

11

12        WALMART, INC. AND JETSON ELECTRIC BIKES, LLC,

13                       Defendants

14

15

16

17

18

19

20

21

22

23   DEPONENT:  GREGORY E. GORBETT, PH.D.

24   DATE:      OCTOBER 24, 2024

25   REPORTER:  OLIVIA M. DOSKER

Page 58

1    Q.  Okay.  But not in preparation of this -- these
2  opinions?
3    A.  Not for today, but I read that article.  He
4  also, as I mentioned, references it in his Ignition
5  Handbook, and that section I did read to see if that was
6  consistent with this scenario.
7    Q.  Okay.  In the testing that was performed and
8  that is referenced in the article that you cited to,
9  chairs and mattresses were tested.  Did you know that?
10   A.  Yes.
11   Q.  Okay.  Obviously, we're not -- in this case,
12 there was no upholstered chairs or any mattresses within
13 that shed.  We could agree on that.
14   A.  I disagree with that.  I believe that's what
15 they testified to.
16   Q.  That there was a -- the upholstered chair?
17   A.  Yes.
18   Q.  Okay.  Do you know what --
19   A.  And similar materials.
20   Q.  Okay.  Do you know what the material of that
21 chair was?
22   A.  Not exactly, but she does say that it's, you
23 know, an -- an -- essentially, an upholstered covered
24 some kind of foam chair, and that is consistent with the
25 chairs and mattress that the study is referencing.

Page 59

1    Q.  Okay.  Are you familiar with the results of
2  that study performed on the 102 items?
3    A.  Yeah.  Not without pulling the article and
4  looking at it again.
5    Q.  Okay.  You agree that transitioning from
6  smoldering to flaming doesn't occur in all cases?
7    A.  That is correct.
8    Q.  Did you -- do you recall the percentage of
9  cases in which transitioning from smoldering to flaming
10 occurs, at least pursuant to the testing and the
11 research done by Babrauskas?
12   A.  No.  But I will tell you, you know,
13 percentages are not -- not the ultimate assessment
14 metric you should be using for that.  But no, I don't
15 know that off the top of my head.
16   Q.  Okay.  Did you know that as part of the
17 testing performed by Babrauskas that you cited to, and
18 at least partially relied on in your report, that there
19 was an electric ignition source for many of the items?
20   A.  That's probably -- that's a standard way of
21 testing these items.  That does not shock me.
22   Q.  Are you familiar with any of the variables or
23 differing factors that were used in the testing relied
24 upon by Babrauskas?
25   A.  I -- without pulling the article right now and

Page 60

1  -- and going through it with you, no.
2    Q.  You mentioned, relating to the smoldering to
3  flame idea, that the times from placement of the
4  cigarette to flaming of 22 minutes to several hours
5  exists.
6       That's a -- that's a big variation of time, is
7  it not?
8    A.  In -- in general, yes.
9    Q.  Okay.  And how do you determine, in this case,
10 whether that was a possibility first, and where along
11 that spectrum of time it would fall?
12   A.  Well, I think -- I mean, by its nature, the
13 study says it is a possibility.  So I think that's
14 answered in the study.  As far as specific to this
15 scenario, I didn't do that analysis.
16   Q.  Okay.  How reliable is -- well, strike that.
17      The -- do you agree that an item cannot
18 transition to flaming if it's been smoldering long
19 enough to essentially be consumed?
20   A.  Yeah, that -- it depends.
21   Q.  I mean, those were his words.  You saw that in
22 the article?
23   A.  I'm sure I did, but it -- it depends, right?
24 It's -- it's going to be very scenario-specific, of
25 which I did not analyze that for this case.  That's not

Page 61

1  what I was asked to do.
2    Q.  Okay.  Did you analyze at all the location of
3  the ashtrays within that shed?
4    A.  No.  That was not part of my analysis.
5    Q.  Did you analyze the material or the makeup of
6  those ashtrays at all?
7    A.  No, it was not part of my analysis.
8    Q.  From all of the evidence and materials that
9  you received, and you reviewed, was there any evidence
10 that establishes a cigarette was the cause of this fire?
11   A.  Other than --
12      MR. LAFLAMME:  Object to form.
13      THE WITNESS:  I was going to say, other than
14   she smoked out there and she -- she testified that
15   she smoked out there, that is the only information
16   that I have, because I did not dig into that side of
17   the analysis.
18 BY MR. AYALA:
19   Q.  Okay.  But you would agree, based on what
20 you've reviewed, that there was no testimony from
21 Stephanie or any other member of the Wadsworth family
22 that there was a cigarette that was wrongly or
23 wrongfully discarded within that shed on the night of
24 incident?
25   A.  Yeah, that -- that I didn't look into.  That

16 (Pages 58 - 61)

Page 62

1  wasn't part of my analysis.  Okay.
2      Q.  Why mention the smoldering cigarette at all if
3  it was a part of your analysis?
4      A.  You see in that paragraph, it's in context
5  with the heat release rate curve of the shed.  So what I
6  wanted to make sure was clear that, yes, this is roughly
7  a -- what I'm showing you a snapshot of a
8  ten-to-15-minute fire for this specific fuel.  I am not
9  saying this could not have been a longer developing fire
10  if it had been smoldering.  That's -- so I was just
11  trying to show that there's research that says that
12  there are longer times pre-igniting this with a flame
13  that I'm showing in this test.
14      MR. AYALA:  Okay.  We've been going for about
15  an hour and a half.  You want to take a quick break?
16      MR. LAFLAMME:  Yep.
17      MR. AYALA:  Was I reading your mind?
18      MR. LAFLAMME:  Yep.
19      THE VIDEOGRAPHER:  We're off the record.  The
20  time is 11:27 a.m.
21      (OFF THE RECORD)
22      THE VIDEOGRAPHER:  We are back on the record
23  for the deposition of Dr. Gorbett.  My name is
24  Madison Haven.  Today is October 24, 2024.  The time
25  is 11:34 a.m.

Page 63

1  BY MR. AYALA:
2      Q.  In the -- since I'm still on page 9.  I guess,
3  I didn't flip it as quick as I probably should have, but
4  the picture of the shed.
5          When you conducted the fire test, at least
6  from my review of the video, and tell me if it's
7  consistent with your recollection, the shed melts down
8  within five minutes from its original shape and
9  structure?
10      A.  So yeah, you start seeing softening of the
11  side of the shed and then once it breaches to the
12  exterior, it melts quickly.  And I think that
13  five-minute estimate is about right.
14      Q.  And then after it melts up quickly within that
15  five or so minutes, after that, is that when you start
16  to see that pool fire that you were describing earlier?
17      A.  Yes.
18      Q.  Page 10 of your report, that's the
19  eyewitnesses, the fire department and dispatch data.  You
20  described a little bit of the timeline, if you will,
21  that you gathered from some of the depositions,
22  including the children going to sleep around 8:00 to
23  8:30 at night.
24          And you mentioned Stephanie having smoked a
25  cigarette or possibly several cigarettes in the shed

Page 64

1  before going to sleep on the couch around 2:00 a.m.,
2  correct?
3      A.  Yes.
4      Q.  You mentioned, "G. had woken up about 30
5  minutes before the fire, around 3:30, in the morning to
6  use the bathroom.  He did not notice anything out of the
7  ordinary at that time."
8          Did I read that correctly?
9      A.  Yes.
10      Q.  Okay.  As you're reviewing these depositions
11  and you're reviewing the witness statements on video,
12  are you factoring in, at all, the age of the children?
13      A.  I mean, obviously you -- you kind of do and --
14  and most people will factor that in, but you know, you
15  look at also the consistency of their statements, so
16  that's kind of how I gauge.  And then ultimately, you
17  know, I'm -- I'm a big one of correlating the witness
18  statements to actual physical evidence and the physics
19  themselves.
20      Q.  Okay.  Did you -- by way of example, did you
21  factor in G.'s age when he talks about having woken up
22  around 3:30 or 30 minutes before the fire?  Do you know
23  if he can tell time?
24      A.  I thought he said that he had a clock in his
25  bedroom or somewhere on his route to the bathroom so

Page 65

1  that -- I remember -- I recall him saying that.  So
2  yeah, I -- I mean, I would have factored that in, but
3  when he said I actually saw a clock that -- that kind of
4  helps.
5      Q.  Okay.  Did you reach any conclusions or
6  opinions as to whether or not the fire had started as of
7  3:30 in the morning?
8      A.  No.
9      Q.  No, you did not reach any conclusions or have
10  any opinions, or no, it had not.
11      MR. LAFLAMME:  I'm just going to object to form
12  to the -- are you talking smoldering fire or flaming
13  fire?
14      MR. AYALA:  Any aspect or iteration of the
15  fire.
16      MR. LAFLAMME:  Okay.
17      THE WITNESS:  No.  I mean, I didn't -- I didn't
18  do an analysis of, you know, when exact timewise
19  this fire would've started.
20  BY MR. AYALA:
21      Q.  Okay.
22      THE VIDEOGRAPHER:  Do you mind putting that
23  microphone back on?
24      MR. LAFLAMME:  Oh, I'm sorry.
25      THE VIDEOGRAPHER:  You're good.  Thank you.

17 (Pages 62 - 65)

Page 126

1  found it because it literally was, you know, attached
2  and melted over with the shed.
3      Q.  Well, that's speculation, right?
4      MR. LAFLAMME:  Object to form.
5      THE WITNESS:  Well, the melting and -- and
6  prying it off the concrete was not speculation.  So
7  if -- if you added something in there, because we
8  did have contents in the -- in the shed.  It -- we
9  had to -- so like the wooden chair, right?  The leg
10  of the wooden chair fell over.  It was completely
11  coated in plastic.  I wouldn't -- I didn't notice it
12  was the chair leg.  So you know, something smaller
13  like a cigarette butt could have done the same thing
14  is what I'm saying.
15  BY MR. AYALA:
16      Q.  Yeah.  No.  And I'm not -- I'm not disputing
17  that it could have, but my question to you was whether
18  there was any evidence that you saw, that you were
19  provided, that you reviewed to establish that fact?  That
20  was my initial question.
21      A.  Yeah.  That -- that -- I didn't do that
22  analysis.
23      Q.  Okay.  Page 16, you begin your data analysis.
24  We've been going through some of it already.  And you
25  describe, it goes onto page 17, the purpose of the

Page 127

1  computer fire models as we know to evaluate the effect
2  of fire on people, property, post-fire reconstruction,
3  fire risk assessment.  Obviously for some of those
4  purposes, you employed it in this case.
5      Have there ever been -- have you ever been
6  involved in the development of any computer fire
7  modeling software?
8      A.  Yes.  You know, I've served as a -- what you
9  would call a beta tester and providing feedback to the
10  model developers.  We have built our own correlations
11  off of the empirical or experimental test data that
12  ultimately, you know, are incorporated into larger
13  mathematical models.  So in that sense, yes, I have
14  been, you know, involved in -- in that type of software
15  development.
16      Q.  Okay.  You cite to a portion of NFPA 921 that
17  states, "Mathematical modeling techniques provide the
18  investigator with tools for testing hypotheses regarding
19  origin and cause of the fire/explosion and the cause of
20  the resulting damage to property or injury to people."
21      Did I read that correctly?
22      A.  Yes.
23      Q.  Okay.  And although NFPA 921 sites to that --
24  to that modeling and the modeling techniques, it
25  certainly doesn't require the use of the modeling

Page 128

1  techniques for purposes of fire investigation, correct?
2      A.  So that's where -- to determine origin, fire
3  dynamics is one prong of the information necessary to do
4  that, to -- to determine the origin effectively.  There
5  are times where the fire dynamics are difficult to just
6  sit there from years of experience and guess at what
7  happened.  Doing modeling and actually evaluating the
8  physics and testing those hypotheses is a tool for a
9  fire investigator to check those fire dynamics as it
10  relates to origin.
11      Q.  And so, with individuals who have investigated
12  fires and analyzed potential origin and causes of fires
13  that do not use modeling software, you would agree with
14  me that they are not violating or breaching NFPA 921?
15      A.  I would say that if they're capable based on
16  the scenario, to determine origin on fire dynamics, I
17  think they should still pull research data that assists
18  them.  But no, you wouldn't have to always do a model.
19  But in -- in this situation, this scenario specifically,
20  I think, it is problematic because it is a difficult
21  case, and there are a lot of variables that are involved
22  that people don't understand.  And they should have
23  called for assistance, essentially, in checking their
24  ability to understand the physics in this case.
25      Q.  Okay.  Obviously, you disagree with the

Page 129

1  conclusions reached by Michael Schulz, correct?
2      A.  Yes.
3      Q.  You know, Michael Schulz actually did go to
4  the scene and look at evidence?
5      A.  I understand he went there once.  Yes.
6      Q.  You disagree with the conclusions reached by
7  Detective Sheaman who investigated this fire on behalf
8  of Sweetwater County?
9      A.  I'm not sure if I do because I -- I thought he
10  was the one who kind of altered his opinion during his
11  deposition.  So I'm not -- I'm not exactly sure if he's
12  the one that wavered or not.
13      Q.  Yeah.  I don't -- I don't know what you're
14  referring to, but if you can identify it, I'd love to
15  hear it.  My recollection of Detective Sheaman's
16  testimony and opinions as to the origin was that it
17  began in the bedroom, and he was pretty definitive in
18  that during his deposition, assuming that to be true,
19  that was his ultimate conclusion.
20      You disagree with that?
21      A.  Yes.
22      Q.  Okay.  Detective Sheaman was of the belief
23  that the cause of the fire was the hover board, but
24  you're not getting into any analysis and not going to be
25  rendering any opinions at the time of trial as to the