Timothy M. Stubson, Wyo. Bar No. 6-3144
Brandon E. Pryde, Wyo. Bar No. 8-6883
Holly L. Tysse, Wyo. Bar No. 7-5553
Crowley Fleck PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
htysse@crowleyfleck.com

Eugene M. LaFlamme (Admitted pro hac vice)
Jared B. Giroux (Admitted pro hac vice)
Jillian L. Lukens (Admitted pro hac vice)
McCoy Leavitt Laskey, LLC
N19 W24200 Riverwood Drive, Suite 125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

*Attorneys for Defendants,*
*Walmart Inc. and Jetson Electric Bikes, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STEPHANIE WADSWORTH Individually and as Parent and Legal Guardian of W.W., K.W., G.W., and L.W., minor children and MATTHEW WADSWORTH, | ) ) ) ) ) | Case No. 2:23-cv-00118-KHR |
| Plaintiffs, | ) ) ) | **DEFENDANTS JETSON ELECTRIC BIKES, LLC AND** |
| v. | ) ) | **WALMART INC.'S RESPONSE IN OPPOSITION TO** |
| WALMART INC. and JETSON ELECTRIC BIKES, LLC, | ) ) ) | **PLAINTIFFS' MOTIONS *IN LIMINE*** |
| Defendants. | ) ) | |

WALMART INC. ("Walmart") and JETSON ELECTRIC BIKES, LLC ("Jetson"), (collectively "Defendants"), by and through their attorneys, Crowley Fleck PLLP and McCoy Leavitt Laskey LLC, hereby submit their response in opposition to Plaintiffs' Motions *in Limine*.

## INTRODUCTION

Plaintiffs cited nine supposed cases to support their various motions *in limine*. (Doc. 141). Eight of the nine cases are allegedly United States District Court decisions with seven of the eight supposedly emanating from the United States District Court for the District of Wyoming. The eighth district court case Plaintiffs cite is supposedly from the United States District Court for the Southern District of New York. All of the United States District Court decisions are cited only with a Westlaw citation and no pin cites or specific dates of decisions are provided. For the Court's convenience, all nine cases are listed below:

- *Wyoming v. U.S. Department of Energy*, 2006 WL 3801910 (D. Wyo. 2006);
- *Holland v. Keller*, 2018 WL 2446162 (D. Wyo. 2018);
- *United States v. Hargrove*, 2019 WL 2516279 (D. Wyo. 2019);
- *Meyer v. City of Cheyenne*, 2017 WL 3461055 (D. Wyo. 2017);
- *Benson v. State of Wyoming*, 2010 WL 4683851 (D. Wyo. 2010);
- *Smith v. United States*, 2011 WL 2160468 (D. Wyo. 2011);
- *States v. Hargrove*, 2019 WL 2516279 (D. Wyo. 2019);
- *Woods v. BNSF Railway Co.*, 2016 WL 165971 (D. Wyo. 2016);
- *Fitzgerald v. City of New York*, 2018 WL 3037217 (S.D.N.Y. 2018); and
- *U.S. v. Caraway*, 534 F.3d 1290 (10th Cir. 2008).

The only case cited correctly was *U.S v. Caraway*, 534 F.3d 1290, 1301 (10th Cir. 2008). Incidentally, this was the only cited case that also included a pinpoint citation.

For each of the alleged United States District Court decisions referenced above, none of their corresponding Westlaw citations are accurate, nor could Defendants identify these cases on Westlaw by their cited case names and venue designations. Defendants took further steps to try and identify these cases through LexisNexis, PACER and Google. Defendants, however, still could not identify the improperly cited cases through any of these additional search methods.

It is unknown as to how Plaintiffs identified these supposed cases, but at least some of these

mis-cited cases can be found on ChatGPT. Below is an example:



Despite being identified by ChatGPT as shown above, the *Meyer v. City of Cheyenne* case,

for example, cannot be found through any of the traditional legal research websites. With the

exception of the *U.S. v. Caraway* case, Plaintiffs' cited cases seemingly do not exist anywhere

other than in the world of Artificial Intelligence.[1] As such, this Court should wholly disregard these

---

[1] The use of Artificial Intelligence for legal research and briefing through such outlets as ChatGPT was the topic of the highly publicized case *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023). The offending party was sanctioned in the *Mata* case. *See also United States v. Hayes*, --F. Supp. 3d--, 2025 WL 235531, No. 2:24-cr-0280-DJC (E.D. Cal. Jan. 17, 2025) (noting the harms caused by use of fictitious or hallucinated authorities in the legal system and sanctioning counsel).

cases, deny Plaintiff's motions *in limine* and issue any further relief or actions that it deems appropriate.

## ARGUMENT

**I.    RESPONSE TO PLAINTIFFS' MIL #1**: **Plaintiffs have Testified that the Shed was Used Only for Smoking.**

Plaintiffs cite to a case – *Meyer v. City of Cheyenne,* 2017 WL 3461055 (D. Wyo. 2017) – in support of this motion that cannot be found on Westlaw or the other legal search engines Defendants consulted.

Nonetheless, Defendants agree that the term "smoking shed" has been used throughout this litigation, but such a term is accurate as to how the Wadsworths used this shed. Specifically, Mrs. Wadsworth testified:

> Q.    So when you were home and you would smoke, you would use the smoking shed in the winter.
> A.    Yes.
> Q.    Okay. Was the smoking shed used for anything else other than smoking?
> A.    No.

(LaFlamme Dec. ¶3, Ex. 1: S. Wadsworth Dep. 71:7-12). While the shed was not manufactured or initially sold to be a smoking shed, that is how it was exclusively used by Mr. and Mrs. Wadsworth.

This motion *in limine* is nothing more than an effort by Plaintiffs to minimize the fact that Mrs. Wadsworth smoked cigarettes in the smoking shed before she went to bed in the evening and early morning hours before the fire. Plaintiffs argue that Mr. and Mrs. Wadsworth "only used the shed from time [to time][2] to smoke and shield themselves from the harsh weather…" As Mrs. Wadsworth testified, however, this shed was used by Mr. and Mrs. Wadsworth to *only* smoke cigarettes in the winter months. They did not use the shed for any other purpose.  As such, the term

---

[2] It is presumed that Plaintiffs intended to say from "time to time" or "sometimes" in this quoted portion.

smoking shed is merely a descriptive and accurate term to identify how Mr. and Mrs. Wadsworth used this shed. The phrase is not inflammatory or misleading to the jury.

Moreover, Plaintiffs have even used the term "smoking shed" in this litigation. Following Mr. and Mrs. Wadsworth's depositions, Defendants requested any photographs Plaintiffs may have that show the shed's interior. Plaintiffs produced those photos in a fileshare link that Plaintiffs' titled "Smoking Shed pictures_S. Wadsworth." (LaFlamme Dec. ¶4, Ex. 2).

Finally, the fact that Mr. and Mrs. Wadsworth smoked in the shed is highly relevant to the case – especially with respect to the fact Mrs. Wadsworth admitted to smoking in the shed a couple of hours before the fire. (LaFlamme Dec. ¶3, Ex. 1: S. Wadsworth Dep. 87:6-90:8). Defense experts have concluded that the fire originated at the smoking shed from a cigarette and then spread to the house. (Doc. 80-1, Filas Report). As such, Defendants should be permitted to use the term smoking shed during trial to describe a shed that Plaintiffs used exclusively for smoking cigarettes.

**II.    RESPONSE TO PLAINTIFFS' MIL #2: Defendants' Expert Conclusion that this Fire Likely Started Due to an Improperly Discarded Cigarette is Admissible.**

In support of this motion, Plaintiffs cite a case – *Benson v. State of Wyoming*, 2010 WL 4683851 (D. Wyo. 2010) – that is not on Westlaw or the other legal search engines Defendants consulted. The Westlaw citation provided by Plaintiffs is for *Quilter v. Holder*, 401 Fed. App'x. 985 (5th Cir. 2010), which is a one paragraph decision that relates to an immigration case brought by a citizen of Belize. The only Wyoming case with a similar case name that could be identified on Westlaw was the *Benson v. State*, 571 P.2d 595, 601 (Wyo. 1977) case. This case, however, addresses a dispute over which jury instructions should have been given to the jury and whether a telephone conference that involved the defendant was admissible. Neither of these issues relate to the instant motion *in limine*.

Nonetheless, with this motion *in limine*, Plaintiffs seek to bar Joe Filas' fire origin and cause opinion that "the probable cause of the fire was the ignition of combustible materials from heat generated by the smoldering coal of an improperly discarded cigarette that ignited adjacent combustible material." (Doc. 80-1, pg. 6). This is, in essence, a duplication of Plaintiffs' Rule 702 *Daubert* motion against Filas.

As referenced in Defendants' response to Plaintiffs' Rule 702 *Daubert* motion against Filas, his conclusion that the fire originated at the smoking shed due to an improperly discarded cigarette flowed from his reliable scientific methodology and the facts at issue. *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3rd Cir. 1999) (holding that an expert opinion is admissible if it is based on reliable methodology and reasonably flowed from that methodology and the facts at issue).

Plaintiffs similarly seem to seek to prevent defense expert Greg Gorbett from also discussing Filas' opinion that a smoldering cigarette scenario caused this fire. While Gorbett is not offering any cause opinions in this case, he is able to comment on the opinions offered by other experts.

Further, Plaintiffs contend that there is no evidence that a cigarette was improperly discarded. That is not true. Mrs. Wadsworth testified that she smoked in the smoking shed hours before the fire. (LaFlamme Dec. ¶3, Ex. 1: S. Wadsworth Dep. 87:6-90:8). Further, the Wadsworth children also stated on body camera footage immediately after the fire that the fire started by the shed and that the fire was outside by the shed. (LaFlamme Dec. ¶5, Ex. 3: S. Schulz Dep. 51:7-53:6; 95:18-24; see also Doc. 80-1, pg. 23-29). Moreover, fire investigation studies have shown that a cigarette can smolder for "several hours" before it turns into flames. (Doc. 80-4, pg. 14).

Also, even Plaintiffs' origin expert, Michael Schulz, concedes that the careless disposal of smoking material (*i.e.,* cigarettes) can cause a smoldering fire that does not materialize into active flames for a number of hours. (LaFlamme Dec. ¶5, Ex. 3: Schulz Dep. 136:9-137:13). Moreover, Schulz also conceded that it would not concern him if a specific cigarette that was carelessly disposed of could not be identified when asked to assume that the fire started at the smoking shed due to careless use of smoking materials. (LaFlamme Dec. ¶5, Ex. 3: Schulz Dep. 204:16-205:16). This is because a cigarette can be consumed by the very fire that it starts. Further, Schulz acknowledged that:

> I do not believe, based on experience all these years, [] when somebody says, "Well, I always put my cigarette out and I know it was out," I don't ever rely on that. That may be what they believe that they did. It may or may not be the truth.

(LaFlamme Dec. ¶5, Ex. 3: Schulz Dep. 207:8-13). Plaintiffs argue that there is no evidence to support Defendants' theory because the causal cigarette could not be specifically identified in the fire debris and Mrs. Wadsworth contends that she properly disposed of her cigarettes when she smoked in the shed the evening and morning before the fire. Despite that argument, Plaintiffs' own expert acknowledges that testimony about a witness' supposed proper cigarette disposal is not always accurate – particularly in this case where Mrs. Wadsworth testified she had 10 drinks prior to smoking her last cigarette that evening. Further, it is not unusual, nor would it be surprising, for a cigarette to get consumed in this fire.

Additionally, Gorbett's computer models specifically show that this fire could not have originated in G.W. and L.W.'s bedroom, but it could have originated at the smoking shed. (LaFlamme Dec. ¶6, Ex. 4: Gorbett Dep. 135:16-19; 194:1-14). Again, this supports the conclusion that the fire was caused by the careless disposal of smoking materials in the smoking shed.

All of the above supports the admissibility of Filas' expert opinion. While Plaintiffs may dispute that opinion, that does not make it inadmissible. Defendants further rely on and incorporate herein Defendants' responses to Plaintiffs' Rule 702 *Daubert* motions filed against Gorbett and Filas. (Doc. 115 and 117).

III.    **RESPONSE TO PLAINTIFFS' MIL #3: Evidence of Stephanie Wadsworth's Alcohol Use is Relevant.**

As with the prior two motions *in limine*, the case cited in support of this motion – *Smith v. United States*, 2011 WL 2160468 (D. Wyo. 2011) also was not located on Westlaw or the other legal search engines Defendants consulted. The Westlaw citation provided is from what appears to be a foreign case – possibly Australia. In searching for any cases titled *Smith v. United States* (or some similar variation) from the United States District Court for the District of Wyoming, Defendants were not able to identify a case with that case name that discusses the admissibility of evidence related to alcohol use in a similar context.

Regardless, this motion *in limine* should be denied as Mrs. Wadsworth's alcohol use – especially in the evening and early morning hours before the fire – is highly relevant. While Mrs. Wadsworth testified that she doesn't specifically remember how many drinks she had the evening/morning before the fire, she did state that it was a typical alcohol consumption day for her, which was "somewhere around ten or so" drinks. (LaFlamme Dec. ¶3, Ex. 1: S. Wadsworth Dep. 62:24-64:7, 90:9-91:24).

The admissibility of alcohol consumption by a plaintiff was recently discussed in *Boyer v. Price*, 2021 WL 5759300, at *2 (E.D. Okla. Dec. 3, 2021). Plaintiff in *Boyer* was a passenger on a boat that was operating at night without lights and was involved in an accident. *Id*. at *1-2. Despite any evidence that the *Boyer* plaintiff actively caused or contributed to the accident, the *Boyer* defendant argued that plaintiff's alcohol consumption was relevant to plaintiff's credibility

and that alcohol may have impaired his perception or recollection of events. *Id*. at *2. The *Boyer* defendant further argued that such evidence is important to allow the jury to evaluate and weigh plaintiff's testimony. *Id.* The *Boyer* court agreed and ruled that evidence of plaintiff's alcohol consumption was relevant and that its probative value was not outweighed by the Fed. R. Evid. 403 considerations. *Id.*

A similar analysis was also recently completed by the Wyoming Supreme Court in *Roberts v. Roberts*, 523 P.3d 894 (Wyo. 2023). The plaintiff in this case was the father and father-in-law to the defendants. Defendants invited plaintiff to their house to watch fireworks. During his visit, plaintiff went to the back porch and stepped off the edge – which caused him to fall and suffer personal injuries. *Id.* at 896. Plaintiff filed a motion to exclude any evidence of his alcohol consumption prior to the accident. The trial court, however, admitted evidence of plaintiff's alcohol consumption, but barred testimony as to whether plaintiff was legally intoxicated. *Id.*

The *Roberts* court noted that there were two competing theories as to how the accident occurred – did plaintiff stumble off the deck or did he step off the deck into a hole that caused him to fall. *Id.* at 899. In *Roberts*, plaintiff's alcohol consumption, such as how many beers he drank, was relevant and admissible. *Id*. at 900. It would then be the jury's duty to weigh the facts related to plaintiff's alcohol consumption and apply that to the other evidence presented. *Id.* The *Roberts* court also rejected plaintiff's argument that the probative value of his alcohol consumption was substantially outweighed by potential unfair prejudice. *Id.*

Here, Mrs. Wadsworth admitted that she consumed "ten or so" alcoholic drinks during the night and early morning hours before the fire. She also admitted to smoking in the smoking shed a couple of hours prior to the fire. Her alcohol use is highly relevant to her recollection of activities and whether she could have carelessly or improperly disposed of her cigarette that night.

Moreover, the probative value is not substantially outweighed by any of the Fed. R. Evid. 403 considerations.

Like the *Boyer* and *Roberts* courts, this Court should similarly deny Plaintiff's motion *in limine*.

**IV.    RESPONSE TO PLAINTIFFS' MIL #4: The Electrical Service to the House was Severed in the Fire.**

Plaintiffs again cite to a case – *Wyoming v. U.S. Dept. of Energy*, 2006 WL 3801910 (D. Wyo. 2006) – in support of this motion that is not identifiable on Westlaw or the other legal search engines Defendants consulted.

Nonetheless, Plaintiffs contend that Defendants should be precluded from arguing that the Wadsworth home "was 'de-energized' at the time of the incident." As an initial matter, it is unclear exactly what type of ruling Plaintiffs seek with this motion. Defendants agree that the home was energized when the fire started. The home only became "de-energized" after the electrical service triplex was severed by the fire. When the service triplex was severed, then the home had no way to obtain electrical power and became "de-energized."

Plaintiffs further argue, without much explanation, that "Defendants' experts failed to fully test and examine electrical circuits throughout the entire house, choosing only to rely upon the Bedroom #4 circuit to conclude that the entire house was de-energized." This is not true, Strandjord did fully inspect the home's electrical system.

Strandjord inspected the home's main electrical panel and the electrical subpanel – which distribute electricity through the whole house. (Doc. 80-10, pg. 7-14). He also inspected the electrical service triplex, which was severed in fire. (Id.). Plaintiffs do not dispute that the electrical service triplex was severed at some point in the fire – nor can they.

Strandjord also reviewed and analyzed the branch circuit conductors in bedroom 4 (G.W. and L.W.'s bedroom) and outside bedroom 4 where the smoking shed was located to evaluate the only two potential areas of origin identified by the various fire investigators. (LaFlamme Dec. ¶7, Ex. 5: Strandjord Dep. 52:7-54:25). Electrical arcing was identified in the smoking shed, indicating that fire was present in the shed before the electrical service triplex was severed. (LaFlamme Dec. ¶7, Ex. 5: Strandjord Dep. 52:17-54:25). Specifically, when the service triplex (located above the smoking shed) melted and severed, there was no longer any electrical energy in the home and there was no possibility of electrical arcing on conductors within the home. (LaFlamme Dec. ¶7, Ex. 5: Strandjord Dep. 52:7-54:25; 56:12-25; 72:16-73:18). Therefore, for there to be evidence of electrical arcing in the smoking shed, it had to have occurred prior to the time that the service triplex was severed as arcing does not occur on non-energized lines. (LaFlamme Dec. ¶7, Ex. 5: Strandjord Dep. 52:7-54:25; 71:1-12; 75:7-13). Similarly, the fact that no electrical arcing was found in bedroom 4 along with the absence of any tripped circuit breakers is consistent with a conclusion that the home was "de-energized" when the fire entered the home from the smoking shed. (Id.).

Plaintiffs seem to suggest that Strandjord should have pulled all the electrical wiring from the entire house to inspect it further in a lab. To the extent this is what Plaintiffs suggest, that is absurd. Strandjord preserved all the electrical wiring from the two potential areas of origin and examined this wiring further in a lab setting. It is not necessary to preserve the electrical wiring from other areas of the house that have been excluded as a potential area of origin – especially when none of the circuit breakers tripped. Of course, Plaintiffs cite to no authority (fictitious or otherwise) to support such a ridiculous notion. Moreover, Plaintiffs had their own electrical engineering expert at the site inspection. Even though Plaintiffs ultimately decided not to name

this electrical engineer as an expert in this case, Plaintiffs had every opportunity to preserve further electrical wiring from other rooms in the house had they felt it was necessary.

In short, Strandjord's knowledge, skill, training, education and experience with regard to electrical theory, electrical systems, NFPA 921, arc surveys, and arc mapping, allowed him to determine that there was no electrical power to the home after the service triplex melted and, therefore, no electrical energy in any of the home's branch circuits. This is consistent with the lack of arc evidence within bedroom 4 and the lack of any tripped electrical breakers for the house.

While Plaintiffs obviously do not like the opinion that the home was "de-energized" when the fire entered the home from the smoking shed, there is ample evidentiary support for such a conclusion. Plaintiffs, of course, are free to cross-examine the defense experts on this issue, but this does not mean that the opinions are inadmissible. This is a matter for the jury to decide. Defendants further rely on and incorporate herein Defendants' responses to Plaintiffs' Rule 702 *Daubert* motions filed against Strandjord and Filas. (Doc. 116 and 117).

Given the above, this Court should deny this motion *in limine*.

## V.    RESPONSE TO PLAINTIFFS' MIL #5: This Motion is not Opposed.

Defendants do not object to this motion *in limine* and agree that Defendants' economist will use the $80 figure for any "The Dollar Value of a Day" testimony.

## VI.    RESPONSE TO PLAINTIFFS' MIL #6: The Expert Opinions and Testimony Offered by Defense Experts Filas, Strandjord and Gorbett are not Cumulative or Duplicative.

Once again, Plaintiffs cite to a case – *States v. Hargrove*, 2019 WL 2516279 (D. Wyo. 2019) – in support of this motion that cannot be found on Westlaw or the other legal search engines Defendants consulted. While there is a 2019 case *United States v. Hargrove* from the Tenth Circuit, it was an appeal from the United States District Court for the District of New Mexico. *See United*

*States v. Hargrove*, 911 F.3d 1306, 1309 (10th Cir. 2019). Even that Tenth Circuit case, however, does not discuss the issue of any potential cumulative or duplicative expert testimony as Plaintiffs suggest in this motion.

With respect to the substance of Plaintiffs' motion, Gorbett is a computational fluid dynamics modeling expert, Strandjord is an electrical engineer and Filas is a fire origin and cause investigator. Gorbett conducted computer model simulations to assess the competing origin hypotheses based on fire development, fire spread and occupant exposure/tenability issues. Strandjord is an electrical engineer that assessed the home's electrical system and identified areas where electrical arcing occurred. Filas is a fire origin and cause expert. There is no duplication in the Defendants' proffered expert testimony or disciplines.

While Gorbett and Strandjord's opinions are building blocks for Filas' opinion – none of the three opinions are in any way duplicative. Plaintiffs could have, but did not, identify any experts to discuss fire modeling and fire dynamics engineering like Gorbett. Plaintiffs also could have, but did not, have an electrical engineer assess the home's electrical system and identify areas where electrical activity occurred.[3] Defendants should not be punished because Plaintiffs did not work-up their case.

Further, to the extent there is any duplication – which there is not – U.S.D.C.L.R. 26.1(e)(1) specifically acknowledges that complex cases may require multiple expert witnesses with "specialized areas of expertise within a larger general field." In *United States v. Hamilton*, 2014 WL 12814334, No. 10-CV-231-J (D. Wyo. Mar. 10, 2014), this district court had to decide expert challenges in a Clean Water Act case. The two experts at issue had testimony in "similar areas of

---

[3] Plaintiffs did have an electrical engineer at the August 2-3, 2022 site inspections (Daren Slee from ESi) and a different electrical engineer at the October 30, 2023 evidence inspection (Scott Cramer from EDT), but neither of these electrical engineers were included in Plaintiffs' expert disclosures.

expertise, [but] not identical" and focused on similar topics, but with some "significant areas of difference." *Id. at \*6.* In the *Hamilton* case, Judge Rankin ruled that in such a situation, the trial judge should determine if there is duplicative testimony during trial. *Id.*

Like a Clean Water Act case, fire cases are similarly complex. The fact that NFPA 921 is an approximate 500-page guide with numerous topics exemplifies the complex nature of fire investigations. Therefore, to the extent Gorbett, Strandjord and Filas may address some similar topics, they do so with significant areas of difference. Further, Defendants do not intend to offer any duplicative expert testimony at trial.

Moreover, if Defendants did not have Gorbett and Strandjord assess the competing origin theories through their respective fire dynamics/modeling and electrical engineering disciplines, then Plaintiffs would undoubtedly criticize Defendants for not modeling the fire or assessing the home's electrical system with an electrical engineer. Defendants further adopt by reference the arguments and authorities raised in the Rule 702 *Daubert* response briefs (Docs. 115, 116, and 117).

As a result, this Court should deny this motion *limine*.

**VII.    RESPONSE TO PLAINTIFFS' MIL #7: Plaintiffs' Prior Rule 702 *Daubert* Motions Should be Denied.**

This motion *in limine* simply adopts by reference Plaintiffs' prior Rule 702 *Daubert* motions. For the reasons stated in Defendants' Rule 702 *Daubert* response briefs (Docs. 115, 116, and 117), this motion *in limine* should be similarly denied.

**VIII.    RESPONSE TO PLAINTIFFS' MIL #8: The UL Listings Applicable to the Plasma Hoverboard and its Components are Relevant and Admissible.**

As with every other motion *in limine* filed where a case was cited, Plaintiffs again cite cases – *Woods v. BNSF Railway Co.,* 2016 WL 165971 (D. Wyo. 2016) and *Fitzgerald v. City of*

*New York*, 2018 WL 3037217 (S.D.N.Y. 2018) – in support of this motion that could not be located on Westlaw or the other legal search engines Defendants consulted.

Despite the lack of proper case law cited in this motion, it is unclear exactly what type of ruling Plaintiffs seek. Moreover, Plaintiffs do not give any examples of the type of questions defense counsel has supposedly asked that suggest a UL listing "is essentially a certification that their product is safe and cannot cause injury or malfunction." Certainly, the fact that the hoverboard and its components were UL listed is relevant and admissible. The type of testing that is required to obtain the UL listing is also admissible as it is relevant to the product liability and negligence claims. If Plaintiffs merely seek a ruling that Defendants should be precluded from arguing that a UL listing makes it impossible that UL listed products could have a product failure in one form or another, then Defendants do not anticipate making such an argument.

**CONCLUSION**

Based on the above, Plaintiffs' Motions *in Limine*, and each of them, should be denied.

**McCOY LEAVITT LASKEY LLC**

Attorneys for Defendants, Jetson Electric Bikes, LLC and Walmart Inc.

Dated: January 29, 2025          By:_____

Eugene M. LaFlamme *(pro hac vice)*
Jared B. Giroux *(pro hac vice)*
Jillian L. Lukens *(pro hac vice)*
McCoy Leavitt Laskey, LLC
N19 W24200 Riverwood Drive, Suite 125
Waukesha, WI 53188
(P) 262-522-7000
elaflamme@MLLlaw.com
jgiroux@MLLlaw.com
jlukens@MLLlaw.com

and

15

Timothy M. Stubson, Wyo. Bar No. 6-3144
Brandon E. Pryde, Wyo. Bar No. 8-6883
Holly L. Tysse, Wyo. Bar No. 7-5553
Crowley Fleck, PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
(P) 307-232-6901
tstubson@crowleyfleck.com
bpryde@crowleyfleck.com
htysse@crowleyfleck.com