EXHIBIT 3

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING


STEPHANIE WADSWORTH,                )
Individually and as Parent          )
and Legal Guardian of W.W,          )
K.W., G.W., and L.W., minor         )
children, and MATTHEW               )
WADSWORTH                           )
                                    )
          Plaintiffs,               )
                                    )
     vs.                            )   No. 2:23-cv-00118-NDF
                                    )
WALMART, INC., and JETSON           )
ELECTRIC BIKES, LLC,                )
                                    )
          Defendants.               )
_____)


DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California


REPORTED BY: Joy E. Shure, CSR No. 3659

1    scene are obviously made immediately after the witness

2    encounters the situation?

3              MR. AYALA:  Form.

4    BY MR. LaFLAMME:

5         Q.    I think that probably goes without saying.

6         A.    Yeah.  Yeah, pretty intuitive.

7         Q.    Okay.  I am going to, since you haven't seen

8    these before, show you the body camera footage from

9    Ashley Merrill's body cam.

10        A.    And you're representing to me that I don't --

11   this is not one of them I have in my file; right?

12        Q.    I can tell you it is not.

13        A.    Okay.

14        Q.    Unless you have additional stuff that was not

15   put into the Dropbox.

16        A.    No.  Everything's there.

17        Q.    All right.  So this is a 30-minute video that

18   is denoted "Fire;_1620_HWY_374-2," and that's how it was

19   provided to us.

20              And you don't need to take down the audio on

21   this.

22              THE REPORTER:  Okay.  Great.

23   BY MR. LaFLAMME:

24        Q.    All right.  I'm going to go to about 5:30,

25   specifically starting at 5:27.

1            Hold on.  Let me get the volume up more for

2    you.  All right.  And I'll back it up to 5:25.

3                    (Video played.)

4    BY MR. LaFLAMME:

5        Q.   Are you able to hear that well?

6        A.   I am.

7        Q.   Is there volume coming out of there or not?

8        A.   I think it's coming out of here, yes.

9        Q.   Okay.

10                   (Video played.)

11   BY MR. LaFLAMME:

12       Q.   Do you hear Kamille say, "It started by the

13   shed"?

14       A.   I heard that, yes.

15       Q.   You have not seen this video before; correct?

16       A.   I have not.

17       Q.   And Kamille indicated, "It started by the shed"

18   at five minutes 42 seconds.

19       A.   Correct.

20                   (Video played.)

21   BY MR. LaFLAMME:

22       Q.   You heard Kamille and Layne there say that the

23   fire was outside by the shed?

24       A.   I heard that, yes.

25       Q.   Okay.  And you heard Kamille indicate that her

Page 53

1    parents smoke at the shed; correct?

2         A.    Correct.

3         Q.    Okay.  And that's your understanding of what

4    the shed was used for as well; correct?

5         A.    Yeah, it's always been referred to as the

6    "smoking shed."

7         Q.    Okay.  And you're aware that Mrs. Wadsworth did

8    smoke in that shed in the early morning hours before the

9    fire?

10        A.    You want to change your screen because I can

11    see your outline.

12        Q.    Oh, thanks.

13             MR. AYALA:  It will tell you where he's going

14   with his questions.

15             THE WITNESS:  No, that's not fair.

16   BY MR. LaFLAMME:

17        Q.    Okay.  You're aware that Mrs. Wadsworth smoked

18   in that smoking shed within a couple hours of the fire;

19   correct?

20             MR. AYALA:  Form.

21             THE WITNESS:  Correct.  I think her testimony

22   was she had smoked out there and then was in the house

23   and going to bed in the living room by 2:00 a.m.  So

24   sometime prior, just prior to 2:00 a.m. is the way the

25   deposition read.

1  BY MR. LaFLAMME:

2      Q.   Okay.  You agree that Gunner and Layne are

3  indicating --

4          MR. AYALA:  Well, were you done with your

5  answer?

6          THE WITNESS:  Yeah.  For example, if we make

7  the assumption that the window is broken out and that

8  the fire is on the outside and it's breaching into the

9  bedroom, then I would ask the same question, "Why aren't

10  they burned?"

11  BY MR. LaFLAMME:

12      Q.   You agree that Gunner and Layne indicated that

13  the fire was at the window when they woke up; correct?

14          MR. AYALA:  Form.

15          THE WITNESS:  In their statements to the

16  detective at the time of the event, yes.

17  BY MR. LaFLAMME:

18      Q.   Okay.  And the statements that you heard in the

19  body camera footage immediately after the fire, Kamille

20  and Gunner also indicated that the fire was outside;

21  correct?

22          MR. AYALA:  Form.

23          THE WITNESS:  They're making that -- yes.

24  They're making that statement, yes.

25  ///

1      Q.    Do you know, as you sit here today, how many

2    cells had expelled?

3      A.    I don't know.  I wasn't involved in that

4    examination.

5      Q.    Do you know the manner in which the cells

6    expelled?

7      A.    I don't.  I'm not offering opinions on that.

8      Q.    You have -- let me strike that.

9            With a fire that initiates from careless

10   disposal of smoking material, that generally can be a

11   smoldering type fire; correct?

12           MR. AYALA:  Form.

13           THE WITNESS:  It has a high likelihood to do

14   that, yes.

15   BY MR. LaFLAMME:

16      Q.    Okay.  And in saying "smouldering type fire,"

17   meaning that that is a fire that could initiate a

18   lengthy period of time after the actual careless

19   disposal of smoking materials occurs?

20      A.    And before and after the flaming combustion,

21   yes.

22      Q.    Meaning if Mrs. Wadsworth had smoked in the

23   smoking shed sometime between 1:30 and 2:00 a.m. and

24   this fire initiated sometime between 4:00 and 4:30 a.m.,

25   and assuming it was due to careless use of smoking

1    material, that time lapse is not unusual with careless

2    use of smoking material-generated fires?

3              MR. AYALA:  Form.

4              THE WITNESS:  No, it can't be used to exclude

5    that possibility.

6    BY MR. LaFLAMME:

7        Q.    Meaning the time difference from which

8    Mrs. Wadsworth testified that she last smoked in the

9    smoking shed and the identification of this fire had it

10   started -- assuming it started in the smoking shed, that

11   time lapse would not exclude careless use of smoking

12   material?

13       A.    No.

14       Q.    Looking at Pages 56 to 59, this is a list of

15   all the evidence in this case; correct?

16       A.    Correct.

17       Q.    All right.  And aside from visual observations

18   either in person or of photographs, you have not

19   physically inspected any of the evidence in this case?

20       A.    Not as part of an evidence exam.

21             Obviously, I looked at the -- I looked at the

22   hoverboard the first time we were there.  I looked at

23   the outlet.  I looked at some of the branch wiring and

24   so forth, but I did not look at any of this evidence as

25   part of a subsequent organized laboratory inspection.

Page 204

1  BY MR. LaFLAMME:

2      Q.   Okay.  You had discussed with Mr. Ayala some of

3  the deposition testimony from the Wadsworth children.

4           Do you agree that that deposition testimony was

5  given in May of this year; correct?

6      A.   Yes.

7      Q.   So more than two years after the fire; correct?

8      A.   Correct.

9      Q.   Okay.  And do you agree that, as a general

10  statement, people's memories are freshest in the closest

11  in time to the event?

12           MR. AYALA:  Form.

13           THE WITNESS:  I always agree to that as a

14  general statement, yes.

15  BY MR. LaFLAMME:

16      Q.   With respect to the disposal of smoking

17  material, you had indicated that there was no way to

18  reach that conclusion.

19           Do you recall that?

20      A.   Correct.  That's one of those fire causes that

21  even if that's what occurred, it's very hard to ever

22  prove or reach that conclusion without very credible

23  evidence.

24      Q.   And what you are getting at there is that the

25  careless disposal of the smoking material will be

1   subsumed within the fire damage material; correct?

2          MR. AYALA:  Form.

3          THE WITNESS:  Generally, that's the biggest

4   problem, yes.

5   BY MR. LaFLAMME:

6       Q.   Okay.  So in this situation --

7       A.   Either consumed or even recognized in the

8   processing of the fire scene.

9       Q.   Okay.  So in this situation, based on an

10  assumption that the fire started due to a careless use

11  of smoking material within the smoking shed, it is not

12  surprising to you that you would not be able to identify

13  the specific cigarette that was carelessly disposed of;

14  correct?

15         MR. AYALA:  Form.

16         THE WITNESS:  That wouldn't bother me, no.

17         MR. LaFLAMME:  Okay.  That's all the questions

18  I have, sir.

19         THE WITNESS:  Thank you.

20

21                  FURTHER EXAMINATION+

22  BY MR. AYALA:

23      Q.   In other words, a smoking material that is

24  carelessly disposed of, in this case, based upon the

25  facts and circumstances of this case, in order to

Page 207

1    shed?

2        A.    Yes.

3        Q.    You'd have to ignore the physical evidence

4    indicating the origin inside of the home?

5        A.    That's the biggest one for me.  The origin is

6    not out in the shed, and so I can dismiss the careless

7    use of smoking materials.

8              I'm not -- I do not believe, based on

9    experience all these years, is when somebody says,

10   "Well, I always put my cigarette out and I know it was

11   out," I don't ever rely on that.

12             That may be what they believe that they did.

13   It may or may not be the truth.

14       Q.    Which is why in doing what you do for all of

15   these years, you rely on the hard evidence, the physical

16   evidence that indicates the most likely origin?

17       A.    Correct.  And so in many cases where I have

18   believed it's careless use of smoking materials, I

19   always label those as undetermined.

20       Q.    This is not one of those cases?

21       A.    No.

22       Q.    By the way, you were asked questions about you

23   not being present for certain subsequent inspections of

24   evidence and things of that nature.

25             Did your absence from any other events in this

Page 212

1                     REPORTER'S CERTIFICATE

2

3            I, Joy E. Shure, a Certified Shorthand Reporter,

4    holding a valid and current license issued by the State of

5    California, CSR No. 3659, do hereby certify:

6            That said proceedings were taken down by me in

7    shorthand at the time and place therein set forth and

8    thereafter transcribed into typewriting under my direction

9    and supervision.

10           I further certify that I am neither counsel for

11   nor related to any party to said action nor in anywise

12   interested in the outcome thereof.

13           Before completion of the deposition, review of

14   the transcript [X ]was [  ]was not requested.

15           The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's certificate

17   null and void.

18

19           IN WITNESS WHEREOF, I have hereunto subscribed my

20   name on this 25th day of September, 2024.

21

22

23                     _____

24                     Joy E. Shure, CSR No. 3659

25