**EXHIBIT 5**

```
                                                              Page 1

 1              UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF WYOMING
 2
     Case No. 2:23-cv-00118-NDF
 3
     STEPHANIE WADSWORTH, Individually and as
 4   Parent and Legal Guardian of W.W., K.W, G.W,
     and L.W., minor children, and MATTHEW WADSWORTH,
 5
          Plaintiffs,
 6
     vs.
 7
     WALMART, INC. and JETSON ELECTRIC BIKES, LLC,
 8
          Defendants.
 9
     ---------------------------------------------------------
10   VIDEO DEPOSITION OF BRIAN N. STRANDJORD, PE, CFI, CFEI
                     November 27, 2024
11   ---------------------------------------------------------
12   APPEARANCES:
13   ON BEHALF OF THE PLAINTIFFS:
                     T. MICHAEL MORGAN, ESQ.
14                   Morgan & Morgan, P.A.
                     20 North Orange Avenue, Suite 1600
15                   Orlando, Florida 32801
                     Phone: 407-420-1414
16                   Email: mmorgan@forthepeople.com
                     (Via Zoom)
17
     ON BEHALF OF THE DEFENDANTS:
18                   EUGENE M. LaFLAMME, ESQ.
                     McCoy Leavitt Laskey LLC
19                   N19 W24200 Riverwood Drive, Suite 125
                     Waukesha, Wisconsin 53188
20                   Phone: 262-522-7026
                     Email: elaflamme@mlllaw.com
21
     Also Present:   Julie Butcher, Videographer
22                   Peter Curran, Concierge-Tech (Via Zoom)
                     Angela Kelsey-Flowers (Via Zoom)
23
24
25
```

Page 52

1             MR. MORGAN:  If we can pull up the report
2     again, Exhibit A, and go back to the conclusions,
3     please.
4             MR. CURRAN:  Yes, sir.  One moment.
5             It's up, sir.
6             MR. MORGAN:  Okay.
7        Q    (By Mr. Morgan)  When we look at Conclusion
8     No. 4, the conclusion reads, "The physical evidence
9     presented by the electrical system at the Residence
10    was not consistent with a fire originating within the
11    Residence."
12            When we talk about the physical evidence
13    presented by the electrical system, are you referring
14    to arcing?
15       A    Yes.  I'm referring to electrical arcing or
16    the lack thereof.
17       Q    Okay.  And is it a fair interpretation of
18    this statement that it is not saying conclusively the
19    fire did not originate in the residence; it is simply
20    saying there was no evidence of electrical arcing in
21    Bedroom 4?
22       A    Part of what -- part of what Conclusion 4
23    is saying is that there's no evidence of electrical
24    arcing in Bedroom 4, but it goes -- it goes further
25    than that.

1          The arc mapping as a whole provides in this
2     case an indication of the fire spread or how the fire
3     progressed through the course of the fire.
4          Q    Okay.  Explain.
5          A    Sure.  So when we look at the -- the
6     area -- potential areas of origin defined by the fire
7     investigators involved in this matter -- so we looked
8     at the Bedroom 4 and we looked at the area just
9     outside of Bedroom 4, where a polymer smoking shed was
10    located.
11              If we look at the -- all of the conductors
12    that we looked at, we found no evidence of electrical
13    arcing in the branch circuit conductors in Bedroom 4;
14    we found evidence of electrical arcing on small
15    fragments of wires located in what was the polymer
16    shed.  Whether that was the ends of extension cords or
17    appliance cords plugs into that, we don't know.  They
18    were simply fragments.  But we have evidence of
19    electrical arcing in the shed.
20              And then we have the severed service
21    triplex that provided electrical service to the
22    residence from the -- from the utility company.
23              And so we have -- we have arc -- once --
24    I'll start with the service triplex.  The service
25    triplex was composed of aluminum, and it ran

Page 54

1     approximately right over the polymer shed.
2               The service triplex was melted and severed
3     during the fire, which is not uncommon.  Again,
4     aluminum has a low enough melting temperature that it
5     is common for aluminum to melt in a fire.
6               Once that service triplex melted and was
7     severed, there would no longer be any electrical
8     service to the residence; there would no longer be any
9     electrical energy in any of the branch circuits in the
10    residence.
11              So having evidence of electrical arcing on
12    cords in the shed, we know that fire was present in
13    the shed or at the shed prior to the time that the
14    service triplex was severed; because again, after the
15    service triplex was severed, we would have no
16    electricity to produce arcing.
17              Then the --
18        Q    Okay.
19        A    -- the -- once that service triplex was
20    severed, there is no longer -- again, no longer any
21    electrical energy present in any of the branch
22    circuits; so there would be no -- there would be no
23    electrical arcing, there would be no evidence of
24    electrical arcing on any of the other circuits after
25    that.

Page 56

1      Q    So when you say that you believe that
2  because the triplex was melted and you didn't see
3  arcing in Bedroom 4, that means there was no
4  electricity to the home, right?
5      A    (No response.)
6      Q    Is that right?
7      A    I want to make sure I understand exactly
8  what you're stating there.
9           Yes, once the service triplex was melted
10 and severed, there was no more electrical power to the
11 home.
12     Q    Right.  But what I'm saying is:  Because
13 you only arc mapped two places, Bedroom 4 and the
14 shed, you cannot tell anyone that there was not
15 electricity in the home at the time that the service
16 triplex melted, because you don't have any evidence
17 yourself, right?
18          MR. LaFLAMME:  Object to form.
19     A    So if I understand what you just asked me,
20 you're saying -- you're saying that I cannot determine
21 that there was no electrical power in the home when
22 the service triplex melted.  And that is incorrect.
23     Q    (By Mr. Morgan)  Correct.
24     A    When the service triplex melted, there was
25 no longer any electrical energy in the home.

Page 71

1    Q    (By Mr. Morgan)  Okay.  No. 3 says -- we'll
2    take it in two parts -- The physical evidence
3    presented by the electrical system at the Residence
4    was consistent with:  A, Fire being present at or
5    within the polymer Smoking Shed prior to the time that
6    the fire severed the overhead service triplex to the
7    Residence.
8         So let's start just with that.  The
9    evidence that that is based off is the arcing found on
10   the metal fragments within the shed, correct?
11   A    Yes, on the conductor fragments in the
12   shed.
13   Q    As well as the lack of arcing in Bedroom 4,
14   correct?
15   A    Well, when we're -- when we're speaking
16   specifically about Conclusion 3a, when I say fire
17   being present at or within the polymer smoking shed
18   prior to the time that the fire severed the overhead
19   service triplex to the residence, I'm not -- I'm not
20   making that statement based on anything that was or
21   was not found in Bedroom 4.
22        I'm making that statement simply based on
23   the fact that the service triplex was severed; and
24   after the time that that service triplex was severed,
25   there was no longer any electrical energy supplied to

Page 72

```
 1      the residence.
 2              Therefore, any electrical arcing that
 3      occurred to those conductors in the shed, which was
 4      plugged into extension cords, powered by the
 5      residence, for there to be evidence of electrical
 6      arcing in the shed, that had to have happened prior to
 7      the time that the service triplex was severed.
 8          Q   Okay.  I do -- I believe I understand.  But
 9      let me ask you a hypothetical:  Hypothetically, if we
10      had a fire in Bedroom 4, coming out of the window,
11      could that also cause the aluminum to melt and
12      disconnect power from the home?
13          A   Any fire present at the service triplex
14      could cause the aluminum to melt and severe the
15      service to the residence.
16          Q   Okay.  And so going specifically to A:
17      What we are basing the fact that the fire must have
18      come from the shed is that we have the presence of
19      arcing on the wire fragments and we do not have the
20      presence of arcing in Bedroom 4?
21          A   No.  That's not what I'm stating in 3a.
22      What I'm stating -- what I'm stat- --
23          Q   Okay.  I'm still lost.
24          A   I'm sorry.  Go ahead.
25          Q   Go ahead.
```

Page 73

1              No, I'm still -- I'm just having trouble
2     figuring out what other elements are considered there,
3     so I want to -- I'm trying to understand it.  I'm
4     sorry.
5          A    Sure.  Sure.  Conclusion 3a is very simple:
6     There was evidence of arcing, electrical arcing, on
7     conductor fragments in the shed.  That could only
8     occur if there was electrical energy present, if the
9     electrical service to the residence was still intact.
10              The service triplex to the residence, which
11    supplies all of the electrical power to the residence,
12    was severed during the fire.  It was melted and
13    severed.
14              After the time that that service triplex
15    was severed, there was no longer any electrical energy
16    in the building and there was no possibility of
17    electrical arcing on conductors powered by the
18    building.
19              So all I'm saying in Conclusion 3a is that
20    the arcing occurred on the conductors within the shed
21    prior to the time that the overhead service triplex
22    was severed.
23         Q    How do you determine that there was not
24    fire inside the residence and fire in the shed at the
25    same time?

Page 75

1    time that the fire attacked the branch circuit wiring
2    within Bedroom 4 of the Residence.
3            And is that saying that because there was
4    no arcing within Bedroom 4, that you believe the power
5    must have been cut by that time?
6        A    That is correct.
7        Q    Got it.
8            Now, are you aware of a hypothesis or
9    research relating to arcing on non-energized lines?
10       A    I'm not aware -- I'm not aware of any
11   arcing occurring on non-energized lines, because
12   electrical arcing requires that the lines be
13   energized.
14       Q    Okay.  And then let's go to Conclusion 1.
15   And I'm going to leave out a word just for future
16   motion in limine, but we can talk about whether it
17   should come back in later.
18           No. 1:  Evidence of electrical arcing was
19   present on conductors located within the polymer Shed
20   adjacent to the Residence.
21           That conclusion is simply talking about the
22   arcing on the metal fragments that we've seen,
23   correct, or that we've spoken about?
24       A    Yes.  That is -- that is speaking about
25   evidence of electrical arcing on the conductor

1   STATE OF MARYLAND
2       I, David Corbin, a Notary Public in and
    for the State of Maryland, do hereby certify
3   that the within named, SAMUEL SUDLER, III,
    personally appeared before me at the time and
4   place herein set according to law, was
    interrogated by counsel.
5
        I further certify that the examination was
6   recorded stenographically by me and then
    transcribed from my stenographic notes to the
7   within printed matter by means of
    computer-assisted transcription in a true and
8   accurate manner.
9       I further certify that the stipulations
    contained herein were entered into by counsel
10  in my presence.
11      I further certify that I am not of counsel
    to any of the parties, not an employee of
12  counsel, nor related to any of the parties, nor
    in any way interested in the outcome of this
13  action.
14      AS WITNESS my hand and Notarial Seal this
    4th day of December, 2024, at Centerville,
15  Maryland.
16
17
                                 *David C. Corbin (signature)*
18                               David C. Corbin
                                 Notary Public
19
20
21  My commission expires November 13, 2027