# EXHIBIT 2

Michael Schulz
09/10/2024

Page 1

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

```
STEPHANIE WADSWORTH,            )
Individually and as Parent      )
and Legal Guardian of W.W,      )
K.W., G.W., and L.W., minor     )
children, and MATTHEW           )
WADSWORTH                       )
                                )
          Plaintiffs,           )
                                )
     vs.                        ) No. 2:23-cv-00118-NDF
                                )
WALMART, INC., and JETSON       )
ELECTRIC BIKES, LLC,            )
                                )
          Defendants.           )
_____)
```

DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California

REPORTED BY: Joy E. Shure, CSR No. 3659

Michael Schulz
09/10/2024

Page 29

```
 1   this house would have had electrical power at the time
 2   the fire initiated?
 3        A.   Correct.
 4        Q.   And the house would have maintained electrical
 5   power to it until the fire breached through this window
 6   and either the flames from the window or the flames from
 7   the smoking shed, under your theory, severed it?
 8        A.   Correct.
 9        Q.   All right.  We'll get back to all of this.  I
10   got a little sidetracked from your invoices here, which
11   will happen.
12             All right.  After your May site inspection,
13   that was the only time that you have physically seen any
14   evidence in this case; correct?
15        A.   Correct.
16        Q.   And there was a follow-up August site
17   inspection with a number of additional parties; correct?
18        A.   Correct.
19        Q.   You did not attend that?
20        A.   I did not.
21        Q.   Mr. Birdsong attended on your behalf?
22        A.   Correct.
23        Q.   All right.  Why did you not attend it?
24        A.   I think I had a trial conflict or something.
25             Originally, I was scheduled to attend and he
```

Michael Schulz
09/10/2024

Page 34

1   indicating -- or the diagrams that you're indicating
2   that he did?
3       A.   Correct, independent of the Matterport diagrams
4   that he generated.
5       Q.   Correct.
6       A.   And the only difference is there's a few more
7   of these in my case file, but he provided some without
8   the graph paper lines.
9       Q.   Okay.  So the other diagrams that are in your
10  case file, they're similar to what we see here in
11  Exhibit 98; correct?
12      A.   That's where I printed these from.
13      Q.   Okay.
14      A.   And then under Matterport scan, under his
15  Matterport data, you'll see some other diagrams of the
16  incident scene that are generated automatically by
17  Matterport.
18      Q.   And the Matterport process involves setting up
19  the scanner, letting it run its 360 in each area where
20  you want a data point and then that is then developed
21  into a 3D scan; correct?
22      A.   Correct.  And then from that they generate
23  floor plans for you.
24      Q.   Okay.  Do you know if Mr. Birdsong assisted in
25  processing the fire scene in August of 2022?

Lexitas Legal Philadelphia
215-504-4622

Page 35

```
 1        A.    I know that he did.
 2        Q.    Okay.  What was his involvement in that regard?
 3        A.    He's the one that I had him define the search
 4   grids and then I have him over -- supervise the
 5   searching of the different search grids, another thing
 6   that he routinely does at fire and explosion scenes for
 7   as long as I've known him some 20 years.
 8        Q.    So the search grids would be shown on Page 4 of
 9   Exhibit 98?
10        A.    Correct, and he originally defined those.
11        Q.    Okay.  Do you know if he was -- was he actually
12   involved in the processing of the scene or did he just
13   oversee it?
14        A.    I wasn't there, so I don't think -- I don't
15   know that I can answer that question, but he was there
16   to supervise it and make sure that the evidence got
17   marked properly out of those search grids.
18        Q.    Okay.  Do you know if he was involved in
19   actually shoveling out the fire debris and sifting
20   through it?
21        A.    I don't know the extent of his involvement.  I
22   don't know that I've ever discussed that with him.
23        Q.    In looking at the search grids that he put
24   together, so there's a Search Grid A-1 and then B-1 that
25   seem to indicate the areas of where the hoverboard was
```

Michael Schulz
09/10/2024

Page 136

1    Q.   Do you know, as you sit here today, how many
2  cells had expelled?
3    A.   I don't know.  I wasn't involved in that
4  examination.
5    Q.   Do you know the manner in which the cells
6  expelled?
7    A.   I don't.  I'm not offering opinions on that.
8    Q.   You have -- let me strike that.
9         With a fire that initiates from careless
10  disposal of smoking material, that generally can be a
11  smoldering type fire; correct?
12         MR. AYALA:  Form.
13         THE WITNESS:  It has a high likelihood to do
14  that, yes.
15  BY MR. LaFLAMME:
16    Q.   Okay.  And in saying "smouldering type fire,"
17  meaning that that is a fire that could initiate a
18  lengthy period of time after the actual careless
19  disposal of smoking materials occurs?
20    A.   And before and after the flaming combustion,
21  yes.
22    Q.   Meaning if Mrs. Wadsworth had smoked in the
23  smoking shed sometime between 1:30 and 2:00 a.m. and
24  this fire initiated sometime between 4:00 and 4:30 a.m.,
25  and assuming it was due to careless use of smoking

Michael Schulz
09/10/2024

Page 137

1  material, that time lapse is not unusual with careless
2  use of smoking material-generated fires?
3           MR. AYALA:  Form.
4           THE WITNESS:  No, it can't be used to exclude
5  that possibility.
6  BY MR. LaFLAMME:
7     Q.   Meaning the time difference from which
8  Mrs. Wadsworth testified that she last smoked in the
9  smoking shed and the identification of this fire had it
10 started -- assuming it started in the smoking shed, that
11 time lapse would not exclude careless use of smoking
12 material?
13    A.   No.
14    Q.   Looking at Pages 56 to 59, this is a list of
15 all the evidence in this case; correct?
16    A.   Correct.
17    Q.   All right.  And aside from visual observations
18 either in person or of photographs, you have not
19 physically inspected any of the evidence in this case?
20    A.   Not as part of an evidence exam.
21         Obviously, I looked at the -- I looked at the
22 hoverboard the first time we were there.  I looked at
23 the outlet.  I looked at some of the branch wiring and
24 so forth, but I did not look at any of this evidence as
25 part of a subsequent organized laboratory inspection.

Michael Schulz
09/10/2024

Page 204

1    BY MR. LaFLAMME:
2        Q.    Okay.  You had discussed with Mr. Ayala some of
3    the deposition testimony from the Wadsworth children.
4              Do you agree that that deposition testimony was
5    given in May of this year; correct?
6        A.    Yes.
7        Q.    So more than two years after the fire; correct?
8        A.    Correct.
9        Q.    Okay.  And do you agree that, as a general
10   statement, people's memories are freshest in the closest
11   in time to the event?
12             MR. AYALA:  Form.
13             THE WITNESS:  I always agree to that as a
14   general statement, yes.
15   BY MR. LaFLAMME:
16       Q.    With respect to the disposal of smoking
17   material, you had indicated that there was no way to
18   reach that conclusion.
19             Do you recall that?
20       A.    Correct.  That's one of those fire causes that
21   even if that's what occurred, it's very hard to ever
22   prove or reach that conclusion without very credible
23   evidence.
24       Q.    And what you are getting at there is that the
25   careless disposal of the smoking material will be

Michael Schulz
09/10/2024

Page 205

1  subsumed within the fire damage material; correct?
2          MR. AYALA:  Form.
3          THE WITNESS:  Generally, that's the biggest
4  problem, yes.
5  BY MR. LaFLAMME:
6     Q.  Okay.  So in this situation --
7     A.  Either consumed or even recognized in the
8  processing of the fire scene.
9     Q.  Okay.  So in this situation, based on an
10 assumption that the fire started due to a careless use
11 of smoking material within the smoking shed, it is not
12 surprising to you that you would not be able to identify
13 the specific cigarette that was carelessly disposed of;
14 correct?
15         MR. AYALA:  Form.
16         THE WITNESS:  That wouldn't bother me, no.
17         MR. LaFLAMME:  Okay.  That's all the questions
18 I have, sir.
19         THE WITNESS:  Thank you.
20
21                 FURTHER EXAMINATION+
22 BY MR. AYALA:
23    Q.  In other words, a smoking material that is
24 carelessly disposed of, in this case, based upon the
25 facts and circumstances of this case, in order to

Michael Schulz
09/10/2024

Page 212

1                    REPORTER'S CERTIFICATE

2

3         I, Joy E. Shure, a Certified Shorthand Reporter,

4   holding a valid and current license issued by the State of

5   California, CSR No. 3659, do hereby certify:

6         That said proceedings were taken down by me in

7   shorthand at the time and place therein set forth and

8   thereafter transcribed into typewriting under my direction

9   and supervision.

10         I further certify that I am neither counsel for

11   nor related to any party to said action nor in anywise

12   interested in the outcome thereof.

13         Before completion of the deposition, review of

14   the transcript [X ]was [  ]was not requested.

15         The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's certificate

17   null and void.

18

19         IN WITNESS WHEREOF, I have hereunto subscribed my

20   name on this 25th day of September, 2024.

21

22

23                          _____

24                          Joy E. Shure, CSR No. 3659

25

Lexitas Legal Philadelphia
215-504-4622