Taly Goody, Esq.
Wyoming Bar No.: 8-6737
Greyson M. Goody, Esq.
GOODY LAW GROUP
58 Malaga Cove Plaza
Palos Verdes Estates, CA 90274
Telephone: (310) 893-1983
Email: taly@GoodyLawGroup.com
greyson@GoodyLawGroup.com

T. Michael Morgan, Esq.*
Florida Bar No.: 062229
MORGAN & MORGAN, P.A
20 N. Orange Ave, Suite 1600
Orlando, FL 32801
Telephone: (407) 420-1414
Email: mmorgan@forthepeople.com

Josh M. Autry, Esq.*
New York Bar No.: 6161962
MORGAN & MORGAN, P.A.
199 Water Street, Suite 1500
New York, NY 10005
Telephone: (859) 899-8785
Email: jautry@forthepeople.com

*** *Pro Hac Vice*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STEPHANIE WADSWORTH, Individually and as Parent and Legal Guardian of W.W., K.W., G.W., and L.W., minor children, and MATTHEW WADSWORTH, <br><br> Plaintiffs, <br><br> v. <br><br> WALMART, INC. and JETSON ELECTRIC BIKES, LLC, <br><br> Defendants. | Case No.: 2:23-cv-00118-KHR <br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' TRIAL BRIEF FOR FEBRUARY 28, 2025 HEARING

I.    **The jury may infer that the hoverboard was defective.**

    **A. This Court ruled that Plaintiffs may present an inference of defect.**

This Court denied summary judgment because, inter alia, a jury could find based upon Plaintiffs' evidence that there was no abnormal use of the hoverboard and there were no secondary causes of the defect. Accordingly, in this case, Wyoming permits "an inference that a product was defective at the time it left the seller's hands" because "a prima facie case can be presented that there was no abnormal use of the product or that there were no reasonable secondary causes for the defect." *Rohde v. Smiths Med.*, 165 P.3d 433, 437-38 (Wyo. 2007) (citing *Sims v. GM*, 751 P.2d 357, 360-61 (Wyo. 1988)); *see also Ogle v. Caterpillar Tractor*, 716 P.2d 334, 344 (Wyo. 1986) (citing RESTATEMENT (SECOND) OF TORTS Section 402A).[1]

As this Court has held, a jury could determine based upon Plaintiffs' evidence that Plaintiffs did not abnormally use the hoverboard and that there was no secondary cause of the hoverboard defect.[2] Indeed, Defendants did not argue—and still do not—that there was a secondary cause creating the *defect*. Because, as the Court found, the record supports a *prima facie* case of an inference that the hoverboard was defective, a jury instruction is warranted.

Defendants now argue that 1) Plaintiffs did not plead an inference of defect theory, and 2)

---

[1] Defendants cite distinguishable cases where plaintiffs "did not present *any* evidence … to counter" the defendant's showing of a reasonable secondary cause of the product's malfunction, *see Rohde*, 165 P.3d at 439, whose "characterization of the evidence was not plausible," *see Tolman v. Stryker*, 640 F. App'x 818, 819 (10th Cir. 2016), and who actually "presented evidence … that the malfunction may have been caused" by secondary causes. *Sims*, 751 P.2d at 360; *see also Bielskis v. Louisville Ladder*, 663 F.3d 887, 887-98 (7th Cir. 2011) (plaintiff could not rule out abnormal use because ladder had been used for seven years by other people before plaintiff used it and plaintiff could not rule out wear and tear given age of the ladder); *Rogers v. Johnson & Johnson*, 565 A.2d 751,754 (Pa. 1989) (holding that, contrary to defendants' argument, plaintiff need only present a case free of secondary causes).

[2] ECF 143 at 18-19 ("[B]ecause Wyoming allows an inference of defect when there is a prima facie showing of no abnormal use or secondary cause, summary judgment would still be denied even if the Court excluded Mr. King's testimony.").

1

there is evidence of other reasonable secondary causes for the fire. As shown below, both arguments fail.

### B. The federal rules do not prevent a jury instruction on an inference of defect.

Defendants argue that inference of design defect theory must be pleaded separately from a specific defect theory. Instead of pointing this Court to law that applies the Federal Rules of Civil Procedure, Defendants rely on cases applying state court procedural law. *White v. Mazda*, 99 A.3d 1079, 1091-92 (Conn. 2014); *Scanlon v. GM*, 326 A.2d 673, 680-81 (N.J. 1974). However, "State laws that solely address procedure and do not 'function as a part of the State's definition of substantive rights and remedies' are inapplicable in federal diversity actions." *Los Lobos Renewable Power v. Americulture,* 885 F.3d 659, 668 (10th Cir. 2018). Rather, Federal Rule of Civil Procedure 8 governs the pleadings. *Bledsoe v. Carreno*, 53 F.4th 589, 598 n.7 (10th Cir. 2022). Contrary to Defendants' argument, Rule 8 allows for an "imperfect statement of the legal theory supporting the claim asserted" in a complaint. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("[N]o heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim."); *see also Enter. Mgmt. v. Warrick*, 717 F.3d 1112, 1120 (10th Cir. 2013) ("[W]e have never required plaintiffs to plead their evidence."); *Brooks v. Mentor Worldwide*, 985 F.3d 1272, 1281 (10th Cir. 2021) ("The degree of specificity needed to establish and provide fair notice depends on the context and type of case.").

Further, in *White*, the Connecticut Supreme Court noted that "the defendants and the trial court addressed only a claim based on a specific defect. Neither the defendants nor the court had any reason to believe that the plaintiff was also raising a[n inference of] malfunction theory claim." *White*, 99 A.3d at 1092. Similarly, the New Jersey Supreme Court in *Scanlon* found that "[t]he entire theory of the case, through discovery, pretrial, and the trial, was that there was a single and specific defect ... that is the case defendants had every reason to believe they were defending

2

against; and that is precisely the theory upon which the trial proceeded." *Scanlon*, 326 A.2d at 680-81. This is clearly not the case here, where in its Order on summary judgment, this Court discussed Wyoming's inference of a defect theory in regard to the Plaintiffs' ability to show the existence of a genuine issue of material fact as to the defectiveness element.[3]

Next, Defendants argue that an inference of defect is inconsistent with Plaintiffs' pleadings. However, the federal rules do not prohibit inconsistent liability theories. *See* FED. R. CIV. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also Montano v. Christmas by Krebs*, 239 F. App'x 625, 630 (10th Cir. 2008) ("Because a plaintiff 'may not be sure in advance upon which legal theory she will succeed," the rules of procedure "permit parties to 'set forth two or more statements of a claim or defense alternatively or hypothetically ….'"); *U.S. v. Roe*, 913 F.3d 1285, 1300 n.21 (10th Cir. 2019); *see e.g. Burke v. Holman*, 750 F. App'x 616, 624 n.8 (10th Cir. 2018) (recognizing that estate "could have pled at any point in the litigation that [the defendant doctor] was an employee of [the defendant hospital] … and, separately, that [the defendant doctor] was not an employee of [the defendant hospital] …."); *Dean v. Wright Med.*, 593 F. Supp. 3d 1086, 1102 (D. Colo. 2022) ("Even if plaintiff's design and manufacturing defect claims are internally inconsistent, plaintiff is permitted to plead claims in the alternative."). Therefore, even if the specific design defect and inference of design defect are inconsistent, such inconsistency has no bearing on Plaintiffs' ability to assert them.

Defendants also rely on *Muskrat v. Deer Creek Pub. Sch.*, for the proposition that "[n]ew liability theories after summary judgment are discouraged." 715 F.3d 775, 791 (10th Cir. 2013). However, *Muskrat* is easily distinguished. There, the plaintiffs brought a civil rights claim under

---

[3] Further, Defendants' argument that it is too late for Plaintiffs to proceed on an inference of defect theory is belied by the Federal Rules themselves, which allow for amendment of pleadings at trial to conform them to the evidence. *See* FED. R. CIV. P. 15(b).

3

the Fourteenth Amendment. *Id*. at 790. Later, in response to a summary judgment motion, the plaintiffs asserted a *Fourth* Amendment claim. *Id*. Unlike in *Muskrat*, the Court here addressed the inference of defect in its summary judgment Order. Moreover, unlike the Plaintiffs here, the plaintiffs in *Muskrat* alleged an entirely new cause of action. The issue here is simply the method of proving the strict liability claim.

Finally, Plaintiffs adequately pled facts establishing an inference of design defect theory in their complaint. Wyoming law states that "the inference of defectiveness arises 'if a prima facie case can be presented that there was no abnormal use of the product or that there were no reasonable secondary causes for the defect.'" *Tolman v. Stryker*, 108 F. Supp. 3d 1160, 1163 (D. Wyo. 2015) aff'd 640 F. App'x 818 (10th Cir. 2016). Unlike the plaintiff in *Tolman*, here, Plaintiffs' complaint repeatedly pleads facts giving rise to an inference of a defect. For the lack of abnormal use, throughout the complaint, Plaintiffs plead that "[o]n February 1, 2022, [Plaintiff] was using the Subject Hover Board for its ordinary purpose."[4] In addition, Plaintiffs' experts King and Schulz ruled out non-defect causes in their opinions.[5] Accordingly, Defendants were on notice of the evidence and allegations to support the two elements of the inference.

### C. Plaintiffs have presented a prima facie case that there was no abnormal use of the product and that there were no reasonable secondary causes for the defect.

In their Trial Brief, Defendants apparently do not dispute Plaintiffs' evidence that there was no abnormal use of the hoverboard. However, Defendants contend that there is evidence of other reasonable secondary causes for the product failure. Though Plaintiffs believe it not necessary to re-explore an issue resolved at summary judgment stage, the analysis below explains why Defendants' argument is without merit.

---

[4] ECF 1 at 38; *see also id.* at 11, 16, 21, 27, 32, 43, 49, 54, 59.
[5] *See* Schulz Rpt. (Ex. 1); King Rpt. (Ex. 2) at 12-15.

4

Defendants conflate the standard of proof required to instruct the jury on an inference of defect theory. Defendants argue that Plaintiffs "cannot rule out this alternative cause for the fire and failure of two separate cells within the hoverboard,"[6] but Plaintiffs need not disprove the secondary cause beyond a reasonable doubt; rather, Plaintiffs must only establish a material issue of fact as to the secondary cause presented by Defendants. *Rohde*, 165 P.3d at 438 (prima facie case of defect made by "proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform" in reasonably expected manner) (internal citations omitted);[7] *see also accord* Allan E. Korpela, *Strict Products Liability: Proof of Defect Under Doctrine of Strict Liability in Tort,* 51 A.L.R.3d 8, 15 (1973) (inference of defect may be appropriate "where there is at least some evidence offered, or present in the circumstances surrounding the event, which tends to eliminate or make improbable some other cause").[8]

In other words, Defendants' ability to create a factual dispute does not *prevent* the jury from resolving the question of whether there was a secondary cause of the defect:

> Evidence offered by the defendant that is contrary to the evidence offered by the plaintiff creates a question for the jury; it does not prevent the jury from relying upon the plaintiff's evidence and inferring a defect. An inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true.

---

[6] ECF 170 at 9.

[7] *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 575 (1976*)*, an Illinois case cited by Defendants, reiterates the applicable more-likely-than-not standard: "[R]easonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion, and on review (t)he inquiry is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached." (internal citations omitted) (affirming lower court's finding that "there was no evidence of any reasonable secondary cause").

[8] The Tenth Circuit cites to 51 A.L.R.3d 8, 15 in *Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987) (analyzing Colorado law) and *Orth v. Emerson Elec. Co., White-Rodgers Div.*, 980 F.2d 632, 637 (10th Cir. 1992) (analyzing Kansas law).

*Weir v. Fed. Ins.*, 811 F.2d 1387, 1392 (10th Cir. 1987) (internal citations omitted) (explaining that "inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident").[9]

Further, Defendants conflate the cause of the fire with the cause of the hoverboard's defect. While Defendants point to their own experts' opinions about the cause of the fire,[10] Defendants offer no proof supporting an alternative cause of the hoverboard's defect.

The Supreme Court of Wyoming acknowledged this distinction in *Rohde* when it noted the "analytical difference" between the law on inference of defect in Wyoming, which "requires the plaintiff to show he is entitled to an inference that the product was defective because there no other reasonable causes for the *product's failure*" and a holding based on Illinois law which "considered other causes of the *plaintiff's injuries*." *Rohde*, 165 P.3d at 439 (emphasis in original). The *Rohde* court was clear that "[o]ther causes of the plaintiff's injuries should be analyzed in determining whether the product's defect was the proximate cause of the injuries (the fifth element of a strict liability claim), not in determining whether the product was defective (the second element of a strict liability claim)." *Id.*

Here, Defendants' theory that the fire started from a cigarette—while relevant to causation—is irrelevant to whether there was a secondary cause *of the hoverboard's defect*. As this Court recognized on the summary judgment record, Defendants have not shown a secondary cause of the defect, and the inference of defect should be submitted to the jury.[11]

### D. Plaintiffs have offered proof that a fire in the shed is not a reasonable secondary cause of the hoverboard malfunction.

---

[9] The Tenth Circuit in *Weir* analyzed an inference of defect under Colorado law, but the point is generally applicable as apparent by the court's citation to Connecticut, Missouri, and Oklahoma cases as support.
[10] *See* ECF 170 at 9 (referencing Filas and Gorbett reports).
[11] ECF 143 at 19.

6

In addition, contrary to Defendants' argument, Plaintiffs have offered proof that the fire originated from the hoverboard, and not from the shed. Mr. Schulz explained that "the initiation of this fire based on my analysis is not related to a failure of an electrical system of the involved [shed] structure".[12] Mr. Schulz saw no evidence establishing that the fire originated in the shed,[13] and he "would expect the [shed] to be much more damaged" if the fire had originated in the shed.[14] Mr. Schulz considered and evaluated both scenarios—that the fire started in the shed and that the fire started in the house—and determined that "there's no way to reach [the] conclusion" that "there was a cigarette that was improperly discarded within that shed". The "potential competing hypotheses," including Defendants' shed theory, "when objectively evaluated and considered against the totality of all the available data and information were found to be implausible."[15]

Likewise, Mr. King testified that "if these [battery] cells are susceptible to explosion due to external heating, then I would expect more – most of the cells that were also exposed to fire to also explode," which led to his conclusion that "it's more likely that the cells were an origin for fire."[16] In his opinion, "[a] ruptured cell is more consistent with an internal short resulting in a cell fire",[17] and "[s]ome observations can be made indicating the evidence is more consistent with an interior origin versus an origin outside the bedroom window".[18] Based upon this evidence, the jury

---

[12] Schulz Dep. (Ex. 3) at 142:11-19.
[13] Schulz Dep. (Ex. 3) at 180:2-6; *see also* Schulz Dep. (Ex. 3) at 181:1-11 ("Q. Any evidence that at the time that this fire began or originated, that it was due to a cigarette being improperly discarded? A. No evidence at all. Q. Any evidence that you were able to observe and analyze that would lead you to conclude that any malfunction with that shed was the cause of the fire? … The Witness: No, because it's not the origin of the fire. And the cause of every fire is necessary to locate it within the area of origin.").
[14] Schulz Dep. (Ex. 3) at 179:7-17.
[15] Schulz Rpt. (Ex. 3) at 158.
[16] King Dep. (Ex. 4) at 204:10-205:1; *see also id.* at 190:23-191:9, 192:1-2, 32:3-6, 51:2-14.
[17] King Rpt. (Ex. 2) at 10.
[18] King Rpt. (Ex. 2) at 6.

7

could determine that the fire did not start in the shed and rather started from the hoverboard.

Additionally, Defendants misconstrue the evidence when they argue that Plaintiffs' experts acknowledge reasonable secondary causes for the fire.[19] While Mr. King stated that "lithium-ion battery cells *can* fail when they are subject to an external fire attack"[20] and that the cells "would have the same appearance *if* it was an external fire attack,"[21] nowhere does Mr. King opine that a fire originating in the shed is a reasonable alternative cause. As mentioned above, Mr. King "would expect more –most of the cells that were also exposed to fire to also explode" if the hoverboard was attacked by fire externally.[22] Also, Mr. Schulz did not "conced[e] at his deposition … that a smoldering cigarette could have caused the fire[.]"[23] Mr. Schulz agreed only that "a fire that initiates from careless disposal of smoking material … *generally can* be a smoldering type fire"[24] and that a smoldering type fire "*could* initiate a lengthy time after the careless disposal of smoking materials occurs."[25] Mr. Schulz's acknowledgment that a two-to-three-hour time lapse between smoking in a shed and initiation of a fire cannot be used to exclude the secondary cause was in response to a hypothetical posed by defense counsel "*assuming it was due to careless use of smoking material*."[26]

Ultimately, Defendants attempt to place too high of a burden on the Plaintiffs. Plaintiffs need only demonstrate that it is more likely than not that Defendants' hoverboard is defective.

---

[19] ECF 170 at 8. Because Defendants' theory of the fire's origin is not a secondary cause of the hoverboard's malfunction, Plaintiffs contend that their cited testimony of Plaintiffs' experts testimony for this point is not relevant to the inference of defect analysis.
[20] King Dep. (Ex. 4) at 190:7-10 (emphasis added).
[21] King Dep. (Ex. 4) at 192:9-14 (emphasis added).
[22] King Dep. (Ex. 4) at 204:10-205:1.
[23] ECF 170 at 9.
[24] Schulz Dep. (Ex. 3) at 136:9-14 (emphasis added).
[25] Schulz Dep. (Ex. 3) at 136:16-21.
[26] Schulz Dep. (Ex. 3) at 136:22-137:1-5 (emphasis added).

Based upon Plaintiffs' evidence, a jury can conclude, by a preponderance of the evidence, that there was no secondary cause for the defect.

## II. The "Rogue" Model, *Kaufman* Matter and Other Disclosed Incidents are Substantially Similar

In the second part of their brief, Defendants repeat the same arguments already rejected by this Court in its order on their motions *in limine* on evidence related to the Rogue recall and *Kaufman* case. Indeed, Defendants rely on the very same caselaw presented in the parties' motions, and they offer no reason for this Court to reconsider its decision that this evidence is relevant and not unduly prejudicial.[27] Defendants' Trial Brief amounts to little more than a disagreement with this Court's application of the substantial similarity test, and a conclusory analysis of their preferred interpretation to a number of Plaintiffs' trial exhibits. However, as explained below, each exhibit satisfies the substantial similarity test as applied by the Tenth Circuit and this Court.

As Plaintiffs explained in their opposition, similar accidents or failures hold great relevance, because such failures tend to make the existence of a defect more probable. *In re Cooper Tire*, 568 F.3d 1180, 1191 (10th Cir. 2009). The degree of similarity required to ensure relevance depends on the theory of defect in the case. *Four Corners Helicopters v. Turbomeca,* 979 F.2d 1434, 1440 (10th Cir. 1992). To show notice, the incidents must be similar enough that they would have alerted the defendant to the problem or danger at issue. *Smith v. Ingersoll-Rand*, 214 F.3d

---

[27] *See Black v. M & W Gear*, 269 F.3d 1220, 1227 (10th Cir. 2001); *Smith v. Ingersoll-Rand*, 214 F.3d 1235, 1248 (10th Cir. 2000). These cases either support finding substantial similarity across Jetson's hoverboard lithium-ion battery-powered product line or are distinguishable. In *Smith,* the court found that, although the milling machines from other incidents were of different sizes, and thus their blind spots (which was one of the issues in the case) varied, they were substantially similar. 214 F.3d at 1249. In *Black*, the plaintiff had not "made any attempt to establish the substantial similarity of the tractor rollovers reported in the in the Arndt article" which led to the court "assum[ing], therefore, that such a showing was not made[.]" 269 F.3d at 1227. The court otherwise found that an expert's testimony regarding investigations of other rollover accidents involving small tractors used primarily for mowing was sufficient to satisfy the substantial similarity test. *Id.* at 1230.

9

1235, 1248 (10th Cir. 2000). But any incident, including subsequent incidents, may show that a product is defective. *Id.* Importantly, the substantial similarity rule does not require identical products; nor does it require comparison of the products in their entireties. *Id.* The rule requires substantial similarity among the variables relevant to the plaintiff's theory of defect. *Id.*

In applying the substantial similarity rule, and rejecting Defendants' attempt to exclude alleged prior incidents related to the Rogue model hoverboard, this Court noted that Plaintiffs "need not show the models are identical[,]"[28] and that, "[m]ost importantly, the events are substantially similar in that both involved a house fire where the alleged point of origin was a Jetson hoverboard and the causes being lithium-ion battery failures."[29] Defendants contend that "Plaintiffs cannot prove that there is a 'high degree of similarity' between the Rogue and Plasma models" for the reasons presented in their motion *in limine*.[30] However, this was the very standard this Court expressly applied in rejecting Defendants' arguments related to incidents occurring after the instant case, including the *Kaufman* incident and Rogue recall.[31]

As explained in previous briefing, the Rogue hoverboard was recalled due to fact that "the lithium-ion battery packs in the self-balancing scooters/hoverboards can overheat, posing a fire hazard."[32] As the recall notice states, "This product is too dangerous to be in homes."[33] When Jetson CEO Sam Husain was questioned about Jetson's Rogue model and its recall, he was unable to identify any significant differences between the Rogue's battery pack and that of the subject Plasma, except for testifying that Plasma has a slightly higher capacity; however, he said that had

---

[28] ECF163 at 11.
[29] ECF163 at 11.
[30] ECF170 at 13 (citing ECF 140 at 2-5).
[31] ECF 163 at 9.
[32] *See* ECF 123-5; ECF 123-9.
[33] Recall Notice (Ex. 5) at 1.

10

a very minimal impact on the battery's potential risk of fire or explosion.[34] Mr. Husain also testified that the recalled Rogue model had a battery pack from the same manufacturer the Plasma model,[35] and that the two batteries are "pretty similar".[36] Thus, Jetson's recall of over 53,000 Rogue hoverboards, whose battery packs are similar to those of Plasma hoverboards, with the only difference being a very minimal difference in capacity, is extremely relevant for a jury's consideration. Additionally, the *Kaufman* case, which was settled by Jetson and involved a lithium-ion battery explosion in a Rogue model resulting in deaths, should be admissible on the issue of product defect given the similarity between the two models. The *Kaufman* case was the straw that broke the camel's back prior to the issued recall.

Turning to *Demark*, *Hottenstein*, *Mendoza*, and *Reichley*, in line with this Court's order, each case involved "a house fire where the alleged point of origin was a Jetson hoverboard and the causes being lithium-ion battery failures."[37] While these cases involve different Jetson hoverboard models—Glyro and Strike—Defendants acknowledge that they are making the same arguments about differences between battery cell capacity and/or manufacturer that they made when they failed to refute Plaintiffs' showing of substantial similarity between the Rogue and Plasma models

---

[34] ECF 123; ECF 119; Husain Dep. (Ex. 6) at 103-104.
[35] Husain Dep. (Ex. 6) at 102:2-19.
[36] Husain Dep. (Ex. 6) at 102:2-19.
[37] ECF 170-3 ¶ 9 ("That on September 27, 2017, a Gyro Self Balancing Scooter's battery pack overheated, resulting in a fire, which caused extensive damage to the Plaintiff's home."); ECF 170-4 ¶ 26 ("On or about November 25, 2019, the Product [a Jetson Glyro flashing LED electric scooter and component parts, including a battery charger and lithium-ion rechargeable batteries] malfunctioned, caught fire and caused a fire inside of the Dwelling and caused damage to the Dwelling[.]"); ECF 170-5 ¶ 8 ("The Hoverboard was designed, manufactured, assembled and sold in a defective condition, unreasonably dangerous to Mendoza, in that on or about November 14, 2019, the [Jetson Strike] Hoverboard caught fire, which resulted in damage to Mendoza's residence and personal property."); ECF 170-6 ¶ 13 ("On September 15, 2021, the subject Self-Balancing Scooter / Hoverboard was being stored in the living room closet of Plaintiffs home when it suddenly and unexpectedly ignited, which quickly spread to nearby combustible materials, causing the home to be engulfed with flames and smoke.").

at the motion *in limine* stage.[38] Regardless, each Jetson hoverboard model at issue—Plasma, Rogue, Glyro, Strike, Hali, and Spin—operates with the same design where the battery pack and circuit boards are in the same positions consistent with the typical schematic for a hoverboard;[39] remains in closed circuit even when the board is turned off,[40] which increases the risk of failure as demonstrated throughout the product line; and, with the possible exception of the Glyro model, contains a circuit board manufactured by the same manufacturer.[41] And again, each is a Jetson hoverboard powered by rechargeable 18650 lithium-ion batteries that have been the alleged source of origin of malfunction resulting in overheating, smoking, and catching fire.[42] Even if Plaintiffs were called upon to show similarities between the batteries amongst the various Jetson models, which again this Court and the referenced case law has not required, Jetson's own materials show those similarities in battery capacity: Plasma – 36V, 2.5 Ah lithium-ion; Rogue – 24V, 4.0 Ah lithium-ion; Rave – 24V, 4.0 Ah lithium-ion; Hali X – 25.2V, 4.0 Ah lithium-ion; Strike – 36V, 2.0 Ah lithium-ion; Plasma – X 36V, 2.0 Ah lithium-ion; Sync – 36V, 2.0 Ah lithium-ion; Mojo – 36V, 2.0 Ah lithium-ion; Tracer – 36V, 2.0 Ah lithium-ion.[43] The Jetson CEO, Sam Husain, testified that the Rogue and Plasma battery capacities were pretty similar and the difference in capacity had a

---

[38] ECF 170 at 13-14 (citing Defendant's argument in ECF 140 at 2-5 that Plaintiffs cannot show sufficient similarity where the Rogue and Plasma models "utilized different capacity battery cells and the cells were manufactured by different manufacturers[,]" and then repeating this argument as applied to the Gyro and Strike models.
[39] *Id.* and (Ex. 7) Typical Hoverboard Schematic produced by Def. Expert Sudler.
[40] ECF 170-3 at 114 (Sudler Report in *Demark*); and (Ex. 8) Def. Expert Sudler Report at 26.
[41] Sudler Dep. (Ex. 9) at 128:11-129:17.
[42] *See, e.g.* ECF 170-4 ¶ 16, 26 (involving a "Jetson Glyro flashing LED electric scooter and component parts, including a battery charger and lithium-ion rechargeable batteries" that "malfunctioned, caught fire and caused a fire inside of the Dwelling"), ECF 170-5 ¶ 6 (involving a "Jetson Strike hoverboard" that caught fire), ECF 170-7 at 18 (CPSC report of a Hali Jetson hoverboard smoking); *id.* at 19 (CPSC report of a Spin Jetson hoverboard, while not being charged or used, overheating and melting).
[43] *See* Jetson Product Manuals (Ex. 10).

"very minimal" impact on any additional risk of fire or explosion.[44] It stands to reason that, given the similarities between the Plasma and Rogue batteries, all the other Jetson models that have the same or similar capacity lithium-ion battery would also be considered similar to the Plasma.

Defendants argue that, because the Glyro model pre-dated the UL 2272 standard, Plaintiffs cannot prove a substantial similarity, but they do not explain how this fact is relevant, let alone dispositive.[45] Moreover, like in their motion *in limine*, where they failed to refute the substantial similarity between the Rogue and Plasma models with the testimony of Mr. Husain, Defendants point to no such support or testimony with respect to any of the other Jetson hoverboard models identified in their trial brief.[46] As Plaintiffs explained in their response to Defendants' motion *in limine*, "the nature of the defect in all Jetson hoverboard incidents is the same, to wit: the defective cells within the battery failed. Whether plugged in to a charger or not, the batteries failed."[47]

Further, all of the incidents in *Demark*, *Hottenstein*, *Mendoza*, and *Reichley* predate both the February 1, 2022 accident and Plaintiffs' December 2021 purchase of the product at issue,[48] and two of the complaints, *Denmark* and *Mendoza* were filed on September 18, 2020 and

---

[44] Husain Dep. (Ex. 6) at 103:8-104:20.
[45] To be clear, UL certification is not a design standard but a post design certification.
[46] While Defendants contend that this Court's application of the substantial similarity test is too broad, it is limited by Plaintiffs' theory of the design defect. For example, this Court excluded evidence related to an incident involving an RC car battery "because it does not involve a lithium-ion battery failure." ECF 163 at 13. Defendants highlight a proposed Plaintiffs' exhibit from the National Fire Protection Association ("NFPA") safety notice "E-Bike and E-Scooter Safety." While Jetson has a line of electric bikes and electric scooters, the NFPA Safety Notice is relevant to Plaintiffs' defect theory, concerns lithium-powered electric vehicles, and warns that "[d]amaged or defective batteries can overheat, catch fire, or explode." ECF 170-10.
[47] ECF 149-0 at 6. Defendants cite Plaintiffs' expert Derek King's testimony regarding the failure of individual battery cells, but as this Court noted in its summary judgment order, even without his testimony, Wyoming law allows an inference of defect when there is a prima facie showing of no abnormal use or secondary cause. ECF 143 at 18-19. These failures of other Jetson lithium ion battery-powered hoverboard models would therefore be relevant with or without his testimony.
[48] *See* ECF 170-3 ¶ 9 (September 27, 2017); ECF 170-4 ¶ 26 (November 25, 2019); ECF 170-5 (November 14, 2019); ECF 170-6 ¶ 13 (September 15, 2021).

13

September 17, 2021 respectively, naming Jetson Electric Bikes, LLC as a defendant.[49] In addition to their relevance to the existence of defect, these cases are also relevant to Defendants' notice that the lithium-ion battery powered hoverboards posed an unreasonable risk of fire injury, and therefore the more relaxed standard for the substantial similarity test would apply. *See In re Cooper*, 568 F.3d at 1191.[50]

Defendants next argue that the CSPC reports are inadmissible hearsay. Under Rule 803, hearsay is admissible if it takes the form of a public record and contains "factual findings from a legally authorized investigation." *See* FED. R. EVID. 803(8)(A)(iii). The CPSC is an independent Federal agency, created under the Consumer Product Safety Act. *See* 15 U.S.C. §§ 2051 et seq. The CPSC is charged with conducting investigations of potentially dangerous products and issuing safety alerts and recalls when appropriate. Further, while all of the CSPC reports are relevant to the defect, the majority of these incidents occurred before the date of Plaintiffs' purchase.[51] For these, Defendants were notified when the CSPC reports were submitted, again, before both Plaintiffs' accident and purchase date. Similarly, the Facebook posts to the Jetson Facebook page and Amazon reviews on Jetson hoverboard products provided Defendants with further notice of

---

[49] *See* ECF 170-3 at 7; ECF 170-5 at 7.
[50] ECF 163 at 13 ("Because the *Donwell* incident occurred before the instant action, Plaintiffs do not need to meet the higher degree of similarity as required to show the existence of defect.").
[51] ECF 170-7 at 2 (1-17-16 incident where batteries of Jetson Glyro hoverboard "apparently overheated and caught fire"; sent to manufacturer 2-1-16); *id.* at 3 (7-6-16 incident where Glyro hoverboard sparks when being charged and battery "gets very hot"; sent to manufacturer 7-14-16); *id.* at 5 (6-6-20 incident where Jetson hoverboard "made a loud popping sound and started smoking" and later caught fire; sent to manufacturer 6-19-20); *id.* at 9 (1-27-21 incident where Jetson hoverboard exploded and caught fire in garage while unplugged; sent to manufacturer 2-19-21); *id.* at 10 (8-30-21 incident where unplugged hoverboard "spontaneously combusted in the night" and "lit [the] carpet on fire"; sent to manufacturer 9-3-21). Subsequent incidents are also evidence of malfunctions in the Jetson lithium-ion battery powered hoverboards. *See id.* at 11 (Jetson hoverboard "spontaneously burned from battery."); *id.* at 18 (Jetson hoverboard smoking); *id.* at 19 (Jetson hoverboard overheated and melted while not being charged or used).

the unreasonable risk of injury that their products posed to Plaintiffs and demonstrate that Defendants failed to mitigate that risk. When introduced for this purpose, these social media posts are not hearsay and are relevant to Defendants' knowledge of the fire hazard caused by defects in their lithium-ion battery-powered hoverboard line.

Defendants' argument that the CSPC complaints, Facebook complaints, and Amazon customer reviews would be unduly prejudicial under Fed. R. Evid. 403 is conclusory and provides no reason for this Court to reconsider its ruling that other substantially related incidents were not unfairly prejudicial and will not waste time or confuse jurors. *See Wheeler v. John Deere*, 862 F.2d 1404, 1408-09 (10th Cir. 1988) ("Any differences in the accidents not affecting a finding of substantial similarity go to the weight of the evidence[,]" and "exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly." (quotation mark omitted)).[52] For these reasons, consistent with this Court's February 11, 2025 order, these prior incidents are substantially similar to how the existence of defect.

### III. Conclusion

For these reasons and this Court's prior rulings, this Court should permit Plaintiffs to proceed on an inference of defect theory and present evidence of substantially similar incidents.

---

[52] ECF 163 at 13.

Date: February 21, 2025                            Respectfully Submitted,

/s/ T. Michael Morgan, Esq.*
**T. Michael Morgan, Esq.**
Florida Bar No.: 062229
**MORGAN & MORGAN, P.A**
20 N. Orange Ave, Suite 1600
Orlando, FL 32801
Telephone: (407) 420-1414
Email: mmorgan@forthepeople.com

**Josh M. Autry, Esq.***
New York Bar No. 6161962
**MORGAN & MORGAN, P.A.**
199 Water Street, Suite 1500
New York, NY 10005
Telephone: (859) 899-8785
E-mail: jautry@forthepeople.com

**TALY GOODY, Esq.**
Wyoming Bar No.: 8-6737
**GOODY LAW GROUP**
58 Malaga Cove Plaza
Palos Verdes Estates, CA 90274
Telephone: (310) 893-1983
Primary Email:
Taly@GoodyLawGroup.com

*Pro Hac Vice*
*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 21, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                                        /s/ T. Michael Morgan
                                        T. Michael Morgan

16