# EXHIBIT 3

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF WYOMING

STEPHANIE WADSWORTH,               )
Individually and as Parent         )
and Legal Guardian of W.W,         )
K.W., G.W., and L.W., minor        )
children, and MATTHEW              )
WADSWORTH                          )
                                   )
            Plaintiffs,            )
                                   )
       vs.                         )   No. 2:23-cv-00118-NDF
                                   )
WALMART, INC., and JETSON          )
ELECTRIC BIKES, LLC,               )
                                   )
            Defendants.            )
_____)

DEPOSITION OF MICHAEL J. SCHULZ

Tuesday, September 10, 2024

Roseville, California

REPORTED BY:  Joy E. Shure, CSR No. 3659

1

2

3                UNITED STATES DISTRICT COURT

4            IN AND FOR THE DISTRICT OF WYOMING

5

6

7    STEPHANIE WADSWORTH,           )
     Individually and as Parent     )
8    and Legal Guardian of W.W,     )
     K.W., G.W., and L.W., minor    )
9    children, and MATTHEW          )
     WADSWORTH                      )
10                                   )
               Plaintiffs,          )
11                                   )
          vs.                       )   No. 2:23-cv-00118-NDF
12                                   )
     WALMART, INC., and JETSON      )
13   ELECTRIC BIKES, LLC,           )
                                     )
14             Defendants.          )
     _____)

15

16

17

18         Deposition of MICHAEL J. SCHULZ, an Expert

19   Witness, taken on behalf of Defendant JETSON ELECTRIC

20   BIKES, LLC, at 915 Highland Pointe Drive, Suite 250,

21   Roseville, California 95678, commencing at the hour

22   of 9:22 a.m., Tuesday, September 10, 2024, before

23   Joy E. Shure, CSR No. 3659, pursuant to Notice of Taking

24   Deposition.

25

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For Plaintiffs:

 4           MORGAN & MORGAN
             BY:  RUDWIN AYALA, ESQ.
 5           1700 Palm Beach Lakes Boulevard
             Suite 500
 6           West Palm Beach, Florida 33401
             561-764-2220
 7           rayala@forthepeople.com

 8   For Defendant JETSON ELECTRIC BIKES, LLC:

 9           McCOY LEAVITT LASKEY, LLC
             BY:  EUGENE M. LaFLAMME, ESQ.
10           N19 W24200 Riverwood Drive
             Suite 125
11           Waukesha, Wisconsin 53188
             262-522-7026
12           ELaflamme@MLLlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3    WITNESS                 EXAMINATION              PAGE

4    Michael J. Schulz       By Mr. LaFlamme            6

5                            By Mr. Ayala             173

6                            By Mr. LaFlamme          201

7                            By Mr. Ayala             205

8                            By Mr. LaFlamme          209

9                            By Mr. Ayala             210

10

11               EXHIBITS FOR IDENTIFICATION

12   Exhibit 93   M.J. Schulz & Associates,            17
                  Inc., invoices; 6 pages
13
     Exhibit 94   M.J. Schulz & Associates,            17
14                Inc., invoices; 2 pages

15   Exhibit 95   M.J. Schulz & Associates,            18
                  Inc., invoices
16
     Exhibit 96   Michael Schulz's notes from          20
17                the 5/18/2022 inspection;
                  12 pages
18
     Exhibit 97   Michael Schulz's photographs;        22
19                32 pages

20   Exhibit 98   Notes - Birdsong Involved            33
                  Structure Diagrams; 4 pages
21
     Exhibit 99   Notes - Sheriff's Detective          83
22                (Sheaman) Outlet Observations;
                  2 pages
23
     Exhibit 100  Diagrams from Michael Schulz's      108
24                file that were put together
                  by Mr. Birdsong; 5 pages
25

```
                                                              Page 5
 1   (cont.)                    I N D E X

 2

 3                    EXHIBITS FOR IDENTIFICATION

 4   Exhibit 101  Michael Schulz's notes                       110
                  from his initial call with
 5                Mr. Ayala; 2 pages

 6   Exhibit 102  Michael Schulz's Notes -                     113
                  Findings and Conclusions;
 7                2 pages

 8   Exhibit 103  M.J. Schulz & Associates,                    116
                  Inc., Testimony List; 6 pages
 9
     Exhibit 104  M.J. Schulz & Associates,                    126
10                Inc., Report of Forensic
                  Investigation and Analysis;
11                88 pages

12   Exhibit 105  Michael Schulz's Notes -                     172
                  BEAR Experts, David Rondinone
13                and Derek King; 10 pages

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        TUESDAY, SEPTEMBER 10, 2024, ROSEVILLE, CALIFORNIA

 2                        9:22 A.M.

 3                        *   *   *

 4

 5                    MICHAEL J. SCHULZ,

 6    the witness herein, having been first duly sworn, was

 7    examined and testified as follows:

 8

 9                      EXAMINATION+

10    BY MR. LaFLAMME:

11       Q.   Mr. Schulz, my name is Eugene LaFlamme.

12    Obviously, we know each other from past fires.  Good to

13    see you again.

14            I know you've had your deposition taken a

15    number of times; so I will not go through the typical --

16    all of the typical instructions.

17            The only ones I want to get out are, obviously,

18    we're here to figure out what your opinions are in this

19    case.

20            If at any point in time you don't understand my

21    question or don't hear it, let me know; I'll rephrase it

22    or restate it to a point where we're communicating.

23            Understood?

24       A.   Understood.  I won't be shy in that regard.

25       Q.   I know you won't.
```

```
 1              And if you have answered a question as worded,
 2   I would presume you're giving your honest and truthful
 3   answer to that question.
 4              Is that fair?
 5        A.    That's fair.
 6        Q.    All right.  Would you please state your full
 7   name for the record.
 8        A.    Michael J. Schulz.  Schulz is S-c-h-u-l-z.
 9        Q.    Where are you employed?
10        A.    M.J. Schulz & Associates, Inc.
11        Q.    How many employees does that company have now?
12        A.    Currently, two.
13        Q.    You and your wife?
14        A.    Yes.
15        Q.    I know your fee schedule lists technicians or
16   consultants.  How does that come into play?
17        A.    I have contract people that I use to assist me
18   at times.
19        Q.    So you 1099 those types of people when you need
20   them?
21        A.    Yes.
22        Q.    When was the last time you've had any other
23   employees besides yourself and your wife?
24        A.    10 years ago probably.
25        Q.    As I understand it, you are -- you do the code
```

1    work, origin and cause work, and your wife does more of

2    the admin business operations side?

3        A.    And she really doesn't do that.

4        Q.    Okay.

5        A.    She does litigation support services and she

6    had her own company which ran into difficulties with the

7    pandemic, and so when we came out of the pandemic, she

8    had laid off her employees and so I just brought her

9    business under my umbrella.

10           So she really doesn't do anything, have

11   anything to do with the work that I do, and I don't

12   really have anything to do with the work she does,

13   although sometimes we're working on the same case for

14   different reasons.

15       Q.    All right.  Describe for me what her side of

16   the business does.

17       A.    So she works with attorneys to provide trial

18   techs for trials, to develop litigation exhibits, to

19   facilitate e-discovery, to interview witnesses, and so

20   forth, and probably the bulk of her activity in the last

21   five or six years is she has a couple contracts with

22   major wildfire plaintiff litigators and she

23   interviews all of their victims and does witness impact

24   statements.

25       Q.    Is your wife at all involved in the Wadsworth

Page 9

 1  case?

 2       A.   Not at all.

 3       Q.   What's your wife's name again?

 4       A.   Allie, A-l-l-i-e.

 5       Q.   Anyone else within your business, whether it's

 6  a direct employee or consultant-wise, involved in the

 7  Wadsworth case?

 8       A.   So on one of the inspections, the second joint

 9  inspection, I was unavailable, so I dispatched Austin

10  Birdsong from Apex, A-p-e-x.

11       Q.   And that was the August 2022 inspection?

12       A.   Correct.  And he's one of the regular contract

13  people that I use.

14       Q.   Anyone else besides you and Austin that have

15  done any work on the Wadsworth case?

16       A.   Not on behalf of my company, no.

17       Q.   Okay.  In going through your report, it looks

18  like you are -- you were retained to provide a point of

19  origin opinion; is that correct?

20       A.   Correct.

21       Q.   Okay.  Are you providing a cause opinion in

22  this case?

23       A.   I'm reporting it, but I'm not the one that had

24  responsibility for that analysis.

25       Q.   So are you relying on BEAR Engineering or the

1    BEAR entity, the Berkeley Engineering And Research?

2        A.    I think.

3        Q.    B-E-A-R -- it's an acronym, all capitalized --

4    for the cause determination in this case?

5        A.    I will defer to them for the specifics of the

6    sequence of ignition, yes.

7        Q.    When you say "sequence of ignition," you're

8    talking about the initiation of the fire?

9        A.    Correct.  So I think it's fair to take a look

10   at it, I'm providing the origin.  They then looked at

11   the cause or ignition factor, although there is some

12   overlap.

13       Q.    But as far as the specific alleged failure mode

14   with respect to the hoverboard, you are not providing

15   any opinions in that regard?

16       A.    I am not.

17       Q.    And you are not providing any opinions with

18   respect to the lithium-ion batteries that were within

19   the hoverboard; correct?

20       A.    I am not, that's correct.

21       Q.    And you are not providing any opinions with

22   respect to the design or manufacture of the hoverboard;

23   correct?

24       A.    That's correct.

25       Q.    Now, you indicated that sequence of ignition,

1  you're deferring to BEAR on.  At some point, you did an

2  analysis on fire spread, though; correct?

3      A.   Correct.

4      Q.   Okay.  So where do you pick up from where they

5  drop off?

6      A.   So they really pick up from where I drop off.

7  I identified the origin of the fire, and within that

8  origin I identified two potential sources of ignition --

9  well, three potential sources of ignition, and then they

10 picked up from there.

11     Q.   Okay.  What are the three potential sources of

12 ignition?

13     A.   The hoverboard and any -- at the time, any

14 associated charging components, the electrical outlet

15 for Bedroom No. 4 on the wall behind the refrigerator,

16 and then thirdly, initially, I included the refrigerator

17 as a potential source because of its location on the

18 other side of that bedroom wall.

19     Q.   Was the hoverboard charging at the time of the

20 accident -- of the fire?

21     A.   There's testimony that it had been charging at

22 the end of the day's use and prior to the fire, but I

23 concur -- and I did not see and I concur that in the

24 photographs of the joint inspection of the evidence,

25 there were no electrical plugs in that outlet.

1    Q.   Okay.  So based on your investigation, you've
2   concluded that the hoverboard was not charging at the
3   time of the fire; correct?
4          MR. AYALA:  Form.
5          THE WITNESS:  I don't see any evidence that
6   says that it was, but I can only speak to how I found
7   the electrical outlet post incident, and not having any
8   of the blade plates in there, that would seem to be
9   indicative that the charger was not plugged in at the
10   time of the fire, yes.
11  BY MR. LaFLAMME:
12   Q.   Okay.  So there were no blade plugs in the
13  outlet directly behind the hoverboard; correct?
14   A.   Correct.
15   Q.   There was no wiring from any charging device
16  found by the hoverboard; correct?
17   A.   Correct.
18   Q.   And there was no indication on the female end
19  of the receptacle on the hoverboard that anything had
20  been plugged in at the time of the fire; correct?
21   A.   So that's something I didn't -- I looked at
22  briefly in the field, but I didn't do a detailed
23  analysis of that, but I'm not aware of any evidence of
24  that.
25   Q.   Okay.  So based on the physical evidence,

1    you're not aware of any evidence that would suggest this

2    hoverboard was plugged in at the time of the fire; true?

3         A.    True.   That's correct.

4         Q.    And this fire was first identified by Gunner

5    and Layne Wadsworth; correct?

6         A.    Correct.

7         Q.    And Gunner and Layne, we've referred to it as

8    Bedroom 4, that was their bedroom; correct?

9         A.    Correct.

10        Q.    All right.   And they were in a bunk bed that

11   abutted the wall and window for their bedroom?

12        A.    Correct.

13        Q.    And when they first woke up, that window had

14   already been breached or broken; correct?

15             MR. AYALA:   Form.

16             THE WITNESS:   I haven't read any testimony that

17   that's their testimony.   There is testimony that Gunner

18   in particular recalls that there were shards of glass in

19   the bed.

20   BY MR. LaFLAMME:

21        Q.    Okay.   And that's when he woke up; correct?

22        A.    Yes.

23        Q.    And you've seen the interview with -- that

24   Detective Sheaman did with the Wadsworth boys; correct?

25        A.    Correct.

1    Q.   And in that interview Gunner describes how when

2    he woke up, the window had already broken; correct?

3    A.   I don't recall.  It's been a while since I've

4    watched it, but I'm not doubting your representation.

5    Q.   Well, we can pull it up if you'd like to.

6    A.   No, I'm fine.

7    Q.   Okay.  You agree that that's what Gunner said

8    to Detective Sheaman; correct?

9    A.   That's my recollection, yes.

10    Q.   All right.  So when the boys woke up, based on

11    the evidence that's in the record, you'd agree that the

12    fire was already at the window; correct?

13    MR. AYALA:  Form.

14    THE WITNESS:  Correct.  And I think that's

15    consistent with Gunner's other testimony.

16    BY MR. LaFLAMME:

17    Q.   Okay.  And that's the window of -- just so I'm

18    clear as to what window -- the window of Bedroom No. 4?

19    A.   Correct.

20    Q.   And there's only one window in that bedroom;

21    correct?

22    A.   That's correct.

23    I'll stop you if I think we need to identify

24    something --

25    Q.   Okay.

Page 15

1      A.    -- more precisely.

2      Q.    Was there any arcing found in the house?

3      A.    Not that I'm aware of; however, I did not

4    undertake to study that or not.

5      Q.    Was there any arcing found anywhere on the

6    site?

7      A.    There are reports and there are photographs of

8    what appear to be electrical anomalies on electrical

9    wiring in the shed located in front of the house

10   outdoors.

11     Q.    Okay.

12     A.    But I wasn't present for that evidence

13   inspection and I've never had a close-up look at those

14   artifacts, and I would defer to the electrical engineers

15   that were present.

16     Q.    Do you know if the electrical engineers that

17   were present for the Wadsworth family have been named as

18   experts in this case?

19     A.    I'm not aware that they are, but I don't know

20   who all of the experts are in this case.

21     Q.    So based on your involvement in the case, you

22   just don't have an opinion one way or the other as to

23   whether the anomalies, as I think you termed it, on the

24   wiring at the shed outside was indeed arcing; correct?

25     A.    Correct.

1    Q.    You agree that there are electrical anomalies

2    that were identified out at the shed?

3    A.    Correct.

4    Q.    Okay.  And those anomalies do have an

5    appearance of arc damage; correct?

6    A.    They do.  Those anomalies that were marked with

7    the colored wire ties would be things that I would want

8    an electrical engineer to look at under a microscope,

9    and if I was present, I would have looked under the

10   microscope, too, and formed more of an opinion.

11   Q.    Okay.  Have you seen the microscopic images of

12   the arc damage?

13   A.    I have not.

14   Q.    Were you aware any were taken?

15   A.    I saw a reference to marking things for the

16   microscope in something that I read, but I don't think

17   that I've ever seen the images.

18   Q.    Did any circuit breakers trip in the house?

19   A.    Not that I'm aware of, no.

20         When I was there on Day 1, which was in May of

21   2022, there were no circuit breakers that were

22   identifiable in the tripped position.

23         There was a single circuit breaker in the

24   subpanel that was off, and I think it was marked for a

25   washing machine.

 1       Q.   No circuit breakers had tripped that would have

 2    controlled power to Bedroom 4; correct?

 3       A.   Not that I'm aware of, no.

 4       Q.   All right.  So when you were first engaged in

 5    this case, that would be reflected in your invoicing?

 6       A.   Correct.

 7            MR. LaFLAMME:  So we'll mark as Exhibit 93 --

 8    we have copies for you if you want them.

 9            MR. AYALA:  Sure.

10            MR. LaFLAMME:  Take that paper weight off for

11    me.

12            MR. AYALA:  Yeah, I'll do that.

13                (The aforementioned document was

14                marked as Exhibit 93 for identification

15                and is attached hereto.)

16    BY MR. LaFLAMME:

17       Q.   And then we'll also mark as Exhibit 94, I

18    believe that's the Apex bill to you?

19       A.   Yes.

20                (The aforementioned document was

21                marked as Exhibit 94 for identification

22                and is attached hereto.)

23    BY MR. LaFLAMME:

24       Q.   And then just so we're complete, I think you

25    had another -- ah, I have it in front of me.

Page 18

```
 1              (The aforementioned document was
 2         marked as Exhibit 95 for identification
 3         and is attached hereto.)
 4   BY MR. LaFLAMME:
 5      Q.   All right.  So the three exhibits that we have
 6   in front of you which would be 93, 94, 95, does that
 7   encompass the full invoicing in this case?
 8      A.   To date, yes.  So that would be through the end
 9   of July 2024.
10      Q.   Then you've obviously had some additional work
11   in preparation for the deposition and then the
12   deposition here today; correct?
13      A.   Correct.
14      Q.   Okay.  And I assume that will be invoiced at
15   some point in the near future?
16      A.   Yes.
17      Q.   So in looking at your invoicing, it looks like
18   you were first retained on February 17th.  That's on the
19   second page of Exhibit 93?
20      A.   Correct.
21      Q.   All right.  And on that entry, that's where it
22   indicates "open a new case file," and is that the first
23   date that you would have done work on this case?
24      A.   Yes.
25      Q.   And that is about just a little more than two
```

Page 19

1    weeks after this fire occurred; correct?

2        A.    Correct.

3        Q.    Then it just goes through, you have some

4    additional entries on February 19th, 2022,

5    February 22nd, 2022, March 16th, 2022, and then we get

6    to May 17th through the 19th, 2022, which is when there

7    was a site inspection scheduled; correct?

8        A.    Correct.

9        Q.    And the site inspection that was scheduled, I

10   think it was scheduled to be a multiple Day 1, but it

11   was cut short because other parties needed to be put on

12   notice; correct?

13       A.    Correct.

14       Q.    All right.  So with respect to the May site

15   inspection, I was there as well, I seem to recall that

16   it went about three to four hours.

17             Is that about right?

18       A.    I think that sounds about right.

19       Q.    And at that site inspection, your activities

20   were limited to documenting and visually observing the

21   fire scene; correct?

22       A.    Correct.  I interviewed Mr. Wadsworth, and then

23   I did an inspection and documentation of the fire scene,

24   and as part of that examination and documentation, I did

25   a heat and flame vector analysis.

Page 20

1       Q.   Was that a written heat and flame vector

2  analysis?

3       A.   I made notes.  So they should be attached to my

4  inspection notes from that date, so I noted it on

5  diagrams.

6       Q.   What would that be called in your file?

7       A.   Uhm, let me open it.  I'm not sure how I filed

8  it.

9       Q.   Just your notes?

10      A.   Yeah.  I think I had it separately probably by

11  the date maybe.

12      Q.   Okay.  So we have some notes dated 5/18/2022?

13      A.   That's it.  So there should be notes in the

14  diagrams attached to it at the end.

15      Q.   And I'll probably print this off on a break and

16  we can go through it then.

17      A.   Okay.  I have the original copy here and I've

18  already digitized it, so --

19      Q.   Okay.  You don't mind marking that?

20      A.   I don't mind marking this because --

21      Q.   All right.  Let's do it that way.

22            (The aforementioned document was

23            marked as Exhibit 96 for identification

24            and is attached hereto.)

25  ///

Page 21

1   BY MR. LaFLAMME:

2       Q.   All right.  So I've handed you what's been

3   marked as Exhibit 96 which is a copy of your notes from

4   the 5/18/2022 inspection.

5       A.   Correct.

6       Q.   Okay.  And it notes -- on the first page, it

7   notes that the inspection started at 9:30 a.m.; correct?

8       A.   Correct.

9       Q.   All right.  And then getting through your

10  notes, starting on Page 10 is -- are some diagrams?

11      A.   Correct.

12      Q.   Okay.  And this is what you have for your notes

13  for your flame and vector analysis; correct?

14      A.   From that day, yes.

15      Q.   Okay.  Have you done any other flame and vector

16  analysis beyond that day in May of 2022?

17      A.   So what I did this weekend, I went and picked

18  out representative photographs that correspond to this

19  and then I've individually annotated them.

20      Q.   Okay.

21      A.   So while doing this, I'm taking photographs to

22  photographically document the heat and flame vector

23  analysis and I picked out those photographs, and that's

24  one of the things I brought for you today.

25      Q.   All right.  Why don't we mark this as

1  Exhibit 97.

2       A.   So that's going to be the --

3       Q.   Or am I on the wrong one?

4       A.   No, that's it, but the -- yeah, that is a copy

5  for you to mark.  This is the original (indicating).

6       Q.   Do you want me to mark -- we can go off the

7  record.

8            (Discussion held off the record.)

9  BY MR. LaFLAMME:

10      Q.   So I've handed you what's been marked as

11 Exhibit 97, and those are pictures that you pulled over

12 the weekend, I understand?

13      A.   Correct.

14      Q.   And these are supposed to be in companion with

15 your flame and vector analysis that's in Exhibit 96?

16      A.   Correct.  I went back and picked out

17 representative photographs.

18            (The aforementioned photographs were

19            marked as Exhibit 97 for identification

20            and are attached hereto.)

21 BY MR. LaFLAMME:

22      Q.   Okay.  So a flame and vector analysis, as I

23 understand it, that basically is just a diagram or a

24 graph of the way in which you believe the flames moved

25 through the structure?

Page 23

1      A.    Well, the process is the location of fire

2    patterns within the fire incident scene, the

3    identification of those fire patterns, in other words,

4    what type are they and what do they indicate.

5            And then the third part of the analysis is to

6    create a heat and flame vector analysis diagram that

7    allows you to track the fire incident from its origin

8    and then follow its progression and development.

9      Q.    Okay.  So on the first page of your written

10   flame and vector analysis of Exhibit 96, that's the

11   front of the structure; correct?

12     A.    Correct.

13     Q.    Okay.  And what photographs are you correlating

14   to this portion?

15     A.    So it would be -- out of Exhibit 97, it would

16   be Exhibits 3 --

17     Q.    "Photographs."

18     A.    You're right, Photographs 3, 4, and 7.

19     Q.    Any others in there?

20     A.    Not for the front of the house, no.

21     Q.    So in looking at the front of the house, you

22   have on Exhibit 97 also added some markings on here;

23   correct?

24     A.    Correct.

25     Q.    Okay.  Were those markings also added this

1   weekend?

2       A.   Yes.  That's really what I did this weekend is

3   annotated them with these markings.

4       Q.   Okay.  So looking at the markings on

5   Photographs 3, 4, and 7, starting on 3, you have arrows

6   pointed up and then dotted arrows pointing down?

7       A.   Correct.

8       Q.   Is there a difference between a solid arrow and

9   a dotted arrow?

10      A.   The dotted arrows are, I'm indicating, fall

11  down.

12      Q.   Okay.  So for Photo No. 3, you're indicating

13  that at least we're looking at the kitchen windows

14  there; correct?

15      A.   Correct.

16      Q.   Okay.  That once the fire breached the kitchen

17  windows, there was flame that went upward into the eaves

18  of the house?

19      A.   Correct.

20      Q.   And there was some fall down that came from the

21  windows as well?

22      A.   Correct, all along the ground there.

23      Q.   Okay.

24      A.   So, for instance, on the fall down, I put two

25  arrows, but there is fall-down material all along that

1   length of the front of the house below the windows.

2      Q.   Okay.  This would have been later in the fire

3   when this occurred, this damage?

4      A.   Yes.

5      Q.   Okay.  Because you have to get the fire to

6   travel from through the house into the kitchen; correct?

7      A.   Correct.  So as a benchmark, the occupants are

8   out of the house when this is happening.

9      Q.   Looking at Photo 4, what does the circle

10  indicate?

11     A.   The circle is indicating that is the swath of

12  fall-down materials from those, uhm, I refer to them as

13  three windows, but from that series of windows, however

14  you want to count the panes.

15     Q.   And then what is the diagonal arrow?  What does

16  that mean?

17     A.   That is a pattern that is on the front door

18  that shows that at some point when the front door was

19  open, the fire was moving across the face of the door in

20  that direction.  It's now in the closed position in this

21  photograph.

22     Q.   Do you have an understanding as to when the

23  fire -- or when that door was opened in the fire?

24     A.   It was open during the escape sequence, but

25  when they opened the door, they felt a lot of heat and

Page 26

1    so they abandoned that exit path.

2        Q.   They were unable to escape through that front

3    door; correct?

4        A.   They chose not to escape from that front door

5    because they viewed that the heat was -- there was too

6    much heat.

7        Q.   All right.  And too much heat on the outside of

8    the door?

9        A.   Correct.

10       Q.   Meaning --

11       A.   They identified heat coming in through the door

12   and chose not to exit, use that door; they went to an

13   alternative exit.

14       Q.   So the heat that the Wadsworth occupants

15   identified was on the exterior side of that door;

16   correct?

17       A.   Correct.

18       Q.   All right.  Then looking at Photo 7, you have

19   some yellow lines, the red fall-down lines, and then the

20   red solid arrows?

21       A.   Correct.

22       Q.   So what are we looking at here?

23       A.   So the dotted red lines again are fall-down

24   materials that are falling down into the front of the

25   house, and the arrows are the heat and flame vectors

1    showing the progression and development of the fire

2    plume out of that window.  The location of those arrows

3    identify the base of that fire plume as having been at

4    the window level.

5            And then the two yellow lines are, I've marked

6    those two lines of demarcation to show that the damage

7    to the brickwork on the front of the house is straight

8    up, kind of a columnar shape which would represent the

9    second phase of the development of a fire plume.

10           So when I compare the fire plume denoted by the

11   red arrows compared to the one denoted by the -- in

12   between the yellow lines, the fire plume coming out of

13   the window occurred first because it's fully developed

14   in a conical shape.

15   Q.    Okay.  And above that window area is the

16   electrical service that comes into the house; correct?

17   A.    On the righthand side there, yes.

18   Q.    And that comes diagonally across the window?

19   A.    Correct.

20   Q.    Meaning --

21   A.    Yeah, I think we need to define which way we're

22   seeing the diagonals.

23   Q.    Yeah, so --

24   A.    From upper right at the post, it comes across

25   towards the lower left --

Page 28

1    Q.    Okay.

2    A.    -- in that direction, the diagonal.

3          Well, let's just make it -- it crosses over

4    the -- it crosses over the area in front of that bedroom

5    window.

6    Q.    Okay.  And crosses over the area where the

7    smoking shed was?

8    A.    Correct.

9    Q.    When in your analysis did that electrical

10   service line get breached?

11   A.    I don't -- I don't know any way to determine

12   that because we have venting out of this front window

13   that was pretty intense based on the witnesses and even

14   some of the police body cam videos, and then and/or it

15   could be from the -- once the smoke -- plastic smoking

16   shed is ignited and is contributing to the overall fire.

17   Q.    If the fire started inside at the hoverboard,

18   when that fire initiated, this electrical service line

19   would have still been intact; correct?

20   A.    It should have been, yes.

21   Q.    This electrical service line, if the fire

22   started inside the bedroom, would not have been impacted

23   until there is flame coming out of that window?

24   A.    Correct.

25   Q.    So if the fire started at the hoverboard, then

1    this house would have had electrical power at the time

2    the fire initiated?

3        A.    Correct.

4        Q.    And the house would have maintained electrical

5    power to it until the fire breached through this window

6    and either the flames from the window or the flames from

7    the smoking shed, under your theory, severed it?

8        A.    Correct.

9        Q.    All right.  We'll get back to all of this.  I

10   got a little sidetracked from your invoices here, which

11   will happen.

12           All right.  After your May site inspection,

13   that was the only time that you have physically seen any

14   evidence in this case; correct?

15       A.    Correct.

16       Q.    And there was a follow-up August site

17   inspection with a number of additional parties; correct?

18       A.    Correct.

19       Q.    You did not attend that?

20       A.    I did not.

21       Q.    Mr. Birdsong attended on your behalf?

22       A.    Correct.

23       Q.    All right.  Why did you not attend it?

24       A.    I think I had a trial conflict or something.

25           Originally, I was scheduled to attend and he

1    was going to come as well to do the scanning for me, and

2    then I couldn't attend, so he attended by himself.

3        Q.   Okay.  Mr. Birdsong is not an origin and cause

4    expert; correct?

5        A.   I don't use him in that role.  I use him as a

6    technician.  I do believe he would qualify as an origin

7    and cause expert if he chose to.

8        Q.   Does he have his CFEI?

9        A.   I'm not sure, but I've worked with him long

10   enough that I understand his abilities.

11       Q.   Does he have a CFI?

12       A.   I don't know the answer to that.

13       Q.   Okay.  Do you know what his background is prior

14   to joining Apex?

15       A.   I don't really know.

16       Q.   Have you ever looked at his LinkedIn page?

17       A.   No.

18       Q.   He lists himself as an IT Architect/Media

19   Manager for Apex Fire Services.

20       A.   That's one of his major roles.  He does all the

21   computer stuff.

22       Q.   Why is it you think he would qualify as an

23   origin and cause expert?

24       A.   Based on the training that I've known that --

25   I'm familiar that he's taken and the years of experience

 1    of working on fire scenes.

 2        Q.   Has he ever acted as an origin and cause expert

 3    for you?

 4        A.   No, I've never used him that way.  I only use

 5    him as a technician.

 6        Q.   And when you say "technician," do you mean

 7    someone that will, for example, do drone footage,

 8    Matterport scans, other types of technical aspects for

 9    documenting the scene?

10        A.   Correct.

11        Q.   Do you know if Apex fire uses Austin Birdsong

12    as an origin and cause expert at all?

13        A.   He participated in their investigations, but

14    I'm not sure what role they acknowledge him as holding.

15        Q.   Do you know if he has ever been retained for a

16    fire scene as an origin and cause expert?

17        A.   I don't know that as I sit here.

18        Q.   Do you know if he has taken any origin and

19    cause training or undergone any origin and cause

20    training?

21        A.   I believe that he has, but I don't know what

22    his training repertoire is.

23        Q.   As you sit here today, you do not know what

24    Mr. Birdsong's origin and cause training is; correct?

25        A.   I don't know what the totality of it is.  I

1   just know that I've seen him at training seminars.

2       Q.    And you're not aware of any origin and cause

3   certifications that he has obtained; correct?

4       A.    Not as I sit here, no.

5       Q.    Are you aware of how the Apex fire website

6   describes Austin Birdsong's background?

7       A.    I haven't looked at that website in a long

8   time.

9       Q.    It's described as joining Apex in 2015 with a

10  background in IT/Media, "Mr. Birdsong serves as the

11  IT/Media Manager at Apex.  With six years of the

12  IT/Media Industry, he helps deploy new technology within

13  the company and manages the information systems of Apex

14  and its employees.  His experience includes employment

15  at Sagemont," S-a-g-e-m-o-n-t, "Church where he served

16  five years as a media technician and lead lighting

17  designer."

18          You'd agree that there's no description in

19  there of him being an origin and cause expert; correct?

20          MR. AYALA:  Form.

21          THE WITNESS:  Correct, but I also know that

22  that description does not encompass the roles that I've

23  seen him participate in in many, many different origin

24  and cause investigations that I've been involved in --

25  ///

Page 33

1   BY MR. LaFLAMME:

2       Q.   Okay.

3       A.   -- even those where he's not working as a

4   technician for me.

5            That's how I was aware of his skills and was

6   able to have him cover this assignment.

7       Q.   Did Mr. Birdsong do anything besides photograph

8   the site in August of 2022?

9       A.   He did the Matterport scanning and he did

10  photographic documentation, and he did the diagramming

11  of the incident scene independent of the

12  Matterport-generated scans.

13           If I were to mark his No. 1 specialty, he's by

14  far one of the best fire scene diagrammers I've ever

15  seen.

16      Q.   We'll mark as Exhibit 98, these were from your

17  file which indicate "Birdsong Involved Structure

18  Diagrams."

19           Do you see that?

20      A.   Correct.

21               (The aforementioned document was

22               marked as Exhibit 98 for identification

23               and is attached hereto.)

24  BY MR. LaFLAMME:

25      Q.   Okay.  And are these the notes that you are

1  indicating -- or the diagrams that you're indicating

2  that he did?

3      A.   Correct, independent of the Matterport diagrams

4  that he generated.

5      Q.   Correct.

6      A.   And the only difference is there's a few more

7  of these in my case file, but he provided some without

8  the graph paper lines.

9      Q.   Okay.  So the other diagrams that are in your

10  case file, they're similar to what we see here in

11  Exhibit 98; correct?

12     A.   That's where I printed these from.

13     Q.   Okay.

14     A.   And then under Matterport scan, under his

15  Matterport data, you'll see some other diagrams of the

16  incident scene that are generated automatically by

17  Matterport.

18     Q.   And the Matterport process involves setting up

19  the scanner, letting it run its 360 in each area where

20  you want a data point and then that is then developed

21  into a 3D scan; correct?

22     A.   Correct.  And then from that they generate

23  floor plans for you.

24     Q.   Okay.  Do you know if Mr. Birdsong assisted in

25  processing the fire scene in August of 2022?

Page 35

1    A.    I know that he did.

2    Q.    Okay.  What was his involvement in that regard?

3    A.    He's the one that I had him define the search

4   grids and then I have him over -- supervise the

5   searching of the different search grids, another thing

6   that he routinely does at fire and explosion scenes for

7   as long as I've known him some 20 years.

8    Q.    So the search grids would be shown on Page 4 of

9   Exhibit 98?

10    A.    Correct, and he originally defined those.

11    Q.    Okay.  Do you know if he was -- was he actually

12   involved in the processing of the scene or did he just

13   oversee it?

14    A.    I wasn't there, so I don't think -- I don't

15   know that I can answer that question, but he was there

16   to supervise it and make sure that the evidence got

17   marked properly out of those search grids.

18    Q.    Okay.  Do you know if he was involved in

19   actually shoveling out the fire debris and sifting

20   through it?

21    A.    I don't know the extent of his involvement.  I

22   don't know that I've ever discussed that with him.

23    Q.    In looking at the search grids that he put

24   together, so there's a Search Grid A-1 and then B-1 that

25   seem to indicate the areas of where the hoverboard was

1  located.

2      A.    That's the search grids that it was located in,

3  yes, a traversable search grids.

4      Q.    And in neither of those grids was a hoverboard

5  charger found; correct?

6      A.    Correct.

7      Q.    And there was no hoverboard charger found

8  anywhere in the Bedroom 4?

9      A.    Correct.

10     Q.    Did you visit with Mr. Birdsong after the

11  August inspection?

12     A.    I did when he compiled all his data and so

13  forth and transferred it to me.

14     Q.    And what did that discussion entail?

15     A.    He walked me through the day.  He compared what

16  was actually done compared to the protocol which I had

17  written for that day and indicated that they were able

18  to execute everything in the protocol.

19          And most importantly, the question I always

20  ask, "Were all the parties that were there, did

21  everybody get to do what they wanted?" and he assured me

22  that he facilitated that.

23     Q.    Did he indicate to you that they -- in August

24  of 2022 is when the potential arc damage areas were

25  identified at the shed?

1    A.   He did.

2    Q.   And Mr. Birdsong, was he involved in attempting

3 to identify any arc damage on the interior portions of

4 the house?

5    A.   I don't know if he was involved in that or not

6 because the plaintiffs' attorney at the time also had an

7 electrical engineer there.

8    Q.   And that was Daren Schlee?

9    A.   Yes.

10    Q.   I think that's S-c-h-l-e-e.

11    A.   Yes, I think that's correct.

12    Q.   And you're aware that Mr. Schlee has not been

13 named as an expert in this case?

14    A.   I haven't seen the name; so I'm making that

15 assumption, yes.

16    Q.   Have you ever had any discussions with Daren

17 Schlee?

18    A.   I have not.

19    Q.   So as far as what Mr. Schlee found during the

20 August 2022 site inspection, you don't know what that

21 is?

22    A.   Correct, I don't.

23    Q.   After the August 2022 site inspection, it looks

24 like you did not really have any further involvement

25 until March of 2024 when you had a telephone conference

Page 38

1    with Mr. Ayala?

2        A.    That's correct.

3        Q.    Were you ever made aware that there was an

4    evidence inspection that occurred at Palmer's lab in

5    Salt Lake City in October of 2023?

6        A.    I was not until March of 2024.

7        Q.    That's something you would have liked to have

8    been made aware of?

9        A.    Depending what they expected me to -- depending

10   if they expected me to continue working on the case or

11   not, then I probably would have made an indication of

12   whether I needed to be there or not.

13       Q.    Was there any --

14       A.    So I really heard nothing from the client after

15   the August 2022 joint inspection until March of 2024.

16       Q.    Was there an indication after the August 2022

17   inspection, at some point between then and March of

18   2024, that they were not going to use you on the case

19   anymore?

20       A.    I was never told that.

21       Q.    Okay.

22       A.    So I just kept the case open.

23       Q.    You just did not receive any information?

24       A.    Correct.  The last thing -- the last

25   information I received from Mr. Goody following the

1   August 2022 inspection is that he was going to refer the

2   case and associate -- I didn't know that it was

3   Mr. Rudwin, but he told me he was going to refer the

4   case to Morgan & Morgan.  That's the last thing I heard.

5   That would have been probably the week after the joint

6   inspection.

7       Q.   Okay.  As an origin and cause investigator, you

8   would want to be involved in evidence inspections;

9   correct?

10          MR. AYALA:  Form.

11          THE WITNESS:  Again, it depends on what's being

12  inspected and what my role continued to be.

13          If my role -- if they still wanted me to

14  address causation and sources of ignition and ignition

15  sequences, then yes, I would have said I absolutely have

16  to return.  I have to return.

17          If somebody else was going to address that,

18  then it wasn't necessary for me to be there, but I would

19  have made sure that the client had an electrical

20  engineer there.

21      Q.   So you think from an origin analysis, it was

22  not necessary for you to be at the lab inspection?

23      A.   I did not, because I had all the data and

24  information I needed to do the origin determination.

25      Q.   Okay.  So from an origin perspective -- strike

Page 40

1    that.

2            When you've been hired to do an origin analysis

3    of a fire and there are subsequent evidence inspections

4    following a site inspection, it's typical for you to

5    attend the evidence inspection; correct?

6            MR. AYALA:  Form.

7            THE WITNESS:  A lot of clients have me go to

8    all of those, but I don't always glean any new

9    information that I need for my role in the case.

10   BY MR. LaFLAMME:

11       Q.   Okay.

12       A.   And this was not a unique case.  It's a little

13   bit different because all they were looking for me was

14   to establish the origin of the fire.

15       Q.   Even when you were just establishing the origin

16   of the fire, it is more typical for you to go to an

17   evidence inspection that follows a site inspection;

18   correct?

19           MR. AYALA:  Form.

20           THE WITNESS:  More typically, yes.

21   BY MR. LaFLAMME:

22       Q.   Aside from an origin analysis in this case, are

23   you offering any other opinions with respect to this

24   fire?

25       A.   No.

1      Q.   Are you offering any opinions with respect to

2   the sequence and propagation of the fire?

3      A.   Progression development, yes, that's part of

4   the heat and flame vector analysis.  So I did an

5   analysis of how the fire progressed and developed

6   through the whole house.

7      Q.   From August 2022 to March 18th, 2024, did you

8   do any work on this file?

9      A.   Nothing.

10      Q.   Are you aware of the individuals that went to

11   the October evidence inspection?

12      A.   I am from reading the case file, and that's you

13   one of the sets of new notes I added.  I just like to

14   remember their names.

15      Q.   I have it for you.  Richard Dyer and Scott

16   Kramer?

17      A.   Yes.  It's Scott's name I couldn't remember.

18      Q.   All right.

19      A.   So that's one of the new sets of notes I had.

20   I just added their names that they were at that

21   inspection.

22      Q.   Richard Dyer, do you know what his background

23   is?

24      A.   He started out in the Fire Marshal's Office.

25   Well, he grew up, his father being the Fire Chief, a

Page 42

1    very famous Fire Chief, and he actually got his nickname

2    "Smokey" from being a young kid in his father's

3    firehouse, and then he worked for the State Fire

4    Marshal's Office and then eventually -- I don't know all

5    his progression -- eventually was the Chief of the

6    Kansas City Fire Department.

7        Q.   He's an origin and cause expert?

8        A.   He is.

9        Q.   Similar to the role that you are playing in

10   this case?

11       A.   Correct.

12       Q.   Did you ever speak with Mr. Dyer about his

13   findings with respect to the evidence inspection?

14       A.   I have not.  I was only provided with his

15   photographs from that inspection.

16       Q.   How about Mr. Kramer, did you ever speak with

17   him?

18       A.   I did not.

19       Q.   Have you ever requested to physically review

20   the evidence that's at Palmer's lab?

21       A.   I have not.  I requested to see the photographs

22   of what evidence that they had looked at there, and I've

23   reviewed those photographs -- well, I've reviewed Smokey

24   Dyer's photographs of that.

25       Q.   You're aware that Smokey Dyer is not a named

Page 43

1    expert in this case; correct?

2         A.    I'm coming to understand that here today, yes.

3         Q.    Okay.  And you're aware that Scott Kramer is

4    not a named expert in this case; correct?

5         A.    The same realization, yes.

6         Q.    Do you know how many experts plaintiffs have

7    had in this case in total?

8              MR. AYALA:  Form.

9              THE WITNESS:  Did you say "four" or "form"?

10             MR. AYALA:  Form.

11   BY MR. LaFLAMME:

12        Q.    He said "form."

13        A.    Oh, "form," okay.

14             Besides myself, I'm only aware of Mr. "Schlay"

15   of "Schlee," however he pronounces it, Smokey Dyer, and

16   Mr., is it Kramer, did you say?

17        Q.    Kramer.

18        A.    Kramer, right.

19        Q.    And you're aware that none of those other three

20   experts have been named as experts in this case or

21   designated?

22        A.    Well, I am aware of one more expert and that's

23   Mr. King, Derek King.

24        Q.    Okay.

25        A.    So besides Derek King, he's the only one that I

1    know for certain, as I sit here today, has been named as

2    an expert.

3        Q.   Do you know what King's involvement has been in

4    any of the inspections that have been conducted?

5        A.   My understanding is he did an independent

6    examination, inspection and evaluation of the remains of

7    the subject hoverboard.

8        Q.   Have you ever spoken with Mr. King?

9        A.   I have not.

10       Q.   Have you ever spoken with anyone at BEAR about

11   this case?

12       A.   I have not.

13       Q.   Have you ever spoken with Cristal VanDongen

14   after the April -- or after the August 2022 inspection?

15            Let me ask you this first:  Do you know who

16   Cristal VanDongen is?

17       A.   I do.  She's the insurance investigator for the

18   ICS company.

19            I think after the inspection, she called me

20   once because she was looking for someone to help pay for

21   her invoices and time from that August inspection and I

22   referred her to Mr. Goody.

23       Q.   Okay.

24       A.   So we didn't discuss the case at all.

25            I said, "I'm not the person to talk to about

1  your invoices that you want contributions to.  You have

2  to talk to Mr. Goody."

3      Q.   V-a-n-D-o-n-g-e-n, and Cristal is

4  C-r-i-s-t-a-l.

5          You had contact with Ms. VanDongen prior to the

6  May inspection; correct?

7      A.   Correct, organizing that.  We collaborated on

8  that date.

9      Q.   Did you have any substantive discussions with

10  her following the May 2022 inspection?

11      A.   Only that I contacted her and I told her I was

12  distributing to her and all the interested parties all

13  of the Sweetwater County FOIA response information I had

14  received.

15      Q.   Ever any substantive discussion with

16  Ms. VanDongen as to what her conclusions were following

17  the May and August of 2022 inspections?

18      A.   No.

19      Q.   You're not aware that she could not rule out a

20  fire starting at the outside smoking shed?

21      A.   I'm not aware of any of her opinions.

22      Q.   How about with Mr. Palmer, the electrical

23  engineer, did you ever have any discussions, substantive

24  discussions with him about his findings?

25      A.   I have not.

1    Q.  So it sounds like with respect to all of the

2  other experts that have been involved either for the

3  Wadsworth family or for Farmers, the property insurer,

4  you have not had any substantive discussions with any of

5  them?

6    A.  I have not.  I stayed in my lane.

7    Q.  Have you read Mr. King's report?

8    A.  I have not.

9    Q.  Have you read Mr. King's deposition?

10    A.  I have not.

11    Q.  Are you familiar with Mr. King's background?

12    A.  I am not.

13    Q.  Do you know he just got his PE license last

14  year?

15    A.  I'm not aware of that.

16    Q.  Are you aware that he has never been designated

17  as an expert in a lithium-ion battery case?

18        MR. AYALA:  Form.

19        THE WITNESS:  I would have no knowledge of

20  that.

21  BY MR. LaFLAMME:

22    Q.  Do you know what Mr. King's opinion is in this

23  case as far as the failure mode?

24    A.  As far as the failure mode, no.

25    Q.  Okay.  His opinion in this case is that

1  Cells 10 and 4 had an internal short circuit which then

2  initiated the fire.

3          Are you aware of that?

4          MR. AYALA:  Form.

5          THE WITNESS:  I wasn't given -- the cell number

6  designations weren't identified to me.

7          What I was advised by my client is that he had

8  completed his examination and was going to testify that

9  the fire started within the hoverboard and that it was

10  the source of ignition for this fire.

11  BY MR. LaFLAMME:

12     Q.   Okay.  Were you ever told that his opinion was

13  going to be that two separate cells had an internal

14  short circuit that ignited the fire?

15     A.   I wasn't given that specificity, but I could

16  see from my exam of the hoverboard, a visual exam and

17  from the subsequent X-rays that were taken that there

18  was more than one cell that had failed.

19     Q.   Do you know how an internal short circuit

20  occurs with a lithium-ion battery cell?

21     A.   So the train -- I'm not a lithium-ion battery

22  expert, so that's why I said they needed an electrical

23  engineer.

24          So I'm aware that it is often the original

25  construction of the battery or its contaminants within

1    the battery, but I just a general awareness of how they

2    fail.

3                I'm certainly not going to speak to how the

4    batteries in this hoverboard failed.

5        Q.    Do you know how an internal short circuit

6    actually occurs within the internal portions of a

7    lithium-ion battery cell?

8        A.    I don't.  I've seen presentations that give

9    overviews of it, but I don't pretend to be an electrical

10   engineer.

11       Q.    And you will not be offering any opinions in

12   this case as to the exact -- the specific failure mode,

13   alleged failure mode with the lithium-ion batteries;

14   correct?

15       A.    I can guarantee you of that.

16       Q.    Okay.  Have you ever -- you've done other

17   lithium-ion battery cases; correct?

18       A.    I've been involved in other cases in which

19   lithium-ion batteries are a subject, and I always tell

20   my clients and defer to electrical engineers.

21       Q.    Have you ever been involved in another case

22   that you can think of where two independent -- where

23   it's alleged that two independent cells have an internal

24   short circuit at virtually the same time?

25       A.    I really don't know that I can say yes or no to

1  that because I'm usually not involved in that part of

2  the case.

3      Q.   Okay.  Are you able to state, one way or the

4  other, whether it's unusual for two lithium-ion battery

5  cells to have internal short circuits at virtually the

6  same time?

7           MR. AYALA:  Form.

8           THE WITNESS:  I don't have any frame of

9  reference to determine whether it's unusual or not.

10  BY MR. LaFLAMME:

11      Q.   You can put the invoices to the side probably

12  wherever you put those.

13      A.   Yeah, I'm going to put all the marked exhibits

14  down here.

15      Q.   Have you viewed all of the body camera footage

16  in this case?

17      A.   I have.

18      Q.   Not all of it was in your expert file.

19      A.   Well, that I'm not aware of.  I have reviewed

20  everything that's in my file.  That was everything that

21  was provided to me by the County of Sweetwater.

22      Q.   Okay.  So if we go to, in your file,

23  "Sweetwater County SO FOIA Response" --

24      A.   Correct.

25      Q.   -- there are some videos and recordings there;

```
 1   correct?
 2        A.   Correct.  That's all that was ever provided to
 3   me by them.
 4        Q.   Okay.
 5        A.   So if there's more than that, I don't know that
 6   sitting here.
 7        Q.   All right.  Are you aware of Ashley Merrill's
 8   body camera footage where there were statements from the
 9   Wadsworth children about what they witnessed in the
10   early stages of the fire?
11        A.   I've read that in the other depositions.
12        Q.   Okay.  You have not listened to that, those
13   statements?
14        A.   I don't know if I recall hearing that when I
15   first reviewed these body cam videos.
16        Q.   As in --
17        A.   So most of these body cam videos aren't the way
18   I would want to identify whose body cams are there
19   necessarily.
20        Q.   As an origin and cause expert, you would want
21   to have the benefit of listening to any witness
22   statements from the immediate post-fire incident;
23   correct?
24        A.   Correct.  It's all data to consider.
25        Q.   And the statements that are made on the fire
```

Page 51

1  scene are obviously made immediately after the witness

2  encounters the situation?

3        MR. AYALA:  Form.

4  BY MR. LaFLAMME:

5     Q.   I think that probably goes without saying.

6     A.   Yeah.  Yeah, pretty intuitive.

7     Q.   Okay.  I am going to, since you haven't seen

8  these before, show you the body camera footage from

9  Ashley Merrill's body cam.

10    A.   And you're representing to me that I don't --

11  this is not one of them I have in my file; right?

12    Q.   I can tell you it is not.

13    A.   Okay.

14    Q.   Unless you have additional stuff that was not

15  put into the Dropbox.

16    A.   No.  Everything's there.

17    Q.   All right.  So this is a 30-minute video that

18  is denoted "Fire;_1620_HWY_374-2," and that's how it was

19  provided to us.

20        And you don't need to take down the audio on

21  this.

22        THE REPORTER:  Okay.  Great.

23  BY MR. LaFLAMME:

24    Q.   All right.  I'm going to go to about 5:30,

25  specifically starting at 5:27.

1              Hold on.  Let me get the volume up more for

2    you.  All right.  And I'll back it up to 5:25.

3                    (Video played.)

4    BY MR. LaFLAMME:

5        Q.   Are you able to hear that well?

6        A.   I am.

7        Q.   Is there volume coming out of there or not?

8        A.   I think it's coming out of here, yes.

9        Q.   Okay.

10                   (Video played.)

11   BY MR. LaFLAMME:

12       Q.   Do you hear Kamille say, "It started by the

13   shed"?

14       A.   I heard that, yes.

15       Q.   You have not seen this video before; correct?

16       A.   I have not.

17       Q.   And Kamille indicated, "It started by the shed"

18   at five minutes 42 seconds.

19       A.   Correct.

20                   (Video played.)

21   BY MR. LaFLAMME:

22       Q.   You heard Kamille and Layne there say that the

23   fire was outside by the shed?

24       A.   I heard that, yes.

25       Q.   Okay.  And you heard Kamille indicate that her

Page 53

1    parents smoke at the shed; correct?

2        A.    Correct.

3        Q.    Okay.  And that's your understanding of what

4    the shed was used for as well; correct?

5        A.    Yeah, it's always been referred to as the

6    "smoking shed."

7        Q.    Okay.  And you're aware that Mrs. Wadsworth did

8    smoke in that shed in the early morning hours before the

9    fire?

10       A.    You want to change your screen because I can

11   see your outline.

12       Q.    Oh, thanks.

13             MR. AYALA:  It will tell you where he's going

14   with his questions.

15             THE WITNESS:  No, that's not fair.

16   BY MR. LaFLAMME:

17       Q.    Okay.  You're aware that Mrs. Wadsworth smoked

18   in that smoking shed within a couple hours of the fire;

19   correct?

20             MR. AYALA:  Form.

21             THE WITNESS:  Correct.  I think her testimony

22   was she had smoked out there and then was in the house

23   and going to bed in the living room by 2:00 a.m.  So

24   sometime prior, just prior to 2:00 a.m. is the way the

25   deposition read.

Page 54

1   BY MR. LaFLAMME:

2       Q.   Okay.  And she had indicated she would

3   typically have a cigarette before going to bed; correct?

4       A.   Correct.

5       Q.   And do you know how many alcoholic drinks she

6   had that night?

7       A.   She was asked in her deposition, I don't

8   remember the number, but I just remember that it was

9   Jagermeister.

10      Q.   And do you recall there was approximately 10

11  drinks that she had had that night?

12      A.   I don't recall that number, but I'm not

13  disputing it.  Whatever the deposition says.  I remember

14  she was asked.

15      Q.   The alcohol use is not mentioned anywhere in

16  your report; correct?

17      A.   It is not.

18      Q.   And you do not mention anywhere in the report

19  the statements of the Wadsworth children about the fire

20  being at the shed; correct?

21      A.   Correct.  This is the first time I've seen this

22  video.

23      Q.   Have you heard the telephone interview with

24  Matthew Wadsworth from Detective Sheaman the day after

25  the fire?

1     A.   I don't know if I've ever listened to the

2   actual audio.

3     Q.   As an origin and cause expert, that's something

4   you would want to review in your investigation; correct?

5     A.   I would review it --

6          MR. AYALA:  Form.

7          THE WITNESS: -- and then, as I do with all of

8   this, I compare and contrast it to the physical

9   evidence, yes.

10  BY MR. LaFLAMME:

11    Q.   Do you know when Mr. Wadsworth was told by

12  Detective Sheaman that he thought it was the hoverboard

13  that caused the fire?

14    A.   I don't remember the exact date, no.

15    Q.   Do you know if it was the day after the

16  accident?

17    A.   I don't recall, as I sit here, when he

18  transferred that information.

19    Q.   Would you be critical of the local investigator

20  for indicating what his preliminary thoughts are to the

21  homeowner when his investigation is not complete?

22         MR. AYALA:  Form.

23         THE WITNESS:  I don't really have any reason to

24  be critical of him.

25  ///

Page 56

1    BY MR. LaFLAMME:

2        Q.    Okay.  You are a municipal fire investigator;

3    correct?

4        A.    Correct.

5        Q.    When you did your municipal investigations,

6    would you tell witnesses what your preliminary thoughts

7    were of the investigation before it was completed?

8        A.    I never did that, no.

9        Q.    And you wouldn't do that because you wouldn't

10   want to taint the witness's statements to you

11   subsequently?

12       A.    That's one reason not to do it.

13             MR. AYALA:  Form.

14             MR. LaFLAMME:  Okay.  I'm going to start

15   Sheaman's interview with Matthew Wadsworth at 11:30.

16             (Video played.)

17   BY MR. LaFLAMME:

18       Q.    Those aren't any types of statements that you

19   would make to a homeowner the day after the fire when

20   your investigation is still ongoing; correct?

21             MR. AYALA:  Form.

22             THE WITNESS:  I would not by my personal choice

23   of how I do business.

24   BY MR. LaFLAMME:

25       Q.    You would not indicate that a certain product

Page 57

1   is notorious for causing fires when you have not

2   completed your fire investigation to the homeowner;

3   correct?

4           MR. AYALA:  Form.

5           THE WITNESS:  I wouldn't do that, no.

6           MR. LaFLAMME:  Then moving up to 23 minutes,

7   33 seconds.

8               (Video played.)

9   BY MR. LaFLAMME:

10      Q.   Would you make that type of statement that

11  you'd be willing to bet your next paycheck as to the

12  cause of the fire the day after the fire?

13          MR. AYALA:  Form.

14          THE WITNESS:  I would not do that, no.

15  BY MR. LaFLAMME:

16      Q.   Okay.  And just so I get my full statement out

17  here, you heard Detective Sheaman state to Mr. Wadsworth

18  the day after the fire that he would be willing to bet

19  his paycheck that it was the hoverboard.

20          That is not a statement you would ever make as

21  a municipal fire investigator to the homeowner; correct?

22          MR. AYALA:  Form.

23          THE WITNESS:  I would not, no.

24          MR. LaFLAMME:  And then continuing on at 24

25  minutes.

Page 58

```
 1                    (Video played.)
 2    BY MR. LaFLAMME:
 3        Q.   And you heard Mr. Wadsworth there between
 4    24 minutes and 24:45 seconds even tell Detective Sheaman
 5    about the smoking shed; correct?
 6        A.   He did, yes.
 7        Q.   Yeah.  And you read Detective Sheaman's
 8    deposition in this case; correct?
 9        A.   I did.
10        Q.   Were you surprised to see Detective Sheaman
11    testify that he was not aware of the smoking shed?
12        A.   It was inconsistent with this, yes.
13        Q.   And as a fire investigator, a municipal fire
14    investigator working on a case, if you are given
15    information from the witness about a smoking shed and
16    that they had concerns about the fire maybe starting in
17    there, you would look into that; correct?
18             MR. AYALA:  Form.
19             THE WITNESS:  I would like to think, as I did
20    in this case, that I already had considered exterior
21    origins for the fire as part of the analysis of
22    competing hypothesis and just for the overall
23    completeness of fire.
24             So whenever you have a fire going, whether the
25    fire is between an exterior wall, inside or outside, or
```

1  even in the interior walls between different rooms, you

2  have to evaluate which way it was moving.

3  BY MR. LaFLAMME:

4     Q.   Okay.  As a municipal investigator, you would

5  have wanted to look into the smoking shed further once

6  provided that information; correct?

7          MR. AYALA:  Form.

8          THE WITNESS:  I would have wanted to consider

9  it as an alternative hypothesis, which is what I did in

10  this case.

11  BY MR. LaFLAMME:

12     Q.   Okay.  But I'm talking about Detective Sheaman

13  in this case.

14          If you were in the place of Detective Sheaman,

15  you would want to consider the potential hypothesis of

16  the fire starting at the smoking shed; correct?

17          MR. AYALA:  Form.

18          THE WITNESS:  I would think he would want to do

19  that, depending upon how certain he was of his

20  determination of the progression and development between

21  the exterior of the house and the interior of the house,

22  and I don't know that I have a full comprehension of how

23  certain he was of that.

24  BY MR. LaFLAMME:

25     Q.   Okay.  This was the first time you heard that

Page 60

```
 1    interview with Mr. Wadsworth; correct?

 2        A.    I believe so, yes.

 3        Q.    Did you ever ask counsel for the Wadsworth

 4    family for all of the body camera footage that was

 5    available?

 6        A.    I made a deduction that I had it because the

 7    sheriff's department and the County of Sweetwater had

 8    indicated to me that they had provided everything that

 9    they had.

10        Q.    Okay.

11        A.    So I had a couple interactions with their

12    Freedom of Information officer.

13        Q.    But now you understand you did not get

14    everything?

15        A.    I understand that now, yes.

16        Q.    And you do not -- you are not aware of the

17    statements Mr. Pasborg would have made on the body

18    camera footage of Ms. Merrill; correct?

19        A.    Correct.  I don't recall that.

20        Q.    And going back to the prior body camera footage

21    of Ms. Merrill which is the "Fire;_1620_HWY_374-2 video

22    at 12:50 -- I'm trying to make it louder for you so

23    starting at 12:45.

24                    (Video played.)

25    ///
```

Page 61

1   BY MR. LaFLAMME:

2       Q.   Okay.  You heard Pasborg indicate that it

3   looked like the fire started on the outside or at the

4   exterior wall?

5       A.   I did.

6       Q.   Okay.

7                (Video played.)

8   BY MR. LaFLAMME:

9       Q.   And that was statements from Mr. Pasborg and

10  Detective Merrill from 12:50 to about 13:15.

11               You had not heard those before; correct?

12      A.   I have not.

13      Q.   All right.  Based on your investigation, you

14  indicated that you were involved in assessing the

15  propagation of the fire; correct?

16      A.   Correct.

17      Q.   Okay.  So under your theory, we have a fire

18  that starts at the hoverboard?

19      A.   Correct.

20      Q.   Where does it go next?

21      A.   I can show you with photographs its progression

22  from that location in the bedroom primarily to begin

23  with.  It then vents itself out that bedroom window and

24  then enters the main bedroom hallway of the house and

25  makes its way through the house.

1            And so what I've done is I've selected the

2     photographs that show that progression throughout the

3     house.

4         Q.   Okay.  You're talking about the photographs

5     that you provided which we've marked as Exhibit 97?

6         A.   Correct.

7         Q.   Okay.  Why don't you pull those out then.

8              Mike, if you need a break at any time --

9              (Discussion held off the record.)

10    BY MR. LaFLAMME:

11        Q.   All right.  So we have the fire under

12    plaintiffs' theory initiating at the hoverboard, and you

13    said you pulled out photographs from Exhibit 97 which

14    show the fire progression.

15        A.   Right.  Do you want me to start with the

16    patterns that are in Bedroom No. 4?

17        Q.   I would like you to start from when the fire

18    initiates and to where it goes.

19        A.   Okay.  So I'm going to go -- I'm not going to

20    do these photographs in order.  That's what I'm

21    representing to you.

22        Q.   Okay.

23        A.   So I think we can start at Photograph 143.

24        Q.   Okay.

25        A.   And just for the record, these photograph

1    numbers match how they are in my case file in a file

2    marked "MJS AA photographs."

3        Q.    Okay.  So these photographs would have been

4    taken at the May 2022 inspection?

5        A.    Correct.

6        Q.    All right.  Are all of the photographs in this

7    packet from your May 2022 inspection?

8        A.    They are.

9        Q.    Okay.

10        A.    So looking at Photograph 143, I'm trying to

11    think, we use the cardinal direction as being north,

12    this way (indicating).

13            So this is a photograph of the west wall of

14    Bedroom No. 4, and the pattern that is manifested along

15    that wall and particularly the damage to the vertical

16    wood wall studs is what we call a manifestation of a

17    truncated cone pattern.

18            So it tells us that the fire plume is in its

19    third stage of progression, or its conical state, and

20    the interpretation of the way the wall studs are

21    damaged, their heights, the distribution of the greater

22    area of charring, greater heat treatment, greater

23    consumption shows us that the progression and spread in

24    this photograph was from the door frame and moving right

25    to left in the photograph or north to south along that

1   wall.

2        Q.    Okay.

3        A.    And it's also telling us that the fire plume

4   from which this pattern was created is located somewhere

5   to the right of this photograph.

6        Q.    Do you consider the -- you don't believe that

7   what we are looking at for a fire pattern on Photo 143

8   is a "V" pattern; correct?

9        A.    It's one-half of a "V" pattern, yes.

10       Q.    Okay.  You believe it's a "V" pattern?

11       A.    Yes.  So the truncated cone is the

12   three-dimensional representation of the fire plume, and

13   this is one side of that developing fire plume which

14   what most people would refer to it's one-half of a "V"

15   pattern.

16       Q.    Okay.

17       A.    Remembering that your "V" patterns are

18   representing the fire plume more in two dimensions as

19   opposed to three dimensions, we'll see some of that.

20       Q.    So what does this tell us as far as the fire

21   propagation?

22       A.    Across that wall it's from right to left in the

23   photograph, or north to south on that segment of wall.

24       Q.    All right.  So coming through the door area?

25       A.    Not coming through.  It's just the direction

Page 65

1    across that wall.

2        Q.    Okay.

3        A.    We're not indicating that the -- this vector

4    does not indicate that the fire is coming from the

5    hallway into the bedroom because the -- well, the other

6    patterns will show that the fire goes from this bedroom

7    into the hallway.

8            You can start to see that, although it's like

9    in this photograph, you can start to see this by the

10   damage across from the bedroom hallway there, and what

11   you're looking at is the consumption of that bathroom

12   wall.

13           The bathroom is directly across the hall and

14   the fire has penetrated that wall directly across from

15   this doorway.

16           So at some point in the fire, this fire has

17   vented out Bedroom 4's door, and the first thing it

18   really impacted in the hallway was the wall and the

19   bathroom across the hallway.

20       Q.    So this fire pattern is developed by venting

21   through the door?

22       A.    No.  It's developed by a developing fire plume

23   within the bedroom.  This fire --

24       Q.    Do you know where the whole house fan was

25   located?

Page 66

1          MR. AYALA:  Wait, wait, wait.

2          THE WITNESS:  Okay.  Sorry.

3          MR. AYALA:  Finish your answer before the next

4    question, please.

5          MR. LaFLAMME:  He had, but you can make a

6    statement.

7     Q.    Go ahead.

8     A.    This fire pattern is not indicating the

9    movement of the fire through that doorway.  It's only

10   representing the movement of the fire along that wall on

11   the interior surface.

12    Q.    Okay.  Do you know where the whole house fan

13   was located?

14    A.    In the hallway.

15    Q.    Where in the hallway?

16    A.    Outside this bedroom.

17    Q.    And that would have provided a ventilation

18   avenue for the fire into the attic space; correct?

19    A.    If it was operating, yes.

20    Q.    It's still a space into the attic; correct?

21    A.    It's an opening into the attic, yes.

22    Q.    So regardless as to whether it was operating or

23   not, it's an opening into the attic that would provide a

24   path for the flame to travel into the attic area and

25   obtain further oxygen; correct?

Page 67

 1    A.    Flame or smoke.

 2    Q.    So you agree?

 3    A.    I agree.

 4    Q.    All right.

 5          Okay.  So my question was, from a fire

 6    propagation perspective, the fire starts at the

 7    hoverboard.  Where does the fire go next?

 8    A.    Okay.  Well, I'm showing the series of pictures

 9    in the bedroom to show you.

10          So the hoverboard would be located just to the

11    right of Photograph 143.  So it's moving away from the

12    area of the hoverboard.

13          Photograph 144, the next photograph, is giving

14    us a better view of that west wall, and we're seeing the

15    same indications of the progression of the fire from

16    right to left or north to south.  So I'm just showing

17    you that it continues all the way down that wall.

18          And right now I'm focusing on the interior side

19    of that bedroom wall.  I've got photographs that show

20    what it did on the exterior which you can kind of see

21    from this photograph which way it's moving.

22    Q.    So on Photograph 144, are we able to see where

23    the hoverboard was located?

24    A.    The hoverboard is to the right of

25    Photograph 144.  So no, you can't picture the location

Page 68

1    in this photograph.

2        Q.    Okay.  The hoverboard would have been on the

3    wall that we are looking at where you have these arrows

4    drawn -- correct? -- or against the wall?

5        A.    No.  It's against the intersecting

6    perpendicular wall to the right of this photograph.

7        Q.    Okay.  Maybe I'm not sure where this photograph

8    is taken then.

9        A.    Yeah.  So let me point out a diagram just real

10   quick.  We can cut down on a number of questions, I

11   think.

12            So the wall that's pictured on this photograph

13   is this wall right here (indicating).

14       Q.    On 144 as well?

15       A.    Yes, both.

16       Q.    Okay.  So you're just further down the hallway

17   then on 144?

18       A.    I'm further into the bedroom.

19            MR. AYALA:  Do you mind if he indicates on the

20   record what he just pointed to on Exhibit -- what was

21   that -- 98? -- what wall you're referring to?

22            THE WITNESS:  So on Exhibit 98, on Page 4, I

23   was pointing to the interior surface of the west wall

24   for grids A2 and A3.

25            MR. AYALA:  Okay.

1          THE WITNESS:  So I'm not focusing on any

2     patterns that are out in the hallway.  I'm just focusing

3     on the patterns that are inside the bedroom.

4     BY MR. LaFLAMME:

5          Q.   No, I understand that.

6          A.   Okay.

7          Q.   This is the wall, the party wall between the

8     hallway and the bedroom, though?

9          A.   Exactly.

10         Q.   Okay.

11         A.   So there's multiple lines of demarcation

12    indicated there just showing that the plume continued

13    from the north -- from the north side of the bedroom

14    moving to the south side of the bedroom.

15              Photograph 147, I just want to make sure you

16    have your orientation because we're now looking at this

17    segment of wall (indicating).

18         Q.   Okay.  So we are basically working

19    counterclockwise as if around this bedroom if you were

20    looking at the doorway?

21         A.   Exactly.  And the patterns on the interior

22    surface of that short section of the west wall there

23    we're seeing the same direction that the fire plume, and

24    the fire is moving from north to south along that

25    smaller section of wall.

1    And then when we look at the south wall of
2  Bedroom No. 4, we have what is referred to as a
3  "U" pattern on that wall.  That's an indication that the
4  heat is moving all the way across the room from the fire
5  plume on the opposite side of the room and moving
6  towards that south wall.
7    So that "U" shape comes from -- is a part of
8  the three-dimensional manifestation of a fire plume
9  that's in its conical phase of development, fully
10  developed.
11    Q.    Okay.
12    A.    So everything is pointing back to the other
13  side of the room.
14    Photograph 153, you can see the window to the
15  right of the photograph.  So we're looking at the
16  segment of the east wall of Bedroom No. 4 between the
17  window and the closet located to the north there, and
18  the fire patterns indicate that the fire is moving from
19  the closet across that wall segment towards the window.
20    Q.    What in this photograph is indicating that to
21  you?
22    A.    It is the amount of damage to the vertical wood
23  wall studs as you compare them, and then the angular
24  nature of the damage to the interior of the wall studs
25  underneath.

1          Now, some of these are clear if you look at the

2    actual photograph.  So when I print these, I lose a

3    little detail from it because of the printer, but you

4    can also look at the distribution of the damage on the

5    interior surfaces of the vertical wood wall studs, and

6    there are lines of demarcation which indicate that the

7    fire is coming from the closet towards the window in

8    that section of that wall.

9        Q.   This is an exterior wall; correct?

10       A.   It is.

11       Q.   And we had insulation, batt insulation in

12   between the wall studs?

13       A.   Correct.

14       Q.   And batt insulation would provide protection to

15   the wall studs; correct?

16            MR. AYALA:  Form.

17            THE WITNESS:  Yes -- well, no, it's not the

18   batt insulation.  It's the wall covering that would

19   provide that.

20            Well, I guess I'll agree with you.  The batt

21   insulation will provide insulation to the sides of the

22   wall studs, but not to the surfaces facing the room.

23   BY MR. LaFLAMME:

24       Q.   So when we are looking at the -- how you can

25   see the front of the wall studs are charred, whereas the

1    sides are not, that's because it's protected from the

2    batt insulation; correct?

3        A.    Correct.

4        Q.    So the fact that these wall studs are less

5    charred than other wall studs, that's a result of the

6    batt insulation within them?

7        A.    Yeah, I'm not comparing the -- I'm not

8    necessarily comparing just the sides of the wall studs.

9    I'm also looking at the surface of the wall stud that

10   faces the interior of this room.

11       Q.    Okay.  That's fine that you may not be, put

12   some others may have made those types of statements.

13            MR. AYALA:  Form.

14   BY MR. LaFLAMME:

15       Q.    So looking at the lack of char on the side of

16   these studs, that's due to the presence of batt

17   insulation in that area; correct?

18            MR. AYALA:  Form.

19            THE WITNESS:  Yes, because the pattern we're

20   seeing there is a protected area.

21   BY MR. LaFLAMME:

22       Q.    Correct.  So that's not an unexpected protected

23   area due to the presence of batt insulation?

24       A.    Not unexpected to me, no.

25       Q.    All right.  Go ahead -- actually, take a step

Page 73

1    back.

2           From Photo 153, so you said you are more

3    looking at the fire patterns on the front part of the

4    studs?

5        A.   Correct, and the degree of damage.

6        Q.   Okay.  So were you doing a depth of char

7    analysis there, or what was --

8        A.   That's what I'm doing, but you're able to do it

9    visually because it's visually observable.

10       Q.   And wouldn't the depth of char be limited by

11   the placement of the batt insulation in between the

12   studs?

13       A.   The depth of char on the sides of the vertical

14   wood wall studs would be protected by that, yes, but as

15   you look at the narrow surface of these vertical wood

16   wall studs as they face the interior of Bedroom No. 1,

17   you can see that the damage is greater closer to the

18   closet and becomes less and less as you move away from

19   the closet towards the window, and that's an indication

20   that the fire is moving from the area of the closet

21   towards the window depicted in the photograph.

22       Q.   Okay.

23       A.   Okay.  Photograph 154, I'm really focusing on

24   the interior of the closet that's in that corner of the

25   room on the northeast corner of Bedroom No. 4.

1              I'm making two observations, and I've got

2    another picture that shows the other side of the wall on

3    the opposite side of this closet taken from the kitchen

4    side, and when you compare those two, we know that the

5    fire progressed through that wall from Bedroom No. 4's

6    closet into the kitchen.  That's the way that it burned

7    through that wall.

8              Let me just find the opposite picture because

9    it's probably better to look at them in comparison.

10             If you look at Photograph 104, that's that same

11   wall taken from the kitchen side.

12        Q.   Okay.  So looking at Photographs 104 and 154?

13        A.   Correct.

14        Q.   Okay.  So that's just an indication that the

15   fire moved from Bedroom 4 into the kitchen?

16        A.   Correct.

17        Q.   You would have a similar situation if the fire

18   started externally, entered the Bedroom 4 through the

19   window and the first inside portion of the house that

20   was on fire was within Bedroom 4.

21             You would still have that same pattern;

22   correct?

23        A.   Correct, because it's only telling us the

24   progression development between Bedroom 4 and the

25   kitchen.

1      Q.   So Photo 104 and 154 are just telling us that

2   the fire moved from Bedroom 4 into the kitchen?

3           MR. AYALA:  Form.

4           THE WITNESS:  Correct, except there's more on

5   Photograph 154.  That's one thing.  That's what the text

6   box -- I'm trying to indicate by the text box.

7           But when you look at the header over the closet

8   represented with the arrow, we can see that the degree

9   of charring is greatest closest to the left side opening

10  of the closet and decreases the closer you get to the

11  east wall of Bedroom No. 4, and that is showing us the

12  development of the fire is moving from left to right or

13  west to east across the top of that header on top of the

14  closet, and that's moving away from the area of origin

15  that we'll get to, my identified area of origin.

16  BY MR. LaFLAMME:

17     Q.   Okay.  So you have an arrow on 154 going across

18  the header of the closet?

19     A.   Correct.

20     Q.   And that arrow was going towards the exterior

21  wall?

22     A.   Correct.

23     Q.   All right.  So it's your belief that the fire

24  traveled from, looking at the closet, the left side to

25  the right side of the closet?

1    A.    Across that header, yes.

2    Q.    Okay.

3    A.    So in all my photographs, I probably should

4 have said at the beginning, I'm putting the arrowhead to

5 indicate the movement of the heat and the fire and the

6 development of the plume.

7    Q.    Okay.

8    A.    And then from this photograph you'll see that

9 to the left, and we'll come to a better photograph, we

10 can see the back of the refrigerator visible through the

11 burned wall there.

12    Q.    So you're looking at the left, lower left

13 corner of Photo 154?

14    A.    Correct.  And what you're seeing there is that

15 the north bedroom wall has all the way burned through

16 and we're seeing the back of the refrigerator there.

17    Q.    And that's generally where the hoverboard was

18 located?

19    A.    Directly below it, yeah.  I've got a close-up

20 photo for us.

21    Q.    Okay.

22    A.    So Photograph 155 is that section of wall

23 between the closet opening and the hallway door.

24          So we're again in the center of that photograph

25 is the back of the refrigerator which is exposed because

1    the fire has burned through it from Bedroom 4 moving

2    towards the kitchen and that is a -- that pattern is

3    what's commonly referred to as a flame zone pattern

4    usually centered in the center of the fire plume.

5         Some people refer to it as the -- some techs

6    refer to it as the fire zone.

7    Q.    Okay.

8    A.    And it's indicating that that's an area that

9    continued to burn and stay hot enough.

10        So other people would refer to the back of the

11   refrigerator, now exposed, as exhibiting a clean burn

12   area, meaning that it remained hot enough throughout the

13   duration of the fire that the soot couldn't condense on

14   it.

15   Q.    And we can see some wiring in that area;

16   correct?

17   A.    Correct.  That's a branch circuit that comes

18   down from the attic area, and at the bottom, and I've

19   got a better picture to see it, at the very bottom

20   you'll see that is running to the outlet which faced the

21   bedroom.

22   Q.    So we have -- and I think you can see the

23   electrical box --

24   A.    Yes.

25   Q.    -- just above the compressor area for the

Page 78

1    refrigerator; correct?

2        A.    Correct, directly above that vent in the back

3    of the refrigerator.

4        Q.    Okay.  And that would have been directly above

5    where the hoverboard was located?

6        A.    Correct.

7        Q.    And the wiring insulation is burned off of

8    those electrical wires; correct?

9        A.    On the lower portions of it, yes.

10        Q.    All right.

11        A.    And I'm going to show you, we'll see a close-up

12    of this box.

13        Q.    Okay.

14        A.    Now I'm looking at the same wall.  So to the

15    right you can see the area where we were just looking

16    at, and there are a number of lines of demarcation on

17    this wall, and I placed the arrows directly below the

18    angular lines that are lower on the righthand side,

19    taller on the lefthand side, and there's multiple ones

20    on this wall, but there were three predominant ones that

21    I was able to see all saying the same thing, that the

22    fire plume was developing.  So we're seeing again, we're

23    kind of seeing half of a "V" pattern.

24            Now, we don't see other half on the other side

25    of where the refrigerator is because there was an open

1    closet.  So there wasn't a mating surface for that to

2    manifest, but all of the lines of demarcation and

3    distribution of damage to the wall there show that the

4    fire is moving from right to left in this picture or

5    east to west across the north wall, and your reference

6    is where the back of the refrigerator is exposed there.

7        Q.   So in Photo 156 we can still see the wall studs

8    are intact; correct?

9        A.   We can.

10       Q.   Okay.

11       A.   And we have another indication, but the exposed

12   refrigerator says that the fire is coming from Bedroom 4

13   into the kitchen, and I don't think that's disputed in

14   this case that I'm aware of.

15       Q.   Okay.  So in looking at Photograph 156, you

16   believe that that damage is half of a "V" pattern?

17       A.   It could be referred to that, yeah.  There are

18   lanes of demarcation that's showing which way.

19            So as the fire plume develops, it gets bigger

20   and bigger and bigger, it leaves its signature, and we

21   have multiple lines of demarcation on that wall, all of

22   which are parallel to one another and they're indicative

23   of a fire plume developing from the area at the base of

24   the back of the refrigerator on the bedroom side.

25       Q.   So the initiating fire plume, under your

1    theory, would have developed basically by the grate on

2    the backside of the refrigerator?

3        A.    From that origin, yes.

4        Q.    Okay.  So this area would have been the first

5    area affected by the fire?

6        A.    One of the first areas.

7        Q.    Okay.  And here we still have the wall studs

8    intact; correct?

9        A.    Correct.

10        Q.    So there is no consumption of the wall studs

11    similar to what you saw on the party wall with the

12    hallway?

13        A.    Correct.  Now, we can look at pictures in

14    the -- when we look at the pictures taken from the

15    hallway side of the party wall, we know -- I can show

16    you why those wall studs aren't consumed, because they

17    are being affected by both sides of the wall from the

18    fire progressing initially in Bedroom No. 4 and then

19    later as the fire progressed down the hallway.

20        Q.    And you can also see that the wood panelling

21    between Bedroom 4 and the kitchen, at least on the

22    kitchen side, is not consumed completely on 156?

23        A.    That's correct.  And the reason for that is on

24    the opposite -- on the kitchen side of this wall is the

25    refrigerator and then to the left of it in Picture 156

Case 2:23-cv-00118-KHR    Document 178-4    Filed 02/21/25    Page 82 of 266

Page 81

1    is cabinetry.

2          So there is a large mass on the opposite side

3    of that wall and that mass is able to absorb heat energy

4    and, therefore, the wall does not get consumed because

5    the heat energy being imparted by conduction through the

6    wall is absorbed by the mass on the opposite side of the

7    wall, and you don't have that in the hallway.  In the

8    hallway, it's just panelling on both sides of the 2 x 4

9    stud.

10    Q.    Okay.

11    A.    Okay.  I'm going in order here.

12          So Photograph 159, here I was just labeling the

13    three sources of ignition that are located in the area

14    of origin.  I'm going to show you some more patterns in

15    the bedroom.

16          As I talked about earlier, we've got the

17    refrigerator, the back of the refrigerator, and there's

18    an electrical outlet on the kitchen side of this wall

19    that the refrigerator was plugged into, and I've circled

20    that electrical outlet.

21          That's the electrical outlet serving the

22    bedroom or facing the bedroom side, and just on the

23    other side here is an outlet that's on the kitchen side

24    of the wall that it appears the refrigerator was plugged

25    into, and that's the box that Detective Sheaman focused

1    on with the wire coming out.  That's not -- that wasn't

2    on the bedroom side of the wall.  That's on the kitchen

3    side of the wall.

4         Q.   Okay.

5         A.   And I have a separate set of two pages of notes

6    where I showed those two photographs because I was

7    trying to decide, figure out what he was talking about,

8    and I figured it out.

9         Q.   I was as well at one point.

10        A.   Okay, yeah.  And then the oval at the bottom of

11   this represents that the hoverboard is also located

12   there.

13        Q.   So you would agree that the outlet that was on

14   the bedroom side, there is no wiring coming from that

15   outlet; correct?

16        A.   No wire protruding from that.

17        Q.   Okay.  The wiring that is protruding from an

18   outlet in that area is the upper outlet that serviced

19   the refrigerator?

20        A.   Correct.

21        Q.   So Detective Sheaman in his analysis when he

22   indicated that there was wiring from that outlet into

23   Bedroom No. 4 was incorrect?

24        A.   That's incorrect.

25             And I think I called that set of notes

1    something like Sheaman's observations of the outlets,

2    but yes, it's in the case notes folder and it's entitled

3    "Sheriffs Detective Sheaman Outlet Observations."

4        Q.    Since I have it here, why don't we mark it and

5    we'll knock that one out.

6        A.    Okay.

7        Q.    I'll hand you what's been marked as Exhibit 99,

8    and this is from your expert file; correct?

9        A.    Correct.

10            (The aforementioned document was

11            marked as Exhibit 99 for identification

12            and is attached hereto.)

13   BY MR. LaFLAMME:

14       Q.    Okay.  And there was an indication from

15   Detective Sheaman's report that there was wiring coming

16   out of an outlet in Bedroom 4; correct?

17       A.    Both his report and as well in his discovery

18   deposition.

19       Q.    And he had attributed that potentially to the

20   hoverboard being plugged in; correct?

21       A.    Correct.

22       Q.    Okay.  Based on your analysis, it sounds like

23   you disagree with that; correct?

24       A.    I totally disagree with that.

25       Q.    All right.  That the wiring that was in the

1   receptacle that Detective Sheaman identified was wiring

2   that went to the refrigerator?

3       A.    Correct.

4       Q.    Okay.  And that wiring was in the receptacle

5   that would have been facing the kitchen?

6       A.    Correct, so it started on the opposite side of

7   this wall.

8       Q.    And the receptacle that was in Bedroom

9   No. 4 doesn't have any wiring protruding from it?

10      A.    Correct.  And that's depicted on Page 2 of

11  Exhibit 99 and represented by my Photograph 160.

12      Q.    All right.  Back to your annotations here.

13      A.    Okay.

14      Q.    So we're on Photo 159 of Exhibit 97.

15      A.    Correct.  So I'm indicating the circles and the

16  ovals are indicating the potential sources of ignition

17  that are located within the area of origin.

18            And then in the top third quadrant there's

19  damage to -- there's burning of this little section of

20  horizontal 2 x 4 which indicates that the burning is

21  moving from left to right on that little short section.

22  It's about four, six inches long.

23      Q.    Okay.  So you have three circles here.  One is

24  the area of the hoverboard?

25      A.    The lower oval at the bottom is the hoverboard.

1  The next circle would be the outlet, and at the time, I

2  was identifying and we had to address if there was

3  anything plugged in there, and then the big circle is to

4  represent the refrigerator and its electrical.

5       Q.   Okay.

6       A.   And then we do have this move pattern, that the

7  pattern is moving from the center of this pattern and

8  moving from left to right, or west on to east.

9            Okay.  Photograph 166 is I'm looking at the

10  damage to the ceiling joists that run east and west over

11  the bedroom, and when you look at the degree of damage

12  to them and consumption, and so forth, and you compare

13  them as you move across the room, the flame plume --

14  the fire plume is moving from left to right in

15  Photograph 166 which would be from north to south across

16  the bedroom ceiling.

17            So we're seeing another component of that

18  developing fire plume coming from the area of the

19  hoverboard and moving across the bedroom.

20            Here I'm just looking at the ceiling joists.

21  We're going to look at some other objects in the bedroom

22  that shows the same thing.

23            And the next photograph -- sorry.

24       Q.   I'm sorry.  Was the ceiling, was that drywall

25  or was that wood panel as well?

1      A.    I have to go back to the construction notes.  I

2   think it was all light combustibles.

3      Q.    The wall framing covering was wood panelling;

4   correct?

5      A.    Yes, and thermally thin wood panelling.  The

6   type, I don't think you can even purchase any more.

7            Then Photograph 167 is I'm looking not only

8   again at the ceiling joists, looking further to the

9   south in the bedroom, and I'm seeing the same

10  continuation of that pattern.  It's moving across the

11  bedroom ceiling from the north wall to the south wall.

12           And then there's some more pictures in the

13  bedroom I've got to find for you.

14     Q.    Okay.

15     A.    I thought I had them all together, but

16  apparently not.

17           You know, let's go back to Photograph 147 which

18  is back in the bedroom.

19           So on Photograph 147 out of Exhibit 97, I

20  talked about the pattern on that little short section of

21  wall.  I talked about the presence of the U-turn on the

22  south wall of Bedroom 4.

23           I also looked at the damage to the bunk bed

24  framing, and the biggest consumption of the bunk beds

25  occurred on the north end, and as you move from north to

Page 87

 1    south or towards from the foot to the head of the

 2    bunk bed framing, the damage became less and less,

 3    indicating a progression that the bunk bed was burned --

 4    the progression of the fire was from the foot of the

 5    bunk bed towards the head of the bunk bed.

 6         Q.   The foot of the bunk bed was towards the

 7    kitchen?

 8         A.   The foot of the bunk bed was facing the

 9    kitchen.  Yes, it was facing the south.

10         Q.   Okay.

11         A.   The head of the bunk board is facing -- no,

12    that's wrong.

13         Q.   The head of the bunk board was against the

14    party wall between the master bedroom and the bedroom;

15    correct?

16         A.   Correct.  So that would be the south side.  The

17    foot of the bed was facing south or towards the kitchen.

18         Q.   And I'm only trying to use room orientations

19    because the north/south, east/west is a little askew on

20    this property.

21         A.   I know, yeah.  And so when I'm using my

22    directions, I'm sticking to the -- I'm sticking to the

23    diagrams in Exhibit 98.

24         Q.   Yeah.  Just to make sure we're communicating

25    here, looking at Exhibit 97, the head of the bed is

Page 88

1    adjacent to Bedroom 1?

2        A.    Correct.

3        Q.    Okay.  All right.

4        A.    And then at the foot of the bed or on the north

5    side of the bed closer to the kitchen is where that

6    little nightstand table was, and it was almost

7    completely consumed.  There was very little of the

8    framing left.

9        Q.    Is that shown in Photograph 147 or is that

10   further to the left --

11       A.    No, it's further to --

12             THE REPORTER:  I need you to wait until he's

13   done.

14             THE WITNESS:  Yeah, I'm sorry.

15             (The record was read by the

16             reporter as follows:

17             "Question:  Is that shown in

18             Photograph 147 or is that further --")

19   BY MR. LaFLAMME:

20       Q.    -- further to the left on this photo?

21       A.    It's further to the left or further to the

22   bottom, however we want to look at this photograph.

23       Q.    Okay.

24       A.    See, I didn't give you my warning at the start,

25   no court reporter in 42 years has failed to yell at me

Page 89

1    for talking too fast.

2        Q.    All right.  Any other pictures you want to show

3    me from Bedroom 4?

4        A.    No.  All these other photos then will take us

5    from when the fire moves out into the hallway, the

6    bedroom hallway, and how it moved in other directions.

7              I don't know if you're interested because I

8    don't know if that's that disputed.  It's up to you.

9        Q.    We'll talk about it just for completeness, but

10   I wanted to get through Bedroom 4.

11       A.    Okay.

12             MR. LaFLAMME:  Do you want to take a break?

13             THE REPORTER:  Sure.

14             MR. LaFLAMME:  It's a good breaking point if we

15   want to.

16                 (A recess was taken from 11:24 a.m.

17             to 11:34 a.m.)

18   BY MR. LaFLAMME:

19       Q.    So we talked about the fire propagation within

20   Bedroom 4 and you used a number of photographs with

21   Exhibit 97; correct?

22       A.    Correct.

23       Q.    Okay.  When the window broke, when in that

24   process do you believe that occurred, the bedroom window

25   for Bedroom 4?

Page 90

1    A.   It occurs before Gunner, at or when Gunner is

2    leaving the room.

3         Remember, Layne is already out, and he's in the

4    hallway when Gunner wakes up, and Gunner is the one that

5    says, "I see the fire coming along the floor and towards

6    the window," and he seems to recall glass.  So it's very

7    early.

8    Q.   When Gunner wakes up, though, the window has

9    already been broken; correct?

10        MR. AYALA:  Form.

11        THE WITNESS:  There's certainly a fracture of

12   the window.

13   BY MR. LaFLAMME:

14   Q.   Okay.

15   A.   He doesn't describe anything to me that

16   indicates that the fire has fully breached it and is

17   fully venting out the window.

18   Q.   What temperature does the glass need to get to

19   break?

20   A.   It depends on the type of glass, the thickness

21   of the glass.

22   Q.   What's the range?

23   A.   I would have to go to charts.  I don't have

24   that memorized.

25   Q.   Is it in the range of 250 degrees Fahrenheit?

 1            MR. AYALA:  Form.

 2            THE WITNESS:  Yes, I would accept that.

 3    BY MR. LaFLAMME:

 4       Q.   And the window is right next to Gunner;

 5    correct?

 6       A.   Correct.

 7       Q.   Okay.  So in order for the window to start to

 8    break, you need approximately 250 degrees Fahrenheit at

 9    that window; correct?

10       A.   Somewhere in the window, yes.

11       Q.   And 250 degrees Fahrenheit is a level in which

12    an individual would receive burns?

13       A.   Correct.  So it's any temperature at the skin

14    or the target greater than 100 degrees Fahrenheit.

15       Q.   And you're aware that Gunner was not burned in

16    this case; correct?

17       A.   Correct.

18       Q.   And Layne was not burned at all in this case;

19    correct?

20       A.   Correct.

21       Q.   How do you explain how the boys were able to

22    escape uninjured if a fire started at the hoverboard and

23    still cracked the window before they escaped?

24       A.   It indicates to me that although the window may

25    have cracked, there was no ventilation of the fire out

Page 92

1   to the outside.

2         It's also counter indicative that the fire came

3   from the outside and coming in because of those

4   temperatures.  He couldn't have been there.

5     Q.   Did you do any fire modeling in this case?

6     A.   I did not.

7     Q.   You're aware the fire modeling is an accepted

8   practice under NFPA 921 in helping to determine the

9   origin?

10    A.   It's generally not held to determine the

11  origin.  It can be used to evaluate your opinions, some

12  of which may be the origin.

13    Q.   Once this fire initiates, you're going to get

14  products of combustion within that room; correct?

15    A.   Correct.

16    Q.   Have you done any analysis to determine what

17  level of products of combustion would have reached when

18  the boys woke up?

19    A.   No.

20    Q.   Are you aware of the fire modeling softwares

21  that are available?

22    A.   Generally, yes.

23    Q.   Have you ever done fire modeling?

24    A.   In years past, yeah.

25         The models have become so complicated, unless

 1    you're using them on a regular basis, I just chose to

 2    stop doing it.

 3        Q.    Okay.

 4        A.    In fact, I used to teach mathematical peer fire

 5    modeling for the NFPA.

 6        Q.    Why didn't you do any fire modeling in this

 7    case?

 8        A.    I didn't see any reason that it was

 9    necessary --

10        Q.    Okay.

11        A.    -- for my role in this case.

12        Q.    But you can't state what the products, the

13    level of the products of combustion, meaning carbon

14    monoxide and other products of combustion would be when

15    the boys woke up; correct?

16        A.    I cannot, no.

17        Q.    And when the boys woke up, where was the fire?

18        A.    They describe it as floor level near the area

19    of the hoverboard and moving along the area of the

20    closet and towards the window.

21        Q.    Well, you heard on the body camera statements

22    that the -- they saw fire outside; correct?

23              MR. AYALA:  Form.

24              THE WITNESS:  That was their statement at the

25    time they made those statements, yes.

Page 94

1    BY MR. LaFLAMME:

2        Q.    Okay.  When Gunner wakes up, he said in the

3    interview with Detective Sheaman that the window was

4    gone; correct?

5        A.    I believe he said that, yes.

6        Q.    And that Gunner remembers seeing fire behind

7    him when he woke up; correct?

8        A.    Correct.

9        Q.    And fire behind him would be at the window

10   side; correct?

11       A.    Correct.

12       Q.    And Detective Sheaman asked, "When you guys saw

13   the fire, where was the fire in the room?"

14             Gunner responded, "It was by the window."

15             "Gunner, there was no window when I woke up."

16             Do you recall those statements?

17       A.    I do.

18       Q.    So when Gunner woke up, there was no window;

19   correct?

20             MR. AYALA:  Form.

21             THE WITNESS:  No, I don't think you could draw

22   the conclusion that this child when he's making these

23   statements has any comprehension of what the condition

24   of the window or the fire was.  If --

25   ///

1   BY MR. LaFLAMME:

2       Q.   Okay.  You agree that Gunner and Layne are

3   indicating --

4            MR. AYALA:  Well, were you done with your

5   answer?

6            THE WITNESS:  Yeah.  For example, if we make

7   the assumption that the window is broken out and that

8   the fire is on the outside and it's breaching into the

9   bedroom, then I would ask the same question, "Why aren't

10  they burned?"

11  BY MR. LaFLAMME:

12      Q.   You agree that Gunner and Layne indicated that

13  the fire was at the window when they woke up; correct?

14           MR. AYALA:  Form.

15           THE WITNESS:  In their statements to the

16  detective at the time of the event, yes.

17  BY MR. LaFLAMME:

18      Q.   Okay.  And the statements that you heard in the

19  body camera footage immediately after the fire, Kamille

20  and Gunner also indicated that the fire was outside;

21  correct?

22           MR. AYALA:  Form.

23           THE WITNESS:  They're making that -- yes.

24  They're making that statement, yes.

25  ///

Page 96

1    BY MR. LaFLAMME:

2        Q.    If the fire had started at the hoverboard, and

3    using your Exhibit 97 photos, the house wiring still

4    would have been energized; correct?

5        A.    Correct.

6        Q.    And immediately above the hoverboard was an

7    outlet; correct?

8        A.    Correct.

9        Q.    And that outlet was heavily fire damaged and

10   heat damaged?

11       A.    Correct.

12       Q.    And the wire insulation was off on the wiring;

13   correct?

14       A.    Yeah.  By the time the fire is extinguished,

15   yes.

16       Q.    If the fire started at the hoverboard in that

17   area, you would expect to see arcing on that wiring;

18   correct?

19            MR. AYALA:  Form.

20            THE WITNESS:  I don't know that I can say I

21   would expect to see arcing.  It depends on how much heat

22   energy the wiring actually saw --

23            THE REPORTER:  I'm sorry.  "It depends on how

24   much heat energy the wiring actually saw --"

25            THE WITNESS:  -- the wiring saw protected

Page 97

1    inside the wall.

2    BY MR. LaFLAMME:

3        Q.    Well, this is wood panelling covering; correct?

4        A.    Correct.

5        Q.    Combustible covering?

6        A.    It is.

7        Q.    There is no fire rating to wood panelling

8    covering; correct?

9        A.    There is not.

10       Q.    So unlike drywall where it would have some

11   protection, it does not have protection from the wood

12   panelling covering; correct?

13       A.    Correct.  Well, it has far less protection.

14       Q.    The fire is going to breach that wood panelling

15   fairly quickly?

16       A.    Compared to drywall, yes.

17       Q.    How quickly does the fire breach the wood

18   panelling immediately above the hoverboard?

19       A.    I don't have an estimation of that.

20       Q.    The fire would breach the wood panelling before

21   the fire breaches the window; correct?

22       A.    I don't know that I can say that with any

23   certainty.

24       Q.    Okay.  You agree that there is no arcing

25   anywhere in Bedroom 4; correct?

Page 98

1       A.    I'm not aware of any arcing.

2       Q.    And the circuit breaker for Bedroom 4 also did

3    not trip at all?

4       A.    Correct.

5       Q.    So for the entire time in which the fire, under

6    your theory, is moving through Bedroom 4, the house

7    wiring is energized -- or let me take a step back.

8    That's a poor question.

9            For the early stages of the fire when it is

10   moving through Bedroom 4, under your theory, until the

11   window is breached and it is venting out the window, the

12   house wiring is energized?

13      A.    Correct.  It will remain energized until the

14   service entrance conductor is damaged.

15      Q.    Okay.  And under your theory, the only way the

16   service -- electrical service would be damaged is once

17   that fire breaches the window?

18      A.    Correct.

19      Q.    Okay.  And then it is either damaged through

20   the fire venting through the window or through an

21   ignition of the shed outside?

22      A.    It could be heat energy from either one of

23   those or a combination thereof, yes.

24      Q.    Okay.  And how long does it take the fire to

25   move from the hoverboard to venting out the window?

Page 99

1        A.    I don't have an estimate of that.

2        Q.    Can you give me an estimate in just a range?

3        A.    I don't even know how I would give you a range.

4        Q.    Is it seconds or minutes?

5              MR. AYALA:  Form.

6              THE WITNESS:  It's more than seconds.

7    BY MR. LaFLAMME:

8        Q.    Okay.  Is it more than one minute?

9        A.    I don't have an estimate for you; so I won't

10   play this couching game.

11       Q.    You can't give any estimate at all?

12       A.    I don't have any basis on which to give that

13   estimate, no.

14       Q.    You could get an estimate on that through a

15   fire model process; correct?

16             MR. AYALA:  Form.

17             THE WITNESS:  You would get some information to

18   make that analysis.

19   BY MR. LaFLAMME:

20       Q.    Do you know what the smoking shed was made of?

21       A.    It's plastic.

22       Q.    Okay.  Combustible; correct?

23       A.    Combustible, yes.

24       Q.    Did you do any testing in this case related to

25   your opinions?

```
                                              Page 100
 1       A.    I did no physical testing.

 2       Q.    You didn't do any test burns, for example?

 3       A.    I did not.

 4       Q.    When you say "no physical testing," what type

 5   of testing did you do?

 6       A.    So I'm using the analytical and critical

 7   thinking test methods for testing my hypothesis that are

 8   allowable by NFPA 921.  I think I listed them in my

 9   report.

10       Q.    Okay.  Meaning you're testing it within your

11   head?

12       A.    Correct.  They're all analytical based on

13   critical thinking and analytical thinking models.

14       Q.    How was it that you excluded a fire originating

15   at the shed?

16       A.    Based on a totality of the physical evidence

17   and a totality of the data and information about the

18   fire, and that totality includes the physical evidence

19   on the burn patterns and fire patterns both on the

20   exterior of the house and the interior of the house.

21       Q.    Okay.  So the physical evidence is the burn

22   patterns on the exterior and interior of the house?

23       A.    Correct, the comparison and contrast.

24       Q.    Any other physical evidence?

25       A.    Physical evidence of the stage of development
```

Page 101

1    of the fire plumes both inside and exterior to the

2    house.

3        Q.    How do you explain why there was arcing outside

4    of the shed when there was none inside the house?

5        A.    It simply means that a condition occurred

6    within the shed in which the conductors were still

7    energized and arcing occurred, and it's only indicative

8    that arcing occurred on that wiring at a time that they

9    were energized.

10       Q.    So we certainly agree that for an arcing to

11   occur in the shed, those wires had to be energized;

12   correct?

13       A.    Yes.

14       Q.    Which would mean that the electrical service

15   that goes into the house would still need to be active?

16       A.    Correct.

17       Q.    Okay.  Once the electrical service is severed

18   to the house, you can't have arcing in the house and you

19   can't have arcing in the shed; correct?

20       A.    Correct.

21       Q.    When this fire, if it started inside the

22   bedroom and moved towards the window and ventilated out

23   the window, it's going to vent up; correct?

24       A.    Correct.

25       Q.    Meaning it's going to lap against the upper

Page 102

1    part of the eaves of the house?

2         A.    Correct.

3         Q.    Okay.  The shed was lower than the window;

4    correct?

5         A.    Correct.

6         Q.    So if the fire had started in Bedroom

7    No. 4 and it vents out through the window, the

8    electrical service is going to be first impacted by the

9    fire and heat coming out of the window; correct?

10        A.    Yes, and much more quickly than a fire from the

11   shed with no fire from the house.

12        Q.    Meaning once you get the flame coming out,

13   venting out of the window, that flame and heat is going

14   to affect the electrical service line quicker than

15   had -- than a fire that is originating in the shed?

16        A.    Correct.

17        Q.    Basically, once it starts to vent out the

18   window, you have flame lapping right up into the area

19   where the electrical service weatherhead is; correct?

20        A.    Correct.

21        Q.    Okay.

22        A.    Well, not so much the weatherhead, but the

23   routing of the service entrance conductor.

24        Q.    And the service conductor is the electrical

25   wire that comes in the -- that provides the house

Page 103

1    energy?

2        A.    Correct, it comes from the utility to the

3    weatherhead.

4        Q.    Do you know how high flames will reach when --

5    or strike that.

6            Assume for me the fire originated in the shed.

7    Had the fire originated in the shed, do you agree that

8    the flames and heat generated from a fire at the shed

9    would be enough to sever the electrical service?

10            MR. AYALA:  Form.

11            THE WITNESS:  I think that potential exists.

12    BY MR. LaFLAMME:

13        Q.    Okay.  And you have not done any -- you haven't

14    done a test burn or anything on the shed; correct?

15        A.    I have not.

16        Q.    Do you have any criticisms of Detective

17    Sheaman's investigation in this case?

18            And we've talked about the statements he made

19    to Mr. Wadsworth that you wouldn't have made.

20            MR. AYALA:  Form.

21            THE WITNESS:  Yeah, and I really haven't done

22    an analysis of his -- sorry.

23            I really haven't done an analysis of his

24    investigation.  I wasn't asked to do that.

25    ///

Page 104

1    BY MR. LaFLAMME:

2        Q.    Okay.  Well, I'm going to ask you questions

3    about it.

4        A.    And I'll answer your questions.

5        Q.    So one of the criticisms that you would have

6    had of Detective Sheaman is you wouldn't have made those

7    types of statements to Mr. Wadsworth the day after the

8    fire that he made on the interview?

9            MR. AYALA:  Form.

10            THE WITNESS:  What I would represent to you is

11    I would not have made those statements.  So I don't if

12    that's -- because that's my choice and how I do

13    investigations.  I don't know that that means I'm

14    critical of Detective Sheaman.

15            Every investigator does their investigations

16    the way they see fit and they report the findings and

17    conclusions and hypotheses at a time when they see fit,

18    so --

19    BY MR. LaFLAMME:

20        Q.    But you were a municipal investigator at one

21    point; correct?

22        A.    I was.

23        Q.    Okay.  As a municipal investigator in your role

24    in that regard, either back then or if you were to step

25    into it today, you would not make those types of

Page 105

 1    statements that Detective Sheaman made to a homeowner

 2    the day after the fire; correct?

 3            MR. AYALA:  Object to the form, and asked and

 4    answered, I think, a few times by now.

 5            THE WITNESS:  My choice is I wouldn't operate

 6    that way.

 7    BY MR. LaFLAMME:

 8      Q.   Okay.  Did you review the interview that

 9    Detective Sheaman had with the Wadsworth children?

10      A.   Yes.

11      Q.   Any criticisms with the manner in which he did

12    that interview?

13      A.   Again, I didn't analyze the interview to see

14    how he conducted it.  I would not have conducted it the

15    same way.  I have a different way of interviewing.

16      Q.   You would have interviewed each child

17    individually; correct?

18      A.   Correct.

19            MR. AYALA:  Form.

20    BY MR. LaFLAMME:

21      Q.   And when you say you would have interviewed

22    each child individually, you would have them in a room

23    maybe with one of their parents and then asked them

24    questions individually?

25      A.   Correct.  We were required to always have a

Page 106

1    parent present, yes.

2        Q.    So if you were to interview Gunner and Layne in

3    this case, you would have had Layne come with one of his

4    parents and then interview him in an interview room;

5    correct?

6        A.    Correct.

7        Q.    And then you would have had Gunner separately

8    go in a separate -- or maybe the same room, but at a

9    different time with a parent and you would have

10   interviewed Gunner; correct?

11       A.    Correct.

12       Q.    And you would have done the same with Kamille?

13       A.    Correct.

14       Q.    And you probably would have done the same with

15   Weston; correct?

16       A.    Correct, because you don't want any influence

17   or bias that can result from a group interview like

18   that.

19            The same thing, I would have never done an you

20   interview in the back of that squad car the way that was

21   conducted because you don't know what the kids are

22   drawing from the other kids in statements that they're

23   making.

24            You don't know if they're actually their

25   statements and their observations or they're playing off

1  what the other kids, the other interviewees are saying,

2  and you don't know if now they're trying to develop in

3  their mind what they think the correct answer is.

4      Q.   Well, a formal interview process is a little

5  different than body camera footage that is taken at the

6  scene; correct?

7          MR. AYALA:  Form.

8          THE WITNESS:  An interview occurred, and so if

9  you're going to do the interview, you need to do it

10  correctly.

11          So you'd still do a body cam at the scene, just

12  not in a group setting like that.

13  BY MR. LaFLAMME:

14      Q.   The Wadsworth children were not interviewed by

15  Detective Sheaman until March 4th, 2022, which is more

16  than a month after the fire.

17      A.   Correct.

18      Q.   Would you have tried to interview the children

19  before that?

20      A.   I would have.

21      Q.   How quickly would you have tried to interview

22  the children?

23      A.   I would have told the parents as soon as -- I

24  always consulted the parents and I would ask them to

25  talk to their medical providers or any type of

1  healthcare that they were dealing with to find out

2  whether or not it's okay to interview them, and you also

3  want the parents to feel okay with that.

4          So you don't want to put anybody in a position

5  that they're resentful for the interview, but I always

6  tried to do it as soon as possible.

7      Q.   And you also identified in your report that

8  Detective Sheaman had incorrectly identified one of the

9  outlets as belonging to Bedroom 4 with wiring in it when

10  that outlet actually was in the kitchen?

11          MR. AYALA:  Form.

12          THE WITNESS:  Correct.

13  BY MR. LaFLAMME:

14      Q.   Anything else with Detective Sheaman's

15  investigation that either you would have handled

16  differently or that you thought was incorrect?

17      A.   Not that I can think of as I sit here, no.

18      Q.   I'm going to show you what's been marked as

19  Exhibit 100 which are some diagrams that came from your

20  file, and these were put together by Mr. Birdsong;

21  correct?

22      A.   Correct.

23          (The aforementioned document was

24          marked as Exhibit 100 for identification

25          and is attached hereto.)

 1  BY MR. LaFLAMME:

 2       Q.   Okay.  And in looking at the diagrams, these

 3  are -- well, some of these are similar to the ones we

 4  marked before.

 5       A.   That's Exhibit 98.  They're the same diagrams

 6  as appear in Exhibit 98.

 7       Q.   Okay.  This one's just in better detail, it

 8  looks like, or crisper?

 9       A.   Well, they're just enlarged.  Exhibit 98, the

10  diagrams are shrunk.

11       Q.   Gotcha.

12            Okay.  So looking at Exhibit 100, in the

13  hallway you can see the attic fan?

14       A.   Correct.

15       Q.   And that's the whole house fan?

16       A.   The "whole house fan" is what I refer to it as.

17       Q.   And is that dimensionally accurate as far as

18  the size within the hallway on this diagram?

19       A.   I don't know if it is on this diagram, but you

20  could draw that data from the Matterport documentation.

21       Q.   Okay.  I know Mr. Birdsong indicates in the

22  lower right "approximate" scale.

23            So is it your understanding that his attempt

24  was to make this approximately to actual scale?

25       A.   Yes, because he's been trained to never say

Page 110

1    anything is totally to scale.

2        Q.    Okay.  But his goal would have been to show the

3    approximate dimension of the attic fan as compared to

4    other components of the house around it?

5        A.    Correct.  And I've looked at hundreds of his

6    diagrams and that's always been his intent.

7        Q.    Do you know if the whole house fan was running

8    at the time of the fire?

9        A.    I don't have any information one way or the

10   other.

11       Q.    Do you know how the whole house fan was

12   operated as far as how it was turned on and off?

13       A.    I don't.

14       Q.    I'll show you what's been marked as 101.  And

15   these are just your notes from your initial call with

16   Mr. Ayala; correct?

17       A.    Correct.

18              (The aforementioned document was

19              marked as Exhibit 101 for identification

20              and is attached hereto.)

21   BY MR. LaFLAMME:

22       Q.    Okay.  And if you go to the second page, it

23   indicates your continued role towards the bottom.

24              Do you see that?

25       A.    I do.

Page 111

1    Q.    Okay.  And then I think it says "scene

2    documentation"?

3    A.    Correct.

4    Q.    And then "joint scene inspection"?

5    A.    Correct.

6    Q.    And "origin determination"?

7    A.    Correct.

8    Q.    Okay.

9    A.    And the second line is referring to the

10   May 2022 inspection.

11   Q.    That was going to be my question as to which

12   scene inspection that references.

13   A.    That's what I was thinking of when I wrote it

14   down.

15   Q.    Okay.  So with respect to your involvement in

16   this case and your designation as an expert, is that

17   your understanding of what your role is, these three

18   items?

19   A.    Correct, because I was aware of, you'll see in

20   the front page, that other activities had been

21   occurring.

22         Really, when he called me, because I hadn't

23   herd anything about the case, I wasn't even sure if the

24   case was still in progress, and so I was defining my

25   role and I made notes of it because, obviously, I missed

Page 112

1   a bunch of inspections.

2           And so I particularly wanted to put guardrails

3   on or bookends that I was not going to talk about the

4   alleged failure of the hoverboard.

5       Q.   Okay.

6       A.   So I think my testimony here today has followed

7   these bookends defined here.

8       Q.   Meaning you weren't going to talk about the

9   cause of the fire?

10      A.   Correct.

11      Q.   And you'd agree that if your origin

12  determination is not correct, then the cause

13  determination would not be correct?

14          MR. AYALA:  Form.

15          THE WITNESS:  Yeah, there exists that

16  possibility.

17  BY MR. LaFLAMME:

18      Q.   Meaning if your origin determination in this

19  case isn't accurate, the cause can't be accurate as

20  identified by BEAR; correct?

21      A.   I'll state it this way:  The cause of this fire

22  incident necessarily has to be located within the area

23  of origin I defined.

24      Q.   I'll show you what's Exhibit 102, and these are

25  some notes regarding findings and conclusions which I

Page 113

1    think track your report to a certain extent.

2                (The aforementioned document was

3            marked as Exhibit 102 for identification

4            and is attached hereto.)

5    BY MR. LaFLAMME:

6        Q.    In here there's a reference for Dr. Rondinone.

7        A.    Correct.  I was originally told that he was the

8    contact at Berkeley so that's the reason I included his

9    name, and then later I learned that it was actually

10   Derek.

11       Q.    Mr. King?

12       A.    Mr. King.

13       Q.    And Dr. -- I'm probably butchering the name,

14   but Rondinone is R-o-n-d-i-n-o-n-e.

15             Are you aware of any role that Dr. Rondinone

16   had with respect to this investigation?

17       A.    No, but that's the name I was originally given

18   at -- for the BEAR activities and it just might be

19   because he's one of the partners of the primary experts

20   there.

21       Q.    Who gave you that name?

22       A.    My client, Mr. Ayala, in that March phone call.

23       Q.    And do you know if Dr. Rondinone has done

24   anything with this case?

25       A.    I don't, as I sit here, no.

Page 114

```
1        Q.   You have never spoken with him?
2        A.   I have not.
3        Q.   Do you know Dr. Rondinone?
4        A.   You know, I think that I've met him because
5   I've been to BEAR a number of times, but if he walked in
6   here today, I couldn't recognize -- I wouldn't be able
7   to tell you.
8        Q.   Do you know Mr. King at all?
9        A.   I only -- again, I only know his name.  I've
10  never met him in person either.
11       Q.   Have you ever had another case where Mr. King
12  was involved?
13       A.   No.
14       Q.   So in looking at Exhibit 102, it goes through
15  seven findings and conclusions.
16            Do you see that?
17       A.   Correct.
18       Q.   And for four of those you're deferring to BEAR;
19  correct?
20       A.   Correct, either partially or in total.
21       Q.   And the four that you're deferring to BEAR is
22  the first bullet point, the third bullet point, the
23  fourth bullet point, and the seventh bullet point?
24       A.   First, third, and seventh, is that what you
25  said?
```

Page 115

```
 1       Q.   One, three, four, and seven.

 2       A.   That's correct.

 3       Q.   And you said deferring either in totality or

 4   partially.  Which ones are you deferring to partially?

 5       A.   Because the second one, I'm doing the origin

 6   and that's the origin opinion.

 7            What Mr. Ayala related to me during that

 8   initial conversation is that BEAR's opinion would opine

 9   that the hoverboard and its failure was the first

10   adverse event and the first thing that occurred, and so

11   that's why I put that that opinion is consistent with my

12   origin.

13       Q.   Okay.  So the second bullet point is the one

14   that you're saying you partially defer, but also invokes

15   your own opinion as well?

16       A.   It's mostly my opinion, yes.

17       Q.   Okay.  But with respect to the one, three, four

18   and seven where you specifically state "Defer to

19   investigation and analysis of consulting expert of

20   Dr. Rondinone of Berkeley Engineering And Research,

21   Inc.," that's all BEAR that you're relying on?

22       A.   Yeah.  I'm just reporting what the findings are

23   in the totality of the report.

24       Q.   Okay.  I'll show you what's been marked as

25   Exhibit 103 which is a copy of your testimony list, and
```

1   this is updated as of July 1, 2024; correct?

2       A.    Correct.

3             (The aforementioned document was

4             marked as Exhibit 103 for identification

5             and is attached hereto.)

6   BY MR. LaFLAMME:

7       Q.    And I believe, or maybe you have a deposition

8   coming up?

9       A.    I have a deposition on Thursday.

10      Q.    Okay.

11      A.    I'm just looking at the list to see if I've had

12  any others.  There's one other one that's not on this

13  list.

14      Q.    Okay.  What's the one that you would add?

15      A.    I would add Villarel, V-i-l-l-a-r-e-l, versus

16  IHC.  They're the school bus manufacturer that was

17  pending in Texas.  So my deposition was two or three

18  weeks ago, and the case is now, it settled as of this

19  week.

20      Q.    So that's the only additional one that you

21  would need to add to this testimony list?

22      A.    Correct.

23      Q.    Okay.  In your testimony list, there's U.S.

24  deposition trial and then you have a couple designations

25  for motion hearings.

Page 117

1        A.    Correct.

2        Q.    And I think the first one is on Page 2.

3              Are those Daubert motions, or Rule 702 motions?

4        A.    Let me see the case.

5              So on Page 2 there's Zamora.  It was not a

6    Daubert motion.  It was a motion I testified in support

7    of the judge granting us a court order for some interest

8    of testing of a gas service line.

9        Q.    So more a motion hearing to conduct some

10   testing that wasn't allowed?

11       A.    Exactly, yes.

12       Q.    And then there's another one on Page 4 -- I'm

13   sorry, on Page 5, Walker v. Conagra?

14       A.    That was -- that was a hearing to limit my

15   testimony in a Pam cooking oil case.

16       Q.    Okay.  And was your testimony limited?

17       A.    I don't know that I ever heard the result

18   because the case settled.

19       Q.    You're not aware that there was certain

20   testimony of yours that was going to be excluded?

21             MR. AYALA:  Form.

22             THE WITNESS:  I don't recall what was or

23   wasn't.

24   BY MR. LaFLAMME:

25       Q.    Have you ever read the case?

1       A.    I have not.

2       Q.    Have you ever talked to counsel about the

3    results of the case?

4       A.    I have not.

5       Q.    So as to what was limited from your opinions,

6    you're not aware?

7       A.    Not as I sit here, no.

8             Are you representing there's a published case?

9       Q.    There is a published case, yes.

10      A.    Thanks.

11      Q.    Any cases in which you have been fully excluded

12   as an expert?

13      A.    Only once, and it was a carbon monoxide

14   poisoning case in Southern Texas, man, 15 years ago.

15            I did some testing at the structure, but I was

16   not the witness that was testifying about the carbon

17   monoxide poisoning.

18            I did the testing because I had the equipment,

19   and the magistrate didn't let us present the testing,

20   ruling that we hadn't showed that it's reproducible.

21      Q.    Is that the Garcia case?

22      A.    Yes.

23      Q.    And --

24      A.    I don't remember what the actual case is, but

25   that's what I call it.

1    Q.    Garcia v. BRK?

2    A.    Yes.

3    Q.    And in that case you -- the testing that you

4    had conducted was deemed unreliable; correct?

5    A.    Correct, because I didn't repeat -- his

6    specific ruling was we didn't repeat it, we didn't do it

7    more than once.

8    Q.    And you used an incorrect model detector;

9    correct?

10         MR. AYALA:  Form.

11         THE WITNESS:  That wasn't the mistake.  I

12   intentionally used that model detector.  So I was unable

13   to use the model detector that was actually involved in

14   the incident.

15   BY MR. LaFLAMME:

16   Q.    Do you know if the court took issue with the

17   fact that you used a model detector that was not the

18   model that was used in the incident?

19   A.    I don't recall.  It's been sometime since I

20   read that.

21   Q.    Any other cases in which you recall being

22   struck?

23   A.    I've really never been struck.  I'm usually

24   not -- I usually am not the subject of Daubert motions

25   in these fire cases.

Page 120

1      Q.    Do you recall a Smith v. Chrysler Group case?

2      A.    I do.

3      Q.    Were your opinions limited in that case?

4      A.    My supplemental report after I testified

5    initially in my deposition, I filed a supplemental

6    report, the court didn't allow that supplemental report.

7      Q.    Okay.

8      A.    So it didn't speak to the opinions.  It spoke

9    to the fact that it wasn't filed in a timely manner.

10     Q.    So whatever supplemental opinions were provided

11   for whatever reason were barred?

12     A.    Correct.

13     Q.    Okay.  Any other cases that you can recall?

14     A.    Not that I can recall sitting here.

15     Q.    Have you reviewed any of the party's document

16   productions in this case?

17     A.    No.  Well, I haven't reviewed any document

18   productions presented by the defendants --

19     Q.    Okay.

20     A.    -- other than the Walmart receipt.

21     Q.    You don't have any opinion with respect to the

22   hoverboard and whether it was -- its design was

23   consistent with UL standards?

24     A.    I have no opinion one way or the other.

25     Q.    And I presume no opinion as to whether its

1    design -- or it was manufactured consistent with UL

2    standards?

3        A.    No opinion one way or the other.

4        Q.    Okay.  It's fair to state that respect to the

5    hoverboard in totality, you don't have any opinions?

6        A.    Better than fair, it's true.

7        Q.    Okay.  What is your -- your current rate

8    schedule is 475?

9        A.    Correct.

10       Q.    And is that across the board, meaning for

11   depositions, testimony as well?

12       A.    For all work, yes.  This case was probably

13   billed at a different range because it started before

14   the current rate.

15       Q.    But that's your current rate; correct?

16       A.    The current rate is 475 an hour for all

17   activities.

18       Q.    Did you do any assessment of the X-rays from

19   the hoverboard?

20       A.    I wouldn't call it an assessment.  I looked at

21   them and saw the number of cells that showed failure.

22       Q.    Did you do any assessment as to the condition

23   of the printed circuit board?

24       A.    I did not.

25       Q.    Have you done any assessment of the hoverboard

Page 122
1   to determine whether it is consistent, or any assessment

2   of the condition of the hoverboard to determine whether

3   it is consistent with a fire originating within the

4   hoverboard, or have you left that to King?

5       A.   I did not.  I'd defer to King on that.

6       Q.   So with respect to the condition of the

7   hoverboard, where it's fire damaged, and what is and

8   what isn't fire damaged, that's not anything that you

9   did an assessment of for this case?

10      A.   That's correct.

11      Q.   Did the Bedroom No. 4, did it go into

12  flashover?

13      A.   I did not see any conclusive evidence that I

14  can say that flashover occurred.

15           There definitely is fire damage at all

16  different levels, but whether an actual flashover

17  occurred or not, I'm not able to say.

18      Q.   Okay.  Once the -- so with the breached window

19  or once the window is not in place, that's an area of

20  ventilation for the fire; correct?

21      A.   Correct.

22      Q.   And then the other area of ventilation for the

23  fire within Bedroom 4 is through the doorway?

24      A.   Correct.

25      Q.   Okay.  So when the fire is ventilating, it has

Page 123

1    those two areas of ventilation, and let's find the graph

2    that was the better one.

3        A.    Oh, with the smaller pictures?

4              Oh, (indicating).

5        Q.    There we go.

6              So looking at Exhibit 100, we can see Bedroom

7    No. 4; correct?

8        A.    Correct.

9        Q.    Okay.  So the window is basically between the

10   bed and the smoking shed depicted on this diagram?

11       A.    Correct.

12       Q.    Okay.  The areas of ventilation from this

13   bedroom are the window and the doorway; correct?

14       A.    Correct, the window on the east wall, the

15   doorway on the west wall.

16       Q.    Okay.  So as the fire is ventilating, that

17   would create a fire path between those two ventilation

18   areas; correct?

19       A.    Correct.

20       Q.    And you would, in a fire which has two sides of

21   ventilation, you would expect to see the most fire

22   damage along that path of ventilation; correct?

23             MR. AYALA:  Form.

24             THE WITNESS:  Correct, absent any other way for

25   the fire flow to go.

Page 124

1  BY MR. LaFLAMME:

2      Q.   So once that -- assume for me the fire started

3  out here, it then breached the window, and it comes into

4  the room, it's then ventilating out the window and

5  ventilating out this door; correct?

6      A.   Correct.

7      Q.   Okay.  So then you would have a path of fire

8  that is ventilation-driven where you would have the most

9  fire damage between the two areas of ventilation;

10  correct?

11      A.   Correct.

12      Q.   And similarly, whenever there is two areas of

13  ventilation, you're going to have increased heat in the

14  fire path between those two areas of ventilation;

15  correct?

16      A.   Yes, because of the second ventilation opening,

17  you're bringing in fresh air.

18      Q.   Right.  So in a ventilation-driven fire, that

19  can create fire patterns that aren't necessarily related

20  to the origin of the fire; correct?

21      A.   Correct, and that's why you have to look at the

22  totality of all the fire patterns.

23      Q.   At some point, was this a ventilation-driven

24  fire?

25      A.   Yes.

Page 125

1    Q.   And even in your analysis, that would have

2    occurred once that window was breached; correct?

3    A.   It becomes more dominant ventilation control.

4    Q.   And that's because you have two areas of

5    ventilation at that point?

6    A.   Correct.

7    Q.   Was the boys' bedroom door open or closed when

8    the fire started?

9    A.   I wasn't able to determine that, but the

10   testimony is that Gunner tried to close it, but then it

11   bounced back open, or tried to close it, but it bounced

12   open to some degree.

13        So based on the testimony, the indication is it

14   was some degree open.  So let's just call it partially

15   open.

16   Q.   Okay.  Do you know how partially open it was?

17   A.   I don't.

18        MR. LaFLAMME:  Rudy, I didn't bring you a copy

19   of this one.  It was too heavy.  That's the report.

20   Q.   I'm handing you what's been marked as

21   Exhibit 104.

22        All right.  Exhibit 104 is your -- the report

23   that you issued in this case; correct?

24   A.   Correct.

25   Q.   All right.  And this is the only report you've

Page 126

```
 1    issued to date?

 2        A.    Correct.

 3              (The aforementioned document was

 4         marked as Exhibit 104 for identification

 5         and is attached hereto.)

 6    BY MR. LaFLAMME:

 7        Q.    Going to the first page is just background

 8    information.  The second page is still continued to be

 9    background information.

10        A.    Correct.

11        Q.    With respect to information about your company,

12    so you're a registered corporation in Illinois?

13        A.    Yeah, that's where it's --

14        Q.    That's where you started?

15        A.    That's where it started and still is.

16        Q.    And then there's a reference to Texas statutes

17    that require experts to be licensed through Texas

18    Department of Public Safety.

19              Do you see that?

20        A.    Yeah.  That was -- that was a position put

21    forward, oh, man, a long time ago.

22              So I did a lot of work in Texas; so I just went

23    and got their license, and then once you get it, it was

24    so much work to get it, I just -- I maintain it.

25              That is not their position any more that you
```

Page 127

 1    have to be licensed there unless you have an office

 2    there, but it's still active.

 3        Q.   Do you have any specific licenses to Wyoming?

 4        A.   No.

 5        Q.   On Page 7, you have a statement that "This

 6    comprehensive summary then was not intended to enumerate

 7    and specifically describe in detail each and every

 8    individual fact or observation upon which my findings

 9    and conclusions were based."

10             Do you see that?

11        A.   I do.

12        Q.   What does that mean?

13        A.   So an example of today, I indicated to you the

14    overall opinion is here's the origin and where it's

15    located, on what wall.

16             And then see, I look at all the fire pattern

17    analysis.  Each one of those is kind of a separate

18    little opinion, and so that's what I'm trying to say

19    here.

20             I'm not listing each and every opinion.  I'm

21    giving you the major opinions I expect to give at trial.

22        Q.   And you did not provide any fire sequencing

23    detail in your report; correct?

24        A.   No.

25        Q.   Why didn't you put that in your report?

1      A.    I just normally don't.

2      Q.    With respect to authoring expert reports, you

3    understand that they are to -- an effort to show your

4    investigation process in the case; correct?

5      A.    Correct.

6      Q.    And I assume you agree that NFPA 921 is the

7    guide that you attempted to follow in your

8    investigation; correct?

9      A.    Correct.

10     Q.    What version or edition of NFPA 921?

11     A.    I stay up with the current versions.

12     Q.    So would it be the 2024 one or the 2021?

13     A.    Uh, I've got the 2024 by now.

14     Q.    But when you did the May inspection, it was the

15   2021 edition that would have been in effect?

16           I know there's not much difference between the

17   two.

18     A.    Yeah, but, you know, I'm always watching the

19   progress of the committee and looking at all the

20   comments and that, so I try to stay current.

21           I don't try to use that -- well, I try to use

22   what was the state of the generally recognized and

23   accepted practices of this profession at the time

24   irregardless of what NFPA 921 edition was applicable.

25     Q.    Okay.  In your report, you didn't list any of

1    the other hypotheses that you considered; correct?

2        A.    I did not.  I did those -- there's a specific

3    set of notes on that issue in my case file.

4        Q.    Okay.  What are those notes called?

5        A.    Uhm, let me find it.  They're going to be in

6    the case notes folder, I can tell you that.

7        Q.    Okay.  The notes "Competing hypothesis"?

8        A.    That's it.

9        Q.    So in that note it does not provide any detail

10   as to what other competing hypothesis you listed or

11   considered.

12       A.    It doesn't give the specific details.  It just

13   lists what I considered as I was doing that competing

14   hypothesis opinion.

15       Q.    It just lists process that you went through.

16   It doesn't list what hypothesis there is --

17       A.    Hold on.  Let me find it.

18       Q.    -- unless I'm looking at the wrong one.

19       A.    Yeah, I think you might be.

20             Yeah, I know what notes you're looking at.

21   There's another set of notes.

22             Okay.  So it's called -- I see which one you're

23   looking at.  That describes the process.

24             There's another set, it's called "Notes -

25   Potential Competing Hypotheses," and then I've listed

Page 130

1    them.

2         Q.    Yeah.  And so that's where you keep your -- the

3    hypotheses that you took a look at as opposed to putting

4    them in your report?

5         A.    Yeah, that was while I'm going through my

6    analytical process and testing and so forth, yes.

7         Q.    Okay.  And did you do any physical testing on

8    any of these hypotheses?

9         A.    No.

10        Q.    Looking at the -- going to Page 19, just the

11   graphs that you're pulling, these are from the 2021

12   edition of NFPA 921; correct?

13        A.    They probably are, yes.

14        Q.    Okay.  You have a reference to NFPA 1730 in

15   your report.  What applicability does 1730 have to this

16   case?

17        A.    So 1730 addresses, it's in the series within

18   NFPA 921, and so I think I characterized it for you in

19   here.

20        Q.    Doesn't that relate to code enforcement issues?

21        A.    Well, but it also, that code also covers fire

22   prevention inspection and investigation.

23             So there are references of investigation, but I

24   would represent to you if you're following NFPA 921 and

25   NFPA 1033, you could live without 1730, but I include it

1   because it does address investigation in it.

2       Q.   Okay.

3       A.   But it's more the administrative organization

4   of it.

5       Q.   Was there anything with respect to NFPA 1730

6   that was applicable to your investigation in this case?

7       A.   Other than it reinforces that you also have to

8   follow 921 and 1033, no.

9            So I'm not being -- I'm really not being guided

10  by NFPA 1730 during my investigation.

11      Q.   Okay.  Starting on Page 30, I believe -- no,

12  one more, 29, that's where you first start to get into

13  the particulars of the -- of this incident; correct?

14      A.   Correct.

15      Q.   So everything before Page 29 are general

16  references to various NFPA guides, 921, 1033, 1730, and

17  background on your accompanying involvement in this

18  case?

19      A.   Well, it's also the methodology and applied

20  practices, and so forth, that I believe are required by

21  the requirements of a Rule 26(b) report.

22      Q.   Okay.

23      A.   But, you know, I get asked about that,

24  "So isn't it the same thing in every report?"

25           Yeah, because the recognized practice hasn't

Page 132

 1    changed, so --

 2        Q.   Yeah.  And certainly, you agree that basically

 3    from Pages 1 to 28, other than the specifics about

 4    Mr. Ayala and who you were hired by in this case, that's

 5    the same in almost every report you do?

 6        A.   Correct.

 7        Q.   Okay.

 8        A.   Every report that I write is a federal report,

 9    but I choose to do all my reports as if they're Federal

10    Court cases.

11        Q.   With respect to the summary of hostile fire

12    incident, you didn't provide any sources as to where

13    you're getting all of this information.  What are those

14    sources?

15        A.   Well, I am because I'm telling you as

16    documented and memorialized in what report I'm looking

17    at.

18        Q.   Okay.

19        A.   So for each section I'm telling you what I'm

20    looking at and what I'm reading.

21        Q.   You don't have any information in there about

22    any of the body camera footage statements; correct?

23        A.   I don't.  I didn't do any summarization of

24    those.

25        Q.   And there's no statements in here in the

1    summary about the condition of the bedroom or the window

2    when Gunner and Layne woke up; correct?

3        A.    Correct.

4        Q.    On Page 39 you have an indication about what

5    Fire Chiefs Bill Robinson and Larry Erdmann have found

6    with respect to area of origin?

7        A.    Yes.

8        Q.    Have you read their depositions?

9        A.    I have.

10       Q.    You're aware that Larry Erdmann did not come up

11   with an origin determination; correct?

12       A.    That's what he testified to in his deposition,

13   but that wasn't what was reported in the sheriff's

14   department's supplemental narrative that I indicated

15   here.

16       Q.    The sheriff's department supplemental narrative

17   was something done by the sheriff's department as

18   opposed to the Green River Fire Department; correct?

19       A.    Correct.

20       Q.    And you saw in Fire Chief Robinson's deposition

21   that when he was presented with additional evidence

22   related to this fire, that he indicated that the fire,

23   as he sat there today, would be undetermined pending

24   further investigation?

25       A.    Correct.

1      Q.    So you're just referencing what the

2   supplemental narrative said as opposed to what those

3   individuals testified to?

4      A.    Correct.

5      Q.    When the hoverboard was located on the floor,

6   did you make a determination as to whether it was

7   outside of the swing of the door or inside the swing of

8   the door?

9      A.    I did not.

10      Q.    Do you know one way or the other whether it was

11   outside or inside the swing of the door?

12      A.    We could factor that by the photographs and the

13   stud spacing.

14      Q.    And certainly that's something you --

15      A.    It's certainly not -- it's certainly not

16   totally behind the door.

17      Q.    And that's something you could do with the

18   Matterport; correct?

19      A.    The Matterport would tell you that as well.

20      Q.    All right.  A lot of these we've already gone

21   through, so I'm flippin' through.

22      A.    Just keep flippin'.

23      Q.    Going to Page 46, this is the discussion about

24   the May 18th, 2022 inspection; correct?

25      A.    Correct.

Page 135

1      Q.    Okay.  And there was a joint inspection

2    protocol and that's what you're describing on 46?

3      A.    Correct.

4      Q.    Okay.  So with respect to what occurred on

5    May 18th, just so we're on the same page, basically, you

6    got to the third bullet point and then that's when the

7    inspection was stopped?

8      A.    I agree with that.

9      Q.    Okay.  So with respect to the bullet points

10   after "3," you were not personally involved in any of

11   those activities?

12     A.    That's correct.

13     Q.    Then you include X-rays on Page 49 and 50, but

14   that's more just for background information because you

15   don't have any opinions with respect to the hoverboard?

16     A.    Correct, other than it was obvious to me that a

17   couple of the cells had failed.

18     Q.    How many cells failed?

19     A.    Uhm, I'd have to go back and look at the

20   picture.  There's more than one.

21     Q.    Have you ever seen the CT scans in this case of

22   the hoverboard?

23     A.    I have not.

24     Q.    Were you provided copies of those at all?

25     A.    Not -- I don't believe so.

1     Q.   Do you know, as you sit here today, how many

2  cells had expelled?

3     A.   I don't know.  I wasn't involved in that

4  examination.

5     Q.   Do you know the manner in which the cells

6  expelled?

7     A.   I don't.  I'm not offering opinions on that.

8     Q.   You have -- let me strike that.

9          With a fire that initiates from careless

10  disposal of smoking material, that generally can be a

11  smoldering type fire; correct?

12          MR. AYALA:  Form.

13          THE WITNESS:  It has a high likelihood to do

14  that, yes.

15  BY MR. LaFLAMME:

16     Q.   Okay.  And in saying "smouldering type fire,"

17  meaning that that is a fire that could initiate a

18  lengthy period of time after the actual careless

19  disposal of smoking materials occurs?

20     A.   And before and after the flaming combustion,

21  yes.

22     Q.   Meaning if Mrs. Wadsworth had smoked in the

23  smoking shed sometime between 1:30 and 2:00 a.m. and

24  this fire initiated sometime between 4:00 and 4:30 a.m.,

25  and assuming it was due to careless use of smoking

1  material, that time lapse is not unusual with careless

2  use of smoking material-generated fires?

3          MR. AYALA:  Form.

4          THE WITNESS:  No, it can't be used to exclude

5  that possibility.

6  BY MR. LaFLAMME:

7      Q.   Meaning the time difference from which

8  Mrs. Wadsworth testified that she last smoked in the

9  smoking shed and the identification of this fire had it

10  started -- assuming it started in the smoking shed, that

11  time lapse would not exclude careless use of smoking

12  material?

13     A.   No.

14     Q.   Looking at Pages 56 to 59, this is a list of

15  all the evidence in this case; correct?

16     A.   Correct.

17     Q.   All right.  And aside from visual observations

18  either in person or of photographs, you have not

19  physically inspected any of the evidence in this case?

20     A.   Not as part of an evidence exam.

21          Obviously, I looked at the -- I looked at the

22  hoverboard the first time we were there.  I looked at

23  the outlet.  I looked at some of the branch wiring and

24  so forth, but I did not look at any of this evidence as

25  part of a subsequent organized laboratory inspection.

Page 138

1    Q.   And when you looked at it, you looked at it in

2    a nondestructive documentation fashion?

3    A.   Visual only, nonintrusive, nondestructive.

4    Q.   Okay.

5    A.   The hoverboard had already been removed from

6    the scene prior to my involvement.

7    Q.   And that was removed by Ms. VanDongen?

8    A.   She was in possession of it, but I thought she

9    told us the fire department had removed it and brought

10   it out to the front porch is my recollection.

11   Q.   Have you ever had or have you ever retained any

12   evidence in this case?

13   A.   No.

14   Q.   When a lithium-ion battery fails, it makes a

15   loud noise; correct?

16   A.   I feel that more often there is an audible

17   report, yes.

18   Q.   Meaning it makes a "bang" type noise?

19        MR. AYALA:  Form.

20        THE WITNESS:  I don't know how to characterize

21   it.

22   BY MR. LaFLAMME:

23   Q.   It's probably a poor characterization as well.

24   A.   Because I've seen demonstrations, sometimes

25   they're very loud, sometimes they're not so loud.

1            Sometimes they're, I would character it as a

2    "bang," and sometime it's more of a fizzing, offending

3    sound.

4        Q.    It does have an audible response to a

5    lithium-ion battery failing; correct?

6        A.    Definitely an audible report, yes.

7        Q.    There haven't been any indications from the

8    Wadsworth children of an audible sound coming from the

9    hoverboard either just prior to them -- strike that.

10            There haven't been any reports from the

11    Wadsworth children of an audible sound coming from the

12    hoverboard around the time of the fire?

13            MR. AYALA:  Form.

14            THE WITNESS:  I don't recall any indication

15    provided by them of that.

16    BY MR. LaFLAMME:

17        Q.    There was certainly no mention of it in their

18    interviews with Detective Sheaman; correct?

19            MR. AYALA:  Form.

20            THE WITNESS:  Limited to at the time of the

21    fire, the start of the fire, if that's something that

22    woke them up, no, but they do talk about hearing noises

23    as the fire continued and they were present on the

24    scene.

25    ///

```
 1   BY MR. LaFLAMME:
 2       Q.   Correct, but when they first woke up, it wasn't
 3   the noise from the hoverboard that woke them up?
 4       A.   Nobody has indicated what the stimulus was that
 5   woke them up.  So I would agree with your statement.  No
 6   one's attributed to a "bang" or a particular noise.
 7       Q.   And the only "bang" that the Wadsworth children
 8   reported hearing was shortly before they exited the
 9   house through the garage; correct?
10            MR. AYALA:  Form.
11            THE WITNESS:  That's one time, but I also
12   thought they talked about hearing more than one audible
13   report during the fire is my recollection.
14   BY MR. LaFLAMME:
15       Q.   Okay.  And where are you getting that from?
16       A.   It was either in the interviews or their
17   depositions.
18       Q.   Do you know which one?
19       A.   I don't recall as I sit here.  I would have
20   highlighted it, so I would have to go back to the
21   transcripts.
22       Q.   So on Page 67 of the items that you also
23   reviewed, you have the compilation of Sweetwater County
24   Sheriff's Department body cam images.
25            Those are just the ones that are in your file?
```

Page 141

1      A.    Correct.

2      Q.    Okay.

3      A.    Yes, so everything identified in this report is

4  what's in my case file.

5      Q.    And those are under your case "Sweetwater

6  County SO FOIA Response"?

7      A.    Correct.  Stated more completely, everything I

8  have in regard to this case file is in that electronic

9  case file.

10     Q.    You have a reference in your file to a recall

11  of a Jetson hoverboard?

12     A.    Correct.  I thought I found a recall for the

13  one of their models.

14     Q.    That's the Rogue model?

15     A.    Yes.

16     Q.    Did that have any involvement in your

17  investigation?

18     A.    No.

19     Q.    Do you know whether the Rogue model hoverboard

20  even shares the same battery cells with the plasma?

21     A.    I do not.

22     Q.    You didn't do any investigation as to what the

23  similarities may or may not be between the Rogue and the

24  plasma models?

25     A.    I did not, no.

 1      Q.    On Page 76 of your report, you talk about
 2   "An origin of a hostile fire incident may also include
 3   the analysis of information and data obtained from other
 4   sources, including but not limited to the following,"
 5   and then you have three bullet points.
 6      A.    Correct.
 7      Q.    The second bullet point is the application and
 8   analysis of arc mapping.
 9            Do you see that?
10      A.    I do.
11      Q.    Okay.  You did not do any arc mapping in this
12   case; correct?
13      A.    No.
14      Q.    Is that because the only arcing that was
15   present was at the smoking shed outside?
16      A.    Well, it's that and the initiation of this fire
17   based on my analysis is not related to a failure of an
18   electrical system of the involved structure where the
19   arc mapping would probably become more important.
20      Q.    Arc mapping can be used to identify an area of
21   origin as well -- correct? -- even if it's not an
22   electrical failure with the electrical house wiring?
23      A.    Yeah.  And 921 has downgraded that position
24   over time.  So if you go to the current versions, it
25   would probably be in conflict with the list I use.

```
 1              I still think it's a tool, but in order to be
 2    an effective tool, you have to totally know how the
 3    system is wired and how everything interacts with one
 4    another.
 5              That's why I say the arcing found in the shed
 6    indicates that when that arcing occurred, those circuits
 7    were energized.
 8        Q.   All right.  Meaning they would have been
 9    attacked by fire when those circuits were energized?
10        A.   Correct.  So arc mapping really, in my
11    experience, comes more into play is when you have
12    multiple locations of arcing within a fire scene or a
13    structure, whatever, and you're trying to determine
14    which one came first.  That's the real focus of the
15    application of arc mapping.
16        Q.   In your report, you list the first fuel ignited
17    as the electrolyte in the first failed lithium-ion
18    battery cell.
19        A.   Correct.
20        Q.   But you aren't aware that King is claiming that
21    two cells failed almost simultaneously?
22              MR. AYALA:  Form.
23              THE WITNESS:  I wasn't aware of that when I
24    wrote this.  I'm just reporting, because that's the
25    failure mode of lithium-ion batteries.  That's always
```

1    the first fuel.

2    BY MR. LaFLAMME:

3        Q.    Okay.  Where was it that you got the

4    information that the electrolyte in the first failed

5    lithium-ion battery cell was the first fuel ignited?

6        A.    I'm just trying to express that there had to be

7    the first one.  So the very first one that failed would

8    be -- that would be the source of fuel for it.

9        Q.    Okay.  But you haven't seen King's report;

10   correct?

11       A.    I wasn't aware that he's saying that two failed

12   simultaneously.  I don't know that I -- well, as I sit

13   here, I don't know if it's possible for two to fail at

14   exactly the same time.

15       Q.    Okay.  I agree with you.

16           MR. AYALA:  Move to strike.

17   BY MR. LaFLAMME:

18       Q.    You have not seen King's report; correct?

19       A.    I have not.

20       Q.    You have not seen King's deposition; correct?

21       A.    I have not.

22       Q.    With respect to your statement "the electrolyte

23   in the first failed lithium-ion battery cell," where did

24   you get that information?

25       A.    I'm just making a deduction that one cell had

Page 145

1    to be the first one to fail and that the failure of that

2    one may have contributed to the failure of the next

3    cell.

4        Q.    Okay.  But who told you it was a lithium-ion

5    battery cell that failed?  Was that counsel?

6        A.    I could see that in the extract.  I could see

7    that when I visually looked at the hoverboard.

8        Q.    But you're not offering any opinions as to the

9    cause of this fire; correct?

10       A.    Correct.

11       Q.    So where do you get the information on the

12   first fuel ignited?

13       A.    I'm reporting this from my understanding of

14   what Mr. King's opinions are going to be as related to

15   me by counsel.

16       Q.    So you got this information from counsel?

17       A.    That's the basis for it, yeah.  I'm not

18   rendering that opinion independently and separately from

19   Mr. King.

20       Q.    Because you haven't talked to King, you haven't

21   read King's report; correct?

22       A.    Correct.

23       Q.    So the opinion under "first fuel ignited,"

24   that's not your opinion?

25       A.    That's correct.  That's fair.

Page 146

1      Q.   And then similarly with the ignition sequence,

2   cause of the hostile fire incident, that's not your

3   opinion either?

4      A.   That's correct.  That's all Mr. King's venue.

5      Q.   I think we actually have an exhibit somewhere

6   where you walked through that in a little more detail

7   where you defer to BEAR; correct?

8      A.   Correct.  I believe we marked it already.

9      Q.   Yeah, Exhibit 102.

10     A.   Got it.  Yes, that's correct.

11     Q.   Okay.  And I think Exhibit 102 actually tracks

12  your report; correct?

13     A.   It does, yeah.

14     Q.   Okay.  So in looking at Exhibit 102, on

15  Page 73, the nature of the hostile fire event or nature

16  of the hostile fire incident, that section you are

17  deferring to BEAR?

18     A.   Correct.

19     Q.   Yeah.  And then 74, the origin determination

20  which we've been talking about, that was your role in

21  this case?

22     A.   Correct.

23     Q.   Okay.  The first fuel ignited section, on

24  Page 78 you are deferring to BEAR?

25     A.   Correct.

Page 147

1      Q.    The ignition sequence on Page 79, you are

2  deferring to BEAR?

3      A.    Correct.

4      Q.    And then the classification of the cause, in

5  that regard, you're just looking at the four options

6  under NFPA 921?

7      A.    Correct.  I made that determination.

8      Q.    And that's just incendiary, accidental

9  intentional, or undetermined?

10     A.    Correct.  I'm just trying to indicate that

11  there's no indication that this is an intentionally set

12  fire or incendiary in nature.

13     Q.    And then the development, progression,

14  propagation, we've talked about that a little bit thus

15  far; correct?

16     A.    Correct.

17     Q.    And that's what your photographs that you

18  pulled for Exhibit 97, you pulled those in attempt to

19  explain that further?

20     A.    Correct.  And I've given some science on the

21  way that heat is transferred in all fires, including

22  this fire.

23     Q.    With respect to that section in your report,

24  there isn't anything specific to this case in that

25  section.  You're just giving the background on how heat

Page 148

1    is transferred?

2        A.    In any fire, yes.  So it's applicable to this

3    case because this is a fire.

4        Q.    But you're just giving definitions basically of

5    how conduction, convection, and radiation heat is

6    transferred from one object to another?

7        A.    Correct.

8        Q.    Okay.  You don't go through any specific

9    sequencing of the fire development in this case in your

10   report?

11       A.    Other than the heat and flame vector analysis,

12   no.

13       Q.    But that's not in your report.  That's in your

14   notes; correct?

15       A.    Correct.

16       Q.    And then for the responsibility of the

17   occurrence, you're again on that section on Page 84,

18   you're again deferring to BEAR on that?

19       A.    Correct.

20             MR. AYALA:  Form.

21   BY MR. LaFLAMME:

22       Q.    Did you do any determination into what type of

23   testing is required to obtain a UL certification for the

24   hoverboard?

25       A.    I did not.

Page 149

1    Q.   Any determination into determining -- or any

2    assessment into determining what type of testing is

3    required for the lithium-ion battery cells to be UL

4    certified?

5    A.   I did not.

6    Q.   On Page 86 for -- you have a statement that --

7    A.   And just so that -- they're not really

8    certified.  They're listed.

9    Q.   Okay.

10   A.   I always use the term "listed" because I think

11   that that's what the UL goes by.

12   Q.   I think that's probably the accurate term that

13   UL uses as well.

14   A.   Okay.

15   Q.   I'll clean that up then.

16        You didn't do any assessment as to what testing

17   is required for a hoverboard to be listed under the

18   UL 2272 standard?

19   A.   That's correct.  Thank you for that.

20   Q.   You did not do any assessment to determine what

21   testing is required for the battery cells to be listed

22   under the applicable UL standard?

23   A.   I did not.

24   Q.   Okay.  On Page 86 of your report, you indicate

25   that it's submitted based on the status of the

Page 150

1    investigation as of the date of its issuance?

2        A.    Correct.

3        Q.    Safe to say you have not done any further work

4    that would change any of your report since July 15th of

5    2024?

6        A.    I have not.

7        Q.    Do you have plans to do any further work in

8    this case?

9        A.    I don't have any plans to do any additional

10   work.

11            As I sit here today, however, I will do

12   whatever my client asks me to, and if that impacts my

13   opinions in any away, I will notify him to notify you.

14       Q.    Okay.  Why don't we go back to your photographs

15   on Exhibit 97.

16            All right.  So you walked me through the manner

17   in which you believe the fire propagated in Bedroom 4.

18       A.    Yes.  So we're up to kind of the point where it

19   leaves Bedroom 4.

20       Q.    Okay.  And it leaves Bedroom 4 in two avenues

21   under your theory; correct?

22       A.    Eventually it leaves -- well, you have the

23   window and the door, they're the first way it leaves,

24   but it also burns through several walls.

25            So I'm not sure how to answer your question.  I

1    think you were talking about the two ventilation

2    openings.

3        Q.    Correct.

4        A.    There are two ventilation openings where it

5    first would have progressed.

6        Q.    And it progress through the ventilation

7    openings before it would burn through any of the party

8    walls; correct?

9        A.    Yes.

10        Q.    All right.  So once the fire progresses outside

11    one of the ventilation openings, which way do you want

12    to go?  Out the window or out the door first?

13        A.    I think I did it as out the door, and then we

14    kind of follow the photographs in order.  So if we go to

15    Photograph 115 --

16        Q.    Okay.

17        A.    -- this is the photograph of the kitchen

18    counter and we can see the distribution of the fire

19    damage as to the -- keep myself honest here -- as to the

20    south end of that kitchen counter.

21            So it just tells us that the fire is, from the

22    damage to the kitchen counter, is coming into the

23    kitchen from south to north.

24        Q.    So from the hallway?

25        A.    From the hallway.

Page 152
1              Okay.  Then the next photograph, you tell me if
2    you want me to stop because these are pretty intuitive.
3         Q.   Yeah.
4         A.   Photograph 113, we can look at the damage to
5    the upper cabinetry.  We can look to the damage on the
6    countertop and the degree of consumption and
7    destruction.
8              And then at the very bottom, I'm looking at the
9    melting and consumption of the plastic control
10   components to the dishwasher, and they all tell us the
11   same thing, they parallel what we see on the center
12   island.  The fire is moving from the hallway into the
13   kitchen and moving from south to north.
14             Photograph 114 is a little bit further into the
15   kitchen and we can see plume patterns across the
16   microwave door.  We can see the damage to the upper
17   cabinetry, and we can see the damage to some of the
18   countertop islands.  It's just showing us that that
19   progression through the kitchen continued from south to
20   north.
21        Q.   And were the items that are on the counter, are
22   those fall down from above or were they on the counter?
23        A.   Some of it looks like it's fall down or
24   post-incident because they don't -- but when you look at
25   the ones that don't have any sooting, but a lot of the

Page 153

1   stuff I saw on the counter, you could tell it was in

2   place at the time of the -- so there was a lot of

3   accumulation.

4          Photograph 101, this is the interior east wall

5   of the kitchen.  So you can see in the foreground, you

6   can see the center island, and the fire patterns on that

7   interior surface of the wall and the degree of

8   consumption, the fire patterns show that the plume is

9   moving from south to north across that wall, that's that

10  angular line of demarcation on the wall.

11         And then when I looked at the damage near the

12  floor, you could see that as you got further to the

13  north in the kitchen, in that area the damage got less

14  and less until we got to the point that there really

15  wasn't any fire damage at the floor level.

16         So again, all the patterns in the kitchen show

17  it's coming in from the hallway.  We also talked earlier

18  it came through the wall from the Bedroom 4 closet and

19  then moved from south to north.

20  Q.   So when we're looking at Photograph 101 just so

21  we can orient it ourselves, this door is the man door to

22  the garage?

23  A.   Correct.  Photograph 104 we looked at earlier.

24         So we looked at the -- we looked at this to

25  talk about the fire was coming through this wall from

1   Bedroom 4 into the kitchen, but there is also a fire

2   plume pattern on that wall that shows that the fire

3   moved from the hallway opening across that south wall

4   from west to east.

5       Q.   Go back to that one again.  So you're saying

6   that this wall was attacked on both sides; correct?

7       A.   Yes.  Yes.

8       Q.   Okay.

9       A.   Photograph 120, the next photograph takes us

10  into the living room, and we're seeing two walls of the

11  living room, and the patterns on both walls, there are

12  multiple lines of demarcation.

13           I put two red arrows, but there's actually, as

14  the fire plume is developing, it develops -- it leaves

15  its witness mark and then gets bigger, it leaves another

16  witness mark.

17           All of the patterns on both of those walls were

18  consistent that it came into the room from the hallway

19  and it's moving across there.

20           Photograph 122 is a wider shot of the south

21  wall of the living room, and that is a -- there's a

22  series -- the damage to the couch shows that the fire is

23  attacking it from left to right in the photograph, or

24  east to west in the room, and then the damage and the

25  plume pattern on the wall behind the sofa gives us the

Page 155

1    same indication.

2          The fire comes in from the hallway and moves

3    from east to west, or left to right in the photograph.

4    Q.   Do you know where within the living room

5    Mrs. Wadsworth was sleeping that night?

6    A.   Uhm, I do not.  And after the fire, it was not

7    real clear exactly where she -- it wasn't visible to me

8    or obvious to me where she was sleeping.

9          Photograph 135 takes us back towards that

10   kitchen opening.  So the photographer is kind of

11   standing in the opening to the living room, and now we

12   can see that we have patterns across the cabinetry to

13   the right or to the west -- to the west of the

14   refrigerator, and the damage shows the fire came into

15   that opening again and went into the kitchen.

16         Then when it impacted the west side of the

17   refrigerator, it started developing upwards back towards

18   that back wall.  So everything is consistent in both

19   these rooms.

20   Q.   When you say "the photographer," that was you;

21   correct?

22   A.   Yes.

23   Q.   Okay.  And just for orientation --

24   A.   I don't know why I always say it that way, but

25   that's the way I always say it.

1     Q.   All right.  I just wanted to make sure you

2     didn't have someone there that I'm not aware of.

3     A.   It's me.  No, no, it's me.  I took all these

4     pictures.

5     Q.   All right.  Looking at this photograph, just

6     for orientation purposes, the left side is the kitchen,

7     the right side you can see into Bedroom 4?

8     A.   Correct.

9     Q.   All right.

10     A.   Okay.  Photograph 137, this is, I am standing

11     in that hallway, front hallway between the kitchen and

12     the living room, and what I'm taking -- what I'm trying

13     to photograph is are the patterns in the closet.

14          So it's kind of that closet that's off of

15     the -- you walk into off of the living room, and I'm

16     looking at the distribution of the charring, and it

17     shows me that the charring is close.  There's greater

18     charring to the opening of the closet versus the back of

19     the closet.

20     Q.   Is that this closet here (indicating)?

21     A.   Yes.

22     Q.   Okay.  Meaning the closet that is just off the

23     living room?

24     A.   Just off the living room and backs to Bathroom

25     No. 2 as labeled on Exhibit 100.

Page 157

1      Q.    Okay.

2      A.    So the fire is just burning into that closet.

3            Photograph 138 is the -- a couple things on

4      here.  This is the -- I need to get my orientation --

5      west wall of the hallway, and I am still standing near

6      the intersection of the living room and the kitchen and

7      the hallway.

8            And so what I'm looking at are two things on

9      here.  You'll see that in the center of that wall, we

10     have a complete consumption of the vertical wooden wall

11     studs.

12           And then the two adjacent to it, we have very

13     heavy directional damage to them from left to right.

14     That's directly across from the doorway opening,

15     Bedroom 4 doorway opening.  So as the fire comes and

16     vents out there, it's impacting that wall right there,

17     so we have greater damage.

18           As we look further down the wall, we have what

19     I call truncated cone patterns on the walling material

20     and the distribution of charring on the studs that are

21     also representing that fire plume presence, and it just

22     shows us that the fire is moving down towards the back

23     bedrooms once it's in the hallway.

24     Q.    For orientation purposes, the Bedroom 4 is to

25     your left in this photo?

1      A.   To the left.

2      Q.   Okay.  So this wall stud, which I think you

3   reference is on the opposite side of the hallway of

4   Bedroom 4?

5      A.   Correct.

6      Q.   Okay.

7      A.   Photograph 140, I'm trying to focus your

8   attention on the opposite wall, the wall that is common

9   with Bedroom No. 4.

10        So it would be the east wall of the hallway,

11   and on that wall, we see similar damage like we saw on

12   the other side of the wall, from the bedroom side, and

13   we have this -- these truncated cone patterns and lines

14   of demarcation that show us that the fire is moving down

15   the hallway from north to south from the bedroom door

16   opening, which is located at the base of the arrow

17   there.

18        And then at the far end of the hall, we have

19   that "U" shape pattern again which is the third

20   dimension of the fire plume as it's going down the

21   hallway, and it just tells us the same thing, the fire

22   is coming down the hallway from the Bedroom 4 doorway

23   opening and moving towards the south end of the house.

24      Q.   The fire damage that we see in 138 to the

25   studs, that's ventilation attributed?

1    A.    138, well, what's important is that where the

2    stud's missing and the heavy damage there, it's from the

3    fire venting out Bedroom No. 4 door and immediately

4    impacting those.

5    Q.    The whole house fan is just above there as

6    well; correct?

7    A.    Yes.

8    Q.    So a path of ventilation for the fire?

9    A.    The whole house fan would be a path for the

10   ventilation of the fire and/or the byproducts

11   combustion.

12         There's good evidence that a lot of smoke went

13   into the attic because -- I don't think I have them in

14   here, but I photographed all the vent, attic vent

15   openings and they're all heavily smoke damaged, but not

16   fire damage.

17   Q.    So the consumption of the wall studs on the

18   opposite side of the bedroom floor hallway, that is a

19   ventilation pattern from the fire venting out the

20   doorway of Bedroom 4?

21   A.    It's partially a ventilation pattern, but it's

22   also showing the movement of the fire, because now once

23   the bedroom window is gone, now that fire has fresh

24   oxygen and so it's kind of a combination of both.  It's

25   kind of a combination of fire flow and ventilation.

```
                                                    Page 160
 1      Q.   Okay.

 2      A.   Okay.  Photograph 168 is --

 3      Q.   Mike, why don't we take a quick break here and

 4   we'll come back to 168.

 5      A.   Okay.

 6      Q.   Joy wants a quick break.

 7              (A recess was taken from 1:15 p.m.

 8           to 1:21 p.m.)

 9   BY MR. LaFLAMME:

10      Q.   We were on Photograph 168 and you were working

11   to get your orientation --

12      A.   I got it.

13      Q.   -- on that photograph.

14      A.   So Photograph 168 is the north short wall

15   between the hallway and Bathroom No. 2, and on the left

16   side of the picture we're looking into Bedroom No. 3.

17      Q.   Okay.  And that's Kamille's bedroom?

18      A.   Yes.

19      Q.   Okay.

20      A.   So this little wall right here (indicating).

21           And there's a number of them, of truncated cone

22   patterns, and I've used one vector to show, it shows

23   that the fire is coming from the hallway into Bedroom

24   No. 3.

25      Q.   Okay.
```

Page 161

1      A.    And then the next Photograph 174 is the bedroom

2   door to that same bedroom, Bedroom No. 3, and we're

3   seeing the same pattern across the top of the door that

4   the fire was coming from the hallway into Bedroom No. 3,

5   not vice versa.

6            And here your reference is that there's that

7   little closet area just to the left of the doorway

8   opening to Bedroom 3 in the diagram.

9      Q.    Okay.

10     A.    Okay.  173 is another view of that short

11  section of wall showing that the fire is moving into

12  Bedroom No. 3 from the hallway, but the angular natures

13  that come from the development of the fire plume.

14     Q.    And Bedroom 3 again is Kamille's bedroom?

15     A.    Yes.

16     Q.    All right.  So we're still in that same area.

17     A.    Okay.  So now Photograph 195, we're in the

18  hallway.  We're looking directly towards Bathroom

19  No. 1, and I'm looking on the door frame and the little

20  kickout leading into Bedroom No. 2 and the angular

21  nature, that's from a developing fire plume and it shows

22  us that the fire is moving left to right in the

23  photograph or from the hallway into Bedroom No. 2.

24     Q.    Okay.  And Bedroom No. 2 is Weston's bedroom?

25     A.    Correct.

Page 162

1    Q.   All right.

2    A.   So the next Photograph 192, to the right is the

3    opening to Bedroom No. 2.  I'm now looking at the damage

4    to the doorway for Bathroom No. 1 in the diagram marked

5    as 100, and the angular nature of the consumption of the

6    door and the distribution of the heat and subpar

7    particulate shows us that the fire here is moving into

8    the bathroom from the hallway and not vice versa.

9         And then also when we looked at the damage to

10   the entrance to Bedroom No. 1.  We see again that the

11   fire is moving from the hallway into Bedroom No. 1.

12        Photograph 198 is a continuation of that

13   movement into Bedroom No. 1 on both the south wall and

14   the west wall.  The fire has vented into that bedroom

15   and is moving down both those walls.  So again, we're

16   just showing the fire is -- I'm showing the fire is

17   coming from the hallway into Bedroom No. 1.

18   Q.   And in Photo 198, the breach that we have in

19   the ceiling, is that an overhaul effort by the fire

20   department?

21   A.   Yes, most likely.  I mean, there's no other

22   explanation for that localized damage.  There is an

23   attic access in this bedroom, but it's in the closet.

24   It's not there.

25        Photograph 219 is we are inside the master

Page 163

1    bedroom, and kind of your continuation clue is the crate

2    for the dogs.

3           So now I'm standing inside the bedroom.  I'm

4    looking at the fire pattern on the opposite door frame

5    which again shows me this fire is coming from the

6    hallway into the bedroom.

7           There's a larger truncated plume pattern across

8    that wall over the front of the closet.  It tells me the

9    exact same thing.

10          And then the angular nature of the truncated

11   cone patterns on the west wall of the bedroom just

12   inside the doorway opening show the same thing, all this

13   heat energy and smoke is coming from the hallway into

14   Bedroom No. 1.

15          And you can see at the top of the closet in

16   Photograph 219 that the fire has burned through the wall

17   there.

18          On the opposite side of this wall is Bedroom

19   No. 1, and we can see that the fire damage in Bedroom

20   No. 1 is burning into --

21      Q.    Bedroom No. 4, you mean?

22      A.    Bedroom No. 4, yes, is burning into Bedroom

23   No. 1 exactly the way I labeled Photograph 220.  So it

24   burned through that closet wall.

25      Q.    Okay.

Page 164
1      A.    Now we've gone through all the photos.

2      Q.    Okay.  So then the remainder of the photos from

3    143 on, those are all Bedroom 4 --

4      A.    Correct.

5      Q.    -- that we went through before?

6      A.    I think we went through -- yes, we went all

7    through these before.

8      Q.    Okay.  Looking at Photo 7, which is the

9    exterior photo, you have the yellow lines, and is that

10   dimensionally correct for the size of the shed or is

11   that approximate?

12     A.    I'm just marking where I see the lines of

13   demarcation.  I haven't measured that distance to the

14   shed.

15     Q.    Okay.  Do you know what height the shed was?

16     A.    The shed doesn't come up to the top of the

17   window.

18     Q.    That doesn't mean -- the shed is below the

19   window; correct?

20     A.    Below the window, yes.

21     Q.    Do you know how far below the window?

22     A.    The testimony is that it's just below, it's

23   below the window, but not by a lot.  And I think we can

24   see the fire damage.  So we're seeing that radiated

25   heat.

Page 165

1              So I think dimensionally this is pretty close

2     to the shed, although this is a little wider because

3     we've got some heat movement away from the shed.

4              The size of the shed compared to the window in

5     the front of the house, if you look at some of the body

6     cam -- well, the squad car footage coming in, there is

7     one of the clips that you can see the fire coming out of

8     the window and then you can see the remains of the shed

9     burning down below, and it gives you a pretty good size

10    approximation.

11        Q.   Okay.  You recall from Mr. Pasborg's statements

12    after the fire that when he arrived on scene, there was

13    fire on the ground beneath the window and then there was

14    fire coming out of the window; correct?

15        A.   Correct.

16        Q.   The fire that was on the ground beneath the

17    window, you attribute that to the shed?

18        A.   The shed and/or fall down.

19        Q.   What is the fall down that would be on fire in

20    that location?

21        A.   What got ignited by the fall down, or what's

22    the fall down comprised of?

23        Q.   Correct.  What's is the fall down comprised of?

24        A.   So as the fire is venting out the window, it's

25    attacking the eaves and falling to the ground.  So

Page 166

1   you're taking, I guess you would call them, exterior

2   structural materials.

3       Q.   Do you know whether the -- or strike that.

4            When you were at the site in May of 2022, were

5   you able to look at the shed damage in any respect?

6       A.   Yes, I was able to identify the contents of the

7   shed.

8       Q.   All right.

9       A.   And it matched what Mr. Wadsworth had told me

10  in my interview with him.

11      Q.   And you saw that there was still a remnant of

12  the shed; correct?

13      A.   Yes.

14      Q.   And you have seen pictures where at the

15  August inspection that shed is actually picked up, and

16  you're able to get some dimensions from at least the

17  burned or the melted portion of the shed in that regard;

18  correct?

19      A.   Correct.

20      Q.   The chair that we see in Photo 7, do you know

21  if that was in the shed or outside of the shed?

22      A.   There's two chairs in the shed.  One had the --

23  so I think inside.

24      Q.   Okay.  Do you know what else was inside the

25  shed?

Page 167

1    A.    Two chairs, a table with a couple of -- two

2    drawers, uhm, two chairs, a table in between.  The space

3    heater, and the space heater would be the large

4    components.

5    Q.    There was also a blanket in there; correct?

6    A.    There os a blanket in there, some type of like

7    a quilt it was described.

8    Q.    And there was a cigarette disposal bucket;

9    correct?

10    A.    Cigarette disposal bucket, ashtrays, brass

11    shell casings, that those were still laying there, and

12    cigarette lighters and he described two ashtrays.

13          I'm not sure -- I don't recall, as I sit here

14    today, that I visualized two ashtrays in the debris, but

15    one of them might have been covered, but there's

16    certainly an ashtray that I observed, and cigarette

17    lighters, the metallic -- I can't remember what that

18    brand name was.  It's the kind my dad always used.

19    Q.    Bic?

20    A.    Huh?

21    Q.    The Bic lighters?

22    A.    No, the square metal ones where you flip the

23    top off.

24    Q.    Okay.  As far as the ashtrays, you only recall

25    seeing one?

1      A.    Two were reported.  I didn't see it when I

2  looked at it here, but in the testimony they talk about

3  two of them as well.

4      Q.    Have you gone through photographs to see if you

5  can identify two ashtrays?

6      A.    I looked at the photographs from there and I

7  don't remember.

8      Q.    Were you able to identify the cigarette

9  disposal bucket?

10     A.    Yes.

11     Q.    Okay.

12     A.    Oh, let me go back to one of your earlier

13  questions.  Are you talking about the wooden chair in

14  this picture?

15     Q.    Correct.

16     A.    No, that was not inside the shed.

17     Q.    Okay.

18     A.    I was looking at the chair that's visualized to

19  the left of the stump.

20           No, the wooden chair facing the -- when I took

21  the picture was not in the shed.

22     Q.    Okay.  I didn't think it was, but --

23     A.    Okay.

24     Q.    Yes, I thank you for that clarification.

25           So the wooden chair that we see in Photo 07 you

Page 169

1    agree was not in the shed?

2        A.    Not inside the shed.

3        Q.    Okay.

4        A.    I can only imagine the thought running through

5    your head when I gave that answer.

6        Q.    Do you know what levels of CO start to

7    incapacitate a person?

8        A.    So my training -- first of all, my training has

9    always been that there is -- they're different for

10   everybody.

11            I was generally taught that when you got above,

12   when you got above 10 percent, it's going to start to

13   have effect, and then everybody's different of where

14   you're going to reach incapacitation, and that outside

15   parameter has generally been taught in every course that

16   I've ever taken to be somewhere between 30 to 40

17   percent.

18       Q.    Okay.  And you understand it to be less for

19   children?

20            MR. AYALA:  Form.

21            THE WITNESS:  Yes, because it has a lot to do

22   with your lung size, your rate of respirations.

23            So carbon monoxide only comes into the body

24   through inhalation; so children tend to breathe faster

25   than adults, and so they take it in faster.  So I agree

Page 170

1    with that.

2    BY MR. LaFLAMME:

3        Q.    So with respect to CO levels that would be

4    needed to incapacitate the Wadsworth children, Gunner

5    and Layne, in Bedroom 4, you agree those would be less

6    than an adult?

7            MR. AYALA:  Form.

8            THE WITNESS:  I think that that's a fair

9    general statement, but again, my training has always

10   indicated that everybody is different.  And so those

11   general rules are, you're always cautioned not to accept

12   them as a general rule and live by them.

13   BY MR. LaFLAMME:

14       Q.    As you sit here today, are you able to state

15   what range of CO level would incapacitate either Gunner

16   or Layne given their age and size?

17       A.    I'm not.

18       Q.    I know you said you haven't done any CO

19   analysis in this case; correct?

20       A.    I have not.

21       Q.    Do you know what temperature a lithium-ion

22   battery cell reaches when it fails through an internal

23   short circuit?

24       A.    I don't, but it is results in visible flames

25   within the visual spectrum.  And so that research has

Page 171

 1    shown that always to be, at a minimum, somewhere between

 2    25- and 2700 degrees Farenheit, but I don't know what

 3    the maximum theoretical burning temperature is.

 4        Q.    And a window can break just from heat

 5    impingement as opposed to flame impingement; correct?

 6        A.    Correct.  Thermal shock is what we usually call

 7    it.

 8        Q.    So you don't need actual flame impingement on a

 9    window to break it?

10        A.    You do not.

11        Q.    It could be broken by the temperature created

12    from a flame, and I think we referenced 250 degrees

13    Fahrenheit before which was roughly the range in which

14    you agree with?

15        A.    Yeah.  And the distinction we're making is that

16    it can be hot gases, which is really what a flame is,

17    but it doesn't have to be direct flame contact.  You can

18    have hot gases that cause the same thermal shock.

19        Q.    All right.  I'll go through my notes.

20              I'm sure Mr. Ayala may have some questions for

21    you and then probably start to wrap this up, or we can

22    take a break if Rudy doesn't have any questions.

23              Do you have any questions?

24              MR. AYALA:  Of course.

25              MR. LaFLAMME:  I figured you would.

Page 172

 1              MR. AYALA:  No, I thought you were going to

 2    review and I would wait until you were done reviewing

 3    before I begin my questions.

 4              MR. LaFLAMME:  Okay.  We can take a quick

 5    break.

 6              MR. AYALA:  Do you want to do that?

 7              MR. LaFLAMME:  Sure.

 8              (A recess was taken from 1:38 p.m.

 9              to 1:41 p.m.)

10    BY MR. LaFLAMME:

11       Q.  All right.  Mr. Schulz, with respect to any

12    FMEA analysis, Failure Modes and Effects Analysis, you

13    have not done any of that type of work for this case;

14    correct?

15       A.  I have not.

16              MR. LaFLAMME:  Okay.  We'll mark this.

17              (The aforementioned document was

18              marked as Exhibit 105 for identification

19              and is attached hereto.)

20    BY MR. LaFLAMME:

21       Q.  All right.  Mr. Schulz, I'll hand you what has

22    been marked as 105, which is just a note from your file

23    entitled "BEAR Experts" and you have David Rondinone and

24    Derek King listed there; correct?

25       A.  Correct.  And then I have -- I attached to it

1    their curriculum vitae off their website for each.

2        Q.    That was going to be my question, where did you

3    get these CVs?

4        A.    They were on their website.

5        Q.    Did you do any assessment of their CVs as to

6    whether they would be the appropriate experts for this

7    type of case?

8        A.    Not at all.

9        Q.    And Mr. Rondinone, he's listed as a mechanical

10   engineer; correct?

11       A.    Correct.

12       Q.    And you're aware that he is not named as an

13   expert in this case?

14       A.    I've learned that today, yes.

15             MR. LaFLAMME:  Okay.  That's all I have.  Thank

16   you.

17

18                         EXAMINATION+

19   BY MR. AYALA:

20       Q.    Mr. Schulz, are you good to continue?

21       A.    I am.

22       Q.    Okay.  And bear with me.  I might jump around a

23   little bit on my questions in response to opposing

24   counsel's questions.

25             Early on in your deposition you were asked

Page 174

1    whether or not Mrs. Wadsworth's alcohol use factored

2    into your analysis and your opinions in any way, shape,

3    or form.

4              Do you remember some of those questions?

5         A.   I do.

6         Q.   Okay.  You were also asked whether or not the

7    kids' statements as seen and heard by the body cam

8    footage was in any way considered by in rendering your

9    opinions.

10              Do you remember some of those questions?

11         A.   I do.

12         Q.   Okay.  Having heard that body cam footage from

13    the children and knowing what you know about

14    Mrs. Wadsworth's alcohol use at least pursuant to

15    deposition testimony, does that -- do those two factors

16    in any way, shape, or form change your opinions after

17    your analysis of the physical evidence in this case?

18         A.   No.

19         Q.   And you were asked a lot of questions, in

20    particular about the children's statements to Detective

21    Sheaman, as well as those that were seen and heard on

22    the body cam footage.

23              From what you can gather, the body footage

24    statements, those children were in each other's

25    presence?

Page 175

1    A.   Yes.

2    Q.   Those children, as you can hear in the

3    background, were sitting next to their mother in that

4    pickup truck?

5    A.   That's my understanding, yes.

6    Q.   That mother, that based on certainly the

7    deposition testimony of Mr. Pasborg, as well as the

8    children, the mother who was dragged out of the burning

9    home was revived and was severely burned, sitting next

10   to the children in the pickup truck; correct?

11   A.   That's my understanding, yes.

12   Q.   And by the way, the pickup truck that was still

13   outside, parked outside of this burning home; correct?

14   A.   Correct.

15   Q.   Okay.  So when opposing counsel asked the

16   questions about the statements given and seen on the

17   body cam footage having occurred immediately after the

18   fire, the fire was still going on.

19        You are aware of that?

20   A.   Yeah, I'm totally aware of that.

21   Q.   Okay.  So these minor children are witnessing

22   their mother burned, their little brother burned, and

23   they're still witnessing this fire going on.

24        Do you appreciate that?

25   A.   I appreciate that, yes.

Page 176

1                MR. LaFLAMME:  Object to form.

2    BY MR. AYALA:

3        Q.    Okay.  And so let me ask you whether it was the

4    body cam statements that they made in each other's

5    presence, whether it was statements made to Detective

6    Sheaman, you had a further opportunity to read and

7    review their deposition testimony, did you not?

8        A.    I did.

9        Q.    Okay.  And those were not given, that testimony

10   was not given with other children in the room; correct?

11       A.    That's correct.

12       Q.    Okay.  And from your review of the deposition

13   testimony and even, in fact, from some of what you heard

14   in Detective Sheaman's interviews of the children, did

15   you learn that the children were sleeping, they were

16   sleeping and stated that the fire woke them up?

17       A.    Correct.

18                MR. LaFLAMME:  Object to form.

19   BY MR. AYALA:

20       Q.    In other words, they were not awake at the time

21   this fire began?

22       A.    It's my understanding they were not.

23       Q.    Okay.  In reading Kamille's deposition

24   testimony, did you read that she stated it was the fire

25   alarms that woke her up?

Page 177

1    A.    I think my recollection is that and the
2    screaming of her brothers.
3    Q.    Okay.  You've been doing this, meaning fire
4    analysis and investigation for how long, sir?
5    A.    43 years now.
6    Q.    The fire alarm, the smoke alarm that exists
7    within a residence, how long does it take for those to
8    be activated in the presence of an active fire?
9    A.    Very quickly.  They're the cheapest life
10   insurance you can buy for your family.
11   Q.    Okay.  As Kamille is woken up, woken up by this
12   smoke alarm and the fire alarm that's going off, and she
13   even testified, if you remember, she thought for a while
14   it was a dream.
15        Do you remember reading that?
16   A.    I do.
17   Q.    Eventually, she hears her brother or brothers
18   screaming.  Do you remember that?
19   A.    I do.
20   Q.    And she stated in deposition that as she made
21   her way out of her room, which was across the hall from
22   the boys' room, by the way?
23   A.    Opposite side.  Not across from, but opposite
24   side of the hall.
25   Q.    As she made her way out and passed the boys'

Page 178

1   room, do you remember reading Kamille's testimony that

2   she looked into the boys' room?

3       A.   Yes.

4       Q.   And when she looked into the boys' room, she

5   saw the fire within that bedroom?

6       A.   Yes.

7       Q.   And, in fact, in the deposition testimony she

8   stated that she could not see outside because of the bed

9   and the wall of that window being on fire.

10          Do you remember seeing that?

11          MR. LaFLAMME:  Object to form.

12          THE WITNESS:  I don't recall if she said it was

13  because it was on fire, but she talked about the bed and

14  the wall obstructing her view.

15  BY MR. AYALA:

16      Q.   Okay.

17      A.   But that's where she placed the fire at the

18  time she walked by the bedroom door.

19      Q.   Sure.  In any event, at the time that they

20  make, meaning the children, make their way outside of

21  the residence, do you recall Kamille testifying that she

22  saw the shed on fire?

23          MR. LaFLAMME:  Object to form.

24          THE WITNESS:  Yes, and then she makes another

25  observation when she gets outside.

Page 179

1  BY MR. AYALA:

2      Q.    And what was that other observation she made?

3      A.    That the top of the shed was burning.

4      Q.    Okay.  Do you recall her testimony that she was

5  still able to make out the form or shape of the shed?

6      A.    Correct.

7      Q.    You've been doing this for all these years.

8            A plastic shed like this, would you expect it

9  to be still in its original shape and form of a shed if

10  it had been the origination of this fire?

11            MR. LaFLAMME:  Object to form.

12            THE WITNESS:  I would not expect it to be

13  completely consumed, but I would expect it to be much

14  more damaged than she refers to it.

15            And Layne actually gives a similar statement

16  that it's the top -- I think either Layne or Gunner that

17  the top of the shed was on fire.

18  BY MR. AYALA:

19      Q.    Okay.  You've been asked a lot of questions

20  about the fire originating in this shed, and you've been

21  asked questions about smoldering fire and whether or not

22  that could have been the cause of this fire based upon

23  either a cigarette not being properly put out or

24  otherwise.

25            Do you remember some of those questions?

Page 180

1      A.    I do.

2      Q.    Okay.  In your review, including your presence

3   upon that property for inspection, did you see any

4   evidence that conclusively established the fire

5   originating in that smoking shed?

6      A.    Not at all.

7      Q.    Okay.  In fact, what you reviewed as part of

8   your analysis is you reviewed all of the signs and all

9   of the factors that you considered that were consistent

10  with a fire originating in Bedroom 4, the boys' room;

11  correct?

12     A.    Correct, but as part of my investigative

13  process and the scientific method and considering

14  competing hypotheses, I had to consider and evaluate

15  both scenarios; that it started in the shed and moved

16  into the house or if it started in the house and moved

17  onto the bed, along with a couple of others, but those I

18  would admit are the two primaries which way it was

19  coming from.

20     Q.    From your review and analysis, which includes

21  deposition testimony, by the way, any evidenced that

22  there was a cigarette that was improperly discarded

23  within that shed?

24     A.    Based on the totality of evidence, there's no

25  way to reach that conclusion.

Page 181

1    Q.   Any evidence that at the time that this fire

2   began or originated, that it was due to a cigarette

3   being improperly discarded?

4    A.   No evidence at all.

5    Q.   Any evidence that you were able to observe and

6   analyze that would lead you to conclude that any

7   malfunction within that shed was the cause of the fire?

8        MR. LaFLAMME:  Object to form.

9        THE WITNESS:  No, because it's not the origin

10  of the fire.  And the cause of every fire is necessary

11  to locate it within the area of origin.

12  BY MR. AYALA:

13   Q.   And what you concluded based on everything

14  you've reviewed is that the origin of the fire was

15  within Bedroom 4 and specifically at the location of the

16  hoverboard as testified to by the children and as all

17  the evidence has, at the very least, concluded?

18        MR. LaFLAMME:  Object to form.

19        THE WITNESS:  And I'm defining the origin as

20  the same area where the hoverboard was found.

21        I'm not saying that I did an analysis and can

22  tell you that the fire -- I don't have any fire pattern

23  analysis saying that it came out of the hoverboard, just

24  that they occupied the same area.

25  ///

Page 182

1    BY MR. AYALA:

2        Q.    Yes, sir.  And from the deposition testimony

3    you reviewed, you've seen all the children testify that

4    they would have placed that hoverboard at the location

5    where it was found within that bedroom?

6        A.    That seemed to be their normal practice based

7    on their deposition testimony.

8        Q.    You were asked questions about Detective

9    Sheaman and whether or not you had any criticisms of his

10   investigative process.

11           Do you remember some of those questions?

12       A.    I do.

13       Q.    Okay.  And there were occasions where you

14   testified that there was perhaps some statements or

15   comments that you would not make to the homeowner as

16   part of your personal practice in investigating fires?

17       A.    Correct.  I wouldn't share my findings and

18   conclusions like he was doing.

19       Q.    From everything that you've seen from Detective

20   Sheaman's fire investigation and analysis, did his

21   sharing of information with the Wadsworth family detract

22   from the conclusions he made as to the origin of the

23   hoverboard?

24           MR. LaFLAMME:  Object to form --

25           THE WITNESS:  I don't see that --

 1          MR. LaFLAMME:  -- calls for speculation.

 2          THE WITNESS:  I'm sorry.

 3          MR. LaFLAMME:  Go ahead.

 4          THE WITNESS:  I don't see that because he had

 5   already reached those conclusions before he shared the

 6   information.

 7   BY MR. AYALA:

 8      Q.   And, in fact, the conclusions that he reached

 9   as to the origin, those are consistent with what you

10   were able to find from reviewing the totality of the

11   evidence; correct?

12      A.   We agree on the area of origin, yes.

13      Q.   You discussed with opposing counsel the concept

14   of electrical arcing.

15          Do you remember some of that?

16      A.   Yes.

17      Q.   Despite the fact that you were unable to find

18   evidence of electrical arcing within Bedroom 4, does

19   that fact preclude Bedroom 4 and specifically the

20   hoverboard location being the origin of this fire?

21      A.   I don't believe so.

22      Q.   And why not?

23      A.   Because the location of arcing is independent

24   in this case because no one is alleging that electrical

25   arcing within Bedroom 4 had anything to do with the

Page 184

1   initiation of this fire, and so to me it's really not an

2   issue.

3           When you keep in mind that the presence of

4   arcing just means that that conductor or component or

5   device or whatever it was, it just means that it was

6   energized at the time damage occurred to it or something

7   caused there to be an alternative path of the

8   electricity such that it will result in electrical

9   arcing.

10      Q.   Does the presence of electrical arcing, could

11  that lead to a circuit tripping?

12      A.   It can, depending upon the -- depending upon

13  the amperage of the electrical arc.

14      Q.   You testified earlier you didn't see any

15  circuits that were tripped when you presented to the

16  residence?

17      A.   I saw none.  Just the one that was clearly in

18  the off position.

19      Q.   And so there were no circuits that were tripped

20  that would have related to anything that was plugged

21  into the shed either?

22      A.   That's true.

23      Q.   Okay.  Would you expect with the electrical

24  arcing that was purportedly found outside of this shed,

25  would you expect there to have been a circuit that was

1    tripped relating to that arcing found?

2            MR. LaFLAMME:  Object to the form.

3            THE WITNESS:  That would be a reasonable

4    expectation.

5            However, to be fair, not every occurrence of

6    electrical arcing results in the tripping of a circuit

7    breaker because again, you have to have the event and

8    then the amperage has to be right and the distance from

9    the circuit breaker, the rating of the circuit breaker,

10   but the fact that no circuit breakers were tripped

11   should not lead you to believe that no electrical arcing

12   occurred on any of those circuits, I guess, is the way

13   to put it.

14   BY MR. AYALA:

15       Q.   Uh-huh.

16       A.   So there just aren't a lot of absolutes in fire

17   investigation on the national level.

18       Q.   And the reason why you rely upon certainly the

19   patterns that you see in fire investigation is because

20   of that same fact, that there's not a lot of absolutes

21   from conclusions.

22           Even when you employ modeling, you look at the

23   hard physical evidence that really provides the best

24   indicator as to where a fire originated.

25       A.   I'm always trying to compare it to everything,

Page 186

1    to the actual physical evidence and our understanding of

2    fire science and fire dynamics, which in our country,

3    more so than any other country, we have invested a lot

4    of time and research in.

5        Q.    You were asked questions about Mr. Birdsong and

6    whether or not you were familiar with his background,

7    his training, and it was indicated to you that he was an

8    IT specialist.

9             Do you remember some of those questions and

10   answers?

11       A.    Well, he's a genius at those issues.

12       Q.    And it was, at the very least, inferred to you

13   that he did not have, according to the listings on the

14   Apex website, and even I believe it was his LinkedIn,

15   that he did not have any indication of having fire

16   investigation background, training, or education.

17            Do you remember some of that?

18       A.    I do.  I know that he has because I've directed

19   him to courses and so forth, and I've -- he's talked to

20   me about what type of training he should do.

21            To be clear, Apex, his employer themselves,

22   primarily uses him the way that I do as a technician,

23   and I'm not expecting him to be the one that's going to

24   testify to origin and cause, but that doesn't take away

25   from his knowledge and his experience of operating at

 1    fire scenes and searching fire scenes, and so forth.

 2            So he's not this computer guy that came in off

 3    the street and was thrown into a fire scene.  He does a

 4    lot more than -- he knows more about fire investigation

 5    and fire dynamics and that than a lot of fire

 6    investigators that I run across.

 7        Q.   And I just want to be clear, sir, and I want

 8    the record to reflect, are you aware that the Apex

 9    website where it lists Mr. Birdsong as a member of that

10    company, in fact, identifies him as the IT director and

11    fire investigator?

12        A.   I understand that, yes.

13        Q.   Okay.  And that's certainly consistent with

14    your knowledge and appreciation of his background,

15    training, and experience?

16        A.   Correct.

17        Q.   Have you investigated other hoverboard fires in

18    your career?

19        A.   I can't recall another one as I sit here.

20        Q.   With regards to the method and manner in which

21    you investigate fire origin, whether it's a hoverboard

22    or any other type of product or device, does your

23    methodology follow the same or similar pattern?

24        A.   Yes.

25        Q.   So whether or not it was related to a

 1   hoverboard, related to an appliance or otherwise, you

 2   follow the same principled method in investigating

 3   fires?

 4        A.   Correct.  You don't ever worry about what the

 5   suspected cause the fire is or product of the fire.

 6             You first have to find the origin, and then you

 7   would move into the analysis of potential sources of

 8   ignition within that area of origin.  So that's what I

 9   did and then I stopped.

10        Q.   Okay.  You were asked questions about the

11   UL 2272 listing.  Do you remember some of those?

12        A.   I do.  I don't think it was enumerated, but we

13   talked about UL listings, yes.

14        Q.   And you also were asked, I guess, the reason

15   why you had certain documentation in your file relating

16   to a Jetson Rogue hoverboard recall.

17             Do you remember some of that?

18        A.   I do.

19        Q.   Did you have an appreciation that the Rogue

20   model that was recalled by Jetson was UL 2272 listed?

21        A.   I didn't look up its listing, but I made the

22   deduction that it probably was.

23        Q.   Okay.  And so based upon, at the very least,

24   your understanding and background and experience,

25   UL 2272 does not certify a product as being precluded

Page 189

1    from failure.  Is that fair?

2              MR. LaFLAMME:  Object to form.

3              THE WITNESS:  Correct.  So here's how I do UL

4    and always have throughout my career.

5              Having a UL listing allows you to compare one

6    product to another that they're both going to meet the

7    same requirements of UL.  It does not mean that the

8    product is safe and cannot fail and cause a fire.

9              And my evidence of that is in 43 years of

10   investigating fires, I've only had one event where the

11   product that caused the fire was not UL listed;

12   otherwise, they've always been UL listed.

13             So my simplistic view of UL is UL listing makes

14   your product marketable and sellable.

15   BY MR. AYALA:

16        Q.   That's certainly what your experience has been

17   in investigating all of the fires you have in your

18   career?

19        A.   I do, yes.

20        Q.   You were asked questions about Mr. King's

21   analysis and opinions and all of that.

22             You're not offering opinions today as to the

23   cause of the fire, only the origin; correct?

24        A.   Correct.

25        Q.   What you --

Page 190

1      A.   And the closest I got to the cause is I

2  identified three sources of ignition within that area of

3  origin that needed to be considered.

4      Q.   Okay.  And ultimately, your conclusion, more

5  likely than not, is that the origin occurred within

6  Bedroom 4 at the location where the hoverboard was

7  found?

8      A.   Correct.  The hoverboard was co-located within

9  the area of origin.

10      Q.   By the way, is there anything from the evidence

11  that you reviewed and collected that led you to a

12  conclusion that the refrigerator on the other side of

13  that Bedroom 4 wall was in any way responsible for this

14  fire?

15      A.   I saw no evidence or indications of that.

16           However, I put them on notice and we collected

17  it, and I directed them to be collected as evidence

18  because that's -- because it was within the area of

19  origin and needed to be reevaluated.

20      Q.   Okay.  You were asked questions about NFPA 921

21  and whether or not that is the standard or guidance that

22  is followed for purposes of fire analysis and

23  investigation.

24           Do you remember some of those questions?

25      A.   Yes.

1      Q.    You're familiar with that standard; correct?

2      A.    Very familiar with it.

3      Q.    Okay.  How are you so familiar with it?

4      A.    I was on the original committee when 921

5    started.  So I was on the NFPA Technical Committee

6    before -- the day we decided and voted that we needed to

7    write a 921, and then I served on that committee I think

8    for probably 17 years overall.

9      Q.    Okay.  All right.  And so as you go about

10   collecting the evidence and information and performing

11   your analysis for determining origin of the fire, you

12   certainly are mindful and taking into account NFPA 921

13   as you go about your duties in analysis; fair?

14     A.    I have to.  I can't claim ignorance of what's

15   in the document.

16     Q.    And so you would have done that also in this

17   case?

18     A.    I do it in every case.  Even before 921 was

19   published, I started that practice even as we were

20   writing the document.

21     Q.    You were asked questions about whether you

22   employed any fire modeling or performed any test burns.

23          Do you remember some of those questions?

24     A.    I do.

25     Q.    Okay.  You did not do either; correct?

Page 192

1    A.    I did neither, no.

2    Q.    Did you need to for purposes of the scope of

3    your analysis and ultimate conclusions?

4    A.    It was my position that I was able to arrive at

5    my opinions to a reasonable degree of certainty within

6    the field of fire and explosion and investigation

7    analysis without doing those physical tests.

8    Q.    You were asked questions about your experience

9    rendering expert witness testimony and opinions and

10   shown a list of your deposition and trial history.

11         Do you remember some of that?

12   A.    Correct.  And that list, I think, was from the

13   last four or five years.

14   Q.    And you were asked questions in particular

15   about what cases you've either been stricken as an

16   expert or had some of your opinions stricken or limited.

17         Do you remember some of those questions?

18   A.    I do.

19   Q.    Have you ever had your opinions as to origin,

20   fire origin stricken?

21   A.    Never.

22   Q.    And I know you talked about one of the cases,

23   if I recall, you had a supplemental opinion that was

24   disallowed -- correct? -- because of the timing?

25   A.    Correct.

Page 193

1      Q.    There was another opinion, at the very least,

2  partial of which was disallowed due to failing to

3  reproduce a certain test for examination?

4      A.    That was the Garcia case.  We only did the test

5  once, and the magistrate ruled that it would have been

6  acceptable had we repeated the test more than once.

7      Q.    Okay.  But you've never had any of your

8  opinions stricken or limited in any fashion as it

9  relates to fire origination analysis?

10     A.    No.  In fact, what was a little humorous is

11  when I'm told that in the Garcia ruling the judge

12  acknowledged my expertise in fire origin and cause

13  analysis.

14     Q.    Okay.  You were asked a lot of questions about

15  the battery cells of this hoverboard and how you knew

16  that some expelled, how many, things like that.

17           Do you remember some of those questions?

18     A.    I do.

19     Q.    For purposes of the scope of your opinions in

20  this case and your analysis, does it matter to you how

21  many cells were expelled during this fire?

22     A.    No.  I was just able to observe from the very

23  first, my very first inspection of the actual item that

24  more than one cell had -- and I'm using the word

25  "failed" just to mean that they had opened up, that the

Page 194

1    tops were off.

2              I'm not trying to make commentary on why that

3    is, and so that included it as a potential source of

4    ignition --

5        Q.    Okay.

6        A.    -- besides the fact that it was located right

7    in the area of origin as were the other two items

8    identified.

9        Q.    The children testified that they were sleeping,

10   and in one way or another, were awakened by the fire,

11   whether it was due to the fire alarms or the window or

12   heat, what have you.

13             Would that -- would the fact that they were

14   sleeping at the time of this fire began be at least one

15   reasonable explanation for why they may not have heard

16   hoverboard, I think it was described as a "bang" or

17   explosion?

18             MR. LaFLAMME:  Object to form.

19             THE WITNESS:  And I used the term "audible

20   report."  It may be a reason they didn't hear the

21   audible report.

22             You know, and a good segue to that is I have

23   lots of fire -- I've investigated lots of fires over the

24   years where people say, "I don't know why I woke up."

25             And you ask them, "Did you hear the smoke

1    alarm?"  And they say, "No, never heard it."  And then

2    we test the smoke alarms and we know that they went off.

3         And so that's a good audible report.  It's

4    intended to be very, very loud and they just don't

5    recall or appreciate what it is that alerted them that

6    something was different.

7    BY MR. AYALA:

8    Q.    And that certainly gets into a little bit of

9    the psyche that may be beyond your level of expertise

10   relating to trauma and relating to events like a fire?

11   A.    Correct.  I don't begin to understand all that

12   trauma.  I have seen people involved in fires, you know,

13   throughout my career and everything's different.  It

14   affects everybody differently, and it affects how they

15   express their experience.

16   Q.    In your years of experience, have you learned

17   about, either personally or through your review of

18   research or literature, have you learned about

19   lithium-ion batteries failing whether or not they are

20   plugged into a power source?

21        MR. LaFLAMME:  Object to form.

22        THE WITNESS:  I have.  I took, I think, the

23   most recent training was maybe two years ago from the

24   International Association of Arson Investigators on

25   what's called their CFI trainer website.

1          And then anything else that I've ever read in

2    articles, there's a lot of attention to it right now

3    pretty much spurned on by New York's experience with

4    lithium-ion battery fires.

5          And they do not have -- this is how I -- this

6    is my takeaway I took from all of the training I've ever

7    attended or podcasts I've listened to.

8          They are more likely to fail when they're being

9    charged, but they don't have to be being charged in

10   order for them to fail, and that two of the common modes

11   are there's a defect in the battery, there's damage,

12   some type of damage to the battery, or they've been

13   previously overcharged.

14   BY MR. AYALA:

15      Q.   By the way, if a device like a hoverboard is

16   not plugged into an electrical source at the time of

17   failure, would you expect to see electrical arcing?

18          MR. LaFLAMME:  Object to form.

19          THE WITNESS:  Not in the structure's electrical

20   distribution system because it's not attached to it.

21   BY MR. AYALA:

22      Q.   You were asked questions and certainly you went

23   over portions of your report, but in particular, on

24   Page 84 of your report, which is titled "Responsibility

25   For the Occurrence of the Hostile Fire Incident," you

1   were asked whether or not you were deferring to BEAR

2   with regards to some of those items and conclusions

3   which I believe you stated that you were.

4          Do you remember that?

5   A.   Yes.

6   Q.   And I want to ask you in particular to a

7   portion of that section where you state there is --

8   "The plaintiffs had no control over the design and

9   control of the artifact Jetson hoverboard.  In addition,

10  there is no evidence that the plaintiffs used the

11  artifact Jetson hoverboard for any purpose other than

12  what was reasonably intended.  And lastly, there is no

13  evidence that the plaintiffs misused the artifact Jetson

14  hoverboard neither intentionally nor otherwise."

15         What I just read, is that, at the very least,

16  what you yourself have gathered from your review of all

17  of the evidence, including deposition testimony in this

18  case?

19  A.   That's the totality of the evidence, yes.

20  Q.   Okay.  So that's at least a portion of that

21  responsibility for the occurrence of a hostile fire

22  incident that you did not defer to BEAR.

23         In fact, you gathered that information from the

24  evidence in the case?

25  A.   Yeah.  I'm just reporting the evidence as I

Page 198

1   viewed it having drawn out from the totality of the

2   evidence and just restated it.

3       Q.   You were asked about the bedroom window being

4   compromised and if a flame was required or if the heat

5   alone could cause its compromise.

6            Do you remember some of those questions?

7       A.   I do.

8       Q.   And I believe you stated that thermal -- was it

9   thermal shock by hot gases can cause the compromise?

10      A.   Correct.

11      Q.   Okay.  Given the facts and circumstances as you

12  understand them in this case, in February in Wyoming,

13  winter, the cold temperatures that existed, would it be

14  a reasonable conclusion that the surrounding hot gases

15  would be higher inside if the origin was that bedroom

16  versus outside?

17           MR. LaFLAMME:  Object to form.

18           THE WITNESS:  I think it's a reasonable

19  deduction that the temperature inside the house was

20  warmer than outside.

21  BY MR. AYALA:

22      Q.   And so it would not be surprising to you if

23  either flame or hot gases from within Bedroom 4 was the

24  cause of that bedroom window being compromised?

25      A.   Correct.  And we've kind of made the

Page 199

1   distinction between flames and hot gases.

2           There really is no distinction other than

3   flames are luminescent hot gases that we can see within

4   the visual spectrum, but I understood what the defense

5   counsel -- how the distinction he was trying to make as

6   we talked about it.

7       Q.   Okay.  You were asked questions about CO levels

8   needed or necessary to incapacitate a person.

9           Do you remember some of those questions?

10      A.   I do.

11      Q.   Can we at least agree here, you're not a

12  medical doctor?

13      A.   I am not.

14      Q.   Any and all thoughts and opinions that you

15  might have with regards to CO intoxication that is

16  capable of incapacitating a person, that's just based on

17  things that you've seen and heard throughout your career

18  in investigating fires?

19      A.   And it's based on training that every fire

20  investigator received and I received multiple times over

21  the years to be maybe kind of a field indicator of what

22  a generalized amount of carbon monoxide is required, and

23  so forth.

24          It allows you to make some, uhm -- it really

25  comes into play for me in my investigations when I see

Page 200

1    the toxicology reports.

2        Q.   A person's level of CO intoxication depends on

3    a multitude of factors.  Would you agree?

4        A.   Yes.

5        Q.   The least of which is the age of the person.

6             There are other factors that play into to

7    determine whether or not a person is -- receives CO

8    exposure significant enough to incapacitate.

9        A.   There's a whole list in all the training

10   manuals and all the training that I've undertaken.

11            The only constant is the only way your body

12   intakes carbon monoxide is through respiration, through

13   breathing.

14       Q.   Was there any evidence that you reviewed either

15   through photographs, through your review of the

16   deposition testimony or your presence upon the premises

17   that would leave any doubt, in your mind, that the

18   origin of this fire was the hoverboard location in

19   Bedroom 4?

20       A.   No.  I'm expressing that opinion to a

21   reasonable degree of certainty within my chosen field of

22   fire and explosion investigation and analysis.

23       Q.   Okay.  And lastly, is there any piece of

24   evidence, of materials from this case that you have not

25   reviewed that you wish to review before these opinions

202 of 266

1    become final?

2        A.    No.

3            MR. AYALA:    Those are all my questions.    Thank

4    you, sir.

5

6                    FURTHER EXAMINATION+

7    BY MR. LaFLAMME:

8        Q.    A couple quick followup here, Mr. Schulz.

9            With respect to the lithium-ion batteries,

10    you're aware that they can expel their contents, or I

11    think as you termed it, the top pop off, due to an

12    external fire attack; correct?

13        A.    Yes, I agree with that.

14        Q.    Meaning just because the top popped off or the

15    top came off of a lithium-ion battery and it expelled

16    its contents, that, in and of itself, is not indicative

17    of an internal failure with that battery cell?

18        A.    No.    I was just trying to say that when the top

19    does come off, there's an expelling of its contents, it

20    usually gets ignited, and so you have a source of heat

21    energy.

22        Q.    Yeah.    And there's really two ways that it can

23    expel its contents.    One is from an internal failure in

24    that battery cell; correct?

25        A.    Correct.

1   Q.   And then the second is from an external fire

2   attack from another source; correct?

3   A.   Correct, but I would add to that in the

4   training that I've had is physical damage which would be

5   an external influence on the battery.

6   Q.   Okay.  Fair enough.  So there's three.

7   A.   Okay.

8   Q.   All right.  So just to recap, the three are

9   internal issue with the battery cell itself; two, an

10  external fire attack from another source; and then

11  three, physical damage to the cell in one respect?

12  A.   Correct.

13  Q.   Okay.  Do you know what the amperage was of the

14  circuit breaker that controlled the power to the smoking

15  shed?

16  A.   To the what?

17  Q.   The smoking shed.

18  A.   I don't recall, as I sit here.  I'd have to go

19  back and look at the photographs.  I think most

20  circuits, to my recollection, were 15 or 20 amp.

21  Q.   15 amp would be a normal circuit breaker for a

22  house; correct?

23  A.   A very common size.  15 and 20s are the very

24  common sizes.

25  Q.   Okay.  You don't know whether it was a 30 amp

Page 203

1    breaker for the outside portion of the house; correct?

2        A.   I don't.

3        Q.   All right.  If it's a 30 amp breaker and

4    there's an arc at the wiring, that would be less likely

5    to trip that breaker because of the higher amperage;

6    correct?

7             MR. AYALA:  Form.

8             THE WITNESS:  Exactly, which is -- yes.

9    BY MR. LaFLAMME:

10       Q.   Okay.

11       A.   That's why I said it depends on the amperage of

12   that electrical arc.

13            And so that's why -- well, when people ask me

14   is it safe to go by this bundle of four extension cords

15   for $12 at the checkout line at your Kroger or whatever,

16   I go, "No.  You've got to look at the size of the wire

17   because they will fail and your circuit breakers will

18   never see it happen."

19       Q.   So the higher the amperage of a circuit

20   breaker, the less likely it is for that circuit breaker

21   to trip in an arc situation; correct?

22            MR. AYALA:  Form.

23            THE WITNESS:  Yes, in an arc situation that is

24   less than the rating of the circuit breaker.

25   ///

Page 204

1    BY MR. LaFLAMME:

2        Q.    Okay.  You had discussed with Mr. Ayala some of

3    the deposition testimony from the Wadsworth children.

4            Do you agree that that deposition testimony was

5    given in May of this year; correct?

6        A.    Yes.

7        Q.    So more than two years after the fire; correct?

8        A.    Correct.

9        Q.    Okay.  And do you agree that, as a general

10   statement, people's memories are freshest in the closest

11   in time to the event?

12           MR. AYALA:  Form.

13           THE WITNESS:  I always agree to that as a

14   general statement, yes.

15   BY MR. LaFLAMME:

16       Q.    With respect to the disposal of smoking

17   material, you had indicated that there was no way to

18   reach that conclusion.

19           Do you recall that?

20       A.    Correct.  That's one of those fire causes that

21   even if that's what occurred, it's very hard to ever

22   prove or reach that conclusion without very credible

23   evidence.

24       Q.    And what you are getting at there is that the

25   careless disposal of the smoking material will be

1    subsumed within the fire damage material; correct?

2          MR. AYALA:  Form.

3          THE WITNESS:  Generally, that's the biggest

4    problem, yes.

5    BY MR. LaFLAMME:

6       Q.   Okay.  So in this situation --

7       A.   Either consumed or even recognized in the

8    processing of the fire scene.

9       Q.   Okay.  So in this situation, based on an

10   assumption that the fire started due to a careless use

11   of smoking material within the smoking shed, it is not

12   surprising to you that you would not be able to identify

13   the specific cigarette that was carelessly disposed of;

14   correct?

15         MR. AYALA:  Form.

16         THE WITNESS:  That wouldn't bother me, no.

17         MR. LaFLAMME:  Okay.  That's all the questions

18   I have, sir.

19         THE WITNESS:  Thank you.

20

21                  FURTHER EXAMINATION+

22   BY MR. AYALA:

23      Q.   In other words, a smoking material that is

24   carelessly disposed of, in this case, based upon the

25   facts and circumstances of this case, in order to

Page 206

1    conclude that that was the cause or the origin, rather,

2    of this fire, you'd have to speculate?

3            MR. LaFLAMME:  Object to form.

4            THE WITNESS:  Yeah, because in order to make it

5    conclusively, you would have to know -- you would have

6    to know four things about the smoking material.

7            You would have to know its temperature.  You

8    would have to know how much heat energy it was giving

9    off.  You would have to know the duration of that the

10   heat energy transfer.

11           You would have to know whether or not it had

12   its ability to transfer its heat energy to whatever

13   you're deciding the first fuel ignited is, and then

14   you'd have to know all about what the first fuel ignited

15   is and what its ignitability is from a particular

16   discarded smoking material.

17   BY MR. AYALA:

18       Q.   You'd have to ignore the testimony that

19   Stephanie and Matthew used the ashtrays, one of which

20   was clay and the other of which was cast iron?

21       A.   Correct, but it's that one that looked like a

22   little frying pan.

23       Q.   All right.  You'd have to ignore the testimony

24   or evidence that exists that they would have put out the

25   cigarette or the cigarettes before leaving the smoking

Page 207

1    shed?

2        A.    Yes.

3        Q.    You'd have to ignore the physical evidence

4    indicating the origin inside of the home?

5        A.    That's the biggest one for me.  The origin is

6    not out in the shed, and so I can dismiss the careless

7    use of smoking materials.

8              I'm not -- I do not believe, based on

9    experience all these years, is when somebody says,

10   "Well, I always put my cigarette out and I know it was

11   out," I don't ever rely on that.

12             That may be what they believe that they did.

13   It may or may not be the truth.

14       Q.    Which is why in doing what you do for all of

15   these years, you rely on the hard evidence, the physical

16   evidence that indicates the most likely origin?

17       A.    Correct.  And so in many cases where I have

18   believed it's careless use of smoking materials, I

19   always label those as undetermined.

20       Q.    This is not one of those cases?

21       A.    No.

22       Q.    By the way, you were asked questions about you

23   not being present for certain subsequent inspections of

24   evidence and things of that nature.

25             Did your absence from any other events in this

Page 208

1    case in any way, shape, or form limit your ability to

2    reach the conclusions you have?

3        A.    No.    All those examinations were focusing on

4    the cause of the fire.

5        Q.    And with regards to the question asked about

6    generally you have a better memory closer in time to the

7    event, obviously, you're not taking into account any

8    psychological factors relating to traumas and tragic

9    events?

10       A.    No.    And there's a whole bunch of -- I'll tell

11   you the thought that went through my mind when you asked

12   me that is one big factor is the interview, how is the

13   interview being conducted, what questions are being

14   asked, and so forth.

15           And so that's why I always agree that generally

16   it's closer in time, but if it's closer in time and it's

17   not a good interview conducted the way an interview

18   should be conducted and with your subject not being

19   under any distress or any medical or psychological

20   conflicts, it might not be better.    Generally, yes.

21           MR. AYALA:    Those are all my questions, sir.

22   Thank you.

23

24   ///

25   ///

Page 209

1                            FURTHER EXAMINATION+

2    BY MR. LaFLAMME:

3        Q.   Sir, you had indicated that all the

4    examinations that you did not attend were focusing on

5    the cause of the fire?

6        A.   That's my review -- based on my review of what

7    they photographed and what the protocols were.

8        Q.   Wasn't the August 2022 inspection focused on

9    the origin as well?

10       A.   I was thinking of laboratory inspections.

11       Q.   Okay.

12       A.   You are correct.  The August one was definitely

13   what was done on origin.

14       Q.   Okay.  Just making sure --

15       A.   No, no.  That's a good catch.  Thank you.

16       Q.   It sounds like you've attended a number of

17   seminars or training sessions that discuss lithium-ion

18   battery failures?

19       A.   You know, they've all been on-line training

20   actually.

21       Q.   Okay.  Have you ever experienced any on-line

22   training that has discussed the failure of two separate

23   lithium-ion batteries from an internal short circuit at

24   near the site simultaneous times?

25                  MR. AYALA:  Form.

Page 210

 1          THE WITNESS:  As I sit here, I don't recall

 2  anybody presenting that type of hypothesis.

 3  BY MR. LaFLAMME:

 4     Q.   And you've never heard of that type of failure

 5  situation in all your years of fire investigation;

 6  correct?

 7     A.   I have not.

 8          MR. LaFLAMME:  Okay.  That's all the questions

 9  I have.

10

11              FURTHER EXAMINATION+

12  BY MR. AYALA:

13     Q.   And just to be clear, your not being present at

14  the August inspection even relating to origin, does that

15  in any way, shape, or form prevent you from reaching the

16  conclusions that you have?

17     A.   No.

18          MR. AYALA:  Thank you, sir.

19          MR. LaFLAMME:  I don't have any more.

20          MR. AYALA:  He'll read, I'm sure.  We'll order.

21  We'll take an E-tran, whatever.

22              (Proceedings concluded at 2:30 p.m.)

23                    *   *   *

24

25

Page 211

1                              DECLARATION

2

3          I hereby declare I am the deponent in the within

4     matter; that I have read the foregoing deposition and know

5     the contents thereof, and I declare that the same is true

6     of my knowledge except as to the matters which are therein

7     stated upon my information or belief, and as to those

8     matters, I believe it to be true.

9          I declare under the penalties of perjury of the

10    State of California that the foregoing is true and

11    correct.

12          Executed this _____ day of _____,

13    2024, at _____, California.

14

15

16

17                    _____

18                              MICHAEL J. SCHULZ

19

20

21

22

23

24

25

Page 212

1                    REPORTER'S CERTIFICATE

2

3          I, Joy E. Shure, a Certified Shorthand Reporter,

4    holding a valid and current license issued by the State of

5    California, CSR No. 3659, do hereby certify:

6          That said proceedings were taken down by me in

7    shorthand at the time and place therein set forth and

8    thereafter transcribed into typewriting under my direction

9    and supervision.

10          I further certify that I am neither counsel for

11    nor related to any party to said action nor in anywise

12    interested in the outcome thereof.

13          Before completion of the deposition, review of

14    the transcript [X ]was [   ]was not requested.

15          The dismantling, unsealing, or unbinding of the

16    original transcript will render the Reporter's certificate

17    null and void.

18

19          IN WITNESS WHEREOF, I have hereunto subscribed my

20    name on this 25th day of September, 2024.

21

22

23                    _____

24                    Joy E. Shure, CSR No. 3659

25