# EXHIBIT 9

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3    STEPHANIE WADSWORTH, ET AL,

4              Plaintiffs          Case No.

5       vs.                        2:23-CV-00118-NDF

6    WALMART, INC., ET AL,

7              Defendants

8    _____/

9          Pursuant to Notice, the videotaped

10        deposition of SAMUEL SUDLER, III was taken on

11        Friday, November 22, 2024, commencing at 10:05

12        a.m., at the offices of Veritext Legal

13        Solutions, 36 S. Charles Street, Suite 2002,

14        Baltimore, Maryland before David C. Corbin, a

15        Registered Professional Reporter and Notary

16        Public.

17

18

19

20

21          REPORTED BY:  David Corbin, RPR

1              A P P E A R A N C E S

2        ON BEHALF OF THE PLAINTIFF:

3              RUDWIN AYALA, ESQUIRE (via Zoom)

4              Morgan & Morgan, Tampa, P.A.

5              1700 Palm Beach Lakes Blvd, Suite 820

6              W. Palm Beach, Florida  33401

7              rayala@forthepeople.com

8        ON BEHALF OF THE DEFENDANT:

9              JARED GIROUX, ESQUIRE

10             McCoy, Leavitt, Laskey

11             202 US Route 1, Suite 200

12             Falmouth, Maine  04105

13             JGiroux@mlllaw.com

14

15     VIDEOGRAPHER:  Adam Nudelman

16

17

18

19

20

21

Page 3

1                          I N D E X

2     Name of Witness

3     Samuel Suder, III

4     Examination:                              Page

5     By Mr. Ayala                               5

6

7                       E X H I B I T S

8       Exhibit 1 C.V.                           10

9       Exhibit 2 Sudler report                  11

10      Exhibit 3 Fee schedule                   12

11      Exhibit 4 Sudler testimony log           13

12

13

14

15

16

17

18

19

20

21

Page 4

1          IT IS HEREBY STIPULATED AND AGREED that

2    the reading and signing of this deposition are not

3    waived.

4          VIDEOGRAPHER:  This is media unit number

5          one in the videotaped deposition of Mr. Samuel

6          G. Sudler, the Third, in the matter of

7          Stephanie Wadsworth, et al, versus Walmart,

8          Inc, et al, in the U.S. District Court in and

9          for the District of Wyoming.  Case number

10         2:23-CV-00118-NDF.  Today's date is

11         November 22nd, 2024.  Time on the record,

12         10:05 a.m.  Videographer today is Adam Nudelman

13         representing Veritext.  This deposition is

14         taking place hybrid.  The witness is in the

15         Veritext offices, 36 South Charles Street,

16         Baltimore, Maryland.  Would all attorneys

17         present please identify themselves, state whom

18         they represent, beginning with the party that

19         noticed this proceeding.

20          MR. AYALA:  Rudy Ayala on behalf of the

21         plaintiffs.

Page 5

1           MR. GIROUX:  Jared Giroux on behalf of the

2      defendants Jetson and Wal-mart.

3           VIDEOGRAPHER:  Court reporter today, Dave

4      Corbin, also with Veritext will now administer

5      the oath and we can proceed.

6                SAMUEL SUDLER, III,

7  duly been sworn/affirmed to tell the truth, the

8  whole truth, and nothing but the truth, testifies as

9  follows:

10                E X A M I N A T I O N

11  BY MR. AYALA:

12      Q.   Good morning, sir.  Again, we've met

13  before and I reintroduced myself before the

14  deposition.  So it's good to see you again.  My

15  understanding is you are where, in Baltimore?

16      A.   Yes.

17      Q.   Okay.  How is the weather up there?

18      A.   Right now we're looking at flurries.

19      Q.   I just had to rub it in because we're

20  having a very rare cold front and it's about 63

21  degrees here.

Page 6

1          A.    We would kill for 63.

2          Q.    Well, it's good to see you again.

3          A.    Good to see you.

4          Q.    Obviously we have the opportunity today to

5     chat a little bit about this Wadsworth case, and

6     let's start out as we typically do in these

7     depositions, please state your name?

8          A.    Samuel George Sudler, the Third.

9          Q.    Mr. Sudler, is it okay if I call you

10    Mr. Sudler for purposes of today?

11         A.    That's fine.

12         Q.    This is not your first deposition.

13         A.    No, sir.

14         Q.    I'm not going to bore you with the ins and

15    outs and ground rules of depositions.  Certainly you

16    know them very well by now.  The only thing I'll say

17    is because of the unique nature of remote versus

18    live where you are, I just ask that you allow me as

19    best you can to finalize any questions so that we

20    don't talk over each other.  It will make the court

21    reporter's job a whole heck of a lot easier if

Page 7

1  we can both do that.  I don't know how long we will

2  be today.  Obviously at any point in time if you

3  need a break, as long as there is no question

4  pending, just let me know that and we will go ahead

5  and accommodate that break, okay?

6      A.    I will do so.

7      Q.    And of course if you don't understand my

8  question or we in fact do lose connection, once we

9  reestablish just let me know that and I'll make sure

10  that I restate it or rephrase my question.  Fair?

11      A.    Fair.

12      Q.    Okay.  Sir, my understanding is that

13  you've been retained as an expert forensic engineer

14  in this matter and have prepared some opinions and

15  conclusions that you'll be sharing with us today

16  regarding your review of this case.  Is that fair?

17      A.    That's fair.

18      Q.    Okay.  I was provided a couple days ago

19  with a report which also included a C.V., trial

20  testimony, and a fee schedule totaling 67 pages

21  altogether.  Based on your understanding, and I

Page 8

1    would assume provision to counsel who retained you,

2    does that sound about right in terms of report,

3    C.V., fee schedule, and trial testimony?

4         A.   Yes, it does sound right.

5         Q.   As part of the notice duces tecum we have

6    certainly some materials we requested, but do you at

7    the very least have a copy of your report with you

8    today?

9         A.   Yes, I do.  I have a physical copy of it.

10        Q.   Perfect.  Do you have a copy of your most

11   current C.V. as well?

12        A.   Trying to see if this -- I mean this here.

13   One moment.

14        Q.   If you don't, that's okay, I'll ask you if

15   the one that was provided to us is up-to-date?

16        A.   Yes, I believe it is up-to-date.  Yes,

17   sir.

18        Q.   Okay.  We have a -- at least an issue date

19   for this report of September 13th, 2024, but to your

20   understanding the C.V. that's included and begins

21   right around page 40 of that compilation document

Page 9

1    that is the most up-to-date C.V. that you have?

2         A.   That is correct, yes, sir.

3         Q.   Okay.

4         A.   And I'm going to jump to -- electronically

5    I'm going to jump to it on page 40, because I don't

6    have it electronically.  I mean physically.

7         Q.   Not a problem.  At any point in time, sir,

8    if you need to jump to whatever document, whether

9    electronic or paper, just let me know that we will

10   follow along as best we can.

11        A.   Okay.  No problem.

12        Q.   The report that you prepared in this case,

13   issue date September 13, 2024, is that the first and

14   only version of the report prepared in this case?

15        A.   This is the only version that I have, sir.

16        Q.   And so that report encompasses pages one

17   through 39, correct?

18        A.   Just double checking now.  Yes.  One

19   through 39, correct.

20        Q.   Okay.  So we're going to go ahead and we

21   will attach -- and Jared, you know this is the game

```
                                                    Page 10
 1    that we always play, I don't know what number we're
 2    up to, so we will figure that out in time.  We will
 3    attach, sir, your C.V. as the first exhibit to your
 4    deposition.
 5         A.   Okay.
 6              (Deposition Exhibit 1 marked.)
 7         Q.   And we will attach the 39 page report with
 8    an issue date of September 13, '24 as a second
 9    exhibit to your deposition.
10         A.   Okay.
11              CONCIERGE:  Which tabs are those,
12         Mr. Ayala?
13              MR. AYALA:  I'm sorry.
14              CONCIERGE:  Which tabs?
15              MR. AYALA:  Hold on.  Hold on.  So tab one
16         will be the first exhibit.
17              CONCIERGE:  Yes, sir.
18              MR. AYALA:  And then I don't know that the
19         report has a separate tab.
20         A.   It doesn't.
21              CONCIERGE:  So we're saying report.
```

Page 11

1          A.    It's tab ten.

2                CONCIERGE:  Okay.

3                MR. AYALA:  Okay.

4                (Deposition Exhibit 2 marked.)

5          Q.    The fee/cost summary that was included as

6    part of this compilation, that is up-to-date as to

7    your current billable rate per hour?

8          A.    Yes, sir.

9          Q.    And that is currently $450 per hour?

10         A.    That is correct.

11         Q.    That -- and is that a flat 450 regardless

12   of the separate or individual tasks that you're

13   performing, whether review, inspection or otherwise?

14         A.    That is correct.

15         Q.    If this case proceeds to trial as expected

16   in March of next year, do you anticipate going live?

17         A.    Going?  I'm sorry, I didn't hear the last

18   part.

19         Q.    Sure.  Do you anticipate going live to

20   trial?

21         A.    Yes.  Yes, sir.

Page 12

1      Q.   And if you go live to trial, would you

2  continue to charge at a rate of 450 per hour?

3      A.   Unless the company raises my billable

4  rate, it should be 450 an hour.

5      Q.   Is that rate for trial, would that include

6  travel time as well?

7      A.   Yes, sir.

8      Q.   We will attach this fee schedule, which is

9  tab three, as a third exhibit to your deposition.

10      A.   Okay.

11           (Deposition Exhibit 3 marked.)

12      Q.   And this is just a one page document,

13  correct?

14      A.   That is correct.

15      Q.   Now I see the separate tab ten for your

16  report.  Thank you.  You have included a testimony

17  log pursuant to Federal Rule 26 which is a total of

18  two pages, correct?

19      A.   Yes, two pages, correct.

20      Q.   The oldest case on the list is a Christina

21  Nolan case from December 2020; is that correct?

Page 13

1      A.   No.   The -- well, that's the -- yeah,

2   that's the -- that's the oldest one is -- yes,

3   December 16.  I was looking at the first page.  My

4   apologies.  Yes.

5      Q.   All good.  All good.  Okay.  So in looking

6   at this testimony log, are there any cases on here

7   where you've given deposition testimony where you've

8   been retained by the current counsel or counsel's

9   office that has retained you in this case?

10      A.   I'm going through it now.  My apologies,

11   I'm just looking at it.

12      Q.   Okay.

13      A.   To my knowledge, no, sir.

14      Q.   Before I forget, we will attach this

15   testimony log as the fourth exhibit to your

16   deposition.

17          (Deposition Exhibit 4 marked.)

18      Q.   And that's tab two.  Any of the cases here

19   on the testimony log relate to a hoverboard fire or

20   explosion?

21      A.   I'm just going through now.  My apologies.

Page 14

1   Let me see.  No, sir.

2        Q.   Aside from this testimony list going back

3   four years, do you have any recollection of a case

4   in which you've given deposition testimony relating

5   to a hoverboard fire or explosion incident?

6        A.   Not that I recall, sir.

7        Q.   How about trial testimony for a similar

8   type of case?

9        A.   No, sir.

10        Q.   Have you ever had any of your opinions

11   either stricken or limited by a court?

12        A.   Not to my knowledge, no, sir.

13        Q.   This case list that you have, the

14   fourth exhibit to your deposition, any of those

15   cases relate to a mobility device?

16        A.   Not a mobility device, no, sir.

17        Q.   All right.  Any of them relate to a

18   vehicle?

19        A.   I guess you could call it a vehicle, a

20   forklift.

21        Q.   Okay.  Which case was that?

Page 15

1        A.    If you go on the first page, Kevin Cole

2   and Selena Cole v. Crown Equipment Corp.

3        Q.    Got it.  The first listing on your

4   testimony log?

5        A.    Correct.

6        Q.    Is that --

7        A.    Go ahead.

8        Q.    Is that still going on?

9        A.    That I do not know.  No, I actually

10   believe it is going on, meaning I think it's set for

11   trial but it's been moved.  But it is still going

12   on.

13        Q.    Okay.  And in that Cole case, it looks

14   like it's sitting in Knox, Indiana.  You've been

15   disclosed as an expert, a forensic engineer in that

16   case, and being called to or at least expected to be

17   called to trial?

18        A.    Yes, sir, as an electrical controls

19   engineer.  Yes, sir.

20        Q.    Okay.  What are the -- if you can give me

21   the 35,000 foot high view of what your scope in that

Page 16

1    case is?

2         A.   My scope in that case was to look at the

3    electrical control system and see if there were any

4    issues with the control system allowing the truck to

5    stop, and evaluating from that standpoint.

6         Q.   Got it.  Sitting here today, do you recall

7    having been retained in any case relating to a

8    hoverboard fire or explosion other than this one?

9         A.   Retained?

10        Q.   Yes, sir.  As an expert witness?

11        A.   Yes.  Yes.  I've been retained in

12   hoverboard cases, yes, sir.

13        Q.   When was the last time you were retained

14   in a hoverboard case other than this one?

15        A.   I can't recall.  I can't recall.

16        Q.   Would it have been prior to 2016?

17        A.   Yes, there would have been cases prior to

18   2016 I would have been retained on hoverboard cases,

19   yes.

20        Q.   Aside from this Wadsworth case, have you

21   been retained on a hoverboard case since 2016?

Page 17

1        A.    Yes, I have.  I just don't know offhand,

2    but, yes, I have.

3        Q.    Do you recall -- well, are you currently

4    retained on any other hoverboard case?

5        A.    That's a good question.  I can't think of

6    any right now.  I may be but none that are scheduled

7    for deposition or trial.

8        Q.    Are you currently working with defense

9    counsel and/or their firm on any other hoverboard

10   case?

11       A.    Not currently, no.  Not that I recall.

12   Not currently.

13       Q.    You've been retained by them on other

14   hoverboard cases in the past?

15       A.    I think there have been a few, yes.

16       Q.    Were you retained by them in the

17   Pennsylvania case a few years back?

18       A.    I believe so, yes.

19       Q.    The Pennsylvania case that you were

20   retained -- you were retained on, that one was also

21   filed against Jetson Electric Bikes, correct?

Page 18

1          A.    I believe it was.

2          Q.    Amongst others?

3          A.    Yes.   There were a number of parties

4    involved, yes.

5          Q.    Okay.   The scope of your review of your

6    services in that Pennsylvania case, were they

7    similar to what you've been asked to do and tasked

8    to do in this case?

9          A.    No, a little different.   In that case I

10   was looking at the electrical control system for the

11   house, the structure, other items that they had in

12   the room, and other artifacts that included at the

13   remains of a hoverboard.

14         Q.    Okay.   Did you ultimately render any

15   conclusions or opinions in that Pennsylvania case?

16         A.    I believe I did.   I can't recall what they

17   are right now specifically but I believe I did, yes,

18   sir.

19         Q.    Were you deposed in that case?

20         A.    No.   No, sir.

21         Q.    Did you do a report in that case?

Page 19

1          A.    I believe I did.

2          Q.    Again, a 35,000 foot high view, do you

3     recall if the ultimate opinions or conclusions you

4     reached in that Pennsylvania case were ultimately

5     that there were no deficiencies or malfunctions in

6     the Jetson hoverboard involved in that case?

7          A.    I can't remember the specifics, but if I'm

8     recalling correctly, my opinion was that it was due

9     to another ignition source, not the Jetson

10    hoverboard.

11         Q.    Aside from that Pennsylvania case and this

12    case, have you been retained on any other cases in

13    which Jetson Electric Bikes is a defendant?

14         A.    I may have, I just can't recall any right

15    now.

16         Q.    In any o the other cases in which you may

17    have been retained where Jetson is a defendant, have

18    you ever found that Jetson, either hoverboards, or

19    electric bikes that they also manufacture or design,

20    have you ever found them to be deficient or

21    defective?

1          A.    In the cases that I've looked at, and I

2     don't recall the number, but the cases I've looked

3     at for Jetson, I have not found one in those cases,

4     no, sir.

5          Q.    Just going through your C.V. here, and

6     I've attached it so I'm not going to go through each

7     and every detail, it's voluminous, a testament to

8     your experience, but let me ask you a few questions.

9          A.    Sure.

10         Q.    One mostly out of curiosity that I have.

11         A.    Sure.

12         Q.    You have beginning on page three of your

13    C.V., you have a section titled Professional

14    Registrations.  I haven't gone through line by line,

15    but are you licensed in every single state in the

16    country?

17         A.    No, all but three.

18         Q.    Okay.  Which are the three?

19         A.    The three are Hawaii, Alaska, and New

20    Jersey.

21         Q.    I don't need to ask why not in New Jersey.

Page 21

1    But let me ask the converse.  Why are you licensed

2    in virtually every other state in the country?

3         A.   It was -- well, for me, depending on the

4    investigations, you have to be licensed as a

5    profession engineer in order to do forensic work.

6    For example, the State of Montana, you can not go

7    and investigate unless you have a license.  I

8    believe Alabama may be another.  So there's certain

9    states and jurisdictions that require you to be

10   licensed.  In addition, it's just easier to be able

11   to do investigations or conduct investigations when

12   you're licensed in those states.

13        Q.   Okay.  And like what does it take to get

14   licensed in all of these 47 states.  Are they

15   reciprocal licenses or do you sit for examinations?

16        A.    It's interesting.  The actual electrical

17   engineering professional engineers license exam is

18   the same.  So that's the one I took back in 2001.

19   But certain states have it where you have to sit and

20   take an ethics exam related to their state laws.  So

21   it really depends.  But as far as the testing, what

Page 22

1    we call practice and principles exam, that test is

2    accepted by all of the states.

3        Q.    Understood.  So I guess similar in some

4    cases with the bar, for us lawyers there are some

5    states that accept the reciprocal, I guess, results

6    from one state, but they might have additional

7    requirements whether ethical requirements or

8    otherwise?

9        A.    That is correct, yes, sir.

10        Q.    The 47 or so states and Commonwealth in

11    this list, all of those licenses are current and

12    active?

13        A.    That is correct, they are.

14        Q.    Have you ever had any of your licenses

15    either suspended, you know, taken away or

16    reprimanded in any fashion?

17        A.    No, sir.  No, sir.

18        Q.    Have any of your licenses ever lapsed?

19        A.    I had one that lapsed like two weeks

20    because they were working on the website.  And after

21    I paid it they put it back in, but that was it.

Page 23

1       Q.   Okay.  Which one was that one if you
2    recall?
3       A.   If I recall, I think it was -- hold on,
4    give me a second.  Oregon.  Oregon was still one of
5    the paper -- I call it a paper state where they had
6    to actually receive the paper document.  And there
7    was a miscommunication but I cleared it up, wasn't
8    an issue at all.
9       Q.   Okay.
10      A.   Yup.
11      Q.   Are you required to go through any type of
12   renewal testing, examination or anything of the sort
13   for your licenses?
14      A.   Not testing.  We have professional
15   development hours or continuing development hours we
16   have to maintain in certain states.  And most of the
17   states have adopted it.  So it's the equivalent of
18   about 15 professional development hours per year
19   related to your field of study.  And you have to
20   also include I believe it's two hours or so of
21   ethics per year also.

Page 24

1      Q.   Okay.  Again, similar to our CLE's or

2   continuing legal education.  Do you -- when you take

3   some of those courses, whether it's the ethics based

4   or otherwise, are you able to use them for multiple

5   states requirements?

6      A.   Yes, yes.  That's the beauty of it.  Well,

7   my organization has contacted the states many years

8   ago, it's the National Academy of Forensic

9   Engineers, and I take their courses.  I also teach

10  some of the courses there.  But they are accepted by

11  all of the states.

12     Q.   Okay.

13     A.   Yup.

14     Q.   And when you say my organization, are you

15  referring to SEA Limited?

16     A.   No, no, no.  The National Academy of

17  Forensic Engineers.

18     Q.   Okay.  Got it.

19     A.   Yeah.  Professional organization, that's

20  what I meant by that.  Yes.

21     Q.   Understood.  Understood.  You have --

Page 25

1    along those lines, you've listed in your C.V. many

2    certifications that you currently hold, and some of

3    these are in fact sanctioned if you will by the

4    National Academy of Forensic Engineers such as your

5    board certification as a diplomat in forensic

6    engineering, correct?

7        A.    That is correct.

8        Q.    You're also a certified fire and explosion

9    investigator and a certified vehicle fire

10   investigator?

11       A.    That is correct.

12       Q.    You're a certified model law engineer by

13   the National Council of Examiners for Engineers and

14   Surveyors, correct?

15       A.    That is correct.

16       Q.    What does that mean?

17       A.    What that means is that the people who

18   administer the professional engineers license exam

19   is the National Council of Examiners for Engineers

20   and Surveyors.  What that means is this they went

21   through my complete background and verified that my

Page 26

1    experience, the taking of the fundamentals of

2    engineering exam, having experience after that and

3    taking the practice and principles exam meets the

4    requirement of what they call model law engineering.

5    All of the states have a model law.  If you follow

6    the following credentials you can be licensed in

7    this state.  And that was verified by NCEES.

8         Q.   Got it.

9         A.   Yup.

10        Q.   And the last certification listed on here

11   is certified lean six sigma black belt by Six Sigma

12   Qualtech, Inc.  I mean is that what I think it

13   means, you're a black belt?

14        A.   From the standpoint of manufacturing, yes,

15   sir.  Not martial arts.  But, yes, I am a six sigma

16   black belt.

17        Q.   I was a little confused by that which is

18   why I'm not there live, sir.

19        A.   Yeah, no, that was through Six Sigma

20   Qualtech when I was at Pilkington Libbey Owens Ford.

21        Q.   Got it.  Got it.  Other than that you've

Page 27

1    listed -- under standards, technical committes,

2    you've listed quite a few.  You've talked about

3    being a member of the American National Standards

4    Institute, or ANSI, Underwriters Laboratories, UL,

5    technical committee, and listed various certain

6    standards under the UL, if you will, model.

7         A.    Yup.

8         Q.    Am I to understand that you have served on

9    technical committees under or on behalf of

10   Underwriters Laboratories?

11        A.    No.  I serve as a member of those

12   technical committees for Underwriters Laboratories.

13   So I represent what they call a general interest,

14   okay.  And since it's an ANSI technical committee,

15   you can't have one interest group have more than

16   30 percent membership.  So what it allows me to do

17   is to sit on those committees to make comments,

18   suggestions, or to vote on those related to the

19   various standards that you see there.

20        Q.    Okay.  All right.  And obviously there is

21   not dates or anything attached to all these and it

Page 28

1    goes on to various pages.  But by way of example, do

2    you know how long you've served as a member on the

3    technical committees for UL 2272?

4         A.   I would say it's probably around the range

5    of 2020 or 2021.

6         Q.   How about for UL 2271?

7         A.   It would probably be the same.

8         Q.   As a member on those technical committees,

9    do you engage in any type of agreement or contract

10   with UL that outlines, I guess, the scope or

11   agreement of whatever it is that your tasks and

12   duties might be?

13        A.   Just the agreement that if you have a

14   conflict of interest that you raise that.  That you

15   follow the ethical standards related to it.  But

16   beyond that -- that's the only contract to make sure

17   that in good faith that you're evaluating the

18   standards in the interest of public safety, things

19   of that nature.

20        Q.   Do -- does UL require you to disclose any

21   litigation that you're currently involved in where

Page 29

1    you serve as an expert dealing with some of those

2    standards on which you are a committee member?

3         A.    No, sir.  No.

4         Q.    Have you been involved in drafting any

5    portion of the UL 2272 standard?

6         A.    Drafting?  I wouldn't say drafting.  I

7    would probably say voting on the last time it came

8    up for a vote.  But I can't tell you when the date

9    was.  Periodically we go back and evaluate them, but

10   I couldn't give you a date.

11        Q.    Okay.  You can't give me a date as it

12   relates to UL 2272 or 2271?

13        A.    That is correct, I can't recall.

14        Q.    At the very least we can agree it would

15   have been after 2020 or 2021 when you became

16   involved as a member?

17        A.    It would definitely be after 2020, yeah,

18   or 2021, yes, sir.

19        Q.    Do you have to pay any type of membership

20   fees to be on those technical committees?

21        A.    No.  This is all volunteer, yes.

Page 30

1      Q.    Do you know approximately how many people

2   serve as members on the technical committee for UL

3   2272?

4      A.    No, I don't know, but you can go to the

5   roster and count them up if you want to.  It's

6   publicly available if you go to the website you'll

7   see it.

8      Q.    Okay.  I'm going to go through this, there

9   is various pages for that.  And then you have a

10  section of your C.V. talking about publications.

11  And from my quick review and untrained eye it looks

12  like you've been fairly involved with the Defense

13  Research Institute, correct?

14     A.    I mean as far as the publications go.  And

15  it's because of the requirement.  Whenever you

16  present for DRI you have to write a paper.  So I

17  mean I've presented in other instances, but as far

18  as publications, that's why you see it that way.

19     Q.    Okay.  And what is DRI?

20     A.    Defense Research Institute.  It's a

21  conglomeration of I think attorneys relating to

1    defense work, things of that nature.

2        Q.   Okay.  So defense attorneys and also

3    in-house counsel for certain companies and

4    corporations?

5        A.   It could be.  I know the FDCC has that,

6    Federation of Defense and Corporate Counsel, but I'm

7    not sure about the makeup of DRI.

8        Q.   Okay.  Just changed screens and lost your

9    C.V.  Give me a minute, hold on.

10       A.   Okay.

11       Q.   Okay.  Yeah, so you've -- according to

12   this listing at least, you have published "The

13   Evolution of Batteries Utilized in Outdoor Power

14   Tools and Vehicles" for DRI back in 2022?

15       A.   Correct.

16       Q.   And a few other publications including

17   "Use of 3D Printing in Forensic Investigations, the

18   Forensic Engineer as an Expert: Developing Your

19   Construction Defect Case Defense", and "Who Is In

20   Charge Here, Management of the Complex Fire Scene",

21   all on behalf of DRI, correct?

Page 32

1     A.   Yeah, there's one other one above that,

2    "Management of Catastrophic Industrial or

3    Construction Disasters: From Prevention To

4    Preservation" for the FDCC.

5     Q.   Yes, sir.  And I was trying to limit it to

6    the DRI one.

7     A.   Okay.  I'm sorry, go ahead.

8     Q.   You're fine.  You're fine.  But does

9    this -- does this list encompass all of the

10   publications that you have either individually

11   authored or at the very least been involved in on

12   behalf of any professional entity, whether DRI,

13   Federation of Defense and Corporate Counsel, or

14   otherwise?

15    A.   That's an interesting question.  The

16   reason I say that is because when I was Chairman of

17   the Board of Ethical Review, those cases were

18   actually published.  So if you count that, and that

19   was when I was chairman, this would not be all

20   encompassing.  Those are ethical cases.  So to

21   answer that properly, this wouldn't be the only

1    thing.  These are the things where I published it

2    and presented, I'll put it that way.

3        Q.   Understood.  Are there -- aside from

4    publications, we can at least agree there are

5    instances where you have presented, whether by way

6    of lecture, seminar or otherwise, on various topics

7    in the field of engineering, fair?

8        A.   Yes, that is fair.  Yes, sir.

9        Q.   And my understanding is just from review

10   certainly of your C.V. but some other materials is

11   that you have presented on behalf of DRI, you've

12   presented on behalf of various defense bar

13   associations throughout the country?

14       A.   Yes, I have, and I've also done some for

15   NAST too, if I'm not mistaken.

16       Q.   By way of example, you presented for the

17   Virginia Association of Defense Attorneys on "tips

18   of effective cross examination of engineering

19   experts"?

20       A.   I'm trying to see where that is.  Give me

21   one second.

1      Q.   As they used to say back in the 1990's,

2   it's on the world wide web?

3      A.   Yes, yes, yes.  That was -- I'm smiling

4   because I know specifically what that is.  That was

5   where they gave experts in the area like a file and

6   said, okay, study this.  And it was really used for

7   attorneys to get familiar with cross-examining

8   experts.  So we would have to study this case file

9   and then act as the witness for that case.  It was

10   in front of an actual judge.  It was pretty cool for

11   the attorneys.  But that's what that's involving

12   when you see that.

13      Q.   Got it.  So it was a mock deposition?

14      A.   No, trial.  Mock trial.  They actually --

15   they actually had a retired federal judge, which

16   was -- that was what was interesting.  And he

17   actually gave them insight when they were presenting

18   both as defendant and plaintiff.  So we were just

19   basically players in their courtroom.

20      Q.   Got it.  That was going to be my question

21   really, the review and the critique was for the

Page 35

1   attorneys as opposed to for you as a witness?

2       A.   That is correct, yes.  Yes.

3       Q.   And have you presented for the Virginia

4   Association of Defense Attorneys in any other -- any

5   other fashion other than this "tips on effective

6   cross-examination"?

7       A.   No, I think that was it.  Just to be

8   available.  Because as I said, it was difficult to

9   find experts to come in.  But that would be it, to

10  assist them with the attorneys trying to get

11  familiar with the process.

12      Q.   Okay.  There was a portion of that

13  presentation at least as again as listed on the

14  world wide web that talked about "how to prevent

15  your engineering expert from being excluded."  Did

16  you participate in that discussion at all?

17      A.   Yeah, that was the -- what was the whole

18  thing.  That was all part of it.  So when they gave

19  you the case study, it was -- it was real.  You

20  know, like, okay, I studied facts, but when I as on

21  the stand it was like a real direct and cross

Page 36

1    examination.  And the judge was making actual

2    rulings on it.  That's what they meant by that.

3        Q.    Okay.

4        A.    Yeah.

5        Q.    Did you either before or after the mock

6    testimony that you gave, were you involved in the

7    discussion on that topic of precluding -- preventing

8    an engineer expert from being excluded?

9        A.    No, no.  I sat there and listened, but no,

10   like I said, I was just, you know, an actor in their

11   play.  But, no, I didn't participate in it itself.

12   I stay in my lane.

13       Q.    So having sat through that and listened,

14   what did you learn?

15       A.    It was essentially what I thought before,

16   that the opinions you give as an expert need to be

17   within a reasonable degree of engineering certainty,

18   has to have a basis.  And you have to make sure that

19   you do your homework and understand that when you're

20   cross-examined they are coming after deficiencies

21   and you just have to be prepared for it.

1          Q.    All right.  We talked a little bit about

2    your involvement with DRI.  DRI at least again from

3    some materials I looked at, that's the largest bar

4    association of civil defense attorneys and inhouse

5    counsel, did you know that?

6          A.    I did not know that, no, sir.  No.

7          Q.    There was a conference back in 2018 that

8    you were a part of it in D.C.  Do you remember your

9    participation in that?

10         A.    I think I do remember that.  I think I

11   presented on evidence, a collection of evidence, if

12   I'm not mistaken.

13         Q.    I think you're right.  The topic from what

14   I can see protocols and fire scene investigation, do

15   you remember that?

16         A.    Yes, yes.  I do remember that, yes.  It

17   was one of the few times they didn't require us to

18   write a paper either.

19         Q.    And in that, in the portion that

20   involved -- that had your involvement, there was a

21   section titled quick hits and it said "it's one

Page 38

1  thing to go to a fire scene find and preserve

2  physical evidence or test a product for litigation,

3  but it's something else to do it so that your client

4  is protected.  Sometimes issues come up and counsel

5  and consultants are challenged to make quick

6  decisions that can have long term consequences.  Be

7  ready to answer the tough questions on the fly with

8  step by step guidelines from these quick hits."  Do

9  you recall talking on those issues?

10        A.   I didn't talk on those.  That's the

11  interesting thing about a DRI presentation.  When

12  you present, you're presenting actually with an

13  attorney.  And the attorney was addressing those

14  things.  I was there to show them how to properly

15  identify evidence, to collect it falling under ASTM,

16  I forget what the collection number is, but under

17  the ASTM standards.  So I showed them how you would

18  do it on the scene.  But as far as what you just

19  mentioned, the attorney, and I can't remember who

20  the attorney was presenting, that's the attorney was

21  addressing those issues that you're talking about.

1       Q.   Got it.  Got it.  You've also been

2   involved in I guess some publications from the

3   Federation of Defense and Corporate Counsel as

4   referenced.  And at least in looking at that, that

5   publication, it discusses and it states that NFPA

6   921 should be relied on by companies in

7   investigating fire events and dealing with

8   litigation relating to a fire event because, quote,

9   "the guide allows the company to present the most

10  compelling evidentiary case should the incident

11  reach trial", end quote.  Do you recall reviewing

12  that from the publication that you were involved

13  with?

14       A.   Yeah, we -- well, I wrote it with a number

15  of attorneys, and I think one of the attorneys made

16  that comment.  And that's what they would say.  I

17  was covering it more from the standpoint of

18  following the scientific methodology and dealing

19  with the public sector and understanding when you

20  come to a scene, if it's still under the

21  jurisdiction of the public, you're essentially a

1  guest.  And until they turn the scene over, you

2  don't get that information so you have to sit there

3  and rely on discretion and also relationship

4  building to see if you can get access to the scene.

5  I had an advantage, specifically with ATF in

6  Chicago, I was free labor, okay.  So they didn't

7  have a -- they had one electrical engineer who

8  covered the country, so they knew that ethically I

9  would go in and evaluate it.  So they would allow me

10  to come on to the scene, look at the electrical for

11  them, and get on to the scene.  But that's what it

12  really was talking about from my standpoint, you

13  know, working with the public sector and

14  understanding before they turn it over.  It's really

15  their jurisdiction.

16        Q.   Got it.  Got it.  There was another

17  comment in and around that last one, and I want to

18  see if you're involved at all with this.  It states

19  that -- that NFPA 921 teaches that "companies that

20  have already taken a proactive approach to disaster

21  prevention and management are better equipped to

```
                                              Page 41

 1    save substantial sums typically incurred in

 2    litigation costs, fines, and penalties and defending

 3    against citations issued by regulatory agencies."

 4    Were you involved in at all in that analysis?

 5            A.    No, sir, not at all.  No.

 6            Q.    Okay.

 7            A.    That is -- that is out of my lane.

 8            Q.    Okay.  And it went on to say "a proactive

 9    approach minimizes negative public sentiment

10    regarding the accident and will enhance the

11    company's ability to avoid damage to stock value and

12    reputation or a potentially catastrophic damage

13    award by a court or jury."  Were you involved in

14    that analysis from that same publication?

15            A.    No, sir.  No.

16            Q.    Okay.  We talked certainly quite a bit

17    about DRI.  What plaintiff -- what plaintiff

18    organization or professional associations have you

19    presented at that you recall?

20            A.    National Association of Subrogation

21    Professionals.  I had one in 2005 but I've done
```

Page 42

1    small lunches for them before just discussing it.

2    It's been some time.  But that's who I used to

3    present to in the Illinois area.

4         Q.   Okay.  When you say it's been some time, I

5    mean what are we talking, how many years?

6         A.   Oh, that would have been when I was still

7    in Chicago.  So maybe 2009, 2010.

8         Q.   Okay.  And it's your understanding that

9    you said the National Association of Subrogation

10   Professionals, sir?

11        A.   Correct.

12        Q.   It's your understanding that that's a

13   plaintiff's professional association?

14        A.   Well, not plaintiff.  I look at it as, and

15   again I'm an engineer so I'm looking at it as

16   usually there is a plaintiff, there is a defense.

17   So subrogation to me is plaintiff even though

18   technically from you guys standpoint it's probably

19   not.  So that's what I meant by that.

20        Q.   Okay.  Well, that's your job to use me.  I

21   look at subrogation and that's not a plaintiff.

Page 43

1          A.    Yeah.  Again, from my standpoint it's

2     like, okay, it's one side or the other that hires

3     you.  Technically a subrogation, so I would say if

4     you say it strictly as a plaintiff firm, then

5     probably not, no (Mark).

6          Q.    Understood.  Can you -- sitting here today

7     can you think of any presentation you've ever given

8     on a true plaintiff professional association or

9     organization?

10         A.    No, I can't think of one.  I don't even if

11    I know of one to be honest.  I don't know.

12         Q.    Fair enough.

13         A.    Okay.

14         Q.    Talk to me a little bit about -- well,

15    let's talk about your expert work.  You've been

16    involved in the forensic engineering field for quite

17    a while.  And in looking at your C.V., let me go to

18    that frame again because I lost it.  Hold on.  In

19    looking at your C.V. on pages one and two, you've

20    been with SEA Limited since approximately 2002, does

21    that sound about right?

Page 44

1      A.    That is correct, yes.

2      Q.    Would that have been when your career in

3   forensic engineering as it relates to litigation

4   would have begun?

5      A.    There is one instance where it was in

6   litigation when I worked Weirton Steel.  But I

7   wasn't -- I was basically an engineer assisting in

8   the loss.  But, yeah, that would be -- I would say

9   that would be fair to say for me as getting involved

10   in litigation or cases that may get into litigation

11   is when it started in 2002.

12      Q.    Okay.  And you mentioned Weirton Steel

13   Corporation.

14      A.    Yes.

15      Q.    Obviously you listed the other employers

16   over the course of your career that you've been

17   associated with, and the first listing is West Penn

18   Power --

19      A.    Yes.

20      Q.    -- as a co-op student?

21      A.    Yes, sir.  Yes.

Page 45

1     Q.    And that was from 1990 to 1992 in

2   Greensburg, Pennsylvania, correct?

3     A.    That is correct.

4     Q.    Following that in 1994 to 1995 you were at

5   Weirton Steel Corporation and were an electrical

6   maintenance planner, correct?

7     A.    That is correct.

8     Q.    Between '92 and '94 were you still in

9   school?

10     A.    Yes, yes.  The co-op program allowed us

11   to -- we would -- the way it worked was when you

12   started, I guess the end of your sophomore year, you

13   had the option of working a semester and then going

14   to school so it alternates.  That's why you see 1990

15   to 1992 where -- and what happens is when you do

16   that, as you can see in the listing, progressively

17   they give you more tasks, more responsibilities

18   related to the electrical engineering field.  It

19   actually helped me pick my elective of electric

20   machinery and power and controls.  But that's what

21   that was involving.  So I was in school when I was

Page 46

1    doing the co-op at the same time.

2        Q.   Got it.  So when did you actually graduate

3    from Pittsburgh?

4        A.   December 1993.

5        Q.   So Weirton Steel Corporation would have

6    been your first employment following graduation in

7    the engineering field?

8        A.   January of 1994, yes, sir.

9        Q.   Okay.  And that would have been followed

10   by your employment at Beta Steel Corporation from

11   '95 to '96?

12       A.   That is correct.

13       Q.   And there you acted as electrical

14   engineer, correct?

15       A.   That is correct.

16       Q.   Following -- the following year, '96 to

17   1998 you were electrical maintenance supervisor at

18   Birmingham Steel Corporation, correct?

19       A.   That is correct.

20       Q.   And then from '98 to '99 you were at

21   Pilkington NA, Inc. as a senior electrical engineer,

Page 47

1    correct?

2        A.    Yeah.  As a senior electrical engineer,

3    that is correct, yes, sir.

4        Q.    And then from 1999 to 2002 you were still

5    with Pilkington but you were now a senior process

6    engineer?

7        A.    That is correct.

8        Q.    Okay.  What is the difference in your

9    duties, responsibilities from senior electrical

10   engineer to senior process engineer?

11       A.    The duties were different in this respect.

12   As an electrical engineer my job was to maintain the

13   electrical controls equipment, handle maintenance

14   for the cranes, for forklifts, things of that

15   nature.  But it was essentially working on the

16   electrical and control systems.  As a senior process

17   engineer, my job then was to look at the process

18   itself, look at the line to see how can we improve

19   productivity, what do we have to do.  And in my case

20   I found projects in which one of them was a vision

21   system.  And when you cut glass you have certain

Page 48

1    parameters where you can't have pieces broken or odd

2    ends.  And what it was was I set up a system to look

3    at the glass as it came real-time down the line,

4    wrote the programming and the code, created a

5    database to log in good pieces of glass versus bad,

6    and then was able to reject that glass until, in

7    many instances, our robot, which we programmed and

8    processed and packed, to not pack that glass so that

9    customers received good glass.  So I was looking at

10   the process in an effort to improve it.  And at the

11   same time those projects allowed me to then get into

12   the Six Sigma measure, analyze, improve and check

13   process.  And that's where I started going from

14   there, conducting FMEA's, failure mode and effect

15   analysis, and things of that nature.  That's the

16   difference.  One is looking at the electrical and

17   control equipment, the other is how do you utilize

18   those system in order to improve the quality and

19   also throughput of that glass lamp.

20       Q.   Thank you for that description.  That's

21   helpful.  At any point in time in your career, prior

1    to coming to SEA Limited, were you ever involved

2    with consumer products, obviously with a focus on

3    electrical engineering?

4         A.    Yeah.    I mean we had whether it be

5    electrical meters or carts, forklifts.    I mean I

6    consider those consumer for the plant, working on

7    those.    Radios that we were using, making sure that

8    we fixed them.    Looking at the batteries associated

9    with those.    Anything maintenance and electrically

10    related I was working on.    And it could be consumer

11    products.    But it was strictly working on it, get it

12    fixed.    If it's not working, get rid of it, get a

13    new one, that sort of thing.    Nothing like we're

14    doing now.

15         Q.    And I guess that was going to be my

16    follow-up.    Understanding that your involvement

17    would have been certainly, if I can say internally

18    within the plant for some of the equipment, devices,

19    products, et cetera, but when was the first time

20    that you would have been involved in inspecting,

21    analyzing, and investigating consumer product

Page 50

```
 1    failures.  And by consumer product I'm using that
 2    term I guess loosely as we talk about consumer
 3    facing, like for sale?
 4         A.   That would have been 2002 when I started
 5    with SEA.
 6         Q.   Okay.
 7         A.   Yes.
 8         Q.   When was the first time that you were ever
 9    involved in inspecting or investigating any
10    electrical engineering matters relating to a
11    hoverboard?
12         A.   It would probably have been after 2011,
13    2012.  I can't give you an exact date.
14         Q.   Okay.  And SEA Limited, just describe for
15    the jury if you could what they do, who they are?
16         A.   SEA is a multi-disciplinary forensic
17    engineering firm hired to evaluate and investigate
18    various questions clients have, whether it be
19    equipment loss, personal injury, or damage to
20    property.  To go out, evaluate it, depending on your
21    discipline, and if necessary write a report and
```

Page 51

1    potentially testify in either deposition or trial.

2         Q.    Would you say that the majority of the

3    clients that utilize SEA's services are either

4    companies, corporations, but certainly defense --

5    defense relating to litigation?

6              MR. GIROUX:  Form.

7         A.    Sorry.

8              MR. GIROUX:  Go ahead.

9         A.    The answer is no.  A lot of our

10   investigators actually do a lot of work for

11   insurance companies.  As you were pointing out

12   before, subrogation work.  So it depends on the case

13   and what the matter is.  But, no, our company as a

14   whole is probably -- I couldn't give you a

15   percentage, but I can tell from you my standpoint I

16   usually do about 50/50.

17        Q.    When you say insurance companies, do you

18   see that different from defense work?

19        A.    Oh, it is.  When I say insurance, I'm

20   talking about subrogation where they are trying to

21   see or go after or they think someone is responsible

Page 52

1   and they are trying to recover their funds.  So

2   that's different to me.

3       Q.   Okay.  What -- explain for me if you

4   could, since you've been involved at SEA, the amount

5   of work that you do and perform on behalf of

6   companies requiring your services versus the

7   insurance companies or subrogation companies that

8   you just described?

9       A.   It's probably about 50/50 for me.

10      Q.   Over the course of your career, at least

11  since 2002, how many legal cases have you been

12  retained as an expert on where you have been

13  retained on behalf of a plaintiff?

14      A.   An actual plaintiff?

15      Q.   Yes, sir.

16      A.   Again, I want to make sure I'm clear.  So

17  we're talking not subrogation, truly a plaintiff.  I

18  would say once.  It was once.

19      Q.   Okay.  What case was that if you recall?

20      A.   I can't remember the name of the case but

21  I know it was in California.  It was in California.

Page 53

1    I wish I could remember right now.  Maybe it was

2    Edwards V. something.  I can't remember the title.

3    But that was the only one I can think of truly by a

4    plaintiff.

5         Q.   Do you recall at least the year or

6    timeframe in which you would have been involved in

7    that case?

8         A.   Probably within the last two to three

9    years.

10        Q.   Did that case go to trial?

11        A.   No, sir.  No.

12        Q.   Did you give a deposition in that case?

13        A.   I don't believe so, no, I did not.

14        Q.   Is that case still ongoing?

15        A.   I believe they settled.

16        Q.   Were you involved in coming to any

17   conclusions or rendering any opinions in the case?

18        A.   Yes, I can't remember if I wrote a report

19   or not.

20        Q.   Okay.  Aside from that case, you've been

21   doing forensic engineering work since '02, how --

Page 54

1    quantify for me if you could how many legal cases, I

2    know it's a lot and we're going back a long time,

3    but how many legal cases have you been involved in

4    where you've been retained as an expert witness

5    since about 2002?

6         A.   Well, let me make this clear.  Involved in

7    cases that potentially could go to litigation, there

8    would be over 4,000.

9         Q.   And how about cases in litigation?

10        A.   I'm just going to go by my depositions.

11   I've had probably a little north of 50 depositions.

12        Q.   All right.  So since 2002 you've had a

13   little over 50 depositions?

14        A.   That is correct.

15        Q.   And when you said that you've been

16   involved in over 4,000 cases prior to them going to

17   litigation, would that have been for purposes of

18   review, analysis, and ultimately rendering opinions

19   prelitigation?

20        A.   It could be, yes.  There are some that got

21   to that point.  There are others where I go out

Page 55

1    there and, you know, they decide, okay, we're not

2    going to go any further with it.  So it just

3    depends.  It just depends.

4         Q.   And those over 4,000 cases that you're

5    discussing, those would have been the ones that you

6    described as either reviewing on behalf of companies

7    or reviewing on behalf of insurance or subrogation

8    entities.  Or are those on behalf of potential

9    defendants?

10        A.   It could be potential defendants too, it

11   could be manufacturers, service companies.  It

12   really depends.  It runs the gamut.

13        Q.   Okay.  How many of those, if you can

14   quantify, were on behalf of potential plaintiffs?

15        A.   Well, again, we talk plaintiffs, I

16   couldn't quantify it.  It's not a whole lot.  They

17   are usually involving injuries and things so I

18   couldn't give you a number.  It's not a large

19   number.

20        Q.   Can you give me a percentage.  If it's not

21   a large number, are we talking 5 percent,

Page 56

1    10 percent, less?

2         A.    Truly plaintiffs, maybe, I would say,

3    10 percent or less.

4         Q.    To be fair, that's since 2002?

5         A.    That is correct.  And we're talking truly

6    plaintiffs, that would be it, yes.

7         Q.    Got it.  And in terms of actual litigation

8    that you've been involved in, it was just the one

9    case that you recall, regardless of the name, but

10   the one California case?

11        A.    Yes, where I'm actually working for a

12   plaintiff, yes.  That is correct, yes.

13        Q.    We talked a little bit ago, and sorry to

14   have to go back to it, but my screen has got me a

15   little tripped up, or maybe it's the Jersey trip I

16   just got back from.  The presentations that you've

17   given, we talked about DRI, we talked about the

18   Federation of Defense and Corporate Counsel, but

19   you've also given presentations at litigation

20   seminars on behalf of counsel that has retained you

21   in this case, correct?

1        A.    That's correct, yes.  Yes, sir.

2        Q.    And as recent as 2022 you gave a lecture

3    or seminar relating to Lithium ion battery forensic

4    investigations, correct?

5        A.    I believe that is correct, yes, sir.

6        Q.    Who attended that?

7        A.    I'm not sure.  There were attorneys, there

8    were manufacturers, other experts were there.  It

9    was just a number of people there but I don't have

10   the names of anybody.

11       Q.    Was Mr. Giroux there or Mr. LaFlamme?

12       A.    I believe they may have been.

13       Q.    Okay.  Do you recall the contents of your

14   presentation?

15       A.    Yeah.  The contents of the presentation

16   was just to follow the scientific methodology, to

17   evaluate cases involving Lithium ion battery cells

18   or packs, and to make sure that you're properly

19   coming up with a hypothesis that's supported by the

20   facts and known and pertinent information.

21       Q.    Did you discuss this case at that seminar?

Page 58

1        A.    No.  No, sir.  No.

2        Q.    Did you discuss the Pennsylvania case that

3    you were involved with with this firm on?

4        A.    I don't believe so, sir.

5        Q.    Did you prepare, whether it's a PowerPoint

6    or some type of visual presentation, for that?

7        A.    It may have been a PowerPoint, yes.

8        Q.    Do you still have a copy of that

9    PowerPoint presentation?

10        A.    I would have to look for it to see if I

11    still have it.  Because it was real general.  It

12    wasn't anything earth shattering.  But it was trying

13    to go through the process and evaluate things.  And

14    also utilizing the UL standards and testing that

15    they go through also.  So just to make sure

16    everything is covered.

17        Q.    Okay.  Did you discuss with them during

18    this 2022 presentation any tips or tools that they

19    could use in their defense of such cases?

20        A.    Not in their defense, just evaluating

21    their cases.  In other words are they UL certified.

Page 59

1   Have they been tested by the IEC.  Do we have all of

2   the pertinent facts and information.  Have we

3   confirmed that the item is actually authentic and

4   not counterfeit.  I run into a number of those too.

5   So those are the different things that I discussed

6   to make sure that you have the proper data and

7   information and not just making any assumptions.  So

8   that's what I was talking about also.

9        Q.   Okay.  All right.  You've given other

10  seminars or lectures to this firm in the past,

11  correct?

12       A.   Yes, sir, I have.

13       Q.   Including one relating to electrical

14  systems and the electrical grids, supplying power or

15  causing the problem.  Do you remember that?

16       A.   Yes.  Yes, sir.

17       Q.   That one was in Texas?

18       A.   I believe it was.

19       Q.   Sitting here today, aside from those two,

20  do you recall how many other seminars or lectures

21  you've given to this law firm?

Page 60

1        A.    I believe there was one probably within

2    the last year.  And that would probably be it that I

3    can recall.

4        Q.    What was the topic of that one?

5        A.    I can't remember offhand.  I would have to

6    look it up.

7        Q.    Where did you give that presentation?

8        A.    I believe that one was in Chicago.

9        Q.    Do you provide lectures or seminars for

10    any other law firms?

11        A.    I have in the past.  Yes, sir, I have.

12    Yes.

13        Q.    When was the last time you provided one to

14    any other law firm aside from McCoy, Leavitt and

15    Laskey?

16        A.    I don't know, maybe five, six years ago,

17    before Covid.

18        Q.    Okay.  I'm looking here at your courses

19    taught and presentations portion of your C.V., page

20    24 of your C.V.

21        A.    Yeah.

Page 61

1      Q.   I don't see it listed there?

2      A.   No, those -- those presentations are just

3   small, we call them like lunch presentations.  So

4   we're just talking about various topics.  Typically

5   bring me in to talk about the scientific method,

6   things of that nature.  It's not -- like these were

7   actually seminars where there is a variety of people

8   there, people traveling.  The ones I'm talking about

9   would be local.  So let's say for instance there is

10  a firm that says, hey, we have some new attorneys,

11  we want you go over electrically how you would

12  process a scene, things of that nature.  I would

13  drive up to Philly over lunch and give a

14  presentation, that's all.  So nothing formalized,

15  put it that way.

16     Q.   I guess in response to my question, there

17  have been occasions where you've been called upon to

18  speak on electrical engineering issues, whether it's

19  luncheons or some other events of that sort that are

20  more local in nature?

21     A.   That is correct.  They're just small

1    things.  Another one would be fire departments.

2    I've gone by fire departments also, walked them

3    through it.  Especially with people getting nervous

4    about batteries, I try to explain to them about the

5    systems, the safeguards in place, so that they don't

6    have to worry about it.  So that's -- but again,

7    it's not something formal, it's just me going by

8    talking to the chief and then speaking to the

9    firefighters, things of that nature.

10        Q.   Okay.  But in terms of formal conferences

11   or retreats, would it be fair to say that you've

12   only presented for McCoy, Leavitt and Laskey in

13   those types of venues or events?

14             MR. GIROUX:  Form.

15        A.   No.  Because if you look at it, I also

16   presented at the National Academy of Forensic

17   Engineers on ethics.  So...

18        Q.   Poor question.  My question was really

19   towards law firms?

20        A.   Oh, no.  If you look, you'll see on my

21   C.V. that I also presented for U.S. Law over in

Page 63

1    London at Lloyds of London.

2         Q.    Okay.

3         A.    Also the Arch Syndicate Management, but I

4    guess that's not a law firm.  But U.S. Law would be

5    the other one that I would think of that's on there.

6    And I have actually presented to them in 2012 also

7    in London.

8         Q.    Okay.  That was -- in looking here on page

9    24, in 2018 that would have been the last time you

10   presented at U.S. Law?

11        A.    Yes, sir.  Yes.

12        Q.    And is U.S. Law a law firm?

13        A.    No, I think it's a conglomerate of law

14   firms that do subrogation work.  I think that's my

15   understanding of it.

16        Q.    It's a -- yeah, it's a service that

17   multiple attorneys from various law firms can join

18   where an individual can go on and search for

19   attorneys, search for law firms, and certainly they

20   have resources that they provide to those various

21   members, fair?

Page 64

1        A.    Yes, I've never looked into it that deep.

2   They would say, hey, look, we have a topic we would

3   like you to talk about.

4        Q.    Okay.  But in terms of an actual law firm,

5   not a conglomerate, not a service, but an actual law

6   firm, would McCoy, Leavitt and Laskey be the only

7   law firm where you presented at a formal retreat or

8   conference in the field of electrical engineering?

9        A.    Yes, that would be correct.

10        Q.    Were you -- who asked you to present at

11   the last conference that you gave for -- where you

12   spoke and gave a seminar on behalf of McCoy, Leavitt

13   and Laskey?

14        A.    One of the associates, one of the

15   attorneys asked.  Because typically you present with

16   an attorney, similar to DRI, on different topics.

17        Q.    Do you recall who you presented with at

18   the last one?

19        A.    Jill.  Forgive me, I can't remember her

20   last name.  Jillian.

21        Q.    No problem.

Page 65

1        A.    All right.

2        Q.    How about with regards to the Lithium ion

3   battery forensic investigation.  Who if anybody did

4   you present with?

5        A.    I can't recall who the attorney was.

6        Q.    Was it Eugene or Jared?

7        A.    I don't believe so.  I don't believe so.

8   But I could be off.  You know, it's a number of

9   years ago.  But I don't think so.

10       Q.    Talk to me a little bit, if you could,

11   about how you are assigned work at SEA?

12       A.    In a variety of ways.  One is a client may

13   call the office and say, hey, I have a case, I'm

14   looking for a certain expert.  I would get it that

15   way.  Or if I've worked with different clients

16   before, they would ask me specifically.  Could also

17   come through the web, a referral.  Or work on cases

18   from other engineers.  They're working on something,

19   they need an electrical guy, and they may call me

20   and ask me.  So it just depends on the

21   circumstances.

Page 66

1      Q.   Are there times where SEA assigns you

2   those cases directly that they feel you are best fit

3   for?

4      A.   Typically they will talk to me about it,

5   or yeah, if they know specifically what it is, they

6   will say, yeah, heads up, this is a case, do you

7   think you can handle it.  Or if it's specific and

8   they know I can, they will assign me to it.

9      Q.   Is there somebody within SEA that is

10  typically the individual that you speak with about

11  cases that assigns them to you or forwards them to

12  you?

13     A.   Oh, no.  No.  It goes all over the place.

14  I mean I can get a call from Florida or Colorado.

15  It really depends on the circumstances and what they

16  are dealing with.

17     Q.   Okay.  Have you ever worked on a case

18  involving a hoverboard fire or explosion where you

19  have come to the conclusions that the product was

20  defective in some manner?

21     A.   Yes, I have.

Page 67

1          Q.    Okay.  When was that?

2          A.    It would have probably been before 2016.

3     It was probably about maybe four or five cases.

4          Q.    Okay.  And what was it about those four or

5     five cases and the product in those cases that led

6     you to conclude that the products were defective?

7          A.    Well, in those cases we found -- there

8     were a couple of them we found counterfeit battery

9     cells.  They weren't the cells that were supposed to

10    be there, workmanship was poor, and you could see

11    where the failure was.  And the other cases,

12    probably the other two or three, they used the

13    non-OEM charger which caused damage internally and

14    caused the batteries to result in a failure.

15         Q.    Okay.  And when you say prior to 2016, is

16    that because that year or around that year there was

17    a movement afoot for purposes of following certain

18    guidelines or standards to make those batteries and

19    products using batteries safer?

20         A.    I think there was a movement, I don't know

21    if it was necessarily with the safer.  I think what

1    it was was they were trying to cut down on

2    counterfeit hoverboard's batteries.  They were

3    trying to get something where it was consistent so

4    it would be safe so when a consumer goes into a

5    store and they see UL with a circle around it they

6    know -- they feel confident, okay, this is a proper

7    product.  And it's sort of like with my family

8    members, they will ask me, they will say, "well, I

9    want to buy this product."  And I'll say "yeah, is

10   it UL listed."  And they will laugh and say, "yeah,

11   we looked for the UL, we know."  So it's just one of

12   those things where I think they were trying to

13   create uniformity and also to get the counterfeits

14   out of play.  And as a result I will say I haven't

15   run into any counterfeit hoverboards probably prior

16   to 2016, since then.

17       Q.   Okay.  Certainly the CPSC would have been

18   involved at the forefront of that movement as of the

19   end of '15 and even beginning of '16 as to

20   application of the UL 2272 product certification or

21   standard, correct?

1      A.    Yes.    Typically what happens in -- with UL

2      it's the same.    This is the way it works.    CPSC may

3      say they have a concern, they have a problem.    They

4      will be -- depending on what the committee is,

5      technical committee, we will have meetings with

6      them, they will talk about it and say, okay, I think

7      there should be a standard.    And they start to

8      discuss it and we go through it and evaluate it.

9      But they are there.    Interesting thing is they are

10     nonvoting member but they have just as much input as

11     anybody else.    And typically CSA is involved.    I

12     apologize, Canadian Standards Association.    You get

13     a couple of Government entities that get involved.

14     Sometimes NFPA people.    But typically that's the way

15     it works.    CPSC may see an issue and they say, look,

16     we may need to create a standard, or we may need to

17     modify the current standard depending on what they

18     are looking at.

19     Q.    Okay.    Around the time that CPSC, and

20     you're certainly familiar with, you referenced it in

21     your report, the CPSC safety alert that they

Page 70

1   published?

2        A.   Yes, I am familiar with it.  Yes.

3        Q.   You appreciate at least according to CPSC

4   that despite their push to have hoverboards be UL

5   2272 compliant, they have acknowledged that UL 2272

6   compliance doesn't guarantee a hoverboard will not

7   overheat or catch fire.  You're familiar with at

8   least their position on that?

9        A.   Yeah, I'm familiar with their position.

10  But as I pointed out to Jake Alawalla and the rest

11  of them, we need to know the specifics.  And I know

12  that from dealing with different investigations

13  there could be an explanation that you may not know

14  about.  What I found out, which was interesting, is

15  sometimes they may pull complaints from Amazon

16  without actually verifying it.  So I've always said

17  I need to see the case itself and evaluate the

18  information without generalizing.  And it's for that

19  reason.

20       Q.   Have you seen any references either

21  through the UL website or any of the materials they

Page 71

1    have published that also acknowledges that UL

2    certification does not guarantee that a hoverboard

3    will not overheat or catch fire?

4        A.    I haven't seen it.  But it wouldn't

5    surprise me.  Depending on the circumstances, you

6    can have an issue.  And I think it's important to

7    look at it this way.  When we talk about

8    certification, it's certifying that certain tests

9    were performed on that item.  And the failure may be

10   related to something that goes beyond the scope of

11   that standard.  And I think that's why I always say

12   you need to look at that case and the information

13   before you make a statement that may not be

14   justified based on the actual evidence.

15       Q.    Got it.  Got it.

16       A.    Excuse me, I need some water.

17       Q.    Of course.  And we have been going -- why

18   don't we do this.  We have been going on for almost

19   an hour and a half.  Let's take five minutes,

20   stretch out, look at the flurries coming down and

21   we'll assume back.

Page 72

1          MR. GIROUX:  Sounds good.

2     A.    Thanks for rubbing it in in Florida.

3          VIDEOGRAPHER:  Off the record at 11:21.

4          (Off the record colloquy.)

5          VIDEOGRAPHER:  We're back on the record,

6     11:31.

7     A.    Mr. Ayala, I wanted to clear something up

8  because you had asked me a question about that

9  Pennsylvania case, Kaufmann.  And at the break I

10 looked it up and I was wondering, because I kept

11 saying to myself "did I write a report."  And I

12 looked it up.  I did not write a report, it settled

13 before.  So I just wanted to clarify that.  And I

14 searched and I did not write a report.  So I just

15 wanted to make that clear.

16    Q.    Thank you for that.

17    A.    No problem.

18    Q.    What did you look through to, I guess,

19 refresh your recollection as to whether you wrote a

20 report in that case?

21    A.    E-mail.  I went to the e-mail to see, I

Page 73

1   just typed Kaufmann expert report, and then received

2   the notice that, hey, the case is settled.  Because

3   I think we were right around the time we were about

4   to do that.  So that's what I looked at.

5           Q.   Did you look at anything else during your

6   break?

7           A.   No, no.

8           Q.   Did you speak with counsel during the

9   break?

10          A.   No.  Just about, you know, coffee, stuff

11  like that, just general.

12          Q.   You were retained on this case when?

13          A.   Have to look at my report.  September 13,

14  2023.

15          Q.   One moment here.  So you were retained a

16  year prior to authoring and issuing this report?

17          A.   Yes.  A year exactly.  Wow.

18          Q.   Okay.  Who contacted you for purposes of

19  at least discussing your potential involvement?

20          A.   I'm not sure if they contacted me or sent

21  an e-mail related to the case or they wrote it up.

Page 74

1    But eventually I would have been speaking to Eugene

2    LaFlamme eventually.  But as far as it coming in,

3    I'm not sure how it came in.

4        Q.    Do you recall anything about that initial

5    conversation or discussion?

6        A.    No, just where it's going to be.  Will all

7    the evidence with present.  Will we have x-ray

8    capability.  And we were going to Palmers in Salt

9    Lake City.  And I think that was pretty much it.

10        Q.    Do you recall what you were asked to do,

11    meaning what the scope of your involvement would be?

12        A.    Scope of my involvement was to look at all

13    of the evidence, but specifically to evaluate all of

14    the electrical items, more importantly focus on the

15    hoverboard, the control system for the hoverboard,

16    and the battery cells themselves.

17        Q.    Obviously this wouldn't have been your

18    first encounter or interaction with the folks at

19    this law firm, so you would have been at the very

20    least familiar with who they were by that point?

21        A.    Oh, yes.  Yes.  Yes.

Page 75

1        Q.    Were you, upon initial contact, were you

2    provided with any materials relating to the case?

3        A.    I can't remember if I was provided with

4    the matterport or x-rays.  I can't recall.  But I

5    know after we left I definitely had access to the

6    matterport, x-rays, things of that nature.

7        Q.    Okay.  And when you say after we left,

8    you're talking about the inspection of Palmer?

9        A.    Yes, I apologize.  Yes, after the

10    inspection October 30th and 31.

11        Q.    Okay.  There is references in your report

12    to that inspection October 30th and 31.  You

13    mentioned 2024 but obviously that was 2023, correct?

14        A.    That is correct, yes.  That was a typo.

15        Q.    Prior to presenting to that inspection at

16    Palmer, did you have any discussions with other

17    experts retained by McCoy, Leavitt, Laskey?

18        A.    No, sir.  No.

19        Q.    Let's talk a little bit about, before I

20    get into more specifics about the inspection as well

21    as certainly your review in the case, how many --

Page 76

1   how many hours have you worked on this case since
2   September 13th, 2023?
3        A.   I do not know.  I can find out for you,
4   but I do not know offhand.
5        Q.   Okay.  Some of the materials were just
6   provided to me prior to your deposition, but did you
7   include any invoices in your file?
8        A.   I don't believe -- no, invoices were not
9   included in there.  I can get that to you.  But, no,
10  I didn't include any invoices.
11       Q.   Okay.  So sitting here today you have no
12  idea of how many hours you worked in the case?
13       A.   No, no.  I mean a number of hours but I
14  couldn't give you an exact amount.  And the reason
15  you don't see it in my file material, I don't keep
16  invoices in there.  That's separate.  Our corporate
17  office sends the invoices so that's why I don't have
18  them.  But I can get them to you though.
19       Q.   Have you gotten paid anything on the case?
20       A.   The company may have received payment but
21  I'm not sure.  I usually don't get involved unless

Page 77

1    they say, hey, we have a problem.  But I haven't

2    heard anything so I would assume so.

3         Q.   Over the course of your involvement since

4    September 13, 2023 I would assume there have been at

5    least more than one conversation that you've had

6    with whether it's Eugene, Jared or anyone at their

7    firm about this case, is that fair?

8         A.   Yeah, that's fair.

9         Q.   Do you know how many times you've had

10   discussions, conversations with the folks at the law

11   firm about the case?

12        A.   No.  A lot of it probably would have been

13   at the inspections in October and February, but I

14   couldn't give you a time when we talked about it.

15   Couldn't give you an exact number.

16        Q.   Did you ever have -- during your

17   involvement, have you ever had conversations with

18   other experts about the case?

19        A.   Only when we were at Palmer, that was it.

20        Q.   Who do you recall speaking with there?

21        A.   Just the guy from AEI.  Actually everybody

1    there.  I mean we were talking and chatting.  But

2    nothing significant other than having both -- Palmer

3    is going to kill me because I can't remember his

4    first name.  Anyway.  Palmer as well as the other

5    experts trying to take that diagram they had from

6    AEI and identifying where certain things were.

7    That's what they helped me with.  It was

8    collectively I was asking all of them, where are the

9    items located, which helped us when we x-rayed the

10   various areas that were gridded off from A to D.

11       Q.   Okay.  Prior to issuing your report on

12   September 13th of this year, do you recall having a

13   conversation with any of the attorneys at the law

14   firm about the contents of your report?

15       A.   Yeah, just the scope to make sure that we

16   agree that my scope is strictly going to be on the

17   hoverboard and those items, but that was pretty much

18   it.

19       Q.   You mentioned towards the beginning of

20   your deposition there is only one -- one version of

21   the report, correct?

Page 79

1      A.   Correct.

2      Q.   We'll go through the materials that you

3   received in a little bit and reviewed, but the

4   opinions outlined in your report, and I think it's

5   page -- page six of 39, you've included opinions, I

6   guess it begins on page five of 39.  But you've

7   listed one, two, three, four, five opinions there on

8   page six of 39.  Does that encompass the, I guess,

9   the scope of your opinions.  Obviously you get into

10  more details throughout the report, but are those to

11  your general opinions that you'll be offering in

12  this case?

13     A.   Yes.  To a reasonable degree of

14  engineering certainty, yes, sir.

15     Q.   Are those opinions on page six of 39, are

16  those final as of today?

17     A.   As of today, unless I see something else

18  that, you know, in the record or something that

19  comes up, but, yes, those are the opinions as of

20  today, yes, sir.

21     Q.   Obviously if no new evidence is discovered

Page 80

1    and revealed to you, if we go to trial in March or

2    whenever we do, then these would be the opinions

3    that you're prepared to offer at the time of trial?

4         A.    That is correct.  And any that I may give

5    during the deposition.

6         Q.    Okay.  Sitting here today without my

7    prompting with certain questioning, are there any

8    additional opinions that you have aside from those

9    listed on page six?

10        A.    No, sir.  No.

11        Q.    All right.  So let's talk about if we

12   could the materials that you received from the law

13   firm for purposes of your review and your analysis.

14   Talk to me about the depositions that you have

15   received and reviewed?

16        A.    They would be listed under tab 11,

17   discovery material under client materials.

18        Q.    Okay.  I'm there.

19        A.    And if you look and you open up, you'll

20   see the date codes, like the first one is

21   February 7, 2024.

Page 81

1      Q.   Got it.  All right.  So let's -- let's go

2    through that if we can.  So with that date, when it

3    says received 2/7/2024, would you have received

4    those items within the folder electronically on that

5    date?

6      A.   Yeah, it would have been a link that was

7    set up, and someone from my office would have

8    downloaded and eventually I would have read those,

9    yes.

10     Q.   So on or about that date, February of this

11   year, you would have received copies of Jeff

12   Sheaman's deposition transcript as well as the

13   transcripts of Bill Robinson, Ryan Pasborg and Larry

14   Erdmann, E-R-D-M-A-N-N, correct?

15     A.   Correct.

16     Q.   Okay.  You've reviewed all of those

17   transcripts?

18     A.   Yes, I have.  It's been a while, but yes,

19   I have reviewed them.

20     Q.   When you go about your process of

21   reviewing file or case materials, in particular

Page 82

1    depositions, do you highlight or take notes on those
2    depositions?
3         A.   No.  Only if something jumps out at me.  I
4    may make a note of a page.  But when I say jumps out
5    at me, I mean something that the evidence
6    corroborates one way or the other.  It may be of
7    interest, it may not.  But typically I just read
8    them to try to understand what they are saying and
9    get a gist of what they are dealing with, you know.
10        Q.   With regards to those specific depositions
11   Sheaman, Robinson, Pasborg and Erdmann, do you
12   recall either highlighting or making any notes on
13   any of those depositions?
14        A.   No, I didn't highlight or make any notes
15   on them.  I noted a few things that came up.  And,
16   you know, I addressed them obviously in the report.
17   But there were things that I wanted to look at a
18   little further based on their deposition testimony,
19   especially Sheaman.
20        Q.   Okay.  Any portions of, in this case
21   Detective Sheaman's deposition transcript, that you

Page 83

1    either felt you needed to follow up on, comment on,

2    or look into further, those would have been included

3    in your report?

4        A.    Yes.   There was nothing specific, you

5    know, that I can point to physically in the

6    deposition, but what I'm getting at is his

7    impression was that the hoverboard caused the fire,

8    just to boil it down.   So if you look at the report,

9    especially the first opinion, he's of the opinion I

10   think the same as Schulz that, hey, this is the

11   areas of origin.   And I just took the approach, you

12   know what, I'm going to treat it as let's say that's

13   the area, is this hoverboard capable of causing this

14   fire.   That's the approach I took to weed through

15   everything else.

16       Q.    Understood.

17       A.    Yeah.

18       Q.    In looking at the next folder under client

19   materials, it's dated July 16, 2024.   And within it

20   is a folder that states Plaintiff Liability Expert

21   Reports.   At least my folder is empty.   Do you have

Page 84

1    any materials in that folder on your end?

2        A.    Yeah, it was just two reports.  Basically

3    Derek King's report and Michael Schulz's report.

4    And that's what I was worried about is everything

5    going to transfer over.  But under that folder under

6    my link, it's showing Derek King and Mike Schulz's

7    reports.  But that's all that's under there.

8        Q.    Okay.  The next folder is August 1st,

9    2024.  It says Sup Depositions and Exhibits,

10    7/19/24.  Same thing, for me there is nothing in

11    that folder.  What do you have on your end?

12        A.    I knew this was going to happen.  I

13    actually have discovery material.  Depositions.  I

14    have a couple things related to the Plasma and a zip

15    folder.  It appears as if you're not picking up on

16    the zip folder either.  That included exhibits.

17        Q.    Okay.

18        A.    But that's what I have.  It doesn't seem

19    like it's following up for you.  Hold on.  I'm

20    trying -- here we go.  So under -- can you see the

21    zip folder at least?

Page 85

1        Q.    Hold on, let me go back to that folder
2    because I moved it.
3        A.    Yeah, if you go to 8-1 and you go under
4    supplemental depositions, on the bottom it should
5    say Supplemental Depositions and Exhibits dot -- or
6    7/19/24 dot zip.
7        Q.    No, I don't have that.  Let me do this.
8    Let me share my screen and then you can see what I
9    have.  Can you see my screen there?
10       A.    Nothing is up yet but it just says.  Here
11   we go, yes.  Discovery.
12       Q.    Yeah, so let me back up.  So I had --
13   under client materials, eight-one, sup depositions,
14   there is nothing under there?
15       A.    It looks like your link is broken too.
16   You see the little X mark right next to where it
17   says modify.
18       Q.    Yeah.
19       A.    It looks like that link is broken.  So you
20   may not be seeing the information.  I mean what I
21   can do is obviously if you need it, I can put it on

Page 86

1    a hard drive so you have it.  But just so you know,

2    this is a very large folder.  Because Schulz's

3    information, I don't think all of it downloaded it

4    was so large.  That's why I had to put it in zip

5    folders.  But I can put it there.  But it's

6    essentially the discovery material and depositions.

7    But I can do that if you need to me.

8        Q.   Yeah, I think what we will do is, and we

9    will deal with that after the deposition.  But,

10   yeah, I would need a copy of your complete file.

11   But for now, go through these folders and you'll

12   just tell me what you have in them?

13       A.   What I was going to do is if I share the

14   screen you can see what I have under that one that

15   you're looking at, if you would like.

16       Q.   Yeah, let's do that if you can share.

17       A.   Hold on one second.  All right.  Can you

18   see this now?

19       Q.   Yes, now I can.

20       A.   So under here, this is what I was talking

21   about, when you look at supplemental, see the zip

Page 87

1    file here?

2         Q.    Yup.

3         A.    And even under this, if you look

4    supplemental deposition discovery, you don't see any

5    exhibits.  When you go to the zip folder and you

6    double click, now you see deposition exhibits,

7    discovery, and then these are the exhibits for all

8    of the depositions.  And the discovery information

9    including the production.  So it appears as if it

10   just didn't transfer over.

11        Q.    Okay.  Yup.

12        A.    Yeah.

13        Q.    All right.  So let's -- let's go to the

14   next one because I -- I don't know if I'm going to

15   have it all, 8/14/2024, I have some subfolders there

16   including BEAR admin, admin to BEAR.  Material.

17        A.    Yeah, this looks likes the link for BEAR's

18   file.  So that was what I received.  So this is

19   essentially BEAR, Berkeley Engineering and Research,

20   this is their file or folder.

21        Q.    Okay.  The next date is 8/16/2024.  And

Page 88

1    within that what I have is 5/18/22 inspection.

2    2/25/18, says Wadsworth matter, and it's empty.  And

3    then eight photographs.  And it is empty?

4         A.   Yeah, this is Mike Schulz's folder.  I

5    have all of his folders under here.  So in addition

6    to that I have the August 2022 inspection protocol,

7    case notes folder.  But it's essentially his.  And

8    if I'm not mistaken I think he's over 50 gig and

9    that might be the issue.  That folder alone is 25.1

10   gigabytes.

11        Q.   Got it.  Got it.

12        A.   Yeah.

13        Q.   Okay.  The next folder is 8/29/24, and

14   when I open that up it looks like there are exhibits

15   here to -- and Derek King's deposition transcript.

16   Is there anything else on your end for that folder?

17        A.   No, that's it.  It's his deposition and

18   the exhibits.

19        Q.   Okay.

20        A.   Yup.

21        Q.   10/27/23, within that is Wadsworth

1   hoverboard x-ray and CT folder.  And then it's

2   broken up into two subfolders, one for x-rays, one

3   for CT.  And then for the CT scans folder there is

4   nothing there.  And for the x-rays folder there is

5   nothing there?

6        A.   Yeah.  It looks like you're not getting

7   the transfer for whatever reason.  But I have x-rays

8   that were taken by Palmer.  And the CT scans are the

9   CT scans that were distributed by BEAR.  So that one

10  folder we went to, let me see, the one you have for

11  8/14.

12       Q.   Right.

13       A.   Those CT scans from BEAR are literally

14  what is under the folder for Wadsworth hoverboard.

15  That's their scans they did.  So I didn't do

16  anything independent, that's their scans.

17       Q.   Okay.  And, you know, obviously I have

18  BEAR's file.  But even within that 8/14 folder I

19  don't have anything?

20       A.   That's what I mean, it looks like it

21  didn't transfer.  Must be something with the size.

Page 90

1    Only thing I can think of.  On my end I can see it,

2    but it looks like the transfer didn't work using One

3    Drive.

4         Q.   Okay.  The next folder, 11/4/2024, I see a

5    Felis report, Gorbet report, and Strangard report.

6    Is there anything else on your end?

7         A.   No, that's it.

8         Q.   And then the next folder, it says -- hold

9    on, it rearranged them for me.  Give me one moment.

10   I guess -- it says received 2/7/24 and it's got the

11   Erdmann, Pasborg, Robinson and Sheaman depos again.

12   Is the 11/4/2024 folder, is that the last one that

13   you have under client materials?

14        A.   That is correct.  That is the last one I

15   have under client materials, yes.

16        Q.   And then there are on my end four files

17   independent of any subfolders.  One of them is

18   titled Sweetwater Combined Communication Center, CAD

19   detailed report redacted.  Then there is a

20   Sweetwater County Sheriff Department report.

21   Sweetwater Fire District Number One report.  And the

Page 91

1    Wadsworth complaint?

2         A.    That is correct.

3         Q.    Okay.  Any other materials that you have

4    identified as we've gone through these subfolders

5    and the general folder that you have not mentioned?

6         A.    No.  Just -- well, I don't know what you

7    have.  So on my end, you didn't mention it, but I

8    have a March 13, 2024 folder, March 14, 2024 folder,

9    a June 13, 2020 folder -- '24 folder.  And then I

10   think we started on July 16, 2024.

11        Q.    Okay.  So go through those March folders

12   and the June folder and let me know what's in there?

13        A.    March 13th, 2024 is the deposition of

14   Matthew Wadsworth.  March 14th is the deposition of

15   Stephanie Wadsworth.  And June 13, 2024 are the

16   depositions of Gunnar Wadsworth, Camile Wadsworth,

17   Lane Wadsworth, and Westin Wadsworth.

18        Q.    Okay.  Have you reviewed all of those

19   deposition transcripts?

20        A.    Yes, sir.

21        Q.    Any notes, highlights or otherwise for

Page 92

1    those various deposition transcripts?

2        A.    No, not from my scope, no, sir.  No.

3        Q.    Any other materials in subfolders that

4    maybe I haven't -- I don't have or we haven't

5    mentioned?

6        A.    Not -- other than the ones we went over,

7    no, sir.

8        Q.    Okay.  So now let me go back to tab 11

9    generally and get out of the client materials.

10       A.    Okay.

11       Q.    You have another folder there, CT images.

12   That one on my end does have a few files.  You've

13   included three, four, ten files there titled BEAR

14   CTV and it has various numbers.  Do you have that?

15       A.    Yes.

16       Q.    Okay.  Are there any more files or images

17   that begin at least as titled with BEAR?

18       A.    No, not beginning with the title of BEAR.

19   No, sir.

20       Q.    Okay.  There is a file here titled

21   FEMA.PDF.  Do you see that on your end?

Page 93

1      A.    Yes.

2      Q.    And what is that and what is that from?

3      A.    Well, if you open it up you'll see at the

4  top that comes from UL -- ULC 2580, and that's page

5  12 listing the standards that were utilized in

6  creating -- or part -- part of the standards used in

7  creating this document.  So on here you'll see the

8  FEMA IEC 6812.  You'll see the fault tree, 61025.

9  And trying to think of the other ones.  But this is

10  just listing those.  That's why it says FEMA,

11  because there was a question about the FEMA, and I

12  was showing in the actual standard they actually

13  list those and those are what are utilized in

14  developing the standards and the testing that those

15  items will go through.

16      Q.    Okay.  Do you include in here, without

17  going through each and every PDF, but do you include

18  the pages prior to this.  It looks like this is page

19  12.  But do you include pages prior where it

20  describes that these are the various standards taken

21  into account or considered?

Page 94

1          A.   No, I didn't -- no, not in the folder.

2     Just in general I have them from the standard

3     itself.  So if you pull up 2580 you'll see this as

4     well as the other pages from that.

5          Q.   Okay.  The next PDF is front, underscore,

6     UL, underscore, 2580, and that appears just to be

7     the front or cover page in ANSI Can UL, ULC 2580

8     from 2022, correct?

9          A.   That is correct.

10         Q.   And that's just one page?

11         A.   Yeah, it's just one page.

12         Q.   Okay.  You have a copy of screen shots

13    that follow that UL 2580, and what are those screen

14    shots of?

15         A.   Well, the one screen shot, the first one

16    of 2024 where it says 10.1550, that's actually

17    included include in my report also.  But that's a

18    screen shot showing the distance from I believe cell

19    ten, yeah, cell ten to the wiring that still has

20    insulation on it.

21         Q.   Okay.  What's the next screen shot?

Page 95

1       A.    The next screen shot is actually an image

2    from Derrick's report, Derek King of BEAR, where he

3    identified the different cell numbers, which was

4    used for him to talk about what cells he think

5    caused an issue.

6       Q.    And then the last screen shot in the three

7    there, what is that?

8       A.    The last screen shot is showing the

9    distance -- hold on, give me one second.  Yeah, it's

10   showing the distance from the cell to the bottom of

11   the circuit board.  And I'm trying to show it in the

12   three dimensions that you see there.

13      Q.    Okay.  The next file in this folder is TC

14   2580, the wording is cut off, but I think it says

15   batteries for use in electric vehicles roster.  Do

16   you see that?

17      A.    Yeah, that's the technical committee

18   roster for 2580 as of that date.

19      Q.    Okay.  And this relates to electric

20   vehicles only?

21      A.    Batteries for use in electric vehicles.

Page 96

1    And it also covers standards 2271 and 2580.  So

2    that's the technical committee but those are the

3    standards that fall under it if you look in the

4    upper left corner.

5         Q.    Why did you include this here?

6         A.    Oh, to see who was actually -- to identify

7    who was on the committee, to list them, to see if

8    anybody was on there.  And I was able to identify --

9    Consumer Product Safety Commission.  I want to

10   see -- you had asked a question before how many

11   people.  I was just curious as to who was actually

12   on the committee because it changes periodically

13   depending on who is representing who.

14        Q.    Got it.

15        A.    Yup.

16        Q.    All right.  And when -- is there a date on

17   this chart?

18        A.    Not -- not on the chart.  But if you look

19   at the top, it's as of -- yeah, that's the way

20   printed.  As of August 15, 2024 if you look at the

21   actual title of the file.

1        Q.    Okay.  Now I see it.

2        A.    Yup.

3        Q.    The next file is titled temp, underscore,

4   chart, and it's an image and it's a temperature

5   index.  What is the purpose of including this in

6   your material?

7        A.    Oh, these are the temperatures that I'm

8   looking for as far as melting temperatures of fires,

9   of different component pieces.  For example you'll

10  see fires rarely get above 1900 degrees, and I show

11  the different melting temperatures.  And it's

12  actually highlighted in my report like solder.

13  Solder melts at 275 to 350 degrees Fahrenheit which

14  is less than the ignition of paper.  So those are

15  things I look at when I do my analysis of the data

16  that I have.  Excuse me.

17       Q.    And where did you pull this chart from?

18       A.    I created the chart but those numbers come

19  from NFPA 921.  And I actually include a number --

20  well, the chart itself, a part of the chart, in my

21  report.  Give me a second, I'll give you a page.

1    Yeah, page 28 of 39, figure 22 is where a number of

2    those come from.  Now, as far as ignition of paper,

3    that came from -- as well as CO gas -- well,

4    actually the paper came from the ignition handbook,

5    which is a reference in NFPA 921.  And the rest of

6    them come from NFPA 921.

7          Q.    Okay.  And so where it says -- in looking

8    at figure 22 there in your report, table, it lists

9    it as table 6.2.8.2.  Are you telling this jury that

10   that table was taken directly from NFPA 921?

11         A.    In figure 22.  Yes.

12         Q.    Yes, sir.

13         A.    Yes, sir.  If you go to that table, you'll

14   see I literally took the snippet and put it in there

15   so you could see what the melting temperatures of

16   various metals are.

17         Q.    Got it.

18         A.    Yup.

19         Q.    Okay.  Let me go to the next inclusion

20   here.  UL, underscore, standards PDF.  And that's

21   dated June 28, 2022.  This is also a standard for

Page 99

```
 1    ANSI Can ULC 2580?
 2         A.   Yes, that is the second page.  Remember --
 3    well, remember the first one was page 12.  This is
 4    now page 13.
 5         Q.   Got it.  Okay.  All right.  So at least in
 6    what I have here, that concludes all of the
 7    inclusions under the CT images subfolder on tab 11.
 8    Do you have anything else on your end?
 9         A.   No, sir, that's it.
10         Q.   Okay.  Under the e-mail subfolder, tab 11,
11    there is one e-mail that I have.  Do you have any
12    additional e-mails?
13         A.   No, that's all I have in here.
14         Q.   Okay.  And this appears to be an e-mail
15    from February 7, 2024 from Sandy Corrigan,
16    litigation paralegal at McCoy, Leavitt and Laskey.
17    And it looks like she shared a Stratoshare link to
18    access depositions taken to date and exhibits
19    marked; is that correct?
20         A.   That is correct.
21         Q.   Okay.  Do you have or have you received
```

Page 100

1    any other e-mail correspondence from whether it's

2    Sandy or any of the attorneys involved in the case?

3        A.    Just I think for recent setting up the

4    deposition.  But a number of those would have been

5    sent to my assistant, like the downloading of the

6    folder material, they would have just went directly

7    to her and have her download it, which is what you

8    saw under the client material under tab 11.

9        Q.    Okay.  And what's your assistant's name?

10       A.    Charday.

11       Q.    Would she be the one that is more closely

12   communicating with the attorney clients or the

13   attorney firms for purposes of receipt of materials

14   or information?

15       A.    It could be her or one of the other

16   assistants, depending on who it is.  The main thing

17   is just try to get the information and download it.

18   And the reason I say that is because a number of

19   those links have timelines on them.  It's like you

20   have seven days to download it.  So somebody would

21   have downloaded it, whether it be her or someone

Page 101

1    else.

2         Q.   All right.  The next subfolder is titled

3    photos.  And within that eventually you get to three

4    subfolders of joint evidence exam it says.  The

5    first one is 06.136153, underscore, joint,

6    underscore, evidence, underscore, exam, underscore,

7    at, underscore, BEAR, underscore, in, underscore,

8    Berkeley, underscore, CA, underscore, 29,

9    underscore, fed, underscore, 2024.  That's a lot of

10   underscores.  Essentially this is a folder with the

11   photographs and information from the joint evidence

12   exam at BEAR in February of '24?

13        A.   That is correct, yes, sir.

14        Q.   And within it there are a number of

15   photographs and materials.  It looks like I have 164

16   items within that subfolder.  And it includes

17   photographs that were taken by you during that

18   inspection; is that correct?

19        A.   Yes, I have 163 items.  So something must

20   have gotten duplicated.  But yes, essentially that's

21   it.

Page 102

1      Q.   Okay.  That would have been the first time
2   that I met you at that inspection, correct?
3      A.   Yes, that is correct.
4      Q.   And in addition to the photographs, I have
5   a PDF document and it says -- it's got 161 pages to
6   it.  Do you have that on your end?
7      A.   Yes, yes.  That should reflect the number
8   of photographs in that file you're looking at.  So
9   the other two items would be the PDF and the folder.
10  Yeah, so if you look at it, the way I typically do
11  it is I'll create a PDF and each one of those images
12  has its own page so that it makes easier going
13  through.  And if you'll look at the first page,
14  you'll see, I know it's a lot of underscores, but
15  you'll see all of that information we talked about
16  from the joint evidence exam at BEAR and Berkeley
17  and you'll see 001 and it literally counts down
18  until you get to 161.
19     Q.   Got it.  Okay.
20     A.   Yup.
21     Q.   And then in that -- in that other

Page 103

1    subfolder titled PDF Ready, I don't have anything in

2    there.  What do you have in that figure?

3         A.   Oh, it should be all of the photos that

4    you looked at, the 161, reduced so that I could put

5    them in a PDF form and they wouldn't be too large

6    for most e-mail systems.  So that PDF we just looked

7    at was created from the images in the PDF Ready

8    folder if that makes sense.

9         Q.   Yup.

10        A.   Otherwise it's too large to send and

11   nobody will be able to receive it.

12        Q.   All right.  Going back now to the second

13   folder, it appears to be, without all the

14   underscores, it's the joint evidence exam at Salt

15   Lake City in October of 2023, correct.  That's the

16   Palmer exam?

17        A.   Correct.

18        Q.   Okay.  And within that I have 232 items.

19   Same style or layout where you have all of the

20   photographs and then you have a PDF that you

21   prepared with the photographs embedded within them?

Page 104

1    A.   And that is -- you're on 30 October?

2    Q.   Yes.

3    A.   Yes.  I have 470 items.  So some of the

4  items must not have gotten copied over.  I think --

5  we were talking about size.  I think, and I have to

6  keep this in mind in the future, the One Drive seems

7  to be limiting me as far as the size of the folder I

8  can have in there and share.  That's what it looks

9  like, it's not copying them all over.  But --

10    Q.   Aside from --

11    A.   Sorry, go ahead.

12    Q.   Sorry.  Aside from photographs in that

13  folder, do you have videos?

14    A.   No, no.  It's all photographs.  And those

15  are reflected in the PDF.  Hopefully you can see a

16  PDF.

17    Q.   Let me open up the PDF.

18    A.   If you open the PDF you should see pages

19  one of 469.

20    Q.   That's correct, yes.  So this would have

21  all of those that for whatever reason, probably

1    size, didn't transfer?

2       A.   Yeah, which is one of the reasons I try to

3    create a PDF so at least I can send that so you can

4    see them.  And then if you have a question I can

5    pull up the individual jpeg that's underneath that

6    on that page.

7       Q.  Okay.  Perfect.  All right.  So let me go

8    back now.  And then the third and last folder under

9    photos is from October 31st, 2023.  I don't have

10   anything in there but I would assume it's the same

11   layout where you have a photograph from the

12   October 31st as well as the PDF incorporating those

13   photos?

14       A.   That is correct.  I have a total of 300

15   items.  And the PDF is the same format you saw, page

16   one of 299.

17       Q.  Okay.  Perfect.  So let me go back now to

18   tab 11 and you have the next folder is Photos for

19   Wadsworth Matter?

20       A.   Yes.

21       Q.   And in that there is a subfolder Exemplar

Page 106

1    Report Ready with various photographs.  I have 136

2    items in that folder?

3         A.    That is correct.

4         Q.    Does that sound right?

5         A.    Yes.

6         Q.    Okay.  And this would be photographs taken

7    by you of an exemplar?

8         A.    No, no, no, these are actually BEAR's

9    photographs.  I put them in a report format so I

10   could utilize them if I needed to.  So these would

11   have come from that client material we looked at

12   earlier labeled Received 8/14/2024.  It would have

13   been under one of the exemplar folders that I pulled

14   that from.

15        Q.    Got it.  Okay.  The next folder is Report

16   Photos.  Have 67 items within that subfolder.  And a

17   lot of these photos are from the joint inspection

18   October 31st, Utah.  You have some of the BEAR

19   images included in there as well.  You have UL 2580

20   included in there, correct?

21        A.    The test report from 2580.

Page 107

1        Q.    Okay.

2        A.    Yup.

3        Q.    And is that specific to this battery

4    manufacturer?

5        A.    No, I don't believe so.  I was trying to

6    see where that came from.  No, it wasn't.  No.

7        Q.    Where did it come from?

8        A.    It might have been in the discovery

9    material.  In fact if you look at it you'll see

10   there is a Bates stamp number at the bottom.

11       Q.    Right.

12       A.    Yup.

13       Q.    What is the reliance if any that you put

14   on this UL 2580 document?

15       A.    None.  I was trying to see if there was a

16   difference or what the difference was between when

17   batteries were made and certain dates.  And

18   obviously this is JDDL.  So it was just me going

19   through the material and looking at it.

20       Q.    Okay.

21       A.    That was it.

Page 108

1      Q.   But this 26 page report on UL 2580, it

2   does not relate in any way, shape or form to the

3   specific hoverboard in this case?

4           MR. GIROUX:  Form.

5      A.   No, it does not.

6      Q.   Or even the hoverboard manufacturer or

7   model?

8      A.   Correct.  That is correct.

9      Q.   Okay.  You have included in this folder a

10  certificate of compliance that I saw in your report

11  as well dated October 15th, 2021, correct?

12     A.   Correct.

13     Q.   This certificate of compliance is

14  communicating the UL 2272 testing being performed

15  and completed by -- well, it says issue to Jetson

16  Electric, LLC, correct?

17     A.   That is correct.

18     Q.   Do you have a -- or have you reviewed a

19  certificate of compliance that was issued to Jetson

20  relating to UL 2271?

21     A.   Jetson itself, I don't believe so.

Page 109

1      Q.    Okay.

2      A.    I don't believe so.

3      Q.    Do you -- do you have or have you reviewed

4   a certificate of compliance that was issued to the

5   manufacturer of the battery that was implemented

6   into the Jetson hoverboards that we're talking about

7   today?

8      A.    Yes.

9      Q.    Relating to UL 2271?

10      A.    Oh, the 2271?  I don't know.  I think it

11   was related just to the individual battery cells.

12   In my report I list the actual certificate.  But it

13   was for the cell itself.  Let me look, give me one

14   moment, please.

15      Q.    Sure.

16      A.    All right.  You were asking about 2271,

17   sir?

18      Q.    Yes, sir.

19      A.    No, I just have 2272.  And the IEC

20   standard related to the battery cells themselves.

21      Q.    Sitting here today, would it be a fair

Page 110

1    statement that you have not received or reviewed any

2    record or material that affirms compliance with UL

3    2271 as it relates to the batteries within the

4    Jetson hoverboard?

5         A.   I can't recall right now for 2271.  I

6    would have to look.  But I didn't include it because

7    I was looking at the individual battery cells which

8    were more related to IEC 62133-2.  So it may exist,

9    I just can't recall it right now because I was

10   focused on the individual cells that Derek was

11   talking about.

12        Q.   Okay.  Does UL 62133-2 apply to battery

13   cells manufactured in China?

14        A.   Yes.  It's actually IEC 62133.  Yes.  And

15   I actually have the certification in my report.  I

16   pulled it up from -- I pulled it up from the IEC

17   website and included it in my report.  But it does

18   apply to that actual manufacturer on site with their

19   manufacturing process.

20        Q.   Okay.  Under the IEC 62133-2 is there a,

21   if you know, is there a stipulation that for

Page 111

1    purposes of design evaluation, and more specifically

2    forced internal short circuit testing, that it only

3    applies to Korea, Japan, Switzerland and France?

4            MR. GIROUX:  Form.

5        A.   Oh, that's the requirement for those, but

6    the manufacturer themselves make it so all of their

7    batteries comply.  And when I say that I'm talking

8    about various manufacturers, not just this one.  But

9    all of the major manufacturers, since they have to

10   comply with those countries, they make sure that all

11   their batteries meet it, which is why you see the

12   certification there.

13       Q.   Aside from the certification material that

14   you're referring to, have you received or reviewed

15   any of the test materials performed by the

16   manufacturer for purposes of complying with the

17   62133-2?

18       A.   I have not seen their test results, just

19   the fact that they were confirmed by the IEC and

20   which is how they actually get the certification.

21       Q.   The certification that you're referring to

Page 112

1    for 62133-2, what is the compliance -- or

2    certificate of compliance date?

3         A.   That one is November 20, 2018.  And it's

4    figure 19, page 25 of 39 in my report.  I included

5    it.

6         Q.   Was there a subsequent certification

7    process relating to the same batteries after

8    November 20, 2018?

9         A.   There may have.  I just tried to find the

10   certificate -- the earliest certificate that they

11   had and that was it.  I could go back to their

12   website and find it, but that was the one -- the

13   earliest one that I found at the IEC website.

14        Q.   Are you familiar with any changes in the

15   testing from the 2018 date of certificate that you

16   referenced in figure 19 to any subsequent

17   certification performed?

18        A.   Not related to the internal short circuit,

19   no, that is still the same.

20        Q.   The testing pursuant to the IEC 62133

21   standard, at least as referenced on this test

Page 113

1    certificate, that was using the 2012 standard?

2         A.    Correct.

3         Q.    There was a change after that to the

4    standard, correct, at least one?

5         A.    Yeah, there was one change and it was -- I

6    think the date may be 2022 or 2024 as far as the

7    standard change.  But it's not related to the

8    internal short circuit change.  I can't tell you

9    specifically what it is but I know it's not related

10   to that.

11        Q.    Okay.  Are you familiar with how many

12   times since the 2012 standard this IEC 62133 has

13   been changed or modified?

14        A.    I think just a few.  I mean I could look

15   it up, but I think it's just a few changes that they

16   made.

17        Q.    Okay.  Are you familiar with what those

18   changes are or have been?

19        A.    No, not specifically.  Because IEC

20   ironically enough is a -- the members are all

21   standards organizations, which I can't be a member

Page 114

1    of obviously.  So UL, CSA, all of them, they get

2    together.  So whatever changes they made, they would

3    have an idea, but it wasn't related to what I'm

4    looking at and focusing on which is the forced

5    internal short circuit.

6        Q.   Okay.  Did the manufacturer of the

7    batteries involved in the hoverboard we're talking

8    about today, were they the ones that performed the

9    testing?

10       A.   No, it's an independent lab.  In fact I

11   think they list them there.  UL Demco did the actual

12   testing.

13       Q.   Do you know if the lab subcontracted out

14   any of the testing relating to the forced internal

15   short circuit?

16       A.   No, my understanding is, no, they do it

17   themselves as part of their UL -- being UL certified

18   to do the testing.  They do the testing inhouse and

19   actually confirming that the manufacturing line and

20   everything else is in order in order for them to

21   issue the certificate.

Page 115

1      Q.   Okay.  Let me see if I can share my screen

2    here.  Give me one minute.

3      A.   Okay.

4      Q.   Can you see my screen, sir?

5      A.   It's taking a minute.  Give me one second.

6    Okay, there it is.  Whoa, if you can zoom in,

7    please.

8      Q.   It's small.  Is that any better?

9      A.   Yeah, yeah.  I'm starting to realize I'm

10   getting older.  I apologize.  Okay.

11     Q.   All good.  I'm showing you what I pulled

12   directly from the IEC website relating to testing

13   and measuring equipment, allowed subcontracting,

14   specifically the IEC 62133-2 standard.  And it

15   discusses, at least pursuant to this chart, the

16   different testing and measuring done relating to at

17   least this section.  And on the right-hand side

18   there is a column that states equipment

19   classification.  Do you see that?

20     A.   Yes.

21     Q.   Do you know what that relates to?

Page 116

1          A.    It just says required.  If you look above

2     that chart, you see the little designations, the R

3     equals required and S may be subcontracted.

4          Q.    Okay.  So meaning that wherever the R is

5     indicated under equipment classification, that would

6     relate to that particular measurement or test being

7     required?

8          A.    Correct, yes.

9          Q.    If there is an S under equipment

10    classification, does that indicate that that

11    particular measurement or testing may be

12    subcontracted?

13         A.    It may be subcontracted depending on what

14    it is.  That happens sometimes if you have a -- for

15    example if you're taking detailed micro ohm

16    measurements, a testing lab may have the required

17    equipment that you wouldn't have on hand and they

18    can subcontract for that.  If they do, that lab that

19    does the subcontract also has to be certified.

20         Q.    Okay.  Under this standard -- hold on, I

21    don't know why I'm zooming out.  Let me go down to

Page 117

1    clause 7.3.9, design evaluation, forced internal

2    short circuit cells.  They classify this as an S,

3    may be subcontracted.  Does that indicate that this

4    particular measurement or testing may be

5    subcontracted to a different lab?

6        A.   Yes, that's what that means, it can be,

7    correct.

8        Q.   Sitting here today, do you know whether or

9    not as it relates to the particular batteries,

10   battery cells, that we're talking about today for

11   the Jetson hoverboard, whether that testing for the

12   forced internal short circuits was subcontracted

13   out?

14       A.   My understanding, this is the IEC, like I

15   said, was a bunch of standards groups, but I would

16   say based on my experience that the answer would be

17   no, based on the certification.  UL usually requires

18   that it's the same company doing the testing.  So

19   when it says Demco on my figure 19, if it was

20   subcontracted they would have been listed on there.

21   That's just a UL thing.  And that was the reason I

Page 118

1  wanted to see who the certification came from.  And

2  in this case it's UL.  So they typically do not

3  subcontract.  Whoever is doing the testing, they

4  have to do all of the testing going through.

5       Q.   All right.  And in addition to the

6  certificate compliance on figure 19, have you

7  reviewed any additional records or materials

8  relating specifically to the testing pursuant to IEC

9  62133-2?

10      A.   As it relates to this manufacturer, no,

11  sir.

12      Q.   Going back to the folder that we kind of

13  left off on.

14      A.   Excuse me.

15      Q.   You've included here Don Juan Ulong.  It

16  appears to be a confirmation letter from UL sent to

17  that entity.  Do you see that?

18      A.   Yes.

19      Q.   What is the purpose of this within your

20  materials?

21      A.   All right, this is the one -- I realize

1    what it is.  In the exemplar testing or evaluation

2    that Derek did, he looked at both of them had two

3    different manufacturers.  And one of them was this

4    group and then the other one was JDDL.  That was the

5    reason I pulled this to see was it still under

6    compliance, but it doesn't apply here so it doesn't

7    matter.  That's when I was trying to determine, you

8    know, was it authentic, were we looking at the same

9    thing.  And looking at Derrick's information and my

10   evaluation, it appears the relevant batteries are

11   JDDL, not this group.  But that was me collecting

12   that information based on what I saw in his exemplar

13   breakdown.  So that's the reason why you see those

14   in there.

15        Q.   Understood.  And continuing on in the

16   folder, you included screen shots and photographs

17   from the exemplar exam?

18        A.   Yeah.

19        Q.   You've included, again, the TC 2580 list

20   that we have discussed, the temperature index chart

21   that you created from the NFPA 921, and the ULC

Page 120

1    2580, this is page 13, so the second page of your

2    inclusion, correct?

3         A.   Correct.

4         Q.   Okay.  Are there other materials -- that's

5    the last file I have within that subfolder, the UL

6    2580, the second page of it.  Do you have anything

7    additional?

8         A.   No, that's the last folder under there.

9    We talked about the other items in there, but that

10   would be the last item in that folder.

11        Q.   Okay.  Going back now, there is an x-rays

12   folder within tab 12 that has six, six documents,

13   six items at least on my end.  Do you have that same

14   amount?

15        A.   Yes, sir.

16        Q.   Okay.  And those would be certainly the

17   x-ray photos relating to the subject hoverboard?

18        A.   Yeah, my understanding is these are the

19   x-rays originally taken of the hoverboard by Palmer

20   and they gave me a copy of them.

21        Q.   Okay.

Page 121

1      A.   Or taken by somebody.  Palmer was the one

2   that provided them to me.

3      Q.   Okay.  Are you familiar with, you know,

4   these x-ray photos that we have talked about, CT

5   scans, but are these taken at the -- at the scene or

6   are these taken at a lab?

7      A.   No, this would be at a lab.  No, they

8   wouldn't be done at the scene.  Well, you can but

9   typically people do not like taking their x-ray

10   equipment to a fire scene.  So these would have been

11   done -- my understanding is that this would be done

12   at a lab, yup.

13      Q.   All right.  Do you have any knowledge one

14   way or another whether the images, whether it's the

15   x-rays or the CT, if they reflect the exact same

16   condition of the hoverboard and its components at

17   the scene?

18      A.   That's my understanding that they reflect

19   how it was at the scene.

20      Q.   Do you -- do you know whether or not there

21   are any differences in what we see in the x-rays by

Page 122

1  way of example of positioning and layout of

2  components versus how it appeared at the scene of

3  the incident?

4       A.    My understanding is this is the way it

5  was.  They would have collected it, wrapped it up

6  and brought it back.  So this should be the

7  condition of the hoverboard when it was collected

8  from the scene.

9       Q.    In your experience have there been times

10 where evidence is collected from a -- the scene of a

11 fire and brought to a lab and components that make

12 up that evidence are either moved around or they

13 change location?

14      A.    Not that I've been involved in.  If there

15 is something that sensitive, we wrap it right there,

16 shrink wrap it and make sure it doesn't move, we put

17 it in a bag.  Anything sensitive, no.  There may be

18 things where you collect evidence and debris, it

19 could move around.  But anything that's related to a

20 component or electronic items, we usually, and they

21 did that in this case, they collected as is, wrap it

Page 123

1    so nothing can move.

2         Q.    Okay.  So by way of example, if we look at

3    the second photo there under x-rays -- sorry, not

4    the second one.  Which one am I looking at here.

5    The fifth one.  It starts with Top B, 100 KV?

6         A.    What -- you said Top B?

7         Q.    Yes.

8         A.    There it is, I got it.  Top B.  Does it

9    say 100 KV zero to 20 milliamp seconds?

10        Q.    Correct.

11        A.    Yes, okay.

12        Q.    Okay.  So in looking at this x-ray image,

13   there are certainly screws and bolts and other

14   components that are laid out throughout this image.

15   You see all that?

16        A.    Yes.

17        Q.    Okay.  Do you know sitting here today

18   whether or not by way of example some of those

19   screws were in different places or locations on the

20   scene versus once collected and brought to the lab?

21        A.    Just looking at this, and my

Page 124

1    understanding, this is how they came from the scene.

2    But, again, this is a two-dimensional x-ray so it's

3    hard to say which is why they went for a CT scan.

4        Q.   Okay.  Is there any way to confirm whether

5    or not all of these components, screws, springs, and

6    otherwise, is there any way to confirm whether or

7    not they were laid out just as this, as it reflects

8    in this photograph at the scene?

9        A.   Not just looking at the x-ray.  You would

10   have to take the photographs from anybody that

11   looked at it and then compare them.  But, yeah, just

12   looking at a two-dimensional item, you just have to

13   go by what you see here and also was at the scene.

14   And in addition, it's also asking the questions of

15   those experts and knowing how they processed things.

16   I would be surprised if it wasn't in the same

17   condition when they x-rayed it as it was at the

18   scene.  I'll put it that way.

19       Q.   Yeah.  And my question is not so much as

20   to condition of the components, my question really

21   is as to location of components.  Have you gone back

Page 125

1    and looked at any photographs taken at the scene of

2    the hoverboard and its components in its original

3    position and compared these images?

4         A.   I see what you're saying.  You can't do

5    that because when you look at the hoverboard it's

6    solidified and has plastic.  We're looking at it as

7    an x-ray so it's shooting through the materials

8    that's melted and things.  If you look at, even in

9    my photographs and report, you'll see maybe some of

10   the cells you can make out.  But when they do an

11   x-ray, it shoots through that and you can actually

12   see it in more detail.

13        Q.   All right.  And so in looking at this

14   x-ray, can we at least agree you have not gone back

15   to look at the scenes of the incident and

16   specifically compared what you see by way of certain

17   component layout and locations to this image, is

18   that fair?

19             MR. GIROUX:  Form.

20        A.   Well, not really.  And I'll say the reason

21   why is you can't see these at the scene because of

Page 126

1    the debris or how it was configured.  Now, what I

2    did do, I went to the matterport and did look at the

3    photographs, and the image of the board, or the

4    hoverboard here, is consistent with what I saw when

5    we were actually in Palmer.  So the set-up that they

6    had there, where it was located, all of those things

7    were in the same condition as I saw the image of the

8    photograph at the scene.  What you're looking at

9    here is kind of an advantage because now you're

10   shooting through that and you can see the component

11   pieces from a two-dimensional standpoint.  So

12   comparing them, nothing should have moved because

13   the hoverboard physically looks the same as it did

14   when we examined it at Palmer on October 30th and

15   31.

16        Q.   Who collected the hoverboard and all of

17   the components of the hoverboard from the scene?

18        A.   I think it was a joint effort.  I can't

19   remember who the group was.  I think it's on the

20   chain of custody.  But I know jointly everyone was

21   there and they collected it.  But I can't give you a

Page 127

1    specific name or firm.

2         Q.   All right.  Let me go back.  The last

3    folder that I have under tab 11 is titled "x-rays

4    from 10/30/23 and 10/31/23."  Is that what you have?

5         A.   Yes, that is correct.

6         Q.   Okay.  And it appears that there are 78

7    items within that subfolder.  Is that consistent

8    with yours?

9         A.   Yes, it is.

10        Q.   And those would be all of the x-ray images

11   taken at the Palmer inspection in October of '23?

12        A.   Yes, sir.

13        Q.   The only other items contained within tab

14   11 that we have not discussed are the Apex

15   matterport and the bedroom floor measurement of -- I

16   guess to the window.  Do you have any additional

17   items within tab 11?

18        A.   No, that's it.

19        Q.   All right.  There is a tab 12 that you

20   provided to us and it's titled "CT scan data and

21   research material."  Within that there is a CT scans

Page 128

1    folder with 11 items.  And I think that's all from

2    BEAR, correct?

3          A.    That is.  And it's interesting, when you

4    were asking me earlier about that other folder, the

5    CT scans you had nothing in, this is what supposed

6    to be in there.

7          Q.    All right.  And that is a total of 11

8    items.  Well, I should say 11 items but it includes

9    four sub subfolders within there; is that correct?

10         A.    Yes, yes.

11         Q.    Okay.  All right.  And then outside of any

12   subfolders within tab 12, you have a document that

13   is 2015072 hoverboard SCH PDF.  What is that?

14         A.    This is a typical schematic for a

15   hoverboard and just looking at the markings to make

16   sure everything was consistent.  This is how you

17   would have the different connection, how the motor

18   moves, how it's keeping track of things, including

19   the balancing board.  But those contain, it should

20   be seven pages.  And it's just typically how those

21   are set up.

Page 129

1      Q.   Is that -- in looking at these seven

2   pages, is that reflective of how this particular

3   Jetson hoverboard is set up?

4      A.   In general.  When I say in general, I'm

5   talking about from the battery to different

6   connection points, those are consistent.  What I was

7   looking for more importantly than anything else was

8   the circuit board and how the wiring goes from one

9   end to the other.

10     Q.   What are the differences between this

11  seven page document and the Jetson hoverboard that

12  we're talking about, sir?

13     A.   Minor things as far as different

14  connection points.  What I mean by that is like a

15  balancing board, some of these have the hull sensor.

16  They don't.  But it's nothing significant related to

17  this particular case.

18     Q.   Okay.  The next document you have there is

19  the CPSC safety alert that we discussed previously,

20  correct?

21     A.   Correct.  Yes, sir.

Page 130

1      Q.   Did that factor in at all in your

2   opinions?

3      A.   I reviewed it.  But it -- no, I mean just

4   looking at it to see is there an issue, what it was.

5   It was an exhibit from someone's deposition, I can't

6   remember whose exactly, but it was just me

7   evaluating and looking at it.

8      Q.   Okay.  The next is the test certificate

9   that we discussed pursuant to the IEC 62133,

10  correct?

11     A.   Correct.

12     Q.   The following is the confirmation letter

13  from UL to specifically the manufacturer of this

14  battery, do you see that, September 12th, 2024?

15     A.   Yes, sir.

16     Q.   What is the purpose of this letter?

17     A.   To show that certification is still valid

18  and up-to-date.

19     Q.   Do you have or did you receive a letter

20  similar to this one that is dated either 2020, 2021

21  or at any time prior to the date of incident?

Page 131

1        A.    No.   I see what you're saying.  This

2    letter is when I go into the website, I signed up

3    for confirmation, so that date is the date that I

4    actually inquired about it, which was on

5    September 12th, 2024.  So it's electronic.  So you

6    go on there and you click the button that says

7    confirmation letter and this is what's printed out.

8    It's not like they gave it to me individually, it's

9    an electronic verification.

10        Q.    Understood.

11        A.    Yup.

12        Q.    The next two, or I should say the last two

13    items within this subfolder are the CPSC recall for

14    the Jetson Electric Bikes Rogue hoverboard, correct?

15        A.    Correct.

16        Q.    What -- what intention, what purpose, what

17    reliance if any do you place on those two last items

18    relating to the recall of the Rogue?

19        A.    It's related to the fact that the recall

20    was related to the Rogue and not the Plasma.  So I

21    wanted to see, was there anything else.  So I, you

Page 132

1    know, looked at it and just verified, okay, this is

2    not the same, the manufacturer is different as far

3    as the battery goes so it's not the same thing.  But

4    I was trying to see if there is anything else

5    related to the Plasma and there is not.

6         Q.   Sorry, I didn't mean to cut you off.

7         A.   That's okay.

8         Q.   Aside from a different manufacturer for

9    the Rogue battery versus the Plasma, what

10   differences if any exist in the battery that was

11   implemented in the Rogue versus the Plasma?

12        A.   Well, it's a different manufacturer, the

13   voltage is different.  I'm not sure of the

14   configuration as far as how many batteries are in

15   series as opposed to parallel.  So it's a different

16   battery configuration and power pack.

17        Q.   Okay.  Do you recall reviewing the

18   deposition of the 30(b)(6) corporate representative

19   of Jetson Electric Bikes?

20        A.   Yeah, I believe Sam, I forget his last

21   name.  Yeah, but I don't remember it verbatim.  But,

Page 133

1    yeah, I do remember reading it, yes, sir.

2        Q.   Do you remember in the portion in which we

3    discussed the battery and the differences between

4    the Rogue battery and the Plasma battery, do you

5    remember any of that conversation?

6        A.   I can't recall right now as I sit here.

7        Q.   He discussed that they are similar,

8    meaning the battery of the Rogue versus the Plasma.

9    Do you from your review, if you conducted this

10   review, do you have an opinion as to whether or not

11   the battery of the Rogue is similar to that of the

12   Plasma?

13           MR. GIROUX:  Form.

14       A.   Well, they are similar in that they

15   18650's, which is the diameter and the length.  But

16   as far as the capacity and things, no, they may be

17   different.  I'm just looking at the voltage here.

18   That voltage is different from the Plasma, by

19   6 volts.  So clearly there is a difference between

20   them, but dimensionally they may be similar.  It

21   just depends on what people's definition of similar

Page 134

1    is.  To me they are similar in dimension, but as far

2    as the makeup of the voltage and current, they are

3    going to be different.

4        Q.    Okay.  You were provided with a tab five

5    which appears to just include the expert file of

6    Derek King and the expert file of Schulz.  You see

7    that?

8        A.    Yes.  You were asking me previously and

9    that's why I had the tabs up.  What other e-mails,

10   these are the other e-mails.

11       Q.    Got it.

12       A.    Yup.

13       Q.    And then there is an e-mail here or

14   supplemental discovery and deposition, dated

15   July 31st.  And then the February 7th, 2024 one that

16   we have already discussed?

17       A.    Correct.

18       Q.    Any additional e-mails that you can think

19   of?

20       A.    Not that I can think of other than related

21   to this deposition, no, sir.

Page 135

1          Q.   And then generally outside of any

2    subfolder, there are just the copies of your C.V.,

3    the report, your fee schedule, retention agreement,

4    the testimony log, a list of technical requirements?

5          A.   References.

6          Q.   Sorry, references, yes, it was cut off.

7    Does this list all of your references that you've at

8    least relied upon for purposes of your opinions in

9    your report?

10         A.   There are a few that I didn't list, and it

11   was an oversight from my part but it's listed in my

12   report.  For example I talk about the NREL NASA

13   testing and you see the images.  It's not listed on

14   her but I did rely on it and look at it, obviously

15   because it's in the report.  But this is -- yes,

16   these are the items I looked at and referred to.

17   But that is one that I can think of that did not

18   make the list that should have made the list.

19         Q.   Did you -- it's not on here, but did you

20   look at and rely upon UL 2271 at all?

21         A.   I did review it, yes.  It's not on here

Page 136

1    but I did review it and I did look at it, yes, sir.

2        Q.   What was the purpose of your reviewing it?

3        A.   It was -- it was to see exactly what was

4    related to it.  Let me look up -- give me a second

5    because I can't remember.  There was a lot of

6    numbers on there.  Let me see what 2271 specifically

7    says and I can answer that question for you.

8        Q.   Sure.

9        A.   Give me one moment.  I did look at it.  It

10   is a reference in one of the standards, standards

11   for batteries for use in light electric vehicles.

12   But I saw that in our case it was more prevalent

13   with 2272 with the mobility.  Personal mobility or

14   E-mobile items.  And that was it.

15       Q.   Okay.  UL 2271 specifically looks at the

16   batteries, correct, these Lithium ion batteries?

17       A.   They are looking at them in light electric

18   vehicle applications.

19       Q.   It's only electric vehicle applications?

20       A.   Yeah, light.  They call it light.  If you

21   go to my C.V., page five, you'll see it.  But they

Page 137

1    are talking about actual electrical vehicles.  So

2    like, I don't know, let's say like a Tesla or

3    something like that or a golf cart.  Think of those

4    kinds of items.

5        Q.   Okay.  So is it your opinion that UL 2271

6    does not apply to hoverboards such as the one we're

7    talking about today?

8        A.   I didn't look at it from that standpoint.

9    There may be an application, a reference maybe with

10   some testing.  From what I was looking at, 2272 was

11   applicable as opposed to 2271.

12       Q.   2272 looks at the hoverboard as a whole

13   and how it interacts with itself or each other,

14   correct?

15       A.   Correct.

16       Q.   Okay.  2271 specifically looks at and

17   ensures proper operating voltage, is that true?

18            MR. GIROUX:  Form.

19       A.   Yeah, it may, but also a number of the

20   other standards do the same thing because they are

21   looking at charging and balance, things of that

Page 138

1    nature.  So it's not just exclusive to light

2    electric vehicles.

3         Q.   Okay.  All right.  Other than all of the

4    materials that we talked about, I think the last one

5    here under your Docs Produced Folder, tab seven,

6    eight, nine, those are all the PDF's of the various

7    photographs from the inspections we discussed?

8         A.   Yes.  And that we looked at.  That's what

9    those are.

10        Q.   I was provided some materials this

11   morning.  Let me just open that real quick.  I was

12   provided with tab 13, which appears to be the joint

13   evidence exam at Palmer.  Looks like there is photos

14   of the house layout and there is notes here?

15        A.   Yes, those are -- tab 13 are the notes

16   from the October 30 and October 31 exam at Palmer

17   and Salt Lake City.

18        Q.   Those are your notes, sir?

19        A.   Yes, they are.

20        Q.   Okay.  I have a total of 19 pages of

21   notes?

Page 139

1          A.    That is correct.

2          Q.    Okay.  I was also provided with tab 14

3     this morning, which appears to be the joint evidence

4     exam and accompanying notes at BEAR from

5     February 2024; is that correct?

6          A.    That is correct.

7          Q.    I have a total of nine pages, is that

8     consistent with your copy?

9          A.    Yes, it is.

10         Q.    All right.  And the last materials I was

11    provided this morning are the deposition transcripts

12    of the Wadsworth family, parents and children.  Is

13    there any other material that you've received,

14    you've reviewed, and that you've relied upon for

15    purposes of coming to the conclusions that you have

16    as contained within your report?

17         A.    Other than what we talked about, no, sir.

18         Q.    Okay.  So let's do this, because I know we

19    have taken a while and I appreciate your patience in

20    kind of going through all this and sifting through

21    the material, but let's take a few minutes if that's

Page 140

1    okay and then we will get to your report and move

2    through this thing.

3        A.    Okay.

4            VIDEOGRAPHER:  Off the record, 12 -- did

5        you want to go off the record.

6            MR. GIROUX:  Yeah.

7            VIDEOGRAPHER:  12:53.

8            (Off the record colloquy.)

9            VIDEOGRAPHER:  We're back on the record,

10        13:02.

11   BY MR. AYALA:

12       Q.    During the break did you have a chance to

13   review any materials?

14       A.    No.  No.  Just wanted to make sure I had

15   the report in front of me.  But, no, I didn't review

16   any materials.

17       Q.    Any conversations with counsel or

18   otherwise about the case?

19       A.    No.

20       Q.    Okay.  So let's get to your report, sir.

21   We talked briefly about the overarching opinions

Page 141

1    that you've laid out on page six of 39.  And with

2    regards to the scope of your work on this case, did

3    you perform any type of destructive testing?

4         A.    No, sir.  No.

5         Q.    Okay.  Did you -- other than review

6    photographs of the exemplar, did you do any type of

7    testing relating -- or with the exemplar?

8         A.    No, because the exemplar actually is with

9    Derek.  So I don't even have that exemplar.

10        Q.    Have you ever looked at one either

11   purchased by you or by the attorneys that retained

12   you?

13        A.    No, sir.

14        Q.    Have you performed any type of testing

15   relating to this case?

16        A.    Other than the -- at the evidence exams

17   when we were looking at it, non-destructably taking

18   measurements, no.  No, sir.

19        Q.    That examination was really observations,

20   measurements and photographs?

21        A.    That is correct.

Page 142

1        Q.    The first opinion you listed here on page

2    six is that the hoverboard did not cause the fire,

3    correct?

4        A.    Yeah.    That's not what it says but

5    essentially that's the gist of it.    "It is the

6    opinion of SEA that the subject hoverboard found in

7    the area of origin identified by MJ Schulz and

8    Associates was not the cause of the fire."

9        Q.    Right.    So your opinion is that the

10   hoverboard was not the cause of the fire?

11       A.    Oh, yes.    Yes.    I'm just so used to

12   reading the whole sentence out.    My apologies.

13       Q.    Not a problem.    The next opinion that

14   you've listed here is that this particular Jetson

15   model, the Plasma, "was designed, functioned and

16   operated in accordance with all applicable standards

17   and that all of the battery cells adhered to IEC

18   62133-2 testing and standards", correct?

19       A.    Correct.

20       Q.    What you say that it was designed,

21   functioned and operated in accordance with all

Page 143

1    applicable standards, I mean are you including in

2    that UL 2272?

3            A.    Yeah.

4            Q.    Correct?

5            A.    Correct.

6            Q.    Are you including in that UL 2271?

7            A.    I didn't look at it from 2271.  It may

8    comply.  Like I said, I looked at that as light

9    electric vehicles.  But as far as the batteries are

10   concerned, the standards would be covered by both

11   2271 and 2272.

12           Q.    Okay.  Have you looked at any records or

13   documents directly from Jetson that relate to the

14   specific design of this model?

15           A.    The design of this model.  No, I haven't

16   seen any documentation with that.  But as far as the

17   hoverboard, what I was referring to specifically are

18   just the component pieces associated with the

19   battery cells, and the design and function just how

20   it's set up as far as where the cables go, where

21   they route to the motors, things of that nature.

Page 144

1    That's what I was talking about.

2         Q.    And those are certainly based upon

3    observations that you've made during the various

4    inspections and examinations, is that fair?

5         A.    Yes, that's fair.  Observations, the

6    different material that we have, knowing the testing

7    results and the standards that are applicable, and

8    the substandards under each one of those.  So I'm

9    talking about applicable standards, so UL 1642, say

10   UL 746 A, B and C related to polymer materials,

11   related to motors.  It's a variety of them that

12   apply that meet those specifications under UL 2272.

13        Q.    When you say testing results, you didn't

14   look at the actual testing results.  Are you relying

15   on the conclusion of it complying with those various

16   standards, is that what you're referring to?

17        A.    I'm talking about the test report that was

18   in the -- in the discovery materials from Jetson.

19        Q.    Okay.  And did that relate specifically to

20   the hoverboard that we're talking about today?

21        A.    Yes.

Page 145

1     Q.   Did you receive and review any materials

2   relating to the design of the battery that was

3   implemented in the Jetson model Plasma hoverboard

4   from the manufacturer?

5     A.   No, not from the manufacturer.  Just the

6   standard in looking at the CT scans, I could see the

7   design is consistent with other 18650's for this

8   application.  For example, the battery cells have

9   current interrupting devices.  Those are the kinds

10  of things I'm talking about when I say design and

11  safety features.  So that if you have a buildup of

12  pressure it will separate.  And I know from looking

13  at the CT scans and the fact that they adhere to

14  those standards that it's designed in the same

15  manner you would expect other batteries in this

16  application to be designed for.

17    Q.   When you mentioned the testing results or

18  the testing records provided in discovery, what file

19  so we can go to it.  What file are you referring to?

20    A.   It's probably easier to use the exhibits

21  from Derrick's deposition because I think that was

Page 146

1    one of them.  Give me one moment, I'll get it for

2    you.

3         Q.    Sure.

4         A.    Okay.  So if you go to -- we went through

5    this before.  If you go to tab 11.

6         Q.    Yup.

7         A.    Received 8/29/24.  These are the exhibits

8    from Derrick's deposition.  It's obviously in the

9    material but it's easier for me to pull it since

10   it's already up.  So Exhibit 74 in particular is

11   talking about the test report, the component piece,

12   the battery cells for use in stationary and/or

13   transport applications.  That's what I was referring

14   to, the information that's in there where they have

15   talk about the cells and various information.

16        Q.    Okay.  Got it, yeah, so that's --

17   Exhibit 74 is a 11 page document, correct?

18        A.    Correct.  And you asked me that question

19   about 2271.  And this here is where 2271 is where

20   they say it also complies.  So technically this is

21   it.  I focused on 2272 but this also says these

Page 147

1    batteries meet the standard UL 2271 batteries for

2    use in light electric vehicles.  So I misspoke.  So

3    that is in that.  I'm referring to page three of

4    that document.

5          Q.    Page three of the document?

6          A.    Yeah.  At the top it says page two but on

7    the PDF it's page three.

8          Q.    I got it.

9          A.    Yup.

10          Q.    When you go to page four of the document

11    do you see where under paragraph three it states

12    "evaluation of the cells in this report to the

13    following tests have been conducted with acceptable

14    results."

15          A.    You said page four.  I see, you're doing

16    the same thing I did.  Okay.  The PDF page four,

17    correct?

18          Q.    Yeah, it's Bates stamp Jetson 0314.

19          A.    No, I was doing the same thing, it's fine.

20          Q.    Okay.  Under paragraph three it says

21    "evaluation of the cells in this report to the

1    following tests have been conducted with acceptable

2    results" and it marks UL 2580 appendix B.  Do you

3    see that?

4           A.    Yes, I do.

5           Q.    What it didn't mark is UL 2271.  Do you

6    see that?

7           A.    Yeah, I do see it.

8           Q.    Okay.  Or UL 1973.  Do you see that?

9           A.    Yes.

10           Q.    It says "the need for additional testing

11    of the cells shall be determined in the end use

12    application."  Do you know sitting here today

13    whether evaluation of the cells in this report was

14    conducted following testing as to the UL 2271

15    standard?

16           A.    Not -- no, not based on this report or

17    anything I've seen so far, no.  Based on what you

18    just read to me.  And, again, that's interpretation,

19    because like I said, I read on page two or three of

20    our PDF that it says that but you're looking at the

21    actual checkbox, which is appendix B.  So based on

Page 149

1    that, the answer would be no.  Actually that is not

2    true.  If you look at it, the checkbox is not marked

3    UL 2271 clause 16.  It doesn't say all of 2271.

4    Just like UL 2580 appendix B specifically.  That's a

5    specific clause related to 2271 that it did not

6    meet, not that it didn't meet 2271 as outlined on

7    page two of this actual technical report.

8         Q.   Do you know what clause 16 provides within

9    UL 2271?

10        A.   No.  But if you give me a five minute

11   break I can tell you.

12        Q.   Sure.  You have access to UL 2271 with you

13   today?

14        A.   Online I have access to it, yeah.  Being

15   on the technical committee I have access.  So if you

16   give me five minutes, I can find that clause for

17   you.

18        Q.   Sure, why don't we do that.

19             VIDEOGRAPHER:  Off the record, 13:13.

20             (Off the record colloquy.)

21             VIDEOGRAPHER:  We're back on the record,

Page 150

1          13:14.

2          A.    Okay.  Is it easier for me to just show

3    you the screen.  I can't send it to you, obviously

4    there's copyright infringement, but I can share my

5    screen if you want so you can see it.

6          Q.    Why don't we do that.

7          A.    Hold on, give me a second.  Let me know if

8    you can see now my screen.

9          Q.    I can.

10         A.    You said you can?

11         Q.    Yes, sir.

12         A.    Okay.  So 16 is cells, electric chemical

13   capacitors, repurposed cells and batteries.  And if

14   you looks at it, it says "cells and electric

15   chemical capacitors shall be designed to safely

16   withstand anticipated abuse conditions for vehicular

17   applications."  And I think what they are saying is

18   these cells don't meet -- that's what I was talking

19   about with 2271 about a light vehicle, that they

20   don't meet this requirement for a vehicular

21   application, because it's technically not a quote,

Page 151

1    unquote, vehicle, which is why I think they came up

2    with E-mobility device.

3        Q.    How many -- you're scrolling down so that

4    was going to be my question, how many subsections of

5    clause 16 exist?

6        A.    Yeah, there is a number of them.  With

7    different chemistries too.

8        Q.    Okay.  Is there any portion of clause 16

9    that applies to the batteries manufactured by this

10   entity that we're talking about today?

11       A.    No, not that I see here, no, sir.

12       Q.    Okay.

13       A.    I'll stop sharing so you can have your

14   screen back.

15       Q.    Thank you.  And continuing to look at

16   Exhibit 74 from Mr. King's deposition.

17       A.    Yes.

18       Q.    What page is this, there is -- I'll just

19   go with the Bates stamp, Jetson 0319, it talks about

20   separator?

21       A.    Hold on, 319.  Getting down there.  All

Page 152

1    right.  Wait a minute.  Yeah, separator.  Yes.

2         Q.   Okay.  What does this refer to?

3         A.   This should be referring to the actual

4    separator that separates the head of the cathode and

5    the electrolytic roll.

6         Q.   What is this reference to the separator,

7    does that refer to specific testing on that

8    component?

9         A.   That's what I'm looking at now.  Okay.  I

10   see what you're doing.  What they are saying is the

11   separator that they are using needs to extend beyond

12   the electrodes so that you don't have the potential

13   for those to inadvertently come into contact.  So

14   the minimum extension, if you look over on the

15   right, the minimum extension beyond the electrodes

16   is 1.25 millimeters.

17        Q.   Got it.

18        A.   Yeah.  If you've ever unrolled one before

19   you'll see the separator should just be a little

20   longer than the electrodes when you fully unwrap

21   them, or unroll them I should say.

Page 153

1     Q.   This exhibit, this is the only testing

2  report or records that you reviewed?

3     A.   As it relates to the manufacturer of the

4  batteries, yes, sir.

5     Q.   Do you agree that the testing reflected on

6  this exhibit do not consider the capacity

7  performance or any capacity performance testing?

8          MR. GIROUX:   Form.

9     A.   In here, yeah, that would be consistent.

10  But this is because that's the individual cells.

11  The capacity and performance would be something that

12  would be looked at under UL 2272.

13     Q.   Okay.  And have you seen any of that

14  testing, any of those testing materials relating to

15  UL 2272 as it relates to this particular

16  manufacturer and this?

17     A.   Not that I can recall.  I can't recall if

18  they talk about the testing that you're referring

19  to.  The test report I mean.

20     Q.   Have you -- have you reviewed any end-use

21  testing or application relating to this model?

Page 154

1      A.   Well, when you say end-use, what do you

2   mean by end-use?

3      Q.   Sure.  And I'm just referring to that page

4   three of the document that you looked at?

5      A.   Hold on, let me...

6      Q.   That's at 0314.

7      A.   Let me scroll back down, give me one

8   second.  Okay, I'm back.

9      Q.   Paragraph two talks about the

10  compatibility of the cell and charging circuit

11  combination, "shall be evaluated in the end-use

12  application."  Have you reviewed any materials

13  relating to the end-use application?

14     A.   Other than the application related to UL

15  2722 I have not seen actual testing of it, no.  I

16  have not seen test results.

17     Q.   If goes on to say "in addition, the

18  end-use application is to provide protection,

19  circuitry, to prevent cells from exceeding the

20  limits for voltage, current and temperature under

21  charging and discharging as specified by the

Page 155

1    manufacturer of the tables above."  But you

2    haven't -- you haven't received or reviewed any of

3    those materials, fair?

4              MR. GIROUX:  Form.

5         A.   No, I received them but the fact that they

6    have a certification that says they have been done,

7    I just don't have the actual test results report.

8    And it's not unusual.  That's why we start with the

9    certification.  And it's not really a report that's

10   released by a lot of manufacturers, but the fact

11   that it meets -- the certification is there, we know

12   testing was done, but I have not seen the actual

13   report.

14        Q.   Okay.  Does obtaining UL 2272

15   certification guarantee that a hoverboard will not

16   catch on fire?

17             MR. GIROUX:  Form.

18        A.   It -- it's extremely unlikely provided

19   that it's not misabused, they're using OEM

20   equipment.  There is a lot of factors in there.

21   What it's giving you is the standard or testing with

Page 156

1    foreseeable misuse and abuse of the product as

2    evaluated by members of the committee as far as

3    that's there.  As far as a guarantee, you would have

4    to know what the circumstance are.  So I would not

5    make a blanket statement guarantee.  I would say

6    it's designed to eliminate a cause of a fire, but if

7    there are circumstances that you don't know about it

8    and it leads to it, it would lead to a blanket

9    statement which I don't make.  So I would say it's

10   designed to eliminate a cause of a fire from a

11   hoverboard, but if there are circumstances beyond

12   any testing, then that can occur.

13       Q.   We've seen and you included in your

14   materials the recall documentation of the Rogue

15   hoverboard.  From your review, the Rogue hovered was

16   UL certified, correct?

17       A.   Yes, it was certified.  But, again, the

18   circumstances -- I don't know what the circumstances

19   are for them doing the recall.  When I say them, I'm

20   talking about CPSC.

21       Q.   Okay.  Well, the recall was not just by

Page 157

1    CPSC, it was a voluntary recall by Jetson as well.

2    Did you see that?

3         A.   Yeah, no, what I'm saying is I don't know

4    what the circumstances are related to it so I can't

5    make a determination of that standard related to the

6    recalling.  I don't know why they did it.

7         Q.   Do you recall reviewing the reasons why in

8    that 30(b)(6) deposition of the Jetson corporate

9    representative?

10        A.   I can't recall offhand.  I'm pretty sure

11   he gave a list or probably went through that with

12   you.  But I can't recall it right now.  I was

13   focused on the Plasma and those batteries.

14        Q.   Okay.  What he discussed relating to the

15   Lithium ion battery packs in the Rogue is that they

16   can overheat posing a fire hazard as referenced in

17   the recall.  Do you remember reviewing that?

18             MR. GIROUX:  Form.

19        A.   I can't recall right now.  But as far as

20   the overheat, my question obviously would be what

21   causes the overheat, things like that.  So I can't

Page 158

1    make a blanket statement.  If he said that, he was

2    looking at that, I wasn't, I was looking at the JDDL

3    related to the Plasma.

4         Q.   We can at least agree that the Rogue, as

5    included in the materials that you provided of your

6    file, the Rogue self-balancing scooter hoverboard

7    was UL certified?

8         A.   Yes, it was.

9         Q.   When Exhibit 74 refers to USR, what does

10   that mean?

11        A.   I can't tell you right now.  I'm not sure.

12        Q.   Okay.  Like on the second page, it's

13   Jetson 0312?

14        A.   No, I saw that, I just don't know what USR

15   stands for.  Whether it's US Representative

16   indicates compliance or what.  I'm not sure.

17        Q.   Okay.  So by way of example, the reference

18   that you made where it says "USR indicates

19   compliance with requirements outlined in one or more

20   of the following standards", and it gives the

21   various standards, you don't know what USR means?

Page 159

1      A.    As I sit here, no.  No.  I mean looking at

2    it, it says technical consideration, not the field

3    representation, but USR, I do not know what that

4    stands for as I sit here.

5      Q.    And what that paragraph states is that it

6    indicates compliance with one or more of the

7    following standards and it lists all those

8    standards.  Do you know what -- what standards

9    specifically it's referencing having complied with?

10     A.    It's those, the ones listed there.  It

11   looks like it's 2580, 2271 and 1973.  And as we

12   pointed out, 2271 on the bottom where you showed me,

13   was related to clause 16, which is inapplicable.

14   But according to this report it did meet the

15   compliance for those standards.  That's exactly what

16   it says.

17     Q.    Well, exactly what it says is that it

18   indicates the requirements outlined in one or more

19   of the following standards.  Do you know which, if

20   it's one or more?

21     A.    Well, no, not as I sit here.  I can tell

Page 160

1    you one of them definitely is UL 2580.  We have seen

2    that.  But beyond that -- beyond that, no.

3        Q.    I'm sorry.

4        A.    I apologize, that's me.

5        Q.    The UL 2580, that's based on some of the

6    other documentation and certifications that we have

7    already looked at.  That's why you know and can say

8    at least confidently that the UL 2580 is one of

9    those that meets the compliance requirements?

10       A.    That is correct.

11       Q.    Okay.  But as it relates to UL 2271 or UL

12   1973, you don't know sitting here today reading this

13   paragraph whether that is one or more of the

14   standards that have been complied with?

15       A.    No.  But I will tell you looking at 1973,

16   no, I can't say because they use 18650's in a

17   variety of places.  But I can't tell you as I sit

18   here about these cells in particular except UL 2580.

19       Q.    And even looking at that next page that I

20   referred to under paragraph three, UL 1973, there is

21   clause 5.11, there is a paragraph E.  All of those

Page 161

1    are left unchecked meaning that the evaluation of

2    the cells in this report have not been tested to

3    those specific requirements, is that fair?

4        A.    Fair but those requirements under those

5    specific locations.  Like 1973 is clause 5.11.  And

6    also appendix E.  So as far as those are concerned,

7    it doesn't meet that, whatever those are, and I

8    haven't looked at them.

9        Q.    Got it.

10       A.    Yup.

11       Q.    Okay.  This Exhibit 74 to Derek King's

12   deposition, I don't need to reattach it, it's

13   already in the records, but this would be the

14   only -- the only testing results or materials

15   specific to this manufacturer that you've reviewed

16   and at least partially relied upon for purposes of

17   your analysis in this case, is that fair?

18       A.    That is correct, yes.

19       Q.    All right.  Getting back to your report

20   and I'll give you a minute if you need to flip

21   through some windows there.

Page 162

1      A.   I'm back on it.

2      Q.   Okay.  Page six of 39, your opinions.  The

3  third one there, third bulletpoint is that the

4  "hoverboard contained 18650 Lithium ion battery

5  cells associated with the battery pack manufactured

6  by Jiangxi Jiuding Power New Energy Technology Co

7  Limited, were designed, functioned and operated in

8  accordance with all applicable standards, and that

9  this incident was not caused by an internal short

10  circuit that would have resulted in thermal runaway

11  failure within any of the recovered subject battery

12  cells."  Did I encapsulate that opinion correctly?

13      A.   Yes, and pronounced the name impressively.

14  Yes, you did.

15      Q.   Okay.  Great.  The -- and again, similar

16  question, but the applicable standards, primarily

17  what you're referring to is the IEC 62133-2 as well

18  as the UL 2580 and the UL 2272 standards?

19      A.   And UL 1642.

20      Q.   I knew I was missing one.

21      A.   Yup.

Page 163

1          Q.    The next opinion is that "the 18650

2    Lithium ion battery cells identified by BEAR, as

3    cell four and ten, do not have enough energy to

4    cause this fire as the Jetson model Plasma

5    hoverboard was not plugged in at the time of the

6    incident which invalidates the BEAR opinion that an

7    internal short circuit in battery cell four and ten

8    caused the fire."  Did I summarize that correctly?

9          A.    Yes, sir.

10         Q.    Okay.   I think somewhere in your report

11   towards the end you reference that the maximum

12   wattage, if you will, would have been nine, 9 watts

13   of power?

14         A.    Well, 9 watts is what the battery

15   provides.   However, if you look at the report I talk

16   about the maximum power -- I break it down into

17   seconds.   And that's when I started looking at it,

18   how long a time.   And it's actually more than that

19   when you break it into seconds.   But it's 9-watt

20   hours is what you have.   But when you get into watt

21   seconds it's a lot different and I describe that

Page 164

1    later in the report.

2         Q.   And so when you say in this opinion that

3    there would not have been enough energy to cause a

4    fire, do you have an opinion, and if you need to

5    flip through your report please do, but do you have

6    an opinion as to the amount of energy required in

7    order to cause a fire?

8         A.   Yeah, I think I listed it in the report.

9    It's 30 watts based on NFPA 921.  But more

10   importantly what I was talking about was this

11   particular battery cell, based on the calculation

12   and testing done by NREL, the reason it doesn't have

13   enough energy is because the temperature is not hot

14   enough or high enough to even ignite paper or more

15   importantly to even melt solder.  And that's how I

16   know it's not enough energy.  So it's not just the

17   one thing, it's me doing analysis and looking at it,

18   calculating the energy.  And my calculated number is

19   within, I believe, four degrees of the actual

20   empirical data as shown on page 33 of 39 of my

21   report in figure 27.  And this is NREL and NASA.

Page 165

1    Let me stop.  NREL stands for National Renewable

2    Energy Lab, which is a part of the Department of

3    Energy.  And NASA is NASA.

4         Q.   Have you reviewed any literature that

5    provides the minimum values of voltage current or

6    power for the ignition of fire?

7         A.   Well, they don't go by voltage or current,

8    it goes by watts, because that's the energy you need

9    to create a fire.  But it's 30 watts.  And that is

10   from NFPA 921 in the electrical section.  And I

11   think I talk about that in my report, that the

12   minimum energy you need is 30 watts of power.

13        Q.   Okay.  And you've gone through and walked

14   through in your report, I guess, the calculation of

15   the wattage, right, the watt hours?

16        A.   Correct.

17        Q.   How you convert from volts to the watt

18   hours needed and necessary for purposes of that

19   opinion?

20        A.   Correct.

21        Q.   And so by way of example, if you have a

Page 166

1     voltage of 1.2, how would you go about making the

2     calculation to converting it to watt hours?

3          A.    Well, you can't.  You have to know what

4     the starting point is for the battery itself.  If

5     you look, we had the information from JDDL that we

6     looked at obviously in Exhibit 74 and also on the

7     exemplar battery that said it was 9-watt hours.  You

8     have to know what the watt hours are because that's

9     your energy, not the voltage.  It's just like in

10    your home, you may have 120 volts, but if you run

11    your washing -- your dryer, it's going to draw more

12    current and have more power or watts, or watt hours

13    they will charge you for, as opposed to charging a

14    phone.  So just having -- you can't piecemeal and

15    say, okay, if I change this voltage what happens.

16    You have to look at the entirety of that particular

17    energy source and then break down based on the

18    voltage, the current and the information, including

19    the internal resistance and the specific heat how

20    you would actually come up with that calculation.

21          Q.    So am I to understand based on this

Page 167

1    fourth opinion, the fourth bulletpoint on page six,

2    that you are of the opinion that the BEAR

3    conclusions relating to the short within cell four

4    and cell ten is impossible?

5                    MR. GIROUX:  Form.

6         A.   No, no, you can have a short, but I'm

7    talking about -- and I want to be specific.  I'm

8    saying that it did not cause this fire, okay.  There

9    was not an internal short circuit that resulted in

10   this fire.  And I go painstakingly through in the

11   report and explain why.  But it's not just, Oh,

12   there was no short.  No, there was no internal short

13   circuit related to these batteries based on the

14   analysis and based on the information we have that

15   any physical evidence that shows us that these

16   battery cells did not cause this fire.

17        Q.   Okay.  So you dispute that there was an

18   internal short circuit in cells four and ten?

19                    MR. GIROUX:  Form.

20        A.   I dispute that there was an internal short

21   circuit that caused this fire.

1      Q.   I get that.  I get that.  But are you

2  disputing -- are you disputing that there was an

3  internal short within cells four and ten?

4      A.   No, I mean you have a short based on the

5  fact that the separator is gone.  But that's the

6  result of a fire, not the cause of the fire.  I'm

7  looking at it from the standpoint of a cause, not

8  necessarily -- if it's attacked by fire, yeah, you

9  can have an internal short circuit inside but it's

10  created by the fire.  If it's the cause of the fire,

11  then the evidence is going to look a lot different

12  if it was the cause as opposed to being the victim

13  of the fire.  And in this case it's a victim as

14  opposed to the cause.

15      Q.   No, I get that.  And I'm going through

16  and -- I understand your opinions, I do.

17      A.   Okay.  I just try to be precise, that's

18  all.

19      Q.   I get it.  And so like I was walking you

20  through piece by piece.  I want to see what you

21  dispute and what you don't dispute based upon at the

1  very least Mr. King's opinions, if that makes sense.

2       A.   It does, but I can't take a piece from it.

3  I look at it collectively.  And I think that's the

4  challenge for me.  That's why I follow the

5  scientific method.  During my analysis and the

6  development of hypothesis, I take everything into

7  consideration.  I don't take different pieces and

8  parts in order to create that opinion.  So I will

9  say it this way.  My opinion is is an internal short

10  circuit in four and ten was not the cause of this

11  fire.

12       Q.   I understand.  Do you dispute Mr. King's

13  opinion as to the timing of the -- the short in

14  cells four and ten?

15       A.   Yeah, now that I do have -- yeah, I really

16  have a hard time with the evidence trying to say

17  that cells four and ten simultaneously failed at the

18  same exact time.  I have not seen any -- I can't

19  come up with that.  I can't come up with that

20  opinion within a reasonable degree of engineering

21  certainty because of the separation, how far away

Page 170

1    the cells are.  Yeah, I don't agree with it.  I
2    can't see it.  I really can't.  I'm talking about
3    when I can't see it, I mean physically looking at
4    the evidence, the information, and more importantly,
5    the fact that it's not plugged in at the time, I
6    have a hard time believing something like that would
7    happen simultaneously.
8         Q.   So -- just again, so I'm clear, your
9    dispute of -- or disagreement with Mr. King's
10   opinion as to the timing of the short in cells four
11   and ten, I believe he testified that they occurred
12   at or about the same time, you dispute that, you do
13   not see evidence to the support or suggest that?
14        A.   Yeah, I don't see any evidence that
15   suggests that as far as a failure.  But let's take,
16   for example -- let's say it was true.  The physical
17   evidence tells us that it wasn't the cause of the
18   fire because of the damage we have with the circuit
19   board, with the wiring, with the insulation still on
20   it.  So it's -- you know, I'm not going to get into,
21   okay, well, he says this, he says that.  Okay, fine.

Page 171

1    Does the evidence show that an internal short

2    circuit that he described caused the fire, and the

3    answer within a reasonable degree of engineering

4    certainty is no.

5        Q.    Okay.  I understand that to be your

6    opinion, sir.

7        A.    Okay.

8        Q.    The next opinion that you have listed here

9    in the bullets is --

10       A.    Wait, I got to flip the screen again.

11   Okay.  I'm back to you.

12       Q.    "The opinion of SEA", and I'm going to

13   skip over a few words for timing purposes.

14       A.    Okay.

15       Q.    "that the manufacturers have and continues

16   to utilize UL and IEC testing shown in the results

17   of those respective test reports as" -- again, the

18   only report you're referring to is Exhibit 74 of

19   King's depo, correct?

20       A.    Well, that report, but, see, it's

21   difficult for me to separate it because I know what

Page 172

1    the IEC testing and getting that certification that

2    it was tested.  I just don't have the physical test

3    results that someone did.  But I know it was

4    confirmed with that certification, so it's kind of

5    hard for me to separate the two.

6         Q.   I understand.  You know the outcome.

7         A.   Correct.

8         Q.   But my question is as to the process.

9    What you don't have other than Exhibit 74 of

10   Mr. King's deposition, you don't have any other

11   testing report or documentation?

12        A.   No, I do not.

13        Q.   You just have the results?

14        A.   Correct, just the results, yes.

15        Q.   Okay.  And by the way, have you in your

16   career have you ever been involved in specific

17   testing to the IEC 62, what is it, 133 standard?

18        A.   I have not been physically involved in the

19   testing.  I've evaluated the standard under UL

20   because they adopted it, but I have not done the

21   actual testing.  It's extremely expensive and the

Page 173

1    only people I know so far, and that's why I

2    mentioned them, that's done it properly has been

3    NREL and NASA.

4         Q.   Okay.  And same type of question, but you

5    haven't been involved in the specific testing under

6    any other of the UL standards that we have been

7    talking about today as it relates to hoverboards?

8         A.   Not that I can think of.  I mean I've done

9    testing on hoverboards.  But as it relates to the

10   specific testing in UL, I have not done that as a

11   certified lab would.  No, I have not.

12        Q.   This opinion talks about the manufacturer

13   of the battery utilizing the UL and IEC testing.

14   You talk about the respective test reports as its

15   tool to be a practical FMEA as it addresses all

16   known and potential failure modes outlined in those

17   standards.

18        A.   Yes.

19        Q.   And then you further opine that the CPSC

20   safety alert was not related to the subject Jetson

21   model Plasma and is therefore not pertinent to the

Page 174

1    investigation of the Wadsworth fire.  Is that

2    correct?

3         A.   Yes, sir.

4         Q.   Okay.  That -- those, one, two, three,

5    four, five -- five or six, because the last one kind

6    of has two opinions, but those five or six opinions,

7    those encapsulate the breadth of your opinions that

8    you've concluded in this case, is that fair?

9         A.   You mean all of the opinions that we

10   talked about?

11        Q.   Yes, sir.

12        A.   Yes.  Yes.  And the -- all of those

13   opinions with the basis in the body of the report,

14   yes, it does.

15        Q.   Okay.  You don't have -- and I know we

16   started at 10:00 o'clock our time, right.  You don't

17   have additional materials -- opinions that you have

18   come to since we started this depo?

19        A.   That is correct, I do not.

20        Q.   And so what we have just read on page six,

21   obviously there is more detail about those

Page 175

1    extrapolating upon those opinions, but these

2    opinions on page six are the opinions that you have

3    concluded in this case and will be offering at the

4    time of trial?

5         A.   Within a reasonable degree of engineering

6    certainty, yes, sir.

7         Q.   Okay.  The next page of your report has a

8    signature there of Robert House.  Who is Robert

9    House?

10        A.   Bob House.  Robert House.  He's an

11   electrical engineer out of our Florida office who

12   technically reviews -- or reviewed this report.

13        Q.   Okay.  I don't have the opportunity to

14   call him Bob.  I don't know Bob.

15        A.   I know.  I apologize.  The reason we do

16   that is because we have so many Roberts in the

17   company.  Somebody is Bob, somebody is Bobby,

18   someone is Robert.  My apologies, yeah, that's Bob

19   House.  Yes.

20        Q.   All good.  Page eight of your report goes

21   through the procedures?

Page 176

1        A.    Yes.

2        Q.    And I would assume this is your procedures

3    that act as the basis at the very least of your

4    ultimate opinions or conclusions, is that fair?

5        A.    That would be fair, yes.

6        Q.    So you talk about certainly the

7    October 2024 examination?

8        A.    Yeah.  Other than the typo, yes.

9        Q.    I know.  I know.  That's all right.  But

10   you talked about that examination, you talk about

11   the February 2024 examination at BEAR?

12       A.    Yes.

13       Q.    And you talk about various materials,

14   research obtained, reviewed, and you list there from

15   page eight all the way through page ten of your

16   report all of those materials, correct?

17       A.    Correct.  Except for the one that I

18   mentioned earlier about NREL and NASA, that is

19   correct.

20       Q.    Okay.  You have those though, you have

21   copies of that somewhere in your files, those

Page 177

1    reports?

2        A.   Not in my file because it's a reference,

3    but I have access to it.  But it's just a reference

4    I use.  Just like the other ones, they are

5    references, they are not actually in the case file.

6        Q.   Okay.  And all of these materials under

7    paragraph three of procedures, have we gone through

8    and outlined and even reviewed all of those through

9    the materials we covered in tabs one through 14?

10       A.   We haven't gone through them all.  I

11   evaluated them.  But for the basis of my opinion

12   with this report, we have covered them.  Indirectly

13   we have covered them, yeah.

14       Q.   And, again, I know I've asked you about

15   this, but since we're on the list, there was no

16   reference at all to UL 2271, correct?

17       A.   Yeah, not on this list, that is correct.

18   It's not on here.

19       Q.   So we get to page 11 and this begins the

20   discussion portion of your report and the scope of

21   the services that you provided in this case, fair?

Page 178

1      A.   That is fair.

2      Q.   You give a brief background of this

3   incident --

4      A.   Wait, wait, let me stop you for a second.

5   Not the scope.  The scope is actually further up the

6   report.  I apologize.  The scope is actually on page

7   five.

8      Q.   Okay.

9      A.   Yeah.  But as far as a discussion, the

10   background and things, that would be starting on

11   page 11, yes.

12      Q.   You're right.  And I'm sorry, page five

13   because we passed it to your opinions.  But page

14   five you discussed briefly the matter assignment,

15   September 13, 2023, a very brief factual description

16   of at least what I could assume was information

17   provided to you about this incident?

18      A.   That is correct.

19      Q.   And then you go on to discuss the scope.

20   And according to this you are asked or requested to

21   conduct an electrical evaluation and investigation

Page 179

1    to determine, if possible, whether the cause of the

2    fire loss was associated with the Jetson Plasma

3    hoverboard device, correct?

4        A.    That is correct, yes, sir.

5        Q.    You talk about in the methodology your

6    investigation and analysis of these types of fire

7    related incidents.  You talk about use of the

8    scientific method in accordance with NFPA 1033 and

9    NFPA 921, correct?

10       A.    Correct.

11       Q.    And then there is a conclusions portion

12   which really spills over to the next page which is

13   your opinion?

14       A.    That is correct, yes, sir.

15       Q.    All right.  So now that gets us to page 11

16   where the discussion portion gives a background of

17   simple facts as to the incident, correct?

18       A.    Correct.

19       Q.    Joint laboratory examinations.  Again, you

20   described the Palmer exam, the BEAR exam, correct?

21       A.    That is correct.

Page 180

1      Q.   And as you continue through the pages you

2   provide some of those PDF photos that we briefly

3   went through your file and discussed for the various

4   examinations, correct?

5      A.   That is correct.

6      Q.   When I get to page 16 you have some more

7   description here and you talk about -- you talk

8   about the hoverboard sustaining heat damage from the

9   exterior.  Does that mean according to you that the

10  batteries would not have exploded?

11     A.   No, no.  That means that some external

12  heat attacked this hoverboard, as opposed to the

13  hoverboard being the start of the fire and the heat.

14     Q.   Okay.

15     A.   That's what I was trying to describe.

16     Q.   Okay.  And when you -- when you start to

17  talk about that, is there -- if this hoverboard

18  was -- I'm trying to understand your conclusion.  If

19  this hoverboard was the cause of the fire, it is

20  your opinion that the hoverboard would have evidence

21  of melting and further damage, is that true?

1      A.   Yes, it's not just my opinion but the

2  physical evidence shows that -- yeah, that's the

3  opinion but the physical evidence shows that that

4  did not occur in this case.  And I go through

5  talking about the melting of solder, aluminum, all

6  of those various things that are not damaged when

7  you physically look at the evidence that confirms

8  that the cause of the fire was not the hoverboard as

9  opposed to a fire attacking the hoverboard.  And

10  that's what I'm describing on that page.

11      Q.   Okay.  The fire attacking the hoverboard,

12  is that what caused the shorts in cells four and

13  ten?

14           MR. GIROUX:  Form.

15      A.   Correct.  That is correct.

16      Q.   And that caused essentially those cells to

17  explode?

18      A.   Well, I won't say explode, but they --

19  they vented.

20      Q.   Okay.

21      A.   They vented.  I apologize, when I think

Page 182

1    explosion, I think that the entire steel casing is

2    ripped apart.  That to me is an explosion.  So this

3    vented and pushed out the electrolytic roll.  That's

4    how I would describe it.

5         Q.   If this hoverboard was attacked by fire as

6    opposed to being the cause of the fire, why were

7    only cells ten and four the ones that vented?

8         A.   Based on probably protection.  Remember,

9    one of the things you have to understand about this

10   hoverboard is you have an aluminum encasement, you

11   have plastic.  The actual battery pack itself has

12   another piece of plastic over top of it.  And then

13   you have the plastic for the actual steel cans for

14   the battery cells.  And then the cells themselves, I

15   call it the can, but the canister, is made of

16   stainless steel.  So you have to be able to

17   penetrate all of those things and then compromise

18   the interior by heating up the steel up enough to

19   create that.  In this case ten and four had enough

20   heat to expose them to that and the pressure did not

21   build up in the other battery cells.

Page 183

1          Q.   With the venting of cells four and ten

2     occurring, would you expect that to have led to

3     other cells venting?

4               MR. GIROUX:   Form.

5          A.   No.  No.  One of the things they do is an

6     imbalancing related to the standard, I think it's

7     2580 or 2272, and they actually tested where they

8     forced a discharge of one of the cells to see can

9     you create this.  They also do the short circuit in

10    the battery pack so that it -- to show it can't

11    extend.  But the key thing is do you see evidence of

12    it, and there is no physical evidence of the other

13    cells venting in that scenario.

14         Q.   At what temperature would you expect these

15    cells to vent?

16         A.   It's not about the temperature, it's about

17    the compromise of the separator.  So when the

18    separator is melted and it allows the anode and

19    cathode to come together, that's when it starts to

20    vent.  I can't give you a number on it.

21         Q.   Okay.  Have you looked at any references

Page 184

1     to -- that would guide you as to what those numbers

2     might be?

3          A.   Yeah, the only reference that I had is the

4     one that I showed you that's actually in the report,

5     in the figure from NREL.  They tell you what the

6     temperatures are that they were able actually --

7     actually able to compromise it.  But that was

8     because of the testing they did.  They have other

9     tests that show that, but it really depends on the

10    circumstances of the fire, how it is protected.  And

11    there is a variety of things which is why I like

12    looking at the evidence of a particular case, and in

13    this case we don't have that event occurring.

14         Q.   Where was cell four in comparison to cell

15    ten?

16         A.   I think it's on the diagram.  I believe

17    it's one cell over.  Give me a second, I'll give you

18    the page number.  It might be easier to use the

19    electronic copy.  Okay.  Page 34 in my report, I'm

20    showing the diagram, the image from BEAR's report,

21    and it shows where ten is located and where four is

Page 185

1    located right up above.  Above the word vertical

2    connection.

3        Q.   Okay.  So that -- at least in looking at

4    this CT scan, it looks like they are -- it looks

5    like they are on opposite ends?

6        A.   They are.  Well, it looks like it.  The

7    one cell is bent.  I believe it's four should be

8    bent forward.  But, yeah, they are not next to each

9    other.  Which goes back to what I was saying about a

10   simultaneous failure.  I had a hard time believing

11   that.  But they are separate from one another as you

12   can see in this diagram.

13       Q.   Based on the protections that you were

14   describing, how is it that cell four and cell ten at

15   opposite ends of that pack both vented?

16       A.   Well, this is the thing I talked about

17   before.  When it's attacked, there is no way to

18   quantify that based on what you see.  What you're

19   saying is ten and four eventually vented.  When they

20   vented, I don't know if anyone is going to be able

21   to tell you.  It depends on the fire and when it

1    started to compromise those cells.  But clearly it's

2    compromising just those two cells but I can't tell

3    you which way the fire went and how it acted.  What

4    I can tell you though is if those cells caused the

5    fire then the damage would be different as it

6    relates to the wiring, as it relates to the solder

7    on circuit board and things of that nature.  That's

8    what I took collectively.  And I think it's

9    important to understand when I follow the scientific

10   methodology, I don't take one piece of information,

11   it has to be everything collectively looked at.  And

12   collectively looking at it we know the fire attacked

13   them.  And the question about whether they caused

14   the fire, the evidence shows that it did not.

15       Q.   How do you explain cells two, three, and

16   seven not venting?

17            MR. GIROUX:  Form.

18       A.   The fire didn't compromise the

19   electrolytic cell in those cells.  The physical

20   evidence shows that that didn't occur.  How it

21   occurred, again, I don't know how the fire, you

1    know, gets inside.  Remember, as I stated before,

2    this is -- these are batteries.  You're looking at

3    it now without the plastic, without the cover,

4    without any of those items.  So I have no idea how

5    the fire compromised four and ten and why it didn't

6    compromise the other ones.  Because obviously they

7    are protected by various pieces, the plastic, the

8    aluminum on the outside.  But when you look at it

9    and ask that question the other way, well, if cell

10   ten and cell four caused the fire, why don't I have

11   the damage that would be consistent with melting of

12   solder, which is less than the ignition of paper.

13        Q.   I mean I guess the question could be asked

14   both ways.  I mean you would expect to see at least

15   some of those cells between four and ten to have

16   been compromised given just the location of four and

17   ten, would you not?

18             MR. GIROUX:  Form.

19        A.   No.  Four, the way it's located, should be

20   faced the other way.  The fire attacked it.  This is

21   why you can ask that question but what does the

1    physical evidence show you.  It shows you that it

2    didn't start.  So I take the premise, okay, fine,

3    let's say that it did start it.  What would the

4    evidence physically look like based on empirical

5    data, based on our knowledge and understanding of

6    melting temperatures in fires and how they create,

7    you know, the damage that they do, and it's

8    inconsistent with the actual evidence in this case.

9    They are inconsistent.

10        Q.   To be fair, you've never -- you've never

11   been retained on a case where you concluded that the

12   battery cells within a hoverboard have been the

13   cause of a fire, correct?

14        A.   Incorrect.  We discussed that earlier.  I

15   told you that I found hoverboards where they had,

16   two of them, where the hoverboards were using

17   counterfeit battery cells and the cells did cause

18   the fire and the damage was consistent with that.

19   I've actually seen that.  And also with the

20   charging, the chargers inappropriately charged them

21   and caused the batteries to create a thermal runaway

Page 189

1    and the damage was consistent with that.  This

2    damage is not consistent with an internal short

3    circuit causing the fire as those were.

4           Q.   Those cases were pre 2016?

5           A.   Yes.

6           Q.   Those cases were prior to the

7    implementation of UL 2272?

8           A.   That would be correct, yes.

9           Q.   Those cases dealt with counterfeit

10   batteries as opposed to batteries the purpose

11   intended for that particular device?

12          A.   Only two of them.  The other three were

13   the inappropriate chargers.  They were not OEM

14   chargers.

15          Q.   But since -- since 2016 you've never

16   looked at a hoverboard case and made a determination

17   that it was the cause of a fire, correct?

18          A.   In the cases I've been involved in, the

19   evidence has not supported that, no, sir.

20          Q.   Have you done any testing on hoverboards

21   to corroborate some of the opinions about the

Page 190

1    melting temperatures that you've included here?

2        A.   Have -- related to this case or just in

3    general?

4        Q.   Generally relating to hoverboards in the

5    cases that you've been retained on?

6        A.   Not cases I've been retained on, just

7    testing that been done as a group at our company.

8    We've created scenarios where a fire happens on the

9    interior.  We arranged it in that manner and were

10   able to look at the damage to see if it's

11   consistent, or see what it looks like.  And that

12   information as well as other information supports

13   what I'm talking about.  But, no, I have done

14   testing before but not as it relates in particular

15   to this case.

16       Q.   Okay.  I don't know if I understood all of

17   that.  Let me ask it in a different way.  Have you

18   had done -- have you done any testing any of the

19   cases you've been retained on relating to a

20   hoverboard for purposes of analyzing the melting

21   temperatures as described on page 16 of your report?

1      A.   Just bringing up my report.  Hold on.  Not

2    destructive testing but non-destructive testing I

3    have.  And that goes into what I was talking about.

4    Solder.  I've seen the solder in cases where there

5    is a fire interior where you can see the actual

6    damage.  The wiring, there is no insulation on any

7    of the wiring at all, completely melted and gone,

8    because everything is internal and enclosed.  So the

9    first thing that's going to burn is the insulation,

10    starts to damage the solder, things of that nature.

11    So I have non-destructably seen the results of it

12    but I haven't gone out and just set something on

13    fire to see what occurred.

14      Q.   Have you done any testing of the specific

15    materials used in this hoverboard, this Jetson

16    hoverboard model?

17           MR. GIROUX:  Form.

18      A.   I've done testing looking at the wiring

19    when you put a flame to it, how it reacts.  Like for

20    example vertical flame tests.  You put a flame

21    underneath the insulation where the wiring would

Page 192

1    have been here, and when you remove the flame it

2    doesn't propagate.  I've done testing on printed

3    wiring boards to see what happens when you put

4    flames to them.  I've done that kind of testing.

5         Q.   But you have not done any testing as it

6    specifically relates to a Jetson hoverboard?

7         A.   No, not at all.  And, you know, I always

8    say the metals never lie.  The melting temperatures

9    are confirmed with different organizations and we

10   know that.

11        Q.   Did you test the material and makeup of

12   those materials that were implemented into the

13   Jetson hoverboard?

14        A.   No, that was done in -- it was

15   incorporated into the UL standards I talked about

16   earlier, UL 1642, UL 2580 and UL 2272.  I mention

17   one of them which was UL 746 A, B and C.  They

18   actually test those items.  When you look at the

19   standard you will see the variety of standards that

20   the component pieces must meet.  And that's the

21   testing that they do, so it's not necessary for me

Page 193

1    to do what they have already done and confirmed.

2         Q.   Do you know one way or another whether or

3    not there was any variances or issues with the

4    materials tested under those standards as it relates

5    to the Jetson hoverboard model?

6              MR. GIROUX:  Form.

7         A.   As it relates the Jetson model there

8    wouldn't be any variances because that's the one

9    thing about UL that's interesting.  UL when they

10   test, they got out to the facility where they

11   manufacture the items and confirm the set-up, they

12   confirm the equipment, all of those things,

13   including the material, and come back and

14   periodically test it.  But that's the reason why,

15   you know, they are confident in setting up the

16   certification because it's a manufactured product.

17   Once the line is set up, once you have it, when they

18   do the periodic test they just confirm it.  But that

19   would be a part of a testing phase which is actually

20   testing the manufacturing process as well as taking

21   samples.

Page 194

1      Q.    So are you saying that UL, I believe it

2   was UL Demco, would have gone to the factory in

3   China for purposes of manufacturing and testing?

4      A.    They do.  And that's why the UL

5   certifications to my knowledge is expensive.  A lot

6   of companies don't do it because they couldn't

7   afford it.  But, yeah, they actually go to the

8   facility to verify it.

9      Q.    Did they go to verify every year upon

10  renewal?

11     A.    No, I don't know -- it depends on the

12  company.  I can't speak to that with Jetson.  I just

13  know how UL sets up their testing so that they can

14  give product certifications.  They go to the

15  factory, they verify that information so that that

16  the R and R is consistent.  R and R being repeatable

17  and reproducible.  Once you repeat the steps in this

18  process, it reproduces the same product.

19     Q.    Are you familiar with UL's processes for

20  purposes of ensuring that a manufacturer of a

21  battery pack such as in this case is consistently

Page 195

1    complying with what those standards are?

2          MR. GIROUX:  Form.

3      A.    That's the part of the compliance phase

4    that they do with the manufacturers.  I haven't

5    dealt with this particular manufacturer but I've

6    dealt with other manufacturers where they do

7    consistently verify that they do meet that standard,

8    that they don't deviate.

9      Q.    So my question is are you familiar with it

10   as it relates to this manufacturer?

11     A.    Not with this manufacturer, no, sir.

12     Q.    Are you familiar with the number of times

13   if more than once that UL would have gone out to

14   this factory for purposes of ensuring compliance

15   with the UL standard?

16     A.    I do not have that information, no.

17     Q.    Are you familiar with whether or not they

18   ever, meaning the manufacturer, ever failed to

19   comply with the UL standard?

20          MR. GIROUX:  Form.

21     A.    I have not seen anything that said they

Page 196

1    did.  I saw the certification that said they met it.

2    But I do not have any information disputing that.

3        Q.   On page 16, as you described the

4    carpeting, the wiring insulation, and the plastic

5    encasement being intact, you describe your

6    examination of the hoverboard revealing the main

7    motor board and two balancing boards intact with no

8    signs of electrical arching and shorting in the form

9    of melted copper as seen on the figures 13 and 14.

10   And of course you describe your review of the x-ray

11   images and you talk about the temperatures of solder

12   melting and aluminum melting.  That is the basis of

13   your opinion that this hoverboard was not the cause

14   of the fire which counters Mr. Schulz's opinion?

15           MR. GIROUX:  Form?

16       A.   Well, I don't know about Mr. Schulz's

17   opinion, about Derek King's opinion that this was

18   the cause of the fire.  Remember, I actually said,

19   and says it right there, the area of origin

20   identified by Mr. Schulz, I'm saying this subject

21   hoverboard was not the cause of the fire.  So I'm

Page 197

1    not talking about origin, I accepted the premise

2    that his origin is correct.  But in evaluating that,

3    the basis, along with all the other information, I

4    don't want to make it so that, hey, you only talked

5    about this, everything collectively leads me to this

6    opinion and those are parts of it that you're

7    looking at right there, that this was not the cause

8    of the fire.

9         Q.   So are you contesting the origin?

10        A.   No, no, no.  No.  I said I assumed or took

11   the premise that Schulz was right.  That I started

12   with, okay, let's say Schulz is right, and then I

13   evaluated the hoverboard in his area of origin to

14   see it that was the cause, and the answer was no,

15   that's not the cause.  I'm not talking about origin

16   at all so I'm clear.

17        Q.   Got it.  Got it.  And so -- just so I'm

18   clear.

19        A.   Okay.

20        Q.   For purposes of your opinions and whatever

21   you might be offering this jury at trial, are you

Page 198

1    solely focusing on the cause of the fire?

2        A.    The cause as it relates to the hoverboard.

3    I want to be very clear about that.  I'm only

4    looking -- and that's my scope, if you looked at it

5    it said whether it was the cause -- whether the

6    Jetson Plasma hoverboard was the cause.  I'm focused

7    on the hoverboard being the cause of the fire, full

8    stop.

9        Q.    Yes, sir.  And so I understand it, you

10   will not be offering opinions as to the origin of

11   the fire, correct?

12       A.    That is correct.

13       Q.    You will not be offering opinions as to

14   alternative causes of the fire, correct?

15       A.    That is correct.

16       Q.    Only excluding the possibility of the

17   hoverboard being the cause of the fire, is that

18   fair?

19       A.    Well, no, evaluating it and eliminating it

20   is how I would phrase it.  But, yeah, I'm strictly

21   dealing just with the hoverboard itself.

Page 199

1          Q.    Okay.  Continuing forward in your report,

2     you've included photographs from the various

3     examinations of the evidence as well as the CT

4     imagery.  And then we get to page 20, which is

5     titled Research and Investigation.  You see that?

6          A.    Yes.

7          Q.    Okay.  That's certainly where you talk

8     about and outline UL 2272 and you reference IEC

9     62133-2, correct?

10          A.    Correct.

11          Q.    And in it you describe the IEC standard,

12     the performance tests included.  And that's just

13     general information that you pulled directly from

14     those, what is it, the UL 2272 standard in figure

15     15?

16          A.    Yes, that is correct.  Page -- I think if

17     we look at it, you'll see it's page ten.

18          Q.    Yup.  Did you -- in any of your materials,

19     and I didn't see it in your report, but in your

20     materials that make up your file, did you include a

21     full copy of UL 2272?

1      A.   No, it's what we talked about before.  Due

2   to copyright infringement, I can't provide a fully

3   copy.  That's why I took an excerpt from it.  I have

4   access to it online.  I can't, you know, reproduce

5   it.  That's why it's not in the file.  It's

6   something that I can actually access and refer to,

7   but I can't produce -- that's why it's not in the

8   actual file material.

9      Q.   Did you include any copies of prior pages,

10   meaning any other pages aside from page ten of UL

11   2272?

12      A.   I may have.  I can look real quick and

13   tell you.  I may have.  But they would just be

14   excerpts of pages, that would be it.  But it's not

15   the full standard.

16      Q.   Okay.  By way of example, in looking at

17   figure 15, there is a number six there that

18   identifies a glossary, but the section above that,

19   what section is that, what does that relate to?

20      A.   Those are the standards that they are

21   using in order to test under 2272.

1    Q.   Okay.  Does UL 2272 describe at the

2   beginning of that list, whatever page that might

3   start on, does it describe that those are all of the

4   standards being tested under 2272?

5    A.   That's what they're referencing.  I don't

6   have the exact language but that's what they are

7   referencing.  So I pulled it.  And if you look at

8   it, they are telling you, like for example the

9   software and programming components, that's the

10   standard that applies that would be applicable to

11   this particular item.  And they are just listing

12   them all.  If you look, you also see UL 62133-2 is

13   on that page also.

14    Q.   Yes, sir.  Why didn't you include the

15   beginning of that list of standards?

16        MR. GIROUX:  Form.

17    A.   Oh, I just -- because this is the one

18   where they reference UL 62133-2.  So what I'm

19   showing you is this standard references this

20   standard, and then I went and did research and found

21   out that, by the way, this particular manufacturer

1    of the batteries meets IEC 62133.  And I go into the

2    next section and you can see the certification.  So

3    that was all I was trying to show you when I talked

4    about it, that IEC 62133-2, the batteries are tested

5    for that and then later on in the report I talk

6    about it and show the actual certification.  That's

7    why I only showed that one page.

8         Q.   Despite the references, you're not

9    testifying that UL 2272 subsumes UL 62133-2, are

10   you?

11        A.   No, no.  What I'm saying is according to

12   them, this is the standard they can test it to.  I

13   went further to say, okay, they talked about 61233,

14   does this manufacturer of battery cells actually

15   meet that, does it test for that.  I found out from

16   IEC the answer is yes and I talk about that in the

17   next section.

18        Q.   By way of example on figure 15 they also

19   reference UL 2271 but you have not seen any

20   certification of compliance with that standard,

21   correct?

Page 203

1          A.    I have not seen anything, no, sir.

2          Q.    Page 22 has a copy of that certificate of

3    compliance you've been referring to and we looked at

4    earlier for UL 2272 applicable to Jetson Electric,

5    LLC, correct?

6          A.    That is correct.  And the Bates number on

7    that is zero -- Jetson 0333.  Yes, sir.

8          Q.    Is it your understanding that that

9    certificate of compliance is relevant for the time

10   period within which the subject hoverboard in this

11   case would have falled under.  Fell under?

12         A.    That would be my understanding, sir.

13         Q.    Do you know sitting here today when the

14   subject hoverboard in this case was actually

15   manufactured and brought to the United States?

16         A.    No, I do not.  I do not have that

17   information, no, sir.

18         Q.    Did the IEC standard we've been

19   discussing, does that test -- do they conduct

20   vibration tests and thermal cycling tests?

21         A.    I can't recall.  I mean I didn't look at

Page 204

1    it from that standpoint.  I was looking at it for

2    internal short circuit.  I can look it up and see if

3    it does.  I was focused on -- because of the opinion

4    of BEAR, an internal short circuit, I was focused on

5    that section of the standard.  But it may have it, I

6    just haven't looked at it right now -- recently to

7    see if it test for that.  It may.

8         Q.   Do you know if it tests for thermal

9    runaway and overcharge and over-discharge?

10        A.   I'm not sure if it's that standard because

11   it may be covered under UL 1642.  So I haven't --

12   actually overcharge, over-discharge, 2272 covers it

13   because that's on page 20 of my report.  I list

14   those.  Overcharge test, short circuit test,

15   over-discharge test, imbalance charging test, crush

16   test and temperature test.  There may be a number of

17   others.  So I'm just focused on can this cause the

18   fire.  But as far as that testing, I list those and

19   there's probably more, I just didn't focus on that.

20        Q.   Does that testing specifically relate to

21   the battery cells under 2272?

1          A.    2272 should relate to it as a battery

2     pack.  And individually 1642 looks at the individual

3     cells.  So it's kind of a combination of two things.

4          Q.    And you know 2271 does as well, meaning it

5     looks at the individual cells?

6          A.    I believe it does.

7          Q.    And it tests for all of those things,

8     external short circuits, thermal runaway,

9     overcharge, over-discharge, sudden shocks, physical

10    threats.  You're familiar with that falling under

11    2271 as well?

12         A.    I haven't looked at 2271 but it wouldn't

13    surprise if it did.

14         Q.    On page -- where are we.  Do you know why

15    figure 16, the certificate of compliance we have

16    been talking about, why that is issued to Jetson and

17    not the manufacturer of the battery?

18         A.    Well, because the manufacturer of the

19    battery is a separate component piece.  They are

20    testing for something completely different.  Jetson

21    I guess is the whole piece, but the battery cell

Page 206

1    manufacturer is completely different and a

2    completely different test.  And they may make those

3    batteries for more than just the hoverboard which is

4    why typically they have another standard test and

5    compliance.

6         Q.   So because this certificate of compliance

7    under figure 16 relates to UL 2272, it's looking at

8    the hoverboard as a whole as opposed to the

9    individual components?

10              MR. GIROUX:  Form.

11        A.   No.  2272 looks at it as a whole, and what

12    it's telling you when you look at it is the

13    individual component pieces, in order to be UL

14    certified, those component pieces must meet certain

15    standards.  And we went over those a minute ago, one

16    of them being IEC 62133.  Also UL 2580.  So it's a

17    combination of things.  They are just giving you

18    2272 as a whole.  But if you're interested in the

19    component pieces and you know the manufacturer, you

20    can look it.  And in this case we knew the

21    manufacturer and we could see that those battery

Page 207

1    cells individually were tested under the standards

2    that I told you about.

3        Q.   Are you familiar with how many battery or

4    battery packs are tested when -- when UL is

5    performing these -- these evaluations, if you will,

6    for purposes of certifying compliance with their

7    standards?

8        A.   No, I'm not familiar with the number that

9    they pull.  But as I said before, they are looking

10   at it from the standpoint of manufacturing it.  So

11   they may pull some, but what's consistent is that

12   they are making them the same way by repeating and

13   reproducing the same results.

14       Q.   And you don't know how many times UL

15   visited the facility in China for purposes of

16   confirming their repeating of the same process,

17   correct?

18       A.   Yeah, I don't know the number of times,

19   but I know that it met the certification or else

20   they wouldn't have a certificate of compliance.

21   That much I do know.

1      Q.    We move on to page 23.  You talk about IEC

2   62133 a little bit further.  And under figure 17,

3   where did you pull those from?

4      A.    This is from the actual IEC standard.

5   This is -- and I think I say it.  Oh, I didn't --

6   next point I have to make a point of that.  But that

7   is literally from the standard for IEC 62133-2 that

8   talks about an internal short circuit.  So these

9   images are physically in the actual standard.  It's

10  also in UL 62133-2.  But these images are showing

11  you how they test.  This whole section, including

12  figure 18, that's coming from the actual standard.

13  They are showing you how they set them up, they show

14  you what they are looking for, how much pressure

15  they put on them.  That's what this is showing.

16     Q.    And you go on to describe on page 23 and

17  24 really the process, if you will, as outlined by

18  IEC in their materials, in their standards, that

19  ultimately lead to the result or conclusion in

20  figure 19 of the certification under that standard,

21  is that fair?

1      A.    That is fair.  That is correct, yes, sir.

2      Q.    Page 27 of your report contains a CT scan

3  of the hoverboard, as you put it, showing no

4  evidence of electrical arching and shorting in

5  wiring, correct?

6      A.    Correct.

7      Q.    We talked a little bit about the melting

8  temperatures and even gotten into the chart that you

9  created in your materials.  On page 28, figure 22 is

10  the reference that you pull from NFPA 921 as to

11  melting temperatures, correct?

12      A.    Yes.  Yes, that is their actual table,

13  that is correct, sir.

14      Q.    And although it's not listed there,

15  sitting here today you know, you've been intimately

16  familiar with 921 for a while, but you know that

17  chart is from that reference, from that resource,

18  correct?

19      A.    Yes.  Yes, sir, it is.

20      Q.    All right.  And on page 28 is where you

21  conclude that the subject Plasma hoverboard

Page 210

1    contained this 18650 Lithium battery cells

2    associated with the battery pack manufactured by

3    this company we described, and that they were

4    designed, functioned and operated in accordance with

5    those applicable standards that you describe and

6    we've gone over; and that this incident was not

7    caused by an internal short circuit that would have

8    result in thermal runaway failure within any of the

9    recovered subject battery cells, correct?

10        A.    That is correct.

11        Q.    Did you find evidence of thermal runaway?

12        A.    Well, the evidence of thermal runaway is

13   the venting of ten and four.  That's why it spews it

14   and, you know pushes it out of the can.

15        Q.    The lack of evidence of any electrical

16   arching, why is that significant?

17        A.    It's significant because the way the power

18   is routed to the motors going over to the MOSFETs,

19   the metal oxide semiconductor field effect

20   transitors, routes through the center, which is

21   where you see the colored wires.  And the reason

Page 211

1    that's important is because if you have a fire that

2    starts in that location, which based on my

3    measurement using the CT can is less than a half

4    inch, if it's less than a half inch away and the

5    fire starts there, it should compromise the

6    insulation, those fires should come together and

7    create a short circuit which will sever and show it

8    in the form of a melting that you could see with the

9    CT scan, and that did not occur.

10        Q.   Would electrical arching be possible

11   without the hoverboard being plugged into the

12   electrical source?

13        A.   Yeah, you can have it if -- if --

14   depending on the circumstances.  Again, in this

15   case, you know, the wires aren't compromised and the

16   fire is attacking it.  But if you had it, it is --

17   you potentially could have it occurred.  But in this

18   case we don't see that.  The plugging -- being

19   plugged in is just about the energy source, does it

20   have enough energy.  That's really what that is

21   about.

Page 212

1    Q.  Does the lack of electrical arching found

2    in and of itself render the cause of this fire as

3    being at the hoverboard impossible?

4        MR. GIROUX:  Form.

5    A.  Well, two things.  One, based on the

6    evaluation, we know that there was no electrical

7    arching, so it's the absence of arching and shorting

8    and the form of melted copper didn't occur.  And in

9    this instance, within a reasonable degree of

10   engineering certainty we know that did not occur

11   based on the physical evidence and the analysis.  So

12   it's not this is my opinion, it's my opinion based

13   on the facts, the information, and the evidence that

14   did not occur.  If it did we would see the physical

15   evidence of it and we do not.

16   Q.  Yes, sir.  But my question was is the lack

17   of any evidence of electrical arching in and of

18   itself confirmation that the hoverboard was not the

19   cause of the fire?

20       MR. GIROUX:  Form.

21   A.  No.  It's the same thing I said before, I

Page 213

1  don't take one piece of information, because I don't

2  see arching this didn't occur, no.  It is the

3  plastic directly below where the batteries are is

4  still intact and still green.  The insulation on the

5  wiring is still there.  It's not gone.  We have no

6  arching and shorting on any of the wiring.  We also

7  have rubber insulation on the tires are still there,

8  the carpeting is still there.  If the fire starts

9  there and is a starting point, those things should

10 be burned because that's the fuel next to the fire

11 to keep it going.  And we do not have any of that in

12 this case.  That's the basis, not just arching by

13 itself or lack of arching.

14      Q.   You go on on page 28 and it spills into

15 page 29 of your report, and certainly describe

16 having reviewed and evaluated the BEAR report.  You

17 describe certainly your disagreement with the

18 opinions reached and we talked about that today.

19      A.   Yes.

20      Q.   The BEAR conclusions if you will.  And

21 then on page 29, that last bulletpoint, you also

Page 214

1    reference the CPSC safety alert as being

2    inapplicable to this case just based on your --

3    based on your review.  Does that -- I mean does this

4    page, page 29, does that encapsulate your

5    disagreement, essentially, with the BEAR report?  I

6    mean we talked about it I think quite a bit today,

7    but is this the area of your report basically

8    summarizing that disagreement?

9        A.    No, I think it's important that we look at

10   I don't separate.  So I don't take one paragraph.

11   It's the entire report and everything I looked and

12   we talked about that gets me to the point where I

13   disagree with him.  I am trying to point out the

14   various things, but there are things that are not

15   listed in here that are important that I don't want

16   taken the wrong way to say, okay, well, you only

17   talked about this paragraph.  So I want to make it

18   clear, the report shows the information, it shows

19   what I relied upon collectively throughout the

20   report to get to the conclusions you see.  This is

21   just a summary showing what they had.  And actually

Page 215

1    on this page, yeah, I disagree with it.  But I don't

2    want you to take it or want it to be taken as this

3    is the only thing I relied upon and this is a

4    general summary and that's it.  This is a part of it

5    with everything else collectively that I looked at.

6         Q.    Okay.  On page 30 you go on to describe

7    the scientific method and you have a few paragraphs

8    here that go on to page 31 describing confirmation

9    bias and expectation bias, correct?

10        A.    Yes.

11        Q.    Those are -- those are areas, at least

12   from my world wide web search, I was able to see --

13   you talked about those before with the defense

14   associations, whatever they were, but you talked

15   about those matters before, confirmation bias and

16   expectation bias, correct?

17        A.    Yes, I have.  Yes.

18        Q.    And that in relation to certainly your

19   adherence to and need for adherence to the

20   scientific method as outlined in NFPA 921?

21        A.    That is correct, that's the reason I do it

Page 216

1    so I don't get caught in the trap of missing

2    information or only looking at certain pieces, which

3    is why I treat every case as unique so I don't get

4    caught in that trap.  And that's just a reminder,

5    you know, not to get caught into confirmation bias

6    or expectation bias.  But, yes, that is correct.

7        Q.   Have you -- have you reviewed over the

8    course of your career, at least since '02 when you

9    started with the -- with SEA, have you reviewed any

10   type of research or literature that stands for the

11   proposition that 9-watt hours is sufficient to cause

12   a fire?

13            MR. GIROUX:  Form.

14       A.   I can't recall that I have.  There may be

15   literature that exists, but I will say this.  In

16   this instance it wasn't enough energy to cause this

17   fire under these circumstances.

18       Q.   And what's your basis of that opinion?

19       A.   What I went through in the report.  The

20   basis is based on the energy, based on the lack of

21   melting, based on no arching and shorting, based on

1    the insulation there, based on the plastic.  And in

2    fact on the left side of the plastic is paper tag

3    physically on the bottom of that same hoverboard

4    that supposedly caused this fire, that information

5    coupled together tells me that this was not enough

6    energy to cause this fire in addition to the fact

7    it's not plugged in.  So I'm suing that in addition

8    to the information from NREL to confirm the

9    temperature that I show you or calculate that's

10    shown in their empirical testing that shows 106

11    centigrade is not even enough to ignite paper.

12        Q.   And you talk further about that, certainly

13    here on page 31 and over the course of the

14    photographs and even the charts on the following

15    pages, correct?

16        A.   Correct.

17        Q.   All right.  Including through 34 which we

18    quickly looked at earlier, what is that, figure 28?

19        A.   Yes.

20        Q.   The layout of the individual cells.  And

21    then you get to page 35, again, in bold with your

Page 218

1    opinion that cells four and ten did not have -- do
2    not have sufficient energy to cause a fire, correct?
3         A.   Yes, that is correct.
4         Q.   I know there is a lot more words there but
5    I'm trying to short circuit this.
6         A.   I know.
7         Q.   No pun with short circuiting.  Then you go
8    on and you talk about -- you talk about your Sigma
9    black belt which really threw me on off page 35, but
10   we discussed that already.
11        A.   Yes.
12        Q.   Page 36 of 39, figure 31, what are you
13   identifying with this figure?
14        A.   Oh, those -- that's produced by UL based
15   on their analysis of Lithium ion battery hazards.
16   And they go through a variety of them as you can see
17   and they look at, okay, what can cause an internal
18   short.  And typically what they see is misuse in the
19   field, which is why they are pointing to it.
20   External short circuits, extreme thermal
21   environments, high or low temperatures, overcharge

Page 219

1    or repeated overcharge discharge.  They are just

2    showing you that what they have encountered is

3    misuse in the field as opposed to manufacturing

4    defects, which is, you know, a part of why they look

5    at FMEA's and things.  But that's all that chart is

6    showing.  That's actually from UL and what they see

7    as the hazards and how they lead to internal short

8    circuits.

9         Q.   Okay.  Figure 32 is the UL 2272.  This is

10   page nine.  I think earlier we looked at, whatever

11   the figure was, that we looked at on page ten of

12   that standard, correct?

13        A.   I believe so, yes, sir.

14        Q.   And page 38 concludes with the last

15   opinion offered as to the manufacturer utilizing UL

16   and IEC testing.  You say "shown in the results of

17   those respective test results as its tool to be

18   practical FMEA as it addresses all known and

19   potential failure modes outlined in UL, IEC, and

20   other applicable standards that are utilized by

21   other Lithium ion battery manufacturers."  Again,

Page 220

1    you relied more so on the results, on the

2    certificate of compliance, as opposed to actual test

3    reports and documentation, aside from Exhibit 74

4    that we looked at?

5         A.    Yeah, it's an understanding of, you know,

6    how they reached the conclusion to give a

7    certificate.  But also understanding how FMEA's are

8    performed.  And this just from my training,

9    knowledge, and education as a Six Sigma black belt

10   when I was in manufacturing, the things like you

11   saw, over-discharge and crushing, that comes from

12   them identifying there is a failure mode.  What's

13   the failure mode.  Over-discharge, overcharge.  What

14   effect will have that on the system?  And when you

15   look the standards, you can say, uh-huh, that's why

16   they are testing it, to make sure the effect is

17   minimized or eliminated.  So that's what I'm going

18   by when I say that.  The test results show you the

19   test results, but I'm talking about the FMEA's being

20   practical that they follow the same procedures when

21   you look at the testing that you would typically see

Page 221

1    if you were to perform an FMEA without listing the

2    RPN, the O, the S and the D, that's all.

3        Q.    But the FMEA relating to this particular

4    manufacturer, you don't have any -- well, strike

5    that.  With regards to this manufacturer, you've

6    never worked for any battery manufacturers, correct?

7        A.    No.  Not as an employee, no, sir.

8        Q.    You've never worked for any employer

9    specifically tasked with the responsibility of

10   designing or manufacturing consumer facing product,

11   meaning products produced for purposes of sale to

12   consumers?

13       A.    Incorrect.

14       Q.    Okay.  Tell me about that?

15       A.    Well, when I worked at Pilkington

16   Libbey-Owens Ford, we actually produced glass that

17   many of you use in your rear-view mirrors.  You ever

18   notice that -- I'm saying rear-view mirrors that dim

19   when high beams hit them.  You know how they dim?

20   You ever seen that before?  We actually produce that

21   glass.  We produced 90 percent of that glass through

Page 222

1    our facility.  So we had to follow an FMEA to make

2    sure that the product that was being utilized by the

3    customers, because there is a certain amount of

4    resistance inside of that glass so that you can

5    actually get the glass to dim, we actually were

6    using an FMEA to make sure that we produced a

7    product that could be relied upon by the

8    manufacturers of automobiles in this country.

9        Q.   So that's a manufacturer of a component

10   within an automobile?

11       A.   Used in an automobile.  Used in an

12   automobile, correct.

13       Q.   Have you ever been employed by a company

14   such as Jetson that sells and distributes

15   hoverboards as a unit to the consumer?

16       A.   No, sir, I have not.  No.

17       Q.   So -- then the next page, page 39, is the

18   appendices and it outlines the C.V., testimony log,

19   and billable rate disclosure being attached and has

20   a list of referenced material.  Obviously the list

21   of referenced material is not a complete list

Page 223

1    because there is another list earlier in the report
2    we talked about?
3        A.    That is correct, yes, sir.  Yes.
4        Q.    Okay.  Are there any other materials that
5    you've looked at and relied upon for the opinions we
6    have discussed today that is not listed on either
7    page 39 or whatever the other page was of your
8    report?
9        A.    Other than what we discussed and other
10   than what -- other than what is in tab six, no,
11   everything has been listed.
12       Q.    Okay.  You will not be offering any
13   opinions as to the cause of the fire being a smoking
14   shed outside of the Wadsworth home?
15       A.    No, no.  As you saw in my scope and we
16   discussed, it's focused strictly on the hoverboard
17   itself.
18       Q.    You were never asked to analyze whether or
19   not the cause was outside of the home?
20       A.    No, sir, I was not.
21       Q.    Have I, and I know we have gone a bit

Page 224

1    today and appreciate your patience and

2    professionalism, have I given you an opportunity to

3    discuss with us all of your opinions and go through

4    your report to the extent needed and necessary to

5    explain what those opinions are?

6         A.    I believe so, yes, sir.

7         Q.    At any point in time after conclusion of

8    this deposition if there are any changes or

9    modifications to your deposition, either because in

10   your review maybe something needs to be changed like

11   October 31st, 2024 to '23, or you review additional

12   materials and something changes, will you do me a

13   favor and just let counsel that retained you know so

14   that I can at least go over some of those to see

15   whether we need to chat again?

16        A.    Yeah, I will do that, no problem.

17        Q.    Okay.  Also I guess I need -- we need to

18   figure out how I can get the complete files given

19   some of the issues we had with the transfer?

20        A.    I can offer a suggestion.  And my

21   suggestion would be that I create for both my

Page 225

1    counsel and you two separate hard drives with all of
2    the information that you can access without a
3    problem.  That way I don't have to worry about links
4    or size requirements and things like that and you'll
5    have everything.  But, again, the things that you're
6    missing, for example that one section you were
7    missing a lot of data, that is actually in Schulz's
8    file.  I just happen to not be able to download it.
9    But, again, I can create two separator ones, one for
10   my counsel and one for you, so that you actually
11   have all of that information.
12        Q.   Yeah, I think that's fair and sufficient.
13   The only thing I would do, and I would just reserve
14   the right to ask you any additional questions based
15   on whatever I've been missing that we have not had a
16   chance to go over, but I would presume there is
17   probably not much anyways that I'm missing.
18        A.   I would say no.  Based -- what you were
19   talking about, again, the deposition exhibits that
20   didn't download, you have that information.  So I
21   think you're going to see that you have that data

Page 226

1    and information but I want you to have a complete

2    file with it just so you have it.  Not a problem.

3         Q.    Fair.

4              MR. AYALA:  Thank you for your time.

5         Those are all my questions.

6         A.    I appreciate it.  Thank you.

7              MR. GIROUX:  None for me.

8              VIDEOGRAPHER:  This ends today's -- this

9         ends today's deposition.  Off the record,

10        14:41.

11             (Off the record colloquy.)

12             THE COURT:  Jared, copy of the transcript?

13             MR. GIROUX:  Just the transcript.  No

14        video.

15             (Deposition concluded at 2:45 p.m.)

16

17

18

19

20

21