# EXHIBIT 9

Page 1

```
 1            UNITED STATES DISTRICT COURT
          IN AND FOR THE DISTRICT OF WYOMING
 2    ----------------------------------------

 3    STEPHANIE WADSWORTH,
      Individually and as Parent
 4    and Legal Guardian of W.W., K.W.,
      G.W., and L.W., minor children,
 5    and MATTHEW WADSWORTH,

 6                           Plaintiffs,

 7            vs.         Case No.
                          2:23-cv-00118-NDF
 8

 9    WALMART, INC. AND JETSON
      ELECTRIC BIKES, LLC,
10
                           Defendants.
11
      ----------------------------------------

12

13

14      REMOTE DEPOSITION OF DR. GIAVONNI LEWIS

15

16

17

18            Monday, August 5, 2024

19              9:00 a.m. (MDT)

20

21

22

23    Reported By:

24    Joan Ferrara, RMR, FCRR

25    Job No. 44610
```

Page 2

```
 1

 2

 3

 4                    August 5, 2024

 5                    9:00 a.m. (MDT)

 6

 7

 8

 9

10       Deposition of DR. GIAVONNI LEWIS, held

11   remotely via Zoom, before Joan Ferrara,

12   a Registered Merit Reporter, Federal

13   Certified Realtime Reporter and Notary

14   Public.

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1   REMOTE APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFFS:

 4   MORGAN & MORGAN, P.A.

 5           1700 Palm Beach Lakes Boulevard

 6           Suite 500

 7           West Palm Beach, Florida 33401

 8   BY:     RUDWIN AYALA, ESQ.

 9

10

11   ON BEHALF OF DEFENDANT JETSON ELECTRIC

12   BIKES LLC:

13   MCCOY LEAVITT LASKEY LLC

14           N19 W24200 Riverwood Drive

15           Suite 125

16           Waukesha, Wyoming 53188

17   BY:     EUGENE M. LAFLAMME, ESQ.

18

19

20   ALSO PRESENT:

21           KEVIN MONTGOMERY, Lexitas Monitor

22           SUZANNE LEE, ESQ. University of
             Utah Health
23

24

25
```

```
 1   GIAVONNI LEWIS,

 2          called as a witness, having been

 3          duly sworn by a Notary Public, was

 4          examined and testified as follows:

 5   EXAMINATION BY

 6   MR. LAFLAMME:

 7          Q     Good morning, Dr. Lewis.  My

 8   name is Eugene LaFlamme.  I represent two

 9   of the defendants that are involved in the

10   Wadsworth case.  I'm not sure how familiar

11   you are with that, other than obviously you

12   were involved in the treatment of W███████

13   and Stephanie W██████████.

14          Are you aware that there is a

15   litigation going on as well?

16          A     Not until I received notice

17   about the deposition.

18          Q     Okay.  Have you gone through

19   this process before, as far as giving

20   deposition testimony about patients that

21   you have treated?

22          A     I have.

23          Q     Okay.  I won't belabor all the

24   traditional instructions because I know

25   you're familiar with it, and I certainly
```

1    correct?

2        A      Correct.

3        Q      Now with respect to W██████

4    W███████████, his date of birth was ██████2017.

5    So he was about 3 or 4-years old when he

6    came in for your care and he also came in

7    on February 1, 2022.

8              Do you have any memory of caring

9    for W███████ W██████████?

10       A      I apologize, I don't.

11       Q      Okay.

12       A      I've seen a lot of patients

13   since then.

14       Q      I'm sure.  I'm sure it's like

15   attorneys with cases.  You know, we have a

16   lot of them and it's tough to keep track of

17   all of them.

18              W█████████ W███████████ was discharged

19   on February 27, 2022 and he had 8 percent

20   TBSA on his bilateral feet, bilateral hands

21   and lower extremities, also involved in a

22   house fire in Wyoming.

23              Any of that ring a bell to you

24   as far as your care with W█████████?

25       A      Not specifically.

1    Q    Okay.  With respect adolescent

2  burn injuries, is there a difference

3  between treating adolescent burn injuries

4  compared to adult burn injuries?

5    A    There are some differences, for

6  sure.  The grafting procedures and care are

7  very similar to adults.

8          The issues are when it comes to

9  the long-term follow-up and expectations of

10  the scarred or grafted or healed areas, and

11  that is we have to follow them until they

12  reach physical maturity, and that is

13  because the grafts or the scars do not

14  grow.  And so as they meet each milestone

15  of physical maturity, we may see increase

16  in contractures, increase in other

17  functional deficits related to that.

18          So much like if an adult will,

19  you know, say grow in girth and gain

20  weight, their scars will be on stretch and

21  cause them functional issues.

22          This is the same thing for kids,

23  but it's on a longer term, and we see that

24  as an issue until they meet physical

25  maturity.

1          Q     What is the typical follow-up --

2    and I recognize that burn injuries are very

3    different from one person to another --

4    someone that has an 8 percent TBSA on

5    bilateral feet, hands and right lower

6    extremities, what would the generally

7    expected follow-up be for that type of

8    injury for an adolescent as they mature?

9          A     Sure.  Could you remind me if he

10   had surgery, like split thickness

11   autografting?

12         Q     He did have some grafting, yes.

13         A     So typically we would see the

14   patient every one to two weeks at discharge

15   until the grafts and wounds were completely

16   healed.

17               Then we would see them every,

18   you know, two to three months as we got

19   closer to that timeline of the six to eight

20   weeks -- six to eight months from the

21   original injury to determine if there were

22   any reconstructive needs or deficits that

23   weren't being managed with the conservative

24   approach, which is usually scar massage,

25   physical therapy, compression therapy.

```
1              And so if they weren't meeting
2    our goals from that capacity, then we would
3    start considering our reconstructive
4    options, which includes laser treatment.
5    We would recommend laser treatment based on
6    the scar in the functionality and then we
7    would proceed with our cycle of that.
8              For pediatric patients, we
9    typically do one laser round, or one laser
10   cycle, and then assess and give the kiddos
11   a break because they typically require an
12   OR procedure.  So we can't do them at the
13   bedside or in our clinic.  They require,
14   you know, full anesthesia or at least like
15   a twilight with, you know, anesthesia safe
16   support.
17              And then we would, you know,
18   once we got to a stable space where the
19   kiddos are meeting all of their milestones,
20   they're from a functional capacity able to
21   do all the things that are expected, we
22   will start to move out their evaluations to
23   every six months to every year to assess
24   and reassess how they are growing and
25   maturing along with the grafts and any
```

```
 1   scars that developed, and we do that until
 2   they're 18.
 3        Q    Is one round of laser treatment
 4   for an adolescent, is that the same six to
 5   eight sessions or is that different?
 6        A    It's the same.
 7        Q    Okay.  So for a single laser
 8   treatment session for an adult, it sounds
 9   like that is a -- is that just a day
10   procedure?
11        A    It's a day procedure, uh-huh.
12        Q    And then for an adolescent, is
13   that -- does that require any overnight
14   hospitalization or is that a day procedure
15   or there's just a higher level of providing
16   them medication to knock them out?
17        A    Correct.
18        Q    Okay.  All right.  I'm going to
19   show you here a copy of W██████'s discharge
20   summary just to see if this provides any
21   recollection for you.
22             So here you can see that you are
23   listed as the attending, and the discharge
24   date is February 27, 2022.
25             I'll just let you read here a
```

1    little bit.  Let me know if you need me to

2    blow it up.

3        A      Nope.

4        Q      Good to move down?

5        A      Correct.  Seems very

6    straightforward.  Okay.  And you can keep

7    going.

8        Q      Okay.

9        A      Okay.  This looks like a

10   different note.

11       Q      You are correct.  That's a

12   follow-up note.

13              As far as the discharge summary,

14   does that provide you any indication as to

15   what you may expect W████'s future care to

16   be?

17       A      Yes.  If you scroll back up to

18   the procedures, so the right lower leg

19   received an autograft.  Again, if kids heal

20   pretty quickly, that's in three to four

21   weeks, typically they do well.

22              I can't determine from the

23   description here if this went across his

24   joints, like the knee, or across the ankle.

25   Those are pretty impactful areas as far as

```
 1    function and long-term impacts.

 2              If this is like on the thigh, in

 3    the middle, or in the middle of the calf,

 4    typically we don't see a lot of long-term

 5    impact functionally except when kids are

 6    growing taller it may cause some issues in

 7    stretch across joints.

 8              So that would be my best guess

 9    based on what I'm looking at as to the

10    actual site that was grafted.

11        Q    And W█████ did receive some

12    laser treatment as well.  So would we

13    expect to see the laser -- would there be

14    an assessment again at the fourth laser

15    treatment?

16        A    Yes.

17        Q    Let me see if I can get that for

18    you.  Actually, here are some photos of it

19    that may help show you where the burn

20    injuries are.

21        A    Oh, yeah, okay.

22        Q    It looks like this photo would

23    have been taken on 6/3/2022.

24        A    Uh-huh.

25        Q    And this is at page P-WW 1843,
```

1    also referencing page 175.

2              And then this may be a better

3    picture for you as well.

4        A    Uh-huh.

5        Q    Which is on the following page,

6    which is P-WW 1844 and page 176.

7              So in looking at those burn

8    injuries, does that provide you any further

9    information with respect to W█████?

10       A    Yes, it does.  It goes over the

11   knee.  So that's a really high stakes area

12   and we would definitely need to watch him

13   as he grew to physical maturity.

14       Q    So then you would expect to

15   follow him at least to some degree up until

16   age 18?

17       A    Yes.

18       Q    And is that generally a

19   once-a-year type of follow-up?

20       A    Correct.

21       Q    I'm just trying to find his

22   fourth laser treatment.  I seem to be very

23   good at finding the third laser treatment

24   record.

25              While I have the fourth laser

1    treatment being pulled up for W████, I

2    have the fourth one for Stephanie, so why

3    don't we take a step back and go to that

4    one.

5         A    Sure.

6         Q    And this is at Bates stamp STEPH

7    00212 where this starts.  You can see that

8    the date of service is 11/7/23.

9         A    Uh-huh.

10        Q    Let me know where you want me to

11   go so that you can read this a little bit.

12        A    Sure.  If we could scroll down

13   to the bottom portion of the assessment.

14        Q    That is right there.

15        A    So that's just the beginning of

16   the note.  Could we go down further?

17        Q    Yep.  Give me one second and

18   I'll have to -- my paralegal only e-mailed

19   me the first page.

20        A    Oh, okay.

21             MR. LAFLAMME:  Why don't we just

22        take two minutes, a quick break, and

23        I'll get them pulled up for you.

24             THE WITNESS:  Okay.

25             (Recess taken 9:42 a.m.)

```
 1              (Resumed 9:45 a.m.)
 2   BY MR. LAFLAMME:
 3        Q     Dr. Lewis, it actually looks
 4   like W██████ may not have gotten his fourth
 5   yet.  The third, it's at least the last
 6   record that we have.  He may have gotten
 7   his fourth, but we just don't have the
 8   record yet.
 9              So I just want to walk through
10   the third laser treatment just to see if
11   there's anything in here that would give
12   you any information as far as what you
13   could expect for W██████ going forward.
14        A     Sure.
15        Q     And this is on page P-WW 058.
16        A     Uh-huh.
17        Q     And the treatment date looks to
18   be 11/7/2023.  Here you can see it as the
19   third laser treatment.
20        A     Correct.  If you could scroll
21   down.  Keep going.  You can keep scrolling.
22   Keep scrolling.  Keep scrolling.  The note
23   just seems incomplete.
24              If you scroll back up -- so what
25   I would anticipate after this page, after
```

1    history, there would be an area of the

2    physical exam and what we are planning to

3    do for the patient and our assessment of

4    all of the information.

5            This, based on what I'm seeing

6    currently, it just supports the fact that

7    he still has ongoing scars, he tolerated

8    the laser treatments, and he's doing well.

9    So this is the H&P for the procedure.

10            There should be a separate note

11    outside of the burn laser H&P to assess.

12            So the attending will see the

13    patient outside of the laser treatment

14    sessions to provide an assessment and note

15    to determine if further treatment is

16    required.

17        Q    Okay.  Is that done on the third

18    laser treatment as well or would that be

19    more something that is done on the fourth

20    at the midpoint for W███████?

21        A    It's after the fourth treatment

22    before the fifth treatment.

23        Q    Okay.  So since that was the

24    third treatment, laser treatment, and we

25    don't have a record of at least the fourth

1    yet, that's what we would be looking for

2    once we get the fourth laser treatment

3    record?

4         A       Correct.

5         Q       Okay.  All right.

6                 And then looking at Stephanie's

7    fourth laser treatment record, which I'll

8    pull up here -- this should be all of it.

9         A       Uh-huh.

10        Q       And this was the first page that

11   you had looked at before.

12        A       Right.

13        Q       But if you want to look at

14   anything further on here, let me know.

15        A       We can keep going.  Okay, keep

16   going.  More.  Keep going.  Stop there.

17   Okay, keep going.  You can keep going.  And

18   you can hold there.  Okay, you can keep

19   going.  And here.

20                So this outlines what we

21   essentially do as part of the practice.  So

22   she is receiving her laser treatment on the

23   day of this service for number four, and

24   the areas that are being treated are also

25   listed and there's been improvement for

1    both feet.

2              And then there, again, she will

3    need a burn attending clinic visit.  That

4    will be the discussion about an assessment

5    of the status of her burn injuries and

6    scars and determination of further

7    treatment and plans.

8        Q    Would that be an in-person burn

9    attending clinic visit at the hospital?

10       A    Typically, yes.  Sometimes we do

11   them virtually, but our preference is in

12   person.

13       Q    And when that clinic visit

14   occurred or will occur, that's when further

15   discussion will happen as far as how future

16   laser treatments may be utilized?

17       A    Correct.

18       Q    And since she is still on her

19   first round of laser treatments, is that

20   assessment done at this point after the

21   fourth laser treatment or is that done at

22   the end of the course of the six to eight

23   sessions?

24       A    So we do an assessment after the

25   fourth laser, and then after every fourth

1    assessment or fourth laser, or if we have

2    decided not to do any further laser if it's

3    anywhere between numbers five to eight,

4    then we will have a follow-up attending

5    appointment to determine if they are, in

6    fact, okay and don't require any further

7    intervention currently.  And then we move

8    into the watchful waiting period and then

9    determine if we're okay to kind of be less

10   aggressive and sort of evaluate as needed.

11        Q     And is Dr. Chris LaChapelle, is

12   he with your clinic in Salt Lake City?

13        A     Yes.  He's one of the burn

14   surgeons, yes.

15        Q     So at this point is

16   Dr. LaChapelle, is he the attending, in

17   essence, for the laser treatment side of

18   it?

19        A     Correct, for this particular

20   procedure, uh-huh.

21        Q     So is it just on a procedure

22   basis or is it on a patient basis?

23        A     On a procedure basis, because

24   this is a shared model.

25        Q     As far as who is making the call

1   for future laser treatment recommendations,

2   who would that be within the Burn Center?

3        A    All four physicians, we share a

4   practice, and we also share our clinical

5   algorithms, so to speak.

6             And so we -- either one of us

7   would be -- if we have space in our clinic,

8   we would be designated to see the patient

9   after their fourth laser treatment and

10  provide a realtime assessment and then

11  determination.

12            So it's not necessarily

13  Dr. LaChapelle's personal patient.  But

14  again, since we share our practice, he

15  would make his assessment, but it would be

16  based on our general principles of care.

17       Q    And I think you had indicated

18  that there were four physicians on your

19  team.  Is that accurate?

20       A    Correct.

21       Q    So it would be you, Dr. Fleming,

22  Dr. Thompson and then Dr. LaChapelle?

23       A    Correct.

24       Q    And just for the record, that

25  treatment note for the fourth laser

Page 39

1   treatment was STEPH 00212 to STEPH 00216.

2            MR. LAFLAMME:  Doctor, I think

3       that's all the questions I have for

4       you today.

5            Attorney Ayala may have some

6       follow-up for you, but I appreciate

7       your time here this morning.

8            THE WITNESS:  Thank you.

9            MR. LAFLAMME:  And apologies for

10      the lateness in getting you the link

11      for this.

12  EXAMINATION BY

13  MR. AYALA:

14      Q    Good morning, Doctor.  Can you

15   hear me okay?

16      A    Yes, I can.

17      Q    Thank you for attending today.

18   Thank you for your professionalism.  I just

19   have a few follow-up questions.

20            Same rules apply.  If at any

21   point in time you can't hear me or we lose

22   connection, once we re-establish let me

23   know that, I'll make sure that I reask the

24   question so we have effective

25   communication.  Okay?