# EXHIBIT 10

```
 1            UNITED STATES DISTRICT COURT
           IN AND FOR THE DISTRICT OF WYOMING
 2
                CASE NO. 2:23-cv-00118-NDF
 3
 4  STEPHANIE WADSWORTH, Individually
    and as Parent and Legal Guardian of
 5  W.W., K.W., G.W., and L.W., minor
    children, and MATTHEW WADSWORTH,
 6
          Plaintiffs,
 7
    vs.
 8
    WALMART, INC., and JETSON
 9  ELECTRIC BIKES, LLC,
10        Defendants.
    _____/
11
12
13
14                      Remote/Zoom
                        Monday, 11:03 AM -12:13 PM MST
15                      October 21, 2024
16
17          VIDEOTAPED DEPOSITION OF
          CHRISTOPHER R. LACHAPELLE, MD, DPT
18
19
20      Taken on Behalf of the Plaintiffs before
21    Lisa Gerlach, FPR, Notary Public in and for
22    the State of Florida at Large, pursuant to
23    Notice of Taking Deposition in the above
24    cause.
25
```

Page 2

1  Appearances via Zoom:
2  Counsel for the Plaintiffs:
3  RUDWIN AYALA, ESQUIRE
   Morgan & Morgan, PA
4  1700 Palm Beach Lakes Boulevard
   Suite 500
5  West Palm Beach, FL 33401
   rayala@forthepeople.com
6
7  Counsel for the Defendants:
8  JARED B. GIROUX  ESQUIRE
   McCoy Leavitt Laskey
9  202 US Route 1
   Falmouth, ME 04105
10 jgiroux@mlllaw.com
11
12
13 Also Present:
14 Peter Curran, Videographer
15 Suzanne Lee, Esquire, University of Utah
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2  WITNESS        EXAMINATION           PAGE
3  Christopher R. LaChapelle, MD, DPT
4      Direct by Mr. Ayala            4
5      Cross by Mr. Giroux            48
6      Redirect by Mr. Ayala          56
7  Certificate of Oath                61
8  Certificate of Reporter            62
9  Witness Review Letter              63
10 Errata Sheet                       64
11           EXHIBITS
12            None

Page 4

1       THE VIDEOGRAPHER: Good morning. We are
2  going on the record at 11:03 a.m. on
3  October 21, 2024. Please note that this
4  deposition is being conducted virtually.
5  Quality of the recording depends on the
6  quality of camera and internet connection of
7  the participants. What is seen from the
8  witness and heard on screen is what will be
9  recorded. Audio and video recording will
10 continue to take place unless all parties
11 agree to go off the record.
12      This is media unit one of the
13 video-recorded deposition of Dr. Christopher
14 R. LaChapelle, MD, DPT, taken by counsel for
15 the plaintiff, in the matter of Stephanie
16 Wadsworth, et al., vs. Walmart, Inc. and
17 Jetson Electric Bikes, LLC. This is filed in
18 the United States District Court in and for
19 the District of Wyoming, Case Number
20 2:23-cv-00118-NDF.
21      My name is Peter Curran, representing
22 Veritext Legal Solutions and I am the
23 videographer. The court reporter is Lisa
24 Gerlach from the firm Veritext. I am not
25 authorized to administer an oath, I am not

Page 5

1  related to any party in this action, nor am I
2  financially interested in the outcome. If
3  there are any objections to the proceeding,
4  please state them at the time of your
5  appearance.
6       Counsel and all present, including
7  remotely, will now state their appearances
8  and affiliations for the record, beginning
9  with the noticing attorney.
10      MR. AYALA: Rudy Ayala, on behalf of the
11 plaintiffs.
12      MR. GIROUX: Jared Giroux, on behalf of
13 the defendants, Jetson and Walmart.
14      MS. LEE: Suzanne Lee, here from the
15 University of Utah, representing
16 Dr. LaChapelle.
17      THE VIDEOGRAPHER: Thank you.
18      Will the court reporter, please, swear in
19 the witness? And then counsel may proceed.
20 THEREUPON,
21      CHRISTOPHER R. LACHAPELLE, MD, DPT,
22 a witness herein, acknowledged after having been duly
23 sworn, testified upon his oath as follows:
24      THE WITNESS: I do.
25           DIRECT EXAMINATION

Page 38

1  A. Yes.
2  Q. Let's talk, if we can, about W▮▮▮▮▮. Let me
3 pull those up so we can move through those.
4     Based on my review, Doctor, I saw that you
5 would've been involved in his care also on June 6,
6 2023, as well as November 7, 2023.
7     Is that consistent with your record?
8  A. Yes.
9  Q. Did you see him after November 7, 2023 as
10 well?
11  A. In June of 2024.
12  Q. I'm just looking now at the November 7, 2023
13 H&P note. That's the last date of service that I
14 have. I don't have that June 2024 note.
15     But it describes W▮▮▮▮▮, "A 4-year-old male,
16 having sustained an 8 percent TBSA partial thickness
17 and full thickness thermal injury to the right lower
18 extremity, bilateral hands, and feet when he was in a
19 house fire."
20     Is that consistent with your recollection and
21 assessment of W▮▮▮▮▮?
22  A. Yes.
23  Q. You talked about, during this November '23
24 visit, that he underwent excision and grafting to his
25 right lower extremity on February 10, 2022, discharged

Page 39

1 on February 27, 2022, and has continued to follow up
2 at the clinic since that time.
3     That's consistent with your recollection;
4 correct?
5  A. Correct.
6  Q. As of November 7th, he was there for his
7 third laser treatment. Your note says, "He states
8 that he is doing good since his last laser treatment."
9     Let me ask you, based on your recollection
10 and your interactions with W▮▮▮▮▮, is his demeanor one
11 that's positive and energetic as a young boy?
12  A. Yes.
13  Q. Would you say he's the type of young boy who
14 is, at the very least, happy and would minimize any
15 issue or injury that he has?
16     MR. GIROUX: Form.
17  A. I can't speak to whether he would minimize
18 any issue he has, but I would say he is -- he appears
19 happy.
20 BY MR. AYALA:
21  Q. Do you recall, in any of the interactions
22 you've had with W▮▮▮▮▮, him focusing or dwelling on
23 his burn injuries in any way?
24  A. No.
25  Q. In some of the prior depositions of members

Page 40

1 of your team, they were asked about the significance
2 of W▮▮▮▮▮'s burn injuries; in particular, their
3 location.
4     Is there an additional concern given the
5 location of W▮▮▮▮▮'s burn injuries being over joints?
6  A. There is concern and that is something that
7 would need to be monitored as he grows.
8  Q. Would it be the anticipated plan to continue
9 to monitor W▮▮▮▮▮ until he reaches the age of
10 majority, where he's no longer growing, where his skin
11 isn't stretching as much as it would during these
12 younger years?
13  A. Yes.
14  Q. And what is the additional concern for
15 W▮▮▮▮▮, given his age of immaturity at this point and
16 anticipated further stretching and growth of his skin?
17  A. So as children grow, their scars do not grow
18 with them. If the scars cross a joint, as the bones
19 and underlying tissues get longer and the skin does
20 not, it can lead to issues with range of motion and
21 function.
22  Q. If the scar -- if it doesn't grow with him --
23 does in fact lead to decreased or issues with range of
24 motion, what would be the plan to address that?
25  A. That depends on the assessment at the time.

Page 41

1 And the severity of the contracture, but it could be
2 conservative measures with stretching, scar massage,
3 things of that nature, it could be additional laser
4 treatments, and it could be scar release surgeries
5 with local rearrangements or other.
6  Q. Over the course of your career, have you
7 treated minor patients like W▮▮▮▮▮ for their burn
8 injuries?
9  A. Yes.
10  Q. Have you followed the care of those minor
11 patients through the point of their growth and, I
12 guess, attaining either 18 or 21 years of age?
13  A. Yes.
14  Q. Over the course of your career, have you
15 recommended scar release surgeries for any minor
16 patients who have suffered with a decreased range of
17 motion or any other complication?
18  A. Yes.
19  Q. Do you have any opinion, based on your own
20 experience of treating minor patients with burn
21 injuries over joints, of the frequency with which
22 those patients require such a scar release surgery as
23 they get older?
24  A. It varies from patient to patient, so it is
25 hard to say. Some people require one. Some people

11 (Pages 38 - 41)

Page 42

1  require two or three.
2      Q. Sitting here today, do you have any opinion
3  as to whether or not W▇▇▇ will require scar release
4  surgery in the future?
5      A. I cannot predict that as of this time. It is
6  possible.
7      Q. And what you would need to see, certainly, is
8  how he continues with his laser treatments at this
9  point and whether or not he suffers a complication in
10 the future?
11     A. Yes.
12     Q. To your knowledge, did W▇▇▇ complete eight
13 laser therapy sessions?
14     A. I am not certain. I think he was one or two
15 laser treatments behind his mother's. So I'm not
16 certain. I can look.
17     Q. Okay.
18     A. It looks like he's done seven.
19     Q. The last visit that you had with W▇▇▇,
20 would that have been his seventh treatment?
21     A. No. It was his sixth treatment.
22     Q. Okay. Did any complications result from that
23 sixth treatment?
24     A. Not that I recall and none are documented in
25 the operative note.

Page 43

1      Q. Do you have any opinion as to whether W▇▇▇
2  will require further laser treatments more likely than
3  not?
4      A. I do not.
5      Q. Do you have an opinion as to whether or not
6  Stephanie will require further laser treatments more
7  likely than not?
8      A. I do not.
9      Q. Do you have an opinion as to whether
10 Stephanie will require any type of scar release
11 surgeries?
12     A. At this time, I do not.
13     Q. Same question as before. Are you waiting for
14 the reassessment and reevaluation to be performed
15 prior to determining what her prognosis might be and
16 any future surgeries or procedures?
17     A. Yes. So this next clinic visit will be
18 helpful, and then she may require some follow-up in
19 the future should she develop any issues.
20     Q. Is W▇▇▇ currently scheduled for an
21 additional laser treatment, if you know?
22     A. I do not know. Actually, yeah -- I do not
23 see one, but I am not certain of the entire
24 scheduling.
25     Q. Aside from the possibility of either

Page 44

1  additional laser treatments or scar release surgeries,
2  are there therapies that either Stephanie and/or
3  W▇▇▇ will require throughout the course of their
4  life for purposes of whether it's treating the
5  itchiness they continue to experience or to improve
6  range of motion?
7          MR. GIROUX: Form.
8      A. I can't really say exactly what they'll
9  require in the future.
10 BY MR. AYALA:
11     Q. Okay.
12     A. Each patient is different and will present
13 with different issues at different times. She may
14 have ongoing issues with range of motion and itch that
15 require us to revisit lasers; however, she may not.
16     Q. Is Stephanie a candidate for any additional
17 physical therapy?
18     A. As of my last evaluation, she was not
19 receiving physical therapy and we did not feel she
20 needed it at that time, but she potentially could
21 need that.
22     Q. Are you aware of the current condition of
23 Stephanie's feet?
24     A. Can you repeat the question? You popped out
25 for a second.

Page 45

1      Q. It's no problem.
2          Are you aware of the current condition of
3  Stephanie's feet?
4      A. I am not.
5      Q. In terms of any issues, complications, or
6  otherwise relating to her feet, that would not be
7  something that you are aware of or really that you
8  would know since that care was continued by another
9  treater?
10     A. Correct. We will continue to evaluate her
11 scars. If there are specific issues related to her
12 scars, then we'll address those. However, these other
13 bumps and things she was reporting, we will not
14 evaluate or manage those.
15     Q. You mentioned earlier the camp that W▇▇▇
16 attended.
17         Do you or your team at the burn unit provide
18 any type of psychological counseling to patients?
19     A. So my team, including me and the other
20 attendings, do not provide any of that. We do have
21 social workers in our clinic that provide input and
22 assess patients for anxiety, depression, and other
23 issues related to PTSD and things of that nature.
24     Q. Do you have any opinions as to whether or not
25 Stephanie has suffered PTSD relating to the incident

Page 46

1 that led to her burn injuries?
2    A. I do not.
3    Q. Same question as it relates to W████.
4       Do you have an opinion as to whether he
5 suffered any PTSD relating to the incident leading to
6 his burn injuries?
7    A. I do not.
8    Q. Do you have any opinions as to complications
9 or limitations that Stephanie may have relating to her
10 activities of daily living?
11    A. Could you repeat that one more time?
12    Q. Yes, sir. Do you have any opinions as to any
13 limitations or complications that Stephanie has as
14 they relate to her activities of daily living?
15    A. I know she still does report the tightness of
16 her scars, especially across her back. It impacts her
17 ability to reach for things and impacts some of her
18 household activities.
19    Q. Are you familiar or at least aware of
20 activities that Stephanie would engage in before the
21 burn injuries that she can no longer take part in?
22    A. I am not aware of that.
23    Q. Same question as to W████. Are you aware of
24 any of those types of activities?
25    A. No.

Page 47

1    Q. Any other recollection that you have, after
2 your review of the records, as it relates to care and
3 treatment rendered to Stephanie that we've not
4 discussed?
5    A. No.
6    Q. Same question as it relates to W████.
7    A. No.
8    Q. Any other need that you have recommended to
9 Stephanie or to W████ that we have not discussed?
10    A. No.
11    Q. Is it a fair interpretation of your testimony
12 that, for purposes of determining any additional care,
13 even with laser treatments or surgeries, that you
14 would first need to assess or reevaluate Stephanie now
15 that she has completed her eight laser sessions?
16       MR. GIROUX: Form.
17    A. Yes.
18 BY MR. AYALA:
19    Q. Same question as to W████. Any need for
20 future laser therapy sessions or future surgeries
21 relating to his burn scars, that's something that you
22 would continue to follow until the age of his
23 majority?
24    A. Yes.
25       MR. AYALA: Doctor, thank you for your

Page 48

1 time. Those are all of my questions.
2       THE WITNESS: Thank you.
3          CROSS-EXAMINATION
4 BY MR. GIROUX:
5    Q. Good afternoon, Dr. LaChapelle. I
6 represent -- my name is Jared Giroux -- I represent
7 Jetson and Walmart in this case.
8       I don't have a bunch for you, but would you
9 like a break before we keep going? We've been going
10 for a little bit over an hour.
11    A. No. I'm all set.
12       THE VIDEOGRAPHER: Counsel, I apologize.
13 This is the videographer. It would be
14 helpful to change the media unit real quick.
15 It will take me about ten seconds.
16       MR. GIROUX: Okay.
17       THE VIDEOGRAPHER: The time is 12:13 p.m.
18 We're going off the record. This ends media
19 unit one.
20       (Off record.)
21       THE VIDEOGRAPHER: The time is 12:14 p.m.
22 We are back on the record. This begins media
23 unit two. Thank you for your patience, sir.
24 BY MR. GIROUX:
25    Q. Good afternoon again, Dr. LaChapelle. Again,

Page 49

1 my name is Jared Giroux and I represent Jetson and
2 Walmart.
3       I think you testified earlier that you
4 recalled Stephanie reporting a lot of sensitivity and
5 limitations with respect to her feet.
6       What did you mean by her limitations?
7    A. Limitations, meaning not being able to walk
8 extensive distances or be able to stand for prolonged
9 periods of time, or to wear footwear for prolonged
10 periods of time that potentially aggravate those.
11    Q. Have those limitations continued from the
12 time that you first saw Stephanie up until the time
13 that you last treated her?
14    A. So since she had her care of those foot
15 lesions taken over by a different physician, I have
16 not continued to evaluate those.
17    Q. So you don't have an opinion one way or the
18 other as to whether those limitations are ongoing for
19 Stephanie?
20    A. I am not aware.
21    Q. You testified a little bit about the scar
22 revision surgery and the laser treatments that are the
23 options to treat burns such as Stephanie's; correct?
24    A. Correct.
25    Q. What is the difference between the scar

Page 58

1 like her who have suffered that extent of a burn
2 injury, to limit the amount of time that they spend
3 outside with skin exposed?
4    A. With skin exposed, yes. We do not recommend
5 that. We recommend skin protection.
6    Q. With regards to W▇▇▇, you mentioned that
7 certainly he'll require reevaluation every few years.
8 And at the time of early adolescence, which I think
9 you put it as between 12 and 13 years, he'll be
10 reassessed as it relates to his knee area burns and
11 hand burns to determine whether he requires further
12 care, treatment, or even surgical intervention?
13    A. That is an estimate of the time of when that
14 would arise. It depends on when he grows.
15    Q. Okay. Are you familiar, Doctor, with any of
16 the either research or studies as to the frequency
17 with which burn survivors, such as W▇▇▇ -- a minor
18 burn survivor -- requires future surgical intervention
19 relating to those burn injuries?
20    A. I am not. There's significant variability
21 from patient to patient.
22    Q. Same question as it relates to the adult
23 population of patients who have suffered the extent of
24 burn injury that Stephanie has.
25        Are you aware of any type of research or

Page 59

1 studies that in any way, shape, or form quantify the
2 frequency with which they require surgical
3 intervention in the future?
4    A. I am not due to the variability and injury
5 with patients.
6        MR. AYALA: Sir, thank you for your time.
7        THE WITNESS: You're welcome.
8        MR. GIROUX: Nothing further from me.
9    Thank you, Dr. LaChapelle.
10        THE VIDEOGRAPHER: Order for a transcript
11    or video?
12        MR. AYALA: Yes.
13        MR. GIROUX: Please.
14        THE VIDEOGRAPHER: Both?
15        MR. GIROUX: Just the transcript for us.
16        MR. AYALA: We'll hold off on the video
17    for now.
18        THE VIDEOGRAPHER: Read or waive.
19        MS. LEE: Dr. LaChapelle, did you decide
20    if you want to read and sign the transcript
21    or waive that right?
22        THE WITNESS: I will read and sign it.
23        THE REPORTER: Can I have your email
24    address, Doctor?
25        THE WITNESS: Sure. It's

Page 60

1 Christopher.lachapelle@hsc.utah.edu.
2        THE REPORTER: Thank you.
3        THE VIDEOGRAPHER: The time is
4    12:13 p.m.. we're going off the record.
5    This concludes today's testimony given by
6    Christopher LaChapelle. The total number of
7    media units used was two and will be retained
8    by Veritext Legal Solutions.
9        (Proceedings concluded at 12:13 p.m.)

Page 61

CERTIFICATE OF OATH
(VIDEOCONFERENCE PROCEEDINGS)

STATE OF FLORIDA
COUNTY OF PALM BEACH

    I, Lisa Gerlach, Shorthand Reporter and
Notary Public, State of Florida, certify that
Christopher R. LaChapelle, MD, DPT, appeared before me
via videoconference on the 21st day of October 2024
and was duly sworn.

    WITNESS my hand and official seal this 28th
day of October 2024.

_____
Lisa Gerlach, FPR
Commission #HH41912
Expires 9/13/2028

Witness produced his Utah driver's license.

Page 62

1  CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA
4  COUNTY OF PALM BEACH
5
6       I, Lisa Gerlach, Court Reporter, do hereby
7  certify that I was authorized to and did
8  stenographically report the foregoing deposition; and
9  that the transcript is a true and correct
10 transcription of the testimony given by the witness.
11      I further certify that I am not a relative,
12 employee, attorney or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am
15 I financially interested in the action.
16      Dated this 28th day of October 2024.
17
18
19  _____
20       Lisa Gerlach, FPR
21 The foregoing certification of this transcript does
22 not apply to any reproduction of the same by any means
23 unless under the direct control and/or discretion of
24 the certifying reporter.
25

Page 63

1  Christopher R. LaChapelle, MD, DPT
   Christopher.lachapelle@hsc.utah.edu.com
2
            November 4, 2024
3
   RE: Wadsworth v. Walmart/Jetson, Christopher R.
4  LaChapelle, MD, DPT, October 21, 2024, Job #6958060
5     The above-referenced transcript is available
6  for review.
7     The witness should read the testimony to
8  verify its accuracy. If there are any changes,
9  the witness should note those with the reason
10 on the attached Errata Sheet.
11    The witness should, please, date and
12 sign the Errata Sheet and email to the deposing
13 attorney as well as to Veritext at
14 transcripts-fl@veritext.com and copies will
15 be emailed to all ordering parties.
16    It is suggested that the completed errata be
17 returned 30 days from receipt of testimony, as
18 considered reasonable under Federal rules*, however,
19 there is no Florida statute to this regard.
20    If the witness fails to do so, the transcript may
21 be used as if signed.
22
23     Yours,
24     Veritext Legal Solutions:
25 *Federal Civil Procedure Rule 30(e)/Florida Civil
   Procedure Rule 1.310(e).

Page 64

1  RE: Wadsworth v. Walmart/Jetson, Christopher R.
   LaChapelle, MD, DPT, October 21, 2024, Job #6958060
2
            E R R A T A   S H E E T
3
   PAGE____ LINE____ CHANGE_____
4
   REASON_____
5
   PAGE____ LINE____ CHANGE_____
6
   REASON_____
7
   PAGE____ LINE____ CHANGE_____
8
   REASON_____
9
   PAGE____ LINE____ CHANGE_____
10
   REASON_____
11
   PAGE____ LINE____ CHANGE_____
12
   REASON_____
13
   PAGE____ LINE____ CHANGE_____
14
   REASON_____
15
   PAGE____ LINE____ CHANGE_____
16
   REASON_____
17
   PAGE____ LINE____ CHANGE_____
18
   REASON_____
19
   PAGE____ LINE____ CHANGE_____
20
   REASON_____
21
   Under penalties of perjury, I declare that I have
22 read the foregoing document and that the facts
   stated in it are true.
23
24 _____    _____
   CHRISTOPHER R. LACHAPELLE       DATE
25