# EXHIBIT 11

1                UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF WYOMING
2

3

      STEPHANIE WADSWORTH,
4     Individually and as
      Parent and Legal Guardian   CASE NO.:
5     of W.W., K.W., G.W., and    2:23-cv-00118-NDF
      L.W., minor children, and
6     MATTHEW WADSWORTH,
7        Plaintiffs,
8     vs.
9     WALMART, INC. AND JETSON
      ELECTRIC BIKES, LLC,
10

       Defendants.
11    _____/
12

13

14

              VIDEOTAPED REMOTE DEPOSITION OF
15            CALLIE M. THOMPSON, M.D., FACS
                   Pages 1 to 56
16

17                October 15, 2024
             12:34 p.m. ET to 1:51 p.m. ET
18           10:34 a.m. MT to 11:51 a.m. MT
                Via Zoom Videoconference
19

20

              Stenographically Reported By:
21       HEATHER M. ANDREWS, Certified Court Reporter,
                    Notary Public
22

23

24                 Videotaped By:
25            COREY MCMILLAN, Videographer

Page 2

```
 1   ALL APPEARANCES REMOTE:
 2       RUDWIN AYALA, ESQUIRE
         Morgan & Morgan
 3       1700 Palm Beach Lakes Blvd Ste 500
         West Palm Beach, FL 33401-2013
 4       Office: 561-764-2220
         Cell: 954-871-2801
 5       Rayala@forthepeople.com
 6           On behalf of the Plaintiffs
 7
         JARED GIROUX, ESQUIRE
 8       McCoy Levitt Laskey
         202 US Route 1
 9       Suite 200
         Falmouth, ME 04105
10       Phone: 207-387-6929
         Jgiroux@mlllaw.com
11
             On behalf of the Defendants
12
13       SUZANNE LEE, ESQUIRE
         University of Utah
14       525 E 100 S Ste 4325
         Salt Lake City, UT 84102
15
             On behalf of the Dr. Thompson
16
17                   C O N T E N T S
18                                        PAGE
19   Examination by Mr. Ayala               5
     Examination by Mr. Giroux             40
20   Examination by Mr. Ayala             47
     Examination by Mr. Giroux            53
21   Certificate of Oath                  55
     Reporter's Certificate               56
22
23               EXHIBITS                PAGE
24   Exhibit 1  2024 records..................39
     (Will be marked and sent to counsel upon receipt.)
25
```

Page 3

1    Deposition taken before Heather M. Andrews, Court

2    Reporter and Notary Public in and for the State of

3    Florida at Large in the above cause.

4                   - - - - - - -

5         THE VIDEOGRAPHER:  Good afternoon.  We are

6         going on the record at 10:34 a.m. Mountain Time on

7         October 15th, 2024.  Please note that this

8         deposition is being conducted virtually.  Quality

9         of recording depends on the quality of camera and

10        Internet connection of participants.  What is seen

11        from the witness and heard on screen is what will

12        be recorded.  Audio and video recording will

13        continue to take place unless all parties agree to

14        go off the record.

15             This is Media Unit 1 of the video recorded

16        deposition of Dr. Callie M. Thompson taken by

17        counsel for plaintiff in the matter of Stephanie

18        Wadsworth, et al. vs. Walmart Inc. and Jetson

19        Electric Bikes, LLC, filed in the United States

20        District Court in and for the District of Wyoming,

21        Case No. 2:23-cv-00118-NDF.

22             My name is Corey McMillan representing

23        Veritext and I am the videographer.  The court

24        reporter is Heather Andrews, also from the firm

25        Veritext.  I am not authorized to administer an

1    oath.  I'm not related to any party in this action,

2    nor am I financially interested in the outcome.  If

3    there are any objections to proceeding please state

4    them at the time of your appearance.

5         Counsel will now state their appearances and

6    affiliations for the record beginning with the

7    noticing attorney.

8         MR. AYALA:  Rudy Ayala for Morgan & Morgan on

9    behalf of the plaintiff.

10        MR. GIROUX:  Jared Giroux of McCoy Leavitt &

11    Laskey on behalf of Jetson and Walmart.

12        MS. LEE:  Suzanne Lee with the University of

13    Utah here representing Dr. Thompson.

14        THE VIDEOGRAPHER:  Will the court reporter

15    please swear in the witness and then counsel can

16    proceed.

17        THE REPORTER:  Raise your right hand, Doctor.

18    Do you swear or affirm to tell the truth, the whole

19    truth and nothing but the truth?

20        THE WITNESS:  I do.

21    THEREUPON,

22                   DR. CALLIE M. THOMPSON,

23    having been first duly sworn, was examined and testified

24    as follows:

25

1                          EXAMINATION

2    BY MR. AYALA:

3        Q.    Good morning, Doctor.  My name is Rudy Ayala.

4    I briefly introduced myself.  I represent the plaintiffs

5    in this matter which includes Stephanie Wadsworth,

6    Matthew Wadsworth and their children, L█████, G█████,

7    W█████ and K█████ W█████.  First, can you please

8    state your name.

9        A.    My name is Callie Marie Thompson.

10       Q.    Dr. Thompson, it's my understanding that you

11   are currently employed at the University of Utah,

12   U Health?

13       A.    That's correct.

14       Q.    And how long have you been employed by the

15   university within their medical or health department?

16       A.    Just over four years.

17       Q.    And what is your current role at the

18   university?

19       A.    I'm an associate professor of surgery and a

20   burn and critical care surgeon.

21       Q.    Have you held the same or similar role for the

22   four years?

23       A.    I was promoted during that time so when I

24   started here I was an assistant professor but otherwise

25   yes.

1    A.    I don't have a recollection of any of those

2  conversations.

3    Q.    Sitting here today do you have any -- I'll stop

4  sharing.

5          Do you have an opinion as to any care and

6  treatment that Stephanie needs related to her scars?

7    A.    At this time I do not.

8    Q.    And is that what you were saying that you would

9  first need to review the reassessment or perform a

10  reassessment if it's tasked to you in determining what

11  those next treatment steps might be?

12    A.    Correct.

13    Q.    Let's talk if we could about W██████.    Same

14  thing, you would have seen and treated W██████ when he

15  was admitted back in February of 2022; correct?

16    A.    Correct.

17    Q.    What is your recollection and understanding of

18  the burn injuries that he sustained?

19    A.    His burn injuries were much smaller than his

20  mom's.  He did need grafting and has undergone laser

21  therapy since discharge.

22    Q.    Do you recall the locations of his burn

23  injuries?

24    A.    I don't recall all of them.  I know the one

25  that I have lasered that has been the most impactful is

Page 34

1    on his right leg near his knee.

2        Q.    Let me see if I can pull something up real

3    quick.  Do you see my screen?

4        A.    I can.

5        Q.    This appears to be an H&P note from June 6th,

6    2023 relating to W██████, and it describes him a

7    four-year-old male who sustained an 8 percent TBSA

8    partial thickness and full thickness thermal burn to the

9    right lower extremity, bilateral hands and feet.  Did I

10   read that correctly?

11       A.    Yeah, that's correct.

12       Q.    Apparently on this date he was there for laser

13   treatment number 2 and it was described that he was

14   doing well, denied pain, has itchiness around his donor

15   site mostly and an area on the medial side of his right

16   hand as well.  Do you see that?

17       A.    I do.

18       Q.    In this case we took the deposition of

19   Dr. Lewis who talked a little bit about the concern of

20   not just the laser treatment but as to the type of burn

21   injury that he suffered, those in particular over his

22   joints.

23            First, you haven't had a chance to read

24   Dr. Lewis' deposition; correct?

25       A.    No, I don't know where I would see it.

1    Q.    No problem.  Is there any type of heightened

2  concern over burn injuries suffered by minors like

3  W██████ that occur over joints?

4    A.    Yes.

5    Q.    Can you talk a little bit about what that

6  heightened concern is and how that would affect or

7  impact W██████?

8    A.    So when you have a burn over a joint, even if

9  it doesn't receive a skin graft, if it takes longer than

10  14 to 21 days to heal, you're at increased risk for at

11  least tight scarring.  When that happens over a joint

12  your body's initial response to that is to contract.  So

13  if you have a burn here on the palm of your hand and

14  you're growing, what's going to happen is the skin on

15  the top part of your hand is going to grow fine but the

16  skin on the palm of your hand will not grow in the same

17  way, and you'll have kind of clawing of the hand.  This

18  is just an example.  So when a patient is growing you

19  don't want to really let them out of your sight for too

20  long.  You want to have regular follow-up with them

21  because a lot of times we can actually intervene before

22  it creates a deeper problem in the joints and tendons as

23  the patient is growing.

24    Q.    Is there a time period in which you want to

25  continue to monitor, continue to follow minor burn

1    survivors for purposes of determining whether

2    intervention is needed and necessary to avoid some of

3    those complications?

4        A.    Yeah.  So a kid who was injured when W███ was

5    injured would be followed until they went through their

6    entire pubertal growth spurt, which is typically once

7    they graduate high school.

8        Q.    So we're talking really 17, 18 years old of

9    continued monitoring to try and identify any potential

10   need for intervention due to some of those risks that

11   you described?

12       A.    That's correct.

13       Q.    To date have you seen any of those

14   complications or the issues arise with W███?

15       A.    No, not to date.

16       Q.    Have the laser treatment that he's undergone

17   been successful?

18       A.    Yes, they have.

19       Q.    Do you know how many laser treatment he has

20   undergone?

21       A.    I do not.  He and his mom were getting them on

22   the same day.  I can definitely double check.  I'm going

23   to assume he had his eighth on the same day that his mom

24   did.  No, it looks like he actually had -- he's only had

25   seven.  One, two, three, four, five, six, seven.  He's

1   had seven and his last one was also that 5th of August.

2      Q.   And to the best of your knowledge is there a

3   plan to undergo an eighth treatment?

4      A.   He does not currently have any visits

5   scheduled.

6      Q.   Is the intention of you and/or the folks, the

7   providers at the burn unit that W█████ undergo an eighth

8   treatment.

9      A.   Not necessarily.  If I was the one that was

10  seeing Stephanie I would have a conversation about what

11  we think the benefit is to W█████ and if it's worth the

12  burden of the family taking two days out of their

13  schedule to bring him down given that he has had a very

14  good outcome with the seven lasers he's had.

15     Q.   Sitting here today are you aware of any

16  treatments or surgeries that are needed to address

17  W█████'s burn injuries?

18     A.   Not at this time.

19     Q.   Will W█████ undergo a reassessment even though

20  he hasn't completed his eight sessions?

21     A.   Yeah.  That will be up to Stephanie and Matthew

22  if they just want to combine the visits.  We would just

23  do his reassessment at seven instead of eight.

24     Q.   The camp that you described earlier -- I think

25  you said Camp Nah Nah Mah, was that just an emotional,

1    kind of like an emotional support camp for burn

2    survivors?

3          A.   It's an everything support camp for burn

4    survivors.  It really gives kids in particular but all

5    burn survivors, especially if you're in a small town

6    like Green River, Wyoming, you may be the only burn

7    survivor that's a child that you know.  It gives kids a

8    chance to come and be with other kids that also have

9    burn scars.  We let them be kids and play and be active.

10   But we also work a lot on scar acceptance, conversations

11   with people who may just be meeting you, practicing

12   scripts.  That's what we worked on this past year is we

13   helped kids do their short and long scripts when someone

14   says, hey, what happened to you so they can be prepared

15   and they don't feel anxious or nervous about having to

16   talk about their burn injury.  But a lot of it is just

17   fun and normalizing being a kid after they've been

18   through some hard stuff.

19         Q.   Okay.  Would it be fair to say that you are

20   unaware of any need and necessity for additional

21   therapy, laser treatments, or surgeries as it pertains

22   to W█████ until such time a reassessment can be

23   accomplished?

24         A.   Yes, that's correct.

25         Q.   And certainly even with a reassessment that can

1    change as W█████ continues to grow and get older up

2    through the age of either 17 or 18?

3            MR. GIROUX:  Form.

4        A.   That's correct.  He will need at least a

5    once-a-year visit.

6        Q.   (By Mr. Ayala)  You don't have an opinion yet

7    as to any need or benefit to scar revision surgeries

8    given W██████'s age; is that fair?

9        A.   That's fair.

10       Q.   Any other recollection you have relating to

11   either Stephanie or W█████ and the care and interactions

12   you've had with them that we haven't discussed?

13       A.   No, I don't think so.

14           MR. AYALA:  Those are all of my questions.

15       What I'd like to do -- and Suzanne, maybe you can

16       assist on this one.  I'd like to attach the 2024

17       records of W█████ and Stephanie that we don't have

18       in our file as of yet.  Dr. Thompson mentioned

19       August and having seen Stephanie at some point in

20       August of 2024.  So we'd like to attach those as

21       Exhibit 1 to Dr. Thompson's deposition.

22           (Exhibit 1 to be marked for identification.)

23           MS. LEE:  I can help with that but I am not

24       the custodian of the records so I actually need you

25       to make that request to our health information

1    management department and they would be happy to

2    help you with that.

3          MR. AYALA:  We can do that.

4          MS. LEE:  Great, thanks.

5          MR. GIROUX:  Dr. Thompson, do you need a brief

6    break or are you okay?

7          THE WITNESS:  I'm okay.

8          MR. GIROUX:  Is everyone else good to go?  I

9    don't have much.

10                        EXAMINATION

11   BY MR. GIROUX:

12        Q.   Good morning your time, Dr. Thompson.  My name

13   is Jared Giroux.  I represent Walmart and Jetson in this

14   case.  I got a few questions for you but not many.

15   Thank you for taking the time to be here today.  And I

16   may jump a little bit more since plaintiff's counsel has

17   already asked you a number of questions and I don't want

18   to be duplicative and I apologize if I am.

19          When you're talking about the eight different

20   laser treatments, is a patient such as Stephanie with 35

21   percent of her burns receiving treatments on the entire

22   area of the burned portions of her body?

23        A.   No.  She would only be receiving $CO_2$ laser on

24   areas that are thickened, firm or very itchy.

25        Q.   So in Stephanie's case did those change, you