# EXHIBIT 1

Page 14
1  A.         For -- for attorneys or for insurance
2  or -- is that what you're asking?
3  Q.         Any other work I'm looking for outside of
4  treating the four children.  Have you submitted bills
5  to attorneys or insurance companies for that work?
6  A.         Outside of treating the four children,
7  no.
8  Q.         Approximately how much time did you spend
9  preparing for today's deposition?
10 A.         I'm going to say seven hours.
11 Q.         And that included the review of the notes
12 and meeting with the counsel; correct?
13 A.         Yes.
14 Q.         I'm going to show you a document that we
15 will mark as Exhibit 88.
16            (Deposition Exhibit 88 was
17             marked for identification.)
18 BY MR. GIROUX:
19 Q.         Can you see the document that I've pulled
20 up and shared on the screen?
21 A.         Yes.
22 Q.         Have you ever seen this document before?
23 A.         Yes.
24 Q.         And you're aware that you're here to
25 testify under oath as to, among other things, your

Page 15
1  treatment of the four Wadsworth children; correct?
2  A.         Yes.
3  Q.         And I kind of want to just walk you
4  through your treatment of each one by one.  Okay?
5            MR. GIROUX:  So again I can -- why don't
6  we mark -- could we go off the record for a second,
7  please?
8            (A discussion took place off the record.)
9            MR. GIROUX:  I will mark what we have --
10 what will be, excuse me, Exhibit 89.
11           (Deposition Exhibit 89 was
12            marked for identification.)
13 BY MR. GIROUX:
14 Q.         And I'll let you know, Ms. Tollefson,
15 that this is the records that we received from your
16 office with respect to K.W., including the most recent
17 records for the treatment within the last few weeks.
18 Do you recognize these records?
19 A.         Yes.
20 Q.         At any point if you want me to refer to
21 them or if you want to refer to them, again please let
22 me know.  I'm not going to keep sharing them
23 throughout.  I may just pop to different sections of
24 them.  Okay?
25 A.         Yes.

Page 16
1  Q.         When did you first meet K.W.?
2  A.         March of 2022.
3  Q.         And what were her complaints when you
4  first met with her?
5  A.         This was after the fire that had burned
6  down their home.
7  Q.         And in terms of what types of symptoms
8  you were treating her for, can you tell me sort of
9  what she told you in that first meeting?
10 A.         Yes.  She was experiencing intrusive
11 thoughts and images related mostly to seeing her mom
12 in the condition that she was in after the fire, also
13 the experience of taking her and her younger brothers
14 out of the home.
15 Q.         And I think I saw that you were treating
16 her for acute stress disorder.  Does that sound right?
17 A.         Yes.
18 Q.         Can you tell me what acute stress
19 disorder is?
20 A.         Well, acute stress disorder happens after
21 a traumatic experience.  It's a series of symptoms
22 that the nervous system goes through as it's trained
23 to regulate and integrate the experience.
24 Q.         When you were treating K.W., was it just
25 her or were her parents or anyone else with her as

Page 17
1  well?
2  A.         Her -- her parents were present during
3  that first session, yes.
4  Q.         And so I know that you treated all four
5  children.  Would you treat them each -- or meet with
6  each individually with their parents or maybe alone at
7  times as well?
8  A.         Yes, on their own individually.
9  Q.         So it wasn't like you were meeting with
10 all four children at once; correct?
11 A.         Correct.
12 Q.         And are you still treating K.W. today?
13 A.         I have begun another treatment session,
14 yes.
15 Q.         And what was the reason for starting
16 another treatment session?
17 A.         Oh, let me pull that up because it is
18 new.
19 Q.         Sure.
20 A.         She returned to treatment due to a recent
21 relapse into depressive symptoms ████████████████
22 ████████.
23 Q.         And the return to treatment because of
24 the depressive symptoms, what was she attributing
25 those depressive symptoms to?

Page 42

1  Q.        All right.  We will mark as Exhibit 91
2  a -- Ms. Tollefson, your medical records and notes for
3  the treatment of G.W., which are Bates stamped GW_001
4  through GW_004.
5            (Deposition Exhibit 91 was
6             marked for identification.)
7  BY MR. GIROUX:
8  Q.        And it looks like you first saw G.W. on
9  March 29th, 2022; is that correct?
10 A.        Yes.
11 Q.        And what were his complaints during that
12 initial consultation?
13 A.        He was not sleeping.  He was avoiding
14 talking about the fire and he was avoiding his mom.
15 Q.        And again we talked a little bit about
16 the avoidance of Steph previously.  Was that because
17 of burns that she had experienced?
18 A.        Yes, um-hum.
19 Q.        Can you sort of describe for me your
20 treatment of G.W.?
21 A.        Yes.  So I'm going to review my notes.
22 Q.        Sure.
23 A.        It looks like G.W. and I used mostly sand
24 tray therapy to support his processing.
25 Q.        And you saw G.W. on March 29th,

Page 43

1  April 5th, April 12th, and April 19th, 2022; correct?
2  Excuse me.  Yeah, 2022; correct?
3  A.        Yes.
4  Q.        Okay.  Was there any reason why you
5  discontinued treatment after April 19th, 2022?
6  A.        No.  I don't remember.
7  Q.        Had you ever treated G.W. prior to
8  February of 2022?
9  A.        No.
10 Q.        What was your prognosis for G.W. in that
11 last meeting on March -- excuse me, April 19th, 2022?
12 A.        It looks -- it looks fair, um-hum.  I --
13 um-hum.
14 Q.        Do you have any pending or upcoming
15 appointments scheduled for G.W.?
16 A.        No.
17 Q.        Did G.W.'s mental and emotional state get
18 better during your course of treatment with him?
19 A.        Yes.  The last note states he is sleeping
20 through the night and he is talking about the fire
21 more.
22 Q.        And you have not met with him since that
23 date of April 19th, 2022.  So you have no reason to
24 believe that he has not continued to make progress;
25 correct?

Page 44

1  A.        Correct.
2  Q.        In your professional opinion as a
3  clinical social worker, what was G.W.'s future outlook
4  with regards to his mental and emotional state?
5  A.        That's a difficult question to answer if
6  you understand trauma and how it affects the body
7  because, remember, trauma is not an event.  Like it
8  could -- it could affect him in the future if
9  something comes up from his memory, right, and so
10 that's a difficult question to answer.  I don't know
11 how to answer that.
12 Q.        Sure.  You're unaware of any setbacks
13 that G.W. has experienced since his last date of
14 treatment with you; correct?
15 A.        Correct.
16 Q.        Is there anything else about your
17 treatment of G.W. that you have not told me that you
18 would like to tell me now?
19 A.        No.
20 Q.        Let's move on to W.W.  When did you first
21 meet W.W.?
22 A.        March 29th, 2022.
23 Q.        I'll mark this as Exhibit 92, which are
24 your notes and medical records for the treatment of
25 W.W. Bates stamped WW_001 through WW_015.

Page 45

1            (Deposition Exhibit 92 was
2             marked for identification.)
3  BY MR. GIROUX:
4  Q.        Do these appear to be true and accurate
5  copies of your records for W.W.?
6  A.        Yes.
7  Q.        When you first met W.W. on March 29th,
8  2022, what were his complaints?
9  A.        W.W. was very quiet, but he was still
10 ongoing under (sic) medical treatment for his burns.
11 He was also not sleeping, having some difficulties
12 with that, and he did not want to talk about or show
13 people his scars.
14 Q.        Can you describe for me the course of
15 treatment that you provided to W.W.?
16 A.        Yes.  I'm going to review my notes.  It
17 looks like for W.W. I utilized mostly Synergy Play
18 Therapy and worked with the nervous system in the
19 play.
20 Q.        You saw W.W. on four occasions, the first
21 on March 29th, then April 5th, April 12th, and
22 April 19th, 2022; correct?
23 A.        Yes.
24 Q.        Had you ever treated W.W. prior to
25 February 1st, 2022?

Malinda Tollefson
08/28/2024

Page 66

1  BY MR. AYALA:
2  Q.        You indicated that K.W. is continuing to
3  treat with you; right?
4  A.        Yes.
5  Q.        Is she meeting with you weekly at this
6  point?
7  A.        Yes.
8  Q.        Is there a plan in place for how long she
9  will continue to meet with you weekly?
10 A.        At this point her treatment plan is three
11 months.
12 Q.        Okay.  And following the completion of
13 the three months, will there then be a reevaluation to
14 determine if there's further need for weekly visits?
15 A.        A continued treatment plan will be
16 assessed, yes.
17 Q.        By the way, during those initial meetings
18 back in March of '22 when you meet with the parents,
19 do you talk to them about certain coping mechanisms
20 and therapies they can employ at home?
21 A.        Yes.
22 Q.        And as you continue to see and meet with
23 the children, any time the parents come, which would
24 probably be every time since the children can't drive,
25 do you have discussions with the parents about maybe

Page 67

1  additional coping mechanisms and ideas and thoughts to
2  do at home?
3  A.        Frequently that is my practice, yes.
4  Q.        Okay.  So the fact that G.W. and L.W. and
5  W.W. are not attending any routine sessions with you
6  currently, does that equate to them being over this
7  trauma, over the issues that they spoke with you about
8  for those sessions?
9  A.        No.
10 Q.        Okay.  In fact, isn't it likely and
11 reasonable that the children are continuing with their
12 coping to get over this trauma at home?
13           MR. GIROUX:  Form.
14           THE WITNESS:  Possible or they may have
15 other supports.  I don't know.
16 BY MR. AYALA:
17 Q.        Right.  Okay.  With regards to L.W., I
18 believe it was the note from August 12th, 2021 prior
19 to the fire.  You noted that he experienced
20 exceptional growth relating certainly to his progress
21 in therapy for his ADHD; is that true?
22 A.        Yes.  I'm trying to find my note.  Sorry.
23 Q.        Yep.  Not a problem.
24 A.        Dear L.W.  Oh, okay.  Okay.  I am there.
25 Thank you.

Page 68

1  Q.        Okay.  And so at least the reference I
2  saw on August 12th was that he had experienced
3  exceptional growth.  He had great -- good progress, at
4  least according to your assessment, relating to his
5  ADHD; fair?
6  A.        Yes.
7  Q.        And then certainly when he comes back in
8  March of '22, at that point in time you're dealing
9  with the acute stress disorder relating to that fire
10 trauma that he and the children experienced; correct?
11 A.        Yes.
12 Q.        Can you talk to us a little bit about the
13 effect, the impact, or the interplay between a child
14 like L.W. who has ADHD and now on top of that has
15 suffered a trauma relating to a fire event like he
16 did?
17           MR. GIROUX:  Form.
18           THE WITNESS:  Well, with parts of L.W.'s
19 ADHD, I'm going to talk about his emotional regulation
20 abilities because he was quite an impulsive little
21 rambunctious guy there, so cute, and -- so we did
22 a lot of work on regulating emotions, tolerating
23 frustrations, following directions, those type of
24 things in play therapy with him.
25           And then when he came back in March, I

Page 69

1  do -- I do recall just this, like, change of -- and I
2  can review my notes, but like he was more teary-eyed,
3  more hesitant, just more vulnerable I guess is a good
4  way to say it.  Like he needed a lot more reassurance,
5  if that makes sense.
6  BY MR. AYALA:
7  Q.        Okay.  All right.  And so he -- I'm
8  sorry?
9  A.        I was just -- I was just recalling a
10 moment that he was the cuddly one with Mom.  Like he
11 avoided her because he was worried about, like,
12 hurting her and she really did look quite different,
13 but I do remember, like, he was the cuddly one,
14 um-hum, out of the four children.  So thank you.
15 Sorry.
16 Q.        And I -- you bring that up.  I remember
17 in one of the records for L.W. you describing Mom
18 rubbing his back and him being cuddled up with Mom
19 during one of the sessions.  That's at least your
20 recollection that he, of the four, was the one that
21 was most cuddly, if you will, to use your term, with
22 Mom?
23 A.        Yes, um-hum.
24 Q.        And so he, like the other boys, attended
25 the four sessions, but L.W. came back after some time

Malinda Tollefson
08/28/2024

Page 70
1  for continued problems, issues, or coping that he was
2  experiencing?
3  A.          Yes.
4  Q.          And, by the way, I want to discuss
5  briefly a few terms that have come up in your
6  deposition.  You've been asked about prognosis and
7  you've been asked about progress.  Two separate
8  concepts; correct?
9  A.          Yes.
10 Q.          Okay.  When you've described -- for
11 instance, let's take L.W. as an example.  When you've
12 described that he had good progress prior to the fire
13 event with his ADHD therapies or treatment, that is a
14 description of how he has dealt with and grown from
15 the care or treatment he's received; is that fair?
16 A.          Yes.  Synergy Play Therapy is very
17 specific that when you are working with a child,
18 you're looking for empowerment within the play.  And
19 so I may not use that word in my notes all the time,
20 but that is what you are assessing.
21             And so if you look at the notes, I saw
22 earlier that, yes, he was setting up challenges,
23 overcoming challenges, and regulating through,
24 beautiful.
25 Q.          Okay.  All right.  And then when you talk

Page 71
1  about prognosis --
2  A.          Yes.
3  Q.          -- you're looking into the future as to
4  how he or she may do based upon those problems,
5  issues, or underlying conditions; is that fair?
6  A.          Yes, um-hum.
7  Q.          Okay.  And so when you say that a client
8  like these children have fair prognosis, what do you
9  mean by that?
10 A.          Well, it really depends on -- you know,
11 because everybody -- everybody can go through a
12 similar experience and have different outcomes
13 depending on how they deal with it or they don't deal
14 with it, right?
15             So -- so when I am saying their progress,
16 I am also thinking about the support that they receive
17 in the community because they have a very good
18 community, the support that they receive at school
19 because they go to a very good school with a good
20 school counselor, the support that they receive from
21 family friends and family because they do have a good
22 group around them.  So I'm thinking about all of
23 those, but also knowing I don't know so --
24 Q.          Okay.  And so in hearing and
25 understanding that answer, would it be fair to say

Page 72
1  that when you ascribe a client with having a fair
2  prognosis, that is certainly hopeful with regards to
3  their future progress in this area; is that fair?
4  A.          Yes.
5  Q.          Okay.  And you've described that there's
6  a good school system in place, there's other support
7  mechanisms and therapies and individuals that could
8  assist in those areas in the future; correct?
9  A.          Yes.
10 Q.          But what you're not saying is that these
11 children have gotten over or are cured from any issues
12 they experienced related to this trauma; correct?
13             MR. GIROUX:  Form.
14             THE WITNESS:  No, they have not gotten
15 over it.  That is correct.  I don't --
16 BY MR. AYALA:
17 Q.          Okay.  And there's still the chance or
18 the likelihood that they experience relapses,
19 triggering events, recurrences in the future?
20             MR. GIROUX:  Form.
21             THE WITNESS:  Yes.
22 BY MR. AYALA:
23 Q.          And I would assume if at any point in
24 time either L.W. or G.W. or even W.W. experienced some
25 of those events in the future, you'd be open to seeing

Page 73
1  them again and speaking with them and helping them
2  out?
3  A.          Yes.
4  Q.          Given the fact that K.W. has future
5  appointments with you, certainly she's going to
6  require future treatment.  You just don't know how
7  long or how many; is that fair?
8  A.          Yes.
9  Q.          And sitting here today, you don't know
10 whether or not L.W., G.W., or W.W. will require future
11 therapy sessions with you to go over some of the
12 traumatic events or symptomatology that you were
13 assisting them with prior; correct?
14 A.          Yes, I do not know.
15 Q.          Are you aware of how the Wadsworth family
16 paid for the additional sessions that K.W. and L.W.
17 received?
18 A.          Insurance.
19 Q.          I know we've talked about the progression
20 or evolution of acute stress disorder and how that can
21 manifest itself into the future, but have you
22 diagnosed any of the children with whether it's PTSD
23 or any other condition aside from acute stress
24 disorder?
25 A.          What did I diagnose L.W. with?  Didn't I